UNITED STATES DISTRICT COURT

MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| DELAWARE COUNTY EMPLOYEES RETIREMENT SYSTEM, Individually and on Behalf of All Others Similarly Situated, | ) ) ) ) | Civ. Action No.<br><br>CLASS ACTION |
| Plaintiff, | ) ) ) | COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS |
| vs. | ) ) | |
| CABOT OIL & GAS CORPORATION, DAN O. DINGES and SCOTT C. SCHROEDER, | ) ) ) ) | |
| Defendants. | ) ) | |
| | ) | DEMAND FOR JURY TRIAL |

Plaintiff Delaware County Employees Retirement System ("plaintiff"), by its undersigned attorneys, individually and on behalf of all others similarly situated, alleges the following based upon personal knowledge as to itself and upon information and belief based on the investigation of plaintiff's attorneys as to all other matters, which included, among other things, a review and analysis of: Cabot Oil & Gas Corporation ("Cabot" or the "Company") U.S. Securities and Exchange Commission ("SEC") filings, conference calls, defendants' public statements, media reports, analyst reports, industry reports, other complaints filed against defendants, and other publicly available information.  Plaintiff believes substantial additional evidentiary support will likely exist for the allegations set forth herein after a reasonable opportunity for discovery.

## INTRODUCTION

1.      This is a securities fraud class action on behalf of purchasers of Cabot common stock between October 23, 2015 and June 12, 2020, inclusive (the "Class Period"), against Cabot, its Chief Executive Officer ("CEO"), and its Chief Financial Officer ("CFO") for violating §§10(b) and 20(a) of the Securities Exchange Act of 1934 ("1934 Act") and SEC Rule 10b-5 promulgated thereunder (17 C.F.R. §240.10b-5) by engaging in a scheme to defraud investors and issuing false and misleading statements to conceal the truth about the Company's internal

environmental controls and procedures as well as exposure to legal liability associated with gas wells in Susquehanna County, Pennsylvania.

2.     Cabot is an independent oil and gas company that explores for, exploits, develops, produces, and markets oil and gas properties in the United States with a primary focus on the Marcellus Shale in Susquehanna County, Pennsylvania.

3.     Throughout the Class Period, defendants concealed and misrepresented that: (a) Cabot had inadequate environmental controls and procedures and/or failed to properly mitigate known issues related to those controls and procedures; (b) Cabot failed to fix faulty gas wells which polluted Pennsylvania's water supplies through stray gas migration; and (c) Cabot continually downplayed its potential civil and/or criminal liabilities with respect to environmental matters.   These issues were foreseeably likely to subject Cabot to increased governmental scrutiny and enforcement, as well as increased reputational and financial harm, and would also materially impact Cabot's financial results. These omissions and misrepresentations caused Cabot's stock price to trade at artificially inflated prices throughout the Class Period.

4.     On July 26, 2019, Cabot filed its quarterly report on Form 10-Q with the SEC, reporting the Company's financial and operating results for the third quarter ended June 30, 2019 (the "2Q19 10-Q"). The 2Q19 10-Q disclosed that the Company had received two proposed Consent Order and Agreements related to two

- 2 -

Notices of Violation it had received from the Pennsylvania Department of Environmental Protection ("PaDEP") *two years earlier* (in June and November, 2017, respectively), for failure to prevent the migration of gas into fresh groundwater sources in the area surrounding Susquehanna County, Pennsylvania. The 2Q19 10-Q stated, in relevant part:

> We will continue to work with the PaDEP to finalize the [Consent Orders and Agreements], and to bring this matter to a close. With regard to the November 2017 [Notice of Violation], [t]he proposed [Consent Order and Agreement], if finalized as drafted, would require Cabot to submit a detailed written remediation plan, continue water sampling and other investigative measures and restore or replace affected water supplies and would result in the payment of a civil monetary penalty in an amount likely to exceed $100,000, up to approximately $355,000. We will continue to work with the PaDEP to finalize the [Consent Order and Agreement], and to complete the ongoing investigation and remediation.

