UNITED STATES DISTRICT COURT

MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| DELAWARE COUNTY EMPLOYEES RETIREMENT SYSTEM, Individually and on Behalf of All Others Similarly Situated,<br><br>                Plaintiff,<br><br>    vs.<br><br>CABOT OIL & GAS CORPORATION, et al.,<br><br>                Defendants. | Civ. Action No. 3:20-cv-01815-CCC<br><br><u>CLASS ACTION</u><br><br>The Honorable Christopher C. Conner<br><br>DECLARATION OF LAWRENCE F. STENGEL IN SUPPORT OF LEAD PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION TO TRANSFER VENUE TO SOUTHERN DISTRICT OF TEXAS |

4848-9453-0530.v1

I, Lawrence F. Stengel, declare as follows pursuant to 28 U.S.C. §1746:

1.    I am a member in good standing of the bar of the Commonwealth of Pennsylvania and am admitted to practice before this Court.  I am a shareholder at the law firm of Saxton & Stump and local counsel for Lead Plaintiff Delaware County Employees Retirement System ("Lead Plaintiff").  I submit this Declaration in support of Lead Plaintiff's Memorandum of Law in Opposition to Defendants' Motion to Transfer Venue to Southern District of Texas (the "Opposition").  I have personal knowledge of the matters stated herein and, if called upon, I could and would competently testify thereto.

2.    Attached are true and correct copies of the following exhibits:

Exhibit A:    Excerpts of the Cabot Oil & Gas Corp. Annual Report (2017);

Exhibit B:    Excerpts of the Cabot Oil & Gas Corp. Annual Report (Form 10-K) (Feb. 25, 2020);

Exhibit C:    Excerpts of the Cabot Oil & Gas Corp. Annual Report (Form 10-K) (Feb. 26, 2021);

Exhibit D:    Excerpts of the Cabot Oil & Gas Corp. Annual Report (Form 10-K) (Feb. 27, 2018);

Exhibit E:    Excerpts of the Cabot Oil & Gas Corp. Annual Report (2016);

Exhibit F:    Andrew Bary, *Cabot Oil & Gas Stock Is Soaring While the S&P 500 Tanks. Here's Why.*, Barron's (Mar. 9, 2020), https://www.barrons.com/articles/cabot-oil-gas-stock-sp-500-down-51583768845;

Exhibit G:    The report entitled: *Susquehanna County 3rd Quarter, 2020*, Pa. Dep't    of    Lab.    &    Indus.    (Feb.    2021),

- 1 -

https://www.workstats.dli.pa.gov/Documents/Top%2050/Susquehanna_County_Top_50.pdf;

Exhibit H:    The report entitled: *Office of Oil and Gas Management*, Pa. Dep't of Env't Prot., https://www.dep.pa.gov/Business/Energy/OilandGasPrograms/Pages/default.aspx;

Exhibit I:    *Dep't of Env't Prot. Before the House Republican Pol'y Comm.*, Pa. G.A. (May 20, 2010) (statement of J. Scott Roberts, Deputy Sec., Mineral Res. Mgmt);

Exhibit J:    *Police Crim. Complaint* (June 15, 2020), https://www.attorneygeneral.gov/wp-content/uploads/2020/06/2020-06-15-Cabot-Presentment.pdf;

Exhibit K:    Excerpts of the Cabot Oil & Gas Corp. Quarterly Report (Form 10-Q) (July 26, 2019);

Exhibit L:    *AG Shapiro and 43rd Statewide Grand Jury File Criminal Charges Against NEPA Fracking Company* (June 15, 2020), https://www.attorneygeneral.gov/taking-action/press-releases/ag-shapiro-and-43rd-statewide-grand-jury-file-criminal-charges-against-nepa-fracking-company/#:~:text=NEPA%20Fracking%20Company-,AG%20Shapiro%20and%2043rd%20Statewide%20Grand%20Jury,Charges%20Against%20NEPA%20Fracking%20Company&text=The%20Grand%20Jury's%20investigation%20into,in%20the%20local%20water%20supply;

Exhibit M:    Excerpts of the PaDEP Oil and Gas Compliance Report, which was generated through PaDEP's reporting portal website, https://www.depgreenport.state.pa.us/ReportExtracts/OG/OilComplianceReport, by using the following Parameters: Date Inspected From – "1/1/2017"; Date Inspected to – "1/1/2018"; Operator – "Cabot Oil & Gas Corp (43513)"; Violations Only – "Yes.";

Exhibit N:    Excerpts of the "Judicial Caseload Profile" page for the Middle District of Pennsylvania in 2018, which was printed from the Federal Court Management Statistics web page,

- 2 -

https://www.uscourts.gov/statistics/table/na/federal-court-management-statistics/2018/09/30-1;

Exhibit O:    Excerpts of the "Judicial Caseload Profile" page for the Southern District of Texas in 2018, which was printed from the Federal Court Management Statistics web page, https://www.uscourts.gov/statistics/table/na/federal-court-management-statistics/2018/09/30-1;

Exhibit P:    Excerpts of the "Judicial Caseload Profile" page for the Middle District of Pennsylvania in 2019, which was printed from the Federal Court Management Statistics web page, https://www.uscourts.gov/statistics/table/na/federal-court-management-statistics/2019/09/30-1;

Exhibit Q:    Excerpts of the "Judicial Caseload Profile" page for the Southern District of Texas in 2019, which was printed from the Federal Court Management Statistics web page, https://www.uscourts.gov/statistics/table/na/federal-court-management-statistics/2019/09/30-1; and

Exhibit R:    *U.S. District Court for the Middle District of Pennsylvania: Summary of Case Filings*, Lex Machina (Mar. 23, 2021), https://law.lexmachina.com/court/pamd/cases?status=open&case_types-include=263&pending-from=2021-03-23&pending-to=2021-03-23&filters=true&tab=summary&view=analytics&cols=475.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 25th day of March 2021.

s/ LAWRENCE F. STENGEL
LAWRENCE F. STENGEL

4848-9453-0530.v1

## CERTIFICATE OF SERVICE

I hereby certify under penalty of perjury that on March 25, 2021, I authorized the electronic filing of the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the e-mail addresses on the attached Electronic Mail Notice List, and I hereby certify that I caused the mailing of the foregoing via the United States Postal Service to the non-CM/ECF participants indicated on the attached Manual Notice List.

s/ LAWRENCE F. STENGEL
LAWRENCE F. STENGEL

SAXTON & STUMP
280 Granite Run Drive, Suite 300
Lancaster, PA  17601
Telephone:  717/556-1000
717/441-3810 (fax)

E-mail:  lfs@saxtonstump.com

Pennsylvania Middle District Version 6.1

# Mailing Information for a Case 3:20-cv-01815-CCC Delaware County Employees Retirement System v. Cabot Oil & Gas Corporation et al

## Electronic Mail Notice List

The following are those who are currently on the list to receive e-mail notices for this case.

- **Amy L. Barrette**
  amy.barrette@bipc.com,tara.klingensmith@bipc.com

- **Lawrence F. Stengel**
  lfs@saxtonstump.com,cag@saxtonstump.com,jss@saxtonstump.com

- **Peter Stokes**
  peter.stokes@nortonrosefulbright.com

## Manual Notice List

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

- (No manual recipients)

# EXHIBIT A

Exhibit A

**2017** Annual Report

where we stand
where we are going





# where we are going

As a result of our strategic transformation in 2017, Cabot enters 2018 as a pure-play Marcellus Shale company focused on our low-cost, high-return position in Susquehanna County, Pennsylvania. Our engagement with shareholders coming out of the recent downturn highlighted the continued frustration investors had with the destruction of capital across the exploration and production sector as many industry participants continually chased uneconomic growth at any cost while diluting shareholders and overleveraging balance sheets. While Cabot's focus during my 16 years at the helm has always been on providing returns-focused growth and balancing capital spending with operating cash flow and proceeds from asset sales, I am pleased to say that as a result of our team's recent efforts, our company is now better positioned than ever to execute on our strategy for creating long-term shareholder value by delivering debt-adjusted per share growth; generating positive free cash flow; improving

**6**      From left to right: Scott C. Schroeder, Executive Vice President and Chief Financial Officer and Dan O. Dinges, Chairman, President and CEO

# Price Performance*



| | |
|---|---|
| Cabot Oil & Gas | 347% |
| S&P 500 Index | 206% |
| Exploration & Production Index | 18% |
| NYMEX Henry Hub Price* | (54%) |

*Price performance since Cabot's first release of horizontal well results from the Marcellus Shale in December 2008; NYMEX Henry Hub Price based on 12-Month Futures Strip



**Marcellus Net Production**
*(Bcf)*

| '15 | '16 | '17 |
|---|---|---|
| 540.8 | 581.9 | 641.7 |

**Marcellus Proved Reserves**
*(Bcf)*

| '15 | '16 | '17 |
|---|---|---|
| 7,512.0 | 7,997.7 | 9,314.9 |

**Marcellus All-Sources Finding Development Costs**
*($ per Mcf)*

| '15 | '16 | '17 |
|---|---|---|
| $0.31 | $0.26 | $0.22 |



Cabot Oil & Gas Corporation

Three Memorial City Plaza   840 Gessner Road, Suite 1400   Houston, Texas 77024
(281) 589-4600

www.cabotog.com

# EXHIBIT B

Exhibit B

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
**WASHINGTON, D. C. 20549**

# FORM 10-K
**ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d)
OF THE SECURITIES EXCHANGE ACT OF 1934**

**For the fiscal year ended December 31, 2019**

**Commission file number 1-10447**

# CABOT OIL & GAS CORPORATION
(Exact name of registrant as specified in its charter)

| | |
|---|---|
| **Delaware** | **04-3072771** |
| (State or other jurisdiction of incorporation or organization) | (I.R.S. Employer Identification Number) |

**Three Memorial City Plaza,
840 Gessner Road, Suite 1400, Houston, Texas 77024**
(Address of principal executive offices including ZIP code)
**(281) 589-4600**
(Registrant's telephone number, including area code)

Securities registered pursuant to Section 12(b) of the Act:

| Title of each class | Trading Symbol(s) | Name of each exchange on which registered |
|---|---|---|
| Common Stock, par value $0.10 per share | COG | New York Stock Exchange |

Securities registered pursuant to Section 12(g) of the Act: **None**

Indicate by check mark if the registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act. Yes ☒    No ☐

Indicate by check mark if the registrant is not required to file reports pursuant to Section 13 or Section 15(d) of the Act. Yes ☐    No ☒

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days. Yes ☒    No ☐

Indicate by check mark whether the registrant has submitted electronically every Interactive Data File required to be submitted pursuant to Rule 405 of Regulation S-T during the preceding 12 months (or for such shorter period that the registrant was required to submit such files). Yes ☒    No ☐

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, smaller reporting company, or an emerging growth company. See the definitions of "large accelerated filer," "accelerated filer," "smaller reporting company," and "emerging growth company" in Rule 12b-2 of the Exchange Act. (Check one):

Large accelerated ☒ filer    Accelerated filer ☐    Non-accelerated filer ☐    Smaller reporting company ☐    Emerging growth ☐ company

If an emerging growth company, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant to Section 13(a) of the Exchange Act. ☐

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Exchange Act). Yes ☐    No ☒

The aggregate market value of Common Stock, par value $.10 per share ("Common Stock"), held by non-affiliates as of the last business day of registrant's most recently completed second fiscal quarter (based upon the closing sales price on the New York Stock Exchange on June 28, 2019) was approximately $9.4 billion.

As of February 19, 2020, there were 398,575,510 shares of Common Stock outstanding.

**DOCUMENTS INCORPORATED BY REFERENCE**

Portions of the Proxy Statement for the Annual Meeting of Stockholders to be held April 30, 2020 are incorporated by reference into Part III of this report.

In 2020, our capital program will focus on the Marcellus Shale, where we expect to drill, complete and place on production 60 to 70 net wells. We allocate our planned program for capital expenditures based on market conditions, return on capital and free cash flow expectations and availability of services and human resources. We will continue to assess the natural gas price environment and may adjust our capital expenditures accordingly.

## DESCRIPTION OF PROPERTIES

Our operations are primarily concentrated in one unconventional play—the Marcellus Shale in northeast Pennsylvania. Our Marcellus Shale properties represent our primary operating and growth area in terms of reserves, production and capital investment. Our properties are principally located in Susquehanna County, Pennsylvania, where we currently hold approximately 173,000 net acres in the dry gas window of the play. Our 2019 net production in the Marcellus Shale was 865 Bcfe, representing substantially all of our total equivalent production for the year. As of December 31, 2019, we had a total of 788.0 net wells in the Marcellus Shale, of which approximately 99.5 percent are operated by us.

During 2019, we invested $773.4 million in the Marcellus Shale and drilled or participated in drilling 94.0 net wells, completed 97.0 net wells and turned in line 97.0 net wells. As of December 31, 2019, we had 26.0 net wells that were either in the completion stage or waiting on completion or connection to a pipeline. We exited 2019 with three drilling rigs operating in the play and plan to exit 2020 with two rigs operating.

## DIVESTITURES

In July 2018, we sold certain proved and unproved oil and gas properties in the Haynesville Shale to a third party for $30.0 million and recognized a gain on sale of oil and gas properties of $29.7 million.

In February 2018, we sold certain proved and unproved oil and gas properties in the Eagle Ford Shale to an affiliate of Venado Oil & Gas LLC for $765.0 million. During the fourth quarter of 2017, we recorded an impairment charge of $414.3 million associated with the proposed sale of these properties and upon closing recognized a loss on sale of oil and gas properties of $45.4 million.

In September 2017, we sold certain proved and unproved oil and gas properties and related pipeline assets located in West Virginia, Virginia and Ohio to an affiliate of Carbon Natural Gas Company for $41.3 million. During the second quarter of 2017, we recorded an impairment charge of $68.6 million associated with the proposed sale of these properties and upon closing the sale in the third quarter of 2017, we recognized a loss on sale of oil and gas properties of $11.9 million.

In February 2016, we sold certain proved and unproved oil and gas properties in east Texas to a third party for $56.4 million and recognized a $0.5 million gain on sale of assets.

## MARKETING

Substantially all of our natural gas is sold at market sensitive prices under both long-term and short-term sales contracts and is subject to seasonal price swings. The principal markets for our natural gas are in the northeastern United States where we sell natural gas to industrial customers, local distribution companies, gas marketers and power generation facilities.

We also incur transportation and gathering expenses to move our natural gas production from the wellhead to our principal markets in the United States. The majority of our natural gas production is transported on third-party gathering systems and interstate pipelines where we have long-term contractual capacity arrangements or use purchaser-owned capacity under both long-term and short-term sales contracts.

To date, we have not experienced significant difficulty in transporting or marketing our natural gas production as it becomes available; however, there is no assurance that we will always be able to transport and market all of our production.

### *Delivery Commitments*

We have entered into various firm sales contracts to deliver and sell natural gas. We believe we will have sufficient production quantities to meet substantially all of our commitments, but may be required to purchase natural gas from third parties to satisfy shortfalls should they occur.

8

*In accordance with the Financial Accounting and Reporting for Oil and Gas Producing Activities Pursuant to the Federal Securities Laws and the Energy Policy and Conservation Act of 1975. Reg. § 210.4-10.*

# **EXHIBIT C**

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
**WASHINGTON, D. C. 20549**

# FORM 10-K
**ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d)**
**OF THE SECURITIES EXCHANGE ACT OF 1934**

**For the fiscal year ended December 31, 2020**

**Commission file number 1-10447**

# CABOT OIL & GAS CORPORATION
(Exact name of registrant as specified in its charter)

| **Delaware** | **04-3072771** |
|---|---|
| (State or other jurisdiction of incorporation or organization) | (I.R.S. Employer Identification Number) |

**Three Memorial City Plaza,**
**840 Gessner Road, Suite 1400, Houston, Texas 77024**
(Address of principal executive offices including ZIP code)
**(281) 589-4600**
(Registrant's telephone number, including area code)

Securities registered pursuant to Section 12(b) of the Act:

| Title of each class | Trading Symbol(s) | Name of each exchange on which registered |
|---|---|---|
| Common Stock, par value $0.10 per share | COG | New York Stock Exchange |

Securities registered pursuant to Section 12(g) of the Act: **None**

Indicate by check mark if the registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act. Yes ☒   No ☐

Indicate by check mark if the registrant is not required to file reports pursuant to Section 13 or Section 15(d) of the Act. Yes ☐   No ☒

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days. Yes ☒   No ☐

Indicate by check mark whether the registrant has submitted electronically every Interactive Data File required to be submitted pursuant to Rule 405 of Regulation S-T (§ 232.405 of this chapter) during the preceding 12 months (or for such shorter period that the registrant was required to submit such files). Yes ☒   No ☐

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, a smaller reporting company, or an emerging growth company. See the definitions of "large accelerated filer," "accelerated filer," "smaller reporting company," and "emerging growth company" in Rule 12b-2 of the Exchange Act.

Large accelerated filer ☒      Accelerated filer ☐      Non-accelerated filer ☐      Smaller reporting company ☐      Emerging growth ☐ company

If an emerging growth company, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant to Section 13(a) of the Exchange Act. ☐

Indicate by check mark whether the registrant has filed a report on and attestation to its management's assessment of the effectiveness of its internal control over financial reporting under Section 404(b) of the Sarbanes-Oxley Act (15 U.S.C. 7262(b)) by the registered public accounting firm that prepared or issued its audit report. ☒

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Act). Yes ☐   No ☒

The aggregate market value of Common Stock, par value $.10 per share ("Common Stock"), held by non-affiliates as of the last business day of registrant's most recently completed second fiscal quarter (based upon the closing sales price on the New York Stock Exchange on June 30, 2020) was approximately $6.7 billion.

As of February 22, 2021, there were 399,419,748 shares of Common Stock outstanding.

**DOCUMENTS INCORPORATED BY REFERENCE**

Portions of the Proxy Statement for the Annual Meeting of Stockholders to be held April 29, 2021 are incorporated by reference into Part III of this report.

promote efficient use of water and protect water quality, eliminate releases, and minimize land surface impact. Because we are a producer of 100 percent natural gas, we believe we have a competitive advantage as it relates to the production of clean energy and our overall carbon footprint on the environment.

Refer to "Management's Discussion and Analysis of Financial Condition and Results of Operations - Non-GAAP Financial Measures" for a discussion and calculation of return on capital employed, free cash flow and finding and development cost, which are non-GAAP financial measures.

## 2021 OUTLOOK

Our 2021 capital program is expected to be approximately $530.0 million to $540.0 million, representing a six percent reduction, at the midpoint of the range, from our 2020 capital program of $569.8 million. We reduced our planned capital expenditures, which contemplates a maintenance capital program, as a result of the weaker natural gas price environment. We expect to fund these expenditures with our operating cash flow and, if required, cash on hand.

In 2021, our capital program will focus on the Marcellus Shale, where we expect to drill and complete 80 net wells. We allocate our planned program for capital expenditures based on market conditions, return on capital and free cash flow expectations and availability of services and human resources. We will continue to assess the natural gas price environment and may adjust our capital expenditures accordingly.

## DESCRIPTION OF PROPERTIES

Our operations are primarily concentrated in one unconventional play—the Marcellus Shale in northeast Pennsylvania. Our Marcellus Shale properties represent our primary operating area and are principally located in Susquehanna County, Pennsylvania, where we currently hold approximately 175,000 net acres in the dry gas window of the play. Our 2020 net production in the Marcellus Shale was 857 Bcfe, representing substantially all of our total equivalent production for the year. As of December 31, 2020, we had a total of 865.9 net wells in the Marcellus Shale, of which approximately 99.5 percent are operated by us.

During 2020, we invested $562.1 million in the Marcellus Shale and drilled or participated in drilling 64.3 net wells, completed 77.3 net wells and turned in line 69.2 net wells. As of December 31, 2020, we had 13.0 net wells that were either in the completion stage or waiting on completion or connection to a pipeline. We exited 2020 with three drilling rigs operating in the play and plan to exit 2021 with two rigs operating.

## DIVESTITURES

In July 2018, we sold certain proved and unproved oil and gas properties in the Haynesville Shale to a third party for $30.0 million and recognized a gain on sale of oil and gas properties of $29.7 million.

In February 2018, we sold certain proved and unproved oil and gas properties in the Eagle Ford Shale to an affiliate of Venado Oil & Gas LLC for $765.0 million. During the fourth quarter of 2017, we recorded an impairment charge of $414.3 million associated with the proposed sale of these properties and upon closing recognized a loss on sale of oil and gas properties of $45.4 million.

In September 2017, we sold certain proved and unproved oil and gas properties and related pipeline assets located in West Virginia, Virginia and Ohio to an affiliate of Carbon Natural Gas Company for $41.3 million. During the second quarter of 2017, we recorded an impairment charge of $68.6 million associated with the proposed sale of these properties and upon closing the sale in the third quarter of 2017, we recognized a loss on sale of oil and gas properties of $11.9 million.

In February 2016, we sold certain proved and unproved oil and gas properties in east Texas to a third party for $56.4 million and recognized a $0.5 million gain on sale of assets.

## MARKETING

Substantially all of our natural gas is sold at market sensitive prices under both long-term and short-term sales contracts and is subject to seasonal price swings. The principal markets for our natural gas are in the northeastern United States where we sell natural gas to industrial customers, local distribution companies, gas marketers and power generation facilities.

