UNITED STATES DISTRICT COURT

MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| DELAWARE COUNTY EMPLOYEES RETIREMENT SYSTEM, Individually and on Behalf of All Others Similarly Situated,<br><br>     Plaintiff,<br><br> vs.<br><br>CABOT OIL & GAS CORPORATION, et al.,<br><br>     Defendants. | Civ. Action No. 3:20-cv-01815-CCC<br><br>CLASS ACTION<br><br>The Honorable Christopher C. Conner<br><br>CONSOLIDATED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS<br><br><br><br>DEMAND FOR JURY TRIAL |

# TABLE OF CONTENTS

**Page**

I. INTRODUCTION AND SUMMARY OF THE FRAUD ............................1

II. NATURE OF THE ACTION ..........................................................7

III. JURISDICTION AND VENUE ......................................................7

IV. THE PARTIES ...........................................................................8

V. SUBSTANTIVE ALLEGATIONS ...............................................13

  A. Cabot's Pennsylvania Drilling Operations Were (and Are) Critically Important to the Company's Business ................................13

  B. Relevant Law Governing Cabot's Drilling Operations.......................15

    1. The Clean Streams Law ...........................................................15

    2. The Oil and Gas Act .................................................................18

  C. Cabot's Management and Board Oversaw the Company's Purported Compliance with Applicable Environmental Laws ..........19

    1. The Safety and Environmental Affairs Committee .................19

    2. The Audit Committee ................................................................20

    3. Cabot's Code of Business Conduct ..........................................21

  D. Defendants Repeatedly and Falsely Assure Investors that Cabot's Fracking During the Class Period was in Compliance with Governing Laws ...........................................................................24

  E. A Grand Jury Finds Cabot Knowingly Disregarded Environmental Law Throughout the Class Period ..............................24

    1. Cabot's Fracking Activities in the Marcellus Shale Deposit ......................................................................................26

4839-4959-3828.v1

2.  The Environmental Impact of Cabot's Fracking on
    Susquehanna County Residents ................................................27

    a.  Nolan Scott Ely .............................................................29

    b.  Eric Roos .......................................................................30

    c.  Testimony by Other Dimock Area Residents.................32

3.  The PaDEP Confirms That Cabot's Drilling Operations
    Released Methane Pollution Into Water Supplies ....................33

4.  Cabot's Specific Criminal Acts Throughout the Class
    Period ........................................................................................38

    a.  Crimes Related to Cabot's Problem Wells Covered
        by the December 2010 Consent Order ...........................39

    b.  Crimes Related to Cabot's Problem Wells Drilled
        After 2015 Outside of Dimock .......................................41

F.  Cabot Repeatedly Violates Pennsylvania's Environmental
    Regulations ...........................................................................................43

    1.  Cabot Fails to Remediate its Gas Wells Pursuant to its
        Obligations Under the December 2010 Consent Order
        and Settlement Agreement ........................................................45

    2.  Cabot's Violations Outside the Dimock Box ...........................48

    3.  Additional Violations................................................................49

G.  A Former Cabot Geologist Corroborates the Grand Jury's
    Findings .................................................................................................50

VI. DEFENDANTS' FALSE AND MISLEADING STATEMENTS AND
    OMISSIONS................................................................................................53

**Page**

VII.    THE TRUTH EMERGES ...........................................................................64

VIII.   DEFENDANTS ACTED WITH SCIENTER ...............................................67

      A.    The PaDEP and Criminal Investigation Findings Contribute to a
Strong Inference of Defendants' Scienter ...........................................68

      B.    Defendants Have Engaged in a Pattern of Wrongdoing ....................69

      C.    Cabot's Gas Exploration and Production in Pennsylvania Is a
Core Operation .....................................................................................70

      D.    Defendants' Internal Reporting Tracked Cabot's
(Non)Compliance with Environmental Laws .....................................70

      E.    Dinges Was Personally Involved in Addressing the Allegations
that Cabot's Drilling Operations Polluted Pennsylvania Waters ........71

      F.    Defendants Were Incentivized to Ignore Cabot's Criminal
Violations of Environmental Law .......................................................74

      G.    Defendants' Violation of Company Policy Supports an
Inference of Scienter ...........................................................................75

      H.    Cabot Operates in a Highly Regulated Industry .................................75

      I.    Dinges's and Schroeder's SOX Certifications and Signing of
SEC Filings Further Support a Strong Inference of Scienter ..............76

      J.    The Duration and Magnitude of the Misconduct Adds to the
Inference of Scienter ...........................................................................77

      K.    Dinges's Stock Sales Support a Motive to Commit Fraud .................77

IX.    LOSS CAUSATION .......................................................................................78

- iii -

**Page**

X.    APPLICABILITY OF THE PRESUMPTION OF RELIANCE AND
      FRAUD ON THE MARKET ........................................................................82

XI.   NO SAFE HARBOR ..................................................................................83

XII.  CLASS ACTION ALLEGATIONS ............................................................84

XIII. CLAIMS FOR RELIEF ..............................................................................86

XIV.  PRAYER FOR RELIEF ..............................................................................88

XV.   JURY DEMAND ........................................................................................89

Lead Plaintiff Delaware County Employees Retirement System ("Lead Plaintiff") and additional plaintiff Iron Workers District Council (Philadelphia and Vicinity) Retirement and Pension Plan ("Iron Workers" and together with Lead Plaintiff, "Plaintiffs"), by its undersigned attorneys, individually and on behalf of all others similarly situated, alleges the following based upon personal knowledge as to Plaintiffs and upon information and belief based on the investigation of Plaintiffs' attorneys as to all other matters, which included, among other things, a review and analysis of: Cabot Oil & Gas Corporation ("Cabot" or the "Company") U.S. Securities and Exchange Commission ("SEC") filings, conference calls, Defendants' (as defined herein) public statements, media reports, analyst reports, industry reports, other complaints filed against Defendants, findings by regulators and law enforcement resulting from investigations of Cabot, interviews with former Cabot employees and persons knowledgeable about the Company's business, and other publicly available information.  Plaintiffs believe substantial additional evidentiary support will likely exist for the allegations set forth herein after a reasonable opportunity for discovery.

## I.      INTRODUCTION AND SUMMARY OF THE FRAUD

1.      This case concerns a straightforward fraudulent scheme – Cabot and its Chairman and CEO, Dan O. Dinges ("Dinges"); CFO, Scott C. Schroeder ("Schroeder"); and Vice President and Regional Manager, Phil L. Stalnaker ("Stalnaker") (collectively, the "Defendants") sought to portray the Company as a

good steward of the environment and in compliance with applicable environmental laws, telling investors that Cabot's "efforts to improve the environment" and to do the "right thing" made the Company a "beacon of light."  Indeed, throughout the Class Period, Cabot's SEC filings stated that Defendants "substantially compl[ied] with the Clean Water Act and related federal and state regulations."  Yet nothing could have been further from the truth.  In reality, Cabot cut corners and knowingly violated the very environmental laws it publicly claimed to uphold – polluting Pennsylvania's waters over and over again, despite repeated notices of regulatory violations and consent orders, for over a decade.

2.      Cabot is, fundamentally, a fracking company.  "Fracking" refers to an unconventional drilling process used for extracting natural gas from underground geological formations that could not otherwise be extracted by conventional drilling methods.  Cabot has, for years, exploited the Marcellus Shale Deposit – a geological formation located underground that stretches 575 miles beneath parts of Pennsylvania, West Virginia, Ohio, and New York – for natural gas extraction through fracking.

3.      Prior to and leading into the Class Period, Cabot was clamoring to establish itself as an environmentally responsible fracking business.  At that time, the Company's drilling operations in the town of Dimock, in Susquehanna County, had become the poster child for the hazards fracking posed to rural communities. Susquehanna County was, and is, critically important to Cabot; it is where

substantially all of the Company's natural gas production occurs. Without drilling in Susquehanna County, Cabot has virtually no business whatsoever.

4.      Following a January 1, 2009 explosion at a Dimock resident's water well, the Pennsylvania Department of Environmental Protection (the "PaDEP" or the "Department") began investigating Cabot's gas wells in the area. They found that Cabot's drilling caused methane gas to migrate into numerous Dimock residents' water wells and, as a result, the PaDEP and the Company entered into a Consent Order and Agreement on November 4, 2009, which Stalnaker signed (the "November 2009 Consent Order"), to address the problem.

5.      But on April 15, 2010, the PaDEP announced in a press release that Cabot and the Department had entered into a new, sweeping Consent Order and Agreement, which Dinges signed (the "April 2010 Consent Order"), following "Cabot's failure to abide by the terms" of the November 2009 Order. PaDEP Secretary John Hanger stated in a related press release that "Cabot had every opportunity to correct these violations, but failed to do so. Instead, it ***chose to ignore*** its responsibility to safeguard the citizens of this community and to protect the natural resources there." As Secretary Hanger explained in the press release, drilling companies "have the legal responsibility to design and construct their wells to keep all gas contained within the wells and to prevent gas from moving into fresh

4839-4959-3828.v1

groundwater." He added: "Gas migration is a serious issue that can have dire consequences to affected communities."

6.  Then, on December 15, 2010, Cabot and the PaDEP entered into what would be the final, global Consent Order and Agreement, which Dinges also signed, concerning the Dimock pollution (the "December 2010 Consent Order"). While refusing to take responsibility for polluting the water, Cabot did agree to "take ***all actions*** necessary . . . to comply with all applicable environmental laws and regulations, including all applicable provisions" of Pennsylvania's Clean Streams Law, Oil and Gas Act, and related regulations.

7.  Following these consent orders, Cabot was eager to rebuild its reputation and remove the overhang the story had on the Company's stock price. As one stock analyst at KeyBanc wrote on December 14, 2010: "We believe a settlement would be received favorably by the market, as it would remove a hangover on the stock caused by the negative press associated with its Marcellus operations." Thus, after signing the April 2010 Consent Order, Dinges assured investors on an April 29, 2010 conference call that the Company "takes safety in all environmental matters extremely seriously" and that Cabot "will continue to cooperate fully with the Pennsylvania DEP to remedy and resolve the items from the consent order." Following the December 2010 Consent Order, Cabot issued a press release, in which Dinges further stated: "we have redoubled our efforts with the Pennsylvania Department of Environmental

- 4 -

Resources to resolve past issues" and that the Company was "committed to responsible operations within Susquehanna County."

8.     But none of that was true.  Throughout the Class Period, Cabot continued knowingly violating Pennsylvania environmental laws, through repeated felony and misdemeanor violations, yet falsely assured the public that the Company complied with the law, that Cabot had "an ***unwavering commitment*** to comply with or exceed all regulations to enhance the environment and communities where we operate," and that it made "***every effort*** to reduce and limit [the Company's] impact on air, water and the environment," as making the "***least possible*** impact to the environment" was of "***paramount***" importance to Cabot.

9.     On June 15, 2020, however, following a grand jury investigation, Cabot was charged by the Pennsylvania Office of the Attorney General with fifteen criminal charges, including ***nine felonies***, for failing to fix ***known*** faulty gas wells leaking methane into the residential water supplies in Dimock and surrounding communities. The grand jury found "that, over a period of many years, and despite mounting evidence, Cabot Oil & Gas failed to acknowledge and correct conduct that polluted Pennsylvania water through stray gas migration," before further criticizing Cabot's "***long-term indifference*** to the damage it caused to the environment and citizens of Susquehanna County."

10.     Pennsylvania Attorney General Josh Shapiro said in a video statement that same day that "***Cabot took shortcuts that broke the law, damaged our environment, harming our water supplies and endangering Pennsylvanians***.  They put their bottom line ahead of the health and safety of our neighbors."   Indeed, numerous residents of Susquehanna County testified during the grand jury proceeding that, shortly after Cabot had drilled gas wells near their homes, they began experiencing nausea, bodily blotches and rashes after showering, vision problems, and difficulty breathing and that their water turned black and oily in some instances or orange in others.   Testing showed poisons such as arsenic and lead in their water. Their property values plummeted.  Cabot had knowingly polluted Pennsylvania waters and failed to comply with PaDEP orders requiring the Company to remediate its gas wells to stop the discharge of methane gas, in direct contravention of its Class Period representations to the contrary.

11.     When this truth was partially revealed in Company disclosures and the June 15, 2020 announcement of the Pennsylvania Attorney General's criminal charges against Cabot, the Company's stock price plummeted, causing millions of dollars of damages to investors who bought Cabot securities at prices inflated by Defendants' fraudulent scheme.  This action seeks to recover those losses.

4839-4959-3828.v1

## II.  NATURE OF THE ACTION

12.  This is a federal securities class action on behalf of all purchasers of Cabot common stock (the "Class") between October 23, 2015 and June 12, 2020, inclusive (the "Class Period"), seeking to pursue remedies under §§10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), as amended by the Private Securities Litigation Reform Act of 1995 ("PSLRA") and Rule 10b-5 promulgated thereunder (17 C.F.R. §240.10b-5).

## III.  JURISDICTION AND VENUE

13.  This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331 and §27 of the Exchange Act (15 U.S.C. §78aa), as the claims asserted herein arise under and pursuant to §§10(b) and 20(a) of the Exchange Act (15 U.S.C. §§78j(b) and 78t(a)) and SEC Rule 10b-5 promulgated thereunder (17 C.F.R. §240.10b-5).

14.  Venue is proper in this District pursuant to §27 of the Exchange Act and 28 U.S.C. §1391(b)-(d).  Cabot primarily operates and transacts substantial business in this District, and many of the acts charged herein, including the violations of environmental law that underlie Defendants' materially false and misleading statements and dissemination of the materially false and misleading information, occurred in this District.

15.     As of December 31, 2020, Cabot's operations were concentrated in the Marcellus Shale in northeast Pennsylvania – where substantially all of Cabot's total equivalent production for the year was derived.  Cabot's Marcellus Shale properties, which represent the Company's primary operating area, are principally located in Susquehanna County, Pennsylvania within this District.  During the Class Period, Dinges and Schroeder routinely traveled from Houston to Cabot's Pittsburgh, Pennsylvania office, where Stalnaker was located, and all three Individual Defendants (as defined herein) visited the Company's Susquehanna operations multiple times per year.

16.     In connection with the acts and conduct alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the U.S. mails, interstate telephone communications, and the facilities of the New York Stock Exchange ("NYSE").

## IV.   THE PARTIES

17.     As set forth in its previously-filed certification (*see* ECF No. 6-3), Lead Plaintiff Delaware County Employees Retirement System – a defined benefit pension fund with more than 4,600 beneficiaries that provides retirement benefits for current and former Delaware County employees – purchased Cabot common stock at artificially inflated prices during the Class Period and suffered damages as a result of Defendants' alleged misconduct.

18.     Additional plaintiff Iron Workers, headquartered in Philadelphia, Pennsylvania, also purchased Cabot common stock at artificially inflated prices during the Class Period and suffered damages as a result of Defendants' alleged misconduct. The certification of Iron Workers, setting forth its Class Period trades in Cabot common stock, is attached as Exhibit A to this document.

19.     Defendant Cabot is an independent oil and gas company engaged in the development, exploitation, and exploration of oil and gas properties, including through fracking, exclusively in the continental United States. Since 2015, Cabot has continuously refined its operating focus, and narrowed its natural gas development effort to the Marcellus Shale in northeast Pennsylvania. The Company's shares trade on the NYSE under the symbol COG. It is incorporated in Delaware, and its offices are located in Pittsburgh, Pennsylvania; Montrose, Pennsylvania (in Susquehanna County); and Houston, Texas.

