# EXHIBIT A

**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

DELAWARE COUNTY EMPOLOYEES       )          No. 4:21-cv-2045
RETIREMENT SYSTEM, et al         )
                                 )
                                 )          Houston, Texas
VS.                              )          9:54 a.m.
                                 )
                                 )          NOVEMBER 29, 2021
TREPPEL FAMILY TRUST U/A          )
08/18/18, et al                  )


**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

JODY EZELL, DERIVATIVELY ON      )          No. 4:21-cv-2046
BEHALF OF NOMINAL DEFENDANT      )
CABOT OIL & GAS CORPORATION,     )
et al                            )          Houston, Texas
                                 )          9:54 a.m.
                                 )
VS.                              )          NOVEMBER 29, 2021
                                 )
                                 )
CABOT OIL & GAS CORPORATION,     )
et al                            )


\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

**MOTION HEARING VIA ZOOM**

**BEFORE THE HONORABLE CHIEF JUDGE LEE H. ROSENTHAL**

**UNITED STATES DISTRICT JUDGE**

**VOLUME 1 OF 1**


\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

KATHY MILLER, RMR, CRR  -  kathy@miller-reporting.com

APPEARANCES:   (ALL PARTIES APPEARING VIA ZOOM)

FOR DELAWARE COUNTY EMPLOYEES RETIREMENT SYSTEM:

    Mr. Kevin Lavelle
    Mr. Darryl James Alvarado
    Robbins Geller Rudman & Dowd LLP
    655 W. Broadway, Suite 1900
    San Diego, CA 92101
    619-231-1058
    Email:  Klavelle@rgrdlaw.com
           Dalvarado@rgrdlaw.com

    Mr. Joe Kendall
    Kendall Law Group, PLLC
    3811 Turtle Creek Blvd.
    Suite 1450
    Dallas, TX 75219
    Tel:  214-744-3000
    Email: Jkendall@kendalllawgroup.com

FOR IRON WORKERS DISTRICT COUNCIL (PHILADELPHIA AND VICINITY) RETIREMENT AND PENSION PLAN:

    Mr. Joshua Edward D'Ancona
    Kessler Topaz Meltzer Check, LLP
    280 King of Prussia Road
    Radnor, PA 19087
    Tel:  610-667-7706
    Email: Jdancona@ktmc.com

FOR JODY EZELL DERIVATIVELY ON BEHALF OF NOMINAL DEFENDANT CABOT OIL & GAS CORPORATION, HUDSON AND FISCHER:

    Mr. Benjamin Isaac Sachs-Michaels
    Mr. Matt Houston
    Glancy Prongay Murray
    712 Fifth Avenue
    Suite 31st Floor
    New York, NY 10019
    Tel:  212-935-7400
    Email: Bsachsmichaels@glancylaw.com

    Mr. Stuart Lee Cochran
    Steckler Wayne Cochran Cherry, PLLC
    12720 Hillcrest Rd., Suite 1045
    Dallas, TX 75230
    Tel:  972-387-4040
    Email:  Stuart@swclaw.com

FOR COOPERATING PLAINTIFFS AND JOHN HUDSON:

    Mr. Nicolas Kravitz
    Ms. Melinda Nicholson
    Ms. Alayne Gobeille
    Kahn Swift & Foti
    1100 Poydras Street
    Suite 3200
    New Orleans, LA 70163
    Tel:  504-455-1400

FOR THE TREPPEL FAMILY TRUST U/A 08/18/18:

    Mr. Balon B. Bradley
    11910 Greenville Ave.
    Suite 220
    Dallas, TX 75243
    Tel:  972-991-1582
    Email:  Balon@bbradleylaw.com

    Mr. Shane P. Sanders
    Robbins LLP
    5040 Shoreham Place
    San Diego, CA 92122
    Tel:  619-525-3990
    Email: Ssanders@robbinsllp.com
           KLavelle@robbinsllp.com

FOR THE CABOT OIL & GAS CORPORATION:

    Mr. Peter Andrew Stokes
    Norton Rose Fulbright US LLP
    98 San Jacinto Blvd.
    Suite 1100
    Austin, TX 78701
    Tel:  512-536-5287
    Email: Peter.stokes@nortonrosefulbright.com

COURT REPORTER:

    Ms. Kathleen K. Miller, CSR, RMR, CRR
    515 Rusk, Room 8004
    Houston, Texas  77002
    Tel:  713-250-5087

Proceedings recorded by mechanical stenography.
Transcript produced by computer-assisted transcription.

                KATHY MILLER, RMR, CRR  -  kathy@miller-reporting.com

P R O C E E D I N G S

THE COURT:  Good morning.  Is everybody present?

MR. BRADLEY:  Good morning, Your Honor.

THE COURT:  Let me get the appearances of all of you who are going to be speaking, and when you -- because we have so many, for our court reporter, if you could, each time you speak, remind us who you are speaking on behalf of, that will be helpful.

All right.  Let's start with the derivative counsel, and then move to the securities class action plaintiffs first.

MS. NICHOLSON:  Good morning, Your Honor.  This is Melinda Nicholson from Kahn, Swick and Foti, counsel for the cooperating plaintiffs, and John Hudson.  My cocounsel, Ben Sachs-Michaels, intended to present, and I do not see him on the screen.

THE COURT:  We are a few minutes early.

MS. NICHOLSON:  Yes.

THE COURT:  We are a few minutes early, so let's get the other appearances while we're waiting.

MS. NICHOLSON:  Matt, we're doing plaintiffs' counsel for derivative if you want to take the next turn.

MR. HOUSTON:  Yes.  Good morning, Your Honor.  This is Matt Houston from Glancy, Prongay & Murray on

behalf of derivative plaintiffs.

THE COURT:  All right.

MR. SANDERS:  Good morning, Your Honor.  Shane Sanders from Robbins, LLP, on behalf of plaintiff, The Treppel Family Trust, one of the derivative plaintiffs.

THE COURT:  Okay.

MR. COCHRAN:  Good morning, Your Honor.  This is Stuart Cochran.  I'm liaison counsel for the Glancy firm.  I will mostly be quiet today.

THE COURT:  Good.  And, I'm sorry, who is going to be speaking on behalf of the Treppel Family Trust? Mr. Sanders?

MR. SANDERS:  I will, Your Honor.  Mr. Sanders.

THE COURT:  Okay.  Thank you.

MR. HOUSTON:  Your Honor, I don't know if it has been made clear by Melinda Nicholson or not, but speaking on behalf of the Cabot derivative plaintiffs will be Ben Sachs-Michaels of my firm, who has yet to join the call.

THE COURT:  All right.  Thank you.  Go ahead. Anybody else on behalf of the derivative plaintiffs, either of the two groups?

All right.  The derivative defendants?

MR. STOKES:  Good morning, Your Honor.  This is Peter Stokes at Norton Rose Fulbright, and I will be

speaking today on behalf of all defendants in both cases.

THE COURT:  All right.  Other plaintiffs, then, in the class case?

MR. KENDALL:  Joe Kendall, and I don't intend to speak unless, like law school, I am called on.

THE COURT:  All right.  I assume someone is going to be doing that.

MR. LAVELLE:  Good morning, Your Honor.  This is Kevin Lavelle from Robbins Geller Rudman & Dowd on behalf of Delaware County Employees Retirement System, and I will be speaking today on behalf of the plaintiffs in the securities class action.

THE COURT:  All right.  Is there anybody who is -- I see that Mr. Sachs-Michaels is on the phone.  You are going to be speaking on behalf of the non-Treppel group of plaintiffs; is that correct?

MR. SACHS-MICHAELS:  Yes.  Good morning, Your Honor.  I'm sorry if I am a little bit late.

THE COURT:  No.  Actually, we started a little bit early.  So you are going to be speaking on behalf of?

MR. SACHS-MICHAELS:  Plaintiffs Ezell, Hudson and Fischer.

THE COURT:  All right.  I am going to call you the Hudson-Ezell group.  Go ahead.

MR. D'ANCONA:  Good morning, your honor.  My

name is Josh D'Ancona.  I'm here from Kessler Topaz Meltzer & Check in the securities class case.  I will not be speaking today.

THE COURT:  Great.  Anyone else who is present, wants your appearance recorded on the record, but who will not be speaking?

MR. ALVARADO:  Good morning, Your Honor.  This is Darryl Alvarado from Geller Rudman & Dowd for the class plaintiffs.  I will not be speaking today.

THE COURT:  All right.  Thank you.

MR. BRADLEY:  Good morning, Your Honor.  This is Balon Bradley.  I am with the Treppel Family Trust.  I will not be speaking today either.

THE COURT:  Turning into an expensive call.

Mr. Kravitz, I don't think we have gotten appearance from you or Ms. Gobeille.

MR. KRAVITZ:  Good morning, Your Honor.  Nicolas Kravitz, Kahn Swick & Foti, for Plaintiff Hudson.

THE COURT:  Very good.  Thank you.

MS. GOBEILLE:  Good morning, Your Honor.  This is Alayne Gobeille on behalf of Plaintiff Hudson, with Kahn Swick & Foti.

THE COURT:  Very good.  And then I have some of my staff on the call as well.  So thank you all for doing this.  I am sure that this cost you some Thanksgiving

weekend time, and I'm sorry for that, but I hope it was beneficial.

So there is some question as to which part of this chicken and egg ought to go first.  I know the defendants are arguing that the motions to dismiss will moot the need to decide whether the primary role in the derivative case will be by the lawyers for the Treppel Family Trust or from the Ezell group of plaintiffs.

But my concern about doing the motion to dismiss first is that whatever happens, there will be further proceedings, and I think it will be useful to have the question of primary role, or whether to continue the structure put into place before this case was transferred from Pennsylvania.  I think it would be helpful to have that clear on the record.

So let me start by inviting counsel for each of the opposing sides in the derivative plaintiff groups to present any additional arguments they wish, starting with the -- let's start with those seeking to maintain the status quo.  I think it's the Ezell plaintiffs.

MR. SACHS-MICHAELS:  Thank you, Your Honor. Ben Sachs-Michaels again.

Your Honor, we have been litigating this case since October of 2020.  We initially filed complaints

in Pennsylvania, as the Court is aware.  There were three cases consolidated into our action in Pennsylvania.

Everyone agreed to cooperate.  We entered a stipulation.  The Court so ordered it, appointing my firm and the Brown Law Firm as co-lead counsel.

THE COURT:  Yes.  Mr. Sachs-Michaels, can I ask you a question?

MR. SACHS-MICHAELS:  Yes.

THE COURT:  It may be part of your baked-in presentation, but among the various factors I am looking at are the amounts of stock held by your clients as opposed to the Treppel clients, and the length of time you have held that stock.  So if you could give me those numbers, that would be a helpful place to start.

MR. SACHS-MICHAELS:  Sure.  Your Honor, I actually will need to confirm the amount of stock, and the reason for that is that in this -- in situations like this, I believe that the law is, in all respects, the amounts held by the plaintiffs are tiny, tiny portions of the float.  There is not a huge difference in terms of the overall --

THE COURT:  I think that's true for the Treppel plaintiffs.  I just want -- I think the critical thing is not the precise number, but whether you have any significantly larger percentage of the overall holding.

MR. SACHS-MICHAELS:  Your Honor, I do not believe that we have a significantly larger percentage.  It may be slightly smaller.

THE COURT:  Okay.

MR. SACHS-MICHAELS:  But our --

THE COURT:  Go ahead.

MR. SACHS-MICHAELS:  But our plaintiffs all have complete standing.  Plaintiff Ezell has held stock since May of 2015 which, as the Court is aware, the majority of the allegations in this case involve conduct that occurred between 2015 and the present.

Plaintiff Hudson has held his stock since 2012.  And so we have the temporal standing necessary to prosecute the claims.  And for what it's worth, the plaintiffs have been -- Ezell and Fischer, in particular, have been diligently involved in litigation since the second -- since October of 2008, and we all agreed to cooperate together.

We all agreed to advance the claims on behalf of the company in a collaborative manner.  For the efficiencies of the parties and the Court, we agreed to avoid duplicative briefing on the motion to transfer in Pennsylvania because we all agreed that this case should just be wherever the securities class action is.  I think that's a fairly unusual thing for plaintiffs to get it

together to do.  We did that.

We allowed disposition of the transfer motion in the class case to decide where we should end up. Once we were transferred, over the summer I appeared before Your Honor at a status conference.  We filed an amended complaint, as we were directed to do.

In August, we were contacted by counsel for Plaintiff Hudson, and were told that Plaintiff Hudson was considering intervening.  He had this books and records production, and we all agreed to cooperate together for the good of the case.

When we were contacted by counsel for Treppel, we also offered to cooperate together for the good of the case.  We were not able to reach an agreement, obviously, but all along our approach has been inclusive. It has been to attempt to avoid what we consider to be a side show in the situation because I think all counsel agree that everyone is experienced and capable in this type of litigation.  All the complaints --

THE COURT:  I think that's not -- that is not the issue.  All the lawyers here know what they're doing, know securities law --

MR. SACHS-MICHAELS:  Yes.

THE COURT:  -- know government law, so that is not the issue.

Here is what I think is the main issue: The argument by the Treppel plaintiffs that they did some harder work first, that they made the book and records request, that they were there first, and they got the information, put it in the complaint, and you guys piggybacked and you shouldn't be rewarded for that.

Is that an accurate summary?

MR. SACHS-MICHAELS:  That is.  Yes, Your Honor.

THE COURT:  Okay.  Respond to that.  I think that is really the key issue.

MR. SACHS-MICHAELS:  Yes.

THE COURT:  I beg your pardon for upsetting the order that was put into place in Pennsylvania.

MR. SACHS-MICHAELS:  Okay.  What we understand from the briefing is that there were four stockholders who made books and records demands.  I don't know where the other two are.  But two of them ended up in front of Your Honor:  One is Hudson; the other is Treppel.

My understanding is that Treppel served the demand a few months before Hudson did, and Treppel filed a complaint to seek to -- the company to compel the production of the documents.

The fact that -- essentially Treppel's argument, as I understand it, is that because Treppel filed a complaint, that is sort of like the magic step that

confers legitimacy on him as a plaintiff, as opposed to everyone else.

But, Your Honor, we end up in a situation where we all have the same documents.  And I don't know.  I, in other situations, personally, prosecute these books and records demands frequently.  Sometimes it is more efficient to negotiate than it is to litigate.

Plaintiff Hudson obtained the same benefit without going through filing a complaint as Plaintiff Treppel did.  I know that Plaintiff Treppel tries to take credit for it and say that no one would have gotten any documents if it weren't for his lawsuit, but all he did is file his complaint.  He didn't litigate the 220 proceeding.  That's a summary proceeding.  The court in Delaware will set it for trial in, like, three or four weeks if necessary.  They didn't litigate it.  They just used it as leverage in negotiating.

I think it is probably unknowable whether we would have all ended up with the same documents, had Treppel simply followed the same path as Hudson, to negotiate for the documents.  But at the end of the day, whether or not Treppel filed the complaint, we have the same documents.  Our complaint has all of the same facts in it.  So --

THE COURT:  So tell me what your best case is,

Mr. Sachs-Michael.  What is your best authority, hopefully circuit court, that supports your argument that the first to file, if you will, does not get some kind of preference in the designation of -- it's not quite lead counsel but, effectively, it is.

MR. SACHS-MICHAELS:  Your Honor, I don't -- to be candid with Your Honor, I don't think that there is a case that we're relying on that says that.  I don't think that this is an issue that is easily susceptible to the citation of case law because we filed -- we were first filed in Pennsylvania.  They took a different course of action.  They had another forum open to them in Delaware Chancery Court that they chose not to avail themselves of and decided to come here.

And I think that really this is an issue that balances the equities, and I apologize that I don't have a case at my fingertips for Your Honor, but I think that I can cite the *Exxon* case out of the Northern District of Texas, where you had large institutions, one of which had litigated a books and records demand in New Jersey and held substantially more stock than the plaintiffs in the pending case.  And in that case, the Court denied the motion to vacate the leadership structure.

So I would cite that as a decision that sort of reflects what we think the outcome should be here,

but we recognize that this is a decision that is completely subject to the discretion of the Court, and there's not a case that's going to dictate the outcome.

THE COURT: All right.

MR. SACHS-MICHAELS: But what we --

THE COURT: No. Go ahead. Go ahead.

MR. SACHS-MICHAELS: Well, what I would just emphasize is that there is no material difference in what is going on with the litigation here because we have the same documents. We were attempting to be inclusive of everyone, and for reasons that only Treppel knows, Treppel decided to go its own away.

And I don't think that it goes to the merits of the case, and I don't think it goes to standing. We are not subject to any kind of unique defense, and as is evidenced by defendants' motion to dismiss, they view the allegations as essentially the same in both cases.

THE COURT: All right. Do you want to respond? Is it Ms. Nicholson who is going to speak on behalf of this? Or --

MS. NICHOLSON: No, Your Honor, I represent John Hudson, who --

(Simultaneous speaking.)

THE COURT: Okay. Who is speaking on the part --

KATHY MILLER, RMR, CRR - kathy@miller-reporting.com

MS. NICHOLSON:  -- who is part of the --

THE COURT:  All right.  So is Mr. Sanders going to speak on behalf of the Treppel Trust's claim to upset the current consolidation order or at least modify it?

MR. SANDERS:  Yes, Your Honor, I will.  Thank you.

I wouldn't call it upset it, but, yeah, we are asking --

THE COURT:  Modify it.

MR. SANDERS:  Sure.  We are asking Your Honor to, I guess for the first time, to have a look at and subsequently evaluate which plaintiff and which firm should be leading the prosecution of the derivative claims as the case moves forward.

You know, I don't want to repeat everything that is in our papers but, you know, the factors are pretty clear.  It's the variousness of the prosecution to date, the quality of the pleadings, and -- and to some extent the size of the plaintiffs' holdings.  As to all of those --

THE COURT:  No.  I think that all of those come out pretty much even.  The only question is whether you have somewhat of an advantage because of your work in the Delaware forum, while the other side on this issue was working in Pennsylvania.

KATHY MILLER, RMR, CRR  -  kathy@miller-reporting.com

MR. SANDERS:  Correct.  But I would argue that goes to the vigorousness of the prosecution and, you know, I do take issue with this idea that the other plaintiffs have been actively litigating cases since 2020.  They haven't.  They filed the case in Pennsylvania.  They stipulated to consolidate, and they stood pat while our client made a Section 220 demand, and when the defendants offered what was not nearly --

THE COURT:  Their version of standing pat is that they were negotiating.  I'm not sure that they would agree with that characterization.

MR. SANDERS:  Well, I am not sure what they were negotiating at the time.  But, you know, I take issue with that.  You know, I will note, you know, Plaintiff Hudson didn't make his inspection demand until after we had already not only made our inspection demand, but also commenced a 220 action in Delaware.

And I know in the papers they say, you know, it was a threat of their 220 -- you know, both of them filing a 220 action after the fact that lead to the production of the documents, and that's sort of preposterous.

The reason the defendants produced more documents is because we filed a 220 action in Delaware. And we are largely, if not entirely, responsible for the

reason that the plaintiffs have the documents today, and as we will get into in the motion to dismiss, they're a critical piece of -- you know, if we are able to defeat the defendants' motion to dismiss, it's a critical component of that.

You know, I will say one thing, Your Honor, which is, we have tried to cooperate. We didn't come in even after, you know, the 220, and we were concerned about, you know, briefing on a motion to dismiss in this case without the benefit of those documents, and we sought to intervene, which Your Honor permitted. But we tried to cooperate.

We couldn't agree to the leadership structure that is in place today, and that's what those folks wanted to stick with. That is the reality. We didn't come in and say we want the case all to ourselves. But, certainly, you know, counsel and the plaintiff who made the leadership demand should be part of this leadership structure.

And I think it is notable that Plaintiff Hudson and his counsel are not part of the leadership structure. So you have two co-lead counsel, one of whom is not on the call right now and --

THE COURT REPORTER: Mr. Sanders. Mr. Sanders. Mr. Sanders.

THE COURT:  Mr. Sanders, slow down.

THE COURT REPORTER:  You are talking so fast, I can't follow you on a Zoom.

THE COURT:  Slow down.

THE COURT REPORTER:  You need to back way up and slow down.

MR. SANDERS:  I apologize.

I think it's notable that Plaintiff Hudson, who made the inspection demand, is not part of the leadership structure that is in place today; and that the two co-lead counsel firms currently serving in that role, neither of those plaintiffs, and neither of their firm -- their counsel made inspection demands.

And I would argue that is not the appropriate structure moving forward, and Plaintiff Treppel and our firm should certainly be a part of any leadership structure, if not appointed the lead counsel.  Frankly, that was our -- our issue and why we weren't able to work cooperatively with the existing leadership.

THE COURT:  What was the issue?

MR. SANDERS:  The issue was that we couldn't support the leadership structure as it stands today, not that we are not willing to work with the other law firms. We worked with them in many cases, and there were leadership structures different than the existing one that

I think --

THE COURT:  So all you want to do is be -- are you saying that you simply want to be added as co-lead counsel?

MR. SANDERS:  That's not our primary position. I am saying that, yes, that should be a minimum in our view.  And there were -- there is a possibility of working that out, that we were not -- we're still not comfortable and we weren't comfortable at the time with the existing leadership structure in this case.

And, yes, I would urge Your Honor to at a minimum add Plaintiff Treppel, and its counsel, as part of any restructure.

THE COURT:  I want to hear from Mr. Sachs-Michaels on the two points that have been -- three points:  One, where is Mr. Hudson and his counsel? Two, what is wrong with simply adjusting to add a -- the Treppel lawyers as co-co-co-lead counsel, so it seems like we're basically, with no ethnic insult intended, adding just a whole bunch of chiefs, with no underlying infrastructure, so it becomes a little bit meaningless?

But respond to the issue as to why I should not at a minimum do that, and the absence of counsel for Hudson?

MS. NICHOLSON:  I --

KATHY MILLER, RMR, CRR  -  kathy@miller-reporting.com

MR. SACHS-MICHAELS:  Your Honor, just to clarify --

THE COURT:  Excuse me.  Ms. Nicholson, I think I am recognizing Mr. Sachs-Michaels, and then I'll let you chime in if you want to add anything.

MR. SACHS-MICHAELS:  Thank you, Your Honor.  I may be saying what Ms. Nicholson was going to say, which is that she is Hudson's counsel.

THE COURT:  Okay.

MR. SACHS-MICHAELS:  So Hudson's counsel is on the line.  The counsel that is not on the line is the Brown Law Firm, who is the co-lead counsel with my firm.  My firm is Glancy, Prongay & Murray.

THE COURT:  Right.

MR. SACHS-MICHAELS:  The Brown Law Firm is not on the line.  You know, my assumption is that -- oh, I'm sorry, he is on the line.  I see it.  It is difficult with all of these pictures on the Zoom.

Mr. Brown is on the line, so everyone is on the line right now.  So that is not correct.

THE COURT:  I don't think we got Mr. Brown's appearance, though.

Would you, please, make it, Mr. Brown, so that it is clear on the record that you are present?

MR. BROWN:  Yes, Your Honor.  Sorry, I wasn't

so visible up until now.  I am co-lead counsel for plaintiffs, and I am --

THE COURT:  Which plaintiffs?

MR. BROWN:  -- with the Brown Law Firm.  Thank you very much.

THE COURT:  Which plaintiffs?  Mr. Brown --

MR. SACHS-MICHAELS:  The derivative plaintiffs.

THE COURT:  All right.  The nonTreppel derivative plaintiffs, to be clear.

MR. BROWN:  That is correct, Your Honor.

MR. SACHS-MICHAELS:  Yes.

THE COURT:  All right.  So the other point was the question of whether modifying, at a minimum, to add Mr. Sanders and his group as co-co-lead counsel.

MR. SACHS-MICHAELS:  Your Honor, I think we all long were hoping to find a way to work with everyone and have offered inclusions throughout.  So we are -- I -- obviously, I am in a situation here where I am not consulting with my cocounsel, you know, I am -- but I believe our position all along has been that we're willing to collaborate with everyone.

And if the title of "co-lead" is so important to them, I am -- my personal response would be that we are open to finding a way for firms to work together because this is not what the case is about.  This

is lawyers fighting.  We want to get to the merits.  I am prepared to get to the merits here.

THE COURT:  Good.

MR. SACHS-MICHAELS:  And I think that whatever resolves the dispute is probably acceptable to us, as long as we are able to continue the role because we have been involved in this for a while.

And the one thing I just want to say in response to what Mr. Sanders said, is that it is not a requirement of a derivative action to do a 220 books and records demand first.

Our clients acted in good faith when they filed their complaints in Pennsylvania.  There is a lot in the public record here.  And it turned out that plaintiffs did do 220 documents, and as I said, we're trying to get every advantage we can to focus on the merits, and so when we have the opportunity to incorporate the documents, we're willing to do it.  From the outset our position was not that it was necessary in this situation.

And so, Your Honor, I think that answered your questions.  I apologize.

THE COURT:  No, it did.  It did.  Mr. Sanders, last word, if any.  Because I --

MR. SANDERS:  Yes.  Thank you, Your Honor. Just two quick points.  One is, I don't -- I don't know

that we need three lead counsel, and it may be that it's plaintiff Treppel's counsel, and whether it's Mr. Sach-Michael's firm, or whoever from that side.  We are sensitive to, you know, loading it up with multiple firms.

So I think we should be a part of that structure and Plaintiff Treppel should be a part of that structure.  I don't have a strong feeling about who all should be on that leadership structure.

But the last point I'll make, Your Honor, is it is true that it is not a requirement that a plaintiff make a 220 demand first, but we cited a series of cases.  It is well recognized the importance of those in establishing demand futility.  And certainly the other plaintiffs thought they were valuable as you see from the amount of redactions in their second amended complaint.

