United States District Court
Southern District of Texas
**ENTERED**
August 10, 2022
Nathan Ochsner, Clerk

**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| DELAWARE COUNTY EMPLOYEES RETIREMENT SYSTEM on behalf of itself individually, and ALL OTHERS SIMILARLY SITUATED, and IRON WORKERS DISTRICT COUNCIL (PHILADELPHIA AND VICINITY) RETIREMENT AND PENSION PLAN, | § § § § § § § § | |
| Plaintiffs, | § § | |
| V. | § § | CIVIL ACTION NO. H-21-2045 |
| CABOT OIL & GAS CORPORATION, *et al.*, | § § | |
| Defendants. | § | |

**MEMORANDUM AND OPINION**

This Memorandum and Opinion addresses the defendants' motion to dismiss the plaintiffs' first amended consolidated complaint. The Delaware County Employees Retirement System and the Iron Workers District Council (Philadelphia and Vicinity) Retirement and Pension Plan, (the "Retirement Plans" or "the Plans"), purchased common stock in Cabot Oil & Gas Corporation. The Retirement Plans allege that from February 2016 to June 2020, Cabot and its executive officers told investors that it was remediating environmental problems and complying with ongoing legal and regulatory requirements, increasing the stock price. The Retirement Plans allege that Cabot was instead leaving problems unremediated and continuing to violate environmental laws. (Docket Entry No. 110 at ¶¶ 1–4). In June 2020, the Pennsylvania Office of the Attorney General announced criminal charges against Cabot, including felony counts for failing to fix faulty gas wells that leaked pollutants into residential water supplies. (*Id.* at ¶ 50). The stock price dropped, and litigation followed. In October 2020, the Retirement Plans sued Cabot and three executive

1

officers on behalf of those who purchased Cabot common stock between February 22, 2016, and June 12, 2020, alleging that the Retirement Plans and investors like them lost millions.  (*Id.* at ¶ 13).

On January 12, 2022, the court issued a Memorandum and Opinion addressing the defendants' motion to dismiss the complaint.  The court dismissed the Plans' claims, in part with prejudice and in part without prejudice.  (Docket Entry No. 109).  The court dismissed with prejudice the Plans' claims based on the following categories of statements:

- the Code of Business Conduct statements;

- the Notice of Violation statements in Form 10-Qs and 10-Ks;

- the potential risk statements in Form 10-Ks;

- the Dinges letter in the 2016 Annual Report;

- the 2018 Schroeder presentation;

- the Dinges letter in the 2019 Annual Report; and

- the 2019 Annual Report statements.

The court dismissed claims based on four categories of statements without prejudice and with leave to amend, including:

- the substantial compliance statements in Form 10-Ks;

- the remediation statements related to the 2011 Notice of Violation in Form 10-Qs and Form 10-Ks;

- the 2016 Consent Order notification in the 2016 Form 10-K; and

- the Report of 2017 Notices of Violation in the 2019 Form 10-Q.

The Plans filed a first amended consolidated complaint asserting claims against Cabot; its chief executive officer, Dan O. Dinges; its chief financial officer, Scott O. Schroeder; and its senior vice president and regional manager, Phil L. Stalnaker, under § 10(b) and § 20(a) of the Securities

Exchange Act of 1934, as amended by the Private Securities Litigation Reform Act of 1995, and Rule 10b-5, 17 C.F.R. § 240.10b-5.  (Docket Entry No. 110).  Cabot and the three officers, referred to collectively as "Cabot," have moved to dismiss the first amended complaint.  (Docket Entry No. 111).  The Plans responded, Cabot replied, and the Plans surreplied.  (Docket Entry No. 113, 114, 115).

Based on the motion, the response, the replies, and the applicable law, the court grants the motion to dismiss in part and denies the motion to dismiss in part.  To the extent the Plans' claims in its first amended complaint are based on the substantial compliance statements, or are asserted against Stalnaker, they are dismissed with prejudice because leave to amend has already been granted and the first amended complaint fails to cure the previously identified deficiencies.  To the extent the claims are based on the following categories of statements, they may proceed:

- the remediation statements related to the 2011 Notice of Violation in Form 10-Qs and Form 10-Ks;

- the 2016 Consent Order notification in the 2016 Form 10-K; and

- the Report of 2017 Notices of Violation in the 2019 Form 10-Q.

An initial conference is scheduled for **August 26, 2022**, at 10:45 a.m. C.D.T., by video to set a scheduling order.  A zoom link will be separately sent.

The reasons for these rulings are set out below.

## I.    Background

Cabot Oil & Gas Corporation is a publicly traded oil and gas company on the New York Stock Exchange.  (Docket Entry No. 110 at ¶ 26).  From 2015 to 2019, its revenues grew from $1.3 to over $2 billion.  (*Id.* at ¶ 29).  The Delaware County Employees Retirement System and the Iron Workers District Council (Philadelphia and Vicinity) Retirement and Pension Plan invested in Cabot's common stock.  (*Id.* at ¶¶ 18–19).

Like many in its business, Cabot fracks.  Fracking requires drilling into underground geological formations to release and capture natural gas.  (*Id*. at ¶ 43).  Cabot's fracking is concentrated in the Marcellus Shale Deposit in parts of Pennsylvania, West Virginia, Ohio, and New York. (*Id*.).  By December 31, 2016, 93% of Cabot's year-end proved reserves were allegedly located in the Marcellus Shale.  (*Id*. at ¶ 31).  By 2019, all of Cabot's proved undeveloped reserves were located in the part of the Marcellus Shale located under Susquehanna County, Pennsylvania. (*Id*.).

In early 2009, the Pennsylvania Department of Environmental Protection opened an investigation into Cabot's Susquehanna County fracking operations after an explosion at a residential water well in Dimock Township.  (*Id.* at ¶¶ 45, 93).  The investigation concluded that Cabot's drilling had caused methane gas to migrate into residential water wells.  (*Id.* at ¶¶ 45, 94). The Pennsylvania Department of Environmental Protection and Cabot entered into a Consent Order Agreement, but after "Cabot's failure to abide by the terms," Cabot and the Department signed a new Consent Order in April 2010.  (*Id.* at ¶ 46).  In a final Consent Order signed in December 2010, Cabot agreed to "take all actions necessary . . . to comply with all applicable environmental laws and regulations."  (*Id.* at ¶ 47).

The Retirement Plans allege that Cabot repeatedly and knowingly flouted the December 2010 Consent Order over the next decade.  Ken Kennedy, an Oil and Gas Inspector Supervisor at the Pennsylvania Department of Environmental Protection, testified that in 2015, he discovered 11 gas wells needing evaluation, but that Cabot did not begin remediating any of these wells until 2018.  (*Id.* at ¶ 117).  A geologist who worked for Cabot from 2011 to 2018 testified that Cabot's drill sites often lacked sufficient cement bonds, which in his view was "the number one issue for gas migration at the Company's drill sites."  (*Id.* at ¶ 156–59).  Cabot would test the cement casings

by creating a "cement bond log."  The geologist stated that "when you saw a good log[,] you were

surprised."  (*Id.*).  Several Dimock Township residents testified that as late as 2019, they were

experiencing the same water issues that had resulted in the 2009 water well explosion.  (*Id.* at ¶¶

95, 103, 105).

In February 2020, a Pennsylvania grand jury recommended charges against Cabot, finding

that:

> [o]ver a period of many years, and despite mounting evidence,
> Cabot Oil & Gas failed to acknowledge and correct conduct that
> polluted Pennsylvania water through stray gas migration.  Indeed,
> some of these gas wells have been in place for more than a decade,
> yet Cabot has only recently taken steps to remediate them.  In light
> of Cabot's long-term indifference to the damage it caused to the
> environment and the citizens of Susquehanna County, these were
> not merely technical violations.

(*Id.* at ¶ 119).  In June 2020, criminal charges were filed.  (*Id.* at ¶ 120).

The charges were based on two categories of Cabot wells: (1) those covered by the

December 2010 Consent Order that were not remediated as of 2015; and (2) more recently drilled

wells in Susquehanna County outside the Dimock Township area.  The charges listed regulatory

violations from industrial waste discharges in the following Dimock Township wells and dates:

- from August 14, 2009 through June 11, 2018, from gas wells G Shields IV, G Shields 2H, G Shields 4H, and G Shields 5H;

- from July 16, 2008 through June 11, 2018, from gas wells Costello 1V, Costello 2V, Gesford 4H, and Gesford 8H;

- from October 31, 2008 through June 11, 2018, from gas wells Ratzel 1H, Ratzel 2H, and Ratzel 3V; and

- from March 27, 2008 through June 11, 2018, from gas wells Ely 4H and Ely 6H.

(*Id.* at ¶ 121).  The Pennsylvania Department of Environmental Protection had served Cabot with

Notices of Violation for each of these gas wells from 2010 to 2020.  (*Id.* at ¶ 124).  For the G

Shields well, the Notice of Violation was issued in October 2011; for the Costello and Gesford wells, in June 2014; for the Ratzel wells, in December 2014; and for the Ely wells, in March 2018. (*Id.* at ¶ 126).   According to a June 2018 letter from the Department, all the violations were outstanding.  (*Id.*).

Cabot also had fracking operations outside Dimock Township but still within Susquehanna County.   The Pennsylvania Department of Environmental Protection also served Cabot with Notices of Violation for some of these wells.   The Notices issued in March and June 2017 for Howell gas wells 2H, 4H, 6H, and 8H; in November 2017 for Jeffers Farm gas wells 7H, 8H, 9H, 10H, 11H, 12H, and 14H; and in October 2019 for POWERS M gas well 002.  (*Id.* at ¶ 128).  As of June 2018, at least the Jeffers Farm and Howell wells remained unresolved.  (*Id.* at ¶ 129).

