**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | |
|---|---|
| DELAWARE COUNTY EMPLOYEES RETIREMENT SYSTEM, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiffs,<br><br>v.<br><br>CABOT OIL & GAS CORPORATION, *et al.*,<br><br>Defendants. | Case No: 4:21-CV-02045 |

## DEFENDANTS' RESPONSE IN OPPOSITION TO CLASS CERTIFICATION

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................................ 1

NATURE AND STAGE OF PROCEEDINGS ................................................................ 3

STATEMENT OF QUESTION INVOLVED ................................................................. 3

FACTUAL BACKGROUND ........................................................................................... 4

    The Surviving Alleged Misstatements .................................................................... 4

    Categories 1 and 2: The Stalter Wells .................................................................... 4

    Category 3: The Howell Wells and Jeffers Farms Pad 2 Wells ........................... 6

    Alleged Corrective Disclosure 1 ............................................................................. 9

    Alleged Corrective Disclosure 2 ........................................................................... 10

    The Subsequent Plea Agreement and Consent Orders ..................................... 11

    The Event Studies and Economic Evidence ....................................................... 13

ARGUMENT AND AUTHORITIES ............................................................................ 16

I.     THE EVIDENCE REFUTES ANY CLASSWIDE PRESUMPTION OF RELIANCE ............................................................................................................. 16

II.    PLAINTIFFS' ANTICIPATED COUNTER-ARGUMENTS ARE MERITLESS ......... 23

CONCLUSION AND PRAYER FOR RELIEF ........................................................... 25

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re Aceto Corp. Secs. Litig.*,
   2019 WL 3606745 (E.D.N.Y. Aug. 6, 2019) ........................................................15

*Allergan, Inc. v. Teva Pharms. USA, Inc.*,
   2017 WL 4803941 (E.D. Tex. Oct. 16, 2017) ......................................................20

*In re Allstate Corp. Secs. Litig.*,
   966 F.3d 595 (7th Cir. 2020) ................................................................................1

*Basic Inc. v. Levinson*,
   485 U.S. 224 (1988) ....................................................................................18, 23

*Brooks v. Lincoln Nat. Life Ins. Co.*,
   No. 5:03CV256, 2008 WL 623222 (E.D. Tex. Mar. 5, 2008) ..............................17

*Carpenters Pension Trust Fund of St. Louis v. Barclays Plc*,
   310 F.R.D. 69 (S.D.N.Y. 2015) ....................................................................18, 24

*Chamberlin v. Fisher*,
   885 F.3d 832 (5th Cir. 2018) (Costa, J., dissenting) ............................................20

*In re Chicago Bridge & Iron Co.*,
   2019 WL 5287980 (S.D.N.Y. Oct. 18, 2019) ......................................................24

*City of Sterling Heights Gen. Empls. Ret. Sys. v. Prudential Fin., Inc.*,
   2015 WL 5097883 (D.N.J. Aug. 31, 2015) ........................................................24

*Comcast Corp. v. Behrend*,
   569 U.S. 27 (2013) ..............................................................................................16

*Delaware County Empls. Ret. Sys. v. Cabot Oil & Gas Corp.*,
   -- F. Supp. 3d --, 2022 WL 3227584 (S.D. Tex. Aug. 10, 2022) .......................3, 4

*Donato v. Insys Therapeutics Inc.*,
   2017 WL 3268797 (D. Ariz. Aug. 1, 2017) ........................................................25

*Donato v. Insys Therapeutics, Inc.*,
   333 F.R.D. 427 (D. Ariz. 2019) ..........................................................................25

*Eng v. Edison Int'l*,
   2018 WL 1367419 (S.D. Cal. Mar. 16, 2018) ....................................................19

*Erica P. John Fund, Inc. v. Halliburton Co.*,
   309 F.R.D. 251 (N.D. Tex. 2015) (Lynn, J.) ...................................2, 3, 17, 19, 20

*In re Finisar Corp. Secs. Litig.*,
  No. 5:11-cv-01252-EJD, 2017 WL 6026244 (N.D. Cal. Dec. 5, 2017) ...................................19

*In re Franklin Bank Corp. Secs. Litig.*,
  782 F. Supp. 2d 364 (S.D. Tex. 2011) ....................................................................15

*Greenberg v. Crossroads Sys., Inc.*,
  364 F.3d 657 (5th Cir. 2004) ...........................................................................19, 22

*Halliburton Co. v. Erica P. John Fund, Inc.*,
  134 S. Ct. 2398 (2014) ...................................................................................17, 18

*Halliburton Co. v. Erica P. John Fund, Inc.*,
  573 U.S. 258 (2014) ...........................................................................................21

*Heinze v. Tesco Corp.*,
  971 F.3d 475 (5th Cir. 2020) ...............................................................................17

*IBEW Local 98 Pension Fund v. Best Buy Co.*,
  818 F.3d 775 (8th Cir. 2016) ...............................................................................19

*Ind. Elec. Workers' Pens. Tr. Fund IBEW v. Shaw Grp.*,
  537 F.3d 527 (5th Cir. 2008) ...............................................................................17

*In re Intuitive Surgical Sec. Litig.*,
  2016 WL 7425926 (N.D. Cal. Dec. 22, 2016)........................................................2, 20

*Konrick v. Exxon Mobil Corp.*,
  2016 WL 439361 (E.D. La. Feb. 4, 2016) ...............................................................20

*Krogman v. Sterritt*,
  202 F.R.D. 467 (N.D. Tex. 2001) ..........................................................................17

*Li v. Aeterna Zentaris, Inc.*,
  2018 WL 1147082 (D.N.J. Feb. 28, 2018) ...............................................................18

*In re Lone Pine Res., Inc.*,
  2014 WL 1259653 (S.D.N.Y. Mar. 27, 2014)........................................................15, 21

*Magruder v. Halliburton Co.*,
  2009 WL 854656 (N.D. Tex. Mar. 31, 2009) ...........................................................24

*Magruder v. Halliburton Co.*,
  359 F. Supp. 3d 452 (N.D. Tex. 2018) ...................................................................24

*In re Merrill Lynch ARS Secs. Litig.*,
  704 F. Supp. 2d 378 (S.D.N.Y. 2010).....................................................................22

*Monroe County Empls. Ret. Sys. v. Southern Co.*,
  332 F.R.D. 370 (N.D. Ga. 2019)............................................................................24

*In re Moody's Corp. Secs. Litig.*,
  274 F.R.D. 480 (S.D.N.Y. 2011) ...........................................................................19

*Ohio Public Empls.Ret. Sys. v. Federal Home Loan Mortgage Corp.*,
    2018 WL 3861840 (N.D. Ohio Aug. 14, 2018) ....................................................19

*Pelletier v. Endo Int'l PLC*,
    338 F.R.D. 446(E.D. Pa. 2021) ...........................................................................25

*Pirnik v. Fiat Chrysler Automobiles, N.V.*,
    327 F.R.D. 38 (S.D.N.Y. 2018) ..........................................................................24

*Rooney v. EZCorp, Inc.*
    330 F.R.D. 439 (W.D. Tex. 2019) ......................................................................24

*Santiago v Miles*,
    774 F. Supp. 775 (W.D.N.Y. 1991) ....................................................................18

*Torres v. American Airlines, Inc.*,
    2020 WL 3485580 (N.D. Tex. May 22, 2020) ....................................................16

*In re Vivendi, S.A. Secs. Litig.*,
    838 F.3d 223 (2d Cir. 2016)..........................................................................22, 23

*Vizirgianakis v. Aeterna Zentaris, Inc.*,
    775 F. App.'x 51, 53 (3d Cir. May 30, 2019) ....................................................24

*Waggoner v. Barclays PLC*,
    875 F.3d 79 (2d Cir. 2017)..................................................................................17

*Wal-Mart Stores, Inc. v. Dukes*,
    564 U.S. 338 (2011) ............................................................................................16

*Ward v. Hellerstedt*,
    753 F. App.'x 236, 243 (5th Cir. Oct. 16, 2018) ...............................................16

*West Palm Beach Police Pens. Fund v. DFC Global Corp.*,
    2016 WL 4138613 (E.D. Pa. Aug. 4, 2016) .......................................................24

**Rules and Statutes**

15 U.S.C. § 78u-4(b)(1), (b)(4)...............................................................................25

Fed. R. Civ. P. 23 ....................................................................................................16

Fed. R. Civ. P. 23(a) and (b)(3) ...............................................................................4

Defendants Cabot Oil & Gas Corporation ("Cabot"), Dan O. Dinges and Scott C. Schroeder ("Defendants") oppose Plaintiffs' class certification motion for the reasons set forth below.

