**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF TEXAS**

---

DELAWARE COUNTY EMPLOYEES
RETIREMENT SYSTEM, Individually and on
Behalf of All Others Similarly Situated,

                Plaintiff,

v.

CABOT OIL & GAS CORPORATION, et al.,

                Defendants.

Civil Action No. 4:21-cv-02045

---

# EXPERT REPORT AND DECLARATION

# OF

# LUCY P. ALLEN

**January 20, 2023**

**TABLE OF CONTENTS**

I.    Scope of assignment ..................................................................................................1

II.   Qualifications and remuneration ................................................................................1

      A.  Qualifications ....................................................................................................1

      B.  Remuneration ....................................................................................................2

III.  Materials considered ..................................................................................................2

IV.   Background ................................................................................................................3

      A.  Company background ........................................................................................3

      B.  Summary of allegations ....................................................................................4

V.    Methodology and relevant economic principles ......................................................10

      A.  Event study analysis can be used to test whether information is material to
          investors ..........................................................................................................10

      B.  Review of analyst reports can be used to determine whether information is
          important to investors ....................................................................................12

      C.  In an efficient market, only new, material public information would be expected
          to impact a security's price ............................................................................13

VI.   During the alleged Class Period Cabot's stock price did not decline due to the alleged
      misrepresentations....................................................................................................14

      A.  Following the July 26, 2019 alleged corrective disclosure, Cabot's stock price did
          not decline due to the alleged misrepresentations..........................................15

          1.   An analysis of Cabot's intraday stock price movements shows that Cabot's
               stock price decline on July 26, 2019 was not due to the disclosure of the two
               NOVs but was due to changes in guidance..........................................15

          2.   A review of analyst commentary confirms that Cabot's stock price decline on
               July 26, 2019 was not due to the disclosure of the two NOVs but was due to
               changes in guidance ..........................................................................17

      B.  Following the June 15, 2020 alleged corrective disclosure, Cabot's stock price did
          not decline due to the alleged misrepresentations..........................................22

          1.   The majority (if not all) of the June 15, 2020 disclosure could not be attributed
               to the alleged misrepresentations because it relates to wells and time periods
               that do not even correspond to the alleged misrepresentations............22

          2.   There was no statistically significant stock price decline following the June
               15, 2020 disclosure due to the alleged misrepresentations ...................25

VII.  The market evidence demonstrates that in an efficient market the alleged
      misrepresentations would not have an impact on Cabot's stock price ...........27

A.  When the alleged misrepresentations were made, none of the analysts following Cabot mentioned the alleged misrepresentations, and there were no statistically significant stock price increases due to the alleged misrepresentations ....................27

B.  A review of Cabot's public filings and market commentary demonstrates that the alleged misrepresentations did not conceal any economically material information that was not already known to the market ..................................................................29

    1.  Before and during the alleged Class Period, Cabot repeatedly disclosed that "from time to time we receive notices of violation"...............................29

    2.  The potential fines associated with the Notice of Violations were not economically material to Cabot ...........................................................30

    3.  None of the analysts covering Cabot issued reports on the day when the criminal charges were first announced or changed their valuation of Cabot due to the criminal charges and the only analyst that mentioned the criminal charges in their later reports noted that potential fines "even in a worst case scenario" "would be minimal"...............................................................32

C.  The market did not react to disclosures of information similar to what's allegedly concealed by the alleged misrepresentations ...............................................33

    1.  Cabot's disclosure of a Notice of Violation at the beginning of the alleged Class Period did not impact its stock price and none of the analysts following Cabot mentioned this disclosure ...................................................33

    2.  Just three days before charging Cabot, PA Attorney General charged Cabot's peer company Range Resources – Range Resources' stock price did not react to the charges ...................................................................................34

    3.  The fine on Cabot from the criminal charges was announced on November 29, 2022 to no price reaction................................................................35

VIII.  Dr. Feinstein's event study statistical tests are non-standard, unreliable and yield clearly erroneous and unreasonable results..........................................................36

A.  Dr. Feinstein applies non-standard adjustments to test the statistical significance of his event study results to purportedly account for the impact of increased volatility during Covid-19 pandemic but the adjustments clearly fail to do this........36

B.  After applying the non-standard adjustments, days with small excess returns were categorized by Dr. Feinstein as being statistically significant while days with much larger excess returns were categorized as being not statistically significant – a result that is contrary to the underlying finance theory..............................37

C.  Dr. Feinstein's model yields the unreasonable results that days that are close in time with similar excess returns have completely different and contrary statistical significance results.............................................................................41

I, Lucy P. Allen, pursuant to 28 U.S.C. § 1746, declare as follows:

# I.   SCOPE OF ASSIGNMENT

1.      I have been asked by counsel for Defendant Cabot Oil & Gas Corporation

("Cabot" or the "Company") to review and comment on Plaintiff's claims as alleged in the First

Amended Consolidated Complaint filed February 11, 2022 (the "First Amended Complaint") and

review and comment on the Expert Report filed by Steven Feinstein on December 5, 2022 (the

"Feinstein Report"). I have been asked to analyze whether the misrepresentations as alleged in

the First Amended Complaint impacted Cabot's stock price during the alleged Class Period and

whether in an efficient market the alleged misrepresentations would be economically material to

Cabot's stock price. For the purposes of this report, I have been asked to assume that the facts

asserted in the Declaration of Scott C. Schroeder and the Declaration of John Smelko are true

and correct.

# II.   QUALIFICATIONS AND REMUNERATION

## A.   Qualifications

2.      I am a Managing Director of NERA Economic Consulting ("NERA") and a

member of NERA's Securities and Finance Practice.  NERA provides practical economic advice

related to highly complex business and legal issues arising from competition, regulation, public

policy, strategy, finance, and litigation.  NERA was established in 1961 and now employs

approximately 500 people in more than 20 offices worldwide.  NERA's Securities and Finance

Practice, which performs research in securities and financial markets, dates from the early 1970s

and employs a research staff of more than 100 professionals holding degrees in economics,

finance, and mathematics.  The practice group counts among its clients major securities

exchanges, risk managers, principals needing valuation services, and parties in litigation.

1

3.      I have an A.B. from Stanford University, an M.B.A. with a concentration in Finance and Accounting from Yale University, and M.A. and M. Phil. degrees in Economics, also from Yale University.  Prior to joining NERA, I was an Economist for both President George H. W. Bush's and President Bill Clinton's Council of Economic Advisers, providing economic analysis on regulation and health care policy issues.  In my over 25 years at NERA, I have been engaged as an economic consultant or expert witness in numerous projects involving securities and financial economics.  In the course of this work, I have analyzed the effect of information on stock prices of over 100 companies.  My resume with recent publications and testifying experience is included as Appendix A.

### B.      Remuneration

4.      NERA is being compensated for time spent by me and my team at standard billing rates and for out-of-pocket expenses at cost.  NERA currently bills for my time at $1,150 per hour.  NERA's fees are not in any way contingent upon the outcome of this matter.

## III.   MATERIALS CONSIDERED

5.      In preparing this report, I considered the following categories of materials (a complete list of materials considered is included as Appendix B):

a)      First Amended Consolidated Complaint, filed February 11, 2022;

b)      Expert Report of Steven P. Feinstein dated December 5, 2022 including exhibits and appendices;

c)      Declaration of Scott C. Schroeder, dated January 19, 2023;

d)      Declaration of John Smelko, dated January 19, 2023;

e)      Defendants' Motion to Dismiss Amended Complaint, filed March 10, 2022;

2

f)   Plaintiffs' Memorandum of Law in Opposition to Defendants' Motion to Dismiss
     Amended Complaint, filed April 13, 2022;

g)   Memorandum and Opinion re Defendants' Motion to Dismiss the Plaintiff's First
     Amended Consolidated Complaint, filed August 10, 2022;

h)   Memorandum of Law in Support of Plaintiff's Motion for Class Certification,
     filed December 5, 2022;

i)   Cabot's SEC filings;

j)   Cabot press releases, conference call transcripts, and news stories;

k)   Notices of Violation, Consent Orders, and Orders from PaDEP;

l)   Analyst reports on Cabot and Range Resources Corporation from Refinitiv Eikon;

m)   Financial data from Bloomberg, L.P., and FactSet Research Systems, Inc.;

n)   Legal decisions on materiality and price impact; and

o)   Academic literature and textbooks on finance, securities, valuation and statistics.

## IV.   BACKGROUND

### A.   Company background

6.       Cabot is "an independent oil and gas company engaged in the development,
exploitation and exploration of oil and gas properties."[1] Most of the Company's operations were
concentrated in Marcellus Shale, principally located in Susquehanna County, Pennsylvania.[2] The
vast majority of Cabot's revenues were generated from its natural gas wells within that region.[3]

---

[1]   Cabot FY15 Form 10-K, filed February 22, 2016, p. 7.

[2]   Cabot FY15 Form 10-K, filed February 22, 2016, p. 8. Additionally, Cabot owned properties in Eagle Ford Shale
      located in Atascosa, Frio and La Salle Counties, Texas. Cabot sold its Eagle Ford Shale properties in February
      2018. See, Cabot FY18 Form 10-K, filed February 26, 2019, p. 8.

[3]   Cabot FY20 Form 10-K, filed February 26, 2021, p. 49.

3

Cabot's natural gas exploration and production heavily depended on the use of hydraulic fracturing ("fracking").[4]

### B.   Summary of allegations

7.      Plaintiff alleges that between February 22, 2016 and June 12, 2020 (the alleged "Class Period") Cabot falsely represented that the Company "'had performed appropriate remediation efforts' to address known environmental violations." [5] According to Plaintiff, Cabot had in reality "fail[ed] to remediate wells that it had publicly committed to fix."[6]

8.      Each of the alleged misrepresentations relates to specific instances of alleged environmental violations that Cabot publicly disclosed. Specifically, the alleged misrepresentations relate to three separate Notices of Violation ("NOV") that Cabot received from the Philadelphia Department of Environmental Protection (the "PaDEP") and one Consent Order and Agreement ("Consent Order") that Cabot entered into with the PaDEP, including: [7]

- NOV dated September 11, 2011 (the "Sept 2011 NOV");

- Consent Order dated December 30, 2016 (the "2016 Consent Order"); and

- NOV dated June 20, 2017 as well as NOV dated November 17, 2017 (the "2017 NOVs").[8]

9.      The alleged misrepresentations associated with the NOVs and Consent Order discussed above are described in more detail below.

---

[4]   Cabot FY20 Form 10-K, filed February 26, 2021, p. 18.

[5]   First Amended Complaint, ¶1. Plaintiff also alleges that Cabot falsely represented that "the Company 'substantially compl[ied] with the Clean Water Act and related federal and state regulations.'" The allegation was dismissed by the Court. See, Motion to Dismiss Order, p. 2.

[6]   First Amended Complaint, ¶2.

[7]   Motion to Dismiss Order, p. 2.

[8]   The two 2017 NOVs were both first disclosed in Cabot's 2Q19 Form 10-Q on July 26, 2019, p.29.

4

**Sept 2011 NOV Misrepresentation**

10.     In its 2015 Form 10-K and in subsequent Form 10-Ks and Form 10-Qs, Cabot reported that it received the Sept 2011 NOV and "ha[d] performed appropriate remediation efforts."[9] Plaintiff claims Cabot's statements relating to the Sept 2011 NOV were false and misleading because Cabot allegedly "undertook little to no remedial work."[10] It is my understanding that the Sept 2011 NOV pertained to the Stalter 1H, 2H, and 8V wells.[11]

11.     The portion of Cabot's 2015 Form 10-K that contained the alleged misrepresentation is excerpted below:

> **We received a Notice of Violation from the PaDEP in September 2011** for failure to prevent the migration of gas into fresh groundwater sources in the area surrounding these wells. Since then, **we have been engaged with the PaDEP in investigating the incident and have performed appropriate remediation efforts**, including the provision of alternative sources of drinking water to affected residents.[12]

**2016 Consent Order Misrepresentation**

12.     In its 2016 Form 10-K filed on February 27, 2017, Cabot reported that it had finalized the 2016 Consent Order with the PaDEP to address the issues raised in the Sept 2011 NOV and it "believe[d] the source of methane ha[d] been remediated." According to Plaintiff, Cabot's statements relating to the 2016 Consent Order were false and misleading because Cabot allegedly had "inadequate environmental controls and procedures and/or failed to properly mitigate known issues related to those controls and procedures to ensure its gas wells prevented

---

[9]   Cabot FY15 Form 10-K filed February 22, 2016, p. 32. See also, First Amended Complaint, ¶187.

[10]   First Amended Complaint, ¶¶2, 4, and 190(a).

[11]   Notice of Violation, dated September 19, 2011. See also, Declaration of Scott C. Schroeder.

[12]   Cabot FY15 Form 10-K filed February 22, 2016, p. 32, emphasis added. See also, First Amended Complaint, ¶187.

