# Exhibit 3



**COMMONWEALTH OF PENNSYLVANIA**
GOVERNOR'S OFFICE OF GENERAL COUNSEL

December 30, 2016

(570) 321-6568

FAX:  (570) 327-3565

**RECEIVED**
**JAN - 4 2017**

Cole Delancey, Esquire
Cabot Oil & Gas Corporation
2000 Park Lane
Suite 300
Pittsburgh, PA  15275

BY: .......................

**Re:**   *Cabot Oil & Gas Corporation Stalter Area Gas Migration*

Dear Cole,

Enclosed is the fully executed Consent Order and Agreement for the above referenced case.  Thank you.

Sincerely,

Anne C. Shapiro
Assistant Counsel

Enclosure

OFFICE OF CHIEF COUNSEL | DEPARTMENT OF ENVIRONMENTAL PROTECTION
Northcentral Regional Office | 208 West 3rd Street | Williamsport, PA 17701-6448 | 570.321.6568 | Fax 570.327.3565 | www.depweb.state.pa.us

# COMMONWEALTH OF PENNSYLVANIA
## DEPARTMENT OF ENVIRONMENTAL PROTECTION

**RECEIVED**

**JAN - 4 2017**

**IN THE MATTER OF:**

BY: ............:............

| | | |
|---|---|---|
| Cabot Oil & Gas Corporation | : | Violations of the 2012 Oil and Gas |
| Stalter Area Gas Migration | : | Act, the Clean Streams Law, and § 78 |
| Lenox Township | : | of the Department's Rules and Regulations |
| Susquehanna County | | |

## CONSENT ORDER AND AGREEMENT

This Consent Order and Agreement is entered into this ___30th___ day of _December_ 2016, ("Effective Date"), by and between the Commonwealth of Pennsylvania, Department of Environmental Protection (hereinafter "Department"), and Cabot Oil & Gas Corporation (hereinafter "Cabot"); collectively, the "Parties".

## Findings

The Department has found and determined the following:

A.      The Department is the agency with the duty and authority to administer and enforce the Oil and Gas Act, Act of December 19, 1984, P.L. 1140, as amended, 58 Pa. C.S. §§ 3201-3274 (hereinafter "2012 Oil and Gas Act"); The Clean Streams Law, Act of June 22, 1937, P.L. 1987, as amended, 35 P.S. § 691.1 et seq. (hereinafter "Clean Streams Law"); Section 1917-A of the Administrative Code, Act of April 9, 1929, P.L. 177, as amended, 71 P.S. § 510-17 (hereinafter "Administrative Code"); and the rules and regulations promulgated thereunder (hereinafter "Regulations").

B.      Cabot is a Delaware corporation authorized to do business in Pennsylvania and is engaged in various oil and natural gas exploration and production activities in Pennsylvania, including Lenox Township, Susquehanna County.  Cabot maintains a business address of 2000 Park Lane, Suite 300, Pittsburgh, Pennsylvania 15275.

C.      Cabot is a "person" as that term is defined in Section 1 of the Clean Streams Law, 35 P.S. § 691.1, and "operator," "owner" and "person" as those terms are defined in Section 3203 of the 2012 Oil and Gas Act, 58 Pa.C.S. § 3203.

D.    Cabot owns and operates the Stalter 1H, Stalter 2H, and Stalter 8V gas wells (hereinafter "Gas Wells") in the vicinity of the gas migration area, authorized by Permit Numbers 115-20517, 115-20496, and 115-20457, respectively.  The Gas Wells are located in Lenox Township, Susquehanna County, Pennsylvania.

E.    On August 16, 2011, the Department and Cabot received a complaint of methane present in a private water supply serving a residence in Lenox Township, Susquehanna County, Pennsylvania.  (Identified as Landowner "A" on Exhibit A).

F.    As requested by the Department and in response to this complaint, Cabot conducted a survey of water supplies within 2,500 feet of the Gas Wells in accordance with the requirements of 25 Pa. Code § 78.89.  From August 16, 2011, through August 20, 2011, Cabot reported testing fourteen water sources on ten different properties.  An additional four water sources involving two properties were tested on September 23, 2011, and October 9, 2011, due to landowner unavailability.

G.    As a result of Cabot's survey, three other properties, which are identified on Exhibit A as Landowners "B", "C" & "D", with water supplies located within 2,500 feet of the Gas Wells, exhibited elevated concentrations of natural gas.  No natural gas was detected in the ambient air of structures associated with these properties.

H.    Inspections of the Gas Wells on August 18, 2011, documented the presence of natural gas between various casing strings  of the Gas Wells.

I.    On September 19, 2011, the Department issued to Cabot a Notice of Violation ("NOV") for the following:

    1)  Failure to prevent the migration of gas or other fluids into sources of fresh groundwater, in violation of Sections 78.81(a)(2) and (3) of the Department's Rules and Regulations, 25 Pa. Code §§ 78.81(a)(2) and (3);

2

2) Failure to report defective, insufficient, or improperly cemented casing, in violation of Section 78.86 of the Department's Rules and Regulations, 25 Pa. Code §78.86; and,

3) Causing or allowing the unpermitted discharge of pollutional substances to waters of the Commonwealth, in violation of Section 401 of the Clean Steams Law, 35 P.S. § 691.401.

J.     On November 22, 2011, Cabot submitted its investigation and response to the NOV entitled "Stalter Gas Migration Response."

K.     On July 2, 2012, Cabot reported to the Department that it had responded to an additional complaint from a resident in Lenox Township, Susquehanna County, Pennsylvania, (identified as Landowner "E" on Exhibit A.)

L.     Over the course of the gas migration investigation, between August 16, 2011, and September 6, 2012, the Department determined that five water supplies (hereinafter "Water Supplies"), as identified in the list attached hereto and incorporated herein by reference as Exhibit A, were impacted by gas drilling activities.

M.     On September 15, 2011, the Department was present when Cabot conducted a down hole video of the Stalter 8V Gas Well which documented collar leaks at various depths within the 5 ½ inch casing string.

N.     Daily drilling reports for the 8V gas well from January 31, 2011 and February 1, 2011 indicated insufficient wait times following casing cement placement and completion of cementing operations.

