COMMONWEALTH OF PENNSYLVANIA
DEPARTMENT OF ENVIRONMENTAL PROTECTION

IN THE MATTER OF:

| | | |
|---|---|---|
| Coterra Energy Inc. | : | The Oil and Gas Act, and |
| Dimock Township and Springville | : | The Clean Streams Law |
| Township, Susquehanna County | : | |

**CONSENT ORDER AND AGREEMENT**

This Consent Order and Agreement is entered into this 29th day of November, 2022, by and between the Commonwealth of Pennsylvania, Department of Environmental Protection ("Department") and Coterra Energy Inc.

The Department has found and determined the following:

A.      The Department is the agency with the duty and authority to administer and enforce The Clean Streams Law, Act of June 22, 1937, P.L. 1987, *as amended*, 35 P.S. §§ 691.1-691.1001 ("Clean Streams Law"); the Oil and Gas Act of February 14, 2012, P.L. 87, No. 13, 58 Pa. C.S. §§ 3201-3274 ("Oil and Gas Act"); Section 1917-A of the Administrative Code of 1929, Act of April 9, 1929, P.L. 177, *as amended*, 71 P.S. § 510-17 ("Administrative Code"); and the rules and regulations promulgated thereunder ("Regulations").

B.      Coterra Energy Inc. is a Delaware Corporation, which engages in oil and gas exploration and production activities in Pennsylvania and maintains a business address of 2000 Park Lane, Suite 300, Pittsburgh, Pennsylvania 15275-1121 ("Coterra").  Coterra previously was named Cabot Oil & Gas Corporation ("Cabot") and changed its name to Coterra Energy Inc. following the merger of Cimarex Energy Co. and a subsidiary of Cabot effective as of October 1, 2021.

C.      Coterra is a "person" as that term is defined by Section 3203 of the Oil and Gas Act, 58 Pa.C.S. § 3203, and Section 1 of the Clean Streams Law, 35 P.S. § 691.1.

-1-

D.      Following the merger described in Paragraph B, Coterra continues to be the "owner" and "operator," as those terms are defined in Section 3203 of the Oil and Gas Act, 58 Pa.C.S. § 3203, of several gas wells located in Susquehanna County, Pennsylvania ("Cabot Wells").

E.      On November 4, 2009, the Department and Cabot executed a Consent Order and Agreement, which was subsequently modified on April 15, 2010 and July 19, 2010.  On December 15, 2010, the Department and Cabot executed a Consent Order and Settlement Agreement, which replaced the November 4, 2009 Consent Order and Agreement and all subsequent modifications of the November 4, 2009 Consent Order and Agreement ("2010 COSA").  The 2010 COSA is attached and incorporated herein as Exhibit A.

F.      The 2010 COSA identified an area defined as South of 41 degrees 45 minutes latitude; East of -75 degrees 54 minutes 11 seconds longitude; North of 41 degrees 42 minutes 14 seconds latitude; and West of -75 degrees 50 minutes 48 seconds longitude as the "Dimock/Carter Road Area."  The Dimock/Carter Road Area is depicted within the black dashed line on the figure attached hereto and identified as Exhibit B (hereinafter "Dimock/Carter Road Area").

**Affected Water Supplies**

G.      Before entering into the 2010 COSA, the Department determined that eighteen (18) water supplies that serve nineteen (19) homes within the Dimock/Carter Road Area were affected by Cabot's drilling activities (hereinafter "Original Water Supplies").  The Original Water Supplies are identified on the attached and incorporated Exhibit C.

H.      Pursuant to and in satisfaction of its restoration and replacement obligations with respect to the Original Water Supplies under Paragraphs 6 (a) and (b) of the 2010 COSA, Cabot offered a whole-house water treatment system to the landowners of each of the Original Water

Supplies and deposited $4,235,888.00 into an escrow fund to fund these systems. This escrow fund was made available to each of the landowners of the Original Water Supplies and was calculated based on two times the assessed value of the associated properties and included separate payments for tenants.

I.    On February 8, 2019, the Department determined that six (6) of the Original Water Supplies had returned to background conditions or contained 7 mg/L or less of dissolved methane for eight consecutive quarters in accordance with paragraph 5.b.vi. of the 2010 COSA. These six (6) Original Water Supplies are identified as "Resolved" on Exhibit C.

J.    Cabot reached separate civil settlement agreements with and/or provided the applicable escrow funds to the original property owners for all of the Original Water Supplies and their tenants.

K.    On October 22, 2013, the Department determined that Cabot was presumed to be responsible for the degradation of a water supply located in the Dimock/Carter Road Area identified as Additional Water Supply #1 on Exhibit D.

L.    On June 16, 2014, the Department issued to Cabot a Notice of Violation ("NOV") for the presumed degradation of Additional Water Supply #1, for the following violations:

1.    Failure to case and cement a gas well to prevent the migration of gas or other fluids into sources of fresh groundwater and otherwise prevent pollution or diminution of fresh groundwater, in violation of 25 Pa. Code §§ 78a.81(a)(2) and (3); and

2.    Causing or allowing the unpermitted discharge of methane gas from lower formations and other pollutional substances to waters of the Commonwealth, in violation of Section 401 of the Clean Streams Law, 35 P.S. § 691.401.

M.    On October 28, 2014, the Department determined that Cabot's gas well drilling activities had impacted a water supply in the Dimock/Carter Road Area identified as Additional Water Supply #2 on Exhibit D.

-3-

N.      On December 5, 2014, the Department determined that Cabot's gas well drilling activities had impacted a water supply in the Dimock/Carter Road Area identified as Additional Water Supply #3 on Exhibit D.

O.      On December 19, 2014, the Department issued to Cabot a NOV for the degradation of Additional Water Supplies #2 and #3, for the following violations:

1.      Failure to case and cement a gas well to prevent the migration of gas or other fluids into sources of fresh groundwater and otherwise prevent pollution or diminution of fresh groundwater, in violation of 25 Pa. Code §§ 78a.81(a)(2) and (3); and

2.      Causing or allowing the unpermitted discharge of methane gas from lower formations and other pollutional substances to waters of the Commonwealth, in violation of Section 401 of the Clean Streams Law, 35 P.S. § 691.401.

P.      On February 21, 2018, the Department determined that Cabot's gas well drilling activities had impacted a water supply in the Dimock/Carter Road Area identified as Additional Water Supply #4 on Exhibit D.

Q.      On March 21, 2018, the Department issued to Cabot a NOV for the degradation of Additional Water Supply #4, for the following violations:

1.      Failure to case and cement a gas well to prevent the migration of gas or other fluids into sources of fresh groundwater and otherwise prevent pollution or diminution of fresh groundwater, in violation of 25 Pa. Code §§ 78a.81(a)(2) and (3); and

2.      Causing or allowing the unpermitted discharge of methane gas from lower formations and other pollutional substances to waters of the Commonwealth, in violation of Section 401 of the Clean Streams Law, 35 P.S. § 691.401.

R.      On August 30, 2018, Coterra entered into a private settlement with the property owner of Additional Water Supply #4 and that supply is identified as "Settled" on Exhibit D.

S.      The Department has notified Coterra of its ongoing investigations at two additional water supplies in the Dimock/Carter Road Area identified as Additional Water Supply #5 and Additional Water Supply #6 on Exhibit D.

T.      As set forth in Paragraph 3, below, Coterra agrees to supplement its prior compliance with the water supply restoration obligations of the 2010 COSA and further comply with the Oil and Gas Act for the Additional Water Supplies in the manner outlined below for the water supplies identified as "Subject Water Supplies" on Exhibit E.

**Gas Well Investigations and Remedial Actions**

U.      In May 2011, the Department categorized forty-three (43) of the Cabot Wells located within the Dimock/Carter Road Area as follows:

1.      **Category I** – six (6) Cabot Wells with gas present in the annular space between the intermediate casing and surface casing;

2.      **Category II** – eight (8) Cabot Wells with gas present in the annular space between the production casing and the intermediate or surface casings, with the production casing top of cement within the intermediate or surface casing seat;

3.      **Category III** – eight (8) Cabot Wells with gas present in the annular space between the production casing and the intermediate or surface casings, but with open formation intervals that may explain the presence of gas in these annular spaces;

4.      **Category IV** – twenty-one (21) Cabot Wells with no gas present in any annular spaces.

V.      In May 2015, the Department conducted inspections and evaluations of thirty (30) Cabot Wells including the six (6) Category I gas wells and the eight (8) Category II gas wells from the Department's May 2011 assessment, and an additional sixteen (16) gas wells based on other information reviewed by the Department.  In May 2018, the Department shared its evaluation with Cabot and recommended that Cabot prioritize eleven (11) of these thirty (30) gas wells and two (2) previously plugged gas wells for further evaluation and potential remediation.

W.    Beginning in September 2018 and continuing through May 2019, Cabot conducted a series of pressure build-up tests on eight (8) of the gas wells identified in Paragraph U above, and conducted remedial work on a number of those gas wells, based on a prioritization agreed to by the Department.

X.    Beginning in September 2018 and continuing through May 2019, the Department and Cabot monitored multiple water supplies in coordination with the testing and remedial work at the various gas wells.

Y.    Based upon the results of the testing and monitoring described in Paragraphs W and X above, Cabot's remedial work appears to have addressed the observable defects in the wells within the Dimock/Carter Road Area identified on Exhibit F as "Remediated Wells."

Z.    Data collected as a result of more recent remediation on several wells in the Dimock/Carter Road Area was provided to the Department and is still being evaluated.  These wells are identified in the attached and incorporated Exhibit F as "Recently Remediated Wells."

AA.    As of the date of this Consent Order and Agreement, the Department continues to monitor and evaluate certain wells identified in Paragraph U, which Coterra has agreed to plug and abandon in accordance with the conditions set forth herein.  The Department has also suggested additional evaluation of alleviating potential gas pressure and volume in the vicinity of other wells identified in Paragraph V.

BB.    In prior years, Coterra had requested to resume drilling in the Dimock/Carter Road Area, but the Department denied these requests while it continued to evaluate the Cabot Wells and monitor Cabot's remedial efforts.  Based upon the remedial work Cabot has conducted as described above, Coterra is requesting that the Department allow new drilling and hydraulic fracturing of wells with surface locations outside the Dimock/Carter Road Area and laterals that

traverse under and produce the Dimock/Carter Road Area, which new drilling or hydraulic fracturing is currently restricted by the 2010 COSA.

CC.     Based upon the results of the testing and monitoring described in Paragraphs W,X,Y, and Z, above, the conditions contained in Paragraph 4, below, are appropriate mitigation measures to allow Coterra's new drilling, hydraulic fracturing, and production of wells with laterals that traverse under the Dimock/Carter Road Area.

**Applicable Law**

DD.     Pursuant to 25 Pa. Code § 78a.73(b), an operator shall prevent gas, oil, brine, completion and servicing fluids, and any other fluids or materials from below the casing seat from entering fresh groundwater and shall otherwise prevent pollution or diminution of fresh groundwater.

EE.     Pursuant to 25 Pa. Code § 78a.81(a)(2), an "operator shall case and cement a well to accomplish the following: … [p]revent the migration of gas or other fluids into sources of fresh groundwater."

