UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF TEXAS

HOUSTON DIVISION

| | | |
|---|---|---|
| DELAWARE COUNTY EMPLOYEES RETIREMENT SYSTEM, Individually and on Behalf of All Others Similarly Situated, | § § § § | Civil Action No. 4:21-cv-02045 <br><br> <u>CLASS ACTION</u> |
| Plaintiff, | § § § | |
| vs. | § § § | |
| CABOT OIL & GAS CORPORATION, et al., | § § § | |
| Defendants. | § § § § | |

**REPLY IN SUPPORT OF PLAINTIFFS' MOTION FOR CLASS CERTIFICATION**
**[REDACTED]**

4877-1786-3777.v1

## TABLE OF CONTENTS

Page

I.    INTRODUCTION ...................................................................................................1

II.    ARGUMENT ........................................................................................................3

       A.    Defendants Have Not Met Their Burden of Proving a Complete Lack of Price Impact ...................................................................................................3

            1.    Defendants Concede the July 26, 2019 Corrective Disclosure Impacted Cabot's Stock Price...................................................................5

            2.    Defendants' Evidence Does Not Prove an Absence of Price Impact for the June 15, 2020 Corrective Disclosure...............................................11

       B.    There Is No "Mismatch" Between the Alleged Misstatements and Omissions and the Corrective Disclosures ...........................................................20

            1.    The "Category 1 and 2" False and Misleading Statements........................22

            2.    The "Category 3" False and Misleading Statements .................................24

III.    CONCLUSION...................................................................................................25

4877-1786-3777.v1

# TABLE OF AUTHORITIES

**Page**

## CASES

*Alaska Elec. Pension Fund v. Flowserve Corp.*,
  572 F.3d 221 (5th Cir. 2009) ...............................................................................23

*Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*,
  568 U.S. 455 (2013)...............................................................................1, 6, 19

*Aranaz v. Catalyst Pharm. Partners Inc.*,
  302 F.R.D. 657 (S.D. Fla. 2014)..........................................................................3, 14

*Ark. Tchr. Ret. Sys. v. Goldman Sachs Grp., Inc.*,
  955 F.3d 254 (2d Cir. 2020)...............................................................................16

*Baker v. SeaWorld Ent., Inc.*,
  2017 WL 5885542 (S.D. Cal. Nov. 29, 2017) ........................................................7

*Basic Inc. v. Levinson*,
  485 U.S. 224 (1988)...............................................................................1

*Bos. Ret. Sys. v. Alexion Pharms., Inc.*,
  2023 WL 2932485 (D. Conn. Apr. 13, 2023)..........................................................16

*Brokop v. Farmland Partners Inc.*,
  2021 WL 4913970 (D. Colo. Sept. 30, 2021)..........................................................18

*City of Cape Coral Mun. Firefighters' Ret. Plan*
  *v. Emergent Biosolutions, Inc., HQ*,
  322 F. Supp. 3d 676 (D. Md. 2018) ...............................................................4

*Cosby v. KPMG, LLP*,
  2021 WL 1828114 (E.D. Tenn. May 7, 2021)..........................................................4

*Erica P. John Fund, Inc. v. Halliburton Co.*,
  309 F.R.D. 251 (N.D. Tex. 2015) ................................................................ *passim*

*Erica P. John Fund, Inc. v. Halliburton Co.*,
  563 U.S. 804 (2011) (*Halliburton I*)...............................................................7, 17

*FindWhat Inv. Grp. v. FindWhat.com*,
  658 F.3d 1282 (11th Cir. 2011) ...............................................................5

*Glickenhaus & Co. v. Household Int'l, Inc.*,
  787 F.3d 408 (7th Cir. 2015) ...............................................................5

- ii -

**Page**

*Goldman Sachs Grp., Inc. v. Ark. Tchr. Ret. Sys.*,
    _U.S._, 141 S. Ct. 1951 (2021)...................................................................................... *passim*

*Halliburton Co. v. Erica P. John Fund, Inc.*,
    573 U.S. 258 (2014).........................................................................................................3, 4

*IBEW Loc. 98 Pension Fund v. Best Buy Co.*,
    818 F. 3d 775 (8th Cir. 2016) ............................................................................................5

*In re Apple Inc. Sec. Litig.*,
    2022 WL 354785 (N.D. Cal. Feb. 4, 2022) ......................................................................17

*In re BancorpSouth, Inc.*,
    2017 WL 4125647 (6th Cir. Sept. 18, 2017) .....................................................................4

*In re Celgene Corp. Sec. Litig.*,
    2020 WL 8870665 (D.N.J. Nov. 29, 2020) ........................................................................5

*In re CenturyLink Sales Pracs. & Sec. Litig.*,
    337 F.R.D. 193 (D. Minn. 2020)......................................................................................6, 8

*In re Cobalt Int'l Energy, Inc. Sec. Litig.*,
    2017 WL 2608243 (S.D. Tex. June 15, 2017)........................................................8, 14, 16

*In re EQT Corp. Sec. Litig.*,
    2022 WL 3293518 (W.D. Pa. Aug. 11, 2022) ...........................................................15, 17

*In re Finisar Corp. Sec. Litig.*,
    2017 WL 6026244 (N.D. Cal. Dec. 5, 2016)...................................................................15

*In re Goldman Sachs Grp., Inc. Sec. Litig.*,
    2015 WL 5613150 (S.D.N.Y. Sept. 24, 2015)
    *vacated and remanded by Ark. Tchrs. Ret. Sys.*
    *v. Goldman Sachs Grp., Inc.*, 879 F.3d 474 (2d Cir. 2018)....................................................18

*In re Goldman Sachs Grp., Inc. Sec. Litig.*,
    579 F. Supp. 3d 520 (S.D.N.Y. 2021)................................................................................3

*In re Intuitive Surgical Sec. Litig.*,
    2016 WL 7425926 (N.D. Cal. Dec. 22, 2016)................................................................15

*In re Mattel, Inc. Sec. Litig.*,
    2021 WL 4704578 (C.D. Cal. Oct. 6, 2021)...................................................................23

- iii -

**Page**

*In re Moody's Corp. Sec. Litig.*,
    274 F.R.D. 480 (S.D.N.Y. 2011) ..................................................................15

*KBC Asset Mgmt. NV v. 3D Sys. Corp.*,
    2017 WL 4297450 (D.S.C. Sept. 28, 2017)..............................................12

*Loc. 703, I.B. of T. Grocery & Food Emps. Welfare
    Fund v. Regions Fin. Corp.*,
    2014 WL 6661918 (N.D. Ala. Nov. 19, 2014) ..................................................17

*Lormand v. US Unwired, Inc.*,
    565 F.3d 228 (5th Cir. 2009) .......................................................................21

*Marcus v. J.C. Penney Co.*,
    2016 WL 8604331 (E.D. Tex. Aug. 29, 2016)
    *adopting report and recommendation*, 2017 WL 907996
    (E.D. Tex. Mar. 8, 2017)....................................................................... *passim*

*Matkovich v. Sec'y of Dep't of Health & Hum. Servs.*,
    1994 WL 142294 (Fed. Cl. Apr. 7, 1994)....................................................15

*Monroe Cnty. Emps.' Ret. Sys. v. S. Co.*,
    332 F.R.D. 370 (N.D. Ga. 2019) ("*Southern*") ............................... *passim*

*Ohio Pub. Emps. Ret. Sys. v. Fed. Home Loan Mortg. Corp.*,
    2018 WL 3861840 (N.D. Ohio Aug. 14, 2018),
    *rev'd and remanded*, 64 F.4th 731 (6th Cir. 2023).................................15

*Okla. Firefighters Pension & Ret. Sys. v. Six Flags Ent. Corp.*,
    58 F.4th 195 (5th Cir. 2023) ........................................................................21

*Pearlstein v. BlackBerry Ltd.*,
    2021 WL 253453 (S.D.N.Y. Jan. 26, 2021) ..........................................8, 14, 22

*Rooney v. EZCORP, Inc.*,
    330 F.R.D. 439 (W.D. Tex. 2019) ........................................................2, 5, 12, 14

