# EXHIBIT 1

**UNITED STATES DISTRICT COURT**

**SOUTHERN DISTRICT OF TEXAS**

| | |
|---|---|
| DELAWARE COUNTY EMPLOYEES RETIREMENT SYSTEM, Individually and on Behalf of All Others Similarly Situated,<br><br>　　　　　　Plaintiff,<br>　　vs.<br><br>CABOT OIL & GAS CORPORATION, et al.,<br><br>　　　　　　Defendants. | Civil Action No. 4:21-cv-02045 |

REBUTTAL REPORT OF

PROFESSOR STEVEN P. FEINSTEIN, PH.D., CFA

May 8, 2023

TABLE OF CONTENTS

I.      SCOPE OF PROJECT AND REPORT ................................................................................1

II.     SUMMARY OF CONCLUSIONS AND OPINIONS ........................................................2

III.    DEFINING AND ASSESSING PRICE IMPACT ............................................................7

IV.     CRITIQUE OF ALLEN REPORT ....................................................................................8

        A.    Ms. Allen's Event Study Analysis is Flawed and Unreliable .................................8

              1.    Heteroskedasticity Renders Ms. Allen's Event Study Results
                    Flawed and Unreliable ...................................................................................9

              2.    Mistakes in Ms. Allen's Construction of the Market Index and Peer
                    Index ...............................................................................................................14

              3.    Flawed Comparison to Range Resources and Mistakes in Ms.
                    Allen's Range Resources Regressions.........................................................14

                    a.    Ms. Allen Did Not Remove Range Resources from Her
                          Peer Index .........................................................................................15

                    b.    Ms. Allen Inexplicably Omitted Two Observation Dates
                          from Her Range Resources Regressions.........................................16

              4.    Ms. Allen Included an Erroneous Return Observation in One of
                    Her Event Studies .........................................................................................17

        B.    Ms. Allen's Analysis of the 26 July 2019 Disclosure is Flawed and Her
              Conclusion of No Price Impact is Erroneous.........................................................19

              1.    Ms. Allen Agrees that the Disappointing Production and CapEx
                    Guidance Caused a Statistically Significant Price Decline on 26
                    July 2019 .......................................................................................................19

              2.    Ms. Allen's 26 July 2019 Price Impact Argument Founders
                    Because it is Based on an Assumption at Odds with Plaintiffs'
                    Allegations ....................................................................................................20

        C.    Ms. Allen's Analysis of the 15 June 2020 Disclosure is Flawed and Her
              Conclusion of No Price Impact is Erroneous.........................................................22

              1.    Ms. Allen's Opinion is Not a Conclusion From Economic Analysis
                    That the Misrepresentations Had No Price Impact, But Rather a
                    Merits Argument That There Were No Misrepresentations .....................23

              2.    15 June 2020 is Statistically Significant Using a Correct
                    Regression Specification...............................................................................24

              3.    Ms. Allen Overlooks that the News Media and An Analyst
                    Discussed the Criminal Charges and Acknowledged Its Negative
                    Impact on the Cabot Stock Price...................................................................25

        D.    Ms. Allen's Purported Analysis of the Misrepresentation Dates is Flawed
              and Uninformative ..................................................................................................27

1.    Price Maintenance Principle ...................................................................29

2.    Statistical Significance and the Absence of Evidence Fallacy ..................30

3.    Ms. Allen's Flawed Event Study Indicates Price Impact ..........................31

4.    Analysts and the Company .......................................................................31

E.    Ms. Allen's Criticisms of My Event Study and Statistical Tests Emanate From Her Apparent Incomprehension of Heteroskedasticity and How to Correct For It............................................................................................................33

1.    The Number of Statistically Significant Days is Reasonable ....................35

2.    Ms. Allen Misunderstands that Statistical Significance is a Function of Both the Magnitude of the Residual Return and the Estimated Level of Volatility.......................................................................36

3.    Ms. Allen's Assertion That I Did Not Use the Newey-West Correction the Same Way in a Different Case is Misguided.....................37

V.    LIMITING FACTORS AND OTHER ASSUMPTIONS....................................................38

## I.    SCOPE OF PROJECT AND REPORT

1.    On 5 December 2022, I submitted a report addressing market efficiency and the methodology for computing damages in this matter (the "Feinstein Report").[1] Based on the analyses presented in the Feinstein Report, I concluded that the common stock of Cabot Oil & Gas Corporation ("Cabot" or the "Company") traded in an efficient market during the Class Period, 22 February 2016 through 12 June 2020.[2] I further concluded that Section 10(b) damages in this matter can be computed for all Class members using a common methodology consistent with the Plaintiffs' theory of liability.[3] In the Feinstein Report, I described that methodology.[4]

2.    In the Feinstein Report, I showed that each of the *Cammer* and *Krogman* factors supports a finding that the market for Cabot stock was efficient over the course of the Class Period.[5] The analyses included an event study and statistical test that compared the price behavior of Cabot stock on a set of high information flow dates with the stock price movements on ordinary non- or lesser-news dates. These tests proved that Cabot stock responded to new Company-specific information and thereby demonstrated market efficiency during the Class Period.[6]

3.    Subsequently, Robbins Geller Rudman & Dowd LLP and Kessler Topaz Meltzer & Check, LLP, proposed Class Counsel, asked me to consider and evaluate the arguments and conclusions in the Expert Report and Declaration of Lucy P. Allen, dated 20 January 2023 (the "Allen Report"), submitted by Defendants in this matter. To that end, I read and analyzed the Allen Report. I also reviewed the transcript of Lucy Allen's deposition, dated 24 April 2023 ("Allen Deposition").

---

[1] Unless otherwise indicated, capitalized terms used herein have the same definition and meaning ascribed to them in the Feinstein Report.

[2] Feinstein Report, ¶¶17-20, and 151.

[3] Feinstein Report, ¶21.

[4] Feinstein Report, ¶¶152-163.

[5] Feinstein Report, ¶¶55-148.

[6] Feinstein Report, ¶¶103-148.

4.   The scope of the Allen Report was "to review and comment on Plaintiff's claims as alleged in the First Amended Consolidated Complaint filed February 11, 2022 (the 'First Amended Complaint') and review and comment on the Expert Report filed by Steven Feinstein on December 5, 2022 (the 'Feinstein Report')."[7] Ms. Allen sought to analyze "whether the misrepresentations as alleged in the First Amended Complaint impacted Cabot's stock price during the alleged Class Period and whether in an efficient market the alleged misrepresentations would be economically material to Cabot's stock price."[8,9]

5.   This rebuttal report presents my analysis and conclusions relating to the Allen Report.

6.   My conclusions are based on the information presently available to me. I reviewed and relied upon all of the data and documents cited and listed in the Feinstein Report. Additional data and documents considered are listed in Exhibit-1 of this report. My credentials and compensation are presented in the Feinstein Report, as is a list of testimony I provided during the four years preceding that report. Testimony I have provided since the Feinstein Report is identified in Exhibit-2 of this report.

7.   My work in this matter is ongoing, and I reserve the right to amend, refine, or supplement my analyses and opinions in the event that I become aware of additional information, evidence, arguments, or analyses that bear on my work in this matter.

## II.   SUMMARY OF CONCLUSIONS AND OPINIONS

8.   Ms. Allen does not dispute my conclusion presented in the Feinstein Report that Cabot stock traded in an efficient market throughout the Class Period. In fact, Ms. Allen assumes the efficiency of the market in the presentation of her argument.[10] Thus, the efficiency of the market for Cabot stock is undisputed.

---

[7] Allen Report, ¶1.

[8] Allen Report, ¶1.

[9] For her engagement, Ms. Allen was asked to assume that "the facts asserted in the Declaration of Scott C. Schroeder and the Declaration of John Smelko are true and correct" (Allen Report, ¶1). By contrast, not only did Ms. Allen not assume the facts alleged by Plaintiffs in their Complaint, she disputes them. Consequently, her analysis, report, and opinion, far from being an economic analysis of the facts as alleged by Plaintiffs, is heavily dependent on adjudication of an alternative factual narrative.

[10] Allen Report, ¶22 and ¶26; and "I'm assuming market efficiency is alleged in the Complaint." (Allen Deposition at 34:10-11.)

9.   Ms. Allen does not dispute my conclusion in the Feinstein Report that damages can be computed for all Class members using a common damage methodology that is consistent with Plaintiffs' theory of liability. Ms. Allen does not challenge the existence, applicability, or feasibility of the out-of-pocket damage methodology for commonly computing damages for all Class members.

10.  As such, the Allen Report provides no reason to reconsider or revise any of the conclusions presented in the Feinstein Report.

11.  Ms. Allen proffers an opinion that the alleged misrepresentations and omissions had no impact on the price of Cabot stock. This opinion, however, is unsupported by Ms. Allen's analysis, and runs contrary to documentary evidence and the results of reliable analyses. Several of Ms. Allen's price impact arguments inappropriately rely on the assumption that Plaintiffs will not be able to prove their account of the facts and their allegation of liability in this case.

12.  Most of Ms. Allen's regression models are invalid and unreliable on account of her disregarding the presence and effects of heteroskedasticity, a complexity in the data that requires advanced regression analysis to correct. Ms. Allen made no correction for heteroskedasticity in her statistical analyses, rendering her methodology deficient and outside generally accepted scientific norms. Her statistical conclusions are consequently unreliable.[11] The Newey-West methodology that I applied in the Feinstein Report is well grounded in the statistics and econometric literature and is a valid approach for correcting heteroskedasticity, which is necessary in this case.[12]

13.  Ms. Allen's quantitative analysis suffers from numerous additional flaws and outright mistakes, making it unsound and unreliable. The host of errors in Ms. Allen's purported quantitative analysis include the following.

---

[11] See e.g., *Econometric Models, Techniques, & Applications*, by Michael Intriligator, Prentice-Hall, 1978, p. 156; and the additional sources cited in ¶¶29-31 below.

[12] See e.g., "Securities Litigation Event Studies in the Covid Volatility Regime," by Steven Feinstein and Miguel Villanueva, *Journal of Forensic Economics*, vol. 30, no. 1, 2022; and the discussion in ¶¶29-31 below.