5.    As a result of this news, the price of Cabot stock declined 12%.

6.    Then, on June 15, 2020, following a grand jury investigation, the Pennsylvania Attorney General's office charged Cabot with 15 *criminal* counts due to its failure to fix the faulty gas wells which had polluted Pennsylvania's water supplies through stray gas migration. In announcing the charges, Pennsylvania's Attorney General, Josh Shapiro, emphasized that defendants "'put their bottom line ahead of the health and safety of our neighbors'" and that "'Cabot knows what they've done.'"

7.     As a result of defendants' wrongful acts and omissions, plaintiff and the Class (as defined below) purchased Cabot common stock at artificially inflated prices and were damaged thereby.

## JURISDICTION AND VENUE

8.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331 and §27 of the 1934 Act (15 U.S.C. §78aa), as the claims asserted herein arise under and pursuant to §§10(b) and 20(a) of the 1934 Act (15 U.S.C. §§78j(b) and 78t(a)) and SEC Rule 10b-5 promulgated thereunder (17 C.F.R. §240.10b-5).

9.     Venue is proper in this District pursuant to §27 of the 1934 Act and 28 U.S.C. §1391(b).  Defendant Cabot transacts business in this District, and many of the acts charged herein, including the dissemination of materially false and misleading information, occurred in substantial part in this District.

10.     In connection with the acts and conduct alleged in this complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the U.S. mails, interstate telephone communications and the facilities of the New York Stock Exchange ("NYSE").

## PARTIES

11.     As evidenced by the attached Certification, plaintiff Delaware County Employees Retirement System purchased Cabot common stock at artificially

- 4 -

inflated prices during the Class Period and suffered damages as a result of defendants' alleged misconduct.

12.     Pursuant to its website, defendant Cabot is an independent oil and gas company engaged in the development, exploitation and exploration of oil and gas properties exclusively in the continental United States.[1]  As of December 31, 2019, the Company had approximately 12.9 Tcfe of total proved reserves. Cabot continues to refine its operating focus, narrowing its natural gas development effort to the Marcellus Shale in northeast Pennsylvania.  The Company's shares trade on the NYSE under the symbol COG.

13.     Defendant Dan O. Dinges ("Dinges") is Cabot's CEO and is the Chairman of the Board.  During the Class Period, defendant Dinges sold 66,610 shares of his Cabot stock for proceeds of more than $1.8 million.  As CEO, defendant Dinges spoke on Cabot's behalf in press releases, conference calls, and SEC filings. Pursuant to §§302 and 906 of the Sarbanes-Oxley Act of 2002, SEC Rule 13a-14(a), and 18 U.S.C. §1350, defendant Dinges certified and signed the Company's Forms 10-K filed with the SEC on February 22, 2016, February 27, 2017, March 1, 2018, February 26, 2019 and February 25,2020.

---

[1]      https://www.cabotog.com/about-cabot/ (last visited Oct. 1, 2020).

14. Defendant Scott C. Schroeder ("Schroeder") is Cabot's CFO and Executive Vice President. As CFO, defendant Schroeder spoke on Cabot's behalf in press releases, conference call and SEC filings. Pursuant to §§302 and 906 of the Sarbanes-Oxley Act of 2002, SEC Rule 13a-14(a) and 18 U.S.C. §1350, defendant Schroeder certified and signed the Company's Forms 10-K filed with the SEC on February 22, 2016, February 27, 2017, March 1, 2018, February 26, 2019 and February 25,2020.

15. Defendants Dinges and Schroeder are sometimes collectively referred to herein as the "Individual Defendants." During the Class Period, the Individual Defendants, as senior executive officers and/or directors of Cabot, were in possession of and privy to confidential, proprietary information concerning Cabot, its operations, finances and financial condition, and its legal liability for its gas wells. Because of their positions as Cabot's senior-most executive officers, the Individual Defendants obtained, had access to, and/or were in possession of material adverse nonpublic information concerning Cabot via internal corporate documents and communications with other corporate officers and employees, attendance at management and/or Board of Directors meetings (and committees thereof), and via the reports, presentations and other information provided to them in connection therewith. As a result of their possession of such information, the Individual

Defendants knew or recklessly disregarded that the adverse facts specified herein had not been disclosed to, and were being concealed from, the investing public.