We also incur transportation and gathering expenses to move our natural gas production from the wellhead to our principal markets in the United States. The majority of our natural gas production is transported on third-party gathering systems and interstate pipelines where we have long-term contractual capacity arrangements or use purchaser-owned capacity under both long-term and short-term sales contracts.

8

Changes in PUD reserves that occurred during the year were due to:

- transfer of 1,785 Bcfe from PUD to proved developed reserves based on total capital expenditures of $455.5 million during 2020;

- new PUD reserve additions of 1,945 Bcfe in the Dimock field in northeast Pennsylvania; and

- upward PUD reserve revisions of 57 Bcfe resulting from upward performance revisions of 123 Bcfe associated with performance revisions along with the drilling of longer lateral wells, partially offset by downward revisions of 66 Bcfe associated with PUD reclassifications as a result of the five-year limitation.

**PRODUCTION, SALES PRICE AND PRODUCTION COSTS**

The following table presents historical information about our production volumes for natural gas and oil (including NGLs), average natural gas and crude oil sales prices, and average production costs per equivalent. Substantially all of our total company historical operational information and proved reserves are derived from our Dimock field in northeast Pennsylvania:

|  | Year Ended December 31, | | |
|---|---|---|---|
|  | **2020** | **2019** | **2018** |
| **Production Volumes** |  |  |  |
| Natural gas (Bcf) | 857.7 | 865.3 | 729.9 |
| Oil (Mbbl)[1] | — | — | 829 |
| Equivalents (Bcfe) | 857.7 | 865.3 | 735.0 |
|  |  |  |  |
| **Average Sales Price** |  |  |  |
| Natural gas excluding realized impact of derivative settlements ($/Mcf) | $ 1.64 | $ 2.29 | $ 2.58 |
| Natural gas including realized impact of derivative settlements ($/Mcf) | $ 1.68 | $ 2.45 | $ 2.54 |
| Oil excluding realized impact of derivative settlements ($/Bbl) | $ — | $ — | $ 64.51 |
| Oil including realized impact of derivative settlements ($/Bbl) | $ — | $ — | $ 63.53 |
|  |  |  |  |
| Average Production Costs ($/Mcfe) | $ 0.06 | $ 0.06 | $ 0.05 |

(1) There was no significant NGL production for the years ended December 31, 2020 and 2019 and less than one percent of our equivalent production for the year ended December 31, 2018. NGL production represented 8.5 percent of our crude oil production for the year ended December 31, 2018.

**ACREAGE**

Our interest in both developed and undeveloped properties is primarily in the form of leasehold interests held under customary mineral leases. These leases provide us the right to develop oil and/or natural gas on the properties. Their primary terms range in length from approximately three to 10 years. These properties are held for longer periods if production is established.

12

addition, if existing laws and regulations with regard to hydraulic fracturing are revised or reinterpreted or if new laws and regulations become applicable to our operations through judicial or administrative actions, our business, financial condition, results of operations and cash flows could be adversely affected. For additional information about hydraulic fracturing and related environmental matters, please read "Risk Factors—Legal, Regulatory and Governmental Risks—Federal and state legislation, judicial actions and regulatory initiatives related to oil and gas development and the use of hydraulic fracturing could result in increased costs and operating restrictions or delays and adversely affect our business, financial condition, results of operations and cash flows" in Item 1A.

*Greenhouse Gas.* In response to studies suggesting that emissions of carbon dioxide and certain other gases may be contributing to global climate change, the United States Congress has considered, but not enacted, legislation to reduce emissions of greenhouse gases from sources within the United States between 2012 and 2050. In addition, many states have already taken legal measures to reduce emissions of greenhouse gases, primarily through the planned development of greenhouse gas emission inventories and/or regional greenhouse gas cap and trade programs. The EPA has also begun to regulate carbon dioxide and other greenhouse gas emissions under existing provisions of the Clean Air Act. This includes potential regulation of methane emissions from new and modified sources in the oil and gas sector. If we are unable to recover or pass through a significant portion of our costs related to complying with current and future regulations relating to climate change and GHGs, it could materially affect our operations and financial condition. To the extent financial markets view climate change and GHG emissions as a financial risk, this could negatively impact our cost of, and access to, capital. Future legislation or regulations adopted to address climate change could also make our products more or less desirable than competing sources of energy. Please read "Risk Factors—Legal, Regulatory and Governmental Risks—Climate change and climate change legislative and regulatory initiatives could result in increased operating costs and decreased demand for the oil and natural gas that we produce" in Item 1A.

*OSHA and Other Laws and Regulations.* We are subject to the requirements of the federal Occupational Safety and Health Act (OSHA), and comparable state laws. The OSHA hazard communication standard, the EPA community right-to-know regulations under the Title III of CERCLA and similar state laws require that we organize and/or disclose information about hazardous materials used or produced in our operations. Also, pursuant to OSHA, the Occupational Safety and Health Administration has established a variety of standards related to workplace exposure to hazardous substances and employee health and safety.

### Human Capital Resources

We believe that our ability to attract, retain and develop the highest quality personnel is an important component of our success. We believe our employee levels are appropriate and that we have the human capital to operate our business and carry out our strategy as determined by management and our Board of Directors. As of December 31, 2020, we had 503 employees, 274 of whom were associated with our upstream operations, of which 92 were located at our corporate headquarters in Houston, Texas, 88 were located at our regional office in Pittsburgh, Pennsylvania, and 94 were located in our field operations in Susquehanna County, Pennsylvania. Of these 274 upstream employees, 214 were salaried and 60 were hourly. In addition to our upstream employees, we had 229 employees that are employed by our wholly owned subsidiary, GasSearch Drilling Services Corporation (GDS), which is a service company engaged in water hauling and site preparation exclusively for our field operations. Of these 229 GDS employees, 13 were salaried and 216 were hourly. We believe that our relations with our employees are favorable. None of our employees is represented by a collective bargaining agreement.

In managing our human capital resources, we seek to:

- Attract and retain a highly qualified and motivated workforce, maintaining a conservative headcount to minimize workforce fluctuations, promote job security and provide employees opportunities for learning and development;

- Offer a competitive compensation and benefits package; and

- Promote a safe and healthy workplace.

We believe these practices, further described below, are the key drivers in our very low voluntary turnover rates, which averaged less than five percent over the five-year period ended December 31, 2020.

*Recruiting Hiring and Advancement.* Due to the cyclical nature of our business and the fluctuations in activity that can occur, we take a conservative approach to managing our headcount, carefully evaluating whether a new hire is necessary for an open position or whether we can fill the position by expanding the role of a current employee or several employees. In this way, we provide employees with opportunities to learn new roles and develop their skills horizontally and vertically and minimize layoffs and fluctuations when downturns occur. When a position cannot be filled by expanding the role of a current employee or several employees, we first consider opportunities to promote current employees before going to outside sources for a new

19

recovered will equal or exceed the estimate. A high degree of confidence exists if the quantity is much more likely to be achieved than not, and, as changes due to increased availability of geoscience (geological, geophysical, and geochemical), engineering, and economic data ore mode to estimated ultimate recovery (EUR) with time, reasonably certain EUR is much more likely to increase or remain constant than to decrease.

**Reliable Technology**

Reliable technology is a grouping of one or more technologies (including computational methods) that has been field tested and has been demonstrated to provide reasonably certain results with consistency and repeatability in the formation being evaluated or in on analogous formation.

*In accordance with the Financial Accounting and Reporting for Oil and Gas Producing Activities Pursuant to the Federal Securities Laws and the Energy Policy and Conservation Act of 1975. Reg. § 210.4-10.*

# EXHIBIT D

Exhibit D

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
WASHINGTON, D. C. 20549

# FORM 10-K

**ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d)**
**OF THE SECURITIES EXCHANGE ACT OF 1934**

**For the fiscal year ended December 31, 2017**

**Commission file number 1-10447**

# CABOT OIL & GAS CORPORATION
(Exact name of registrant as specified in its charter)

| **Delaware** | **04-3072771** |
|---|---|
| (State or other jurisdiction of | (I.R.S. Employer |
| incorporation or organization) | Identification Number) |

**Three Memorial City Plaza, 840 Gessner Road, Suite 1400, Houston, Texas 77024**
(Address of principal executive offices including ZIP code)
**(281) 589-4600**
(Registrant's telephone number, including area code)

Securities registered pursuant to Section 12(b) of the Act:

| **Title of each class** | **Name of each exchange on which registered** |
|---|---|
| Common Stock, par value $.10 per share | New York Stock Exchange |

Securities registered pursuant to Section 12(g) of the Act: **None**

Indicate by check mark if the registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act. Yes ☒   No ☐

Indicate by check mark if the registrant is not required to file reports pursuant to Section 13 or Section 15(d) of the Act. Yes ☐   No ☒

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months and (2) has been subject to such filing requirements for the past 90 days. Yes ☒   No ☐

Indicate by check mark whether the registrant has submitted electronically and posted on its corporate Web site, if any, every Interactive Data File required to be submitted and posted pursuant to Rule 405 of Regulation S-T during the preceding 12 months (or for such shorter period that the registrant was required to submit and post such files). Yes ☒   No ☐

Indicate by check mark if disclosure of delinquent filers pursuant to Item 405 of Regulation S-K is not contained herein, and will not be contained, to the best of registrant's knowledge, in definitive proxy or information statements incorporated by reference in Part III of this Form 10-K or any amendment to this Form 10-K ☒   .

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, smaller reporting company, or an emerging growth company. See the definitions of "large accelerated filer," "accelerated filer," "smaller reporting company," and "emerging growth company" in Rule 12b-2 of the Exchange Act. (Check one):

| Large accelerated ☒ | Accelerated filer ☐ | Non-accelerated filer ☐ | Smaller reporting company ☐ | Emerging growth company ☐ |
|---|---|---|---|---|
| filer | | (Do not check if a smaller reporting company) | | |

If an emerging growth company, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant to Section 13(a) of the Exchange Act. ☐

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Exchange Act). Yes ☐   No ☒

The aggregate market value of Common Stock, par value $.10 per share ("Common Stock"), held by non-affiliates as of the last business day of registrant's most recently completed second fiscal quarter (based upon the closing sales price on the New York Stock Exchange on June 30, 2017 ) was approximately $11.4 billion .

As of February 16, 2018 , there were 460,786,236 shares of Common Stock outstanding.

**DOCUMENTS INCORPORATED BY REFERENCE**

Portions of the Proxy Statement for the Annual Meeting of Stockholders to be held May 2, 2018 are incorporated by reference into Part III of this report.

- positive PUD reserve revisions of 772.4 Bcfe resulting from positive performance revisions of 809.8 Bcfe associated with the drilling of longer lateral wells and completing more frac stages in our Dimock field in northeast Pennsylvania and positive price revisions of 0.9 Bcfe, partially offset by downward revisions of 38.3 Bcfe associated with PUD reclassifications as a result of the five year limitation.

## PRODUCTION, SALES PRICE AND PRODUCTION COSTS

The following table presents historical information about our production volumes for natural gas and oil (including NGLs), average natural gas and crude oil sales prices, and average production costs per equivalent, including our Dimock field located in northeast Pennsylvania, which represents more than 15% of our total proved reserves:

| | | Year Ended December 31, | | | | |
| --- | --- | --- | --- | --- | --- | --- |
| | | 2017 | | 2016 | | 2015 |
| **Production Volumes** | | | | | | |
| Natural gas  *(Bcf)* | | | | | | |
| Dimock field | | 641.7 | | 581.9 | | 540.8 |
| Total | | 655.6 | | 600.4 | | 566.0 |
| Oil  *(Mbbl)* [1] | | | | | | |
| Total | | 4,953 | | 4,454 | | 6,096 |
| Equivalents  *(Bcfe)* | | | | | | |
| Dimock field | | 641.7 | | 581.9 | | 540.8 |
| Total | | 685.3 | | 627.1 | | 602.5 |
| **Natural Gas Average Sales Price  *($/Mcf)*** | | | | | | |
| Dimock field | $ | 2.33 | $ | 1.69 | $ | 1.78 |
| Total (excluding realized impact of derivative settlements) | $ | 2.30 | $ | 1.70 | $ | 1.81 |
| Total (including realized impact of derivative settlements) | $ | 2.31 | $ | 1.70 | $ | 2.15 |
| **Oil Average Sales Price *($/Bbl)*** | | | | | | |
| Total (excluding realized impact of derivative settlements) | $ | 47.81 | $ | 37.65 | $ | 45.72 |
| Total (including realized impact of derivative settlements) | $ | 48.16 | $ | 37.30 | $ | 45.72 |
| **Average Production Costs  *($/Mcfe)*** | | | | | | |
| Dimock field | $ | 0.04 | $ | 0.03 | $ | 0.04 |
| Total | $ | 0.11 | $ | 0.11 | $ | 0.18 |

(1)  *Includes NGLs which represent less than 1.0% of our equivalent production for all years presented and 10.3%, 9.9%, and 11.0% of our crude oil production for the years ended December 31, 2017 , 2016 and 2015 , respectively.*

## ACREAGE

Our interest in both developed and undeveloped properties is primarily in the form of leasehold interests held under customary mineral leases. These leases provide us the right to develop oil and/or natural gas on the properties. Their primary terms range in length from approximately three to 10 years. These properties are held for longer periods if production is established.

13

been penetrated by a wellbore, and the registrant believes that such adjacent portions are in communication with the known (proved) reservoir. Possible reserves may be assigned to areas that are structurally higher or lower than the proved area if these areas are in communication with the proved reservoir.

6.    Pursuant to Item 3 under Proved Oil and Gas Reserves, where direct observation has defined a highest known oil (HKO) elevation and the potential exists for an associated gas cap, proved oil reserves should be assigned in the structurally higher portions of the reservoir above the HKO only if the higher contact can be established with reasonable certainty through reliable technology. Portions of the reservoir that do not meet this reasonable certainty criterion may be assigned as probable and possible oil or gas based on reservoir fluid properties and pressure gradient interpretations.

# EXHIBIT E

Exhibit E

**CABOT OIL & GAS CORPORATION**



A **decade** of
progress and perseverance in the Marcellus Shale.

**2016** Annual Report



**LLUS** Shale

A **partner** in Pennsylvania.

For more than a decade, Cabot Oil & Gas has been a strong economic and community partner in Pennsylvania. Our goal has always been to make the region stronger, and we are proud of the many accomplishments we – and our dedicated employees – have achieved.

**Operations**

**$4.6B** total capital dollars spent since 2006

**$963M** paid in royalties to 5,948 land owners since 2008

**$48M** spent on road maintenance since 2009

**300+** Cabot employees with 90% local workforce

**$60.6M** paid by Cabot in Impact Fee dollars to the Commonwealth

**Community**

**$4.4M** raised for construction of Endless Mountains Health Systems hospital

**$6M** donated to community organizations since 2011

**$754K** awarded to educational programs through EITC tax credits since 2012

**$2.5M** endowment at Lackawanna College School of Petroleum & Natural Gas

A **decade** of Marcellus milestones.

**2006**
- Acquired first lease
- Drilled first vertical well

**2009**
- First multi-horizontal well pad placed on production

**2008**
- Drilled first horizontal well
- First production

**2010**
- Surpassed 100 Mmcf/d of gross production
- Sold gathering system to focus capital spending on accelerating production growth

**2011**
- Cabot named #1 performing S&P 500 stock, driven by success in the Marcellus

**2013**
- Produced 14 of the top 20 wells in Pennsylvania
- Annual production growth of 70 percent

**2012**
- Surpassed 1 Bcf/day of gross production
- Annual production growth of 75 percent

**2014**
- Exceeded 1 Tcf of cumulative gross production
- Surpassed 2 Bcf/d of gross production

**2015**
- 500th horizontal well drilled
- Exceeded 2 Tcf of cumulative gross production

**2016**
- 11,000th frac stage completed
- First well to exceed 18 Bcf of cumulative gross production





Cabot Oil & Gas Corporation

Three Memorial City Plaza
840 Gessner Road, Suite 1400
Houston, Texas 77024

(281) 589-4600

**www.cabotog.com**

# EXHIBIT F

# BARRON'S

ENERGY

# Cabot Oil & Gas Stock Is Soaring While the S&P 500 Tanks. Here's Why.

By Andrew Bary    March 9, 2020 11:48 am ET



Cabot Oil & Gas stock was the top performer in the S&P 500 Monday.
Photograph by Spencer Platt/Getty Images

Cabot Oil & Gas is the top stock in the S&P 500 during Monday's market rout as investors anticipate that the sharp drop in crude oil prices will reduce the U.S. supply of natural gas and lift depressed gas prices.

Cabot shares (ticker: COG) were up $1.68, or 10%, to $18.08 in recent trading. Cabot is one of the largest and lowest-cost U.S. producers of gas in the prolific Marcellus region of Pennsylvania. Cabot also has one of the best balance sheets in the group with debt of about $1 billion and a debt-to-cash-flow ratio of less than one based on its 2019 earnings before interest, taxes, depreciation, and amortization, or Ebitda. Cabot is one of the best-performing energy stocks this year with a gain of about 5%.

EQT (EQT), another big gas producer, also has gained Monday, rising 49 cents, to $6.88. Among other major gas stocks, Range Resources (RRC) is down 2 cents at $2.38 and Southwestern Energy (SWN) is up four cents at $1.35.

Spot natural gas prices are up two cents to $1.73 per million BTUs, and deferred-month contracts are showing increases of 4 to 5 cents, even as crude oil, as measured by West Texas Intermediate, is down $8.73 a barrel at $32.55.

Wall Street is anticipating that the drop in crude will result in curtailments to U.S. oil production that in turn will cut the output of "associated gas," which is gas output directly related to oil production, mostly from shale formations in the Permian basin and other energy-producing regions. Associated gas accounts for about a third of U.S. gas production and the growth in associated gas output has weighed on the gas market in the past few years.

"If you believe $30 oil has any sort of duration, it's hard not be bullish on gas as we
see the roll-off of associated volumes driving gas back toward $3/mcf," wrote Tudor, Pickering, & Holt analysts in a client note Monday. Mcf refers to a thousand cubic feet, which is equivalent to a million BTUs.

The analysts went through the math on gas production and wrote: "Add it all up, and it's possible we exit the year with a 3 bcfd [billion cubic feet per day] undersupplied gas market." U.S. gas production is around 90 billion cubic feet per day. Tudor, Pickering, & Holt added that the bullish outlook for gas hinges on oil prices holding below $40 per barrel "for an extended period of time, but we think adding high quality gas exposure at this time is prudent and are looking to COG" (Cabot) as one of the firm's "preferred names." Barron's has written favorably on Cabot.

In a flash note this morning, commodity analysts at Citigroup had a bullish view on gas, writing that, "The further that oil prices fall, the higher that gas prices rise... in winter and beyond. The market could tighten up more in 2021, lifting prices above $3/MMBtu."