20.     Defendant Dinges was Cabot's CEO and Chairman of the Company's Board of Directors (the "Board") during the Class Period. Dinges remains Cabot's CEO and Chairman of the Board at the time of this writing. During the Class Period, Dinges sold 66,610 shares of his Cabot stock for proceeds of more than $1.8 million. As CEO, Dinges spoke on Cabot's behalf in press releases, conference calls, and SEC filings. Pursuant to §§302 and 906 of the Sarbanes-Oxley Act of 2002, SEC Rule 13a-14(a), and 18 U.S.C. §1350, Dinges certified and signed the Company's Forms

10-K filed with the SEC on February 22, 2016, February 27, 2017, March 1, 2018, February 26, 2019, and February 25, 2020.  Dinges further certified and signed the Company's Forms 10-Q filed with the SEC on October 23, 2015, May 3, 2016, July 29, 2016, October 28, 2016, April 28, 2017, July 28, 2017, October 30, 2017, April 27, 2018, July 27, 2018, October 26, 2018, April 26, 2019, July 26, 2019, and October 25, 2019.  In addition, the Company's Annual Reports were issued under his name, and included an introductory letter signed by Dinges to shareholders.

21.     Defendant Schroeder was Cabot's CFO and Executive Vice President during the Class Period.  Schroeder remains in these positions at the time of this writing.  As CFO, Schroeder spoke on Cabot's behalf in press releases, conference calls, and SEC filings.  Pursuant to §§302 and 906 of the Sarbanes-Oxley Act of 2002, SEC Rule 13a-14(a) and 18 U.S.C. §1350, Schroeder certified and signed the Company's Forms 10-K filed with the SEC on February 22, 2016, February 27, 2017, March 1, 2018, February 26, 2019, and February 25, 2020.  Schroeder further certified and signed the Company's Forms 10-Q filed with the SEC on October 23, 2015, May 3, 2016, July 29, 2016, October 28, 2016, April 28, 2017, July 28, 2017, October 30, 2017, April 27, 2018, July 27, 2018, October 26, 2018, April 26, 2019, July 26, 2019, October 25, 2019, and May 1, 2020.  In addition, the Company's Annual Reports were issued under his name.

22.    Defendant Stalnaker was Cabot's Vice President, Regional Manager North Region at the start of the Class Period, and he has been a Cabot executive officer since 2009.  During the Class Period, he was promoted in 2017 to Senior Vice President, North Region, and promoted again in 2019 to Senior Vice President, Operations.  Stalnaker oversaw Cabot's Susquehanna operations from the Company's Pittsburgh, Pennsylvania offices.  Prior to and during the Class Period, Stalnaker was repeatedly described on Cabot conference calls as "running our north region" and the person who "runs our Marcellus."  As an executive officer of the Company, Stalnaker spoke on behalf of Cabot, including during quarterly earnings conference calls, and the Company's Annual Reports were issued under his name.

23.    Defendants Dinges, Schroeder, and Stalnaker are sometimes collectively referred to herein as the "Individual Defendants."  During the Class Period, the Individual Defendants, as senior executive officers and/or a director of Cabot, were in possession of and privy to confidential, proprietary information concerning Cabot, its operations, finances, and financial condition, and its legal and regulatory compliance and liability related to its gas wells.

24.    Because of their positions as Cabot's senior-most executive officers, the Individual Defendants obtained, had access to, and/or were in possession of materially adverse nonpublic information concerning Cabot via internal corporate documents and communications with other corporate officers and employees, attendance at

- 11 -

management and/or Board meetings (and committees thereof), and via the reports, presentations, and other information provided to them in connection therewith. As detailed below, Dinges and Stalnaker also received, including as the named addressees or signatory on behalf of Cabot, nonpublic regulatory letters, agreements and notices of violation sent by Pennsylvania authorities to the Company related to the facts and circumstances underlying the claims in this case. As a result of their possession of such information, the Individual Defendants knew or recklessly disregarded that the adverse facts specified herein had not been disclosed to, and were being concealed from, the investing public.

25.    As senior executive officers and controlling persons of a publicly traded company whose common stock, during the Class Period, was registered with the SEC pursuant to the Exchange Act and was actively traded on the NYSE and governed by the federal securities laws, the Individual Defendants had a duty to promptly disseminate accurate and truthful information regarding Cabot's operations, business, and financial statements and to correct any previously issued statements that had become materially misleading or untrue, so that the market price of Cabot stock would be based upon truthful and accurate information. Defendants' materially false statements and omissions during the Class Period violated these requirements and obligations.

26.     The Individual Defendants, because of their positions of control and authority as officers and/or a director of the Company, were able to, and did, control the disclosures in various SEC filings, press releases, and public statements pertaining to the Company during the Class Period.  Each Individual Defendant was provided with information alleged herein to be misleading before or shortly after its issuance and/or had the ability and/or opportunity to prevent its issuance or cause it to be corrected.  Accordingly, each Individual Defendant is responsible for the accuracy of the public statements detailed herein and is, therefore, primarily liable for the misrepresentations contained in those public statements.

27.     Each Defendant is liable as a participant in a fraudulent scheme and course of business that operated as a fraud or deceit on purchasers of Cabot common stock by engaging in the violative conduct alleged herein, which caused Cabot securities to trade at artificially inflated prices during the Class Period.

## V.    SUBSTANTIVE ALLEGATIONS

### A.    Cabot's Pennsylvania Drilling Operations Were (and Are) Critically Important to the Company's Business

28.     During the Class Period, Cabot generated billions of dollars in revenue each year from its oil and gas operations, primarily in Pennsylvania.  In 2015, Cabot's revenues exceeded $1.3 billion.  By 2019, the Company's revenue grew to more than $2 billion.  The source of Cabot's financial growth during and before the Class Period was its operations in the Marcellus Shale, located in northeastern Pennsylvania.  Cabot

- 13 -

was, in fact, "named #1 performing S&P 500 stock" in 2011, "driven by [its] success in the Marcellus" Shale in Pennsylvania.  Today, "Cabot is one of the largest and lowest-cost U.S. producers of gas in the prolific Marcellus region of Pennsylvania." ECF 41-1 at 32.

29.   Cabot describes its position in the Marcellus Shale as the "cornerstone asset of its portfolio" and the "primary driver of record production and reserve growth" during the period since 2008.  By the start of the Class Period in 2015, Cabot's Marcellus Shale properties in Susquehanna County, Pennsylvania, already represented the Company's largest operating and growth area in terms of reserves (*i.e.*, oil or gas that can be recovered at a financially feasible cost), production, and capital investment, and approximately 90% of Cabot's 2015 total equivalent production (a standardized measure of oil and gas production) came from the Marcellus Shale.  By 2019, "substantially all" of Cabot's annual total equivalent production came from its Marcellus Shale operations.

30.   Like its growth during the Class Period, Cabot's future is also tied to the Marcellus Shale.  In 2010, the Company's largest field, known as the Dimock field, located in northeastern Pennsylvania, alone made up approximately 46% of the Company's proved reserves (*i.e.*, a metric describing the amount of hydrocarbon resources that can be recovered from a deposit with a reasonable level of certainty), and was Cabot's only field that contained more than 15% of the Company's proved

- 14 -

reserves.  As of December 31, 2016, 97% of Cabot's year-end proved reserves were natural gas and **93%** were located in the Marcellus Shale.  By 2019, **all** of Cabot's proved undeveloped reserves were located in Susquehanna County, Pennsylvania.

### B.    Relevant Law Governing Cabot's Drilling Operations

31.    Cabot's oil and gas exploration and production operations in Pennsylvania are subject to an array of federal, state, and local laws and regulations. During the Class Period, Cabot told investors that:

> Our operations are subject to extensive federal, state and local laws and regulations relating to the generation, storage, handling, emission, transportation and discharge of materials into the environment.  Permits are required for the operation of our various facilities.  These permits can be revoked, modified or renewed by issuing authorities.  Governmental authorities enforce compliance with their regulations through fines, injunctions or both.  Government regulations can increase the cost of planning, designing, installing and operating, and can affect the timing of installing and operating, oil and natural gas facilities.

32.    Because Cabot's drilling operations are primarily located in Pennsylvania, that state's laws concerning the oil and gas industry are particularly relevant to this case, especially its environmental protection laws, including the Pennsylvania Clean Streams Law, 35 P.S. §§691.1 et seq.

### 1.    The Clean Streams Law

33.    Pennsylvania enacted its Clean Streams Law to preserve and improve the purity of the state's waters for the protection of public health.  The Clean Streams Law's objective is not only to prevent further pollution of Pennsylvania's waters, but

- 15 -

also to restore streams in Pennsylvania to a clean and unpolluted state.  The law recognizes that the prevention and elimination of water pollution is directly related to the economic future of Pennsylvania.  Under the law, water pollution includes the "contamination of any waters of the Commonwealth such as will create or is likely to create a nuisance or to render such waters harmful, detrimental or injurious to public health, safety or welfare."  To further its goal of preventing water pollution, the Clean Streams Law provides certain prohibitions against and penalties for polluters.

34.   Section 301 of the Clean Streams Law, in particular, prohibits unauthorized discharges of "industrial waste," which broadly includes "any liquid, gaseous, radioactive, solid or other substance, not sewage, resulting from any manufacturing or industry."  Section 301 states: "No person or municipality shall place or permit to be placed, or discharged or permit to flow, or continue to discharge or permit to flow, into any of the waters of the Commonwealth any industrial wastes, except as hereinafter provided in this act."  Section 307 further provides:

> No person or municipality shall discharge or permit the discharge of industrial wastes in any manner, directly or indirectly, into any of the waters of the Commonwealth unless such discharge is authorized by the rules and regulations of the department or such person or municipality has first obtained a permit from the department . . . .

35.   Section 401, moreover, prohibits other types of pollutants, stating:

> It shall be unlawful for any person or municipality to put or place into any of the waters of the Commonwealth, or allow or permit to be discharged from property owned or occupied by such person or

- 16 -

municipality into any of the waters of the Commonwealth, any substance
of any kind or character resulting in pollution as herein defined . . . .

36.     It is a crime to cause air or water pollution or violate any provision of the

Clean Streams Law.  As further detailed in Section 611, it is also a crime to fail to

comply with or violate any order of the PaDEP or its rules and regulations:

> It shall be unlawful to fail to comply with any rule or regulation of
> the department or to fail to comply with any order or permit or license of
> the department, to violate any of the provisions of this act or rules and
> regulations adopted hereunder, or any order or permit or license of the
> department, to cause air or water pollution . . . .

37.     In addition to civil penalties, "[a]ny person or municipality who

negligently violates any provision of this act, any rule or regulation of the department,

any order of the department, or any condition of any permit issued pursuant to the act

is guilty of a misdemeanor of the second degree" (§602(b)), and "[a]ny person or

municipality who intentionally or knowingly violates any provision of this act, any

rule or regulation of the department, any order of the department, or any condition of

any permit issued pursuant to the act is guilty of a felony of the third degree."  Section

602(b.1).

38.     The PaDEP is responsible for determining when pollution has occurred,

for formulating and adopting rules and regulations, and issuing such orders as are

necessary to implement the provisions of the Clean Streams Law.  The PaDEP, as the

primary enforcer of the law, is also tasked with investigating any alleged source of

pollution of Commonwealth waters, and instituting appropriate proceedings under the

- 17 -

provisions of the law to discontinue any such pollution.  Among the recourse provided by the Clean Streams Law is the PaDEP's ability to issue orders as necessary to "aid in the enforcement of the provisions of this act" or to modify, suspend, or revoke permits.  The PaDEP may also issue orders that require persons "to cease operations of an establishment which, in the course of its operation, has a discharge which is in violation of any provision of this act."

39.    Under Section 205 of the Commonwealth Attorneys Act and Section 601 of the Clean Streams Law, violations of the Clean Streams Law may be referred to the Pennsylvania Office of the Attorney General by the PaDEP or local district attorneys.

## 2.    The Oil and Gas Act

40.    The PaDEP also enforces Pennsylvania's Oil and Gas Act and the rules and regulations promulgated thereunder.  These rules require, for example, that operators properly case and cement their wells so as to prevent the migration of gas or other fluids into fresh groundwater.  25 Pa. Code §78.81(a)(2)-(3).  The rules also set cement and well construction standards and require that an operator report and correct defective, improper, or insufficient cement casings on gas wells.  *See* 25 Pa. Code §§78.86; 78a.73(b); 78a.85(a)(5).  The failure to abide by these rules constitutes a violation under the Oil and Gas Act.

4839-4959-3828.v1

41.     During the Class Period, Cabot failed to ensure that its drilling activities complied with these laws, and knowingly violated them, thereby committing numerous felony and misdemeanor criminal acts under Pennsylvania law.

## C.     Cabot's Management and Board Oversaw the Company's Purported Compliance with Applicable Environmental Laws

42.     Cabot's management, Board, and its committees regularly assessed legal and regulatory risks to the Company, specifically including those risks associated with environmental law compliance, throughout the Class Period.  Cabot's management routinely provided the Board and its committees with reports on these subject matters and reviewed Cabot's operations concerning environmental matters.  Members of Cabot's management also received notices from regulators, including the PaDEP, when its drilling operations violated applicable laws and regulations.

### 1.     The Safety and Environmental Affairs Committee

43.     Cabot's Safety and Environmental Affairs Committee (the "S&EA Committee"), which was made up of at least three Board members, assisted the Board in providing "oversight and support" of the Company's safety and environmental policies, programs, and initiatives.  The S&EA Committee's charter specifically included, among other things, responsibility for "[r]eviewing and providing input to management and the Board regarding the Company's compliance with laws, regulations, policies, programs and practices with regard to environmental, health, and

- 19 -

safety matters," including by, "***receiving and reviewing with management reports regarding*** . . . the Company's management of and responses to releases, investigations, notices of violations, remediations, civil action, or other occurrences involving environmental laws or regulations."  As detailed herein, Cabot was subject to numerous such investigations and notices of violations in Pennsylvania during the Class Period.  *See* §§V.E.-F.*, infra.*

44.     The S&EA Committee was required to report its actions and recommendations to the Board following each S&EA Committee meeting, which occurred at least twice per year.

45.     The S&EA Committee would, moreover, "oversee[] and review[] all ***external disclosures*** regarding the Company's environmental, health and safety sustainability data, programs, initiatives and outcomes and providing insight and recommendations to the Board of Directors on such matters."[1]

## 2.     The Audit Committee

46.     As stated in Cabot's Proxy Statements, the function of the Audit Committee is to assist the Board in overseeing, among other things, "the integrity of the financial statements of the Company" and the "compliance by the Company with legal and regulatory requirements."  Each year, Company management provided

---

[1]     During the Class Period, the S&EA Committee's name was changed to the "Environment, Health & Safety Committee."

Cabot's Audit Committee with "periodic reports" on these areas of potential exposure, including litigation, financial reporting and disclosures, and regulatory risks, among others.

### 3.    Cabot's Code of Business Conduct

47.    During the Class Period, Cabot publicly maintained its Code of Business Conduct (sometimes referred to herein as the "Code") on the Company's website. The Code concerned, among other things, Cabot's purported adherence to environmental laws.  Cabot required that every director, officer, and employee sign a statement that he or she understood and would comply with the principles enumerated in the Code.  The Code further stated that Cabot would ensure that all employees complied with the Code's policies.