So that's all I would say, Your Honor.

THE COURT:  All right.  So I think we have spent enough time on this, which is probably the least favorite thing that judges do besides sentencing and dealing with sanctions, and fee fights at the end of the day.  This is sort of like an anticipatory fee fight, in a way, and I -- it's made difficult by the fact that, frankly, I don't think that there is a significant difference in vigorousness of prosecution, in the quality of counsel, the quality of briefing, the quality of the

pleading.

As I said, this is sort of a dream team on all sides of the Vs, so that's not the decisive part.

The decisive part is how much do we want to upset the status quo and how concerning is the inability to get along at this point in a proposed structure to add as co-lead counsel another part of the team who will be required to cooperate and to collaborate?

But, Mr. Sanders, I am willing to accept that you have a legitimate claim to participate in that organizational leadership structure on an equal footing with the existing lawyers under the order that was entered in Pennsylvania prior to transfer.

So I will, to a limited extent, grant the motion to modify. I will not replace or elevate the Treppel family lawyers, or parties, above the Ezell, Hudson, Fischer group and the lawyers who represent them. I will add you as an equal member of that team now.

MR. SANDERS: Understood, Your Honor.

THE COURT: And I will modify further. The operative complaint is the one that is filed by the Ezell, Hudson, Fischer people. It is already there and that is what the motion is directed to.

All right. Let's go to the motions to dismiss. And, Mr. Stokes, I know you have been waiting

patiently --

MR. STOKES:  Thank you, Your Honor.

THE COURT:  -- on all cases.

MR. STOKES:  Do you have a preference, Your Honor, as to which one to take up first?

THE COURT:  No.  I really don't.  They overlap a lot.

So here is one question:  One of the major arguments you make on both cases is that the substantial compliance representation that was made in a number of filings and statements was accurate, not misleading, because at most we're talking about 5 percent of the wells, a very small amount of money in terms of funds.

Unclear the amount of money in remediation costs, but that's not really central to the argument.  But where does your number of 5 percent come from?

MR. STOKES:  Thank you, Your Honor.  It actually comes from the number of wells in the grand jury presentment, which is -- specifically deals with 25 wells. And it is a function of dividing that number by the total number of what they call net wells that are listed in Cabot's 10-Ks which are part of --

THE COURT:  So can I take judicial notice of the truth of that statement?  Or merely the existence of that statement?

MR. STOKES:  You can certainly take judicial notice of the existence of the statement, and I would suggest that it is the plaintiffs' burden in both cases to plead facts showing a false statement, and showing either the scienter in the securities case, or bad faith, which is very similar in the derivative case.  It's the plaintiffs' burden to show that the substantial compliance statement is a false statement.

THE COURT:  Well, to plead facts that would be sufficient to show it.

MR. STOKES:  Correct.  Correct.  And part of that is showing that, you know, inherently in a statement that speaks of substantial compliance, that they have to plead that this is actually substantial in light of Cabot's footprint, that it is pervasive, that it is something that would render the substantial compliance statement false and misleading.

And there is no allegation in this case that -- they don't dispute that Cabot has more than 500 wells, and of the over 800 wells at the time of the 2019 10-K, but they don't purport to allege that the number of wells in this case is anything other than a very small percentage of Cabot's overall number of wells.

I can actually cite -- there are some cases that do look at numbers in 10-Ks, and treat those, if

they're not disputed seriously by plaintiffs' counsel, as -- as indicative of what the facts are.

The *Stephens vs. Uranium* case, Your Honor, is a case --

THE COURT: Cite.

MR. STOKES: -- that you may recall. And there was a statement in the --

THE COURT: No, I don't recall. I have been on the bench 30 years.

MR. STOKES: I'm sorry.

THE COURT: So if you can cite cases, please, my law clerks would be grateful.

MR. STOKES: Touche, Your Honor.

But in that case, one of the issues was the core operations theory, and how many employees the company had. And Your Honor, in the opinion, remarked that there were 61 employees, and that, I believe, came from the 10-K because in the 10-K, the company lists the number of employees each year. And that was not --

THE COURT: What case -- do you have an appellate case that includes a similar analysis?

MR. STOKES: I -- you know, I am -- I am hard pressed to think of one off the top of my head. The *Diodes* case, which addresses the circumstances under which the core operations theory may, I don't know for a fact if it

-- if it drew the employee information from the same source.  But -- but certainly, in the *Stephens* case, and I think we also cite the *Bellicum* case that Judge Bennett had.

That was also a case where we relied on the number of employees being 100 employees, and therefore too many employees to fall outside the -- the core, the usual rule that the core operations document does not apply.

And so in those two cases, that's typically where you would get information like that.  If it is not expressly disputed by the plaintiffs and there is no countervailing factual allegation showing that this was a large percentage, I think that's the bigger issue.  But it is their burden, ultimately, to show that this was a false and fraudulent statement, and --

THE COURT:  How do you respond -- but, Mr. Stokes, how do you respond to the argument that is forcefully made that it is not only the number of wells, but the number of violations that were being issued at the time that the defendants were making statements that it's been remediated, or we believe it has been remediated?

MR. STOKES:  So I would actually like to address those two statements head on, Your Honor, because that's a very --

THE COURT:  I think you need to.

MR. STOKES:  -- that is a very important point.

THE COURT:  Yes, I think you should take that up.

MR. STOKES:  We are talking about -- we are specifically talking about the statements in paragraphs 123 and 139 of the securities class action complaint, and these are statements that Cabot has been engaged with the -- I am going to say "PaDEP," is the acronym I will use for the Pennsylvania Department of Environmental Protection, but the disclosure was Cabot has been, "Engaged with the PaDEP in investigating the incident, and had performed appropriate remediation efforts, including the provision of alternative sources of drinking water to affected residents.  We belive the source of methane has been remediated, and are working with the PaDEP to reach agreement on the disposition of this matter."

And those last two words are crucial to this, Your Honor.  It's "this matter."  These two statements were made about specific alleged violations, and for those specific alleged violations, there is no particularized allegation that with respect to those specific wells this statement was -- was false.

I'll take, with the Court's permission, the February 22nd, 2016 disclosure first.  This was not a

statement that was made in every 10-K or 10-Q generically about Cabot.  This was made specifically about two sets of alleged violations.

In the February 22nd, 2016 disclosure, this is paragraph 123 of the complaint in the securities case, this had to do with a NOV received in September of 2011 and a consent agreement, a proposed consent order received on November 12, 2015.  And this -- this involved what they call the Stalter wells.  I don't know if that part of it is in the complaint.

But the important thing is there is no allegation with respect that this specific NOV, that either PaDEP or the Pennsylvania Attorney General subsequently cited Cabot for any specific violation with respect to the remediation work with respect to that specific well.  This was not intended to be a catchall statement applying to all of Cabot's wells.  By its plain terms, it applied to this particular matter.

There is a generalized misdemeanor allegation that is cited in paragraph 92 of the amended complaint that Cabot in general did not remediate gas wells between 2010 and January 9th of 2020, but it is not specific as to any well.  There is no allegation that relates specifically to the -- the specific NOV, or notice of violation.  And so this is a particular --

particularized pleading realm.  They have to allege specific facts.

They do not and cannot allege specific facts showing that with respect to these wells, the remediation work that Cabot did itself became the subject of a violation or a criminal charge.

The disclosure also reflects, as of February 22nd, 2016, that negotiations with respect to this well were still ongoing.  The consent order had not yet been finalized at the time.

Later on, on February 27th, 2017, Cabot disclosed that it did manage to enter a final consent order addressing those wells, but the -- and that that required additional monitoring post-remediation to ensure the source of methane had been remediated.  But there is no allegation with respect to that consent order, specifically, that Cabot violated the law with respect to the remediation work.

And, again, Cabot did not promise that there will never again be any issues with any specific wells, nor can the words "appropriate remediation efforts" be construed in this context as a representation that the remediation done to date would absolutely certain -- satisfy the regulators.

In the very next sentence, Cabot makes

clear that there is uncertainty about that, that we believe -- we believe the source of methane has been remediated, and are working to reach agreement on the disposition.  But that inherently makes clear that resolution had not been resolved at that point.  So --

THE COURT:  So, Mr. Stokes, how do you respond to the allegations of the statements from the Cabot geologist that Cabot had widespread cement casing issues in all wells, and that residents continued to have many issues with water supplies?

MR. STOKES:  These allegations are just not particularized as required by Fifth Circuit law, and we do cite a mountain of Fifth Circuit cases on the particularity requirements for confidential witnesses.  It is not specific as to time.  It covers -- this unnamed geologist was apparently there for seven or eight years.

He doesn't specify when he is talking about.  He says that he saw a cement bond log at some point in Mr. Stalmaker's office on some undisclosed occasion.  That just doesn't cut it in the Fifth Circuit, by a long shot.

This is -- there is also insufficient allegations showing that this geologist was even qualified or privy to all the wells of the company, or that his expertise even lined up sufficiently to make those kinds of

allegations. But it's certainly not -- the fact that only 25 wells were -- were ultimately cited in this -- in this criminal complaint, I think, discredits the fact that -- this idea that these geologist's allegations should be accorded any weight.

There was not, ultimately, a determination by Pennsylvania authorities that this was a pervasive problem that affected Cabot's entire footprint.

So that's -- we don't think those allegations either in the derivative context or the class action context are close to being sufficient.

And with respect to the other iteration of that same disclosure, this was in paragraph 139 of the securities complaint, this had to do with two proposed consent orders received by Cabot on June 17th, 2019 which pertained two NOVs received in June and November of 2017.

THE COURT: Mr. Stokes, can I ask a question for everybody?

MR. STOKES: Sure.

THE COURT: Don't use acronyms. I hate them.

MR. STOKES: I'm sorry.

THE COURT: And NOV is something -- with civil procedure, it is -- okay. It is a notice of violation, I think, that you are asking about, right?

MR. STOKES: It is, Your Honor. I apologize.

KATHY MILLER, RMR, CRR  -  kathy@miller-reporting.com

Notice of violation.

THE COURT: Thank you.

MR. STOKES: So the Department of Environmental Protection issued two notices of violation in June and in November of 2017. These are the Howell and Jeffers Farm's wells, and those wells are actually discussed in paragraphs 95 through 99 of the amended complaint.

Plaintiff acknowledges that other than this one conclusory allegation I mentioned earlier about remediation work, in paragraph 92, just generally not being done, without specifying any wells, there is no specific allegation that any of the -- the portion of the alleged criminal violation relating to the Howell and Jeffers Farm's wells pertains to the remediation work that was done after this July 26, 2019 disclosure. In fact, in paragraph 90, plaintiff acknowledges that the end date on the presentment was June 11th of 2018.

So, again, there is no specific allegation that the remediation work that was done after these notices of violation were received was itself the source of any criminal charge or any subsequent notice of violation. And so, again, they don't plead particularized facts showing that this statement is an untrue statement of fact, even if it can be construed as a statement of fact, as opposed to a statement of aspiration or opinion.

We think it does -- when you read the statement together, we think it does fall within the same universe of statements that the Court addressed in *Plains All American*, in the *Anadarko* case, which also included substantial compliance type statements, we believe we're in substantial compliance.  We believe the source of --

THE COURT:  That case I do remember.

MR. STOKES:  Thank you, Your Honor.  We think that case is highly instructive at a minimum in this case.

THE COURT:  There is a difference.  It was appealed and affirmed.

MR. STOKES:  It was appealed, and it was affirmed.  It was resoundingly affirmed, as was *Anadarko*, Your Honor.  And in both cases -- particularly in the *Plains All American* case, this Court distinguished between the types of allegations -- the types of disclosures at issue in this case, which are the soft, aspirational disclosures and statements of opinion, from the hard statement, the harder statement that we are in compliance.

There is a statement to that effect in *Plains All American* that was still dismissed for lack of scienter, and we think the scienter allegations here are even weaker.  But we don't, in our view, get to scienter in this case because the plaintiffs have not alleged an actionable misstatement in the first place under the

precedent in the Fifth Circuit and in this Court's -- consistent with this Court's previous opinions.

The statements also -- one major -- recent cases and Fifth Circuit law generally is you don't look at statements -- you don't look at snippets out of context. You look at the entire 10-K, including the cautionary statements, and you don't just isolate statements out of context.

And these were real cautionary statements. This was not some hypothetical we might some day get sued kind of precautionary statement, but the specific language here was from time to time we received notices of violation. We get them. That's what day said over and over again.

And we cite multiple cases in Footnote 43, on page 21 of our motion to dismiss that granted dismissals with similar time to time disclosures precisely because of that, and you have to look at that in conjunction with the substantial compliance statements, that no reasonable investor could look at those statements together and say that there is full -- and hold that there is a guarantee of full compliance.

THE COURT: Okay. Mr. Stokes -- Mr. Stokes --

MR. STOKES: Yes, Your Honor.

THE COURT: -- let's take a five-minute break.

I want you to wrap up this part of the argument, respond to the code of conduct argument, and respond to the insider sales argument, and then I am going to hear from the plaintiff on the -- from the -- first from the retirement system.

MR. STOKES:  Thank you, Your Honor.

THE COURT:  All right.  Five-minute break.

MR. STOKES:  Thank you.

(Proceedings recessed from 10:37 to 10:41.)

THE COURT:  All right.  I hope everybody got a chance to stand up for a moment.

All right.  Is everybody back, so that we can resume?  I want to be sure that I --

MR. STOKES:  Yes, Your Honor.

THE COURT:  All right.  Very good.

All right.  Mr. Stokes, you want to address the code of conduct, any remaining response to the other allegations that you have not adequately covered, and talk about the insider sale allegations as well, as to one of the executive officer defendants?

MR. STOKES:  Yes, Your Honor.  I will start with the code of conduct, if it please the Court.

In Footnote 34 of our motion to dismiss, we cite a number of cases that deal with a very similar code of conduct specifics.  The bottom line is simply

saying you have a code of conduct, or that you aspire or value safety, those kinds of -- those kinds of disclosures have been repeatedly held to be inadequate. And they don't -- they don't trigger a freestanding duty to confess every alleged violation or fact that could possibly be brought to contradict them. They are just not actionable as a matter of law. Certainly not so blatantly false as to support the required strong inference of scienter.

And on scienter, this is a case, in our view, that just doesn't come anywhere close to the Fifth Circuit law on scienter.

Number one, we cited Judge Bennett's opinion, and several others, about this concept that the disclosures themselves, even if there is some argument here that they are not -- this case is not saying, as *Anadarko* or *In Re Plains*, with respect to the aspirational nonfactual nature of the statements. Given the state of law in the Fifth Circuit, I just don't think it can reasonably be said that these are so blatantly misleading and beyond the pale as to support an inference of recklessness.

This comes straight from the Fifth Circuit's definition of recklessness. It's got to be something that is so obviously wrong that no reasonable person could make that statement without believing it is

going to mislead investors.  That's the idea of recklessness, and these statements just don't get there.

They also fail for lack of particularity. There is no particularized allegations that the persons who made the statements acted with scienter or received contradictory information.

Mr. Stalmaker was not adequately alleged to have made any misstatements.  He is not alleged to have signed any of the 10-Ks or 10-Qs, and you can't get to scienter of the makers of the statement or Cabot itself through Mr. Stalmaker.

Even if you could, Your Honor, they just haven't pled enough with respect to the deficient geologist allegations discussed before.  The cautionary statements weigh heavily against scienter.

The fact that the consent order was out there publicly in 2010, and has a paragraph 19 that says that if Cabot complies with the consent order, the obligations terminate.  Cabot never said that the obligations ever terminated.  It never said it was permitted to drill in the Dimock box again.

So I think that's important context and background in evaluating these statements.  Cabot never represented that it had satisfied the obligations in the consent order.

And with respect to the sale, this was one sale 20 months before the alleged stock drop.  It's the first stock drop at issue in this case, and that kind of attenuation had -- just does not lend itself to an inference that this was suspicious.  We cite cases for that proposition.

This is a natural gas company at the time.  It doesn't trade based on the types of issues in this case.  It trades based on commodities prices, and how much money are they making producing?  That's what they make -- that is how these companies operate.  There is no pump-and-dump inference in this case.  And that's --

THE COURT:  No.  I don't think that is the plaintiffs' argument.

MR. STOKES:  I don't think it is, but I do think that is what -- you have to use motive as almost a proxy for documents showing intent.  And you can't infer by looking at this isolated stock sale 20 months before the first stock drop, that it was made based on, you know, fear that the stock was going to collapse because of the issues raised in this complaint.  It is too attenuated.

And nobody else is alleged to have sold stock, and that is something that the Court can take into consideration as well.

Holistically, the allegations don't

support a strong inference of scienter.

I do want to clarify one thing for the record, Your Honor, just to be precise, and this goes for both cases, we cite the Pennsylvania statute and the database with respect to the violations being public, not only to be clear, but some of the violations are actually linked on the cite.

The statute says that they are publicly available and you can go inspect them. They are -- they are listed. The other ones are listed. They are not all linked on the site. It is a little more cumbersome than that.

I want to be very clear for the record, that I don't overstate what is available on that website and what is not. Some of them were available on the web site. But the bottom line is, we see this as another scienter point that it is just not cogent and compelling to defraud the market about documents that are ultimately publicly available anyway.

And the plaintiffs themselves alleged that Cabot is the poster child for environmental noncompliance in, I think, their second or third paragraph of the complaint. They can't -- when you look at the facts together, the disclosures as a whole, the inference of these disclosures are reasonable, is far stronger than any

inference that these disclosures are fraudulent.

And we do think there is a real loss causation problem here. It's not -- I will admit I don't have a truckload of Fifth Circuit cases on that point, but we -- that doesn't necessarily -- it doesn't mean the answer can't be divined from the cases that are there.

*Twombly* was at its core a case about correlation not being enough to show causation. And the plaintiffs themselves introduced this idea that the first stock drop occurred because of disappointing earnings. They used the word "disappointing earnings" in the complaint. They injected that issue into the complaint.

As a matter of just common sense, earnings are what drive stock prices, not $300,000 penalties for a company that's, you know, over a billion dollars in annual revenue.

They have to allege a minimum threshold of plausibility. We cite a New York, Southern District case that I don't think is really distinguished. It is not Fifth Circuit, but I believe it is consistent with Fifth Circuit law and with *Twombly*, generally.

Once they inject the issue, they have to plead enough to support a plausible inference. That has not been done here. And the stock drop on the second disclosure, similarly, the Court can look at the entire

public record of commodities prices. They just haven't alleged that drop was anything out of the ordinary for a company like Cabot that bounced up and down with natural gas prices.

And we think that is also --

THE COURT: It's also the stock.

MR. STOKES: That's right. We think they have to get scienter as well. There is not this great, big discrepancy between how the market priced the company after these disclosures versus -- after the so-called corrective disclosures versus before. And we think that also supports an inference these disclosures were reasonable, that Cabot reasonably disclosed its risk profile and did not defraud anybody.

So we believe that this case doesn't come close to the threshold, and should be dismissed. And I am happy to pause if you want to take up the class response.

THE COURT: I do.

MR. STOKES: Okay. Thank you, Your Honor.

THE COURT: I think, Mr. Lavelle, are you going to be arguing that or --

MR. LAVELLE: I will, Your Honor.

THE COURT: All right. You're up.

MR. LAVELLE: All right. Thank you very much, Your Honor.

So, you know, there's a lot to unpack there, obviously. I'm going to take the various points that Cabot made in turn, but I would like to pause for a minute at the outset to set a little bit of context for where we're coming from in this case.

This is a company that going back to 2010 had major problems in Susquehanna County, Pennsylvania where they primarily operated. That's substantially where all of their operations took place prior to and during the class period. And going back to 2010, they had major problems in Dimock, in the town of Dimock, in Susquehanna County --

THE COURT: Go ahead and use those words, please.

THE COURT REPORTER: I'm sorry. I did not understand what you said.

MR. LAVELLE: Sure. I was saying going back to 2010, the company had problems in Dimock, Pennsylvania, Susquehanna County, Pennsylvania.

THE COURT: Hang on one second.

Kathy, Dimock, D as in David, I-M-O-C-K. Susquehanna is a part of Pennsylvania. Do you need that spelled or are you okay?

THE COURT REPORTER: I'm okay.

THE COURT: Good. Okay. Mr. Lavelle.

MR. LAVELLE:  Thank you.  And Dimock is within Susquehanna County, Pennsylvania.

Now, going back to finish up what I was saying, the company signed a consent order with the Pennsylvania Department of Environmental Protection.  And if it is okay, Your Honor, I will refer to it as the DEP.

THE COURT:  No.  No.  No.  It's not okay.

MR. LAVELLE:  It's not okay?

THE COURT:  You can call them the "Pennsylvania Department."

MR. LAVELLE:  Okay.  I will refer to them -- I will try to do my best to refer to them as the "Pennsylvania Department."  Thank you.

THE COURT:  And then you have go read Bryan Garner on legal writing.  Go ahead.

MR. LAVELLE:  Sure.  Okay.  Thank you, Your Honor.

As I was saying, they entered into an agreement.  In fact, Mr. Dinges specifically entered into an agreement.  He signed the agreement with the Pennsylvania Department, agreeing to remediate the issues that they were facing for numerous gas wells in Dimock.

He promised and told investors that these issues would be dealt with, but that's not what happened at all.

In fact, after and leading up into the class period in 2011, 2014, and then during the class period in 2017, in 2018, there were numerous notices of violation for continuing violations of the Pennsylvania Environmental Protection laws, where gas from -- from these wells continued to pollute Pennsylvania waters.

Now, Mr. Dinges made a promise that this would be dealt with, specifically in -- in Dimock, and this was pursuant to a consent order entered into with the Pennsylvania Department.  That is not what happened.

In fact, the Pennsylvania Department specifically told Cabot in June 2018 -- they sent a letter to the company stating that you are not in compliance with the 2010 consent order.  These were continuing violations.

Nevertheless, throughout the -- throughout the class period, the company made numerous statements which we allege to be false and misleading.  And first and foremost, the one that comes to mind are the statements that Your Honor has already discussed regarding the company's belief that they were in substantial compliance. And, you know, we're simply in a position that you cannot claim substantial compliance when, in fact, you know, you continue to receive notices of violation from your primary regulator in the only place that you operate saying that there are repeated offenses occurring over and over again,

where your wells are allowing methane to continue to pollute the water there.

Now, of course, it is not just that. It is also the fact that they made the promise to address these issues and they didn't.

THE COURT: Yeah. Wait. Wait. The word "promise" here is a loaded one. Cite? What are you referring to?

MR. LAVELLE: Sure. Specifically, I'm referring to the 2010 consent order, which Mr. Dinges signed, where he stated that Cabot would take all actions necessary to comply with all applicable environmental laws and regulations, including all but the applicable provisions. And that is in paragraphs six and 101 of the complaint.

And then, again, at paragraph 65, the -- the 2010 consent order also required Cabot to undertake remedial work on its wells and to eliminate methane penetration. And that is something that they just did not do. And that's evidenced by numerous notices of violation that the company received prior to the start of the class period, and these are violations that were received in 2011, 2014, 2018. These are cited in paragraph 94 of the complaint.

Now, I heard Cabot argue, you know,

earlier that, well, these violations only amounted to something like 5 percent of the wells.

THE COURT:  I assume you mean Mr. Stokes?

MR. LAVELLE:  Mr. Stokes, yes.

THE COURT:  Go ahead.

MR. LAVELLE:  Argued that, well, this is simply 5 percent of the wells, which is not a significant number. With that -- we take serious issue with that argument for numerous reasons.

I think first and foremost, is that we already had allegations in the complaint that investors, in fact, did think that even a small number of wells were significant to the extent that they had -- the company had serious environmental pollution issues with those wells.

I mean, specifically, in Dimock, going back to 2010, there are only 18 water wells at issue being polluted, and specifically at the time that that 2010 consent order was entered into between Cabot and the Pennsylvania Department, analysts picked up on the fact that there was a, "Hangover on the stock caused by the negative press associated with its Marcellus operations." And that comes from paragraph 156 of the complaint, quoting a analyst reports --

THE COURT REPORTER:  I'm sorry, Mr. Lavelle.

MR. LAVELLE:  Yes.

THE COURT REPORTER:  Can you back up a sentence or two?

MR. LAVELLE:  Sure.  So, I believe, a sentence or two, earlier what I was saying was that investors found, even a small number of wells to be significant to the extent that the Pennsylvania DEP found significant violations there of methane migrating from those wells into the ground water.  And what I was specifically saying was, there were 18 water wells that were polluted in Dimock, Pennsylvania, going back to 2010.

Now, when the company entered into that December 2010 consent order, analysts recognized the fact that even 18 water wells cause huge headaches for the company, to the extent that it caused a "hangover" on the stock price, Cabot stock price, caused by all that negative press associated with its Marcellus operations.

And the Marcellus operations, and the reference to its operations in Susquehanna County, which, again, is the only place -- or the place that the company substantially operated in during the class period.

So here, we had an even greater number of wells, gas wells, at issue.  As we previously discussed, there is 25 gas wells at issue that received notices of violation, as alleged in the complaint.  But it's not just the notice of the violation.  It is also notice of the

violation plus criminal conduct.

The Pennsylvania Attorney General found that this conduct was criminal.

THE COURT:  But when you say "criminal," nobody is going to jail.

MR. LAVELLE:  Sure.  But they were criminally --

THE COURT:  Not a felony conviction.  They are not going to be stripped of any right to operate.

Basically, they are paying a fine that is sort of peanutty.

MR. LAVELLE:  You are correct, Your Honor, to date no individual has been indict3ed.  It is only the company has been indicted.  But they have been indited for felony offenses, for knowing -- knowing conduct, knowing violations of Pennsylvania environmental law.