During this time, Cabot had a Safety and Environmental Affairs Committee that was made up of at least three of Cabot's board members.[1]   The Committee advised the Board on matters relating to Cabot's compliance with environmental laws and received reports of notices of violations, civil actions, and remediation work.  (*Id.* at ¶¶ 60–61).   Cabot also had an Audit Committee that reported to the Board on matters affecting Cabot's financial reporting and its compliance with legal and regulatory requirements.  (*Id.* at ¶ 71).   Company management provided periodic reports to the Audit Committee on areas of potential exposure, including litigation and regulatory risks.  (*Id.*).   All Cabot directors, officers, and employees had to sign a statement that they understood and would comply with Cabot's Code of Business Conduct, which was posted on Cabot's website.  (*Id.* at ¶ 75).

---

[1]  The Committee's name was changed to the "Environment, Health & Safety Committee" during the class period.  (Docket Entry No. 110 at 20 n.4).  For consistency, the court will refer to it by its original name, the Safety and Environmental Affairs Committee.

As CEO, Dan Dinges signed press releases, spoke on conference calls, and certified and signed Securities and Exchange Commission filings on Cabot's behalf.  (*Id.* at ¶ 21).  Cabot's CFO, Scott C. Schroeder, similarly spoke on Cabot's behalf and certified and signed filings with the SEC.  (*Id.* at ¶ 22).  As the senior vice president and regional manager overseeing Cabot's Susquehanna operations, Phil L. Stalnaker also spoke on behalf of Cabot.  (*Id.* at ¶ 23).

The Retirement Plans allege that due to numerous false and material misrepresentations and omissions made by Cabot, Dinges, Schroeder, and Stalnaker from February 2016 to June 2020, investors were in the dark as to the nature and extent of Cabot's violations of environmental law, failures to remediate, and lack of compliance with the December 2010 Consent Order.  (*Id.* at ¶¶ 12, 25).  Although the Retirement Plans alleged in their first amended complaint eleven different categories of misrepresentations, the court dismissed seven of those categories of misstatements with prejudice.  The Retirement Plans, with leave of the court, filed an amended complaint, continuing to allege four remaining categories of misrepresentations:

1. ***Substantial Compliance Statements in Form 10-Ks***.  Cabot's 2015, 2016, 2017, 2018, and 2019 Form 10-Ks included the statement that Cabot "believe[s] that it substantially compl[ies] with the Clean Water Act and related federal and state regulations."  (*Id.* at ¶ 186).

2. ***Statements About Remediation Efforts Related to the 2011 Notice of Violation in Form 10-Qs and Form 10-Ks***.  Cabot's 2015 Form 10-K stated that the company had received a Notice of Violation from the Pennsylvania Department of Environmental Protection in September 2011 for failing to prevent the migration of methane gas into fresh groundwater sources in Susquehanna County.  Cabot stated that: it was "engaged with the PaDEP in investigating the incident and ha[s] performed appropriate remediation efforts, including

7

the provision of alternative sources of drinking water to affected residents"; it believed "the source of methane has been remediated and [that it was] working with the PaDEP to reach agreement on the disposition of this matter"; it had received a proposed Consent Order that, if finalized, would result in a civil penalty of between $100,000 and $300,000; and it would continue to work to bring the matter to a close.  (*Id.* at ¶ 187).  Similar statements were made in Cabot's Form 10-Qs filed in May 2016, July 2016, and October 2016.  (*Id.* at ¶ 188).

3. ***Statements About the 2016 Consent Order Notification in the 2016 Form 10-K***.  In its 2016 Form 10-K, Cabot notified investors that it had had finalized a new Consent Order and Agreement with the Pennsylvania Department of Environmental Protection.  (*Id.*). Cabot stated:

> We believe the source of methane has been remediated and we entered into a Consent Order and Agreement with the PaDEP on December 30, 2016.  We agreed to pay a civil monetary penalty in the amount of approximately $0.3 million and to continue to provide alternative sources of drinking water to affected residents until the affected water supplies are permanently restored.  Further, the related gas well is being permanently plugged.  Following the plugging of the gas well, additional monitoring will be required to ensure the source of methane has been remediated.  Cabot continues to work with the PaDEP to bring this matter to a close.

4. ***The Report of 2017 Notices of Violation in the 2019 Form 10-Q***.  In July 2019, Cabot filed its 2019 Form 10-Q with the Securities and Exchange Commission, reporting that it had received two proposed Consent Orders and Agreements related to two Notices of Violation from the Pennsylvania Department of Environmental Protection.  (*Id.* at ¶ 205). Cabot stated:

> We will continue to work with the PaDEP to finalize the [Consent Orders and Agreements], and to bring this matter to a close.  With regard to the November 2017 Notice of Violation, the proposed

> Consent Order and Agreement, if finalized as drafted, would require
> Cabot to submit a detailed written remediation plan, continue water
> sampling and other investigative measures and restore or replace
> affected water supplies and would result in the payment of a civil
> monetary penalty in an amount likely to exceed $100,000, up to
> approximately $355,000.  We will continue to work with the PaDEP
> to finalize the Consent Order and Agreement, and to complete the
> ongoing investigation and remediation.

Cabot also addressed a June 2017 Notice of Violation, stating that it believed the water-quality complaints had been resolved through remediation and that it was working with the Pennsylvania Department of Environmental Protection.  (*Id.* at ¶ 207).

The Retirement Plans allege that these statements misrepresented Cabot's compliance with the environmental laws and regulations, the December 2010 Consent Order, and Cabot's remediation efforts, and that the misrepresentations inflated Cabot's stock price.

On November 2, 2017, CEO Dinges sold 66,610 shares of Cabot stock for over $1.8 million.  (*Id.* at ¶¶ 21, 248).  When Cabot first disclosed the 2017 Notices of Violation in its 2019 Form 10-Q on July 26, 2019, the price of Cabot stock declined 12%, while the Dow Jones U.S. Exploration & Production Index fell by less than 0.5%.  (*Id.* at ¶ 260).

When the Pennsylvania Attorney General's Office announced charges against Cabot on June 15, 2020, Cabot's stock price dropped by more than 3%, while the Dow Jones U.S. Exploration & Production Index increased slightly.  (*Id.* at ¶ 263).  The Retirement Plans allege that they and their investors lost millions.  (*Id.* at ¶ 13).  This lawsuit followed.

The Plans included additional allegations in the first amended consolidated complaint to support their claims based on the four categories of misrepresentations dismissed without prejudice:

1. ***Allegations as to the State Regulatory Citations for Violations.***  Between January 2011 and March 2020, the Pennsylvania Department of Environmental Protection cited

Cabot for 781 violations for failing to prevent gas migration into groundwater, defective casings and cementing; the release of brine, drilling mud, and base oil; and failing to properly store, transport, process, or dispose of residual waste. (*Id.* at ¶¶ 142, 144, 146). Approximately 333 of those citations occurred between October 2016 and March 2020. (*Id.*). Many of these violations were not included in the criminal charges, even though they remained unresolved as of the June 2018 letter and breached the December 2010 Consent Order. (*Id.* at ¶¶ 144, 145). Some of these were continuing violations, meaning that they had been previously found during an inspection and were still present at a subsequent inspection. (*Id.* at ¶ 146). The June 2018 letter noted continuing violations for at least 10 additional wells and well sites not named in the Attorney General's criminal charges. Between 2011 and 2017, follow-up inspections designed to determine whether a previous violation had been resolved or addressed revealed violations at 21 additional wells and well sites. (*Id.* at ¶ 148).

2. ***Allegations About the Significance of Noncompliant Cabot Wells.*** The Retirement Plans conducted a forensic analysis to identify how much the noncompliant wells and well sites contributed to Cabot's overall production and revenue. From 2016 through 2019, 65 identified noncompliant wells and well sites were responsible for approximately 13% of Cabot's total gas production and generated approximately $1 billion in revenue. (*Id.* at ¶¶ 150–51). Cabot generated approximately $1.5 billion in revenue per year on average between 2016 and 2020. (*Id.* at ¶ 151). In addition to the forensic findings, John Papso, the Reservoir Engineering Manager in the Pittsburgh office, explained that certain noncompliant wells, Ely 6 and Blacks 1&2H, showed production levels that were uncommon for the industry and unheard of for onshore

wells.  (*Id.* at ¶¶ 152–53).  The Retirement Plans also point to the Grand Jury's conclusion that the Pennsylvania Department of Environmental Protection's oversight of fracking was poor, implying that the number of violations identified by the Department was understated.  (*Id.* at ¶ 155).

3.  ***Allegations About Information Provided by a Former Cabot Geologist.***  The geologist, who worked in Cabot's Pittsburgh office from 2011 to 2018, helped drill 120 wells, reviewed cement bond logs for 80 of those wells, and estimated that 50% did not contain adequate cement for the surface casing.  (*Id.* at ¶ 159).  These "problematic wells were located in Cabot's 'core area'—the Company's best acreage producing the highest quality gas for Cabot."  (*Id.*).  The geologist believed that Stalnaker reviewed copies of the cement bond logs, which were consistent with issues the Pennsylvania Department of Environmental Protection had identified. (*Id.* at ¶ 160).  According to the geologist, Stalnaker was in regular communication with Dinges.  (*Id.* at ¶ 164). Stalnaker attended Cabot board meetings and made presentations that included information about well drill sites and their status.  (*Id.* at ¶ 165).  Dinges approved the PowerPoint slide decks for these presentations.  (*Id.*).  Stalnaker also attended meetings and made presentations to assist Cabot's preparation for the Securities and Exchange Commission filings.  (*Id.* at 166).  The geologist alleged that Stalnaker knew about every Notice of Violation, based on observing closed-door meetings between Stalnaker and regulatory managers and answering requests for reports and diagrams about well site problems.  (*Id.* at ¶ 167).  Stalnaker would also receive reports about any gas leaks or gas migration from managers and was responsible for approving remediation costs and funds authorized for expenditure over $25,000.  (*Id.* at ¶ 168).