## <u>INTRODUCTION</u>

In *Goldman Sachs Group, Inc. v. Arkansas Teacher Retirement System*, the Supreme Court reaffirmed that a proposed class cannot be certified in a securities case if it is more likely than not that the alleged misstatements did not impact the stock price.[1] Relevant factors in assessing price impact include the nature of the challenged statement, whether there is a "mismatch" between the contents of the alleged misstatements and the alleged corrective disclosures (which necessarily includes the degree to which the alleged corrective disclosures actually "correct" the challenged statements), whether the alleged misstatements and corrective disclosures actually impacted the stock price, and whether the economic impact of the alleged misrepresentation would be likely to impact the stock price—with the analysis "'aided by a good dose of common sense.'"[2]

The evidence in this case overwhelmingly refutes price impact from every conceivable angle. There are three surviving categories of alleged misstatements after the Court's Rule 12(b)(6) decision, and two alleged corrective disclosures. The first two categories of challenged statements were made during 2016-17 and pertain to a Notice of Violation ("NOV") issued for wells on the Stalter well pad and a subsequent Consent Order to resolve the same NOV, for which Cabot paid a total penalty of approximately $300,000. The third category pertains to statements made in Form 10-Q filings beginning on July 26, 2019 regarding two NOVs and proposed Consent Orders pertaining to wells on the Howell and Jeffers Farm well pads. The alleged "corrective disclosures" are the same July 26, 2019 disclosure regarding the Howell and Jeffers Farm NOVs (which

---

[1] *See* 141 S. Ct. 1951, 1958-59 (2021).

[2] *See id.* at 1960 (quoting *In re Allstate Corp. Secs. Litig.*, 966 F.3d 595, 613, n. 6 (7th Cir. 2020)).

Plaintiffs allege is "corrective" regarding the first two categories) and the Presentment of Charges announced June 15, 2020 by the Pennsylvania Attorney General (the "AG Presentment").

The evidence thoroughly refutes any inference that the surviving alleged misstatements impacted the stock price. As demonstrated by the attached Declaration of Lucy P. Allen ("Allen Declaration" or "Allen Decl."), the July 26, 2019 stock drop was caused by a reduction in Cabot's production and capital budget guidance, which was announced earlier in the day and had nothing to do with the alleged environmental violations at issue. There was no statistically significant price decline when the Form 10-Q containing the alleged "corrective" information was filed later that day. There is also an irrefutable "mismatch" between the July 26, 2019 "corrective disclosure" (which pertained solely to the Howell and Jeffers Farm NOVs) and the prior surviving alleged misstatements (which pertained solely to the Stalter NOV). Nothing in the July 26, 2019 disclosure revealed any "inflation" purportedly caused by the Stalter wells, which were not the subject of the July 26, 2019 disclosure, were not cited by Pennsylvania authorities for any violations following the earlier challenged statements regarding those wells, and were not part of the AG Presentment.

There is likewise no price impact as to the July 15, 2020 AG Presentment announcement or with respect to the third category of challenged disclosures. The small July 15, 2020 stock price decline was not statistically significant at the 95% confidence level endorsed by Judge Lynn in the *Halliburton* class action litigation.[3] Moreover, there is a gaping mismatch between the AG

_____

[3] *See Erica P. John Fund, Inc. v. Halliburton Co.* ("*Halliburton*"), 309 F.R.D. 251, 262, 270 & n.18 (N.D. Tex. 2015) (Lynn, J.) ("To show that a corrective disclosure had a negative impact on a company's share price, courts generally require a party's expert to testify based on an event study that meets the 95% confidence standard, which means 'one can reject with 95% confidence the null hypothesis that the corrective disclosure had no impact on price'"; refusing to certify class for stock drop at 90% confidence level, which is below the 95% level "which the Court finds is necessary"); *In re Intuitive Surgical Sec. Litig.*, 2016 WL 7425926, at *15 (N.D. Cal. Dec. 22, 2016) ("Although Plaintiffs argue that price impact at a 90% confidence level is a statistically

2

Presentment and the alleged misstatements. The AG Presentment did not include the Stalter wells at all and included numerous other wells in addition to the Howell and Jeffers Farms Pad 2 Wells, which were charged only as ***misdemeanors and were not among the 13 wells that received felony charges***. In addition, the AG Presentment ***only charged Cabot with conduct occurring "through June 11, 2018"*** with respect to the Howell and Jeffers Farms Pad 2 Wells. The challenged statements about the remedial status of these wells, however, ***were not made until July 26, 2019 and contained no representation that the wells were already remediated as of June 11, 2018.*** Nothing in the AG Presentment asserts that the Howell and Jeffers Farms Pad 2 Wells were still unremediated at the time of the July 26, 2019 disclosures. There is no basis to infer that any stock price movement on June 15, 2020—to the extent it was even statistically significant—reflects "inflation" attributable to the alleged falsity of Cabot's July 26, 2019 disclosures about the wells' remediation status at that time. Class certification is thus improper and should be denied.

## NATURE AND STAGE OF PROCEEDINGS

The current complaint (the "Complaint" or "Compl.") was filed on February 11, 2022. (*See* ECF #110.) On August 10, 2022, the Court issued an opinion granting in part and denying in part Defendants' motion to dismiss (the "Rule 12 Opinion").[4] Discovery is ongoing.

## STATEMENT OF QUESTION INVOLVED

1. Whether the Court should certify this case in whole or in part as a class action pursuant to Fed. R. Civ. P. 23(a) and (b)(3), including whether the requirements of numerosity, commonality, typicality, adequacy, and predominance have been met.

---

significant, the district court in [*Halliburton*] adopted 95% confidence level as the threshold requirement and this court finds no reason to deviate here").

[4] *See Delaware County Empls. Ret. Sys. v. Cabot Oil & Gas Corp.*, -- F. Supp. 3d --, 2022 WL 3227584 (S.D. Tex. Aug. 10, 2022).

2. Whether a preponderance of the evidence demonstrates a lack of price impact, which would rebut the fraud-on-the-market presumption and defeat predominance.

## FACTUAL BACKGROUND[5]

During the alleged Class Period,[6] Cabot was a Houston-based energy company with natural gas properties located in northeastern Pennsylvania. (Compl. ¶ 20.) Defendant Dan O. Dinges served as Cabot's Chairman, President, and CEO. (*Id.* ¶ 21.) Defendant Scott C. Schroeder served as Cabot's CFO and Executive Vice President. (*Id.* ¶ 22.)

### *The Surviving Alleged Misstatements*

In the Rule 12 Opinion, the Court granted dismissal with prejudice of all claims arising from Cabot's generalized statements regarding substantial compliance with environmental regulations and other general positive statements about Cabot's environmental commitments.[7] The Court denied dismissal as to three categories of alleged misstatements (the "Categories"; each a "Category"), which are described below and on pages 11 and 14-16 of the Rule 12 Opinion.[8]

### *Categories 1 and 2: The Stalter Wells*

The first Category includes the statements in Cabot's 2015 Form 10-K on February 22, 2016, and in Cabot's May 3, 2016, July 29, 2016, and October 28, 2016 Form 10-Qs about remediation related to a September 2011 Notice of Violation.[9] These disclosures stated that Cabot

---

[5] Defendants are relying on the same exhibits filed with their original motion to dismiss to show the contents of the challenged statements, which do not appear to be in dispute. *See* ECF #65. Exhibits to that declaration will be labeled as "MTD Ex." Exhibits to the contemporaneous Declaration of Peter A. Stokes will be labeled "Class Ex."

[6] As Plaintiffs note, Cabot subsequently merged with Cimarex Energy Co. and is now known as Coterra Energy Inc. For simplicity, Defendants will continue to use the name "Cabot."

[7] *See Delaware County*, 2022 WL 3227584 at *21.

[8] *See id.* at *12, *14-16.