5

stray methane gas migration into fresh groundwater supplies."[13] As with the Sept 2011 NOV, it is my understanding that the 2016 Consent Order pertained to Stalter wells 1H, 2H, and 8V.[14]

13.    The portion of Cabot's 2016 Form 10-K that contained the alleged misrepresentation is excerpted below:

> **We believe the source of methane has been remediated and we entered into a Consent Order and Agreement with the PaDEP on December 30, 2016.** We agreed to pay a civil monetary penalty in the amount of approximately $0.3 million and to continue to provide alternative sources of drinking water to affected residents until the affected water supplies are permanently restored. Further, the related gas well is being permanently plugged. Following the plugging of the gas well, additional monitoring will be required to ensure the source of methane has been remediated. Cabot continues to work with the PaDEP to bring this matter to a close.[15]

## 2017 NOV Misrepresentation

14.    In its 2Q 2019 Form 10-Q filed on July 26, 2019, Cabot reported it received the June 2017 NOV and the November 2017 NOV. Cabot states that with regard to the June 2017 NOV the Company believed "these water quality complaints ha[d] been resolved." With regard to the November 2017 NOV, Cabot states that it would "continue to work with the PaDEP […] to complete the ongoing investigation and remediation."[16] Plaintiff claims that Cabot's statements relating to the two 2017 NOVs were misleading because Cabot failed to "remediate, over a period of years, continuing violations at its wells."[17] It is my understanding that the June 2017 NOV pertained to the Howell gas wells 2H, 4H, 6H and 8H, and the November 2017 NOV

---

[13]   First Amended Complaint, ¶190(g).

[14]   Consent Order and Agreement, dated December 30, 2016. See also, Declaration of Scott C. Schroeder.

[15]   Cabot's FY16 Form 10-K filed February 27, 2017, p. 33, emphasis added.

[16]   Cabot's 2Q19 Form 10-Q filed July 26, 2019, p. 29.

[17]   First Amended Complaint, ¶190(a).

pertained to the Jeffers Farm gas wells 7H, 8H, 9H, 10H, 11H, 12H, 13H, 14H, 15H, 16H, 17H, and 18H.[18]

15.     The portion of Cabot's 2Q 2019 Form 10-Q that contained the alleged misrepresentation is excerpted below:

> **We received Notices of Violation ("NOV") from the PaDEP in June and November, 2017, respectively,** for failure to prevent the migration of gas into fresh groundwater sources in the area surrounding these wells. With regard to the June 2017 NOV, **we believe these water quality complaints have been resolved**, and we are working with the PaDEP to reach agreement on the disposition of this matter. The proposed CO&A is the culmination of this effort and, if finalized, would result in the payment of a civil monetary penalty in an amount likely to exceed $100,000, up to approximately $215,000. We will continue to work with the PaDEP to finalize the CO&A, and to bring this matter to a close. With regard to the November 2017 NOV, The proposed CO&A, if finalized as drafted, would require Cabot to submit a detailed written remediation plan, continue water sampling and other investigative measures and restore or replace affected water supplies and result in the payment of a civil monetary penalty in an amount likely to exceed $100,000, up to approximately $355,000. **We will continue to work with the PaDEP to finalize the CO&A, and to complete the ongoing investigation and remediation**.[19]

16.     Plaintiff claims the alleged misrepresentations discussed above were corrected in two alleged corrective disclosures:

### a)  July 26, 2019 Alleged Corrective Disclosure

17.     Plaintiff claims that Cabot's 2Q 2019 10-Q, which contained the 2017 NOV Misrepresentations discussed above, is also a partial corrective disclosure. Specifically,

---

[18]   Notice of Violation, dated June 20, 2017. Notice of Violation, dated November 16, 2017. See also, Declaration of Scott C. Schroeder.

[19]   Cabot's 2Q19 Form 10-Q filed July 26, 2019, p. 29, emphasis added.

according to the Plaintiff, the announcement of the two 2017 NOVs in the 2Q 2019 Form 10-Q "partially revealed the truth of Defendants' fraudulent scheme."[20]

18.    In addition, Plaintiff claims that Cabot's new guidance disclosed in Cabot's earnings announcement on the same day is also a partial corrective disclosure. In this earnings release, Cabot announced a reduction in its production guidance for the second half of 2019 while increased its capital expenditure guidance for 2019.[21] Cabot also provided a preliminary 2020 production guidance that was below market expectations. Cabot stated that the changes in guidance were "due in large part to a change in the operating plan resulting from a unique opportunity to acquire acreage adjacent to an eight-well pad, allowing the Company to increase the total lateral footage on the pad by approximately 28,000 feet (increasing the average lateral length per well from 8,950 feet to 12,450 feet)."[22] Cabot further stated that lower gas prices, a potential cost inflation, and the possibility of supply growth outpacing demand growth were also the reasons for its guidance adjustment.[23]

19.    According to Plaintiff, Cabot's new guidance is a disclosure "relating to Cabot's failure to remediate the faulty oil wells."[24] In particular, Plaintiff alleges that the production guidance was "negatively impacted by Cabot's inability to resume drilling in the Dimock Box, a

---

[20]   First Amended Complaint, ¶206.

[21]   Cabot Form 8-K, "Exhibit 99.1: Press release issued by Cabot Oil & Gas Corporation dated July 26, 2019", filed July 26, 2019, p. 4.

[22]   Cabot Form 8-K, "Exhibit 99.1: Press release issued by Cabot Oil & Gas Corporation dated July 26, 2019", filed July 26, 2019, p. 4.

[23]   Cabot's 2Q19 Earnings Conference Call, July 26, 2019.

[24]   First Amended Complaint, ¶258.

nine-square mile area in Dimock, due to ongoing violations."[25] Drilling in the Dimock Box was shut down in 2010 and was never resumed during the alleged Class Period.[26]

### b) June 15, 2020 Alleged Corrective Disclosure

20.     On June 15, 2020, following recommendations from a Grand Jury, the Pennsylvania Attorney General's office charged Cabot with criminal counts for allegedly knowingly allowing methane discharge from its wells to local groundwater.[27] According to Plaintiff, the criminal charges revealed that "Cabot undertook little to no remedial work on numerous gas wells until approximately August 2018 – shortly after the Grand Jury began its investigation of Cabot's activities."[28]

21.     The chart below shows Cabot's stock price, trading volume, and the alleged misrepresentations that remained and alleged corrective disclosures:

---

[25]  First Amended Complaint, ¶259.

[26]  Motion to Dismiss, filed March 10, 2022, p. 7 and Motion to Dismiss Order, filed August 10, 2022, p. 40.

[27]  First Amended Complaint, ¶208. According to the Complaint, the criminal charge was announced before market hours; however, it appears the first announcement was through the Pennsylvania Attorney General's tweet at 12:17PM on June 15, 2020. See, @PAAttorneyGen, accessed at: https://twitter.com/PAAttorneyGen/status/1272563867248406534?s=20&t=gVxIecUF80iZgUong9PBlA.

[28]  First Amended Complaint, ¶2.

9



**V. METHODOLOGY AND RELEVANT ECONOMIC PRINCIPLES**

**A. Event study analysis can be used to test whether information is material to investors**

22.     In an efficient market, publicly available information is rapidly impounded into the stock price. Accordingly, if information material to investors is disclosed in an efficient market, one would expect a significant reaction in the stock price to the first public announcement of such material news. Thus, a test of whether information is material to investors is whether the stock price reacts when the information is first publicly disclosed.

23.     A standard method of testing whether a stock price reacts following a particular announcement is to perform an event study. An event study is a commonly accepted statistical

10

analysis that measures the movement in a stock's price after an event or public announcement, typically adjusting for the movement in the overall market and/or industry.[29] Academics often use an event study to determine how stock prices respond to new information.[30] An event study typically uses a statistical analysis called a regression to estimate the relationship between the company's daily stock returns and the daily returns of market and/or industry indices, often over a control period.[31] Using the regression results and the returns of the indices, the predicted stock price movement and excess stock price movement (or the amount the stock price moves in excess of the predicted amount) can be calculated for the day or period being tested. Then, the statistical significance of the excess stock price movement can be tested.[32] If a price reaction is not statistically significant, it is within the range of normal expected daily variation in stock prices. The absence of a statistically significant price reaction demonstrates that the information announced was not material to investors – i.e., that there was no new, stock-price relevant information disclosed.

---

[29]   See, for example, Alexander, Janet C., "The Value of Bad News in Securities Class Actions," UCLA Law Review 41: 1994, Fischel, Daniel R., "Use of Modern Finance Theory in Securities Fraud Cases Involving Actively Traded Securities," *The Business Lawyer* 38: 1982, and Dunbar, Frederick C., and David I. Tabak, "Materiality and Magnitude: Event Studies in the Courtroom*," Litigation Services Handbook: The Role of the Financial Expert* (John Wiley & Sons, Inc.: New York, NY, 3rd ed., 2001), ch. 19.

[30]   See, for example, MacKinlay, A. Craig, "Event Studies in Economics and Finance," Journal of Economic Literature, 35: 1997, and Bowman, Robert G., "Understanding and Conducting Event Studies," *Journal of Business Finance & Accounting* 10(4): 1983.

[31]   Regression analysis is used to estimate the relationship between two or more variables. See, for example, Hogg, Robert V. and Elliot A. Tanis, *Probability and Statistical Inference* (Prentice Hall: Upper Saddle River, NJ, 5th ed., 1997).

[32]   The results of the event study are based on the 5% significance level, the standard typically used. See, for example, Freedman, David A., and David H. Kaye, "Reference Guide on Statistics," *Reference Manual on Scientific Evidence* (Washington, D.C.: The National Academies Press, 3rd ed., 2011), pp. 211-302, and Fisher, Franklin M., "Multiple Regression in Legal Proceedings," *Columbia Law Review*, 80: 1980.

**B.    Review of analyst reports can be used to determine whether information is important to investors**

24.    Analyst reports are periodic reports issued by professional financial analysts at brokerage firms who perform research and analysis on specific industries and companies. Analysts analyze companies by studying publicly available information, such as SEC filings, as well as participating on conference calls and attending investor conferences where they can ask questions directly to management.  Analysts use this information to model and value companies and industries, using financial techniques such as discounted cash flow models and valuation multiples.  Using these valuations, analysts typically issue price targets (*i.e.*, what price they expect the stock of a company to be in a certain time period), provide estimates reflecting their expectations of the company's future financial performance (such as estimates of future revenue, profits and earnings per share ("EPS")), and give recommendations to buy, hold or sell the stock. Analysts typically issue reports after new information about the company is released.  These reports play an important role in disseminating information about a stock and can be a valuable source of information on market knowledge and sentiment at the time.

25.    The review of analyst reports is a standard and generally accepted methodology for determining what information is important to the market in valuing a stock, and thus, for

12

determining whether a piece of information is material to investors.[33] There were at least 886

reports issued by 36 analysts covering Cabot during the alleged Class Period.[34]

### C. In an efficient market, only new, material public information would be expected to impact a security's price

26.     In an efficient market, information that is already known does not affect the stock

price because it is already reflected in the stock price; similarly, information about incidents that

are likely to happen from time to time would be incorporated in the stock price as a known risk.[35]

In other words, only new news should affect the security price and confirmatory or repeated

news (i.e., news that has already been publicly disclosed) should not impact the market.

27.     Moreover, in an efficient market, the price of a stock reflects the market's

expectation of the discounted value of future cash flows.[36] The only information that affects the

stock price is information that affects the market's expectation of the discounted value of future

cash flows.

---

[33]   In particular, courts have relied on analyst reports in determining what information is important to the market in valuing a stock and in determining the cause of stock price movements.  See, for example, *In Re TECO Energy Inc. Securities Litigation*, 2006 U.S. Dist. LEXIS 18101 (M.D. Fla. March 30, 2006) ("Specifically, the analyst reports on September 3, 2002, September 23, 2002, October 8, 2002, and January 23, 2003 address ratings cuts, opinions, and predictions regarding TECO's stock value but do not reference any misstatements, omissions, or accounting practices by Defendants as the reason for the bleak forecasts or changes in market conditions.") and *Barrie v. Intervoice-Brite, Inc.*, 2006 U.S. Dist. LEXIS 69299 (N.D. Tex. Sept. 25, 2006) ("Barry's review of analyst reports and the public press also shows that those information sources did not link the June 6 disclosure to any prior earnings or revenues that were supposedly overstated.").  The First Circuit has also recommended analyzing contemporaneous content for explaining stock price movements, citing a paper that specifically describes performing content analysis of analyst reports and commentary.  *Bricklayers & Trowel Trades International Pension Fund v. Credit Suisse Securities (USA) LLC*, 752 F.3d 82, 92 (1st Cir. 2014), citing David Tabak, "Making Assessments About Materiality Less Subjective Through the Use of Content Analysis," 2007.