O.     Isotopic samples collected by the Department showed that natural gas in the residential Water Supplies listed in Exhibit A, was of a similar isotopic composition as natural gas found in the annuli of the Gas Wells, identified in Paragraph D., above.

3

**Gas Migration Violations**

P.    Section 78.81(a)(2) and (3) of the Department's Rules and Regulations, 25 Pa. Code § 78.81(a)(2) and (3), states: "The operator shall case and cement a well to accomplish the following:… (2) Prevent the migration of gas or other fluids into sources of fresh groundwater." and, "(3) Prevent pollution or diminution of fresh groundwater."

Q.    Section 78.86 of the Department's Rules and Regulations, 25 Pa. Code § 78.86, states: "In a well that has defective, insufficient, or improperly cemented casing, the operator shall report the defect to the Department within 24 hours of discovery by the operator and shall correct the defect. The operator shall correct the defect or submit a plan to correct the defect for approval by the Department within 30 days. If the defect cannot be corrected or an alternate method is not approved by the Department, the well shall be plugged under §§ 78.91-78.98 (relating to plugging)."

R.    Section 78.85(c) of the Department's Rules and Regulations, 25 Pa. Code § 78.85(c), states: "After any casing cement is placed and cementing operations are complete, the casing may not be disturbed for a minimum of 8 hours by doing any of the following: (3) Slacking off by the rig supporting the casing in the cement sheath.

S.    Section 401 of the Clean Streams Law, 35 P.S. § 691.401, states: "It shall be unlawful for any person … to put or place into any of the waters of the Commonwealth, or allow or permit to be discharged from property owned or occupied by such person … into any waters of the Commonwealth, any substance of any kind or character resulting in pollution as herein defined…."

T.    Section 78.51(a) of the Department's Rules and Regulations, 25 Pa. Code § 78.51(a), states: "A well operator who affects a public or private water supply by pollution or diminution shall restore or replace the affected supply with an alternate source of water adequate in quantity and quality for the purposes served by the supply as determined by the Department."

U.    Additionally, Section 78.51(f) of the Department's Rules and Regulations, 25 Pa. Code § 78.51(f), states: "Tank trucks or bottled water are acceptable only as temporary water

4

replacement for a period approved by the Department and do not relieve the operator of the obligation to provide a restored or replaced water supply."

V.      Failure to properly case and cement a gas well to prevent the migration of gas or other fluids into sources of fresh groundwater and to prevent pollution or diminution of fresh groundwater, as described in Paragraph E. through O., above, constitute violations of Sections 78.81(a)(2) and (3) of the Department's Rules and Regulations, 25 Pa. Code §§ 78.81(a)(2) and (3).

W.      The defective cement and the defect in the casing of the Stalter 8V Well, as described in Paragraphs H. and M., constitute violations of Section 78.86 of the Department's Rules and Regulations, 25 Pa. Code § 78.86.

X.      Cabot's' failure to allow adequate wait time after casing cement placement and completion of cementing operations, as described in Paragraph N., constitutes a violation of Section 78.85(c)(3) of the Department's Rules and Regulations, 25 Pa. Code § 78.85(c)(3).

Y.      The unpermitted discharge of natural gas, a pollutional substance, into groundwater, a water of the Commonwealth, as described in Paragraphs E through O., above, constitutes a violation of Section 401 of the Clean Streams Law, 35 P.S. § 691.401.

Z.      Failure to restore or replace some of the affected supplies with an alternate, non-temporary source of water adequate in quantity and quality for the purposes served by the water supply as determined by the Department constitutes violations of Section 78.51(a) and (f) of the Department's Rules and Regulations, 25 Pa. Code §§ 78.51(a) and (f).

AA.     The violations described in Paragraphs P. through Z., above, constitute unlawful conduct under Section 611 of the Clean Streams Law, 35 P.S. § 691.611; and Section 3259 of the 2012 Oil and Gas Act, 58 Pa.C.S. § 3259; constitute a public nuisance under Section 401 of the Clean Streams Law, 35 P.S. § 691.401; and Section 3252 of the 2012 Oil and Gas Act, 58 Pa.C.S. § 3252; and subject Cabot to civil penalty liability under Section 605 of the Clean Streams Law, 35 P.S. § 691.605; and Section 3256 of the 2012 Oil and Gas Act, 58 Pa.C.S. § 3256.

5

## **Order**

After full and complete negotiation of all matters set forth in this Consent Order and Agreement, and upon mutual exchange of the covenants contained herein, the Parties, desiring to avoid litigation and intending to be legally bound, it is hereby ORDERED by the Department and AGREED to by Cabot as follows:

1. **Authority.** This Consent Order and Agreement is an Order of the Department authorized and issued pursuant to Section 5 of the Clean Streams Law, 35 P.S. § 691.5; Section 3253 of the 2012 Oil and Gas Act, 58 Pa.C.S. § 3253; and Section 1917-A of the Administrative Code, 71 P.S. § 510-17.

2. **Findings.**

   a. Cabot agrees that the Findings in Paragraphs A. through O., are true and correct and, in any manner or proceeding involving Cabot and the Department, Cabot shall not challenge the accuracy or validity of these Findings.

   b. The parties do not authorize any other persons to use the findings in this Consent Order and Agreement in any matter or proceeding.

3. **Corrective Actions.**

   a. Gas Well Plugging Plan. Cabot has provided and the Department has approved the Plugging Plan for the 8V gas well attached as Exhibit C.

   b. Cabot shall commence the plugging pursuant to the Plugging Plan within thirty (30) days of the Effective Date.

   c. Within thirty (30) days of the date of completion of the plugging of the Stalter 8V, Cabot shall submit to the Department the Stalter 8V certificate of plugging in accordance with the plugging requirements contained in 25 Pa. Code § 78a.124

6

4. **Restore or Replace the Water Supplies.**

    a. <u>Temporary Drinking Water Supply</u>.  Cabot will continue to provide the users and/or landowner(s) of the Water Supplies with a temporary drinking water supply of adequate and reliable quantity and quality for the purposes served by the supply until the Department notifies Cabot, in writing, that the Restoration/Replacement requirements of this Consent Order and Agreement as described in Paragraph 4.c. have been satisfied; provided however, that Cabot may cease all water deliveries pursuant to Paragraph 4.c.v. at any time. Cabot shall notify the Department of any substantive changes to the way in which temporary water is being provided for the duration that this Consent Order and Agreement is in effect and until the Water Supplies are permanently restored or replaced.