FF.     Pursuant to 25 Pa. Code § 78a.81(a)(3), an "operator shall case and cement a well to accomplish the following: … [p]revent pollution or diminution of fresh groundwater."  The groundwater at the Dimock/Carter Road Area is "waters of the Commonwealth" as that term is defined in Section 103 of the Clean Streams Law, 35 P.S. § 691.103.

GG.     Section 401 of the Clean Streams Law, 35 P.S. § 691.401, makes it "unlawful for any person or municipality to put or place into any of the waters of the Commonwealth… any substance of any kind or character resulting in pollution."

HH.     The failures to prevent gas from below the casing seat from entering fresh groundwater, as described in Paragraphs L, O, and Q, above, violate Section 78a.73(b) of the Department's Rules and Regulations, 25 Pa. Code § 78a.73(b).

-7-

II.     The failures to properly case and cement gas wells to prevent the migration of gas or other fluids into sources of fresh groundwater and the failures to prevent the pollution or diminution of fresh groundwater, as described in Paragraphs L, O, and Q, above, violate Sections 78a.81(a)(2) and (a)(3) of the Department's Rules and Regulations, 25 Pa. Code §§ 78a.81(a)(2) and (3).

JJ.     The failures to prevent gas or other fluids generated from the operation of the Cabot Wells from polluting groundwater in the Dimock/Carter Road Area as described in Paragraphs L, O, and Q, above, violate Section 401 of the Clean Streams Law, 35 P.S. § 691.401.

KK.     The failures described in Paragraphs HH through JJ, subject Cabot to civil penalty liability under Section 605 of the Clean Streams Law, 35 P.S. § 691.605.

LL.     This Consent Order and Agreement supersedes and replaces Coterra's obligations under the 2010 COSA, but not the Findings agreed to by Cabot in Paragraph 2.b. of the 2010 COSA.

## ORDER

After full and complete negotiation of all matters set forth in this Consent Order and Agreement, and upon mutual exchange of the covenants contained herein, the parties desiring to avoid litigation and intending to be legally bound, it is hereby ORDERED by the Department and AGREED to by Coterra as follows:

1.      Authority.  This Consent Order and Agreement is an Order of the Department authorized and issued pursuant to Section 3253 of the Oil and Gas Act, 58 Pa.C.S. § 3253; Section 610 of the Clean Streams Law, 35 P.S. § 691.610; and Section 1917-A of the Administrative Code, 71 P.S. § 510-17.

-8-

2.      Findings.

a.      In any matter or proceeding between Coterra and the Department, Coterra shall not challenge the Department's assertion of the truth, accuracy, or validity of Paragraphs A through LL above.

b.      The parties do not authorize any other persons to use the findings in this Consent Order and Agreement in any matter or proceeding.  Specifically, nothing herein shall constitute an admission on the part of Coterra in any matter or proceeding not between Coterra and the Department.

3.      Restoration or Replacement of Water Supplies.  Coterra shall supplement its restoration and replacement obligations of the 2010 COSA and satisfy all obligations to restore or replace the Subject Water Supplies in compliance with 58 Pa.C.S. § 3218(a), 25 Pa. Code § 78a.51(d), as follows:

a.      Within 90 days after the date of this Consent Order and Agreement, Coterra shall fund, by a one-time payment of $16.29 million dollars to the Pennsylvania Attorney General's Office, a community water well system and water distribution system constructed and operated by Pennsylvania American Water Company, which provides or makes available water to each owner of a Subject Water Supply ("Public Water System").  Coterra's one-time payment of $16.29 million dollars to fund the Public Water System shall include, connecting the Subject Water Supplies to the Public Water System, and a credit of $50,000 applied to each of the Subject Water Supplies, being the estimated cost to purchase water for 75 years from the date the Public Water System is available to service the Subject Water Supplies.

b.      It is expected that the Public Water System will be completed and potable water will be available to each Subject Water Supply on or before December 31, 2027, however

the ultimate completion date is subject to change. In the meantime, Coterra will offer interim water treatment to the Subject Water Supplies.

      c.    *Interim Water Treatment.* Within 180 days after the date of this Consent Order and Agreement, Coterra shall offer to the owners of all of the Subject Water Supplies on Exhibit E, and install for those who accept, new treatment systems that will treat the water to meet the requirements of 58 Pa.C.S. § 3218(a), 25 Pa. Code § 78a.51(d) ("Interim Treatment") and provide for the continuous operation and maintenance of said Interim Treatment until the Public Water System is available to provide potable water to the Subject Water Supplies.

    i.   Coterra shall conduct wellhead screening and raw water sampling of each of the Subject Water Supplies and Additional Water Supply #4 each calendar quarter until the Public Water System is available to provide water to the Subject Water Supply;

    ii.   Following installation of the Interim Treatment on each of the Subject Water Supplies and subject to landowner consent, Coterra shall sample the raw untreated water and the treated water for four calendar Quarters and submit the sample analysis to the Department within 30 days after the end of each Quarter;

    iii.   If the sampling performed in accordance with Paragraph 3.c.ii., above, indicates the Interim Treatment is not meeting 58 Pa.C.S. § 3218(a), 25 Pa. Code § 78a.51(d), then, within 30 days after written notice from the Department, Coterra shall submit a corrective action plan for the same ("Corrective Action Plan"); and

    iv.   Upon the Department's approval of any Corrective Action Plan submitted pursuant to Paragraph 3.c.iii, above, Coterra shall implement the Corrective Action Plan.

      d.    *Long Term Operation and Maintenance.* If the Public Water System is unable to be completed for any reason, then within 90 days following written notice from the Pennsylvania Attorney General's Office that the Public Water System is unable to be completed in accordance with Paragraph 3.a. and 3.b., above, Coterra shall submit to the Department a plan for the operation and maintenance of the Interim Treatment for a period of 30 years from the date of the written notice that shall be funded from the one-time payment of $16.29 million dollars

referenced in Paragraph 3.a., above ("Long Term O&M Plan").  Upon the Department's

approval of the Long Term O&M Plan, Coterra shall implement the Long Term O&M Plan,

which satisfies the water restoration replacement obligations of this Paragraph.

e.      *Mitigation Fund for Interim Treatment.*  In the event Coterra is unable to

secure the consent of the owner of a Subject Water Supply to accept Interim Treatment in

accordance with Paragraph 3.c., above, Coterra will be deemed to have met its obligation to

provide Interim Treatment under Paragraph 3.c. by depositing sufficient funds in a segregated

Interim Treatment fund for the future installation, operation and maintenance of Interim

Treatment for the Subject Water Supply, ("Mitigation Fund"), as follows:

i.   Upon determining that an owner of a Subject Water Supply refuses Interim Treatment, Coterra shall notify the Department in writing of such refusal, provide evidence of its attempts to secure consent, provide evidence that consent could not be obtained, and propose an amount of funds to be set aside in the Mitigation Fund, including the basis for such amount ("Funding Notice");

ii.   Within 10 days after receiving the Department's approval in accordance with Paragraph 5, below, of a Funding Notice required by Paragraph 3.e.i., above, Coterra shall deposit or otherwise set aside in the Mitigation Fund the amount of funds set forth in the Funding Notice and submit to the Department evidence to demonstrate the deposit;

iii.   Upon reasonable advance notice, the Department may request and Coterra shall provide a statement of the deposits and expenditures from the Mitigation Fund and the remaining balance of the Mitigation Fund;

iv.   Coterra shall retain sufficient funds in the Mitigation Fund for the future installation, operation and maintenance of Interim Treatment for any Subject Water Supply that the owner refuses Interim Treatment for which a Funding Notice has been approved by the Department for a period of 10 years from the date of refusal or until the Public Water System is available to provide water to the Subject Supply, whichever comes first; and

v.   Upon the Department's written confirmation that all of the Subject Water Supplies have received Interim Treatment or have been provided notice of the availability of connection to the Public Water

Supply, as applicable, any remaining funds in the Mitigation Fund shall be disbursed to Coterra.

f.      *Non-Interference.*  No settlement, agreement, or other understanding between Coterra and any owner of one or more of the Additional Water Supplies shall prohibit, hinder, obstruct, delay, impede, impair, or prevent the Department or its duly authorized agents, acting in the course of lawful performance and duty, from entering upon lands, buildings, facilities, premises, or operations in order to make inspections, conduct tests or sampling, examine records, or otherwise carrying out investigations as may be necessary, relating to gas migration or causes thereto.

g.      *Satisfaction of Restoration and Replacement of Water Supplies.*  Upon the Public Water System becoming available to the owners of the Subject Water Supplies and/or the Department's approval of the Long Term O&M Plan, Coterra shall be deemed to have satisfied its obligations to restore or replace the Subject Water Supplies under this Consent Order and Agreement.

4.      <u>Plugging Wells and Drilling in the Dimock/Carter Road Area.</u>

a.      Upon Coterra providing written confirmation to the Department that it has completed the requirements of Paragraphs 3.a. and installed the Interim Treatment Systems or funded the Mitigation Fund as provided for in 3.c. and 3.e. above, and subject to Paragraph 4.b.-f., below, Coterra may, 30 days after providing such written confirmation, submit permit applications to drill new wells and may drill, complete, and produce permitted wells in accordance with Department-issued permits, the applicable laws and regulations of the Commonwealth, and this Consent Order and Agreement at surface hole locations outside the Dimock/Carter Road Area depicted on Exhibit B and such wells may have completed and producing, horizontal wellbores that traverse under the Dimock/Carter Road Area from surface hole locations outside the Dimock/Carter Road Area.  Coterra shall not drill or complete wells

from surface holes located inside the Dimock/Carter Road Area during the term of this Consent Order and Agreement.

        b.     *Well Plugging.*  Coterra shall plug the wells listed on Exhibit G, which are located within the Dimock/Carter Road Area as follows:

      i.    Coterra shall plug the wells listed in Exhibit G in conjunction with the drilling of new wells that will traverse under the Dimock/Carter Road Area from surface hole locations outside the Dimock/Carter Road Area;

     ii.    When applicable, Coterra shall include a plugging plan and schedule for the plugging of the wells listed in Exhibit G with each Operations Monitoring Plan submitted pursuant to Paragraph 4.c., below;

   iii.    All wells identified on Exhibit G will be plugged in accordance with an Operations Monitoring Plan and shall be plugged on or before December 31, 2032, unless the Department consents to additional time;

   iv.    The plugging plan included in the Operations Monitoring Plan will provide for monitoring any wells not being plugged that are located on the same well pad as those wells being plugged; and

    v.    All well plugging shall be in accordance with the requirements of 58 Pa.C.S. § 3220 and 25 Pa. Code §§ 78a.91-78a.98, or an appropriate Department-approved alternative under 25 Pa. Code § 78a.75.

        c.     *Operations Monitoring Plan.*  For each well Coterra proposes to drill, complete and produce that will have a horizontal wellbore that traverses under the Dimock/Carter Road Area, Coterra shall, at least 60 days before drilling the well, submit to the Department for review and approval, a written plan to simultaneously monitor and evaluate nearby gas wells identified on Exhibit G, water supplies, and other potential receptors for any changes as a result of the drilling or stimulation of any wells or well laterals under the Dimock/Carter Road Area along with an implementation schedule that allows monitoring to occur during drilling completions and plugging ("Operations Monitoring Plan").  Coterra may submit an Operations Monitoring Plan for multiple wells on the same well pad.  The Operations