*St. Clair Cnty. Emps.' Ret. Sys. v. Acadia Healthcare Co.*,
    2022 WL 4598044 (M.D. Tenn. Sept. 30, 2022)....................................6, 11, 14

*Strougo v. Tivity Health, Inc.*,
    606 F. Supp. 3d 753 (M.D. Tenn. 2022),
    *vacated and remanded sub nom.*, *In re Tivity Health, Inc.*,
    2022 WL 17243323 (6th Cir. Nov. 21, 2022)............................................11

**Page**

*Thorpe v. Walter Inv. Mgmt., Corp.*,
  2016 WL 4006661 (S.D. Fla. Mar. 16, 2016) ..........................................................................18

*Waggoner v. Barclays PLC*,
  875 F.3d 79 (2d Cir. 2017) ................................................................................4, 5, 17

*Zwick Partners, LP v. Quorum Health Corp.*,
  2019 WL 1450546 (M.D. Tenn. Mar. 29, 2019) ............................................................7, 12, 14

- v -

## I.    INTRODUCTION

Plaintiffs present a straight-forward case for class treatment, meeting all of the prerequisites of Rule 23.[1]  In fact, Defendants do not dispute that Plaintiffs have established the requisite elements of Rule 23(a).  Defendants also largely concede Rule 23(b)(3) predominance – falsity, materiality, scienter, and loss causation are all common issues that will be decided by common evidence at a later stage in this action (*Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*, 568 U.S. 455, 471-72 (2013)), and Defendants do not challenge that Plaintiffs are entitled to the fraud-on-the-market presumption of reliance under *Basic Inc. v. Levinson*, 485 U.S. 224 (1988) ("*Basic*").

Rather, Defendants contest certification only by seeking to rebut the *Basic* presumption through an attempt to show an absence of price impact.  *See Goldman Sachs Grp., Inc. v. Ark. Tchr. Ret. Sys.*, _U.S._, 141 S. Ct. 1951, 1963 (2021) ("*Goldman*").  But Defendants **concede** that the information Plaintiffs allege partially revealed Defendants' fraud ***caused Cabot's stock price to decline*** on July 26, 2019, the first of two alleged corrective disclosures.  Despite this concession, they submit a self-serving declaration from Defendant Scott Schroeder, Cabot's CFO, claiming that the gas production miss, which was a subject of the July 26, 2019 disclosure, "had nothing to do with the alleged environmental violations."  Defendants' Response in Opposition to Class Certification (ECF 142) ("Opp.") at 20.  Putting aside the impropriety of Defendants' self-serving, fact-intensive argument at class certification, actual contemporaneous evidence confirms that the production miss was caused, in part, by well downtime and drilling moratoriums caused by the alleged environmental violations and required remediation.  Critically, the evidence shows that Schroeder personally received communications in real time linking the production miss to delays

---

[1]    All terms not defined herein have the same meaning as in Plaintiffs' Motion for Class Certification (ECF 134; 134-1) ("Motion").  All citations and footnotes are omitted and emphasis is added unless otherwise indicated.  All "¶__" and "¶¶__" references are to the Complaint unless otherwise indicated.

4877-1786-3777.v1

stemming from Cabot's environmental violations – directly contradicting the after-the-fact declaration Defendants now submit from Schroeder.

With regard to the second alleged disclosure on June 15, 2020, which revealed the Pennsylvania Attorney General's criminal charges against Cabot for its failure to remediate longstanding violations of environmental law, Defendants claim that the announcement of the "Presentment of Charges" had no price impact because the resulting price drop was purportedly not statistically significant. But Plaintiffs' expert's event study establishes that the June 15 stock decline was, in fact, statistically significant. To support their argument regarding statistical significance, Defendants rely on their competing expert's invalid and unreliable event study that is riddled with errors and fails to account for the abnormal market volatility present during the COVID-19 pandemic. Plaintiffs' expert, on the other hand, properly accounts for this volatility and even highlighted the issue in his opening report, and his reply report identifies the numerous additional fundamental flaws in Defendants' expert's analysis. Rebuttal Report of Professor Steven P. Feinstein, Ph.D., CFA ("Feinstein Rbt."), attached to the Declaration of Kevin Lavelle in Support of Reply in Support of Plaintiffs' Motion for Class Certification ("Lavelle Decl.") as Ex. 1, ¶¶12-14, 29-34, 48, 56-57.[2] But even if Defendants were correct regarding statistical significance – and they are not – pointing to a non-statistically significant stock decline would not rebut the *Basic* presumption. That is because Defendants' argument is "flawed from a statistical perspective"; a non-statistically significant decline is not proof of the absence of price impact. *Rooney v. EZCORP, Inc.*, 330 F.R.D. 439, 450 (W.D. Tex. 2019). In addition, Plaintiffs also proffer contemporaneous market commentary attributing the stock drop to the June 15 announcement of criminal charges, which Defendants conspicuously ignore.

---

[2] All "Ex. __" references are to the Lavelle Decl.

Recognizing that their arguments fail to establish the absence of price impact, Defendants use *Goldman* as a pretext to rehash previously rejected motion-to-dismiss arguments about the "match" between: (a) the alleged false and misleading statements and omissions; and (b) the corrective disclosures, in order to raise impermissible merits attacks on falsity, materiality, and loss causation that have no bearing on whether common issues predominate.  Moreover, this Court has already held that the corrective disclosures are "relevant to" the subject matter of Defendants' alleged false and misleading statements and omissions, and Defendants further concede that the June 15, 2020 corrective disclosure **is related**, in part, to their false assurances that the Company was "appropriately" remediating and resolving gas migration cases in Susquehanna County – Cabot's center of operations.  Defendants cannot show a complete lack of price impact, and therefore fail to rebut the *Basic* presumption of reliance.

Accordingly, Plaintiffs' Motion for Class Certification should be granted.

## II.    ARGUMENT

### A.    Defendants Have Not Met Their Burden of Proving a Complete Lack of Price Impact

Defendants do not dispute that Cabot stock traded in an efficient market during the Class Period or that Plaintiffs may rely on the *Basic* presumption of reliance.  *See* Feinstein Rbt., ¶8. Accordingly, in order to rebut that presumption, Defendants must demonstrate by a preponderance of the evidence the "***absence of price impact***" – that the "asserted misrepresentation (or its correction) did not affect the market price of the defendant's stock."  *Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258, 278, 280 (2014) ("*Halliburton* II"); *In re Goldman Sachs Grp., Inc. Sec. Litig.*, 579 F. Supp. 3d 520, 526 (S.D.N.Y. 2021) ("Defendants must show a ***complete lack*** of price impact . . . .") (citing *Goldman*, 141 S. Ct. at 1963).  This is a "daunting task" (*Aranaz v. Catalyst Pharm. Partners Inc.*, 302 F.R.D. 657, 673 (S.D. Fla. 2014)) that requires Defendants to prove that the fraud-

- 3 -

related news caused "no price impact whatsoever." *City of Cape Coral Mun. Firefighters' Ret. Plan v. Emergent Biosolutions, Inc., HQ*, 322 F. Supp. 3d 676, 687 (D. Md. 2018); *Cosby v. KPMG, LLP*, 2021 WL 1828114, at *5 (E.D. Tenn. May 7, 2021).  Defendants cannot meet this heavy burden merely by creating doubt about whether the fraud affected the price.  *See Goldman*, 141 S. Ct. at 1962 ("[T]he defendant must 'in fact' 'seve[r] the link' between a misrepresentation and the price paid by the plaintiff – and a defendant's mere production of some evidence relevant to price impact would rarely accomplish that feat.") (second alteration in original).