3

i.   Ms. Allen failed to correctly remove the effects of Cabot stock returns from the market index in her regressions on Cabot stock.

ii.  Ms. Allen failed to correctly remove the effects of Cabot stock returns also from the peer index in her regressions on Cabot stock.

iii. Ms. Allen applied inconsistent treatments when constructing the market and peer indices for her regressions on Cabot stock and Range Resources. While she erred when attempting to remove Cabot from the market and peer indices, she did not even attempt to remove Range Resources from the market and peer indices in her Range Resources regressions, despite admitting that such removal is a necessary step.[13]

iv.  With no explanation or justification, Ms. Allen omitted two observation dates from each of her six regressions on Range Resources.[14]

v.   In one of Ms. Allen's Cabot stock regressions, she incorrectly entered that Cabot's stock price fell 76% on 29 November 2021, rather than entering the correct return of -0.76%. This error alone dramatically inflates the estimated background volatility to which Ms. Allen compares event returns.

vi.  Ms. Allen offers no explanation for her choice of regression estimation period for testing the alleged corrective disclosure on 15 June 2020.

14.  Drawing valid inferences from statistical analysis requires that the statistical analysis be conducted correctly and with care. The deficiencies and errors in Ms. Allen's purported analysis make her quantitative analysis unsound and thus uninformative. Given the number of errors I found in Ms. Allen's analysis, I cannot guarantee that I have found all of them. I do know that my analysis delivers qualitatively different results than does Ms. Allen's flawed analysis rife with errors.

---

[13] Allen Deposition at 207:18-208:7.

[14] The omitted dates are 14 October 2019 and 11 November 2019.

4

15. Notwithstanding the flaws in Ms. Allen's quantitative analysis, Ms. Allen and I agree that the Cabot stock price decline in response to the Company announcement on 26 July 2019, an event that Plaintiffs allege was a corrective disclosure, was statistically significant. Ms. Allen and I also agree that the significant stock price decline is attributable to the Company's disappointing guidance, i.e., lower expected production and higher capital expenditures.[15] However, without any independent analysis of her own, Ms. Allen maintains that the Company's disappointing guidance had nothing to do with Plaintiffs' allegations.[16] She conducts no economic analysis to support her opinion, and admits that she simply assumes that the Company's lower production guidance and higher capital expenditures were unrelated to the impact of remediating faulty gas wells.[17]

16. In short, with respect to the 26 July 2019 corrective disclosure, Ms. Allen simply assumes rather than proves her conclusion that there was no price impact.

17. With respect to 15 June 2020, Ms. Allen has no proof or any reliable basis to assume or conclude that the announcement of criminal charges that day did not impact the Cabot stock price. Contemporaneous documentary sources, financial principles, and sound statistical analysis establish otherwise.

18. Ms. Allen's finding that the Cabot stock price return on 15 June 2020 was not statistically significant at the 95% level is wrong. Ms. Allen's neglect of basic statistical principles, as I explain herein, render her regression analysis of 15 June 2020 unreliable and her conclusions erroneous. A regression estimation that appropriately considers and controls for heteroskedasticity proves that Cabot's negative residual return on 15 June 2020 is statistically significant. Moreover, several news articles and an analyst covering Cabot affirmatively attribute the 15 June 2020 Cabot stock price decline to the news of the

---

[15] Ms. Allen's observation of intraday Cabot stock price movements on 26 July 2019, and her cursory review of analyst reports are moot as we both agree that the significant price decline that day was precipitated by the pre-market announcement of disappointing guidance. However, Plaintiffs allege that the announced adverse developments resulted from conditions concealed by the misrepresentations and omissions, and the announcement was therefore a partially corrective disclosure. Ms. Allen assumes but does not prove that this was not the case.

That the price did not fall by a further statistically significant amount later in the day when the NOVs were disclosed does not prove that the NOVs were unimportant.

[16] "[Question]: So you assume plaintiff's allegations are correct in this case except for plaintiff's allegation that the change in guidance was corrective? [Answer]: That's right. That's right." (Allen Deposition at 70:21-25.)

[17] Allen Report, ¶29.

Pennsylvania Attorney General ("Pennsylvania AG") filing criminal charges against Cabot.

19.     Even if, arguendo, there were a valid justification for Ms. Allen's use of an ordinary-least-squares ("OLS") regression to analyze the 15 June 2020 stock return, which ignores heteroskedasticity, the nonsignificant result produced by her model is an indeterminate result, not affirmative proof of no price impact. As explained in the Feinstein Report and below, a finding of significance proves that the price was impacted by the information at issue, but a finding of nonsignificance does not prove the opposite. Believing otherwise is an example of the absence of evidence logical fallacy. Imprecise language[18] and unsubstantiated (in fact, false) claims of the generally accepted practice among economists[19] cannot erase the flawed logic underlying Ms. Allen's argument.

20.     Ms. Allen's price impact conclusion is especially specious in light of there being substantial evidence of price impact, notably, news media and analyst commentary, financial principles, and sound statistical analysis, which confirm that there was indeed price impact, and which she completely disregards. Running select tests that fail to prove price impact does not prove that there was no price impact, or even that there is no evidence of price impact, especially when there indeed is substantial evidence of price impact from other tests and documentation.

21.     In addition to purportedly examining corrective disclosure dates, Ms. Allen also runs event studies on misrepresentation and omission dates. Her finding that Cabot's stock price did not move by statistically significant amounts on eight of nine misrepresentation event dates does not prove that the alleged misrepresentations and omissions had no price impact. There are several reasons why a misstatement or omission may cause artificial inflation,

---

[18] "[Answer]: It's -- I think -- I think a lack of a statistically significant price reaction is -- is evidence that there is no price impact. And it is one definition of price impact that does it actually impact the price of formulated testing. [Question]: So I understand your testimony that that would be evidence of no price impact. But does it affirmatively prove no price impact? [Answer]: I -- you know, I am not sure what -- it depends on what your burden of proof is." (Allen Deposition at 84:10-20.)

[19] "[Answer]: And what most financial economists mean when they're saying that there -- that a price doesn't react or something didn't impact the stock price, that that is -- an event study is one way of testing that. So a lack of statistically significant reaction is what they mean by the -- is often what they mean by no price impact." (Allen Deposition at 91:3-10); "[Question]: So are you aware of any academic papers that stand for the following proposition: That the lack of a statistically significant price movement proves the absence of price impact? [Answer]: Yeah. I'm not sure. [Question]: So you are not aware of any? [Answer]: I don't know. I mean, I am not sure that I quite understand your question. And I am not sure -- yeah. I'm not sure." (Allen Deposition at 83:17-84:3.)

and hence have a price impact, but nonetheless not elicit a statistically significant price increase. Therefore, the lack of a statistically significant price increase when a misrepresentation is made does not prove that the misrepresentation had no price impact.

22. As detailed in the Feinstein Report, a misrepresentation or omission may have price impact and increase artificial inflation without causing a statistically significant stock price increase. This result can occur for a number of reasons, including: i) when there is a release of countervailing negative news at the time of the misrepresentation; ii) when the deception conceals new adverse conditions and thereby prevents an appropriate fall in stock price; iii) when the representation, though false, is consistent with the market's prior beliefs so that the mix of publicly available information has not materially changed; iv) when the elicited stock price decline is substantial but below the high threshold for statistical significance; or v) when the power of the applied statistical test is too weak to register the stock price increase as significant.

23. Once again, statistical significance can prove price impact, but nonsignificance does not prove there was no price impact. Believing otherwise is a logical and methodological error that pervades Ms. Allen's argument, report, and opinion. This error, and the incompleteness of Ms. Allen's analysis, whereby she ignores the valid statistical and documentary evidence establishing price impact, are responsible for Ms. Allen's erroneous conclusions and proffered opinion.

## III.   DEFINING AND ASSESSING PRICE IMPACT

24. The Supreme Court in *Halliburton II* held that defendants at the class certification stage may rebut the presumption of reliance "by showing that the alleged misrepresentation did not actually affect the stock price – that is, that it had no 'price impact.'"[20] From an economic perspective, a statement has price impact if it either i) causes the stock price to move, or ii) maintains the stock price at a level other than what it would be but for the statement.

---

[20] *Halliburton Co. v. Erica P. John Fund, Inc.*, 134 S. Ct. 2398, 2402 (2014) ("*Halliburton II*").

25. Price impact and price movement are not the same thing. Information that prevents a stock price decline has price impact even though there may be no movement in the stock price. Therefore, while a statistically significant positive price reaction in response to misrepresentations may demonstrate price impact, a nonsignificant reaction, or even no price movement at all, does not prove there was no price impact. False statements that are consistent with market expectations or that omit material negative information would generally not be expected to cause a contemporaneous, statistically significant price increase. Such statements would have price impact by preventing a stock price decline that would otherwise have occurred had the truth been disclosed.

26. The Feinstein Report noted that misrepresentations and omissions can have price impact not only by measurably increasing the stock price, but also by maintaining the stock price where it was, or even supporting the stock price so that it fell less than it otherwise would have but for the false and misleading statements.[21] This principle is also discussed in the professional literature:

> "Misrepresentations that falsely confirm market expectations will not lead to an *observable change in price*. But this does not mean they have no *price impact*. As the Second Circuit explained in *Vivendi*, 'a statement may cause inflation not simply by *adding* it to a stock, but by maintaining it.' The relevant price impact is simply counterfactual: the price would have fallen had there not been fraud."
> **"The Logic and Limits of Event Studies in Securities Fraud Litigation," by Jill Fisch et al., *Texas Law Review*, vol. 96, 2018, pp. 564-565 (emphasis in original).**

## IV.    CRITIQUE OF ALLEN REPORT

### A.    Ms. Allen's Event Study Analysis is Flawed and Unreliable

27. In an attempt to support her opinion about price impact, Ms. Allen ran 25 different regression specifications. During her deposition, however, she stated she was unaware that she did so.[22] According to her report, Ms. Allen wished to establish with these regressions

---

[21] Feinstein Report, ¶¶122-123.

[22] When asked during her deposition whether she ran 25 different regressions, Ms. Allen said that it did not sound right. "[Question]: So, in total, do you recall how many regressions -- different regressions you ran? [Answer]: Well, I would have to run a different regression for each time period. No. I could try to count up, but I don't know. [Question]: Does 25 sound about right? [Answer]: No. It doesn't really. I wouldn't -- but not that I recall, no." (Allen Deposition at 160:23-161:5.)

that the misrepresentations did not elicit statistically significant price increases, that the 15 June 2020 corrective disclosure did not elicit a statistically significant decline, and the stock price of another firm (Range Resources) did not react statistically significantly when that firm received criminal charges.