16.    As senior executive officers and controlling persons of a publicly traded company whose common stock, during the Class Period, was registered with the SEC pursuant to the 1934 Act and was actively traded on the NYSE and governed by the federal securities laws, the Individual Defendants had a duty to promptly disseminate accurate and truthful information regarding Cabot's operations, business, and financial statements and to correct any previously issued statements that had become materially misleading or untrue, so that the market price of Cabot stock would be based upon truthful and accurate information.   Defendants' materially false statements and omissions during the Class Period violated these requirements and obligations.

## DEFENDANTS' FALSE AND MISLEADING STATEMENTS AND OMISSIONS

17.    The Class Period begins on October 23, 2015, when Cabot filed its quarterly report on Form 10-Q with the SEC (the "3Q15 10-Q") which downplayed Cabot's potential liabilities with respect to environmental matters, assuring investors, in part:

> From time to time we receive notices of violation from governmental and regulatory authorities in areas in which we operate relating to alleged violations of environmental statutes or the rules and regulations promulgated thereunder.  While we cannot predict with certainty whether these notices of violation will result in fines and/or

penalties, if fines and/or penalties are imposed, they may result in monetary sanctions individually or in the aggregate in excess of $100,000.

18.     Defendants repeated this same disclosure in the 2015 Form 10-K filed on February 22, 2016 ("2015 10-K"), the 2016 Form 10-K filed on February 27, 2017 ("2016 10-K"), the 2017 Form 10-K filed on March 1, 2018 ("2017 10-K"), the 2018 Form 10-K filed on February 26, 2019 ("2018 10-K"), and the 2019 Form 10-K filed on February 25, 2020 ("2019 10-K").

19.     Appended as an exhibit to the 3Q15 10-Q were signed certifications pursuant to the Sarbanes-Oxley Act of 2002, wherein the Individual Defendants certified that "the [3Q15 10-Q] fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934," and that "the information contained in the [3Q15 10-Q] fairly presents, in all material respects, the financial condition and results of operations of the Company." The Individual Defendants signed similar statements in connection with the 2015 10-K filed on February 22, 2016, the 2016 10-K filed on February 27, 2017, the 2017 10-K filed on March 1, 2018, the 2018 10-K filed on February 26, 2019, and the 2019 10-K filed on February 25, 2020.

20.     On February 22, 2016, Cabot filed the 2015 Form 10-K with the SEC, reporting the Company's financial and operating results for the quarter and year ended December 31, 2015, which once again touted the Company's compliance with

- 8 -

environmental and safety regulations, representing that defendants "believe that [they] substantially comply with the Clean Water Act and related federal and state regulations." Cabot further assured investors that the Company had been engaged with the PaDEP regarding its investigation and that Cabot had "performed appropriate remediation efforts, including the provision of alternative sources of drinking water to affected residents" and that the Company "believe[s] the source of methane has been remediated and [is] working with the PaDEP to reach agreement on the disposition of this matter."

21.   With respect to Cabot's response to ongoing environmental matters related to gas migration allegations in Pennsylvania, the 2015 10-K assured investors, in relevant part, that, following receipt of a Notice of Violation from the PaDEP in September 2011 for failure to prevent the migration of gas into fresh groundwater sources in the area surrounding several wells owned and operated by Cabot in Susquehanna County, Pennsylvania, defendants "have been engaged with the PaDEP in investigating the incident and have performed appropriate remediation efforts, including the provision of alternative sources of drinking water to affected residents"; that defendants "believe the source of methane has been remediated and are working with the PaDEP to reach agreement on the disposition of this matter"; that, on November 12, 2015, defendants received a "proposed Consent Order and Agreement [that] is the culmination of th[eir] effort[s] and, if finalized, would result

- 9 -

in the payment of a civil monetary penalty in an amount likely to exceed $100,000, up to approximately $300,000"; and that defendants "will continue to work with the PaDEP to finalize the Consent Order and Agreement and bring this matter to a close."