**Write to** Andrew Bary at andrew.bary@barrons.com

# **EXHIBIT G**

Exhibit G

**pennsylvania**
DEPARTMENT OF LABOR & INDUSTRY
CENTER FOR WORKFORCE INFORMATION & ANALYSIS

# Susquehanna County        3rd Quarter, 2020

Combined Government Ownerships

| Rank | Employer | Rank | Employer |
|---|---|---|---|
| 1 | GasSearch Drilling Services Corp | 26 | Rob's Market |
| 2 | Montrose Area School District | 27 | Williams WPC-I Inc |
| 3 | Barnes-Kasson County Hospital | 28 | Meadow View Senor Living Center LLC |
| 4 | Susquehanna County | 29 | Youth Advocate Programs Inc |
| 5 | Endless Mountains Health Systems | 30 | CareGivers America LLC |
| 6 | State Government | 31 | Susquehanna County Career & Tech Center |
| 7 | Elk Lake School District | 32 | JP Reilly Construction LP |
| 8 | Mountain View School District | 33 | Andre & Son Inc |
| 9 | Blue Ridge School District | 34 | Merakey Pennsylvania |
| 10 | Forest City Regional School District | 35 | Summit Ridge Farms |
| 11 | Susquehanna Community School District | 36 | Hinds Oil Co Inc |
| 12 | Federal Government | 37 | Dolgencorp LLC |
| 13 | Forest City Care Continuum | 38 | Matthews Chrysler Dodge Jeep Ram |
| 14 | Diaz Manufacturing LLC | 39 | Rain for Rent |
| 15 | Lattner Enterprises of PA LLC | 40 | Camp Susquehannock Inc |
| 16 | Peoples National Bank-Susquehanna County | 41 | Masters RMC Inc |
| 17 | Cabot Oil & Gas Corporation | 42 | Lindsey Oil Company |
| 18 | DTE Gas Enterprises LLC | 43 | Nep Telephone Company |
| 19 | Price Chopper Operating Co of PA | 44 | Singh Realty LLC |
| 20 | Trehab Center Inc | 45 | Bingham's Family Restaurant |
| 21 | Pump N Pantry Inc | 46 | Gracious Living Estates PCH |
| 22 | RHL Companies Inc | 47 | New Enterprise Stone & Lime Company |
| 23 | Shell | 48 | Pioneer Drilling Services Ltd |
| 24 | Shen Manufacturing Company Inc | 49 | Powers Stone Inc |
| 25 | Diaz Stone & Pallet Inc | 50 | Montrose Auto Parts Inc |

*Source: Quarterly Census of Employment and Wages*

**pennsylvania**
DEPARTMENT OF LABOR & INDUSTRY
CENTER FOR WORKFORCE INFORMATION & ANALYSIS

# Susquehanna County     3rd Quarter, 2020

| Rank | NAICS Industry Description | NAICS |
|------|---------------------------|-------|
| 1 | Elementary and secondary schools | 6111 |
| 2 | Restaurants and other eating places | 7225 |
| 3 | General medical and surgical hospitals | 6221 |
| 4 | Nonmetallic mineral mining and quarrying | 2123 |
| 5 | Executive, legislative and general government | 9211 |
| 6 | Support activities for mining | 2131 |
| 7 | Gasoline stations | 4471 |
| 8 | Grocery stores | 4451 |
| 9 | Other specialty trade contractors | 2389 |
| 10 | Individual and family services | 6241 |
| 11 | Depository credit intermediation | 5221 |
| 12 | Architectural and engineering services | 5413 |
| 13 | Continuing care, assisted living facilities | 6233 |
| 14 | Highway, street, and bridge construction | 2373 |
| 15 | Automobile dealers | 4411 |
| 16 | Other nonmetallic mineral products | 3279 |
| 17 | General Merchandise Stores, including Warehouse Clubs and Supercenters | 4523 |
| 18 | Household and institutional furniture mfg. | 3371 |
| 19 | RV parks and recreational camps | 7212 |
| 20 | Management of companies and enterprises | 5511 |
| 21 | Automotive repair and maintenance | 8111 |
| 22 | Natural gas distribution | 2212 |
| 23 | Postal service | 4911 |
| 24 | Services to buildings and dwellings | 5617 |
| 25 | Lumber and const. supply merchant wholesalers | 4233 |
| 26 | Traveler accommodation | 7211 |
| 27 | Petroleum merchant wholesalers | 4247 |
| 28 | Other professional and technical services | 5419 |
| 29 | Warehousing and storage | 4931 |
| 30 | Other amusement and recreation industries | 7139 |
| 31 | General freight trucking | 4841 |
| 32 | Pipeline transportation of natural gas | 4862 |
| 33 | Cement and concrete product manufacturing | 3273 |
| 34 | Building material and supplies dealers | 4441 |
| 35 | Nursing care facilities, skilled nursing | 6231 |
| 36 | Health and personal care stores | 4461 |
| 37 | Building equipment contractors | 2382 |
| 38 | Outpatient care centers | 6214 |
| 39 | Offices of other health practitioners | 6213 |
| 40 | Direct selling establishments | 4543 |
| 41 | Drinking places, alcoholic beverages | 7224 |
| 42 | Offices of physicians | 6211 |
| 43 | Scientific research and development services | 5417 |
| 44 | Residential building construction | 2361 |
| 45 | Machine shops and threaded product mfg. | 3327 |
| 46 | Wired and Wireless Telecommunications Carriers | 5173 |
| 47 | Nonresidential building construction | 2362 |
| 48 | Other miscellaneous store retailers | 4539 |
| 49 | Other personal services | 8129 |
| 50 | Specialized freight trucking | 4842 |

*Source: Quarterly Census of Employment and Wages*

**Center for Workforce Information & Analysis**
(877) 4WF-DATA  •  www.workstats.dli.pa.gov  •  workforceinfo@pa.gov

February 2021

# EXHIBIT H

# Oil and Gas Programs

DEP's Office of Oil and Gas Management is responsible for the statewide oil and gas conservation and environmental programs to facilitate the safe exploration, development, recovery of Pennsylvania's oil and gas reservoirs in a manner that will protect the commonwealth's natural resources and the environment. The office develops policy and programs for the regulation of oil and gas development and production pursuant to the Oil and Gas Act, the Coal and Gas Resource Coordination Act, and the Oil and Gas Conservation Law; oversees the oil and gas permitting and inspection programs; develops statewide regulation and standards; conducts training programs for industry; and works with the Interstate Oil and Gas Compact Commission and the Technical Advisory Board.

For more information contact:
DEP Oil and Gas

 (mailto:ra-epoilandgas@pa.gov)

The Office of Oil and Gas Management only regulates aboveground and underground storage tanks at oil and gas well sites. All questions regarding aboveground and underground storage tanks that are not located on oil and gas well sites should be directed to the Storage Tank Program at ra-EPEnvirCleanandBr@pa.gov.

 (mailto:ra-EPEnvirCleanandBr@pa.gov)

Citizens with oil and gas related complaints can call the state wide toll free number 1-866-255-5158.

| | |
|---|---|
| **Act 13** | (https://www.dep.pa.gov/Business/Energy/OilandGasPrograms/Act13/Pages/default.aspx) |
| **Office of Oil and Gas Management** | (https://www.dep.pa.gov/Business/Energy/OilandGasPrograms/OilandGasMgmt/Pages/default.aspx) |

# EXHIBIT I

Exhibit I

**Testimony of
J. Scott Roberts, Deputy Secretary for Mineral Resources Management
Department of Environmental Protection
before the House Republican Policy Committee
Thursday, May 20, 2010**

Chairman Saylor and members of the committee, thank you for the opportunity to appear before you today to discuss the gas migration events that have taken place in Dimock Township, Susquehanna County and the department's actions to correct and further prevent these types of events in the future.

Gas migration is a dangerous phenomenon that can cause explosions, destruction of property, injuries and loss of life. Local emergency responders and police are often on the front lines of evacuating residences and securing properties and neighborhoods during gas migration events. A reasonable severance tax on the extraction of natural gas would provide funds for state and local officials to receive the necessary training and equipment so that these brave men and women are not endangered during performance of their duties to protect lives and property.

The well contamination situation in Dimock was the result of poorly constructed wells by Texas-based Cabot Oil & Gas Corporation that allowed methane to migrate into water supplies, making those supplies unusable and endangering area residents. The gas that migrated was shallower gas that was not isolated as Cabot drilled for the deeper Marcellus gas. Frac fluids did not contaminate drinking wells but the gas did.

An explosion did occur in Dimock as a result of gas migration from Cabot's wells on January 1, 2009, and fortunately no injuries resulted. Following this explosion DEP conducted an investigation and found that two nearby Cabot wells had pressures exceeding that allowed by regulations and that other Cabot wells had insufficient or improperly cemented casings. Both of these problems are believed to have allowed or caused gas from a shallow formation to migrate into groundwater supplies and ultimately into residential homes and wells. The investigation identified other Cabot wells in the vicinity where visual observation indicated that insufficient or improperly cemented casings may be a concern.

The attached chronology lists the actions taken in 2009, and in November 2009, the department issued a consent order and agreement that directed Cabot to meet a March 31, 2010 deadline to fix defective cement and well casings. The company did not meet this deadline.

During further inspections in March, 2010, DEP identified five additional defective Cabot gas wells and another home water supply that has been affected by gas migration, bringing to 14 the number of impacted water supplies in the Dimock area.

On April 15, 2010, the department issued an unprecedented order that required Cabot to take extensive actions and help the residents affected by the company's drilling activities. Under

the agreement, Cabot must plug three wells by May 25, 2010 that are believed to be the source of migrating gas that has contaminated groundwater and the drinking water supplies of 14 homes in the region. The company was also ordered to install permanent treatment systems by July 15, 2010.

In addition, the department immediately suspended its review of Cabot's pending permit applications for new drilling activities statewide until it fulfills its obligations under the order. The company is also barred from drilling any new wells for at least one year in the area impacted by gas migration.

As part of the order, Cabot paid a $240,000 fine to the commonwealth, which has been deposited into the state's well-plugging account and must continue to pay $30,000 per month beginning in May until DEP has determined that the company has met its obligations under the 2009 order.

**Current Progress**
Since the issuance of the order, Cabot has contacted the 14 affected homeowners to fix their water supplies. Twelve of these families have raised concerns with the methane treatment systems proposed by the company and the department continues to work with these residents regarding other acceptable options.

On May 4, DEP Secretary John Hanger and members of my staff traveled to Dimock and met personally with the affected families and their attorneys to discuss their concerns about our Consent Order and Agreement with Cabot and to answer questions about the regulation of gas drilling in Pennsylvania.

The company has begun the process of plugging the three wells and fixing a fourth well. Cabot has also hired an environmental service firm that has had a strong and positive working relationship with DEP to oversee all environmental aspects of their drilling operations in Pennsylvania.

Pennsylvania welcomes the economic opportunities presented by the Marcellus Shale. Producing this gas will create thousands of new jobs and profoundly change our economy, but these changes place added burdens on local and state government. The companies that are coming here to harvest this resource are large, often multi-national corporations that typically pay a severance tax on the gas they extract in other states such as Texas, Alaska and Louisiana.

We are strengthening our regulations in response to the anticipated growth of this industry. On May 17, the Environmental Quality Board (EQB) approved rules to strengthen our existing well construction standards. A properly cased and cemented well is critical to containing gas, oil and other fluids within the well bore and avoiding the sort of problems that happened in Dimock. These regulations make important improvements through such measures as pressure testing casing used in Marcellus Shale and other high-pressure wells, and further defining specifications for oil field-grade cement to be used for well casing. The regulations will also require well operators to inspect all existing wells quarterly to ensure

- 2 -

that each well is structurally sound, and report the results of these inspections to DEP. If the operator discovers a problem with the well, such as being over-pressured or if the casing has become corroded, they must notify DEP immediately and take steps to remedy the problem.

The EQB also approved final rules requiring drilling companies to treat highly polluted drilling wastewater to drinking water quality if they chose to return drilling wastewater to rivers and streams. Drilling companies have other options for disposing of wastewater other than treating such as reuse and recycling or injection into EPA-permitted caverns thousands of feet below drinking water supplies.

In addition to strengthening our rules, Governor Rendell has directed DEP to increase the staff due to the increased drilling monitoring and enforcement. The department hired 37 new staff in 2009 and we are in the process of hiring another 68 staff this year, more than doubling our oil and gas staff since 2008. As a part of our effort to further increase oversight, DEP has also opened new offices in Williamsport and Scranton to oversee drilling operations in the north-central and northeast areas of the state. A reasonable severance tax paid by the operators would assist in covering the cost of these additional Department staff and resources.

We are taking these actions to put in a place a comprehensive and world class regulatory framework that will protect our residents and our natural resources while allowing development of Pennsylvania's Marcellus Shale reserves to continue. None of us should underestimate the importance of this gas reserve or the amount of interest it has generated on a global scale.

The lure of productive and accessible natural gas reserves in close proximity to the high population densities on the east coast is drawing billions of dollars in investment from companies in other states and around the world. The profit potential is enormous with companies estimating a 10 percent return on their investment at gas prices of $2.20 to $2.80 per cubic foot. Today, gas prices are approximately $4 per cubic foot.

Even with strong regulations, impacts will not be zero. Drilling is an industrial process. It is impacting the land; it is impacting our roads. Spills and accidents will occur. Tragically, three workers have been killed in workplace accidents at Marcellus sites.

Local and environmental impacts can be reduced but cannot be eliminated. A severance tax is one way to ensure the benefits of gas production outweigh its costs. Pennsylvania must join nearly every other gas-producing state and enact a reasonable severance tax as part of its development of the Marcellus Shale gas reserve.

### Conclusion
The drilling industry is ultimately responsible for ensuring their wells are properly constructed and must use the best casing and cementing practices to prevent problems. DEP will hold drillers in Pennsylvania accountable for problems caused by drilling. In addition, our new wastewater and well construction regulations and a severance tax on the extraction

of natural gas will give regulators and local governments the tools they need to protect our environment and our residents.

The gas migration situation in Dimock has given a black eye to the oil and gas industry, to the Department of Environmental Protection and to the entire state. The Marcellus Shale gas industry operating in Pennsylvania can and must be the very best in the world. Strong rules and enforcement combined with companies dedicated to production, environmental and safety excellence is the way to become world class.

Chairman Saylor and members of the committee, thank you for your attention. I will answer any question you have at this time.

### 

**Gas Migration Events Timeline in Dimock Township:**

- Jan 1, 2009 -- An explosion was reported in an outside, below-grade water well pit in Dimock Twp, Susquehanna Co. Because the site of explosion was near Cabot drilling activities, DEP initiated an investigation to determine if the explosion was related to Cabot's activities.

- Jan 23, 2009 -- DEP forwarded correspondence to Cabot requesting that Cabot provide DEP with information for an investigation of the explosion, and directed Cabot to take certain actions at nearby gas wells. Information gathered by DEP during the investigation revealed that two Cabot wells had pressures exceeding that allowed by regulations, that certain other Cabot wells had insufficient or improperly cemented casings, and that DEP's visual observation at other wells indicated that insufficient or improperly cemented casings may be a concern.

- Feb 27, 2009 -- DEP cited Cabot for, among other things, discharging natural gas - a polluting substance - to waters of the Commonwealth and for failing to prevent gas from entering fresh groundwater. DEP also directed Cabot to install methane gas detectors in nine specified residences, to provide alternate sources of water to four residences, to provide DEP with all sample results gathered by Cabot since the onset of the investigation and to submit a plan and schedule to undertake and complete the requested actions. DEP also requested to meet with Cabot regarding the gas migration investigation.

- March 13, 2009 -- Cabot responded to DEP that much information has been gathered, that several residents have been provided with an alternate source of water, that vents have been installed on water wells at certain residences and that Cabot has undertaken a series of actions to move towards resolution of the migration concerns. Cabot advised that they will have a summary report of their investigation in April, and agreed to meet with DEP early that month.

- April 7, 2009 -- DEP met with Cabot to discuss the status of the gas migration investigation and to gather information from Cabot regarding steps that they have taken and will take to eliminate gas migration. At the meeting, Cabot indicated that they have installed vents, provided an interim water supply to the specified residents, undertaken an investigation and remedial actions on a number of wells and provided DEP with specific information regarding wells in question. Cabot also advised that a pilot program was initiated to installed methane gas removal systems at 3 residences that had been affected.

- May 13, 2009 -- DEP cited Cabot for an improperly cemented casing at its Gesford 3 well and for failing to prevent the migration of gas into fresh groundwater.

- June 19, 2009 -- DEP requested additional information from Cabot to address further concerns arising during the investigation and directed Cabot to take additional actions and provide monthly reports to document its ongoing efforts.

- July 16, 2009 -- Cabot responded to the June 19 correspondence from DEP providing some of the requested information, and promising to deliver several finals reports within the next 30 days.

- October 1, 2009 -- Cabot provides additional information but advises that some information cannot be provided until October 15, 2009.

- October 19, 2009 -- DEP meets with Cabot to discuss a Consent Order and Agreement that DEP is preparing.

- October 28, 2009 -- Cabot and DEP met to discuss additional measures that Cabot had employed in a modified drilling program in an attempt to help prevent future gas migration occurrences.

- November 4, 2009 – DEP executed a Consent Order and Agreement that required Cabot to:
  - Pay $120,000 civil penalty to address violations resulting from gas migration as well as other violations due to a number of unpermitted discharges at well sites and administrative violations.
  - Continue to provide temporary potable water for 13 affected residents.
  - Only to drill new wells upon prior, DEP written approval of a casing and cementing plan for each well.
  - Submit a plan to DEP within 15 days to identify cementing and casing integrity investigation steps that it will take at specified wells.
  - By March 31, 2010, correct deficiencies identified as a result of well integrity investigation or plug the well.
  - Provide information regarding any other residents that have been provided with alternate water source or that have complained to Cabot regarding their water quality.

- By March 31, 2010, provide plan and schedule to permanently replace or restore 13 affected water supplies.
- By March 31, 2010, complete all actions necessary to prevent the unpermitted discharge of natural gas form Cabot wells in the defined affected area.
- Pay daily stipulated penalties at $1000/day for missed milestones.

- November 20, 2009 -- Cabot Oil & Gas was sued by 15 Dimock residents in Federal Court

- March 10, 2010 -- DEP identified additional suspect wells where gas was observed migrating to the surface at the well(s).

- March 31, 2010 -- Deadline for Cabot to address drinking water and gas migration issues passes. No action has been

- April 13, 2010 -- Cabot is determined to be in violation of the November 4, 2009 Consent Order and Agreement and notified that the department will be taking action to enforce the agreement.

- April 14, 2010 – The CEO of Cabot Oil & Gas and representatives of the company meet with DEP in Harrisburg and are given a final opportunity to fix the leaking wells and address contaminated water supplies. The department orders Cabot to:

  - Pay $240,000 civil penalty
  - Within 40 days, plug three wells and take corrective action on a fourth well that are the primary sources of gas migration in Dimock
  - Install methane treatment systems and provide drinking water to 14 homes in Dimock that is at least equal to the water that was present there before drilling began
  - Halt all well completion activity on other wells in the affected area until the three wells are plugged and the water supply problems are addressed.
  - In addition, Cabot is prohibited from drilling any new wells in the 9 square mile area surrounding Dimock for one year and the Department has suspended review of all Cabot permit applications statewide until all wells are plugged and all water supply problems are addressed.

# EXHIBIT J

| COMMONWEALTH OF PENNSYLVANIA<br>COUNTY OF: SUSQUEHANNA<br><br>Magisterial District Number: 4-3-01<br>MDJ: Hon. Jeffrey Hollister<br>Address: 71 Lake Ave. (PO Box 154)<br>Montrose, PA 18801<br><br>Telephone: (570)278-5965 | **POLICE CRIMINAL COMPLAINT**<br>**COMMONWEALTH OF PENNSYLVANIA**<br>**VS.**<br>DEFENDANT:                    *(NAME and ADDRESS):*<br>CABOT OIL AND      GAS        CORPORATION<br>*First Name*          *Middle Name*    *Last Name*          Gen<br><br>2000 Park Lane, Suite 300, Pittsburgh, PA 15275-1121 |

### NCIC Extradition Code Type

| | | | |
|---|---|---|---|
| ☐ 1-Felony Full | ☐ 5-Felony Pending Extradition | ☐ C-Misdemeanor Surrounding States | ☐ Distance: _____ |
| ☐ 2-Felony Limited | ☐ 6-Felony Pending Extradition Determ. | ☐ D-Misdemeanor No Extradition | |
| ☐ 3-Felony Surrounding States | ☐ A-Misdemeanor Full | ☐ E-Misdemeanor Pending Extradition | |
| ☒ 4-Felony No Extradition | ☐ B-Misdemeanor Limited | ☐ F-Misdemeanor Pending Extradition | |

### DEFENDANT IDENTIFICATION INFORMATION

| Docket Number | Date Filed<br>/  / | OTN/LiveScan Number | Complaint/Incident Number<br>49-1220 | Request Lab<br>Services?<br>☐ YES  ☐ NO |
|---|---|---|---|---|

| GENDER | DOB  /  / | POB | Add'l DOB  /  / | Co-Defendant(s)  ☐ |
|---|---|---|---|---|
| ☐ Male | First Name | Middle Name | Last Name | Gen. |
| ☐ Female | AKA | | | |

| RACE | ☐ White | ☐ Asian | ☐ Black | ☐ Native American | ☐ Unknown |
|---|---|---|---|---|---|
| ETHNICITY | ☐ Hispanic | ☐ Non-Hispanic | ☐ Unknown | | |

| Hair Color | ☐ GRY (Gray) | ☐ RED (Red/Aubn.) | ☐ SDY (Sandy) | ☐ BLU (Blue) | ☐ PLE (Purple) | ☐ BRO (Brown) |
|---|---|---|---|---|---|---|
| | ☐ BLK (Black) | ☐ ONG (Orange) | ☐ WHI (White) | ☐ XXX (Unk./Bald) | ☐ GRN (Green) | ☐ PNK (Pink) |
| | ☐ BLN (Blonde / Strawberry) | | | | | |

| Eye Color | ☐ BLK (Black) | ☐ BLU (Blue) | ☐ BRO (Brown) | ☐ GRN (Green) | ☐ GRY (Gray) |
|---|---|---|---|---|---|
| | ☐ HAZ (Hazel) | ☐ MAR (Maroon) | ☐ PNK (Pink) | ☐ MUL (Multicolored) | ☐ XXX (Unknown) |

| DNA  ☐ YES  ☐ NO | DNA Location | WEIGHT (lbs.) |
|---|---|---|
| FBI Number | MNU Number | |
| Defendant Fingerprinted  ☐ YES  ☐ NO | | Ft.  HEIGHT  In. |
| Fingerprint Classification: | | |

### DEFENDANT VEHICLE INFORMATION

| Plate # | State | Haz mat ☐ | Registration<br>Sticker (MM/YY)  / | Comm'l Veh.<br>Ind. ☐ | School Veh.<br>☐ | Oth. NCIC Veh. Code | Reg.<br>same<br>as Def. |
|---|---|---|---|---|---|---|---|
| VIN | | Year | Make | Model | Style | Color | ☐ |

Office of the attorney for the Commonwealth  ☒ Approved  ☐ Disapproved because: _____

*(The attorney for the Commonwealth may require that the complaint, arrest warrant affidavit, or both be approved by the attorney for the Commonwealth prior to filing. See Pa.R.Crim.P. 507).*

REBECCA S. FRANZ, CDAG                                                    /  /
(Name of the attorney for the Commonwealth)    (Signature of the attorney for the Commonwealth)    (Date)

I, SSA H. JUSTUS BRAMBLEY, IV                           528
(Name of the Affiant)                     (PSP/MPOETC -Assigned Affiant ID Number & Badge #)

of   Pennsylvania Office of Attorney General           PA0222400
(Identify Department or Agency Represented and Political Subdivision)    (Police Agency ORI Number)
do hereby state: (check appropriate box)

1. ☒ I accuse the above named defendant who lives at the address set forth above

☐ I accuse the defendant whose name is unknown to me but who is described as _____

☐ I accuse the defendant whose name and popular designation or nickname are unknown to me and whom I have therefore designated as John Doe or Jane Doe
with violating the penal laws of the Commonwealth of Pennsylvania at [208]          Dimock Township
(Subdivision Code)      (Place-Political Subdivision)

in SUSQUEHANNA County    [58]        on or about MARCH 27, 2008 THROUGH JANUARY 9, 2020
(County Code)

AOPC 412A - Rev. 7/18                                              Page 1 of __

## POLICE CRIMINAL COMPLAINT

| Docket Number: | Date Filed: / / | OTN/LiveScan Number | Complaint/Incident Number 49-1220 |
|---|---|---|---|
| **Defendant Name:** | First: CABOT OIL AND | Middle: GAS | Last: CORPORATION |

The acts committed by the accused are described below with each Act of Assembly or statute allegedly violated, if appropriate. When there is more than one offense, each offense should be numbered chronologically.