48.    As relevant here, the Code stated that "[i]t is the Company's policy to observe and comply with all governmental laws, rules and regulations applicable to it or the conduct of its business wherever located."  Concerning "The Environment," the Code stated:

> It is Company policy to comply fully with the letter and the spirit of all applicable federal, state, and local environmental protection laws and regulations (the "Environmental Laws").  The Company will conduct operations in such a manner as to meet or exceed all Environmental Laws in its business activities.

To achieve this policy, the Code affirmed Cabot's practice of "***routinely review[ing]*** the conduct of its operations in an effort to strive for continuous improvement in its environmental performance."

49.     The foregoing representations were not merely aspirational statements about what the Company should do, but were concrete statements about what Cabot was in fact doing.

50.     For example, Cabot held daily operational meetings at 7:30 a.m. with its Montrose and Pittsburgh offices, in person and telephonically, to review daily well operations, including well procedures and any problems at each well and rig. Geologists, drilling engineers, and completion engineers would brief Stalnaker, a member of Cabot's senior management, at these meetings.

51.     Cabot also specifically referenced the Code in its SEC filings during the Class Period.  For example, in its 2016 Proxy Statement on Form Def 14A filed with the SEC on March 22, 2016, the Company stated:

> All employees, officers and directors are required to comply with the Company's Code of Business Conduct to help ensure that the Company's business is conducted in accordance with the highest standards of moral and ethical behavior.  The Code of Business Conduct covers all areas of professional conduct . . . , as well as requiring strict adherence to all laws and regulations applicable to the Company's business.  Employees, officers and directors are required annually to reply to a Code of Conduct Questionnaire, which is designed to elicit information related to any known or possible violation of the Code.

52.     In its Proxy Statements, Cabot directed investors to the full text of the Code of Business Conduct on the Company's website at www.cabotog.com on a page entitled "Governance."   The Code, moreover, was specifically incorporated by reference during the Class Period in Cabot's Forms 10-K filed with the SEC, which also directed investors to the full text of the Code on Cabot's website and the Company's description of the Code in its Proxy Statements.

53.     It was not only critical that Cabot's drilling operations in Susquehanna County comply with Pennsylvania's environmental laws to avoid regulatory and enforcement penalties and risk, including potential criminal liability, which could interfere with Cabot's extensive Pennsylvania operations, but also because violating such laws could (and did) harm the health of local residents and the value of their properties.  As Defendants knew, and admitted on their website, Cabot's Susquehanna County operations were situated in rural communities where the majority of residents relied on groundwater wells as their primary source of water.

54.     As detailed herein, however, in conduct that belied its public statements to investors, Cabot routinely and knowingly violated Pennsylvania's Clean Streams Law and the Oil and Gas Act by polluting Susquehanna residents' water supplies – and then purposely avoided its obligations to remediate those violations throughout the Class Period.

- 23 -

**D.  Defendants Repeatedly and Falsely Assure Investors that Cabot's Fracking During the Class Period was in Compliance with Governing Laws**

55.     As fully set forth in Sections VI.-VII., *infra*, during the Class Period Defendants made materially false and misleading statements concerning Cabot's compliance with environmental law and regulations.  For example, Cabot's SEC Form 10-Ks filed throughout the Class Period stated that Defendants "***believe that [they] substantially comply with the Clean Water Act and related federal and state regulations***."

56.     Various Cabot Annual Reports explicitly professed Cabot's "***unwavering commitment to comply with or exceed all regulations to enhance the environment and communities where we operate***" and that the Company made "***every effort to reduce and limit our impact on air, water and the environment***."  Cabot, indeed, claimed that making the "***least possible impact to the environment remains paramount in importance to us***" and that the Company was "***doing the right thing*** to "***to improve the environment***."  As explained further below, *see* §§V.E.-G.; VI.-VII., *infra*, each of these statements, and others made by Defendants, were false and misleading when made.

**E.  A Grand Jury Finds Cabot Knowingly Disregarded Environmental Law Throughout the Class Period**

57.     During the latter portion of the Class Period, Pennsylvania convened a grand jury – the Forty-Third Statewide Investigating Grand Jury (the "Grand Jury") –

- 24 -

to review evidence related to a comprehensive and ongoing statewide investigation of numerous environmental crimes that occurred during fracking operations in Pennsylvania by oil and gas companies, including Cabot.  Members of the Grand Jury received *evidence*, including sworn testimony provided by witnesses, regarding violations by Cabot of the Clean Streams Law that occurred in and around Susquehanna County, Pennsylvania.  Based on that evidence, the Grand Jury made numerous findings of fact concerning Cabot's drilling activities in that area.  As a result of these findings, on February 11, 2020, the Grand Jury recommended that criminal charges be filed against Cabot, including numerous *felony* charges, based on its determination that Cabot's drilling and fracking activities caused widespread contamination of residential water supplies in Susquehanna County in direct violation of Pennsylvania law.  The Grand Jury's findings, however, were not made public until June 15, 2020, when Cabot was criminally charged.

58.    Specifically, the Grand Jury found that:

[O]ver a period of *many years*, and despite mounting evidence, Cabot Oil & Gas failed to acknowledge and correct conduct that polluted Pennsylvania water through stray gas migration.  Indeed, some of these gas wells have been in place for more than a decade, yet Cabot has only recently taken steps to remediate them.  *In light of Cabot's long-term indifference to the damage it caused to the environment and citizens of Susquehanna County, these were not merely technical violations*. . . .

59.    The Pennsylvania Office of the Attorney General led an investigation which reviewed the Grand Jury's findings of fact and found that they were consistent

with the Attorney General's own investigative findings.  Based on the Grand Jury's findings of fact and its own investigation, the Attorney General found probable cause that **Cabot committed the crimes alleged and knowingly violated Pennsylvania environmental laws and regulations**.  The Pennsylvania Attorney General, Josh Shapiro, announced criminal charges against Cabot on June 15, 2020.  A preliminary hearing is scheduled to take place in the matter on July 20, 2021.

### 1.    Cabot's Fracking Activities in the Marcellus Shale Deposit

60.    Fracking is a multistep process that involves drilling down deep into the earth to shale rock deposits.  Next, fluid is injected into the rock at high pressures to create fractures in the shale that release the natural gas otherwise trapped within the rock.  The gas is then able to flow freely up to the surface to be captured by oil and gas operators, like Cabot.

61.    As the initial step of this process, heavy machinery is used to drill a hole, known as a wellbore, into the ground at the well site.  Piping, known as casing, is then inserted down into the hole to stabilize the wellbore, and the drillers pour cement into spaces between the casing and the walls of the wellbore to both secure the piping in place and to fill any voids through which gas, such as methane, might escape.  Methane is the chief constituent of natural gas, which contains from 50 to 90 percent methane, and is a potentially explosive gas that burns readily in air.

4839-4959-3828.v1

62.     Numerous potential flaws that arise during the cementing process, however, may cause the cement in a well to fail to bond properly.  For example, when the cement is pumped in to seal the space between the wellbore and the pipe that lines it, groundwater may dilute the cement, which affects the cement's ability to bond to and fill the voids between the casing and wellbore, causing imperfections in the cement.  Once a well goes into production, such imperfections provide a pathway for gas, including methane, to migrate into and contaminate other nearby geological features, such as drinking water aquifers.

63.     Cabot began fracking in Susquehanna County, Pennsylvania, in the mid-2000s.  Cabot's activities started after it leased mineral rights from multiple residents in Dimock Township, Susquehanna County.  In 2006, it started to drill gas wells on their properties.

### 2.     The Environmental Impact of Cabot's Fracking on Susquehanna County Residents

64.     By 2008, residents in the Dimock area began to experience changes to their water, causing them to suspect that methane gas was migrating into their water supply from Cabot's new, nearby wells.  Some began to see effervescence in their water, while others noticed sediment.  But one event in particular alerted local residents to the problem – when the water well of Norma Fiorentino, a Dimock area resident, ***spontaneously exploded***.  Despite the fact that the explosion happened in close proximity to Cabot's drilling operations, the Company denied responsibility.

- 27 -

65.     The PaDEP began investigating soon thereafter and concluded that Cabot's drilling activities released stray methane gas that had migrated into and contaminated the aquifer in Dimock.  The PaDEP determined that no fewer than 18 drinking water supplies serving 19 homes were affected by Cabot's Dimock drilling activities.  The methane migration was so prevalent that the PaDEP took legal action against Cabot, which ultimately resulted in the Company entering into a Consent Order and Agreement with the PaDEP, which was finalized in the December 2010 Consent Order.  The December 2010 Consent Order shut down Cabot's operations within a nine-square mile area in Dimock (known as the "Dimock Box") and established a series of obligations, which remain in force today, including that Cabot restore or replace the impacted drinking water supplies and undertake remedial work on its gas wells to eliminate any further methane migration.  As noted above, Dinges signed the December 2010 Consent Order on behalf of Cabot.

66.     As would be disclosed at the end of the Class Period, numerous Dimock residents who relied on well or spring water for their water supply testified to the Grand Jury regarding the effect Cabot's drilling activities had on their homes, health, and drinking water.  Despite the December 2010 Consent Order requiring that Cabot remediate its wells to stop the migration of methane into their water, residents testified that the problems never abated and have in fact continued for over a decade.

### a.    Nolan Scott Ely

67.    Nolan Scott Ely and his extended family lived on 183-acres of farmland in Dimock.  Starting in 2008, Cabot drilled six wells on the Ely property and, soon thereafter, Mr. Ely's wife began experiencing nausea and bodily blotches.  Mr. Ely assured his wife that the recent drilling activity could not be the cause.  After all, Mr. Ely, himself a Cabot employee, had worked on many of the Company's well sites, helping to construct well pads and set up drill rigs.  He had repeatedly asked his well site supervisor if there was any possibility that the drilling could contaminate his water.  His supervisor, as Mr. Ely testified, "kept telling me, no, there is no possible way."

68.    But Mr. Ely's groundwater had been contaminated by stray methane gas from Cabot's mining activities.  A relative who lived next door brought Mr. Ely two jugs of tap water, filled from their common water source.  The water was brown, and when Mr. Ely applied a lighter to it, the water caught fire – "***flames came flying out of the jug***."  He then turned on the kitchen faucet and found that he was able to set the running water on fire as well.  When he alerted Cabot to the problem, he was told he should leave his house because it might explode.  Testing of the well water at his house revealed "astronomical" amounts of methane, as well as ethane, propane, excessive levels of sodium, and magnesium.

4839-4959-3828.v1

69.     Prior to discovering the contamination, however, Mr. Ely and his family had regularly been drinking the water.  Mr. Ely experienced vision problems, such as "tunnel vision" while driving.  His wife had difficulty breathing and dizziness, and she continued to experience rashes on her skin after showering.  The contamination of his property from Cabot's activities took more than just a physical and emotional toll on Mr. Ely and his family – it also took a financial one.  While their land was once valued at $1.2 million, it is now valued at just $153,000, an 87% decrease.

70.     Mr. Ely was surprised by Cabot's reaction to his plight given that the Company was not only a local business, but his employer.  He testified:

> I spent a lot of time with them.  I knew them.  I knew them, and I worked with them to try to get them to help us out with[] our situation.  And they just – ***they didn't care*** . . . they weren't really doing anything other than just bringing me water, which didn't last very long.

### b.     Eric Roos

71.     Eric Roos lived in Montrose, Susquehanna County for 29 years.  When Cabot commenced drilling in the County in the mid-to late 2000s, an agent of the Company approached him to sign a lease that would allow drilling on his land in return for royalties.  Effectively forcing Mr. Roos to sign, the Cabot agent told him that if he refused to sign the lease, the Company would legally be able to take what it wanted from his property.  Mr. Roos signed the lease, but at no time did Cabot inform him that its drilling activities could contaminate his well water.

4839-4959-3828.v1

72.     As with Mr. Ely, problems with Mr. Roos's water began shortly after Cabot had drilled a number of wells near his home in 2009.  Mr. Roos testified that there were violent blasts of gas and water while his wife was washing dishes, intimating that the Rooses' water was contaminated with methane and should not be consumed.  Cabot agreed, without admitting it had caused any stray gas migration, to install a vent on Mr. Roos's well because his well head was located in the basement of his home.  That meant that explosive concentrations of methane emanating from his well water put the inhabitants of the house at risk.

73.     In addition to the potential for an explosion, high methane concentrations can also cause asphyxiation in rooms where water is used, such as bathrooms.  Despite these dangers, it took six months before Cabot installed the vent at the Rooses' residence.  And in addition to methane, the water in Mr. Roos's well was also found to contain lithium, barium, manganese, and other toxic chemicals.  Due to Cabot's failure to remediate, the Rooses were forced to obtain their drinking water from a public well, which required a 14-mile trip every time they needed water.

74.     A decade later, the problem remains.  At the time Mr. Roos testified in March 2019, his neighbors were still having problems with their water.  Mr. Roos told the Grand Jury that he would like to move away, but added, "I don't know who will buy my house now.  How can I leave?"

- 31 -

### c.   Testimony by Other Dimock Area Residents

75.     One of the Rooses' neighbors testified that she and her husband built their home on land in Dimock that the couple had bought in 2003.  Their home also relied on well water.  Beginning in February 2008, a new oil or gas well was constructed in the area every month, the closest being just 650 feet away from their house.  By late fall of 2008 the neighbor testified that she began finding black, oily water in her washing machine.  She later found orange water coming from the kitchen faucet and in the toilet.

76.     In April 2010, a test of her well water revealed the presence of ethylene glycol, propylene glycol, and two other unidentified hazardous chemicals.  The neighbor further recalled that when coming out of the tap, the water would foam with "an Alka Seltzer consistency," smelled like turpentine, and left behind a "black slime."  In 2012, water testing showed manganese present at twice the state limit and a high level of lithium.  A 2018 water test found arsenic, lead, sodium, uranium, lithium, and propane.  Refusing to accept responsibility, Cabot representatives told her the arsenic in her well water must have come from "apple orchards."  The couple has not been able to drink water from their property for ten years.

77.     Her neighbors in Susquehanna County similarly reported changes in their water's color, taste, smell, and appearance, along with "Alka Seltzer-like" bubbling.  Some also described explosive bursts from their faucets that could blow a plate out of

- 32 -

a person's hands while washing dishes.  Many of the neighbors similarly experienced rashes and other skin problems following bathing after Cabot's drilling started. Despite this, Cabot has, for many years, declined to remedy the gas well integrity issues that the PaDEP found caused stray methane migration into Dimock water sources.

      **3.**      **The PaDEP Confirms That Cabot's Drilling Operations Released Methane Pollution Into Water Supplies**

78.    Methane is naturally present in the surface and groundwater in Susquehanna County as a result of the normal decomposition of organic matter.  This naturally present methane is known as "biogenic" methane gas.  Another type of methane gas – known as "thermogenic" methane gas – is created by heat and pressure deep in the geologic strata.  Biogenic and thermogenic gases have two different chemical identities.  Consequently, laboratory tests can identify methane as either biogenic or thermogenic.