So it is --

THE COURT:  Are we talking convictions?

MR. LAVELLE:  No.  As I just said, we're talking about an indictment.

THE COURT:  Yeah.  So in my world there is a world of difference between the two.

MR. LAVELLE:  And you're absolutely right, Your Honor.  However, the indictment, nonetheless was -- was based on evidence that was provided to the Pennsylvania

Grand Jury, and that, of course, is all listed in our complaint, the various types of testimony and documents that were relied on.  Partially, of course.  We don't have a full access to all the evidence.  But what we do know is there was enough to indict the company on felony -- felony offenses for knowing violations.

I would also just like to point out that this quite possibly is really just the tip of the iceberg.

Now, the criminal charges detailed how there was actually additional criminal charges contemplated, but not brought, due to the Clean Streams statute of limitations, and the Clean Streams Law is the environmental protection law in Pennsylvania.  That is in Paragraph 89 of the complaints.

So there very well could be additional significant violations that weren't charged just because of the statute of limitations issue.  I think that is also a fact that is corroborated by the geologist, which we plead in the complaint, who discussed how when you saw a good cement bond log report, that you were surprised.

So, I think there was a basis that they would be -- the problems are more widespread than simply what was included in the charging documents from the Pennsylvania Attorney General.

Now -- but getting back to this five

percent issue, which I would like to address further.

THE COURT:  Go ahead.

MR. LAVELLE:  So the five percent number standing alone, we don't think it is particularly meaningful because there is no information about how important these 5 percent of the wells were.  They could be extraordinarily productive wells, or wells with very significant potential.  We simply don't know.

Someone told me once that the brain is only two percent of the human body, but I think we can all agree, it's a pretty important two percent.

THE COURT:  I think your number is wrong.

MR. LAVELLE:  The two percent, Your Honor, percentage?  I think it was told to me.  But, nevertheless, I think we can agree, that's a small percentage of the human body.  And, really, the point being is that it very well could be the case that at least 5 percent of wells that they are talking about are actually extraordinarily important to the company.

And, you know, just reinforcing my earlier point, you know, even a relatively small number of wells can still be important to investors when the environmental problems are significant.  And we have already seen this before, going back to 2010, in the issues with Dimock when those problems caused that overhang on the stock price.

So I think that, you know -- fundamentally, Cabot just can't claim that it believes it's in substantial compliance with the law when it's knowingly violating a consent order with its primary regulator, being the Pennsylvania Department, through these continuing unremediated violations in Susquehanna County, which, again, is the only place that the company operates.

THE COURT:  Can I get you to stop there and hear from Mr. Stokes on just that point?

MR. LAVELLE:  Absolutely.

THE COURT:  Thank you.

MR. STOKES:  So, Your Honor, there were a couple of things we take issue with.

Number one, this idea that a company still can't believe that they're in compliance just because a third-party or an outside party reaches a different conclusion in a charging document with respect to some wells.  That doesn't render the statement false, even if it is assumed to be a significant percentage of wells, because a company can still believe that they're right.  They can believe that they're correct.  That was actually part of the -- it's part of the cases cited in Footnote 8 of our reply brief in the class case.

It is also a big component of the *Plains All American* and *Anadarko* Fifth Circuit decisions where the

language was used about it not being sufficient simply to show complete documents that showed there might be a violation, but they have to plead facts showing as a matter of law that the directors were told of the violation, as a matter of law that they knew there was a violation, for this kind of statement to be -- or for even a more definitive statement like was at issue in that case to have scienter.  And that's just not -- that's just not pled here.

Plaintiffs -- Mr. Lavelle said it very well may be the case that this is significant.  It is the plaintiffs' burden to plead --

THE COURT:  Tip of the iceberg.

MR. STOKES:  It's tip of the iceberg.  It's the plaintiffs' burden to plead this, and I think, again, this is where the size of the stock declines, or lack thereof, come into play as, you know, counseling against the inference that plaintiff -- that Mr. Lavelle is trying to advocate here.

He seemed to argue that the -- that the consent order from 2010 itself was a promise.  That was not listed.  I am not aware of law saying that a consent order is itself a attributable misrepresentation to a company, but there is no -- it was way before the statute of limitations.  It was not listed among the alleged

misstatements starting in paragraph 117 of the complaint, and there is no allegation that at that time, that statement was made with scienter in any way, that Cabot didn't intend to ultimately deal with the issues that were in the consent order.

But, I think, Your Honor, in questioning about the word "promise," there was no promise made during the class period in any of these disclosures that Cabot was fully compliant, or that it would not face additional circumstances, including circumstances like this.

The law is also clear, particularly in the Fifth Circuit, but also elsewhere, that these kind of post, after-the-fact charging documents that don't parse out scienter by individuals and are simply charging documents, these are just grossly insufficient to show scienter as to the individuals or to the company itself.

And I think one of the great examples of this is the Fifth Circuit's decision in the *Asar* case, the Hanger -- it involved a company called Hanger. It's cited in Footnote 33 of our opening brief. I actually argued and lost this case in the Fifth Circuit originally two to one, but they reversed themselves and affirmed dismissal 3-0. Never had that happen before.

But the important part there is that was -- the company's own audit committee published a report

highly critical of the company's accounting, including our client, the former CFO, and the Court, Fifth Circuit, unanimously said that was not enough to show scienter. And we cite in that same footnote numerous other cases, the FDIC reports, SEC complaints, government investigations, all across the board, across the country, are routinely held insufficient to show scienter.

It doesn't contradict the disclosures, and it's just, again, the inference that the disclosures were reasonable is stronger.

The other issue that was inherent in the response is that this is some kind of flip-the-switch issue where you go out to a well you see a leak and you put a patch on it right there, and that's -- it's that simple. It is not that simple.

And the inference is plain from the base of the complaint. Paragraph 86 of plaintiffs' cite, they cite the Pennsylvania Department of Environmental Protection inspector supervisor, who had become involved in 2013, and all he said was that inspections in 2011 raised questions about additional wells; and that by 2015, four years later, and two years after he started, he had identified 11 wells needing further evaluation, and after two years of work as the supervising inspector.

So this was not a simple -- it was not

simple to determine that migration was occurring. It was not simple to remediate either. And that was -- I think that is reflected in the disclosures, that this was a dialog. It was an ongoing process.

The consent order itself on its face contemplates work over time. It's not a flip-the-switch in terms of assessing whether a violation exists, and it is not a flip-the-switch trying to satisfy the regulator on either side.

And so I think when we are talking about this whole issue, this -- this insinuation that because it persisted for a certain number of years, allegedly, that therefore there is fraud, or scienter, that is just not in the context of these allegations in the fact history with this regulator, and with these disclosures. That is not a reasonable inference.

Again, I think that the stronger -- much stronger inference is that these were reasonable disclosures about a company that had an iterative process with the regulator, and it just didn't work out the way they wanted it to in the end, but that doesn't show that these statements were false or fraudulent in realtime.

THE COURT: Okay. That's helpful. And now I think, Mr. Lavelle, you have got a lot to respond to, and we can go until -- I hope we can get everybody heard from

by about 11:30; but if we need a little more time, we can do that as well.

Go ahead, Mr. Lavelle.

MR. LAVELLE: Thank you, Your Honor. So, you know, I understand the argument that Mr. Stokes is trying to make, that this is not a black-and-white issue, that there is a lot of gray area. But I think we take issue with that and we disagree, and I think the allegations in our complaint bear that out.

And really, I would like to turn your attention to the KV Pharmaceutical -- that is letter K, letter V -- Pharmaceuticals case that we cite, and we think it's -- it's very on point to the situation here. And the cite is 679 F.3d at 981.

Now, this was a case involving FDA notices of violation, the equivalent of that, and similar statements to those that we're dealing with here, where what the company said, quote --

THE COURT: "FDA," you mean Federal Drug Administration?

MR. LAVELLE: Yes, the Federal Drug Administration.

THE COURT: Thank you.

MR. LAVELLE: Force of habit. I apologize.

So, again, Your Honor, the statements in

that case, quite similar involving statements, quote, we believe we are currently in material compliance with regula- -- end quote -- with the regulations that that company was subject to by the Federal Drug Administration.

Now, those statements were found false and misleading by -- and this is an Eighth Circuit case, by the way, Your Honor, and I pulled a couple of cases.  Those statements were found to be false and misleading, but because of the company's history of continued violations, like in this case, the FDA had sent the company repeated notices of violation that the company was not in compliance, and that's exactly what happened here as well, Your Honor.

The notice of violation that was at issue in this case from the Federal Drug Administration was known as a Form 483.  And the Court in that case specifically said:  The issuance of a Form 482 represents the risk that the FDA may take corrective action against a company, unless the company's obligated to assess the seriousness of the risk and disclose such information to potential investors, if it also represents it is in compliance with FDA regulations.  And I think that is very similar to the situation that we have here.

Cabot received numerous and continuing violations.  Violations that they did not fix, they did not

remediate, and, yet, they continue to affirm that they believe they were in substantial compliance with the law.

And -- and, you know, I think that the -- the argument that, Well, what the company, you know, believes about whether the -- the allegations from their regulator are meritorious or not is a bit of a red herring, because at the end of the day what is important for the falsity of these statements regarding their substantial compliance, for the same reasons as in this *KV Pharmaceuticals* case, is that they knew that their company, Cabot, was -- was being regulated by the Pennsylvania Department.

This was their primary regulator, and their primary regulator was taking the opposite opinion from the company and finding these violations, that the company was, in fact, violating environmental law.  And that's what these notices of violation state.  That's what we allege they state, that the company had drilled these wells, and was allowing methane to leak from these wells into the ground water in Susquehanna County.  So I think that is really the key thing to keep in mind when thinking about these statements.

Now, regarding the 2010 consent order, we don't allege that it's a false statement, but nonetheless, it is extraordinarily important context for this case, an

important fact.  Obviously, Mr. Dinges was the CEO of the company, of Cabot, was involved at the highest levels.  He signed that consent order.  And the consent order bound Cabot, and Cabot agreed to remediate the problems in Dimock, and it didn't.

And we know that because the DEP -- excuse me, the environmental -- the Pennsylvania -- the Pennsylvania Department followed up with -- with a letter in June of 2018 with a laundry list of continuing violations, just like in the *KV Pharmaceutical* case, showing that -- that Cabot over a course of years had not remediated these issues.

And that, I think, fundamentally is also what the criminal case is about, that that is why the company was indicted, because these were as the -- as the grand jury found, these were not mere technical violations. This was a longstanding indifference to doing what the company -- to doing what the company had said it would do and remediating these problems.

And it took a course over ten years. Remember, the 2010 consent order was entered into in 2010, and, yet, it's the same problem occurring over and over again up through the time that they were indicted.  So you have a period of time spanning approximately a decade where Cabot is not doing what it said it would do and remediating

KATHY MILLER, RMR, CRR  -  kathy@miller-reporting.com

the issues.

THE COURT:  Okay.  Mr. Lavelle, I think we covered almost all of this.

MR. LAVELLE:  Okay.

THE COURT:  So let me turn to the derivative plaintiffs.  I want to hear you guys on demand futility because I think most of the other arguments track what Mr. Lavelle has very capably and thoroughly outlined.

I will hear the defendants' response to the demand futility, and then I want to touch on whether to the extent I grant a motion to dismiss, it is with or without prejudice.

The final thing I want to ask is whether you guys have a -- now informed each other thoroughly of all the issues, and knowing the upsides and downsides better than I do, and knowing what the Fifth Circuit today looks like, whether before I rule there is any window for resolution.  So, that's a three-item checklist.

Who is going to present on behalf of the derivative plaintiffs?  Is that you, Mr. Sachs-Michaels?

MR. SACHS-MICHAELS:  Yes, Your Honor, it is I.

THE COURT:  Go for it.

MR. SACHS-MICHAELS:  Thank you.  Your Honor, what I would like to really focus on here is the part of our case that is different from everything you just heard

which is --

THE COURT:  Demand futility.

MS. NICHOLSON:  Yes, the *Caremark* theory of demand futility.

THE COURT:  Right.

MR. SACHS-MICHAELS:  We have alleged that demand futility as it's used under the second prong of *Caremark,* which requires a plaintiff to allege particularized facts, that the majority of the board knew of red flags of misconduct but consciously disregarded them in bad faith.

And defendants say --

THE COURT:  How are they different from scienter?

MR. SACHS-MICHAELS:  Well, I think here there is no question of what the board knew because of the 220 documents.  So we are not really fighting about scienter.  What we're fighting about is what the board did in reaction to the knowledge that it was given, and if I can unpack that, back that up a little bit.

THE COURT:  Okay.

MR. SACHS-MICHAELS:  The elements of the claim are that the company was subject to a mission critical compliance risk.  The board was presented with red flags alerting it to a lack of compliance.

THE COURT: So define mission critical. Define mission critical because nothing here was going to impair the ability -- Cabot had a whole lot of other wells. It had an exposure to a fine that --

THE COURT REPORTER: Judge, I think you froze. Is everybody there?

(Zoom transmission interrupted.)

MR. LAVELLE: -- the allegation is that 90 to 100 percent of the company's --

THE COURT REPORTER: Judge, this is Kathy Miller. Judge, you froze on my end.

THE COURT: Well, not on my end so let's keep going.

THE COURT REPORTER: The last thing I heard is it had exposure to a fine.

THE COURT: Yes, that's fine. To a small fine. Go ahead, Mr. Sach-Michaels.

MR. SACHS-MICHAELS: Yes.

Effectively, all of the company's operations are in this one rural county in Pennsylvania. So the company is subject to the Pennsylvania Department of Environmental Protection's jurisdiction, and Pennsylvania law enforcement, all of its operations.

It is not a situation like the Plains case where you have thousands of miles of pipeline and ten miles

of them in some far off place have a problem.  The company, all of its operations, are subject to the same authorities. So that is the mission critical compliance risk, which is depending on what the sanctions that flow from a felony conviction are, there may be serious consequences to this company.

Now, the board, we have alleged -- and I know there is this issue with the sealed documents, and I don't want to sort of speak out of turn here so I'll --

THE COURT:  Correct.

MR. SACHS-MICHAELS:  We have alleged nine specific red flags where the board of directors was told between approximately 2010 and 2018 that methane was migrating out of its wells, that it was not -- that the position of the regulator was that it wasn't in compliance.

Critically, defendants do not really dispute the red flags here.  They -- they say the board was diligently monitoring the problems, but monitoring the problems is another way of saying, And the board knew what was going on.  So this litigation is not -- this motion is not really about whether there were red flags.  And that's important because a number of the cases that defendants cite are cases where motions to dismiss were granted on this theory because there were no red flags.

That is like the *MetLife* case, the

*LendingClub* case, the *Qualcomm* case.  Those are cases that involved like one or two flags.  We've got nine specific red flags here, and defendants agree that the board knew about it.  They just say the board was diligently monitoring.  So we're not fighting about that.

The crux of the disagreement, and I think where the outcome of this motion resides is in the final element, which is, did the board consciously disregard the red flags?  And, you know, funny how this worked out, there's a pair of opinions.  We cited one, of course, and they have cited one, that are from the second half of 2020 out of the Delaware Court of Chancery that decide this exact issue, and coincidentally are decided by the same vice chancellor.  So they are sort of grappling with two different sides of this one issue.

Those opinions are the *Teamsters Local v. Chou* case that we cite, that involves AmerisourceBergen, and the *Richardson v. Clark* case that they cite that involves MoneyGram.  The first of those, which was issued in August of 2020, is the *Chou case*, AmerisourceBergen.

In this case the board knew that a subsidiary was refilling syringes for cancer patients in violation of Food and Drug Administration rules.  And the reason that the motion to dismiss was denied is that the board -- the record before the Court showed nothing

tangible -- the keyword here is "tangible" -- that the board did to remedy the issues. And the quote is: That there was nothing -- no tangible action taken to remedy the issues. Calling attention to the hiring of law firms to review alleged illegality without more is insufficient to refute well pled allegations that the board failed to address mission critical compliance risks. And then in the same portion, concluding of this opinion, the Court returns to the concept of tangible saying that there is no, quote, tangible reaction to as opposed to review of the mission critical compliance failures.

So what we're alleging and what our complaint alleges is that the board did nothing tangible in response to its knowledge that there was gas, methane, leaking into the water wells of the rural community in which it was operating, rendering people's homes and farms unusable. It's very serious, what was happening.

And the *MoneyGram* case, which is defendants' side of the argument, is a situation where MoneyGram, which is the money transfer company, was violating anti-money laundering laws. They entered a consent with the Department of Justice. The board monitored and oversaw what was going on following the consent, and took tangible action and implemented a new software system called Actimize to stop the money

laundering use of its platform.  And it didn't work and the money laundering continued, and there was a subsequent penalty.

And so the distinction that these two opinions together provide for us, is that if you have tangible action in response, then, demand -- then the motion to dismiss would be granted because the board didn't consciously disregard; and if there is no tangible action, then you have an allegation of conscious disregard.

Here, what we have got is the grand jury charge that says that Cabot didn't even begin taking remedial action on these wells until it knew it was facing criminal charges.  The quote we cite in our brief is, "Over a period of many years, and despite mounting evidence, Cabot failed to acknowledge and correct conduct that caused stray gas migration.  Indeed, some of these gas wells have been in place for more than a decade, yet Cabot has only recently taken steps to remediate them."

We also don't have a single board meeting or minute that we cite in our complaint where the board is implementing some new process for the remediation of these wells.  The only things that defendants cite -- you know, in the AmerisourceBergen case, like here, the defendants had incorporation by reference of all the 220 documents.  So similar to this case, it's like defendants have their

own record that they are able to rely on.

And here in the motion to dismiss and in the reply, defendants identify three things that they say that they did in response to the red flags, and this is at page 8 of the motion to dismiss. They hired a consultant to test the wells. They hired some party that was preparing closure report memos. And they provided new water to some people for some period of time.

And what's notable there is, they do not identify, even though they have the entire record at their fingertips, anything that the board actually did to stop the migration of methane from these wells into the aquifer and to prevent new wells from causing the same problems. And so there is no good faith action in the record that the board took to address the problem.

Testing is not remediation. That's what the *Chou* case says about hiring lawyers to review the problem isn't enough. You have to do something. And so what they -- their -- I think their answer to that weakness in their argument is that they rely on this *Qualcomm* case for the proposition that if you dispute the regulators, that can count as taking action in response to red flags.

But the *Qualcomm* case involved a situation where the company knew it was facing antitrust scrutiny from regulators around the world, and instead of acceding

to the demands and restructuring its business, what it did was, it lobbied governments around the world and tried to educate regulators on why it wasn't violating antitrust rules.

That is not a defense that is available to this board because it already committed to remediate the problems in these consent orders.  The ship has sailed on that argument.  They could have said from the beginning, We're not violating the law here.  We are not committing to do anything because we're not violating the law.

But the problem for them is that in 2010 and 2015, they agreed to consent orders where they committed to do something, and then the board didn't ever do anything, didn't require the company to do it.

So for those reasons we have alleged -- series of red flags is not even disputed.  I don't think there is any dispute that the company cannot operate outside of the jurisdiction of law enforcement in Pennsylvania, or the Pennsylvania Department of Environmental Protection.

And the record is -- there is nothing in the record, notwithstanding that defendants have 1600 pages of documents that they could cite, to identify what the board -- what tangible thing the board actually did to remediate this problem.

*Caremark* invokes bad faith.

THE COURT:  Okay.  I think we -- I think we have that.

All right.  So let me hear from anyone else on behalf of the derivative plaintiffs; then I will go back to Mr. Stokes; then I want to hear about whether any amendment should be with or without leave to amend; and then I want to hear whether this is a good moment to think about going forward at all.

MR. SACH-MICHAELS:  Thank you, Your Honor.

THE COURT:  Go ahead.  So anybody else on behalf of the derivative plaintiffs?  I think we have heard a lot.

MR. BROWN:  Nothing further for myself --

THE COURT:  Bless you.

MR. BROWN:  --with co-lead counsel.  Thank you, Your Honor.

THE COURT:  Let me hear now from, I guess, Mr. Stokes in response to these arguments, briefly as much as you can, and then we will pick up the other issues.  And weigh in here on the amendment with or without prejudice question, too.

MR. STOKES:  Thank you, Your Honor.

So just to deal with the opening line on the argument, we are contesting scienter in this case.  Bad

faith is all about scienter and we are contesting -- we don't -- this allegation that we don't dispute red flags, that's not in our view the way to frame the analysis here.

I actually argued the *Richardson* case, the *MoneyGram* case, to Vice Chancellor Glasscock. It was right after the *AmerisourceBergen* case came out. So I got that decision about a week or two before the oral argument and prepared on it. And this case here bears no resemblance to *AmerisourceBergen* where the company was running a -- what they call a criminal enterprise.

It was actually just horrific what was -- what was being alleged in that case with selling -- you know, pulling cancer drugs and not sanitizing things and then selling it.

There is a whole panoply of cases out there, including these FDA nonapproval cases, the *Wells Fargo* case that they cite, where companies are -- they're essentially in -- selling illegal products for the purpose of making money.

It is like we can all agree you can't run a side cocaine business or illegal drugs business and comply with -- that's something that is going to be frowned upon. But that's very different from a situation like this in the energy industry where you have violations, alleged violations, that are incidental to producing gas out of the

ground.

Cabot was not in the business of violating -- it wasn't selling illegal gas. It was selling a perfectly lawful product, and there were some compliance issues involved in -- in preparing that -- in producing that product, but this was a fundamentally lawful business.

And *Richardson* is quite -- it is eerie how similar the facts are in that case. There was a deferred prosecution agreement in 2012 where MoneyGram agreed to improve its systems, and undertook a lot of obligations, similar in some ways to the consent order here.

There was a long period where the board presided over remediation efforts, and then there was a very bad outcome at the end where they got hit with a 125-million-dollar penalty. Far steeper, I think, than what is being contemplated and alleged with respect to this case.

And in the *MoneyGram* case, this idea that just because you can't point to a document that says the board itself stood up and recommended a different course of action than what management had proposed, or that the board didn't go down to fix the money laundering system itself, or didn't go down to the well and patch the wells itself, that is not how boards operate.

*MoneyGram* made clear -- the decision made

clear -- that alleging that the directors relied excessively on management's proposals, and management's approach, that is not enough to show bad faith.  Being allegedly feckless, being allegedly wistless, deferring to management, bad oversight is not bad faith oversight.  That's the money -- quote from that *MoneyGram* opinion.  And I think that we won't concede that there was bad oversight here.  But all that's alleged here, at best, is that the board -- in response to alleged violations, they undertook a plan with management that didn't get the job done, ultimately, or it didn't succeed.  And that's just not sufficient.

And case after case on this -- under these same concepts, the *MetLife* case, 2020 Westlaw 4746635:  A failure to undertake immediate remediation of a reported defect even where immediate action would be wise is not evidence of bad faith.

*General Motors, Corbat*:  An ineffective response to purported red flags does not, without more, indicate bad faith.

The plaintiffs in this case don't allege anything like what happened in the *Massey* case, or the *Westmoreland* case, where you have allegations -- even the *Facebook* 220 case, where you have allegations that rather than contest the regulators' determinations, the company

just decided to flout them, and to -- the company openly decided to distract and hide from the regulator.

That is not alleged here.  There is no dispute that, as alleged in both of the cases, if this was an iterative process where -- as one of the plaintiffs' counsel put it, this was their principal regulator, they went back and forth.  At all times there was a plan of remediation, testing, and contesting, where the company thought that they didn't have to agree.

And I think that *Jacobs* case, the *Qualcomm* case that was mentioned, that's a critical component to this, that companies don't have -- directors don't have to roll over and accept whatever a regulator, or even an attorney general, alleges.  They have -- they have the right to fight, and to assert the company's position.

It would be a detriment to shareholders if directors were required in every case to take the most expensive, the most conciliatory tack with the regulator.  They are allowed to fight.  And here, this company, even if crediting all of the allegations, they stayed within that lane.

THE COURT:  Two minutes, Mr. Stokes.

MR. STOKES:  Sorry.  So there is just no inference here that this company deliberately engaged in an illegal business for the purpose of making money.  I stress

on the derivative case that this is very serious. We are talking about holding directors personally liable. But in a *Caremark* case, when a dismissal is denied, that is a serious issue and that is why that *AmerisourceBergen* case and the *Boeing* case, and all these cases, it's very significant, obviously, to the directors when that happens.

And to hold directors accountable in a business like this, an industry like this, where notices of violation are common, just like in the pipeline business, if directors are held to this kind of standard, it would set a -- as the plaintiffs propose, it would deter good people from sitting on boards, if they could be held personally liable just because a proposed tack of the regulator doesn't work out, or proposed remediation --

THE COURT: I understand your argument.

MR. STOKES: Yes, Your Honor. So we don't think the claims here come even close to showing demand futility. We don't believe any court has gone nearly as far as the plaintiffs want to take demand futility here.

THE COURT: So I take it your argument is that amendment beyond what has already been done would be futile, and therefore any dismissal should be with prejudice. And the plaintiffs in both the securities and derivative cases would argue that at least they should be able to address some of the deficiencies that have been

aired in the papers that have been exchanged.

Is that a fair summary of where we are, guys?

MR. STOKES:  That is correct from our standpoint.  And I just want to put out, in the class case, the Delaware County, they filed the first complaint in Pennsylvania, and then they were appointed lead counsel, and filed an amended complaint.  They have already amended.

So we think this case, again, is more like *Uranium Energy*.  I know it's been awhile, but that was a case where the statements didn't even get across the false statement threshold, and the Court denied leave to amend.