4. ***Allegations About Information Provided by a Former Cabot Environmental Health and Safety Manager.***  A former Environmental Health & Safety manager was an employee of a wholly owned subsidiary of Cabot in Susquehanna County from 2017 to 2019.  (*Id.* at ¶ 169).  The manager participated in weekly conference calls with Cabot's Houston headquarters regarding safety, environmental issues and remediation, gas migration into wells, and landowner complaints.  (*Id.* at ¶¶ 169, 171, 172).  The manager stated that the subsidiary provided environmental health and safety information to Gordon Ganaway, Cabot's Director of Safety and Environmental Compliance.  (*Id.* at ¶¶ 169, 173).  Ganaway would include this information in a quarterly report that was then given to Dinges, the Board, and other individuals in Pittsburgh.  (*Id.* at ¶ 173).

5. ***Allegations About Information Provided by a Former Cabot Environmental Health and Safety Specialist.***  According to a former Cabot Environmental Health & Safety specialist who was employed from 2011 and 2021, the weekly environmental health and safety conference calls began in approximately 2016.  (*Id.* at ¶¶ 174–75).  These calls covered issues regarding remediation, gas migration, landowner complaints, and ongoing issues and reports of violations raised by the Pennsylvania Department of Environmental Protection.  (*Id.* at ¶¶ 175–76).  John Smelko, Environmental Regional Manager, and Andy Mehalko, Supervisor for Environmental, were also present on these calls in addition to Ganaway.  (*Id.*).  The specialist stated that when it was time to discuss and prepare the Quarterly Update Report, it was understood that the Report would go to Dinges and the Board.  (*Id.* at ¶ 177).  The specialist also recalled a log of major and minor incidents kept on a spreadsheet within a shared drive for Cabot

employees to review and update. (*Id.* at ¶¶ 178–79). The specialist believes Stalnaker would have had access to this log. (*Id.* at ¶ 178). The specialist would tell Smelko and Mehalko about an incident recorded on the log. (*Id.*). Ganaway would be made aware of a major incident recorded on the log, and would also get the reports and files. (*Id.* at ¶ 179). Smelko compiled information for the quarterly reports, which were given to Schroeder and Dinges before the Board meetings. (*Id.* at ¶¶ 180–82). These reports included the number of violations, gas migration issues and their remediation status, and other issues that involved costs over approximately $25,000–$50,000. (*Id.* at ¶ 183).

The court examines these amended allegations and the claims in light of the record, the applicable legal standards and the arguments of able counsel.

## II.   The Legal Standards

### A.   Rule 12(b)(6)

Rule 12(b)(6) allows dismissal if a plaintiff fails "to state a claim upon which relief can be granted." FED. R. CIV. P. 12(b)(6). Rule 12(b)(6) must be read in conjunction with Rule 8(a), which requires a short and plain statement of the claim showing that the pleader is entitled to relief." FED. R. CIV. P. 8(a)(2). "[A] complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). Rule 8 "does not require 'detailed factual allegations,' but it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Id.* at 678 (quoting *Twombly*, 550 U.S. at 555). "A claim has a facial plausibility when the plaintiff pleads factual content that allows the courts to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S.

at 556).  "The plausibility standard is not akin to a 'probability requirement.' But it asks for more

than a sheer possibility that a defendant has acted unlawfully." *Id.* (quoting *Twombly*, 550 U.S. at

556).

A complaint 'does not need detailed factual allegations,' but facts alleged 'must be enough

to raise a right to relief above the speculative level.'" *Cicalese v. Univ. Tex. Med. Branch*, 924

F.3d 762, 765 (5th Cir. 2019) (quoting *Twombly*, 550 U.S. at 555).  "Conversely, when the

allegations in a complaint, however, true, could not raise a claim of entitlement to relief, this basic

deficiency should be exposed at the point of minimum expenditure of time and money by the

parties and the court." *Cuvillier v. Taylor*, 503 F.3d 397, 401 (5th Cir. 2007) (alterations omitted)

(quoting *Twombly*, 550 U.S. at 558).

A court reviewing a motion to dismiss under Rule 12(b)(6) may consider "(1) the facts set

forth in the complaint, (2) documents attached to the complaint, and (3) matters of which judicial

notice may be taken under Federal Rule of Evidence 201." *Inclusive Cmtys. Project, Inc. v.

Lincoln Prop. Co.*, 920 F.3d 890, 900 (5th Cir. 2019).

### B.   Section 10(b) of the Securities Exchange Act of 1934

Under § 10(b) of the Securities Exchange Act of 1934, "[i]t shall be unlawful for any

person, directly or indirectly, . . . [t]o use or employ, in connection with the purchase or sale of

any security registered on a national securities exchange . . . any manipulative or deceptive device

or contrivance in contravention of such rules and regulation as the [Securities and Exchange

Commission] may prescribe as necessary or appropriate in the public interest or for the protection

of investors."  15 U.S.C. § 78j(b).  Rule 10b–5 implements § 10(b) by forbidding, among other

things, the making of any "untrue statement of material fact" or the omission of any material fact

"necessary in order to make the statements made . . . not misleading."  17 C.F.R § 240.10b–5(b).

While providing a cause of action to securities purchasers or sellers injured by statutory and rule violations, *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 318 (2007), "these latter actions [are] available, not to provide investors with broad insurance against market losses, but to protect them against those economic losses that misrepresentations actually cause." *Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 345 (2005).

To state a claim under § 10(b), a plaintiff must allege facts sufficient to show: (1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation. *R2 Invs. LDC v. Phillips*, 401 F.3d 638, 641 (5th Cir. 2005) (internal citations omitted); *see also Dura Pharm.*, 544 U.S. at 338 (citing 15 U.S.C. § 78u–4(b)(4)).

## 1.    Material Misrepresentations and Omissions

A plaintiff who asserts securities fraud in violation of § 10(b) and Rule 10b–5 must comply with the pleading requirements of Federal Rule of Civil Procedure 9(b) and the Private Securities Litigation Reform Act. *See Lormand v. U.S. Unwired, Inc.*, 565 F.3d 228, 239 (5th Cir. 2009); *see also Tellabs*, 551 U.S. at 322–23.  Rule 9(b) requires the complaint to "state with particularity the circumstances constituting fraud."  FED. R. CIV. P 9(b).   In the Fifth Circuit, "the Rule 9(b) standards require 'specificity as to the statements (or omissions) considered to be fraudulent, the speaker, when and why the statements were made, and an explanation why they are fraudulent." *Plotkin v. IP Axess Inc.*, 407 F.3d 690, 696 (5th Cir. 2005).  "Put simply, Rule 9(b) requires 'the who, what, when, where, and how' to be laid out." *Benchmark Elecs., Inc. v. J.M. Huber Corp.*, 343 F.3d 719, 724 (5th Cir. 2003) (citation omitted); *see also Martin Res. Mgmt. Corp. v. Fed. Ins.*

*Co.*, No. 20-40571, 2021 WL 4269565, at *5 (5th Cir. Sept. 20, 2021); *Neiman v. Bulmahn*, 854 F.3d 741, 746 (5th Cir. 2017).

The Private Securities Litigation Reform Act requires the party to "specify each statement alleged to have been misleading, and the reason or reasons why the statement is misleading." *Neiman*, 854 F.3d at 746 (quoting *Local 731 I.B. of T. Excavators & Pavers Pension Tr. Fund v. Diodes, Inc.*, 810 F.3d 951, 956 (5th Cir. 2016)). "[F]or each act or omission alleged to be false or misleading, plaintiffs must state with particularity facts giving rise to a strong inference that the defendant acted with the requisite state of mind." *Id.* (quoting *Diodes*, 810 F.3d at 956)).

Even if misrepresentations and omissions are pleaded with sufficient specificity, they must be material. There is no bright-line rule; determining materiality is a fact-intensive inquiry into "the source, content, and context" of the allegedly misleading or omitted information. *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 43 (2011). A representation is material if there is a substantial likelihood that a reasonable investor would consider it important in making an investment decision. *Basic Inc. v. Levinson*, 485 U.S. 224, 231 (1988). Omitted facts are material if there is a "substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." *Emp. Ret. Sys. v. Whole Foods Mkt., Inc.*, 905 F.3d 892, 901 (5th Cir. 2018) (quoting *Rosenzweig v. Azurix Corp.*, 332 F.3d 854, 865 (5th Cir. 2003)).

"[T]he disclosure required by the securities laws is measured not by literal truth, but by the ability of the statements to accurately inform rather than mislead prospective buyers." *Lormand*, 565 F.3d at 248. Opinion statements, such as those prefaced by "we believe" or "we think," may, or may not, be actionable. *Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*, 575 U.S. 175, 188 (2015). Whether representations in an opinion statement are actionable depends

on whether (1) "the speaker did not hold the belief she professed" and (2) "the supporting fact she supplied [was] untrue." *Id.* at 185–86.  Whether omissions in an opinion statement are actionable depends on whether the statement "omits material facts about the issuer's inquiry into or knowledge concerning a statement of opinion, and if those facts conflict with what a reasonable investor would take from the statement itself." *Id.* at 189.