[9] *See* Compl. ¶¶ 187-88.

was "engaged with the PaDEP in investigating the incident and ha[s] performed appropriate remediation efforts, including the provision of alternative sources of drinking water to affected residents," that Cabot "believe[d] the source of methane has been remediated," that Cabot was "working with the PaDEP to reach agreement on the disposition of this matter," that Cabot had received a proposed Consent Order that, if finalized, would result in a civil penalty of between $100,000 and $300,000, and that Cabot would continue to work to bring the matter to a close.[10]

The second Category of alleged misstatements consists of Cabot's February 27, 2017 Form 10-K disclosure that Cabot had "entered into a Consent order and Agreement with the PaDEP on December 30, 2016," pursuant to which Cabot "agreed to pay a civil monetary penalty in the amount of approximately $0.3 million and to continue to provide alternative sources of drinking water to affected residents until the affected gas supplies are permanently restored."[11] The disclosure also stated that "additional monitoring will be required to ensure the source of methane has been remediated. Cabot continues to work with the PaDEP to bring this matter to a close."[12]

Categories 1 and 2—including the statements regarding the September 2011 NOV and the proposed and finalized 2016 Consent Order—*pertain exclusively to wells 1H, 2H, and 8V on the Stalter well pad (the "Stalter Wells")*.[13] No other wells are referenced or discussed in the Category 1 and 2 disclosures besides the Stalter Wells.[14] At no time after the first alleged misstatement on

---

[10] *See id.*; *see also* MTD Ex. 2 at 32; MTD Ex. 3 at 24; MTD Ex. 4 at 28; MTD Ex. 5 at 29.

[11] *See* Compl. ¶¶ 187-88; MTD Ex. 7 at 33.

[12] *See id.*

[13] *See* Declaration of Scott C. Schroeder ("Schroeder Decl.") ¶ 8; *see also* Class Ex. 1 (Sept. 19, 2011 NOV) (referencing Stalter Wells); Class Ex. 2 (proposed Consent Order and Agreement referenced in Category 1 disclosures); Class Ex. Ex. 3 (Dec. 30, 2016 Consent Order and Agreement for Stalter Wells) (same).

[14] *See* Schroeder Decl. ¶ 8.

February 22, 2016 did any regulator or governmental authority cite Cabot for any violations pertaining to the Stalter Wells based on conduct occurring during the Class Period, nor did Cabot or anyone else make any disclosure after February 22, 2016 that Cabot had been cited for any additional violations pertaining to the Stalter Wells based on conduct occurring during the Class Period.[15] The Stalter Wells were not mentioned in the June 11, 2018 letter from PaDEP in response to Cabot's request to resume drilling within the Dimock Box (the "June 2018 Letter"), were not the subject of the NOVs and Consent Orders announced on July 26, 2019, did not contribute to the changes in production and capital budget guidance that were announced on July 26, 2019, and were not part of the AG Presentment.[16] At no point during the Class Period did Cabot reduce forecasted production from the Stalter Wells as a result of any alleged environmental violations.[17]

### Category 3: The Howell Wells and Jeffers Farms Pad 2 Wells

The third Category of alleged misstatements consists of a disclosure in Cabot's July 26, 2019 Form 10-Q pertaining to two NOVs issued by PaDEP to Cabot in June and November 2017, respectively, as well as similar disclosures in Cabot's Form 10-Q filed on October 25, 2019, Cabot's Form 10-K filed on February 25, 2020, and Cabot's Form 10-Q filed on May 1, 2020.[18] These disclosures included a statement that Cabot would "continue to work with the PaDEP" to finalize proposed Consent Orders with respect to those NOVs. With respect to the June 2017 NOV, the disclosure stated that "we believe these water quality complaints have been resolved, and we

---

[15] *See* Schroeder Decl. ¶ 13.

[16] *See id.*; Class Ex. 14 (June 2018 Letter).

[17] *See id.*

[18] *See* Compl. ¶ 189; MTD Ex. 17 at 29; MTD Ex. 18 at 29; MTD Ex. 20 at 32; MTD Ex. 21 at 25.

are working with the PaDEP to reach agreement on the disposition of this matter."[19] With respect to the November 2017 NOV, the disclosure stated that the proposed Consent Order and Agreement "would require Cabot to submit a detailed remediation plan, continue water sampling and other investigative measures and restore or replace affected water supplies and would result in the payment of a civil monetary penalty in an amount likely to exceed $100,000, up to approximately $355,000. We will continue to work with the PaDEP to finalize the [Consent Order and Agreement], and to complete the ongoing investigation and remediation."[20]

The statements in Category 3 regarding the June 2017 NOV *pertain exclusively to wells 2H, 4H, 6H, and 8H on the Howell well pad (the "Howell Wells")*, which were also the only wells referenced in the proposed Consent Order for the June 2017 NOV referenced in the Category 3 disclosures and in the final Consent Order entered with respect to this NOV on December 28, 2020.[21] The statements in Category 3 regarding the November 2017 NOV *pertain exclusively to wells 7H, 8H, 9H, 10H, 11H, 12H, 13H, 14H, 15H, 16H, 17H, and 18H on the Jeffers Farms Pad 2 well pad (the "Jeffers Farms Pad 2 Wells")*, which were also the only wells addressed in the proposed Consent Order described in the Category 3 disclosures and in the final Consent Order

---

[19] *See id.*

[20] *See id.*

[21] *See* Schroeder Decl. ¶ 8; *see also* Class Ex. 4 (June 20, 2017 NOV) (referencing Howell Wells); Class Ex. 5 (proposed Consent Order for June 20, 2017 NOV referenced in Category 3 disclosures); Class Ex. 6 (Dec. 28, 2020 Consent Order and Agreement for Howell Wells) (same).

entered on December 28, 2020 with respect to these wells.[22] No other wells are referenced or discussed in the Category 3 disclosures besides the wells specifically listed in this paragraph.[23]

On December 28, 2020, PaDEP issued a Consent Order finding that "***Cabot concluded remedial actions [on the Howell Wells] in November 2017***. Evaluation of pressure in the annuli of the Gas Wells since the remedial work indicated that the work was effective in eliminating the flow of gas in the cemented annuli."[24] Cabot did indeed perform appropriate remediation measures with respect to the Howell Wells prior to the making of the third Category of disclosures and believed at the time of those disclosures that the source of methane had been remediated with respect to the Howell Wells.[25] Nothing in the Order faulted Cabot for any violation or deficiency with respect to the Howell Wells occurring on or after July 26, 2019.[26]

Further, with respect to the Jeffers Farms Pad 2 Wells, the Category 3 statements specifically disclosed that Cabot would be required to "submit a detailed written remediation plan, continue water sampling and other investigative measures and restore or replace affected water supplies," and that Cabot "will continue to work with the PaDEP to finalize the CO&A, and to complete the ongoing investigation and remediation."[27] The disclosure thus specifically conveyed that investigation and remediation work was not yet complete, but would be completed in the

---

[22] *See* Schroeder Decl. ¶ 8; *see also* Class Ex. 7 (Nov. 17, 2017 NOV) (referencing Jeffers Farm Wells); Class Ex. 8 (proposed Consent Order for Nov. 17, 2017 NOV referenced in Category 3 disclosures); Class Ex. 9 (Dec. 28, 2020 Consent Order and Agreement for Jeffers Farm Wells) (same).

[23] *See* Schroeder Decl. ¶ 8.

[24] *See* Schroeder Decl. ¶ 19; Class Ex. (Dec. 28, 2020 Consent Order and Agreement for Howell Wells).

[25] *See* Schroeder Decl. ¶ 19.