[34]   Based on available analyst reports from Refinitiv Eikon.

[35]   See, for example, Richard A. Brealey and Stewart C. Myers, *Principles of Corporate Finance*, (New York: McGraw-Hill Irwin, 7th Edition, 2003), p. 365. ("If the market is efficient, prices impound all available information.")

[36]   See, for example, Brealey, Richard A., Stewart C. Myers and Franklin Allen, Principles of Corporate Finance (McGraw-Hill: New York, NY, 10th ed., 2011), p. 74.

13

## VI.   DURING THE ALLEGED CLASS PERIOD CABOT'S STOCK PRICE DID NOT DECLINE DUE TO THE ALLEGED MISREPRESENTATIONS

28.      Plaintiff alleges that there were two dates, July 26, 2019 and June 15, 2020, on which information allegedly corrective of the alleged misrepresentations were released to the market and caused Cabot's stock price to decline. Information released on July 26, 2019 that was allegedly corrective included Cabot's new guidance announced in its earnings press release prior to market open as well as two NOVs that Cabot disclosed in its Form 10-Q filed on the same day. On June 15, 2020, according to Plaintiff, the allegedly corrective information was Pennsylvania Attorney General's announcement of criminal charges against Cabot.

29.      It is my understanding that Cabot's new guidance could not in fact be corrective of the alleged misrepresentations because the changes in guidance were completely unrelated to the alleged environmental violations at any of the wells that the alleged misrepresentations pertained to but were instead due to changes in Cabot's operating plan that were completely unrelated to those wells.[37] In particular, according to the Declaration of Scott C. Schroeder, "the reduction in Cabot's production growth guidance and the increase in Cabot's capital budget guidance announced in the July 26, 2019 Disclosures had nothing to do with (and did not result from) any NOV or other alleged environmental violations associated with the Stalter Wells (or, for that matter, with the Howell Wells, the Jeffers Farms Pad 2 Wells, or any of the allegedly deficient wells referenced in the June 2018 Letter or the AG Presentment)."

30.      In addition, I understand that Defendants contend that the two NOVs disclosed on July 26, 2019 and the criminal charges announced on June 15, 2020 were not corrective of the alleged misrepresentation either. According to Defendants, the July 26, 2019 alleged corrective

---

[37]  Declaration of Scott C. Schroeder.

disclosure only pertained to the Howell Wells and Jeffers Farm Wells, while the alleged misrepresentations prior to that disclosure only pertained to the Stalter Wells. Further, as detailed in Section VI.B. below, the criminal charges announced on June 15, 2020 implicated wells and time periods that Defendants contend do not correspond to the alleged misrepresentations. From an economic standpoint, stock price movement after an alleged corrective disclosure that does not reveal the falsity or reverse the financial implications of a prior statement would not provide a basis for inferring price impact from that prior statement and could not be deemed as resulting from that prior statement. However, for the purposes of this report I have been asked to assume that the two NOVs and the criminal charges were information that could potentially be corrective of the alleged misrepresentations. As detailed below, even if the full content of the NOVs and the criminal charges are assumed to be corrective of the prior alleged misrepresentations, my analysis demonstrates that the alleged misrepresentations did not impact Cabot's stock price during the alleged Class Period and in an efficient market the alleged misrepresentations would not be economically material.

### A. Following the July 26, 2019 alleged corrective disclosure, Cabot's stock price did not decline due to the alleged misrepresentations

#### 1. An analysis of Cabot's intraday stock price movements shows that Cabot's stock price decline on July 26, 2019 was not due to the disclosure of the two NOVs but was due to changes in guidance

31. According to Plaintiff, the announcement of the June and November 2017 NOVs in the Company's 2Q19 10-Q filed on July 26, 2019 "partially revealed the truth of Defendants' fraudulent scheme."[38] Plaintiff further states that as a result of this alleged partial disclosure, "the price of Cabot stock declined 12% on volume of more than 22.6 million shares to close at $19.16

---

[38] First Amended Complaint, ¶206.

15

per share on July 26, 2019."[39] However, Cabot's stock price had already declined before the Form 10-Q with the allegedly corrective information was even filed. In particular, Cabot's 2Q19 10-Q was filed at 11:42AM EST;[40] however, by 11:00 AM EST, before the 10-Q was filed, Cabot's stock price had already dropped as much as 12% compared to the closing price on the prior trading day. The chart below shows Cabot's intraday stock prices (*i.e.,* stock prices during the trading day) and as well as Cabot's intraday stock prices in the last trading hour on the prior trading day.



**Cabot Oil & Gas Corporation Intraday Stock Price**

Source:
Data from Bloomberg, L.P. SEC website shows Cabot 2Q19 Form 10-Q, filed July 26, 2019 was accepted at 11:42AM. See, "Filing Detail," https://www.sec.gov/Archives/edgar/data/858470/000085847019000032/0000858470-19-000032-index.htm , last accessed January 13, 2023.

---

[39]   First Amended Complaint, ¶260.

[40]   Cabot 2Q19 Form 10-Q, filed July 26, 2019. SEC website shows that Cabot 2Q19 Form 10-Q was accepted at 11:42AM on July 26, 2019. See, SEC website "Filing Detail," accessed at: https://www.sec.gov/Archives/edgar/data/858470/000085847019000032/0000858470-19-000032-index.htm.

32.     An analysis of the intraday movement of Cabot's stock price, as can be seen in the chart above, indicates that Cabot's stock price drop was due to information released before the market opened because the stock price drop had already occurred by the time the market opened. On that same day, July 26, but before market hours, Cabot released its 2Q19 earnings at approximately 6:38AM EST.[41] In this earnings release, Cabot announced negative news regarding its forward-looking guidance. In particular, Cabot announced a reduction in its production guidance for second half 2019 but announced an increase in its 2019 capital expenditures guidance. Furthermore, Cabot announced a preliminary 2020 production guidance that was below market expectations.[42] Thus, the pattern of Cabot's price movement shows that the price drop on July 26, 2019 was due to the earnings release and was not due to the two NOVs, which were disclosed *after* the price drop already happened. Therefore, I find that on this day there is no price drop or price impact from the alleged misrepresentations.

> **2.     A review of analyst commentary confirms that Cabot's stock price decline on July 26, 2019 was not due to the disclosure of the two NOVs but was due to changes in guidance**

33.     A review of analyst commentary following the July 26, 2019 alleged corrective disclosure further confirms that Cabot's stock price drop on that day was not due to the disclosure of the two NOVs but was instead due to Cabot's announcement of the new guidance.

34.     Analysts covering a company typically issue reports after new information about the company is released, and these reports play an important role in disseminating information about a stock and can be a valuable source of information on market knowledge and sentiment at

---

[41]   Based on timestamp for Cabot Form 8-K, filed July 26, 2019. See, SEC Website "Filing Detail," accessed at: https://www.sec.gov/Archives/edgar/data/858470/000085847019000030/0000858470-19-000030-index.htm.

[42]   See, for example, Credit Suisse analyst report, dated July 26, 2019.

the time. *None* of the 18 analysts following Cabot even mentioned the two NOVs in their reports issued on or after July 26, 2019, indicating that the NOVs were not viewed by analyst as information material to Cabot's stock price.[43]

35.     In contrast, *all* analysts covering Cabot discussed and highlighted Cabot's new guidance announced before the market open on the same date and noted that the new guidance was negative news to Cabot. The table below shows excerpts of analyst commentary on Cabot's new guidance and whether each analyst mentioned the NOVs disclosed in Cabot 10-Q in reports issued following the July 26, 2019 alleged corrective disclosure.

| Analyst | Date | Mentions NOVs? | Mentions Guidance Change? | Selected Commentary on Guidance Change |
|---|---|---|---|---|
| 1. BMO | 7/26/19 | No | Yes | "[…] positives are outweighed by higher capex, lower 2019 growth, and a less capital efficient 2020 outlook." |
| 2. Bank of America | 7/26/19 | No | Yes | "Despite the solid quarter, we expect the market to focus on preliminary 2020 guidance [...]" |
| 3. Cowen | 7/26/19 | No | Yes | "Investors will focus on lower '19 prod guide of 16-18% (-3% vs our model) and 1% higher capex while '20 growth is moderated [...]" |
| 4. Credit Suisse | 7/26/19 | No | Yes | "Lowers 2019 volume growth outlook; initial 2020 guidance disappoints." |
| 5. Evercore ISI | 7/26/19 | No | Yes | "COG outlined a preliminary 2020 development plan of 5% production growth on capital spending of $700-725 mm. Previously we had estimated 8% growth […]" |

---

[43]   Based on available Cabot analyst reports from Refinitiv Eikon.

| Analyst | Date | Mentions NOVs? | Mentions Guidance Change? | Selected Commentary on Guidance Change |
|---|---|---|---|---|
| 6. Guggenheim Securities | 8/20/19 | No | Yes | "We are reducing our 2019/20 EPS estimates to $1.74/$1.41 from $2.00/$1.75. The revision primarily reflects an ~1.9% decrease in production estimates for 2020 […]" |
| 7. Jefferies | 7/26/19 | No | Yes | **"COG raised FY19 capex while cutting production guidance, which is never a good formula […]"** |
| 8. JP Morgan | 7/26/19 | No | Yes | "Although relatively minimal, a capex raise for the full-year with lower production is not typically treated well […] the updated growth guidance of 5% undershoots the Street's 10% [...]" |
| 9. Ladenburg Thalmann | 7/26/19 | No | Yes | "COG reduced this year's production growth target [...] COG provided preliminary 2020 production growth target of 5.0% [...] This compares with our 15% production growth target […]" |
| 10. Macquire | 7/26/19 | No | Yes | "COG's initial 2020 guidance sets production growth at 5% on a capex budget of US$700–725mm, which compares with our 14% growth on US$820mm […]" |
| 11. MKM Partners | 7/29/19 | No | Yes | "2019 production growth expectation was reduced 2% to ~18% in conformity with the upper end of guidance […] while our 2020 growth outlook was lowered […] which reconciles with preliminary guidance." |
| 12. Piper Jaffray | 7/26/19 | No | Yes | "COG is lowering 2019 guidance [...] an initial look at 2020 which implies […] below SE/Street expectations […]" |
| 13. Scotiabank | 7/26/19 | No | Yes | "While the initial 2020 guidance lines up well with our expectations (growth 7 % vs. 5% […]), consensus is still calling for 11% […]" |
| 14. Seaport Global Securities | 7/26/19 | No | Yes | "With this dialed-down budget, FY20 production growth fails to meet Street expectations […]" |

| Analyst | Date | Mentions NOVs? | Mentions Guidance Change? | Selected Commentary on Guidance Change |
|---|---|---|---|---|
| 15. Susquehanna | 7/29/19 | No | Yes | "[…] we are lowering our COG price target to $23 from $28 on reduced production estimates [...] Early 2020 look shows lower implied capital efficiency." |
| 16. TD Securities | 7/26/19 | No | Yes | **"2019 Production Guidance Revised Down [...] FY 2020 Guidance Introduced. Lower Capex and Growth Than Expected […]"** |
| 17. UBS | 7/26/19 | No | Yes | "FY19 production growth guidance was also lowered [...] for 2020, the growth numbers are below UBS / consensus expectations […]" |
| 18. Wells Fargo | 7/26/19 | No | Yes | "we expect investors to focus on the preliminary 2020 guidance [...] the company reduced its 2019 volume outlook [...]" |

36.     Furthermore, analysts not only noted that Cabot's new guidance was negative news but also directly attributed Cabot's stock price decline on July 26, 2020 to the new guidance. For example:

> "**FY 2020 Guidance Introduced. Lower Capex and Growth Than Expected** (…) **Our View**: In light of currently weak U.S. gas prices, a more moderate level of spending and growth seems prudent. However, as with the 2019 guidance revision this will likely result in 2020 CF falling short of investor expectations and **weigh on its share price.** [TD Securities, July 26, 2019, emphasis added]

> While revised 2019 guidance didn't help, **we think the main driver behind today's share price underperformance was COG's disappointing 2020 outlook** (+5% YoY growth with a $700-$725MM budget vs. consensus +10% YoY at similar capex.) This slower growth/capex strategy is an effort to maximize FCF at lower gas prices, but also suggests COG is losing operational/logistical efficiencies as it moves to larger pads and operates a much larger production base. [Credit Suisse, 7/26/19, emphasis added]

**COG shares underperformed on Friday after 2020 capital efficiency disappointed, but we maintain our Buy rating as we continue to see COG as a leader in FCF generation. While some growth and FCF does get pushed out with COG's prelim 2020 guide, we see the decision as prudent in the current gas environment.** [Jefferies, 7/29/19, emphasis in original]

COG's stock responded negatively, down ~12% on Friday, July 26th, **we believe due to the increase in maintenance capex and signs of capital efficiency degradation**. [Macquarie, 7/29/19, emphasis added]

37.     Moreover, when analysts updated their price target following the July 26, 2019 alleged corrective disclosure, none of the analysts attributed their price target change to the two NOVs, further confirming that the two NOVs were not viewed as information material to Cabot's stock price.[44] Instead, analysts explicitly revised their price targets due to changes in guidance. For example:

Following 2Q results Friday, **we are lowering our COG price target to $23 from $28 on reduced production estimates and a lower target multiple to reflect COG's narrowing capital efficiency advantage versus its peers**. **The company's preliminary 2020 projections seemed to confirm our view (discussed in a June 20 note: 'FCF King Among Gas Names, but Has Capital Efficiency Peaked?') that its capital efficiency has peaked.** We maintain a Positive rating given COG's still robust free cash flow profile and our view that gas prices are likely to recover next year. [Susquehanna, 7/29/19, emphasis added]

The superior margins (full-cycle CF margin of 60%), industry-leading capital efficiencies (TD estimates ~$4000/BOE/d), robust balance sheet (YE-2019E D/CF 0.6x), modest growth within CF, and ongoing return of capital to shareholders warrant a BUY rating. **However, we are reducing our target price to $27.00 from $29.00 to reflect the lower production outlook through 2020.** [TD Securities, 7/29/19, emphasis added]

We are upgrading our rating on COG shares from Neutral to Buy, though **we are decreasing our COG price target by $1 to $25 per share due to slightly lower near-term growth**. Specifically, our 2019 production growth expectation was reduced ~2% to

---

[44]  Based on available Cabot analyst reports from Refinitiv Eikon.