    b. <u>Investigation of Gas Migration</u>.

        i. <u>Sampling</u>.  Cabot shall continue sampling of the affected Water Supplies as identified in Exhibit A, with the exception of Landowner A, in accordance with the Restoration/ Replacement Plan attached as Exhibit B.

        ii. <u>Monitoring Period</u>. Within ninety (90) days of completion of the plugging of the Stalter 8V gas well as required by Paragraphs 3.a. and b. above, Cabot shall initiate eight consecutive quarters of monitoring of the Water Supplies, with the exception of Landowner A, subject to Paragraph 4.b.iii (Post-Plugging Monitoring Period).

        iii. <u>Determination of Background</u>. The Water Supplies will be determined to be at a background condition for methane once the results of monitoring done by the Department and Cabot show that for eight consecutive quarters, seventy-five (75%) of the water samples taken from each Landowner's water supply contain seven milligrams per liter (7 mg/L) or less dissolved methane, and no individual sample from a Landowner's

7

water supply exceeds two times this standard. Additionally, in light of the data already collected, Cabot may petition the Department after four (4) quarters of sampling, based on information obtained in accordance with this paragraph and other relevant data such as isotopic analysis of gas within the Water Supplies, for a determination that the concentration of methane in each Water Supply is at a background level for the aquifer that supplies the Water Supply, or is the result of some other cause, or shows the source of any migration has stopped. Cabot may submit a report with its request to terminate sampling which includes data supporting its analysis that the Landowner's Water Supply is at background throughout 4 quarters of sampling. The Department will terminate its requirement for ongoing sampling related to those Water Supplies for whom Cabot submits such a request after receipt and agreement with such data. The Department will review such a request and make a determination within sixty (60) days.

iv.  Within ninety (90) days of the Effective Date of this COA, Cabot shall submit a report detailing their analysis of the Water Supply of Landowner A. This report will discuss  the potential reasons why any water quality issues remain. The report will be signed and sealed by a Professional Geologist licensed in the state of Pennsylvania.

v.  Within sixty (60) days of a determination that all water supplies have reached background conditions for the Water Supplies, or in a time frame otherwise approved by the Department in writing, Cabot shall submit to the Department for review and approval, a "Gas Migration Final Report" which complies with 25 Pa. Code § 78a.89(h). The Gas Migration Final Report shall identify in detail:  1) Cabot's findings and conclusions from its gas migration investigation; and, 2) all corrective actions taken by Cabot at the Gas Wells, in accordance with all of the requirements under 25 Pa. Code § 78.89, and this Consent Order and Agreement.

8

vi.  No future settlement, agreement, or other action between Cabot and those landowners identified in Exhibit A, shall refuse, hinder, obstruct, delay, impede, impair, or prevent the Department or its duly authorized agents, acting in the course of lawful performance and duty, from entering upon lands, buildings, facilities, premises, or operations in order to make inspections, conduct tests or sampling, examine records, or otherwise carry out investigations as may be necessary, relating to gas migration or causes thereto.

c.  <u>Restoration/Replacement Plan</u>. Cabot shall restore or replace the affected Water Supplies in accordance with the Water Supply Restoration / Replacement Plan attached to this Consent Order and Agreement as Exhibit B or in accordance with any settlement agreement reached with an individual landowner.  Subject to Exhibit B or any settlement agreement, the Restoration / Replacement Plan or treatment of all the affected Water Supplies shall be implemented with in forty-five (45) days of this Agreement and completed by no later than June 30, 2017.  Cabot shall provide the below additional information regarding restoration/ replacement of each Water Supply:

i.  Within twenty (20) days of signing this Consent Order and Agreement, Cabot shall provide a proposed schedule to implement the corrective actions.  Subject to Landowner availability and access to property, Cabot shall implement the Restoration / Replacement Plan plan within forty-five (45) days of the the Department's written approval of the proposed schedule;

ii.  Upon restoration/replacement or treatment of each Water Supply, Cabot shall provide for all plumbing, conveyance, pumping, or auxiliary facilities, if any, necessary for the use of the permanently restored or replaced Water Supplies;

iii.  Upon restoration/replacement of each Water Supply, Cabot shall provide a plan for permanent operation and maintenance of the Water

9

Supplies or contracts/agreements between Cabot and the owner(s) of the Water Supplies, if any, documenting that Cabot will compensate the owner(s) on a permanent basis for any increased operating and maintenance costs for the replaced or restored Water Supplies; and,

iv.  After the date that Cabot asserts that it has permanently restored or replaced any or all of the Water Supplies, or after the date that Cabot asserts that any or all of the Water Supplies are no longer impacted, Cabot shall provide a proposed schedule for Confirmatory Sampling as described in Exhibit B.  Such samples will be used to determine whether the Water Supplies meet the standards set forth in Section 3218(a) of the 2012 Oil and Gas Act, 58 Pa.C.S. § 3218(a).  The proposed schedule should:  provide for split samples with the Department at the Department's cost; ensure that sampling would only take place Monday through Thursday during Department working hours, subject to Landowner availability; and, specify that Cabot will notify the Department at least three (3) working days before any scheduled confirmatory sampling of the Water Supplies which shall be used to satisfy the intent of this paragraph.  The Department will provide its determination with respect to the adequacy of restoration/replacement of each water supply in writing upon request by Cabot, and after receipt and analysis of relevant data.  This does not represent final compliance with this Consent Order and Agreement.

v.  Notwithstanding anything in this Consent Order and Agreement, a Landowner may declare their water is within acceptable levels or that it has been restored or replaced by Cabot at any time and for any reason.  Upon receipt of such declaration, the Department will consider the water restored or replaced pursuant to this Consent Order and Agreement.

10

5. **Submission of Documents.**

   a. With regard to any document that Cabot submits pursuant to Paragraphs 3 and 4 of this Consent Order and Agreement, the Department will review such document and will approve, modify, or disapprove the document in writing. If the document, or any portion of the document, is disapproved by the Department, Cabot shall, within thirty (30) days of receiving the Department's written disapproval, submit a revised document to the Department that addresses the Department's identified deficiencies. Upon approval by the Department, the document shall become a part of this Consent Order and Agreement for all purposes, and shall be enforceable as such.