Monitoring Plan shall require that Coterra:

    i.    Utilize isolation mechanisms and continuous monitoring in real-time by Coterra's 24-hour Operations Control Center for gas wells identified on Exhibit G in the Dimock/Carter Road Area located within 2,000 feet measured horizontally from the new Coterra vertical wellbore or 2,000 feet measured from the surface above the entire length of the new Coterra horizontal wellbore;

    ii.    Monitor all drinking water wells within 3,000 feet of Coterra's surface location for the new wellbore, subject to landowner consent, by conducting pre-drill and post-completion water sampling for dissolved methane;

    iii.    Plug and abandon the wells identified on Exhibit G in the Dimock/Carter Road area located within 1,000 feet measured horizontally from the new Coterra vertical wellbore or 1,000 feet measured from the surface above the entire length of the new Coterra horizontal wellbore in accordance with Paragraph 4.b, above; and

    iv.    Report monitoring results to the Department.

    d.    Upon the Department's prompt review and approval of an Operations Monitoring Plan, including any modifications necessary to comply with the requirements of Paragraphs 4.c.i-iv made by the Department, Coterra shall implement the Operations Monitoring Plan in accordance with the Department-approved implementation schedules contained therein. Coterra may submit in writing, for Department review and approval, modifications to an Operations Monitoring Plan, as appropriate.

    e.    Coterra agrees that failure to comply with the Department's Regulations regarding casing and cementing or an Operations Monitoring Plan during the drilling or completion of new wells that traverse under the Dimock/Carter Road Area is a violation of this Consent Order and Agreement.

f.      *Gesford K PAD 3.*  Coterra shall investigate alleviating potential gas pressure and volume in the vicinity of the Gesford 3 gas well (Permit no. 115-20019) and the Gesford 9 gas well (Permit no. 115-20187).

    i. Within 180 days after the date of this Consent Order and Agreement, Coterra shall provide to the Department a written analysis and recommendation that is signed and sealed by a Pennsylvania licensed-professional engineer or geologist, as appropriate, and addresses the technical feasibility, practicality, reasonableness, and potential adverse impacts of attempting to alleviate potential gas pressure and volume in the vicinity of the Gesford 3 gas well and the Gesford 9 gas well, including but not limited to, potential impacts to residents of Carter Road, ("Gesford 3 and 9 Plan");

    ii. The Gesford 3 and 9 Plan shall address the known gas intervals encountered and documented in the top-hole sections while drilling and plugging the Gesford 3 and Gesford 9 wells and include an implementation schedule;

    iii. Upon the Department's receipt of the Gesford 3 and 9 Plan, the Department will promptly review the Gesford 3 and 9 Plan and the parties shall meet to discuss the Gesford 3 and 9 Plan;

    iv. If the Department requests modification of the Gesford 3 and 9 Plan, those modifications will require review and approval by the author and signatory of the Gesford 3 and 9 Plan before implementation is required; and

    v. To the extent the Gesford 3 and 9 Plan contains a feasible, practical, and reasonable plan to alleviate potential gas pressure and volume in the vicinity of the Gesford 3 gas well and the Gesford 9 gas well, Coterra shall implement the Gesford 3 and 9 Plan in accordance with the approved implementation schedule.

5.      <u>Submission of Documents.</u>  With regard to the Corrective Action Plan (Paragraph 3.c.iii.), the Long Term O&M Plan (Paragraph 3.d.), the Funding Notice (Paragraph 3.e.i.), an Operations Monitoring Plan (Paragraph 4.c.), and the Gesford 3 and 9 Plan (Paragraph 4.f.), that Coterra is required to submit pursuant to this Consent Order and Agreement, the Department will review the document and will approve or disapprove the document, or portion thereof, in writing, explaining the Department's reasoning for any disapproval.  If the document, or any portion thereof, is disapproved by the Department, Coterra shall submit a revised document to the

Department that addresses the Department's concerns within a reasonable time, as specified by the Department. The Department will approve, or modify and approve, the document in writing. Upon approval by the Department, the document, including any schedule contained therein, shall become a part of this Consent Order and Agreement for all purposes and shall be enforceable as such.

6.     Civil Penalty Settlement. Coterra consents to the assessment of a civil penalty of Four Hundred Forty-Four Thousand Dollars ($444,000.00), which shall be paid in full upon signing this Consent Order and Agreement. This payment is in settlement of the Department's claim for civil penalties and Department costs related to the violations set forth in Paragraphs HH through JJ, above, for the dates set forth in Paragraphs L, O, and Q, above. The payment shall be made by corporate check or the like, made payable to the "Commonwealth of Pennsylvania," and forwarded to Eastern District Oil and Gas Operations, Pennsylvania Department of Environmental Protection, 208 West Third Street, Suite 101, Williamsport, Pennsylvania 17701-6448.

7.     Stipulated Civil Penalties.

a.     In the event Coterra fails to comply in a timely manner with the restriction on drilling in the Dimock/Carter Road Area in Paragraph 4.a., Paragraph 4.b.,iii. or Paragraph 4.d., above, Coterra shall be in violation of this Consent Order and Agreement and, in addition to other applicable remedies, shall pay a stipulated civil penalties as follows:

    i.     The amount of Five Thousand Dollars ($5,000.00) per day for each day, or any portion thereof, that Coterra fails to comply with the restriction on drilling from surface holes located in the Dimock/Carter Road Area in Paragraph 4.a.;

    ii.    The amount of Five Hundred Dollars ($500.00) per day for each day, or any portion thereof, that Coterra fails to comply with Paragraph 4.b.iii; and

      iii.   The amount of Two Hundred Fifty Dollars ($250.00) per day for each day, or any portion thereof, that Coterra fails to comply with Paragraph 4.d.

b.     Stipulated civil penalty payments shall be payable on or before the fifteenth (15th) day of each succeeding month and shall be forwarded as described in Paragraph 6, above.

c.     Any payment under this paragraph shall neither waive Coterra's duty to meet its obligations under this Consent Order and Agreement nor preclude the Department from commencing an action to compel Coterra's compliance with the terms and conditions of this Consent Order and Agreement.  The payment resolves only Coterra's liability for civil penalties arising from the violations of this Consent Order and Agreement for which the payment is made.

d.     Stipulated penalties shall be due automatically and without notice.

8.     <u>Additional Remedies.</u>

a.     In the event Coterra fails to comply with any provision of this Consent Order and Agreement, the Department may, in addition to the remedies prescribed herein, pursue any remedy available for a violation of an order of the Department, including an action to enforce this Consent Order and Agreement.

b.     The remedies provided by this Paragraph are cumulative and the exercise of one does not preclude the exercise of any other.  The failure of the Department to pursue any remedy shall not be deemed to be a waiver of that remedy.

9.     <u>Reservation of Rights.</u>  The Department reserves the right to require additional measures to achieve compliance with applicable law.  Coterra reserves the right to challenge any action which the Department may take to require those measures.

10.     <u>Liability of Operator.</u>  Coterra shall be liable for any violations of the Consent Order and Agreement, including those caused by, contributed to, or allowed by its officers, agents, employees, or contractors.

-17-

11.    Transfer of Cabot Wells.

a.    The duties and obligations under this Consent Order and Agreement shall not be modified, diminished, terminated, or otherwise altered by the transfer of any legal or equitable interest in any Coterra gas well(s) within the Dimock/Carter Road Area, without the Department's written approval as outlined in Paragraph 11.c., below.

b.    If Coterra intends to transfer any legal or equitable interest in any Coterra gas well(s) within the Dimock/Carter Road Area that is subject to this Consent Order and Agreement, Coterra shall serve a copy of this Consent Order and Agreement upon the prospective transferee of the legal and equitable interest at least thirty (30) days prior to the contemplated transfer and shall simultaneously inform the Eastern Oil and Gas District of the Department of such intent.

c.    The Department in its sole discretion may agree to terminate all or a portion of Coterra's duties and obligations under this Consent Order and Agreement upon transfer of any Coterra gas well(s) within the Dimock/Carter Road Area.

12.    Correspondence with Department.  All correspondence with the Department concerning this Consent Order and Agreement shall be addressed to:

> Jennifer W. Means
> Environmental Program Manager
> Eastern District Oil and Gas Operations
> Department of Environmental Protection
> 208 West Third Street, Suite 101
> Williamsport, PA 17701-6448
> Phone: (570) 321-6557
> e-Mail: jenmeans@pa.gov

13.    Correspondence with Coterra.  All correspondence with Coterra concerning this Consent Order and Agreement shall be addressed to:

> Gary Hlavinka, Vice President
> Marcellus Business Unit
> Coterra Energy Inc.
> 2000 Park Lane, Suite 300
> Pittsburgh, PA 15275-1121
> Phone: (412) 249-3850
> e-Mail: gary.hlavinka@coterra.com

Coterra shall notify the Department whenever there is a change in the contact person's name, title, or address.  Service of any notice or any legal process for any purpose under this Consent Order and Agreement, including its enforcement, may be made by mailing a copy by first-class mail to the above address.

14.    Severability.  The paragraphs of this Consent Order and Agreement shall be severable and should any part hereof be declared invalid or unenforceable, the remainder shall continue in full force and effect between the parties.

15.    Entire Agreement. This Consent Order and Agreement shall constitute the entire integrated agreement of the parties.  No prior or contemporaneous communications or prior drafts shall be relevant or admissible for purposes of determining the meaning or intent of any provisions herein in any litigation or any other proceeding.

16.    Attorney's Fees.  The parties shall bear their respective attorney fees, expenses and other costs in the prosecution or defense of this matter or any related matters, arising prior to execution of this Consent Order and Agreement.

17.    Modifications.  No changes, additions, modifications, or amendments of this Consent Order and Agreement shall be effective unless they are set out in writing and signed by the parties hereto.

18.    <u>Titles.</u>  A title used at the beginning of any paragraph of this Consent Order and Agreement may be used to aid in the construction of that paragraph but shall not be treated as controlling.

19.    <u>Decisions Under Consent Order and Agreement.</u>  Coterra waives its rights to appeal to the Environmental Hearing Board any decision that the Department makes under the provisions of this Consent Order and Agreement, including a notice that stipulated civil penalties are due, which rights may be available under Section 4 of the Environmental Hearing Board Act, the Act of July 13, 1988, P.L. 530, 35 P.S. § 7514; the Administrative Agency Law, 2 Pa. C.S. § 103(a) and Chapters 5A and 7A; or any other provision of law.  The Department agrees any objection that Coterra may have to the decision may be raised as a defense in any Court where the Department enforces this Consent Order and Agreement. The Department further agrees that decisions made on new permit applications submitted in accordance with Paragraph 4.a, above are not decisions under this Consent Order and Agreement for the purposes of this Paragraph 19.

20.    <u>Termination of Consent Order and Agreement.</u>  Coterra's obligations, but not the Findings of this Consent Order and Agreement, shall terminate when Coterra has completed all of the requirements of this Consent Order and Agreement; and 2) paid any outstanding penalties due under Paragraph 7 of this Consent Order and Agreement.