Because Plaintiffs can proceed on either a "front-end" or "back-end" price impact theory, Defendants must affirmatively disprove **both** to satisfy their burden.  *Waggoner v. Barclays PLC*, 875 F.3d 79, 104-05 (2d Cir. 2017); *see also In re BancorpSouth, Inc.*, 2017 WL 4125647, at *1 (6th Cir. Sept. 18, 2017) ("BancorpSouth maintains that it rebutted the *Basic* presumption because it demonstrated a lack of price impact at the time the alleged misrepresentations were made.  But price impact may be demonstrated either at the time that the alleged misrepresentations were made, *or* at the time of their correction.") (citing *Halliburton II*, 573 U.S. at 278-80); *Marcus v. J.C. Penney Co.*, 2016 WL 8604331, at *7-*8 (E.D. Tex. Aug. 29, 2016) (concluding that the defendants failed to rebut the presumption of reliance even though there were no front-end price increases on misstatement dates, because the stock declined following corrective disclosures, thereby showing price impact), *adopting report and recommendation*, 2017 WL 907996 (E.D. Tex. Mar. 8, 2017).[3] Defendants do not come close to meeting their burden.[4]

---

[3]   Defendants' expert, Lucy Allen, accepts that a stock price need not increase on the "front end" for a misrepresentation to have price impact.  Ex. 2 at 92:6-8 ("[Q]: So does a stock price need to increase for there to be a price impact from a statement? [A]: No."); *see also* Ex. 3 at 121:13-23 (opining that: "So it can be the case the stock does not move after alleged misrepresentation, but if an alternate statement had been made or if the alleged misrepresentation had not been made at all, the price would have been different.  And the difference – so the alleged misrepresentation is affecting the stock price in this hypothetical because the stock price would have been different if not

### 1.    Defendants Concede the July 26, 2019 Corrective Disclosure Impacted Cabot's Stock Price

Defendants concede that the July 26, 2019 stock drop was both statistically significant and caused by the first alleged partial corrective disclosure exposing Cabot's reduction in its production guidance. Opp. at. 2; Feinstein Rbt., ¶¶15, 49-53. This "statistically significant price adjustment following a corrective disclosure is evidence the original misrepresentation did, in fact, affect the stock price." *Rooney*, 330 F.R.D. at 450. Thus, Defendants' "concession dooms [their] attempt to rebut the presumption of reliance because the inquiry is whether Defendants have proven ***a complete lack of price impact*** during the Class Period, not whether the stock price decline following

for the alleged misrepresentation."); *Id.* at 280:6-11 ("Q. And you agreed with Mr. Brower's proposition that there could be a price impact even if there was not price movement at the time the alleged misrepresentation was made? A. That's correct."). In fact, according to Ms. Allen, looking at the corrective disclosure "may help you analyze what would have been the effect when the alleged misrepresentation or omission was made." Ex. 2 at 67:9-15; *see also id.* at 97:21-24 ("[S]o at the time of a corrective disclosure, you can do an event study and see if the market – in fact, the price reacts if there is impact on the price from the corrective disclosure.").

[4]    Defendants' argument that there is no "front end" price impact (Opp. at 15, 18-19, 21) is misplaced as Plaintiffs rely on the "price maintenance" theory that Defendants' misrepresentations and omissions artificially maintained the price of Cabot's stock. *See* ¶¶28, 210, 254-57, 261; Feinstein Rbt., ¶¶21-26; 83-87. The Second, Seventh and Eleventh Circuits have all adopted price maintenance. *See Waggoner*, 875 F.3d at 104; *Glickenhaus & Co. v. Household Int'l, Inc.*, 787 F.3d 408, 419 (7th Cir. 2015); *FindWhat Inv. Grp. v. FindWhat.com*, 658 F.3d 1282, 1316 (11th Cir. 2011). And district courts in this Circuit also rely on the theory. *See Erica P. John Fund, Inc. v. Halliburton Co.*, 309 F.R.D. 251, 262 (N.D. Tex. 2015) ("Measuring price change at the time of the corrective disclosure, rather than at the time of the corresponding misrepresentation, allows for the fact that many alleged misrepresentations conceal a truth. Thus, the misrepresentation will not have changed the share price at the time it was made."). Ms. Allen concurs. *See* Ex. 2 at 92:23-93:2 ("[A]n omission can impact a stock price. But you don't necessarily see a – you know, the price move. It's that, if you hadn't made the omission, the stock price might have been something different."). Defendants do not cite a single decision in this Circuit that has rejected the majority position accepting the price maintenance theory or any reason why it is not appropriate here. Defendants' reliance on *IBEW Loc. 98 Pension Fund v. Best Buy Co.*, 818 F. 3d 775 (8th Cir. 2016), is misplaced, as that case has been largely limited to its unique facts not present here, and "the Eighth Circuit did not, as Defendants argue, outright reject the price maintenance theory." *In re Celgene Corp. Sec. Litig.*, 2020 WL 8870665, at *10 (D.N.J. Nov. 29, 2020) ("the Eighth Circuit's decision was based on the specific evidence presented in that matter").

- 5 -

individual corrective disclosures was caused by the alleged misrepresentations, which is a loss causation analysis not appropriate at this stage." *Monroe Cnty. Emps.' Ret. Sys. v. S. Co.*, 332 F.R.D. 370, 395 (N.D. Ga. 2019) ("*Southern*").[5]

Absent a basis to prove a lack of price impact, Defendants resort to an inappropriate and fact-intensive loss causation argument that the July 26, 2019 stock drop was unrelated to the fraud and therefore not "corrective." But "*Basic* presumes that the alleged statements or omissions were misrepresentations and that the alleged corrective disclosures were in fact corrective." *J.C. Penney Co.*, 2016 WL 8604331, at *8. Nevertheless, based solely on a self-serving, post hoc declaration from Defendant Schroeder, Defendants argue that Cabot's disappointing production guidance in the July 26, 2019 corrective disclosure "had nothing to do with the alleged environmental violations." Opp. at 20. Legally, this loss causation argument should be rejected out of hand, as a motion for class certification "grants courts no license to engage in free-ranging merits inquiries." *Amgen*, 568 U.S. at 466. *See also* Feinstein Rbt., ¶¶54-60. Factually, Defendants' bald claim is not supported by *any* corroborating documentary evidence, and as discussed below, is belied by contemporaneous evidence establishing a link between the production miss and the alleged environmental violations.

*First*, whether a disclosure is "corrective" is the central inquiry concerning the element of loss causation – a common merits issue not to be decided at class certification. *Erica P. John Fund,*

---

[5]    *See St. Clair Cnty. Emps.' Ret. Sys. v. Acadia Healthcare Co.*, 2022 WL 4598044, at *5 (M.D. Tenn. Sept. 30, 2022) ("Defendants concede the October 2017 corrective disclosure had an impact on Acadia's stock price. In doing so, Defendants concede they cannot rule out price impact during the Class Period completely."); *In re CenturyLink Sales Pracs. & Sec. Litig.*, 337 F.R.D. 193, 210-11 (D. Minn. 2020) ("Defendants' expert admits that there were statistically significant price drops following two of the three disclosure dates. This is sufficient to prevent Defendants from 'sever[ing] the link' between the alleged misrepresentations and any impact on [the company's] stock price.") (first alteration in original).

*Inc. v. Halliburton Co.*, 563 U.S. 804, 812-13 (2011) ("*Halliburton I*").[6] Defendants' own authority

is in accord. *See Halliburton*, 309 F.R.D. at 260-62 ("Based on the Supreme Court's discussion in

*Halliburton I*, *Amgen*, and *Halliburton II*, the Court finds that class certification is not the proper

procedural stage for the Court to determine, as a matter of law, whether the relevant disclosures were

corrective."); *id.* at 262 ("To hold otherwise would require the Court to pass judgment on the merits

of the allegations after the dismissal stage and before summary judgment . . . .").

    *Goldman* did not change this binding precedent.  In *Goldman*, the Supreme Court merely

clarified that the "generic nature of an alleged misrepresentation" (*e.g.*, the statement "'we have faith

in our business model'"), may be one factor in assessing price impact.  141 S. Ct. at 1960-61.  That

is not the situation here; the alleged false and misleading statements explicitly claim Cabot was

properly remediating and resolving known gas migration violations in Susquehanna County when

that was not the case.  Moreover, *Goldman* did not hold that loss causation, or other fact-intensive

merits issues common to all class members, may be resolved at class certification.  *See id*. at 1961,

n.2 (explaining that while a court may use evidence to "decide the price impact issue" it must

"'resist[] the temptation to draw what may be obvious inferences for the closely related issues that

must be left for the merits'").