28.    However, Ms. Allen's regressions suffer from numerous methodological and implementation flaws, rendering her findings unreliable and her conclusions incorrect. The logic underlying her approach is also faulty.

### 1.    Heteroskedasticity Renders Ms. Allen's Event Study Results Flawed and Unreliable

29.    A prerequisite condition for valid OLS regression analysis[23] is that the residual returns (the returns after controlling or market and sector effects) have the same volatility throughout the entire estimation period. This condition is known as homoskedasticity. If residual return volatility is not constant (i.e., heteroskedastic), more advanced regression analysis is required to account for this data complexity in order to arrive at valid conclusions.[24]

30.    In the Feinstein Report, I noted that in the instant matter, the Class Period spans the start of the Covid-19 pandemic (30 January 2020), during which many stocks began to exhibit elevated volatility.[25,26] I explained in the Feinstein Report that regressions during the Class Period would therefore likely exhibit heteroskedasticity and other econometric issues.[27]

---

[23] OLS regression analysis is the simplest type of regression analysis, the type Ms. Allen used.

[24] *Econometric Models, Techniques, & Applications*, by Michael Intriligator, Prentice-Hall, 1978, p. 156; Quantitative Methods and Economics, Level 2 Curriculum, CFA Institute, 2022, pp. 92-93.

[25] "Securities Litigation Event Studies in the Covid Volatility Regime," by Steven Feinstein and Miguel Villanueva, *Journal of Forensic Economics*, vol. 30, no. 1, 2022.

[26] On 30 January 2020, the Director-General of the World Health Organization declared the novel coronavirus outbreak a Public Health Emergency of International Concern. "WHO Director-General's statement on IHR Emergency Committee on Novel Coronavirus (2019-nCoV)," speech transcript, World Health Organization, 30 January 2020, https://www.who.int/director-general/speeches/detail/who-director-general-s-statement-on-ihr-emergency-committee-on-novel-coronavirus-(2019-ncov); and "Statement on the second meeting of the International Health Regulations (2005) Emergency Committee regarding the outbreak of novel coronavirus (2019-nCoV)," World Health Organization, 30 January 2020, https://www.who.int/news/item/30-01-2020-statement-on-the-second-meeting-of-the-international-health-regulations-(2005)-emergency-committee-regarding-the-outbreak-of-novel-coronavirus-(2019-ncov).

[27] Feinstein Report, ¶139.

31.   With heteroskedasticity in the data the necessary assumptions for the reliability of the regression and statistical analysis are not met. When that is the case, reliable inferences cannot be drawn unless corrections for the heteroskedasticity are applied. That is, further analysis is required in order to be able to draw reliable conclusions. Nowhere in the Allen Report, or in the backup materials she produced, did Ms. Allen even test for heteroskedasticity, let alone correct for it. In her deposition Ms. Allen admitted that she did not test for heteroskedasticity.[28] She also could not name a test that one could use.[29] Despite the proof in the Feinstein Report that heteroskedasticity was present,[30] and the application of the Newey-West procedure to correct for it in my regressions, Ms. Allen neglected to consider heteroskedasticity.

32.   NERA, the firm at which Ms. Allen is a Managing Director, recognizes that heteroskedasticity "would result in a non-normal distribution of the coefficient estimates," and endorses "adjusting the standard errors of the significance test, like those proposed by Newey and West (1987) … ."[31] That is, NERA acknowledges that heteroskedasticity is a problem that needs to be corrected in econometric work, and directs one to use the very correction I applied. Fundamental principles of statistics dictate that uncorrected heteroskedasticity in regression analysis produces unreliable conclusions.

> "The problem of heteroskedasticity arises when the assumption of homoskedasticity – that the variances of the stochastic disturbance term [the residuals] are finite and constant over the sample – is not met. … Heteroskedasticity has two important implications for estimation. The first is that the least-squares estimators, while still linear and unbiased (in the case of finite but differing variances), are no longer efficient, no longer providing minimum-variance ('best') estimators among the class of linear unbiased estimators. The second implication is that ***the estimated variances***

---

[28] "[Question]: Do you know if heteroscedasticity was, in fact, present during the Class Period? [Answer]: I don't believe I did any tests of it; so I didn't." (Allen Deposition at 113:19-22.)

[29] "[Question]: And so what are the tests that you can use to identify the presence of heteroscedasticity? [Answer]: There are -- there are different -- there are different tests. [Question]: What are they? [Answer]: I don't -- it depends on different contexts. And, you know, there are -- there are a number of different tests. [Question]: What are the tests in the different context? [Answer]: I wouldn't -- I would -- I don't know if I can say them off the top of my head. So yeah." (Allen Deposition at 109:6-17.)

[30] Feinstein Report, ¶¶139-141.

[31] "Response to Provisional Findings – Critique of CMA Analysis of Retail Price Increase of Durex Play Products," by Frank Maier-Rigaud and Felix Forster, *NERA*, 16 June 2015, pp. 12-13.

*of the least-squares estimators are biased, so the usual test of statistical significance, such as the t or F tests of the last chapter, are no longer of value*. It is thus important to test for and correct possible heteroskedasticity."
***Econometric Models, Techniques, & Applications*, by Michael Intriligator, Prentice-Hall, 1978, p. 156 (emphasis added).**

"The variation in the difference between the actual and the predicted values is the same for all fitted values of $Y$. That is, $(Y - Y')$ must be approximately the same for all values of $Y'$. When this is the case, differences exhibit homoscedasticity."
***Statistical Techniques in Business and Economics*, by Robert D. Mason, Douglas A. Lind, and William G. Marchal, Irwin/McGraw-Hill, 10th edition, 1999, p. 475.**

"The assumptions for regression analysis also require that the residuals remain constant for all values of $Y'$. Recall that this condition is called homoscedasticity."
***Statistical Techniques in Business and Economics*, by Robert D. Mason, Douglas A. Lind, and William G. Marchal, Irwin/McGraw-Hill, 10th edition, 1999, p. 487.**

33.    The CFA Institute, the premier professional organization for financial analysts, similarly warns that "t-tests for the significance of individual regression coefficients are unreliable" when heteroskedasticity is present.[32] This admonition is directed exactly at the same statistical *t*-test that Ms. Allen used to arrive at her (erroneous) conclusions.

"What are the consequences when the assumption of constant error variance is violated? Although heteroskedasticity does not affect the consistency of the regression parameter estimators, it can lead to mistakes in inference. When errors are heteroskedastic, the $F$-test for the overall significance of ***the regression is unreliable. Furthermore, t-tests for the significance of individual regression coefficients are unreliable because heteroskedasticity introduces bias into estimators of the standard error of regression coefficients***. If a regression shows significant heteroskedasticity, the standard errors and test statistics computed by regression programs will be incorrect unless they are adjusted for heteroskedasticity."
***Quantitative Methods and Economics*, Level 2 Curriculum, CFA Institute, 2022, pp. 92-93 (emphasis added).**

---

[32] *Quantitative Methods and Economics*, Level 2 Curriculum, CFA Institute, 2022, pp. 92-93.

34.     The literature on heteroskedasticity lists various tests that can be run to determine whether heteroskedasticity is present to any appreciable degree.[33] The White Test is a generally accepted diagnostic test that is commonly used for this purpose.[34] NERA has implemented and relied on the results of the White Test to detect heteroskedasticity, multiple times.[35] In her deposition, Ms. Allen stated that the White Test can be used to test for heteroskedasticity and that she would not be surprised to learn that NERA has used the White Test for that purpose.

> "[Question]: Have you ever heard of the White tests for testing for the presence of heteroscedasticity?
>
> [Answer]: I have heard of a White test.
>
> [Question]: Have you heard of the White test for testing specifically for the presence of heteroscedasticity?
>
> [Answer]: I think that is the -- I think I have only heard of one White test, and I think it is a test of heteroscedasticity but... That's my recollection.
>
> [Question]: Are you aware of any instances of NERA using the White test to find the presence of heteroscedasticity?
>
> [Answer]: Not -- not off the top of my head, but I wouldn't be surprised."
> **Allen Deposition at 113:23-114:12.**

35.     As presented in Table-1, I ran the White Test on each of the 25 regressions run by Ms. Allen. As shown below, the White Test found statistically significant levels of heteroskedasticity (indicated by a p-value surpassing the 95% confidence threshold) in 19 of the 25 regressions.

---

[33] Chapter 8 of *A Guide to Econometrics*, by Peter Kennedy, 6th edition, Blackwell Publishing, 2008.

[34] "A Heteroskedasticity-Consistent Covariance Matrix Estimator and a Direct Test for Heteroskedasticity," by Halbert White, *Econometrica*, May 1980, vol. 48, no. 4, pp. 817-38; and *A Guide to Econometrics*, by Peter Kennedy, 6th edition, Blackwell Publishing, 2008, p. 117.

[35] "Response to Provisional Findings – Critique of CMA Analysis of Retail Price Increase of Durex Play Products," by Frank Maier-Rigaud and Felix Forster, *NERA*, 16 June 2015, pp. 12-13; and "The Evidence for Differences in Risk for Fixed vs Mobile Telecoms," by Richard Hern et al., *NERA*, November 2017, p. 18.

36.    As a result of the statistically significant heteroskedasticity in most of the regression models employed by Ms. Allen, her event study tests are invalid. They cannot reliably determine whether the stock return on any particular event date was statistically significant.