22.    In addition, the 2015 10-K contained generic, boilerplate representations with respect to "environmental and safety regulations, which can adversely affect the cost, manner or feasibility of doing business" for Cabot.  For example, the 2015 10-K represented, in relevant part, that Cabot's "operations are subject to extensive  federal, state and local laws and regulations, including drilling, permitting and safety laws and regulations and those relating to the generation, storage, handling, emission, transportation and discharge of materials into the environment"; that "[t]hese laws and regulations can adversely affect the cost, manner or feasibility of doing business"; that "[g]overnmental authorities have the power to enforce compliance with their regulations, and violations could subject [Cabot] to fines, injunctions or both"; that "[r]isks of substantial costs and liabilities related to environmental compliance issues are inherent in natural gas and oil operations"; that "[f]ailure to comply with these laws also may result in the suspension or termination of [defendants'] operations and subject [them] to administrative, civil and criminal penalties as well as the imposition of corrective action orders"; and that "[i]t is possible that other developments, such as stricter

- 10 -

environmental laws and regulations, and claims for damages to property or persons resulting from natural gas and oil production, would result in substantial costs and liabilities." These risk warnings were generic "catch-all" provisions that were not tailored to Cabot's actual known risks regarding the Company's inadequate environmental controls and procedures, much less its failure to fix faulty gas wells that were polluting Pennsylvania's water supplies through stray gas migration.

23. The 2016 10-K filed on February 27, 2018, the 2017 10-K filed on March 1, 2018, the 2018 10-K filed on February 26, 2019, and the 2019 10-K filed on February 25, 2020, contained substantively similar representations as in ¶¶20-22.

24. In November 2017, while the price of Cabot common stock was near its Class Period high, defendant Dinges cashed out more than $1.8 million worth of his Cabot stock at artificially inflated prices.

25. On July 26, 2019, the Company filed its 2Q19 10-Q, reporting that it had received two proposed Consent Order and Agreements related to two Notices of Violation it had received from the PaDEP for failure to prevent the migration of gas into fresh groundwater sources in the area surrounding Susquehanna County. Cabot received the Notices of Violation in June and November 2017. Specifically, the 2Q19 10-Q stated, in part:

> We will continue to work with the PaDEP to finalize the [Consent Orders and Agreements], and to bring this matter to a close. With regard to the November 2017 [Notice of Violation], [t]he proposed [Consent Order and Agreement], if finalized as drafted, would require

Cabot to submit a detailed written remediation plan, continue water sampling and other investigative measures and restore or replace affected water supplies and would result in the payment of a civil monetary penalty in an amount likely to exceed $100,000, up to approximately $355,000. We will continue to work with the PaDEP to finalize the [Consent Order and Agreement], and to complete the ongoing investigation and remediation.

26.   As a result of this news, the price of Cabot common stock declined 12%. Despite this decline, the Company's stock continued to trade at artificially inflated prices throughout the remainder of the Class Period as a result of defendants' continued misstatements and omissions.

27.   For example, in the same section of the 2Q19 10-Q that revealed Cabot's additional failures to prevent the migration of gas into fresh groundwater sources in Pennsylvania, the 2Q19 10-Q assured investors that, following the receipt of the Notice of Violations from the PaDEP, defendants "have been engaged with the PaDEP in investigating the incidents and have performed appropriate remediation efforts, including the provision of alternative sources of drinking water to the affected residents"; that, "[w]ith regard to the June 2017 [Notice of Violation], [defendants] believe these water quality complaints have been resolved, and [they] are working with the PaDEP to reach agreement on the disposition of this matter"; that "[t]he proposed CO&A [for the June 2017 Notice of Violation] is the culmination of [defendants'] effort[s]"; that defendants "will continue to work with the PaDEP to finalize the CO&A [related to the June 2017 Notice of Violation], and

- 12 -

to bring this matter to a close"; and that, with respect to the November 2017 Notice of Violation, defendants "will continue to work with the PaDEP to finalize the CO&A, and to complete the ongoing investigation and remediation."