(Set forth a *brief* summary of the facts sufficient to advise the defendant of the nature of the offense(s) charged. A citation to the statute(s) allegedly violated, without more, is not sufficient. In a summary case, you must cite the specific section(s) and subsection(s) of the statute(s) or ordinance(s) allegedly violated. The age of the victim at the time of the offense may be included if known. In addition, social security numbers and financial information (e.g. PINs) should not be listed. If the identity of an account must be established, list only the last four digits. 204 PA.Code §§ 213.1 – 213.7.)

| Inchoate Offense | ☐ Attempt 18 901 A | ☐ Solicitation 18 902 A | ☐ Conspiracy 18 903 | | Number of Victims Age 60 or Older _____ |
|---|---|---|---|---|---|

| Lead? ☐ | Offense # 1 | Section 691.301 | Subsection | of the | PA Statute (Title) 35 | Counts 1 | Grade F3 | NCIC Offense Code | UCR/NIBRS Code |
|---|---|---|---|---|---|---|---|---|---|

| PennDOT Data (if applicable) | Accident Number _____ | | ☐ Interstate | ☐ Safety Zone | ☐ Work Zone |
|---|---|---|---|---|---|

Statute Description (include the name of statute or ordinance): **CLEAN STREAMS LAW, PROHIBITION AGAINST DISCHARGE OF INDUSTRIAL WASTES, 35 P.S. § 691.301, A FELONY OF THE THIRD DEGREE**

Acts of the accused associated with this Offense: The defendant, Cabot Oil and Gas Corporation, by it's own conduct or the conduct of another, pursuant to 18 Pa C.S.A. § 307, did place, or permit to be placed, or discharged or permit to flow, or continue to discharge or permit to flow, into any waters of the Commonwealth any industrial wastes. To wit: on one or more occasion, on or about August 14, 2009 through June 11, 2018, the defendant, Cabot Oil and Gas Corporation did knowingly discharge, permit to flow or continue to discharge or permit to flow, methane into groundwater, from the gas wells G Shields 1 V, G Shields 2H, G Shields 4H and G Shields 5H located in Dimock Township, Susquehanna County, Pennsylvania.

| Inchoate Offense | ☐ Attempt 18 901 A | ☐ Solicitation 18 902 A | ☐ Conspiracy 18 903 | | Number of Victims Age 60 or Older _____ |
|---|---|---|---|---|---|

| Lead? ☐ | Offense# 2 | Section 691.301 | Subsection | of the | PA Statute (Title) 35 | Counts 1 | Grade F3 | NCIC Offense Code | UCR/NIBRS Code |
|---|---|---|---|---|---|---|---|---|---|

| PennDOT Data (if applicable) | Accident Number _____ | | ☐ Interstate | ☐ Safety Zone | ☐ Work Zone |
|---|---|---|---|---|---|

Statute Description (include the name of statute or ordinance): **CLEAN STREAMS LAW, PROHIBITION AGAINST DISCHARGE OF INDUSTRIAL WASTES, 35 P.S. § 691.301, A FELONY OF THE THIRD DEGREE**

Acts of the accused associated with this Offense: The defendant, Cabot Oil and Gas Corporation, by it's own conduct or the conduct of another, pursuant to 18 Pa C.S.A. § 307, did place, or permit to be placed, or discharged or permit to flow, or continue to discharge or permit to flow, into any waters of the Commonwealth any industrial wastes. To wit: on one or more occasion, on or about July 16, 2008 through June 11, 2018, the defendant, Cabot Oil and Gas Corporation did knowingly discharge, permit to flow, or continue to discharge or permit to flow, methane into groundwater, from the gas wells Costello 1 V, Costello 2V, Gesford 4H and Gesford 8H located in Dimock Township, Susquehanna County, Pennsylvania.

| Inchoate Offense | ☐ Attempt 18 901 A | ☐ Solicitation 18 902 A | ☐ Conspiracy 18 903 | | Number of Victims Age 60 or Older _____ |
|---|---|---|---|---|---|

| Lead? ☐ | Offense# 3 | Section 691.301 | Subsection | of the | PA Statute (Title) 35 | Counts 1 | Grade F3 | NCIC Offense Code | UCR/NIBRS Code |
|---|---|---|---|---|---|---|---|---|---|

| PennDOT Data (if applicable) | Accident Number _____ | | ☐ Interstate | ☐ Safety Zone | ☐ Work Zone |
|---|---|---|---|---|---|

Statute Description (include the name of statute or ordinance): **CLEAN STREAMS LAW, PROHIBITION AGAINST DISCHARGE OF INDUSTRIAL WASTES, 35 P.S. § 691.301, A FELONY OF THE THIRD DEGREE**

Acts of the accused associated with this Offense: The defendant, Cabot Oil and Gas Corporation, by it's own conduct or the conduct of another, pursuant to 18 Pa C.S.A. § 307, did place, or permit to be placed, or discharged or permit to flow, or continue to discharge or permit to flow, into any waters of the Commonwealth any industrial wastes. To wit: on one or more occasion, on or about October 31, 2008 through June 11, 2018, the defendant, Cabot Oil and Gas Corporation did knowingly discharge, permit to flow, or continue to discharge or permit to flow, methane into groundwater, from the gas wells Ratzel 1 H, Ratzel 2H, and Ratzel 3V located in Dimock Township, Susquehanna County, Pennsylvania.

# POLICE CRIMINAL COMPLAINT

| Docket Number: | Date Filed: / / | OTN/LiveScan Number | Complaint/Incident Number 49-1220 |
|---|---|---|---|
| Defendant Name: | First: CABOT OIL AND | Middle: GAS | Last: CORPORATION |

---

| Inchoate Offense | ☐ Attempt 18 901 A | ☐ Solicitation 18 902 A | ☐ Conspiracy 18 903 | Number of Victims Age 60 or Older _____ |
|---|---|---|---|---|

| Lead? | Offense# | Section | Subsection | PA Statute (Title) | Counts | Grade | NCIC Offense Code | UCR/NIBRS Code |
|---|---|---|---|---|---|---|---|---|
| ☐ | 4 | 691.301 | of the | 35 | 1 | F3 | | |

| PennDOT Data (if applicable) | Accident Number _____ | | ☐ Interstate | ☐ Safety Zone | ☐ Work Zone |
|---|---|---|---|---|---|

Statute Description (include the name of statute or ordinance): **CLEAN STREAMS LAW, PROHIBITION AGAINST DISCHARGE OF INDUSTRIAL WASTES, 35 P.S. § 691.301, A FELONY OF THE THIRD DEGREE**

Acts of the accused associated with this Offense: The defendant, Cabot Oil and Gas Corporation, by it's own conduct or the conduct of another, pursuant to 18 Pa C.S.A. § 307, did place, or permit to be placed, or discharged or permit to flow, or continue to discharge or permit to flow, into any waters of the Commonwealth any industrial wastes. To wit: on one or more occasion, on or about March 27, 2008 through June 11, 2018, the defendant, Cabot Oil and Gas Corporation did knowingly discharge, permit to flow, or continue to discharge or permit to flow, methane into groundwater, from the gas wells Ely 4H and Ely 6H located in Dimock Township, Susquehanna County, Pennsylvania.

---

| Inchoate Offense | ☐ Attempt 18 901 A | ☐ Solicitation 18 902 A | ☐ Conspiracy 18 903 | Number of Victims Age 60 or Older _____ |
|---|---|---|---|---|

| Lead? | Offense# | Section | Subsection | PA Statute (Title) | Counts | Grade | NCIC Offense Code | UCR/NIBRS Code |
|---|---|---|---|---|---|---|---|---|
| ☐ | 5 | 691.301 | of the | 35 | 1 | M2 | | |

| PennDOT Data (if applicable) | Accident Number _____ | | ☐ Interstate | ☐ Safety Zone | ☐ Work Zone |
|---|---|---|---|---|---|

Statute Description (include the name of statute or ordinance): **CLEAN STREAMS LAW, PROHIBITION AGAINST DISCHARGE OF INDUSTRIAL WASTES, 35 P.S. § 691.301, A MISDEMEANOR OF THE SECOND DEGREE**

Acts of the accused associated with this Offense: The defendant, Cabot Oil and Gas Corporation, by it's own conduct or the conduct of another, pursuant to 18 Pa C.S.A. § 307, did place, or permit to be placed, or discharged or permit to flow, or continue to discharge or permit to flow, into any waters of the Commonwealth any industrial wastes. To wit: on one or more occasion, on or about October 9, 2016 through June 11, 2018, the defendant, Cabot Oil and Gas Corporation did negligently discharge, permit to flow, or continue to disharge or permit to flow, methane into groundwater, from the Howell gas wells 2H, 4H, 6H, and 8H located in Auburn Township, Susquehanna County, Pennsylvania.

---

| Inchoate Offense | ☐ Attempt 18 901 A | ☐ Solicitation 18 902 A | ☐ Conspiracy 18 903 | Number of Victims Age 60 or Older _____ |
|---|---|---|---|---|

| Lead? | Offense# | Section | Subsection | PA Statute (Title) | Counts | Grade | NCIC Offense Code | UCR/NIBRS Code |
|---|---|---|---|---|---|---|---|---|
| ☐ | 6 | 691.301 | of the | 35 | 1 | M2 | | |

| PennDOT Data (if applicable) | Accident Number _____ | | ☐ Interstate | ☐ Safety Zone | ☐ Work Zone |
|---|---|---|---|---|---|

Statute Description (include the name of statute or ordinance): **CLEAN STREAMS LAW, PROHIBITION AGAINST DISCHARGE OF INDUSTRIAL WASTES, 35 P.S. § 691.301, A MISDEMEANOR OF THE SECOND DEGREE**

Acts of the accused associated with this Offense: The defendant, Cabot Oil and Gas Corporation, by it's own conduct or the conduct of another, pursuant to 18 Pa C.S.A. § 307, did place, or permit to be placed, or discharged or permit to flow, or continue to discharge or permit to flow, into any waters of the Commonwealth any industrial wastes. To wit: on one or more occasion, on or about February 20, 2017 through June 11, 2018, the defendant, Cabot Oil and Gas Corporation did negligently discharge, permit to flow, or continue to discharge or permit to flow, methane into groundwater, from the Jeffers Farm gas wells 7H, 8H, 9H, 10H, 11H, 12H, and 14H located in Harford Township, Susquehanna County, Pennsylvania.

# POLICE CRIMINAL COMPLAINT

| Docket Number: | Date Filed: / / | OTN/LiveScan Number | Complaint/Incident Number 49-1220 |
|---|---|---|---|
| **Defendant Name:** | First: CABOT OIL AND | Middle: GAS | Last: CORPORATION |

| Inchoate Offense | ☐ Attempt 18 901 A | ☐ Solicitation 18 902 A | ☐ Conspiracy 18 903 | Number of Victims Age 60 or Older _____ |
|---|---|---|---|---|

| ☐ | 7 | 691.301 | | of the | 35 | 1 | M2 | | |
|---|---|---|---|---|---|---|---|---|---|
| Lead? | Offense# | Section | Subsection | | PA Statute (Title) | Counts | Grade | NCIC Offense Code | UCR/NIBRS Code |

| PennDOT Data (if applicable) | Accident Number _____ | | ☐ Interstate | ☐ Safety Zone | ☐ Work Zone |
|---|---|---|---|---|---|

Statute Description (include the name of statute or ordinance): **CLEAN STREAMS LAW, PROHIBITION AGAINST DISCHARGE OF INDUSTRIAL WASTES, 35 P.S. § 691.301, A MISDEMEANOR OF THE SECOND DEGREE**

Acts of the accused associated with this Offense: The defendant, Cabot Oil and Gas Corporation, by it's own conduct or the conduct of another, pursuant to 18 Pa C.S.A. § 307, did place, or permit to be placed, or discharged or permit to flow, or continue to discharge or permit to flow, into any waters of the Commonwealth any industrial wastes. To wit: on one or more occasion, on or about February 27, 2019 through January 9, 2020, the defendant, Cabot Oil and Gas Corporation did negligently discharge, permit to flow or continue to discharge, or permit to flow, methane into groundwater, from the POWERS M gas well 002 located in Auburn Township, Susquehanna County, Pennsylvania.

| Inchoate Offense | ☐ Attempt 18 901 A | ☐ Solicitation 18 902 A | ☐ Conspiracy 18 903 | Number of Victims Age 60 or Older _____ |
|---|---|---|---|---|

| ☐ | 8 | 691.401 | | of the | 35 | 1 | F3 | | |
|---|---|---|---|---|---|---|---|---|---|
| Lead? | Offense# | Section | Subsection | | PA Statute (Title) | Counts | Grade | NCIC Offense Code | UCR/NIBRS Code |

| PennDOT Data (if applicable) | Accident Number _____ | | ☐ Interstate | ☐ Safety Zone | ☐ Work Zone |
|---|---|---|---|---|---|

Statute Description (include the name of statute or ordinance): **CLEAN STREAMS LAW, PROHIBITION AGAINST OTHER POLLUTIONS, 35 P.S. § 691.401, A FELONY OF THE THIRD DEGREE**

Acts of the accused associated with this Offense: The defendant, Cabot Oil and Gas Corporation, by it's own conduct or the conduct of another, pursuant to 18 Pa C.S.A. § 307, did put or place into any of the waters of the Commonwealth, or allow or permit to be discharged from property owned or occupied by such person or municipality into any of the waters of the Commonwealth, any substance of any kind or character resulting in pollution as herein defined. Any such discharge is hereby declared to be a nuisance. To wit: on one or more occasion, on or about August 14, 2009 through June 11, 2018, the defendant, Cabot Oil and Gas Corporation did knowingly allow or permit the discharge, of methane into groundwater, from the gas wells G Shields 1 V, G Shields 2H, G Shields 4H and G Shields SH located in Dimock Township, Susquehanna County, Pennsylvania, which resulted in pollution.

| Inchoate Offense | ☐ Attempt 18 901 A | ☐ Solicitation 18 902 A | ☐ Conspiracy 18 903 | Number of Victims Age 60 or Older _____ |
|---|---|---|---|---|

| ☐ | 9 | 691.401 | | of the | 35 | 1 | F3 | | |
|---|---|---|---|---|---|---|---|---|---|
| Lead? | Offense# | Section | Subsection | | PA Statute (Title) | Counts | Grade | NCIC Offense Code | UCR/NIBRS Code |

| PennDOT Data (if applicable) | Accident Number _____ | | ☐ Interstate | ☐ Safety Zone | ☐ Work Zone |
|---|---|---|---|---|---|

Statute Description (include the name of statute or ordinance): **CLEAN STREAMS LAW, PROHIBITION AGAINST OTHER POLLUTIONS, 35 P.S. § 691.401, A FELONY OF THE THIRD DEGREE**

Acts of the accused associated with this Offense: The defendant, Cabot Oil and Gas Corporation, by it's own conduct or the conduct of another, pursuant to 18 Pa C.S.A. § 307, did put or place into any of the waters of the Commonwealth, or allow or permit to be discharged from property owned or occupied by such person or municipality into any of the waters of the Commonwealth, any substance of any kind or character resulting in pollution as herein defined. Any such discharge is hereby declared to be a nuisance. To wit: on one or more occasion, on or about July 16, 2008 through June 11, 2018, the defendant, Cabot Oil and Gas Corporation did knowingly allow or permit the discharge, of methane into groundwater, from the gas wells Costello 1 V, Costello 2V, Gesford 4H and Gesford 8H located in Dimock Township, Susquehanna County, Pennsylvania, which resulted in pollution.

# POLICE CRIMINAL COMPLAINT

| Docket Number: | Date Filed: / / | OTN/LiveScan Number | Complaint/Incident Number 49-1220 |
|---|---|---|---|
| **Defendant Name:** | First: CABOT OIL AND | Middle: GAS | Last: CORPORATION |

| Inchoate Offense | ☐ Attempt 18 901 A | ☐ Solicitation 18 902 A | ☐ Conspiracy 18 903 | Number of Victims Age 60 or Older _____ |
|---|---|---|---|---|

| Lead? | Offense# | Section | Subsection | of the | PA Statute (Title) | Counts | Grade | NCIC Offense Code | UCR/NIBRS Code |
|---|---|---|---|---|---|---|---|---|---|
| ☐ | 10 | 691.401 | | of the | 35 | 1 | F3 | | |

| PennDOT Data (if applicable) | Accident Number | | ☐ Interstate | ☐ Safety Zone | ☐ Work Zone |
|---|---|---|---|---|---|

Statute Description (include the name of statute or ordinance): **CLEAN STREAMS LAW, PROHIBITION AGAINST OTHER POLLUTIONS, 35 P.S. § 691.401, A FELONY OF THE THIRD DEGREE**

Acts of the accused associated with this Offense: The defendant, Cabot Oil and Gas Corporation, by it's own conduct or the conduct of another, pursuant to 18 Pa C.S.A. § 307, did put or place into any of the waters of the Commonwealth, or allow or permit to be discharged from property owned or occupied by such person or municipality into any of the waters of the Commonwealth, any substance of any kind or character resulting in pollution as herein defined. Any such discharge is hereby declared to be a nuisance. To wit: on one or more occasion, on or about October 31, 2008 through June 11, 2018, the defendant, Cabot Oil and Gas Corporation did knowingly allow or permit the discharge, of methane into groundwater, from the gas wells Ratzel 1 H, Ratzel 2H, and Ratzel 3V located in Dimock Township, Susquehanna County, Pennsylvania, which resulted in pollution.

| Inchoate Offense | ☐ Attempt 18 901 A | ☐ Solicitation 18 902 A | ☐ Conspiracy 18 903 | Number of Victims Age 60 or Older _____ |
|---|---|---|---|---|

| Lead? | Offense# | Section | Subsection | of the | PA Statute (Title) | Counts | Grade | NCIC Offense Code | UCR/NIBRS Code |
|---|---|---|---|---|---|---|---|---|---|
| ☐ | 11 | 691.401 | | of the | 35 | 1 | F3 | | |

| PennDOT Data (if applicable) | Accident Number | | ☐ Interstate | ☐ Safety Zone | ☐ Work Zone |
|---|---|---|---|---|---|

Statute Description (include the name of statute or ordinance): **CLEAN STREAMS LAW, PROHIBITION AGAINST OTHER POLLUTIONS, 35 P.S. § 691.401, A FELONY OF THE THIRD DEGREE**

Acts of the accused associated with this Offense: The defendant, Cabot Oil and Gas Corporation, by it's own conduct or the conduct of another, pursuant to 18 Pa C.S.A. § 307, did put or place into any of the waters of the Commonwealth, or allow or permit to be discharged from property owned or occupied by such person or municipality into any of the waters of the Commonwealth, any substance of any kind or character resulting in pollution as herein defined. Any such discharge is hereby declared to be a nuisance. To wit: on one or more occasion, on or about March 27, 2008 through June 11, 2018, the defendant, Cabot Oil and Gas Corporation did knowingly allow or permit the discharge, of methane into groundwater, from the gas wells Ely 4H and Ely 6H located in Dimock Township, Susquehanna County, Pennsylvania, which resulted in pollution.

| Inchoate Offense | ☐ Attempt 18 901 A | ☐ Solicitation 18 902 A | ☐ Conspiracy 18 903 | Number of Victims Age 60 or Older _____ |
|---|---|---|---|---|

| Lead? | Offense# | Section | Subsection | of the | PA Statute (Title) | Counts | Grade | NCIC Offense Code | UCR/NIBRS Code |
|---|---|---|---|---|---|---|---|---|---|
| ☐ | 12 | 691.401 | | of the | 35 | 1 | M2 | | |

| PennDOT Data (if applicable) | Accident Number | | ☐ Interstate | ☐ Safety Zone | ☐ Work Zone |
|---|---|---|---|---|---|

Statute Description (include the name of statute or ordinance): **CLEAN STREAMS LAW, PROHIBITION AGAINST OTHER POLLUTIONS, 35 P.S. § 691.401, A MISDEMEANOR OF THE SECOND DEGREE**

Acts of the accused associated with this Offense: The defendant, Cabot Oil and Gas Corporation, by it's own conduct or the conduct of another, pursuant to 18 Pa C.S.A. § 307, did put or place into any of the waters of the Commonwealth, or allow or permit to be discharged from property owned or occupied by such person or municipality into any of the waters of the Commonwealth, any substance of any kind or character resulting in pollution as herein defined. Any such discharge is hereby declared to be a nuisance. To wit: on one or more occasion, on or about October 9, 2016 through June 11, 2018, the defendant, Cabot Oil and Gas Corporation did negligently allow or permit the discharge, of methane into groundwater, from the Howell gas wells 2H, 4H, 6H, and 8H located in Auburn Township, Susquehanna County, Pennsylvania, which resulted in pollution.