79.    The methane gas identified in the contaminated water in Susquehanna County has been, by and large, identified as thermogenic in the testing of samples over the ten-plus year period that the pollution problems in Susquehanna County have evolved.  Unlike biogenic gas, thermogenic gas remains trapped underground until it is released ***by drilling activities***.  As PaDEP Program Manager Seth Pelepko explained to the Grand Jury, if "the signature looks like a deep gas that has been isolated for

hundreds of millions of years, it shouldn't be there unless there is an impairment or pathway that has been opened up."  Such a newly opened pathway, he concluded, existed in Susquehanna County, allowing thermogenic methane to pollute local water, because of "the way the [Cabot] wells were constructed in this area, the gas wells." The Grand Jury learned, through testimony, that Cabot's well integrity issues were related to problems with the cement jobs at its wells.  Either gas flowed through the cement while it was hardening, resulting in permanent channels through which gas could escape, or the cement did not completely fill certain spaces between the casing and the wellbore.  The PaDEP used various sophisticated geochemistry analyses to confirm this conclusion about Cabot's role in releasing thermogenic methane into local water supplies.

80.    Notably, when Cabot began gas exploration in Susquehanna County, it collected pre-drilling samples of the drinking water of residents nearby the Company's wells.  Cabot, however, failed to test the samples for methane levels. When announcing criminal charges against Cabot in June 2020, Pennsylvania's Attorney General stated that the Company ***deliberately*** did not test for methane in residential water wells prior to drilling in order to maintain plausible deniability: "Cabot's failure to test its pre-drill water samples for methane eliminated the ability to establish a baseline for promptly assessing and addressing the problem of stray gas . . .

- 34 -

.  In essence, *they didn't test their samples so that there would be no proof that they were contaminating nearby water supplies*."

81.    To compensate for this deliberate omission by Cabot, the PaDEP conducted its own analysis to establish baseline methane levels in local water by reviewing 10,615 water samples collected by other organizations operating in the area, including the United States Environmental Protection Agency, the United States Agency for Toxic Substances and Disease Registry, Duke University scientists, and consultants engaged by area property owners.  The PaDEP used the samples to establish, using isotopic geochemistry, the origin of methane gas in the Dimock area groundwater.

82.    As part of this review, the PaDEP also analyzed 12 post-drilling samples of drinking water supplies within Dimock Township dating back to 2009 that had been contaminated with "stray" methane gas from Cabot wells.  These samples exhibited extremely high and hazardous levels of methane.  For example, the highest level readout, 92 mg/l, exceeded the point at which gas-filled water can explode. Over 50% of the time, the methane concentration in these impacted water supplies was greater than 10 mg/l – the warning range for dangerous methane concentration. As noted above, aside from the risk of explosion or fire, high methane concentrations can also cause asphyxiation in rooms where water is used, such as bathrooms.  The methane levels in these impacted water supplies far exceeded the background methane

- 35 -

levels found in the area at large:   In 90% of testing, the naturally occurring background level of methane, by comparison, was less than 0.5 mg/l.

83.     Citing these analyses, PaDEP Program Manager Pelepko testified to the Grand Jury that Cabot's defective wells caused methane to migrate into homeowners' water wells and that this connection is demonstrated by the elevated levels of thermogenic methane found in multiple data sets.   Pelepko further testified that, in addition to methane, he looked for other substances in well water when testing for contamination from fracking activities.   He stated that he found elevated levels of these substances in the Dimock well tests, and further explained that these other substances likely were lying inert at the bottom of the water wells, but were stirred up by migrated methane bubbling through the water.

84.     The hazardous test results drove the PaDEP to investigate and comprehensively address the methane migrating from Cabot's wells into Dimock area residents' water supplies in 2009 and 2010, culminating in the December 2010 Consent Order.   As part of that investigation, the PaDEP determined that 18 water supplies, serving 19 homes, in Dimock Township around Carter Road had been affected by Cabot's drilling.   The PaDEP further found, as reflected in the December 2010 Consent Order, that Cabot had not stopped the discharge of methane into the groundwater aquifers as initially promised as part of the November 2009 Consent Order and that the contamination was ongoing.

85.     Despite the remediation obligations memorialized in the December 2010 Consent Order and Cabot's public promises to comply with all applicable environmental laws and regulations, the Grand Jury found that contamination from Cabot's drilling activity continued unabated after the December 2010 Consent Order and throughout the Class Period.

86.     Ken Kennedy, an Oil and Gas Inspector Supervisor at the PaDEP who investigated integrity issues in Cabot's gas wells, testified to the Grand Jury that he became involved in the ongoing Dimock investigation in 2013.  He explained that certain of Cabot's wellbore integrity issues had been addressed in 2009-2010, but that PaDEP inspections in 2011 raised questions about the integrity of additional wells. Kennedy rechecked these wells, and other wells that shared the same well pad.  By 2015, he had identified 11 wells needing further evaluation.  Cabot then did some of its own testing, but did not begin actively remediating *any* of these wells until 2018.

87.     This was particularly egregious because the December 2010 Consent Order required that Cabot restore or replace impacted drinking water supplies and undertake remedial work of certain of its gas wells to eliminate further migration. Yet, according to testimony and evidence presented to the Grand Jury, Cabot undertook little to no remedial work on its gas wells until approximately August 2018 – shortly after the Grand Jury began its investigation of Cabot's activities – and even then, the Company started work on only certain wells.

- 37 -

88.     As a result of Cabot's repeated failures to remediate the environmental harms it was continuing to create in Pennsylvania and its overall "indifference" to the ongoing damage it had caused, the Grand Jury, unbeknownst to investors, found in February 2020 that:

> [O]ver a period of many years, and despite mounting evidence, Cabot Oil & Gas failed to acknowledge and correct conduct that polluted Pennsylvania water through stray gas migration.  Indeed, some of these gas wells have been in place for more than a decade, yet Cabot has only recently taken steps to remediate them.  In light of Cabot's long-term indifference to the damage it caused to the environment and citizens of Susquehanna County, these were not merely technical violations.

> The Grand Jury concluded that, as to Cabot, "criminal charges are appropriate."

### 4.     Cabot's Specific Criminal Acts Throughout the Class Period

89.     Following the Grand Jury's recommendation, the Pennsylvania Office of the Attorney General filed fifteen criminal counts against Cabot, including nine felonies for knowing violations of Pennsylvania law, on or around June 15, 2020, stemming from stray methane migration from numerous Cabot wells into groundwater sources (the "June 15, 2020 Presentment of Charges").  Notably, additional criminal charges were contemplated but not ultimately brought due to the Clean Streams Law's statute of limitations.  The charges filed were based on two categories of problem Cabot wells: (i) those covered by the December 2010 Consent Order that were not remediated as of 2015; and (ii) other, more recently drilled wells in Susquehanna County outside of the Dimock area.

- 38 -

### a.   Crimes Related to Cabot's Problem Wells Covered by the December 2010 Consent Order

90.     The June 15, 2020 Presentment of Charges disclosed numerous facts that were previously unknown to investors, including that prior to and throughout the Class Period, Cabot did, among other violations, "***knowingly*** discharge, permit to flow or continue to discharge or permit to flow, methane into groundwater" on one or more occasions from numerous of the Company's gas wells through at least June 11, 2018 – the date the PaDEP sent a letter to Stalnaker (the "June 2018 Letter") listing the Company's extensive ***continuing*** violations for discharges of pollution that remained unresolved under the December 2010 Consent Order.  According to the June 15, 2020 Presentment of Charges, these criminal violations occurred:

- On or about ***August 14, 2009 through at least June 11, 2018***, from the gas wells G Shields 1V, G Shields 2H, G Shields 4H and G Shields 5H located in Dimock Township, Susquehanna County, Pennsylvania;

- On or about ***July 16, 2008 through at least June 11, 2018***, from the gas wells Costello 1V, Costello 2V, Gesford 4H and Gesford 8H located in Dimock Township, Susquehanna County, Pennsylvania;

- On or about ***October 31, 2008 through at least June 11, 2018***, from the gas wells Ratzel 1H, Ratzel 2H, and Ratzel 3V located in Dimock Township, Susquehanna County, Pennsylvania; and

- On or about ***March 27, 2008 through at least June 11, 2018***, from the gas wells Ely 4H and Ely 6H located in Dimock Township, Susquehanna County, Pennsylvania.

91.     Each of the above four charges constitutes a felony for knowingly violating the Clean Streams Law's prohibition against the discharge of industrial

- 39 -

waste.  35 P.S. §691.301.  Based on this same conduct, the Attorney General also charged Cabot with an additional four felony counts under the Clean Streams Law for knowingly polluting Pennsylvania waters.  35. P.S. §691.401.

92.     The Attorney General further charged that on or about ***December 15, 2010 through January 9, 2020***, Cabot, based on the above conduct, did "***knowingly*** fail to comply with orders of the [PaDEP], including but not limited to the December 15, 2010 Consent Order and Settlement Agreement, when it failed to remediate its gas wells to eliminate the discharge of natural gas, which allowed contamination to continue unabated," in violation of the Clean Streams Law's prohibition of unlawful conduct, another felony.  35. P.S. §691.611.

93.     For each of the gas wells described in ¶90, *supra*, the PaDEP had previously served Cabot with Notices of Violation (or "NOVs"), both prior to and during the Class Period, alerting Cabot that its cementing and casing activities failed to prevent the migration of gas into fresh groundwater.[2]  Despite Cabot's obligations to remediate these wells and to eliminate methane gas migration pursuant to the December 2010 Consent Order, however, these violations remained outstanding and were inadequately addressed (and repeated in other locations) by the Company during the Class Period.

---

[2]     The continuing violations in these NOVs were detailed in the June 2018 Letter, which did not come to light until described in the June 15, 2020 Presentment of Charges.

- 40 -

94.     In particular, the PaDEP issued the NOV for the G Shields wells on October 20, 2011; for the Costello and Gesford wells on June 16, 2014; for the Ratzel wells on December 19, 2014; and for the Ely wells on March 21, 2018.  Despite Cabot management's receipt of the NOVs, these violations remained outstanding as of the June 2018 Letter, which, as noted above, listed the Company's continuing violations under the December 2010 Consent Order.[3]  Cabot's violations are further detailed in §V.F., *infra*.

### b.     Crimes Related to Cabot's Problem Wells Drilled After 2015 Outside of Dimock

95.     In addition to failing to address the problems with the Dimock gas wells subject to the December 2010 Consent Order, Cabot began drilling new gas wells outside Dimock, but still within Susquehanna County, that suffered from similar violations and well integrity issues: (a) in 2016, Cabot drilled gas wells on the Howell well pad in Auburn Township; (b) in 2017, the Company drilled the Jeffers Farm wells in Harford Township; and (c) in 2019, Cabot drilled the POWERS M wells in Auburn Township.  Shortly after Cabot drilled these gas wells, problems began to appear in local water supplies, just as they had in Dimock.

---

[3]     Nor were these NOVs contemporaneously disclosed.  Rather, they did not become publicly known until the June 2018 Letter came to light in connection with the June 15, 2020 Presentment of Charges.

96.     For each of these wells, and at the time unknown to investors, the PaDEP served Cabot with NOVs during the Class Period for cementing and casing activities that failed to prevent the migration of gas into fresh groundwater, in violation of Pennsylvania law: (a) the Howell gas wells 2H, 4H, 6H and 8H were the subject of two separate PaDEP NOVs on March 16, 2017 and June 20, 2017; (b) the Jeffers Farm gas wells 7H, 8H, 9H, l0H, 11H, 12H, and 14H were the subject of a NOV on November 16, 2017; and (c) the POWERS M gas well 002 was the subject of a NOV on October 18, 2019.

97.     Further, the NOVs for the Howell and Jeffers Farm wells remained unresolved, and were both included in the June 2018 Letter listing Cabot's continuing violations as of that date.  These violations are further detailed in ¶107, *infra*.  Cabot would later reveal in a SEC Form 10-Q, filed on July 26, 2019, that it had received two proposed Consent Order and Agreements that were related to the June 2017 NOV at the Howell gas wells and the November 2017 NOV at the Jeffers Farm gas wells. ¶¶137-139, *infra*.  The other pertinent NOVs identified in the June 2018 Letter were not publicly known until that letter was detailed in the June 15, 2020 Presentment of Charges.

98.     The violations described in ¶¶95-97, *supra*, and ¶107, *infra*, formed the basis of additional criminal charges against Cabot for further violations the Clean

- 42 -

Streams Law's prohibition against the discharge of industrial waste and other pollutions. 35 P.S. §691.301; 35. P.S. §691.401.

99.     In announcing the charges against Cabot in June 2020, Attorney General Shapiro concluded: "The Grand Jury presentments *prove that Cabot took shortcuts that broke the law*, and damaged our environment – harming our water supply and public health." Cabot "put their bottom line ahead of the health and safety of Pennsylvanians," and "[t]he Grand Jury repeatedly found evidence of a company that placed profit over our laws."

### F.   Cabot Repeatedly Violates Pennsylvania's Environmental Regulations

100.    As detailed in the June 2018 Letter, but unknown to investors until 2020, Cabot – both prior to and throughout the Class Period – repeatedly ignored known environmental violations that the Company was obligated to address under the December 2010 Consent Order. These serial violations, which in many instances rose to the level of criminal offenses, belied Defendants' public Class Period misrepresentations, as set forth in in §§VI.-VII., *infra*. Numerous of these violations were based on Cabot's defective cementing and casing activities that failed to prevent the migration of gas into fresh groundwater. These included many of the same violations underlying the Pennsylvania Attorney General's 2020 criminal case against Cabot.

- 43 -

101.   Pursuant to the December 2010 Consent Order signed by Dinges on behalf of Cabot, the Company expressly agreed to "take all actions necessary including, but not limited to, the requirements set forth in th[e] Consent Order and Settlement Agreement, to comply with all applicable environmental laws and regulations, including all applicable provisions of the Clean Streams Law, Oil and Gas Act, and Regulations [promulgated thereunder]."  Cabot further agreed to conduct ongoing testing of its gas wells and water supplies until the identified violations were adequately remediated.

102.   To ensure Cabot's compliance with the December 2010 Consent Order, the PaDEP conditioned its authorization for the completion of any existing Cabot wells and the drilling of any new gas wells in the Dimock Township area upon the PaDEP confirming that Cabot was in compliance with all obligations under the order, following a written request by the Company to renew drilling.

103.   Although Cabot had undertaken some superficial efforts to remediate the environmental impact of its drilling activities, the PaDEP made clear in the nonpublic June 2018 Letter that the Company's obligations under the December 2010 Consent Order remained outstanding throughout the Class Period, as it had yet to restore and/or replace the polluted water supplies and prevent and remediate the unpermitted discharge of natural gas into fresh groundwater sources.

4839-4959-3828.v1

1.      **Cabot Fails to Remediate its Gas Wells Pursuant to its Obligations Under the December 2010 Consent Order and Settlement Agreement**

104.    Despite its agreement to satisfy its obligations under the December 2010 Consent Order and comply with all applicable environmental laws and regulations, Cabot failed to do so between 2010 and 2020. Both before and during the Class Period, the PaDEP consistently advised Cabot, through a parade of NOVs, that it had failed to comply with the terms of the order and that it remained in continuing violation of applicable environmental laws.

105.    The June 2018 Letter, which was written in response to a request by Cabot to begin drilling new gas wells within the Dimock Box, provided a detailed history of Cabot's failure to comply with its obligations under the December 2010 Consent Order and identified each continuing violation that remained unresolved as of the date of the letter. As a result of the unresolved violations, the PaDEP denied Cabot's request to begin drilling, stating that "[u]ntil these compliance matters are resolved, Cabot is not in compliance with its obligation under the 2010 Agreement and cannot begin drilling new Gas Wells within the Dimock/Carter Road Area."