It is not like *Anadarko* or *Plains All American* where the Court did find some conceivable statements and some conceivable basis that might be curable.  It wasn't cured.  But here they haven't gotten there yet and we think the great weight of authority compels dismissal.

THE COURT:  So stepping back very briefly, you guys have educated not only me, but each other on the ups and downs of the case, cases, and you know what the Fifth Circuit is like, and you know what the law is developing towards nationally.

Is there any benefit to sending you, prior to my resolving the issues that are before me that I didn't

resolve in my earlier bench ruling on the side show, as somebody said -- so I took care of the tail.  Now we got the dog, dogs.  Is there any benefit to putting you in a kennel with a dog whisperer, a skilled mediator, knowledgeable about these kinds of cases, and seeing if a resolution can't be reached while the uncertainties of further motion practice and appellate threshings remain.

I want to hear from --

MR. STOKES:  Your Honor --

THE COURT:  Yes.  Go ahead, Mr. Stokes.

MR. STOKES:  Your Honor, I can say, just based on previous conversations with our client, and trying to -- not to divulge attorney/client information.

THE COURT:  No.  I don't want to --

MR. STOKES:  They were not receptive to the idea of settlement at this stage.  I will certainly -- as you may know, Your Honor, they also recently went through a merger transaction, and so, there has been some integration.  I will visit with them again, and we can file a notice, if you would like, of any change in position.

THE COURT:  Why don't you --

MR. STOKES:  But they were not excited, to put it modestly.

THE COURT:  I am not looking for excitement. That is not my standard.

KATHY MILLER, RMR, CRR  -  kathy@miller-reporting.com

MR. STOKES:  I understand.

THE COURT:  So confer internally and with each other.  It is Monday, the what, 29th?  Let me know by next Monday, which is December -- December 6, right?

Yes.  Let me know by Monday, December 6, by close of business, if there is any interest in proceeding.  It will certainly take me at least that long to begin digesting the arguments that have been presented today, in addition to the thorough briefs that were earlier filed.

All right?  And with that --

MR. SACHS-MICHAEL:  Thank you, Your Honor.

THE COURT:  With that, I think we have, once again, demonstrated that this is a whole lot more fun than being an appellate court judge because I don't have to limit you to 20 minutes.  And interesting issues, very interesting issues.

So, thank you for good arguments, and good or -- briefing, and we will proceed.  And I need an agreed modified order on the leadership structure.

MR. SACHS-MICHAELS:  Yes, Your Honor.

THE COURT:  All right.  Your first test of collaboration is that you guys can get me an agreed order by Monday.

MR. SACHS-MICHAELS:  Thank you.

KATHY MILLER, RMR, CRR  -  kathy@miller-reporting.com

THE COURT:  Okay.

MR. SACHS-MICHAELS:  That works.

THE COURT:  Thank you.

MR. SACHS-MICHAELS:  Thank you, Your Honor.

MR. STOKES:  Thank you, Your Honor.

THE COURT:  All right.  You are all excused.

(Concluded at 11:37 a.m.)

COURT REPORTER'S CERTIFICATE

     I, Kathleen K. Miller, certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

DATE: 12/13/21          /s/     _Kathleen K. Miller_

                        Kathleen K. Miller, RPR, RMR, CRR

KATHY MILLER, RMR, CRR  -  kathy@miller-reporting.com

**$**

**$300,000** [1] - 43:14

**/**

**/s** [1] - 81:14

**0**

**08/18/18** [2] - 1:7, 3:7

**1**

**1** [2] - 1:22
**10-K** [5] - 27:21, 28:18, 31:1, 37:6
**10-Ks** [3] - 26:22, 27:25, 40:9
**10-Q** [1] - 31:1
**10-Qs** [1] - 40:9
**100** [2] - 29:6, 65:9
**10019** [1] - 2:21
**101** [1] - 48:14
**1045** [1] - 2:24
**10:37** [1] - 38:9
**10:41** [1] - 38:9
**11** [1] - 57:23
**1100** [2] - 3:4, 3:18
**117** [1] - 56:1
**11910** [1] - 3:8
**11:30** [1] - 59:1
**11:37** [1] - 81:7
**11th** [1] - 35:17
**12** [1] - 31:8
**12/13/21** [1] - 81:14
**123** [2] - 30:6, 31:5
**125-million-dollar** [1] - 74:15
**12720** [1] - 2:24
**139** [2] - 30:7, 34:13
**1450** [1] - 2:9
**156** [1] - 49:22
**1600** [1] - 71:22
**17th** [1] - 34:15
**18** [3] - 49:16, 50:9, 50:13
**19** [1] - 40:17
**1900** [1] - 2:4
**19087** [1] - 2:15

**2**

**20** [3] - 41:2, 41:18, 80:16
**2008** [1] - 10:17
**2010** [19] - 31:22, 40:17, 45:6, 45:10, 45:18, 47:14, 48:10, 48:17, 49:16, 49:17, 50:10, 50:12, 53:24, 55:21, 61:23, 62:21, 66:13, 71:11
**2011** [4] - 31:7, 47:2, 48:23, 57:20
**2012** [2] - 10:13, 74:9
**2013** [1] - 57:20
**2014** [2] - 47:2, 48:23
**2015** [5] - 10:9, 10:11, 31:8, 57:21,

71:12
**2016** [3] - 30:25, 31:4, 32:8
**2017** [4] - 32:11, 34:16, 35:5, 47:3
**2018** [6] - 35:17, 47:3, 47:12, 48:23, 62:9, 66:13
**2019** [3] - 27:20, 34:15, 35:15
**2020** [6] - 8:25, 17:4, 31:22, 67:11, 67:20, 75:14
**2021** [2] - 1:6, 1:14
**21** [1] - 37:16
**212-935-7400** [1] - 2:21
**214-744-3000** [1] - 2:10
**220** [14] - 3:9, 13:13, 17:7, 17:17, 17:19, 17:20, 17:24, 18:8, 23:10, 23:15, 24:11, 64:16, 69:24, 75:24
**22nd** [3] - 30:25, 31:4, 32:8
**25** [3] - 26:19, 34:2, 50:23
**26** [1] - 35:15
**27th** [1] - 32:11
**280** [1] - 2:14
**29** [2] - 1:6, 1:14
**29th** [1] - 80:3

**3**

**3-0** [1] - 56:22
**30** [1] - 28:9
**31st** [1] - 2:20
**3200** [1] - 3:4
**33** [1] - 56:20
**34** [1] - 38:23
**3811** [1] - 2:8

**4**

**43** [1] - 37:15
**4746635** [1] - 75:14
**482** [1] - 60:17
**483** [1] - 60:16
**4:21-cv-2045** [1] - 1:3
**4:21-cv-2046** [1] - 1:11

**5**

**5** [6] - 26:12, 26:16, 49:2, 49:7, 53:6, 53:17
**500** [1] - 27:19
**504-455-1400** [1] - 3:5
**5040** [1] - 3:12
**512-536-5287** [1] - 3:19
**515** [1] - 3:22

**6**

**6** [2] - 80:4, 80:5
**61** [1] - 28:17
**610-667-7706** [1] - 2:15
**619-231-1058** [1] - 2:5
**619-525-3990** [1] - 3:13
**65** [1] - 48:16

**655** [1] - 2:4
**679** [1] - 59:14

**7**

**70163** [1] - 3:5
**712** [1] - 2:20
**713-250-5087** [1] - 3:23
**75219** [1] - 2:9
**75230** [1] - 2:24
**75243** [1] - 3:9
**77002** [1] - 3:23
**78701** [1] - 3:19

**8**

**8** [2] - 54:22, 70:5
**800** [1] - 27:20
**8004** [1] - 3:22
**86** [1] - 57:17
**89** [1] - 52:14

**9**

**90** [2] - 35:16, 65:8
**92** [2] - 31:20, 35:10
**92101** [1] - 2:5
**92122** [1] - 3:13
**94** [1] - 48:23
**95** [1] - 35:7
**972-387-4040** [1] - 2:25
**972-991-1582** [1] - 3:10
**98** [1] - 3:18
**981** [1] - 59:14
**99** [1] - 35:7
**9:54** [2] - 1:5, 1:13
**9th** [1] - 31:22

**A**

**a.m** [3] - 1:5, 1:13, 81:7
**ability** [1] - 65:3
**able** [6] - 11:14, 18:3, 19:18, 23:6, 70:1, 77:25
**above-entitled** [1] - 81:12
**absence** [1] - 20:23
**absolutely** [3] - 32:23, 51:23, 54:10
**acceding** [1] - 70:25
**accept** [2] - 25:9, 76:13
**acceptable** [1] - 23:5
**access** [1] - 52:4
**accorded** [1] - 34:5
**accountable** [1] - 77:7
**accounting** [1] - 57:1
**accurate** [2] - 12:7, 26:11
**acknowledge** [1] - 69:15
**acknowledges** [2] - 35:8, 35:16
**acronym** [1] - 30:9
**acronyms** [1] - 34:20
**acted** [2] - 23:12, 40:5

**Actimize** [1] - 68:25
**action** [21] - 4:12, 6:12, 9:2, 10:24, 14:12, 17:17, 17:20, 17:24, 23:10, 30:7, 34:11, 60:18, 68:3, 68:24, 69:6, 69:8, 69:12, 70:14, 70:22, 74:21, 75:16
**actionable** [2] - 36:25, 39:6
**actions** [1] - 48:11
**actively** [1] - 17:4
**add** [6] - 20:12, 20:17, 21:5, 22:13, 25:6, 25:18
**added** [1] - 20:3
**adding** [1] - 20:19
**addition** [1] - 80:9
**additional** [6] - 8:18, 32:14, 52:10, 52:15, 56:9, 57:21
**address** [7] - 29:24, 38:17, 48:4, 53:1, 68:7, 70:15, 77:25
**addressed** [1] - 36:3
**addresses** [1] - 28:24
**addressing** [1] - 32:13
**adequately** [2] - 38:18, 40:7
**adjusting** [1] - 20:17
**Administration** [5] - 59:20, 59:22, 60:4, 60:15, 67:23
**admit** [1] - 43:3
**advance** [1] - 10:19
**advantage** [2] - 16:23, 23:16
**advocate** [1] - 55:19
**affected** [2] - 30:14, 34:8
**affirm** [1] - 61:1
**affirmed** [4] - 36:11, 36:13, 56:22
**after-the-fact** [1] - 56:13
**agree** [8] - 11:18, 17:11, 18:13, 53:11, 53:15, 67:3, 73:20, 76:9
**agreed** [11] - 9:3, 10:17, 10:19, 10:21, 10:23, 11:10, 62:4, 71:12, 74:9, 80:19, 80:23
**agreeing** [1] - 46:21
**agreement** [8] - 11:14, 30:17, 31:7, 33:3, 46:19, 46:20, 74:9
**ahead** [13] - 5:20, 6:24, 10:6, 15:6, 45:13, 46:15, 49:5, 53:2, 59:3, 65:17, 72:11, 79:10
**aired** [1] - 78:1
**al** [4] - 1:3, 1:7, 1:12, 1:16
**Alayne** [2] - 3:3, 7:21
**alerting** [1] - 64:25
**ALL** [1] - 2:1
**allegation** [14] - 27:18, 29:13, 30:22, 31:12, 31:20, 31:23, 32:15, 35:9, 35:12, 35:18, 56:2, 65:8, 69:9, 73:2
**allegations** [23] - 10:10, 15:17, 33:7, 33:11, 33:23, 34:1, 34:4, 34:10, 36:16, 36:22, 38:18, 38:19, 40:4, 40:14, 41:25, 49:11, 58:14, 59:8, 61:5, 68:6, 75:23, 75:24, 76:20
**allege** [9] - 27:21, 32:1, 32:3, 43:17, 47:17, 61:18, 61:24, 64:8, 75:21
**alleged** [26] - 30:20, 30:21, 31:3, 35:12,

36:24, 39:5, 40:7, 40:8, 41:2, 41:22, 42:20, 44:2, 50:24, 55:25, 64:6, 66:7, 66:11, 68:5, 71:15, 73:12, 73:24, 74:16, 75:8, 75:9, 76:3, 76:4
**allegedly** [3] - 58:12, 75:4
**alleges** [2] - 68:13, 76:14
**alleging** [2] - 68:12, 75:1
**allowed** [2] - 11:2, 76:19
**allowing** [2] - 48:1, 61:19
**almost** [2] - 41:16, 63:3
**alone** [1] - 53:4
**alternative** [1] - 30:14
**Alvarado** [2] - 2:3, 7:8
**ALVARADO** [1] - 7:7
**amend** [2] - 72:7, 78:12
**amended** [6] - 11:5, 24:15, 31:20, 35:7, 78:8
**amendment** [3] - 72:7, 72:21, 77:21
**American** [5] - 36:4, 36:15, 36:21, 54:25, 78:14
**AmerisourceBergen** [6] - 67:17, 67:20, 69:23, 73:6, 73:9, 77:4
**amount** [4] - 9:16, 24:15, 26:13, 26:14
**amounted** [1] - 49:1
**amounts** [2] - 9:11, 9:18
**Anadarko** [5] - 36:4, 36:13, 39:15, 54:25, 78:13
**analysis** [2] - 28:21, 73:3
**analyst** [1] - 49:23
**analysts** [2] - 49:19, 50:12
**AND** [4] - 2:12, 2:12, 2:17, 3:1
**Andrew** [1] - 3:17
**annual** [1] - 43:15
**answer** [2] - 43:6, 70:19
**answered** [1] - 23:20
**anti** [1] - 68:21
**anti-money** [1] - 68:21
**anticipatory** [1] - 24:21
**antitrust** [2] - 70:24, 71:3
**anyway** [1] - 42:19
**apologize** [5] - 14:16, 19:7, 23:21, 34:25, 59:24
**appealed** [2] - 36:11, 36:12
**appearance** [3] - 7:5, 7:16, 21:22
**appearances** [2] - 4:5, 4:21
**APPEARANCES** [1] - 2:1
**appeared** [1] - 11:4
**APPEARING** [1] - 2:1
**appellate** [3] - 28:21, 79:7, 80:15
**applicable** [2] - 48:12, 48:13
**applied** [1] - 31:17
**apply** [1] - 29:9
**applying** [1] - 31:16
**appointed** [2] - 19:17, 78:7
**appointing** [1] - 9:4
**approach** [2] - 11:15, 75:3
**appropriate** [3] - 19:15, 30:13, 32:21
**aquifer** [1] - 70:12
**area** [1] - 59:7

**argue** [5] - 17:1, 19:14, 48:25, 55:20, 77:24
**argued** [3] - 49:6, 56:20, 73:4
**arguing** [2] - 8:5, 44:21
**argument** [20] - 12:2, 12:24, 14:2, 26:15, 29:18, 38:1, 38:2, 38:3, 39:14, 41:14, 49:8, 59:5, 61:4, 68:19, 70:20, 71:8, 72:25, 73:7, 77:15, 77:20
**arguments** [6] - 8:18, 26:9, 63:7, 72:19, 80:8, 80:18
**Asar** [1] - 56:18
**aspiration** [1] - 35:25
**aspirational** [2] - 36:17, 39:16
**aspire** [1] - 39:1
**assert** [1] - 76:15
**assess** [1] - 60:19
**assessing** [1] - 58:7
**assisted** [1] - 3:25
**associated** [2] - 49:21, 50:16
**assume** [2] - 6:6, 49:3
**assumed** [1] - 54:19
**assumption** [1] - 21:16
**attempt** [1] - 11:16
**attempting** [1] - 15:10
**attention** [2] - 59:11, 68:4
**attenuated** [1] - 41:21
**attenuation** [1] - 41:4
**Attorney** [3] - 31:13, 51:2, 52:24
**attorney** [1] - 76:14
**attorney/client** [1] - 79:13
**attributable** [1] - 55:23
**audit** [1] - 56:25
**August** [2] - 11:7, 67:20
**Austin** [1] - 3:19
**authorities** [2] - 34:7, 66:2
**authority** [2] - 14:1, 78:17
**avail** [1] - 14:13
**available** [5] - 42:9, 42:14, 42:15, 42:19, 71:5
**Ave** [1] - 3:8
**Avenue** [1] - 2:20
**avoid** [2] - 10:22, 11:16
**aware** [3] - 9:1, 10:9, 55:22
**awhile** [1] - 78:10

## B

**background** [1] - 40:23
**bad** [11] - 27:5, 64:11, 72:1, 72:25, 74:14, 75:3, 75:5, 75:7, 75:17, 75:20
**baked** [1] - 9:9
**baked-in** [1] - 9:9
**balances** [1] - 14:16
**Balon** [2] - 3:8, 7:12
**balon@bbradleylaw.com** [1] - 3:10
**base** [1] - 57:16
**based** [5] - 41:8, 41:9, 41:19, 51:25, 79:11
**basis** [2] - 52:21, 78:15

**bear** [1] - 59:9
**bears** [1] - 73:8
**became** [1] - 32:5
**become** [1] - 57:19
**becomes** [1] - 20:21
**BEFORE** [1] - 1:20
**beg** [1] - 12:12
**begin** [2] - 69:11, 80:8
**beginning** [1] - 71:8
**behalf** [18] - 4:9, 5:1, 5:4, 5:11, 5:17, 5:21, 6:1, 6:10, 6:11, 6:15, 6:20, 7:21, 10:20, 15:19, 16:3, 63:19, 72:5, 72:12
**BEHALF** [2] - 1:11, 2:17
**belief** [1] - 47:20
**believes** [2] - 54:2, 61:5
**belive** [1] - 30:15
**Bellicum** [1] - 29:3
**Ben** [3] - 4:16, 5:18, 8:23
**bench** [2] - 28:9, 79:1
**beneficial** [1] - 8:2
**benefit** [4] - 13:8, 18:10, 78:24, 79:3
**Benjamin** [1] - 2:18
**Bennett** [1] - 29:3
**Bennett's** [1] - 39:12
**best** [4] - 13:25, 14:1, 46:12, 75:8
**better** [1] - 63:16
**between** [7] - 10:11, 31:22, 36:15, 44:9, 49:18, 51:22, 66:13
**beyond** [2] - 39:20, 77:21
**big** [2] - 44:8, 54:24
**bigger** [1] - 29:14
**billion** [1] - 43:15
**bit** [6] - 6:18, 6:20, 20:21, 45:4, 61:6, 64:20
**black** [1] - 59:6
**black-and-white** [1] - 59:6
**blatantly** [2] - 39:7, 39:19
**bless** [1] - 72:15
**Blvd** [2] - 2:8, 3:18
**board** [31] - 57:6, 64:9, 64:16, 64:18, 64:24, 66:7, 66:12, 66:17, 66:19, 67:3, 67:4, 67:8, 67:21, 67:25, 68:2, 68:6, 68:13, 68:22, 69:7, 69:19, 69:20, 70:11, 70:15, 71:6, 71:13, 71:24, 74:12, 74:20, 74:21, 75:9
**boards** [2] - 74:24, 77:12
**body** [2] - 53:10, 53:16
**Boeing** [1] - 77:5
**bond** [2] - 33:18, 52:20
**book** [1] - 12:3
**books** [5] - 11:9, 12:16, 13:5, 14:20, 23:10
**bottom** [2] - 38:25, 42:16
**bounced** [1] - 44:3
**bound** [1] - 62:3
**box** [1] - 40:21
**Bradley** [2] - 3:8, 7:12
**BRADLEY** [2] - 4:4, 7:11
**brain** [1] - 53:9

**break** [2] - 37:25, 38:7
**brief** [3] - 54:23, 56:20, 69:13
**briefing** [5] - 10:22, 12:15, 18:9, 24:25, 80:19
**briefly** [2] - 72:19, 78:19
**briefs** [1] - 80:9
**Broadway** [1] - 2:4
**brought** [2] - 39:6, 52:11
**brown** [3] - 21:19, 21:23, 22:6
**Brown** [4] - 9:5, 21:11, 21:15, 22:4
**BROWN** [5] - 21:25, 22:4, 22:10, 72:14, 72:16
**Brown's** [1] - 21:21
**Bryan** [1] - 46:14
**bsachsmichaels@glancylaw.com** [1] - 2:22
**bunch** [1] - 20:20
**burden** [5] - 27:3, 27:7, 29:15, 55:12, 55:15
**business** [9] - 71:1, 73:21, 74:2, 74:6, 76:25, 77:8, 77:9, 80:6

## C

**CA** [2] - 2:5, 3:13
**CABOT** [4] - 1:12, 1:15, 2:17, 3:16
**Cabot** [44] - 5:17, 27:19, 30:8, 30:11, 31:2, 31:14, 31:21, 32:5, 32:11, 32:17, 32:19, 32:25, 33:7, 33:8, 34:15, 40:10, 40:18, 40:19, 40:23, 42:21, 44:3, 44:12, 45:3, 47:12, 48:11, 48:17, 48:25, 49:18, 50:15, 54:2, 56:3, 56:8, 60:24, 61:11, 62:2, 62:4, 62:11, 62:25, 65:3, 69:11, 69:15, 69:17, 74:2
**Cabot's** [5] - 26:22, 27:14, 27:23, 31:17, 34:8
**cancer** [2] - 67:22, 73:13
**candid** [1] - 14:7
**cannot** [3] - 32:3, 47:21, 71:17
**capable** [1] - 11:18
**capably** [1] - 63:8
**care** [1] - 79:2
**Caremark** [4] - 64:3, 64:8, 72:1, 77:3
**case** [115] - 6:3, 7:2, 8:7, 8:13, 8:25, 10:10, 10:23, 11:3, 11:11, 11:14, 13:25, 14:8, 14:10, 14:17, 14:18, 14:22, 15:3, 15:14, 16:14, 17:5, 18:10, 18:16, 20:10, 22:25, 27:5, 27:6, 27:18, 27:22, 28:3, 28:4, 28:14, 28:20, 28:21, 28:24, 29:2, 29:3, 29:5, 31:6, 36:4, 36:7, 36:9, 36:15, 36:17, 36:24, 39:9, 39:15, 41:3, 41:8, 41:12, 43:7, 43:18, 44:15, 45:5, 53:17, 54:23, 55:7, 55:11, 56:18, 56:21, 59:12, 59:15, 60:1, 60:6, 60:10, 60:15, 60:16, 61:10, 61:25, 62:10, 62:14, 63:25, 65:24, 66:25, 67:1, 67:17, 67:18, 67:20, 67:21, 68:18, 69:23, 69:25, 70:17, 70:20, 70:23, 72:25, 73:4, 73:5, 73:6, 73:8, 73:12, 73:17, 74:8, 74:17, 74:18,

75:13, 75:14, 75:21, 75:22, 75:23, 75:24, 76:10, 76:11, 76:17, 77:1, 77:3, 77:4, 77:5, 78:5, 78:9, 78:11, 78:21
**cases** [34] - 6:1, 9:2, 15:17, 17:4, 19:24, 24:11, 26:3, 26:9, 27:3, 27:25, 28:11, 29:10, 33:13, 36:14, 37:4, 37:15, 38:24, 41:5, 42:4, 43:4, 43:6, 54:22, 57:4, 60:7, 66:22, 66:23, 67:1, 73:15, 73:16, 76:4, 77:5, 77:24, 78:21, 79:5
**casing** [1] - 33:8
**catchall** [1] - 31:16
**causation** [2] - 43:3, 43:8
**caused** [5] - 49:20, 50:14, 50:15, 53:25, 69:15
**causing** [1] - 70:13
**cautionary** [3] - 37:6, 37:9, 40:14
**cement** [3] - 33:8, 33:18, 52:20
**central** [1] - 26:15
**CEO** [1] - 62:1
**certain** [2] - 32:23, 58:12
**certainly** [9] - 18:17, 19:16, 24:13, 27:1, 29:2, 34:1, 39:7, 79:16, 80:7
**CERTIFICATE** [1] - 81:8
**certify** [1] - 81:10
**CFO** [1] - 57:2
**chance** [1] - 38:11
**chancellor** [1] - 67:14
**Chancellor** [1] - 73:5
**Chancery** [2] - 14:13, 67:12
**change** [1] - 79:20
**characterization** [1] - 17:11
**charge** [3] - 32:6, 35:21, 69:11
**charged** [1] - 52:16
**charges** [3] - 52:9, 52:10, 69:13
**charging** [4] - 52:23, 54:17, 56:13, 56:14
**Check** [2] - 2:14, 7:2
**checklist** [1] - 63:18
**Cherry** [1] - 2:23
**chicken** [1] - 8:4
**CHIEF** [1] - 1:20
**chiefs** [1] - 20:20
**child** [1] - 42:21
**chime** [1] - 21:5
**chose** [1] - 14:13
**Chou** [3] - 67:17, 67:20, 70:17
**circuit** [1] - 14:2
**Circuit** [17] - 33:12, 33:13, 33:20, 37:1, 37:4, 39:11, 39:18, 43:4, 43:20, 43:21, 54:25, 56:12, 56:21, 57:2, 60:6, 63:16, 78:22
**Circuit's** [2] - 39:23, 56:18
**circumstances** [3] - 28:24, 56:10
**citation** [1] - 14:10
**cite** [27] - 14:18, 14:24, 27:24, 28:5, 28:11, 29:3, 33:13, 37:15, 38:24, 41:5, 42:4, 42:7, 43:18, 48:7, 57:4, 57:17, 57:18, 59:12, 59:14, 66:23, 67:17, 67:18, 69:13, 69:20, 69:22, 71:23,