Applying these principles, courts have found that "corporate cheerleading" in the form of "generalized positive statements about a company's progress" is not a basis for liability under the securities laws. *Nathenson v. Zonagen Inc.*, 267 F.3d 400, 419 (5th Cir. 2001).  "[N]o reasonable investor would consider such statements material and … investors and analysts are too sophisticated to rely on vague expressions of optimism rather than specific facts." *In re BP p.l.c. Sec. Litig. (BP I)*, 843 F. Supp. 2d 712, 748 (S.D. Tex. 2012) (citing *Krim v. BancTexas Grp.*, Inc., 989 F.2d 1435, 1446 (5th Cir. 1993)).  The statements the plaintiffs rely on must be something more than a corporate officer's generalized optimistic comments about the company's policies, programs, or performance.  As in other areas of the law, "puffery" is not actionable.

### 2.    Scienter

In addition to pleading that specific statements misrepresented or omitted material facts, the plaintiffs must plead that the responsible person acted with the necessary culpability, or scienter.  *Tellabs*, 551 U.S. at 319.  Section 10(b) and Rule 10b–5 are not insurance against bad corporate management.   Rather, they protect only against knowing or severely reckless misstatements. *Shaw Grp.*, 537 F.3d at 535.  "Scienter, in the context or securities fraud, is defined as 'an intent to deceive, manipulate, or defraud or that severe recklessness in which the danger of misleading buyers or sellers is either known to the defendant or is so obvious that the defendant must have been aware of it.'" *Flaherty & Crumrine Preferred Income Fund, Inc. v. TXU Corp.*,

565 F.3d 200, 207 (5th Cir. 2009) (quoting *R2*, 401 F.3d at 643).  "[F]or 'each act or omission alleged,' securities fraud plaintiffs must 'state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind.'"  *Shaw Grp.*, 537 F.3d at 533 (quoting 15 U.S.C. § 78u–4(b)(2)).

The court may consider documents incorporated by reference into the complaint and matters proper for judicial notice.  *BP I*, 843 F. Supp. 2d at 748 (citing *Tellabs*, 551 U.S. at 323).  The court looks to the allegations about an individual's state of mind when that individual made the statement to determine whether the allegations support a strong inference of scienter.  *Tellabs*, 551 U.S. at 33; *Southland Sec. Corp. v. INSpire Ins. Sols., Inc.*, 365 F.3d 353, 364–65 (5th Cir. 2004).  The inference must be "cogent and compelling," not simply "reasonable" or "permissive," and "at least as compelling as any opposing inference one could draw from the facts alleged." *Tellabs*, 551 U.S. at 324.  The court must consider "plausible nonculpable explanations for the defendant's conduct, as well as inferences favoring the plaintiff."  *Id.* at 323-24.  "[O]missions and ambiguities count against inferring scienter, for plaintiffs must 'state with particularity facts giving rise to a strong inference that the defendants acted with the required state of mind.'"  *Id.* at 326 (quoting 15 U.S.C. §78u–4(b)(2)).  "[A]ppropriate allegations of motive and opportunity may meaningfully enhance the strength of the inference of scienter, but . . . allegations of motive and opportunity, without more, will not fulfill the pleading requirements of the [Private Securities Litigation Reform Act]."  *Owens v. Jastrow*, 789 F.3d 529, 539 (5th Cir. 2015) (quoting *Goldstein v. MCI WorldCom*, 340 F.3d 238, 246 (5th Cir. 2003)).  The plaintiffs must plead facts that give rise to a strong inference of scienter, for each individual defendant, for each alleged misstatement.

The plaintiffs cannot simply allege that some other person at the corporation knew of facts that make a challenged statement misleading and impute that knowledge to the speaker.

*Southland*, 365 F.3d at 366.  The plaintiffs must make specific factual allegations about each responsible individual's state of mind when each challenged statement was made.  Allegations about another person's knowledge, or about the defendants' collective knowledge, are insufficient.  Simply pleading that internal information contradicted an individual defendant's public statements is not enough.  *In re BP P.L.C. Sec. Litig. (BP II)*, 852 F. Supp. 2d 767, 817 (S.D. Tex. 2012) (citing *ABC Arbitrage Plaintiffs Grp. v. Tchuruk*, 291 F.3d 336, 356 (5th Cir. 2002)).  To the extent that a plaintiff's scienter argument is based on the availability of some internal document setting out certain facts, the complaint must make specific allegations about the document, its author, contents, and character, and when and by whom it was received, to link it to the person making the challenged statement, at the time the statement was made.  *Abrams v. Baker Hughes Inc.*, 292 F.3d 424, 432 (5th Cir. 2002).

### 3.     Statements of Opinion After *Omnicare*

*Omnicare* clarifies how a trial court should evaluate whether a plaintiff has alleged an actionably misleading statement of opinion.[2]  *Omnicare* provides "two potential avenues for plaintiffs to establish the falsity of an opinion."  *In re BP p.l.c. Sec. Litig.*, No. 4:10-MD-2185, 2016 WL 3090779, at *9 (S.D. Tex. May 31, 2016).  First, "every . . . statement [of opinion] explicitly affirms one fact: that the speaker holds the stated belief."  *Omnicare*, 575 U.S. at 176.  A speaker may be liable for an opinion statement if the speaker did not in fact hold that opinion.  Second, "depending on the circumstances," a reasonable investor could

---

[2]  Even though "*Omnicare* was decided in the context of Section 11 of the Securities Act, courts have overwhelmingly applied its holdings in the context of alleged omissions under Section 10(b) of the Securities Exchange Act . . ." *In re: BP p.l.c. Sec. Litig.*, No. 4:10-MD-2185, 2016 WL 3090779, at *10 (S.D. Tex. May 31, 2016) (collecting cases).  Its analysis bears both on the material misrepresentation aspect of a § 10(b) claim and on the scienter aspect. *Id.*  *Omnicare*'s discussions about an "issuer's" statements are equally applicable to an Exchange Act defendant speaker's statements.

> understand an opinion statement to convey facts about the speaker's basis for holding that view.  Specifically, [a speaker's] statement of opinion may fairly imply facts about the inquiry the issuer conducted or the knowledge it had. And if the real facts are otherwise, but not provided, the opinion statement will mislead by omission.

*Id*. at 188.  Even if

> a speaker's opinion may be sincerely held, the statement may nonetheless be actionable under 10b–5's omissions provision if: (i) the speaker "omits material facts about the issuer's inquiry into or knowledge concerning a statement of opinion," and (ii) "those facts conflict with what a reasonable investor would take from the statement itself."

*In re BP p.l.c. Sec. Litig.*, 2016 WL 3090779, at *9 (quoting *Omnicare*, 575 U.S. at 189).

The *Omnicare* Court emphasized that a plaintiff may not circumvent the particularity and materiality requirements of a § 10(b) claim by alleging in general terms that the defendant improperly failed to reveal the basis for his opinion or failed to disclose "some fact cutting the other way."  575 U.S. at 189.  "Reasonable investors understand that opinions sometimes rest on a weighing of competing facts; indeed, the presence of such facts is one reason why a [speaker] may frame a statement as an opinion, thus conveying uncertainty."  *Id*. at 190.  One hypothetical the *Omnicare* Court raised bears on the dispute here:

> Consider an unadorned statement of opinion about legal compliance: "We believe our conduct is lawful."  If the [speaker] makes that statement without having consulted a lawyer, it could be misleadingly incomplete.  In the context of the securities market, an investor, though recognizing that legal opinions can prove wrong in the end, still likely expects such an assertion to rest on some meaningful legal inquiry—rather than, say, on mere intuition, however sincere. Similarly, if the [speaker] made the statement in the face of [her] lawyers' contrary advice, or with knowledge that the Federal Government was taking the opposite view, the investor again has cause to complain: He expects not just that the issuer believes the opinion (however irrationally), but that it fairly aligns with the information in the [speaker]'s possession at the time.

*Id.* at 188–89.

### 4.    Loss Causation

Under the Private Securities Litigation Reform Act, "the plaintiff shall have the burden of proving that the act or omission of the defendant . . . caused the loss for which the plaintiff seeks to recover damages."  15 U.S.C. § 78u–4(b)(4).  The Act "makes clear Congress' intent to permit private securities fraud actions for recovery where, but only where, plaintiffs adequately allege and prove the traditional elements of causation and loss."  *Broudo*, 544 U.S. at 346.  "To establish proximate causation, the plaintiff must allege that when the 'relevant truth' about the fraud began to leak out or otherwise make its way into the marketplace, it caused the price of the stock to depreciate and, thereby, proximately caused the plaintiff's economic harm."  *Pub. Emps. Ret. Sys. of Miss. v. Amedisys, Inc.*, 769 F.3d 313, 320 (5th Cir. 2014).  The Fifth Circuit has stated that

> [l]oss causation in fraud-on-the-market cases can be demonstrated circumstantially by: (1) identifying a "corrective disclosure" (a release of information that reveals to the market the pertinent truth that was previously concealed or obscured by the company's fraud); (2) showing that the stock price dropped soon after the corrective disclosure; and (3) eliminating other possible explanations for this price drop, so that the factfinder can infer that it is more probable than not that it was the corrective disclosure—as opposed to other possible depressive factors—that caused at least a "substantial" amount of price drop.

*Id.* at 320–21 (internal quotation marks and citation omitted).

Although the corrective-disclosure information need not "precisely mirror" the alleged misrepresentations, *Alaska Elec. Pension Fund v. Flowserve Corp.*, 572 F.3d 221, 230 (5th Cir. 2009) (quotation marks omitted), a corrective disclosure must be "'related to' or 'relevant to' the defendants' fraud and earlier misstatements."  *Amedisys*, 769 F.3d at 321.  "The test for relevant truth simply means that the truth disclosed must make the existence of the actionable fraud more probable than it would be without that alleged fact, taken as true."  *Id.*

### C.      Section 20(a) of the Exchange Act

Under § 20(a) of the Exchange Act, "[e]very person who, directly or indirectly, controls any person" that is found "liable under any provision of this chapter . . . shall also be liable jointly and severally with" the corporation.  15 U.S.C. § 78t(a).  Section 20(a) is a secondary liability provision.  A plaintiff must establish a primary violation under § 10(b) before liability arises under § 20(a).  *ABC Arbitrage*, 291 F.3d at 348 n.57.  A plaintiff's failure to state a claim for a primary securities fraud violation under § 10(b) or Rule 10b–5 causes a claim for control-person liability under § 20(a) to fail as well.  *Fin. Acquisition Partners LP v. Blackwell*, 440 F.3d 278, 288 (5th Cir. 2006).