[26] *See id.*

[27] *See* Schroeder Decl. ¶ 20.

future. Prior to July 26, 2019, Cabot had already performed appropriate remediation efforts on the Jeffers Farms Pad 2 Wells.[28] Indeed, on December 28, 2020, PaDEP issued a Consent Order with respect to the Jeffers Farms Pad 2 Wells that recited how Cabot "ran various diagnostic logs and performed multiple remedial perforation and squeeze activities" on multiple wells on the Jeffers Farms Pad 2 pad between August 2017 and March 2018, that Cabot ensured in June and July 2019 "that all annular vents on all gas wells on the pad were isolated and monitored correctly via the Alicat meters" that Cabot had installed, and that an August 9, 2019 inspection by PaDEP confirmed there was "no flow and no methane present on the 20x13 and 13x9 cemented annular spaces for each of the" Jeffers Farms Pad 2 Wells.[29] Nothing in the Consent Order faulted Cabot for any violation with respect to the Jeffers Farms Pad 2 Wells occurring on or after July 26, 2019.[30]

### Alleged Corrective Disclosure 1

The first alleged corrective disclosure ("Alleged Corrective Disclosure 1") consists of the same July 26, 2019 Form 10-Q disclosure mentioned above, which again disclosed that Cabot received NOVs in June and November 2017 and proposed Consent Orders pertaining to those NOVs, with penalties up to approximately $215,000 for the Consent Order to resolve the June 2017 NOV and up to approximately $355,000 to resolve the November 2017 NOV.[31]

Alleged Corrective Disclosure 1 does not "match" any of the prior surviving alleged misstatements. As stated above, the NOVs and proposed Consent Orders referenced in the July 26, 2019 alleged corrective disclosures **pertain exclusively to the Howell Wells and Jeffers Farms Pad 2 Wells, and had nothing to do with the Stalter Wells** that were the subject of the challenged

---

[28] *See id.*

[29] *See id.*; *see also* Class Ex. 9 (Dec. 28, 2020 Consent Order for Jeffers Farm Wells).

[30] *See id.*

[31] *See* Compl. ¶ 258; MTD Ex. 17 at 29.

Category 1 and 2 statements (which are the only alleged misstatements to survive the Rule 12 Opinion that occurred before July 26, 2019).[32] Further, the reduction in Cabot's production growth guidance and the increase in Cabot's capital budget guidance announced on July 26, 2019 had nothing to do with (and did not result from) any alleged environmental violations with respect to the Stalter Wells (or, for that matter, the Howell Wells, the Jeffers Farms Pad 2 Wells, or any of the allegedly deficient wells referenced in the June 2018 Letter or the AG Presentment).[33] As explained in Cabot's press release that day (which was included as an attachment to Cabot's July 26, 2019 Form 8-K), the decrease in Cabot's production growth guidance was primarily due to a change in Cabot's operating plan resulting from an opportunity to acquire acreage adjacent to a different well pad.[34] The increase in Cabot's capital budget announced in the July 26, 2019 Disclosures likewise were unrelated to the Stalter Wells, Howell Wells, and Jeffers Farms Pad 2 Wells.[35] The alleged violations as to those wells did not cause or contribute to the reduction of Cabot's production guidance or the increase in Cabot's forecasted capital budget announced on July 26, 2019.[36] Accordingly, there is a clear mismatch between Alleged Corrective Disclosure 1 and the surviving alleged misstatements that preceded it, including Categories 1 and 2.

### Alleged Corrective Disclosure 2

The second alleged corrective disclosure ("Alleged Corrective Disclosure 2") consists of the Pennsylvania Attorney General's July 26, 2020 charging announcement pertaining to 25 Cabot

---

[32] *See* Schroeder Decl. ¶ 8

[33] *See* Schroeder Decl. ¶¶ 11-12, 16, 28. Cabot did not base its quarterly guidance on production from wells subject to the Dimock Box restriction, and the Stalter Wells were not part of the June 2018 Letter explaining PaDEP's reasons for not lifting the restrictions. *Id.* ¶ 28; Class Ex. 14.

[34] *See id.*; *see also* MTD Ex. 17 at 29; Class Ex. 10 (July 26, 2019 Press Release).

[35] *See* Schroeder Decl. ¶¶ 11-12.

[36] *See id.*

gas wells (the "AG Presentment").[37] The AG Presentment, however, did not charge Cabot for any violations with respect to the Stalter Wells, nor did it charge Cabot for any violations with respect to the Howell Wells or the Jeffers Farms Pad 2 Wells that occurred on or after July 26, 2019, meaning that there is again a significant mismatch between Alleged Corrective Disclosure 2 and any of the surviving alleged misstatements in Categories 1, 2, and 3.[38] Instead, with respect to the Howell Wells and the Jeffers Farms Pad 2 Wells, the AG Presentment charged Cabot for alleged misdemeanor violations occurring "on one or more occasion . . . *through June 11, 2018*," and only for seven of the twelve Jeffers Farms Pad 2 Wells identified in the prior NOV.[39] By contrast, the Category 3 disclosures did not represent that the Howell Wells and Jeffers Farms Pad 2 Wells were already remediated by June 11, 2018, but instead merely stated that Cabot had taken "appropriate remediation efforts" as of the date of the challenged disclosures (i.e., as of July 26, 2019 and afterward).[40] Accordingly, nothing in the AG Presentment contradicts any of Cabot's statements in the three Categories of challenged disclosures, as: (i) the Stalter Wells were not charged at all in the AG Presentment; and (ii) the AG Presentment does not charge Cabot for any alleged violations occurring after June 11, 2018, or for any violations (or any purported remediation shortcomings) occurring or existing on or after July 26, 2019.[41]

### *The Subsequent Plea Agreement and Consent Orders*

On November 29, 2022, Coterra (as successor to Cabot following the merger) entered into a Nolo Contendere Plea Agreement and Colloquy of Defendant ("Plea Agreement") to resolve the

---

[37] *See* Compl. ¶ 262; Class Ex. 11 (AG Presentment).

[38] *See* Schroeder Decl. ¶ 21; Class Ex. 11 (AG Presentment).

[39] *See id.* The AG Presentment only included wells 7H, 8H, 9H, 10H, 11H, 12H, and 14H.

[40] *See, e.g.,* MTD Ex. 17 at 29.

[41] *See* Schroeder Decl. ¶ 22.

charges set forth in the AG Presentment, as well as a November 29, 2022 Consent Order and Agreement between Coterra and PaDEP (the "November 2022 Consent Order").[42] Pursuant to the Plea Agreement, Coterra entered a plea of nolo contendere to a single misdemeanor charge under the Pennsylvania Clean Streams Law with respect to the alleged negligent discharge of methane into groundwater "[o]n one or more occasions between March 2008 and June 2018."[43] The Plea Agreement thus does not include any plea with respect to any alleged violations with respect to any wells occurring after June 2018.[44] The November 2022 Consent Order likewise does not find any violations with respect to any wells occurring on or after July 26, 2019, nor does the November 2022 Consent Order reference any alleged violations with respect to the Stalter Wells, Howell Wells, or Jeffers Farms Pad 2 Wells.[45] Pursuant to the Plea Agreement, Cabot agreed to pay a total fine of $2,500 to the Clean Water Fund maintained by PaDEP.[46]

In addition, pursuant to the Plea Agreement and November 2022 Consent Order, Cabot agreed to pay $16.29 million to an interest bearing account established by the Office of Attorney General for construction of a community water well system and water distribution system (the "Public Water System"), which will provide water to certain properties and property owners affected by prior alleged methane migration from Cabot gas wells that occurred prior to July 26, 2019 (the "Subject Water Supplies").[47] The Subject Water Supplies do not include any water supplies, properties, or property owners affected by the Stalter Wells, Howell Wells, or Jeffers

---

[42] *See* Declaration of John Smelko ("Smelko Decl.") ¶ 18; Class Ex. 12 (Plea Agreement); Class Ex. 13 (November 2022 Consent Order).

[43] *See id.*

[44] *See* Smelko Decl. ¶ 19; *see also* Schroeder Decl. ¶ 24.

[45] *See* Smelko Decl. ¶ 20; *see also* Schroeder Decl. ¶ 25.

[46] *See* Smelko Decl. ¶ 21; *see also* Schroeder Decl. ¶ 26.

[47] *See id.*; Class Ex. 12 (Plea Agreement); Class Ex. 13 (November 2022 Consent Order).