21

~18% in conformity with the upper end of guidance (16%-18%), **while our 2020 growth outlook was lowered from ~9% to ~5%, which reconciles with preliminary guidance**. [MKM Partners, 7/29/19, emphasis added]

38.     In sum, an analysis of Cabot's intraday price movements shows and a review of analyst reports further confirms that Cabot's stock price drop on July 26, 2019 was not due to the alleged misrepresentations but was due to Cabot's new guidance. The two NOVs that were allegedly corrective of the alleged misrepresentations were disclosed after the stock price drop already happened. Not one analyst following Cabot even mentioned the two NOVs while all of the analysts commented on Cabot's new guidance, with many analysts explicitly attributing the price drop to the new guidance. Thus, I find that on this day there is no stock price drop due to the alleged misrepresentations and there is no price impact due to the alleged misrepresentations.

### B.     Following the June 15, 2020 alleged corrective disclosure, Cabot's stock price did not decline due to the alleged misrepresentations

#### 1.     The majority (if not all) of the June 15, 2020 disclosure could not be attributed to the alleged misrepresentations because it relates to wells and time periods that do not even correspond to the alleged misrepresentations

39.     The second alleged corrective disclosure was on June 15, 2020, and on that date the Pennsylvania Attorney General's office charged Cabot, following a grand jury investigation, with criminal counts for allegedly knowingly allowing methane discharge to local groundwater from a total of 25 wells.[45] Along with the charges, the Pennsylvania Attorney General's office released the AG Presentment, a document that summarizes the finding of the Grand Jury

---

[45]   First Amended Complaint, ¶208. According to the Complaint, the criminal charge was announced before market hours; however, it appears the first announcement was through the Pennsylvania Attorney General's tweet at 12:17PM on June 15, 2020. See, @PAAttorneyGeneral, accessed at https://twitter.com/PAAttorneyGen/status/1272563867248406534?s=20&t=9JGSr8mxFZXlegJtAEF-ng.

investigation.[46] Each of the wells relating to the criminal charges and the time period of the alleged violations were listed in the AG Presentment.

40.      A review of the AG Presentment shows that out of the 25 wells with alleged violations, 14 of them were not even wells pertaining to the alleged misrepresentations. Moreover, of the 11 wells that actually pertained to the alleged misrepresentations, the AG Presentment did not allege any violations for time periods that pertained to the alleged misrepresentations. Specifically, the AG Presentment charges those 11 wells only for time periods through June 11, 2018, but the alleged misrepresentations pertaining to those wells were made on or after July 26, 2019, more than a year after the violation period alleged in the AG Presentment, and the alleged misrepresentations did not contain statements with regard to whether there were violations back in 2018. The table below shows the 25 wells, the time period of the alleged violations, whether the wells themselves pertained to the alleged misrepresentations, and whether the alleged violation period pertained to the alleged misrepresentations.

---

[46]   See, "AG Shapiro And 43rd Statewide Grand Jury File Criminal Charges Against NEPA Fracking Company," accessed at: https://www.attorneygeneral.gov/taking-action/ag-shapiro-and-43rd-statewide-grand-jury-file-criminal-charges-against-nepa-fracking-company/.

## Cabot Oil & Gas Corporation
## Wells Charged in AG Presentment

| Wells Charged in AG Presentment | Alleged Violation Period | Well Itself Pertained to Alleged Misreps.? | Date of Alleged Misrep. | Alleged Violation Period Pertained to Alleged Misrep.? |
|---|---|---|---|---|
| (1) | (2) | (3) | (4) | (5) |
| 1. G Shields 1 V | 8/14/09 - 6/11/18 | No | - | - |
| 2. G Shields 2H | 8/14/09 - 6/11/18 | No | - | - |
| 3. G Shields 4H | 8/14/09 - 6/11/18 | No | - | - |
| 4. G Shields SH | 8/14/09 - 6/11/18 | No | - | - |
| 5. Costelo 1 V | 7/16/08 - 6/11/18 | No | - | - |
| 6. Costelo 2V | 7/16/08 - 6/11/18 | No | - | - |
| 7. Gesford 4H | 7/16/08 - 6/11/18 | No | - | - |
| 8. Gesford 8H | 7/16/08 - 6/11/18 | No | - | - |
| 9. Ratzel 1 H | 10/31/08 - 6/11/18 | No | - | - |
| 10. Ratzel 2H | 10/31/08 - 6/11/18 | No | - | - |
| 11. Ratzel 3V | 10/31/08 - 6/11/18 | No | - | - |
| 12. Ely 4H | 3/27/08 - 6/11/18 | No | - | - |
| 13. Ely 6H | 3/27/08 - 6/11/18 | No | - | - |
| 14. Howell 2H | 10/9/16 - 6/11/18 | Yes | 7/26/19 | No |
| 15. Howell 4H | 10/9/16 - 6/11/18 | Yes | 7/26/19 | No |
| 16. Howell 6H | 10/9/16 - 6/11/18 | Yes | 7/26/19 | No |
| 17. Howell 8H | 10/9/16 - 6/11/18 | Yes | 7/26/19 | No |
| 18. Jeffers Farm 7H | 2/20/17 - 6/11/18 | Yes | 7/26/19 | No |
| 19. Jeffers Farm 8H | 2/20/17 - 6/11/18 | Yes | 7/26/19 | No |
| 20. Jeffers Farm 9H | 2/20/17 - 6/11/18 | Yes | 7/26/19 | No |
| 21. Jeffers Farm 10H | 2/20/17 - 6/11/18 | Yes | 7/26/19 | No |
| 22. Jeffers Farm 11H | 2/20/17 - 6/11/18 | Yes | 7/26/19 | No |
| 23. Jeffers Farm 12H | 2/20/17 - 6/11/18 | Yes | 7/26/19 | No |
| 24. Jeffers Farm 14H | 2/20/17 - 6/11/18 | Yes | 7/26/19 | No |
| 25. POWERS M 002 | 2/27/19 - 1/9/20 | No | - | - |

**Source:**
Data from AG Presentment and Declaration of Scott C. Schroeder.

41.    Thus, the majority (if not all) of the June 15, 2020 disclosure could not be

attributed to the alleged misrepresentations. As the table above shows, 14 out of the 25 wells

charged in the AG Presentment did not even correspond to any of the alleged misrepresentations,

and for wells that actually correspond to the alleged misrepresentations, the AG Presentment did

not allege that there were continuing violation at those wells at the time of the alleged

24

misrepresentations, nor did the alleged misrepresentations contain any statements with regard to whether there were violations during the alleged violation periods identified in the AG Presentment.

### 2. There was no statistically significant stock price decline following the June 15, 2020 disclosure due to the alleged misrepresentations

42.     Moreover, the stock price decline on June 15, 2020, even if taken as a whole and thus including portions that could not be due to the alleged misrepresentations, was not statistically significant. Specifically, I tested whether there was statistically significant stock price reaction on June 15, 2020 by conducting my own event study as well as by using a modified version of Dr. Feinstein's event study model.

43.     For my event study model, I used the S&P 500 Index (excluding Cabot) to control for market movements (the "market index") and the S&P Oil & Gas Exploration & Production Select Industry Index (also excluding Cabot) to control for industry movements (the "industry index").[47] A control period of one year starting from March 11, 2020, the day that the World Health Organization declared Covid-19 a global pandemic, was used. The control period excluded the June 15, 2020 alleged corrective disclosure.[48] Note that in contrast to Dr. Feinstein's event study model, the coefficients for both the market index and the industry index used in my event study model are statistically significant and positive.[49] In particular, of the three control variables that Dr. Feinstein used (Market Index, Sector Index, and Natural Gas Factor),

---

[47]   Coterra, the company formed by Cabot's merger with Cimarex Energy, compares itself to the S&P Oil & Gas Exploration & Production Select Industry Index in its Form 10-K. Coterra FY21 Form 10-K, filed March 1, 2022, p. 47.

[48]   Results are similar when using a control period that starts from January 30, 2020, the start date of Dr. Feinstein's Covid-period.

[49]   In contrast to Dr. Feinstein's event study models used for days close to June 15, 2020. See, Feinstein Report, Exhibit 8.

only the Market Index has a statistically significant positive coefficient. The Sector Index has a *negative* coefficient that is not statistically significant. The Natural Gas Factor has a positive coefficient that is *not statistically significant*.[50]

44.    I also tested the statistical significance of the stock price decline on June 15, 2020 using a modified version of Dr. Feinstein's event study model. As detailed below, Dr. Feinstein's own statistical tests are unreliable and yield clearly erroneous and unreasonable results. The Modified Feinstein Model that I used included the same control variables as those used by Dr. Feinstein but removes the non-standard adjustments that Dr. Feinstein applied to his tests of statistical significance.[51] To account for the higher volatility due to Covid-19, instead of using a control period that includes both the pre-Covid period and the "Covid period," the model used a control period that only included the "Covid-period" as defined by Dr. Feinstein, which starts from January 30, 2020 and ends on June 12, 2020, the day before the criminal charges were announced.[52]

45.    The price reaction after the June 15, 2020 alleged corrective disclosure is not statistically significant at either the standard 5% level[53] or the lower threshold of 10% level using

---

[50]   See, Feinstein Report, p. 206.

[51]   Dr. Feinstein applied a non-standard adjustment to his tests of statistical significance to purportedly account for higher volatility due to Covid-19 pandemic. As discussed below in Section VIII, Dr. Feinstein's adjustment is not only non-standard but also unreliable and yields clearly erroneous and unreasonable results.

[52]   In addition, following Dr. Feinstein's event study, I used dummy variables to control for days with earnings announcements and days with no Natural Gas Factor returns.

[53]   A 5% statistical significance level is the standard that is typically used by science and by courts. See, for example, Freedman, David A., and David H. Kaye, "Reference Guide on Statistics," *Reference Manual on Scientific Evidence* (Washington, D.C.: Federal Judicial Center, 3rd ed., 2011), pp. 211-302, and Fisher, Franklin M., "Multiple Regression in Legal Proceedings," *Columbia Law Review*, 80: 1980. See, also, Memorandum Opinion and Order, *The Erica P. John Fund, Inc. v. Halliburton Company and David J. Lesar* (3:02-CV-1152-M), filed July 25, 2015. ("To show that a corrective disclosure had a negative impact on a company's share price, courts generally require a party's expert to testify based on an event study that meets the 95% confidence standard, which means 'one can reject with 95% confidence the null hypothesis that the corrective disclosure had no impact on price.'")

either of the two event study models discussed above.[54] In other words, Cabot's stock price decline after the June 15, 2020 announcement, after controlling for market and industry movements, is within the range of normal expected daily variation in the stock price, and thus, cannot be statistically distinguished from zero.

46.      In sum, following the June 15, 2020 alleged corrective disclosure, there was no statistically significant stock price decline due to the alleged misrepresentations. The majority (if not all) of the disclosure on June 15, 2020 was not due to the alleged misrepresentations and the stock price decline on June 15, 2020, even if taken as a whole and thus including portions that could not be due to the alleged misrepresentations, was not statistically significant.