6. **Civil Penalty Settlement.** Upon signing this Consent Order and Agreement, Cabot shall pay a civil penalty of Two Hundred Seventy Four Thousand Four Hundred Twenty One Dollars and Forty-Two Cents ($274,421.42). This payment is in settlement of the Department's claim for civil penalties for violations set forth in Paragraphs P. through Z. This payment shall be made by corporate check or the like made payable to "Commonwealth of Pennsylvania" and sent to the Department at the address set forth in Paragraph 12, below.

7. **Stipulated Civil Penalties.**

   a. In the event that Cabot fails to comply with the provisions of Paragraphs 3 and 4 of this Consent Order and Agreement, Cabot shall be in violation of this Consent Order and Agreement and, in addition to other applicable remedies, shall pay a civil penalty in the amount of One Thousand Dollars ($1,000) per day for each day, or any portion thereof, that Cabot fails to comply with its obligation.

   b. Stipulated penalties shall be payable monthly on or before the 15th day of each succeeding month following Cabot's notice from the Department, and shall be made by corporate check or the like made payable to "Commonwealth of

11

Pennsylvania", and shall be sent to the Department at the address set forth in Paragraph 12, below.

c. Any payment under this Paragraph shall neither waive Cabot's duty to meet its obligations under this Consent Order and Agreement nor preclude the Department from commencing an action to compel Cabot's compliance with the terms and conditions of this Consent Order and Agreement. The payment resolves only Cabot's liability for civil penalties arising from the violations of this Consent Order and Agreement for which the payment is made.

8. **Additional Remedies.**

a. In the event that Cabot fails to comply with any provisions of this Consent Order and Agreement, the Department may, in addition to the remedies prescribed herein, pursue any remedy available for a violation of an order of the Department, including an action to enforce this Consent Order and Agreement.

b. The remedies provided by this Paragraph and Paragraph 7 (Stipulated Civil Penalties) are cumulative and the exercise of one does not preclude the exercise of any other. The failure of the Department to pursue any remedy shall not be deemed to be a waiver of that remedy. The payment of a stipulated civil penalty, however, shall preclude any further assessment of civil penalties for the violation for which the stipulated penalty is paid.

9. **Reservation of Rights.** The Department reserves the right to require additional measures to achieve compliance with applicable law. Cabot reserves the right to challenge any action which the Department may take to require those measures.

10. **Liability of Cabot.** Cabot shall be liable for any violations of the Consent Order and Agreement, including those caused by, contributed to, or allowed by its officers, directors, agents, employees, contractors, successors, and assigns.

12

11. **Transfer of Gas Wells.**

    a.  Cabot's duties and obligations under this Consent Order and Agreement shall not be modified, diminished, terminated, or otherwise altered by the transfer of any legal or equitable interest in the Gas Wells or any part thereof.

    b.  If Cabot intends to transfer any legal or equitable interest in the Gas Wells, Cabot shall serve a copy of this Consent Order and Agreement to the prospective transferee of the legal or equitable interest at least 30 days prior to the contemplated transfer and shall simultaneously inform the Department's Eastern District Oil and Gas Office in Williamsport of such intent, in accordance with Paragraph 12 (Correspondence with the Department).

    c.  The Department in its sole discretion may agree to modify or terminate Cabot's duties and obligations under this Consent Order and Agreement upon transfer of the Gas Wells. Cabot waives any right that it may have to challenge the Department's decision in this regard.

12. **Correspondence with the Department.** All correspondence with the Department concerning this Consent Order and Agreement shall be addressed to:

Jennifer W. Means

Environmental Program Manager

Eastern District Oil and Gas Operations

Department of Environmental Protection

208 W. Third Street, Suite 101

Williamsport, PA 17701

Telephone: (570) 321-6557

e-Mail: jenmeans@pa.gov

13. **Correspondence with Cabot.** All correspondence with Cabot concerning this Consent Order and Agreement shall be addressed to:

13

Phil Stalnaker

Cabot Oil & Gas Corporation

2000 Park Lane, Suite 300

Pittsburgh, Pennsylvania 15275

Telephone: (412) 249-3850

Fax: (412) 249-1686

Cabot shall notify the Department whenever there is a change in the contact person's name, title, or address. Service of any notice or legal process for any purpose under this Consent Order and Agreement, including its enforcement, may be made by mailing a copy by certified mail, return receipt requested, to the above address.

14. **Decisions Under Consent Order and Agreement.** Any decision which the Department makes under the provisions of this Consent Order and Agreement, including a notice that stipulated civil penalties are due, is intended to be neither a final action under 25 Pa. Code § 1021.2, nor an adjudication under 2 Pa.C.S.A. § 101. Any objection, which Cabot may have to the decision, will be preserved until the Department enforces this Consent Order and Agreement.

15. **Force Majeure.**

a. In the event that Cabot is prevented from complying in a timely manner with any time limit imposed in this Consent Order and Agreement solely because of a strike, fire, flood, act of God, or other circumstance beyond Cabot's control and which Cabot, by the exercise of all reasonable diligence, is unable to prevent, then Cabot may petition the Department for an extension of time. An increase in the cost of performing the obligations set forth in this Consent Order and Agreement shall not constitute circumstances beyond Cabot's control. Cabot's economic inability to comply with any of the obligations of this Consent Order and Agreement shall not be grounds for any extension of time.

b. Cabot shall only be entitled to the benefits of this Paragraph if Cabot notifies the Department within five (5) working days by telephone and within ten (10) working

14

days in writing of the date it becomes aware or reasonably should have become aware of the event impeding performance. The written submission shall include all necessary documentation, as well as a notarized affidavit from an authorized individual specifying the reasons for the delay, the expected duration of the delay, and the efforts which have been made and are being made by Cabot to mitigate the effects of the event and to minimize the length of the delay. The initial written submission may be supplemented within ten (10) working days of its submission. Cabot's failure to comply with the requirements of this Paragraph specifically and in a timely fashion shall render this Paragraph null and of no effect as to the particular incident involved.

c. The Department will decide whether to grant all or part of the extension requested on the basis of all documentation submitted by Cabot and other information available to the Department. In any subsequent litigation, Cabot shall have the burden of proving that the Department's refusal to grant the requested extension was an abuse of discretion based upon information then available to it.