21.    <u>Execution of Agreement.</u>  This Consent Order and Agreement may be signed in counterparts, each of which shall be deemed to be an original and all of which together shall constitute one and the same instrument.

IN WITNESS WHEREOF, the parties hereto have caused this Consent Order and Agreement to be executed by their duly authorized representatives.  The undersigned representatives of Coterra certify under penalty of law, as provided by 18 Pa. C.S.A. § 4904, that they are authorized to execute this Consent Order and Agreement on behalf of Coterra; that

Coterra consents to the entry of this Consent Order and Agreement as a final ORDER of the Department; that Coterra hereby knowingly waives its rights to a hearing under the statutes referenced in this Consent Order and Agreement; and that Coterra knowingly waives its right to appeal this Consent Order and Agreement and to challenge its content or validity, which rights may be available under Section 4 of the Environmental Hearing Board Act, the Act of July 13, 1988, P.L. 530, 35 P.S. § 7514; the Administrative Agency Law, 2 Pa. C.S.A. § 103(a) and Chapters 5A and 7A; or any other provisions of law. Signature by Coterra's attorney certifies only that the agreement has been signed after consulting with counsel.

FOR COTERRA ENERGY INC.:

_____
Signature

Gary J. Hlavinka
Name (Typed or Printed)

VP-Marcellus Business Unit
Title for Coterra Energy Inc.

_____
Signature

Scott C Schroeder
Name (Typed or Printed)

EVP and Chief Financial Officer
Title for Coterra Energy Inc.

_____
Signature

Cole DeLancey
Name (Typed or Printed): Attorney for
Coterra Energy Inc.

FOR THE COMMONWEALTH OF
PENNSYLVANIA, DEPARTMENT OF
ENVIRONMENTAL PROTECTION:

_____
Jennifer W. Means
Environmental Program Manager
Eastern Oil and Gas District

_____
Douglas G. Moorhead
Regional Counsel

-21-

# EXHIBIT A

# EXHIBIT A

## COMMONWEALTH OF PENNSYLVANIA
## DEPARTMENT OF ENVIRONMENTAL PROTECTION

**IN THE MATTER OF:**

| | | |
|---|---|---|
| Cabot Oil & Gas Corporation | : | The Clean Streams Law |
| Dimock and Springville Townships | : | Oil and Gas Act |
| Susquehanna County | : | |

### CONSENT ORDER AND SETTLEMENT AGREEMENT

This Consent Order and Settlement Agreement is entered into this 15th day of December 2010, by and between the Commonwealth of Pennsylvania, Department of Environmental Protection ("Department") and Cabot Oil & Gas Corporation ("Cabot").

### Findings

The Department has found and determined the following:

A.      The Department is the agency with the duty and authority to administer and enforce The Clean Streams Law, Act of June 22, 1937, P.L. 1987, *as amended*, 35 P.S. §§691.1-691.1001 ("Clean Streams Law"); the Oil and Gas Act, Act of December 19, 1984, P.L. 1140, *as amended*, 58 P.S. §§601.101-601.605 ("Oil and Gas Act"); Section 1917-A of the Administrative Code of 1929, Act of April 9, 1929, P.L. 177, *as amended*, 71 P.S. §§510-17 ("Administrative Code"); and the rules and regulations promulgated thereunder ("Regulations").

B.      Cabot is a Delaware corporation registered to do business in Pennsylvania and is engaged in various oil and gas exploration and production activities in Pennsylvania, including in Dimock and Springville Townships, Susquehanna County. Cabot maintains a mailing address at 5 Penn Center West, Suite 401, Pittsburgh, PA 15276.

C.      Cabot is the "owner" and "operator," as those terms are defined in Section 103 of the Oil and Gas Act, 58 P.S. §601.103, of certain gas wells, or has received permit authorization from the Department to drill wells, within an area defined as follows:  South of 41 degrees 45 minutes

latitude; East of -75 degrees 54 minutes 11 seconds longitude; North of 41 degrees 42 minutes 14 seconds latitude; and West of -75 degrees 50 minutes 48 seconds longitude in Dimock and Springville Townships, Susquehanna County, Pennsylvania ("Dimock/Carter Road Area," which is the same as the "Affected Area" in the Modified 2009 Agreement.). A map of the Dimock/Carter Road Area is attached as Exhibit A and incorporated herein.

D.    On November 4, 2009, the Department and Cabot executed a Consent Order and Agreement, which the Parties modified on April 15, 2010, and July 19, 2010 (collectively the "Modified 2009 Agreement"). This Consent Order and Settlement Agreement replaces the Modified 2009 Agreement.

E.    The gas wells that Cabot has plugged within the Dimock/Carter Road Area to date, the gas wells that Cabot has drilled and is producing within the Dimock/Carter Road Area, and the gas wells that Cabot has drilled but has not yet fraced within the Dimock/Carter Road Area (collectively "the Dimock/Carter Road Gas Wells") are identified on Exhibit B and incorporated herein.

F.    The Department has determined that eighteen (18) drinking water supplies that serve nineteen (19) homes within the Dimock/Carter Road Area have been affected from the drilling activities at the Dimock/Carter Road Gas Wells (collectively the "Water Supplies"). The owners of the nineteen (19) homes that are served by the Water Supplies are identified on Exhibit C and incorporated herein (collectively the "Property Owners").

G.    As of the date of this Consent Order and Settlement Agreement, Cabot has undertaken, among other things, the following actions:

1.    Plugged and abandoned three of the Dimock/Carter Road Gas Wells -- Baker 1, Gesford 3, and Gesford 9. To date, Cabot has not yet completed the restoration of the Gesford 3 and Gesford 9 Gas Well Sites;

2

2.    Reconditioned the Ely 4 Gas Well by squeezing the annular space, thereby eliminating the pressure that was present in a portion of the annular space between the 41/2 and 7 inch casings on the Gas Well, and conducted similar remedial actions at the Ratzel 2H Gas Well after September 14, 2010;

3.    Prepared and implemented a plan to check the integrity of the Dimock/Carter Road Gas Wells;

4.    Provided temporary, whole house water supplies to owners of residences within the Dimock/Carter Road Area, including to the Property Owners;

5.    Provided new vent stacks or extended existing vent stacks on Water Supplies; and

6.    Paid $570,000 to the Department in settlement of civil and monthly stipulated penalties.

H.    The Department has determined that Cabot has not: (1) permanently restored and/or replaced all of the Water Supplies by September 17, 2010; (2) completely eliminated the unpermitted discharge of natural gas into the waters of the Commonwealth from the Dimock/Carter Road Gas Wells by November 1, 2010; and (3) plugged or taken other remedial actions at certain of the Dimock/Carter Road Gas Wells by November 13, 2010.

I.    Regarding Department costs, from November 4, 2009, to the date of this Consent Order and Settlement Agreement, the Department has incurred costs for staff, lab analyses, and other Department expenses and costs relating to the Dimock/Carter Road Gas Wells, the Water Supplies, and the Modified 2009 Agreement.

J.    The Department has determined that the items identified in Paragraph H, above, constitute unlawful conduct by Cabot pursuant to Section 509 of the Oil and Gas Act, 58 P.S. §601.509, and Section 611 of the Clean Streams Law, 35 P.S. §691.611.

K.    Cabot disagrees with the substance of the Department's determinations in Findings F, H, and J. However ,Cabot agrees to and shall fulfill all of the terms and obligations of this Consent

3

Order and Settlement Agreement. By entering into this Consent Order and Settlement Agreement, Cabot and the Department desire to fully and finally resolve the items identified in Paragraph L, below.

L. To avoid litigation, to resolve the items set forth above in Paragraphs F, H, and J, and as complete and final settlement of any known claims, demands, stipulated civil penalties, and/or sanctions of any type that the Department has made or could have made against Cabot to date relating to the items set forth in Paragraphs F, H, and J, above, relating to the Modified 2009 Agreement, the Dimock/Carter Road Area, and the Dimock/Carter Road Gas Wells, including for obligations under Section 208 of the Oil and Gas Act, 58 P.S. §601.208, and 25 Pa. Code §78.51, to pay for or restore and/or replace the Water Supplies, or to provide for ongoing operating or maintenance expense of such restoration or replacement, and to provide reimbursement for certain costs incurred by the Department to date, Cabot shall: perform the remediation activities to the Ely 2H and Ely 6H Gas Wells as set forth in Paragraph 5.c., below; pay $500,000; and shall complete the requirements below and as approved by the Department in accordance with this Consent Order and Settlement Agreement.

## **Order**

After full and complete negotiation of all matters set forth in this Consent Order and Settlement Agreement, and upon mutual exchange of the covenants contained herein, the Parties desiring to avoid litigation and intending to be legally bound, it is hereby ORDERED by the Department and AGREED to by Cabot as follows:

1. *Authority*. This Consent Order and Settlement Agreement is an Order of the Department authorized and issued pursuant to Section 5 of the Clean Streams Law, 35 P.S. §691.5, Section 503 of the Oil and Gas Act, 58 P.S. §601.503, and Section 1917-A of the Administrative Code.

4

2.    *Findings and Effect on Third Parties.*

a.    This Consent Order and Settlement Agreement is a settlement between the Department and Cabot, and is a settlement only for the matters specifically addressed herein. This Consent Order and Settlement Agreement replaces the Modified 2009 Agreement.

b.    Cabot disagrees with the substance of the Department's determinations in Findings F, H, and J. However, Cabot agrees to and shall fulfill all of the terms and obligations of this Consent Order and Settlement Agreement. Cabot agrees that the Findings in Paragraphs A-L, above, are true and correct and, in any matter or proceeding involving Cabot and the Department, Cabot shall not challenge the accuracy or validity of these Findings.

3.    *Compliance, Permits Inside the Dimock/Carter Road Area, Cabot Agreement and Statements.*

a.    Cabot hereby agrees that it shall take all actions necessary including, but not limited to, the requirements set forth in this Consent Order and Settlement Agreement, to comply with all applicable environmental laws and regulations, including all applicable provisions of the Clean Streams Law, Oil and Gas Act, and the Regulations.

b.    Cabot hereby certifies that it has entered into this Consent Order and Settlement Agreement freely, under no coercion of any kind, and after consulting with Counsel. As identified herein, Cabot hereby agrees to comply with all of its obligations under this Consent Order and Settlement Agreement, and Cabot intends to be legally bound by this Consent Order and Settlement Agreement.

c.    Cabot agrees that this Consent Order and Settlement Agreement is valid, is a binding obligation upon Cabot and is a final Order of the Department, and neither Cabot nor any authorized representative, agent, or attorney of Cabot or representing Cabot in any court or administrative forum shall state or argue otherwise for any purpose.