    Defendants' request that the Court resolve loss causation based on an incomplete record at

class certification is therefore inappropriate.  And, in any event, "[r]esolution of the dispute

---

6    *See Zwick Partners, LP v. Quorum Health Corp.*, 2019 WL 1450546, at *14 (M.D. Tenn. Mar. 29, 2019) ("definitively determining causation constitutes a finding on the merits, which is to be avoided at this stage of litigation" especially where, as here, there are dueling experts addressing complicated issues of causation); *Southern*, 332 F.R.D. at 397 ("[W]hat caused Southern Company's stock price to decline following each of the corrective disclosures (*i.e.*, loss causation)" is an "ultimate question[] for the trier of fact on the merits."); *Baker v. SeaWorld Ent., Inc.*, 2017 WL 5885542, at *12 (S.D. Cal. Nov. 29, 2017) (rejecting similar argument "that the August 13, 2014 statement 'cannot be considered to be a corrective disclosure'" as a premature loss causation argument).

regarding whether the statements were corrective 'is an issue that is common to all members of the class and thus does not defeat predominance.'" *In re Cobalt Int'l Energy, Inc. Sec. Litig.*, 2017 WL 2608243, at *6 n.2 (S.D. Tex. June 15, 2017); *see also J.C. Penney Co.*, 2016 WL 8604331, *8 ("Defendants' arguments about whether the disclosures were actually corrective . . . has no bearing on the predominance inquiry of class certification").

Accordingly, "[a]t this stage of the litigation – when Plaintiffs are ***not*** required to show loss causation – the alleged disclosure need only 'relate[] to,' 'concern,' or be 'linked' to a specific alleged misrepresentation." *Pearlstein v. BlackBerry Ltd.*, 2021 WL 253453, at *18 (S.D.N.Y. Jan. 26, 2021) (emphasis and second alteration in original). Here, the Court has already rejected Defendants' argument that the July 26, 2019 disclosure did not relate to the alleged fraud, finding that the disclosure is "relevant to" the alleged misleading statements and omissions. ECF 118 at 42. Defendants' recycled argument therefore fails. *See CenturyLink*, 337 F.R.D. at 211 ("[T]he Court has already rejected Defendants' argument that, as a matter of law, the three disclosures were not actually disclosures."). Defendants' fact-bound challenge to loss causation should be rejected.

***Second***, whether Cabot's inability to drill new wells or remediation delays due to the Company's non-compliance with environmental law affected Cabot's production guidance is – particularly in light of Defendant Schroeder's recent, unsupported, and untested declaration – a hotly disputed factual issue. ¶¶258-59. Although Plaintiffs do not have the burden to establish the ***existence*** of price impact at this stage, documents produced to date reflect a direct link between Cabot's environmental noncompliance and the disappointing production disclosed on July 26, 2019. For example, Schroeder received an email on July 16, 2019 from Cabot's Treasurer ███████

████████████████████████████████████████████

████████████████████████████████████████████

- 8 -

███████████████████████ Ex. 4 at 1; *see also* Ex. 5 (July 19, 2019 email ████████████

███████████████████████ ).[7]

Likewise, ████████████████████████████████████████████████

██████████. Ex. 10.[8] ██████████████████████████████████████████

██████████. *See id.* As a result, ████████████████████████████████████

████████████████████████████████████████. Ex. 11 (████████████████

██████████████████████████); Ex. 12 (████████████████

██████████████████); *see also* Ex. 13 at 1 (████████████████

████████████████████████████████████████████████████

██████████████████████████████████"); *cf.* Ex. 14 (████████████

████████████████████████████████████████████████

██████████); Ex. 15 (████████████████████████████████

██████████████████████████).

---

[7] Worse, the email ██████████████████████████████████████████
████████████████████████████████████████████████████████." Ex.
4 at 1. Nevertheless, in their July 26, 2019 disclosure, Defendants attributed the production miss to
"a unique opportunity to acquire acreage adjacent to an eight-well pad." Ex. 6 at 4. Notably, the
next quarter, Cabot personnel discussed ███████████████████████████████████
████████████████████████████████████████████████████████████
██████████████ Ex. 7 at 1. This was confirmed in February 2020 █████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████ Ex. 8 at 32, 35.
Then, in April 2020, ████████████████████████████████████████████
████████████████████████████████████████████████████████████
██████████████████████ Ex. 9 at 1.

[8] Ely, Ratzel and Gesford well pads were all part of the December 2010 Consent Order and all
three well pads had related felony criminal charges with violations spanning from 2008 to June
2018. ¶¶121-126.

- 9 -

Additionally, in the months leading up to the July 26, 2019 disclosure, Cabot expected to receive permission to re-start drilling in Dimock, but was rebuffed by the Pennsylvania Department due to its continuing non-compliance, further showing that Cabot's non-compliance was a factor in its disappointing production guidance.  For example, Cabot documents reveal that ████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████ Ex. 16 at 16.

However, ██████████████████████████

████████████████████████████████████

██████████████████████ *Id.*[9]

Indeed, ████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████ Ex. 18 at 4.

Similar documents also suggest that Cabot had been reluctant to undertake appropriate remedial steps precisely because those steps required taking gas wells offline and thus negatively impacted production.  For example, an October 4, 2017 ████████████████

████████████████████████████████████

████████████████████████ Ex. 19 at 4. ████████

████████████████████████████████████

---

[9]  In addition, ████████████████████████

████████████████████████ Ex. 17 at 1.

- 10 -

4877-1786-3777.v1

███████████████████████████████████████████████████████████

███████ *Id.* ███████████████████████████████████ *Id.*[10]

Finally, Defendants fail to establish that the revelation of the Notices of Violation disclosed in the July 26, 2019 10-Q had no price impact. In fact, Defendants' expert, Ms. Allen, provided an intraday trading analysis that shows Cabot's stock price continued to decline from a high of $19.76 per share around the time the 10-Q disclosing the Notices of Violation was filed at 11:42 a.m. down to $19.16 per share at market close, a **3% decline**. Ex. 20; Ex. 2 at 146:25-147:8 ("I think it's – it looks like there's a little bit of a downward movement, a general downward movement."); *see also Acadia*, 2022 WL 4598044, at *8 (noting that intraday trading information provided by Ms. Allen reflecting a 1.16% decline in a company's stock price following an alleged corrective disclosure "does not show that the [disclosure] had no impact on the price of [the company's] stock").

### 2.    Defendants' Evidence Does Not Prove an Absence of Price Impact for the June 15, 2020 Corrective Disclosure

Because Defendants have failed to establish the absence of price impact for the July 26, 2019 disclosure, they have failed to carry their burden of establishing a "complete lack of price impact during the Class Period" and the Court's price impact analysis need go no further. *See Southern*, 332 F.R.D. at 395-96 ("[N]umerous courts addressing class certification have refused to shorten class periods by dismissing subsequent corrective disclosures where some but not all of the stock price declines following the alleged corrective disclosures were statistically significant."); *Strougo v. Tivity Health, Inc.*, 606 F. Supp. 3d 753, 766 (M.D. Tenn. 2022), *vacated and remanded sub nom.*,

---

[10]    Further underscoring the inappropriateness of resolving fact-bound merits issues at class certification, Defendants here recently produced **over 90%** of their total documents in the past six weeks. Thus, while the record is already replete with evidence showing a link between Defendants' environmental violations and reduced production, the link will only get stronger with the benefit of a complete record, including a comprehensive review of the nearly **3.4 million pages** of Defendants' production and completion of fact and expert depositions.

*In re Tivity Health, Inc.*, 2022 WL 17243323 (6th Cir. Nov. 21, 2022) ("To the extent Tivity believes it is entitled to shorten and limit the class period without showing a complete lack of price impact, the Court disagrees."); *KBC Asset Mgmt. NV v. 3D Sys. Corp.*, 2017 WL 4297450, at *7-*8 (D.S.C. Sept. 28, 2017) (declining to shorten the class period where only the first of two alleged corrective disclosures was followed by a statistically significant stock price decline).