**Table-1: Heteroskedasticity Test Results Using Ms. Allen's Incorrect Market and Peer Indices**

| Ms. Allen's Regression No.[1] | Test Date | White Test P-Value | Stat. Sig. Heteroskedasticity at the 95% Confidence Level? |
|---|---|---|---|
| Reg1 | 6/15/2020 | 0.00% | Yes |
| Reg2 | 6/15/2020 | 0.00% | Yes |
| Reg3 | 6/15/2020 | 0.00% | Yes |
| Reg4 | 6/15/2020 | 0.00% | Yes |
| Reg5 | 6/15/2020 | 0.00% | Yes |
| Reg6 | 6/15/2020 | 6.30% | |
| Reg7 | 6/15/2020 | 9.07% | |
| Reg8 | 6/15/2020 | 1.20% | Yes |
| Reg9 | 2/22/2016 | 0.86% | Yes |
| Reg10 | 5/3/2016 | 2.91% | Yes |
| Reg11 | 7/29/2016 | 6.97% | |
| Reg12 | 10/28/2016 | 0.90% | Yes |
| Reg13 | 2/27/2017 | 0.00% | Yes |
| Reg14 | 7/26/2019 | 55.26% | |
| Reg15 | 10/25/2019 | 1.11% | Yes |
| Reg16 | 2/25/2020 | 0.09% | Yes |
| Reg17 | 5/1/2020 | 0.00% | Yes |
| Reg18 | 6/12/2020 | 0.00% | Yes |
| Reg19 | 6/12/2020 | 0.00% | Yes |
| Reg20 | 6/12/2020 | 0.00% | Yes |
| Reg21 | 6/15/2020 | 0.00% | Yes |
| Reg22 | 6/15/2020 | 0.00% | Yes |
| Reg23 | 6/15/2020 | 0.00% | Yes |
| Reg24 | 11/29/2022 | 93.34% | |
| Reg25 | 11/30/2022 | 27.51% | |

Shading indicates regressions with Range Resources as the dependent variable. Allen's Range Resources regressions inexplicably omitted two trading days (10/14/2019 & 11/11/2019), I recreated the regressions without correcting this error.
[1] The underlying regression models obtained from Allen Production "3 xlsx"

13

### 2. Mistakes in Ms. Allen's Construction of the Market Index and Peer Index

37. Another mistake in Ms. Allen's regressions stems from incorrect construction of the market and peer indices that she uses to control for market and sector effects. In attempting to replicate Ms. Allen's econometrics, I identified a mathematical error in her construction of what she labels the "S&P 500 Index (excluding Cabot)" (henceforth termed herein the "Allen Market Index"). The same mistake appears in Ms. Allen's construction of the peer index she uses, which she calls the "S&P Oil & Gas Exploration & Production Select Industry Index (also excluding Cabot)" (henceforth termed herein the "Allen Peer Index").[36] The reason for removing the subject stock from an exogenous explanatory index is to preclude the simultaneity problem, wherein Cabot's stock movements would both cause and be caused by movements in the overall stock market index and Cabot's sector peer index. The proper way to factor out a constituent from an index is to apply for each day an adjustment for the subject company's stock price movement that day, multiplied by the weight of the subject company in the index as of the prior day, as the market prepared to enter the next day. Ms. Allen incorrectly used Cabot's index weights from the wrong day when making this adjustment, thereby incorrectly measuring how much influence Cabot had on the market and sector indices. Ms. Allen's attempt to correct the indices by removing Cabot speaks to her appreciation of the importance of this step. Nonetheless, she executed it incorrectly.

### 3. Flawed Comparison to Range Resources and Mistakes in Ms. Allen's Range Resources Regressions

38. In an attempt to show that the criminal charges brought against Cabot were not economically material and that investors would not react negatively to criminal charges against the Company, Ms. Allen directed attention to one of Cabot's peer companies, Range Resources, which also had criminal charges brought against it.[37]

---

[36] Allen Report, ¶43.

[37] Allen Report, ¶¶62-63.

39.   As an initial matter, Ms. Allen's approach is incomplete, if not completely misguided, as she does not account for the differences between the two companies, nor does she control for the many factors that differentiate the charges brought. Ms. Allen contends that the charges brought against the two companies were "similar",[38] but Range Resources was ultimately fined $150,000 for these charges, while Cabot ultimately paid $16.29 million, underscoring the differences between the companies and the seriousness of the matter for the two respective companies.

40.   In addition to the flaws in the overall comparison methodology, Ms. Allen made numerous mistakes in its implementation.

a.      Ms. Allen Did Not Remove Range Resources from Her Peer Index

41.   While Ms. Allen thought it necessary to remove Cabot from the peer index when running the event study focused on Cabot (albeit incorrectly), she did not undertake to perform the same correction in her event study focused on Range Resources. That is, Ms. Allen did not even try to remove Range Resources from the Dow Jones U.S. Exploration and Production Index when constructing a peer index for use in her Range Resources event studies.[39] Ms. Allen gives no explanation for the inconsistencies in her analysis. This appears to be another error.

42.   In her deposition, Ms. Allen could not recall whether she removed Range Resources from the peer index, nor was she even aware whether Range Resources was a constituent of the Dow Jones U.S. Exploration and Production Index.

> "[Question]: So you can't recall Range Resources was removed from the industry index with the Range Resource regressions?
>
> [Answer]: I don't recall. So as we just went over, we saw that we did quite a few alternatives of the Range Resources using alternative indices. I'm trying to find that footnote. And I don't know which, if any, of the indices Range Resources itself is actually in."
> **Allen Deposition at 212:8-13.**

---

[38] Allen Report, ¶62.

[39] According to Bloomberg, the same source that Ms. Allen used to obtain Cabot's index weights, Range Resources was in the Dow Jones U.S. Exploration and Production Index throughout all of her regression estimation periods for Range Resources.

15

43.    Failing to remove Range Resources from the peer index renders Ms. Allen's Range Resources event study flawed, as the regression does not account for the simultaneity of Range Resources returns on the index. Ms. Allen admitted in her deposition that the index without the subject company removed is a poor control for industry factors, and that this oversight may disrupt event study results.

> "[Question]: So it's standard practice or it's good practice to remove the company from the index?
>
> [Answer]: That's right. If that's what -- if you are trying to predict what would happen to Cabot on a given day, knowing what happened to the industry on that day, if you actually have what Cabot did that day in the industry, then you -- you are, in fact, already including partly what happened, right. So...
>
> [Question]: Okay.
>
> [Answer]: It's not a -- it's not a good control. You are trying to use a control. Right. And you are not -- you are not fully controlling. You have actually -- you have actually concluded some of what you are trying to -- to capture."
> **Allen Deposition at 211:7-21.**

b.    Ms. Allen Inexplicably Omitted Two Observation Dates from Her Range Resources Regressions

44.    In addition to the above flaws and mistakes in her regressions, Ms. Allen inexplicably omitted (or removed) two dates from the Range Resources regression estimation periods.[40] The two trading dates she omitted (or removed) are 14 October 2019 and 11 November 2019. In her deposition, Ms. Allen admitted that omitting dates from a regression is not standard practice and that it would not make "a lot of sense to just erase a day."

> "[Question]: And so if there were full days of trading on October 14th and November 11th, 2019, should those dates have been included in your regressions?
>
> [Answer]: If they were full days of trading?
>
> [Question]: Yes.

---

[40] "[Question]: So do you have an explanation of why October 14th, 2019, and November 11th, 2019, were not included in these regressions? [Answer]: I don't know." (Allen Deposition at 201:19-202:6.)

[Answer]: Well, then I'm not sure why they wouldn't be -- yeah, I just don't -- I don't know the answer. I don't why the -- I mean, sort of all things equal, it doesn't make a lot of sense to just erase a day but to download the available price and return date and use that is certainly standard practice. So I just don't know what -- I do not recall what, if anything, happened on those days."
**Allen Deposition at 203:5-17.**

### 4.    Ms. Allen Included an Erroneous Return Observation in One of Her Event Studies

45.    Ms. Allen asserts that "there was no statistically significant stock price reaction to Coterra's stock price following the announcement" of fines in connection with the criminal charges on 29 November 2022.[41] However, Ms. Allen entered an inaccurate stock return into the data she used for this event study regression. According to Ms. Allen's data, Cabot's stock fell 76.2% on 29 November 2021, but it did not.[42] The stock fell only 0.762%. This data error dramatically inflates the estimated background volatility to which Ms. Allen compares the subject event return.

46.    When asked about the data error during her deposition, Ms. Allen offered no coherent explanation.

"[Question]: That wouldn't be a reasonable return; right?

[Answer]: Well, it could be 76 percent return.

[Question]: Do you know if that's correct?

[Answer]: No. I don't think it is. I don't think it's a 76 percent return, but I don't know. I don't see the price before.

[Question]: And do you know what the actual return as a percentage was?

---

[41] Allen Report, ¶64.

[42] Allen Production, "3.xlsx," sheet "Reg24", cell C3.

17

[Answer]: I don't know. I don't know what the price was the day before. I don't know what the price was on the 11 -- you know, whatever the trading day is before, 11/29/2021."
**Allen Deposition at 185:11-23.**

"[Question]: And is that how the software formula would work in this regression for the company return?

[Answer]: Yeah. I don't -- I don't know -- I don't what -- I don't know why that says -- I don't why that says $0.76. I just don't know."
**Allen Deposition at 188:18-22.**

47.    During her deposition, Ms. Allen would not admit that the 76% return was an error.

"[Question]: Okay. So can we agree that the -- it being expressed as $0.76 isn't correct within this regression?

[Answer]: No. I don't know. I don't know why it says -- I don't know why that says 76 in cents. So I just don't know. …"
**Allen Deposition at 188:23-189:8.**

48.    Using Ms. Allen's flawed regression specification and her incorrect data, a residual return for Cabot stock (the return after controlling for market and sector factors) would need to be outside the range of $\pm 10.2\%$ in order to be deemed statistically significant (equal to the her estimated 5.22% standard error of the regression multiplied by 1.96).[43] After correcting for just this one error, the standard error of the regression falls to 1.85%, meaning that the estimated thresholds for statistical significance fall to $\pm 3.63\%$ (equal to a 1.85% standard error of the regression times 1.96). Given the number of errors I found in Ms. Allen's work, I cannot guarantee that I have found them all. This one error, however, dramatically biases Ms. Allen's results toward findings of event nonsignificance.

---

[43] Importantly, according to Ms. Allen's incorrect regression estimation and using the correct daily price returns, there are no residual returns with an absolute value greater than 6.49% during the period 29 November 2021 through 28 November 2022.

18

**B.    Ms. Allen's Analysis of the 26 July 2019 Disclosure is Flawed and Her Conclusion of No Price Impact is Erroneous**

49.    Ms. Allen concedes that the Cabot stock decline following the 26 July 2019 alleged corrective disclosure is statistically significant.[44] She concurs with Plaintiffs that prior to the start of trading on 26 July 2019, Cabot released 2Q19 financial results, reduced its production guidance for the remainder of FY2019, and increased its capital expenditures ("CapEx") guidance for 2019.[45]

50.    Ms. Allen nonetheless contends the adverse announcement on 26 July 2019 was not a corrective disclosure. She reaches this conclusion by assuming, not by proving, that the negative news had nothing to do with the alleged misrepresentations and omissions. Ms. Allen's analysis of this corrective disclosure is incomplete and flawed, and does not prove that the disclosures on 26 July 2019 had no impact on the price of Cabot stock.