28.     The statements referenced above were materially false and misleading because defendants omitted then-known (or recklessly disregarded) material information that:

(a)     Cabot had inadequate environmental controls and procedures and/or failed to properly mitigate known issues related to those controls and procedures;

(b)     Cabot, among other issues, failed to fix faulty gas wells, thereby polluting Pennsylvania's water supplies through stray gas migration;

(c)     the foregoing was foreseeably likely to subject Cabot to increased governmental scrutiny and enforcement, as well as increased reputational and financial harm;

(d)     Cabot continually downplayed its potential civil and/or criminal liabilities with respect to such environmental matters; and

(e)     these issues were reasonably likely to, and would, materially impact Cabot's financial results.

29.     On March 3, 2020, Pennsylvania Attorney General Josh Shapiro revealed that he was conducting investigations into companies involved in the oil

and gas industry in the state, which was the first acknowledgment by the Attorney General of the investigations, and which involved an investigative grand jury in Pittsburgh for more than a year.   It was also the latest revelation into criminal investigations of the oil and gas industry in Pennsylvania.  In the Attorney General's comments to the *Pittsburgh Post-Gazette*, he stated that criminal charges were expected "'in the near future'" and that his office was putting "'enormous resources'" into the investigation.

30.     Then, on June 15, 2020, before the market opened, following a grand jury investigation, the Attorney General's office charged Cabot with 15 criminal counts arising from its failure to fix faulty gas wells, thereby polluting Pennsylvania's water supplies through stray gas migration.  As *The Seattle Times* reported:

> "We find that, over a period of many years, and despite mounting evidence, Cabot . . . failed to acknowledge and correct conduct that polluted Pennsylvania water through stray gas migration," the grand jury wrote, criticizing Cabot's "long-term indifference to the damage it caused to the environment and citizens of Susquehanna County."

> *       *       *

> "Cabot took shortcuts that broke the law, damaged our environment, harming our water supplies and endangering Pennsylvanians.  They put their bottom line ahead of the health and safety of our neighbors," Attorney General Josh Shapiro said in a video statement.

> *       *       *

- 14 -

The company has long insisted the gas in Dimock's aquifer is naturally occurring, saying its pre-drill testing of thousands of private water wells in the area show a high percentage with methane.  The grand jury asserted that Cabot's initial sampling of wells and groundwater did not include tests for methane.  State environmental regulators eventually determined that Cabot's drilling and fracking operations leaked explosive levels of methane into private water supplies.

*     *     *

Residents said they suffered ill health effects from the contamination of their water with methane and drilling chemicals, including nausea, dizziness, skin rashes, impaired vision and breathing difficulties.  Property values plummeted, too, they said.

31.    On this news, the price of Cabot shares declined more than 3%.

32.    As a result of defendants' wrongful acts and omissions, plaintiff and the Class purchased Cabot common stock at artificially inflated prices and were damaged thereby.

## LOSS CAUSATION AND ECONOMIC LOSS

33.    During the Class Period, as detailed herein, defendants engaged in a scheme to deceive the market and a course of conduct that artificially inflated the prices of Cabot common stock and operated as a fraud or deceit on purchasers of Cabot common stock.  As detailed above, when the relevant truth was revealed, the value of Cabot common stock declined precipitously as the prior artificial inflation no longer propped up the stock's prices.  The declines in Cabot's stock price were the direct result of the nature and extent of defendants' fraud being revealed to investors and the market.  The timing and magnitude of the stock price declines

- 15 -

negate any inference that the losses suffered by plaintiff and other members of the Class were caused by changed market conditions, macroeconomic or industry factors, or Company-specific facts unrelated to defendants' fraudulent conduct. The economic loss, *i.e.*, damages, suffered by plaintiff and other Class members was a direct result of defendants' fraudulent scheme to artificially inflate the prices of Cabot common stock and the subsequent significant decline in the value of Cabot common stock when defendants' prior misrepresentations and other fraudulent conduct were revealed.