# POLICE CRIMINAL COMPLAINT

| Docket Number: | Date Filed:<br>/ / | OTN/LiveScan Number | Complaint/Incident Number<br>49-1220 |
|---|---|---|---|
| **Defendant Name:** | First:<br>CABOT OIL AND | Middle:<br>GAS | Last:<br>CORPORATION |

| Inchoate Offense | ☐ Attempt<br>18 901 A | ☐ Solicitation<br>18 902 A | ☐ Conspiracy<br>18 903 | Number of Victims Age 60 or Older _____ |
|---|---|---|---|---|

| ☐ | 13 | 691.401 | | of the | 35 | 1 | M2 | | |
|---|---|---|---|---|---|---|---|---|---|
| Lead? | Offense# | Section | Subsection | | PA Statute (Title) | Counts | Grade | NCIC Offense Code | UCR/NIBRS Code |

| **PennDOT Data**<br>(if applicable) | Accident<br>Number _____ | | ☐ Interstate | ☐ Safety Zone | ☐ Work Zone |
|---|---|---|---|---|---|

Statute Description (include the name of statute or ordinance): **CLEAN STREAMS LAW, PROHIBITION AGAINST OTHER POLLUTIONS, 35 P.S. § 691.401, A MI5DEMEANOR OF THE SECOND DEGREE**

Acts of the accused associated with this Offense: The defendant, Cabot Oil and Gas Corporation, by it's own conduct or the conduct of another, pursuant to 18 Pa C.S.A. § 307, did put or place into any of the waters of the Commonwealth, or allow or permit to be discharged from property owned or occupied by such person or municipality into any of the waters of the Commonwealth, any substance of any kind or character resulting in pollution as herein defined. Any such discharge is hereby declared to be a nuisance. To wit: on one or more occasion, on or about February 20, 2017 through June 11, 2018, the defendant, Cabot Oil and Gas Corporation did negligently allow or permit the discharge, of methane into groundwater, from the Jeffers Farm gas wells 7H, 8H, 9H, 10H, 11H, 12H, and 14H located in Harford Township, Susquehanna County, Pennsylvania, which resulted in pollution.

| Inchoate Offense | ☐ Attempt<br>18 901 A | ☐ Solicitation<br>18 902 A | ☐ Conspiracy<br>18 903 | Number of Victims Age 60 or Older _____ |
|---|---|---|---|---|

| ☐ | 14 | 691.401 | | of the | 35 | 1 | M2 | | |
|---|---|---|---|---|---|---|---|---|---|
| Lead? | Offense# | Section | Subsection | | PA Statute (Title) | Counts | Grade | NCIC Offense Code | UCR/NIBRS Code |

| **PennDOT Data**<br>(if applicable) | Accident<br>Number _____ | | ☐ Interstate | ☐ Safety Zone | ☐ Work Zone |
|---|---|---|---|---|---|

Statute Description (include the name of statute or ordinance): **CLEAN STREAMS LAW, PROHIBITION AGAINST OTHER POLLUTIONS, 35 P.S. § 691.401, A MISDEMEANOR OF THE SECOND DEGREE**

Acts of the accused associated with this Offense: The defendant, Cabot Oil and Gas Corporation, by it's own conduct or the conduct of another, pursuant to 18 Pa C.S.A. § 307, did put or place into any of the waters of the Commonwealth, or allow or permit to be discharged from property owned or occupied by such person or municipality into any of the waters of the Commonwealth, any substance of any kind or character resulting in pollution as herein defined. Any such discharge is hereby declared to be a nuisance. To wit: on one or more occasion, on or about February 27, 2019 through January 9, 2020, the defendant, Cabot Oil and Gas Corporation did negligently allow or permit the discharge, of methane into groundwater, from the POWERS M gas well 002 located in Auburn Township, Susquehanna County, Pennsylvania, which resulted in pollution.

| Inchoate Offense | ☐ Attempt<br>18 901 A | ☐ Solicitation<br>18 902 A | ☐ Conspiracy<br>18 903 | Number of Victims Age 60 or Older _____ |
|---|---|---|---|---|

| ☐ | 15 | 691.611 | | of the | 35 | 1 | F3 | | |
|---|---|---|---|---|---|---|---|---|---|
| Lead? | Offense# | Section | Subsection | | PA Statute (Title) | Counts | Grade | NCIC Offense Code | UCR/NIBRS Code |

| **PennDOT Data**<br>(if applicable) | Accident<br>Number _____ | | ☐ Interstate | ☐ Safety Zone | ☐ Work Zone |
|---|---|---|---|---|---|

Statute Description (include the name of statute or ordinance): **CLEAN STREAMS LAW, UNLAWFUL CONDUCT, 35 P.S. § 691.611, A MISDEMEANOR OF THE SECOND DEGREE**

Acts of the accused associated with this Offense: The defendant, Cabot Oil and Gas Corporation, by it's own conduct or the conduct of another, pursuant to 18 Pa C.S.A. § 307, did fail to comply with any rule or regulation of the department or fail to comply with any order or permit or license of the department, to violate any of the provisions of this act or rules and regulations adopted hereunder, or any order or permit or license of the department, to cause air or water pollution, or to hinder, obstruct, prevent or interfere with the department or its personnel in the performance of any duty hereunder or to violate the provisions of 18 Pa.C.S. section 4903 or 4904. To wit: on one or more occasion, on or about December 15, 2010 through January 9, 2020, the defendant, Cabot Oil and Gas Corporation did knowingly fail to comply with orders of the department, including but not limited to the December 15, 2010 Consent Order and Settlement Agreement, when it failed to remediate its gas wells to eliminate the discharge of natural gas, which allowed contamination to continue unabated.

## POLICE CRIMINAL COMPLAINT

| Docket Number: | Date Filed: / / | OTN/LiveScan Number | Complaint/Incident Number 49-1220 |
|---|---|---|---|
| **Defendant Name:** | First: CABOT OIL AND | Middle: GAS | Last: CORPORATION |

2. I ask that a warrant of arrest or a summons be issued and that the defendant be required to answer the charges I have made.

3. I verify that the facts set forth in this complaint are true and correct to the best of my knowledge or information and belief. This verification is made subject to the penalties of Section 4904 of the Crimes Code (18 Pa.C.S. § 4904) relating to unsworn falsification to authorities.

4. This complaint consists of the preceding page(s) numbered 1 through ___.

5. I certify that this filing complies with the provisions of the *Case Records Public Access Policy of the Unified Judicial System of Pennsylvania* that require filing confidential information and documents differently that non-confidential information and documents.

The acts committed by the accused, as listed and hereafter, were against the peace and dignity of the Commonwealth of Pennsylvania and were contrary to the Act(s) of the Assembly, or in violation of the statutes cited.
**(Before a warrant of arrest can be issued, an affidavit of probable cause must be completed, sworn to before the issuing authority, and attached.)**

_____      _____

(Date)                      (Year)                                  (Signature of Affiant)

AND NOW, on this date    _____    I certify that the complaint has been properly completed and verified.

An affidavit of probable cause must be completed before a warrant can be issued.

_____      _____

(Magisterial District Court Number)      (Issuing Authority)

| SEAL |

AOPC 412A — Rev. 7/18

## POLICE CRIMINAL COMPLAINT

| Docket Number: | Date Filed: | OTN/LiveScan Number | Complaint/Incident Number |
| --- | --- | --- | --- |
| | / / | | 49-1220 |
| Defendant Name: | First:<br>CABOT OIL AND | Middle:<br>GAS | Last:<br>CORPORATION |

## AFFIDAVIT of PROBABLE CAUSE

Your affiant, H. Justus Brambley, IV, Supervisory Special Agent, Pennsylvania Office of Attorney General (hereinafter: OAG), being duly sworn, deposes and states:

Your affiant has been conducting an investigation into criminal activity associated with the fracking/drilling process conducted by numerous companies within the oil and gas industry, including but not limited to Cabot Oil and Gas Corporation. On February 11, 2020, the 43rd Statewide Investigating Grand Jury issued Presentment No. 28 recommending that criminal charges be filed against Cabot Oil and Gas Corporation for violations of the Pennsylvania Clean Streams Law. The aforementioned Presentment was accepted by the Honorable Norman A. Krumenacker, III, Supervising Judge of the 43rd Statewide Investigating Grand Jury by Order dated February 12, 2020.

Your affiant has reviewed the above cited Presentment and having been present at all proceedings, finds that the factual findings described therein correspond to the OAG Investigative findings. Your affiant is adopting the presentment and incorporating it into this Affidavit of Probable Cause (a copy of the presentment is attached hereto). Your affiant has reviewed the sworn testimony given by the witnesses before the Grand Jury and finds that it is consistent with the information contained within the Presentment. Your affiant has reviewed the evidence presented to the Grand Jury and finds that it comports with the results of the OAG investigative efforts and findings as to the allegations contained in this instant criminal complaint.

Your affiant states that based upon the above facts, there is probable cause to believe that the defendant, Cabot Oil and Gas Corporation, committed the acts alleged therein, in violation of Pennsylvania law and respectfully requests the issuance of a summons.

I, SSA H. JUSTUS BRAMBLEY, IV, BEING DULY SWORN ACCORDING TO THE LAW, DEPOSE AND SAY THAT THE FACTS SET FORTH IN THE FOREGOING AFFIDAVIT ARE TRUE AND CORRECT TO THE BEST OF MY KNOWLEDGE, INFORMATION AND BELIEF.

I CERTIFY THAT THIS FILING COMPLIES WITH THE PROVISIONS OF THE *CASE RECORDS PUBLIC ACCESS POLICY OF THE UNIFIED JUDICIAL SYSTEM OF PENNSYLVANIA* THAT REQUIRE FILING CONFIDENTIAL INFORMATION AND DOCUMENTS DIFFERENTLY THAT NON-CONFIDENTIAL INFORMATION AND DOCUMENTS.

_____
(Signature of Affiant)

Sworn to me and subscribed before me this _____ day of _____

_____
Date

_____, Magisterial District Judge

My commission expires  first Monday of January, _____

SEAL

## INTRODUCTION

We, the members of the Forty-Third Statewide Investigating Grand Jury, having received evidence regarding violations of the Clean Streams Law occurring in and around Susquehanna County, Pennsylvania, pursuant to Notice of Submission of Investigation Number 42, do hereby make the following findings of fact and recommendation of charges.

## FINDINGS OF FACT

This presentment arises from a comprehensive and ongoing statewide investigation of numerous environmental crimes that have occurred during fracking operations in the Commonwealth of Pennsylvania. The investigation began in 2018, after county District Attorneys requested the assistance of the Office of Attorney General. The investigation has resulted in two other presentments recommending criminal charges. The Grand Jury further intends to issue a Report documenting bases for recommendations for legislative, executive, and administrative action. The current presentment addresses violation of Pennsylvania criminal statutes by Cabot Oil & Gas Corporation, causing the widespread contamination of residential water supplies in Susquehanna County.

### *Fracking*

The criminal violations in question here arose in the context of unconventional drilling for natural gas, colloquially referred to as "fracking." Fracking has enabled the extraction of oil and gas from once unsuitable geological formations. In Pennsylvania, unconventional drilling has targeted the Marcellus and Utica Shale formations. The Marcellus Shale Deposit stretches beneath 575 miles of West Virginia, Pennsylvania, Ohio and New York.

1

The Grand Jury learned that the process of drilling and fracking a well takes place in several stages. First, the well site is prepared by clearing and leveling the land, paving an access road for heavy truck traffic, and building a well pad for the drilling rig and other equipment

Once the site is prepared, drilling of the wells can begin. Several wells can be drilled at a single site. The drilling process requires large machinery to dig into the earth. Fluids and chemicals are poured into the drill hole – which is called a wellbore – to reduce friction and allow the drill cuttings to move up and out of the wellbore. After the hole is drilled, pipe is inserted to keep the wellbore stable. Then the drillers pump cement into any spaces remaining between the outside of the pipe and the walls of the hole. The cement secures the pipe in place.

When the drill gets down to an oil-bearing rock formation, the drill bit is gradually turned from vertical to horizontal. Drilling then continues horizontally, deep underground, for several thousand more feet.

Once the drilling is done, explosives are sent down the wellbore to perforate multiple holes in the rock. This is when the hydraulic fracturing process really begins. The gas sought in fracking operations does not flow freely underground, but is locked into solid rock formations called shale. Multiple fractures are created in the shale by pumping large amounts of fluid, at extremely high pressure, down the wellbore and into the perforations made by the explosives. The base fluid is water, but a variety of potentially dangerous chemical additives have to be mixed into the water to help release the gas trapped inside the shale. Once released, the gas flows up to the surface.

Witnesses explained that, during the drilling process, when cement is pumped in to seal the space between the wellbore and the pipe that lines it, the cement may be diluted by groundwater. The water can alter the precise balance of materials intended to maximize the cement's ability to bond and fill all voids. The result can be microscopic imperfections in the casing cement.

2

preventing it from properly filling the void between the pipe and the wellbore. Other flaws in the drilling process can also leave voids. After the well goes into production, these voids provide a vertical pathway for gas, including methane, to contaminate any geological feature through which the well travels, including migration into drinking water aquifers.

## *The Dimock drilling*

Cabot Oil & Gas leased mineral rights from multiple residents in Dimock Township, Susquehanna County beginning in 2006. Shortly thereafter, Cabot began constructing well pads and drilling gas wells on numerous properties. Almost immediately after drilling began, residents in the area began to experience changes to their water. Some homeowners began to see a great amount of effervescence in their water. Others started noticing considerable sediment. Neighbors began to suspect that stray methane gas was migrating into the water supply.

A singular event caused most residents to recognize they had a problem: a water well spontaneously exploded, on the property of Norma Fiorentino. Nothing like it had ever happened before. The incident created a heightened level of concern from residents in the area. In spite of the fact that the explosion happened in proximity to the gas drilling activity, Cabot denied any responsibility. The company did, however, begin installing vents for residents' water wells to help remove the methane.

The Pennsylvania Department of Environmental Protection (DEP) utilized multiple investigative techniques to conclude that Cabot's activities had unleashed stray gas from deep within the earth, and that it was migrating into the aquifer. The stray gas migrating from Cabot wells was so pervasive that DEP took legal action against Cabot. Cabot acceded to a Consent Order and Agreement (COSA) that shut down all new gas operations over nine square miles of

3

Dimock (called the Dimock box) and that established a schedule of goals to restore or replace the Dimock residents' water supplies.  These obligations remain in effect to the present.

### *Methane Migration*

We have learned that Susquehanna County has a long history of methane in surface and ground water resulting from the normal decomposition of organic matter.  This type of gas is termed "biogenic," and is sometimes informally referred to as "swamp gas."  Underground gas can also be created by a different process, known as "thermogenic."  Thermogenic gas results from heat and pressure, over thousands or millions of years, in deep geologic strata.  Thermogenic gas is locked under thousands of feet of rock, and can only be reached by drilling down into the earth with complex industrial machinery.  Biogenic gas has a different chemical identity than thermogenic gas.  Because of these differences, laboratory analysis can "fingerprint" the gas as either thermogenic or biogenic.

The methane gas identified in the water contamination in Susquehanna County is by and large thermogenic gas, and has been identified as thermogenic in the testing of samples over the past ten-plus years, as the problems in Susquehanna County and the larger Marcellus Shales regions have evolved.

The Grand Jury heard testimony regarding the mechanics of methane migration from multiple witnesses.  We have learned that, during the drilling process, an operator can encounter thermogenic gas pockets.  Once these pockets are opened by the drill bit, the gas that was previously trapped deep in the earth suddenly has a pathway to travel.  The gas will travel the path of least resistance and can ultimately find its way to drinking water aquifers.  Several types of wellbore integrity issues can provide methane with a path of least resistance that allows it to travel up from deeper layers in the earth and enter into the aquifer.  We learned through testimony that

4

most of Cabot's gas well integrity issues involve problems with the cement. Either gas flowed through the cement while it was hardening, resulting in permanent channels, or the cement just did not completely fill certain spaces between the pipe and the wellbore.

We heard testimony that, when Cabot began preliminary gas exploration in Susquehanna County, pre-drill sampling was done of homeowners' drinking water wells within a certain distance of a Cabot well pad. However, in Cabot's initial sampling of wells and groundwater in Susquehanna County, for reasons known only to Cabot management, Cabot never tested the samples for methane. Thus, although Susquehanna County water may have some history of biogenic methane contamination, Cabot's failure to test its pre-drill samples for methane eliminated the ability to establish a baseline for promptly assessing and addressing the problem of stray gas migration.

As a result, DEP did its own analysis to compensate for Cabot's failure to create a baseline. Testimony and documentary evidence before the Grand Jury examined DEP's process. DEP Program Manager (Michael) Seth Pelepko explained that DEP was able to compensate for the lack of pre-drill methane data at Cabot wells by reviewing 10,615 water samples collected by other operators in Susquehanna County who did test for baseline methane, and by reviewing Dimock area samples collected by other entities as well. These included the federal Environmental Protection Agency, the United States Agency for Toxic Substances and Disease Registry (ATSDR), Duke University scientists, and consultants engaged by area property owners. This very large sample size was then analyzed using isotopic geochemistry to compare data sets and draw conclusions as to the origin of the methane gas in the Dimock area groundwater.

As part of its analysis, DEP sampled or was provided post-drilling sample results for twelve drinking water supplies within Dimock Township, dating back to 2009, that had been infiltrated

5

by stray gas migrating from Cabot's gas wells. All twelve of these sampling locations demonstrated excessively high methane levels, with the highest reading being 92 mg/l, a level far exceeding the point at which the gas-filled water can explode.

We learned through testimony that, over 50 percent of the time, the concentration in the impacted water supplies was greater than 10 mg/l, the warning range for dangerous methane concentration. Importantly, the Grand Jury noted that these levels far exceed the "background" methane level in that area of the Commonwealth, as determined by DEP based on EPA and other samples. In 90% of testing, that naturally occurring background level was less than .5 mg/l. Beginning in 2013, DEP began sampling at another property found to have a water well impacted by stray gas migrating from a Cabot gas well. The results from this location also showed excessively high methane results, with the highest reading being 73 mg/l.

### DEP Investigation

These concerns led to a more comprehensive effort to address the Dimock methane migration crises. We heard testimony and reviewed documents regarding the Consent Order and Settlement Agreement (COSA), noted above, that was entered between Cabot Oil & Gas and DEP on December 15, 2010. The COSA was the result of DEP's determination that eighteen drinking water supplies, serving nineteen homes in the Carter Road area in Dimock, Susquehanna County, were affected by Cabot drilling activities. DEP further determined that Cabot had not completely eliminated the discharge of natural gas, without permit, into the waters of the Commonwealth – that is, groundwater aquifers – and that the contamination was ongoing.

The COSA established a nine-square mile box that encompassed the nineteen homes with contaminated water supplies. The Order instituted a moratorium on drilling activities within the box. The Order required Cabot to restore or replace the impacted drinking water supplies, and to

6

undertake remedial work of its gas wells to eliminate further migration. The moratorium on drilling new wells in the box has remained in effect until the present, now ten years later.

DEP has permitted Cabot to fulfill its obligation to restore or replace impacted drinking water supplies by installing treatment systems in individual homes. Notwithstanding the expensive residential treatment systems that Cabot has installed, however, the methane migration problem from Cabot wells has not completely abated. We heard testimony that Cabot undertook little to no remedial work on its gas wells, the source of the problem, until 18 months ago, (shortly after this investigation began) when it started work on certain wells. Some of this remedial work has resulted in lower methane levels in certain drinking water wells.

As noted, we heard from DEP Program Manager Pelepko, who has played an integral role in tracing the connection between Cabot's defective gas wells and the methane that has migrated into homeowner's drinking water wells. He testified that his analysis consisted of multiple data sets demonstrating that Cabot's gas wells impacted the drinking water wells. Water samples from unaffected water wells established the background level of methane in Susquehanna County. Other samples were used for the isotopic methane analysis, which allowed experts to "fingerprint" the gas as either biogenic, thermogenic, or a mixture of both. He explained that, if "the signature looks like a deep gas that has been isolated for hundreds of millions of years, it shouldn't be there unless there is an impairment or pathway that has been opened up." That pathway, he concluded, existed because of "the way the wells were constructed in this area, the gas wells. They did not isolate the deeper gas from the aquifers."

Program Manager Pelepko uses maps to ascertain the location of the water wells in relation to Cabot's gas wells. He then determines whether methane levels in the water are remaining stable or decreasing over time. If he finds changes, he attempts to determine a connection to remedial

7

work done at a particular gas well. Pelepko explained the importance of distinguishing between gas dissolved into water and "headspace" gas that occupies pockets between water and earth. When efforts are made to remediate a well and cut off further migration, the headspace gas can dissipate fairly quickly. As the Grand Jury learned, however, the dissolved gas – the gas that flows into people's wells and homes in their water – takes much longer to dissipate, often months or years.