106.    The June 2018 Letter referenced no fewer than four NOVs within Dimock that Cabot had failed to resolve in accordance with its obligations under the December 2010 Consent Order:

(a)     On October 20, 2011, the PaDEP privately issued Cabot a NOV, which was addressed to Stalnaker, for stray gas migration and pollution of a water supply.  Although Cabot installed a treatment system on the water supply and conducted some water sampling, it failed to provide the PaDEP with a final report demonstrating satisfactory water quality of the impacted water supply.  In light of this deficiency, the PaDEP sent Cabot a follow-up letter on January 28, 2013, requesting further information.  Cabot failed to provide a full and complete response.  Violations cited in the October 20, 2011 NOV for failure to prevent the migration of gas or other fluids into sources of fresh groundwater, the existence of defective casing or cementing, and the unpermitted discharge of polluting substances, remained unresolved as of the June 2018 Letter.

(b)     On June 16, 2014, the PaDEP privately issued Cabot another NOV, which was addressed to Stalnaker, for stray gas migration and pollution of water supplies.  Based upon its investigation, the PaDEP determined that an additional water supply had been impacted as a result of stray gas migration associated with Cabot's gas wells.  Although Cabot drilled a new water well for the impacted resident in response, it failed to permanently restore or replace the impacted water supply.  Issues with the integrity of Cabot's gas wells were also unresolved.  Violations cited in the June 16, 2014 NOV for failure to prevent the migration of gas and other fluids

into sources of fresh groundwater, as well as the unpermitted discharge of polluting substances, remained unresolved as of the June 2018 Letter.

(c)     On December 19, 2014, the PaDEP privately issued Cabot another NOV, which was addressed to Stalnaker, for stray gas migration and pollution of water supplies.   Based upon its investigation, the PaDEP determined that two additional water supplies were impacted as a result of stray gas migration associated with Cabot's wells.  Violations cited in the December 19, 2014 NOV for failure to prevent the migration of gas or other fluids into sources of fresh groundwater, general well construction and operation, cement standards, and the unpermitted discharge of polluting substances remained unresolved as of the June 2018 Letter.

(d)     On March 21, 2018, the PaDEP privately issued Cabot another NOV for stray gas migration and pollution of water supplies.   Based upon its investigation, the PaDEP determined that at least one additional water supply was impacted as a result of stray gas migration associated with Cabot's wells.  Violations cited in the March 21, 2018 NOV for failure to prevent the migration of gas or other fluids into sources of fresh groundwater, general well construction and operation, and the unpermitted discharge of polluting substances remained unresolved as of the June 2018 Letter.

4839-4959-3828.v1

### 2.    Cabot's Violations Outside the Dimock Box

107.    Following the December 2010 Consent Order, Cabot began drilling new gas wells in areas outside the Dimock Box.  These gas wells, too, were plagued with integrity issues that similarly polluted water supplies – often just months after Cabot installed the well – and were the subject of private NOVs from the PaDEP:

(a)    In 2016, Cabot drilled gas wells on the Howell pad in Auburn Township, Susquehanna County.  On March 16, 2017 and June 20, 2017, the PaDEP privately issued Cabot NOVs for stray gas migration and pollution of water supplies at the Howell pad.  Based upon its investigation, the PaDEP determined that at least two water supplies were impacted by stray gas migration associated with Cabot's gas wells.  Violations cited in the June 20, 2017 NOV for failure to prevent the migration of gas or other fluids into sources of fresh groundwater, inadequate well construction and operation, cement standards, and unpermitted discharge of polluting substances remained unresolved as of the June 2018 Letter.

(b)    In 2017, Cabot drilled gas wells on the Jeffers Farm in Harford Township, Susquehanna County.  On November 16, 2017, the PaDEP privately issued a NOV to Cabot for a gas migration incident and pollution of private water supplies from the Jeffers well.  Based upon its investigation, the PaDEP determined that at least two water supplies had been impacted by stray gas migration associated with Cabot's wells.  Violations cited in the November 16, 2017 NOV for failure to prevent

- 48 -

the migration of gas or other fluids into sources of fresh groundwater, general well construction and operation, cements standards, and the unpermitted discharge of pollution were unresolved as of the date of June 2018 Letter.

(c)     In 2019, Cabot drilled the POWERS M gas wells in Auburn Township, Susquehanna County.  On October 18, 2019, the PaDEP privately issued a NOV to Cabot for stray gas migration and pollution of private water supplies.  Based upon its investigation, the PaDEP determined that at least one additional water supply had been impacted as a result of stray gas migration associated with Cabot's well. Violations cited in the October 18, 2019 NOV for failure to prevent the migration of gas or other fluids into sources of fresh groundwater, general well construction and operation, and the unpermitted discharge of polluting substances were unresolved through at least January 9, 2020, according to the June 15, 2020 Presentment of Charges by the Attorney General.

### 3.     Additional Violations

108.   Cabot's violations for failures to prevent methane gas migration were not limited to those listed above.  For example, in September 2011, and unbeknownst to investors, the Company received yet another NOV, addressed to Stalnaker, for failing to prevent the migration of gas into fresh groundwater sources in the area surrounding several additional wells owned and operated by Cabot in Susquehanna County.  As described below (*see* ¶123, *infra*), Cabot later disclosed this particular violation after

- 49 -

receiving a proposed consent order to resolve the issue with the PaDEP on November 12, 2015, four years after receiving the NOV. Stalnaker ultimately signed the final version of the consent order and agreement, which Cabot fully executed on December 30, 2016.

### G.   A Former Cabot Geologist Corroborates the Grand Jury's Findings

109.   A former geologist in Cabot's Pittsburgh office from 2011 to 2018 (the "Geologist") further supports the factual findings by both the Grand Jury and the PaDEP. The Geologist, who advised Cabot engineers regarding Cabot's drilling activities, confirmed that problems plagued the cement casings Cabot installed at the Company's gas wells.

110.   The Geologist explained that if natural gas present in a geological formation bubbled up during the cementing process after a well had been drilled, a "micro-annular space" (*i.e.*, a space between casings) could be created that would allow gas to migrate into the water table. The Geologist also explained that a cement job could otherwise be insufficient, which would also allow gas to migrate into the water table. In other words, if the well was not cemented properly, it could create a pathway for the gas to migrate into drinking water.

111.   To test the cement job in its wells, the Geologist stated that Cabot would create a "cement bond log" by placing a rod containing sensors down into the well to test the casings. The sensors sent out sound waves that would bounce off the walls of

- 50 -

the casings and detect annular spaces that were devoid of cement.  According to the Geologist, the cement bond logs often showed that insufficient cement was present in the well.  Specifically, the Geologist stated that it was a common occurrence at Cabot to observe poor or inadequate cement in the "surface casing string," a secondary string of casings installed specifically to protect the groundwater table.  The inadequate surface string cement casings were, in the Geologist's view, "the number one issue for gas migration at the Company's drill sites."

112.   The Cabot wells that the Geologist reviewed routinely did not contain adequate cement bonds in the annular spacing.  The Geologist stated that, "when you saw a good log you were surprised."  The Geologist further indicated that Cabot's cementing problems were not isolated to the Dimock area, but were also present everywhere over Cabot's acreage.

113.   Cabot engineers and geologists received a copy of the cement bond log report from the drill site, and the Geologist believed that Stalnaker reviewed copies of the logs, as well, based on seeing them in his office.  Cabot's internal documentation of casing issues at its wells, as described by the Geologist, is consistent with the violations the PaDEP issued to the Company related to cementing and well integrity problems found at Cabot's wells.  The Geologist explained, moreover, that when issues were identified in the cement bond logs, the Company was reluctant to repair the casings because of the expense.  Once a surface string was set, it would take at

4839-4959-3828.v1

least a day to fix, and Cabot would lose approximately $10,000 to $35,000 per-day in rig costs alone due to the downtime it would take to repair the string.   As the Geologist stated, Cabot was "all about doing things fast and as cost effectively as possible."   According to the Geologist, Cabot did not address the recurring issues concerning the inadequate cement bonding and integrity of the surface string in its wells.

114.   The Geologist also explained that Cabot had the ability to test gas methane levels and isotopes present in residential water wells.   This testing would have identified if there was some level of gas migration prior to drilling, which would have provided a baseline understanding of the amount of gas in the water supply – a baseline that the Attorney General faulted Cabot for not measuring.   The Geologist further stated that Cabot only sampled well water from after a well was drilled if a complaint regarding the well water was made, because every time the Company pulled a water well cap, Cabot would be "attached" and "responsible" for that well. The Geologist explained the Company's view was, "no news is good news," and that Cabot did not want to be "attached" to, or have financial obligations for, the water wells.

115.   The Geologist's description of Cabot's drilling process during the Class Period is corroborated by information found on Cabot's own website, which states, for example, that "[m]aintaining an effective barrier between our oil and gas wells and

water supplies is critical to the protection of these resources" and that "[m]ultiple strings of steel pipe, known as casing, are then cemented into place as each well section is drilled.  The sections at the uppermost portion of the well are designed to provide specific protection for groundwater sources while later sections provide an isolated conduit for production."

116.   Cabot's website further states that "[b]efore hydraulic fracturing begins, Cabot conducts a 'cement bond evaluation' using sound waves" and that "[a]ny anomalies observed during these tests are evaluated and necessary pre-emptive measures are taken to ensure wellbore integrity."  Cabot's website also claims that the Company can offer landowners nearby Cabot drill sites "the opportunity to have their water resource supply tested at our expense," including for "general water quality indicators, metals, dissolved gases, and petroleum constituents."  During the Class Period, however, Cabot failed to address well integrity issues after the cement bond evaluations or test water supplies for baseline methane levels at affected residential water wells.  *See* §§V.E.-G., *supra*.

## VI.   DEFENDANTS' FALSE AND MISLEADING STATEMENTS AND OMISSIONS

117.   Throughout the Class Period, Defendants made a series of materially false and misleading statements and omissions regarding the Company's business, operations, and legal and regulatory compliance.  As detailed below, from 2015-2020, Defendants affirmatively misstated that Cabot complied with applicable

- 53 -

environmental laws and failed to disclose that: (1) Cabot failed to fix known faulty gas wells and otherwise violated its obligations under the December 2010 Consent Order, resulting in the pollution of Pennsylvania water supplies through stray gas migration; (2) Cabot was exposed to significant civil and/or criminal liabilities in Pennsylvania with respect to environmental matters, including for knowing environmental violations that Cabot was obligated to address under the December 2010 Consent Order and numerous NOVs and other communications from Pennsylvania authorities; and (3) Cabot had inadequate environmental controls and procedures for installing and maintaining its gas wells, including inadequate cement bonds and other casing defects that were "the number one issue for gas migration" into groundwater at Cabot's drill sites.

118.   These issues were foreseeably likely to and did subject Cabot to increased governmental scrutiny, investigation and enforcement, as well as increased reputational and financial harm, and also impacted Cabot's ability to achieve its financial and operational projections.  As a result, the Company's public statements, which touted Cabot's purported compliance with environmental regulations and downplayed the risks associated with its conduct in Pennsylvania, were materially false and misleading when made.

119.   The Class Period begins on October 23, 2015, when Cabot filed its quarterly report on Form 10-Q with the SEC (the "3Q15 10-Q") which downplayed

- 54 -

Cabot's potential liabilities with respect to environmental matters, assuring investors, in part:

> From time to time we receive notices of violation from governmental and regulatory authorities in areas in which we operate relating to alleged violations of environmental statutes or the rules and regulations promulgated thereunder.  While we cannot predict with certainty whether these notices of violation will result in fines and/or penalties, if fines and/or penalties are imposed, they may result in monetary sanctions individually or in the aggregate in excess of $100,000.

120.   Defendants repeated this same statement in Cabot's 2015 Form 10-K filed on February 22, 2016 ("2015 10-K"), 2016 Form 10-K filed on February 27, 2017 ("2016 10-K"), 2017 Form 10-K filed on March 1, 2018 ("2017 10-K"), 2018 Form 10-K filed on February 26, 2019 ("2018 10-K"), and 2019 Form 10-K filed on February 25, 2020 ("2019 10-K").  The Company further repeated the same statement in Cabot's other quarterly reports on Forms 10-Q filed with the SEC during the Class Period.

121.   Appended as an exhibit to the 3Q15 10-Q were signed certifications pursuant to the Sarbanes-Oxley Act of 2002, wherein Dinges and Schroeder certified that the filing "does not contain any untrue statement of material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report."  Dinges and Schroeder also attested that they had designed disclosure controls to ensure that material information relating to the Company was

- 55 -

made known to them.  Dinges and Schroeder signed similar statements in connection with the 2015 10-K filed on February 22, 2016, the 2016 10-K filed on February 27, 2017, the 2017 10-K filed on March 1, 2018, the 2018 10-K filed on February 26, 2019, and the 2019 10-K filed on February 25, 2020, and in connection with Cabot's other quarterly reports on Forms 10-Q filed with the SEC during the Class Period.

122.   On February 22, 2016, Cabot filed its 2015 Form 10-K with the SEC, reporting the Company's financial and operating results for the quarter and year ended December 31, 2015, which touted the Company's compliance with environmental law and regulations, representing that Defendants "***believe that [they] substantially comply with the Clean Water Act and related federal and state regulations***."  The federal Clean Water Act, like the Pennsylvania Clean Streams Law, seeks to "restore and maintain . . . the Nation's waters" by, among other means, governing the discharge of certain pollutants into the water.  Defendants repeated this same bolded statement in the 2016 10-K filed on February 27, 2017, the 2017 10-K filed on March 1, 2018, the 2018 10-K filed on February 26, 2019, and the 2019 10-K filed on February 25, 2020.

123.   With respect to Cabot's response to ongoing environmental matters related to gas migration allegations in Susquehanna County, Pennsylvania, the 2015 10-K assured investors, in relevant part, that:  (i) following receipt of a Notice of Violation from the PaDEP in September 2011 for failure to prevent the migration of

gas into fresh groundwater sources in the area surrounding several wells owned and operated by Cabot in Susquehanna County, Pennsylvania, Defendants "***have been engaged with the PaDEP in investigating the incident and have performed appropriate remediation efforts, including the provision of alternative sources of drinking water to affected residents***;" that Defendants "believe the source of methane has been remediated and are working with the PaDEP to reach agreement on the disposition of this matter;" (ii) on November 12, 2015, Defendants received a "proposed Consent Order and Agreement [that] is the culmination of th[eir] effort[s] and, if finalized, would result in the payment of a civil monetary penalty in an amount likely to exceed $100,000, up to approximately $300,000;" and (iii) Defendants "will continue to work with the PaDEP to finalize the Consent Order and Agreement and bring this matter to a close."

124.  Cabot's 1Q16 Form 10-Q filed on May 3, 2016, 2Q16 Form 10-Q filed on July 29, 2016, and 3Q16 Form 10-Q filed on October 28, 2016 contained substantively similar representations as those set forth in ¶123.  Cabot updated this statement in the 2016 10-K filed on February 27, 2017, reflecting that Cabot had finalized the Consent Order and Agreement with the PaDEP.  It stated, in relevant part:

> We believe the source of methane has been remediated and we entered into a Consent Order and Agreement with the PaDEP on December 30, 2016.  We agreed to pay a civil monetary penalty in the amount of

- 57 -

approximately $0.3 million and to continue to provide alternative sources of drinking water to affected residents until the affected water supplies are permanently restored.   Further, the related gas well is being permanently plugged.  Following the plugging of the gas well, additional monitoring will be required to ensure the source of methane has been remediated.  Cabot continues to work with the PaDEP to bring this matter to a close.