73:17

**cited** [10] - 24:11, 31:14, 31:20, 34:2, 39:12, 48:23, 54:22, 56:19, 67:10, 67:11

**civil** [1] - 34:22

**claim** [5] - 16:3, 25:10, 47:22, 54:2, 64:22

**claims** [4] - 10:14, 10:19, 16:13, 77:17

**clarify** [2] - 21:2, 42:2

**Clark** [1] - 67:18

**class** [19] - 4:11, 6:3, 6:12, 7:2, 7:8, 10:24, 11:3, 30:7, 34:10, 44:17, 45:10, 47:2, 47:16, 48:21, 50:20, 54:23, 56:8, 78:5

**Clean** [2] - 52:11, 52:12

**clear** [12] - 5:16, 8:15, 16:17, 21:24, 22:9, 33:1, 33:4, 42:6, 42:13, 56:11, 74:25, 75:1

**clerks** [1] - 28:12

**client** [3] - 17:7, 57:2, 79:12

**clients** [3] - 9:11, 9:12, 23:12

**close** [5] - 34:11, 39:10, 44:16, 77:17, 80:6

**closure** [1] - 70:7

**co** [14] - 9:5, 18:22, 19:11, 20:3, 20:18, 21:12, 22:1, 22:14, 22:22, 25:7, 72:16

**co-co-co-lead** [1] - 20:18

**co-co-lead** [1] - 22:14

**co-lead** [9] - 9:5, 18:22, 19:11, 20:3, 21:12, 22:1, 22:22, 25:7, 72:16

**cocaine** [1] - 73:21

**Cochran** [3] - 2:23, 2:23, 5:8

**COCHRAN** [1] - 5:7

**cocounsel** [2] - 4:15, 22:19

**code** [5] - 38:2, 38:17, 38:22, 38:25, 39:1

**cogent** [1] - 42:17

**coincidentally** [1] - 67:13

**collaborate** [2] - 22:21, 25:8

**collaboration** [1] - 80:23

**collaborative** [1] - 10:20

**collapse** [1] - 41:20

**comfortable** [2] - 20:8, 20:9

**coming** [1] - 45:5

**commenced** [1] - 17:17

**committed** [2] - 71:6, 71:13

**committee** [1] - 56:25

**committing** [1] - 71:9

**commodities** [2] - 41:9, 44:1

**common** [2] - 43:13, 77:9

**community** [1] - 68:15

**companies** [3] - 41:11, 73:17, 76:12

**company** [57] - 10:20, 12:21, 28:16, 28:18, 33:24, 41:7, 43:15, 44:3, 44:9, 45:6, 45:18, 46:4, 47:13, 47:16, 48:21, 49:13, 50:11, 50:14, 50:19, 51:14, 52:5, 53:19, 54:7, 54:14, 54:20, 55:23, 56:16, 56:19, 58:19, 59:18, 60:4, 60:10, 60:11, 60:18, 61:4, 61:10, 61:15, 61:16, 61:18, 62:2, 62:15,

62:18, 64:23, 65:21, 66:1, 66:6, 68:20, 70:24, 71:14, 71:17, 73:9, 75:25, 76:1, 76:8, 76:19, 76:24

**company's** [8] - 47:20, 56:25, 57:1, 60:9, 60:19, 65:9, 65:19, 76:15

**compel** [1] - 12:21

**compelling** [1] - 42:17

**compels** [1] - 78:18

**complaint** [35] - 11:6, 12:5, 12:21, 12:25, 13:9, 13:13, 13:22, 13:23, 24:15, 25:21, 30:7, 31:5, 31:10, 31:21, 34:3, 34:14, 35:7, 41:21, 42:23, 43:12, 48:15, 48:24, 49:11, 49:22, 50:24, 52:2, 52:19, 56:1, 57:17, 59:9, 68:13, 69:20, 78:6, 78:8

**complaints** [5] - 8:25, 11:19, 23:13, 52:14, 57:5

**complete** [2] - 10:8, 55:2

**completely** [1] - 15:1

**compliance** [26] - 26:10, 27:7, 27:13, 27:16, 36:5, 36:6, 36:19, 37:19, 37:22, 47:13, 47:20, 47:22, 54:3, 54:15, 60:2, 60:12, 60:21, 61:2, 61:9, 64:24, 64:25, 66:3, 66:15, 68:7, 68:11, 74:4

**compliant** [1] - 56:9

**complies** [1] - 40:18

**comply** [2] - 48:12, 73:22

**component** [3] - 18:4, 54:24, 76:11

**computer** [1] - 3:25

**computer-assisted** [1] - 3:25

**concede** [1] - 75:7

**conceivable** [2] - 78:14, 78:15

**concept** [2] - 39:13, 68:9

**concepts** [1] - 75:14

**concern** [1] - 8:9

**concerned** [1] - 18:9

**concerning** [1] - 25:5

**conciliatory** [1] - 76:18

**Concluded** [1] - 81:7

**concluding** [1] - 68:8

**conclusion** [1] - 54:17

**conclusory** [1] - 35:9

**conduct** [10] - 10:10, 38:2, 38:17, 38:22, 38:25, 39:1, 51:1, 51:3, 51:15, 69:15

**confer** [1] - 80:2

**conference** [1] - 11:5

**confers** [1] - 13:1

**confess** [1] - 39:4

**confidential** [1] - 33:14

**confirm** [1] - 9:16

**conjunction** [1] - 37:18

**conscious** [1] - 69:9

**consciously** [3] - 64:10, 67:8, 69:8

**consent** [30] - 31:7, 32:9, 32:12, 32:16, 34:15, 40:16, 40:18, 40:25, 46:4, 47:9, 47:14, 48:10, 48:17, 49:18, 50:12, 54:4, 55:21, 55:22, 56:5, 58:5, 61:23, 62:3, 62:21, 68:22, 68:24, 71:7, 71:12, 74:11

**consequences** [1] - 66:5

**consider** [1] - 11:16

**consideration** [1] - 41:24

**considering** [1] - 11:9

**consistent** [2] - 37:2, 43:20

**consolidate** [1] - 17:6

**consolidated** [1] - 9:2

**consolidation** [1] - 16:4

**construed** [2] - 32:22, 35:24

**consultant** [1] - 70:5

**consulting** [1] - 22:19

**contacted** [2] - 11:7, 11:12

**contemplated** [2] - 52:11, 74:16

**contemplates** [1] - 58:6

**contest** [1] - 75:25

**contesting** [3] - 72:25, 73:1, 76:8

**context** [9] - 32:22, 34:10, 34:11, 37:5, 37:8, 40:22, 45:4, 58:14, 61:25

**continue** [5] - 8:12, 23:6, 47:23, 48:1, 61:1

**continued** [4] - 33:9, 47:6, 60:9, 69:2

**continuing** [5] - 47:4, 47:14, 54:5, 60:24, 62:9

**contradict** [2] - 39:6, 57:8

**contradictory** [1] - 40:6

**conversations** [1] - 79:12

**conviction** [2] - 51:8, 66:5

**convictions** [1] - 51:18

**cooperate** [7] - 9:3, 10:18, 11:10, 11:13, 18:7, 18:12, 25:8

**cooperating** [1] - 4:15

**COOPERATING** [1] - 3:1

**cooperatively** [1] - 19:19

**Corbat** [1] - 75:18

**core** [5] - 28:15, 28:25, 29:7, 29:8, 43:7

**CORPORATION** [4] - 1:12, 1:15, 2:17, 3:16

**correct** [12] - 6:16, 17:1, 21:20, 22:10, 27:11, 51:12, 54:21, 66:10, 69:15, 78:4, 81:11

**corrective** [2] - 44:10, 60:18

**correlation** [1] - 43:8

**corroborated** [1] - 52:18

**cost** [1] - 7:25

**costs** [1] - 26:15

**COUNCIL** [1] - 2:12

**counsel** [35] - 4:11, 4:14, 4:23, 5:8, 8:16, 9:5, 11:7, 11:12, 11:17, 14:4, 18:17, 18:21, 18:22, 19:11, 19:13, 19:17, 20:4, 20:12, 20:16, 20:18, 20:23, 21:8, 21:10, 21:11, 21:12, 22:1, 22:14, 24:1, 24:2, 24:25, 25:7, 28:1, 72:16, 76:6, 78:7

**counseling** [1] - 55:17

**count** [1] - 70:22

**countervailing** [1] - 29:13

**country** [1] - 57:6

**County** [9] - 6:10, 45:7, 45:12, 45:19, 46:2, 50:18, 54:6, 61:20, 78:6

**COUNTY** [2] - 1:3, 2:2

**county** [1] - 65:20
**couple** [2] - 54:13, 60:7
**course** [8] - 14:11, 48:3, 52:1, 52:3, 62:11, 62:20, 67:10, 74:20
**Court** [19] - 9:1, 9:4, 10:9, 10:21, 14:13, 14:22, 15:2, 36:3, 36:15, 38:22, 41:23, 43:25, 57:2, 60:16, 67:12, 67:25, 68:8, 78:12, 78:14
**court** [5] - 4:7, 13:14, 14:2, 77:18, 80:15
**COURT** [146] - 1:1, 1:9, 3:21, 4:2, 4:5, 4:18, 4:20, 5:2, 5:6, 5:10, 5:14, 5:20, 6:2, 6:6, 6:13, 6:19, 6:23, 7:4, 7:10, 7:14, 7:19, 7:23, 9:6, 9:9, 9:22, 10:4, 10:6, 11:20, 11:24, 12:9, 12:12, 13:25, 15:4, 15:6, 15:18, 15:24, 16:2, 16:9, 16:21, 17:9, 18:24, 19:1, 19:2, 19:4, 19:5, 19:20, 20:2, 20:14, 21:3, 21:9, 21:14, 21:21, 22:3, 22:6, 22:8, 22:12, 23:3, 23:22, 24:17, 25:20, 26:3, 26:6, 26:23, 27:9, 28:5, 28:8, 28:11, 28:20, 29:17, 30:1, 30:3, 33:6, 34:17, 34:20, 34:22, 35:2, 36:7, 36:10, 37:23, 37:25, 38:7, 38:10, 38:15, 41:13, 44:6, 44:18, 44:20, 44:23, 45:13, 45:15, 45:20, 45:24, 45:25, 46:7, 46:9, 46:14, 48:6, 49:3, 49:5, 49:24, 50:1, 51:4, 51:8, 51:18, 51:21, 53:2, 53:12, 54:8, 54:11, 55:13, 58:23, 59:19, 59:23, 63:2, 63:5, 63:22, 64:2, 64:5, 64:13, 64:21, 65:1, 65:5, 65:10, 65:12, 65:14, 65:16, 66:10, 72:2, 72:11, 72:15, 72:18, 76:22, 77:15, 77:20, 78:19, 79:10, 79:14, 79:21, 79:24, 80:2, 80:13, 80:22, 81:1, 81:3, 81:6, 81:8
**Court's** [3] - 30:24, 37:1, 37:2
**covered** [2] - 38:18, 63:3
**covers** [1] - 33:15
**credit** [1] - 13:11
**crediting** [1] - 76:20
**Creek** [1] - 2:8
**criminal** [12] - 32:6, 34:3, 35:13, 35:21, 51:1, 51:3, 51:4, 52:9, 52:10, 62:14, 69:13, 73:10
**criminally** [1] - 51:7
**critical** [11] - 9:23, 18:3, 18:4, 57:1, 64:23, 65:1, 65:2, 66:3, 68:7, 68:11, 76:11
**critically** [1] - 66:16
**CRR** [2] - 3:22, 81:15
**crucial** [1] - 30:18
**crux** [1] - 67:6
**CSR** [1] - 3:22
**cumbersome** [1] - 42:11
**curable** [1] - 78:16
**cured** [1] - 78:16
**current** [1] - 16:4
**cut** [1] - 33:20

**D**

**D'Ancona** [2] - 2:13, 7:1
**D'ANCONA** [1] - 6:25
**Dallas** [3] - 2:9, 2:24, 3:9
**dalvarado@rgrdlaw.com** [1] - 2:6
**Darryl** [2] - 2:3, 7:8
**database** [1] - 42:5
**date** [4] - 16:18, 32:23, 35:16, 51:13
**DATE** [1] - 81:14
**David** [1] - 45:21
**deal** [3] - 38:24, 56:4, 72:24
**dealing** [2] - 24:20, 59:17
**deals** [1] - 26:19
**dealt** [2] - 46:24, 47:8
**decade** [2] - 62:24, 69:17
**December** [4] - 50:12, 80:4, 80:5
**decide** [3] - 8:6, 11:3, 67:12
**decided** [5] - 14:14, 15:12, 67:13, 76:1, 76:2
**decision** [5] - 14:24, 15:1, 56:18, 73:7, 74:25
**decisions** [1] - 54:25
**decisive** [2] - 25:3, 25:4
**declines** [1] - 55:16
**defeat** [1] - 18:3
**defect** [1] - 75:16
**DEFENDANT** [2] - 1:11, 2:17
**defendants** [16] - 5:23, 6:1, 8:5, 17:7, 17:23, 29:21, 38:20, 64:12, 66:16, 66:22, 67:3, 69:22, 69:23, 69:25, 70:3, 71:22
**defendants'** [4] - 15:16, 18:4, 63:9, 68:19
**defense** [2] - 15:15, 71:5
**deferred** [1] - 74:8
**deferring** [1] - 75:4
**deficiencies** [1] - 77:25
**deficient** [1] - 40:13
**define** [2] - 65:1
**definition** [1] - 39:23
**definitive** [1] - 55:7
**defraud** [2] - 42:18, 44:13
**Delaware** [8] - 6:10, 13:14, 14:12, 16:24, 17:17, 17:24, 67:12, 78:6
**DELAWARE** [2] - 1:3, 2:2
**deliberately** [1] - 76:24
**demand** [18] - 12:20, 14:20, 17:7, 17:15, 17:16, 18:18, 19:9, 23:11, 24:11, 24:13, 63:6, 63:10, 64:2, 64:4, 64:7, 69:6, 77:17, 77:19
**demands** [4] - 12:16, 13:6, 19:13, 71:1
**demonstrated** [1] - 80:14
**denied** [4] - 14:22, 67:24, 77:3, 78:12
**DEP** [3] - 46:6, 50:6, 62:6
**Department** [16] - 30:10, 35:3, 46:5, 46:10, 46:13, 46:21, 47:10, 47:11, 49:19, 54:5, 57:18, 61:12, 62:8, 65:21, 68:22, 71:19

**derivative** [21] - 4:11, 4:23, 5:1, 5:5, 5:17, 5:21, 5:23, 8:7, 8:17, 16:13, 22:7, 22:9, 23:10, 27:6, 34:10, 63:5, 63:20, 72:5, 72:12, 77:1, 77:24
**DERIVATIVELY** [2] - 1:11, 2:17
**designation** [1] - 14:4
**despite** [1] - 69:14
**detailed** [1] - 52:9
**deter** [1] - 77:11
**determination** [1] - 34:6
**determinations** [1] - 75:25
**determine** [1] - 58:1
**detriment** [1] - 76:16
**developing** [1] - 78:22
**dialog** [1] - 58:4
**dictate** [1] - 15:3
**Diego** [2] - 2:5, 3:13
**difference** [5] - 9:20, 15:8, 24:24, 36:10, 51:22
**different** [8] - 14:11, 19:25, 54:16, 63:25, 64:13, 67:15, 73:23, 74:20
**difficult** [2] - 21:17, 24:22
**digesting** [1] - 80:8
**diligently** [3] - 10:16, 66:18, 67:4
**Dimock** [12] - 40:21, 45:11, 45:18, 45:21, 46:1, 46:22, 47:8, 49:15, 50:9, 53:24, 62:5
**Dinges** [4] - 46:19, 47:7, 48:10, 62:1
**Diodes** [1] - 28:23
**directed** [2] - 11:6, 25:23
**directors** [9] - 55:4, 66:12, 75:1, 76:12, 76:17, 77:2, 77:6, 77:7, 77:10
**disagree** [1] - 59:8
**disagreement** [1] - 67:6
**disappointing** [2] - 43:10, 43:11
**disclose** [1] - 60:20
**disclosed** [2] - 32:12, 44:13
**disclosure** [7] - 30:11, 30:25, 31:4, 32:7, 34:13, 35:15, 43:25
**disclosures** [17] - 36:16, 36:18, 37:17, 39:2, 39:14, 42:24, 42:25, 43:1, 44:10, 44:11, 44:12, 56:8, 57:8, 57:9, 58:3, 58:15, 58:19
**discredits** [1] - 34:3
**discrepancy** [1] - 44:9
**discretion** [1] - 15:2
**discussed** [5] - 35:6, 40:14, 47:19, 50:22, 52:19
**dismiss** [15] - 8:5, 8:10, 15:16, 18:2, 18:4, 18:9, 25:25, 37:16, 38:23, 63:11, 66:23, 67:24, 69:7, 70:2, 70:5
**dismissal** [4] - 56:22, 77:3, 77:22, 78:18
**dismissals** [1] - 37:16
**dismissed** [2] - 36:21, 44:16
**disposition** [3] - 11:2, 30:17, 33:4
**dispute** [7] - 23:5, 27:19, 66:17, 70:21, 71:17, 73:2, 76:4
**disputed** [3] - 28:1, 29:12, 71:16
**disregard** [3] - 67:8, 69:8, 69:9

**disregarded** [1] - 64:10
**distinction** [1] - 69:4
**distinguished** [2] - 36:15, 43:19
**distract** [1] - 76:2
**District** [2] - 14:18, 43:18
**DISTRICT** [6] - 1:1, 1:1, 1:9, 1:9, 1:21, 2:12
**dividing** [1] - 26:20
**divined** [1] - 43:6
**DIVISION** [2] - 1:2, 1:10
**divulge** [1] - 79:13
**document** [3] - 29:8, 54:17, 74:19
**documents** [24] - 12:22, 13:4, 13:12, 13:19, 13:21, 13:23, 15:10, 17:21, 17:24, 18:1, 18:10, 23:15, 23:17, 41:17, 42:18, 52:2, 52:23, 55:2, 56:13, 56:14, 64:17, 66:8, 69:24, 71:23
**dog** [2] - 79:3, 79:4
**dogs** [1] - 79:3
**dollars** [1] - 43:15
**done** [7] - 32:23, 35:11, 35:14, 35:19, 43:24, 75:10, 77:21
**Dowd** [3] - 2:4, 6:9, 7:8
**down** [6] - 19:1, 19:4, 19:6, 44:3, 74:22, 74:23
**downs** [1] - 78:21
**downsides** [1] - 63:15
**dream** [1] - 25:2
**drew** [1] - 29:1
**drill** [1] - 40:21
**drilled** [1] - 61:18
**drinking** [1] - 30:14
**drive** [1] - 43:14
**drop** [6] - 41:2, 41:3, 41:19, 43:10, 43:24, 44:2
**Drug** [5] - 59:19, 59:21, 60:4, 60:15, 67:23
**drugs** [2] - 73:13, 73:21
**due** [1] - 52:11
**dump** [1] - 41:11
**duplicative** [1] - 10:22
**during** [4] - 45:9, 47:2, 50:20, 56:7
**duty** [1] - 39:4

## E

**early** [3] - 4:18, 4:20, 6:20
**earnings** [3] - 43:10, 43:11, 43:13
**easily** [1] - 14:9
**educate** [1] - 71:3
**educated** [1] - 78:20
**Edward** [1] - 2:13
**eerie** [1] - 74:7
**effect** [1] - 36:20
**effectively** [2] - 14:5, 65:19
**efficiencies** [1] - 10:21
**efficient** [1] - 13:7
**efforts** [3] - 30:13, 32:21, 74:13
**egg** [1] - 8:4

**eight** [1] - 33:16
**Eighth** [1] - 60:6
**either** [7] - 5:21, 7:13, 27:4, 31:12, 34:10, 58:2, 58:9
**element** [1] - 67:8
**elements** [1] - 64:22
**elevate** [1] - 25:15
**eliminate** [1] - 48:18
**elsewhere** [1] - 56:12
**Email** [8] - 2:6, 2:10, 2:16, 2:22, 2:25, 3:10, 3:14, 3:20
**emphasize** [1] - 15:8
**employee** [1] - 29:1
**EMPLOYEES** [1] - 2:2
**Employees** [1] - 6:10
**employees** [6] - 28:15, 28:17, 28:19, 29:6, 29:7
**EMPOLOYEES** [1] - 1:3
**end** [11] - 11:3, 13:3, 13:21, 24:20, 35:16, 58:21, 60:3, 61:7, 65:11, 65:12, 74:14
**ended** [2] - 12:17, 13:19
**energy** [1] - 73:24
**Energy** [1] - 78:10
**enforcement** [2] - 65:23, 71:18
**Engaged** [1] - 30:11
**engaged** [2] - 30:8, 76:24
**ensure** [1] - 32:14
**enter** [1] - 32:12
**entered** [9] - 9:3, 25:12, 46:18, 46:19, 47:9, 49:18, 50:11, 62:21, 68:21
**enterprise** [1] - 73:10
**entire** [4] - 34:8, 37:6, 43:25, 70:10
**entirely** [1] - 17:25
**entitled** [1] - 81:12
**environmental** [8] - 42:21, 48:12, 49:14, 51:16, 52:13, 53:22, 61:16, 62:7
**Environmental** [7] - 30:10, 35:3, 46:5, 47:5, 57:18, 65:22, 71:20
**equal** [2] - 25:11, 25:18
**equities** [1] - 14:16
**equivalent** [1] - 59:16
**essentially** [3] - 12:23, 15:17, 73:18
**establishing** [1] - 24:13
**et** [4] - 1:3, 1:7, 1:12, 1:16
**ethnic** [1] - 20:19
**evaluate** [1] - 16:12
**evaluating** [1] - 40:23
**evaluation** [1] - 57:23
**evidence** [4] - 51:25, 52:4, 69:14, 75:17
**evidenced** [2] - 15:16, 48:20
**exact** [1] - 67:13
**exactly** [1] - 60:12
**examples** [1] - 56:17
**excessively** [1] - 75:2
**exchanged** [1] - 78:1
**excited** [1] - 79:22
**excitement** [1] - 79:24
**excuse** [2] - 21:3, 62:6

**excused** [1] - 81:6
**executive** [1] - 38:20
**existence** [2] - 26:24, 27:2
**existing** [4] - 19:19, 19:25, 20:9, 25:12
**exists** [1] - 58:7
**expensive** [2] - 7:14, 76:18
**experienced** [1] - 11:18
**expertise** [1] - 33:25
**exposure** [2] - 65:4, 65:15
**expressly** [1] - 29:12
**extent** [6] - 16:19, 25:14, 49:13, 50:6, 50:14, 63:11
**extraordinarily** [3] - 53:7, 53:18, 61:25
**Exxon** [1] - 14:18
**Ezell** [8] - 6:21, 6:24, 8:8, 8:20, 10:8, 10:15, 25:16, 25:21
**EZELL** [2] - 1:11, 2:17

## F

**F.3d** [1] - 59:14
**face** [2] - 56:9, 58:5
**Facebook** [1] - 75:24
**facing** [3] - 46:22, 69:12, 70:24
**fact** [24] - 12:23, 17:20, 24:22, 28:25, 34:1, 34:3, 35:15, 35:23, 35:24, 39:5, 40:16, 46:19, 47:1, 47:11, 47:22, 48:4, 49:12, 49:19, 50:12, 52:18, 56:13, 58:14, 61:16, 62:1
**factors** [2] - 9:10, 16:16
**facts** [11] - 13:23, 27:4, 27:9, 28:2, 32:2, 32:4, 35:22, 42:23, 55:3, 64:9, 74:8
**factual** [1] - 29:13
**fail** [1] - 40:3
**failed** [2] - 68:6, 69:15
**failure** [1] - 75:15
**failures** [1] - 68:11
**fair** [1] - 78:2
**fairly** [1] - 10:25
**faith** [10] - 23:12, 27:5, 64:11, 70:14, 72:1, 73:1, 75:3, 75:5, 75:17, 75:20
**fall** [2] - 29:7, 36:2
**false** [13] - 27:4, 27:8, 27:16, 29:15, 30:23, 39:7, 47:17, 54:18, 58:22, 60:5, 60:8, 61:24, 78:11
**falsity** [1] - 61:8
**family** [1] - 25:16
**Family** [4] - 5:5, 5:11, 7:12, 8:8
**FAMILY** [2] - 1:6, 3:7
**far** [4] - 42:25, 66:1, 74:15, 77:19
**Fargo** [1] - 73:17
**Farm's** [2] - 35:5, 35:14
**farms** [1] - 68:16
**fast** [1] - 19:2
**favorite** [1] - 24:19
**FDA** [6] - 59:15, 59:19, 60:10, 60:18, 60:22, 73:16
**FDIC** [1] - 57:5
**fear** [1] - 41:19