## III.   Analysis

In its previous opinion, the court held that the Retirement Plans had failed to allege that the substantial compliance statements in the Form 10-Ks were material misrepresentations.   The court held that the Plans had adequately alleged that certain categories of statements were material misrepresentations, but that they had not alleged scienter as to those categories.  Those categories are:

- remediation Statements Related to the 2011 Notice of Violation in Form 10-Qs and Form 10-Ks;

- the 2016 Consent Order Notification in the 2016 Form 10-K; and

- the Report of 2017 Notices of Violation in the 2019 Form 10-Q.

The court granted leave to amend.  The court now addresses whether the Retirement Plans have added allegations sufficient to plead that the substantial compliance statements are material misrepresentations, whether the Plans have adequately alleged scienter and the other requirements of a § 10(b) claim as to the three remaining categories of material misrepresentation claims, and whether the Plan may pursue the alleged claims under § 20(a).

## A.     The Substantial Compliance Statements in the Form 10-Ks

Cabot first stated in its 2015 Form 10-K, filed on February 22, 2016, that it "believe[s] that it substantially compl[ies] with the Clean Water Act and related federal and state regulations." The statement is repeated in Cabot's 2016, 2017, 2018, and 2019 Form 10-Ks.  (Docket Entry No. 110 at ¶ 186).  The court previously held that these statements were not materially and actionably false because the Plans had not sufficiently alleged whether the noncompliant wells identified in their complaint actually made up a substantial part of Cabot's production or number of wells. (Docket Entry No. 109 at 20).  Cabot characterizes these statements as generalized opinions. (Docket Entry No. 111 at 4).  The Plans respond that the statements are actionable because "the defendants knew its primary regulator 'was taking the opposite view.'"  (Docket Entry No. 115-1 at 3).

Cabot is correct that the substantial compliance statements are nonactionable opinions.  *See In re Plains All Am. Pipeline, L.P. Sec. Litig.*, 307 F. Supp. 3d 583, 622 ("The sentence, which contains the 'substantial compliance' qualifier, is a statement of opinion"); *In re Universal Health Servs., Inc., Derivative Litig.*, Civil Action No. 17-2187, 2019 WL 3886838, at *42 (E.D. Pa. Aug. 19, 2019) ("[S]uch [substantial compliance] statements are opinion statements.").  The word "believe" is a quintessential opinion word.  *See Omnicare*, 575 U.S. at 185.

Under *Omnicare*, opinion statements are actionable if the speaker did not sincerely hold that opinion, or if the plaintiffs allege that "(i) the speaker 'omit[ted] material facts about the issuer's inquiry into or knowledge concerning a statement of opinion,' and (ii) 'those facts conflict with what a reasonable investor would take from the statement itself.'"  *In re BP p.l.c. Sec. Litig.*, 2016 WL 3090779, at *9 (quoting *Omnicare*, 575 U.S. at 189).

23

The Retirement Plans do not allege facts that show the belief that Cabot was in substantial compliance was not sincerely held.  To determine whether a defendant's opinion statement is misleading to a reasonable investor, a court "must address the statement's context" by taking "account of whatever facts [the defendant] did provide about legal compliance, as well as any other hedges, disclaimers or qualifications it included in its registration statement." *Omnicare*, 575 U.S. at 196.  Essentially, the Plans must allege a factual basis to infer that Cabot knew of facts conflicting with the statements that it was in substantial compliance with environmental laws and regulations.

The Plans argue that these statements were materially misleading because Cabot omitted known, or recklessly disregarded, information regarding its continuing and outstanding violations for faulty gas wells and insufficient cement bond logs, which downplayed Cabot's potential environmental liabilities and failures to mitigate gas migration issues.  (Docket Entry No. 110 at ¶¶ 186, 190).  The Plans performed a forensic analysis which found that "the 65 noncompliant wells and wells sites were responsible for approximately 13% of Cabot's total Company gas production during the Class Period." (*Id.* at ¶ 150).  The Plans also allege that the noncompliant wells and well sites were responsible for "between 10% to 19%" of Cabot's annual gas production from 2016 to 2019.  *Id.*  The forensic analysis also showed that "the implicated wells generated approximately $1 billion in revenue for Cabot" while "Cabot generated a total of approximately $1.5 billion per-year in revenue on average" between 2016 and 2020.  (*Id.* at ¶ 151).  The Plans clarify that the violating wells represent 11.6% of Cabot's total revenue from 2016 to 2020 in their response.  (Docket Entry No. 113 at 14).

The question is what a reasonable investor understands a "belief that Cabot is in substantial compliance" to mean, and whether the knowledge that around 13% of its wells and wells sites are

noncompliant falls within that meaning.  In *Plains*, the plaintiffs alleged that the pipelines at issue comprised 9 to 10% of the company's pipelines in high-consequence areas and less than 0.008% of the total pipelines.  *Police & Fire Ret. Sys. of City of Detroit v. Plains All Am. Pipeline, L.P.*, 777 F. App'x 726, 728 (5th Cir. 2019).  The court concluded that the compliance statements were not misleading because the failures occurred in a small percentage of the overall and high-consequence area pipelines.  *Id.* at 731.  In *In re Universal Health Servs.*, the plaintiffs alleged that 25 of the 300 total behavioral facilities were under investigation.  2019 WL 3886838, at *42.  The court concluded that because only a small number of facilities experienced compliance issues, the defendants had "a reasonable basis for believing that the company was in substantial compliance" with regulations.  *Id.*  Courts have dismissed § 10(b) claims despite allegations of belief in substantial compliance statements made by the defendants.  *See Kushner v. Beverly Enters., Inc.*, 317 F.3d 820, 826 (8th Cir. 2003); *In re Express Scripts, Inc.*, No. 04CV1009, 2010 WL 2671456, at *10 (E.D. Mo. June 30, 2010); *Anderson v. Abbott Lab'ys*, 140 F. Supp. 2d 894, 901 (N.D. Ill. 2001).

The Retirement Plans cite *Meyer v. Jinkosolar Holdings Co.*, 761 F.3d 245 (2d Cir. 2014), in support of their position that Cabot's substantial compliance statements are actionable.  In *Meyer*, JinkoSolar manufactured solar cells and solar panel products, primarily using facilities located in China.  *Id.* at 246.  In a prospectus, JinkoSolar explained its potential pollution risks but also described the actions it was taking to comply with environmental laws:

> We generate and discharge chemical wastes, waste water, gaseous waste and other industrial waste at various stages of our manufacturing process as well as during the processing of recovered silicon material.  We have installed pollution abatement equipment at our facilities to process, reduce, treat, and where feasible, recycle the waste materials before disposal, and we treat the waste water, gaseous and liquid waste and other industrial waste produced during the manufacturing process before discharge. We also maintain

> environmental teams at each of our manufacturing facilities to
> monitor waste treatment and ensure that [these] waste emissions
> comply with [People's Republic of China] environmental standards.
> Our environmental teams are on duty 24 hours.  We are required to
> comply with all PRC national and local environmental protection
> laws and regulation . . . .

*Id.* at 247–48.  A month later, it was reported that one of JinkoSolar's plants was "not disposing

of hazardous solid waste in accordance with relevant disposal methods."  *Id.* at 248.  The *Meyer*

court found the compliance statement to be a misleading omission.  *Id.* at 251.  The court reasoned

that when JinkoSolar issued its prospectus stating that it had environmental teams on duty 24

hours, that it treated "the waste water, gaseous and liquid waste and other industrial waste produced

during the manufacturing process before discharge," and that it maintained environmental teams

to ensure compliance, that statement was at odds with the inference that Jinkosolar had knowledge

that none of this was true as to one of its China plants.  *Id.* at 251.  As the *Meyer* court noted, "[o]ne

cannot, for example, disclose in a securities offering a business's peculiar risk of fire, the

installation of a comprehensive sprinkler system to reduce fire danger, and omit the fact that the

system has been found to be inoperable, without misleading investors."  *Id.*

   But *Meyer* is distinguishable.  In *Meyer*, the issue was that a company represented having

comprehensive and successful tools and systems in place to prevent noncompliance with

environmental requirements, but knew that those very tools were not actually working.  Cabot did

not hide that it had some noncompliance issues.  As discussed in the court's previous opinion,

Cabot represented that it received Notices of Violation from time to time in its Form 10-Ks.  (*See*

Docket Entry No. 109 at 8).  At issue is its representation that it believed it was in substantial

compliance despite the Notices of Violation that it received.

   A 13% noncompliance rate—in other words, an 87% compliance rate—does not rise to a

level that overcomes Cabot's belief that it substantially complied with federal and state

regulations.[3]   A reasonable investor would understand Cabot's belief that it was in "substantial compliance" to mean that Cabot understood that most of its wells that were in compliance.  *See, e.g.*,   *Substantial*,   MERRIAM-WEBSTER   DICTIONARY,   https://www.merriam-webster.com/dictionary/substantial (last visited August 9, 2022) (defining substantial as "important,   essential")   ;   *Substantial*,   COLLINS   DICTIONARY, https://www.collinsdictionary.com/us/dictionary/english/substantial (last visited on August 9, 2022) (defining substantial as "large in amount or degree").  A reasonable investor would not find it misleading for a company to report substantial compliance if it operated with the knowledge that close to nine out of ten of its wells and well sites were in compliance.