Farms Pad 2 Wells, nor is the Public Water System intended to provide water to those properties or property owners. The Stalter Wells, Howell Wells, and Jeffers Farms Pad 2 Wells are located outside the Dimock Box, whereas the wells and properties addressed by the Public Water System are located inside the Dimock Box.[48] In return for funding the Public Water System and complying with the other terms of the November 2022 Consent Order, PaDEP agreed that Coterra may resume drilling and production operations in the Dimock Box upon meeting certain conditions.[49]

### The Event Studies and Economic Evidence

Defendants retained a widely-respected economist, Lucy P. Allen of NERA Economic Consulting, to conduct event studies with respect to the surviving alleged misstatements and the alleged corrective disclosures.[50] Plaintiffs also retained an expert, Dr. Steven Feinstein, who analyzed the stock price movement following the alleged corrective disclosures.[51]

Both expert reports confirm there was no price impact with respect to any of the surviving alleged misstatements and the alleged corrective disclosures. In particular, Allen found that the alleged stock price decline on July 26, 2019 occurred *before* Cabot filed the Form 10-Q containing Alleged Corrective Disclosure 1.[52] Cabot released its earnings results—including the reduction in production guidance and increase in capital budget discussed above—before the market opened that day, and did not release Alleged Corrective Disclosure 1 until it filed the Form 10-Q at 11:42 a.m. EST.[53] There was no statistically significant movement in the stock price after the Form 10-

---

[48] *See id.*; *see also* Schroeder Decl. ¶ 27.

[49] *See id.*

[50] *See* Allen Declaration.

[51] *See* Declaration of Dr. Steven Feinstein ("Feinstein Declaration" or "Feinstein Decl.") submitted with Plaintiffs' motion to certify class.

[52] *See* Allen Decl. ¶ 31-32.

[53] *See id.*

Q was filed.[54] As stated above, the reduced production guidance and increased capital budget announced that day had nothing to do with the Stalter Wells, Howell Wells, or Jeffers Farms Pad 2 Wells at issue in this litigation, or to any other alleged environmental violations.[55] The analyst reports published after the July 26, 2019 disclosures confirmed that the analysts ascribed no weight to the NOV-related disclosures, but instead focused on the guidance changes.[56]

Allen also concluded that the absence of a statistically significant stock price decline was consistent with the economic impact of the NOVs discussed in Alleged Corrective Disclosure 1, which did not cause any change in Cabot's production or revenue, had no impact on production guidance, did not affect demand for Cabot's gas or the price at which it was sold, and resulted in a combined maximum penalty of just $570,000, an insignificant amount for a company with Cabot's revenues and net income.[57] From an economic standpoint, one would not expect a news announcement to impact the stock price if it did not significantly affect investors' calculation of Cabot's future cash flows, which the NOVs at issue did not have.[58] The fact that Cabot already

---

[54] *See id.* at ¶¶ 31-32.

[55] *See* Schroeder Decl. ¶ 11, 16, 28.

[56] *See* Allen Decl. ¶¶ 33-38, 61.

[57] *See* Allen Decl. ¶¶ 51-53; Schroeder Decl. ¶¶ 14-15 (discussing how this amount would, if paid in full by Cabot that quarter, reflect a decrease of only approximately 0.3149% of Cabot's net income for the second quarter of 2019 (and would reflect an increase of only approximately 0.1986% to Cabot's total expenses for the quarter), and, if paid in full by Cabot during 2019, reflect a decrease of only approximately 0.0837% of Cabot's net income for the year (and would reflect an increase of only approximately 0.0479% to Cabot's total expenses for the year)). Impacts of such little magnitude are presumptively immaterial. *See In re Franklin Bank Corp. Secs. Litig.*, 782 F. Supp. 2d 364, 408 (S.D. Tex. 2011) (noting agreement that financial impacts of less than 5% are immaterial); *In re Lone Pine Res., Inc.,* 2014 WL 1259653, at *4 (S.D.N.Y. Mar. 27, 2014) ("An omission or misstatement that has an impact of less than 5% on a company's reported financial metrics is presumptively immaterial."); *In re Aceto Corp. Secs. Litig.*, 2019 WL 3606745, at *4 (E.D.N.Y. Aug. 6, 2019) (less than 5% of earnings "presumed" immaterial).

[58] *See* Allen Decl. ¶¶ 27, 53.

disclosed it received NOVs "[f]rom time to time," and did not experience a substantial decline when it announced the earlier NOV (with a similarly small penalty) in the Category 1 and 2 disclosures, provides additional confirmation that there was no price impact, as the market would not perceive the July 26, 2019 disclosures as "new news" that would affect the stock price.[59]

Allen similarly concluded that Alleged Corrective Disclosure 2 did not show price impact. Using the same control variables and control period applied by Dr. Feinstein, Allen found that the stock price decline following the June 15, 2020 disclosures was not statistically significant at a 5% (or 95%) confidence level, and would not be significant at even a 10% (or 90%) confidence level under Dr. Feinstein's model if his non-standard adjustments are removed.[60] Further, because only 11 of the 25 wells in the AG Presentment (and ***none*** of the 13 wells that drew felony charges) came from the Howell Wells and Jeffers Farms Pad 2 Wells (with none from the Stalter Wells), and because the AG Presentment did not charge Cabot with any violations for conduct occurring at or after the time of the July 26, 2019, one cannot fairly attribute all (or any) of the June 15, 2020 stock price decline to the prior alleged misstatements.[61] There is no basis to infer that whichever narrow portion (if any) of Alleged Corrective Disclosure 2 that "matched" the prior alleged misstatements had any statistically significant impact on the stock price.[62] The analysts likewise did not view the disclosure as significant.[63] In addition, none of the surviving alleged misstatements caused a statistically significant price increase at the time they were made.[64]

---

[59] *See* Allen Decl. ¶¶ 26, 49-50. Allen also noted that the public availability of the NOVs would further undermine any expectation of "surprise." *See id.* ¶ 50.

[60] *See* Allen Decl. ¶¶ 44-45.

[61] *See* Allen Decl. ¶¶ 39-40.

[62] *See id.*

[63] *See* Allen Decl. ¶ 54-56.

[64] *See* Allen Decl. ¶ 48. In other words, there was no "front-end" or "back-end" price impact.

## ARGUMENT AND AUTHORITIES

Class certification must be denied unless the Court determines after a "rigorous analysis" that Plaintiff has met his burden of satisfying ***all*** prerequisites under Fed. R. Civ. P. 23.[65] Plaintiffs must also satisfy "through evidentiary proof at least one of the provisions of Rule 23(b)," which in this case requires that "'the questions of law or fact common to class members predominate over any questions affecting only individual members.'"[66]

## I. THE EVIDENCE REFUTES ANY CLASSWIDE PRESUMPTION OF RELIANCE

A securities class action cannot satisfy the predominance requirement unless there is a classwide presumption of reliance that obviates the need to prove reliance individually for each class member. Without a "presumption of reliance, a Rule 10b-5 suit cannot proceed as a class action," as individual questions of reliance would predominate over any common issues.[67] Courts typically assess each alleged corrective disclosure separately in deciding class certification.[68]

There are two potential grounds for a classwide presumption of reliance: the *Affiliated Ute* presumption (which Plaintiffs do not appear to assert), and the fraud-on-the-market presumption.

---

[65] *See Ward v. Hellerstedt*, 753 F. App.'x 236, 243 (5th Cir. Oct. 16, 2018) ("A party seeking class certification has the burden of establishing that all of Rule 23's requirements are met"; vacating certification order); *Torres v. American Airlines, Inc.*, 2020 WL 3485580, at *7-8 (N.D. Tex. May 22, 2020) (denying class certification).

[66] *Comcast Corp. v. Behrend*, 569 U.S. 27, 33 (2013) (quoting *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350-51 (2011)). Defendants take no position at this time on the elements of numerosity, commonality, typicality, and adequacy, which are satisfied in most Rule 10b-5 class actions.

[67] *Halliburton Co. v. Erica P. John Fund, Inc.*, 134 S. Ct. 2398, 2415-16 (2014).

[68] *See, e.g., Erica P. John Fund, Inc. v. Halliburton Co.* ("*Halliburton*"), 309 F.R.D. 251, 269-75 (N.D. Tex. 2015) (denying class certification for five of six alleged corrective disclosures that did not have statistically significant price reaction, while certifying as to sixth disclosure where defendants conceded statistical significance).