## VII.  THE MARKET EVIDENCE DEMONSTRATES THAT IN AN EFFICIENT MARKET THE ALLEGED MISREPRESENTATIONS WOULD NOT HAVE AN IMPACT ON CABOT'S STOCK PRICE

### A.  When the alleged misrepresentations were made, none of the analysts following Cabot mentioned the alleged misrepresentations, and there were no statistically significant stock price increases due to the alleged misrepresentations

47.      A review of analyst commentary and price reactions shows that when the alleged misrepresentations were made, none of the analysts following Cabot mentioned the alleged misrepresentations, and there were no statistically significant stock price increases due to the alleged misrepresentations. As discussed above, analysts covering a company typically issue reports after new information about the company is released. In particular, even though the alleged misrepresentations relate to Cabot's remediation efforts in response to NOVs and/or

---

[54]   Results are similar no matter whether logarithm returns or percentage returns are used and no matter whether dummy variables are used to control for earnings announcement dates or not.

Consent Orders and according to Plaintiff are material to Cabot's stock prices, none of the analysts covering Cabot mentioned any of the alleged misrepresentations.[55]

48.     Moreover, according to Dr. Feinstein's event study, there were no statistically significant stock price increases on any of the 9 days that the alleged misrepresentations were made.[56] I also conducted my own event studies for the 9 days and on 8 of those days I similarly found that there were no statistically significant positive stock price reactions.[57] The one day with a statistically significant stock price increase was February 22, 2016; however, market evidence shows that the increase was not due to the Form 10-K that contained the alleged misrepresentation. The Form 10-K was not released until approximately half an hour before market close and by that time the entire stock price increase of the day had already happened.[58] Moreover, not one analyst mentioned the alleged misrepresentation in their reports. Instead, analysts discussed numerous other events including the "positive operational update" Cabot disclosed in its recent earnings release and an equity offering that Cabot announced later in the day.[59]

---

[55]   Based on a search of Cabot analyst reports available through Refinitiv Eikon containing any of the following keywords: "Notice of Violation," "Notices of Violation," "Consent Order," "groundwater," "PaDEP," "Department of Environmental Protection," "methane," or "fines." I reviewed analyst reports that contained any of those keywords and found none of them relate to the alleged misrepresentations.

[56]   The 9 days are: 2/22/16, 5/3/16, 7/29/16, 10/28/16, 2/27/17, 7/26/19, 10/25/19, 2/25/20, and 5/1/20.

[57]   For each alleged misrepresentation date, a control period of 252 trading days (approximately one calendar year) prior to the alleged misrepresentation date was used. The S&P 500 index was used to control for market movements and the S&P Oil & Gas Exploration & Production Select Industry Index was used to control for industry movements.

[58]   10-K filing time from SEC website "Filing Detail," accessed at: https://www.sec.gov/Archives/edgar/data/858470/000085847016000036/0000858470-16-000036-index.htm.

[59]   GMP analyst report, dated February 22, 2016. See also, KLR analyst report, dated February 22, 2016 and KLR analyst report, dated February 23, 2016.

**B.** **A review of Cabot's public filings and market commentary demonstrates that the alleged misrepresentations did not conceal any economically material information that was not already known to the market**

**1.** **Before and during the alleged Class Period, Cabot repeatedly disclosed that "from time to time we receive notices of violation"**

49.     In an efficient market, only new news should affect a security's price and confirmatory or repeated news should not have an impact. For a number of years before the start of the alleged Class Period, Cabot repeatedly disclosed that "[f]rom time to time we receive notices of violation from governmental and regulatory authorities in areas in which we operate relating to alleged violations of environmental statutes or the rules and regulations promulgated thereunder."[60] In fact, every Form 10-Q and Form 10-K issued by Cabot between 1Q13 and 1Q20 contained the same language, informing investors of the fact that Cabot had been receiving NOVs similar to the ones disclosed in the July 26, 2019 alleged corrective disclosure and the possible imposition of fines or penalties related to those NOVs.

50.     Thus, as Cabot already disclosed before and during the alleged Class Period that the Company received NOVs "from time to time," the receipt of the two 2017 NOVs and the disclosure of those two NOVs by Cabot on July 26, 2019 that was alleged corrective of the alleged misrepresentations was in line with what the market expected to happen to Cabot "from time to time." I also understand from Defendants that NOVs are public records under Pennsylvania law, 35 P.S. § 691.607; 25 Summ. Pa. Jur. 2d Environmental Law § 9:327 (2d ed.) (PaJur Environ § 9:327), and that the Pennsylvania Department of Environmental Protection

---

[60]   See, for example, Cabot 1Q13 10-Q, filed April 26, 2013, p.27.

maintained a searchable public database containing NOVs for Cabot. This would further support the conclusion that the disclosure of the NOVs would not be expected to surprise the market.

### 2. The potential fines associated with the Notice of Violations were not economically material to Cabot

51.     According to Cabot's public filings, the June and November 2017 NOVs that were disclosed in the July 26, 2019 alleged corrective disclosure were expected to result in monetary penalties of up to approximately $215,000 and $355,000 respectively.[61] The table below compares these potential fines with Cabot's operating revenue.  As can be seen in the table these potential fines represented substantially less than $1/10^{th}$ of one percent of Cabot's revenue.

| Cabot Oil & Gas Corporation Potential Fines vs. Cabot's Operating Revenue | | | | |
|---|---|---|---|---|
| Year | Operating Revenue | $215,000 Fine as a % of Operating Revenue | $355,000 Fine as a % of Operating Revenue | Total Fine as a % of Operating Revenue |
| (1) | (2) | (3) = $215,000 / (2) | (4) = $355,000 / (2) | (5) = $570,000 / (2) |
| 2015 | $1.4B | 0.02% | 0.03% | 0.04% |
| 2016 | $1.2B | 0.02% | 0.03% | 0.05% |
| 2017 | $1.8B | 0.01% | 0.02% | 0.03% |
| 2018 | $2.2B | 0.01% | 0.02% | 0.03% |
| 2019 | $2.1B | 0.01% | 0.02% | 0.03% |
| | Average | 0.01% | 0.02% | 0.04% |

Notes and Sources:
Operating revenue data from Cabot's FY19 10-K filed February 25, 2020. The amount of potential fines from 2Q19 10-Q filed July 26, 2019. Maximum potential fines are used.

52.     The table below compares the potential fines with Cabot's net income.

---

[61]   Cabot 2Q19 10-Q, filed July 26, 2019, p.29.

### Cabot Oil & Gas Corporation
### Potential Fines vs. Cabot's Net Income

| Year | Net Income | $215,000 Fine as a % of Net Income | $355,000 Fine as a % of Net Income | Total Fine as a % of Net Income |
|------|------------|------------------------------------|------------------------------------|---------------------------------|
| (1) | (2) | (3) = $215,000 / (2) | (4) = $355,000 / (2) | (5) = $570,000 / (2) |
| 2015 | -$0.1B | -0.19% | -0.31% | -0.50% |
| 2016 | -$0.4B | -0.05% | -0.09% | -0.14% |
| 2017 | $0.1B | 0.21% | 0.35% | 0.57% |
| 2018 | $0.6B | 0.04% | 0.06% | 0.10% |
| 2019 | $0.7B | 0.03% | 0.05% | 0.08% |
| | Average[1] | **0.09%** | **0.16%** | **0.25%** |

Notes and Sources:
Net Income data from Cabot's FY19 10-K filed February 25, 2020. The amount of potential fines from 2Q19 10-Q filed July 26, 2019. Maximum potential fines are used.
[1] Excludes the years with negative net income.

53.     As can be seen in the tables above, the potential fines represented only a tiny portion of Cabot's revenue or net income – on average less than 1/10[th] of one percent of Cabot's annual operating revenue and less than half a percent of Cabot's annual net income for every year within the alleged Class Period. Courts have recognized that variances of less than 5% from a company's earnings or other financial metrics are "presumptively" immaterial or are likely to be viewed as immaterial.[62] As such, these potential fines were not economically material to Cabot and would not be expected to have an impact on Cabot's stock price – consistent with the finding that there were no statistically significant stock price reactions on July 26, 2019 following the disclosure of two NOVs.

---

[62]   See, e.g., *In re Lone Pine Res., Inc.*, 2014 WL 1259653, at *4 (S.D.N.Y. Mar. 27, 2014) ("An omission or misstatement that has an impact of less than 5% on a company's reported financial metrics is presumptively immaterial."); *In re Aceto Corp. Secs. Litig.*, 2019 WL 3606745, at *4 (E.D.N.Y. Aug. 6, 2019) (less than 5% of earnings "presumed" immaterial).

31

**3.** **None of the analysts covering Cabot issued reports on the day when the criminal charges were first announced or changed their valuation of Cabot due to the criminal charges and the only analyst that mentioned the criminal charges in their later reports noted that potential fines "even in a worst case scenario" "would be minimal"**

54.     Further evidence that the alleged misrepresentations would not be expected to affect Cabot's stock price is that none of the analysts covering Cabot issued an analyst report on the day or the day after the announcement of the criminal charges. Analysts covering a company typically issue reports after new information about the company is released, and a lack of analyst reports issued immediately following the criminal charges is evidence that analysts did not view the criminal charges as information material to Cabot's stock price.

55.     Moreover, even in analyst reports issued on days subsequent to the initial announcement, 12 of the 13 analysts covering Cabot did not mention the criminal charges.[63] The JP Morgan analysts are the only one that mentioned the charges – first in a report issued two days after the announcement (on June 17, 2020) and then in another report issued almost a month later (on July 13, 2020). In the June 17, 2020 report, the JP Morgan analysts simply stated that Cabot acknowledged the charges and was negotiating with the parties involved but didn't comment on the charges.[64] In the July 13, 2020 report, in addition to reiterating what was in the earlier report, the JP Morgan analysts also noted that "news reports indicated the charges came with maximum fines of $50,000 per count, so that even in a worst case scenario any cash outflow would be minimal."[65]

---

[63]   Based on available Cabot analyst reports from Refinitiv Eikon.

[64]   JP Morgan analyst report, dated June 17, 2020.

[65]   JP Morgan analyst report, dated July 13, 2020.

56.     A systematic review of analysts' price target changes following the June 15, 2020 alleged corrective disclosure further confirms that the criminal charges were not viewed as economically material information by the market, as none of the 13 analysts covering Cabot changed their price targets due to the criminal charges.[66] Specifically, in the one and half month period between the initial announcement of the criminal charges and Cabot's next earnings announcement, 12 of the 13 analysts following Cabot did not change their price targets. JP Morgan analysts are the only one that changed their price targets during that period, but the analysts did not attribute the changes to the criminal charges – in fact, as discussed above, the JP Morgan analysts noted that "even in a worst case scenario" any cash outflow due to the criminal charges would be "minimal."[67]

### C.     The market did not react to disclosures of information similar to what's allegedly concealed by the alleged misrepresentations

57.     An analysis of other disclosures similar to the alleged corrective disclosures shows that those other disclosures did not cause any statistically significant price reactions, which is further evidence that Cabot's stock price did not drop due to information allegedly corrective of the alleged misrepresentations.

#### 1.     Cabot's disclosure of a Notice of Violation at the beginning of the alleged Class Period did not impact its stock price and none of the analysts following Cabot mentioned this disclosure

58.     Cabot's 2Q19 Form 10-Q filed on July 26, 2019 was not the first SEC filing in which Cabot disclosed that it had received proposed Consent Orders or NOVs relating to gas migration allegations from the PaDEP. In particular, Cabot's FY15 Form 10-K filed in 2016

---

[66]   Based on available Cabot analyst reports from Refinitiv Eikon.

[67]   JP Morgan analyst report, dated July 13, 2020.

stated that the Company "received a Notice of Violation from the PaDEP in September 2011 for failure to prevent the migration of gas into fresh groundwater sources in the area surrounding these wells[.]"[68]

59.     This earlier disclosure of a NOV in Cabot's FY15 Form 10-K was a similar announcement to the alleged corrective disclosure of two additional NOVs in its 2Q19 Form 10-Q. Similar to the alleged corrective disclosure, Cabot disclosed in FY15 Form 10-K that it had received an NOV a couple of years ago and that the NOV could result in a monetary penalty.

60.     The market did not react to this earlier disclosure of an NOV that is substantially similar to the July 26, 2019 allegedly corrective disclosure. According to Dr. Feinstein's event study as well as my own, there were no statistically significant stock price decline on February 22, 2016.

61.     Moreover, none of the analysts covering Cabot even mentioned the disclosure of the NOV in reports issued following Cabot's FY15 Form 10-K. This is further evidence that the disclosure of NOVs similar to the ones alleged in this matter were not viewed by the market as information economically material to Cabot's stock.

### 2.     Just three days before charging Cabot, PA Attorney General charged Cabot's peer company Range Resources – Range Resources' stock price did not react to the charges

62.     One of Cabot's peer companies was charged by the same Attorney General with similar charges a few days before Cabot was charged and that peer company's stock also did not react to the charges. Specifically, on June 12, 2020, just three days before the announcement of criminal charges against Cabot, Pennsylvania Attorney General, the same Attorney General that

---

[68]  Cabot FY15 Form 10-K, filed February 22, 2016, p.32.

would charge Cabot, pressed charges against Range Resources Corporation for environmental crimes related to leaks and contamination at wells in Buffalo Township.