16. **Severability.** The Paragraphs of this Consent Order and Agreement shall be severable and should any part hereof be declared invalid or unenforceable, the remainder shall continue in full force and effect between the Parties.

17. **Entire Agreement.** This Consent Order and Agreement shall constitute the entire integrated agreement of the Parties as to the subject matter hereof. No prior or contemporaneous communications or prior drafts shall be relevant or admissible for purposes of determining the meaning or intent of any provisions herein in any litigation or any other proceeding.

18. **Attorney Fees.** The Parties shall bear their respective attorney fees, expenses, and other costs in the prosecution or defense of this matter or any related matters, arising prior to execution of this Consent Order and Agreement.

15

19. **Modifications.** No change, additions, modifications, or amendments of this Consent Order and Agreement shall be effective unless they are set out in writing and signed by the Parties hereto.

20. **Titles.** A title used at the beginning of any Paragraph of this Consent Order and Agreement may be used to aid in the construction of that Paragraph, but shall not be treated as controlling.

21. **Termination of Consent Order and Agreement.** Cabot's obligations under Paragraphs 3 and 4 of this Consent Order and Agreement shall terminate when the Department determines that Cabot has complied with the requirements of Paragraphs 3 and 4, and paid the civil penalty due under Paragraph 6 above and any outstanding stipulated penalties due under Paragraph 7, above.

IN WITNESS WHEREOF, the Parties have caused this Consent Order and Agreement to be executed by their duly authorized representatives. The undersigned representatives of Cabot certify under penalty of law, as provided by 18 Pa C.S.A. § 4904, that they are authorized to execute this Consent Order and Agreement on behalf of Cabot, that Cabot consents to the entry of this Consent Order and Agreement as a final ORDER of the Department; and that Cabot hereby knowingly waives its right to appeal this Consent Order and Agreement and to challenge its content or validity, which rights may be available under Section 4 of the Environmental Hearing Board Act, the Act of July 13, 1988, P.L. 530, No. 1988-94, 35 P.S. § 7514; the Administrative Agency Law, 2 Pa. C.S.A. § 103(a) and Chapters 5A and 7A; or any other provision of law. Signature by Cabot's attorney certifies only that the Consent Order and Agreement has been signed after consulting with counsel.

16

FOR CABOT OIL & GAS
CORPORATION:

FOR THE COMMONWEALTH OF
PENNSYLVANIA, DEPARTMENT OF
ENVIRONMENTAL PROTECTION:

_Phillip 2 Stalnaker_ 12/27/16

_Jennifer W. Means_ 12/28/16
Jennifer W. Means        (Date)
Environmental Program Manager
East Region Oil and Gas Management

_Phillip L. Stalwaker_
Name (Typed or Printed)

_VP + Regional Manager_
Title for Cabot Oil & Gas Corporation

_Col De Lancey_ 12/27/2016
Signature                (Date)

_Anne C. Shapiro_ 12/30/16
Anne C. Shapiro          (Date)
Assistant Counsel
Northcentral Region

_Cole DeLancey_
Name (Typed or Printed)

_____
Attorney for Cabot Oil & Gas Corporation

17

**CONFIDENTIAL**

## EXHIBIT A

Landowner / Resident A:     Chichura
                            9345 State Route 106
                            Kingsley, PA 18826
                            Water Supply

Landowner / Resident B:     Rozell
                            571 Creek Road
                            Kingsley, PA 18826
                            Water Supply

Landowner / Resident C:     Kyttle
                            9007 State Route 106
                            Kingsley, PA 18826
                            Water Supply

Landowner / Resident D:     Como
                            1723 Royal Road
                            East Meadow, NY 11554
                            Water Supply

Landowner/ Resident E:      Jensen
                            34 Knollview Drive
                            Ashville, NC 28806
                            Water Supply

## EXHIBIT B

## Stalter Area Gas Migration Consent Order and Agreement,

## Lenox Township, Susquehanna County

## Water Supply Restoration/Replacement Plan

### Residential Water Restoration/Replacement Plan

Since the inception of the Stalter gas migration incident, Cabot has been providing alternate supplied water to the five associated landowners/residents as identified in Exhibit A of the Consent Order and Agreement. The current status of such provision is reflected in the following table.

| Landowner/Resident | Resident Status | Treatment System Installed | Treatment System Operating | Treatment System Comments | Bottled Drinking Water Provided | Bulk Water Provided |
|---|---|---|---|---|---|---|
| A | Full - Time | No | - | A settlement was reached with the landowner on May 09, 2016, and the water supply is fully restored. | N/A | N/A |
| B | Full – Time | Yes | No | Encountered sedimentation problems which were not resolved. | Yes | Yes |
| C | Full – Time | Yes | No | Landowner/Resident has geothermal system tied to well which has been incompatible with treatment system. Problems encountered include sedimentation, well yield and microbial growth.  Treatment system bypassed and water well currently used only for geothermal system. | Yes | Yes |
| D | Hunting Camp | Yes | Yes | Landowner/Resident has recently requested treatment system be removed. | Yes | No |
| E | Seasonal | No | - | | Yes | Yes |

In accordance with Section 4.c (Restoration/Replacement Plan) of the Consent Order and Agreement (COA), Cabot has prepared a permanent restoration plan, consistent with Section

1

3218(a) of the 2012 Oil and Gas Act, 58 Pa. C.S. § 3218(a), as follows for each Landowner/Resident:

**Landowner/Resident A** –As of May 09, 2016, Landowner/Resident A's Water Supply has been fully and adequately restored or replaced by way of Settlement accepted by both parties.