5

4.    *New Drilling And Hydro-fracturing Inside the Dimock/Carter Road Area.*

a.    After the date of this Consent Order and Settlement Agreement, for any of the seven (7) Dimock/Carter Road Gas Wells identified in Paragraph 3.c.2) of the Modified 2009 Agreement (A&M Hibbard 2H; A&M Hibbard 4; Ely 1H; Baker 3; Gesford 4R; Gesford 8H NW; and P. Kelly 1) that Cabot has drilled but not yet hydro-fractured, Cabot may begin hydro-fracturing any such Gas Well or Wells *only* upon receipt of written notice from the Department that Cabot has, as of the date Cabot proposes to frac said Gas Well or Wells, complied with all of its obligations as to said Gas Well or Wells under Paragraph 3.a., above, including obtaining all required permits or other authorizations from the Department, and under Paragraph 5.a, below.

b.    In all cases, Cabot shall not complete the drilling of any of Dimock/Carter Road Gas Wells, and shall not begin the drilling of any new Gas Wells within the Dimock/Carter Road Area until after April 15, 2011, at the earliest, and in accordance with all of the requirements of this Paragraph.

c.    Before the drilling permit expires for any of the Dimock/Carter Road Gas Wells, Cabot may submit a request to the Department to renew the drilling permit in accordance with 25 Pa. Code §78.17, and the Department will promptly process any such request in accordance with the applicable regulations.

d.    After April 15, 2011, Cabot may complete the drilling of any of the Dimock/Carter Road Gas Wells, and/or may begin the drilling of any new Gas Wells within the Dimock/Carter Road Area *only* upon receipt of written notice from the Department that, as to said Gas Well or Wells:

i.    Cabot is in compliance with all of its obligations under Paragraph 5, below;

6

ii.   Cabot is, as of the date Cabot proposes to drill said Gas Well or Wells, in compliance with the applicable requirements of Paragraph 3.a., above, including obtaining all required permits or other authorizations from the Department; and

iii.   Cabot is in compliance with all other obligations under this Consent Order and Settlement Agreement as of the date Cabot plans to drill said Gas Well or Well(s).

5.   ***Compliance Obligations Of Cabot With Respect to the Dimock/Carter Road Area Gas Wells***. All compliance obligations of Cabot under this Consent Order and Settlement Agreement with respect to the Department's claims under the Modified 2009 Agreement, the Oil and Gas Act, and the Clean Streams Law, other than the claims in Paragraph 6, below, are satisfied subject to the Department providing Cabot written notice that Cabot has performed the following:

a.   <u>Gas Well Pressure Testing</u>.

i.   Within seven (7) days of the date of this Consent Order and Settlement Agreement, Cabot shall provide to the Department the hydrocarbon bearing intervals for each of the Dimock/Carter Road Gas Wells based on data collected by Cabot during the past drilling of each of Dimock/Carter Road Gas Wells;

ii.   Within seven (7) days of the date of this Consent Order and Settlement Agreement, Cabot shall begin pressure testing of each accessible annuli on each of the Dimock/Carter Road Gas Wells. Cabot shall pressure test each annuli for forty-eight (48) consecutive hours, and shall provide the test results for each of the Dimock/Carter Road Gas Wells to the Department within five (5) days of completion of the pressure test on that Gas Well. At least twenty-four (24) hours before Cabot begins pressure testing in accordance with this Paragraph, Cabot shall provide the Department written notice of the Gas Well to be tested and the date and the approximate time that Cabot shall begin such pressure test;

iii.   In all cases, Cabot shall have completed the 48-hour pressure test of the annuli on all of the Dimock/Carter Road Gas Wells, and shall provide the Department with the results of the pressure tests for all of the Dimock/Carter Road Gas Wells within sixty (60) days of the date of this Consent Order and Settlement Agreement; and

iv.   If the pressure data required to be provided above indicates that the Gas Well in question is in compliance with Chapter 78 of the proposed regulations or such regulations that are finally enacted, then said Gas

7

Well shall, absent contradictory data reviewed by the Department, be considered to not be discharging natural gas into the aquifer.

b.　　Screening/Water Sampling.  Cabot has received copies of the results of screenings for free combustible gas and of the laboratory analyses of all samples taken by the Department at the Water Supplies to date.  In addition to the screenings and sampling done by the Department, beginning upon execution of this Consent Order and Settlement Agreement, Cabot shall:

i.　　at least once every two weeks, screen the well head at each Water Supply for percentage of free combustible gas, and sample the well water at each Water Supply;

ii.　　for each water sample collected at a Water Supply, Cabot shall have the water sample analyzed in a Pennsylvania-licensed laboratory for dissolved methane, dissolved ethane, and dissolved propane;

iii.　　provide the Department a copy of the results of the screening for free combustible gas, and the laboratory analyses of each water sample within five  (5) days of Cabot's receipt of the analyses by its laboratory;

iv.　　Cabot shall continue to conduct the screening and sampling under Paragraph 5.b.i., above, once every two weeks at each Water Supply until the results of the screenings and sampling done by the Department in the past and by Cabot under Paragraph 5.b.i., above, show that either no combustible free gas is present at the wellhead for the Water Supply or that such levels of combustible free gas, if properly vented pursuant to applicable regulations and Department practice, do not pose a danger to persons or property *and* the concentration of dissolved methane is below 7 milligrams/liter ("mg/l"), or meets the standard then prescribed by applicable regulations.  However, Cabot may petition the Department, based on information obtained in accordance with this Paragraph for a determination that the concentration of methane in the Water Supply is at background levels for the aquifer that supplies that Water Supply. Cabot may further petition the Department for a determination that the concentration of combustible free gas at the wellhead is at levels that do not present a danger to persons or property if properly vented according to applicable regulations and Department practice;

v.　　for each Water Supply that meets the standards under Paragraph 5.b.iv, above, Cabot shall continue to screen each such Water Supply for free combustible gas and shall sample each such Water Supply at least

8

once per quarter, and shall have the water sample analyzed in a Pennsylvania-licensed laboratory for dissolved methane only. Cabot shall provide the Department a copy of the results of the screening for free combustible gas, and the laboratory analyses of each water sample within five (5) days of Cabot's receipt of the screening results and water sample analyses by its laboratory; and

vi. unless the Department determines that the concentration of methane in the Water Supply is at background levels for the aquifer that supplies that Water Supply, Cabot shall continue such screenings and sampling under Paragraph 5b.v., above, for each quarter until the results of the screenings and sampling done by the Department in the past and by Cabot under this Paragraph 5 show that, for eight consecutive quarters, seventy-five percent of the water samples within each monitoring point over time contain 7 mg/l or less of dissolved methane (or meets the standard then prescribed by applicable regulations), and no individual water sample exceeds two times this standard.

c. Beginning no more than 30 days from the date of this Consent Order and Settlement Agreement and continuing each day until 120 days from the date of this Consent Order and Settlement Agreement, Cabot shall complete any and all actions to the extent necessary, if any, to bring the Ely 2H Gas Well and Ely 6H Gas Well into compliance with the Oil and Gas Act, the Clean Streams Law, and the Regulations.

6. ***Settlement of Restoration/Replacement Obligation***. The claims by the Department regarding Cabot's obligations under Section 208 of the Oil and Gas Act, 58 P.S. §601.208, and 25 Pa. Code §78.51, including any obligation of Cabot to pay for or restore and/or replace the Water Supplies, or to provide for ongoing operating or maintenance expense shall be satisfied, as follows:

a. <u>Escrow Fund</u>.

i. Within thirty (30) days after the date of this Consent Order and Settlement Agreement, Cabot shall establish nineteen (19) Escrow Funds and each Escrow Fund shall hold an amount equal to, whichever is greater: $50,000; or two times the assessed value by the Susquehanna County Tax Assessor of the property(ies) owned by the Property Owners within the Dimock/Carter Road Area. Such assessed values for each property owned by the Property Owners are listed in chart attached as Exhibit D;

9

ii.    Within ten (10) days after Cabot has established and funded the nineteen (19) Escrow Funds in accordance within Paragraph 6.a.i., above, Cabot shall notify each Property Owner, in writing, of the existence of the funds in the Escrow Fund for that Property Owner, the procedure by which the Property Owner can obtain his/her/their payment from the Escrow Fund;

iii.    Cabot shall pay all fees and costs associated with each of the Escrow Funds. The funds in the Escrow Funds shall be paid to Property Owners, their duly authorized attorney or representative or the heirs of the Property Owners in accordance with this Paragraph 6 and the Escrow Agreement attached hereto as Exhibit E. Exhibit E shall be the model of the Escrow Agreement that Cabot shall use for each of the Escrow Funds established under Paragraph 6.a.i, above, and is incorporated herein; and

iv.    If the Escrow Agent and Cabot have not received the executed and notarized Receipt provided for in the Escrow Agreement from the Property Owner on or prior to the 45th day after the date that the Property Owner has received written notice of the Escrow Fund in accordance with this Consent Order and Settlement Agreement, the Escrow Agent shall continue to hold the Escrow Fund until December 31, 2012. During such time period the Escrow Agent shall deliver all proceeds from the Escrow Fund to the Property Owner if and only if the Escrow Agent receives unqualified and unconditional written instruction to do so from a duly authorized representative of the Department and from a duly authorized representative of Cabot. If as of December 31, 2012, the Property Owner has not claimed and received the Escrow Fund, the Escrow Agent shall deliver all proceeds from the Escrow Fund to Cabot on January 2, 2013, together with all interest and/or earnings attributable to the Escrow Fund.

b.    Effect of Notification to Department. After the time has passed for the Escrow Fund to be funded in accordance with Paragraph 6.a.i., above, and upon completion of the restoration activities described below, the Department's claims regarding Cabot's obligations under Section 208 of the Oil and Gas Act, 58 P.S. §601.208, and 25 Pa. Code §78.51, to restore and/or replace a Water Supply that serves the property owned by a Property Owner shall be satisfied upon the Department's receipt of information from Cabot that verifies that: the nineteen (19) Escrow Funds have been established and fully funded in accordance with Paragraph 6.a.i, above; each of the Property Owners have received written notice from Cabot of the Escrow Fund and of the procedure

10

by which the Property Owner can obtain his/her/their payment from such Escrow Fund; *and* each of the Property Owners have received written notice from Cabot that it will install a whole house gas mitigation device at the property as provided for below.

      c.    For each Property Owner, Cabot shall continue to provide and maintain temporary potable water and, as applicable, shall continue to maintain gas mitigation devices that it had previously installed until Cabot receives written notice from the Department that it has complied with all of the requirements of Paragraph 6.a-6.b., above, for that Property Owner.

      d.    As long as Cabot provides temporary water to the Property Owners under Paragraph 6.c., above, from a water purveyor and/or water hauler, Cabot shall assure that the water purveyor/hauler has all licenses, permits, and/or other authorizations required under Pennsylvania law and Regulations, and that the Property Owners receive water in amounts sufficient to continually satisfy water usage needs until Cabot receives written notice from the Department that it has complied with all of the requirements of Paragraphs 6.a.-6.b., above, for that Property Owner.

      e.    As of the date of this Consent Order and Settlement Agreement, Cabot has purchased whole house gas mitigation devices for residential water supplies within the Dimock/Carter Road Area and it has drilled new drinking water wells to serve other residences within the Dimock/Carter Road Area. Within 30 days of the date of this Consent Order and Settlement Agreement, Cabot shall notify each Property Owner, in writing, that Cabot will install, at Cabot's sole expense, a whole house gas mitigation device at the Property Owner's residence.

      f.    If the Property Owner notifies Cabot, in writing, within sixty (60) days from the date that the Property Owner received the written notice in accordance with Paragraph 6.e, above, that he/she/they agree(s) to Cabot installing a whole house gas mitigation device at his/her/their residence, Cabot shall complete such action at the residence within ninety (90) days from the date that the Property Owner notified Cabot, in writing, of his/her/their agreement.