But even if the Court considers the June 15, 2020 disclosure, Defendants still fail to establish an absence of price impact. As an initial matter, they do not dispute that the June 15, 2020 corrective disclosure concerning the Presentment of Charges relates to the fraud. *See* Opp. at 3, 15, 20 (acknowledging that the Jeffers and Howell wells at issue are part of the Presentment of Charges announced on June 15). Plaintiffs' expert, Dr. Feinstein, using an event study and regression that appropriately accounts for COVID-19-related market volatility, established that the June 15, 2020 stock drop was statistically significant at the 95% level. Feinstein Rbt., ¶¶67-69. This "statistically significant price adjustment following a corrective disclosure is evidence the original misrepresentation did, in fact, affect the stock price." *Rooney*, 330 F.R.D. at 450.

Relying on a flawed event study from Ms. Allen concluding that the stock decline was not significant to the 95% level, Defendants argue they have established a complete absence of price impact. *See* Opp. at 2, 15, 20. But proffering competing (and flawed) expert analysis does not come anywhere close to establishing a complete lack of price impact. *See Quorum Health Corp.*, 2019 WL 1450546, at *14 (disagreements between experts regarding the statistical significance of a corrective disclosure "creates a factual dispute as to the materiality of [a corrective disclosure], which involves complicated questions of causation better left until trial or at the earliest a summary judgment proceeding"); *Southern*, 332 F.R.D. at 389 (noting the "Court's disinclination to engage in a battle of the experts" regarding statistical significance at class certification).

- 12 -

Nevertheless, in a classic "battle of the experts" argument, Defendants suggest that Dr. Feinstein's analysis is somehow unreliable because it accounted for the abnormally volatile market conditions during the COVID-19 pandemic. Feinstein Rbt., ¶¶30, 98-104, 108-109. But Dr. Feinstein's use of the peer reviewed Newey-West correction to address this outsized volatility in his statistical analysis under these circumstances (known as heteroscedasticity) is not a "non-standard procedure," as Ms. Allen contends. Opp. at 15, 21. Rather, it is well-grounded in the scholarly literature, *as acknowledged by Ms. Allen's consulting firm* – NERA Economic Consulting – which applies Dr. Feinstein's same Newey-West correction where heteroscedasticity is present. *See* Feinstein Rbt., ¶¶30-36 ("NERA acknowledges that heteroscedasticity is a problem that needs to be corrected in economic work, and directs one to use the very correction" Dr. Feinstein applied); *id.* at ¶¶99-100; *see also* Ex. 2, Allen Tr. 115:8-23 (acknowledging that the Newey-West correction is "something that academics have done" to correct for heteroscedasticity and autocorrelation). The results of Dr. Feinstein's analysis that Ms. Allen criticizes as "erroneous" and "unreasonable," in fact, are wholly appropriate and demonstrate that Dr. Feinstein correctly applied the generally accepted Newey-West correction. Feinstein Rbt., ¶¶98-112. Ms. Allen's criticisms thus appear to stem from her lack of understanding of the Newey-West correction. *See id.*; Ex. 2 at 114:17-22 ("I don't believe I have ever done the – a Newey-West test. I – I don't know. I don't know if I had before I saw it in – I'm not sure. I have not ever seen it in the context that he is using it, nor have I – but I'm not sure if I had seen it before. I don't believe I have used it before.").

On the other hand, Ms. Allen's failure to account for heteroscedasticity in her own statistical analysis, despite Dr. Feinstein specifically highlighting the issue in his opening report, renders Ms. Allen's analysis unreliable. Feinstein Rbt., ¶¶27-36; *see also* Ex. 2 at 107:14-22 ("Q. And does heteroscedasticity have any effect on a regression analysis? A. It can."); *id.* at 113:19-22 ("Q. Do

you know if heteroscedasticity was, in fact, present during the Class Period?  A. I don't believe I did any tests of it; so I didn't.").  In fact, as a result of the uncorrected heteroscedasticity present in most of Ms. Allen's regression models, her event studies are "invalid" and "cannot reliably determine whether or not the stock return on any particular event date was statistically significant."  Feinstein Rbt., ¶¶36.  Defendants' and their expert's criticisms are thus unfounded and lack credibility and should be afforded no weight.

Numerous additional fundamental flaws in Ms. Allen's regressions, including failing to correctly remove the effects of Cabot from her market and peer-company indices, testing the wrong dates, omitting dates without explanation, using inconsistent estimation periods, and using an erroneous return that "dramatically biases Ms. Allen's results toward findings of event nonsignificance," also render her analysis and conclusions unreliable.  Feinstein Rbt., ¶¶13-14, 37-48.  Notably, courts routinely certify classes in cases where Ms. Allen opines there is no price impact, finding her analysis unhelpful.  *See Catalyst Pharmaceutical*, 302 F.R.D. 657; *Cobalt Int'l*, 2017 WL 2608243; *Quorum Health Corp.*, 2019 WL 1450546; *Blackberry,* 2021 WL 253453; *Acadia*, 2022 WL 4598044.

But even if Defendants were correct that the June 15 stock price decline was not statistically significant at the 95% level (and they are not), "the absence of a statistically significant price adjustment does ***not*** show the stock price was unaffected by the" alleged misstatements or omissions.  *Rooney*, 330 F.R.D. at 450; *see also* Feinstein Rbt., ¶¶19, 69, 77-82, 88-91, 93.  Thus, "courts routinely reject the argument that a non-statistically significant stock price decline proves an absence of price impact."  *Southern*, 332 F.R.D. at 394; *see also id.* at 395 (collecting cases).[11]

---

[11]  The cases cited by Defendants are inapt for the same reasons described by the court in *Southern*, 332 F.R.D. at 395 n.32.  In *Halliburton.*, 309 F.R.D. at 280, the court based its ruling, in part, on the fact that the relevant information had previously been disclosed.  Here there is no evidence the

"Defendants' reliance on arguments that . . . Defendants' expert[] failed to reach a statistically significant conclusion as to price impact is [therefore] ***not*** a basis to deny class certification." *In re EQT Corp. Sec. Litig.*, 2022 WL 3293518, at \*16 (W.D. Pa. Aug. 11, 2022).

Further, there is ***positive proof of price impact*** following the June 15 announcement of criminal charges.  *See* Feinstein Rpt., ¶68 (June 15 stock price decline statistically significant to the 95% confidence level).  And even using Ms. Allen's flawed event study, Cabot's stock experienced residual decline on June 15, 2020 that was statistically significant to the 87% confidence level. Feinstein Rbt., ¶92-93.  Thus, using Feinstein's model (significant decline to the ***95%*** confidence level) or Ms. Allen's model (significant decline to the ***87%*** confidence level), the "preponderance of the evidence" shows that it is indisputably "***more likely than not***" that the alleged corrective disclosure impacted Cabot's stock price.  *Goldman*, 141 S. Ct. at 1963; *see also Matkovich v. Sec'y of Dep't of Health & Hum. Servs.*, 1994 WL 142294, at \*4 (Fed. Cl. Apr. 7, 1994) (preponderance of the evidence merely requires "***fifty percent and a feather***").

Moreover, ***both*** Dr. Feinstein's and Ms. Allen's analyses establish a residual decline in Cabot stock price following the June 15 disclosure, meaning that the stock price decline observed on June

market was aware of Cabot's longstanding failure to remediate known violations, and any suggestion it was disclosed amounts to an "improper attempt to assert a 'truth on the market' defense." *J.C. Penney Co.*, 2016 WL 8604331, at \*8.  In *In re Intuitive Surgical Sec. Litig.*, 2016 WL 7425926 (N.D. Cal. Dec. 22, 2016), unlike here, the plaintiff conceded a non-statistically significant decline would provide no price impact.  *In re Finisar Corp. Sec. Litig.*, 2017 WL 6026244 (N.D. Cal. Dec. 5, 2016) did not analyze the question of whether a non-significant decline proves an absence of price impact.  And *In re Moody's Corp. Sec. Litig.*, 274 F.R.D. 480, 493 (S.D.N.Y. 2011) was based on the fact that there was, unlike here, "no period within the proposed class period where the alleged misrepresentation caused a statistically significant increase in the price ***or*** where a corrective disclosure caused a statistically significant decline in the price."  Defendants' reliance on *Ohio Pub. Emps. Ret. Sys. v. Fed. Home Loan Mortg. Corp.*, 2018 WL 3861840, \*18-\*20 (N.D. Ohio Aug. 14, 2018), *rev'd and remanded*, 64 F.4th 731 (6th Cir. 2023), is similarly misplaced; that case was based on the finding that the plaintiffs were unable to demonstrate market efficiency to invoke the presumption of reliance.  Here, Defendants ***concede*** market efficiency.  Opp. at 17, n.72. Defendants' remaining cases are inapposite, as none are securities cases concerning price impact at class certification.  Opp. at 19, n.81.