**1.    Ms. Allen Agrees that the Disappointing Production and CapEx Guidance Caused a Statistically Significant Price Decline on 26 July 2019**

51.    Ms. Allen and I agree that the Company's lower production and CapEx Guidance caused the statistically significant decline in Cabot's stock on 26 July 2019. Ms. Allen notes that "all analysts covering Cabot discussed and highlighted Cabot's new guidance announced before the market open on the same date and noted that the new guidance was negative news to Cabot."[46] Ms. Allen notes that analysts attributed Cabot's stock price decline to the lower production and higher CapEx guidance.[47]

52.    As shown in the Feinstein Report, Cabot stock declined 12.86% (on a logarithmic basis) on 26 July 2019, from $21.79 at the close of trading on 25 July 2019, to $19.16 at the close of trading on 26 July 2019.[48] After adjusting for market, sector, and natural gas factors, the

---

[44] Allen Deposition at 125:19-25.

[45] Allen Report, ¶32.

[46] Allen Report, ¶35.

[47] Allen Report, ¶36.

[48] Feinstein Report, Exhibit-9.

residual return of Cabot stock on 26 July 2019 was -12.91%, which was statistically significant at the 95% confidence level.[49]

53.    Ms. Allen accepts that the Cabot stock residual return on 26 July 2019 was indeed statistically significant at a high confidence level.[50] This fact, accepted by Ms. Allen, proves that the information in that day's disclosures had price impact. The connection by Plaintiffs of that information to the alleged misrepresentations and omissions, which Ms. Allen does not independently dispute, establishes price impact.

### 2.    Ms. Allen's 26 July 2019 Price Impact Argument Founders Because it is Based on an Assumption at Odds with Plaintiffs' Allegations

54.    As explained in the Feinstein Report, Plaintiffs contend that investors partially learned the truth concerning Defendants' material misrepresentations and omissions on 26 July 2019, when the Company announced earnings results for the second quarter of FY 2019. Specifically, the Complaint alleges:

> "A partial disclosure relating to Cabot's failure to remediate the faulty oil wells entered the market on July 26, 2019, when Cabot issued disappointing production guidance and disclosed that it had received two proposed Consent Order and Agreements from the Pennsylvania Department 'relating to gas migration allegations in areas surrounding several wells owned and operated by us in Susquehanna County, Pennsylvania.' Defendants further disclosed the Consent Order and Agreements related to Notices of Violation received from the Pennsylvania Department nearly two years earlier – in November 2017 – 'for failure to prevent the migration of gas into fresh groundwater sources in the area surrounding these wells.'
>
> Cabot's production guidance had been negatively impacted by the Company's inability to resume drilling in the Dimock Box, located in Cabot's 'core area' – the Company's best acreage producing Cabot's highest quality gas – due to ongoing violations. For example, the Pennsylvania Department denied Cabot's request to resume drilling in the June 2018 Letter because of the Company's failure to remediate longstanding violations. Cabot would go on to later disclose a reduction in production guidance in Q2 2020 caused by the impact of remediation on a large well pad that caused work downtime.

---

[49] Feinstein Report, Exhibit-9.

[50] Allen Report, ¶43; Allen Production, "3.xlsx," sheet "Reg14."

20

> As a result of the July 26, 2019 partial disclosure, the price of Cabot stock declined 12% on volume of more than 22.6 million shares to close at $19.16 per share on July 26, 2019."
> **Complaint, ¶¶258-260.**

55. The Company announced bad production guidance, and Plaintiffs contend the bad guidance was due to conditions previously concealed by the misrepresentations and omissions. Thus, the announcement was a partially corrective disclosure.

56. I understand that the Court addressed this issue at the motion to dismiss stage and concluded that the Plaintiffs' "have adequately alleged two corrective disclosures. The 2019 disclosure that Cabot was still working on remediating the issues in 2017 Notices of Violation, along with the fact that it had disappointing production because it was not permitted to drill in the Dimock Box, were relevant to Cabot's previous misrepresentations that it had remediated violations identified in 2015 and 2016."[51]

57. Rather than accepting Plaintiffs' factual allegations as working assumptions, as is appropriate for a forensic finance expert assessing the price impact of alleged misrepresentations and omissions, Ms. Allen rejects Plaintiffs' alleged connection between the adverse disclosure and the prior alleged misrepresentations and omissions. Critically, her rejection of the connection is not based on any independent economic analysis, but rather on instructions from Defense counsel. Ms. Allen states that she was "asked to assume that the facts asserted in the Declaration of Scott C. Schroeder and the Declaration of John Smelko are true and correct."[52]

58. Based only on assumption and acceptance of the opinion of others, Ms. Allen asserts that "Cabot's new guidance could not in fact be corrective of the alleged misrepresentations because the changes in guidance were ***completely*** unrelated to the alleged environmental violations at any of the wells that the alleged misrepresentations pertained to … ."[53]

---

[51] MTD Order, p. 42.

[52] Allen Report, ¶1.

[53] Allen Report, ¶29 (emphasis added).

59.    Ms. Allen assumes rather corroborates with her own analysis Defendants' legal and factual arguments that the Company's revised guidance on 26 July 2019 was not corrective of Plaintiffs' allegations. She assumes, rather than corroborates with her own analysis, Defendants' position that Plaintiffs' allegations with respect to 26 July 2019 are meritless.[54]

60.    In deposition, Ms. Allen confirmed that she assumed rather than concluded from economic analysis this key point. She testified that for purposes of her analysis she was asked to assume that the guidance was not corrective of Plaintiffs' allegations.

> "[Answer]: But I have been asked to assume, consistent with the declarations from the two company representatives, that the guidance is unrelated -- the change in guidance is unrelated to the alleged misrepresentations. … I have assumed that the guidance is unrelated. The reduction in guidance that was announced on July 26th, 2019, is unrelated to the alleged misrepresentations.
>
> [Question]: And you assumed that because counsel asked you to do so?
>
> [Answer]: That's correct."
> **Allen Deposition at 74:6-23.**

### C.    Ms. Allen's Analysis of the 15 June 2020 Disclosure is Flawed and Her Conclusion of No Price Impact is Erroneous

61.    On 15 June 2020, the Pennsylvania Attorney General's Office announced criminal charges against Cabot for failure to remediate faulty gas wells. This announcement was new news to investors. Plaintiffs contend that the announcement finally informed investors about conditions that were previously misrepresented or concealed. Plaintiffs write:

> "Then, before the market opened on June 15, 2020, following the two-year Grand Jury investigation, the Pennsylvania Attorney General's office charged Cabot with fifteen criminal counts – including nine felonies – arising from its failure to remediate faulty gas wells, thereby polluting Pennsylvania's water supplies through stray gas migration. The Grand Jury report noted the Company's 'long-term indifference' to the damage it caused to Pennsylvania water supplies. The Grand Jury presentment continued: 'We find that, over a period of many years, and despite mounting evidence, Cabot Oil & Gas failed to acknowledge and correct conduct that polluted Pennsylvania water through stray gas migration. Indeed, some of

---

[54] Defendants' Response In Opposition to Class Certification, dated 21 January 2023, p. 6 & p. 10; and Allen Report, ¶¶1 and 29.

22

these gas wells have been in place for more than a decade, yet Cabot has only recently taken steps to remediate them.' In announcing the charge, Attorney General Shapiro stated: 'Cabot took shortcuts that broke the law, damaged our environment, harming our water supplies and endangering Pennsylvanians. They put their bottom line ahead of the health and safety of our neighbors.'"
**Complaint, ¶¶262-263.**

62. Ms. Allen levies three attacks on the 15 June 2020 corrective disclosure, all of which fail: (i) she argues that the criminal charges had nothing to do with any prior misrepresentations and omissions; (ii) Ms. Allen erroneously contends that the 15 June 2020 announcement did not elicit a statistically significant stock price decline; and, (iii) Ms. Allen erroneously contends that news sources and equity analysts did not attribute any stock price decline to the announcement of criminal charges.

**1.    Ms. Allen's Opinion is Not a Conclusion From Economic Analysis That the Misrepresentations Had No Price Impact, But Rather a Merits Argument That There Were No Misrepresentations**

63. Plaintiffs allege that Defendants made misrepresentations and omissions that misled the market about the remediation of faulty gas wells.[55] Plaintiffs contend that the criminal charges about the neglected remediation of faulty gas wells informed the market that conditions were not what they had been represented to be.[56] Ms. Allen disagrees and offers the non-economic opinion that the criminal charges did correct any market misperception stemming from the alleged misrepresentations and omissions. This opinion strains logical credulity and is unsupported by any economic analysis.

64. With respect to the 15 June 2020 disclosure, Ms. Allen contends that "the majority (if not all) of the June 15, 2020 disclosure could not be attributed to the alleged misrepresentations. As the table above shows, 14 out of the 25 wells charged in the AG Presentment did not even correspond to any of the alleged misrepresentations, and for wells

---

[55] Complaint, ¶¶262-263.

[56] Complaint, ¶¶262-263.

23

that actually correspond to the alleged misrepresentations … ."[57] Ms. Allen's opinion simply presumes Plaintiffs' allegations to be meritless.[58]

65.    Rather than accepting Plaintiffs' factual narrative that the criminal charges related to the alleged misrepresentations and omissions, and conducting economic analysis to determine whether the disclosure impacted the Cabot stock price, Ms. Allen disputes the factual narrative that the disclosure related to any prior misrepresentation or omission. In doing so, Ms. Allen also rejects the Court's ruling in the instant matter that "the 2020 disclosure of the grand jury investigation and the criminal charges is relevant to the prior misrepresentations about remediation in the Dimock Box."[59]

66.    To offer this opinion, Ms. Allen steps outside the role of an economics expert and attempts to proffer an opinion more fitting of a fact witness or even the trier of fact. Her opinion is not supported by any economic analysis.