34.    At all relevant times, defendants' materially false and misleading statements or omissions alleged herein directly or proximately caused the damages suffered by plaintiff and other Class members. Those statements were materially false and misleading through their failure to disclose a true and accurate picture of Cabot's business and operations as alleged herein. Throughout the Class Period, defendants issued materially false and misleading statements and omitted material facts necessary to make defendants' statements not false or misleading, causing the prices of Cabot common stock to be artificially inflated. Plaintiff and other Class members purchased Cabot common stock at those artificially inflated prices, causing them to suffer damages as complained of herein.

- 16 -

## PRESUMPTION OF RELIANCE

35.    Plaintiff and the Class are entitled to a presumption of reliance under *Affiliated Ute Citizens v. United States*, 406 U.S. 128 (1972), because the claims asserted herein against defendants are predicated upon omissions of material fact for which there was a duty to disclose.

36.    Plaintiff and the Class are also entitled to a presumption of reliance under the fraud-on-the-market doctrine because the market for Cabot common stock was an efficient market at all relevant times by virtue of the following factors, among others:

(a)    Cabot common stock met the requirements for listing and was listed and actively traded on the NYSE, a highly efficient market;

(b)    as a regulated issuer, Cabot filed periodic public reports with the SEC; and

(c)    Cabot regularly communicated with public investors via established market communication mechanisms, including through the regular dissemination of press releases on major news wire services and through other wide-ranging public disclosures, such as communications with the financial press, securities analysts, and other similar reporting services.

37.    As a result of the foregoing, the market for Cabot common stock promptly incorporated current information regarding Cabot from publicly available

- 17 -

sources and reflected such information in the price of the stock. Under these circumstances, all those who transacted in Cabot common stock during the Class Period suffered similar injury through their transactions in Cabot common stock at artificially inflated prices and a presumption of reliance applies.

38.     At the times they purchased Cabot common stock, plaintiff and other members of the Class were without knowledge of the facts concerning the wrongful conduct alleged herein and could not reasonably have discovered those facts.

## CLASS ACTION ALLEGATIONS

39.     Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class consisting of all purchasers of Cabot common stock during the Class Period (the "Class"), excluding defendants and Cabot's officers and directors at all relevant times, as well as their respective family members, legal representatives, heirs, successors, or assigns, and any entity in which defendants have or had a controlling interest.

40.     The Class members are so numerous and geographically dispersed that joinder of all members is impracticable. Cabot stock was actively traded on NYSE. Record owners and other members of the Class may be identified from records maintained by Cabot or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions. While the exact number of Class members is unknown to plaintiff,

Cabot reported more than 398 million shares of common stock outstanding as of July 29, 2020.

41.    Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by defendants' wrongful conduct in violation of federal law that is complained of herein.

42.    Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

43.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

(a)    whether defendants' acts as alleged herein violated the federal securities laws;

(b)    whether defendants' statements made to the investing public misrepresented or omitted material facts about Cabot's business, operations and financial condition;

(c)    whether the price of Cabot common stock was artificially inflated during the Class Period; and

(d)    to what extent the Class members have sustained damages and the proper measure of damages.

44.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy as joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## COUNT I

### For Violation of §10(b) of the 1934 Act and Rule 10b-5
### Against All Defendants

45.     Plaintiff incorporates ¶¶1-44 by reference.

46.     During the Class Period, the defendants disseminated or approved the false or misleading statements specified above, which they knew or recklessly disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

47.     Defendants violated §10(b) of the 1934 Act and Rule 10b-5 in that they:

(a)     employed devices, schemes, and artifices to defraud;

(b)     made untrue statements of material fact or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

(c)    engaged in acts, practices, and a course of business that operated as a fraud or deceit upon plaintiff and others similarly situated in connection with their purchases of Cabot common stock during the Class Period.

48.    In addition to the duties of full disclosure imposed on defendants as a result of their affirmative false and misleading statements to the public, defendants had a duty to promptly disseminate truthful information with respect to Cabot's operations and performance that would be material to investors in compliance with the integrated disclosure provisions of the SEC so that the market price of the Company's common stock would be based on truthful, complete and accurate information.  SEC Regulations S-X (17 C.F.R. §210.01 *et seq.*) and S-K (17 C.F.R. §229.10 *et seq.*).