Pelepko testified that, in addition to methane, he looks for other substances as well. He explained that these other substances may have been laying inert at the bottom of the water well, but are then stirred up by methane bubbling up through the water. He also explained that, as the methane in a water supply degrades, it can change other characteristics of the water, such as the pH.

In addition to Mr. Pelepko, we also heard from Ken Kennedy, an Oil and Gas Inspector Supervisor at DEP who has investigated integrity issues in Cabot's gas wells. He testified that he became involved in the Dimock investigation in 2013. He explained that some wellbore integrity issues had been addressed in 2009-10, but that DEP inspections in 2011 raised questions about the integrity of additional wells. Kennedy rechecked these wells, and other wells that shared the same well pad. He explained to us the various tests performed to spot integrity issues. By 2015, he had identified 11 wells needing further evaluation. Cabot then did some of its own testing, but did not begin actively remediating any of the wells until 2018. He indicated that at least one active well, Ratzel 3V, remains problematic, and that two inactive, plugged wells, Gesford 3 and Gesford 9, are also potentially still causing migration problems.

8

## *Violations, Pre- and Post-2015*

We have learned through the course of this investigation that problem wells can be divided into three separate categories: problem wells that were part of the COSA and were remediated prior to 2015; problem wells that were part of the COSA but were not remediated prior to 2015; and problem wells that are more recently drilled (and thus, not part of the COSA) that have either been remediated or are in the process of being remediated. We find that 2015 is an important dividing line because of the statute of limitations for Clean Streams Law violations. It is for that reason that we address our discussion of the wells in this manner. Due to the statute of limitations, we find that wells that fall into the first category (problem wells that were remediated prior to 2015) will not form the basis for charges.

1. Problem wells that were part of the COSA that were not remediated prior to 2015

Much has been documented about the gas wells that originally created methane migration problems in Dimock Township. Some of these wells were identified years ago, but others have become known only more recently as new problems have appeared. We learned that DEP issued a letter on June 11, 2018, that documents the history of problems associated with many of these wells.

Cabot began drilling the G Shields well pad in Dimock Township on August 14, 2009. On October 20, 2011, DEP issued a notice of violation to Cabot for gas wells G Shields 1V, G Shields 2H, G Shields 4H and G Shields 5H. The notice specified the following regulatory violations:

- 78a81(a)2. operator conducted casing and cementing activities that failed to prevent migration of gas or other fluids into sources of fresh groundwater;
- 78a81(a)3. operator conducted casing and cementing activities that failed to prevent pollution or diminution of fresh groundwater;
- 78a86. operator failed to report defect in a well that has defective, insufficient or improperly cemented casing to the Department within 24 hours of discovery, and operator

9

- failed to correct defect or failed to submit a plan to correct the defect for approval by the Department within 30 days; and
- 35 PS 691.401, discharged substance of any kind or character resulting in pollution of waters of the Commonwealth.

As of the June 11, 2018 letter, these violations remained outstanding.

Cabot drilled the Costello 1V and 2V and the Gesford 4H and 8H gas wells in Dimock Township beginning on July 16, 2008.  On June 16, 2014, DEP issued a notice of violation to Cabot for gas wells Costello 1V, Costello 2V, Gesford 4H and Gesford 8H.  The notice specified the following regulatory violations:

- 78a81(a)2, operator conducted casing and cementing activities that failed to prevent migration of gas or other fluids into sources of fresh groundwater;
- 78a81(a)3, operator conducted casing and cementing activities that failed to prevent pollution or diminution of fresh groundwater; and
- 35 PS 691.401, discharged substance of any kind or character resulting in pollution of waters of the Commonwealth.

As of the June 11, 2018 letter, these violations remained outstanding.

Cabot drilled the Ratzel well pad in Dimock Township beginning on October 31, 2008.  On December 19, 2014, DEP issued a notice of violation to Cabot for gas wells Ratzel 1H, Ratzel 2H, Ratzel 3V.  The notice specified the following regulatory violations:

- 78a81(a)2, operator conducted casing and cementing activities that failed to prevent migration of gas or other fluids into sources of fresh groundwater;
- 78a81(a)3, operator conducted casing and cementing activities that failed to prevent pollution or diminution of fresh groundwater; and
- 35 PS 691.401, discharged substance of any kind or character resulting in pollution of waters of the Commonwealth.

As of the June 11, 2018 letter, these violations remained outstanding.

Cabot began drilling at the Ely well pad in Dimock Township on March 27, 2008.  On March 21, 2018 DEP issued a notice of violation to Cabot for gas wells Ely 4H and Ely 6H.  The notice specified the following regulatory violations:

- 78a81(a)2, operator conducted casing and cementing activities that failed to prevent

10

migration of gas or other fluids into sources of fresh groundwater;
- 78a81(a)3, operator conducted casing and cementing activities that failed to prevent pollution or diminution of fresh groundwater;
- 78a.73(b), operator failed to prevent gas, oil, brine, completion and servicing fluids, and any other fluids or materials from below the casing seat from entering fresh groundwater, and shall otherwise prevent pollution or diminution of fresh groundwater; and
- 35 PS 691.401, discharged substance of any kind or character resulting in pollution of waters of the Commonwealth.

As of the June 11, 2018 letter, these violations remained outstanding.

## 2. Problem wells that were drilled after 2015

We learned from Mr. Kennedy's testimony, and from further documentation, that certain Cabot wells that were drilled after 2015 also had integrity issues that affected drinking water supplies. While it was still addressing problems with Dimock gas wells that had been drilled in prior years, Cabot began drilling new gas wells outside the Dimock box. In 2016 Cabot drilled gas wells on the Howell well pad in Auburn Township, Susquehanna County. In 2017, the company drilled the Jeffers Farm wells in Harford Township, Susquehanna County. In 2019, Cabot drilled the POWERS M wells in Auburn Township, Susquehanna County. Shortly thereafter, problems with these newly drilled wells appeared.

The Howell gas wells 2H, 4H, 6H and 8H were the subject of two separate DEP notices of violation, on March 16, 2017 and June 20, 2017. The notices specified the following regulatory violations:

- 78a73(b), operator failed to prevent gas, oil, brine, completion and servicing fluids, and any other fluids or materials from below the casing seat from entering fresh groundwater, and shall otherwise prevent pollution or diminution of fresh groundwater;
- 78a81(a)2, operator conducted casing and cementing activities that failed to prevent migration of gas or other fluids into sources of fresh groundwater;
- 78a85(a)5, operator failed to prevent gas flow in the annulus and use gas block additives and low fluid loss slurries in areas of known shallow gas producing zones; and
- 35 PS 691.401, discharged substance of any kind or character resulting in pollution of waters of the Commonwealth.

11

The Jeffers Farm gas wells 7H, 8H, 9H, 10H, 11H, 12H, and 14H were the subject of a DEP notice of violation on November 16, 2017. The notice specified the following regulatory violations:

- 78a73(b), operator failed to prevent gas, oil, brine, completion and servicing fluids, and any other fluids or materials from below the casing seat from entering fresh groundwater, and shall otherwise prevent pollution or diminution of fresh groundwater;
- 78a81(a)2, operator conducted casing and cementing activities that failed to prevent migration of gas or other fluids into sources of fresh groundwater;
- 78a85(a)5, operator failed to prevent gas flow in the annulus and use gas block additives and low fluid loss slurries in areas of known shallow gas producing zones; and
- 35 PS 691.401, discharged substance of any kind or character resulting in pollution of waters of the Commonwealth.

The POWERS M gas well 002 was the subject of a DEP notice of violation on October 18, 2019. The notice specified the following regulatory violations:

- 78a73(b), operator failed to prevent gas, oil, brine, completion and servicing fluids, and any other fluids or materials from below the casing seat from entering fresh groundwater, and shall otherwise prevent pollution or diminution of fresh groundwater;
- 78a81(a)2, operator conducted casing and cementing activities that failed to prevent migration of gas or other fluids into sources of fresh groundwater; and
- 78a81(a)3, operator conducted casing and cementing activities that failed to prevent pollution or diminution of fresh groundwater.

We learned that DEP requires a permit to discharge industrial waste into any waters of the Commonwealth. Cabot never obtained such permits for any of the well pads discussed above.

## *Landowner Impact*

It is sometimes easy to get bogged down in the science and mechanics of methane migration and to lose sight of the reason the Legislature has chosen to impose sanctions – not just regulatory sanctions, but criminal penalties in addition to any regulatory actions – for violations of environmental law.

When a gas well has an integrity issue that allows gas to escape the wellbore, there is the possibility that the gas can then flow into the aquifer. It is this aquifer that residents living near

12

these well pads rely on for their water supply. The applicable statutes specifically define water pollution as contamination of any water source that is detrimental to public health, safety and welfare. Removing the supply of fresh, uncontaminated water from a home plainly causes such detriment. We heard from numerous people living in Dimock about the effects of Cabot's conduct.

Nolan Scott Ely and his extended family lived on a 183-acre farmland area in Dimock, at the northeast extremity of the state. Drilling of six wells on his property and that of family members began in 2008. Mr. Ely himself worked on many of Cabot's oil and gas well sites, building pads and setting up drilling rigs, and he had previously worked in other areas of the industry. All of the residents in this area relied on well or spring water. After the drilling started, Mr. Ely's wife began experiencing nausea and bodily blotches. Mr. Ely, as a well-site worker, assured his wife that the water could not be the cause. He had repeatedly asked his supervisor if there was any possibility that the drilling could contaminate his water. His supervisor "kept telling me, no, there is no possible way."

In the first week of January 2009, the water well of Norma Fiorentino, whose house was about a mile and a half from Mr. Ely's, exploded. Mr. Ely soon learned that his own ground water had been contaminated by methane gas. A relative who lived next door brought two jugs of tap water, drawn from their common water source. The contents was brown. When Mr. Ely applied a lighter to it, the water caught fire—"flames came flying out of the jug." He then turned on the kitchen faucet and found that he was able to set that water on fire as well. When he alerted Cabot to the problem, he was told he should leave his house because it might blow up.

Because Mr. Ely's water had become unusable, Cabot brought in a portable water tank containing 250 gallons. That was not nearly sufficient for Mr. Ely's family with three children. Testing of the well water at his house revealed "astronomical" amounts of methane, as well as

13

ethane, propane, excessive levels of sodium, and magnesium. Mr. Ely was also aware that "combinations of all sorts of chemicals" are used in the fracking process, including a pesticide, a teaspoon of which "will kill every living organism in a pond." Prior to his discovery of the contamination, however, his family had been drinking the water. Mr. Ely experienced vision problems, including "tunnel vision" while driving. His wife complained of difficulty breathing and dizziness. There were rashes on her skin after coming out of the shower.

Mr. Ely was surprised by the reaction of the company – Cabot – which was not just a nearby business but his employer. "I spent a lot of time with them. I knew them. I knew them, and I worked with them to try to get them to help us out without our situation. And they just – they didn't care. … they weren't really doing anything other than just bringing me water, which didn't last very long." The contamination of his property had more than physical and emotional effect on Mr. Ely. His land was once valued at 1.2 million dollars. It is presently valued at $153,000.

Eric Roos lived for 29 years in Montrose, Susquehanna County, in a house with well water. A Cabot agent told him he could sign a lease to allow drilling on his land in return for some royalties; otherwise, said the agent, the company would legally be able to take what it wanted regardless. He was not told that his water could be contaminated.

After a number of wells were drilled in the area, issues with Mr. Roos's water began. At first there were sudden, violent blasts of gas and water while his wife was doing the dishes. Soon he and his wife realized that they had to stop drinking their methane-infused well water. They began getting drinking water from a nearby public artesian well, but that required a fourteen-mile round trip. Mr. Roos contacted DEP. He was told the issue was temporary and would go away. "in a few years." But after a decade the problem remains. Cabot provided drinking water for

14

approximately two years, but after DEP determined that the company need no longer do so, the water supply stopped.

After methane in the water caused the Fiorentino well head literally to explode, Cabot agreed to install a vent on Mr. Roos's well, but it was another six months before that happened. Without the vent he was in particular danger, because his well head was located inside, in his basement. That meant that toxic and explosive concentrations of methane introduced into the well water would put the entire house at risk, not just the well. In addition to the potential for explosions, the Grand Jury learned that high methane concentrations can cause asphyxiation in rooms where water is used, such as bathrooms. The water in Mr. Roos's well was also found to contain lithium, barium, manganese, and other chemicals.

At the time Mr. Roos testified in March 2019, his neighbors were still having problems with their water. Mr. Roos testified that he would like to move away, but "I don't know who will buy my house now. How can I leave?"

Another neighbor testified that she and her husband bought land in Dimock in 2003, and lived there in a trailer while they built a house that was completed in 2008. The house used well water.

Oil and gas development began in the area in 2006. Agents of Cabot told her that if she and her family allowed drilling they could "get a piece of the pie" with no disruption of their way of life. They would "never know we were here." Cabot did not disclose their preexisting plans to inundate the area with drill sites. Based on these assurances she signed a boilerplate, developer-friendly lease to allow drilling.

Beginning in February 2008 a new well was started in the area every month, the closest being only 650 feet from her house. By the late fall of 2008 she found black, oily water in her

15

washing machine. She later found orange water in the kitchen sink and the toilet. Her neighbors similarly reported that their water was changing color.

In January 2009, the Fiorentino well exploded. Testing revealed high methane concentrations in her own well water, and DEP advised residents to vent their wells to avoid further explosions, including explosions inside the house. She testified that she and her family had to buy water because the water from their well was no longer fit to drink. They had to install various filters in order to use the well water for washing, and have not been able to drink their own water for ten years. In April 2010 a test of her well water revealed the presence of ethylene glycol, propylene glycol, and two other unidentified chemicals. When coming out of the tap, the water would foam with "an Alka Seltzer consistency," smelled like turpentine, and left behind a "black slime." In 2012 water testing showed manganese at twice the state limit, and a high level of lithium. A 2018 test found arsenic, lead, sodium, uranium, lithium and propane. Cabot representatives told her the arsenic in her well water must have come from "apple orchards."

Many other neighbors in the area described similar changes to their water's color, taste, smell, or appearance, and an Alka-Seltzer-like bubbling. Some described, as had Ms. Ely, explosive bursts so great they could blow a plate out of a person's hand while washing dishes. Many of the neighbors experienced rashes and other skin problems that they hadn't suffered before the drilling began. All of these residents related the frustration and anxiety of trying to get answers from the company. Cabot continued to deny responsibility, and for many years declined to remedy the wellbore integrity issues in its gas wells.

16

### *Applicable Environmental Statutes*

We have learned much over the course of this investigation about the environmental statutes that govern the illegal conduct exhibited by Cabot. The Clean Streams Law defines "industrial waste" as any liquid, gas or solid resulting from manufacturing or industry, whether or not generally characterized as waste. "Pollution" is any contamination of waters of the Commonwealth that is likely to render those waters harmful, detrimental, or injurious to public health, safety or welfare, or to legitimate beneficial use. "Waters of the Commonwealth" includes any rivers, streams, rivulets, lakes or springs containing surface or underground water.

The Clean Streams Law also contains many criminal provisions pertinent to this investigation. Section 691.301 makes it a crime to discharge industrial waste into the waters of the Commonwealth. Section 691.401 makes it a crime to permit the discharge into the waters of the Commonwealth of any substance of any kind that results in pollution. Section 691.611 provides, in relevant part, that it is a crime to fail to comply with any rule or regulation of the DEP or to fail to comply with any order or permit or license of the DEP; to violate any of the provisions of Clean Streams Law; to violate any order or permit or license of DEP; or, to cause air or water pollution.

### *Conclusion*

We find that, over a period of many years, and despite mounting evidence, Cabot Oil & Gas failed to acknowledge and correct conduct that polluted Pennsylvania water through stray gas migration. Indeed, some of these gas wells have been in place for more than a decade, yet Cabot has only recently taken steps to remediate them. In light of Cabot's long-term indifference to the

17

damage it caused to the environment and citizens of Susquehanna County, these were not merely technical violations.  We conclude that criminal charges are appropriate.

# EXHIBIT K

Exhibit K

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION

**WASHINGTON, D.C. 20549**

## FORM 10-Q

☒ **QUARTERLY REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934.**
**For the quarterly period ended June 30, 2019**

☐ **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934.**
**Commission file number 1-10447**

# CABOT OIL & GAS CORPORATION

(Exact name of registrant as specified in its charter)

| **Delaware** | **04-3072771** |
|---|---|
| (State or other jurisdiction of | (I.R.S. Employer |
| incorporation or organization) | Identification Number) |

**Three Memorial City Plaza**
**840 Gessner Road, Suite 1400, Houston, Texas 77024**
(Address of principal executive offices including ZIP code)

**(281) 589-4600**
(Registrant's telephone number, including area code)

Securities registered pursuant to Section 12(b) of the Act:

| Title of each class | Trading Symbol(s) | Name of each exchange on which registered |
|---|---|---|
| Common Stock, par value $0.10 per share | COG | New York Stock Exchange |

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months and (2) has been subject to such filing requirements for the past 90 days. Yes ☒ No ☐

Indicate by check mark whether the registrant has submitted electronically every Interactive Data File required to be submitted pursuant to Rule 405 of Regulation S-T (§232.405 of this chapter) during the preceding 12 months (or for such shorter period that the registrant was required to submit such files). Yes ☒ No ☐

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, a smaller reporting company, or an emerging growth company. See the definitions of "large accelerated filer," "accelerated filer," "smaller reporting company" and "emerging growth company" in Rule 12b-2 of the Exchange Act. (Check one):

| Large accelerated filer | ☒ | Accelerated filer | ☐ |
|---|---|---|---|
| Non-accelerated filer | ☐ | Smaller reporting company | ☐ |
| | | Emerging growth company | ☐ |

If an emerging growth company, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant to Section 13(a) of the Exchange Act. ☐

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Exchange Act). Yes ☐ No ☒

As of July 24, 2019, there were 418,390,612 shares of Common Stock, Par Value $0.10 Per Share, outstanding.

We use available market data and valuation methodologies to estimate the fair value of debt. The fair value of debt is the estimated amount we would have to pay a third party to assume the debt, including a credit spread for the difference between the issue rate and the period end market rate. The credit spread is our default or repayment risk. The credit spread (premium or discount) is determined by comparing our senior notes and revolving credit facility to new issuances (secured and unsecured) and secondary trades of similar size and credit statistics for both public and private debt. The fair value of all senior notes and the revolving credit facility is based on interest rates currently available to us.

The carrying amount and fair value of debt is as follows:

| | June 30, 2019 | | December 31, 2018 | |
| | Carrying Amount | Estimated Fair Value | Carrying Amount | Estimated Fair Value |
|---|---|---|---|---|
| (In thousands) | | | | |
| Long-term debt | $ 1,219,555 | $ 1,245,889 | $ 1,226,104 | $ 1,202,994 |

### ITEM 4.    Controls and Procedures

As of June 30, 2019, the Company carried out an evaluation, under the supervision and with the participation of the Company's management, including the Company's Chief Executive Officer and Chief Financial Officer, of the effectiveness of the design and operation of the Company's disclosure controls and procedures pursuant to Rules 13a-15 and 15d-15 of the Securities Exchange Act of 1934 (the Exchange Act). Based upon that evaluation, the Chief Executive Officer and Chief Financial Officer concluded that the Company's disclosure controls and procedures are effective, in all material respects, with respect to the recording, processing, summarizing and reporting, within the time periods specified in the Commission's rules and forms, of information required to be disclosed by the Company in the reports that it files or submits under the Exchange Act.

There were no changes in the Company's internal control over financial reporting that occurred during the second quarter of 2019 that have materially affected, or are reasonably likely to materially effect, the Company's internal control over financial reporting.

## PART II. OTHER INFORMATION

### ITEM 1.    Legal Proceedings

*Legal Matters*

The information set forth under the heading "Legal Matters" in Note 8 of the Notes to Condensed Consolidated Financial Statements included in Item 1 of Part I of this quarterly report is incorporated by reference in response to this item.

*Environmental Matters*

On June 17, 2019, we received two proposed Consent Order and Agreements ("CO&A") from the Pennsylvania Department of Environmental Protection (PaDEP) relating to gas migration allegations in areas surrounding several wells owned and operated by us in Susquehanna County, Pennsylvania. The allegations relating to these wells were initially raised by residents in the area in March and June 2017, respectively, in the form of complaints about their drinking water supply. Since then, we have been engaged with the PaDEP in investigating the incidents and have performed appropriate remediation efforts, including the provision of alternative sources of drinking water to the affected residents.  We received Notices of Violation ("NOV") from the PaDEP in June and November, 2017, respectively, for failure to prevent the migration of gas into fresh groundwater sources in the area surrounding these wells.  With regard to the June 2017 NOV, we believe these water quality complaints have been resolved, and we are working with the PaDEP to reach agreement on the disposition of this matter. The proposed CO&A is the culmination of this effort and, if finalized, would result in the payment of a civil monetary penalty in an amount likely to exceed $100,000, up to approximately $215,000. We will continue to work with the PaDEP to finalize the CO&A, and to bring this matter to a close. With regard to the November 2017 NOV, The proposed CO&A, if finalized as drafted, would require Cabot to submit a detailed written remediation plan, continue water sampling and other investigative measures and restore or replace affected water supplies and would result in the payment of a civil monetary penalty in an amount likely to exceed $100,000, up to approximately $355,000. We will continue to work with the PaDEP to finalize the CO&A, and to complete the ongoing investigation and remediation.