125.   On or around March 15, 2017, Cabot published its 2016 Annual Report. The 2016 Annual Report was prepared and distributed by and under the names of Defendants on behalf of Cabot, and featured a letter to shareholders signed by Dinges on behalf of Cabot, which stated, in relevant part: "First and foremost, Cabot's objective is to deliver profitable results and to conduct our operations in a safe and prudent manner for the protection of our employees and contractors *with an unwavering commitment to comply with or exceed all regulations to enhance the environment and communities where we operate*."

126.   On August 20, 2018, Schroeder spoke at the EnerCome Oil & Gas Conference.  During his presentation, he told investors that Cabot's well completion process was "environmentally friendly," stating:

> We have more wells that we're completing right now in the Upper Marcellus.  And look to the February year-end reserve report for data on that.  Question you might ask is, "Okay, why -- if you're doing them now, why don't you tell us sooner?"  *Because of the way we complete our wells in the field to be environmentally friendly, green, however you want to say it*, a long time ago, several years ago, we changed our completion technique.

127.   Cabot then published its 2019 Annual Report on or around March 13, 2020.  The 2019 Annual Report was prepared and distributed by and under the names of Defendants on behalf of Cabot and featured a letter to shareholders signed by Dinges on behalf of Cabot, which stated, in relevant part:  "***We make every effort to reduce and limit our impact on air, water and the environment with the best technologies currently available***" and that "[o]ur commitment to free cash flow, return on capital, and return of capital back to shareholders ***with the least possible impact to the environment remains paramount in importance to us***."

128.   The 2019 Annual report further stated that "Cabot embraces environmental innovation and is a leader in utilizing new technology to reduce our overall impact on the environment" and that "[i]t is from this platform that ***we will continue our efforts to improve the environment, being a beacon of light by doing the right thing***."

129.   The statements referenced in ¶¶119-128 above were materially false and misleading because Defendants omitted then-known (or recklessly disregarded) material information detailed above, including that:

(a)   As confirmed by the June 2020 Presentment of Charges, Cabot repeatedly failed to: (1) fix known faulty gas wells for years, in contravention of its obligations under the December 2010 Consent Order and applicable law; (2) remediate, over a period of years, continuing violations at its wells identified in

various NOVs and formal letters issued to Cabot by the PaDEP, thereby knowingly polluting Pennsylvania's water supplies through stray gas migration and knowingly, serially violating Pennsylvania laws, including the Clean Streams Law; and (3) prevent stray methane gas migration into fresh groundwater by failing to employ proper well construction and cement standards in wells across Pennsylvania in violation of applicable law.

(b)     According to the Geologist, cement bond logs routinely identified insufficient cement in Cabot's wells, as well as poor or inadequate cement in the "surface casing strings," which were secondary casings specifically installed to protect the groundwater table.  The Geologist also stated that, "when you saw a good log you were surprised."  The Geologist further indicated that the problems at Cabot were not isolated to the Dimock area, but were present everywhere over Cabot's acreage.

(c)     Cabot routinely and knowingly failed to comply with the December 2010 Consent Order, itself a violation of the Clean Streams Law, when the Company failed to remediate its gas wells to stop the migration of stray methane gas into Pennsylvania waters.

(d)     The number of outstanding and continuing violations of environmental law that Cabot knowingly failed to remediate constituted "long-term indifference" to applicable law and the damage the Company caused to the

- 60 -

environment and citizens of Susquehanna County, such that its violations were "not merely technical" in nature, but criminal acts.

(e) Cabot continually downplayed its potential civil and/or criminal liabilities with respect to such environmental matters, despite Cabot's management receiving direct communications from Pennsylvania authorities regarding Cabot's serial violations and continuing failure to address it violations of environmental laws and regulations, and its management, Board, and its committees regularly assessing such legal and regulatory risks.

(f) Cabot had inadequate environmental controls and procedures and/or failed to properly mitigate known issues related to those controls and procedures to ensure its gas wells prevented stray methane gas migration into fresh groundwater supplies.

(g) The foregoing was foreseeably likely to subject Cabot to increased governmental scrutiny and enforcement, as well as increased reputational and financial harm.

(h) These issues were reasonably likely to, and would, adversely impact Cabot's ability to achieve its financial and operational projections, given that substantially all of Cabot's production is derived from its wells in Susquehanna County, Pennsylvania.

4839-4959-3828.v1

130.    In addition, the 2015 10-K contained materially false and misleading representations about *potential* risks with respect to "environmental and safety regulations, which can adversely affect the cost, manner or feasibility of doing business" for Cabot, when, in fact, such risks were then *existing*.  The 2015 10-K represented, in relevant part, that Cabot's:

> [O]perations are subject to extensive federal, state and local laws and regulations, including drilling, permitting and safety laws and regulations and those relating to the generation, storage, handling, emission, transportation and discharge of materials into the environment.  These laws and regulations *can* adversely affect the cost, manner or feasibility of doing business. . . .   Governmental authorities have the power to enforce compliance with their regulations, and violations could subject us to fines, injunctions or both. . . . . Failure to comply with these laws also *may* result in the suspension or termination of our operations and subject us to administrative, civil and criminal penalties as well as the imposition of corrective action orders. . . . .

The 2016 10-K filed on February 27, 2017, the 2017 10-K filed on March 1, 2018, the 2018 10-K filed on February 26, 2019, and the 2019 10-K filed on February 25, 2020, contained substantively similar risk warnings.

131.    The statements referenced in ¶130 above were materially false and misleading for the reasons stated in ¶129 herein.

132.    In Cabot's 2015 Proxy Statement on Form Def 14A filed with the SEC on March 12, 2015, the Company highlighted Cabot's Code of Business Conduct as requiring employees' "strict adherence" to legal and regulatory requirements.  The Proxy Statement stated, in relevant part:

- 62 -

All employees, officers and directors are required to comply with the Company's Code of Business Conduct to help ensure that the Company's business is conducted in accordance with the highest standards of moral and ethical behavior. The Code of Business Conduct covers all areas of professional conduct . . . , as well as requiring strict adherence to all laws and regulations applicable to the Company's business. Employees, officers and directors are required annually to reply to a Code of Conduct Questionnaire, which is designed to elicit information related to any known or possible violation of the Code. . . .

133.   Cabot's other Proxy Statements filed during the Class Period contained substantively similar representations as in ¶132.

134.   The statements contained in ¶¶132-133 were materially false and/or misleading because Defendants misrepresented and failed to disclose that Cabot was not in compliance with its Code of Business Conduct, including the requirement that Cabot conduct its business in "strict adherence to all laws and regulations applicable to the Company's business," for the reasons stated in ¶129 herein.

135.   Cabot's Code of Business Conduct itself, which the Company made publicly available and specifically referenced in Cabot's Forms 10-K filed with the SEC during the Class Period, stated, in relevant part, that "[i]t is the Company's policy to observe and comply with all governmental laws, rules and regulations applicable to it or the conduct of its business wherever located." Concerning "The Environment," the Code further stated:

It is Company policy to comply fully with the letter and the spirit of all applicable federal, state, and local environmental protection laws and regulations (the "Environmental Laws"). The Company will

- 63 -

conduct operations in such a manner as to meet or exceed all Environmental Laws in its business activities.

136.   The statements contained in ¶135 were materially false and/or misleading because Defendants misrepresented and failed to disclose that Cabot was not in compliance with its Code of Business Conduct, including the requirement that Cabot "will conduct operations in such a manner as to meet or exceed all Environmental Laws in its business activities," for the reasons stated in ¶129 herein.

## VII.   THE TRUTH EMERGES

137.   On July 26, 2019, the Company filed its 2Q19 10-Q, reporting that it had received two proposed Consent Order and Agreements related to two NOVs from the PaDEP for failure to prevent the migration of gas into fresh groundwater sources in the area surrounding Susquehanna County.  As noted above, Cabot had received the pertinent NOVs in June and November 2017.  Specifically, the 2Q19 10-Q stated, in part:

> We will continue to work with the PaDEP to finalize the [Consent Orders and Agreements], and to bring this matter to a close.  With regard to the November 2017 [Notice of Violation], [t]he proposed [Consent Order and Agreement], if finalized as drafted, would require Cabot to submit a detailed written remediation plan, continue water sampling and other investigative measures and restore or replace affected water supplies and would result in the payment of a civil monetary penalty in an amount likely to exceed $100,000, up to approximately $355,000. We will continue to work with the PaDEP to finalize the [Consent Order and Agreement], and to complete the ongoing investigation and remediation.

138.   Despite this announcement, which partially revealed the truth of Defendants' fraudulent scheme, Defendants continued to misstate and conceal the true extent of their violations and exposure to financial and reputational harm.

139.   For example, in the same section of the 2Q19 10-Q, the Defendants assured investors that, following the receipt of the NOVs from the PaDEP, Defendants "*have been engaged with the PaDEP in investigating the incidents and have performed appropriate remediation efforts*, including the provision of alternative sources of drinking water to the affected residents"; that, "[w]ith regard to the June 2017 [NOV], [Defendants] *believe these water quality complaints have been resolved, and [they] are working with the PaDEP to reach agreement on the disposition of this matter*;" that "[t]he proposed CO&A [for the June 2017 Notice of Violation] is the culmination of [Defendants'] effort[s];" that Defendants "will continue to work with the PaDEP to finalize the CO&A [related to the June 2017 NOV], and to bring this matter to a close;" and that, with respect to the November 2017 NOV, Defendants "will continue to work with the PaDEP to finalize the CO&A, and to complete the ongoing investigation and remediation."   Although this announcement partially revealed that the Company was not in compliance with applicable law, the full extent of the Company's violations continued to be concealed, and the bolded statements in this paragraph were materially false and misleading for the reasons stated in ¶129 herein.

- 65 -

140.   Then, on June 15, 2020, following the Grand Jury's recommendation, the Attorney General's office charged Cabot with fifteen criminal counts arising from its failure to fix faulty gas wells, thereby polluting Pennsylvania's water supplies through stray gas migration.  The Associated Press reported the Grand Jury's findings:

> "We find that, over a period of many years, and despite mounting evidence, Cabot . . . failed to acknowledge and correct conduct that polluted Pennsylvania water through stray gas migration," the grand jury wrote, criticizing Cabot's "long-term indifference to the damage it caused to the environment and citizens of Susquehanna County."

> \*       \*       \*

> "Cabot took shortcuts that broke the law, damaged our environment, harming our water supplies and endangering Pennsylvanians.  They put their bottom line ahead of the health and safety of our neighbors," Attorney General Josh Shapiro said in a video statement.

> \*       \*       \*

> The company has long insisted the gas in Dimock's aquifer is naturally occurring, saying its pre-drill testing of thousands of private water wells in the area show a high percentage with methane.  The grand jury asserted that Cabot's initial sampling of wells and groundwater did not include tests for methane.  State environmental regulators eventually determined that Cabot's drilling and fracking operations leaked explosive levels of methane into private water supplies.

> \*       \*       \*

> Residents said they suffered ill health effects from the contamination of their water with methane and drilling chemicals, including nausea, dizziness, skin rashes, impaired vision and breathing difficulties.  Property values plummeted, too, they said.

141.   The criminal case against Cabot is ongoing, and a preliminary hearing is scheduled to take place in the matter on July 20, 2021.

142.   As a result of Defendants' wrongful acts and omissions, Plaintiffs and the Class purchased Cabot common stock at artificially inflated prices and were damaged thereby.

## VIII.  DEFENDANTS ACTED WITH SCIENTER

143.   The Defendants acted with scienter in that they knew or recklessly disregarded that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading.   The Defendants knowingly or recklessly participated or acquiesced in the issuance or dissemination of such statements or documents as primary violators of the federal securities laws.

144.   By virtue of their receipt of information reflecting the true facts regarding Cabot's operations, as well as their control over and/or receipt of the Company's materially misleading misstatements and/or their associations with the Company that made them privy to confidential proprietary information concerning Cabot, the Defendants were active and culpable participants in the fraudulent scheme alleged herein.  The Defendants knew of and/or recklessly disregarded the alleged false and misleading information they caused to be disseminated to the investing public.  The ongoing fraud as described involved personnel at the highest level of the Company, including the Individual Defendants, and could not have been perpetrated without the

- 67 -

knowledge and/or reckless complicity of personnel at the highest level of the Company, including the Individual Defendants and other senior executives.

145.   Numerous facts support a strong inference of the Defendants' scienter during the Class Period, including: (a) the Individual Defendants' knowledge of and access to information and reports reflecting that Cabot was not in compliance with relevant environmental laws; (b) Defendants' obligations associated with Cabot's disclosure controls and environmental compliance; and (c) that the misstatements and omissions of material facts concerned the Company's core operations.

146.   As detailed herein, there are numerous facts that, taken holistically, give rise to a strong inference that, throughout the Class Period, the Individual Defendants and Cabot knew or, at a minimum, recklessly disregarded that their statements were materially false and misleading.  The cumulative knowledge of Cabot's management team, including, but not limited to, the Individual Defendants, is properly imputed to Cabot.

## A.     The PaDEP and Criminal Investigation Findings Contribute to a Strong Inference of Defendants' Scienter

147.   The pervasive illegal behavior alleged herein is probative of Defendants' scienter.  Here, the Grand Jury and PaDEP investigations demonstrate that prior to and throughout the Class Period, Cabot ignored known violations of environmental law – that the Company's drilling operations caused methane gas to migrate into the water supply of Susquehanna County citizens – and failed to remediate these violations for

- 68 -

years.  Much of the same illegal conduct was also detailed in the June 11, 2018 PaDEP letter to Cabot.  *See* §§V.E.-G.

148.   As detailed herein (*see* §§V.E.-F.), the PaDEP repeatedly put Cabot on notice prior to and throughout the Class Period, through the November 2009, April 2010, and December 2010 Consent Orders, and the NOVs issued to the Company, that Cabot's drilling operations were unlawfully polluting Pennsylvania groundwater, but, nevertheless, Cabot failed to meet its obligation to remediate these offenses, resulting in rampant and repeated violations of environmental law.

## B.   Defendants Have Engaged in a Pattern of Wrongdoing

149.   Courts have recognized that "pattern evidence" (*i.e.*, evidence that a defendant participated in a pattern of malfeasance over a significant period of time), is probative of scienter.  As detailed herein, the Grand Jury and PaDEP investigations and factual findings demonstrate that Cabot exhibited a pattern of willful violation of applicable environmental laws, regulations and other legal obligations over more than a decade.  By way of example, Cabot failed to remediate faulty gas wells for years on end and even attempted to avoid liability by consciously failing to establish baseline methane levels in water wells near Cabot drill sites so that Defendants could maintain plausible deniability regarding their violations.  *See* §V.E.

- 69 -

### C.   Cabot's Gas Exploration and Production in Pennsylvania Is a Core Operation

150.   Defendants' knowledge of or reckless disregard for Cabot's noncompliance with environmental law in the Company's Susquehanna County gas exploration and production operations discussed herein can readily be inferred because these operations were existential to the Company's business.  Substantially all of Cabot's oil and gas production occurred in Susquehanna County during the Class Period.  *See* ¶¶28-30.  Cabot indeed refers to its Marcellus Shale properties there as its "core operations."  Cabot quite literally obtains essentially all of its revenue from its activities in Pennsylvania – the site of its pervasive violations of applicable laws.