**February** [4] - 30:25, 31:4, 32:8, 32:11
**feckless** [1] - 75:4
**Federal** [4] - 59:19, 59:21, 60:4, 60:15
**fee** [2] - 24:20, 24:21
**felony** [5] - 51:8, 51:15, 52:5, 66:4
**few** [3] - 4:18, 4:20, 12:20
**Fifth** [19] - 2:20, 33:12, 33:13, 33:20, 37:1, 37:4, 39:10, 39:18, 39:22, 43:4, 43:20, 54:25, 56:12, 56:18, 56:21, 57:2, 63:16, 78:21
**fight** [3] - 24:21, 76:15, 76:19
**fighting** [4] - 23:1, 64:17, 64:18, 67:5
**fights** [1] - 24:20
**file** [3] - 13:13, 14:3, 79:19
**filed** [14] - 8:25, 11:5, 12:21, 12:24, 13:22, 14:10, 14:11, 17:5, 17:24, 23:13, 25:21, 78:6, 78:8, 80:10
**filing** [2] - 13:9, 17:20
**filings** [1] - 26:11
**final** [3] - 32:12, 63:13, 67:7
**finalized** [1] - 32:10
**fine** [5] - 51:10, 65:4, 65:15, 65:16
**fingertips** [2] - 14:17, 70:11
**finish** [1] - 46:3
**firm** [9] - 5:9, 5:18, 9:4, 16:12, 19:12, 19:16, 21:12, 24:3
**Firm** [4] - 9:5, 21:12, 21:15, 22:4
**firms** [5] - 19:11, 19:23, 22:24, 24:4, 68:4
**first** [22] - 4:12, 8:4, 8:10, 12:3, 12:4, 14:2, 14:10, 16:11, 23:11, 24:11, 26:5, 30:25, 36:25, 38:4, 41:3, 41:19, 43:9, 47:17, 49:10, 67:19, 78:6, 80:22
**FISCHER** [1] - 2:17
**Fischer** [4] - 6:22, 10:15, 25:17, 25:22
**five** [4] - 37:25, 38:7, 52:25, 53:3
**five-minute** [2] - 37:25, 38:7
**fix** [2] - 60:25, 74:22
**flags** [14] - 64:10, 64:24, 66:12, 66:17, 66:21, 66:24, 67:2, 67:3, 67:9, 70:4, 70:22, 71:16, 73:2, 75:19
**flip** [3] - 57:12, 58:6, 58:8
**flip-the-switch** [3] - 57:12, 58:6, 58:8
**float** [1] - 9:20
**Floor** [1] - 2:20
**flout** [1] - 76:1
**flow** [1] - 66:4
**focus** [2] - 23:16, 63:24
**folks** [1] - 18:15
**follow** [1] - 19:3
**followed** [2] - 13:20, 62:8
**following** [1] - 68:23
**Food** [1] - 67:23
**footing** [1] - 25:11
**Footnote** [4] - 37:15, 38:23, 54:22, 56:20
**footnote** [1] - 57:4
**footprint** [2] - 27:15, 34:8
**FOR** [8] - 1:1, 1:9, 2:2, 2:12, 2:17, 3:1,

3:7, 3:16
**force** [1] - 59:24
**forcefully** [1] - 29:19
**foregoing** [1] - 81:10
**foremost** [2] - 47:18, 49:10
**Form** [2] - 60:16, 60:17
**former** [1] - 57:2
**forth** [1] - 76:7
**forum** [2] - 14:12, 16:24
**forward** [3] - 16:14, 19:15, 72:9
**Foti** [4] - 3:3, 4:14, 7:18, 7:22
**four** [3] - 12:15, 13:15, 57:21
**frame** [1] - 73:3
**frankly** [2] - 19:17, 24:23
**fraud** [1] - 58:13
**fraudulent** [3] - 29:16, 43:1, 58:22
**freestanding** [1] - 39:4
**frequently** [1] - 13:6
**front** [1] - 12:17
**frowned** [1] - 73:22
**froze** [2] - 65:5, 65:11
**Fulbright** [2] - 3:17, 5:25
**full** [3] - 37:21, 37:22, 52:4
**fully** [1] - 56:9
**fun** [1] - 80:14
**function** [1] - 26:20
**fundamentally** [3] - 54:2, 62:13, 74:6
**funds** [1] - 26:13
**funny** [1] - 67:9
**futile** [1] - 77:22
**futility** [8] - 24:13, 63:6, 63:10, 64:2, 64:4, 64:7, 77:18, 77:19

## G

**Garner** [1] - 46:15
**gas** [12] - 31:21, 41:7, 44:4, 46:22, 47:5, 50:22, 50:23, 68:14, 69:16, 73:25, 74:3
**GAS** [4] - 1:12, 1:15, 2:17, 3:16
**Geller** [3] - 2:4, 6:9, 7:8
**General** [4] - 31:13, 51:2, 52:24, 75:18
**general** [2] - 31:21, 76:14
**generalized** [1] - 31:19
**generally** [3] - 35:10, 37:4, 43:21
**generically** [1] - 31:1
**geologist** [5] - 33:8, 33:15, 33:23, 40:13, 52:18
**geologist's** [1] - 34:4
**given** [2] - 39:17, 64:19
**Glancy** [4] - 2:19, 4:25, 5:8, 21:13
**Glasscock** [1] - 73:5
**GOBEILLE** [1] - 7:20
**Gobeille** [3] - 3:3, 7:16, 7:21
**government** [2] - 11:24, 57:5
**governments** [1] - 71:2
**grand** [3] - 26:18, 62:16, 69:10
**Grand** [1] - 52:1
**grant** [2] - 25:14, 63:11

**granted** [3] - 37:16, 66:23, 69:7
**grappling** [1] - 67:14
**grateful** [1] - 28:12
**gray** [1] - 59:7
**great** [4] - 7:4, 44:8, 56:17, 78:17
**greater** [1] - 50:21
**Greenville** [1] - 3:8
**grossly** [1] - 56:15
**ground** [3] - 50:8, 61:20, 74:1
**group** [5] - 6:15, 6:24, 8:8, 22:14, 25:17
**Group** [1] - 2:8
**groups** [2] - 5:22, 8:18
**guarantee** [1] - 37:21
**guess** [2] - 16:11, 72:18
**guys** [6] - 12:5, 63:6, 63:14, 78:3, 78:20, 80:23

## H

**habit** [1] - 59:24
**half** [1] - 67:11
**hang** [1] - 45:20
**Hanger** [2] - 56:19
**Hangover** [1] - 49:20
**hangover** [1] - 50:14
**happy** [1] - 44:17
**hard** [2] - 28:22, 36:18
**harder** [2] - 12:3, 36:19
**hate** [1] - 34:20
**head** [2] - 28:23, 29:24
**headaches** [1] - 50:13
**hear** [10] - 20:14, 38:3, 54:9, 63:6, 63:9, 72:4, 72:6, 72:8, 72:18, 79:8
**heard** [5] - 48:25, 58:25, 63:25, 65:14, 72:12
**HEARING** [1] - 1:19
**heavily** [1] - 40:15
**held** [10] - 9:11, 9:12, 9:19, 10:8, 10:12, 14:21, 39:3, 57:7, 77:10, 77:12
**helpful** [4] - 4:9, 8:14, 9:14, 58:23
**herring** [1] - 61:6
**hide** [1] - 76:2
**highest** [1] - 62:2
**highly** [2] - 36:9, 57:1
**Hillcrest** [1] - 2:24
**hired** [2] - 70:5, 70:6
**hiring** [2] - 68:4, 70:17
**history** [2] - 58:14, 60:9
**hit** [1] - 74:14
**hold** [2] - 37:21, 77:7
**holding** [2] - 9:25, 77:2
**holdings** [1] - 16:19
**holistically** [1] - 41:25
**homes** [1] - 68:16
**honor** [1] - 6:25
**Honor** [86] - 4:4, 4:13, 4:24, 5:3, 5:7, 5:13, 5:15, 5:24, 6:8, 6:18, 7:7, 7:11, 7:17, 7:20, 8:22, 8:24, 9:15, 10:1, 11:5, 12:8, 12:18, 13:3, 14:6, 14:7,

14:17, 15:21, 16:5, 16:10, 18:7, 18:11, 20:11, 21:1, 21:6, 21:25, 22:10, 22:15, 23:20, 23:24, 24:9, 24:16, 25:19, 26:2, 26:5, 26:17, 28:3, 28:13, 28:16, 29:24, 30:19, 34:25, 36:8, 36:14, 37:24, 38:6, 38:14, 38:21, 40:12, 42:3, 44:19, 44:22, 44:25, 46:6, 46:17, 47:19, 51:12, 51:24, 53:13, 54:12, 56:6, 59:4, 59:25, 60:7, 60:13, 63:21, 63:23, 72:10, 72:17, 72:23, 77:16, 79:9, 79:11, 79:17, 80:12, 80:21, 81:4, 81:5
**HONORABLE** [1] - 1:20
**hope** [3] - 8:1, 38:10, 58:25
**hopefully** [1] - 14:1
**hoping** [1] - 22:16
**horrific** [1] - 73:11
**Houston** [3] - 2:19, 3:23, 4:25
**HOUSTON** [4] - 1:2, 1:10, 4:24, 5:15
**houston** [2] - 1:4, 1:12
**Howell** [2] - 35:5, 35:13
**Hudson** [20] - 4:15, 6:21, 6:24, 7:18, 7:21, 10:12, 11:8, 12:18, 12:20, 13:8, 13:20, 15:22, 17:15, 18:21, 19:9, 20:16, 20:24, 25:17, 25:22
**HUDSON** [2] - 2:17, 3:1
**Hudson's** [2] - 21:8, 21:10
**Hudson-Ezell** [1] - 6:24
**huge** [2] - 9:20, 50:13
**human** [2] - 53:10, 53:16
**hypothetical** [1] - 37:10

## I

**I-M-O-C-K** [1] - 45:21
**iceberg** [3] - 52:8, 55:13, 55:14
**idea** [7] - 17:3, 34:4, 40:1, 43:9, 54:14, 74:18, 79:16
**identified** [1] - 57:23
**identify** [3] - 70:3, 70:10, 71:23
**illegal** [4] - 73:18, 73:21, 74:3, 76:25
**illegality** [1] - 68:5
**immediate** [2] - 75:15, 75:16
**impair** [1] - 65:2
**implemented** [1] - 68:24
**implementing** [1] - 69:21
**importance** [1] - 24:12
**important** [13] - 22:23, 30:2, 31:11, 40:22, 53:6, 53:11, 53:19, 53:22, 56:24, 61:7, 61:25, 62:1, 66:22
**improve** [1] - 74:10
**IN** [2] - 1:1, 1:9
**inability** [1] - 25:5
**inadequate** [1] - 39:3
**incident** [1] - 30:12
**incidental** [1] - 73:25
**included** [2] - 36:4, 52:23
**includes** [1] - 28:21
**including** [6] - 30:13, 37:6, 48:13, 56:10, 57:1, 73:16
**inclusions** [1] - 22:17

**inclusive** [2] - 11:15, 15:10
**incorporate** [1] - 23:17
**incorporation** [1] - 69:24
**indeed** [1] - 69:16
**indicate** [1] - 75:20
**indicative** [1] - 28:2
**indict** [1] - 52:5
**indict3ed** [1] - 51:13
**indicted** [3] - 51:14, 62:15, 62:23
**indictment** [2] - 51:20, 51:24
**indifference** [1] - 62:17
**indited** [1] - 51:14
**individual** [1] - 51:13
**individuals** [2] - 56:14, 56:16
**industry** [2] - 73:24, 77:8
**ineffective** [1] - 75:18
**infer** [1] - 41:17
**inference** [15] - 39:8, 39:20, 41:5, 41:12, 42:1, 42:24, 43:1, 43:23, 44:12, 55:18, 57:9, 57:16, 58:16, 58:18, 76:24
**information** [7] - 12:5, 29:1, 29:11, 40:6, 53:5, 60:20, 79:13
**informed** [1] - 63:14
**infrastructure** [1] - 20:21
**inherent** [1] - 57:11
**inherently** [2] - 27:12, 33:4
**inject** [1] - 43:22
**injected** [1] - 43:12
**insider** [2] - 38:2, 38:19
**insinuation** [1] - 58:11
**inspect** [1] - 42:9
**inspection** [4] - 17:15, 17:16, 19:9, 19:13
**inspections** [1] - 57:20
**inspector** [2] - 57:19, 57:24
**instead** [1] - 70:25
**institutions** [1] - 14:19
**instructive** [1] - 36:9
**insufficient** [4] - 33:22, 56:15, 57:7, 68:5
**insult** [1] - 20:19
**integration** [1] - 79:19
**intend** [2] - 6:4, 56:4
**intended** [3] - 4:16, 20:19, 31:16
**intent** [1] - 41:17
**interest** [1] - 80:6
**interesting** [2] - 80:16, 80:17
**internally** [1] - 80:2
**interrupted** [1] - 65:7
**intervene** [1] - 18:11
**intervening** [1] - 11:9
**introduced** [1] - 43:9
**investigating** [1] - 30:12
**investigations** [1] - 57:5
**investor** [1] - 37:20
**investors** [6] - 40:1, 46:23, 49:11, 50:4, 53:22, 60:21
**inviting** [1] - 8:16
**invokes** [1] - 72:1

**involve** [1] - 10:10
**involved** [9] - 10:16, 23:7, 31:8, 56:19, 57:19, 62:2, 67:2, 70:23, 74:5
**involves** [2] - 67:17, 67:19
**involving** [2] - 59:15, 60:1
**IRON** [1] - 2:12
**Isaac** [1] - 2:18
**isolate** [1] - 37:7
**isolated** [1] - 41:18
**issuance** [1] - 60:17
**issue** [36] - 11:21, 11:25, 12:1, 12:10, 14:9, 14:15, 16:24, 17:3, 17:13, 19:18, 19:20, 19:21, 20:22, 29:14, 36:17, 41:3, 43:12, 43:22, 49:8, 49:16, 50:22, 50:23, 52:17, 53:1, 54:13, 55:7, 57:11, 57:12, 58:11, 59:6, 59:7, 60:14, 66:8, 67:13, 67:15, 77:4
**issued** [3] - 29:20, 35:4, 67:19
**issues** [22] - 28:14, 32:20, 33:8, 33:9, 41:8, 41:20, 46:21, 46:24, 48:5, 49:14, 53:24, 56:4, 62:12, 63:1, 63:15, 68:2, 68:4, 72:20, 74:5, 78:25, 80:16, 80:17
**item** [1] - 63:18
**iteration** [1] - 34:12
**iterative** [2] - 58:19, 76:5
**itself** [11] - 32:5, 35:20, 40:10, 41:4, 55:21, 55:23, 56:16, 58:5, 74:20, 74:22, 74:23

## J

**Jacinto** [1] - 3:18
**Jacobs** [1] - 76:10
**jail** [1] - 51:5
**James** [1] - 2:3
**January** [1] - 31:22
**jdancona@ktmc.com** [1] - 2:16
**Jeffers** [2] - 35:5, 35:13
**Jersey** [1] - 14:20
**jkendall@kendalllawgroup.com** [1] - 2:10
**job** [1] - 75:10
**JODY** [2] - 1:11, 2:17
**Joe** [2] - 2:7, 6:4
**JOHN** [1] - 3:1
**John** [2] - 4:15, 15:22
**join** [1] - 5:18
**Josh** [1] - 7:1
**Joshua** [1] - 2:13
**judge** [2] - 65:5, 80:15
**Judge** [4] - 29:3, 39:12, 65:10, 65:11
**JUDGE** [2] - 1:20, 1:21
**judges** [1] - 24:19
**judicial** [2] - 26:23, 27:1
**July** [1] - 35:15
**June** [6] - 34:15, 34:16, 35:4, 35:17, 47:12, 62:9
**jurisdiction** [2] - 65:22, 71:18
**jury** [3] - 26:18, 62:16, 69:10
**Jury** [1] - 52:1

**Justice** [1] - 68:22

## K

**Kahn** [4] - 3:3, 4:14, 7:18, 7:21
**Kathleen** [4] - 3:22, 81:10, 81:14, 81:15
**Kathy** [2] - 45:21, 65:10
**keep** [2] - 61:21, 65:12
**Kendall** [3] - 2:7, 2:8, 6:4
**KENDALL** [1] - 6:4
**kennel** [1] - 79:4
**Kessler** [2] - 2:14, 7:1
**Kevin** [2] - 2:3, 6:9
**key** [2] - 12:10, 61:21
**keyword** [1] - 68:1
**kind** [8] - 14:3, 15:15, 37:11, 41:3, 55:6, 56:12, 57:12, 77:10
**kinds** [4] - 33:25, 39:2, 79:5
**King** [1] - 2:14
**klavelle@rgrdlaw.com** [1] - 2:6
**kLavelle@robbinsllp.com** [1] - 3:14
**knowing** [6] - 51:15, 52:6, 63:15, 63:16
**knowingly** [1] - 54:3
**knowledge** [2] - 64:19, 68:14
**knowledgeable** [1] - 79:5
**known** [1] - 60:15
**knows** [1] - 15:11
**Kravitz** [3] - 3:2, 7:15, 7:18
**KRAVITZ** [1] - 7:17
**KV** [3] - 59:11, 61:9, 62:10

## L

**LA** [1] - 3:5
**lack** [4] - 36:21, 40:3, 55:16, 64:25
**lane** [1] - 76:21
**language** [2] - 37:11, 55:1
**large** [2] - 14:19, 29:14
**largely** [1] - 17:25
**larger** [2] - 9:25, 10:2
**last** [4] - 23:23, 24:9, 30:18, 65:14
**late** [1] - 6:18
**laundering** [4] - 68:21, 69:1, 69:2, 74:22
**laundry** [1] - 62:9
**Lavelle** [11] - 2:3, 6:9, 44:20, 45:25, 49:24, 55:10, 55:18, 58:24, 59:3, 63:2, 63:8
**LAVELLE** [25] - 6:8, 44:22, 44:24, 45:17, 46:1, 46:8, 46:11, 46:16, 48:9, 49:4, 49:6, 49:25, 50:3, 51:6, 51:12, 51:19, 51:23, 53:3, 53:13, 54:10, 59:4, 59:21, 59:24, 63:4, 65:8
**Law** [6] - 2:8, 9:5, 21:12, 21:15, 22:4, 52:12
**law** [29] - 6:5, 9:18, 11:22, 11:24, 14:10, 19:23, 28:12, 32:17, 33:12, 37:4, 39:7, 39:11, 39:18, 43:21, 51:16, 52:13, 54:3, 55:4, 55:5, 55:22, 56:11, 61:2, 61:16, 65:23, 68:4, 71:9, 71:10, 71:18, 78:22

**lawful** [2] - 74:4, 74:6
**laws** [3] - 47:5, 48:12, 68:21
**lawsuit** [1] - 13:12
**lawyers** [8] - 8:7, 11:21, 20:18, 23:1, 25:12, 25:16, 25:17, 70:17
**lead** [16] - 9:5, 14:4, 17:20, 18:22, 19:11, 19:17, 20:3, 20:18, 21:12, 22:1, 22:14, 22:22, 24:1, 25:7, 72:16, 78:7
**leadership** [14] - 14:23, 18:13, 18:18, 18:19, 18:21, 19:10, 19:16, 19:19, 19:22, 19:25, 20:10, 24:8, 25:11, 80:20
**leading** [2] - 16:13, 47:1
**leak** [2] - 57:13, 61:19
**leaking** [1] - 68:15
**least** [5] - 16:4, 24:18, 53:17, 77:24, 80:7
**leave** [2] - 72:7, 78:12
**LEE** [1] - 1:20
**Lee** [1] - 2:23
**legal** [1] - 46:15
**legitimacy** [1] - 13:1
**legitimate** [1] - 25:10
**lend** [1] - 41:4
**LendingClub** [1] - 67:1
**length** [1] - 9:12
**letter** [4] - 47:12, 59:11, 59:12, 62:8
**levels** [1] - 62:2
**leverage** [1] - 13:17
**liable** [2] - 77:2, 77:13
**liaison** [1] - 5:8
**light** [1] - 27:14
**limit** [1] - 80:16
**limitations** [3] - 52:12, 52:17, 55:25
**limited** [1] - 25:14
**line** [9] - 21:11, 21:16, 21:17, 21:19, 21:20, 38:25, 42:16, 72:24
**lined** [1] - 33:25
**linked** [2] - 42:7, 42:11
**list** [1] - 62:9
**listed** [6] - 26:21, 42:10, 52:1, 55:22, 55:25
**lists** [1] - 28:18
**litigate** [3] - 13:7, 13:13, 13:16
**litigated** [1] - 14:20
**litigating** [2] - 8:24, 17:4
**litigation** [4] - 10:16, 11:19, 15:9, 66:20
**LLP** [5] - 2:4, 2:14, 3:12, 3:17, 5:4
**loaded** [1] - 48:7
**loading** [1] - 24:4
**lobbied** [1] - 71:2
**Local** [1] - 67:16
**log** [2] - 33:18, 52:20
**longstanding** [1] - 62:17
**look** [9] - 16:11, 27:25, 37:4, 37:5, 37:6, 37:18, 37:20, 42:23, 43:25
**looking** [3] - 9:10, 41:18, 79:24
**looks** [1] - 63:17
**loss** [1] - 43:2

**lost** [1] - 56:21

## M

**magic** [1] - 12:25
**main** [1] - 12:1
**maintain** [1] - 8:20
**major** [4] - 26:8, 37:3, 45:7, 45:10
**majority** [2] - 10:10, 64:9
**makers** [1] - 40:10
**manage** [1] - 32:12
**management** [3] - 74:21, 75:5, 75:10
**management's** [2] - 75:2
**manner** [1] - 10:20
**Marcellus** [3] - 49:21, 50:16, 50:17
**market** [2] - 42:18, 44:9
**Massey** [1] - 75:22
**material** [2] - 15:8, 60:2
**matt** [1] - 4:22
**Matt** [2] - 2:19, 4:25
**matter** [8] - 30:17, 30:19, 31:18, 39:7, 43:13, 55:3, 55:5, 81:12
**mean** [4] - 43:5, 49:3, 49:15, 59:19
**meaningful** [1] - 53:5
**meaningless** [1] - 20:21
**mechanical** [1] - 3:24
**mediator** [1] - 79:4
**meeting** [1] - 69:19
**Melinda** [3] - 3:2, 4:14, 5:16
**Meltzer** [2] - 2:14, 7:1
**member** [1] - 25:18
**memos** [1] - 70:7
**mentioned** [2] - 35:9, 76:11
**mere** [1] - 62:16
**merely** [1] - 26:24
**merger** [1] - 79:18
**meritorious** [1] - 61:6
**merits** [4] - 15:14, 23:1, 23:2, 23:16
**methane** [10] - 30:15, 32:15, 33:2, 48:1, 48:18, 50:7, 61:19, 66:13, 68:14, 70:12
**MetLife** [2] - 66:25, 75:14
**MICHAEL** [1] - 80:12
**Michael** [1] - 14:1
**Michael's** [1] - 24:3
**Michaels** [10] - 2:18, 4:16, 5:18, 6:14, 8:23, 9:6, 20:15, 21:4, 63:20, 65:17
**MICHAELS** [35] - 6:17, 6:21, 8:22, 9:8, 9:15, 10:1, 10:5, 10:7, 11:23, 12:8, 12:11, 12:14, 14:6, 15:5, 15:7, 21:1, 21:6, 21:10, 21:15, 22:7, 22:11, 22:15, 23:4, 63:21, 63:23, 64:6, 64:15, 64:22, 65:18, 66:11, 72:10, 80:21, 80:25, 81:2, 81:4
**might** [3] - 37:10, 55:2, 78:15
**migrating** [2] - 50:7, 66:14
**migration** [3] - 58:1, 69:16, 70:12
**miles** [2] - 65:25
**Miller** [5] - 3:22, 65:11, 81:10, 81:14,

81:15
**mind** [2] - 47:18, 61:21
**minimum** [6] - 20:6, 20:12, 20:23, 22:13, 36:9, 43:17
**minute** [4] - 37:25, 38:7, 45:4, 69:20
**minutes** [4] - 4:18, 4:20, 76:22, 80:16
**misconduct** [1] - 64:10
**misdemeanor** [1] - 31:19
**mislead** [1] - 40:1
**misleading** [6] - 26:11, 27:17, 39:19, 47:17, 60:6, 60:8
**misrepresentation** [1] - 55:23
**mission** [6] - 64:23, 65:1, 65:2, 66:3, 68:7, 68:10
**misstatement** [1] - 36:25
**misstatements** [2] - 40:8, 56:1
**modestly** [1] - 79:23
**modified** [1] - 80:20
**modify** [4] - 16:4, 16:9, 25:15, 25:20
**modifying** [1] - 22:13
**moment** [2] - 38:11, 72:8
**Monday** [4] - 80:3, 80:4, 80:5, 80:24
**money** [11] - 26:13, 26:14, 41:9, 68:20, 68:21, 68:25, 69:2, 73:19, 74:22, 75:6, 76:25
**MoneyGram** [8] - 67:19, 68:18, 68:20, 73:5, 74:9, 74:18, 74:25, 75:6
**monitored** [1] - 68:23
**monitoring** [4] - 32:14, 66:18, 67:5
**months** [3] - 12:20, 41:2, 41:18
**moot** [1] - 8:6
**morning** [14] - 4:2, 4:4, 4:13, 4:24, 5:3, 5:7, 5:24, 6:8, 6:17, 6:25, 7:7, 7:11, 7:17, 7:20
**most** [4] - 26:12, 63:7, 76:17, 76:18
**mostly** [1] - 5:9
**motion** [20] - 8:9, 10:22, 11:3, 14:23, 15:16, 18:2, 18:4, 18:9, 25:15, 25:23, 37:16, 38:23, 63:11, 66:20, 67:7, 67:24, 69:7, 70:2, 70:5, 79:7
**MOTION** [1] - 1:19
**motions** [3] - 8:5, 25:24, 66:23
**motive** [1] - 41:16
**Motors** [1] - 75:18
**mountain** [1] - 33:13
**mounting** [1] - 69:14
**move** [1] - 4:11
**moves** [1] - 16:14
**moving** [1] - 19:15
**MR** [126] - 4:4, 4:24, 5:3, 5:7, 5:13, 5:15, 5:24, 6:4, 6:8, 6:17, 6:21, 6:25, 7:7, 7:11, 7:17, 8:22, 9:8, 9:15, 10:1, 10:5, 10:7, 11:23, 12:8, 12:11, 12:14, 14:6, 15:5, 15:7, 16:5, 16:10, 17:1, 17:12, 19:7, 19:21, 20:5, 21:1, 21:6, 21:10, 21:15, 21:25, 22:4, 22:7, 22:10, 22:11, 22:15, 23:4, 23:24, 25:19, 26:2, 26:4, 26:17, 27:1, 27:11, 28:6, 28:10, 28:13, 28:22, 29:23, 30:2, 30:5, 33:11, 34:19, 34:21, 34:25, 35:3, 36:8, 36:12, 37:24,