Cabot's substantial compliance statements are not materially false or misleading.  The Retirement Plans have not adequately alleged that Cabot lacked a reasonable basis to make the statements when they were made.  Because the statements as to substantial compliance are not materially false or misleading, the Retirement Plans have failed to state a Section 10b claim as to these statements.  Because the allegations as to these statements have been amended without curing the pleading deficiencies, further amendment would be futile. The Section 10b claim based on this category of misstatements is dismissed with prejudice and without leave to amend.

**B.    Scienter**

The court previously dismissed the three other categories of alleged misrepresentations because although the Retirement Plans adequately pleaded that they were actionable material

---

[3] The noncompliance rate may be even smaller still.  Cabot argues that the Retirement Plans' forensic analysis is based on wells and well sites that are outside the class period and should not have been included. (Docket Entry No. 111 at 3).  The Plans concede in their response that "if the analysis only included those wells and well sites with unresolved violations during the Class Period," they would account for "approximately 7.4% of Cabot's Class Period production."  (Docket Entry No. 113 at 14).

misrepresentations, the Retirement Plans had not adequately alleged scienter.  (Docket Entry No. 109 at 28–29).  The categories are restated in full below:

1. ***Statements About Remediation Efforts Related to the 2011 Notice of Violation in Form 10-Qs and Form 10-Ks***.  Cabot's 2015 Form 10-K stated that the company had received a Notice of Violation from the Pennsylvania Department of Environmental Protection in September 2011 for failing to prevent the migration of methane gas into fresh groundwater sources in Susquehanna County.  Cabot stated that: it was "engaged with the PaDEP in investigating the incident and ha[s] performed appropriate remediation efforts, including the provision of alternative sources of drinking water to affected residents"; it believed "the source of methane has been remediated and [that it was] working with the PaDEP to reach agreement on the disposition of this matter"; it had received a proposed Consent Order that, if finalized, would result in a civil penalty of between $100,000 and $300,000; and it would continue to work to bring the matter to a close.  (*Id.* at ¶ 187).  Similar statements were made in Cabot's Form 10-Qs filed in May 2016, July 2016, and October 2016.  (*Id.* at ¶ 188).

2. ***The Notification About the 2016 Consent Order in the 2016 Form 10-K***.  In its 2016 Form 10-K, Cabot notified investors that it had finalized a new Consent Order and Agreement with the Pennsylvania Department of Environmental Protection.  (*Id.*).  Cabot stated:

> We believe the source of methane has been remediated and we entered into a Consent Order and Agreement with the PaDEP on December 30, 2016.  We agreed to pay a civil monetary penalty in the amount of approximately $0.3 million and to continue to provide alternative sources of drinking water to affected residents until the affected water supplies are permanently restored.  Further, the related gas well is being permanently plugged.  Following the plugging of the gas well, additional monitoring will be required to ensure the source of methane has been remediated.  Cabot continues to work with the PaDEP to bring this matter to a close.

3. ***The Report of 2017 Notices of Violation in the 2019 Form 10-Q***.  In July 2019, Cabot

filed its 2019 Form 10-Q with the Securities and Exchange Commission, reporting that it

had received two proposed Consent Orders and Agreements related to two Notices of

Violation from the Pennsylvania Department of Environmental Protection.  (*Id.* at ¶ 205).

Cabot stated:

> We will continue to work with the PaDEP to finalize the [Consent
> Orders and Agreements], and to bring this matter to a close.  With
> regard to the November 2017 Notice of Violation, the proposed
> Consent Order and Agreement, if finalized as drafted, would require
> Cabot to submit a detailed written remediation plan, continue water
> sampling and other investigative measures and restore or replace
> affected water supplies and would result in the payment of a civil
> monetary penalty in an amount likely to exceed $100,000, up to
> approximately $355,000.  We will continue to work with the PaDEP
> to finalize the Consent Order and Agreement, and to complete the
> ongoing investigation and remediation.

Cabot also addressed a June 2017 Notice of Violation, stating that it believed the water-

quality complaints had been resolved through remediation and that it was working with the

Pennsylvania Department of Environmental Protection.  (*Id.* at ¶ 207).

These three categories of misstatements all involve statements that Cabot was working

towards completing, or had completed, remediation of various sites as to which it had received

Notices of Violation.  The specific questions are whether the amended complaint cures the scienter

deficiency by alleging facts that support a strong inference that Stalnaker, Dinges, and Schroeder

each made the identified statements with knowledge or reckless disregard as to the following facts:

(1) throughout 2016, Cabot had not actually remediated a gas methane leak identified in a 2011

Notice of Violation; (2) the source of methane identified in the 2016 10-K had not been remediated;

and (3) Cabot was not in fact taking steps in July 2019 to remediate the well sites that had been

identified in two 2017 Notices of Violation that it had received.  These well sites included at least the Stalter, Howell, and Jeffers Farm wells.  (Docket Entry No. 111 at 23).

The court can first quickly dispose of Stalnaker's liability as to any of the misstatements.  Only CEO Dinges and CFO Schroeder can be considered potentially liable parties for the misstatements.  The Retirement Plans alleged that Stalnaker was involved in preparing SEC filings, including Form 10-Ks and 10-Qs, concerning Susquehanna operations, (*id.* at ¶ 234), but the Plans "failed to allege that Stalnaker himself made any misstatements or misrepresentations."  (See Docket Entry No. 109).  Unlike Schroeder and Dinges, Stalnaker did not sign any of the Form 10-Ks and 10-Qs.

The Plans rely on *Janus Cap. Grp., Inc. v. First Derivative Traders*, 564 U.S. 135 (2011), to argue that Stalnaker can be considered a "maker" of the Form 10-K and 10-Q statements. The "maker of a statement is the person or entity with ultimate authority over the statement, including its content and whether and how to communicate it."  *Id.* at 142.  Stalnaker did not have ultimate authority over Cabot's Form 10-Ks and 10-Qs.  "For purposes of Rule 10b–5, the maker of a statement is the person or entity with ultimate authority over the statement, including its content and whether and how to communicate it."  *Id.*  Although Stalnaker was involved in preparing these filings, preparation is not equivalent to the signing and certification done by Dinges and Schroeder.

The Retirement Plans also attempt to rely on *In re SolarWinds Corp. Sec. Litig.*, 21-CV-138-RP, 2022 WL 958385 (W.D. Tex. Mar. 30, 2022), in which the court held that the defendant was the maker of a challenged misrepresentation because he "reviewed and approved" the statement.  *Id.* at *10.  There are no allegations that Stalnaker was in a position to approve of the Form 10-Ks and 10-Qs.  Because the Retirement Plans have failed to allege facts sufficient to

establish Stalnaker as a maker of any of the actionable misrepresentations, the claims against him are dismissed.

The Retirement Plans allege that the following facts support their claim that CEO Dinges and CFO Schroeder acted with scienter when making the misrepresentations:

- the "Defendants' knowledge of and access to information and reports reflecting that Cabot was not in compliance with relevant environmental laws and prior order from the Pennsylvania Department";

- the "Defendants' obligations associated with Cabot's disclosure controls and environmental compliance";

- that the "misstatements and omissions of material facts concerned the Company's core operations."

(Docket Entry No. 110 at ¶ 213).  The Retirement Plans support their allegations that CEO Dinges and CFO Schroeder made the statements at issue knowing or recklessly disregarding the material falsity of the statements by pointing to various factors that show scienter.  These arguments are analyzed below.

### 1. Alleged Facts That Do Not Contribute to Finding a Strong Inference of Scienter

The court first addresses  alleged facts that do not appear to contribute to a strong inference of scienter.  The alleged facts regarding motive do not support an inference of scienter.  The Plans allege that Cabot's focus on efficiency to increase revenue was a result of the "highly competitive industry," and that Cabot's better resourced competitors motivated it to ignore environmental compliance.  (*Id.* at ¶ 240–42).  A general drive toward efficiency and the presence of competition do not support an inference that a company is motivated to knowingly commit continuing violations of environmental laws and regulations to cut costs and increase revenues.  *See Owens*, 789 F.3d at 539 ("The desire to raise capital in the normal course of business does not support a strong inference of scienter because virtually all corporate insiders share this goal."); *cf. Goldstein*,

340 F.3d at 249–50 (corporate officials knew that certain statements regarding the company's financials were incorrect but their strong motive to avoid correcting them until after a "crucial" corporate merger supported an inference of scienter).

The Plans also allege that Cabot "continuously violated its own policies throughout the Class Period," enhancing the inference of scienter.  (*Id.* at ¶ 243).  In *Abrams*, the court concluded that the plaintiffs' allegations that the defendants violated company policy were not enough to support a securities fraud action.  292 F.3d at 433.  The *Abrams* court cited *Novak v. Kasaks*, 216 F.3d 300 (2d Cir. 2000), in which the defendants approved a practice that violated the company's policy, knew this practice was the reason for inventory growth, and gave false explanations for this growth.  *Novak*, 216 F.3d at 311–12.  In *Abrams*, the court found "no such allegations of actual knowledge or intentional or deliberate behavior."  *Abrams*, 292 F.3d at 433.  As in *Abrams*, and unlike in *Novak*, there are no allegations that CEO Dinges or CFO Schroeder made their statements with actual knowledge that, or reckless disregard as to whether, Cabot was violating its own policies.

The Plans allege that Dinges's knowledge or reckless disregard for the truth of his statements about Cabot's compliance with environmental regulations during the Class Period can be inferred from his public statements outside that Period.  (*Id.* at ¶ 226).  The Plans allege that Dinges falsely communicated Cabot's commitment to environmental compliance through various press releases and conference calls from April 2010 to July 2012, and that Dinges's "intimate personal involvement in promising investors and the public that Cabot was addressing problems" evidences scienter.  (*Id.* at ¶¶ 226–28, 230–32).  The allegations are insufficient to establish an inference of scienter.  Dinges's alleged public statements outside the Class Period do not support an inference of scienter.