The *Affiliated Ute* presumption does not apply in "mixed" cases alleging misstatements in addition to omissions.[69] Plaintiff clearly alleges affirmative misstatements and not just omissions.[70]

The fraud-on-the-market presumption is negated if a preponderance of the evidence shows that the alleged misrepresentation did not impact the stock price, which eliminates the basis for presuming that class members were injured just by relying on the stock price itself.[71] While Defendants have the burden of proof under a bare preponderance-of-the-evidence standard,[72] the Supreme Court emphasized that this burden "should rarely be outcome determinative" because it will matter "only when the court finds the evidence in equipoise—a situation that should rarely arise."[73] The burden is only a "more likely than not" preponderance standard—i.e., "[t]he district court's task is simply to assess all the evidence of price impact—direct and indirect—and

---

[69] *Brooks v. Lincoln Nat. Life Ins. Co.*, No. 5:03CV256, 2008 WL 623222, at *14 (E.D. Tex. Mar. 5, 2008) ("*Affiliated Ute* does not apply to 'mixed claims' that allege both misstatements and material omissions"); *Waggoner v. Barclays PLC*, 875 F.3d 79, 95-96 (2d Cir. 2017) (reversing district court's application of *Affiliated Ute* presumption and holding that presumption did not apply to "half-truths" or affirmative statements rendered misleading by omission); *Krogman v. Sterritt*, 202 F.R.D. 467, 479 (N.D. Tex. 2001) (same).

[70] *See, e.g.,* Compl. ¶¶ 1, 12, 184. This is unsurprising, as the Fifth Circuit has held that "pure omission" claims are not actionable under the securities laws. *See Heinze v. Tesco Corp.*, 971 F.3d 475, 483 (5th Cir. 2020) (holding that "pure-omission claims are not actionable"); *Ind. Elec. Workers' Pens. Tr. Fund IBEW v. Shaw Grp.*, 537 F.3d 527, 541-42 (5th Cir. 2008) (holding that pure-omission claims likewise are not actionable under Section 10(b)).

[71] *See id.* at 1962; *Halliburton Co. v. Erica P. John Fund, Inc.*, 134 S. Ct. 2398, 2415-16 (2014) ("'[a]ny showing that severs the link between the alleged misrepresentation and . . . the price received (or paid) by the plaintiff . . . will be sufficient to rebut the presumption of reliance'" under the "fraud-on-the-market" theory "because 'the basis for finding that the fraud had been transmitted through market price would be gone'" (quoting *Basic Inc. v. Levinson*, 485 U.S. 224, 248 (1988)).

[72] Defendants do not dispute that the market for Cabot stock was efficient.

[73] *See Goldman Sachs*, 141 S. Ct. at 1958, 1963 (emphasis added).

determine whether it is more likely than not that the alleged misrepresentations had a price impact."[74] This does not require complete disproof of price impact with "scientific certainty."[75]

At class certification, a court must consider ***all*** evidence and reasonable inferences that bear on whether the fraud-on-the-market theory applies, including those that overlap with merits issues like materiality and causation.[76] That includes whether "there is a mismatch between the contents of the misrepresentation and the corrective disclosure," which weakens the inference that any post-"correction" stock drop reflects inflation attributable to the alleged misstatement.[77]

The evidence rebutting price impact in this case is overwhelming. Denial of class certification is proper when expert evidence demonstrates an absence of front-end price impact (at the time the alleged misstatement is made) or back-end price impact (after the corrective disclosure).[78] If a stock price decline is not statistically significant at an appropriate confidence

---

[74] *Id.* at 1963.

[75] *See Santiago v Miles*, 774 F. Supp. 775, 797 (W.D.N.Y. 1991) ("Plaintiffs need not prove discrimination to a scientific certainty but rather by a preponderance of the evidence"). Decisions suggesting that Defendants must "definitively" show lack of impact "with scientific certainty" are not good law. *See, e.g., Carpenters Pension Trust Fund of St. Louis v. Barclays Plc*, 310 F.R.D. 69, 95 (S.D.N.Y. 2015) (faulting defendants' reliance on event study that did "not prove lack of price impact with scientific certainty"). *Li v. Aeterna Zentaris, Inc.*, 2018 WL 1147082, at *10 (D.N.J. Feb. 28, 2018) likewise relied on *Carpenter*'s erroneous "scientific certainty" language.

[76] *See Goldman Sachs*, 141 S. Ct. at 1960 ("In assessing price impact at class certification, courts should be open to *all* probative evidence on that question—qualitative as well as quantitative—aided by a good dose of common sense," even if evidence also relates to materiality; *Halliburton*, 134 S. Ct. at 2415-16 ("'[a]ny showing that severs the link" will defeat certification).

[77] *Goldman Sachs*, 141 S. Ct. at 1961.

[78] *See Halliburton*, 309 F.R.D. at 269-75 (Lynn, J.) (denying class certification for five of six alleged corrective disclosures that did not have statistically significant price reaction, while certifying as to sixth disclosure where defendants conceded that statistically significant reaction occurred); *Ohio Public Empls.Ret. Sys. v. Federal Home Loan Mortgage Corp.*, 2018 WL 3861840, at *18 (N.D. Ohio Aug. 14, 2018) (denying class certification where expert report "demonstrated that the alleged misstatements in the case at bar did not impact Freddie Mac's stock price"); *IBEW Local 98 Pension Fund v. Best Buy Co.*, 818 F.3d 775, 781 (8th Cir. 2016) (evidence of no front-end inflation sufficient to rebut fraud-on-the-market presumption and defeat class

level, there is no reasonable basis to assume the change is outside the stock's normal fluctuations.[79]

In the *Halliburton* litigation, Judge Lynn adopted 95% as the threshold level of confidence for plaintiffs.[80] Courts in this circuit have accepted the 95% confidence level in other contexts.[81]

Defendants have submitted the expert declaration of Lucy P. Allen, the same expert Judge Lynn credited in the *Halliburton* litigation.[82] Allen conducted event studies and concluded for

certification); *In re Finisar Corp. Secs. Litig.*, No. 5:11-cv-01252-EJD, 2017 WL 6026244, at *6-8 (N.D. Cal. Dec. 5, 2017) (denying class certification where evidence showed no price inflation caused by alleged misstatement, even where stock price later fell after purported corrective disclosure); *In re Moody's Corp. Secs. Litig.*, 274 F.R.D. 480, 493 (S.D.N.Y. 2011) ("Defendants have demonstrated, and Plaintiffs have not rebutted, that there is no date on which any alleged misrepresentation caused a statistically significant increase in the price").

[79] *See Eng v. Edison Int'l*, 2018 WL 1367419, at * (S.D. Cal. Mar. 16, 2018) (dismissing claims at pleading stage where stock price drops "were well within [the stock's] average trading range" (citing *Greenberg v. Crossroads Sys., Inc.*, 364 F.3d 657, 665 n.9 (5th Cir. 2004))).

[80] *See Halliburton*, 309 F.R.D. at 262, 270 & n.18 ("To show that a corrective disclosure had a negative impact on a company's share price, courts generally require a party's expert to testify based on an event study that meets the 95% confidence standard, which means 'one can reject with 95% confidence the null hypothesis that the corrective disclosure had no impact on price'"; refusing to certify class for stock drop at 90% confidence level, which is below the 95% level "which the Court finds is necessary"); *In re Intuitive Surgical Sec. Litig.*, 2016 WL 7425926, at *15 (N.D. Cal. Dec. 22, 2016) ("Although Plaintiffs argue that price impact at a 90% confidence level is a statistically significant, the district court in [*Halliburton*] adopted 95% confidence level as the threshold requirement and this court finds no reason to deviate here"). A "95% confidence level" means "there is a 5% chance of finding a statistically significant price reaction even when there is company-specific news on the market and the price moves according to normal daily fluctuations"—that is, "for every 100 price reactions analyzed at the 95% confidence level, on average, 5 will be statistically significant for no reason other than the normal daily variation in the stock price." *See Halliburton*, 309 F.R.D. at 263.

[81] *See Konrick v. Exxon Mobil Corp.*, 2016 WL 439361, at *5 (E.D. La. Feb. 4, 2016) ("A study is considered statistically significant only when the results—e.g., RR or OR—are expressed with a 95% confidence interval, and when that interval does not include the number 1.0"); *Allergan, Inc. v. Teva Pharms. USA, Inc.*, 2017 WL 4803941, at *24 (E.D. Tex. Oct. 16, 2017) (noting use of 95% confidence level for clinical trials); *see also Chamberlin v. Fisher*, 885 F.3d 832, 847 (5th Cir. 2018) (Costa, J., dissenting) (noting that 0.05, or a 95% confidence level, is "the most frequently used probability level for determining statistical significance") (quoting Joseph L. Gastwirth, Case Comment: Statistical Tests for the Analysis of Data on Peremptory Challenges, 4 L. PROBABILITY & RISK 179, 182 (2005)).