63.     Using an event study, I found there was no statistically significant reaction to this announcement of criminal charges against Cabot's peer company.[69] The lack of statistically significant price reaction demonstrates that the market did not consider the criminal charge announcement as material.

### 3.     The fine on Cabot from the criminal charges was announced on November 29, 2022 to no price reaction

64.     On November 29, 2022, Coterra, which was formed in 2021 through a merger between Cabot and Cimarex Energy Co., announced that it entered a plea in Susquehanna County Court and agreed to pay a $16.29 million fine in relation to the criminal charges against Cabot that were announced on June 15, 2020.[70] I tested whether there was statistically significant stock price reaction to the announcement of the $16.29 million fine using an event study. The event study model controlled for market and industry movements with the S&P 500 Index and S&P Oil & Gas Exploration & Production Select Industry Index.[71] According to the event study,

---

[69]   The event study model used Dow Jones U.S. Exploration & Production Index and S&P Small Cap 600 Index, which Range Resources lists as benchmark indices in its SEC filings to evaluate its relative performance over time. See, for example, Range Resources FY19 10-K, filed February 27, 2020. The event study model used a control period of 252 trading days before the announcement of the criminal charges. Range Resources also lists S&P Mid Cap 400 Index as another benchmark index. Results do not change if the event study model uses S&P Mid Cap 400 Index instead of S&P Small Cap 600 Index or only uses the Dow Jones U.S. Exploration & Production Index.

[70]   "Gas driller pleads no contest to polluting town's water," *Associated Press*, November 29, 2022. It is my understanding the $16.29 million fine not only served to resolve the criminal charges but would also allow Coterra to resume drilling within the Dimock Box. It is also my understanding that the prior restrictions on drilling within the Dimock Box were unrelated to any of the alleged misrepresentations.

[71]   Coterra compares itself to those two indices in its Form 10-K. See, Coterra FY21 Form 10-K, filed March 1, 2022, p. 47. A control period of 252 trading days before the announcement of the fine was used.

35

there was no statistically significant stock price reaction to Coterra's stock price following the announcement on November 29, 2022.[72]

## VIII. DR. FEINSTEIN'S EVENT STUDY STATISTICAL TESTS ARE NON-STANDARD, UNRELIABLE AND YIELD CLEARLY ERRONEOUS AND UNREASONABLE RESULTS

### A. Dr. Feinstein applies non-standard adjustments to test the statistical significance of his event study results to purportedly account for the impact of increased volatility during Covid-19 pandemic but the adjustments clearly fail to do this

65.    To test whether there are statistically significant price reactions on each of the days over the alleged Class Period, Dr. Feinstein performed event studies. However, instead of following the standard procedure used for testing the statistical significance of each event day, Dr. Feinstein attempts to apply a "Newey-West procedure" to modify the t-statistics associated with each day's excess return – the value of the t-statistic typically determines whether an excess return is statistically significant or not. Dr. Feinstein did not explain in his report the steps that he took to perform the modification, nor did he cite to any academic literature that supports his methodology for using this modification for his event studies.

66.    Dr. Feinstein applied the modifications to purportedly account for "elevated volatility" during the Covid-19 pandemic. However, as discussed below, Dr. Feinstein's application of these adjustments yields clearly erroneous and unreasonable results not only for days during his claimed "Covid period" (from January 30, 2020 to the end of the alleged Class

---

[72]   It appears the fines were first announced after market hours through a tweet by Pennsylvania Attorney General. See, @PAAttorneyGen, accessed at: https://twitter.com/PAAttorneyGen/status/1597710249376768000?s=20&t=zIzxFRv80v49Fni-_3Sjbw. There was no statistically significant price reaction on either November 29, 2022 or the day after.

Period, June 12, 2020) but also for days during the pre-Covid period (from February 22, 2016, the start of the alleged Class Period, to January 29, 2020).[73]

> **B.** **After applying the non-standard adjustments, days with small excess returns were categorized by Dr. Feinstein as being statistically significant while days with much larger excess returns were categorized as being not statistically significant – a result that is contrary to the underlying finance theory**

67.     An event study tests whether the stock return on a given event date, after controlling for market and industry movements, is within the range of normal expected daily variation, and cannot be distinguished from zero. The amount the stock moves after controlling for the market and/or industry movement is called the "excess return."[74] All else equal, excess returns that are larger in magnitude, whether positive or negative, are more likely to be outside the range of normal expected daily variation and thus more likely to be statistically significant, compared to excess returns that are smaller.

68.     During "the Covid period," Dr. Feinstein's regression analysis categorizes the excess returns on only four trading days as being statistically significant, while categorizing the stock returns on all remaining days of the Covid period as being non-statistically significant. The table below shows the four days and the excess returns as calculated by Dr. Feinstein for those four days.

---

[73]   Feinstein Report, ¶139.

[74]   Dr. Feinstein uses the term "residual return." According to Dr. Feinstein, residual return is "the portion of a security price change that cannot be attributed to market-wide or sector factors." Feinstein Report, ¶111.

**Cabot Oil & Gas Corporation**
**Excess Returns That Are Statistically Significant**
**According to Dr. Feinstein**
**Covid Period: January 30, 2020 to June 12, 2020**

| Date | Excess Returns |
|------|----------------|
| 2/18/2020 | 3.8% |
| 3/6/2020 | 13.5% |
| 5/11/2020 | -6.0% |
| 5/15/2020 | -2.7% |

**Notes and Sources:**
Data from Feinstein Report. Covid Period defined in Feinstein Report.

69.     Typically, one would expect the statistically significant excess returns to be large compared to excess returns on other days during the same time period. However, as the table shows, on one of the statistically significant days, May 15, 2020, the magnitude of the excess return was 2.74%, or less than 3%. Over the Covid-period, almost a third of the days had larger excess returns but none of them were statistically significant according to Dr. Feinstein. Moreover, even during the pre-Covid period when stock returns were less volatile, there were still 58 days that had larger excess returns and were not statistically significant according to Dr. Feinstein. In sum, Dr. Feinstein's event study yields the unreasonably result that small excess returns were statistically significant while much larger excess returns during the same time period were not statistically significant.

70.     The unreasonableness of Dr. Feinstein's event study results can be seen in the chart below. The chart shows the magnitude of the excess returns Dr. Feinstein calculated for each of the days during the Covid period and whether that excess return was statistically

significant or not according to Dr. Feinstein's modified tests. As the chart shows, for each of the four days with statistically significant excess returns, there were other days with excess returns that were larger or nearly as large that Dr. Feinstein found to be not statistically significant.



71.     The unreasonable results discussed above are not limited to days during the Covid-period. The chart below shows the magnitude of the excess returns Dr. Feinstein calculated for each day during the first year of the alleged Class Period, from February 22, 2016, to the end of 2016. According to Dr. Feinstein, the 13.2% excess return on November 30, 2016, which is the tallest bar on the chart, is *not* statistically significant – a result that is clearly unreasonable and erroneous. Furthermore, as can be seen in the chart, there are numerous non-statistically significant days with excess returns higher than the days Dr. Feinstein finds

39

statistically significant.



72.    A comparison with Dr. Feinstein's event study results in other matters where he did not apply the non-standard modifications further demonstrates the unreasonableness of Dr. Feinstein's event study statistical results for Cabot. As shown in the chart below, in contrast to the Cabot event study statistical results discussed above, the event study statistical results in a recent report by Dr. Feinstein in another matter where he did not apply the non-standard statistical modification as he did for Cabot event studies, shows that the days with statistically significant price reactions are indeed days with the largest excess returns.[75] In particular, as can

---

[75]    Data from Dr. Feinstein's Report on Market Efficiency dated July 14, 2022, in *UA Local 13 & Employers Group Insurance Fund v. Sealed Air Corporation et al.* Based on a 5% statistical significance level.

be seen clearly in the chart below, all the statistically significant excess returns (the bars in red) are larger in magnitude than the excess returns that are not statistically significant (the bars in green).



Notes and Sources:
Data from Dr. Feinstein's Report on Market Efficient in the matter UA Local 13 & Employers Group  Insurance Fund and Sealed Air Corporation filed July 15, 2022. Excess returns are in absolute values.

### C.   Dr. Feinstein's model yields the unreasonable results that days that are close in time with similar excess returns have completely different and contrary statistical significance results

73.     More evidence of the unreliability of Dr. Feinstein's statistical analysis is that Dr. Feinstein's analysis yields completely different results for days that are close in time and have similar excess returns. As an example, the chart below shows the excess returns on each trading day in March 2020 and the t-statistics associated with the excess returns for three adjacent

41

trading days March 5, 2020, March 6, 2020, and March 9, 2020 (obtained by Dr. Feinstein after

applying his non-standard modifications).



74.     As the chart shows, the excess return on March 6, 2020 was 13% and was

statistically significant according to Dr. Feinstein. The t-statistic for March 6, 2020 was 17.40. In

contrast, the excess return on March 9, 2020, which was also 13%, only had a t-statistic of 3.22,

which according to Dr. Feinstein's analysis is a value that is far from being statistically

significant.[76]

---

[76] Excess returns during the "Covid period" has to be smaller than -13.5673 or larger than 17.3959 to be statistically
    significant at a 5% level. See, Feinstein Report, Exhibit 10.

75.     Moreover, the 3.22 t-statistic for March 9, 2020, which had an excess return of 13%, is even lower than the t-statistic for March 5, 2020, which had an excess return less than 3%. In other words, according to Dr. Feinstein, an excess return of 13% is further away from being statistically significant than an excess return of less than 3% that was only two trading days earlier – a clearly erroneous and unreasonable result.

76.     In sum, the non-standard modification that Dr. Feinstein applied to his event study statistical tests is unreliable and yields clearly erroneous and unreasonable results. Dr. Feinstein characterized days with small excess returns as statistically significant while days with much larger excess returns as not statistically significant. Additionally, his results included days that are close in time with similar excess returns but having completely different and contrary statistical significance results. The pattern of Dr. Feinstein's event study statistical results discussed above are clearly inconsistent with results in his prior report in which he did not apply the non-standard modification.

I declare under penalty of perjury that the foregoing is true and correct.

Lucy P. Allen

43



**Lucy P. Allen**
Managing Director

NERA Economic Consulting
1166 Avenue of the Americas
New York, New York 10036
Tel: +1 212 345 5913  Fax: +1 212 345 4650
lucy.allen@nera.com
www.nera.com

# Appendix A

## LUCY P. ALLEN
## MANAGING DIRECTOR

## Education

**YALE UNIVERSITY**
M.Phil., Economics, 1990
M.A., Economics, 1989
M.B.A., 1986

**STANFORD UNIVERSITY**
A.B., Human Biology, 1981

## Professional Experience

| | |
|---|---|
| 1994-Present | **National Economic Research Associates, Inc.**<br>Managing Director. Responsible for economic analysis in the areas of securities, finance and environmental and tort economics.<br>Senior Vice President (2003-2016).<br>Vice President (1999-2003).<br>Senior Consultant (1994-1999). |
| 1992-1993 | **Council of Economic Advisers, Executive Office of the President**<br>Staff Economist. Provided economic analysis on regulatory and health care issues to Council Members and interagency groups. Shared responsibility for regulation and health care chapters of the *Economic Report of the President, 1993*. Working Group member of the President's National Health Care Reform Task Force. |
| 1986-1988<br>1983-1984 | **Ayers, Whitmore & Company (General Management Consultants)**<br>Senior Associate. Formulated marketing, organization, and overall business strategies including:<br>Plan to improve profitability of chemical process equipment manufacturer.<br>Merger analysis and integration plan of two equipment manufacturers.<br>Evaluation of Korean competition to a U.S. manufacturer.<br>Diagnostic survey for auto parts manufacturer on growth obstacles. |

1

Lucy P. Allen

Marketing plan to increase international market share for major accounting firm.

Summer 1985      **WNET/Channel Thirteen, Strategic Planning Department**
<u>Associate</u>.  Assisted in development of company's first long-term strategic plan. Analyzed relationship between programming and viewer support.

1981-1983        **Arthur Andersen & Company**
<u>Consultant</u>.  Designed, programmed and installed management information systems.   Participated in redesign/conversion of New York State's accounting system.  Developed municipal bond fund management system, successfully marketed to brokers.  Participated in President's Private Sector Survey on Cost Control (Grace Commission).   Designed customized tracking and accounting system for shipping company.

## Teaching
1989- 1992       <u>**Teaching Fellow**</u>**, Yale University**
Honors Econometrics
Intermediate Microeconomics
Competitive Strategies
Probability and Game Theory
Marketing Strategy
Economic Analysis

## Publications

"Snapshot of Recent Trends in Asbestos Litigation: 2022 Update," (co-author), NERA Report, 2022.