**Landowner/Resident B** – The Department sampling and analysis of the Landowner/Resident B water well had previously indicated dissolved methane levels in the water well at 25.70 mg/L on August 23, 2011, 14.30 mg/L on September 1, 2011, and 25.50 mg/L on September 21, 2011. Based on evaluation of the Landowner/Resident B data as gathered and provided by Cabot (see Attachment B-1 for a graphical depiction of the parameters of concern over time), dissolved methane has remained below the PADEP action level of 7 mg/L [25 Pa. Code § 78.89(d)(4)] since December of 2013.  As a point of reference, 2015 concentrations of dissolved methane have ranged from 1.20 mg/L to 4.40 mg/L.  Sampling conducted by the Department on April 5, 2016 and April 13, 2016, in conjunction with Pressure Build-Up Tests on the Gas Wells, yielded results of 0.716 mg/L and 1.12 mg/L of methane respectively.  Also during 2015, monthly sampling was conducted by Cabot for potential parameters of concern.  During this time, manganese was observed above its SMCL along with infrequent slightly elevated levels of turbidity.  This is consistent with the Department's sampling results from April 2016.  These are now the parameters of concern for the Landowner/Resident B water supply.  Further evaluation of the data has indicated that the elevated concentrations of manganese present are in soluble form and can be removed by filtration with media designed to first oxidize and then remove the insoluble particulates formed.  To ensure efficient operation, low maintenance, and ease of use, a packed media (manganese dioxide) filter with an automated air entrainment pre-charging step and automated backwash capability is proposed as a permanent remedy.

**Landowner/Resident C** – The Department sampling and analysis of the Landowner/Resident C water well had previously indicated dissolved methane levels in the water well at 0.023 mg/L on September 1, 2011, and 6.150 mg/L on September 27, 2011.  Based on evaluation of the Landowner/Resident C data as gathered and provided by Cabot (see Attachment B-1 for a graphical depiction of the parameters of concern over time), dissolved methane has remained below the PADEP action level of 7 mg/L [25 Pa. Code § 78.89(d)(4)] since February of 2013.  As a point of reference, 2015 concentrations of dissolved methane have ranged from non-detect to 0.24 mg/L.  Sampling conducted by the Department on April 5, 2016 and April 13, 2016, in conjunction with Pressure Build-Up Tests on the Gas Wells, yielded results of 0.122 mg/L and 6.04 mg/L of methane respectively.  Ethane was also present at 0.088 mg/L on April 13, 2016. No combustible gas was detected in the headspace of this water well prior to the Pressure Build-Up Tests; however, the post-test reading had a headspace concentration of 100 percent LEL and 6 percent methane.  Also during 2015, monthly sampling was conducted by Cabot for potential parameters of concern.  During this time, aluminum and iron were intermittently observed above their respective SMCLs along with elevated levels of turbidity. These are now

identified as the parameters of concern for the Landowner/Resident C water supply. Further evaluation of the data has indicated that the elevated concentrations of metals present are able to be removed by direct filtration (i.e., the metals are not dissolved). Monthly sampling continued during 2016 has further shown that aluminum and iron have remained below their respective SMCLs in samples collected by Cabot for the entirety of this period, though some slight turbidity remains.  Due to the presence of the geothermal system, it is believed that there will continue to be some issues with sediment and/or turbidity and microbial growth due to the recirculation of the well water. Discussions with the landowner have revealed that a larger pump has been installed which is expected to relieve the yield constraints that had been previously experienced.  Due to the increased flowrates from a larger pump, this may be contributing to the sediment and/or turbidity that has been observed.  Consequently, it is proposed that the permanent remedy include an automated disinfection step (e.g., tablet chlorination), direct filtration for sediment and suspended solid removal (expected to be in the form of a cartridge type unit given the low solids currently observed) followed by a polishing carbon filter to remove residual chlorine introduced by the disinfection step.  Additionally, based on the new information obtained regarding the pump, Cabot will evaluate the pump depth relative to the well construction and yield to determine if raising the pump depth would reduce the amount of sediment and/or turbidity observed.

**Landowner/Resident D** – The Department sampling and analysis of the Landowner/Resident D water well had previously indicated dissolved methane levels in the water well at 17.10 mg/L on October 19, 2011.  Based on evaluation of the data as gathered and provided by Cabot (see Attachment B-1 for a graphical depiction of the parameters of concern over time), dissolved methane has remained below the PADEP action level of 7 mg/L [25 Pa. Code § 78.89(d)(4)] since November of 2012.  As a point of reference, 2015 concentrations of dissolved methane have ranged from 0.21 mg/L to 4.8 mg/L.  Sampling conducted by the Department on April 5, 2016 and April 13, 2016, in conjunction with Pressure Build-Up Tests on the Gas Wells, yielded results of 2.37 mg/L and 2.36 mg/L of methane, respectively.  Ethane was also present at 0.019 mg/L on April 5, 2016 and at 0.018 mg/L on April 13, 2016.  Also during 2015, monthly sampling was conducted by Cabot for potential parameters of concern.  During this time, only manganese was observed above its SMCL.  This is consistent with the Department's sampling results from April 2016.  This is now identified as the parameter of concern for the Landowner/Resident D water supply.  Further evaluation of the data has indicated that the elevated concentrations of manganese present are in soluble form and can be removed by filtration with media designed to first oxidize and then remove the insoluble particulates formed.  To ensure efficient operation, low maintenance, and ease of use, a packed media (manganese dioxide) filter with an automated air entrainment pre-charging step and automated backwash capability is proposed as a permanent remedy.

**Landowner/Resident E** – The Department sampling and analysis of the Landowner/Resident E water well had previously indicated dissolved methane levels in the water well at 20.10 mg/L on July 5, 2012.  Based on evaluation of the data as gathered and provided by Cabot (see Attachment B-1 for a graphical depiction of the parameters of concern over time), dissolved

3

methane has remained below the PADEP action level of 7 mg/L [25 Pa. Code § 78.89(d)(4)] since August of 2012. As a point of reference, 2015 concentrations of dissolved methane have ranged from non-detect to 5.30 mg/L. Methane was non-detect in samples collected by the Department on April 5, 2016 and April 13, 2016, in conjunction with Pressure Build-Up Tests on the Gas Wells.  However, a headspace gas reading collected from the vent on this water well had a pre-test reading of no combustible gas while the post-test reading had a concentration of 1.5 percent methane. Also during 2015, monthly sampling was conducted for potential parameters of concern. During this time, aluminum, manganese and iron were observed above their respective SMCLs along with elevated levels of turbidity.  This is consistent with the Department's sampling results from April 2016.  These are now identified as the parameters of concern for the Landowner/Resident E water supply. Further evaluation of the data has indicated that the elevated concentrations of aluminum and iron present are able to be removed by direct filtration (i.e., the metals are not dissolved).  Manganese is present in both soluble and insoluble forms.  However, monthly sampling continued during  2016 has further shown that the dissolved fraction (soluble) of manganese has remained below the SMCL for total manganese for the entirety of this period (consistent with the majority of 2015),  with the exception of January 2016 where it slightly exceeded this value (at 0.053 mg/l vs the SMCL of 0.05 mg/l), which indicates that direct filtration would effectively reduce the concentration to below the SMCL. To ensure efficient operation, low maintenance, and ease of use a packed media (sand) filter with an automated backwash capability is proposed as a permanent remedy.