11

7.    ***Settlement of Claims for Stipulated Civil Penalties and Department Costs.***  Upon signing this Consent Order and Settlement Agreement, Cabot shall pay $500,000 in complete and final settlement of any known claims or demands of any type that Department has made or could have made against Cabot relating to stipulated penalties under the Modified 2009 Agreement through the date of this Consent Order and Settlement Agreement, and to provide reimbursement for certain costs incurred by the Department to date.  The payment shall be made by corporate check or the like made payable to "Commonwealth of Pennsylvania" and sent to the Department at the address set forth in Paragraph 10, below.

8.    ***Reservation of Rights.***  The Department reserves the right to require additional measures to achieve compliance with applicable law.  To date, the Department has not identified any defective Dimock/Carter Road Gas Wells other than the Gesford No. 3, Gesford No. 9, Baker No. 1, Ely No. 4, Ely 2H and Ely 6H Wells.  However, in the event the Department receives new data or information concerning said Wells or any other Dimock/Carter Road Gas Wells, the Department reserves the right to require additional measures to achieve compliance with applicable law, including additional measures to take remedial actions to fix defective Dimock/Carter Road Gas Wells, and to eliminate any unpermitted discharge of natural gas into the waters of the Commonwealth from the Dimock/Carter Road Gas Wells.  Cabot reserves the right to challenge any action which the Department may take to require those measures.

9.    ***Liability of Cabot.***  Cabot shall be liable for any violations of this Consent Order and Settlement Agreement, including those caused by, contributed to, or allowed by its officers, directors, agents, employees, contractors, successors, and assigns.

12

10. ***Correspondence with and Notice to the Department***.  All correspondence with and notice to the Department concerning this Consent Order and Settlement Agreement shall be addressed to:

> Mr. Craig Lobins, Regional Manager
> Oil and Gas Management
> Department of Environmental Protection
> 230 Chestnut Street
> Meadville, PA  16335-3481
> Telephone:  814-332-6860
> Fax:  814-332-6121

11. ***Correspondence with Cabot***.  All correspondence with Cabot concerning this Consent Order and Settlement Agreement shall be addressed to:

> Mr. Phil Stalnaker
> Cabot Oil & Gas Corporation
> 5 Penn Center West, Suite 401
> Pittsburgh, PA  15276
> Telephone:  412-249-3850
> Fax:  412-249-3855

Cabot shall notify the Department whenever there is a change in the contact person's name, title, or address.  Service of any document or notice by the Department under this Consent Order and Settlement Agreement may be made by mail to the above address.  However, service of any legal process by the Department for any purpose under this Consent Order and Settlement Agreement, including its enforcement, will be made by mailing a copy by certified mail, return receipt requested, to the above address.

12. ***Decisions Under Consent Order and Settlement Agreement***.  Any decision which the Department makes under the provisions of this Consent Order and Agreement, including a notice that stipulated civil penalties are due, is intended to be neither a final action under 25 Pa. Code §1021.2, nor an adjudication under 2 Pa.C.S.A. §101.  Cabot hereby agrees that it shall not appeal to the Pennsylvania Environmental Hearing Board and/or shall not file any action of any kind with any Pennsylvania State or Federal Court of any decision by the Department on or arising from any matter

13

under this Consent Order and Settlement Agreement.  Any objection which Cabot may have to any decision by the Department on or arising from any matter under this Consent Order and Settlement Agreement will be preserved until the Department enforces this Consent Order and Settlement Agreement.

13.    *Acknowledgment of No Obligation*.

a.    In conjunction with Cabot, the Department will defend this Consent Order and Settlement Agreement in any future appeal(s) brought by or on behalf of any Property Owner and/or any other person or entity.

b.    Except for any future appeal(s) of this Consent Order and Settlement Agreement brought by or on behalf of any Property Owner and/or any other person or entity, Cabot acknowledges that the Department has no obligation to defend it in any existing or future other appeal, or in any litigation, lawsuit, demand, or claim for any issue, including damages, brought by or on behalf of any Property Owner and/or any other person or entity for any matters arising from the Dimock/Carter Road Gas Wells, the Water Supplies, any other Consent Order and Agreement, this Consent Order and Settlement Agreement, and/or any and all other matters relating in any way to Cabot and/or the Dimock/Carter Road Area.

14.    *Severability*.  The Paragraphs of this Consent Order and Settlement Agreement shall be severable and should any part hereof be declared invalid or unenforceable, the remainder shall continue in full force and effect between the Parties.

15.    *Entire Agreement*.  This Consent Order and Settlement Agreement shall constitute the entire integrated agreement of the Parties as to the subject matter hereof.  No prior or contemporaneous communications or prior drafts shall be relevant or admissible for purposes of determining the meaning or intent of any provisions herein in any litigation or any other proceeding.

14

16.   *Attorneys' Fees*.

a.   Except as stated herein, the Parties shall bear their respective attorney fees, expenses, and other costs in the prosecution or defense of this matter or any related matters, arising prior to execution of this Consent Order and Settlement Agreement.

b.   Cabot shall pay the Department for any attorneys' fees or litigation cost awarded against the Department for the consolidated appeal docketed at EHB No. 2010-065 regarding the Modified 2009 Agreement, and/or any attorneys fees or litigation cost awarded against the Department for any appeal(s) filed in the future by any Property Owner and/or any other person or entity regarding this Consent Order and Settlement Agreement.

c.   Payment to the Department under Paragraph 16.b., above, shall be on or before the 15th day of the succeeding month, and shall be made by corporate check or the like made payable to "Commonwealth of Pennsylvania" and sent to the Department at the address set forth in Paragraph 10, above.

17.   *Modifications*.  No changes, additions, modifications, or amendments of this Consent Order and Settlement Agreement shall be effective unless they are set out in writing and signed by the Parties.

18.   *Titles*.  A title used at the beginning of any Paragraph of this Consent Order and Settlement Agreement may be used to aid in the construction of that Paragraph, but shall not be treated as controlling.

19.   ***Termination of Consent Order and Settlement Agreement***.  Cabot's obligations under this Consent Order and Settlement Agreement shall terminate when Cabot has complied with all of its obligations under this Consent Order and Settlement Agreement.

IN WITNESS WHEREOF, the Parties have caused this Consent Order and Settlement Agreement to be executed by their duly authorized representative.  The undersigned representative

of Cabot certifies under penalty of law, as provided by 18 Pa.C.S.A. §4904, that he is authorized to execute this Consent Order and Settlement Agreement on behalf of Cabot, that Cabot consents to the entry of this Consent Order and Settlement Agreement as a final ORDER of the Department; and that Cabot hereby knowingly waives its right to appeal this Consent Order and Settlement Agreement and to challenge its content or validity, which rights may be available under Section 4 of the Environmental Hearing Board Act, the Act of July 13, 1988, P.L. 530, No. 1988-94, 35 P.S. §7514; the Administrative Agency Law, 2 Pa.C.S.A. §103(a) and Chapters 5A and 7A; or any other provision of law. Signature by Cabot's attorney certifies only that the Consent Order and Settlement Agreement has been signed after consulting with counsel.

FOR CABOT OIL & GAS CORPORATION:

FOR THE COMMONWEALTH OF
PENNSYLVANIA, DEPARTMENT OF
ENVIRONMENTAL PROTECTION:

Dan O. Dinges
Chief Executive Officer

S. Craig Lobins
Regional Manager
Oil and Gas Management Program
Northwest Region

Kevin Cunningham, General Counsel

Susan Shinkman, Chief Counsel

DoDuffy\Cabot\2010 CO&A\Final CO&A 121510 .doc

16

## EXHIBIT A
## MAP OF DIMOCK/CARTER ROAD AREA

17



## EXHIBIT B

### DIMOCK/CARTER ROAD GAS WELLS
### DIMOCK/CARTER ROAD GAS WELLS PLUGGED AND ABANDONED

#### WELL NAME/PERMIT NO.

BAKER 1/115-20026
GESFORD/3115-20019
GESFORD/9115-20187

### REMAINING DIMOCK/CARTER ROAD GAS WELLS

| WELL NAME | PERMIT NO. | WELL NAME | PERMIT NO. |
|---|---|---|---|
| A & M HIBBARD 2H | 115-20149 | HEITSMAN 3V | 115-20123 |
| A & M HIBBARD 4 | 115-20222 | HEITSMAN 4H NW | 115-20162 |
| BAKER 3 | 115-20226 | HUBBARD 1 | 115-20039 |
| BLACK 1H | 115-20048 | HUBBARD 3 | 115-20131 |
| BLACK 2H | 115-20056 | HUBBARD 5H | 115-20148 |
| BROOKS 1H | 115-20051 | HUBBARD 6H | 115-20147 |
| COSTELLO 1 | 115-20036 | J GRIMSLEY 1 | 115-20095 |
| COSTELLO 2 | 115-20043 | J GRIMSLEY 2H SE | 115-20171 |
| ELY 1H | 115-20049 | LEWIS 1 | 115-20035 |
| ELY 2H | 115-20015 | LEWIS 2 | 115-20030 |
| ELY 4H | 115-20034 | P KELLEY 1 | 115-20196 |
| ELY 5H | 115-20054 | R HULL 1H | 115-20122 |
| ELY 6H | 115-20041 | R HULL 2H | 115-20121 |
| ELY 7H SE | 115-20160 | RATZEL 1H | 115-20047 |
| GESFORD 1 | 115-20040 | RATZEL 2H | 115-20152 |
| GESFORD 2 | 115-20033 | RATZEL 3V | 115-20117 |
| GESFORD 4R | 115-20091 | ROZANSKI 1 | 115-20057 |
| GESFORD 5H NW | 115-20201 | TEEL 1 | 115-20007 |
| GESFORD 7H NW | 115-20163 | TEEL 2 | 115-20010 |
| GESFORD 8H NW | 115-20183 | TEEL 5 | 115-20024 |
| HEITSMAN 1H | 115-20050 | TEEL 6 | 115-20011 |
| HEITSMAN 2 | 115-20021 | TEEL 7 | 115-20023 |
| | | TEEL 13V | 115-20116 |

18

## EXHIBIT C

## PROPERTY OWNERS



# 000000Exhibit D to Consent Order and Settlement Agreement Between Cabot Oil Gas and Pennsylvania Department of Environmental Protection