4877-1786-3777.v1

15 was larger than would be expected given Cabot's market and industry peers. Feinstein Rbt., ¶¶68, 92-93. "This establishes that [Cabot's] stock price experienced a decline after factoring out market and sector effects. In other words, [Cabot's] residual stock price decline was larger than the return predicted by the market and its sector peers." *Southern*, 332 F.R.D. at 396, n.33; *see also Bos. Ret. Sys. v. Alexion Pharms., Inc.*, 2023 WL 2932485, at *12 (D. Conn. Apr. 13, 2023) (finding defendants failed to establish a lack of price impact where "every alleged corrective disclosure was accompanied by an abnormal return, even if the difference was not statistically significant"). "Because [Cabot's] stock price suffered negative residual returns following" the June 15 corrective disclosure, "Defendants' citation to non-significance 'merely suggest[s] that another factor also contributed to an impact on a security's price.'" *Southern*, 332 F.R.D. at 396-97 (alteration in original). But "[t]hat 'does not establish that the fraudulent conduct complained of did not also impact the price of the security.'" *Id*.

Defendants, moreover, have no alternative explanation for what caused the ***Cabot-specific*** price decline on June 15, 2020. *See Ark. Tchr. Ret. Sys. v. Goldman Sachs Grp., Inc.*, 955 F.3d 254, 270, n.18 (2d Cir. 2020) ("for a defendant to erase the inference that the corrective disclosure . . . played some role in the price decline[,] it must demonstrate . . . that the other events explain the ***entire*** price drop"). *See Cobalt Int'l*, 2017 WL 2608243, at *6 ("Defendants do not provide an alternate explanation for these significant declines in the Cobalt stock price. As a result, Defendants have not demonstrated that there was no price impact from the challenged disclosures and have failed to rebut the fraud-on-the-market presumption.").

Rather, Defendants' expert concedes that at least some part of the June 15, 2020 disclosure "matched," and is therefore attributable to, the fraud. *See* ECF 142-1 ("Allen Rpt."), ¶46 (stating only that the "***majority*** (if not all) of the disclosure on June 15, 2020 was not due to the alleged

misrepresentations"); Opp. at 15 (stating only that "one cannot fairly attribute *all* (or any) of the June 15, 2020 stock price decline to the prior alleged misstatements"). But "merely suggesting that another factor *also* contributed to an impact on a security's price does not establish that the fraudulent conduct complained of did not also impact the price of the security." *Waggoner*, 875 F.3d at 105 (emphasis in original).[12]

Defendants thus *never* assert, let alone prove, that there is *zero* price impact with respect to the June 15, 2020 corrective disclosure. *See* Allen Rpt., ¶46 (concluding only that "there was no statistically significant stock price decline due to the alleged misrepresentations," not that the alleged corrective disclosure caused zero price impact). And Ms. Allen's "conclusion that one cannot definitively conclude, based upon either [her] or [Plaintiffs' expert's] analyses, that there was price impact at this juncture *does not* establish that there was, in fact, no price impact." *EQT Corp.*, 2022 WL 3293518, at *18.

Additionally, market commentary attributing the decline in Cabot's stock to the Presentment of Charges, "of course, is evidence of price impact." *Loc. 703, I.B. of T. Grocery & Food Emps. Welfare Fund v. Regions Fin. Corp.*, 2014 WL 6661918, at *7 (N.D. Ala. Nov. 19, 2014). Investors and news outlets following Cabot at the time of the disclosure understood that the Company's stock price dropped in response to that news, directly undermining Defendants' argument the June 15 stock drop was due to "normal fluctuations." Opp. at 19. *See* Ex. 21 at 1 (▮▮▮▮▮▮▮▮▮▮▮▮

---

[12] Defendants' suggestion that other wells named in the criminal charges constitute non-fraud related information that Plaintiffs must disaggregate at class certification (Opp. at 15) is factually incorrect and, regardless, a loss causation and damages issue not appropriate for resolution at this stage. "The fact that a subsequent loss may have been caused by factors other than the revelation of a misrepresentation has nothing to do with whether an investor relied on the misrepresentation in the first place, either directly or presumptively through the fraud-on-the-market theory." *Halliburton I*, 563 U.S. at 813*; In re Apple Inc. Sec. Litig.*, 2022 WL 354785, at *10 (N.D. Cal. Feb. 4, 2022) ("Claims that other factors also contributed in part to the price drop are insufficient to rebut the *Basic* presumption.").

- 17 -

██████████████████████████████████████████████; Ex. 22 at 3

(████████████████████████████████████████████████

████████████████████████████████████████████); Feinstein Rbt.,

¶¶73-76 (*SeekingAlpha*, 15 June 2020: "Cabot Oil & Gas (COG -4.5%) dips deeply into the red after

the Pennsylvania Attorney General's office formally charges the company for environmental crimes

in the state"; *Bloomberg*: "Cabot shares fall as much as 4.6%" following charges). And at least one

analyst expected the charges to cause Cabot's stock price to fall. Feinstein Rbt., ¶¶70-72, 76

("KeyBanc Sees 'Slightly Negative' Reaction In Cabot Shares From Suit"). Defendants and their

expert ***ignore*** this market commentary, which is ***inconsistent*** with Ms. Allen's deposition testimony

and prior practice of examining price impact by analyzing, among other things, news stories. *See*

Ex. 23, Allen Acadia Healthcare Report, ¶¶21, 43; Ex. 2 at 135:23-136:4 ("Q. What other sources of

information are there regarding market sentiment besides analyst reports? A. We could look at news

stories of oftentimes, you know, business publications, for example . . . ."); *id.* at 137:2-11 ("[news

stories] were part of the information that I looked at to determine whether the corrective disclosures

or the misrepresentations had price impact."); *see also* Feinstein Rbt., ¶20.

Defendants' argument that "analyst commentary indicat[ed] 'nobody cared'" about the June

15, 2020 disclosure is "not sufficiently persuasive" to demonstrate a lack of price impact. *Brokop v.

Farmland Partners Inc.*, 2021 WL 4913970, at *7 (D. Colo. Sept. 30, 2021). *See Thorpe v. Walter

Inv. Mgmt., Corp.*, 2016 WL 4006661, at *14 (S.D. Fla. Mar. 16, 2016) (holding defendants failed to

rebut *Basic* presumption where "[d]efendants' expert relied exclusively on market commentary" to

prove absence of price impact); *In re Goldman Sachs Grp., Inc. Sec. Litig.*, 2015 WL 5613150, at *7

(S.D.N.Y. Sept. 24, 2015), *vacated and remanded by Ark. Tchrs. Ret. Sys. v. Goldman Sachs Grp.,

Inc.*, 879 F.3d 474 (2d Cir. 2018) (rejecting "argu[ment] that Dr. Gompers demonstrated the absence

- 18 -

of price impact by analyzing the focus of market commentary" holding that the "analysis fails to demonstrate that no part of the decline was caused by the corrective disclosure."). Notably, Ms. Allen does not address the KeyBanc analyst report cited above, and none of the analyst reports cited by Ms. Allen states that the Presentment of Charges had no impact on Cabot's stock price. Rather, both the Company and analysts agreed that regulatory compliance was important and had the ability to impact Cabot's business and operations. *See* Feinstein Rbt., ¶¶94-97.