### 2.    15 June 2020 is Statistically Significant Using a Correct Regression Specification

67.    Based on her faulty econometrics, which neither controls for heteroskedasticity nor compares the residual return to an appropriate control sample, Ms. Allen mistakenly derives a result that the Cabot stock price decline on 15 June 2020 was not statistically significant. She further errs by offering that the indeterminate result of nonsignificance is proof that the information released on 15 June 2020 had no effect on the Cabot stock price.

68.    Ms. Allen is doubly wrong. First, Cabot stock declined 3.40% on 15 June 2020 (on a logarithmic basis). After removing the effects of market and sector movements that day, the Company-specific residual return was -4.35%. Correct econometrics that corrects for heteroskedasticity and compares this Covid period residual stock return to other Covid period residual stock returns finds that this residual return was statistically significant at the 95% confidence level.[60]

---

[57] Allen Report, ¶41.

[58] Defendants' Response In Opposition to Class Certification, dated 21 January 2023, p. 11; and Allen Report, ¶40.

[59] MTD Order, p. 42.

[60] The details of the proper econometric methodology were explained in the Feinstein Report, ¶¶137-141.

69. The second reason why Ms. Allen's opinion is erroneous is that it rests on a foundation of faulty logic. A nonsignificant return does not prove that the Company-specific information had no price impact. A statistically significant return on an information event date proves that Company-specific information impacted the stock price, but nonsignificance does not prove the opposite. A nonsignificant return may also have been caused by the Company information. A finding of nonsignificance is an indeterminate result that neither proves nor disproves price impact. Ms. Allen acknowledged this principle of statistics in her deposition (that nonsignificance does not prove no price impact),[61] but nonetheless disregarded to arrive at her erroneous opinion.

### 3. Ms. Allen Overlooks that the News Media and An Analyst Discussed the Criminal Charges and Acknowledged Its Negative Impact on the Cabot Stock Price

70. Ms. Allen contends that no analyst discussed the 15 June 2020 announcement of criminal charges, and that this purported dearth of coverage proves the announcement was immaterial.[62] But Ms. Allen is mistaken.

71. Ms. Allen missed that on 15 June 2020, a news media article reported that a KeyBanc analyst attributed the Cabot stock price decline to the announcement of criminal charges against Cabot.

> "KeyBanc analyst Leo Mariani expects a 'slightly negative' reaction today in shares of Cabot Oil & Gas after Pennsylvania Attorney General Josh Shapiro announced that his office is formally charging the company with 15 criminal counts of various environmental charges that could result in total fines ranging from $375,000-$750,000. The stock in afternoon trading is down 4% to $19.30."
> **"KeyBanc Sees 'Slightly Negative' Reaction In Cabot Shares From Suit,"** *theflyonthewall.com*, **15 June 2020.**

72. This news article was listed in Appendix B in the Allen Report, which listed the "Materials Considered" by Ms. Allen.[63]

---

[61] Allen Deposition at 84:15-85:2.

[62] Allen Report, ¶¶54-56.

[63] Allen Report, Appendix B.

25

73. Not only did at least one analyst conclude and report that the Pennsylvania AG filing criminal charges against Cabot had a negative impact on the Cabot stock price, but other articles in the financial press also linked Cabot's stock price decline to this news. Two news articles published on *Bloomberg* linked the stock price decline to the Pennsylvania AG filing criminal charges against Cabot. Bloomberg published a headline titled "Cabot Oil Drops Quickly After Pennsylvania AG Allegations."[64] Another article published on *Bloomberg*, by *Bloomberg* reporter Jim Silver, reported that "Pennsylvania Attorney General Josh Shapiro says his office is formally charging Cabot Oil & Gas for environmental crimes in the northeastern part of the state. The charges result from a two-year grand jury investigation, Shapiro said. ***Cabot shares fall as much as 4.6%***."[65]

74. In addition, a report published on *Seeking Alpha* noted that "***Cabot Oil & Gas (COG -4.5%) dips deeply into the red after the Pennsylvania Attorney General's office formally charges the company for environmental crimes in the state.***"[66]

> "***Cabot Oil & Gas (COG -4.5%) dips deeply into the red after the Pennsylvania Attorney General's office formally charges the company for environmental crimes in the state.*** The charges follow a grand jury investigation that found the company failed to fix faulty gas wells in Dimock and surrounding communities that leaked methane into residential water supplies. The Pennsylvania AG charges Cabot with a total of 15 criminal counts, including illegal discharge of industrial wastes and unlawful conduct under the state's Clean Streams Law; maximum fines are $50K or $25K, depending on the count. The company has said the gas in Dimock's aquifer is naturally occurring, saying its pre-drill testing of thousands of private water wells in the area show a high percentage with methane."
>
> **"Cabot Oil & Gas Charged Over Pennsylvania Contamination," by Carl Surran, *SeekingAlpha*, 15 June 2020 (emphasis added).**

---

[64] "Cabot Oil Drops Quickly After Pennsylvania AG Allegations," *Bloomberg*, 15 June 2020.

[65] "Cabot Oil & Gas Charged With Environmental Crimes, Penn. AG Says," by Jim Silver, *Bloomberg*, 15 June 2020 (emphasis added).

[66] "Cabot Oil & Gas Charged Over Pennsylvania Contamination," by Carl Surran, *SeekingAlpha*, 15 June 2020 (emphasis added).

75.  Though *Seeking Alpha* reports are not authored by traditional sell-side analyst firms, they are informative, publicly available, widely disseminated, and contain influential buy/sell recommendations. Published peer-reviewed research has concluded that reports disseminated on internet platforms, *Seeking Alpha* in particular, are influential and useful to investors, providing valuation-relevant information.[67]

76.  Ms. Allen's conclusion that there was no news media or analyst coverage of the criminal charges is false, along with her conclusion that the purported absence of coverage implies the announcement caused no Cabot share price decline on 15 June 2020. Not only was there coverage, but the coverage explicitly linked the announcement to the share price decline.

### D.   Ms. Allen's Purported Analysis of the Misrepresentation Dates is Flawed and Uninformative

77.  Ms. Allen directs event study analysis toward the nine alleged misrepresentation dates. She claims to find that "on 8 of those days [she] similarly found that there were no statistically significant positive stock price reactions."[68] She incorrectly offers that this finding evinces that the misrepresentations and omissions had no impact on the price of Cabot stock.

78.  Again, Ms. Allen's conclusion relies on faulty logic and disregard of a fundamental principle of statistical inference. Nonsignificance does not prove no price impact.

79.  Finding that a price reaction is statistically significant is one way to prove price impact, but the converse is not true. If a price reaction is not statistically significant, it does not prove that there was no price impact. One reason the converse does not hold is that while the information may have caused a price reaction, the economically appropriate magnitude of that reaction may be below the threshold for statistical significance. Such a price reaction would nonetheless be a price movement and price impact. Another reason may be

---

[67] "Wisdom of Crowds: The Value of Stock Opinions Transmitted Through Social Media," by Hailiang Chen et al., *The Review of Financial Studies*, vol. 27, no. 5, 2014, p. 1368: "To examine the role of peer-based advice, we extract user-generated opinions from Seeking Alpha (hereafter, SA; http://seekingalpha.com). Our choice of SA as the focus of this study was motivated by its popularity. As of August 2013, SA had 500,000 to 1 million unique visitors per day (comScore - ScorecardResearch) and, as such, was one of the biggest investment-related social media websites in the U.S. The website's goal is to provide 'opinion and analysis rather than news, and [it] is primarily written by investors who describe their personal approach to stock picking and portfolio management, rather than by journalists.'"

[68] Allen Report, ¶48.

weakness in the test to detect significant price reactions, perhaps due high or mismeasured background volatility (e.g., heteroskedasticity). Another reason is the presence of confounding information. Still another reason is that the information may have had price impact by buoying up a price and keeping it from falling rather than pushing the price up higher. Regardless of the reason, it is a generally accepted principle that nonsignificance of a price reaction does not prove there was no price impact.

80.   Implicitly recognizing that nonsignificance of a price reaction does not prove no price impact, and that a price reaction below the threshold for statistical significance is price impact nonetheless, may be the reason Ms. Allen employed careful but tortured language when answering questions about these basic principles during her deposition.

> "[Question]: Well, let me ask it a different way. If at the time of an alleged misstatement or its correction, there is no statistically significant price movement at the 95 percent confidence level, does that prove an absence of price impact?
>
> [Answer]: It's -- I think -- I think a lack of a statistically significant price reaction is – is evidence that there is no price impact. And it is one definition of price impact that does it actually impact the price of formulated testing.
>
> [Question]: So I understand your testimony that that would be evidence of no price impact. But does it affirmatively prove no price impact?
>
> [Answer]: I -- you know, I am not sure what -- it depends on what your burden of proof is. Right. So if you are talking about a burden of proof from a legal perceptive, I think it's – you know, whatever -- it's preponderance of the evidence, you know. I don't know. …"
> **Allen Deposition at 84:15-85:2.**

81.   Apparently, Ms. Allen understood but was unwilling to admit at her deposition that nonsignificance of a price movement does not prove no price impact, according to generally accepted principles of statistics and economics.

82.   She did undercut her analysis and conclusion in the Allen Report, when she ultimately admitted in her deposition that information can have price impact without eliciting a statistically significant movement.

"[Question]: So does a stock price need to increase for there to be a price impact from a statement?
[Answer]: No."
**Allen Deposition at 92:6-8.**

### 1.    Price Maintenance Principle

83.    Because so much of Ms. Allen's report and opinion depends on her misunderstanding the fundamental principle that nonsignificance does not prove no price impact, a review of the principle and undergirding development may be helpful.

84.    When misleading statements or omissions conceal adverse developments, they serve to maintain the market's prior expectations and valuation. Such misrepresentations and omissions will therefore prevent a price decline. They artificially maintain the prior price level. Because such misrepresentations and omissions cause the price to be at a level other than what the price would be but for the misrepresentations and omissions, they impact the price. This is price impact without price movement.