49.    As a direct and proximate result of the defendants' wrongful conduct, plaintiff and the Class have suffered damages in connection with their respective purchases of Cabot common stock during the Class Period, because, in reliance on the integrity of the market, they paid artificially inflated prices for Cabot common stock and experienced losses when the artificial inflation was released from Cabot common stock as a result of the revelations and price declines detailed herein. Plaintiff and the Class would not have purchased Cabot common stock at the prices they paid, or at all, if they had been aware that the market price had been artificially and falsely inflated by defendants' misleading statements.

- 21 -

50.    By virtue of the foregoing, the defendants have each violated §10(b) of the 1934 Act, and Rule 10b-5 promulgated thereunder.

## COUNT I

### For Violation of §20(a) of the 1934 Act
### Against the Individual Defendants

51.    Plaintiff incorporates ¶¶1-50 by reference.

52.    The Individual Defendants acted as controlling persons of Cabot within the meaning of §20(a) of the 1934 Act:

(a)    By reason of their positions as executive officers and/or directors, their participation in and awareness of the Company's operations and intimate knowledge of the false statements and omissions made by the Company and disseminated to the investing public, the Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decisionmaking of the Company, including the content and dissemination of the various statements that plaintiff contends are false and misleading;

(b)    The Individual Defendants participated in conference calls with investors and were provided with or had unlimited access to copies of the Company's reports, press releases, public filings, and other statements alleged by plaintiff to be misleading before or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected; and

- 22 -

(c)     Because of their positions as CEO and CFO, the Individual Defendants directly participated in the Company's management and were directly involved in Cabot's day-to-day operations.   The Individual Defendants also controlled the contents of Cabot's periodic SEC reports and other public filings, press releases, conference calls, and presentations to securities analysts and the investing public.   The Individual Defendants prepared, reviewed and/or were provided with copies of the Company's reports, press releases and presentation materials alleged to be misleading, before or shortly after their issuance, and had the ability and opportunity to prevent their issuance or cause them to be corrected and failed to do so.

53.     By reason of such conduct, the Individual Defendants are liable pursuant to §20(a) of the 1934 Act.

## PRAYER FOR RELIEF

WHEREFORE, plaintiff prays for judgment as follows:

A.     Determining that this action is a proper class action, designating plaintiff as Lead Plaintiff and certifying plaintiff as Class representative under Rule 23 of the Federal Rules of Civil Procedure and plaintiff's counsel as Lead Counsel;

B.     Declaring that defendants are liable pursuant to the 1934 Act;

C. Awarding compensatory damages in favor of plaintiff and the Class against defendants, jointly and severally, for damages sustained as a result of defendants' wrongdoing, in an amount to be proven at trial;

D. Awarding plaintiff and the Class pre-judgment and post-judgment interest as well as reasonable attorneys' fees, costs and expenses incurred in this action; and

E. Awarding such other relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury.

DATED: October 5, 2020      SAXTON & STUMP
LAWRENCE F. STENGEL (PA #32809)


_____
/s/ Lawrence F. Stengel
LAWRENCE F. STENGEL

280 Granite Run Drive, Suite 300
Lancaster, PA 17601
Telephone: 717/556-1000
717/441-3810 (fax)
lfs@saxtonstump.com

ROBBINS GELLER RUDMAN
  & DOWD LLP
SAMUEL H. RUDMAN
DAVID A. ROSENFELD
MARY K. BLASY
58 South Service Road, Suite 200
Melville, NY  11747
Telephone:  631/367-7100
631/367-1173 (fax)
srudman@rgrdlaw.com
drosenfeld@rgrdlaw.com
mblasy@rgrdlaw.com

ROBBINS GELLER RUDMAN
  & DOWD LLP
DANIELLE S. MYERS
JUAN CARLOS SANCHEZ
655 West Broadway, Suite 1900
San Diego, CA  92101-8498
Telephone:  619/231-1058
619/231-7423 (fax)
danim@rgrdlaw.com
jsanchez@rgrdlaw.com

Attorneys for Plaintiff