From time to time we receive notices of violation from governmental and regulatory authorities in areas in which we operate relating to alleged violations of environmental statutes or the rules and regulations promulgated thereunder. While we cannot predict with certainty whether these notices of violation will result in fines and/or penalties, if fines and/or penalties are imposed, they may result in monetary sanctions, individually or in the aggregate, in excess of $100,000.

29

**EXHIBIT 32.1**

**Certification Pursuant to**
**Section 906 of the Sarbanes-Oxley Act of 2002**
**(Subsections (a) and (b) of Section 1350, Chapter 63 of Title 18, United States Code)**

Pursuant to Section 906 of the Sarbanes-Oxley Act of 2002 (Subsections (a) and (b) of Section 1350, Chapter 63 of Title 18, United States Code) (the "Act"), each of the undersigned, Dan O. Dinges, Chief Executive Officer of Cabot Oil & Gas Corporation, a Delaware corporation (the "Company"), and Scott C. Schroeder, Chief Financial Officer of the Company, hereby certify that, to his knowledge:

(1)     the Company's Quarterly Report on Form 10-Q for the quarter ended June 30, 2019 (the "Report") fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934; and

(2)     the information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company.

Dated: July 26, 2019

/s/ DAN O. DINGES

Dan O. Dinges
*Chief Executive Officer*

/s/ SCOTT C. SCHROEDER

Scott C. Schroeder
*Chief Financial Officer*

# EXHIBIT L

Exhibit L

AG Shapiro and 43rd Statewide Grand Jury File Criminal Charges Against NEPA Fracking Company

**JUNE 15, 2020 | TOPIC:**
CRIMINAL
    SHARE

*VIDEO ANNOUNCEMENT:* https://youtu.be/8BBaqSLTLIg

SUSQUEHANNA COUNTY—Attorney General Josh Shapiro today announced that the Pennsylvania Office of Attorney General is formally charging Cabot Oil and Gas, an unconventional gas, or "fracking," company, for environmental crimes that occurred in northeastern Pennsylvania. The charges come as part of a two-year Grand Jury investigation into environmental crimes committed by unconventional oil and gas companies across the Commonwealth.

"Pennsylvanians understand the careful balance that a strong natural resource economy requires — and companies who put their own profit above our laws, our health, and our constitutional right to clean and pure water will be held accountable," **said Attorney General Shapiro in a video released today.** "Fracking companies come from all over the nation, backed by big investors and big influence, and too often act like they're above the law with no care for the worker on the job site, the farmer next door, or the child impacted by their drilling. We're here to hold these companies accountable, and make sure no matter how powerful or well-connected, the law applies equally in our Commonwealth."

The Pennsylvania Office of Attorney General, in conjunction with the 43rd Statewide Grand Jury, is charging Cabot with 7 counts of Prohibition Against Discharge of Industrial Wastes, 7 counts of Prohibition Against Other Pollutions and one count of Unlawful Conduct under the Clean Streams Law.

The Grand Jury's investigation into the contamination of well water in Dimock, Susquehanna County, revealed that Cabot's fracking activities were responsible for methane pollution in the local water supply. This contamination led to several Dimock residents suffering from the environmental hazards associated with repeated methane exposure, including Norma Fiorentino's drinking water well exploding in January 2009.

The Grand Jury heard testimony from several residents, one of whom was a former Cabot employee. This individual had several Cabot gas wells on their property.  The former employee trusted that their former employer had told them the truth about the possibility of water contamination. However, after several neighbors noticed that their water was cloudy and full of black specks, the former employee tested their own water supply: when they held up a match to a jug of the water that they used to bathe and drink, it caught fire.

Another resident whose testimony was heard by the Grand Jury said that when Cabot came to town, employees had told them that Cabot could drill wells on their property without the resident's agreement.  The resident recounted that after agreeing to have gas wells installed on their property, they began experiencing similar issues with their water. The resident testified that the family had to stop drinking their methane-contaminated water. In order to supply the home with this necessity, the resident began making a regular 14-mile round trip to pick up drinking water.

When the resident contacted the Pennsylvania Department of Environmental Protections to ask when their water would be clean again, they were told that the water would be clean again in several years. A decade later, at the time of their appearance before the grand jury, the issue had remained unresolved.

"The Grand Jury presentments prove that Cabot took shortcuts that broke the law, and damaged our environment — harming our water supply and public health," concluded Attorney General Shapiro. "They put their bottom line ahead of the health and safety of Pennsylvanians. The Grand Jury repeatedly found evidence of a company that placed profit over our laws. If it's against the law, and it hurts Pennsylvanians, we're here to stop it — no matter how powerful or well-connected you are," said AG Shapiro.

"We are in the first stages of a long process to hold the well-connected accountable and meet the promise of our constitution to protect our environment for generations to come.

We must protect Pennsylvanians, it is what we are dedicated to every day. This work will not stop. Our waters, air, and resources will be protected for this generation and the next to come."

# # #

# EXHIBIT M

Exhibit M

| OPERATOR | COUNTY | INSPECTOR | INSPECTION_RESULT_DESCRIPTION | INSPECTION_COMMENT | VIOLATION_DATE | VIOLATION_COMMENT | RESOLVED_DATE | ENFORCEMENT_CODE_[ | DATE_EXECUTED |
|---|---|---|---|---|---|---|---|---|---|
| CABOT OIL & GAS CORP | | HOEHLE, FRANCIS | Violation(s) Noted | | 2/2/2017 | | 3/23/2017 | NOV - Notice of Violation | 1/26/2017 |
| CABOT OIL & GAS CORP | | HOEHLE, FRANCIS | Violation(s) Noted | | 2/2/2017 | | 3/23/2017 | NOV - Notice of Violation | 1/26/2017 |
| CABOT OIL & GAS CORP | | HOEHLE, FRANCIS | Violation(s) Noted | | 2/2/2017 | | 3/23/2017 | NOV - Notice of Violation | 1/26/2017 |
| CABOT OIL & GAS CORP | | SOUTHARD, CHRISTOPHER | Violation(s) Noted | Administrative Inspection record | 11/16/2017 | Failure to case and cement the Jeffers Farms 7H (115-22250), 8H (115-22251), 9H (115-222! | | | |
| CABOT OIL & GAS CORP | | SOUTHARD, CHRISTOPHER | Violation(s) Noted | Administrative Inspection record | 11/16/2017 | Failure to case and cement the Jeffers Farms 7H (115-22250), 8H (115-22251), 9H (115-222! | | | |
| CABOT OIL & GAS CORP | | SASSI, JONATHAN | Viol(s) Noted & Immediately Corrected | I arrived at the site at 11:11 in res | 12/11/2017 | The violation is cited due to | 12/11/2017 | | |
| CABOT OIL & GAS CORP | | SASSI, JONATHAN | Viol(s) Noted & Immediately Corrected | I arrived at the site at 11:11 in res | 12/11/2017 | The violation is cited due to | 12/11/2017 | | |
| CABOT OIL & GAS CORP | | SASSI, JONATHAN | Viol(s) Noted & Immediately Corrected | Arrived at the site at 12:19 in resp | 10/26/2017 | The violation is cited due to | 10/26/2017 | | |
| CABOT OIL & GAS CORP | | SASSI, JONATHAN | Viol(s) Noted & Immediately Corrected | Arrived at the site at 12:19 in resp | 10/26/2017 | The violation is cited due to | 10/26/2017 | | |
| CABOT OIL & GAS CORP | | SASSI, JONATHAN | Viol(s) Noted & Immediately Corrected | Arrived at the site at 12:19 in resp | 10/26/2017 | The violation is cited due to | 10/26/2017 | | |
| CABOT OIL & GAS CORP | | SASSI, JONATHAN | Viol(s) Noted & Immediately Corrected | I arrived at the site at 11:32 in res | 12/4/2017 | The violation is cited due to | 12/4/2017 | | |
| CABOT OIL & GAS CORP | | SASSI, JONATHAN | Viol(s) Noted & Immediately Corrected | I arrived at the site at 11:32 in res | 12/4/2017 | The violation is cited due to | 12/4/2017 | | |
| CABOT OIL & GAS CORP | | SASSI, JONATHAN | Viol(s) Noted & Immediately Corrected | I arrived at the site at 11:32 in res | 12/4/2017 | The violation is cited due to | 12/4/2017 | | |
| CABOT OIL & GAS CORP | | SASSI, JONATHAN | Viol(s) Noted & Immediately Corrected | I arrived at the site at 12:02 in res | 12/4/2017 | The violation is cited due to | 12/4/2017 | | |
| CABOT OIL & GAS CORP | | SASSI, JONATHAN | Viol(s) Noted & Immediately Corrected | I arrived at the site at 12:02 in res | 12/4/2017 | The violation is cited due to | 12/4/2017 | | |
| CABOT OIL & GAS CORP | | CUNNINGHAM, BRIANA | Violation(s) Noted | Arrived at the site to follow up on | 1/25/2017 | | 5/4/2017 | NOV - Notice of Violation | 1/25/2017 |
| CABOT OIL & GAS CORP | | CUNNINGHAM, BRIANA | Violation(s) Noted | Arrived at the site to follow up on | 1/25/2017 | | 5/4/2017 | NOV - Notice of Violation | 1/25/2017 |
| CABOT OIL & GAS CORP | | CUNNINGHAM, BRIANA | Violation(s) Noted | Arrived at the site to follow up on | 1/25/2017 | | 5/4/2017 | NOV - Notice of Violation | 1/25/2017 |
| CABOT OIL & GAS CORP | | SHOPE, MATTHEW | Viol(s) Noted & Immediately Corrected | Upon arrival, I met with Rich Brow | 5/23/2017 | Temporary BMPs to minimiz | 5/23/2017 | | |
| CABOT OIL & GAS CORP | | SHOPE, MATTHEW | Viol(s) Noted & Immediately Corrected | The maximum capacity of the hyd | 8/31/2017 | The release of hydraulic fluic | 8/31/2017 | | |
| CABOT OIL & GAS CORP | | RICKARD, GENE | Viol(s) Noted & Immediately Corrected | Today's inspection, 8/15/17 was c | 8/15/2017 | Approximately 15 gallons of | 8/15/2017 | | |
| CABOT OIL & GAS CORP | | RICKARD, GENE | Viol(s) Noted & Immediately Corrected | On 1/23/17, the Department rece | 1/9/2017 | | 1/10/2017 | | |
| CABOT OIL & GAS CORP | | CUNNINGHAM, BRIANA | Violation(s) Noted | The Department (Eric Rooney and | 2/22/2017 | Sediment is accumulating al | 2/27/2017 | NOV - Notice of Violation | 2/22/2017 |
| CABOT OIL & GAS CORP | | CUNNINGHAM, BRIANA | Violation(s) Noted | The Department (Eric Rooney and | 2/22/2017 | Failure to maintain E&S BMF | 2/27/2017 | NOV - Notice of Violation | 2/22/2017 |
| CABOT OIL & GAS CORP | | CUNNINGHAM, BRIANA | Violation(s) Noted | The Department (Eric Rooney and | 2/22/2017 | Failure to maintain BMP's | 2/27/2017 | NOV - Notice of Violation | 2/22/2017 |
| CABOT OIL & GAS CORP | | CUNNINGHAM, BRIANA | Outstanding Violations - Viols Req'd | The Department was on site to co | 1/27/2017 | | | | |
| CABOT OIL & GAS CORP | | CUNNINGHAM, BRIANA | Outstanding Violations - Viols Req'd | The Department was on site to co | 1/27/2017 | | | | |
| CABOT OIL & GAS CORP | | CUNNINGHAM, BRIANA | Outstanding Violations - Viols Req'd | The Department was on site to co | 1/27/2017 | | | | |
| CABOT OIL & GAS CORP | | CUNNINGHAM, BRIANA | Outstanding Violations - Viols Req'd | The Department returned to the s | 2/24/2017 | Potential for the sediment to | 2/27/2017 | | |
| CABOT OIL & GAS CORP | | CUNNINGHAM, BRIANA | Outstanding Violations - Viols Req'd | The Department returned to the s | 2/24/2017 | Failure to implement/mainta | 2/27/2017 | | |
| CABOT OIL & GAS CORP | | CUNNINGHAM, BRIANA | Outstanding Violations - Viols Req'd | The Department returned to the s | 2/24/2017 | Failure to maintain the acce | 2/27/2017 | | |
| CABOT OIL & GAS CORP | | SASSI, JONATHAN | Viol(s) Noted & Immediately Corrected | I arrived at the site at 11:11 in res | 12/11/2017 | The violation is cited due to | 12/11/2017 | | |
| CABOT OIL & GAS CORP | | RICKARD, GENE | Viol(s) Noted & Immediately Corrected | Resource environmental was on s | 7/14/2017 | 30 gallons of frac fluid releas | 7/14/2017 | | |
| CABOT OIL & GAS CORP | | HOEHLE, FRANCIS | Violation(s) Noted | The Department was on site to cc | 1/6/2017 | | 5/16/2017 | | |
| CABOT OIL & GAS CORP | | SOUTHARD, CHRISTOPHER | Violation(s) Noted | Administrative Inspection record | 6/20/2017 | Failure to case and cement the Howell, G. 2H (1: | ADORD - Administrative | 12/28/2020 |
| CABOT OIL & GAS CORP | | SOUTHARD, CHRISTOPHER | Violation(s) Noted | Administrative Inspection record | 6/20/2017 | Failure to case and cement the Howell, G. 2H (1: | ADORD - Administrative | 12/28/2020 |
| CABOT OIL & GAS CORP | | SOUTHARD, CHRISTOPHER | Violation(s) Noted | Administrative Inspection record | 6/20/2017 | Pollution of a private water supply in Auburn To | ADORD - Administrative | 12/28/2020 |
| CABOT OIL & GAS CORP | | SOUTHARD, CHRISTOPHER | Violation(s) Noted | Administrative Inspection record | 6/20/2017 | Failure to prevent gas or any other fluids or mat | ADORD - Administrative | 12/28/2020 |
| CABOT OIL & GAS CORP | | SOUTHARD, CHRISTOPHER | Violation(s) Noted | Administrative Inspection record | 11/16/2017 | Pollution of a private water supply in Harford Township, Susquehanna County determined to | | |
| CABOT OIL & GAS CORP | | SOUTHARD, CHRISTOPHER | Violation(s) Noted | Administrative Inspection record | 11/16/2017 | Failure to prevent gas or any other fluids or materials from below the casing seat in the Jeffe | | |
| CABOT OIL & GAS CORP | Susquehanna | SHOPE, MATTHEW | Viol(s) Noted & Immediately Corrected | Self-reported of release of <42 gal | 2/2/2017 | | 2/2/2017 | | |
| CABOT OIL & GAS CORP | Susquehanna | HOEHLE, FRANCIS | Viol(s) Noted & Immediately Corrected | At 2:30 pm on December 26, 2017 | 12/27/2017 | The release of flowback fluic | 12/27/2017 | | |
| CABOT OIL & GAS CORP | Susquehanna | CUNNINGHAM, BRIANA | Viol(s) Noted & Immediately Corrected | The Department received a report | 5/30/2017 | Potential for pollution to imp | 5/30/2017 | | |
| CABOT OIL & GAS CORP | Susquehanna | CUNNINGHAM, BRIANA | Viol(s) Noted & Immediately Corrected | The Department received a report | 5/30/2017 | Production fluid impacted th | 5/30/2017 | | |
| CABOT OIL & GAS CORP | Susquehanna | CUNNINGHAM, BRIANA | Viol(s) Noted & Immediately Corrected | The Department received a report | 5/30/2017 | Waste impacted the well pa | 5/30/2017 | | |
| CABOT OIL & GAS CORP | Susquehanna | KENNEDY, KENNETH | Violation(s) Noted | | 3/16/2017 | Gas detected OS Surface casing. (20x13) Water ( | NOV - Notice of Violation | 6/20/2017 |
| CABOT OIL & GAS CORP | Susquehanna | KENNEDY, KENNETH | Violation(s) Noted | | 3/16/2017 | Gas detected OS Surface casing. (20x13) Water ( | NOV - Notice of Violation | 6/20/2017 |
| CABOT OIL & GAS CORP | Susquehanna | KENNEDY, KENNETH | Violation(s) Noted | | 3/16/2017 | Gas detected OS Surface casing. (20x13) Water ( | NOV - Notice of Violation | 6/20/2017 |
| CABOT OIL & GAS CORP | Susquehanna | KENNEDY, KENNETH | Violation(s) Noted | | 3/16/2017 | Gas detected OS Surface casing. (20x13) | NOV - Notice of Violation | 6/20/2017 |
| CABOT OIL & GAS CORP | Susquehanna | SCHOONOVER, DAVID | Outstanding Violations - Viols Req'd | At time of inspection.On site for a | 9/29/2017 | | | | |
| CABOT OIL & GAS CORP | Susquehanna | SASSI, JONATHAN | Viol(s) Noted & Immediately Corrected | I arrived at the site in response to | 12/20/2017 | The violation is cited due to | 12/20/2017 | | |
| CABOT OIL & GAS CORP | Susquehanna | SASSI, JONATHAN | Viol(s) Noted & Immediately Corrected | I arrived at the site in response to | 12/20/2017 | The violation is cited due to | 12/20/2017 | | |
| CABOT OIL & GAS CORP | Susquehanna | SASSI, JONATHAN | Viol(s) Noted & Immediately Corrected | I arrived at the site in response to | 12/20/2017 | The violation is cited due to | 12/20/2017 | | |
| CABOT OIL & GAS CORP | Susquehanna | BECK, CORY | Violation(s) Noted | Administrative Inspection created | 6/20/2017 | The Department's investigation revealed that Ca | NOV - Notice of Violation | 6/20/2017 |
| CABOT OIL & GAS CORP | Susquehanna | SCHOONOVER, DAVID | Violation(s) Noted | At time of inspection, arrived on s | 8/17/2017 | | | | |
| CABOT OIL & GAS CORP | Susquehanna | SCHOONOVER, DAVID | Outstanding Violations - Viols Req'd | At time of inspection, arrived on s | 5/16/2017 | | | | |
| CABOT OIL & GAS CORP | Susquehanna | SCHOONOVER, DAVID | Outstanding Violations - Viols Req'd | At time of inspection, arrived on s | 5/16/2017 | | | | |
| CABOT OIL & GAS CORP | Susquehanna | KENNEDY, KENNETH | Violation(s) Noted | Upon arrival to site, Cabot has had | 9/6/2017 | | | | |
| CABOT OIL & GAS CORP | Susquehanna | KENNEDY, KENNETH | Violation(s) Noted | Upon arrival to site, Cabot has had | 9/6/2017 | | | | |