### D.   Defendants' Internal Reporting Tracked Cabot's (Non)Compliance with Environmental Laws

151.   As detailed herein, Cabot's management and Board closely monitored the Company's compliance with environmental laws.  *See* §§V.C.1.-3.  Dinges was the Chairman of the Board throughout the Class Period.  Moreover, management provided the S&EA Committee reports on investigations, notices of violations, and remediation activities involving environmental laws or regulations.  In particular, during the Class Period, as set forth above, Cabot received multiple notices of violation from Pennsylvania authorities related to Cabot's wells in Pennsylvania, and was subject to an extended investigation by the Pennsylvania Attorney General that resulted in numerous criminal charges in 2020.  The Audit Committee also received reports from

management concerning regulatory risks.  And Cabot "*routinely reviewed*" its operations purportedly to improve its environmental compliance.  The Company, indeed, held daily meetings to discuss well operations, including any problems with those wells, which were attended by Stalnaker who, according to Dinges, "runs our Marcellus" Shale operations.  In addition, other internal reports accessed and accessible by Cabot's management, such as each gas well's cement bond logs, would have informed Cabot that its wells were not cemented properly so as to prevent stray gas migration into groundwater.  *See* §V.G.

152.    These reports informed Cabot's executives that, as detailed in the PaDEP and Grand Jury investigations, the Company was not undertaking ongoing remediation to address the environmental violations cited in the June 11, 2018 PaDEP letter or otherwise originating from Cabot's defective cement and casing activities, which permitted methane to migrate into fresh groundwater sources throughout Susquehanna County prior to and during the Class Period, in violation of applicable environmental laws and regulations.

**E.      Dinges Was Personally Involved in Addressing the Allegations that Cabot's Drilling Operations Polluted Pennsylvania Waters**

153.    Amid the ongoing controversy concerning Dimock, which began after Cabot started drilling there in 2008, Dinges stated in an April 27, 2010 Cabot press release that the Company has "been an active member of the Appalachia exploration

and production community for over 120 years, and throughout that time we have been committed to conducting compliant, safe operations," and assured the public that "we take every issue involving people and the environment very seriously, and we appreciate the sensitive nature of methane in the water for the citizens of the Commonwealth."

154.   Dinges reiterated his purported commitment to environmental compliance days later on an April 29, 2010 conference call: "Cabot takes safety in all environmental matters extremely seriously.  As Cabot announced Tuesday night in a press release, we will continue to cooperate fully with the Pennsylvania DEP to remedy and resolve the items from the consent order."  In fact, this messaging became a common refrain for Dinges.  During a July 22, 2010 conference call, Dinges promised that "Cabot will continue to work with the DEP and the families affected by the operations to the complete satisfaction and a good conclusion," noting that he thought the "issue ha[d] cast uncertainty with the Street on Cabot's ability to conduct operations in Pennsylvania."

155.   When Cabot announced the December 2010 Consent Order, which Dinges himself signed, he told investors in a December 15, 2010 press release that Cabot was "committed to responsible operations within Susquehanna County," and stated that the "we have redoubled our efforts with the Pennsylvania Department of Environmental Resources to resolve past issues."

- 72 -

156.   Market analysts reacted favorably to the prospect that Cabot appeared committed to rebuilding its reputation.   One analyst from KeyBanc wrote on December 14, 2010: "We believe a settlement would be received favorably by the market, as it would remove a hangover on the stock caused by the negative press associated with its Marcellus operations."   Another analyst from BMO published a report on December 15, 2010, stating: "This is a positive development for Cabot. With the resolution of the water claims and the lifting of the drilling ban, Cabot can begin to repair its reputation, which is likely to facilitate smoother interactions with land holders and reduce delays in drilling and completion activities."

157.   A few month later, Dinges again assured investors and the community on a April 28, 2011 conference call that he and the Company were "doing all we can right now to mitigate any potential risks" relating to gas migrations potentially caused by the Company's drilling operations.

158.   Dinges's intimate personal involvement in promising investors and the public that Cabot was addressing the problems raised in the December 2010 Consent Order further evidences his scienter.  Dinges's detailed pronouncements on this topic provide strong circumstantial evidence that he received or recklessly disregarded information about such matters, which demonstrated, as detailed in the PaDEP and Grand Jury investigations, that Cabot was not, in fact, remediating its gas wells in the Dimock area under the terms of the December 2010 Consent Order.

- 73 -

F.   **Defendants Were Incentivized to Ignore Cabot's Criminal Violations of Environmental Law**

159.   Cabot operated in a highly competitive industry and experienced "strong" and "intense" competition in its primary gas production business.  Moreover, Cabot's competitors had "financial and technological resources and exploration and development budgets that are substantially greater than" Cabot's.

160.   Cabot's focus was therefore on efficiency and, as the Geologist stated, "***doing things fast and as cost effectively as possible***," not on environmental compliance.  As Dinges noted in a July 28, 2016 press release, Cabot was expanding the activity levels of its Marcellus operations '"[b]ased on continued efficiency gains'" and "lower service costs" as Cabot was the '"lowest cost producer in Northeast Pennsylvania.'"   Yet Cabot still worked to "optimize" their drilling, completion and operational efficiencies, to continue to "lower operating costs per unit of production."

161.   And the increased volatility in commodities prices during the Class Period only "dr[o]ve[] [Cabot] to be more efficient," as Dinges said in a October 28, 2016 press release, adding: '"We have been successful at creating a free cash flow positive investment program that still generates growth, while simultaneously driving down our cost structure and our resulting breakeven levels.'"   Cabot's focus on "efficiency" in order to drive revenue incentivized the Defendants to ignore environmental compliance, especially given that the PaDEP was initially

- 74 -

overwhelmed by the size and scope of the fracking boom in Pennsylvania.  As the Attorney General stated on June 15, "[t]he game that Cabot continues to play, risking the lives of people across the Commonwealth for a profit, well, that cannot go on any longer."

### G.    Defendants' Violation of Company Policy Supports an Inference of Scienter

162.    The Company purports to have a robust policy of compliance with environmental laws.  *See* §V.C, *supra*.  To that end, Cabot's Code of Conduct states that the "Company will conduct operations in such a manner as to meet or exceed all Environmental Laws in its business activities." ¶48.  Despite these commitments, the Company continuously violated its own policies throughout the Class Period by knowingly failing to abide by the Clean Streams Law and regulations promulgated under the Oil and Gas Act prohibiting stray gas pollution and requiring sound cementing of its well casings.  *See* §§V.E.-G., *supra*.  These violations enhance the inference of scienter.

### H.    Cabot Operates in a Highly Regulated Industry

163.    As acknowledged in various Company SEC filings during the Class Period, Cabot is subject to extensive federal, state, and local laws and regulations relating to its drilling and production operations.  Violations of those laws and regulations subjected Cabot to extensive fines, penalties, and business disruptions. Given this comprehensive and onerous regulatory scheme, it can be inferred that the

- 75 -

Individual Defendants and those working at or under their direction closely monitored the Company's compliance with environmental law during the Class Period.

## I.    Dinges's and Schroeder's SOX Certifications and Signing of SEC Filings Further Support a Strong Inference of Scienter

164.    Defendants' scienter is also underscored by the Sarbanes-Oxley certifications signed by Dinges and Schroeder, which acknowledged their responsibility to investors for establishing and maintaining controls to ensure that material information about Cabot was made known to them and that the Company's disclosure controls were operating effectively.

165.    During the Class Period, Dinges and Schroeder repeatedly certified that they had undertaken an assessment and evaluation of the Company's disclosure controls to ensure that their SEC filings did not contain any false information, including controls designed to ensure all relevant and material information is reviewed by Dinges and Schroeder prior to certifying those filings pursuant to Sarbanes-Oxley. This further establishes that Dinges and Schroeder knowingly misled the market, or were reckless in making such representations and executing such certifications because Dinges and Schroeder were at that time aware of and/or recklessly disregarded material weaknesses in Cabot's system of internal controls concerning environmental compliance and disclosures regarding the same that were not disclosed to the investing public.

4839-4959-3828.v1

## J.    The Duration and Magnitude of the Misconduct Adds to the Inference of Scienter

166.    The duration and magnitude of the misconduct also supports an inference of scienter.  That Cabot's knowing non-compliance with applicable environmental law continued for several years relating to multiple different wells in multiple different locations following the December 2010 Consent Order demonstrates that the fraud was not the result of a temporary lapse in otherwise rigorous management oversight, but rather was caused by a sustained course of misconduct facilitated by Cabot's senior executives that rose to the level of felony crimes.

## K.    Dinges's Stock Sales Support a Motive to Commit Fraud

167.    Dinges was CEO and Chairman of the Board and, as set forth herein, possessed material non-public information regarding Cabot's business.  Dinges exploited his access to and knowledge of material non-public information by selling 66,610 shares of Cabot stock at artificially inflated prices for over $1.8 million in proceeds on November 2, 2017.

168.    Dinges's stock sales during the Class Period were both suspicious and unusual.  His November 2017 transactions occurred while the price of Cabot common stock was near its Class Period high and just two weeks before Cabot formally received the November 16, 2017 NOV from the PaDEP relating to repeated prior failures to prevent the migration of gas into fresh groundwater caused by drilling at Cabot wells.  Moreover, Dinges did not regularly sell his Cabot stock.  Prior to

- 77 -

November 2017, Dinges had not sold any other Cabot stock during the Class Period. In fact, Dinges's last sale of Cabot stock occurred in 2012, five years earlier. His November 2017 stock sales were therefore out of the ordinary and occurred while he was in possession of material non-public information concerning Cabot's non-compliance with environmental law.

## IX.   LOSS CAUSATION

169.   Defendants' wrongful conduct, as alleged herein, directly and proximately caused Plaintiffs' and Class members' economic loss. Plaintiffs' claims for securities fraud are asserted under the fraud-on-the-market theory of reliance. The markets for Cabot's common stock were open, well-developed and efficient at all relevant times. During the Class Period, as detailed herein, Defendants made false and misleading statements by misrepresenting that Cabot had remediated faulty wells that were polluting Pennsylvania's water supplies with methane and other noxious chemicals. Defendants' conduct artificially inflated the price of Cabot common stock and operated as a fraud or deceit on the Class.

170.   The Class Period inflation in Cabot's stock price was removed when information concealed by Defendants' false or misleading statements was revealed to the market. The information was disseminated through partial disclosures that revealed the nature and extent of Defendants' failure to remediate the faulty wells. These disclosures, as more particularly described below, removed artificial inflation

- 78 -

from Cabot common stock, causing economic injury to Plaintiffs and other members of the Class.

171.    The corrective impact of the partial disclosure during the Class Period alleged herein, however, was tempered by Defendants' continued false and misleading statements that continued to conceal the true nature of Defendants' fraud.  The partial disclosure did not on its own fully remove the inflation from Cabot's stock price, because it only partially revealed the nature and extent of the fallout from Defendants' previously misrepresented and concealed well remediation activities.  Defendants' continued misrepresentations maintained the price of Cabot common stock at a level that was inflated by fraud, inducing members of the Class to continue purchasing shares in Cabot even after Defendants' partial disclosure.

172.    The disclosures that corrected the market price to eliminate the inflation maintained by Defendants' fraud are detailed below.  These stock price declines were due to firm-specific, fraud-related disclosures and not the result of market, industry, or firm-specific, non-fraud factors.   The following stock price declines are not necessarily comprehensive since fact and expert discovery are not complete.

173.    A partial disclosure relating to Cabot's failure to remediate the faulty oil wells entered the market on July 26, 2019, when Cabot filed disappointing 2Q19 financial results on Form 10-Q and disclosed that it had received two proposed Consent Order and Agreements from the PaDEP "relating to gas migration allegations

in areas surrounding several wells owned and operated by us in Susquehanna County, Pennsylvania." Defendants further disclosed that the Consent Order and Agreements related to NOV received from the PaDEP nearly two years earlier – in November 2017 – "for failure to prevent the migration of gas into fresh groundwater sources in the area surrounding these wells."

174.   As a result of the July 26, 2019 partial disclosure, the price of Cabot stock declined 12% on volume of more than 22.6 million shares to close at $19.16 per share on July 26, 2019.  In contrast to the 12% decline in Cabot common stock, the Dow Jones U.S. Exploration & Production Index fell by less than a half a percent.[4]

175.   Despite the negative news disclosed in the July 26, 2019 Form 10-Q, Defendants falsely reassured the market that Cabot had "performed appropriate remediation efforts, including the provision of alternative sources of drinking water to the affected residents." Defendants also falsely stated that the violations giving rise to the November 2017 Notices of Violation had been "resolved." Defendants' continued false and misleading statements regarding Cabot's remediation efforts and its exposure related thereto, however, maintained artificial inflation in the price of Cabot's common stock.

---

[4]     For purposes of comparing its stock price performance vis-à-vis the oil and gas market, Cabot referred investors to the Dow Jones U.S. Exploration & Production Index.

4839-4959-3828.v1

176.   Then, before the market opened on June 15, 2020, following the two-year Grand Jury investigation, the Pennsylvania Attorney General's office charged Cabot with fifteen criminal counts – including nine felonies – arising from its failure to remediate faulty gas wells, thereby polluting Pennsylvania's water supplies through stray gas migration.   The Grand Jury report noted the Company's "long-term indifference" to the damage it caused to Pennsylvania water supplies.  The Grand Jury presentment continued: "We find that, over a period of many years, and despite mounting evidence, Cabot Oil & Gas failed to acknowledge and correct conduct that polluted Pennsylvania water through stray gas migration.  Indeed, some of these gas wells have been in place for more than a decade, yet Cabot has only recently taken steps to remediate them."  In announcing the charge, Attorney General Shapiro stated: "Cabot took shortcuts that broke the law, damaged our environment, harming our water supplies and endangering Pennsylvanians.  They put their bottom line ahead of the health and safety of our neighbors."

177.   As a result of the June 15, 2020 disclosure, the price of Cabot stock declined more than 3% on volume of more than 7.6 million shares to close at $19.40 per share.  In contrast to the more than 3% decline in Cabot common stock, the Dow Jones U.S. Exploration & Production Index actually *increased* slightly.

178.   The chart below shows Cabot's stock price during the Class Period and the dates of Defendants' disclosures:

4839-4959-3828.v1



## X.   APPLICABILITY OF THE PRESUMPTION OF RELIANCE AND FRAUD ON THE MARKET

179.   Plaintiffs will rely upon the presumption of reliance established by the fraud-on-the-market doctrine in that, among other things:

(a)   Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

(b)   The omissions and misrepresentations were material;

(c)   Cabot common stock traded in an efficient market;

(d)   The misrepresentations alleged would tend to induce a reasonable investor to misjudge the value of Cabot common stock; and

(e)     Plaintiffs and other members of the Class purchased Cabot common stock between the time Defendants misrepresented or failed to disclose material facts and the time the true facts were disclosed, without knowledge of the misrepresented or omitted facts.

180.   At all relevant times, the market for Cabot common stock was efficient for the following reasons, among others:

(a)     Cabot common stock met the requirements for listing, and was listed and actively traded on the NYSE, a highly efficient and automated market;

(b)     As a regulated issuer, Cabot filed periodic public reports with the SEC; and

(c)     Cabot regularly communicated with public investors via established market communication mechanisms, including through regular dissemination of press releases on the major news wire services and through other wide-ranging public disclosures, such as communications with the financial press, securities analysts and other similar reporting services.