38:6, 38:8, 38:14, 38:21, 41:15, 44:7, 44:19, 44:22, 44:24, 45:17, 46:1, 46:8, 46:11, 46:16, 48:9, 49:4, 49:6, 49:25, 50:3, 51:6, 51:12, 51:19, 51:23, 53:3, 53:13, 54:10, 54:12, 55:14, 59:4, 59:21, 59:24, 63:4, 63:21, 63:23, 64:6, 64:15, 64:22, 65:8, 65:18, 66:11, 72:10, 72:14, 72:16, 72:23, 76:23, 77:16, 78:4, 79:9, 79:11, 79:15, 79:22, 80:1, 80:12, 80:21, 80:25, 81:2, 81:4, 81:5
**MS** [8] - 4:13, 4:19, 4:22, 7:20, 15:21, 16:1, 20:25, 64:3
**multiple** [2] - 24:4, 37:15
**Murray** [3] - 2:19, 4:25, 21:13

## N

**name** [1] - 7:1
**nationally** [1] - 78:23
**natural** [2] - 41:7, 44:3
**nature** [1] - 39:17
**nearly** [2] - 17:8, 77:18
**necessarily** [1] - 43:5
**necessary** [4] - 10:13, 13:16, 23:19, 48:12
**need** [8] - 8:6, 9:16, 19:5, 24:1, 30:1, 45:22, 59:1, 80:19
**needing** [1] - 57:23
**negative** [2] - 49:21, 50:15
**negotiate** [2] - 13:7, 13:21
**negotiating** [3] - 13:17, 17:10, 17:13
**negotiations** [1] - 32:8
**net** [1] - 26:21
**never** [5] - 32:20, 40:19, 40:20, 40:23, 56:23
**nevertheless** [2] - 47:15, 53:14
**New** [4] - 2:21, 3:5, 14:20, 43:18
**new** [4] - 68:24, 69:21, 70:7, 70:13
**next** [3] - 4:23, 32:25, 80:3
**NICHOLSON** [7] - 4:13, 4:19, 4:22, 15:21, 16:1, 20:25, 64:3
**Nicholson** [6] - 3:2, 4:14, 5:16, 15:19, 21:3, 21:7
**Nicolas** [2] - 3:2, 7:18
**nine** [2] - 66:11, 67:2
**nobody** [2] - 41:22, 51:4
**NOMINAL** [2] - 1:11, 2:17
**non** [1] - 6:15
**non-Treppel** [1] - 6:15
**nonapproval** [1] - 73:16
**noncompliance** [1] - 42:21
**nonetheless** [2] - 51:24, 61:24
**nonfactual** [1] - 39:17
**nonTreppel** [1] - 22:8
**Northern** [1] - 14:18
**Norton** [2] - 3:17, 5:25
**notable** [3] - 18:20, 19:8, 70:9
**note** [1] - 17:14
**nothing** [6] - 65:2, 67:25, 68:3, 68:13,

71:21, 72:14
**notice** [10] - 26:23, 27:2, 31:24, 34:23, 35:1, 35:21, 50:25, 60:14, 79:20
**notices** [11] - 35:4, 35:19, 37:12, 47:3, 47:23, 48:20, 50:23, 59:15, 60:11, 61:17, 77:8
**notwithstanding** [1] - 71:22
**NOV** [4] - 31:6, 31:12, 31:24, 34:22
**NOVEMBER** [2] - 1:6, 1:14
**November** [3] - 31:8, 34:16, 35:5
**NOVs** [1] - 34:16
**number** [24] - 9:24, 26:10, 26:16, 26:18, 26:20, 26:21, 27:21, 27:23, 28:18, 29:6, 29:19, 29:20, 38:24, 39:12, 49:7, 49:12, 50:5, 50:21, 53:3, 53:12, 53:21, 54:14, 58:12, 66:22
**numbers** [2] - 9:13, 27:25
**numerous** [7] - 46:22, 47:3, 47:16, 48:20, 49:9, 57:4, 60:24
**NY** [1] - 2:21

## O

**obligated** [1] - 60:19
**obligations** [4] - 40:19, 40:20, 40:24, 74:10
**obtained** [1] - 13:8
**obviously** [6] - 11:15, 22:18, 39:24, 45:2, 62:1, 77:6
**occasion** [1] - 33:19
**occurred** [2] - 10:11, 43:10
**occurring** [3] - 47:25, 58:1, 62:22
**October** [2] - 8:25, 10:17
**OF** [5] - 1:1, 1:9, 1:11, 1:22, 2:17
**offenses** [3] - 47:25, 51:15, 52:6
**offered** [3] - 11:13, 17:8, 22:17
**office** [1] - 33:19
**officer** [1] - 38:20
**OIL** [4] - 1:12, 1:15, 2:17, 3:16
**ON** [2] - 1:11, 2:17
**once** [4] - 11:4, 43:22, 53:9, 80:13
**one** [34] - 5:5, 12:18, 13:11, 14:19, 18:6, 18:22, 19:25, 20:16, 23:8, 23:25, 25:21, 26:5, 26:8, 28:14, 28:23, 35:9, 37:3, 38:19, 39:12, 41:1, 42:2, 45:20, 47:18, 48:7, 54:14, 56:17, 56:21, 65:20, 67:2, 67:10, 67:11, 67:15, 76:5
**ones** [1] - 42:10
**ongoing** [2] - 32:9, 58:4
**open** [2] - 14:12, 22:24
**opening** [2] - 56:20, 72:24
**openly** [1] - 76:1
**operate** [5] - 41:11, 47:24, 51:9, 71:17, 74:24
**operated** [2] - 45:8, 50:20
**operates** [1] - 54:7
**operating** [1] - 68:16
**operations** [11] - 28:15, 28:25, 29:8, 45:9, 49:21, 50:16, 50:17, 50:18, 65:20, 65:23, 66:2

**operative** [1] - 25:21
**opinion** [7] - 28:16, 35:25, 36:18, 39:13, 61:14, 68:8, 75:6
**opinions** [4] - 37:2, 67:10, 67:16, 69:5
**opportunity** [1] - 23:17
**opposed** [4] - 9:11, 13:1, 35:24, 68:10
**opposing** [1] - 8:17
**opposite** [1] - 61:14
**oral** [1] - 73:7
**order** [29] - 12:13, 16:4, 25:12, 31:7, 32:9, 32:12, 32:16, 40:16, 40:18, 40:25, 46:4, 47:9, 47:14, 48:10, 48:17, 49:18, 50:12, 54:4, 55:21, 55:22, 56:5, 58:5, 61:23, 62:3, 62:21, 74:11, 80:20, 80:23
**ordered** [1] - 9:4
**orders** [3] - 34:15, 71:7, 71:12
**ordinary** [1] - 44:2
**organizational** [1] - 25:11
**originally** [1] - 56:21
**Orleans** [1] - 3:5
**ought** [1] - 8:4
**ourselves** [1] - 18:16
**outcome** [4] - 14:25, 15:3, 67:7, 74:14
**outlined** [1] - 63:8
**outset** [2] - 23:18, 45:4
**outside** [3] - 29:7, 54:16, 71:18
**overall** [3] - 9:21, 9:25, 27:23
**overhang** [1] - 53:25
**overlap** [1] - 26:6
**oversaw** [1] - 68:23
**oversight** [3] - 75:5, 75:7
**overstate** [1] - 42:14
**own** [3] - 15:12, 56:25, 70:1

# P

**PA** [1] - 2:15
**PaDEP** [4] - 30:9, 30:11, 30:16, 31:13
**page** [2] - 37:16, 70:5
**pages** [1] - 71:22
**pair** [1] - 67:10
**pale** [1] - 39:20
**panoply** [1] - 73:15
**papers** [3] - 16:16, 17:18, 78:1
**Paragraph** [1] - 52:14
**paragraph** [12] - 31:5, 31:20, 34:13, 35:10, 35:15, 40:17, 42:22, 48:16, 48:23, 49:22, 56:1, 57:17
**paragraphs** [3] - 30:6, 35:6, 48:14
**pardon** [1] - 12:12
**parse** [1] - 56:13
**part** [23] - 8:3, 9:9, 15:25, 16:1, 18:18, 18:21, 19:9, 19:16, 20:12, 24:5, 24:6, 25:3, 25:4, 25:7, 26:22, 27:11, 31:10, 38:1, 45:22, 54:21, 54:22, 56:24, 63:24
**partially** [1] - 52:3
**participate** [1] - 25:10

**particular** [3] - 10:15, 31:18, 31:25
**particularity** [2] - 33:13, 40:3
**particularized** [6] - 30:22, 32:1, 33:12, 35:22, 40:4, 64:9
**particularly** [3] - 36:14, 53:4, 56:11
**parties** [2] - 10:21, 25:16
**PARTIES** [1] - 2:1
**party** [3] - 54:16, 70:6
**pat** [2] - 17:6, 17:9
**patch** [2] - 57:14, 74:23
**path** [1] - 13:20
**patiently** [1] - 26:1
**patients** [1] - 67:22
**pause** [2] - 44:17, 45:3
**paying** [1] - 51:10
**peanutty** [1] - 51:11
**penalties** [1] - 43:14
**penalty** [2] - 69:3, 74:15
**pending** [1] - 14:22
**penetration** [1] - 48:19
**Pennsylvania** [46] - 8:14, 9:1, 9:2, 10:23, 12:13, 14:11, 16:25, 17:5, 23:13, 25:13, 30:10, 31:13, 34:7, 42:4, 45:7, 45:18, 45:19, 45:22, 46:2, 46:5, 46:9, 46:13, 46:21, 47:4, 47:6, 47:10, 47:11, 49:19, 50:6, 50:10, 51:2, 51:16, 51:25, 52:13, 52:24, 54:5, 57:18, 61:11, 62:7, 62:8, 65:20, 65:21, 65:22, 71:19, 78:7
**PENSION** [1] - 2:12
**people** [3] - 25:22, 70:8, 77:12
**people's** [1] - 68:16
**percent** [12] - 26:12, 26:16, 49:2, 49:7, 53:1, 53:3, 53:6, 53:10, 53:11, 53:13, 53:17, 65:9
**percentage** [7] - 9:25, 10:2, 27:23, 29:14, 53:14, 53:15, 54:19
**perfectly** [1] - 74:4
**performed** [1] - 30:12
**period** [11] - 45:10, 47:2, 47:3, 47:16, 48:22, 50:20, 56:8, 62:24, 69:14, 70:8, 74:12
**permission** [1] - 30:24
**permitted** [2] - 18:11, 40:21
**persisted** [1] - 58:12
**person** [1] - 39:25
**personal** [1] - 22:23
**personally** [3] - 13:5, 77:2, 77:13
**persons** [1] - 40:4
**pertained** [1] - 34:16
**pertains** [1] - 35:14
**pervasive** [2] - 27:15, 34:7
**Peter** [2] - 3:17, 5:25
**peter.stokes@nortonrosefulbright. com** [1] - 3:20
**Pharmaceutical** [2] - 59:11, 62:10
**Pharmaceuticals** [2] - 59:12, 61:10
**PHILADELPHIA** [1] - 2:12
**phone** [1] - 6:14

**pick** [1] - 72:20
**picked** [1] - 49:19
**pictures** [1] - 21:18
**piece** [1] - 18:3
**piggybacked** [1] - 12:6
**pipeline** [2] - 65:25, 77:9
**Place** [1] - 3:12
**place** [13] - 8:13, 9:14, 12:13, 18:14, 19:10, 36:25, 45:9, 47:24, 50:19, 54:7, 66:1, 69:17
**plain** [2] - 31:17, 57:16
**Plains** [7] - 36:3, 36:15, 36:21, 39:16, 54:24, 65:24, 78:13
**Plaintiff** [13] - 7:18, 7:21, 11:8, 13:8, 13:9, 13:10, 17:14, 18:20, 19:8, 19:15, 20:12, 24:6
**plaintiff** [14] - 5:4, 8:17, 10:8, 10:12, 13:1, 16:12, 18:17, 24:2, 24:10, 35:8, 35:16, 38:4, 55:18, 64:8
**PLAINTIFFS** [1] - 3:1
**plaintiffs** [43] - 4:12, 4:15, 5:1, 5:5, 5:17, 5:21, 6:2, 6:11, 6:16, 6:21, 7:9, 8:8, 8:21, 9:19, 9:23, 10:7, 10:15, 10:25, 12:2, 14:21, 17:3, 18:1, 19:12, 22:2, 22:3, 22:6, 22:7, 22:9, 23:14, 24:14, 29:12, 36:24, 42:20, 43:9, 55:10, 63:6, 63:20, 72:5, 72:12, 75:21, 77:11, 77:19, 77:23
**plaintiffs'** [10] - 4:22, 16:19, 27:3, 27:6, 28:1, 41:14, 55:12, 55:15, 57:17, 76:5
**plan** [2] - 75:10, 76:7
**PLAN** [1] - 2:12
**platform** [1] - 69:1
**plausibility** [1] - 43:18
**plausible** [1] - 43:23
**play** [1] - 55:17
**plead** [9] - 27:4, 27:9, 27:14, 35:22, 43:23, 52:18, 55:3, 55:12, 55:15
**pleading** [2] - 25:1, 32:1
**pleadings** [1] - 16:18
**pled** [3] - 40:13, 55:8, 68:6
**PLLC** [2] - 2:8, 2:23
**plus** [1] - 51:1
**point** [14] - 22:12, 24:9, 25:6, 30:2, 33:5, 33:18, 42:17, 43:4, 52:7, 53:16, 53:21, 54:9, 59:13, 74:19
**points** [4] - 20:15, 20:16, 23:25, 45:2
**pollute** [2] - 47:6, 48:2
**polluted** [2] - 49:17, 50:9
**pollution** [1] - 49:14
**portion** [2] - 35:12, 68:8
**portions** [1] - 9:19
**position** [7] - 20:5, 22:20, 23:18, 47:21, 66:15, 76:15, 79:20
**possibility** [1] - 20:7
**possibly** [2] - 39:5, 52:8
**post** [2] - 32:14, 56:12
**post-remediation** [1] - 32:14
**poster** [1] - 42:21

**potential** [2] - 53:8, 60:20
**Poydras** [1] - 3:4
**practice** [1] - 79:7
**precautionary** [1] - 37:11
**precedent** [1] - 37:1
**precise** [2] - 9:24, 42:3
**precisely** [1] - 37:17
**preference** [2] - 14:3, 26:4
**prejudice** [3] - 63:12, 72:21, 77:23
**prepared** [2] - 23:2, 73:8
**preparing** [2] - 70:7, 74:5
**preposterous** [1] - 17:22
**present** [7] - 4:3, 4:16, 7:4, 8:18, 10:11, 21:24, 63:19
**presentation** [1] - 9:10
**presented** [2] - 64:24, 80:8
**presentment** [2] - 26:19, 35:17
**presided** [1] - 74:13
**press** [2] - 49:21, 50:16
**pressed** [1] - 28:23
**pretty** [3] - 16:17, 16:22, 53:11
**prevent** [1] - 70:13
**previous** [2] - 37:2, 79:12
**previously** [1] - 50:22
**price** [3] - 50:15, 53:25
**priced** [1] - 44:9
**prices** [4] - 41:9, 43:14, 44:1, 44:4
**primarily** [1] - 45:8
**primary** [7] - 8:6, 8:12, 20:5, 47:23, 54:4, 61:13, 61:14
**principal** [1] - 76:6
**privy** [1] - 33:24
**problem** [8] - 34:8, 43:3, 62:22, 66:1, 70:15, 70:18, 71:11, 71:25
**problems** [12] - 45:7, 45:11, 45:18, 52:22, 53:23, 53:25, 62:4, 62:19, 66:18, 66:19, 70:13, 71:7
**procedure** [1] - 34:23
**proceed** [1] - 80:19
**proceeding** [3] - 13:13, 13:14, 80:7
**proceedings** [3] - 3:24, 8:11, 81:11
**Proceedings** [1] - 38:9
**process** [4] - 58:4, 58:19, 69:21, 76:5
**produced** [2] - 3:25, 17:23
**producing** [3] - 41:10, 73:25, 74:5
**product** [2] - 74:4, 74:6
**production** [3] - 11:10, 12:22, 17:21
**productive** [1] - 53:7
**products** [1] - 73:18
**profile** [1] - 44:13
**promise** [7] - 32:19, 47:7, 48:4, 48:7, 55:21, 56:7
**promised** [1] - 46:23
**prong** [1] - 64:7
**Prongay** [3] - 2:19, 4:25, 21:13
**proposals** [1] - 75:2
**propose** [1] - 77:11
**proposed** [6] - 25:6, 31:7, 34:14, 74:21, 77:13, 77:14

**proposition** [2] - 41:6, 70:21
**prosecute** [2] - 10:14, 13:5
**prosecution** [5] - 16:13, 16:17, 17:2, 24:24, 74:9
**protection** [1] - 52:13
**Protection** [6] - 30:10, 35:4, 46:5, 47:5, 57:19, 71:20
**Protection's** [1] - 65:22
**provide** [1] - 69:5
**provided** [2] - 51:25, 70:7
**provision** [1] - 30:13
**provisions** [1] - 48:14
**proxy** [1] - 41:17
**Prussia** [1] - 2:14
**public** [3] - 23:14, 42:5, 44:1
**publicly** [3] - 40:17, 42:8, 42:19
**published** [1] - 56:25
**pulled** [1] - 60:7
**pulling** [1] - 73:13
**pump** [1] - 41:11
**pump-and-dump** [1] - 41:11
**purport** [1] - 27:21
**purported** [1] - 75:19
**purpose** [2] - 73:18, 76:25
**pursuant** [1] - 47:9
**put** [7] - 8:13, 12:5, 12:13, 57:13, 76:6, 78:5, 79:22
**putting** [1] - 79:3

## Q

**Qualcomm** [4] - 67:1, 70:20, 70:23, 76:10
**qualified** [1] - 33:23
**quality** [4] - 16:18, 24:24, 24:25
**questioning** [1] - 56:6
**questions** [2] - 23:21, 57:21
**quick** [1] - 23:25
**quiet** [1] - 5:9
**quite** [4] - 14:4, 52:8, 60:1, 74:7
**quo** [2] - 8:20, 25:5
**quote** [7] - 59:18, 60:1, 60:3, 68:2, 68:9, 69:13, 75:6
**quoting** [1] - 49:22

## R

**Radnor** [1] - 2:15
**raised** [2] - 41:21, 57:20
**rather** [1] - 75:24
**Rd** [1] - 2:24
**Re** [1] - 39:16
**reach** [3] - 11:14, 30:16, 33:3
**reached** [1] - 79:6
**reaches** [1] - 54:16
**reaction** [2] - 64:18, 68:10
**read** [2] - 36:1, 46:14
**real** [2] - 37:9, 43:2
**reality** [1] - 18:15

**really** [13] - 12:10, 14:15, 26:6, 26:15, 43:19, 52:8, 53:16, 59:10, 61:21, 63:24, 64:17, 66:16, 66:21
**realm** [1] - 32:1
**realtime** [1] - 58:22
**reason** [4] - 9:17, 17:23, 18:1, 67:24
**reasonable** [7] - 37:19, 39:24, 42:25, 44:12, 57:10, 58:16, 58:18
**reasonably** [2] - 39:19, 44:13
**reasons** [4] - 15:11, 49:9, 61:9, 71:15
**receive** [1] - 47:23
**received** [11] - 31:6, 31:8, 34:15, 34:16, 35:20, 37:12, 40:5, 48:21, 48:22, 50:23, 60:24
**recent** [1] - 37:3
**recently** [2] - 69:18, 79:17
**receptive** [1] - 79:15
**recessed** [1] - 38:9
**recklessness** [3] - 39:21, 39:23, 40:2
**recognize** [1] - 15:1
**recognized** [2] - 24:12, 50:12
**recognizing** [1] - 21:4
**recommended** [1] - 74:20
**record** [14] - 7:5, 8:15, 21:24, 23:14, 42:3, 42:13, 44:1, 67:25, 70:1, 70:10, 70:14, 71:21, 71:22, 81:11
**recorded** [2] - 3:24, 7:5
**records** [6] - 11:9, 12:3, 12:16, 13:6, 14:20, 23:11
**red** [14] - 61:6, 64:10, 64:24, 66:12, 66:17, 66:21, 66:24, 67:3, 67:9, 70:4, 70:22, 71:16, 73:2, 75:19
**redactions** [1] - 24:15
**refer** [3] - 46:6, 46:11, 46:12
**reference** [2] - 50:18, 69:24
**referring** [2] - 48:8, 48:10
**refilling** [1] - 67:22
**reflected** [1] - 58:3
**reflects** [2] - 14:25, 32:7
**refute** [1] - 68:6
**regarding** [3] - 47:19, 61:8, 61:23
**regula** [1] - 60:3
**regulated** [1] - 61:11
**regulations** [3] - 48:13, 60:3, 60:22
**regulator** [14] - 47:24, 54:4, 58:8, 58:15, 58:20, 61:6, 61:13, 61:14, 66:15, 76:2, 76:6, 76:13, 76:18, 77:14
**regulators** [4] - 32:24, 70:21, 70:25, 71:3
**regulators'** [1] - 75:25
**reinforcing** [1] - 53:20
**relates** [1] - 31:24
**relating** [1] - 35:13
**relatively** [1] - 53:21
**relied** [3] - 29:5, 52:3, 75:1
**rely** [2] - 70:1, 70:20
**relying** [1] - 14:8
**remain** [1] - 79:7
**remaining** [1] - 38:17

**remarked** [1] - 28:16
**remedial** [2] - 48:18, 69:12
**remediate** [8] - 31:21, 46:21, 58:2, 61:1, 62:4, 69:18, 71:6, 71:25
**remediated** [6] - 29:22, 30:16, 32:15, 33:3, 62:12
**remediating** [2] - 62:19, 62:25
**remediation** [17] - 26:14, 30:13, 31:15, 32:5, 32:14, 32:17, 32:21, 32:23, 35:10, 35:14, 35:19, 69:21, 70:16, 74:13, 75:15, 76:8, 77:14
**remedy** [2] - 68:2, 68:3
**remember** [2] - 36:7, 62:21
**remind** [1] - 4:8
**render** [2] - 27:16, 54:18
**rendering** [1] - 68:16
**repeat** [1] - 16:15
**repeated** [2] - 47:25, 60:10
**repeatedly** [1] - 39:3
**replace** [1] - 25:15
**reply** [2] - 54:23, 70:3
**report** [3] - 52:20, 56:25, 70:7
**reported** [1] - 75:15
**REPORTER** [11] - 3:21, 18:24, 19:2, 19:5, 45:15, 45:24, 49:24, 50:1, 65:5, 65:10, 65:14
**reporter** [1] - 4:7
**REPORTER'S** [1] - 81:8
**reports** [2] - 49:23, 57:5
**represent** [2] - 15:21, 25:17
**representation** [2] - 26:10, 32:22
**represented** [1] - 40:24
**represents** [2] - 60:17, 60:21
**request** [1] - 12:4
**require** [1] - 71:14
**required** [6] - 25:8, 32:13, 33:12, 39:8, 48:17, 76:17
**requirement** [2] - 23:10, 24:10
**requirements** [1] - 33:14
**requires** [1] - 64:8
**resemblance** [1] - 73:8
**residents** [2] - 30:15, 33:9
**resides** [1] - 67:7
**resolution** [3] - 33:5, 63:18, 79:6
**resolve** [1] - 79:1
**resolved** [1] - 33:5
**resolves** [1] - 23:5
**resolving** [1] - 78:25
**resoundingly** [1] - 36:13
**respect** [15] - 30:22, 31:12, 31:14, 31:15, 32:4, 32:8, 32:16, 32:17, 34:12, 39:16, 40:13, 41:1, 42:5, 54:17, 74:16
**respects** [1] - 9:18
**respond** [9] - 12:9, 15:18, 20:22, 29:17, 29:18, 33:6, 38:1, 38:2, 58:24
**response** [13] - 22:23, 23:9, 38:17, 44:17, 57:12, 63:9, 68:14, 69:6, 70:4, 70:22, 72:19, 75:9, 75:19
**responsible** [1] - 17:25

**restructure** [1] - 20:13
**restructuring** [1] - 71:1
**resume** [1] - 38:13
**Retirement** [1] - 6:10
**RETIREMENT** [3] - 1:3, 2:2, 2:12
**retirement** [1] - 38:4
**returns** [1] - 68:8
**revenue** [1] - 43:16
**reversed** [1] - 56:22
**review** [3] - 68:5, 68:10, 70:17
**rewarded** [1] - 12:6
**Richardson** [3] - 67:18, 73:4, 74:7
**risk** [5] - 44:13, 60:17, 60:20, 64:24, 66:3
**risks** [1] - 68:7
**RMR** [2] - 3:22, 81:15
**Road** [1] - 2:14
**Robbins** [4] - 2:4, 3:12, 5:4, 6:9
**role** [4] - 8:6, 8:12, 19:11, 23:6
**roll** [1] - 76:13
**Room** [1] - 3:22
**Rose** [2] - 3:17, 5:25
**ROSENTHAL** [1] - 1:20
**routinely** [1] - 57:6
**RPR** [1] - 81:15
**Rudman** [3] - 2:4, 6:9, 7:8
**rule** [2] - 29:8, 63:17
**rules** [2] - 67:23, 71:4
**ruling** [1] - 79:1
**run** [1] - 73:20
**running** [1] - 73:9
**rural** [2] - 65:20, 68:15
**Rusk** [1] - 3:22