Allegations that CEO Dinges and CFO Schroeder signed Sarbanes-Oxley certifications do not support a strong inference of scienter.  (*Id.* at ¶ 245).  In *Cent. Laborers' Pension Fund v. Integrated Elec. Servs. Inc.*, 497 F.3d 546 (5th Cir. 2007), the Fifth Circuit held that the Sarbanes–Oxley certifications did not permit an inference of scienter.  *Id*. at 555.  The court relied on an Eleventh Circuit case, *Garfield v. NDC Health Corp.*, 466 F.3d 1255, 1266 (11th Cir. 2006), which held that "a Sarbanes–Oxley certification is only probative of scienter if the person signing the certification was severely reckless in certifying the accuracy of the financial statements."  A strong inference of scienter is proper "if the person signing the certification had a reason to know, or should have suspected, due to the presence of glaring accounting irregularities or other 'red flags,' that the financial statements contained material misstatements or omissions."  *Garfield*, 466 F.3d at 1266.  Here, the alleged misstatements do not involve glaring irregularities or red flags that would have provided a basis to believe that the Form 10-Ks and 10-Qs contained material misrepresentations.

Allegations of Dinges's insider trading fare no better.  The Plans allege that Dinges sold 66,610 shares of Cabot stock in 2017, the only time during the Class Period that he sold stock.  (*Id.* at ¶¶ 248–49).  The Plans allege that other executive Cabot officers, including Cabot's General Counsel and its Senior Vice President of Marketing sold significant amounts of stock during the Class Period as well.  (*Id.* at ¶ 250–52).  The Plans allege that these stock sales are suspicious in timing and scope and support a motive to commit fraud.  (*Id.* at ¶ 253).

"Insider stock sales may be probative of scienter . . . if they occur in 'suspicious amounts or at suspicious times.'"  *Shaw Grp.*, 537 F.3d at 543 (quoting *Abrams*, 292 F.3d at 435).  Sales that are "out of line with prior trading practices or [made] at times calculated to maximize personal profit" may generate suspicion, and both "culpable and nonculpable explanations for stock sales .

33

. . must be considered." *Id.* (quoting *Cent. Laborers'*, 497 F.3d at 553).  In the January 2022 Memorandum and Opinion, the court sought allegations from the Retirement Plans regarding "how many shares Dinges had remaining" after selling his stock and "how Dinges timed the sale to maximize personal profit."  (Docket Entry No. 109 at 28).

The Plans' amended complaint still fails to show that Dinges's stock sale was suspicious. Although the Retirement Plans allege stock sales from other Cabot executives, the amended complaint fails to allege that "any other defendant sold stock during the same period."  (Docket Entry No. 109 at 28).  *See Local 731*, 810 F.3d at 960 ("[E]ven unusual sales by one insider do not give rise to scienter when other defendants do not sell some or all of their shares during the Class Period." (quoting Abrams, 292 F.3d at 435)).  Courts typically find that "[t]he fact that the other defendants did not sell their shares during the relevant class period undermines plaintiffs' claim" of scienter.  *Nathenson*, 267 F.3d at 421 (quoting *Acito v. IMCERA Grp., Inc.*, 47 F.3d 47, 54 (2d. Cir. 1995)).  The stock sales by Dinges and the other executives do not support a strong inference of scienter.

### 2.    Alleged Facts That Do Contribute to Strong Inference of Scienter

Allegations that: (1) Cabot operates in a highly regulated industry, requiring vigilant monitoring the company's compliance with environmental law; (2) its Susquehanna County gas operations are "existential" to the company; (3) Cabot received hundreds of Notices of Violation over the Class Period, demonstrating a "sustained course of misconduct";  (4) Cabot "exhibited a pattern of willful violation of applicable environmental laws, regulations and other legal obligations" for more than a decade; and (5) "Cabot was criminally charged with knowing violations of Pennsylvania environmental law" based on a grand jury investigation that found that Cabot's failure to remediate was known to Cabot and the individual defendants based on regularly

occurring meetings and reports, taken together, support an inference of scienter.  (*Id.* at ¶¶ 215, 217, 237–39, 244, 247).  The allegations support a reasonable inference that Cabot's executives were aware of pervasive and prolonged failures to remediate well sites in a particular area that affected residential homes, despite extensive regulations requiring remediation and compliance.  *See Miss. Pub. Emps.' Ret. Sys. v. Bos. Sci. Corp.*, 523 F.3d 75, 91 (1st Cir. 2008) (scienter could be inferred based on the occurrence of fraud due to combination of facts, including that the defendants received reports and were in a highly regulated industry, and the allegations supported an inference that the company had "highly effective information systems"); *In re ArthroCare Corp. Sec. Litig.*, 726 F. Supp. 2d 696, 725 (W.D. Tex. 2010) ("[T]he presence of significant, repeated red flags, the role of the Individual Defendants in the company, the magnitude and duration of the Restatement and the fraud, the allegations of insider trading, and the Sarbanes–Oxley certifications—collectively give rise to a strong inference of at least severe recklessness on the part of the Individual Defendant."); *In re Enron Corp. Sec., Derivative & ERISA Litig.*, 235 F. Supp. 2d 549, 693 (S.D. Tex. 2002) (scienter was "partially satisfied by allegations of a regular pattern of related and repeated conduct"); *In re Bristol Myers Squibb Co. Sec. Litig.*, 568 F. Supp. 2d 148, 168 (S.D.N.Y. 2008) (finding that a Department of Justice investigation was "relevant to the holistic view of the purported facts as they relate to scienter"); *In re Geneva Sec. Litig.*, 932 F. Supp. 2d 352, 380 (E.D.N.Y. 2013) ("While the existence of an investigation alone is not sufficient to give rise to a requisite cogent and compelling inference of scienter, it may be considered by the [c]ourt as part of its analysis."); *Utesch v. Lannett Co.*, 385 F. Supp. 3d 408, 423 (E.D. Pa. 2019) (a State Attorney General's investigation, which had resulted in criminal charges against the company, coupled with other governmental investigations, could support an inference of scienter).

These allegations alone do not support the strong inference required under the Private Securities and Litigation Reform Act.  More is needed to link the specific defendants—Dinges and Schroeder—to knowledge of Cabot's prolonged failures to remediate the specific violations addressed in the alleged misrepresentations.  *See Owens,* 789 F.3d at 541, 544 (rejecting the plaintiff's scienter argument even though "the magnitude [of the misstatement] was undoubtedly large," in part because there were no allegations that the individual defendants were specifically placed on notice that the company's deficient models would lead to a significant overvaluation).

The Plans have made that link in their amended complaint by alleging facts specifically showing that Dinges and Schroeder were routinely apprised of well-site violations and problems with remediation.  The Plans allege that reports of "investigations, notices of violations, and remediation activities" were provided to Cabot's Board at meetings attended by Dinges and Schroeder multiple times a year.  (*Id.* at ¶ 219).  The Plans allege that Dinges and Schroeder, as Board members, received quarterly updates reporting "the number of violations, large spill cleanups and remediation cases."  (*Id.* at ¶¶ 221, 223).  The Plans allege that Dinges had investor conference calls, such as a May 1, 2020, call, in which he discussed "unplanned downtime related to remedial work."  (*Id.* at ¶ 222).  The Plans allege that Stalnaker kept in "constant communication" with Dinges.  (*Id.* at ¶ 224).  Stalnaker attended daily meetings where spills, Pennsylvania Department visits, cementing problems, landowner complaints, and violations were discussed.  (*Id.* at ¶ 235).  Stalnaker was informed of every Notice of Violation, and managers reported all stray gas leaks to Stalnaker.  (*Id.*).  The Plans allege that Stalnaker received Board materials, such as the quarterly update reports, and was required to sign off on reports of remediation activities.  (*Id.* at ¶ 236).  The Plans also allege that Cabot maintained a weekly conference call regarding safety and environmental issues.  (*Id.* at ¶ 224).  The Plans allege that

Cabot kept an ongoing log of these issues, which Dinges and Schroeder had access to as CEO and CFO.  (*Id.*).

The Plans also allege that Dinges and Schroeder received quarterly update reports.  (*Id.* at 221, 223, 236).  The Plans allege that the report authors, Cabot employees within the Environmental Health & Safety Department, would send information to John Smelko, the Environmental Regional Manager, who gave the information to Gordon Ganaway, Director of Safety & Environmental Compliance.  (*Id.* at ¶ 181).  The Plans allege that the reports included details as to the number of violations, larger spill cleanups, remediation cases with potential for private lawsuits, and gas migration cases and their remediation status.  (*Id.* at ¶ 183).  The Plans allege that the reports were prepared and received in advance of the Board meetings, which occurred six times per year between 2015 and 2020.  (*Id.* at ¶ 180).

The court previously found that the Plans failed to plead that "the individual officers were aware of continuing violations and failures to remediate beyond what the Notices of Violations provided."  (Docket Entry No. 109 at 26).  In the Plans' consolidated complaint, they failed to allege "instances in which specific individual officers were apprised of facts contradicting their subsequent public statements."  *Id.*  To satisfy the heightened pleading standard, a plaintiff must make allegations "specifying who prepared internal company reports, how frequently the reports were prepared and who reviewed them."  *ABC Arbitrage*, 291 F.3d at 356.  The allegations must include details about "the document, its author, content, character, and when and by whom it was received."  *Abrams*, 292 F.3d at 432; *see also In re Scholastic Corp. Sec. Litig.*, 252 F.3d 63, 73 (2nd Cir. 2001) ("Plaintiffs have satisfied this [pleading] standard by specifying who prepared internal company reports, how frequently the reports were prepared and who reviewed them.").