[82] *See Halliburton*, 309 F.R.D at 268-80 (evaluating Allen's report against plaintiff's expert report and finding no price impact on all corrective disclosures except one where impact was conceded).

multiple reasons that the alleged misstatements did not impact the stock price. ***First***, Allen found that the July 26, 2019 stock price drop occurred before Alleged Corrective Disclosure 1 was published, and that the stock drop did not result from the alleged correction.[83] The Schroeder Declaration confirms that the earlier-announced production guidance and capital budget changes that day had nothing to do with the alleged environmental violations.[84] ***Second***, Allen found that Alleged Corrective Disclosure 2 had no statistically significant impact at the 95% confidence level accepted in *Halliburton*, or even at a 90% level if appropriate metrics are used.[85] ***Third***, Allen agreed that there is no basis to infer that the portions (if any) of either alleged corrective disclosure that actually corrected or conflicted with the prior alleged misstatements had any price impact.[86] Most if not all of the potentially adverse news in the alleged corrective disclosures concerned wells and time periods not implicated by the alleged misstatements.[87] ***Fourth***, Allen found that the analysts covering Cabot did not treat the NOVs, AG Presentment, or alleged environmental violations as material to Cabot's stock price.[88] ***Fifth***, Allen found that the economic impact of the alleged environmental violations discussed in the July 26, 2019 disclosure to be immaterial to Cabot and highly unlikely to affect the stock price from an economic perspective, a principle courts have also endorsed,[89] and that analysts and the market likewise did not view the impact of the AG

---

[83] *See* Allen Decl. ¶¶ 31-32.

[84] *See* Schroeder Decl. ¶¶ 11, 16, 28.

[85] *See* Allen Decl. ¶¶ 42-46.

[86] *See* Allen Decl. ¶¶ 30, 41.

[87] *See* Allen Decl. ¶ 30, 39-41; Schroeder Decl. ¶¶ 10-12, 21; Smelko Decl. ¶¶ 11, 16-17.

[88] *See* Allen Decl. ¶ 32-36, 52-54, 59.

[89] *See Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258, 278 (2014) (holding that immaterial information "could not have distorted the stock's market price"). Information that has less than a 5% impact on a company's net income or revenues is presumptively immaterial—and

Presentment to be economically material.[90] **Sixth**, Allen observed that Cabot already disclosed that it faced potential penalties from regulators, undermining any inference that the market would be surprised by information about other penalties.[91] **Seventh**, Allen noted that the earlier disclosures of the Stalter NOV, proposed Consent Order, and $300,000 penalty caused no statistically significant stock price decline, further reinforcing the common-sense inference that the July 26, 2019 disclosure regarding a similarly small potential penalty would be unlikely to affect the stock price.[92] **Eighth**, Allen also found no statistically significant front-end stock price increase attributable to the remaining alleged misstatements.[93] **Ninth**, Allen concluded that Plaintiffs' expert used non-standard and unreliable procedures that weigh against crediting his analysis.[94]

There is likewise no basis to infer that the difference between the contents of the alleged misstatements and a legally sufficient alternative disclosure (assuming the actual disclosures violated Rule 10b-5) would have impacted the stock price. The Second Circuit in *Vivendi* phrased the price impact inquiry as asking "what would have happened if [the defendant] had spoken

---

[90] the alleged penalties at issue here had impacts of less than 0.32%. *See supra* footnote 60; *In re Lone Pine,* 2014 WL 1259653, at *4 (impacts below 5% are presumptively immaterial).

[90] Allen Decl. ¶¶ 51-56.

[91] *See* Allen Decl. ¶¶ 26, 49-50; *Greenberg v. Crossroads Sys., Inc.*, 364 F.3d 657, 665–66 (5th Cir. 2004) (explaining that "confirmatory information cannot be the basis for a fraud-on-the-market claim"); *In re Merrill Lynch ARS Secs. Litig.*, 704 F. Supp. 2d 378, 395-96 (S.D.N.Y. 2010) (no reliance presumption when there was no significant difference between the contents of the alleged corrective disclosure and what the market would understand from the prior disclosures).

[92] *See* Allen Decl. ¶¶ 57-61. Allen also found that there was no statistically significant price reaction after the November 29, 2022 announcement of Coterra's plea agreement, *id.* ¶ 64, or when the Pennsylvania Attorney General announced charges against another significant natural gas producer, Range Resources, on June 12, 2020. *See id.* ¶¶ 62-63. This further reinforces the inference that the Cabot charges had no price impact.

[93] *See* Allen Decl. ¶ 48.

[94] *See* Allen Decl. ¶¶ 44, 65-76. The Court should thus disregard or steeply discount his conclusions, and credit Allen's instead. *See Bell v. Ascendant Solutions, Inc.*, 2004 WL 1490009, at *2-4 (N.D. Tex. July 1, 2004) (striking unreliable market price reaction analysis).

truthfully" at the time of the disclosure.[95] Fifth Circuit law compels an even higher standard than *Vivendi*: what would have happened had Cabot simply remained silent about the wells' remediation status (as opposed to saying affirmatively that they were not remediated)?[96] Regardless, Plaintiffs lose under either standard. There is simply no common-sense basis to infer that Cabot's stock price would have behaved differently had Cabot wordsmithed the disclosures to state that the wells had not yet been remediated (which would have made the disclosures legally sufficient under Plaintiffs' theory),[97] let alone if it had simply stayed silent about the wells' remediation status and stated only that it was continuing to negotiate the proposed Consent Orders.

_____

[95] *See In re Vivendi, S.A. Secs. Litig.*, 838 F.3d 223, 258 (2d Cir. 2016).

[96] *Vivendi* posits that because a company that chooses to speak takes on an obligation to disclose sufficient negative information to make a positive disclosure non-misleading, the price impact inquiry should presume what would have happened if the company had disclosed the negative information at the time of the alleged misstatement, rather than what would have happened if the company had simply remained silent and had not made the affirmative statement that triggered the alleged disclosure duty. *See Vivendi*, 838 F.3d at 258; *Basic v. Levinson*, 485 U.S. 224, 239 n.17 (1988) ("Silence, absent a duty to disclose, is not misleading under Rule 10b-5"). In that sense, *Vivendi* punishes a company for opening its mouth on a subject for which it could have stayed silent. Whatever equitable appeal that approach may have, it is flatly inconsistent with the "reliance on price alone" assumption that underlies the fraud-on-the-market theory. If there is no difference between how the stock price behaved following the affirmative statement and how it would have behaved had the company stayed silent, there is no basis under the fraud-on-the-market rule to say that the "price alone" investor relied on the allegedly misleading part of the affirmative disclosure that triggered the duty to disclose. Silence is thus the appropriate front-end benchmark. As stated above, however, there is no price impact even under *Vivendi*'s more generous formulation.

[97] Even under the *Vivendi* approach, the hypothetical "truthful" disclosure of negative information at the time of the alleged misstatement would necessarily include only what is needed to make the challenged disclosure legally sufficient, rather than a full confession of every conceivable adverse fact or a prediction of the precise alleged consequence later disclosed in the alleged corrective disclosure. *See Ludlow*, 800 F.3d at 688 ("We agree that damages stemming from the spill itself," as opposed to damages from the misrepresentation, "are not recoverable under the plaintiffs' theory of liability"). Here, Cabot could have made the challenged statements legally sufficient simply by stating that the specific wells were not yet remediated to PaDEP's satisfaction. Given that Cabot already disclosed it was still negotiating the Consent Orders and was engaging in ongoing remedial work supplying alternative drinking water, there is no reason to presume the stock price would have changed had Cabot simply stated that remedial work remained ongoing.