"Snapshot of Recent Trends in Asbestos Litigation: 2021 Update," (co-author), NERA Report, 2021.

"The Short-Term Effect of Goodwill Impairment Announcements on Companies' Stock Prices" (co-author), *International Journal of Business, Accounting and Finance,* Volume 14, Number 2, Fall 2020.

"Snapshot of Recent Trends in Asbestos Litigation: 2020 Update," (co-author), NERA Report, 2020.

 "Snapshot of Recent Trends in Asbestos Litigation: 2019 Update," (co-author), NERA Report, 2019.

"Snapshot of Recent Trends in Asbestos Litigation: 2018 Update," (co-author), NERA Report, 2018.

Lucy P. Allen

"Trends and the Economic Effect of Asbestos Bans and Decline in Asbestos Consumption and Production Worldwide," (co-author), *International Journal of Environmental Research and Public Health*, 15(3), 531, 2018.

"Snapshot of Recent Trends in Asbestos Litigation: 2017 Update," (co-author), NERA Report, 2017.

"Asbestos: Economic Assessment of Bans and Declining Production and Consumption," World Health Organization, 2017.

"Snapshot of Recent Trends in Asbestos Litigation: 2016 Update," (co-author), NERA Report, 2016.

"Snapshot of Recent Trends in Asbestos Litigation: 2015 Update," (co-author), NERA Report, 2015.

"Snapshot of Recent Trends in Asbestos Litigation: 2014 Update," (co-author), NERA Report, 2014.

"Snapshot of Recent Trends in Asbestos Litigation: 2013 Update," (co-author), NERA Report, 2013.

"Asbestos Payments per Resolved Claim Increased 75% in the Past Year – Is This Increase as Dramatic as it Sounds?  Snapshot of Recent Trends in Asbestos Litigation: 2012 Update," (co-author), NERA Report, 2012.

"Snapshot of Recent Trends in Asbestos Litigation: 2011 Update," (co-author), NERA White Paper, 2011.

 "Snapshot of Recent Trends in Asbestos Litigation: 2010 Update," (co-author), NERA White Paper, 2010.

"Settlement Trends and Tactics" presented at Securities Litigation During the Financial Crisis: Current Development & Strategies, hosted by the New York City Bar, New York, New York, 2009.

"Snapshot of Recent Trends in Asbestos Litigation," (co-author), NERA White Paper, 2009.

"China Product Recalls: What's at Stake and What's Next," (co-author), NERA Working Paper, 2008.

"Forecasting Product Liability by Understanding the Driving Forces," (co-author), The International Comparative Legal Guide to Product Liability, 2006.

 "Securities Litigation Reform: Problems and Progress," Viewpoint, November 1999, Issue No. 2 (co-authored).

3

Lucy P. Allen

"Trends in Securities Litigation and the Impact of the PSLRA," Class Actions & Derivative Suits, American Bar Association Litigation Section, Vol. 9, No. 3, Summer 1999 (co-authored).

"Random Taxes, Random Claims," Regulation, Winter 1997, pp. 6-7 (co-authored).


## Depositions & Testimony (4 years)

Supplemental Declaration before the United States District Court, Central District of California, Southern Division, in *Steven Rupp et al. v. California Attorney General et al.*, 2023.

Deposition Testimony before the United States District Court for the District of Harris County, Texas in *Boxer Property Management Corp. et al. v. Illinois Union Ins. Co. et al.*, 2022.

Declaration before the United States District Court, Southern District of California, in *Virginia Duncan, et al. v. Rob Bonta, et al.*, 2022.

Declaration before the United States District Court, Eastern District of Washington, in *Michael Scott Brumback, et al. v. Robert W. Ferguson, et al.*, 2022.

Trial Testimony before the Supreme Court of the State of New York, County of New York, in *MUFG Union Bank, N.A. (f/k/a Union Bank, N.A.) v. Axos Bank (f/k/a Bank of Internet USA), et al.*, 2022.

Supplemental Declaration before the United States District Court, Southern District of California, in *James Miller et al. v. California Attorney General et al.*, 2022.

Declaration before the United States District Court, Northern District of Texas, Dallas Division, in *Samir Ali Cherif Benouis v. Match Group, Inc., et al.*, 2022.

Deposition Testimony before the United States District Court for the Eastern District of Virginia, in *Plymouth County Retirement System, et al. v. Evolent Health, Inc., et al.*, 2022.

Deposition Testimony before the United States District Court for the Northern District of Georgia, in *Public Employees' Retirement System of Mississippi v. Mohawk Industries, Inc., et al.*, 2022.

Deposition Testimony before the United States District Court for the Southern District of New York, in *SEC v. AT&T, Inc. et al.*, 2022.

4

Lucy P. Allen

Deposition Testimony before the Superior Court of New Jersey, Hudson County, in *Oklahoma Firefighters Pension and Retirement System vs. Newell Brands Inc., et al.,* 2022.

Deposition Testimony before the United States District Court for the District of Pennsylvania, in *Allegheny County Employees, et al. v. Energy Transfer LP., et al.,* 2022.

Deposition Testimony before the United States District Court, District of Tennessee, in *St. Clair County Employees' Retirement System v. Smith & Acadia Healthcare Company, Inc., et al.*, 2022.

Deposition Testimony before the United States District Court, District of Colorado, in *Cipriano Correa, et al. v. Liberty Oilfield Services Inc., et al.*, 2022.

Deposition Testimony before the Superior Court of New Jersey, Hudson County, in *Oklahoma Firefighters Pension and Retirement System vs. Newell Brands Inc., et al.,* 2021.

Deposition Testimony before the Superior Court of New Jersey, Middlesex County, in *Dana Transport, Inc. et al., vs. PNC Bank et al.,* 2021.

Deposition Testimony before the United States District Court, Western District of North Carolina, in *Cheyenne Jones and Sara J. Gast v. Coca-Cola Consolidated Inc., et al.,* 2021.

Testimony and Deposition Testimony before the Court of Chancery of the State of Delaware in *Bardy Diagnostics Inc. v. Hill-Rom, Inc. et al.,* 2021.

Deposition Testimony before the United States Bankruptcy Court, Southern District of Texas, Houston Division, in *Natixis Funding Corporation v. Genon Mid-Atlantic, LLC,* 2021.

Testimony and Deposition Testimony before the United States District Court, Southern District of California, in *James Miller et al. v. Xavier Becerra et al.*, 2021.

Deposition Testimony before the Court of Chancery of the State of Delaware in *Arkansas Teacher Retirement System v. Alon USA Energy, Inc., et al.*, 2021.

Deposition Testimony before the United States District Court, Western District of Oklahoma, in *Kathleen J. Myers v. Administrative Committee, Seventy Seven Energy, Inc. Retirement & Savings Plan, et al.*, 2020.

Deposition Testimony before the United States District Court, Middle District of Tennessee, in *Nikki Bollinger Grae v. Corrections Corporation of America, et al.*, 2020.

5

Lucy P. Allen

Deposition Testimony before the Supreme Court of the State of New York, County of New York, in *MUFG Union Bank, N.A. (f/k/a Union Bank, N.A.) v. Axos Bank (f/k/a Bank of Internet USA), et al.*, 2020.

Declaration before the United States District Court for the Northern District of Georgia, in *Sunil Amin et al. v. Mercedes-Benz USA, LLC and Daimler AG*, 2020.

Deposition Testimony before the United States District Court, Western District of Washington at Seattle, in *In re Zillow Group, Inc. Securities Litigation*, 2020.

Declaration before the United States District Court for the Southern District of California in *James Miller et al. v. Xavier Becerra et al.*, 2020.

Deposition Testimony before the United States District Court, Middle District of Tennessee, in *Zwick Partners LP and Aparna Rao v. Quorum Health Corporation,* 2019.

Testimony and Declaration before the United States District Court, Southern District of Iowa, in *Mahaska Bottling Company, Inc., et al. v. PepsiCo, Inc. and Bottling Group, LLC*, 2019.

Declaration before the United States District Court Western District of Oklahoma in *In re: Samsung Top-Load Washing Machine Marketing, Sales Practices and Products Liability Litigation*, 2019.

Testimony before the United States District Court, Southern District of New York, in *Chicago Bridge & Iron Company N.V. Securities Litigation*, 2019.

Deposition Testimony before the United States District Court, Middle District of Florida, in *Jacob J. Beckel v. Fagron Holdings USA, LLC et al.*, 2019.

# Appendix B − Materials Considered

**Case documents and filings in this matter**

1. First Amended Consolidated Complaint for Violation of the Federal Securities Laws, filed February 11, 2022
2. Defendants' Motion to Dismiss Amended Complaint, filed March 10, 2022
3. Plaintiffs' Memorandum of Law in Opposition to Defendants' Motion to Dismiss Amended Complaint, filed April 13, 2022
4. Memorandum and Opinion re Defendants' Motion to Dismiss the Plaintiff's First Amended Consolidated Complaint, filed August 10, 2022
5. Memorandum of Law in Support of Plaintiff's Motion for Class Certification, filed December 5, 2022
6. Expert Report of Steven P. Feinstein dated December 5, 2022 including exhibits and appendices
7. Declaration of Scott C. Schroeder, dated January 19, 2023
8. Declaration of John Smelko, dated January 19, 2023

**Cabot's SEC filings from 2013 to 2022**

1. FY12 Form 10-K, filed February 28, 2013
2. 1Q13 Form 10-Q, filed April 26, 2013
3. 2Q13 Form 10-Q, filed July 26, 2013
4. 3Q13 Form 10-Q, filed October 25, 2013
5. FY13 Form 10-K, filed February 28, 2014
6. 1Q14 Form 10-Q, filed April 25, 2014
7. 2Q14 Form 10-Q, filed July 25, 2014
8. 3Q14 Form 10-Q, filed October 24, 2014
9. FY14 Form 10-K, filed February 27, 2015
10. 1Q15 Form 10-Q, filed April 24, 2015
11. 2Q15 Form 10-Q, filed July 24, 2015
12. 3Q15 Form 10-Q, filed October 23, 2015
13. FY15 Form 10-K, filed February 22, 2016
14. 1Q16 Form 10-Q, filed May 3, 3016
15. 2Q16 Form 10-Q, filed July 29, 2016
16. 3Q16 Form 10-Q, filed October 28, 2016
17. FY16 Form 10-K, filed February 27, 2017
18. 1Q17 Form 10-Q, filed April 28, 2017
19. 2Q17 Form 10-Q, filed July 28, 2017
20. 3Q17 Form 10-Q, filed October 30, 2017
21. FY17 Form 10-K, filed March 1, 2018
22. FY17 Form 10-KA, filed March 2, 2018
23. 1Q18 Form 10-Q, filed April 27, 2018
24. 2Q18 Form 10-Q, filed July 27, 2018
25. 3Q18 Form 10-Q, filed October 26, 2018
26. FY18 Form 10-K, filed February 26, 2019
27. 1Q19 Form 10-Q, filed April 26, 2019
28. 2Q19 Form 10-Q, filed July 26, 2019
29. 3Q19 Form 10-Q, filed October 25, 2019
30. FY19 Form 10-K, filed February 25, 2020
31. 1Q20 Form 10-Q, filed May 1, 2020

## Appendix B – Materials Considered

32.    2Q20 Form 10-Q, filed July 31, 2020
33.    3Q20 Form 10-Q, filed October 30, 2020
34.    FY20 Form 10-K, filed February 26, 2021
35.    1Q21 Form 10-Q, filed April 30, 2021
36.    2Q21 Form 10-Q, filed July 30, 2021
37.    3Q21 Form 10-Q, filed November 3, 2021
38.    FY21 Form 10-K, filed March 1, 2022
39.    1Q22 Form 10-Q, filed May 3, 2022
40.    2Q22 Form 10-Q, filed August 3, 2022
41.    3Q22 Form 10-Q, filed November 4, 2022
42.    Form 8-K, filed July 26, 2019

**Press releases, conference call transcripts, and news stories on Cabot, including**

*Conference Call Transcript*

1.    2Q19 Earnings Conference Call, July 26, 2019

*News Stories and Press Releases, including*

1.    "Cabot Oil & Gas Corporation Reports Second Quarter 2019 Results, Expands Share Repurchase Program Authorization," *ENP Newswire*, July 26, 2019
2.    "Cabot Oil & Gas Corp: Profits of 30 cents per share anticipated for fourth quarter," *Reuters*, February 18, 2020
3.    "KeyBanc sees 'slightly negative' reaction in Cabot shares from," *Theflyonthewall,* June 15, 2020
4.    "Gas driller pleads no contest to polluting town's water," *Associated Press*, November 29, 2022
5.    @PAAttorneyGen, accessed at: https://twitter.com/PAAttorneyGen/status/1272563867248406534?s=20&t=gVxIecUF80iZgUong9PBlA.
6.    @PAAttorneyGen, accessed at: https://twitter.com/PAAttorneyGen/status/1597710249376768000?s=20&t=zIzxFRv80v49Fni-_3Sjbw.
7.    "AG Shapiro And 43rd Statewide Grand Jury File Criminal Charges Against NEPA Fracking Company," accessed at: https://www.attorneygeneral.gov/taking-action/ag-shapiro-and-43rd-statewide-grand-jury-file-criminal-charges-against-nepa-fracking-company/.