## Confirmatory Sampling

Following installation of the treatment systems described above and to ensure design goals are met, Cabot will collect two successive post-treatment confirmatory samples from each of the associated Stalter area residential water supplies to determine the efficacy of treatment.  Each sample will be analyzed for the attached list of parameters (See Attachment B-2) to ensure that the quality of the restored or replaced water supply meets the standards established under the act of May 1, 1984 (P.L.206, No.43), known as the Pennsylvania Safe Drinking Water Act, for the respective parameters of concern or is comparable to the quality of the water supply before it was affected by the operator if that water supply exceeded those standards.  The Department will consider all confirmatory results, which meet or are below the PA Safe Drinking Water Act criteria, to be effective. The two successive confirmatory samples will be separated by the treatment of at least 1000 gallons of water.  Upon review of the data and concurrence from the Department as described in Paragraph 4.c.iv. of the COA, the treatment system will be turned-in-line.  All confirmatory sampling is dependent upon Cabot's legal access to the respective properties.

All confirmatory samples will be analyzed by Eurofins Lancaster Laboratories Environmental, LLC (Eurofins) in Lancaster, PA. Eurofins is an independent third-party laboratory and is certified

4

in the state of Pennsylvania by the Pennsylvania Department of Environmental Protection's Bureau of Laboratories. Eurofins also maintains NELAC accreditation as well.

## Residential Property Access and Treatment System Installation

The execution of the aforementioned Residential Water Supply Restoration/Replacement Plans is entirely dependent upon Cabot's legal access to the property.  As of the date of this Consent Order and Agreement, Cabot is actively engaged in settlement discussions with these landowners.  No settlement, agreement, or other action between Cabot and those entities identified in Exhibit A, shall conflict with section 4.b.vi. of the Consent Order and Agreement. Each settlement agreement will address provisions for replacement and/or installation, and ongoing operation and maintenance, among other factors consistent with Section 3218(a) of the 2012 Oil and Gas Act, 58 Pa. C.S. § 3218(a).  In the event Cabot and the Landowner reach a settlement pursuant to Section 4.c.v., Cabot will provide a copy of a letter executed by the landowner acknowledging their water has been restored and replaced.

## Ongoing Monitoring

Cabot will continue to monitor the untreated water of the affected Water Supplies in accordance with Section 4.b.iii of the Consent Order and Agreement.   The scheduling of such sampling will be coordinated with the Department.

Should the above monitoring indicate increases in methane or other parameters not included in the current treatment plans, the need for further treatment of the Water Supply will be evaluated.

5

**Attachment B-1**
**Analytical Graphs for Parameters of Concern**







Landowner D- Parameters of Concern
Dissolved Methane vs Manganese



Landowner E- Parameters of Concern
Dissolved Methane vs Aluminum, Iron, Manganese, and Turbidity

**Attachment B-2**

**Sampling Parameters**

| |
|---|
| Specific Conductivity |
| pH |
| Alkalinity |
| Total Suspended Solids |
| Hardness |
| Total Calcium |
| Total Magnesium |
| Total Sodium |
| Total Potassium |
| Chloride |
| Sulfate |
| Total Arsenic |
| Total Barium |
| Total Iron |
| Total Manganese |
| Total Strontium |
| Total Zinc |
| Total Aluminum |
| Total Lithium |
| Total Selenium |
| Total Dissolved Solids |
| Bromide |
| Turbidity |
| Methane |
| Ethane |
| Propane |

**Exhibit C**

**Stalter 8V Final Plugging Procedure**

# Stalter 8V
## API # 37-115-20457
## Lenox Twsp, Susquehanna Co, PA
# FINAL PLUGGING PROCEDURE

By:    G.A.Shirey
AFE:    TBD
Date:    01-04-2016

**OBJECTIVE: Finish plugging the Stalter 8V from current cement top @ 3310' to Surface**

### Wellbore Configuration (Temporarily Abandoned w Cement Top @ 3310', 12-8-2012)
CURRENT STATUS
DTD 7,571' KB
20" 78# ERW Conductor @ 90' GL w/239 sx
13 3/8" H-40 48# @ 621' KB w/475 sx (cement circulated to surface)
9 5/8" N-80 40# @ 1,519' KB w/505 sx (circulated cement to surface) (CBL run 1/28/2011)
5 ½" 20# P-110 @ 7,571' KB w/2100 sx (cement circulated to surface) (CBL run 2/12/2011)
Insert @ 7,523' KB
Marker jt. @ 6,980' KB
CBL TOC @ 0' KB (Cement circulated to surface)
Lower Marcellus Shale 300H/7290-7440'
Upper Marcellus Shale 200H/7076-7204'
Sqz Perfs:12H/5700-5702', 4H/6655',4H/4478', 4H/4300', 8H/4750-4752', 8H/4516-4518', 8H/2486-2488'

### P&A Measures already in Place as of 12-8-12 (from bottom up)
CIBP @ 7250' (isolates LMarc perfs @ 7290' – 7440')
Cement Retainer @ 7020' (Squeezed 400 sx cmt into UMarc perfs @ 7076'-7204', 7-15-12)
Cement Retainer @ 5680' (Squeezed 400 sx cmt into sqz perfs @ 5700' & 6655', 7-25-12)
Section Mill in 5 ½" @ 4695'-4736' (Dump Squeezed 190 sx cmt, 12-8-12)
TOC @ 3310' (inside 5 ½", as a result of dump squeeze above on 12-8-12)