## December 14, 2010

### VALUE OF PROPERTY(IES) OWNED BY THE PROPERTY OWNERS AS ASSESSED BY THE SUSQUEHANNA TAX ASSESSOR

| Tract Number | Landowner Name | Homeowner Address | Tax map & parcel number | Acres | Assessed Land Value | Assessed Building Value | Assessed Total | Fair Market Land Value | Fair Market Building Value | Fair Market Total | Escrow Total (2 X Fair Market Total) | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | Carter, Ronald R. & Jean. E. | PO BOX 82 DIMOCK PA 18816 | 200.00-1,008.00-000. | 26.93 | $19,300 | $14,400 | $33,700 | $56,356 | $42,048 | $98,404 | $196,808.00 | [Carter Tracts Combined] $196,808.00 + $147,752.00 = $344,560.00 |
| 1 | Carter, Ronald R., Sr. & Jean. E. | PO BOX 82 DIMOCK PA 18816 | 200.00-1,001.02-000. | 46.00 | $23,800 | $1,500 | $25,300 | $69,496 | $4,380 | $73,876 | $147,752.00 | |
| 2 | Ely, Michael M., Sr & Andrea L. Ely | 18 CARTER RD MONTROSE PA 18801 | 200.00-1,047.00-000. | 11.12 | $14,300 | $18,800 | $33,100 | $41,756 | $54,896 | $96,652 | $193,304.00 | |
| 3 | Ely, Nolan Scott & Monica Marta-Ely | PO BOX 39 DIMOCK PA 18816 | 200.00-1-006.00-000. | 8.28 | $10,500 | $15,700 | $26,200 | $30,660 | $45,844 | $76,504 | $153,008.00 | |
| 4 | Ely, William T. and Sheila A. | 10994 STATE ROUTE 3023 MONTROSE PA 18801 | 200.00-1-048.00-000. | 17.99 | $17,600 | $31,400 | $49,000 | $51,392 | $91,688 | $143,080 | $286,160.00 | |
| 5 | Fiorentino, Norma J. & Joseph A. | 872 DIMOCK TO BROOKLYN RD MONTROSE PA 18801 | 181.00-1,040.00-000. | 2.90 | $10,700 | $28,500 | $39,200 | $31,244 | $83,220 | $114,464 | $228,928.00 | |
| 6 | Hubert, Ray, Sr. & Victoria Hubert | PO BOX 111 DIMOCK PA 18816 | 200.00-1,005.00-000. | 2.93 | $4,300 | $0 | $4,300 | $12,556 | $0 | $12,556 | $25,112.00 | [Minimum $50,000] |
| 7 | Johnson, Michael A. & Suzanne M. | 11629 TIMBER RIDGE DRIVE TAMPA FL 33625 | 200.00-1,033.00-000. | 7.20 | $10,400 | $16,400 | $26,800 | $30,368 | $47,888 | $78,256 | $156,512.00 | |
| 8 | Kemble, Raymond & Lorna L. Schopperth | 11081 STATE ROUTE 3023 MONTROSE PA 18801 | 200.00-1,039.00-000. | 6.00 | $9,400 | $22,400 | $31,800 | $27,448 | $65,408 | $92,856 | $185,712.00 | |
| 9 | Maye, Timothy J. & Deborah L. | 1059 Carter Road, Montrose, PA 18801 | 181.00-1,042.00-000. | 23.51 | $17,800 | $45,000 | $62,800 | $51,976 | $131,400 | $183,376 | $366,752.00 | |
| 10 | Roos, Erik B. J. & Susan M. Roos | 1669 MESHOPPEN CREEK RD MONTROSE PA 18801 | 200.00-1,045.00-000. | 2.15 | $6,400 | $18,700 | $25,100 | $18,688 | $54,604 | $73,292 | $146,584.00 | |
| 11 | Sautner, Craig A. & Julia I. Sautner | 1101 CARTER RD MONTROSE PA 18801 | 181.00-1,044.03-000. | 3.67 | $7,600 | $37,900 | $45,500 | $22,192 | $110,668 | $132,860 | $265,720.00 | |
| 12 | Seymour, Richard & Wendy K. Seymour | 11239 STATE ROUTE 3023 MONTROSE PA 18801 | 200.00-1,038.00-000. | 21.82 | $16,300 | $21,000 | $37,300 | $47,596 | $61,320 | $108,916 | $217,832.00 | |
| 13 | Switzer, Victoria L. (& Jimmy Lee) | PO BOX 113 DIMOCK PA 18816 | 200.00-1,032.00-000. | 7.20 | $10,400 | $17,400 | $27,800 | $30,368 | $50,808 | $81,176 | $162,352.00 | |

# 000000Exhibit D to Consent Order and Settlement Agreement Between Cabot Oil Gas and Pennsylvania Department of Environmental Protection
## December 14, 2010

| | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 14 | Teel, Ronald J. & Anne | 11484 STATE ROUTE 3023 MONTROSE    PA 18801 | 200.00-1-029.00-000. | 11.00 | $13,000 | $48,300 | $61,300 | $37,960 | $141,036 | $178,996 | $357,992.00 | |
| 15 | Burke, Edward J. | RR 6 BOX 6148A MONTROSE    PA 18801 | 181.00-1,041.00,000. | 3.68 | $7,600 | $37,200 | $44,800 | $22,192 | $108,624 | $130,816 | $261,632.00 | |
| 16 | Hein, Frederick J., Jr. & Jessica L. | 298 LITTLE ELK LAKE RD MONTROSE    PA 18801 | 181.00-1-043.00.000. | 7.83 | $10,900 | $23,300 | $34,200 | $31,828 | $68,036 | $99,864 | $199,728.00 | |
| 17 | Salsman, Loren A. & Ruth A. | 1576 MESHOPPEN CREEK RD MONTROSE    PA 18801 | 200.00-1-011.04-000. | 3.98 | $6,700 | $27,800 | $34,500 | $19,564 | $81,176 | $100,740 | $201,480.00 | [Salsman Tracts Combinedl] $201,480.00 + $8760.00 = $210,240.00 |
| 17 | Salsman, Loren A. | 1576 MESHOPPEN CREEK RD MONTROSE    PA 18801 | 200.00-1,052.00-000. | 0.22 | $1,500 | $0 | $1,500 | $4,380 | $0 | $4,380 | $8,760.00 | |
| 18 | Stover, Richard C. & Sara A. | BOX 340 HOLICONG    PA 18928 | 200.00-1,013.00,000. | 36.82 | $23,000 | $45,300 | $68,300 | $67,160 | $132,276 | $199,436 | $398,872.00 | |
| Total | | | | 251.23 | $241,500 | $471,000 | $712,500 | $705,180 | $1,375,320 | $2,080,500 | $4,161,000.00 | $4,161,000.00 + $24,888.00 |
| | | | | | | | | | | | TOTAL | $4,185,888.00 |

## EXHIBIT E
## MODEL ESCROW FUND AGREEMENT

**EXHIBIT E**

**ESCROW AGREEMENT FOR _____** [Insert name(s) of Property Owner(s)]

This **ESCROW AGREEMENT,** dated as of _____, 2010, is by and between **CABOT OIL & GAS CORPORATION**, a Delaware corporation ("**Cabot**"), and _____ (the "**Escrow Agent**").

**WITNESSETH**

**Whereas,** pursuant to a Consent Order and Settlement Agreement entered into as of December 15, 2010 (the "**CO&A**") between Cabot and the Commonwealth of Pennsylvania, Department of Environmental Protection ("**Department**") regarding certain matters in Dimock and Springville Townships, Susquehanna County, Pennsylvania as identified in the CO&A, there is required to be deposited in escrow certain funds to be held and disbursed by the Escrow Agent subject to the terms and conditions set forth herein.

**NOW THEREFORE,** in consideration of the foregoing and of the mutual covenants hereinafter set forth, Cabot hereby appoints and designates the Escrow Agent as escrow agent for the purposes set forth herein, and the Escrow Agent does hereby accept such appointment under the terms and conditions set forth herein.

1.    **Establishment of Escrow Fund For___** [Insert name(s) of Property Owner(s)]. Simultaneous with the execution of this Escrow Agreement, Cabot is depositing with the Escrow Agent the sum of $_____ [*greater of $50,000 or two times the assessed value by the Susquehanna County Tax Assessor of the property(ies) owned by the Property Owners within the Dimock/Carter Road Area as identified on Exhibit D of the CO&A*](the "____ [Insert name(s) of Property Owner(s)] **Escrow Fund**"). The Escrow Agent shall hold, subject to the terms and conditions hereof, such cash and any investments and reinvestments as may be permitted pursuant to Section 2 hereof.

2.    **Investment of Escrow Fund.** During the term of this Escrow Agreement, the Escrow Agent shall invest and reinvest the Escrow Fund only as follows:

   a.    Bonds or other obligations of, or which are guaranteed by, the United States of America or its agencies or instrumentalities;

   b.    Bonds or other obligations of, or which are guaranteed by, any state within the United States of America or such state's agencies or instrumentalities; and/or

   c.    Any interest-bearing bank account, bank "certificate of deposit" ("CD") account, or any "money market" account.

The Escrow Agent shall have the right to liquidate any investments held, in order to provide funds necessary to make required payments under this Escrow Agreement.

3.  **Disposition and Termination.**  The Escrow Agent shall deliver the Escrow Fund:

a.  To _____ [Insert name(s) of Property Owner(s), or her/his/their duly authorized attorney, representative, or heir(s)] **("Property Owner")** by check within ten (10) business days following receipt by Escrow Agent and Cabot of the Receipt attached hereto properly executed by the Property Owner and properly acknowledged in accordance with Pennsylvania law (in which event Escrow Agent shall simultaneously deliver to Cabot all interest and/or earnings attributable to the Escrow Fund); or

b.  If the Escrow Agent and Cabot have not received the executed and notarized Receipt provided for in the Escrow Agreement from the Property Owner on or prior to the 45th day after the date that the Property Owner has received written notice of the Escrow Fund in accordance with the CO&A, the Escrow Agent shall continue to hold the Escrow Fund until December 31, 2012.  During such time period the Escrow Agent shall deliver all proceeds from the Escrow Fund to the Property Owner if and only if the Escrow Agent receives unqualified and unconditional written instruction to do so from a duly authorized representative of the Department and from a duly authorized representative of Cabot.  If as of December 31, 2012, the Property Owner has not claimed and received the Escrow Fund, the Escrow Agent shall deliver all proceeds from the Escrow Fund to Cabot on January 2, 2013, together with all interest and/or earnings attributable to the Escrow Fund.

c.  Upon delivery in accordance with this Escrow Agreement by the Escrow Agent of all of the Escrow Funds and interest and/or earning thereon, this Escrow Agreement shall terminate, subject to the provisions of Section 9 hereunder.

4.  **Duties of Escrow Agent.**  The Escrow Agent undertakes to perform only such duties as are expressly set forth herein.

5.  **Reliance on Written Notice.**  The Escrow Agent may rely and shall be protected in acting or refraining from acting upon any written notice, instruction or request furnished to it hereunder and believed by it to be genuine and to have been signed or presented by the proper parties.  The Escrow Agent shall be under no duty to inquire into or investigate the validity, accuracy or content of any such document.  The Escrow Agent shall have no duty to solicit any payments which may be due it hereunder.

6.  **Good Faith.**  The Escrow Agent shall not be liable for any action taken or omitted by it in good faith unless a court of competent jurisdiction determines that the Escrow Agent's willful misconduct was the primary cause of any loss to Cabot.  In the administration of the Escrow Fund hereunder, the Escrow Agent may execute any of its powers and perform its duties hereunder directly or through agents or attorneys and may, consult with counsel, accountants and other skilled persons to be selected and retained by it.  The Escrow Agent shall

not be liable for anything done, suffered or omitted in good faith by it in accordance with the advice or opinion of any such counsel, accountants or other skilled persons.