Lacking a viable price impact challenge, Defendants resort to claiming that Cabot's environmental violations were immaterial because the fines associated with the violations were small relative to Cabot's revenues. Opp. at 20-21. But "[P]laintiffs are not required to prove materiality at the class-certification stage." *Amgen*, 568 U.S. at 468. Moreover, Plaintiffs do not allege that the amount of the fines caused Cabot's stock to fall. Plaintiffs allege that the revelation of Cabot's longstanding (but undisclosed) failure to remediate known violations and gas migration incidents, which resulted in fines, regulatory scrutiny, criminal charges, reputational damage, and reduced gas production, caused the stock to drop. ¶¶262-263. Defendants' other arguments regarding disclosures concerning *other* companies and events that *post-date* the class period by years (Opp. at 21) are irrelevant to whether the alleged fraud impacted *Cabot's* stock price *during* the Class Period.[13]

---

[13] Cabot's November 2022 agreement to pay at least ***$16.29 million*** to the Pennsylvania Attorney General's Office (despite facing fines of just $25,000 to $50,000 per-count at trial), plea to a criminal charge, and entry into another consent order with the Pennsylvania Department more than two years after the alleged fraud had been fully disclosed (Opp. at 12) is not relevant to whether the Defendants' alleged false and misleading statements and omissions impacted Cabot's stock price during the Class Period, but does reflect that there are far more costs at issue for Cabot's environmental non-compliance beyond mere fines, including regulatory scrutiny, remediation costs, criminal charges, reputational damage, extended drilling moratoriums, and reduced gas production. ¶¶262-263. Defendants and their expert did not consider any of these costs in their inappropriate materially-based arguments. In fact, Cabot and analysts identified some of those very issues as risks to the Company. *See* Feinstein Rbt., ¶¶92-94. Defendants' argument therefore falls flat.

- 19 -

In any event, Defendants' argument that there is "no basis" to infer that, had the truth been disclosed at the time of the alleged misstatements, it would have impacted Cabot's stock price (Opp. at 21-22): (i) simply ignores that when the truth *was* disclosed, Cabot's stock price *did* suffer a Company-specific, significant decline on June 15 (¶¶262-263; Feinstein Rbt., ¶68); and (ii) constitutes another inappropriate merits-based attack on loss causation.  Accordingly, Defendants cannot demonstrate a *complete* lack of price impact with respect to the June 15, 2020 disclosure.

### B. There Is No "Mismatch" Between the Alleged Misstatements and Omissions and the Corrective Disclosures

Contrary to Defendants' assertions, there is no "mismatch" between the sustained misstatements and omissions and the corrective disclosures.  Rather, the alleged misrepresentations and omissions – Cabot's longstanding failure to remediate known gas migration violations at Company wells across Susquehanna County and the negative impacts of that failure – were brought to light by the alleged corrective disclosures – production guidance reduction and additional Notices of Violation for gas migration disclosed on July 26, 2019, and the Presentment of Charges revealed on June 15, 2020.  ¶¶84-88; 120-131; 205-208.  Indeed, this Court has already held that the alleged misstatements and omissions are related or "relevant to" the corrective disclosures.  *See* ECF 118 at 42.  Defendants' fact-bound arguments premised on a supposed "mismatch" thus fails.

In particular, Plaintiffs allege that Defendants materially misled investors when they stated that, with respect to the "Environmental Matters" then affecting the Company, that: (i) Cabot had "performed appropriate remediation efforts" at unnamed wells in Susquehanna County in response to Notices of Violation received from the Pennsylvania Department in September 2011 and June and November 2017 for failing to prevent gas migration; and (ii) for the September 2011 and June 2017 Notices, Cabot "believe[d] the source of methane ha[d] been remediated" at the unspecified wells.  ¶¶187-189.  Defendants, however, concealed that the Company had failed to, *inter alia*: (i) "fix

- 20 -

known faulty gas wells and redress known violations for years, in contravention of its obligations under the December 2010 Consent Order and applicable law"; and (ii) "remediate, over a period of years, continuing violations at its wells identified in various Notices of Violation and formal letters issued to Cabot by the Pennsylvania Department."  ¶190.

Defendants' statements concerning Cabot's purported "Environmental Matters" were not only false, because the wells at issue in the September 2011 and June and November 2017 Notices of Violation had not been "appropriately" remediated, the statements also misled by omission. Defendants' statements put Cabot's gas migration remediation efforts (or lack thereof) in Susquehanna County squarely at issue by misleadingly suggesting that the Company had been performing limited and "appropriate" remediation efforts when in fact the Company knowingly had contaminated Pennsylvania ground water for over a decade. *See Okla. Firefighters Pension & Ret. Sys. v. Six Flags Ent. Corp.*, 58 F.4th 195, 217 (5th Cir. 2023) (quoting *Lormand v. US Unwired, Inc.*, 565 F.3d 228, 248-49 (5th Cir. 2009) ("'Once the defendants engaged in public discussions . . . they had a duty to disclose a "mix of information" that is not misleading.'")); ECF 113 at 8, 11.

Consistent with these allegations, the Court held in its first motion to dismiss order that Plaintiffs "alleged sufficient facts that, if proven could make these statements false and materially misleading" because, among other reasons, "Cabot had not remediated or resolved the environmental law and various Consent Order obligations for wells in Susquehanna County" and because, as the Court noted, the June 15, 2020 Presentment of Charges against Cabot were "based on compliance issues with wells that were the subjects of" various Notices of Violation, including the June and November 2017 Notices of Violation and several others.  ECF 109 at 23.  The Court also found that loss causation was adequately alleged because the alleged corrective disclosures were relevant to the alleged misstatements and omissions.

### 1.    The "Category 1 and 2" False and Misleading Statements

Nevertheless, Defendants incorrectly claim that, because the July 26, 2019 and June 15, 2020 corrective disclosures do not specifically name the Stalter wells, and the alleged "Category 1 and 2" misstatements purportedly pertain only to those wells, there is a "mismatch" and there can be no price impact.  Opp. at 5, 20.  *First*, Defendants' argument ignores Plaintiffs' omissions case.  As noted above, Defendants' Class Period misstatements are actionable because they fail to disclose the full extent of Cabot's environmental violations, including but not limited to, at its Stalter wells.  The corrective disclosures are linked to the alleged omissions in that they addressed: (i) revised financial guidance due, at least in part, to the effects of Cabot's undisclosed environmental violations in Susquehanna County during the Class Period; and (ii) criminal charges due to Cabot's known environmental violations in Susquehanna County over a decade.  There is no mismatch.

The language of Defendants' misstatements supports Plaintiffs' position that the misstatements were materially incomplete and the material information Defendants omitted relates to the alleged corrective disclosures.  Indeed, *none* of the alleged false and misleading Category 1 and 2 statements refer specifically to the Stalter wells.  Instead, when identifying the supposed "Environmental Matters" then affecting the company, Cabot generally refers to "several wells owned and operated by Cabot in Susquehanna County" and Cabot's purportedly "appropriate" remediation efforts.  ¶187.  Thus, the actual statements were not, on their face, specific to any particular wells, and provided investors with misleadingly incomplete information concerning Cabot's purported efforts to remediate and resolve gas migration violations across Susquehanna County.

Because both corrective disclosures revealed aspects of Cabot's longstanding failure to remediate known gas migration violations at wells across Susquehanna County, there is no mismatch; the information Defendants omitted from the Category 1 and 2 statements, rendering them false and misleading, is relevant to the allege corrective disclosures.  *See BlackBerry*, 2021 WL

- 22 -

253453, at *18-*19 (rejecting arguments like those Defendants make here that "'this disclosure only mentioned [one thing]; discussion of that one thing in no way indicates or reveals a problem with this other thing []; ergo, no revelation of fraud'") (alterations in original).  Furthermore, there is no requirement that the corrective disclosures "'mirror'" the alleged misstatements and omissions. *Alaska Elec. Pension Fund v. Flowserve Corp.*, 572 F.3d 221, 230 (5th Cir. 2009); *In re Mattel, Inc. Sec. Litig.*, 2021 WL 4704578, at *5-*6 (C.D. Cal. Oct. 6, 2021) ("This Court does not read *Goldman* to contradict that a 'corrective disclosure need not be a "mirror image" disclosure . . . .'").