85.    This effect is known as the price maintenance principle. It is a generally accepted principle and described in the forensic finance literature:

> "Statements that allegedly inflated the security's price often do not result in an observed price increase when they are made. For example, one might not expect large increases in share prices for a firm that inflated its security's price by falsely reporting high earnings when doing so meant that the firm met market expectations."
> **"Federal Securities Acts and Areas of Expert Analysis," by Kevin Gold et al., Chapter 27 of the *Litigation Services Handbook: The Role of the Financial Expert*, 6th Edition, edited by Roman Weil et al., John Wiley & Sons, Inc., 2017, p. 4.**

86.    When a company deceives analysts and investors by concealing or misrepresenting important information, the effect of the concealment or misrepresentation would generally not be a significant stock price movement at the time of the concealment or misrepresentation and over its duration. The concealment or misrepresentation would maintain the mix of information as it previously was, so the appropriate price reaction would be a maintenance of the price level where it previously was. Similarly, if an omission or misrepresentation is made alongside countervailing confounding news that impacts the stock price in the opposite direction, one might reasonably expect this mix of new

29

information not to cause a statistically significant stock price reaction, even though the information is impacting the price.

87. In these examples, a modest stock price movement, or even no movement at all, may be the appropriate stock price reaction. In such cases, the event study finding that the stock return was nonsignificant would not indicate no price impact. In fact, in such instances when there was no major change in the available mix of information (due to the misrepresentations and omissions concealing major news), or the news announced was mixed (because simultaneous confounding news countervailed against the pronounced price impact of the alleged fraudulent misrepresentations and omissions), the observed price reaction would reasonably be a nonsignificant stock price movement and would not disprove price impact. The nonsignificance of the price reaction would reasonably show that the stock behaved as it should in an efficient market and that the information at issue had impact.

### 2.    Statistical Significance and the Absence of Evidence Fallacy

88. A statistically significant price reaction proves that information rather than random volatility caused a stock price to move. But nonsignificance does not prove only random volatility caused the stock price to move. Statistical significance allows the researcher to rule out random volatility as the sole cause of a price movement. However, nonsignificance does not rule anything out, including that certain information had price impact. That is, if a price movement is not statistically significant, one cannot rule out random volatility, but neither can one rule out that information was the cause of the price movement or at least a contributing factor.

89. More generally, failing to prove a proposition does not disprove the proposition or prove the opposite of the proposition to be true. Believing otherwise is an example of the "absence of evidence fallacy," which conflates absence of evidence with evidence of absence. Basic statistics textbooks explain the principle.

> "We should emphasize that if the null hypothesis [H0] is not rejected, based on the sample data, we cannot say that the null hypothesis is true. To put it another way, failing to reject the null hypothesis does not prove that H0 is true, it means we have failed to disprove H0."
> **Statistical Techniques in Business and Economics, by Robert D. Mason, Douglas A. Lind, and William G. Marchal, 10th Edition, Irwin McGraw-Hill, 1999, p. 307.**

90.  To understand the logical fallacy, an analogy may be instructive. Suppose I want to ascertain whether a particular lake has fish in it. I test the proposition by dropping a fishing line into the lake. If I catch a fish, that's proof that the lake has fish. However, if I do not catch a fish, I have not proved that there are no fish in the lake. My failure to catch a fish may be due to my being a bad fisherman, using the wrong bait, or dropping the line in the wrong place.

91.  Likewise, it is erroneous for Ms. Allen to conclude that because she failed to detect a statistically significant price movement following an event (using her flawed econometrics), it necessarily follows that the event had no price impact. But this is precisely what she does, inconsistent with basic principles of hypothesis testing.

### 3.    Ms. Allen's Flawed Event Study Indicates Price Impact

92.  Notwithstanding the numerous fatal flaws in Ms. Allen's regression analyses, even according to her flawed model, the residual return of Cabot stock on 15 June 2020 was -3.95%. A residual decline (the stock return after removing both the market and industry effects) of 3.95% represents a substantial loss in value. It is associated with a $t$-statistic of -1.52 according to her flawed model, which is not over the threshold for statistical significance at the 95% confidence level in her model. But even in her model it is significant at the 87% confidence threshold and represents a substantial decline in value.

93.  The absence of statistical significance does not prove that the corrective disclosure had no negative effect on the value of Cabot stock. On the contrary, in light of the mix of information disseminated this day, including analyst commentary and news articles, it is reasonable that the corrective disclosure, Pennsylvania AG's announcement of criminal charges against Cabot, did contribute to the stock price decline this day.

### 4.    Analysts and the Company

94.  Ms. Allen contends that the alleged misrepresentations were not economically material.[69] Her contention that the alleged misrepresentations and omissions relating to environmental regulations were immaterial is negated by Company statements and analyst commentary.

---

[69] Allen Report, ¶47.

95.    In its Form 10-Ks filed throughout the Class Period, Cabot frequently warned investors that increased regulations could adversely impact its ability to drill new wells, slow the approval for new wells, and increase the cost of production.

> "Most of our wells would not be economical without the use of hydraulic fracturing to stimulate production from the well. Due to concerns raised relating to potential impacts of hydraulic fracturing on groundwater quality, legislative and regulatory efforts at the federal, state and local levels have been initiated to render permitting and compliance requirements more stringent for hydraulic fracturing or prohibit the activity altogether. Increased regulation and attention given to the hydraulic fracturing process could lead to greater opposition to oil and natural gas production activities using hydraulic fracturing techniques which could have an adverse effect on oil and natural gas production activities, including operational delays or increased operating costs in the production of oil and natural gas from the developing shale plays, or could make it more difficult to perform hydraulic fracturing. The adoption of federal, state or local laws or the implementation of regulations regarding hydraulic fracturing could potentially cause a decrease in the completion of new oil and natural gas wells and increased compliance costs, which could increase costs of our operations and cause considerable delays in acquiring regulatory approvals to drill and complete wells."
> **Cabot Oil & Gas Corporation, Form 10-K for the fiscal year ended 31 December 2016, filed 27 February 2017, p. 20; Cabot Oil & Gas Corporation, Form 10-K/A for the fiscal year ended 31 December 2017, filed 2 March 2018, pp. 19-20; Cabot Oil & Gas Corporation, Form 10-K for the fiscal year ended 31 December 2019, filed 25 February 2020, p. 18.**

96.    Analysts cited environmental damage and regulatory developments as risks to the Company and the value of its stock.

> "In addition to the substantial risk that wells drilled will not be productive, hazards such as unusual or unexpected geologic formations, pressures, mechanical failures, uncontrollable flows of oil and/or natural gas, pollution and other physical and environmental risks are inherent in oil and natural gas exploration and production. These hazards could result in substantial losses to a company due to injury and/or loss of life, severe damage or destruction of property and equipment and environmental damage. Companies typically carry insurance that they believe is in accordance with customary industry practices. However, as is common in the oil and natural gas industry, a company does not fully insure against all risks associated with its business, either because such insurance is not available, or because it is considered cost prohibitive."
> **"Gas Price Weakness Governing Growth," by John Gerdes and Daniel Prather, KLR Group, analyst report, 22 February 2016, p. 14.**

32

"The key risks associated with our target price include business risks of the company and industry, including, but not limited to: loss of key employees; drilling success; volatile commodity prices; operating costs; capital cost overruns; product supply and demand; financing/access to capital; government regulations; legislation; royalties; taxes; exchange rates; interest rates; environment and weather concerns; and changes in government attitudes towards tracking. Company-specific risks include concentrated asset exposure based on the single asset, a relatively high corporate base decline rate, and access to egress capacity beyond 2020."
**"Lowering Rating to HOLD Under Updated Commodity Outlook," by Aaron Bilkoski and Sean Keaney, TD Securities, analyst report, 8 January 2020, p. 4.**

"Unfavorable regulatory or environmental rulings may hamper the company's ability to develop its properties as planned. Federal, state and local legislation and regulatory initiatives relating to hydraulic fracturing could prohibit certain projects or result in materially increased costs and additional operating restrictions or delays because of the significance of hydraulic fracturing in COG's business."
**"Q4 '15 Conference Call Key Takeaways; Reiterate Buy Rating and $25 PT," by Michael Schmitz, Ladenburg Thalmann, analyst report, 22 February 2016, p. 3.**

"Unfavorable regulatory or environmental rulings may hamper the company's ability to develop its properties as planned. Federal, state and local legislation and regulatory initiatives relating to hydraulic fracturing could prohibit certain projects or result in materially increased costs and additional operating restrictions or delays because of the significance of hydraulic fracturing in COG's business."
**"Preliminary Q4 '19 Results and 2020 Budget and Production Guidance," by Michael Schmitz, Ladenburg Thalmann, analyst report, 4 February 2020, p. 3.**

97. Contrary to Ms. Allen's assertion, the Company and analysts emphasized that information about compliance with regulations is economically material.

### E. Ms. Allen's Criticisms of My Event Study and Statistical Tests Emanate From Her Apparent Incomprehension of Heteroskedasticity and How to Correct For It

98. As she confirmed in her deposition, Ms. Allen neglected to test for the presence of heteroskedasticity in any of her regression models, let alone correct for it.[70] She exclusively employed the OLS methodology, which does not correct for heteroskedasticity. She

---

[70] Allen Deposition, at 113:4-11, 113:21-22 ("I don't believe I did any test of it; so I didn't."), and 114:8-115:7 ("I don't believe I have ever done the – a Newey-West test.").

criticizes my use of the Newey-West methodology instead of OLS for being "non-standard."[71] Ms. Allen rails against the Newey-West methodology[72] without understanding what it is, why it applies, and that her own firm endorses it.[73]

99.   The Newey-West method is a widely used and generally accepted methodology for correcting for heteroskedasticity in regression analysis. In fact, NERA the firm at which Ms. Allen is a Managing Director endorses "adjusting the standard errors of the significance tests, like those proposed by Newey and West (1987) for residual autocorrelation or White (1980) for residual heteroskedasticity."[74] That is, Ms. Allen's firm endorses the correction that I implemented in the Feinstein Report. Clearly, Ms. Allen's criticism of my use of the Newey-West correction is off-base.

100.  NERA went so far as to criticize the Competition and Markets' Authority in Great Britain for *not* considering and correcting for heteroskedasticity in their regression models, in a mergers and acquisition case.[75] That same NERA condemnation should appropriately be directed at Ms. Allen's work in this case. NERA's admonition that heteroskedasticity must be corrected undercuts Ms. Allen's criticism of my analysis in the instant case.

101.  Ms. Allen is perplexed by the output from the regression analysis after it is corrected for heteroskedasticity.[76] She confesses that she does not understand why for two adjacent residual returns that are seemingly of the same magnitude, only one is deemed statistically significant while the other is not. She does not understand that the heteroskedasticity correction methodology determines that the contribution of volatility to the residual returns may have changed from one observation to the next, such that for one observation the estimated level of volatility explains the residual return, while for the next observation the

---

[71] Allen Report, ¶65.