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| CABOT OIL & GAS CORP | Susquehanna | SCHOONOVER, DAVID | Outstanding Violations - Viols Req'd | At time of inspection.I met with cc | 9/29/2017 | | | |
| CABOT OIL & GAS CORP | Susquehanna | SCHOONOVER, DAVID | Outstanding Violations - Viols Req'd | Met with company man Jim Restly | 8/23/2017 | | | |
| CABOT OIL & GAS CORP | Susquehanna | KENNEDY, KENNETH | Violation(s) Noted | Upon arrival to site, Cabot has hac | 9/6/2017 | | | |
| CABOT OIL & GAS CORP | Susquehanna | KENNEDY, KENNETH | Violation(s) Noted | Upon arrival to site, Cabot has hac | 9/6/2017 | | | |
| CABOT OIL & GAS CORP | Susquehanna | KENNEDY, KENNETH | Violation(s) Noted | Upon arrival to site, Cabot has hac | 9/6/2017 | | | |
| CABOT OIL & GAS CORP | Susquehanna | SASSI, JONATHAN | Viol(s) Noted &  Immediately Corrected | I arrived at the site in response to | 12/20/2017 The violation is cited due to | 12/20/2017 | | |
| CABOT OIL & GAS CORP | Susquehanna | SASSI, JONATHAN | Viol(s) Noted &  Immediately Corrected | I arrived at the site in response to | 12/20/2017 The violation is cited due to | 12/20/2017 | | |
| CABOT OIL & GAS CORP | Susquehanna | SCHOONOVER, DAVID | Violation(s) Noted | At time of inspection, arrived on s | 8/17/2017 | | | |
| CABOT OIL & GAS CORP | Susquehanna | SASSI, JONATHAN | Viol(s) Noted &  Immediately Corrected | I arrived at the site in response to | 12/20/2017 The violation is cited due to | 12/20/2017 | | |
| CABOT OIL & GAS CORP | Susquehanna | SCHOONOVER, DAVID | Violation(s) Noted | At time of inspection, arrived on s | 8/17/2017 | | | |
| CABOT OIL & GAS CORP | Susquehanna | SCHOONOVER, DAVID | Violation(s) Noted | At time of inspection, arrived on s | 8/17/2017 | | | |
| CABOT OIL & GAS CORP | Susquehanna | SCHOONOVER, DAVID | Violation(s) Noted | At time of inspection, arrived on s | 7/17/2017 | | NOV - Notice of Violatior | 11/16/2017 |
| CABOT OIL & GAS CORP | Susquehanna | SCHOONOVER, DAVID | Violation(s) Noted | At time of inspection, arrived on s | 8/17/2017 | | | |
| CABOT OIL & GAS CORP | Susquehanna | BECK, CORY | Violation(s) Noted | Administrative Inspection created | 11/16/2017 The Department's investigation revealed that Ca | NOV - Notice of Violatior | 11/16/2017 |
| CABOT OIL & GAS CORP | Susquehanna | BECK, CORY | Violation(s) Noted | Administrative Inspection created | 11/16/2017 The Department's investigation revealed that Ca | NOV - Notice of Violatior | 11/16/2017 |
| CABOT OIL & GAS CORP | Susquehanna | BECK, CORY | Violation(s) Noted | Administrative Inspection created | 11/16/2017 The Department's investigation revealed that Ca | NOV - Notice of Violatior | 11/16/2017 |
| CABOT OIL & GAS CORP | Susquehanna | BECK, CORY | Violation(s) Noted | Administrative Inspection created | 11/16/2017 The Department's investigation revealed that Ca | NOV - Notice of Violatior | 11/16/2017 |
| CABOT OIL & GAS CORP | Susquehanna | SCHOONOVER, DAVID | Outstanding Violations - Viols Req'd | At time of inspection, arrived on s | 8/21/2017 | | | |
| CABOT OIL & GAS CORP | Susquehanna | KENNEDY, KENNETH | Violation(s) Noted | Upon arrival to site, Cabot has hac | 9/6/2017 | | | |
| CABOT OIL & GAS CORP | Susquehanna | HOEHLE, FRANCIS | Viol(s) Noted &  Immediately Corrected | At 2:30 pm on December 26, 2017 | 12/27/2017 The flowback fluid was not p | 12/27/2017 | | |
| CABOT OIL & GAS CORP | Susquehanna | HOEHLE, FRANCIS | Viol(s) Noted &  Immediately Corrected | At 2:30 pm on December 26, 2017 | 12/27/2017 The release was discharged | 12/27/2017 | | |
| CABOT OIL & GAS CORP | Susquehanna | SHOPE, MATTHEW | Viol(s) Noted &  Immediately Corrected | Self-reported of release of <42 gal | 2/2/2017 | | 2/2/2017 | |

# EXHIBIT N

Exhibit N

## U.S. District Court — Judicial Caseload Profile

**PENNSYLVANIA MIDDLE**

| | | | 12-Month Periods Ending | | | | | | Numerical Standing Within | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | Sep 30 2013 | Sep 30 2014 | Sep 30 2015 | Sep 30 2016 | Sep 30 2017 | Sep 30 2018 | U.S. | Circuit |
| **Overall Caseload Statistics** | Filings [1] | | 3,770 | 3,229 | 3,078 | 3,342 | 2,988 | 3,292 | | |
| | Terminations | | 3,418 | 3,370 | 3,030 | 2,948 | 3,002 | 3,009 | | |
| | Pending | | 3,541 | 3,384 | 3,399 | 3,796 | 3,764 | 4,056 | | |
| | Percent Change in Total Filings Current Year Over Earlier Year | | -12.7 | 2.0 | 7.0 | -1.5 | 10.2 | | 26 | 2 |
| | Number of Judgeships | | 6 | 6 | 6 | 6 | 6 | 6 | | |
| | Vacant Judgeship Months [2] | | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | | |
| **Actions per Judgeship** | Filings | Total | 628 | 538 | 513 | 557 | 498 | 549 | 32 | 3 |
| | | Civil | 545 | 434 | 429 | 449 | 399 | 437 | 21 | 3 |
| | | Criminal Felony | 66 | 86 | 69 | 92 | 81 | 93 | 39 | 1 |
| | | Supervised Release Hearings | 17 | 18 | 15 | 16 | 18 | 18 | 72 | 1 |
| | Pending Cases [2] | | 590 | 564 | 567 | 633 | 627 | 676 | 20 | 2 |
| | Weighted Filings [2] | | 526 | 489 | 446 | 505 | 447 | 483 | 35 | 3 |
| | Terminations | | 570 | 562 | 505 | 491 | 500 | 502 | 38 | 3 |
| | Trials Completed | | 27 | 24 | 22 | 22 | 26 | 27 | 14 | 2 |
| **Median Time (Months)** | From Filing to Disposition | Criminal Felony | 13.8 | 11.9 | 11.7 | 13.6 | 13.5 | 13.6 | 79 | 4 |
| | | Civil [2] | 7.0 | 10.0 | 9.3 | 9.0 | 9.7 | 10.1 | 66 | 5 |
| | From Filing to Trial [2] (Civil Only) | | 34.6 | 25.3 | 34.8 | 28.8 | 36.7 | 33.7 | 45 | 4 |
| **Other** | Number (and %) of Civil Cases Over 3 Years Old [2] | | 227 8.2 | 177 6.9 | 213 8.1 | 227 8.1 | 230 8.5 | 241 8.2 | 57 | 3 |
| | Average Number of Felony Defendants Filed per Case | | 1.4 | 1.5 | 1.5 | 1.7 | 1.3 | 1.3 | | |
| | Jurors | Avg. Present for Jury Selection | 24.3 | 32.6 | 45.1 | 38.7 | 66.4 | 49.5 | | |
| | | Percent Not Selected or Challenged | 32.4 | 30.2 | 37.8 | 35.3 | 49.3 | 39.3 | | |

### 2018 Civil Case and Criminal Felony Defendant Filings by Nature of Suit and Offense

| Type of | Total | A | B | C | D | E | F | G | H | I | J | K | L |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Civil | 2,624 | 228 | 119 | 898 | 5 | 114 | 81 | 174 | 208 | 78 | 535 | - | 184 |
| Criminal [1] | 558 | 1 | 208 | 126 | 64 | 59 | 21 | 28 | 4 | 11 | 12 | 1 | 23 |

NOTE: Criminal data in this profile count defendants rather than cases and therefore will not match previously published numbers.

[1] Filings in the "Overall Caseload Statistics" section include criminal transfers, while filings by "Nature of Offense" do not.

[2] See "Explanation of Selected Terms."

# EXHIBIT O

Exhibit O

## U.S. District Court — Judicial Caseload Profile

**TEXAS SOUTHERN**

| | | | 12-Month Periods Ending | | | | | | Numerical Standing Within | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | Sep 30 2013 | Sep 30 2014 | Sep 30 2015 | Sep 30 2016 | Sep 30 2017 | Sep 30 2018 | U.S. | Circuit |
| **Overall Caseload Statistics** | | Filings [1] | 15,258 | 14,581 | 14,419 | 14,898 | 13,776 | 14,894 | | |
| | | Terminations | 15,240 | 14,279 | 14,056 | 14,277 | 14,440 | 14,189 | | |
| | | Pending | 11,704 | 12,107 | 12,447 | 13,123 | 12,497 | 13,079 | | |
| | | Percent Change in Total Filings Current Year Over Earlier Year | -2.4 | 2.1 | 3.3 | | 8.1 | | 31 | 4 |
| | | Number of Judgeships | 19 | 19 | 19 | 19 | 19 | 19 | | |
| | | Vacant Judgeship Months [2] | 27.9 | 37.6 | 44.6 | 12.0 | 24.0 | 26.1 | | |
| **Actions per Judgeship** | **Filings** | Total | 803 | 767 | 759 | 784 | 725 | 784 | 11 | 3 |
| | | Civil | 310 | 327 | 315 | 334 | 302 | 329 | 47 | 5 |
| | | Criminal Felony | 380 | 346 | 352 | 364 | 328 | 358 | 5 | 2 |
| | | Supervised Release Hearings | 114 | 94 | 92 | 86 | 95 | 97 | 9 | 2 |
| | | Pending Cases [2] | 616 | 637 | 655 | 691 | 658 | 688 | 19 | 4 |
| | | Weighted Filings [2] | 588 | 563 | 551 | 569 | 551 | 585 | 18 | 5 |
| | | Terminations | 802 | 752 | 740 | 751 | 760 | 747 | 8 | 2 |
| | | Trials Completed | 25 | 24 | 24 | 27 | 24 | 26 | 15 | 2 |
| **Median Time (Months)** | From Filing to Disposition | Criminal Felony | 4.9 | 4.9 | 5.1 | 5.0 | 5.2 | 4.9 | 4 | 2 |
| | | Civil [2] | 7.2 | 6.8 | 7.1 | 7.8 | 7.8 | 7.6 | 24 | 2 |
| | From Filing to Trial [2] (Civil Only) | | 21.8 | 24.7 | 21.2 | 23.1 | 21.1 | 18.9 | 7 | 3 |
| **Other** | | Number (and %) of Civil Cases Over 3 Years Old [2] | 367 / 7.6 | 399 / 7.8 | 372 / 7.2 | 363 / 6.7 | 393 / 7.4 | 370 / 6.7 | 47 | 6 |
| | | Average Number of Felony Defendants Filed per Case | 1.2 | 1.2 | 1.2 | 1.2 | 1.2 | 1.2 | | |
| | Jurors | Avg. Present for Jury Selection | 50.9 | 51.3 | 47.5 | 47.6 | 45.0 | 44.4 | | |
| | | Percent Not Selected or Challenged | 38.3 | 40.2 | 39.4 | 39.8 | 36.2 | 37.6 | | |

| 2018 Civil Case and Criminal Felony Defendant Filings by Nature of Suit and Offense | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Type of | Total | A | B | C | D | E | F | G | H | I | J | K | L |
| Civil | 6,255 | 103 | 88 | 1,360 | 30 | 361 | 621 | 1,118 | 765 | 279 | 717 | 10 | 803 |
| Criminal [1] | 6,795 | 218 | 811 | 4,830 | 281 | 243 | 85 | 132 | 8 | 20 | 30 | 73 | 64 |

NOTE: Criminal data in this profile count defendants rather than cases and therefore will not match previously published numbers.

[1] Filings in the "Overall Caseload Statistics" section include criminal transfers, while filings by "Nature of Offense" do not.

[2] See "Explanation of Selected Terms."

# **EXHIBIT P**

Exhibit P

## U.S. District Court — Judicial Caseload Profile

**PENNSYLVANIA MIDDLE**

| | | | 12-Month Periods Ending | | | | | | Numerical Standing Within | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | Sep 30 2014 | Sep 30 2015 | Sep 30 2016 | Sep 30 2017 | Sep 30 2018 | Sep 30 2019 | U.S. | Circuit |
| **Overall Caseload Statistics** | Filings [1] | | 3,229 | 3,078 | 3,342 | 2,988 | 3,292 | 2,887 | | |
| | Terminations | | 3,370 | 3,030 | 2,948 | 3,002 | 3,009 | 3,260 | | |
| | Pending | | 3,384 | 3,399 | 3,796 | 3,764 | 4,056 | 3,670 | | |
| | Percent Change in Total Filings Current Year Over Earlier Year | | -10.6 | -6.2 | -13.6 | -3.4 | -12.3 | | 85 | 6 |
| | Number of Judgeships | | 6 | 6 | 6 | 6 | 6 | 6 | | |
| | Vacant Judgeship Months [2] | | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 12.0 | | |
| **Actions per Judgeship** | Filings | Total | 538 | 513 | 557 | 498 | 549 | 481 | 51 | 3 |
| | | Civil | 434 | 429 | 449 | 399 | 437 | 390 | 31 | 3 |
| | | Criminal Felony | 86 | 69 | 92 | 81 | 93 | 70 | 63 | 1 |
| | | Supervised Release Hearings | 18 | 15 | 16 | 18 | 18 | 21 | 69 | 1 |
| | Pending Cases [2] | | 564 | 567 | 633 | 627 | 676 | 612 | 26 | 4 |
| | Weighted Filings [2] | | 489 | 446 | 505 | 447 | 483 | 424 | 51 | 3 |
| | Terminations | | 562 | 505 | 491 | 500 | 502 | 543 | 31 | 3 |
| | Trials Completed | | 24 | 22 | 22 | 26 | 27 | 23 | 25 | 3 |
| **Median Time (Months)** | From Filing to Disposition | Criminal Felony | 11.9 | 11.7 | 13.6 | 13.5 | 13.6 | 15.9 | 88 | 6 |
| | | Civil [2] | 10.0 | 9.3 | 9.0 | 9.7 | 10.1 | 11.0 | 72 | 5 |
| | From Filing to Trial [2] (Civil Only) | | 25.3 | 34.8 | 28.8 | 36.7 | 33.7 | 37.4 | 53 | 4 |
| **Other** | Number (and %) of Civil Cases Over 3 Years Old [2] | | 177 / 6.9 | 213 / 8.1 | 227 / 8.1 | 230 / 8.5 | 241 / 8.2 | 264 / 9.9 | 61 | 4 |
| | Average Number of Felony Defendants Filed per Case | | 1.5 | 1.5 | 1.7 | 1.3 | 1.3 | 1.3 | | |
| | Jurors | Avg. Present for Jury Selection | 32.6 | 45.1 | 38.7 | 66.4 | 49.5 | 46.1 | | |
| | | Percent Not Selected or Challenged | 30.2 | 37.8 | 35.3 | 49.3 | 39.3 | 35.4 | | |

| 2019 Civil Case and Criminal Felony Defendant Filings by Nature of Suit and Offense | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Type of | Total | A | B | C | D | E | F | G | H | I | J | K | L |
| Civil | 2,340 | 210 | 52 | 851 | 2 | 45 | 109 | 154 | 200 | 39 | 497 | 8 | 173 |
| Criminal [1] | 420 | 4 | 162 | 77 | 49 | 49 | 20 | 20 | 2 | 2 | 12 | 4 | 19 |

NOTE: Criminal data in this profile count defendants rather than cases and therefore will not match previously published numbers.

[1] Filings in the "Overall Caseload Statistics" section include criminal transfers, while filings by "Nature of Offense" do not.

[2] See "Explanation of Selected Terms."

# **EXHIBIT Q**

Exhibit Q

## U.S. District Court — Judicial Caseload Profile

**TEXAS SOUTHERN**

| | | | 12-Month Periods Ending | | | | | | Numerical Standing Within | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | Sep 30 2014 | Sep 30 2015 | Sep 30 2016 | Sep 30 2017 | Sep 30 2018 | Sep 30 2019 | U.S. | Circuit |
| **Overall Caseload Statistics** | Filings [1] | | 14,581 | 14,419 | 14,898 | 13,776 | 14,894 | 18,215 | | |
| | Terminations | | 14,279 | 14,056 | 14,277 | 14,440 | 14,189 | 16,658 | | |
| | Pending | | 12,107 | 12,447 | 13,123 | 12,497 | 13,079 | 14,675 | | |
| | Percent Change in Total Filings Current Year Over Earlier Year | | 24.9 | 26.3 | 22.3 | 32.2 | 22.3 | | 8 | 1 |
| | Number of Judgeships | | 19 | 19 | 19 | 19 | 19 | 19 | | |
| | Vacant Judgeship Months [2] | | 37.6 | 44.6 | 12.0 | 24.0 | 26.1 | 34.5 | | |
| **Actions per Judgeship** | Filings | Total | 767 | 759 | 784 | 725 | 784 | 959 | 8 | 3 |
| | | Civil | 327 | 315 | 334 | 302 | 329 | 373 | 35 | 3 |
| | | Criminal Felony | 346 | 352 | 364 | 328 | 358 | 491 | 3 | 2 |
| | | Supervised Release Hearings | 94 | 92 | 86 | 95 | 97 | 95 | 9 | 2 |
| | Pending Cases [2] | | 637 | 655 | 691 | 658 | 688 | 772 | 15 | 3 |
| | Weighted Filings [2] | | 563 | 551 | 569 | 551 | 585 | 703 | 12 | 3 |
| | Terminations | | 752 | 740 | 751 | 760 | 747 | 877 | 7 | 2 |
| | Trials Completed | | 24 | 24 | 27 | 24 | 26 | 23 | 25 | 4 |
| **Median Time (Months)** | From Filing to Disposition | Criminal Felony | 4.9 | 5.1 | 5.0 | 5.2 | 4.9 | 4.4 | 3 | 1 |
| | | Civil [2] | 6.8 | 7.1 | 7.8 | 7.8 | 7.6 | 7.5 | 18 | 3 |
| | From Filing to Trial [2] (Civil Only) | | 24.7 | 21.2 | 23.1 | 21.1 | 18.9 | 23.9 | 20 | 5 |
| **Other** | Number (and %) of Civil Cases Over 3 Years Old [2] | | 399 7.8 | 372 7.2 | 363 6.7 | 393 7.4 | 370 6.7 | 326 5.6 | 36 | 5 |
| | Average Number of Felony Defendants Filed per Case | | 1.2 | 1.2 | 1.2 | 1.2 | 1.2 | 1.1 | | |
| | Jurors | Avg. Present for Jury Selection | 51.3 | 47.5 | 47.6 | 45.0 | 44.4 | 49.9 | | |
| | | Percent Not Selected or Challenged | 40.2 | 39.4 | 39.8 | 36.2 | 37.6 | 40.8 | | |

| 2019 Civil Case and Criminal Felony Defendant Filings by Nature of Suit and Offense | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Type of | Total | A | B | C | D | E | F | G | H | I | J | K | L |
| Civil | 7,084 | 128 | 135 | 1,286 | 26 | 498 | 549 | 1,704 | 921 | 279 | 630 | 8 | 920 |
| Criminal [1] | 9,316 | 149 | 1,057 | 7,018 | 362 | 301 | 119 | 97 | 13 | 22 | 41 | 92 | 45 |

NOTE: Criminal data in this profile count defendants rather than cases and therefore will not match previously published numbers.

[1] Filings in the "Overall Caseload Statistics" section include criminal transfers, while filings by "Nature of Offense" do not.

[2] See "Explanation of Selected Terms."

# EXHIBIT R

# U.S. District Court for the Middle District of Pennsylvania M.D.Pa.
## Cases

Showing **12** open Securities cases in M.D.Pa.; pending between 2021-03-23 and 2021-03-23.; sorted by most recent docket activity.

### Summary

**Case Filings** (Top 6 by Focus Order)



| | <2016 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 |
|---|---|---|---|---|---|---|---|
| 🔵 Antitrust | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 🟠 Contracts | 0 | 0 | 0 | 0 | 1 | 0 | 0 |
| 🟢 Securities | 4 | 0 | 0 | 1 | 1 | 5 | 1 |
| 🔴 Bankruptcy | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 🟡 Civil Rights | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 🔵 Consumer Protection | 0 | 0 | 0 | 0 | 0 | 0 | 0 |

### Cases by Type

| Case Types | Cases |
|---|---|
| Contracts | 1 |
| Securities | 12 |

*All other Case Types have 0 results in this case list.*

### District Judges

| | | |
|---|---|---|
| Christopher C. Conner | 3 | 25% |
| John E. Jones III | 3 | 25% |
| Yvette Kane | 2 | 17% |
| Malachy Edward Mannion | 1 | 8% |

### Case Status

Open: 12 (100%)                    Terminated: 0 (0%)



## Case List

| Title | Civil Action # | Case Type | Court | Filed On | Last Docket | Terminated |
|---|---|---|---|---|---|---|
| Southeastern Pennsylvania Transportation Authority v. Orrstown Financial Services, Inc. et al | 1:12-cv-00993 | Securities | M.D.Pa. | 2012-05-25 | 2021-03-23 | — |
| Ezell v. Dinges et al | 3:20-cv-01948 | Securities | M.D.Pa. | 2020-10-22 | 2021-03-19 | — |
| Delaware County Employees Retirement System v. Cabot Oil & Gas Corporation et al | 3:20-cv-01815 | Securities | M.D.Pa. | 2020-10-05 | 2021-03-18 | — |
| Chabot et al v. Walgreens Boots Alliance, Inc. et al | 1:18-cv-02118 | Securities | M.D.Pa. | 2018-11-02 | 2021-03-12 | — |
| Isaacs v. Kelley et al | 1:21-cv-00118 | Securities | M.D.Pa. | 2021-01-21 | 2021-01-22 | — |
| Mason Capital Master Fund, L.P. v. Walgreens Boots Alliance, Inc. et al | 1:20-cv-02304 | Securities | M.D.Pa. | 2020-12-08 | 2021-01-11 | — |
| Securities and Exchange Commission v. Sheinfeld | 1:20-cv-01692 | Securities | M.D.Pa. | 2020-09-17 | 2020-12-30 | — |
| Recovery Master, LLC v. Walgreens Boots Alliance, Inc. et al | 1:20-cv-01912 | Securities | M.D.Pa. | 2020-10-16 | 2020-12-28 | — |
| Mao v. Pai | 3:19-cv-01466 | Securities Contracts | M.D.Pa. | 2019-08-23 | 2020-12-09 | — |
| SEC v. First Choice Mgmt, et al | 3:02-mc-00232 | Securities | M.D.Pa. | 2002-12-19 | 2002-12-19 | — |
| SEC v. 4NEXCHANGE, et al | 3:02-mc-00107 | Securities | M.D.Pa. | 2002-06-10 | 2002-06-10 | — |
| Securities and Excha v. Bentley, et al | 3:01-mc-00191 | Securities | M.D.Pa. | 2001-11-02 | 2001-11-02 | — |