## XI.   NO SAFE HARBOR

181.   Many (if not all) of Defendants' false and misleading statements during the Class Period were not forward-looking statements ("FLS") and/or identified as such by Defendants, and thus did not fall within any "Safe Harbor."

182.    Defendants' verbal "Safe Harbor" warnings accompanying its oral FLS issued during the Class Period were ineffective to shield those statements from liability.

183.    Defendants are also liable for any false or misleading FLS pleaded because, at the time each FLS was made, the speaker knew the FLS was false or misleading and the FLS was authorized and/or approved by an executive officer of Cabot who knew that the FLS was false or misleading.  Further, none of the historic or present tense statements made by Defendants were assumptions underlying or relating to any plan, projection or statement of future economic performance, as they were not stated to be such assumptions underlying or relating to any projection or statement of future economic performance when made.

## XII.   CLASS ACTION ALLEGATIONS

184.    Plaintiffs bring this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of all persons who purchased or otherwise acquired Cabot common stock during the Class Period.  Excluded from the Class are Defendants and their families, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns, and any entity in which Defendants have or had a controlling interest.

- 84 -

185.   The members of the Class are so numerous that joinder of all members is impracticable.  The Company's stock is actively traded on the NYSE, and there are nearly 400 million shares of Cabot stock outstanding.  While the exact number of Class members is unknown to Plaintiffs at this time and can only be ascertained through appropriate discovery, Plaintiffs believe that there are hundreds or thousands of members in the proposed Class.  Record owners and other members of the Class may be identified from records maintained by Cabot or its transfer agents and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

186.   Common questions of law and fact predominate and include: (i) whether Defendants violated the 1934 Act; (ii) whether Defendants omitted and/or misrepresented material facts; (iii) whether Defendants knew or recklessly disregarded that their statements were false and misleading; and (iv) whether Defendants' statements and/or omissions artificially inflated the price of Cabot common stock and the extent and appropriate measure of damages.

187.   Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

4839-4959-3828.v1

188.    Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class and securities litigation.

189.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small per Class member, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## XIII.  CLAIMS FOR RELIEF

### COUNT I

**For Violation of §10(b) of the 1934 Act and Rule 10b-5
Against All Defendants**

190.    Plaintiffs incorporate ¶¶1-189 by reference.

191.    During the Class Period, Defendants disseminated or approved the false statements specified above, which they knew or recklessly disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

192.    Defendants violated §10(b) of the 1934 Act and Rule 10b-5 in that they:

- 86 -

(a)    Employed devices, schemes, and artifices to defraud;

(b)    Made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

(c)    Engaged in acts, practices, and a course of business that operated as a fraud or deceit upon Plaintiffs and others similarly situated in connection with their purchases of Cabot common stock during the Class Period.

193.   Plaintiffs and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for Cabot common stock. Plaintiffs and the Class would not have purchased Cabot common stock at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by Defendants' misleading statements and omissions.

194.   As a direct and proximate result of these Defendants' wrongful conduct, Plaintiffs and the other members of the Class suffered damages in connection with their purchases of Cabot common stock at artificially inflated prices during the Class Period.

## COUNT II

### For Violation of §20(a) of the 1934
### Act Against All Defendants

195.   Plaintiffs incorporate ¶¶1-194 by reference.

196.    During the Class Period, the Defendants acted as controlling persons of Cabot within the meaning of §20(a) of the 1934 Act.  By virtue of their positions and their power to control public statements about the Company, the Individual Defendants had the power and ability to control the actions of the Company and their employees.  Cabot controlled the Individual Defendants and its other officers and employees.  By reason of such conduct, Defendants are liable pursuant to §20(a) of the 1934 Act.

## XIV.  PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for judgment as follows:

A.    Determining that this action is a proper class action, certifying Plaintiffs as class representatives under Rule 23 of the Federal Rules of Civil Procedure, and designating Plaintiffs' counsel as Class Counsel;

B.    Awarding Plaintiffs and the members of the Class damages and interest;

C.    Awarding Plaintiffs' reasonable costs, including attorneys' fees; and

D.    Awarding such equitable/injunctive or other relief as the Court may deem just and proper.

## XV.  JURY DEMAND

Plaintiffs demand a trial by jury.

DATED:  April 12, 2021          SAXTON & STUMP
LAWRENCE F. STENGEL (PA #32809)


s/ LAWRENCE F. STENGEL
LAWRENCE F. STENGEL

280 Granite Run Drive, Suite 300
Lancaster, PA  17601
Telephone:  717/556-1000
717/441-3810 (fax)
lfs@saxtonstump.com

Local Counsel for Lead Plaintiff

ROBBINS GELLER RUDMAN
  & DOWD LLP
DARRYL J. ALVARADO
KEVIN A. LAVELLE
FRANCISCO J. MEJIA
655 West Broadway, Suite 1900
San Diego, CA  92101-8498
Telephone:  619/231-1058
619/231-7423 (fax)
dalvarado@rgrdlaw.com
klavelle@rgrdlaw.com
fmejia@rgrdlaw.com

Lead Counsel for Lead Plaintiff

- 89 -

KESSLER TOPAZ MELTZER
  & CHECK, LLP
ANDREW L. ZIVITZ
JOSHUA E. D'ANCONA
HENRY W. LONGLEY
280 King of Prussia Road
Radnor, PA  19087
Telephone: 610/667-7706
610/667-7056 (fax)
azivitz@ktmc.com
jdancona@ktmc.com
hlongley@ktmc.com

Additional Counsel for the Class

- 90 -

<u>CERTIFICATE OF SERVICE</u>

I hereby certify under penalty of perjury that on April 12, 2021, I authorized the electronic filing of the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the e-mail addresses on the attached Electronic Mail Notice List, and I hereby certify that I caused the mailing of the foregoing via the United States Postal Service to the non-CM/ECF participants indicated on the attached Manual Notice List.

s/ LAWRENCE F. STENGEL
LAWRENCE F. STENGEL

280 Granite Run Drive, Suite 300
Lancaster, PA  17601
Telephone:  717/556-1000
717/441-3810 (fax)

E-mail:  lfs@saxtonstump.com

- 1 -

4839-4959-3828.v1

# Mailing Information for a Case 3:20-cv-01815-CCC Delaware County Employees Retirement System v. Cabot Oil & Gas Corporation et al

## Electronic Mail Notice List

The following are those who are currently on the list to receive e-mail notices for this case.

- **Amy L. Barrette**
  amy.barrette@bipc.com,tara.klingensmith@bipc.com

- **Lawrence F. Stengel**
  lfs@saxtonstump.com,cag@saxtonstump.com,jss@saxtonstump.com

- **Peter Stokes**
  peter.stokes@nortonrosefulbright.com

## Manual Notice List

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

```
Darryl          J. Alvarado
Robbins Geller Rudman & Dowd, LLP
655 West Broadway
Suite 1900
San Diego, CA 92101

Kevin           A. Lavelle
Robbins Geller Rudman & Dowd, LLP
655 West Broadway
Suite 1900
San Diego, CA 92101

Francisco       J. Mejia
Robbins Geller Rudman & Dowd, LLP
655 West Broadway
Suite 1900
San Diego, CA 92101

Gerard          G. Pecht
Norton Rose Fulbright US LLP
Fulbright Tower
1301 McKinney
Suite 5100
Houston, TX 77010
```

**EXHIBIT A**

## CERTIFICATION

Iron Workers District Council (Philadelphia and Vicinity) Retirement and Pension Plan ("Plaintiff") declares, as to the claims asserted under the federal securities laws, that:

1.      Plaintiff did not purchase the securities that are the subject of this action at the direction of Plaintiff's counsel or in order to participate in any private action.

2.      Plaintiff is willing to serve as a representative party on behalf of the class, including providing testimony at deposition and trial, if necessary.

3.      Plaintiff's Class Period purchase and sale transactions in Cabot Oil & Gas Corporation securities that are the subject of this action are attached in Schedule A.

4.      Plaintiff has full power and authority to bring suit to recover for its investment losses.

5.      Plaintiff has fully reviewed the facts and allegations of the Consolidated Complaint for Violation of the Federal Securities Laws and authorizes its filing.

6.      I, William Kolfenbach, Plan Administrator, am authorized to make legal decisions on Plaintiff's behalf.

7.      Plaintiff intends to actively monitor and vigorously pursue this action for the benefit of the class.

8.      Plaintiff will endeavor to provide fair and adequate representation and work directly with the efforts of class counsel to ensure that the largest recovery for the class consistent with good faith and meritorious judgment is obtained.

9.      Plaintiff has served as a representative party for a class action filed under the federal securities laws during the three years prior to the date of this Certification in *Iron Workers District*

*Council (Philadelphia & Vicinity) Retirement & Pension Plan v. The Kraft Heinz Co.*, No. 19-cv-1845 (N.D. Ill.) (filed initial complaint, not appointed lead plaintiff).[1]

10.     Plaintiff sought to serve (but was not appointed as of the date of this Certification) as a representative party for a class action filed under the federal securities laws during the three years prior to the date of this Certification in: *In re Aegean Marine Petroleum Network, Inc. Securities Litigation*, No. 18-cv-4993 (S.D.N.Y.); *In re Newell Brands, Inc. Securities Litigation*, No. 18-cv-10878 (D.N.J.); *Construction Laborers Pension Trust for Southern California v. CBS Corp.*, No. 18-cv-7796 (S.D.N.Y.); and *Georgia Firefighters' Pension Fund v. Anadarko Petroleum Corp.*, No. 20-cv-576 (S.D. Tex.).

11.     Plaintiff will not accept any payment for serving as a representative party on behalf of the class beyond Plaintiff's pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the class as ordered or approved by the Court.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this ___5th___ day of April 2021.

**Iron Workers District Council (Philadelphia and Vicinity) Retirement and Pension Plan**

By: _____

William Kolfenbach
*Plan Administrator*

---

[1] *Iron Workers District Council (Philadelphia & Vicinity) Retirement & Pension Plan v. The Kraft Heinz Co.*, No. 19-cv-1845 (N.D. Ill.), was consolidated into *In re Kraft Heinz Securities Litigation*, No. 19-cv-1339 (N.D. Ill.).

**SCHEDULE A**

| Security | Buy/Sell | Date | Quantity | Price |
|---|---|---|---|---|
| Common Stock | BUY | 9/1/2017 | 5,788 | $26.46 |
| Common Stock | BUY | 11/2/2018 | 1,300 | $24.46 |
| Common Stock | BUY | 11/5/2018 | 100 | $26.12 |
| Common Stock | BUY | 11/5/2018 | 700 | $25.71 |
| Common Stock | BUY | 11/5/2018 | 100 | $26.14 |
| Common Stock | BUY | 11/6/2018 | 184 | $25.77 |
| Common Stock | BUY | 11/6/2018 | 200 | $25.64 |
| Common Stock | BUY | 11/13/2018 | 387 | $26.66 |
| Common Stock | BUY | 11/27/2018 | 636 | $24.30 |
| Common Stock | BUY | 11/27/2018 | 500 | $24.48 |
| Common Stock | BUY | 11/27/2018 | 400 | $24.35 |
| Common Stock | BUY | 12/14/2018 | 100 | $23.28 |
| Common Stock | BUY | 12/14/2018 | 260 | $23.32 |
| Common Stock | BUY | 12/14/2018 | 100 | $23.31 |
| Common Stock | BUY | 12/17/2018 | 100 | $22.60 |
| Common Stock | BUY | 12/17/2018 | 100 | $22.58 |
| Common Stock | BUY | 12/17/2018 | 324 | $22.63 |
| Common Stock | BUY | 12/17/2018 | 96 | $22.61 |
| Common Stock | BUY | 12/27/2018 | 31 | $22.94 |
| Common Stock | BUY | 2/4/2019 | 100 | $24.87 |
| Common Stock | BUY | 2/5/2019 | 500 | $24.89 |
| Common Stock | BUY | 2/6/2019 | 195 | $24.35 |
| Common Stock | BUY | 2/15/2019 | 1,271 | $25.07 |
| Common Stock | BUY | 3/13/2019 | 756 | $25.94 |
| Common Stock | BUY | 6/25/2019 | 66 | $22.98 |
| Common Stock | BUY | 7/29/2019 | 1,030 | $19.11 |
| Common Stock | BUY | 8/19/2019 | 111 | $16.75 |
| Common Stock | BUY | 8/19/2019 | 200 | $16.74 |
| Common Stock | BUY | 11/11/2019 | 400 | $17.92 |
| Common Stock | BUY | 11/11/2019 | 430 | $17.80 |
| Common Stock | BUY | 11/22/2019 | 400 | $16.45 |
| Common Stock | BUY | 11/22/2019 | 100 | $16.41 |
| Common Stock | BUY | 11/22/2019 | 600 | $16.41 |
| Common Stock | BUY | 11/25/2019 | 347 | $16.71 |
| Common Stock | BUY | 1/2/2020 | 100 | $17.11 |
| Common Stock | BUY | 1/2/2020 | 299 | $17.16 |
| Common Stock | BUY | 1/2/2020 | 500 | $17.04 |
| Common Stock | BUY | 2/3/2020 | 100 | $14.19 |
| Common Stock | BUY | 2/3/2020 | 600 | $14.20 |

| Common Stock | BUY  | 2/4/2020   | 92    | $14.62 |
|--------------|------|------------|-------|--------|
| Common Stock | BUY  | 2/28/2020  | 923   | $13.56 |
| Common Stock | BUY  | 2/28/2020  | 100   | $13.67 |
| Common Stock | SELL | 1/8/2018   | 234   | $28.72 |
| Common Stock | SELL | 1/9/2018   | 1,196 | $29.01 |
| Common Stock | SELL | 1/10/2018  | 874   | $28.40 |
| Common Stock | SELL | 1/11/2018  | 1,066 | $28.47 |
| Common Stock | SELL | 1/12/2018  | 1,214 | $28.61 |
| Common Stock | SELL | 1/16/2018  | 1,204 | $28.23 |
| Common Stock | SELL | 3/20/2020  | 600   | $15.54 |
| Common Stock | SELL | 3/20/2020  | 100   | $15.94 |
| Common Stock | SELL | 4/9/2020   | 600   | $18.94 |
| Common Stock | SELL | 4/9/2020   | 100   | $18.88 |
| Common Stock | SELL | 4/13/2020  | 682   | $19.20 |
| Common Stock | SELL | 4/21/2020  | 500   | $21.08 |
| Common Stock | SELL | 4/21/2020  | 100   | $21.19 |
| Common Stock | SELL | 4/21/2020  | 100   | $20.90 |
| Common Stock | SELL | 4/21/2020  | 100   | $21.03 |
| Common Stock | SELL | 4/22/2020  | 900   | $20.84 |
| Common Stock | SELL | 4/22/2020  | 100   | $20.72 |
| Common Stock | SELL | 4/23/2020  | 100   | $20.54 |
| Common Stock | SELL | 4/23/2020  | 481   | $20.31 |
| Common Stock | SELL | 5/4/2020   | 300   | $19.91 |
| Common Stock | SELL | 5/4/2020   | 100   | $19.96 |
| Common Stock | SELL | 5/4/2020   | 200   | $20.02 |
| Common Stock | SELL | 5/4/2020   | 205   | $20.14 |