## S

**Sach** [2] - 24:3, 65:17
**SACH** [1] - 72:10
**Sach-Michael's** [1] - 24:3
**Sach-Michaels** [1] - 65:17
**SACH-MICHAELS** [1] - 72:10
**SACHS** [35] - 6:17, 6:21, 8:22, 9:8, 9:15, 10:1, 10:5, 10:7, 11:23, 12:8, 12:11, 12:14, 14:6, 15:5, 15:7, 21:1, 21:6, 21:10, 21:15, 22:7, 22:11, 22:15, 23:4, 63:21, 63:23, 64:6, 64:15, 64:22, 65:18, 66:11, 80:12, 80:21, 80:25, 81:2, 81:4
**Sachs** [10] - 2:18, 4:16, 5:18, 6:14, 8:23, 9:6, 14:1, 20:15, 21:4, 63:20
**Sachs-Michael** [1] - 14:1
**SACHS-MICHAEL** [1] - 80:12
**Sachs-Michaels** [9] - 2:18, 4:16, 5:18, 6:14, 8:23, 9:6, 20:15, 21:4, 63:20
**SACHS-MICHAELS** [34] - 6:17, 6:21, 8:22, 9:8, 9:15, 10:1, 10:5, 10:7, 11:23, 12:8, 12:11, 12:14, 14:6, 15:5, 15:7, 21:1, 21:6, 21:10, 21:15, 22:7, 22:11, 22:15, 23:4, 63:21, 63:23, 64:6, 64:15, 64:22, 65:18, 66:11, 80:21,

80:25, 81:2, 81:4
**safety** [1] - 39:2
**sailed** [1] - 71:7
**sale** [4] - 38:19, 41:1, 41:2, 41:18
**sales** [1] - 38:3
**San** [3] - 2:5, 3:13, 3:18
**sanctions** [2] - 24:20, 66:4
**SANDERS** [11] - 5:3, 5:13, 16:5, 16:10, 17:1, 17:12, 19:7, 19:21, 20:5, 23:24, 25:19
**Sanders** [13] - 3:11, 5:4, 5:12, 5:13, 16:2, 18:24, 18:25, 19:1, 22:14, 23:9, 23:22, 25:9
**sanitizing** [1] - 73:13
**satisfied** [1] - 40:24
**satisfy** [2] - 32:24, 58:8
**saw** [2] - 33:18, 52:19
**school** [1] - 6:5
**scienter** [24] - 27:5, 36:22, 36:23, 39:8, 39:9, 39:11, 40:5, 40:10, 40:15, 42:1, 42:17, 44:8, 55:8, 56:3, 56:14, 56:15, 57:3, 57:7, 58:13, 64:14, 64:17, 72:25, 73:1
**screen** [1] - 4:17
**scrutiny** [1] - 70:24
**sealed** [1] - 66:8
**SEC** [1] - 57:5
**second** [7] - 10:17, 24:15, 42:22, 43:24, 45:20, 64:7, 67:11
**Section** [1] - 17:7
**securities** [10] - 4:11, 6:12, 7:2, 10:24, 11:22, 27:5, 30:7, 31:5, 34:14, 77:23
**see** [6] - 4:16, 6:14, 21:17, 24:14, 42:16, 57:13
**seeing** [1] - 79:5
**seek** [1] - 12:21
**seeking** [1] - 8:19
**selling** [5] - 73:12, 73:14, 73:18, 74:3
**sending** [1] - 78:24
**sense** [1] - 43:13
**sensitive** [1] - 24:4
**sent** [2] - 47:12, 60:10
**sentence** [3] - 32:25, 50:1, 50:3
**sentencing** [1] - 24:19
**September** [1] - 31:6
**series** [2] - 24:11, 71:16
**serious** [6] - 49:8, 49:14, 66:5, 68:17, 77:1, 77:4
**seriously** [1] - 28:1
**seriousness** [1] - 60:19
**served** [1] - 12:19
**serving** [1] - 19:11
**set** [3] - 13:15, 45:4, 77:11
**sets** [1] - 31:2
**settlement** [1] - 79:16
**seven** [1] - 33:16
**several** [1] - 39:13
**Shane** [2] - 3:11, 5:3
**shareholders** [1] - 76:16

**ship** [1] - 71:7
**Shoreham** [1] - 3:12
**shot** [1] - 33:21
**show** [12] - 11:17, 27:7, 27:10, 29:15, 43:8, 55:2, 56:15, 57:3, 57:7, 58:21, 75:3, 79:1
**showed** [2] - 55:2, 67:25
**showing** [11] - 27:4, 27:12, 29:13, 32:4, 33:23, 35:22, 41:17, 55:3, 62:11, 77:17
**side** [7] - 11:17, 16:24, 24:3, 58:9, 68:19, 73:21, 79:1
**sides** [3] - 8:17, 25:3, 67:15
**signed** [5] - 40:9, 46:4, 46:20, 48:11, 62:3
**significant** [11] - 24:23, 49:7, 49:13, 50:5, 50:6, 52:16, 53:8, 53:23, 54:19, 55:11, 77:6
**significantly** [2] - 9:25, 10:2
**similar** [10] - 27:6, 28:21, 37:17, 38:24, 59:16, 60:1, 60:22, 69:25, 74:8, 74:11
**similarly** [1] - 43:25
**simple** [5] - 57:14, 57:15, 57:25, 58:1, 58:2
**simply** [10] - 13:20, 20:3, 20:17, 38:25, 47:21, 49:6, 52:22, 53:8, 55:1, 56:14
**simultaneous** [1] - 15:23
**single** [1] - 69:19
**site** [2] - 42:11, 42:16
**sitting** [1] - 77:12
**situation** [10] - 11:17, 13:3, 22:18, 23:19, 59:13, 60:23, 65:24, 68:19, 70:23, 73:23
**situations** [2] - 9:17, 13:5
**six** [1] - 48:14
**size** [2] - 16:19, 55:16
**skilled** [1] - 79:4
**slightly** [1] - 10:3
**slow** [2] - 19:1, 19:6
**Slow** [1] - 19:4
**small** [7] - 26:13, 27:22, 49:12, 50:5, 53:15, 53:21, 65:16
**smaller** [1] - 10:3
**snippets** [1] - 37:5
**so-called** [1] - 44:10
**soft** [1] - 36:17
**software** [1] - 68:25
**sold** [1] - 41:22
**someone** [2] - 6:6, 53:9
**sometimes** [1] - 13:6
**somewhat** [1] - 16:23
**Sorry** [1] - 76:23
**sorry** [9] - 5:10, 6:18, 8:1, 21:17, 21:25, 28:10, 34:21, 45:15, 49:24
**sort** [8] - 12:25, 14:25, 17:21, 24:21, 25:2, 51:11, 66:9, 67:14
**sought** [1] - 18:11
**source** [6] - 29:2, 30:15, 32:14, 33:2, 35:20, 36:6

**sources** [1] - 30:14
**Southern** [1] - 43:18
**SOUTHERN** [2] - 1:1, 1:9
**spanning** [1] - 62:24
**speaking** [14] - 4:6, 4:8, 5:11, 5:17, 6:1, 6:11, 6:15, 6:20, 7:3, 7:6, 7:9, 7:13, 15:23, 15:24
**speaks** [1] - 27:13
**specific** [17] - 30:20, 30:21, 30:23, 31:12, 31:14, 31:15, 31:23, 31:24, 32:2, 32:3, 32:20, 33:15, 35:11, 35:18, 37:11, 66:12, 67:2
**specifically** [13] - 26:19, 30:6, 31:2, 31:24, 32:16, 46:19, 47:8, 47:12, 48:9, 49:15, 49:17, 50:8, 60:16
**specifics** [1] - 38:25
**specify** [1] - 33:17
**specifying** [1] - 35:11
**spelled** [1] - 45:23
**spent** [1] - 24:18
**ssanders@robbinsllp.com** [1] - 3:14
**staff** [1] - 7:24
**stage** [1] - 79:16
**Stalmaker** [2] - 40:7, 40:11
**Stalmaker's** [1] - 33:19
**Stalter** [1] - 31:9
**stand** [1] - 38:11
**standard** [2] - 77:10, 79:25
**standing** [5] - 10:8, 10:13, 15:14, 17:9, 53:4
**standpoint** [1] - 78:5
**stands** [1] - 19:22
**start** [6] - 4:10, 8:16, 8:19, 9:14, 38:21, 48:21
**started** [2] - 6:19, 57:22
**starting** [2] - 8:19, 56:1
**state** [3] - 39:17, 61:17, 61:18
**statement** [30] - 26:24, 26:25, 27:2, 27:4, 27:7, 27:8, 27:12, 27:16, 28:7, 29:16, 30:23, 31:1, 31:16, 35:23, 35:24, 35:25, 36:2, 36:19, 36:20, 37:11, 39:25, 40:10, 54:18, 55:6, 55:7, 56:3, 61:24, 78:12
**statements** [34] - 26:11, 29:21, 29:24, 30:6, 30:8, 30:20, 33:7, 36:3, 36:5, 36:18, 37:3, 37:5, 37:7, 37:9, 37:19, 37:20, 39:17, 40:2, 40:5, 40:14, 40:23, 47:16, 47:18, 58:22, 59:17, 59:25, 60:1, 60:5, 60:8, 61:8, 61:22, 78:11, 78:15
**STATES** [3] - 1:1, 1:9, 1:21
**stating** [1] - 47:13
**status** [3] - 8:20, 11:5, 25:5
**statute** [5] - 42:4, 42:8, 52:12, 52:17, 55:24
**stayed** [1] - 76:20
**Steckler** [1] - 2:23
**steeper** [1] - 74:15
**stenography** [1] - 3:24
**step** [1] - 12:25

**Stephens** [2] - 28:3, 29:2
**stepping** [1] - 78:19
**steps** [1] - 69:18
**stick** [1] - 18:15
**still** [6] - 20:8, 32:9, 36:21, 53:22, 54:14, 54:20
**stipulated** [1] - 17:6
**stipulation** [1] - 9:4
**stock** [21] - 9:11, 9:13, 9:16, 10:8, 10:12, 14:21, 41:2, 41:3, 41:18, 41:19, 41:20, 41:23, 43:10, 43:14, 43:24, 44:6, 49:20, 50:15, 53:25, 55:16
**stockholders** [1] - 12:15
**Stokes** [17] - 3:17, 5:25, 25:25, 29:18, 33:6, 34:17, 37:23, 38:16, 49:3, 49:4, 54:9, 59:5, 72:6, 72:19, 76:22, 79:10
**STOKES** [40] - 5:24, 26:2, 26:4, 26:17, 27:1, 27:11, 28:6, 28:10, 28:13, 28:22, 29:23, 30:2, 30:5, 33:11, 34:19, 34:21, 34:25, 35:3, 36:8, 36:12, 37:24, 38:6, 38:8, 38:14, 38:21, 41:15, 44:7, 44:19, 54:12, 55:14, 72:23, 76:23, 77:16, 78:4, 79:9, 79:11, 79:15, 79:22, 80:1, 81:5
**stood** [2] - 17:6, 74:20
**stop** [3] - 54:8, 68:25, 70:11
**straight** [1] - 39:22
**stray** [1] - 69:16
**Streams** [2] - 52:11, 52:12
**Street** [1] - 3:4
**stress** [1] - 76:25
**stripped** [1] - 51:9
**strong** [3] - 24:7, 39:8, 42:1
**stronger** [4] - 42:25, 57:10, 58:17, 58:18
**structure** [16] - 8:13, 14:23, 18:14, 18:19, 18:22, 19:10, 19:15, 19:17, 19:22, 20:10, 24:6, 24:7, 24:8, 25:6, 25:11, 80:20
**structures** [1] - 19:25
**Stuart** [2] - 2:23, 5:8
**stuart@swclaw.com** [1] - 2:25
**subject** [7] - 15:2, 15:15, 32:5, 60:4, 64:23, 65:21, 66:2
**subsequent** [2] - 35:21, 69:2
**subsequently** [2] - 16:12, 31:13
**subsidiary** [1] - 67:22
**substantial** [13] - 26:9, 27:7, 27:13, 27:14, 27:16, 36:5, 36:6, 37:19, 47:20, 47:22, 54:3, 61:2, 61:8
**substantially** [3] - 14:21, 45:8, 50:20
**succeed** [1] - 75:11
**sued** [1] - 37:10
**sufficient** [4] - 27:10, 34:11, 55:1, 75:12
**sufficiently** [1] - 33:25
**suggest** [1] - 27:3
**Suite** [7] - 2:4, 2:9, 2:20, 2:24, 3:4, 3:9, 3:18
**summary** [3] - 12:7, 13:14, 78:2
**summer** [1] - 11:4
**supervising** [1] - 57:24

**supervisor** [1] - 57:19
**supplies** [1] - 33:10
**support** [5] - 19:22, 39:8, 39:20, 42:1, 43:23
**supports** [2] - 14:2, 44:11
**surprised** [1] - 52:20
**susceptible** [1] - 14:9
**suspicious** [1] - 41:5
**Susquehanna** [8] - 45:7, 45:11, 45:19, 45:22, 46:2, 50:18, 54:6, 61:20
**Swick** [3] - 4:14, 7:18, 7:22
**Swift** [1] - 3:3
**switch** [3] - 57:12, 58:6, 58:8
**syringes** [1] - 67:22
**SYSTEM** [2] - 1:3, 2:2
**system** [3] - 38:5, 68:25, 74:22
**System** [1] - 6:10
**systems** [1] - 74:10

# T

**tack** [2] - 76:18, 77:13
**tail** [1] - 79:2
**tangible** [10] - 68:1, 68:3, 68:9, 68:10, 68:13, 68:24, 69:6, 69:8, 71:24
**team** [3] - 25:2, 25:7, 25:18
**Teamsters** [1] - 67:16
**technical** [1] - 62:16
**Tel** [9] - 2:10, 2:15, 2:21, 2:25, 3:5, 3:10, 3:13, 3:19, 3:23
**temporal** [1] - 10:13
**ten** [2] - 62:20, 65:25
**terminate** [1] - 40:19
**terminated** [1] - 40:20
**terms** [4] - 9:20, 26:13, 31:17, 58:7
**test** [2] - 70:6, 80:22
**testimony** [1] - 52:2
**testing** [2] - 70:16, 76:8
**TEXAS** [2] - 1:1, 1:9
**Texas** [4] - 1:4, 1:12, 3:23, 14:19
**Thanksgiving** [1] - 7:25
**THE** [149] - 1:1, 1:1, 1:9, 1:9, 1:20, 3:7, 3:16, 4:2, 4:5, 4:18, 4:20, 5:2, 5:6, 5:10, 5:14, 5:20, 6:2, 6:6, 6:13, 6:19, 6:23, 7:4, 7:10, 7:14, 7:19, 7:23, 9:6, 9:9, 9:22, 10:4, 10:6, 11:20, 11:24, 12:9, 12:12, 13:25, 15:4, 15:6, 15:18, 15:24, 16:2, 16:9, 16:21, 17:9, 18:24, 19:1, 19:2, 19:4, 19:5, 19:20, 20:2, 20:14, 21:3, 21:9, 21:14, 21:21, 22:3, 22:6, 22:8, 22:12, 23:3, 23:22, 24:17, 25:20, 26:3, 26:6, 26:23, 27:9, 28:5, 28:8, 28:11, 28:20, 29:17, 30:1, 30:3, 33:6, 34:17, 34:20, 34:22, 35:2, 36:7, 36:10, 37:23, 37:25, 38:7, 38:10, 38:15, 41:13, 44:6, 44:18, 44:20, 44:23, 45:13, 45:15, 45:20, 45:24, 45:25, 46:7, 46:9, 46:14, 48:6, 49:3, 49:5, 49:24, 50:1, 51:4, 51:8, 51:18, 51:21, 53:2, 53:12, 54:8, 54:11, 55:13,

58:23, 59:19, 59:23, 63:2, 63:5, 63:22, 64:2, 64:5, 64:13, 64:21, 65:1, 65:5, 65:10, 65:12, 65:14, 65:16, 66:10, 72:2, 72:11, 72:15, 72:18, 76:22, 77:15, 77:20, 78:19, 79:10, 79:14, 79:21, 79:24, 80:2, 80:13, 80:22, 81:1, 81:3, 81:6
**themselves** [5] - 14:13, 39:14, 42:20, 43:9, 56:22
**theory** [4] - 28:15, 28:25, 64:3, 66:24
**therefore** [3] - 29:6, 58:13, 77:22
**thereof** [1] - 55:16
**thinking** [1] - 61:21
**third** [2] - 42:22, 54:16
**third-party** [1] - 54:16
**thorough** [1] - 80:9
**thoroughly** [2] - 63:8, 63:14
**thousands** [1] - 65:25
**threat** [1] - 17:19
**three** [6] - 9:1, 13:15, 20:16, 24:1, 63:18, 70:3
**three-item** [1] - 63:18
**threshings** [1] - 79:7
**threshold** [3] - 43:17, 44:16, 78:12
**throughout** [3] - 22:17, 47:15
**tiny** [2] - 9:19
**tip** [3] - 52:8, 55:13, 55:14
**title** [1] - 22:22
**today** [12] - 5:9, 6:1, 6:11, 7:3, 7:9, 7:13, 18:1, 18:14, 19:10, 19:22, 63:16, 80:9
**together** [9] - 10:18, 11:1, 11:10, 11:13, 22:25, 36:2, 37:20, 42:24, 69:5
**took** [6] - 14:11, 45:9, 62:20, 68:24, 70:15, 79:2
**top** [1] - 28:23
**Topaz** [2] - 2:14, 7:1
**total** [1] - 26:20
**touch** [1] - 63:10
**touche** [1] - 28:13
**towards** [1] - 78:23
**town** [1] - 45:11
**track** [1] - 63:7
**trade** [1] - 41:8
**trades** [1] - 41:9
**transaction** [1] - 79:18
**Transcript** [1] - 3:25
**transcript** [1] - 81:11
**transcription** [1] - 3:25
**transfer** [4] - 10:22, 11:2, 25:13, 68:20
**transferred** [2] - 8:13, 11:4
**transmission** [1] - 65:7
**treat** [1] - 27:25
**Treppel** [25] - 5:5, 5:11, 6:15, 7:12, 8:7, 9:12, 9:22, 11:13, 12:2, 12:18, 12:19, 12:20, 12:24, 13:10, 13:20, 13:22, 15:11, 16:3, 19:15, 20:12, 20:18, 24:6, 25:16
**TREPPEL** [2] - 1:6, 3:7
**Treppel's** [2] - 12:23, 24:2

**trial** [1] - 13:15
**tried** [3] - 18:7, 18:12, 71:2
**tries** [1] - 13:10
**trigger** [1] - 39:4
**truckload** [1] - 43:4
**true** [2] - 9:22, 24:10
**TRUST** [2] - 1:6, 3:7
**Trust** [4] - 5:5, 5:11, 7:12, 8:8
**Trust's** [1] - 16:3
**truth** [1] - 26:24
**try** [1] - 46:12
**trying** [5] - 23:15, 55:18, 58:8, 59:5, 79:12
**turn** [5] - 4:23, 45:3, 59:10, 63:5, 66:9
**turned** [1] - 23:14
**turning** [1] - 7:14
**Turtle** [1] - 2:8
**two** [29] - 5:22, 12:17, 18:22, 19:11, 20:15, 20:17, 23:25, 29:10, 29:24, 30:18, 30:19, 31:2, 34:14, 34:16, 35:4, 50:2, 50:4, 51:22, 53:10, 53:11, 53:13, 56:21, 57:22, 57:24, 67:2, 67:14, 69:4, 73:7
**Two** [1] - 76:22
**Twombly** [2] - 43:7, 43:21
**TX** [4] - 2:9, 2:24, 3:9, 3:19
**type** [2] - 11:18, 36:5
**types** [4] - 36:16, 41:8, 52:2
**typically** [1] - 29:11

# U

**U/A** [2] - 1:6, 3:7
**ultimately** [6] - 29:15, 34:2, 34:6, 42:18, 56:4, 75:11
**unanimously** [1] - 57:3
**uncertainties** [1] - 79:6
**uncertainty** [1] - 33:1
**unclear** [1] - 26:14
**under** [5] - 25:12, 28:24, 36:25, 64:7, 75:13
**underlying** [1] - 20:20
**understood** [1] - 25:19
**undertake** [2] - 48:17, 75:15
**undertook** [2] - 74:10, 75:9
**undisclosed** [1] - 33:19
**unique** [1] - 15:15
**UNITED** [3] - 1:1, 1:9, 1:21
**universe** [1] - 36:3
**unknowable** [1] - 13:18
**unless** [2] - 6:5, 60:19
**unnamed** [1] - 33:15
**unpack** [2] - 45:1, 64:19
**unremediated** [1] - 54:6
**untrue** [1] - 35:23
**unusable** [1] - 68:17
**unusual** [1] - 10:25
**up** [24] - 11:3, 12:17, 13:3, 13:19, 19:5, 22:1, 24:4, 26:5, 30:4, 33:25, 38:1,

38:11, 44:3, 44:17, 44:23, 46:3, 47:1, 49:19, 50:1, 62:8, 62:23, 64:20, 72:20, 74:20
**ups** [1] - 78:20
**upset** [3] - 16:3, 16:7, 25:5
**upsetting** [1] - 12:12
**upsides** [1] - 63:15
**Uranium** [2] - 28:3, 78:10
**urge** [1] - 20:11
**US** [1] - 3:17
**useful** [1] - 8:11
**usual** [1] - 29:8

## V

**vacate** [1] - 14:23
**valuable** [1] - 24:14
**value** [1] - 39:2
**various** [3] - 9:10, 45:2, 52:2
**variousness** [1] - 16:17
**version** [1] - 17:9
**versus** [2] - 44:10, 44:11
**VIA** [2] - 1:19, 2:1
**vice** [1] - 67:14
**Vice** [1] - 73:5
**VICINITY** [1] - 2:12
**view** [5] - 15:16, 20:7, 36:23, 39:10, 73:3
**vigorousness** [2] - 17:2, 24:24
**violated** [1] - 32:17
**violating** [7] - 54:4, 61:16, 68:21, 71:3, 71:9, 71:10, 74:3
**violation** [27] - 31:14, 31:25, 32:6, 34:23, 35:1, 35:4, 35:13, 35:20, 35:21, 37:13, 39:5, 47:4, 47:23, 48:20, 50:24, 50:25, 51:1, 55:3, 55:4, 55:5, 58:7, 59:16, 60:11, 60:14, 61:17, 67:23, 77:9
**violations** [24] - 29:20, 30:20, 30:21, 31:3, 42:5, 42:6, 47:4, 47:14, 48:22, 49:1, 50:7, 51:16, 52:6, 52:16, 54:6, 60:9, 60:25, 61:15, 62:10, 62:16, 73:24, 73:25, 75:9
**visible** [1] - 22:1
**visit** [1] - 79:19
**VOLUME** [1] - 1:22
**vs** [1] - 28:3
**VS** [2] - 1:5, 1:14
**Vs** [1] - 25:3

## W

**wait** [2] - 48:6
**waiting** [2] - 4:21, 25:25
**wants** [1] - 7:5
**water** [10] - 30:14, 33:10, 48:2, 49:16, 50:8, 50:9, 50:13, 61:20, 68:15, 70:8
**waters** [1] - 47:6
**Wayne** [1] - 2:23
**ways** [1] - 74:11

**weaker** [1] - 36:23
**weakness** [1] - 70:19
**web** [1] - 42:15
**website** [1] - 42:14
**week** [1] - 73:7
**weekend** [1] - 8:1
**weeks** [1] - 13:15
**weigh** [2] - 40:15, 72:21
**weight** [2] - 34:5, 78:17
**wells** [60] - 26:12, 26:18, 26:19, 26:21, 27:20, 27:22, 27:23, 29:19, 30:23, 31:9, 31:17, 31:21, 32:4, 32:13, 32:21, 33:9, 33:24, 34:2, 35:6, 35:11, 35:14, 46:22, 47:6, 48:1, 48:18, 49:2, 49:7, 49:12, 49:14, 49:16, 50:5, 50:7, 50:9, 50:13, 50:22, 50:23, 53:6, 53:7, 53:17, 53:21, 54:18, 54:19, 57:21, 57:23, 61:19, 65:3, 66:14, 68:15, 69:12, 69:16, 69:22, 70:6, 70:12, 70:13, 74:23
**Wells** [1] - 73:16
**Westlaw** [1] - 75:14
**Westmoreland** [1] - 75:23
**whisperer** [1] - 79:4
**white** [1] - 59:6
**whole** [6] - 20:20, 42:24, 58:11, 65:3, 73:15, 80:14
**widespread** [2] - 33:8, 52:22
**willing** [4] - 19:23, 22:20, 23:18, 25:9
**window** [1] - 63:17
**wise** [1] - 75:16
**wish** [1] - 8:18
**wistless** [1] - 75:4
**witnesses** [1] - 33:14
**word** [4] - 23:23, 43:11, 48:6, 56:7
**words** [3] - 30:18, 32:21, 45:13
**WORKERS** [1] - 2:12
**works** [1] - 81:2
**world** [4] - 51:21, 51:22, 70:25, 71:2
**worth** [1] - 10:14
**wrap** [1] - 38:1
**writing** [1] - 46:15

## Y

**year** [1] - 28:19
**years** [9] - 28:9, 33:16, 57:22, 57:24, 58:12, 62:11, 62:20, 69:14
**York** [2] - 2:21, 43:18

## Z

**Zoom** [3] - 19:3, 21:18, 65:7
**ZOOM** [2] - 1:19, 2:1