The Plans' allegations in their amended complaint satisfy this pleading standard.  These allegations support an inference that Dinges and Schroder had knowledge that: (1)  throughout 2016, Cabot had not actually remediated a gas methane leak identified in a 2011 Notice of Violation; (2) the source of methane identified in the 2016 Form 10-K had not been remediated; and (3) Cabot was taking steps as late as July 2019 to remediate the well sites that had been identified in two 2017 Notices of Violation.  The alleged facts that Dinges and Schroeder received detailed quarterly reports six times a year describing the number of violations, larger spill cleanups, remediation cases with potential for private lawsuits, and all gas migration cases and their remediation status, is sufficient to support a strong inference that Dinges and Schroeder knew that many wells leaking contaminants had not been remediated years after the violations had been reported.

Although "[a] district court may best make sense of scienter allegations by first looking to the contribution of each individual allegation to a strong inference of scienter," it must "follow this initial step with a holistic look at all the scienter allegations." *Owens*, 789 F.3d at 537.  The question is whether "all of the facts alleged, taken collectively, give rise to a strong inference of scienter." *Tellabs*, 551 U.S. at 323.

Taken together, the allegations of the quarterly update reports that Dinges and Schroeder received detailing gas migration and remediation issues, the grand jury investigation and resulting criminal charges, the allegations that Cabot was in a highly regulated industry but had a pattern of recurrent violations in wells that were at the core of its operations and located in sensitive residential areas all support a strong inference of scienter that Dinges and Schroeder knew that their statements about remediation were materially false when made.  The inference that these

defendants acted with scienter is at least as strong as the inference that they acted without it. *Tellabs*, 551 U.S. at 324.  And "a tie favors the plaintiff."  *Lormand*, 565 F.3d at 254.

### C.      Loss Causation

Cabot argues that the Retirement Plans fail to plead loss causation.  To establish loss causation under § 10(b), it is not enough for a plaintiff to allege a stock purchase at inflated prices and a stock price decline after a negative news report.  *Archdiocese of Milwaukee Supporting Fund, Inc. v. Halliburton Co.*, 597 F.3d 330, 340–41 (5th Cir. 2010), *vacated on other grounds*, 563 U.S. 804 (2011).  The loss must result from a truth having "ma[de] its way into the marketplace," not as a result of "changed economic circumstances, changed investor expectations, new industry-specific or firm-specific facts, conditions," or other factors independent of the alleged fraud.  *Dura*, 544 U.S. at 342–43.

The Fifth Circuit has held that the Rule 8(a) and 12(b)(6) plausibility pleading standard, not heightened pleading, is sufficient to plead loss causation.  *Lormand*, 565 F.3d at 258 ("[W]e conclude that Rule 8(a)(2) requires the plaintiff to allege, in respect to loss causation, a facially 'plausible' causal relationship between the fraudulent statements or omissions and plaintiff's economic loss, including allegations of a material misrepresentation or omission, followed by the leaking out of relevant or related truth about the fraud that caused a significant part of the depreciation of the stock and plaintiff's economic loss or, as *Twombly* indicates, the complaint must allege enough facts to give rise to a reasonable hope or expectation that discovery will reveal evidence of the foregoing elements of loss causation." (internal citations omitted)).  A court is "not authorized or required to determine whether the plaintiff's plausible inference of loss causation is equally or more plausible than other competing inferences, as [it] must in assessing allegations of scienter under the [Private Securities Litigation Reform Act]."  *Id.* at 267.

The Retirement Plans allege that two disclosures caused Cabot's stock price to decrease, one on July 26, 2019, and one on June 15, 2020.  The 2019 disclosure, which the Plans allege was a "partial" corrective disclosure, occurred after Cabot issued "disappointing production guidance" and disclosed that it had received "two proposed Consent Order and Agreements from the Pennsylvania Department 'relating to gas migration allegations in areas surrounding several wells owned and operated by [it] in Susquehanna County, Pennsylvania.'"  (Docket Entry No. 110 at ¶ 258).  Cabot also disclosed the Consent Order and Agreement regarding the November 2017 Notices of Violation for failing to prevent gas migration into groundwater sources.  (*Id.*)   The Plans also alleged that the "disappointing production guidance" related back to the fact that because of Cabot's failures to remediate, it had not been permitted by the Pennsylvania Department to start drilling again in the Dimock Box.  (Id. at ¶ 259).  The Plans allege that this disclosure resulted in a 12% decline in Cabot's stock price, while the Dow Jones Index fell by less than half a percent.  (*Id.* at ¶ 260).

The 2020 disclosure occurred after "the Pennsylvania's Attorney General's office charged Cabot with fifteen criminal counts" regarding "its failure to remediate faulty gas wells."  (*Id.* at ¶ 262).  The Plans allege that this disclosure resulted in a more than 3% decline while the Dow Jones Index slightly increased.  (*Id.* at ¶ 263).  The Plans also presented a chart showing Cabot's stock price movements over the Class Period:



(*Id.* at ¶ 264).

Cabot argues that the Retirement Plans fail to allege facts showing that the disclosures "revealed anything about alleged noncompliance on or after the dates of the challenged disclosures regarding the wells specifically at issue in those disclosures." (Docket Entry No. 111 at 23). Cabot also argues that the Plans must allege facts showing that "the disclosure of the PaDEP notices– with an estimated maximum penalty of just $215,000, an immaterial sum to Cabot's earnings – caused a material portion of the decline." (*Id.* at 29). Last, Cabot argues that the 3% dip was not out of the ordinary, as shown by the chart, and that other natural gas companies' securities also experienced similar dips on June 15, 2020. (*Id.* at 30).

To plead loss causation, a plaintiff must plausibly allege facts "(1) identifying a 'corrective disclosure' (a release of information that reveals to the market the pertinent truth that was previously concealed or obscured by the company's fraud); (2) showing that the stock price dropped soon after the corrective disclosure; and (3) eliminating other possible explanations for this price drop, so that the factfinder can infer that it is more probable than not that it was the corrective disclosure—as opposed to other possible depressive factors—that caused at least a 'substantial' amount of price drop." *Amedisys, Inc.*, 769 F.3d at 320–21.

A corrective disclosure need not be a direct admission that a prior statement was false. *See Alaska Elec. Pension Fund v. Flowserve Corp.*, 572 F.3d 221, 230 (5th Cir. 2009) ("[A] disclosure need not precisely mirror an earlier misrepresentation."). However, a corrective disclosure must at least be "relevant to" a prior misrepresentation. *Lormand*, 565 F.3d at 256 n.20.

The Plans have adequately alleged two corrective disclosures. The 2019 disclosure that Cabot was still working on remediating the issues in 2017 Notices of Violation, along with the fact that it had disappointing production because it was not permitted to drill in the Dimock Box, were relevant to Cabot's previous misrepresentations that it had remediated violations identified in 2015 and 2016. The 2020 disclosure of the grand jury investigation and the criminal charges is relevant to the prior misrepresentations about remediation in the Dimock Box. The Plans have also alleged that stock drops followed these disclosures, and the Plans have eliminated other explanations for the price decreases by comparing them against the general market price movement. At the motion to dismiss stage, these allegations are sufficient to support a reasonable inference of loss causation. *See Amedisys*, 769 F.3d at 326 ("Where the Complaint sets forth specific allegations of a series of partial corrective disclosures, joined with the subsequent fall in [] stock value, and in the absence of any other contravening negative event, the plaintiffs have complied with . . . loss causation."); *Lormand*, 565 F.3d at 267 n.35 ("[I]t is often inappropriate to use a Rule 12(b)(6) motion as a vehicle to resolve disputes over 'loss causation.'"); *cf. Greenberg v. Crossroads Sys., Inc.,* 364 F.3d 657, 665 n.9 (5th Cir. 2004) (requiring at summary judgment that plaintiffs point to evidence that a drop in stock price was statistically significant).

The Plans have adequately pleaded loss causation.

### D.    Section 20(a) Liability

Under § 20(a) of the Exchange Act, "[e]very person who, directly or indirectly, controls any person" that is found "liable under any provision of this chapter . . . shall also be liable jointly and severally with" the corporation.  15 U.S.C. § 78t(a).  Section 20(a) is a secondary liability provision.  A plaintiff must establish a primary violation under § 10(b) before liability arises under § 20(a).  *ABC Arbitrage,* 291 F.3d at 348 n.57.

Having alleged primary liability, the Retirement Plans have stated a claim under § 20(a) as to Dinges and Schroeder.  However, the Plans have not alleged facts supporting an inference that Stalnaker was a "control person" of Cabot, Dinges, or Schroeder.  The Plans have pleaded Section 20(a) claims as to Dinges and Schroeder.

## IV.    Conclusion

The defendants' motion to dismiss, (Docket Entry No. 111), is granted in part and denied in part.  To the extent the Plans' claims in its first amended complaint are based on the substantial compliance statements, or are asserted against Stalnaker, they are dismissed with prejudice because leave to amend has already been granted and the first amended complaint fails to cure previous identified deficiencies.  To the extent the claims are based on the following categories of statements, they may proceed:

- the statements about remediation related to the 2011 Notice of Violation in Form 10-Qs and Form 10-Ks;

- the 2016 Consent Order Notification in the 2016 Form 10-K; and

- the Report of 2017 Notices of Violation in the 2019 Form 10-Q.

An initial conference is scheduled for **August 26, 2022**, at 10:45 a.m. C.D.T. by video to set a scheduling order.   A zoom link will be separately sent.

SIGNED on August 10, 2022, at Houston, Texas.

Lee H. Rosenthal
Chief United States District Judge