There is also a clear "mismatch" between the challenged statements and alleged corrections, which did not reveal anything false about the prior disclosures and included adverse information about other wells that were not part of the earlier disclosures.[98] Prior holdings that courts cannot inquire into whether alleged corrective disclosures are actually corrective are not good law in light of *Goldman Sachs*, which plainly holds that any mismatch between the challenged statements and the alleged corrections **must** be evaluated.[99] A corrective disclosure must reveal the falsity of a prior misstatement to support an inference that a subsequent stock price decline is tied to the earlier alleged misstatement.[100]

## II. PLAINTIFFS' ANTICIPATED COUNTER-ARGUMENTS ARE MERITLESS

The "price impact" cases typically cited by plaintiffs differ greatly from this one. Many involve situations where (unlike here) the defendants furnished no expert-derived event study of their own, or where (unlike here) the alleged misstatement or omission clearly did have an initial price impact.[101] By contrast, none of the statements or "corrections" here had price impact.

---

[98] *See supra* at 9-11.

[99] *Goldman Sachs*, 141 S. Ct. at 1961 *Goldman Sachs*, 141 S. Ct. at 1961 (emphasizing that courts must consider "mismatch" issues regardless of whether they overlap with any merits issue). While the **elements** of materiality and causation may be merits issues, **evidence** refuting those elements can also serve the dual purpose of severing the link between the alleged misstatements and the stock price, thus defeating predominance, and must therefore be considered.

[100] *See Magruder v. Halliburton Co.*, 359 F. Supp. 3d 452, 460 (N.D. Tex. 2018) ("corrective disclosure" must "reveal[]s the falsity of the prior misrepresentation"); *id.* at 466 (plaintiff did not show how subsequent disclosure "corrected" earlier statements). Likewise, the "revelation of confirmatory information, or information already known to the market, cannot constitute a corrective disclosure." *Magruder v. Halliburton Co.*, 2009 WL 854656, at *11 (N.D. Tex. Mar. 31, 2009); *see also Catogas*, 292 F. App.'x at 315 ("[U]nder our precedent, confirmatory information cannot cause a change in stock price")

[101] *See Rooney v. EZCorp, Inc.* 330 F.R.D. 439, 444 (W.D. Tex. 2019) (finding price impact where initial disclosure of accounting problems caused clear stock drop, even though subsequent statements providing more details of accounting problems did not cause further declines); *Monroe County Empls. Ret. Sys. v. Southern Co.*, 332 F.R.D. 370, 393 (N.D. Ga. 2019) (noting defendants' concession that initial disclosure of negative information did cause statistically significant drop);

Plaintiffs also cannot salvage certification by claiming "inflation price maintenance," a theory the Fifth Circuit has not approved.[102] Plaintiffs do not identify any specific earlier alleged misstatements that "inflated" the stock price in the first place,[103] and the same evidence cited above easily rebuts any inference that the challenged statements maintained any "inflation" in the price.

Plaintiffs have also suggested that the challenged misstatements inflated the stock price by falsely suggesting the Dimock Box restrictions would be lifted, or that the violations at issue caused guidance reductions or production declines by preventing Cabot from regaining access to

*Vizirgianakis v. Aeterna Zentaris, Inc.*, 775 F. App.'x 51, 53 (3d Cir. May 30, 2019) (plaintiff's expert found statistical significance of three other events in study); *City of Sterling Heights Gen. Empls. Ret. Sys. v. Prudential Fin., Inc.*, 2015 WL 5097883, at *12 (D.N.J. Aug. 31, 2015) (defendants did not dispute plaintiff's expert's findings that five of the six alleged misstatements caused statistically significant stock price movements); *West Palm Beach Police Pens. Fund v. DFC Global Corp.*, 2016 WL 4138613, at *5-6. 14 (E.D. Pa. Aug. 4, 2016) (plaintiffs provided evidence of significant stock price drop after corrective disclosure, and defendants submitted no expert report); *Pirnik v. Fiat Chrysler Automobiles, N.V.*, 327 F.R.D. 38, 45-46 (S.D.N.Y. 2018) (defendants failed to submit expert report, and multiple corrective disclosures caused losses at 99% confidence level); *Carpenters Pens. Tr. Fund of St. Louis v. Barclays PLC*, 310 F.R.D. 69, 94-95 (S.D.N.Y. 2015) (defendants' expert failed to perform event study, and defendants apparently only challenged price impact on days of alleged misstatements rather than on days of corrective disclosures); *In re Chicago Bridge & Iron Co.*, 2019 WL 5287980, at *37-38 (S.D.N.Y. Oct. 18, 2019) (noting large stock price decline at 1%, or 99%, confidence level); *adopted in part*, 2020 WL 1329354 (S.D.N.Y. Mar. 23, 2020); *Pelletier v. Endo Int'l PLC*, 338 F.R.D. 446, 471(E.D. Pa. 2021) (noting findings of plaintiff's expert that first four corrective disclosures produced significant drops, with no rebuttal opinion from defendant's expert on those declines); *Donato v. Insys Therapeutics, Inc.*, 333 F.R.D. 427, 444 (D. Ariz. 2019) (defense expert challenged dates when alleged misstatements were made, but not large declines after corrective disclosures, which were detailed in opinion denying motion to dismiss); *see also Donato v. Insys Therapeutics Inc.*, 2017 WL 3268797, at *18 (D. Ariz. Aug. 1, 2017) (describing substantial stock price declines after corrective disclosures).

[102] *See Goldman Sachs*, 141 S. Ct. at 1959 & n.1.

[103] The PSLRA plainly requires parties to plead with particularity the misstatements that caused the loss. *See* 15 U.S.C. § 78u-4(b)(1), (b)(4). Allowing plaintiffs to allege pre-existing "inflation" based on unpled misstatements violates the PSLRA's plain language and should not be countenanced. *Goldman Sachs* also makes clear that the absence of statistically significant back-end price reaction, coupled with the equivocal nature of the alleged misstatements (which made clear no final agreement with PaDEP had been reached) and the mismatch with the alleged corrections, are particularly strong evidence rebutting price impact in inflation maintenance cases. *See Goldman Sachs*, 141 S. Ct. at 1961.

new production in the Dimock Box. Unlike at the Rule 12 stage, however, Plaintiffs cannot rest at the class certification stage on bare Rule 12 pleading inferences that the wells and alleged violations at issue affected Cabot's production guidance or the market's valuation of the company—***inferences that are now thoroughly refuted by sworn declarations*** demonstrating that the alleged violations had no impact on expected future production, that Cabot did not base its quarterly guidance (including the July 26, 2019 guidance) on production subject to the Dimock Box restrictions, and that analysts gave no weight to the alleged violations.[104] Cabot moreover made no affirmative representation that it was likely to get the Dimock Box restrictions lifted. Finding price impact based on speculation about lifting the Dimock Box restrictions or unfounded and nonexistent production impacts would contradict the evidence and would give class members a windfall by allowing recovery of damages for Dimock Box-related statements that Cabot never made and for production impacts that had nothing to do with the challenged statements.

## CONCLUSION AND PRAYER FOR RELIEF

This is not one of the "rare" cases where the price impact evidence is in equipoise, or even close to it. Indeed, the evidence weighs decisively against price impact on every front. For the reasons stated above, the Court should deny Plaintiff's motion in its entirety.

---

[104] *See* Schroeder Decl. ¶¶ 11, 12, 13, 16, 28. Not only did the NOVs at issue have no impact on the July 26, 2019 guidance changes, but they also did not cause the production decline announced on May 1, 2020, which in any event is not alleged to be a corrective disclosure. *See id.* ¶ 29.

Dated: January 20, 2023

Respectfully submitted,

/s/ Peter A. Stokes
Gerard G. Pecht
TX ID No. 15701800
1301 McKinney, Suite 5100
Houston, TX 77010-3095
Telephone: (713) 651-5151
Facsimile: (713) 651-5246
gerard.pecht@nortonrosefulbright.com

Peter A. Stokes
TX ID No. 24028017
peter.stokes@nortonrosefulbright.com
98 San Jacinto Boulevard, Suite 1100
Austin, Texas 78701-4255
Telephone: (512) 474-5201
Facsimile: (512) 536-4598
peter.stokes@nortonrosefulbright.com

*Counsel for Defendants*

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing document was filed with the Court's electronic case filing (ECF) system on January 20, 2023, which caused an electronic copy of this document to be served on all counsel of record in this matter who have registered for ECF service.

/s/ *Peter A. Stokes*
Peter A. Stokes