**Notices of Violation, Consent Orders, Orders, and AG Presentment**

1.    September 19, 2011 Notice of Violation
2.    June 20, 2017 Notice of Violation
3.    November 17, 2017 Notice of Violation
4.    December 30, 2016 Consent Order and Agreement
5.    PaDEP Order in the matter of Cabot Oil & Gas Corporation Jeffers Farms Pad 2 Gas Migration Harford Township, Susquehanna County, dated December 28, 2020
6.    PaDEP Order in the matter of Cabot Oil & Gas Corporation Howell Well Pad Gas Migration Auburn Township, Susquehanna County, dated December 28, 2020

## Appendix B – Materials Considered

7. AG Presentment, filed June 15, 2020

**Data from Bloomberg, L.P. and FactSet Research Systems, Inc.**

1. Price, total return, trading volume, implied volatility, market capitalization, and short interest data for Cabot
2. Price, total return, trading volume, implied volatility, market capitalization, and short interest data for Coterra
3. Price and total return data for market and industry indices
4. Institutional and insider holdings data for Cabot
5. Intraday price and volume data for Cabot
6. Intraday price and volume data for Dow Jones U.S. Exploration & Production Index
7. Price, total return, and trading volume data for Range Resources Corporation

**Academic literature and textbooks on finance, securities, valuation and statistics**

1. Alexander, Janet C., "The Value of Bad News in Securities Class Actions*," UCLA Law Review,* 41: 1994
2. Fischel, Daniel R., "Use of Modern Finance Theory in Securities Fraud Cases Involving Actively Traded Securities," *The Business Lawyer,* 38: 1982
3. Dunbar, Frederick C., and David I. Tabak, "Materiality and Magnitude: Event Studies in the Courtroom*," Litigation Services Handbook: The Role of the Financial Expert* (John Wiley & Sons, Inc.: New York, NY, 3rd ed., 2001)
4. MacKinlay, A. Craig, "Event Studies in Economics and Finance," *Journal of Economic Literature*, 35: 1997
5. Bowman, Robert G., "Understanding and Conducting Event Studies," *Journal of Business Finance & Accounting* 10(4): 1983
6. Hogg, Robert V. and Elliot A. Tanis, *Probability and Statistical Inference,* (Prentice Hall: Upper Saddle River, NJ, 5th ed., 1997).
7. Freedman, David A., and David H. Kaye, "Reference Guide on Statistics," *Reference Manual on Scientific Evidence* (Washington, D.C.: The National Academies Press, 3rd ed., 2011)
8. Fisher, Franklin M., "Multiple Regression in Legal Proceedings," *Columbia Law Review*, 80: 1980
9. Richard A. Brealey and Stewart C. Myers, *Principles of Corporate Finance*, (New York:  McGraw-Hill Irwin, 7th Edition, 2003)
10. Feinstein, Steven and Villanueva, Miguel, "Securities Litigation Event Studies in the Covid Volatility Regime," *Journal of Forensic Economics*, vol. 30, no. 1, 2022.

**Analyst reports on Cabot**

1. 2016.02.22-CTRA-Barclays
2. 2016.02.22-CTRA-EVERCORE ISI
3. 2016.02.22-CTRA-GMP Securities
4. 2016.02.22-CTRA-KLR Group
5. 2016.02.22-CTRA-Ladenburg Thalmann
6. 2016.02.22-CTRA-Susquehanna Financial
7. 2016.02.22-CTRA-UBS

## Appendix B – Materials Considered

8.      2016.02.22-CTRA-Wells Fargo
9.      2016.02.23-CTRA-EVERCORE ISI
10.     2016.02.23-CTRA-KLR Group
11.     2016.02.23-CTRA-Topeka Capital Markets
12.     2016.02.24-CTRA-Cowen
13.     2016.02.29-CTRA-Suntrust
14.     2016.05.03-CTRA-Jefferies
15.     2017.01.17-CTRA-Jefferies
16.     2017.02.06-CTRA-UBS
17.     2017.02.10-CTRA-Evercore ISI
18.     2017.02.24-CTRA-UBS
19.     2017.03.02-CTRA-Jefferies
20.     2017.04.18-CTRA-Jefferies
21.     2017.04.21-CTRA-Scotiabank GBM
22.     2017.04.28-CTRA-Evercore ISI
23.     2017.04.28-CTRA-UBS
24.     2017.07.18-CTRA-Siebert Williams
25.     2017.07.19-CTRA-Jefferies
26.     2017.07.27-CTRA-BMO
27.     2017.07.30-CTRA-Piper Jaffray
28.     2017.08.31-CTRA-Piper Jaffray
29.     2017.08.31-CTRA-Wells Fargo
30.     2017.09.01-CTRA-Ladenburg Thalmann
31.     2017.09.12-CTRA-Cowen
32.     2018.01.30-CTRA-Jefferies
33.     2018.06.11-CTRA-Jefferies
34.     2019.02.22-CTRA-Credit Suisse
35.     2019.07.26-CTRA-BMO Capital Markets (1)
36.     2019.07.26-CTRA-BMO Capital Markets (2)
37.     2019.07.26-CTRA-Bank of America
38.     2019.07.26-CTRA-Cowen and Company
39.     2019.07.26-CTRA-Credit Suisse (1)
40.     2019.07.26-CTRA-Credit Suisse (2)
41.     2019.07.26-CTRA-EVERCORE ISI
42.     2019.07.26-CTRA-Jefferies
43.     2019.07.26-CTRA-JP Morgan
44.     2019.07.26-CTRA-Ladenburg Thalmann
45.     2019.07.26-CTRA-Macquarie Research
46.     2019.07.26-CTRA-Piper Jaffray
47.     2019.07.26-CTRA-Scotiabank GBM
48.     2019.07.26-CTRA-Seaport Global Securities
49.     2019.07.26-CTRA-TD Securities
50.     2019.07.26-CTRA-UBS
51.     2019.07.26-CTRA-Wells Fargo
52.     2019.07.29-CTRA-EVERCORE ISI
53.     2019.07.29-CTRA-Jefferies
54.     2019.07.29-CTRA-Macquarie Research
55.     2019.07.29-CTRA-MKM Partners
56.     2019.07.29-CTRA-Scotiabank GBM

## Appendix B – Materials Considered

57.  2019.07.29-CTRA-Susquehanna
58.  2019.07.29-CTRA-TD Securities
59.  2019.08.12-CTRA-Macquarie Research
60.  2019.08.14-CTRA-EVERCORE ISI
61.  2019.08.15-CTRA-JP Morgan
62.  2019.08.20-CTRA-Guggenheim
63.  2020.01.08-CTRA-MKM Partners (1)
64.  2020.01.08-CTRA-MKM Partners (2)
65.  2020.01.08-CTRA-TD Securities
66.  2020.01.13-CTRA-Susquehanna
67.  2020.01.14-CTRA-Scotiabank
68.  2020.01.15-CTRA-JP Morgan
69.  2020.01.27-CTRA-Guggenheim
70.  2020.01.31-CTRA-Piper Jaffray
71.  2020.02.03-CTRA-BMO Capital Markets
72.  2020.02.04-CTRA-Cowen
73.  2020.02.04-CTRA-Credit Suisse
74.  2020.02.04-CTRA-EVERCORE ISI
75.  2020.02.04-CTRA-Guggenheim
76.  2020.02.04-CTRA-JP Morgan
77.  2020.02.04-CTRA-Ladenburg Thalmann
78.  2020.02.04-CTRA-Piper Jaffray (1)
79.  2020.02.04-CTRA-Piper Jaffray (2)
80.  2020.02.04-CTRA-Scotiabank
81.  2020.02.04-CTRA-TD Securities
82.  2020.02.04-CTRA-UBS
83.  2020.02.04-CTRA-Wells Fargo
84.  2020.02.07-CTRA-JP Morgan
85.  2020.02.20-CTRA-BMO Capital Markets
86.  2020.02.20-CTRA-Cowen
87.  2020.02.20-CTRA-Credit Suisse
88.  2020.02.20-CTRA-JP Morgan
89.  2020.02.20-CTRA-Piper Jaffray
90.  2020.02.20-CTRA-Scotiabank
91.  2020.02.20-CTRA-UBS
92.  2020.02.20-CTRA-Wells Fargo
93.  2020.02.21-CTRA-Bank of America
94.  2020.02.21-CTRA-Credit Suisse
95.  2020.02.21-CTRA-EVERCORE ISI
96.  2020.02.21-CTRA-Ladenburg Thalmann
97.  2020.02.21-CTRA-TD Securities
98.  2020.02.24-CTRA-BMO Capital Markets
99.  2020.02.24-CTRA-EVERCORE ISI
100. 2020.02.24-CTRA-MKM Partners
101. 2020.02.24-CTRA-Scotiabank
102. 2020.02.27-CTRA-JP Morgan
103. 2020.03.01-CTRA-Susquehanna
104. 2020.03.02-CTRA-EVERCORE ISI
105. 2020.03.07-CTRA-EVERCORE ISI

## Appendix B – Materials Considered

106.   2020.03.09-CTRA-Scotiabank
107.   2020.03.09-CTRA-Susquehanna
108.   2020.03.10-CTRA-Wells Fargo
109.   2020.03.16-CTRA-Guggenheim
110.   2020.03.16-CTRA-Susquehanna
111.   2020.03.19-CTRA-Piper Jaffray
112.   2020.03.25-CTRA-JP Morgan
113.   2020.04.06-CTRA-MKM Partners
114.   2020.04.07-CTRA-Scotiabank
115.   2020.04.14-CTRA-Susquehanna
116.   2020.04.20-CTRA-JP Morgan
117.   2020.04.22-CTRA-Piper Jaffray
118.   2020.04.30-CTRA-BMO Capital Markets
119.   2020.04.30-CTRA-Cowen and Company
120.   2020.04.30-CTRA-JP Morgan
121.   2020.04.30-CTRA-Piper Jaffray
122.   2020.04.30-CTRA-Scotiabank GBM
123.   2020.04.30-CTRA-UBS
124.   2020.04.30-CTRA-Wells Fargo Securities
125.   2020.05.01-CTRA-Bank of America
126.   2020.05.01-CTRA-Credit Suisse
127.   2020.05.01-CTRA-EVERCORE ISI
128.   2020.05.01-CTRA-TD Securities
129.   2020.05.03-CTRA-Susquehanna Financial
130.   2020.05.04-CTRA-MKM Partners
131.   2020.05.13-CTRA-JP Morgan
132.   2020.06.17-CTRA-JP Morgan
133.   2020.07.08-CTRA-MKM Partners
134.   2020.07.08-CTRA-Piper Jaffray
135.   2020.07.09-CTRA-Credit Suisse
136.   2020.07.09-CTRA-Scotiabank
137.   2020.07.13-CTRA-JP Morgan
138.   2020.07.16-CTRA-Susquehanna (1)
139.   2020.07.16-CTRA-Susquehanna (2)
140.   2020.07.17-CTRA-Scotiabank

**Analyst reports on Range Resources**

1.   2020.06.15-RRC-Susquehanna
2.   2020.06.24-RRC-Wells Fargo

**Legal decisions**

1.   *In Re TECO Energy Inc. Securities Litigation*, 2006 U.S. Dist. LEXIS 18101 (M.D. Fla. March 30, 2006)
2.   *Barrie v. Intervoice-Brite, Inc.*, 2006 U.S. Dist. LEXIS 69299 (N.D. Tex. Sept. 25, 2006)
3.   *Bricklayers & Trowel Trades International Pension Fund v. Credit Suisse Securities (USA) LLC*, 752 F.3d 82, 92 (1st Cir. 2014)
4.   *In re Lone Pine Res., Inc.,* 2014 WL 1259653, at *4 (S.D.N.Y. Mar. 27, 2014)

## Appendix B – Materials Considered

5. *In re Aceto Corp. Secs. Litig.*, 2019 WL 3606745, at *4 (E.D.N.Y. Aug. 6, 2019)
6. *The Erica P. John Fund, Inc. v. Halliburton Company and David J. Lesar* (3:02-CV-1152-M), filed July 25, 2015.

### Miscellaneous

1. "Range Resources pleads no contest after AG's investigation," *Pittsburgh Business Times Online*, June 12, 2020
2. Range Resources FY19 10-K, filed February 27, 2020
3. Dr. Feinstein's Report on Market Efficiency dated July 14, 2022, in *UA Local 13 & Employers Group Insurance Fund v. Sealed Air Corporation et al.*