## PROCEDURE

1. Contact Pittsburgh Office a minimum of 48 hours prior to starting work
2. Contact state inspector a minimum of 24 hours prior to starting work.
3. MIRU service rig.
4. Rig up BOP's on wellhead.
5. Lay 2" line from wellhead to tank and stake down securely.
6. RIH w/ sinker bar on sand line. Tag & verify cement top @ 3310'.
7. TIH w/ open-ended tubing to +/- 3300'.
8. MIRU Cementing Company. Pump 10 bbls FW to ensure circulation. If there is any evidence of gas bubbles or debris in the wellbore fluid, circulate until clean.
9. Pump cement plugs as follows (between plugs, pull tubing to bottom of next plug interval, displacing it clean as needed):
10. Place a 1000' Class A cement plug @ 3310' – 2310' (22 bbls). Pull tubing above cement top, flush clean.
11. Pressure up to 100-200 psig on the casing & tubing. Shut-in well - WOC minimum 8 hours.
12. RIH w/ workstring, tag TOC to confirm. Move up to next plug depth setting.

13. Place a 1000' Class A cement plug @ 2310' – 1310' (22 bbls)
14. Place a 1310' Class A cement plug @ 1310' – Surface (29 bbls, or until cement returns to surface)
15. RDMO Cement company
16. POOH with tubing and let cement plugs set for a minimum of eight hours.
17. Observe or tag to confirm cement top.  Ensure that DEP Inspector is present to witness.
18. Fill up any void space at top of hole w/ sand & gravel.
19. Erect a permanent Monument at least 4' above ground, according to regulations, properly labeled with the well's permit number and date of plugging.
20. RDMO.



**STALTER 8V**
API 37-115-20457
11/7/2013

**8V WBD - FINAL PLUGGED BACK STATUS**

Elevation: 1390'

Drilled 12/28/2010-2/01/2011
Completed 2/13/2011-3/19/2011

CBL TOC 5 1/2"@ 0' KB (2/12/11)

78# 20" @ 90' w/239 sx

48# H-40 13 3/8" @ 621' KB w/475 sx

40# N-80 9.625" @ 1519' KB w/505 sx

**Event #**

16    test perfs 8H/2486'-2488' (7/31/12)
      (injectivity test - low rates; check gas flow - none)

TOC 3310'

4     sqz perfs 4H/4300' (100 sx, 3/9/12)
4     sqz perfs 4H/4478' (100 sx, 3/9/12)
13    sqz perfs 8H/4516'-4518' (300 sx, 6/27/12)

**Event #**

OCT-2012: Milled Window @ 4695'-4736'  (41')        17
      - initial 55 sx job no good, bad cement (11/3/12)
      --under-reamed to 8 3/4"
      --dump sqz cmt plug w/ 190 sx (12/8/12)          18

8     sqz perfs 8H/4750'-4752'
      sqz w/ 55 xs (5/22/12)

      sqz perfs 12H/5700'-5702'          Cement Retainer @ 5680'
1     sqz w/ 105 sx (1/28/12)            Sqz q/ 400 sx (7/25/12)        15
2     sqz w/ 50 sx (2/14/12)
3     sqz w/ 55 sx (2/17/12)
7     sqz w/ 55 sx (5/15/12)            sqz perfs 4H/6655'              6
                                        sqz w/ 55 xs (5/12/12)

                                        Cement Retainer @ 7020'  (7/15/12)
                                          Upper Marcellus
                                          100H/7076-7126'
                                          100H/7154-7204'
                                          Sqz q/ 400 sx (7/18/12)        14

                                        CIBP @ 7250'  (4/22/12)          5

                                          Lower Marcellus
                                          300H/7290-7440'

                                        20# P110 5.50" @ 7571' KB w/2100 sx (circ to surface)

DTD @ 7571'

Last Revised: 5/19/2015 *(g.a. shirey)*



**STALTER 8V**
API 37-115-20457

**8V WBD - "PROPOSED" FINAL P&A STATUS**
Proposed to DEP as of JAN-2016

Elevation: 1390'

Drilled 12/28/2010-2/01/2011
Completed 2/13/2011-3/19/2011

CBL TOC 5 1/2"@ 0' KB (2/12/11)

78# 20" @ 90' w/239 sx

48# H-40 13 3/8" @ 621' KB w/475 sx

40# N-80 9.625" @ 1519' KB w/505 sx

**Event #**

| 16 | test perfs 8H/2486'-2488' (7/31/12) |
| | (injectivity test - low rates; check gas flow - none) |

**Event #**

Proposal JAN-2016: Fill remaining space inside 5 1/2"
from 3310' to surface w/ 73 bbls +/- Class A cement.

| 4 | sqz perfs 4H/4300' (100 sx, 3/9/12) |
| 4 | sqz perfs 4H/4478' (100 sx, 3/9/12) |
| 13 | sqz perfs 8H/4516'-4518' (300 sx, 6/27/12) |

TOC @ 3310' as of 12-8-2012

OCT-2012: Milled Window @ 4695'-4736' (41')    17
- initial 55 sx job no good, bad cement (11/3/12)
--under-reamed to 8 3/4"
--dump sqz cmt plug w/ 190 sx (12/8/12)    18

| 8 | sqz perfs 8H/4750'-4752' |
| | sqz w/ 55 xs (5/22/12) |

| | sqz perfs 12H/5700'-5702' |
| 1 | sqz w/ 105 sx (1/28/12) |
| 2 | sqz w/ 50 sx (2/14/12) |
| 3 | sqz w/ 55 sx (2/17/12) |
| 7 | sqz w/ 55 sx (5/15/12) |

Cement Retainer @ 5680'
Sqz q/ 400 sx (7/25/12)    15

sqz perfs 4H/6655'    6
sqz w/ 55 xs (5/12/12)

Cement Retainer @ 7020' (7/15/12)
Upper Marcellus
100H/7076-7126'
100H/7154-7204'
Sqz q/ 400 sx (7/18/12)    14

CIBP @ 7250' (4/22/12)    5

Lower Marcellus
300H/7290-7440'

20# P110 5.50" @ 7571' KB w/2100 sx (circ to surface)

DTD @ 7571'

Last Revised: 1/5/2016 *(g.a. shirey)*