7.     **Successor Escrow Agent.**

a.     The Escrow Agent may resign at any time by delivering written notice to Cabot at least 30 days prior to the effective date thereof.  Cabot may remove the Escrow Agent at any time, without cause, by delivering written notice there of to the Escrow Agent and such removal will be effective as stated in such notice.

b.     If the Escrow Agent resigns or is removed, the Escrow Agent shall have the right to withhold an amount equal to the amount due and owing to the Escrow Agent, plus any costs and expenses the Escrow Agent shall reasonably believe may be incurred by the Escrow Agent in connection with the termination of the Escrow Agreement.

c.     If the Escrow Agent withholds any amount from the Escrow Funds pursuant to Section 7.b., above, Cabot shall immediately replace such money into the Escrow Fund to ensure that the Escrow Fund is fully funded as set forth in Section 1, above.

8.     **Compensation and Reimbursement.**  Cabot hereby agrees to: pay the Escrow Agent upon execution of this Agreement reasonable compensation for the services to be rendered hereunder, as agreed upon between Cabot and Escrow Agent; and pay or reimburse the Escrow Agent upon request for all expenses, disbursement and advances, including reasonable attorney's fees, incurred or made by it in connection with the preparation, execution, performance, delivery, modification and termination of this Agreement.  Under no circumstances shall the Escrow Agent's compensation and/or reimbursement be paid out of the Escrow Funds.

9.     **Tax Identification Number and Taxes on Interest or Income Earned.**  All federal, state, and local income and/or taxes on any interest or earnings received on the Escrow Funds shall be the responsibility of Cabot, which shall provide the Escrow Agent with its federal taxpayer identification number, documented by an appropriate federal IRS Form W-9 and/or such other documentation as may be required by applicable law.  The Escrow Agent shall have no liability whatsoever for any tax obligations related to the Escrow Funds.

10.     **Escrow Funds Not Subject to Creditors' Claims.**

a.     The Escrow Funds are to be used to pay the Property Owner.  Cabot has no ownership interest in the Escrow Funds and has no independent right or ability to access said Funds except as set forth in this Escrow Agreement.  In the event that the Property Owner does not request payment of the Escrow Funds, as set forth in this Escrow Agreement, title of the Escrow Funds vests in the Department.  As such, if Cabot voluntarily files Bankruptcy or is subject to an involuntary petition for Bankruptcy, the Escrow Funds shall not be considered part of Cabot's "Estate," as that term is used in 11  U.S.C.A §§541-562.

b.    The Escrow Funds and any Party's interest therein shall not be subject to assignment, alienation, pledge, attachment, garnishment, sequestration, levy, execution, legal process, either voluntary, involuntary or by operation of law, and shall not be subject to or applied to the debts, obligations, or liabilities of the Parties including, but not limited to, any claims or actions or seizures by any creditor or claimant under any writ or proceeding at law, in equity, or otherwise.

11.    **Indemnification**.  Cabot shall indemnify, defend and save harmless the Escrow Agent from all loss, liability or expense (including the fees and expenses of in house or outside counsel) arising out of or in connection with its execution and performance of this Agreement, except to the extent that such loss, liability or expense is due to the gross negligence or willful misconduct of the Escrow Agent, or its following any instructions or other directions from Cabot, except to the extent that its following any such instruction or direction is expressly forbidden by the terms hereof.  Anything in this Agreement to the contrary notwithstanding, in no event shall the Escrow Agent be liable for special, indirect or consequential loss or damage of any kind whatsoever (including but not limited to lost profits), even if the Escrow Agent has been advised of the likelihood of such loss or damage and regardless of the form of action.  The Parties hereto acknowledge that the foregoing indemnities shall survive the resignation or removal of the Escrow Agent or the termination of this agreement.

12.    **Limitation on Duties and Responsibilities.**  The duties and responsibilities of the Escrow Agent hereunder shall be determined solely by the express provisions of this Escrow Agreement, and no other or further duties or responsibilities shall be implied.  The Escrow Agent shall not have any liability under, nor duty to inquire into the terms and provisions of any agreement or instructions, other than outlined in this Escrow Agreement.

13.    **Notices.**  All notices and communications hereunder shall be in writing and shall be deemed to be duly given if sent by registered mail, return receipt requested, as follows:

if to Escrow Agent, to:

if to Cabot, to:

Cabot Oil & Gas Corporation
5 Penn Center West, Suite 401
Pittsburgh, PA  15276
Attention:  Phil Stalnaker
Telecopier:  (412) 249-3855

and an additional copy to:
K&L Gates LLP
K&L Gates Center
210 Sixth Avenue
Pittsburgh, PA  15222
Attention:  Kenneth S. Komoroski, Esq.
Telecopier: (412) 355-6501

or at such other address as any of the above may have furnished to the other Parties in writing by registered mail, return receipt requested and any such notice or communication given in the manner specified in this Section 13 shall be deemed to have been given as of the date so mailed, except with respect to the Escrow Agent as to which date shall be deemed to have been given on the date received by the Escrow Agent.  In the event that the Escrow Agent, in its sole discretion, shall determine that an emergency exists, the Escrow Agent may use such other means of communications as the Escrow Agent deems advisable.

**14.**    **Severability**.  The invalidity or unenforceability of any particular provision of this Escrow Agreement will not affect the other provisions hereof, and this Escrow Agreement will be construed in all respects as if the invalid or unenforceable provisions were omitted.

**15.**    **Successors and Assigns; Modifications; Headings**.  This Escrow Agreement shall be binding upon and inure to the benefit of all Parties hereto, and their respective successors and assigns, including those successors and assigns of the Property Owner.  This Escrow Agreement contains the entire understanding between the Parties hereto.  No variations, modifications, or changes in this Escrow Agreement shall be binding upon any Party.  The Section headings in this Escrow Agreement are for guidance and the Parties' convenience only, but shall not be controlling over the actual text of such Sections for interpretation purposes.

**16.**    **Counterparts.**  This Escrow Agreement may be executed in one or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.  All signatures of the parties to this Escrow Agreement may be transmitted by facsimile, and such facsimile will, for all purposes, be deemed to be the original signature of such party whose signature it reproduces and will be binding upon such Party.

**17.**    **Disposition of Escrow Property.**  In the event that the Escrow Agent shall be uncertain as to its duties or rights hereunder or shall receive instructions, claims or demands from any party hereto which, in its opinion, conflict with any of the provisions of this Escrow Agreement, it shall be entitled to refrain from taking any action and its sole obligation shall be to keep safely all property held in escrow until it shall be directed otherwise in writing by all of the other Parties hereto or by a final order or judgment of a court of competent jurisdiction.

**18.**    **Governing Law.**  This Escrow Agreement shall be governed by and construed in accordance with the laws of the Commonwealth of Pennsylvania without regard to its principles of conflicts of laws and any action brought hereunder shall be brought in the courts of the

Commonwealth of Pennsylvania, located in the Commonwealth of Pennsylvania. Each Party hereto irrevocably waives any objection on the grounds of venue, forum non-conveniens or any similar grounds and irrevocably consents to service of process by mail or in any other manner permitted by applicable law and consents to the jurisdiction of said courts.

**IN WITNESS WHEREOF**, the parties hereto have executed this Escrow Agreement on the date and year first above written.

**ESCROW AGENT:**

_____,

a _____

By:
Name:
Title:

**CABOT OIL & GAS CORPORATION**
a Delaware corporation

By:
Name:
Title:

DoDuffy\Cabot\2010 New CO&A\Ex E Escrow Agmt Final 121510.doc

## RECEIPT

The undersigned hereby acknowledges receipt from Cabot Oil & Gas Corporation ("Cabot") of the payment in the amount of $_____ as provided in the Escrow Agreement and constituting payment in full of all amounts payable by Cabot to the undersigned pursuant to Paragraph 6 of the Consent Order and Settlement Agreement entered into as of December 15, 2010, between Cabot and the Commonwealth of Pennsylvania, Department of Environmental Protection.

Date:   _____ ____, 20____

Print name(s):

# **EXHIBIT B**

## EXHIBIT B
## "Dimock/Carter Road Area"



- - - - - - Dimock/Carter Road Area

# EXHIBIT C

# EXHIBIT C
## ORIGINAL WATER SUPPLIES

**CONTAINS CONFIDENTIAL COMPLAINANT INFORMATION**



1. 

2. 

3. 

4. 

5. 

6. 

**RESOLVED**

7. 

**RESOLVED**

## EXHIBIT C
## ORIGINAL WATER SUPPLIES

8.

**RESOLVED**

9. 

10. 

11. 

**RESOLVED**

12. 

**RESOLVED**

13. 

14. 

15.

## EXHIBIT C
## ORIGINAL WATER SUPPLIES



**RESOLVED**

# EXHIBIT D

# EXHIBIT D
# ADDITIONAL WATER SUPPLIES

**CONTAINS CONFIDENTIAL COMPLAINANT INFORMATION**



1. ████

2. ████

3. ████

4. ████

   **Settled.**

5. ████

6. ████

# EXHIBIT E

## EXHIBIT E
## SUBJECT WATER SUPPLIES





12.

13.

14.

15.

16.

17.

18.

19.

# EXHIBIT F

# EXHIBIT F

## I.   REMEDIATED WELLS

| | | |
|---|---|---|
| Baker 1V | 115-20026 - | Plugged 5-7-2010 |
| Brooks 1H | 115-20051 | |
| Costello 2V | 115-20043 | |
| Grimsley 1V | 115-20095 | |
| Teel 5V | 115-20024 | |
| Teel 6V | 115-20011 | |
| Teel 7V | 115-20023 | |

## II.   RECENTLY REMEDIATED WELLS

| | | |
|---|---|---|
| Gesford 2V | 115-20033 | Recent Remediation Under Evaluation |
| Gesford 7H | 115-20163 | Recent Remediation Under Evaluation |
| Ely 1H | 115-20049 | Plugged      9-23-20-Certificate10-20-20 |
| Ely 7H | 115-20160 | Plugged 4-9-19-Certificate 5-7-19 |
| Ely 5H | 115-20054 | Recent Remediation Under Evaluation |
| Ely 4V | 115-20034 | Recent  Remediation  Under  Evaluation |
| Ely 6H | 115-20041 | Recent Remediation Under Evaluation |
| Ratzel 1V | 115-20047 | Recent  Remediation  Under  Evaluation |
| Ratzel 2H | 115-20152 | Recent  Remediation  Under  Evaluation |
| Ratzel 3V | 115-20117 | Recent Remediation Under Evaluation |

# EXHIBIT G

# EXHIBIT G
## WELL PLUGGING LIST

| WELL | PERMIT# |
|---|---|
| COSTELLO 1 | 115-20036 |
| COSTELLO 2 | 115-20043 |
| ELY 2V | 115-20015 |
| ELY 4H | 115-20034 |
| ELY 5H | 115-20054 |
| ELY 6H | 115-20041 |
| GESFORD 1 | 115-20040 |
| GESFORD 2 | 115-20033 |
| GESFORD 4 R | 115-20091 |
| GESFORD 5H NW | 115-20201 |
| GESFORD 7H NW | 115-20163 |
| LEWIS 1 | 115-20035 |
| LEWIS 2 | 115-20030 |
| RATZEL 2H | 115-20152 |
| RATZEL 3V | 115-20117 |
| TEEL 1 | 115-20007 |
| TEEL 2 | 115-20010 |
| TEEL 5 | 115-20024 |