**Second**, Defendants' argument also fails because the limited discovery Plaintiffs have been able to review to date already shows that Cabot had not "appropriately remediated" the Stalter well contamination at the time of Defendants' misstatements.[14]  This connects up with the corrective disclosures as they relate to Cabot's failure to remediate in the same time and place.  Documents produced by Cabot show that the Company had not, in fact, remediated the Stalter wells at the relevant time.  For example, on March 22, 2016, Cabot received an email ███████████

███████████████████████████████ Ex. 24 at 4-5 (███████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████ ).  Similarly, on July 11, 2016, less than three weeks before Cabot's July 29, 2016 disclosure, ███████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████ Ex. 25 at 2.  The Stalter wells therefore had ***not*** been remediated, as Cabot repeatedly claimed during the Class Period, and this continuing environmental contamination is consistent with:

---

[14]  *See* footnote 10, *supra*, noting that Defendants produced over 90% of their ~3.4 million page document production within the last six weeks.

(i) Cabot's July 26, 2019 revised guidance, which was due in part to remediation activities and drilling moratoriums; and (ii) the June 15, 2020 presentment of charges relating to Cabot's knowing violation of the December 2010 Consent Order, which required Cabot to comply with all environmental rules and regulations. Plaintiffs are not required to establish anything further at the class certification stage.[15]

Each of the corrective disclosures therefore revealed the relevant truth that Cabot had not remediated known violations of gas migration at its wells in Susquehanna County, including the Stalter wells. In addition, Cabot's failure to remediate the Stalter wells is consistent with the Pennsylvania Department's decision, noted above, to reject Cabot's requests to restart drilling in Dimock (and therefore impacting the Company's production going forward) based on the Company's continuing non-compliance. Cabot's belated remediation efforts following the June 11, 2018 Pennsylvania Department letter identifying numerous instances of Cabot's continuing non-compliance is likewise entirely consistent with Cabot's disappointing production guidance.

## 2.   The "Category 3" False and Misleading Statements

Defendants incorrectly suggest that the "Category 3" misstatements represent only that Cabot had made "appropriate" remediation efforts as of the date of the disclosure (*i.e.*, July 26, 2019) and therefore do not match the June 15 Presentment of Charges alleging violations through June 11, 2018. Opp. at 10-11, 15. But here again, Defendants attempt to rewrite the false and misleading statements to fit their flawed arguments. *First*, Defendants' again ignore the alleged omissions – the Category 3 statements are actionable by omission as they fail to disclose the full extent of Cabot's

---

[15]   As discussed above, Defendants' argument that the alleged corrective disclosures did not reveal concealed information regarding the Stalter wells is substantively a fact-intensive loss causation argument unripe for determination at class certification. *See Halliburton*, 309 F.R.D. at 260-62 ("Based on the Supreme Court's discussion in *Halliburton I*, *Amgen*, and *Halliburton II*, the Court finds that class certification is not the proper procedural stage for the Court to determine, as a matter of law, whether the relevant disclosures were corrective.").

4877-1786-3777.v1

environmental violations. ***Second***, the Category 3 misstatements are clear that Cabot had supposedly "performed appropriate remediation" efforts at unnamed wells "***[s]ince***" the time the allegations were "initially raised by residents" ***in 2017***. Ex. 26 at 29. They do ***not*** state, as Defendants claim, that appropriate remediation had only occurred as of the time the misstatements were first made on July 26, 2019. Thus, there is no disconnect between the Category 3 misstatements and the June 15 Presentment of Charges, which revealed longstanding violations at numerous wells, including the Howell and Jeffers wells, "through June 11, ***2018***." Ex. 27 at 2-6.

***Third***, evidence shows that gas migration continued unabated at the Jeffers and Howell wells even after June 11, 2018. For example, Cabot Board of Directors materials dated October 17, 2018 note that ███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████ Ex. 28 at 15. On April 3, 2019, a "███████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████ . Ex. 18 at 1. █████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████ Ex. 29 at 1-2. Accordingly, there is no mismatch.

## III.    CONCLUSION

For the reasons stated, Plaintiffs' Motion for Class Certification should be granted in full.

DATED:  May 8, 2023            KENDALL LAW GROUP, PLLC
                              JOE KENDALL (Texas Bar No. 11260700, S.D.
                              Texas Bar No. 30973, Attorney in Charge)


                                      *s/ Joe Kendall*
                              JOE KENDALL

4877-1786-3777.v1

3811 Turtle Creek Blvd., Suite 1450
Dallas, TX  75219
Telephone:  214/744-3000
214/744-3015 (fax)
jkendall@kendalllawgroup.com

Local Counsel for Lead Plaintiff

ROBBINS GELLER RUDMAN
  & DOWD LLP
DARRYL J. ALVARADO
KEVIN A. LAVELLE
FRANCISCO J. MEJIA
JACK ABBEY GEPHART
655 West Broadway, Suite 1900
San Diego, CA  92101-8498
Telephone:  619/231-1058
619/231-7423 (fax)
dalvarado@rgrdlaw.com
klavelle@rgrdlaw.com
fmejia@rgrdlaw.com
jgephart@rgrdlaw.com

Lead Counsel for Lead Plaintiff

KESSLER TOPAZ MELTZER
  & CHECK, LLP
ANDREW L. ZIVITZ
JAMIE M. MCCALL
JOSHUA E. D'ANCONA
ALEX B. HELLER
MAX JOHNSON
280 King of Prussia Road
Radnor, PA  19087
Telephone:  610/667-7706
610/667-7056 (fax)
azivitz@ktmc.com
jmccall@ktmc.com
jdancona@ktmc.com
aheller@ktmc.com
mjohnson@ktmc.com

Additional Counsel for the Class

- 26 -

4877-1786-3777.v1

<u>CERTIFICATE OF SERVICE</u>

I hereby certify under penalty of perjury that on May 8, 2023, I authorized the electronic filing of the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the email addresses on the attached Electronic Mail Notice List, and I hereby certify that I caused the mailing of the foregoing via the United States Postal Service to the non-CM/ECF participants indicated on the attached Manual Notice List.

*s/ Joe Kendall*
JOE KENDALL

KENDALL LAW GROUP, PLLC
JOE KENDALL (Texas Bar No. 11260700, S.D. Texas Bar No. 30973, Attorney in Charge)
3811 Turtle Creek Blvd., Suite 1450
Dallas, TX  75219
Telephone:  214/744-3000
214/744-3015 (fax)

Email:  jkendall@kendalllawgroup.com

- 1 -

4877-1786-3777.v1

# Mailing Information for a Case 4:21-cv-02045 Delaware County Employees Retirement System v. Cabot Oil & Gas Corporation et al

## Electronic Mail Notice List

The following are those who are currently on the list to receive e-mail notices for this case.

- **Darryl James Alvarado**
  dalvarado@rgrdlaw.com

- **Joshua Edward D'Ancona**
  jdancona@ktmc.com

- **Jack Abbey Gephart**
  jgephart@rgrdlaw.com

- **Joe Kendall**
  jkendall@kendalllawgroup.com,administrator@kendalllawgroup.com

- **Kevin Lavelle**
  klavelle@rgrdlaw.com

- **Henry W. Longley**
  hlongley@ktmc.com

- **Jamie M McCall**
  jmcc@ktmc.com

- **Francisco J Mejia**
  fmejia@rgrdlaw.com,E_File_SD@rgrdlaw.com,kjohnson@rgrdlaw.com,bengfelt@rgrdlaw.com

- **Gerard G Pecht**
  gerard.pecht@nortonrosefulbright.com,sumera.khan@nortonrosefulbright.com,tanya.lowe@nortonrosefulbright.com

- **Kelly A Potter**
  kelly.potter@nortonrosefulbright.com

- **Peter Andrew Stokes**
  peter.stokes@nortonrosefulbright.com,julie.wright@nortonrosefulbright.com

- **Andrew L. Zivitz**
  azivitz@ktmc.com

## Manual Notice List

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

```
Helen           J Bass
Kessler Topaz Meltzer & Check LLP
280 King of Prussia Rd
Radnor, PA 19087

Alex            B Heller
Kessler Topaz Meltzer & Check LLP
280 King of Prussia Rd
Radnor, PA 19087
```

**Lawrence        F. Stengel**
Saxton & Stump LLC
280 Granite Run Drive
Suite 300
Lancaster, PA 17601