[72] Allen Report, §VIII.A.

[73] Allen Deposition at 114:8-12.

[74] "Response to Provisional Findings – Critique of CMA Analysis of Retail Price Increase of Durex Play Products," by Frank Maier-Rigaud and Felix Forster, *NERA*, 16 June 2015, pp. 12-13.

[75] "Response to Provisional Findings – Critique of CMA Analysis of Retail Price Increase of Durex Play Products," by Frank Maier-Rigaud and Felix Forster, *NERA*, 16 June 2015, pp. 12-13.

[76] Allen Report, §VIII.C; and Allen Deposition at 238:19-24.

changed level of estimated volatility does not. This is a common and expected result when correcting for changing volatility, i.e., heteroskedasticity.[77]

102. Ms. Allen's criticisms of my econometrics derive from her apparent lack of understanding of these and other statistical concepts. Ms. Allen expresses that she believes my econometrics must be flawed because of the following reasons: (i) only four of the 92 non-earnings trading dates during the Covid period were statistically significant;[78] (ii) the absolute value of the residual return on the four dates identified as statistically significant were not as large as the absolute value of the residual returns on other dates during the Covid period;[79] and (iii) two consecutive dates with similar residual return magnitudes had different levels of significance.[80]

103. Ms. Allen misunderstands that my methodology and these results are correct and not a cause for concern. These results come from the proper functioning of the econometric model. Ms. Allen believing otherwise reflects her apparent deficiencies in her econometric comprehension, not deficiencies in the econometrics. I address each of these points below.

104. Ms. Allen also criticizes that I did not use the same methodology in a different case with different facts.[81] Below I explain that the appropriate tools were employed in each case, and the appropriate tools differed on account of different data, facts and circumstances between the two cases.

**1. The Number of Statistically Significant Days is Reasonable**

105. In her report, Ms. Allen asserts that "During 'the Covid period,' Dr. Feinstein's regression analysis categorizes the excess returns on *only four trading days* as being statistically significant, while categorizing the stock returns on all remaining days of the Covid period as being non-statistically significant."[82]

---

[77] *A Guide to Econometrics*, by Peter Kennedy, 6th edition, Blackwell Publishing, 2008.

[78] Allen Report, ¶68.

[79] Allen Report, ¶69.

[80] Allen Report, ¶74.

[81] Allen Report, ¶72.

[82] Allen Report, ¶68 (Emphasis Added.)

106.    Ms. Allen is wrong to suggest that four significant days out of 92 days indicates a defect in the econometrics. At a 95% confidence level, one would expect approximately 5% of all days to be deemed statistically significant. 5% of 92 is 4.6. Therefore, the result that 4 days were found significant by the test should not be surprising, and certainly is not evidence of a defect. An opinion to the contrary belies understanding of the basic statistical concept of "test size."[83]

### 2.    Ms. Allen Misunderstands that Statistical Significance is a Function of Both the Magnitude of the Residual Return and the Estimated Level of Volatility

107.    Ms. Allen observes that in my results, the biggest returns (both positive and negative) are not always the most significant. She incorrectly opines that this result must indicate a flaw in the econometrics. Again, this criticism exposes a deficiency in Ms. Allen's comprehension of the econometrics rather than a defect in the econometrics.

108.    As described in the Feinstein Report, I ran the event study regressions and tested for statistical significance of all residual returns, applying the Newey-West correction for heteroskedasticity, and employing the relevant empirical distribution to establish the significance threshold. The Newey-West methodology is a peer-reviewed, published, and generally accepted methodology to correct for heteroskedasticity.[84] Using an empirical distribution to establish the significance threshold is also a published, peer-reviewed methodology, which is specifically suited for event studies conducted during the Covid period.[85]

109.    Specifically, with the Newey-West correction applied to the standard error of each residual return, I constructed the t-statistics for all daily residual returns in the Class Period. I then assessed the statistical significance of each pre-Covid period residual return by comparing the pre-Covid period observation's $t$-statistic to the empirical histogram of pre-Covid period $t$-statistic values. I similarly assessed the statistical significance of each Covid

---

[83] *Introduction to* Econometrics, by James Stock and Mark Watson, Pearson, 3rd edition, 2015, pp. 77-79.

[84] See, "A Simple, Positive Semi-Definite, Heteroskedasticity and Autocorrelation Consistent Covariance Matrix," by Whitney Newey and Kenneth West, *Econometrica*, vol. 55, no. 3, 1987, pp. 703-708.

[85] "Securities Litigation Event Studies in the Covid Volatility Regime," by Miguel Villanueva and Steven Feinstein, *Journal of Forensic Economics*, vol. 30, no. 1, 2022.

period residual return by comparing the Covid period observation's *t*-statistic to the empirical histogram of Covid period *t*-statistic values. This use of empirical histograms for event studies is explained in a recent peer-reviewed publication that I co-authored.[86]

### 3. Ms. Allen's Assertion That I Did Not Use the Newey-West Correction the Same Way in a Different Case is Misguided

110. Ms. Allen argues that my methodology in the instant matter differs from the methodology I used in "other matters." Her criticism is misguided and again points to her lack of comprehension of appropriate econometric techniques. It is true that I do not apply a correction for heteroskedasticity in cases where there is no heteroskedasticity in the data. In the one case she cited, which involved the company Sealed Air, I did apply the Newey-West correction in the same manner as in the instant case "to control for the potential presence of heteroscedasticity and autocorrelation."[87]

111. One difference between the Sealed Air case and the instant case is that in the Sealed Air case I showed that the same results were obtained regardless of whether the Newey-West correction was applied. Unlike that case, in the instant case it matters. This may be because the class period in Sealed Air was 17 November 2014 through 20 June 2019, which did not overlap the Covid period.

112. Having used the Newey-West methodology and empirical distributions in the past, in the very report that Ms. Allen cites, demonstrates that the methodology I employed in the instant case is not non-standard or developed for the instant case alone. It is the correct methodology when the data, facts, and circumstances call for it.

---

[86] "Securities Litigation Event Studies in the Covid Volatility Regime," by Miguel Villanueva and Steven Feinstein, *Journal of Forensic Economics*, vol. 30, no. 1, 2022.

[87] Report on Market Efficiency by Professor Steven P. Feinstein, Ph.D., CFA, dated 14 July 2022, *UA Local 13 & Employers Group Insurance Fund v. Sealed Air Corporation et al.*

## V.   LIMITING FACTORS AND OTHER ASSUMPTIONS

113.   This report is furnished solely for the purpose of court proceedings in the above- referenced matter and may not be used or referred to for any other purpose. The analysis and opinions contained in this report are based on information available as of the date of the report. I reserve the right to amend, refine, or supplement this report in the event that I become aware of additional information, evidence, arguments, or analyses which bear on my work on this matter.

Steven P. Feinstein, Ph.D., CFA

**Exhibit-1**
**Documents and Other Information Considered**
**In Addition to Those Cited in the Feinstein Report**

## CASE DOCUMENTS

- Report on Market Efficiency and Damages Methodology by Professor Steven P. Feinstein, Ph.D., CFA, dated 5 December 2022.
- Expert Report and Declaration of Lucy P. Allen, dated 20 January 2023.
- Defendants' Response In Opposition to Class Certification, dated 21 January 2023.
- Videotaped Remote Zoom Deposition of Lucy Allen, dated 24 April 2023.

## NEWS ARTICLES AND PRESS RELEASES

- "Cabot Oil Drops Quickly After Pennsylvania AG Allegations," *Bloomberg*, 15 June 2020.
- "Cabot Oil & Gas Charged Over Pennsylvania Contamination," by Carl Surran, *SeekingAlpha*, 15 June 2020.

## ACADEMIC AND PROFESSIONAL LITERATURE

- Chen, Hailiang, Prabuddha De, Yu Hu, and Byoung-Hyoun Hwang, "Wisdom of Crowds: The Value of Stock Opinions Transmitted Through Social Media," *The Review of Financial Studies*, vol. 27, no. 5, 2014.
- Fisch, Jill, Jonah Gelbach, and Jonathan Klick, "The Logic and Limits of Event Studies in Securities Fraud Litigation," *Texas Law Review*, vol. 96, 2018.
- Intriligator, Michael, *Econometric Models, Techniques, & Applications*, Prentice-Hall, 1978.
- Mason, Robert, Douglas Lind, and William Marchal, *Statistical Techniques in Business and Economics*, Irwin/McGraw-Hill, 10th edition, 1999.
- White, Halbert, "A Heteroskedasticity-Consistent Covariance Matrix Estimator and a Direct Test for Heteroskedasticity," *Econometrica*, 48(4), May 1980.

## DATA AND DATABASES

- Bloomberg
- CRSP (Center for Research in Security Prices)
- EDGAR
- Factiva
- Refinitiv Eikon

**Exhibit-1**
**Documents and Other Information Considered**
**In Addition to Those Cited in the Feinstein Report**

**OTHER**

- Hern, Richard, Marija Spasovska, and Aldo Motta, "The Evidence for Differences in Risk for Fixed vs Mobile Telecoms," *NERA*, November 2017.
- Maier-Riguad, Frank and Felix Forster, "Response to Provisional Findings – Critique of CMA Analysis of Retail Prince Increase of Durex Play Products," *NERA*, 16 June 2015.
- Report on Market Efficiency by Professor Steven P. Feinstein Ph.D., CFA, dated 14 July 2022, *UA Local 13 & Employers Group Insurance Fund v. Sealed Air Corporation et al*.
- Any other documents cited in the report.

**Exhibit-2**

**Steven P. Feinstein, Ph.D., CFA**
**Testimony Subsequent to the Feinstein Report**

In Re Synchrony Financial Securities Litigation
Case No. 3:18-cv-01818-VAB
United States District Court
District of Connecticut
Deposition Testimony
December 2022

In Re Ripple Labs Inc. Litigation
Case No. 4:18-cv-06753-PJH
United States District Court
Northern District of California
Deposition Testimony
January 2023

In Re Kirkland Lake Gold LTD. Securities Litigation
Case No. 20-cv-04953
United States District Court
Southern District of New York
Deposition Testimony
March 2023

41