# EXHIBIT 2

```
 1                UNITED STATES DISTRICT COURT
 2                SOUTHERN DISTRICT OF TEXAS
 3                      HOUSTON DIVISION
 4
 5   DELAWARE COUNTY EMPLOYEES  )
     RETIREMENT SYSTEM,         )
 6   INDIVIDUALLY AND ON BEHALF )
     OF ALL OTHERS SIMILARLY    )
 7   SITUATED,                  )
                                )
 8            PLAINTIFF,         )  CIVIL ACTION NO.
                                )  4:21-CV-02045
 9        VS.                   )
                                )
10   CABOT OIL & GAS            )
     CORPORATION, ET AL.        )
11                              )
              DEFENDANTS.       )
12   _____)
13
14
15
16
17           VIDEOTAPED REMOTE ZOOM DEPOSITION
18   RULES 26 AND 30 OF THE FEDERAL RULES OF CIVIL PROCEDURE
19                      LUCY ALLEN
20               MONDAY, APRIL 24, 2023
21
22
23
24   JOB NO. 5880171
25   REPORTED BY:  DAYNA HESTER, C.S.R. 9970
```

Page 1

```
1    VIDEOTAPED REMOTE ZOOM RULES 26 AND 30 OF THE FEDERAL
2    RULES OF CIVIL PROCEDURE DEPOSITION OF LUCY ALLEN, TAKEN
3    ON BEHALF OF PLAINTIFF DELAWARE COUNTY EMPLOYEES
4    RETIREMENT SYSTEM, AT 11:03 A.M., EASTERN STANDARD TIME,
5    MONDAY, APRIL 24, 2023, WITH THE WITNESS, COURT
6    REPORTER, AND VIDEOGRAPHER APPEARING REMOTELY VIA ZOOM
7    VIDEOCONFERENCE, BEFORE DAYNA HESTER, C.S.R. NO. 9970.
8
9    APPEARANCES OF COUNSEL:
10   FOR PLAINTIFF DELAWARE COUNTY EMPLOYEES RETIREMENT
     SYSTEM:
11
         ROBBINS GELLER RUDMAN & DOWD
12       BY: KEVIN A. LAVELLE, ESQ.
             (PRESENT VIA ZOOM VIDEOCONFERENCE)
13       655 WEST BROADWAY, SUITE 1900
         SAN DIEGO, CALIFORNIA  92101
14       (619) 231-1058
         KLAVELLE@RGRDLAW.COM
15
16       KESSLER TOPAZ MELTZER & CHECK LLP
         BY:  ALEX HELLER, ESQ.
17           (PRESENT VIA ZOOM VIDEOCONFERENCE)
         280 KING OF PRUSSIA ROAD
18       RADNOR, PENNSYLVANIA  19087
         (610) 667-7056
19       AHELLER@KTMC.COM
20
21
22
23
24
25           -- APPEARANCES CONTINUED ON NEXT PAGE --
```

Page 2

```
 1    APPEARANCES OF COUNSEL (CONTINUED):
 2    FOR DEFENDANT CABOT OIL & GAS CORPORATION, ET AL:
 3         NORTON ROSE FULBRIGHT US LLP
           BY:  PETER ANDREW STOKES, ESQ.
 4              (PRESENT VIA ZOOM VIDEOCONFERENCE)
           98 SAN JACINTO BOULEVARD, SUITE 1100
 5         AUSTIN, TEXAS 78701
           (512) 536-5287
 6         PETER.STOKES@NORTONROSEFULBRIGHT.COM
 7
      ALSO PRESENT:
 8
           JOHN MACDONELL, VIDEOGRAPHER
 9         (PRESENT VIA ZOOM VIDEOCONFERENCE)
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page  3

```
 1                    I N D E X
 2   DEPONENT              EXAMINATION              PAGE
 3   LUCY ALLEN
 4                    BY MR. LAVELLE          8
 5                    BY MR. STOKES           229
 6
 7
       QUESTIONS INSTRUCTED BY COUNSEL NOT TO ANSWER
 8
                         (NONE.)
 9
10
11                  E X H I B I T S
12   EXHIBIT NO.    PAGE    DESCRIPTION
13   EXHIBIT 1      44      FILE TITLED "EXHIBIT PLTFFS' 0001 -
                            CABOT L. ALLEN 1.20.23 CLASS CERT.
14                          REPORT.PDF"
15   EXHIBIT 2      164     FILE TITLED "EXHIBIT 0002 - EXCEL
                            3, REG 1.PDF"
16
     EXHIBIT 3      175     FILE TITLED "EXHIBIT 0003 - EXCEL
17                          3, REG 24.PDF"
18   EXHIBIT 4      192     FILE TITLED "EXHIBIT 0004 - EXCEL
                            3, REG 18.PDF"
19
     EXHIBIT 5      192     FILE TITLED "EXHIBIT 0005 - EXCEL
20                          3, REG 19.PDF"
21   EXHIBIT 6      192     FILE TITLED "EXHIBIT 0006 - EXCEL
                            3, REG 20.PDF"
22
     EXHIBIT 7      192     FILE TITLED "EXHIBIT 0007 - EXCEL
23                          3, REG 21.PDF"
24
25            -- EXHIBITS CONTINUED ON NEXT PAGE --

                                              Page  4
```

```
1              E X H I B I T S (CONTINUED)

2      EXHIBIT NO.    PAGE    DESCRIPTION

3      EXHIBIT 8      192     FILE TITLED "EXHIBIT 0008 - EXCEL
                              3, REG 22.PDF"
4
       EXHIBIT 9      192     FILE TITLED "EXHIBIT 0009 - EXCEL
5                             3, REG 23.PDF"

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Veritext Legal Solutions
866 299-5127

```
 1                    ZOOM VIDEOCONFERENCE

 2          MONDAY, APRIL 24, 2023; 11:03 A.M., EDT

 3

 4          THE VIDEOGRAPHER:  We're on the record.      11:03

 5   It's 11:03 a.m. Eastern time on April 24th, 2023.    11:03

 6          This is the deposition of Lucy Allen.         11:03

 7          And we're here on the matter of Delaware      11:03

 8   County Employees Retirement System versus Cabot Oil  11:03

 9   & Gas Corporation, et al.                            11:03

10          I'm John MacDonell, the videographer from     11:03

11   Veritext.                                            11:03

12          Before the reporter swears the witness and    11:03

13   does her read-in, would Counsel, please, identify    11:03

14   themselves beginning with the noticing party,        11:03

15   please.                                              11:03

16          MR. LAVELLE:  Good morning.                   11:03

17          My name is Kevin Lavelle.  I'm here from      11:03

18   Robbins Geller Rudman & Dowd on behalf of the        11:03

19   plaintiffs.                                          11:03

20          MR. HELLER:  Good morning.                    11:03

21          Alex Heller from Kessler Topaz Meltzer on     11:03

22   behalf of the plaintiffs.                            11:03

23          MR. STOKES:  Good morning.                    11:03

24          Peter Stokes with Norton Rose Fulbright on    11:03

25   behalf of defendants.                                11:03
```

Page 6

| | | |
|---|---|---|
| 1 | THE REPORTER:  Okay.  This is the | 11:03 |
| 2 | reporter.  I do have a read-on.  One second. | 11:03 |
| 3 | My name is Dayna Hester.  This statement | 13:08 |
| 4 | is to acknowledge my obligations pursuant to Federal | 13:08 |
| 5 | Rules of Civil Procedure. | 13:08 |
| 6 | Rule 30(b), Subsection 5(a).  My business | 13:08 |
| 7 | address is 707 Wilshire Boulevard, Los Angeles, | 13:08 |
| 8 | California.  The videographer has stated the | 13:08 |
| 9 | additional required information. | |
| 10 | Rule 30(b), Subsection 5(c).  Upon | |
| 11 | completion of the deposition, if there is a | |
| 12 | stipulation about the custody of the transcript or | |
| 13 | other pertinent matters, I will recite such | |
| 14 | stipulation(s).  Additionally, the videographer will | |
| 15 | read-off when the deposition concludes. | |
| 16 | So with this being said, I will now swear | |
| 17 | in the witness. | |
| 18 | Please raise your right hand. | |
| 19 | THE WITNESS:  [Witness did as requested]. | |
| 20 | THE REPORTER:  Do you affirm the testimony | |
| 21 | you are about to give in the cause now pending will | |
| 22 | be the truth, the whole truth, and nothing but the | |
| 23 | truth? | 11:04 |
| 24 | THE WITNESS:  I do. | 11:04 |
| 25 | THE REPORTER:  Thank you. | 11:04 |

Page 7

```
 1

 2                            LUCY ALLEN

 3              having been first duly sworn, was

 4              examined and testified as follows:

 5

 6                            EXAMINATION

 7    BY MR. LAVELLE:

 8         Q.   Good morning, Ms. Allen.            11:04

 9         A.   Good morning.                       11:04

10         Q.   As you heard before, my name is Kevin   11:04

11    Lavelle.  I'm here from Robbins Geller representing  11:04

12    the plaintiffs.                              11:05

13              Thanks for being here today.       11:05

14              Can you please state your full name for   11:05

15    the record.                                  11:05

16         A.   Lucy Page Allen.                    11:05

17         Q.   And you have been deposed before; correct?  11:05

18         A.   Yes, I have.                        11:05

19         Q.   Okay.  And you've been deposed before via  11:05

20    this remote means; correct?                  11:05

21         A.   I'm sorry.  Via what?              11:05

22         Q.   Remote video means?               11:05

23         A.   Remote.  Yes, I have.              11:05

24         Q.   Okay.  So I won't spend too much time   11:05

25    going over those ground rules.  I know you're quite  11:05
```

Page 8

1    familiar with them.                                      11:05
2         I'll just review very quickly.  Probably           11:05
3    most important is that we do our best not to speak       11:05
4    over one another.                                        11:05
5         Fair enough?                                        11:05
6    A.   Yes.                                                11:05
7    Q.   Okay.  I also assume that you understand            11:05
8    the questions I ask unless you ask for a                 11:05
9    clarification.                                           11:05
10        Is that fair enough?                                11:05
11   A.   Yes.                                                11:05
12   Q.   Okay.  Can you hear me okay today?                  11:05
13   A.   It's not that clear.                                11:05
14   Q.   Okay.  Well, if at some point you have too          11:05
15   much difficulty understanding me, let me know.           11:06
16   We'll try to get that taken care of.  Okay?             11:06
17   A.   Yes.  I don't know if that's true for the           11:06
18   court reporter.                                          11:06
19        Are you finding that too?                           11:06
20        THE REPORTER:  Yes, Counsel.  It's not as           11:06
21   clear.                                                   11:06
22        THE VIDEOGRAPHER:  Counsel, if you can              11:06
23   move the table mic closer to you.                        11:06
24        MR. LAVELLE:  Okay.  The table mic is               11:06
25   right in front of me.  So I don't think I can move       11:06

Page 9

| | | |
|---|---|---|
| 1 | it any closer. | 11:06 |
| 2 | If it gets to be an issue at some point in | 11:06 |
| 3 | the day, anyone, please let me know. | 11:06 |
| 4 | Peter, Ms. Allen, Dayna, anyone, just let | 11:06 |
| 5 | me know, and we'll take a break and try to get it | 11:06 |
| 6 | resolved.  Okay? | 11:06 |
| 7 | Okay.  Thank you.  I do appreciate that. | 11:06 |
| 8 | BY MR. LAVELLE: | 11:06 |
| 9 | Q.   Ms. Allen, where are you located today? | 11:06 |
| 10 | A.   In New York City. | 11:06 |
| 11 | Q.   Okay.  Great. | 11:06 |
| 12 | And did you bring anything with you to | 11:06 |
| 13 | this deposition today? | 11:06 |
| 14 | A.   Yes, I did.  I brought a copy of both of | 11:06 |
| 15 | my reports in this matter as well as Dr. Feinstein's | 11:06 |
| 16 | report and a copy of the Complaint. | 11:07 |
| 17 | Q.   Okay.  Great. | 11:07 |
| 18 | Did you mark up any of those documents | 11:07 |
| 19 | that you just discussed? | 11:07 |
| 20 | A.   No. | 11:07 |
| 21 | Q.   Okay.  So they are total clean copies? | 11:07 |
| 22 | A.   Yes.  They just have on them, like, what | 11:07 |
| 23 | they are.  Like, it says, "Allen Report Class Cert | 11:07 |
| 24 | Complaint." | 11:07 |
| 25 | Q.   All right.  Understood. | 11:07 |

Page 10

| | | |
|---|---|---|
| 1 | So today we'll primarily be discussing | 11:07 |
| 2 | your Class Cert Report, which is the -- the report | 11:07 |
| 3 | dated -- I believe it's January 20th, 2023. | 11:07 |
| 4 | So you have that report with you? | 11:07 |
| 5 | A.   Yes. | 11:07 |
| 6 | Q.   Great. | 11:07 |
| 7 | And then the other report that you | 11:07 |
| 8 | referenced from yourself, is that the April 20th, | 11:07 |
| 9 | 2023, Loss Causation and Damages Report? | 11:07 |
| 10 | A.   That's correct. | 11:07 |
| 11 | Q.   Okay.  Great. | 11:07 |
| 12 | Is there any reason that you can't provide | 11:07 |
| 13 | full and fair testimony today? | 11:08 |
| 14 | A.   No. | 11:08 |
| 15 | Q.   You are not on any kind of medication that | 11:08 |
| 16 | might impact your memory? | 11:08 |
| 17 | A.   No. | 11:08 |
| 18 | Q.   You haven't recently suffered any head | 11:08 |
| 19 | injuries that might impact your memory? | 11:08 |
| 20 | A.   Not that I know of. | 11:08 |
| 21 | Q.   Okay.  Well, I'm glad to hear that. | 11:08 |
| 22 | What is your understanding of who you are | 11:08 |
| 23 | offering opinions for in this case? | 11:08 |
| 24 | A.   I was retained by defendants in this case, | 11:08 |
| 25 | Cabot Oil & Gas Corporation. | 11:08 |

Page 11

| | | |
|---|---|---|
| 1 | Q.   And are you represented by counsel today? | 11:08 |
| 2 | A.   Not my -- not my own counsel.  No.  The -- | 11:08 |
| 3 | I am there as a counsel for the defendant, Peter | 11:08 |
| 4 | Stokes, who is defending the deposition, but he's | 11:08 |
| 5 | not -- he's not my counsel. | 11:08 |
| 6 | Q.   Understood. | 11:08 |
| 7 | And I should also mention one more thing. | 11:08 |
| 8 | It's my typical practice to take a break around | 11:09 |
| 9 | every hour or so. | 11:09 |
| 10 | So if you need a break at any point in | 11:09 |
| 11 | time, please let me know.  I'll do my best to | 11:09 |
| 12 | accommodate.  As you probably already know, unless | 11:09 |
| 13 | there is a question pending, it shouldn't be an | 11:09 |
| 14 | issue.  But please do let me know if you need a | 11:09 |
| 15 | break before that -- those hour intervals.  Okay? | 11:09 |
| 16 | A.   Sure.  Thanks. | 11:09 |
| 17 | Q.   Sure. | 11:09 |
| 18 | So aside from the opinions that you do | 11:09 |
| 19 | offer in the -- the two reports that we discussed | 11:09 |
| 20 | today, the Class Certification Report and the Loss | 11:09 |
| 21 | Causation and Damages Report, are there any other | 11:09 |
| 22 | opinions that you have been asked to or intend to | 11:09 |
| 23 | testify to in this case that have not been | 11:09 |
| 24 | identified? | 11:09 |
| 25 | A.   I don't believe so.  No. | 11:09 |

Page 12

| | | |
|---|---|---|
| 1 | Q.   And is it okay if I continue to refer to | 11:10 |
| 2 | the January 20th, 2023, Class Certification Report | 11:10 |
| 3 | of yours as the "Class Certification Report" as | 11:10 |
| 4 | shorthand? | 11:10 |
| 5 | A.   Sure. | 11:10 |
| 6 | Q.   Okay.  And, likewise, do we understand | 11:10 |
| 7 | each other if I refer to your Loss Causation and | 11:10 |
| 8 | Damages Report from April 20th, 2023, as the "Loss | 11:10 |
| 9 | Causation Report"? | 11:10 |
| 10 | A.   Sure. | 11:10 |
| 11 | Q.   Okay.  When was your Loss Causation Report | 11:10 |
| 12 | finalized? | 11:10 |
| 13 | A.   The day it was signed; so I believe | 11:10 |
| 14 | April 20th, 2023. | 11:10 |
| 15 | Q.   And when did you start work on that | 11:10 |
| 16 | report? | 11:10 |
| 17 | A.   I don't recall. | 11:10 |
| 18 | Q.   Okay.  Are you able to ballpark it for me? | 11:10 |
| 19 | A.   No.  It might have -- I'm just not sure. | 11:11 |
| 20 | Q.   Okay.  You can't give me a month? | 11:11 |
| 21 | A.   So it was sometime after the first report | 11:11 |
| 22 | was done.  So my recollection is I was asked to work | 11:11 |
| 23 | on it around the time the first report was done or | 11:11 |
| 24 | perhaps around that time.  But that might not be -- | 11:11 |
| 25 | I'm just not sure. | 11:11 |

Page 13

1          Q.   Okay.  As you know, it's not a memory          11:11
2     test.  I'm just looking for your best recollection.     11:11
3               So turning back to the Class Certification     11:11
4     Report, are all the bases for your class                11:12
5     certification-related opinions identified in that       11:12
6     report?                                                 11:12
7          A.   The report is meant to summarize my           11:12
8     opinions and findings as well as the -- the bases.      11:12
9     So, yes, I believe they are, at least in summary        11:12
10    form, identified.                                       11:12
11         Q.   Okay.  And are there any bases for your        11:12
12    class certification opinions that are not identified    11:12
13    in the report?                                          11:12
14         A.   In summary form, I have -- meant to           11:12
15    identify them in the report.  You know, it's -- not     11:12
16    that I can think of, but it's possible.  So the         11:12
17    report summarizes my findings and identifies how I      11:13
18    came to that -- how I came to those findings and        11:13
19    lists all of the materials considered.  So in that      11:13
20    sense, I believe it should be.                          11:13
21              But, you know, every detail is not            11:13
22    necessarily fully specified in the report.             11:13
23         Q.   Let me ask it this way:                       11:13
24              Can you think of any bases for the            11:13
25    opinions in your Class Certification Report that are    11:13

                                                    Page 14

| | | |
|---|---|---|
| 1 | not identified there in the report? | 11:13 |
| 2 | A.   Not particularly, as I sit here. | 11:13 |
| 3 | Q.   So you just mentioned that the report | 11:13 |
| 4 | summarizes the information regarding the opinions | 11:13 |
| 5 | that you are offering in your Class Certification | 11:14 |
| 6 | Report, but it might not contain every detail; is | 11:14 |
| 7 | that correct? | 11:14 |
| 8 | A.   That's right. | 11:14 |
| 9 | Q.   Was -- was every piece of information that | 11:14 |
| 10 | you believe supports your opinions in your Class | 11:14 |
| 11 | Certification Report identified in your listing of | 11:14 |
| 12 | materials considered? | 11:14 |
| 13 | A.   I believe the materials considered is -- | 11:14 |
| 14 | it's meant to be comprehensive.  I don't have any -- | 11:14 |
| 15 | I've intended to make the list of materials | 11:14 |
| 16 | comprehensive. | 11:14 |
| 17 | Q.   Okay.  And sitting here today, you still | 11:14 |
| 18 | believe that to be the case; it's a comprehensive | 11:15 |
| 19 | list; is that right? | 11:15 |
| 20 | A.   Yes.  I believe so.  I'm trying to think | 11:15 |
| 21 | if I... | 11:15 |
| 22 | [Witness reviews document]. | 11:15 |
| 23 | I believe that is correct. | 11:15 |
| 24 | Q.   And have you amended or added to any of | 11:15 |
| 25 | your opinions in the Class Certification Report | 11:15 |

Page 15

```
 1    since it was finalized?                          11:15

 2         A.   No.  I don't believe so.               11:15

 3         Q.   And other than the opinions identified in   11:16

 4    your Class Certification Report and the Loss     11:16

 5    Causation Report, is there any other opinions that   11:16

 6    you are offering in this case?                   11:16

 7         A.   I -- as far as I know, the -- the reports   11:16

 8    summarize what I have been asked to do in my     11:16

 9    findings and opinions to date.                   11:16

10         Q.   Have you considered any additional     11:16

11    materials after submitting your Class Certification   11:16

12    Report relevant to that report that aren't listed in   11:16

13    your materials considered?                       11:16

14         A.   I don't think so.  The -- the only thing I   11:16

15    am thinking is there may be some -- I just think I   11:16

16    have listed all the analyst reports.  But there may   11:16

17    be some additional -- I may not have every analyst   11:16

18    report listed in here.  So there may be some --  11:17

19              I looked for analyst reports around the   11:17

20    class period on Cabot, for example.  And I -- I just   11:17

21    don't know if they are actually all on this list.   11:17

22         Q.   So are you saying that you considered   11:17

23    additional analyst reports that are not reflected in   11:17

24    the materials considered in your --             11:17

25         A.   Possibly.
```

Page 16

1        Q.    -- Class Certification Report?

2        A.    Though I am not sure.  I'm not sure.  Or

3    whether that's possible.

4        Q.   And did you consider these potential

5    additional analyst reports after you finalized your

6    Class Certification Report or before?

7        A.   I don't know.  So possibly.  So we have

8    searched for analyst reports over time and have -- I

9    have looked again since filing the Class Cert

10   Report.  So I am just not sure if every analyst

11   report that is available that we have seen is

12   actually on this list.

13       Q.   As of the time of submitting your Class

14   Certification Report, was the list of analyst

15   reports considered complete?

16       A.    So I'm not sure.  These are analyst

17   reports.  I think the list in the Class Cert Report

18   is analyst reports that we have.  I don't know if --

19            So one of the ways we get analyst reports

20   is we can search for what reports are available but

21   not necessarily purchase those reports.

22            So I don't -- I just don't know whether

23   this included reports that we were -- knew to be

24   available but may not have purchased.

25       Q.   I think I understand you.

Page 17

1           But if there were reports -- analyst

2     reports at the time of submitting your Class

3     Certification Report that you did not have access

4     to, those were not reports that you considered;

5     right?

6           A.   Well, we had access to them.  So one of        11:19

7     the things we did was -- so one of the things we did     11:19

8     was search whether certain words were in analyst         11:19

9     reports, which doesn't require actually purchasing       11:19

10    the analyst report or obtaining the analyst report.      11:19

11    It's searching whether that analyst report contains      11:19

12    that information and what dates our analyst reports       11:20

13    issued.                                                   11:20

14           So that is information that we would --            11:20

15    that has been considered but is not the actual --        11:20

16    it's that the text of the analyst report doesn't         11:20

17    contain certain words rather than actually obtaining     11:20

18    and buying.                                               11:20

19           So you can search an analyst report and           11:20

20    you can see when analysts issue their reports and        11:20

21    how many pages and what are the analysts without         11:20

22    actually buying the analyst report, which we would       11:20

23    have to purchase through a service.  That is             11:20

24    typically how our service works.                          11:20

25           Q.   I see.  Okay.  I understand the              11:20

Veritext Legal Solutions
866 299-5127

| | | |
|---|---|---|
| 1 | distinction. | 11:20 |
| 2 | So you are considering analyst reports in | 11:20 |
| 3 | your materials considered that may or may not have | 11:20 |
| 4 | come up in a text search versus -- | 11:20 |
| 5 | A.   That's right.  That we know existed | 11:20 |
| 6 | through searches.  But we didn't purchase them.  So | 11:20 |
| 7 | I believe this is the list of analyst reports that | 11:20 |
| 8 | we had actual copies of and -- I don't recall | 11:21 |
| 9 | whether we got some of the analyst reports, perhaps, | 11:21 |
| 10 | from the company, which sometimes happens. | 11:21 |
| 11 | My recollection is that we purchased these | 11:21 |
| 12 | through -- through one of the services that we | 11:21 |
| 13 | subscribe to or, you know, different analyst reports | 11:21 |
| 14 | are different prices often depending on the | 11:21 |
| 15 | page/line. | 11:21 |
| 16 | Q.   Okay.  Understood. | 11:21 |
| 17 | So just to make sure I am clear.  The | 11:21 |
| 18 | analyst reports listed in your Class Certification | 11:21 |
| 19 | Report are the reports that you had actual access to | 11:21 |
| 20 | the full report? | 11:21 |
| 21 | A.   I believe that is correct.  Yes. | 11:21 |
| 22 | Q.   Okay.  Gotcha. | 11:21 |
| 23 | And when -- when were you first contacted | 11:21 |
| 24 | about this case? | 11:21 |
| 25 | A.   I think it was in November of last year. | 11:21 |

Page 19

```
 1          Q.   And who contacted you?                11:21

 2          A.   Peter Stokes.                         11:21

 3          Q.   At what point in time, if you recall, were   11:21

 4     you retained?                                   11:22

 5          A.   I believe it would have been right about   11:22

 6     the same time that we were contacted.           11:22

 7          Q.   Okay.  Did you do anything to prepare for   11:22

 8     today's deposition?                             11:22

 9          A.   Yes, I did.                           11:22

10          Q.   What did you do?                      11:22

11          A.   I reviewed my reports.  I reviewed a   11:22

12     couple of other -- few other documents.  And I met   11:22

13     with counsel briefly.  Had a phone conversation.   11:22

14          Q.   Okay.  When you refer to "counsel," are   11:22

15     you referring to Mr. Stokes?                    11:22

16          A.   That's correct.                       11:22

17          Q.   Okay.  Did you meet with anybody else?   11:22

18          A.   Some of my team members.              11:23

19          Q.   And you met with Mr. Stokes telephonically   11:23

20     just one time in preparation for today's deposition?   11:23

21          A.   Or maybe two -- two brief calls.      11:23

22          Q.   Besides Mr. Stokes and yourself, was there   11:23

23     anyone else on those calls?                     11:23

24          A.   Yes.  One of my teammates was.        11:23

25          Q.   And aside from the teammate you just   11:23
```

Page 20

```
 1    referenced on the calls, I think you also referenced    11:23
 2    another -- additional team members.  Who are those     11:23
 3    team members?                                          11:23
 4         A.    Longxuan Wang is one of them, Malini        11:23
 5    Kohli, Tatiana Curiati, Spencer Tang [verbatim].       11:24
 6    Those are some of the members of my team that worked   11:24
 7    on this report.                                        11:24
 8         Q.    All right.  And you mentioned you also      11:24
 9    reviewed a few other docs in addition to your         11:24
10    reports.  Were those documents that you reviewed on    11:24
11    your own?                                              11:24
12         A.    Not understanding that question.            11:24
13         Q.    Sure.                                       11:24
14               Let me rephrase it.                         11:24
15               Were they documents that counsel           11:24
16    identified for you to review?                          11:24
17         A.    Oh.  No.                                    11:24
18         Q.    All right.  So what were those other       11:24
19    documents?                                             11:24
20         A.    I looked at the Complaint.  I looked at    11:24
21    Dr. Feinstein's report.  I believe one or two of the   11:25
22    declarations from Cabot, Mr. Schroeder -- I think it   11:25
23    was Mr. Schroeder's that I looked at, declaration.     11:25
24               That's what I recall.                       11:25
25         Q.    So did you review two declarations or was   11:25
```

Page 21

| | | |
|---|---|---|
| 1 | it just one, Mr. Schroeder's? | 11:25 |
| 2 | A.   I just recall looking at some part of | 11:25 |
| 3 | Mr. Schroeder's declaration. | 11:25 |
| 4 | Q.   Who is your employer? | 11:25 |
| 5 | A.   NERA. | 11:26 |
| 6 | Q.   And what is NERA? | 11:26 |
| 7 | A.   NERA is an economic consulting firm.  So | 11:26 |
| 8 | the -- National Economic Research Associates is what | 11:26 |
| 9 | the acronym stands for. | 11:26 |
| 10 | Q.   And is NERA an independent company, or is | 11:26 |
| 11 | it owned by somebody? | 11:26 |
| 12 | A.   It's owned by Marsh McLennan. | 11:26 |
| 13 | Q.   Marsh McLennan, that's an insurance | 11:26 |
| 14 | company? | 11:26 |
| 15 | A.   It's a -- it -- it has some insurance | 11:26 |
| 16 | brokerage businesses.  It's a publicly traded | 11:26 |
| 17 | company that -- some of their businesses include | 11:26 |
| 18 | insurance brokerage -- brokerage-related businesses. | 11:26 |
| 19 | Q.   Do you know, do they -- does | 11:26 |
| 20 | Marsh McLennan provide director and officer | 11:26 |
| 21 | liability insurance? | 11:26 |
| 22 | A.   I don't think they do. | 11:26 |
| 23 | Q.   Do you know one way or the other, or you | 11:27 |
| 24 | just surmise? | 11:27 |
| 25 | A.   I don't think they do. | 11:27 |

Page 22

```
 1            Q.    And in your Class Certification Report you      11:27

 2      identify your hourly rates; right?                          11:27

 3            A.    Right.                                          11:27

 4            Q.    And has that hourly rate changed since          11:27

 5      your Class Certification Report?                            11:27

 6            A.    It has not.  But it was a different             11:27

 7      rate -- it was a lower rate in -- I believe in 2022.        11:27

 8                  So that -- that's the 20- -- that's the         11:27

 9      current rate.                                               11:27

10                  That was both the current rate at the time     11:27

11      of my Class Certification Report.  It was -- as well        11:27

12      as my current rate now.                                     11:28

13            Q.    Understood.                                     11:28

14                  For the Class Certification Report, about       11:28

15      how many hours did you spend on that report?               11:28

16            A.    50 to 70 would be my estimate.                  11:28

17            Q.    And that was how many hours that you            11:28

18      personally put into the report; correct?                   11:28

19            A.    That's right.                                   11:28

20            Q.    You have -- let me take a step back.           11:28

21                  Your Class Certification Report concerns       11:28

22      price impact; correct?                                      11:28

23            A.    That is one of the issues I was asked to       11:28

24      address in my Class Certification Report.                   11:28

25            Q.    And you -- you've -- you've offered             11:28
```

Page 23

```
 1     opinions on price impact in other cases; correct?      11:28

 2         A.   Yes, I have.                                   11:29

 3         Q.   Do you know about how long on average it       11:29

 4     takes to complete a price impact-related report?        11:29

 5         A.   Do you mean how long -- how much time do I     11:29

 6     typically spend or how much --                          11:29

 7         Q.   Yes.  How much time you typically spend.        11:29

 8     Yes.                                                     11:29

 9         A.   I would say the 50 to 70 hours is -- might     11:29

10     be a fairly typical range.                              11:29

11         Q.   And you had mentioned about four or five       11:29

12     team members previously.                                11:29

13              Did they all help you on your Class            11:29

14     Certification Report?                                    11:29

15         A.   I believe so.                                  11:29

16              So I have two reports.  And there's been       11:30

17     something -- there may be some different -- a little     11:30

18     bit of a different mix of team members from one         11:30

19     report to the next.  But mostly overlap.                11:30

20              So I think they did all help on the Class      11:30

21     Certification Report.                                    11:30

22         Q.   And given that you had staff members or        11:30

23     team members help you on the report, did you write      11:30

24     the entire report yourself?                             11:30

25         A.   The whole report is written under my           11:30
```

Page 24

| | | |
|---|---|---|
| 1 | supervision and direction.  But I -- I have help | 11:30 |
| 2 | from the team members in -- in working on the -- not | 11:30 |
| 3 | only the analysis and -- but helping to put together | 11:30 |
| 4 | the tables and many aspects of the reports.  So | 11:30 |
| 5 | footnotes and cites and things like that, most of | 11:30 |
| 6 | the -- but it's all done under my direction and | 11:31 |
| 7 | supervision. | 11:31 |
| 8 | Q.   So you -- you don't write every word and | 11:31 |
| 9 | create every chart.  Your team member -- or team | 11:31 |
| 10 | members will help with that.  But you review the | 11:31 |
| 11 | finished product so you can sign your name to it. | 11:31 |
| 12 | Is that a fair characterization? | 11:31 |
| 13 | A.   No.  That's not a fair characterization. | 11:31 |
| 14 | So typically I am -- work is the -- the | 11:31 |
| 15 | analysis is something that is done at -- under my | 11:31 |
| 16 | direction and supervision. | 11:31 |
| 17 | And then at some point it's put into a | 11:31 |
| 18 | report format.  And typically it starts with an | 11:31 |
| 19 | outline, which will be, you know, my -- my words and | 11:31 |
| 20 | what -- you know, what I think makes sense in terms | 11:31 |
| 21 | of an outline. | 11:31 |
| 22 | And then some of the parts are -- for | 11:31 |
| 23 | example, the qualifications are similar, and my | 11:31 |
| 24 | qualifications are similar in every report.  And | 11:31 |
| 25 | that might be something that somebody copies and | 11:32 |

Page 25

1    sort of plops in.                                  11:32

2           But exhibits, I tend not to -- I have        11:32

3    direction on what they should look like and, you   11:32

4    know, what the columns should be or what is the    11:32

5    format.  But I am practically never the one to     11:32

6    actually do that.                                  11:32

7           But that -- that's the typical process for   11:32

8    me.                                                11:32

9        Q.   Okay.  And I understand that              11:32

10   qualifications, you know, tend to stay mostly the  11:32

11   same -- things have changed over time.  So that just 11:32

12   gets copied over from one report to another.       11:32

13          But the substance of the report itself,     11:32

14   did you write every word of the Class Certification 11:32

15   Report?                                            11:32

16       A.   So, again, I think I described the -- the  11:32

17   process to you.                                    11:32

18          Many of the words may have come from -- so  11:33

19   sometimes the parts that are previously described in 11:33

20   other reports.  So there's language that I have used 11:33

21   previously.                                        11:33

22          And there are parts that -- some -- some    11:33

23   of it is typed in by other people.  The words      11:33

24   are things that have come from me or that I review. 11:33

25       Q.   Okay.  I think I understand.              11:33

Page 26

```
 1              And then you mention exhibits.            11:33
 2              Is it fair to say that you typically don't 11:33
 3    create the exhibits?  You review them after the    11:33
 4    fact?                                              11:33
 5       A.   I often design them to begin with and tell 11:33
 6    them what they should look like and then review them 11:33
 7    as they're coming along and make edits to them.    11:33
 8              But I am not the one to put it in.       11:33
 9              They're often in Excel; so I am not      11:33
10    usually the one doing that.  Practically never the 11:34
11    one doing that.                                    11:34
12       Q.   Understood.                                11:34
13              So I understand that you spent around 50 11:34
14    to 70 hours on the report.                         11:34
15              Do you know how many hours your team     11:34
16    members spent on the report?                       11:34
17       A.   I do not.                                  11:34
18       Q.   Do you have -- well, do you have any idea  11:34
19    how much time is spent on the report?              11:34
20       A.   I don't really.  No.                       11:34
21       Q.   Okay.  So you have no idea how many total  11:34
22    hours were put into the report by you and your team 11:34
23    members?                                           11:34
24       A.   I don't.                                   11:34
25       Q.   And what are your team members billed out  11:34
```

Page  27

```
 1    at?                                                  11:34

 2         A.   I don't know that.  There's a -- there's a  11:34

 3    range, but I don't -- I don't know what that is.     11:34

 4         Q.   So you have no sense of what your team       11:34

 5    members are billed at on an hourly basis?            11:34

 6         A.   I don't have it in my head, no.             11:34

 7         Q.   So do you know how much the report, the     11:35

 8    Class Certification Report costs in total?           11:35

 9         A.   I don't.                                    11:35

10         MR. STOKES:  Objection to form.                  11:35

11         THE WITNESS:  I don't know the amount of         11:35

12    time that NERA billed or the amount of money that    11:35

13    NERA billed for doing the analysis in preparing the  11:35

14    report.                                              11:35

15    BY MR. LAVELLE:                                       11:35

16         Q.   And you receive a salary from NERA?         11:35

17         A.   I do.                                       11:35

18         Q.   And --                                      11:35

19         A.   Well, I'm not sure if it's from NERA, but   11:35

20    from -- whatever.  Yes.                              11:35

21         Q.   What do you mean?                           11:35

22         A.   It may technically -- it may technically    11:35

23    come from Marsh McLennan.  But, yeah, that's         11:35

24    correct.                                             11:35

25         Q.   Okay.  And what I am getting at is salary   11:35
```

Page 28

| | | |
|---|---|---|
| 1 | is the primary -- primarily the way that you are | 11:36 |
| 2 | compensated; is that right? | 11:36 |
| 3 | A.   There's also a bonus. | 11:36 |
| 4 | Q.   What is your bonus? | 11:36 |
| 5 | A.   So there is the -- the -- my compensation | 11:36 |
| 6 | is typically salary as well as a bonus that is once | 11:36 |
| 7 | a year. | 11:36 |
| 8 | Q.   And what is your bonus based on? | 11:36 |
| 9 | A.   Well, that's an excellent question.  It's | 11:36 |
| 10 | something that is -- seems quite complex and it's | 11:36 |
| 11 | not entirely clear, but it has many components and | 11:36 |
| 12 | many complicated -- to the point where it's -- yeah. | 11:36 |
| 13 | In part, it's based on some sort of | 11:36 |
| 14 | performance over the year that has to do with -- in | 11:37 |
| 15 | some sense, what -- what -- you know, what the firm | 11:37 |
| 16 | considers better performance yields better bonuses, | 11:37 |
| 17 | but exactly how that works is not straightforward. | 11:37 |
| 18 | Q.   So I understand that the process is | 11:37 |
| 19 | complex, as you described it. | 11:37 |
| 20 | Do you know what the actual components are | 11:37 |
| 21 | that go into your bonus? | 11:37 |
| 22 | A.   No.  It is not -- it's not only complex, | 11:37 |
| 23 | it is fairly opaque. | 11:37 |
| 24 | Q.   Okay.  So you are not sure what criteria | 11:37 |
| 25 | your bonus is actually based on; is that right? | 11:37 |

Page 29

| | | |
|---|---|---|
| 1 | A.   I'm sure NERA -- NERA has descriptions of | 11:37 |
| 2 | what the criteria are, but I would not be able to | 11:37 |
| 3 | tell you what the bonus would be based on those. | 11:37 |
| 4 | There are, you know, firm contributions.  Yeah. | 11:37 |
| 5 | There. | 11:38 |
| 6 | Q.   And you referenced "firm contributions" as | 11:38 |
| 7 | well as "performance" generally. | 11:38 |
| 8 | Would the amount of hours that you billed | 11:38 |
| 9 | over the course of a year be one of the criteria | 11:38 |
| 10 | that your bonus is contingent on? | 11:38 |
| 11 | A.   Not directly.  No. | 11:38 |
| 12 | Q.   What do you mean "not directly"? | 11:38 |
| 13 | A.   I mean, overall, if you bill more hours, | 11:38 |
| 14 | if you have two people at my level, one that bills | 11:38 |
| 15 | many more hours and one that bills fewer hours, all | 11:38 |
| 16 | things equal, it's more likely that the person who | 11:38 |
| 17 | bills more hours would end up with a higher bonus, | 11:38 |
| 18 | but it is not -- there's no formula based on the | 11:38 |
| 19 | hours billed. | 11:38 |
| 20 | Q.   Okay.  And, generally, you have provided | 11:38 |
| 21 | testimony before in -- in securities class actions; | 11:38 |
| 22 | is that right? | 11:39 |
| 23 | A.   I have provided testimony before on | 11:39 |
| 24 | securities class actions. | 11:39 |
| 25 | Q.   Generally, again, how many times have you | 11:39 |

Page 30

| | | |
|---|---|---|
| 1 | provided testimony as a defense-side expert in | 11:39 |
| 2 | securities class actions? | 11:39 |
| 3 | A.   I don't know. | 11:39 |
| 4 | Q.   Can you ballpark it? | 11:39 |
| 5 | A.   I just don't know.  I have a list of my | 11:39 |
| 6 | testimony in the last four years. | 11:39 |
| 7 | Q.   Sure.  And I understand that. | 11:39 |
| 8 | I'm asking for -- on all-time basis. | 11:39 |
| 9 | A.   I -- I just don't know. | 11:39 |
| 10 | Q.   Would it be more than 25 times? | 11:39 |
| 11 | A.   I have to think about what you are asking | 11:39 |
| 12 | me now.  What is your question exactly? | 11:39 |
| 13 | Q.   Sure. | 11:39 |
| 14 | What I'm asking is about how many times | 11:39 |
| 15 | have you testified as a defense-side expert in a | 11:39 |
| 16 | securities class action? | 11:40 |
| 17 | A.   Yeah.  I just -- I just don't know. | 11:40 |
| 18 | Q.   Can you say it's more or less than | 11:40 |
| 19 | 25 times? | 11:40 |
| 20 | A.   I don't know. | 11:40 |
| 21 | Q.   More -- | 11:40 |
| 22 | A.   And -- | 11:40 |
| 23 | Q.   Sorry.  I didn't mean to cut you off. | 11:40 |
| 24 | Had you finished your answer? | 11:40 |
| 25 | A.   And for testimony, you mean testifying at | 11:40 |

Page 31

1    a court or a deposition?  Or what are you...            11:40

2         Q.    Sure.  Fair enough.                          11:40

3               Court or deposition.                         11:40

4         A.    Yeah.  I just -- I don't know.  The actual   11:40

5    testifying is, you know, like, a -- a tiny percent      11:40

6    of the amount of time that I am working.  So it's       11:40

7    not -- I just don't know.  Some cases have              11:40

8    testimony; some projects, you know -- lots of           11:41

9    projects I work on don't have any testimony.            11:41

10              So it's easier to think of what am I         11:41

11   spending my time doing, not, you know, the actual       11:41

12   testimony itself, and then -- whether it's a            11:41

13   securities class action or not is -- I -- I have        11:41

14   testified in a number of matters that are not           11:41

15   securities class actions.  So...                        11:41

16        Q.    Okay.  So you can't say one way or the       11:41

17   other if you have testified more than or less than      11:41

18   25 times as a defense-side expert in securities         11:41

19   class actions?                                          11:41

20        A.    Not off the top of my head, as I sit here.   11:41

21        Q.    Have you ever testified in a securities      11:41

22   class action on behalf of plaintiffs?                   11:41

23        A.    I have worked for plaintiffs in securities   11:42

24   class actions.  I have testified in securities cases    11:42

25   for plaintiffs.                                          11:42

Page 32

| | | |
|---|---|---|
| 1 | I don't believe that I have testified on | 11:42 |
| 2 | behalf of plaintiffs in a securities class action. | 11:42 |
| 3 | Q.   You mention you testified in securities | 11:42 |
| 4 | cases for plaintiffs, but then you also said "I | 11:42 |
| 5 | don't believe that I have testified on behalf of | 11:42 |
| 6 | plaintiffs on securities class action," which seemed | 11:42 |
| 7 | a little bit in conflict to me. | 11:42 |
| 8 | Can you just explained that? | 11:42 |
| 9 | A.   So there have been securities cases that | 11:42 |
| 10 | are not class actions that I have been retained by | 11:42 |
| 11 | plaintiffs. | 11:42 |
| 12 | Q.   Okay.  So in securities class actions, you | 11:42 |
| 13 | have never provided testimony on behalf of | 11:42 |
| 14 | plaintiffs before; is that correct? | 11:42 |
| 15 | A.   So my recollection is I have been retained | 11:43 |
| 16 | by plaintiffs in securities cases, including | 11:43 |
| 17 | securities class actions.  I have testified on | 11:43 |
| 18 | behalf of plaintiffs in securities cases.  I don't | 11:43 |
| 19 | have a recollection of having testified on behalf of | 11:43 |
| 20 | plaintiffs in a securities case that is also a class | 11:43 |
| 21 | action. | 11:43 |
| 22 | Q.   Okay.  I understand your answer. | 11:43 |
| 23 | Before we were talking a little bit about | 11:43 |
| 24 | how many times, like, you have offered testimony as | 11:43 |
| 25 | a defense-side expert in a securities class action. | 11:43 |

Page 33

```
 1     And I want to ask a slightly different variation of      11:43

 2     the question.                                            11:43

 3              Do you have an idea of how many times that      11:43

 4     you have provided reports, expert reports on behalf      11:43

 5     of defendants in securities class actions?              11:43

 6        A.   I don't know.                                    11:44

 7        Q.   Turning back to your Class Certification         11:44

 8     Report in this case, are you offering any opinions       11:44

 9     on market efficiency?                                    11:44

10        A.   No.  I'm assuming market efficiency is           11:44

11     alleged in the Complaint.                                11:44

12        Q.   And when you say "market efficiency," what       11:44

13     do you mean by that?                                     11:44

14        A.   I'm assuming that -- as alleged in the           11:44

15     Complaint.  So I'm assuming what plaintiffs are          11:44

16     assuming regarding market efficiency.  Plaintiff's      11:44

17     claim that they are showing.                             11:44

18        Q.   Okay.  And you don't -- you don't dispute        11:44

19     that in your Class Certification Report that the         11:44

20     market is efficient for -- for --                        11:44

21        A.   I haven't been --                                11:44

22        Q.   -- period?                                       11:44

23        A.   I haven't been asked to analyze market           11:44

24     efficiency; so I'm doing an analysis assuming that       11:44

25     what plaintiffs claim is true.                           11:45
```

Page 34

```
 1          Q.    And did you begin your analysis of price      11:45
 2    impact prior to receiving Dr. Feinstein's report in       11:45
 3    this case?                                                 11:45
 4          A.    I don't know.  I think if I look at the        11:45
 5    date of his report.                                        11:45
 6                [Witness reviews document].                    11:45
 7                December.                                      11:45
 8                I don't know.                                  11:45
 9          Q.    So you could have; you just don't know one     11:45
10    way or the other?                                          11:45
11          A.    Yeah.  I don't know.                           11:45
12          Q.    In preparing your -- your Class               11:45
13    Certification Report, did you communicate with            11:45
14    anyone at Cabot?                                          11:45
15          A.    I don't believe so.                           11:46
16          Q.    So you have no recollection of                11:46
17    communicating with anyone at Cabot about the subject      11:46
18    matter of your Class Certification Report; is that        11:46
19    right?                                                     11:46
20          A.    That's right.  I don't believe I -- I          11:46
21    don't have a recollection of that.                        11:46
22                Correct.  I don't have a recollection of       11:46
23    that.                                                      11:46
24          Q.    Thank you for the clarification.               11:46
25                To your knowledge, did any of the people      11:46
```

Page 35

```
 1    that you were working with at NERA communicate with      11:46
 2    anyone at Cabot about your Class Certification           11:46
 3    Report?                                                  11:46
 4         A.   I don't believe so.                            11:46
 5         Q.   And in the -- the course of your               11:46
 6    engagement with respect to the Class Certification       11:46
 7    Report, did you do any statistical analysis?             11:46
 8         A.   Did I do any -- your question is did I --       11:47
 9         Q.   Yes.                                            11:47
10         A.   Yes.                                            11:47
11              So one of the things that I did is an          11:47
12    event study analysis, which includes a statistical       11:47
13    analysis.                                                11:47
14         Q.   Right.                                          11:47
15              And did you conduct the event study, or        11:47
16    did your staff conduct it for you?                       11:47
17         A.   Oh.  Well, my team helped do the event         11:47
18    study analysis.  So...                                   11:47
19         Q.   And did you conduct that event study of        11:47
20    Cabot stock price during the Class Period prior to       11:47
21    receiving Dr. Feinstein's report in this case?           11:47
22         A.   I don't recall.                                11:47
23         Q.   If you look at Appendix A of your report,      11:47
24    which I believe is your CV, it identifies the            11:48
25    various matters in which you've provided expert          11:48
```

Page 36

```
1    reports, deposition, and testimony for the last      11:48
2    four years.                                           11:48
3           My question is just -- is that -- sitting      11:48
4    here today, is that list still current?              11:48
5       A.   No.   Probably not.                           11:48
6           [Witness reviews document].                    11:48
7           I think I've had at least one deposition       11:48
8    since then.                                           11:48
9       Q.   Any other reports?                            11:48
10      A.   I don't think this lists reports; so this     11:49
11   just lists testimony.                                 11:49
12      Q.   Just testimony.                               11:49
13          Okay.  So for that one additional case         11:49
14   that you can remember, what was that case?            11:49
15      A.   I remember setting up for a deposition,       11:49
16   but I don't remember what the case was.               11:49
17      Q.   You have --                                   11:49
18      A.   So I feel I have recently -- you know, it     11:49
19   takes a little bit of work to set up the --           11:49
20   remember, I'm in a room that I don't normally sit     11:49
21   in.  It doesn't have as much background.  But I -- I  11:49
22   do not recall -- I can't recall what I --             11:49
23      Q.   What are the other --                         11:49
24      A.   It seems like it was -- it was more           11:49
25   recently than January.  So that's what's making       11:49
```

Page 37

```
 1    me --                                             11:49

 2        Q.   Got it.                                  11:49

 3             Do you remember who the defendant or     11:49

 4    defendants were in that case?                     11:49

 5        A.   I just am blanking on what it was        11:49

 6    altogether.  So...                                11:49

 7        Q.   Okay.  And do you remember what the --   11:49

 8    what the report that you offered in that case was 11:49

 9    generally about?                                  11:50

10        A.   No.  I'm just not remembering what the --11:50

11    I'm not remembering what it was at all other than 11:50

12    setting up for a deposition.                      11:50

13        Q.   Sure.                                     11:50

14             Okay.  And so turning back to that       11:50

15    Appendix A and the various matters listed and     11:50

16    identified, did you offer any opinions on price   11:50

17    impact on any of those cases listed?              11:50

18        A.   I don't know.  I may have.  I just don't 11:50

19    recall.  I mean, I would have to -- I could look  11:50

20    through the list and try to recall but --         11:50

21        Q.   Take a quick look and let me know if you 11:50

22    recall any engagements that were listed where you 11:50

23    were offering price impact opinions.              11:50

24        A.   [Witness reviews document].              11:50

25             With some of them I'm sure it's not the  11:50
```

Page 38

| | | |
|---|---|---|
| 1 | case because I recall that they're not securities | 11:51 |
| 2 | class actions.  But the others, I'm just not -- I'm | 11:51 |
| 3 | not sure. | 11:51 |
| 4 | I don't -- I don't know the answer to | 11:51 |
| 5 | that. | 11:51 |
| 6 | Q.   Okay.  So for the matters listed there on | 11:51 |
| 7 | your prior engagements where you offer testimony | 11:51 |
| 8 | over the past four years, did you ever opine that an | 11:51 |
| 9 | alleged false statement or omission had a price | 11:51 |
| 10 | impact on a company's stock price? | 11:51 |
| 11 | A.   On any of these particular cases?  Is that | 11:51 |
| 12 | your question? | 11:51 |
| 13 | Q.   Yeah.  Yes.  Correct. | 11:51 |
| 14 | A.   [Witness reviews document]. | 11:52 |
| 15 | Not that I recall. | 11:52 |
| 16 | Q.   And in any securities class action that | 11:52 |
| 17 | you have offered price impact opinions on, have you | 11:52 |
| 18 | ever opined that a false statement or omission | 11:52 |
| 19 | impacted a company's stock price? | 11:52 |
| 20 | A.   In -- in testimony?  Was that your | 11:52 |
| 21 | question or... | 11:52 |
| 22 | Q.   Yes.  Or in a report. | 11:52 |
| 23 | A.   I may have. | 11:52 |
| 24 | Q.   Can you think of any instances? | 11:52 |
| 25 | A.   Well, not -- so to the extent that I have | 11:53 |

Page 39

```
 1    come to that conclusion and I have been retained by      11:53

 2    defendants, then typically defendants would not          11:53

 3    submit a report to that effect.                          11:53

 4            But if it's not a securities class action,       11:53

 5    I may have done that for -- in a securities case         11:53

 6    that's not -- yeah.  I just don't recall.                11:53

 7        Q.   Can you think of what that securities case      11:54

 8    was?                                                     11:54

 9        A.   No.  I am saying I don't recall.                11:54

10        Q.   Okay.  You can't -- can't recall any            11:54

11    instances.                                               11:54

12            I understand.                                    11:54

13            And have you ever testified that there was       11:54

14    not price impact in a securities case aside from         11:54

15    this one?                                                11:54

16        A.   Yes, I have.  I have testified regarding        11:54

17    price impact and have found that there was no price      11:54

18    impact -- or no price impact with regard to certain      11:54

19    alleged misrepresentations.                              11:54

20        Q.   And how many cases did you offer that           11:54

21    testimony in?                                            11:55

22        A.   I don't know.                                   11:55

23        Q.   Can you say if it's more or less than ten?      11:55

24        A.   I just don't -- I don't know.                   11:55

25        Q.   Do you remember the names of any of those       11:55
```

Page 40

| | | |
|---|---|---|
| 1 | cases where you testified there was no price impact? | 11:55 |
| 2 | A.   I've been asked to address the issue of | 11:55 |
| 3 | price impact in a number of cases.  And I have -- | 11:55 |
| 4 | I'm just not sure whether I've testified or written | 11:55 |
| 5 | reports or -- Halliburton was a case that I believe | 11:55 |
| 6 | I was asked to address price impact and testify to | 11:55 |
| 7 | price impact.  I think I reference that case -- or | 11:56 |
| 8 | part of that decision in this report. | 11:56 |
| 9 | Q.   Sure. | 11:56 |
| 10 | Any others aside from Halliburton? | 11:56 |
| 11 | A.   There have been others.  I just would have | 11:56 |
| 12 | to... | 11:56 |
| 13 | There are others, but -- but they are not | 11:56 |
| 14 | coming to mind. | 11:56 |
| 15 | Q.   Have you ever had a peer-reviewed article | 11:56 |
| 16 | published on price impact for common stock? | 11:56 |
| 17 | A.   So I have had a peer-reviewed article | 11:56 |
| 18 | which analyzes the impact of information on the | 11:56 |
| 19 | price, which is price impact.  So I have a | 11:56 |
| 20 | peer-reviewed article, which should be listed here, | 11:56 |
| 21 | which is about the impact of goodwill announcements | 11:57 |
| 22 | on businesses.  So that is an analysis of the impact | 11:57 |
| 23 | on the stock price of information, which is -- which | 11:57 |
| 24 | is an analysis of price impact. | 11:57 |
| 25 | That's -- it was in the International | 11:57 |

Page 41

| | | |
|---|---|---|
| 1 | Journal of Business, Accounting, and Finance. | 11:57 |
| 2 | Q.   And that was specific to goodwill-related | 11:57 |
| 3 | announcements? | 11:57 |
| 4 | A.   It was about the impact of goodwill | 11:57 |
| 5 | impairment announcements. | 11:57 |
| 6 | Q.   Aside from that article, was there any | 11:57 |
| 7 | others? | 11:57 |
| 8 | A.   I have a peer-reviewed article in the | 11:58 |
| 9 | International Journal of Environment Research in | 11:58 |
| 10 | public health.  It's possible that that may have | 11:58 |
| 11 | involved an analysis of -- I don't think so. | 11:58 |
| 12 | That -- it's possible that that may have -- I may | 11:58 |
| 13 | have done some -- wasn't the main focus of that | 11:58 |
| 14 | article.  I think not, but I'm trying to remember. | 11:58 |
| 15 | I don't think so.  So I don't think I did any kind | 11:59 |
| 16 | of price impact analysis in that article. | 11:59 |
| 17 | Q.   Okay.  Do you have any peer-reviewed | 11:59 |
| 18 | articles that have been published regarding alleged | 11:59 |
| 19 | misstatements or omissions having a price impact on | 11:59 |
| 20 | a common stock -- a company's common stock? | 11:59 |
| 21 | A.   I do not have a -- no.  I don't think so. | 11:59 |
| 22 | Q.   And putting aside peer-reviewed published | 11:59 |
| 23 | articles, do you have any more generally articles | 11:59 |
| 24 | regarding price impact on company's stocks? | 11:59 |
| 25 | A.   Possibly.  So other -- I did a working | 12:00 |

Page 42

| | | |
|---|---|---|
| 1 | paper on -- entitled China Product Recalls.  It's | 12:00 |
| 2 | possible that that involved -- I believe that | 12:00 |
| 3 | involved some analysis of price impact and stock | 12:00 |
| 4 | price reactions information on -- on recalls. | 12:00 |
| 5 | Q.   Right. | 12:00 |
| 6 | And aside from that one article, are there | 12:00 |
| 7 | any others that you can think of? | 12:00 |
| 8 | A.   Not as I sit here, no. | 12:01 |
| 9 | Q.   Okay.  And aside from articles that you | 12:01 |
| 10 | yourself directly authored, have you contributed to | 12:01 |
| 11 | any articles on price impact on company stocks? | 12:01 |
| 12 | A.   Not that I recall. | 12:01 |
| 13 | Q.   Okay.  All right.  Let's go off the record | 12:01 |
| 14 | for a minute. | 12:01 |
| 15 | THE VIDEOGRAPHER:  Okay.  We're off the | 12:01 |
| 16 | record.  It's 12:02 p.m. | 12:01 |
| 17 | (Brief recess.) | 12:01 |
| 18 | THE VIDEOGRAPHER:  We're back on the | 12:14 |
| 19 | record.  It's 12:14 p.m. | 12:14 |
| 20 | BY MR. LAVELLE: | 12:14 |
| 21 | Q.   Welcome back, Ms. Allen. | 12:14 |
| 22 | So I know that you have your Class | 12:14 |
| 23 | Certification Report with you, and it's fine to | 12:14 |
| 24 | refer to that.  I'm going to mark that report as an | 12:14 |
| 25 | exhibit now. | 12:14 |

Page 43

| | | |
|---|---|---|
| 1 | So let me go ahead and do that, and I'll | 12:14 |
| 2 | let you know.  It should be populated in the Exhibit | 12:14 |
| 3 | Share in a moment. | 12:15 |
| 4 | (Deposition Exhibit 1 was marked for | 12:15 |
| 5 | identification and is attached hereto.) | 12:15 |
| 6 | BY MR. LAVELLE: | 12:15 |
| 7 | Q.   Okay.  That exhibit has been introduced. | 12:15 |
| 8 | So let me know, Ms. Allen, are you able | 12:16 |
| 9 | to -- to view it? | 12:16 |
| 10 | A.   Yes, I am.  Thank you. | 12:16 |
| 11 | Q.   Okay.  Very good. | 12:16 |
| 12 | MR. LAVELLE:  So I have just introduced as | 12:16 |
| 13 | Plaintiff's Exhibit 1, and I want to state for the | 12:16 |
| 14 | record it's the "Expert Report and Declaration of | 12:16 |
| 15 | Lucy P. Allen," dated January 20th, 2023. | 12:16 |
| 16 | BY MR. LAVELLE: | 12:16 |
| 17 | Q.   Now, Ms. Allen, like I said, feel free to | 12:16 |
| 18 | refer to the hard copy of your report, but I would | 12:16 |
| 19 | just like you to look at the version that I just | 12:16 |
| 20 | marked as Plaintiff's Exhibit 1 and just let me | 12:16 |
| 21 | know, do you have any reason to believe that this is | 12:16 |
| 22 | not the version of your report that was filed in | 12:16 |
| 23 | this case? | 12:16 |
| 24 | A.   No.  It looks like -- it looks like it is | 12:16 |
| 25 | my report. | 12:16 |

Page 44

```
 1        Q.   Very good.                              12:16

 2             And it appears to be the same version of  12:16

 3   your report that you are looking at in hard copy; is  12:16

 4   that right?                                        12:16

 5        A.   Yes.  Except mine doesn't have, like, the  12:16

 6   filed caption on top.                              12:16

 7        Q.   Right.  And you are referring to the --   12:17

 8   the information that gets stamped on the document   12:17

 9   when it's filed with the Court; right?             12:17

10        A.   Yes.                                     12:17

11        Q.   All right.  I would like to look for a    12:17

12   time at your Appendix B, for "Materials Considered."  12:17

13        A.   Okay.                                    12:17

14        Q.   Did you -- excuse me -- personally review  12:17

15   all of the items listed under Appendix B for        12:17

16   Materials Considered?                              12:17

17        A.   Yeah.                                     12:17

18        Q.   Okay.  What materials did you not         12:17

19   personally review?                                 12:17

20        A.   Well, the SEC filings, I would have looked  12:17

21   at just small portions of them and not most of the   12:17

22   dates.  The SEC filings I -- I did not review many   12:17

23   of them at all and only looked at small portions of  12:18

24   them.                                              12:18

25             Of the "Case documents," I reviewed the   12:18
```

Page 45

| | | |
|---|---|---|
| 1 | Complaint. | 12:18 |
| 2 | I don't particularly recall reviewing Item | 12:18 |
| 3 | Number 2 or 3. | 12:18 |
| 4 | I do recall reviewing Item Number 4. | 12:18 |
| 5 | I don't recall reviewing Number 5. | 12:18 |
| 6 | Q.   And just briefly, when you are referring | 12:18 |
| 7 | to Items 2 or 3 or 5 as items that you did not | 12:18 |
| 8 | review, what are you referring to? | 12:18 |
| 9 | A.   The numbers that are in my "Appendix B - | 12:18 |
| 10 | Materials Considered" that you were asking me about. | 12:19 |
| 11 | Oh.  I'm under the "Case documents."  I'm | 12:19 |
| 12 | sorry.  The numbers repeat.  So I was under the | 12:19 |
| 13 | first category.  "Case documents and filings in this | 12:19 |
| 14 | matter." | 12:19 |
| 15 | Q.   Okay.  So you didn't review "Defendants' | 12:19 |
| 16 | Motion to Dismiss Amended Complaint, filed | 12:19 |
| 17 | March 10th, 2022"; | 12:19 |
| 18 | "Plaintiffs' Memorandum of Law in | 12:19 |
| 19 | Opposition to Defendants' Motion to Dismiss Amended | 12:19 |
| 20 | Complaint, filed April 13th, 2022"; | 12:19 |
| 21 | Or the "Memorandum of Law in Support of | 12:19 |
| 22 | Plaintiff's Motion for Class Certification, filed | 12:19 |
| 23 | December 5th, 2022." | 12:19 |
| 24 | Is that right? | 12:19 |
| 25 | A.   I don't recall reviewing that. | 12:19 |

Page 46

```
 1        Q.   Okay.  Okay.  Aside from the SEC filings,    12:19
 2   some of which you did not review and those Items 2,    12:19
 3   3, and 5, which you do not recall reviewing under      12:19
 4   the Case documents that were filed in this matter,     12:19
 5   are there any other materials that you did not         12:20
 6   personally review that are listed here in              12:20
 7   Appendix B?                                            12:20
 8        A.   [Witness reviews document].                  12:20
 9             So -- so many of the others I would have     12:21
10   reviewed in -- in parts, but -- likely not in their    12:21
11   entirety.  So...                                       12:21
12        Q.   Okay.  So this is your listing of            12:21
13   materials considered.  You mentioned there are some    12:21
14   documents, in particular SEC filings, that you did     12:21
15   not actually review.                                   12:21
16             So what is the difference between            12:21
17   reviewing and considering?                             12:21
18        A.   Oh.  Considered are materials that we        12:21
19   have -- I have had access to and considered as part    12:21
20   of this project.  So there are documents that we,      12:22
21   either myself or members of my team, had access to     12:22
22   and, you know, downloaded or had available and -- so   12:22
23   something -- that's what "considered" means.           12:22
24             Reviewed, would be, you know, actually       12:22
25   looked at it and whatever.  Reviewed the document.     12:22
```

Page  47

```
1    So not all of the SEC filings, for example, would    12:22

2    necessarily have been reviewed and certainly not in   12:22

3    their entirety.                                        12:22

4         Q.   And how did you determine what documents    12:22

5    to review in order to render your opinions in this    12:22

6    Class Certification Report?                            12:23

7         A.   For me personally to review or for my team  12:23

8    to review?                                             12:23

9         Q.   Either.                                      12:23

10        A.   Well, I could walk through the analysis      12:23

11   that was done and what -- you know, for what          12:23

12   potential purpose or purpose was each piece of        12:23

13   information considered or reviewed.                    12:23

14        But overall, one of the things that I am         12:23

15   doing in this is looking at what information was      12:23

16   publicly available to the market about the alleged    12:23

17   misrepresentations and the alleged corrective        12:23

18   disclosures during the alleged Class Period.  So      12:24

19   it's -- and what was the markets' reaction to that   12:24

20   information.  So much of the material falls under     12:24

21   that category.                                         12:24

22        Q.   How do you determine what the markets'      12:24

23   reaction was to information?                          12:24

24        A.   How did I, or how does one?                 12:24

25        Q.   How does one.                                12:24
```

Page 48

```
 1        A.   Well, there -- so there are a number of    12:24
 2   ways.  One is -- is looking at what does the market   12:24
 3   say.  And one way of looking at what the market says  12:24
 4   is to look at what professionals, the analysts, say.  12:24
 5   And looking at analyst reports is -- is useful.       12:24
 6             And it's not just -- you know, it's --      12:24
 7   it's not only what do they put in the reports, but    12:24
 8   it's when do they issue reports and how does it       12:25
 9   compare to other reports that they have issued.  So   12:25
10   that's one way.                                       12:25
11             Another way of looking at it is how does    12:25
12   the stock price react to the information.  And so     12:25
13   looking at the actual stock price movement of the     12:25
14   company at issue as well as how does that compare to  12:25
15   what the market or industry is doing at the same      12:25
16   time.                                                 12:25
17             So doing an event study is one way of       12:25
18   analyzing stock price reaction to information.        12:25
19        Q.   And breaking that down, aside from looking  12:25
20   at analyst reports, are there other ways to           12:25
21   determine what the market is saying?                  12:25
22        A.   Well, so you can look at what the -- the    12:25
23   company is saying.  You can -- there's -- there are   12:25
24   what news stories -- how analysts -- not only what    12:25
25   analysts put in their analyst -- in their reports     12:26
```

Page 49

```
 1    but how do they change their price targets or their       12:26
 2    evaluation of the company.                                 12:26
 3             Those are some of the -- those are all            12:26
 4    things that I have done in this case.                      12:26
 5        Q.   So aside from -- in terms of figuring out         12:26
 6    what the market is saying, aside from looking at           12:26
 7    analyst reports, company disclosures, and news             12:26
 8    reports, is there anything else?                           12:26
 9        A.   Well, analyzing how those things changed          12:26
10    over time.  So it's not just looking at the analyst        12:26
11    reports but whether they are changing their                12:26
12    evaluation based on that information.                      12:27
13             But the sources of information are, you           12:27
14    know, the news, the -- the company analyst reports,        12:27
15    I think that's -- and then how the price is moving         12:27
16    relative to other market and industry factors and         12:27
17    perhaps how competitors' prices are moving or why         12:27
18    are competitor prices moving and things like that.        12:27
19    I mean, it depends, obviously.  I am not...               12:27
20        Q.   So were there any documents that you asked       12:27
21    for to render your Class Certification Report             12:27
22    opinions that you did not receive in this case?           12:27
23        A.   Well, I think we would have asked for all        12:27
24    the analyst reports, for example, that are               12:27
25    available.                                                12:28
```

Page 50

```
 1              And my recollection is we didn't -- we got      12:28
 2    the analyst reports ourselves.  So there is some          12:28
 3    analyst reports or there are some kind of reports         12:28
 4    that are -- we cannot get through our services.           12:28
 5              I don't -- I can't think of anything else       12:28
 6    that we would have asked for -- or recall asking for      12:28
 7    that we did not receive.                                  12:28
 8              That's it.  I don't actually recall for --      12:28
 9    asking for analyst reports, but I am quite sure that      12:28
10    we would have because that is what we typically do.       12:28
11        Q.   Okay.  So aside from the analyst reports,        12:28
12    there is nothing else you can think of in terms of        12:28
13    documents that you asked for but you might not have       12:29
14    received?                                                 12:29
15        A.   That's right.                                    12:29
16        Q.   Okay.  Let's look at -- back at your             12:29
17    Appendix B, the first category "Case documents and        12:29
18    filings in this matter."                                  12:29
19              So you reviewed the -- the operative            12:29
20    Complaint; is that right?                                 12:29
21        A.   That's right.                                    12:29
22        Q.   And why did you do that?                         12:29
23        A.   To understand the -- what plaintiffs were        12:29
24    alleging.                                                 12:29
25        Q.   And why did you need to understand what          12:29
```

Page 51

```
 1    the plaintiffs are alleging?                      12:29

 2         A.   Because that's -- part of my assignment is  12:29

 3    to analyze the alleged misrepresentations and    12:29

 4    whether they impacted the stock price during the 12:30

 5    alleged Class Period.                            12:30

 6         Q.   Okay.  So you need to be familiar with the  12:30

 7    allegations in the Complaint in order to render your 12:30

 8    Class Certification Report opinions?             12:30

 9         A.   Yes.  I think that is generally correct.  12:30

10    Here, I believe the judge has dismissed some of the 12:30

11    categories of the allegations in the Complaint.  So 12:30

12    everything that was alleged in the Complaint is, I 12:30

13    think, no longer -- is not all still part of the 12:30

14    case.                                            12:30

15         Q.   So you -- you analyzed the allegations  12:30

16    that were made in the case following the Court's 12:30

17    order --                                         12:30

18         A.   That's right.                          12:30

19         Q.   -- in --                               12:30

20         A.   That's right.                          12:31

21         Q.   So then, relatedly, you reviewed the   12:31

22    Court's order on the motion to dismiss?          12:31

23         A.   That's right.                          12:31

24         Q.   Did you review both of the Court's orders 12:31

25    on motions to dismiss because there were two?    12:31
```

Page 52

```
 1          A.   I don't believe so.  I just recall one.      12:31

 2          Q.   So you were -- sorry.                          12:31

 3          A.   I have -- I have a second one listed here.     12:31

 4     So I -- I believe if it's a case document that I         12:31

 5     have not listed here, then it would be very              12:31

 6     unlikely -- it would be an omission to not have          12:31

 7     included it on the Materials Considered.  I meant to     12:31

 8     include the Case documents that -- that we have.         12:31

 9          Q.   Well, did you review the Court's first         12:31

10     opinion on defense initial motion to dismiss?            12:32

11          A.   I recall reviewing one Court decision,         12:32

12     which limited the case and got rid of some of the        12:32

13     alleged misrepresentations?                              12:32

14          Q.   And the one Court order that you reviewed      12:32

15     is listed there under Case documents at Point            12:32

16     Number 4 -- correct? -- "Memorandum and Opinion          12:32

17     Regarding Defendants' Motion to Dismiss the              12:32

18     Plaintiffs' First Amended Consolidated Complaint,        12:32

19     filed August 10th, 2022"?                                12:32

20          A.   I believe so.  Yes.                            12:32

21          Q.   And you don't recall reviewing the other      12:32

22     Court opinion on defendants' motion to dismiss;          12:32

23     right?                                                   12:32

24          A.   I do not, no.                                  12:32

25          Q.   Were you provided summaries of Case            12:32
```

Page 53

| | | |
|---|---|---|
| 1 | documents during the -- the course of the -- | 12:32 |
| 2 | preparing your report on class certification? | 12:32 |
| 3 | A.   No. | 12:33 |
| 4 | Q.   We talked a little bit before about your | 12:33 |
| 5 | review of SEC filings, and I understand you didn't | 12:33 |
| 6 | review every single SEC filing here, and of the ones | 12:33 |
| 7 | you did review, you might have only reviewed a | 12:33 |
| 8 | portion of them. | 12:33 |
| 9 | But can you tell me about how much time | 12:33 |
| 10 | did you spend reviewing SEC filings to render your | 12:33 |
| 11 | class certification-related opinions? | 12:33 |
| 12 | A.   I don't recall.  So what -- I don't recall | 12:33 |
| 13 | a substantial amount of time.  So one of the -- one | 12:33 |
| 14 | of the things that we did was search the SEC filings | 12:33 |
| 15 | for information related similar to the alleged | 12:33 |
| 16 | misrepresentations or corrective disclosure or other | 12:34 |
| 17 | information about notices of violation.  But my team | 12:34 |
| 18 | did those searches. | 12:34 |
| 19 | I don't recall spending much time | 12:34 |
| 20 | reviewing SEC filings; so I couldn't tell you. | 12:34 |
| 21 | Q.   So your team would conduct those searches | 12:34 |
| 22 | and then report back to you. | 12:34 |
| 23 | Is that how the process worked? | 12:34 |
| 24 | A.   Yes.  I mean, overall, the -- the work is | 12:34 |
| 25 | done all under my instruction and supervision. | 12:34 |

Page 54

| | | |
|---|---|---|
| 1 | Everything that is done in that is -- you know, that | 12:34 |
| 2 | ends up in the report, every analysis is done and | 12:35 |
| 3 | then checked -- redone from the -- from the -- all | 12:35 |
| 4 | over again by somebody else and checked.  And then, | 12:35 |
| 5 | ultimately, we have, like, an outside peer reviewer | 12:35 |
| 6 | who is someone who is also at NERA, but who did not | 12:35 |
| 7 | work on the project. | 12:35 |
| 8 | So there is -- there is a lot of | 12:35 |
| 9 | processes.  So it's not as if they do something and | 12:35 |
| 10 | then come back to me.  When we are doing an analysis | 12:35 |
| 11 | or -- or working on what we are doing, there's a lot | 12:35 |
| 12 | of discussions with the team and meetings with the | 12:35 |
| 13 | team and looking at things as we're talking.  So | 12:35 |
| 14 | it's not necessarily, "Do this, come back, and | 12:35 |
| 15 | that's the answer." | 12:35 |
| 16 | Q.   Specifically regarding the SEC filings, is | 12:35 |
| 17 | it correct that the process, though, is used to | 12:35 |
| 18 | identify which SEC filings of those listed here in | 12:35 |
| 19 | Appendix B to take a closer look at were based on | 12:36 |
| 20 | searches that your team ran? | 12:36 |
| 21 | A.   Well, that was one of the things that was | 12:36 |
| 22 | done. | 12:36 |
| 23 | Q.   Okay.  And so aside from those searches, | 12:36 |
| 24 | what else did you do to decide which SEC filings to | 12:36 |
| 25 | review? | 12:36 |

Page 55

```
 1          A.   Oh.  Well, these are likely the          12:36
 2   SEC filings -- so the ones that are considered are   12:36
 3   SEC filings around the time of the Class Period.     12:36
 4          So I, typically, would obtain the             12:36
 5   SEC filings around the time of the Class Period for  12:36
 6   all kinds of things to see how big is the company's  12:36
 7   revenue, what are some things that are changing      12:36
 8   during the time period, understanding -- you know,   12:36
 9   sometimes we'll look at something in -- an analyst    12:36
10   report, for example, and it may not be clear.        12:36
11          They may be using some kind of shorthand      12:36
12   about the -- you know, the company's divisions or     12:36
13   products or something like that.  And you go back     12:37
14   into the SEC filings and try to understand a bit      12:37
15   more about, you know, how does the company break      12:37
16   down its businesses or what a certain, you know --    12:37
17   so there are lots of reasons we use the SEC filings.  12:37
18          They have the financial information over       12:37
19   time, the quarterly results, as well as, you know,    12:37
20   information about the company.  And here there is      12:37
21   also issues about what are some of the regulatory     12:37
22   issues.                                               12:37
23          So those are all things that we would look     12:37
24   at the SEC filings to -- and see how that             12:37
25   information changes over time.                        12:37
```

Page 56

```
1        Q.   And -- so I think I might be asking a          12:37
2    slightly different question.                            12:37
3             It's -- aside from the searches that were      12:37
4    run by your team, how did you specifically identify     12:37
5    which SEC reports or portions of SEC reports that       12:37
6    you yourself were going to review personally?           12:37
7        A.   Oh.  I don't -- I don't have a specific        12:38
8    recollection.                                           12:38
9        Q.   All right.  Let's look at the next section     12:38
10   of Page 2 of the Appendix B, "Press releases,           12:38
11   conference call transcripts, and news stories on        12:38
12   Cabot, including," and it list a number of items.       12:38
13            Did you personally review all of the items     12:38
14   listed there?                                           12:38
15       A.   I don't recall specifically.  Just --         12:38
16       Q.   Are there -- I'm sorry.  Go ahead.            12:38
17       A.   I don't know.                                 12:38
18       Q.   Are there any that you recall specifically    12:38
19   not reviewing?                                          12:38
20       A.   No.  I'm not sure one way or the other.      12:39
21       Q.   Okay.  And then the flip side of that are     12:39
22   there any that you specifically remember reviewing?     12:39
23       A.   Well, we cite to them in my report.  So I     12:39
24   just don't -- I'm not sure one way or the other.       12:39
25       Q.   If it was specifically cited in the body      12:39
```

Page 57

| | | |
|---|---|---|
| 1 | of the report itself, you would have personally | 12:39 |
| 2 | reviewed those news materials and transcripts? | 12:39 |
| 3 | A.   Typically but not always.  So sometimes we | 12:39 |
| 4 | cite to something to say, you know, like, a time | 12:39 |
| 5 | that a piece of information came out or... | 12:39 |
| 6 | Q.   All right.  Did you employ specific | 12:39 |
| 7 | methodology for reviewing news with regards to this | 12:40 |
| 8 | report, Class Certification Report? | 12:40 |
| 9 | A.   Yes.  So one of the things that we did is | 12:40 |
| 10 | to analyze how the market was reacting to alleged | 12:40 |
| 11 | misrepresentations and alleged corrective | 12:40 |
| 12 | disclosures when they were made, which included | 12:40 |
| 13 | looking at the news that was released at -- at that | 12:40 |
| 14 | time of the alleged misrepresentations and alleged | 12:40 |
| 15 | corrective disclosures, and seeing what -- what news | 12:40 |
| 16 | stories there were and to what extent were they | 12:40 |
| 17 | related to the company, was there new information | 12:40 |
| 18 | that was being released, were they mentioning the | 12:40 |
| 19 | alleged misrepresentation or the alleged corrective | 12:40 |
| 20 | disclosures. | 12:40 |
| 21 | Q.   And did you use any particular kind of | 12:40 |
| 22 | search criteria to identify those news stories? | 12:41 |
| 23 | A.   We would have done quite a few different | 12:41 |
| 24 | searches. | 12:41 |
| 25 | So, overall, we tend to find information | 12:41 |

Page 58

| | | |
|---|---|---|
| 1 | that is related to the company around certain | 12:41 |
| 2 | events.  And usually -- you know, there are a | 12:41 |
| 3 | couple of -- we use Factiva, typically. | 12:41 |
| 4 | We also tend to look at Bloomberg for news | 12:41 |
| 5 | information and use the -- the company name. | 12:41 |
| 6 | Or sometimes whether the company is tagged | 12:41 |
| 7 | by Factiva as being -- as the story being about the | 12:41 |
| 8 | company rather than -- so sometimes if it's a -- if | 12:41 |
| 9 | it's -- the company name is itself something that's | 12:41 |
| 10 | a common word or could lead to a lot of stories | 12:41 |
| 11 | about something that's other than the company, | 12:41 |
| 12 | we'll -- we'll have a more refined search technique. | 12:41 |
| 13 | And then we would -- we have searched in | 12:42 |
| 14 | this case for news stories about not only the | 12:42 |
| 15 | company but about, again, the notices of violation | 12:42 |
| 16 | or the -- the -- well, the attorney general's | 12:42 |
| 17 | announcements. | 12:42 |
| 18 | So any -- again, any of the specifics that | 12:42 |
| 19 | related to the alleged misrepresentations or the | 12:42 |
| 20 | alleged prior to disclosures. | 12:42 |
| 21 | And I think some of the news searches that | 12:42 |
| 22 | were specific to -- are -- are described, perhaps, | 12:42 |
| 23 | in some of the footnotes. | 12:42 |
| 24 | Q.   All right.  Let's look at the -- the | 12:42 |
| 25 | "Analyst reports" listed.  That starts on Page 3, | 12:42 |

Page 59

| | | |
|---|---|---|
| 1 | Appendix B. | 12:42 |
| 2 | Did you personally review all of the | 12:42 |
| 3 | analyst reports? | 12:43 |
| 4 | A.    I looked at a lot of them.  So typically I | 12:43 |
| 5 | have them all in a folder and go -- go through them | 12:43 |
| 6 | looking at, you know, various different -- looking | 12:43 |
| 7 | through them for various different -- for different | 12:43 |
| 8 | reasons. | 12:43 |
| 9 | So I don't know if I reviewed every single | 12:43 |
| 10 | one, but I probably reviewed quite a few of them. | 12:43 |
| 11 | Q.    And about how much time did you spend | 12:43 |
| 12 | reviewing analyst reports? | 12:43 |
| 13 | A.    I don't know. | 12:43 |
| 14 | Q.    Is it fair to say you didn't review every | 12:43 |
| 15 | single analyst report in detail.  There might have | 12:43 |
| 16 | been a fair few you had skimmed over? | 12:43 |
| 17 | A.    That would be true. | 12:43 |
| 18 | The -- the ones around the alleged | 12:43 |
| 19 | misrepresentations and alleged corrective | 12:43 |
| 20 | disclosures would have been reviewed in detail by my | 12:44 |
| 21 | team -- and multiple members of my team.  And many | 12:44 |
| 22 | of them would also have been reviewed in detail by | 12:44 |
| 23 | me. | 12:44 |
| 24 | Q.    And was there a particular methodology | 12:44 |
| 25 | that you used for reviewing the analyst reports? | 12:44 |

Page 60

| | | |
|---|---|---|
| 1 | A.   So they would have been reviewed multiple | 12:44 |
| 2 | times for many reasons. | 12:44 |
| 3 | So initially it would be to understand | 12:44 |
| 4 | what is happening around various time periods and | 12:44 |
| 5 | get a sense of what is going on during the alleged | 12:44 |
| 6 | Class Period as well as getting a sense of what is | 12:44 |
| 7 | going on around each of the dates of alleged | 12:44 |
| 8 | misrepresentations and alleged corrective | 12:44 |
| 9 | disclosures. | 12:44 |
| 10 | Then there would be other reviews about | 12:44 |
| 11 | whether any analyst, for example, is focusing on the | 12:45 |
| 12 | alleged misrepresentations or the alleged corrective | 12:45 |
| 13 | disclosures. | 12:45 |
| 14 | Then there would be other reviews, which | 12:45 |
| 15 | is what -- to the extent that analysts are changing | 12:45 |
| 16 | their valuations on a particular date -- would -- | 12:45 |
| 17 | the reason that they're changing their valuations. | 12:45 |
| 18 | And then there would be other reviews | 12:45 |
| 19 | about what do the analysts think are peer companies. | 12:45 |
| 20 | So there are -- the analyst reports are | 12:45 |
| 21 | reviewed many times for many different purposes. | 12:45 |
| 22 | Q.   Are there any analyst reports that you | 12:45 |
| 23 | reviewed that are not listed here? | 12:45 |
| 24 | A.   I don't think so.  But that's something I | 12:46 |
| 25 | think I could check on. | 12:46 |

Page 61

```
 1              So I'm just not sure that we have all the      12:46
 2    analyst reports on this list.  But I don't think I     12:46
 3    have reviewed any that are not on this list.  But      12:46
 4    I'm not sure.                                          12:46
 5         Q.   So you didn't ask the company to provide     12:46
 6    you with a comprehensive list of all the analyst       12:46
 7    reports?                                               12:46
 8         A.   So I think that's -- as I previously         12:46
 9    testified, I think we did ask the company to provide   12:46
10    us a list.                                             12:46
11              So we -- I don't have a specific             12:46
12    recollection, but the analyst reports it's -- you      12:46
13    know, relatively expensive to get them through the     12:47
14    service.                                               12:47
15              So we almost always ask first if there's     12:47
16    some way that they can provide them -- that they --    12:47
17    if they have them, to get them for us.  So that --     12:47
18    that is something that I almost always do.             12:47
19              And I don't recall them giving them to us.   12:47
20    So I think we asked and they -- my guess is that we    12:47
21    asked and they didn't have them.                       12:47
22         Q.   And over the course of -- of preparing       12:47
23    your report, your Class Certification Report, were     12:47
24    you provided summaries of analyst reports or news      12:47
25    stories?                                               12:47
```

Page 62

| | | |
|---|---|---|
| 1 | A.   No.  Well, with the exception of -- you | 12:47 |
| 2 | know, to the extent we're taking from analysts, I | 12:47 |
| 3 | don't recall particularly doing that. | 12:48 |
| 4 | But, you know, to the extent we say here | 12:48 |
| 5 | is the average of what analysts are doing -- by a | 12:48 |
| 6 | table of numbers -- then that would be something | 12:48 |
| 7 | that is a summary that comes from analyst reports. | 12:48 |
| 8 | I don't recall there being that. | 12:48 |
| 9 | Q.   Okay.  I'm looking next at the "Legal | 12:48 |
| 10 | decisions" header of your Appendix B on Page 6. | 12:48 |
| 11 | And then my question is what's the purpose | 12:48 |
| 12 | of listing legal decisions in your report? | 12:48 |
| 13 | A.   I think they were cited in footnotes. | 12:48 |
| 14 | Q.   And in the course of rendering the | 12:48 |
| 15 | opinions in your report, do you consider any legal | 12:48 |
| 16 | decisions regarding the standard for a party to | 12:48 |
| 17 | either prove or disprove price impact? | 12:49 |
| 18 | A.   I don't think I'm particularly relying on | 12:49 |
| 19 | that standard to the extent there is a standard. | 12:49 |
| 20 | I'd -- I'd have to look at what each one | 12:49 |
| 21 | of these -- these are ones I -- I think that are | 12:49 |
| 22 | cited.  And I could look at the reason why they were | 12:49 |
| 23 | cited. | 12:49 |
| 24 | Typically, it's to -- to say -- and | 12:49 |
| 25 | something along the lines as, you know, my | 12:49 |

Page 63

| | | |
|---|---|---|
| 1 | understanding that the courts similarly have found | 12:49 |
| 2 | something. | 12:49 |
| 3 | Q.   Okay.  In the course of offering your | 12:49 |
| 4 | opinions on price impact in this case, you're not | 12:49 |
| 5 | relying on any particular court opinions or legal | 12:49 |
| 6 | standards for either proving or disproving price | 12:49 |
| 7 | impact; is that right? | 12:50 |
| 8 | MR. STOKES:  Objection.  Form. | 12:50 |
| 9 | THE WITNESS:  I think that's correct.  I'm | 12:50 |
| 10 | not giving any legal opinions one way or the other. | 12:50 |
| 11 | I am -- I am sometimes citing to some legal | 12:50 |
| 12 | opinions. | 12:50 |
| 13 | BY MR. LAVELLE: | 12:50 |
| 14 | Q.   And are you relying on any legal opinions | 12:50 |
| 15 | or court opinions to provide you with guidance as to | 12:50 |
| 16 | how to either prove or disprove price impact? | 12:50 |
| 17 | A.   I don't believe so. | 12:50 |
| 18 | Q.   So as an -- as an economist, putting aside | 12:50 |
| 19 | the legalese portion -- but as an economist, do you | 12:50 |
| 20 | have an understanding of what is needed to prove a | 12:50 |
| 21 | lack of price impact? | 12:51 |
| 22 | A.   So from an economic perspective, what | 12:51 |
| 23 | academic papers will find is a lack of price impact | 12:51 |
| 24 | is when there is -- for example, it can be a | 12:51 |
| 25 | statistical test that finds that a price reaction is | 12:51 |

Page 64

1    not statistically significant and there is -- that      12:51

2    would be a lack of price impact.                         12:51

3         Q.   And the statistical test that you are         12:51

4    referring to, are you referring to an event study?      12:51

5         A.   Event study is a -- as part of the event      12:51

6    study you can then test the reaction in any             12:52

7    statistical test, yes.                                  12:52

8         Q.   And with regards to alleged                    12:52

9    misstatements -- or, strike that.                       12:52

10            With respect to alleged misrepresentations     12:52

11   and omissions, how do you use a statistical analysis    12:52

12   to determine whether there's been a price impact or     12:52

13   not?                                                    12:52

14        A.   I didn't -- can you repeat that?              12:52

15        Q.   Sure.                                         12:52

16            With respect to alleged misrepresentations     12:52

17   and omissions, how do you use a statistical analysis    12:52

18   to determine whether or not there's been a price        12:52

19   impact caused by those misrepresentations or            12:52

20   omissions?                                              12:52

21        A.   Well, there are a number of ways that one     12:52

22   can do that.  If it's an affirmative                    12:52

23   misrepresentation, which is part of what plaintiffs     12:53

24   are alleging here, you can look to see whether --       12:53

25   you can do an event study and see whether the price     12:53

Page 65

| | | |
|---|---|---|
| 1 | reacts to that affirmative -- allegedly affirmative, | 12:53 |
| 2 | you know, alleged misinformation. | 12:53 |
| 3 | You can also analyze whether the -- so | 12:53 |
| 4 | there are a number -- there are a number of pieces | 12:53 |
| 5 | of information that one can do to analyze price | 12:53 |
| 6 | impact, which I have done in this report.  So it's | 12:53 |
| 7 | not just -- it's not just a matter of doing tests of | 12:53 |
| 8 | statistical significance. | 12:53 |
| 9 | Q.   So aside from doing a test of statistical | 12:53 |
| 10 | significance at the point in time of a | 12:54 |
| 11 | misrepresentation, what else can you do?  Because | 12:54 |
| 12 | you mentioned that there are a few different things | 12:54 |
| 13 | that you can use a statistical analysis for? | 12:54 |
| 14 | A.   Well, if you want to just do a statistical | 12:54 |
| 15 | analysis -- so there -- you can -- you can -- you | 12:54 |
| 16 | know, you can compare it to companies. | 12:54 |
| 17 | So, for example, if you want to look at | 12:54 |
| 18 | omission, you can compare it to companies that don't | 12:54 |
| 19 | make that omission and do some sort of statistical | 12:54 |
| 20 | test on the difference between companies that -- | 12:54 |
| 21 | that don't make that omission and companies that do | 12:54 |
| 22 | make an omission and do a statistical test of | 12:54 |
| 23 | whether their price movement is different, for | 12:54 |
| 24 | example.  That would be something that you can do. | 12:54 |
| 25 | You can look at valuations and, you know, | 12:54 |

Page 66

```
1    you could look at analysts' valuations of a company     12:55
2    and see to the extent that the particular               12:55
3    information that is allegedly omitted or that is        12:55
4    affirmatively misrepresented -- how that actually       12:55
5    impacts their valuation.                                12:55
6           So I think there are a number of different       12:55
7    ways of -- of evaluating whether information is         12:55
8    impacting stock price.                                  12:55
9    Q.   And isn't it correct that you can also             12:55
10   look at when the alleged misrepresentation or           12:55
11   omission is corrected or disclosed?                     12:55
12   A.   I think you can look at that, and that may         12:55
13   help you analyze what would have been the effect        12:55
14   when the alleged misrepresentation or omission was      12:55
15   made.                                                   12:55
16   Q.   And so let's look at it from a slightly            12:56
17   different perspective.                                  12:56
18          Again, as an economist, what would you do        12:56
19   in order to prove that there was, in fact, a price      12:56
20   impact caused by a statement or omission?               12:56
21   A.   Well, I think there is two different               12:56
22   things.                                                 12:56
23          So if it's an affirmative                        12:56
24   misrepresentation, one way to see whether it has a      12:56
25   price impact is to see whether the price -- is to do    12:56
```

Page  67

| | | |
|---|---|---|
| 1 | an event study and see whether the price is, in | 12:56 |
| 2 | fact, moving.  And -- and do that in -- | 12:56 |
| 3 | incoordination. | 12:56 |
| 4 | I mean, all of these things -- there's | 12:56 |
| 5 | lots of information about a publicly traded stock. | 12:56 |
| 6 | And understanding what is moving the stock price | 12:56 |
| 7 | is -- there are lots of pieces that you can put | 12:56 |
| 8 | together to understand that. | 12:57 |
| 9 | One of it is -- is looking at the stock | 12:57 |
| 10 | price movement and looking at that in combination | 12:57 |
| 11 | with how its market or industry is moving. | 12:57 |
| 12 | It's also looking at how -- if there are | 12:57 |
| 13 | these analysts and they're experts analyzing the | 12:57 |
| 14 | value of the company and their expectations about | 12:57 |
| 15 | the stock price at the time, you can look at the | 12:57 |
| 16 | information from the analysts and see what they say | 12:57 |
| 17 | is important about the information and how they are | 12:57 |
| 18 | changing their value based on this information. | 12:57 |
| 19 | So they're, you know, contemporaneous and | 12:57 |
| 20 | experts analyzing the stock price and value of the | 12:57 |
| 21 | company. | 12:57 |
| 22 | So I think there are lots of pieces of | 12:57 |
| 23 | information that you can use to prove price impact | 12:57 |
| 24 | or lack of price impact.  And ideally, you are sort | 12:57 |
| 25 | of looking at all of these pieces of information | 12:58 |

Page 68

```
 1   together.                                      12:58

 2       Q.   As part of that analysis, some of the   12:58

 3   other pieces of information are -- there are also  12:58

 4   company disclosures and -- and contemporaneous news  12:58

 5   stories; right?                                12:58

 6       A.   That's right.                          12:58

 7       Q.   So in terms of your Class Certification  12:58

 8   Report, what assumptions, if any, have you made in  12:58

 9   rendering these opinions?                      12:58

10       A.   So, one, assuming that what plaintiffs are  12:58

11   alleging is true, that there is -- and -- and    12:58

12   assuming that a sufficient market, as alleged by the  12:58

13   plaintiffs, I have also made the assumption that the  12:58

14   change in guidance that is announced is not -- is  12:59

15   as is stated in the declarations of the CFO and  12:59

16   the -- and Mr. Smelko -- that the guidance is not  12:59

17   due to -- the change in guidance is due to reasons  12:59

18   other than anything related to the alleged    12:59

19   misrepresentations.                            12:59

20       Q.   You are referring to the change in    12:59

21   guidance announced on July 26th, 2019?        12:59

22       A.   That's right.                          12:59

23       Q.   And that was alleged by plaintiffs as  12:59

24   being one of the partial corrective disclosures in  12:59

25   this case; correct?                            12:59
```

Page 69

```
 1         A.   That's right.  That date was alleged to be    12:59
 2    one of the corrective disclosures.                      13:00
 3         Q.   Right.  Well, that change in guidance was     13:00
 4    alleged to be one of the partial corrective             13:00
 5    disclosures; correct?                                   13:00
 6         A.   It was both the guidance -- so that date      13:00
 7    is alleged as a corrective disclosure.  And I think     13:00
 8    they alleged that it was both the guidance as well      13:00
 9    as the -- the announcement of the two NOVs that were    13:00
10    announced on that same day.                             13:00
11         Q.   Right.  So it's your understanding in         13:00
12    rendering these opinions that on July 26th              13:00
13    plaintiffs alleged two partial corrective              13:00
14    disclosures, the first being the change in guidance,    13:00
15    and then the second being those two notices of         13:00
16    violation; is that right?                               13:00
17         A.   I think they allege one partial corrective    13:00
18    disclosure, which had the two NOVs as well as the      13:00
19    guidance.  I think they are alleging it all as one     13:01
20    alleged corrective disclosure.                          13:01
21         Q.   So you assume plaintiff's allegations are    13:01
22    correct in this case except for plaintiff's            13:01
23    allegation that the change in guidance was             13:01
24    corrective?                                             13:01
25         A.   That's right.  That's right.                  13:01
```

Page 70

```
1        Q.   Is that typical when you are rendering      13:01

2    opinions regarding class certification to assume     13:01

3    that almost all of plaintiff's allegations are       13:01

4    correct and then conversely assume that one          13:01

5    particular part of plaintiff's allegations is not    13:01

6    correct?                                             13:01

7        A.   So it's -- it's common to -- if there is a  13:01

8    factual issue that the defendants, you know, feel    13:01

9    that they -- they can prove and that there's no      13:02

10   factual basis for what plaintiffs are alleging for   13:02

11   defendants to ask me to make an assumption that --   13:02

12   you know, this is something that -- you know, we do  13:02

13   not think plaintiffs can possibly prove and that we  13:02

14   think we can disprove; so take this assumption as    13:02

15   given and do an analysis assuming liability or       13:02

16   assuming what; but, you know, that this is taking    13:02

17   this piece out.                                      13:02

18            So, yes, that is something that -- that     13:02

19   does happen.  And has happened before.              13:02

20       Q.   And so if that assumption turns out not to  13:02

21   be the case, your opinion wouldn't necessarily       13:02

22   change; is that right?                               13:02

23       A.   I'm making that assumption.  I think what   13:03

24   would change -- I do think -- so there is a stock    13:03

25   price decline on that date that I think is due to    13:03
```

Page 71

| | | |
|---|---|---|
| 1 | the reduction in guidance. | 13:03 |
| 2 | The rest of my report is independent of | 13:03 |
| 3 | that.  The -- there is still not one analyst that | 13:03 |
| 4 | mentions the NOVs, and when the alleged | 13:03 |
| 5 | misrepresentations are made, there is not one | 13:04 |
| 6 | analyst that mentions the NOVs. | 13:04 |
| 7 | So the notice of violations of -- that | 13:04 |
| 8 | plaintiffs are alleging relate to the alleged | 13:04 |
| 9 | misrepresentations are never considered by anyone to | 13:04 |
| 10 | be important to Cabot stock price. | 13:04 |
| 11 | So there's no evidence at all that any | 13:04 |
| 12 | analyst or any stock price reaction relates to these | 13:04 |
| 13 | notices of violations. | 13:04 |
| 14 | So that would still -- there's still no | 13:04 |
| 15 | price impact from that.  So to the extent that the | 13:04 |
| 16 | guidance is reduced, I'm not sure what -- how | 13:04 |
| 17 | plaintiff's could allege the -- if the reduced | 13:04 |
| 18 | guidance relates back to prior -- the prior alleged | 13:04 |
| 19 | misrepresentations, which relate to September 2011 | 13:04 |
| 20 | notices of violations.  Those are never considered | 13:05 |
| 21 | important by the market.  Nobody mentioned them; so | 13:05 |
| 22 | there's no price reaction to them. | 13:05 |
| 23 | So it's not something that I have | 13:05 |
| 24 | analyzed, but I don't see how you could -- I'm not | 13:05 |
| 25 | sure that any of my conclusions would actually be | 13:05 |

Page 72

```
1    different, other than if the guidance -- if the      13:05
2    reduction in guidance is somehow related to the 2011 13:05
3    notices of violation -- yeah.                         13:05
4          I don't -- I don't know.  I'm not sure.  I      13:06
5    don't know how -- I don't know how plaintiffs could   13:06
6    make that story.  So I haven't thought about that.    13:06
7    I have assumed that the change in guidance is not     13:06
8    due to anything related to the alleged                13:06
9    misrepresentations.                                   13:06
10   Q.   So just to -- so I'm clear.  If plaintiffs       13:06
11   were able to demonstrate a connection between the     13:06
12   alleged misstatements and omissions and the change    13:06
13   in guidance, there wouldn't have been a price         13:06
14   impact?                                               13:06
15   A.   Oh.  No.  I'm not saying that.  I'm not          13:06
16   saying that there would be a price impact related to  13:06
17   the alleged misrepresentations.                       13:06
18         I -- I still think you could argue -- you       13:06
19   could use the -- the -- my report to show that there  13:06
20   is no price impact.  But that is not something that   13:06
21   I have been asked to do.                              13:06
22         So I haven't thought about if the guidance      13:06
23   is, in fact -- I mean, it can be solely due to        13:06
24   the -- the CFO is saying that it's due to completely  13:07
25   different things other than the --                    13:07
```

Page 73

| | | |
|---|---|---|
| 1 | I have not been asked to do this analysis. | 13:07 |
| 2 | I think that the analysis that I have done in my | 13:07 |
| 3 | report would still show that there is no price | 13:07 |
| 4 | impact, even if the guidance is, in part, due to or | 13:07 |
| 5 | related to the alleged misrepresentations. | 13:07 |
| 6 | But I have been asked to assume, | 13:07 |
| 7 | consistent with the declarations from the | 13:07 |
| 8 | two company representatives, that the guidance is | 13:07 |
| 9 | unrelated -- the change in guidance is unrelated to | 13:07 |
| 10 | the alleged misrepresentations. | 13:07 |
| 11 | So, in other words, I certainly wouldn't | 13:08 |
| 12 | include that there was price impact if the guidance | 13:08 |
| 13 | had something to do with the alleged | 13:08 |
| 14 | misrepresentations.  I think I would still conclude | 13:08 |
| 15 | that there is no price impact, but I have not been | 13:08 |
| 16 | asked to do that.  And I have not done that. | 13:08 |
| 17 | I have assumed that the guidance is | 13:08 |
| 18 | unrelated.  The reduction in guidance that was | 13:08 |
| 19 | announced on July 26th, 2019, is unrelated to the | 13:08 |
| 20 | alleged misrepresentations. | 13:08 |
| 21 | Q.   And you assumed that because counsel asked | 13:08 |
| 22 | you to do so? | 13:08 |
| 23 | A.   That's correct. | 13:08 |
| 24 | Q.   So in the course of offering your opinions | 13:08 |
| 25 | on price impact, are you offering an opinion on | 13:08 |

Page  74

| | | |
|---|---|---|
| 1 | whether any of the alleged misrepresentations were, | 13:08 |
| 2 | in fact, misrepresentations? | 13:08 |
| 3 | A.   No. | 13:08 |
| 4 | Q.   And are you in the course of offering your | 13:09 |
| 5 | opinions on price impact -- | 13:09 |
| 6 | A.   I think I'm assuming that they are, in | 13:09 |
| 7 | fact, misrepresentations. | 13:09 |
| 8 | Q.   And in the course of offering, you know, | 13:09 |
| 9 | your opinions here on price impact, are you offering | 13:09 |
| 10 | any opinions on whether any of the alleged omissions | 13:09 |
| 11 | were corrected by the alleged corrective | 13:09 |
| 12 | disclosures? | 13:09 |
| 13 | A.   I'm assuming that they are from my | 13:09 |
| 14 | analysis, but I'm noting that they don't match up. | 13:10 |
| 15 | That the -- that the attorney general's announcement | 13:10 |
| 16 | of charges doesn't relate to the wells and the time | 13:10 |
| 17 | period that matches the -- corresponds to the | 13:10 |
| 18 | alleged misrepresentations.  So I'm noting that that | 13:10 |
| 19 | is the case. | 13:10 |
| 20 | I'm able to see what the attorney general | 13:10 |
| 21 | is charging and what are the wells and what are the | 13:10 |
| 22 | time periods, and I can see that they do not match | 13:10 |
| 23 | up.  And I have a table that shows that. | 13:10 |
| 24 | But I am analyzing price impact regardless | 13:10 |
| 25 | and saying suppose -- suppose they actually did | 13:10 |

Page 75

| | | |
|---|---|---|
| 1 | match up, even though they don't.  There is still no | 13:10 |
| 2 | price impact because nobody -- there's no price | 13:10 |
| 3 | reaction, and nobody thought the -- the analyst did | 13:10 |
| 4 | not issue the reports or care about the announcement | 13:11 |
| 5 | of criminal charges. | 13:11 |
| 6 | Q.   You would agree that some of the wells at | 13:11 |
| 7 | issue are related to both the misstatements as well | 13:11 |
| 8 | as the corrective disclosure on June 15th, 2020; | 13:11 |
| 9 | right? | 13:11 |
| 10 | MR. STOKES:  Objection to form. | 13:11 |
| 11 | THE WITNESS:  I have a table that shows | 13:11 |
| 12 | the -- the matching or -- or mismatching of the | 13:11 |
| 13 | wells, and of the 25 wells -- go back a table -- | 13:11 |
| 14 | some of the wells are the same. | 13:11 |
| 15 | BY MR. LAVELLE: | 13:11 |
| 16 | Q.   You are talking about the chart on | 13:11 |
| 17 | Page 24? | 13:11 |
| 18 | A.   Within the time period. | 13:11 |
| 19 | Yeah.  So on Page 24 of my report, it | 13:11 |
| 20 | shows the 25 wells that are charged in the -- in the | 13:11 |
| 21 | AG presentation. | 13:12 |
| 22 | And 14 of them are not even the same wells | 13:12 |
| 23 | at all.  And the remaining that are -- are the same | 13:12 |
| 24 | wells are from a time period there -- they are | 13:12 |
| 25 | alleging a violation period that is before the | 13:12 |

Page 76

```
 1     alleged misrepresentations were made.              13:12

 2             So they are talking about violations        13:12

 3     before the -- before the alleged misrepresentations. 13:12

 4     So they don't correspond to a time period referred   13:12

 5     to in the amending misrepresentations -- when the    13:12

 6     alleged misrepresentation is the same, and now we    13:12

 7     have resolved the problem at this well, for example. 13:12

 8         Q.   So -- that's a good two-part explanation.  13:12

 9     Right.                                               13:12

10             So you -- for 11 of the 25 wells, you        13:12

11     agree that the misrepresentations for those 11 wells 13:12

12     do correspond to the June 15th, 2020,               13:13

13     Pennsylvania Attorney General criminal charges;     13:13

14     right?                                               13:13

15             MR. STOKES:  Objection.  Form.              13:13

16             THE WITNESS:  Can you repeat that?          13:13

17     BY MR. LAVELLE:                                      13:13

18         Q.   Sure.                                       13:13

19             For 11 of the 25 wells that were charged    13:13

20     in the June 15th announcement of charges by the      13:13

21     Pennsylvania Attorney General, 11 of those wells do  13:13

22     pertain to certain of the alleged                    13:13

23     misrepresentations; right?                           13:13

24             MR. STOKES:  Objection.  Form.              13:13

25             THE WITNESS:  The charges relate to the     13:13
```

Page 77

```
1    same -- some of the same wells that were involved in    13:13
2    prior alleged misrepresentation.  That's right.  But    13:13
3    the time period --                                      13:13
4    BY MR. LAVELLE:                                         13:13
5        Q.   Right.  That's the second part; right?         13:13
6        A.   That's right.  Yeah.                           13:13
7        Q.   Let me ask you this then.                      13:13
8            MR. STOKES:  Let me -- before that, can         13:14
9    you let the witness finish what she was going to say    13:14
10   about the time period.                                  13:14
11           MR. LAVELLE:  Yeah.  That's what I was          13:14
12   going to ask her about.                                 13:14
13   BY MR. LAVELLE:                                         13:14
14       Q.   But if you want to complete your thought,      13:14
15   Ms. Allen, please go ahead and do so.                   13:14
16       A.   But the wells that correspond to wells         13:14
17   that are involved in the alleged misrepresentations,    13:14
18   the time period doesn't correspond because the time     13:14
19   period of the alleged violation is prior,               13:14
20   substantially prior to the date of the alleged          13:14
21   misrepresentation.                                      13:14
22           So the charge relates to a time -- the          13:14
23   alleged misrepresentations are saying that, as of       13:14
24   this time period, we have resolved issues that we       13:14
25   previously had with these wells and the charges are     13:14
```

Page 78

| | | |
|---|---|---|
| 1 | for a time period before those alleged | 13:14 |
| 2 | misrepresentations were made. | 13:15 |
| 3 | Q.   And your -- your opinion there on that | 13:15 |
| 4 | issue is related to what the alleged | 13:15 |
| 5 | misrepresentations state in the company's public | 13:15 |
| 6 | disclosures? | 13:15 |
| 7 | A.   It's just -- my analysis of price impact | 13:15 |
| 8 | is assuming that this information is corrective. | 13:15 |
| 9 | You asked me have I analyzed whether it's actually | 13:15 |
| 10 | corrective and I noted that I am -- I have a table | 13:15 |
| 11 | in my report, which just matches up the names of the | 13:15 |
| 12 | wells of the charges and says that most of them are | 13:15 |
| 13 | not the same as the wells that are alleged -- that | 13:15 |
| 14 | have anything to do with the alleged | 13:15 |
| 15 | misrepresentations. | 13:15 |
| 16 | And the ones that do match up or | 13:15 |
| 17 | correspond in terms of actual wells, the timing is a | 13:16 |
| 18 | year or more before the alleged misrepresentation is | 13:16 |
| 19 | made. | 13:16 |
| 20 | Q.   Okay.  I think we'll explore that a little | 13:16 |
| 21 | bit further when we look at that particular part of | 13:16 |
| 22 | your report.  It'll be easier to discuss.  But I | 13:16 |
| 23 | understand what you are saying. | 13:16 |
| 24 | You mentioned the two separate | 13:16 |
| 25 | declarations of the CFO, Mr. Schroeder as well as | 13:16 |

Page 79

| | | |
|---|---|---|
| 1 | Mr. Smelko. | 13:16 |
| 2 | Do you recall that? | 13:16 |
| 3 | A.    Yes. | 13:16 |
| 4 | Q.    Okay.  And as part of your -- rendering | 13:16 |
| 5 | your opinions on class certification, did you review | 13:16 |
| 6 | those two declarations? | 13:16 |
| 7 | A.    I did. | 13:16 |
| 8 | Q.    And for Mr. Schroeder's declaration, did | 13:16 |
| 9 | you do anything to independently verify whether the | 13:16 |
| 10 | declaration was -- is accurate, or did you take it | 13:17 |
| 11 | at its word? | 13:17 |
| 12 | A.    I just took it at its word.  I mean, other | 13:17 |
| 13 | than, perhaps, like, matching up the names that | 13:17 |
| 14 | they -- I don't recall whether he lists the names of | 13:17 |
| 15 | the wells that are in the wells of the | 13:17 |
| 16 | misrepresentations.  So at some point I did match up | 13:17 |
| 17 | names of wells, but I did not -- I did not verify. | 13:17 |
| 18 | I took as given. | 13:17 |
| 19 | And the only part that I took as given in | 13:17 |
| 20 | terms of my analysis is that the reduction in | 13:17 |
| 21 | guidance is not due to the alleged | 13:17 |
| 22 | misrepresentations or anything related to the | 13:17 |
| 23 | alleged misrepresentations. | 13:17 |
| 24 | That's the only part that I am assuming to | 13:17 |
| 25 | be true from either of the declarations. | 13:17 |

Page 80

```
 1        Q.   So did you -- and relatedly, did you      13:17

 2   review any internal Cabot documents to verify        13:18

 3   Mr. Schroeder's declaration that there was no         13:18

 4   connection between the alleged misstatements and      13:18

 5   omissions and the new guidance that was announced on  13:18

 6   July 26th, 2019?                                      13:18

 7        A.   I did not.                                  13:18

 8        Q.   Okay.  I'll just have a few more            13:18

 9   questions, and then we can go ahead and take a break  13:18

10   since I know we have been going close to an hour.     13:18

11            But, again, relatedly, turning to           13:18

12   Mr. Smelko's declaration, same questions again.  Did  13:18

13   you do anything to verify the accuracy of             13:18

14   Mr. Smelko's declaration or did you take it at face   13:18

15   value?                                                13:18

16        A.   I did nothing to verify its accuracy.      13:18

17            MR. LAVELLE:  All right.  Let's go ahead     13:18

18   and take that break now.                              13:19

19            THE VIDEOGRAPHER:  Okay.  We're off the      13:19

20   record.  It's 1:19 p.m.                               13:19

21            (Brief recess.)                              13:41

22            THE VIDEOGRAPHER:  We're back on the         13:41

23   record.  It's 1:41 p.m.                               13:41

24   BY MR. LAVELLE:                                       13:41

25        Q.   Welcome back, Ms. Allen.                    13:41
```

Page 81

```
 1        A.   Thank you.                              13:41

 2        Q.   Do you have a definition of price impact?  13:41

 3        A.   It may depend on the context.  I think   13:41

 4   generally whether it impacted -- whether it impacted  13:41

 5   the price, I think, is really what...              13:41

 6        Q.   Okay.  So in the context of securities   13:42

 7   class actions discussing whether misstatements or   13:42

 8   omissions had a price impact, do you have a         13:42

 9   definition for it in that context?                 13:42

10        A.   I think it means just whether they       13:42

11   impacted the price.  I think what -- in a securities  13:42

12   class action, I think it's maybe the Supreme Court  13:42

13   decision.  One of the Haliburton cases is talking   13:42

14   about defendants can, at the class certification    13:42

15   stage, sever the link between the misrepresentations  13:42

16   and the -- and the price by showing that there's a  13:42

17   lack of -- of an impact on the price.              13:42

18        So I think that's -- that's the sort of a     13:43

19   legal concept that I'm familiar with.             13:43

20        Q.   And do you have a separate definition of  13:43

21   price impact within the context of being an        13:43

22   economist?                                         13:43

23        A.   No.  I think the way that I am analyzing  13:43

24   it here is very consistent with what -- just whether  13:43

25   it is impacting the stock price.                   13:43
```

Page 82

```
 1          Q.   And I think earlier this morning you      13:43

 2    mentioned that there are papers discussing what       13:43

 3    types of information help prove or disprove whether   13:43

 4    a piece of information have had on price impact.       13:43

 5               Do you recall that?                         13:43

 6          A.   No, I do not.                               13:43

 7          Q.   Let me ask you a -- a different question.   13:43

 8               Are you aware of any academic papers        13:43

 9    stating that the lack of a statistically significant  13:44

10    price movement proves the absence of a price impact?  13:44

11               MR. STOKES:  Objection.  Form.              13:44

12               THE WITNESS:  I'm not understanding.  I'm   13:44

13    having trouble understanding that -- that question    13:44

14    or the little...                                       13:44

15    BY MR. LAVELLE:                                        13:44

16          Q.   Sure.  Let me try and break it down.        13:44

17               So are you aware of any academic papers     13:44

18    that stand for the following proposition:              13:44

19               That the lack of a statistically            13:44

20    significant price movement proves the absence of      13:44

21    price impact?                                          13:44

22               MR. STOKES:  Objection.  Form.              13:45

23               THE WITNESS:  Yeah.  I'm not sure.          13:45

24    BY MR. LAVELLE:                                        13:45

25          Q.   So you are not aware of any?                13:45
```

Page 83

```
 1        A.   I don't know.  I mean, I am not sure that      13:45
 2   I quite understand your question.  And I am not         13:45
 3   sure -- yeah.  I'm not sure.                            13:45
 4        Q.   Well, let me ask it a different way.          13:45
 5             If at the time of an alleged misstatement     13:45
 6   or its correction, there is no statistically            13:45
 7   significant price movement at the 95 percent            13:45
 8   confidence level, does that prove an absence of         13:45
 9   price impact?                                           13:45
10        A.   It's -- I think -- I think a lack of a        13:46
11   statistically significant price reaction is -- is       13:46
12   evidence that there is no price impact.  And it is      13:46
13   one definition of price impact that does it actually    13:46
14   impact the price of formulated testing.                 13:46
15        Q.   So I understand your testimony that that      13:46
16   would be evidence of no price impact.  But does it      13:46
17   affirmatively prove no price impact?                    13:46
18             MR. STOKES:  Objection.  Form.                13:46
19             THE WITNESS:  I -- you know, I am not sure     13:46
20   what -- it depends on what your burden of proof is.     13:46
21   Right.  So if you are talking about a burden of         13:46
22   proof from a legal perceptive, I think it's -- you      13:46
23   know, whatever -- it's preponderance of the             13:46
24   evidence, you know.  I don't know.  So I think you      13:47
25   could have -- if you have conflicting pieces of         13:47
```

Page 84

```
1    evidence, then, you know, you might have to weigh        13:47

2    them.                                                    13:47

3            So what -- you know, I don't know what --        13:47

4            I'm not -- I think that you could have a         13:47

5    different standard of proof for -- you could have a      13:47

6    legal standard of proof.                                 13:47

7            I don't think -- in this case I have found       13:47

8    that all of the evidence supports a conclusion that      13:47

9    there is no price impact.  So I have both.  That         13:47

10   there is no statistically significant reaction.          13:47

11   That there is no analyst changing the value of the       13:47

12   company because of the alleged misrepresentations or     13:47

13   because of the alleged corrective disclosures.           13:47

14           And I have that the magnitude of the             13:47

15   violations and fines and potential criminal charges      13:48

16   are all of a magnitude that is not economically          13:48

17   material.  So I have lots and lots of evidence, all      13:48

18   of which points the same way.                            13:48

19           I think what is proof is -- what is the          13:48

20   level of proof required is -- is a legal question.       13:48

21   BY MR. LAVELLE:                                           13:48

22      Q.   Do you have an understanding of what the         13:48

23   legal burden of proof is for proving a lack of price     13:48

24   impact?                                                  13:48

25      A.   I think it's preponderance of the evidence       13:48
```

Page 85

```
 1    is -- as I -- is my understanding.  And I think        13:48

 2    it's -- it's defendants' -- in a securities class       13:48

 3    action, it's my understanding that it's defendants'     13:48

 4    burden to sever the link.                               13:48

 5           And I think if they can sever the link           13:48

 6    between the price and the alleged misrepresentations    13:48

 7    with a preponderance of the evidence, would -- would    13:49

 8    be -- that's -- you know, you are asking me.  That's    13:49

 9    a legal question.  So I think it's up to the            13:49

10    fact-finder to make a determination of whether it       13:49

11    meets a...                                              13:49

12           But what exactly -- where exactly you need       13:49

13    to draw the line is, in this case, doesn't -- a         13:49

14    conclusion doesn't depend on where you draw the line    13:49

15    because there's no evidence that supports price         13:49

16    impact and there is enormous evidence that is           13:49

17    contrary to price impact in this matter.                13:49

18    Q.   Right.  And I am -- my questions are               13:49

19    actually not specific to this matter.  They are more    13:49

20    general.  So let me back up and ask you a few           13:49

21    clarifying questions.                                   13:50

22           Are you offering an opinion as to whether        13:50

23    legally any of the misstatements or opinions --         13:50

24    omissions -- excuse me -- had a price impact on         13:50

25    Cabot stock price?                                      13:50
```

Page 86

```
1         A.   I am not --                        13:50

2              MR. STOKES:  Objection.            13:50

3              THE WITNESS:  I'm not offering legal   13:50

4    opinions.  I am finding that there is no price    13:50

5    impact.  That all of the evidence -- all of the   13:50

6    analysis that I have done demonstrates that the   13:50

7    alleged misrepresentations did not impact the stock   13:50

8    price.                                       13:50

9    BY MR. LAVELLE:                              13:50

10        Q.   Your -- your opinions are based on your   13:50

11   role as a financial economist; right?        13:50

12        A.   That's right.                      13:50

13        Q.   So as a financial economist, does the lack   13:50

14   of a statistically significant stock price movement   13:51

15   prove the absence of price impact?           13:51

16        A.   I -- you know, that's a burden of proof   13:51

17   level.  So I think if you have confounding    13:51

18   information that goes the other way, then that could   13:51

19   counter that evidence.                       13:51

20             And if you have -- the stock is not   13:51

21   trading in an efficient market, then that can make   13:51

22   that -- that could potentially counter that.   13:51

23             So I think there are other things that   13:51

24   could come into play.                        13:51

25        Q.   Now, you referenced a burden -- a burden   13:51
```

Page 87

| 1 | of proof.  And I just wanted to know, what was that | 13:51 |
| 2 | in relation to?  You are not referencing a legal | 13:51 |
| 3 | burden of proof; right? | 13:52 |
| 4 | A.   Yes, I was referencing a legal burden of | 13:52 |
| 5 | proof.  In a securities class action, it's my | 13:52 |
| 6 | understanding that the defendant's have a legal | 13:52 |
| 7 | burden of proof regarding price impact at the class | 13:52 |
| 8 | certification stage.  That's my understanding. | 13:52 |
| 9 | Q.   Right.  So my question is not based on any | 13:52 |
| 10 | legal opinions or standards.  I'm asking you as a | 13:52 |
| 11 | financial economist, with the expertise that you | 13:52 |
| 12 | have, whether the lack of a statistically | 13:52 |
| 13 | significant stock price movement is evidence proving | 13:52 |
| 14 | the absence of price impact? | 13:52 |
| 15 | A.   It's evidence that -- you know, in -- in | 13:52 |
| 16 | most sciences and social sciences you don't prove | 13:52 |
| 17 | something with a 100 percent certainty.  You have | 13:52 |
| 18 | evidence that supports it, and you come to a | 13:53 |
| 19 | conclusion based on the evidence and analysis that | 13:53 |
| 20 | you got -- you have done. | 13:53 |
| 21 | So you would have to tell me what -- what | 13:53 |
| 22 | do you mean by "prove."  And my understanding in a | 13:53 |
| 23 | legal context is -- you know, depending on the | 13:53 |
| 24 | context it's often -- it can often be the | 13:53 |
| 25 | preponderance of the evidence is considered proof. | 13:53 |

Page 88

```
 1          Q.   So if you were writing an academic paper      13:53
 2     on price impact, would you be able to draw the          13:53
 3     conclusion that, if there was no statistically          13:53
 4     significant price movement for a company's stock        13:53
 5     price, that that would allow you to draw the            13:53
 6     conclusion that there is an absence of price impact?    13:53
 7               MR. STOKES:  Objection to form.                13:53
 8               THE WITNESS:  So what -- what academics        13:53
 9     often do is analyze the -- a company's or a series      13:53
10     of companies' reaction to news.                         13:53
11               And the question would be does this type      13:53
12     of news, for example, affect the company's stock        13:54
13     price.  And they would do some sort of an event         13:54
14     study.                                                  13:54
15               To the extent they find that it's not         13:54
16     statistically significant, they would come to the       13:54
17     conclusion that, you know, based on the analysis        13:54
18     they have done, they have found that, whatever,         13:54
19     X, Y, Z type of announcement does not impact the        13:54
20     stock price.                                            13:54
21     BY MR. LAVELLE:                                         13:54
22          Q.   And so I'm just taking one particular part    13:54
23     of that analysis as part of my question.                13:54
24               And so as a financial economist, can you      13:54
25     conclude based -- standing alone on the lack of a       13:54
```

Page 89

```
 1    statistically significant price movement, that there    13:54
 2    has been the absence of price impact?                   13:54
 3        A.   I mean, so that would be a conclusion from     13:54
 4    that.  So if you do an analysis -- and that's what      13:54
 5    you -- that's what that evidence would show, that       13:54
 6    there's a lack of price impact -- you could then,       13:54
 7    you know, say, "Well, it's because at the same time     13:55
 8    all of these companies happen to have some              13:55
 9    confounding information that went the other way."       13:55
10          And, you know -- I mean, the -- the same          13:55
11    way you would test, you know, any kind of -- trying     13:55
12    to decide, you know, whether it rained yesterday,       13:55
13    you could -- you could have a test, which is you        13:55
14    have a -- you know, a little vial or a rain gauge       13:55
15    and you go out there and, you know, no rain fell.       13:55
16          And so you come to the conclusion that it         13:55
17    didn't rain.  And you could say, "That's proof that     13:55
18    it didn't rain."                                        13:55
19          Well, it could be that it -- you know, it         13:55
20    actually did rain.  And it just happened that -- I      13:55
21    don't know, whatever, a whole flock of birds or         13:55
22    planes or -- came by and somehow diverted the rain,     13:55
23    and it didn't fall into your -- your gauge.             13:55
24          And so, you know, would you say that              13:55
25    that's proof that it didn't rain?  Well, certainly      13:56
```

Page 90

| | | |
|---|---|---|
| 1 | it's -- it is the normal kind of proof that it | 13:56 |
| 2 | didn't rain, that your rain gauge had no rain. | 13:56 |
| 3 | And what most financial economists mean | 13:56 |
| 4 | when they're saying that there -- that a price | 13:56 |
| 5 | doesn't react or something didn't impact the stock | 13:56 |
| 6 | price, that that is -- an event study is one way of | 13:56 |
| 7 | testing that. | 13:56 |
| 8 | So a lack of statistically significant | 13:56 |
| 9 | reaction is what they mean by the -- is often what | 13:56 |
| 10 | they mean by no price impact. | 13:56 |
| 11 | Q.   Are you aware of any academic literature | 13:56 |
| 12 | that concludes that there -- if there has not been a | 13:56 |
| 13 | statistically significant price movement, that it | 13:56 |
| 14 | can conclude, standing alone on that information | 13:56 |
| 15 | that there is an absence of price impact? | 13:56 |
| 16 | A.   That's often what a lot of academic | 13:56 |
| 17 | literature does is it looks at -- as I said, is a | 13:57 |
| 18 | certain type of announcement and does it impact | 13:57 |
| 19 | stock prices. | 13:57 |
| 20 | And they will do event studies.  And if | 13:57 |
| 21 | they find that they don't find statistically a | 13:57 |
| 22 | significant reaction, they will say that it -- it | 13:57 |
| 23 | does not impact the stock price. | 13:57 |
| 24 | Q.   And which studies are there? | 13:57 |
| 25 | A.   There are lots of studies that are -- that | 13:57 |

Page 91

| | | |
|---|---|---|
| 1 | use event studies to analyze various types of | 13:57 |
| 2 | information. | 13:57 |
| 3 | Q.   And can you name a few of them? | 13:57 |
| 4 | A.   Not off the top of my head, no.  But | 13:57 |
| 5 | there's all kinds of studies. | 13:57 |
| 6 | Q.   So does a stock price need to increase for | 13:57 |
| 7 | there to be a price impact from a statement? | 13:57 |
| 8 | MR. STOKES:  Objection.  Form. | 13:57 |
| 9 | THE WITNESS:  No. | 13:58 |
| 10 | BY MR. LAVELLE: | 13:58 |
| 11 | Q.   In the instance of a -- strike that. | 13:58 |
| 12 | Would you expect there to be a price | 13:58 |
| 13 | impact from a material omission at the time -- well, | 13:58 |
| 14 | let me strike that again.  Let me back up. | 13:58 |
| 15 | If there was a statement that was | 13:58 |
| 16 | misleading because it omitted information, would you | 13:58 |
| 17 | expect there to be a price impact from that material | 13:58 |
| 18 | omission at the time of the statement or at the time | 13:59 |
| 19 | of the disclosure of the omitted information? | 13:59 |
| 20 | MR. STOKES:  Objection.  Form. | 13:59 |
| 21 | THE WITNESS:  I'm not sure I understand | 13:59 |
| 22 | that. | 13:59 |
| 23 | I think you are not -- so the -- an | 13:59 |
| 24 | omission can impact a stock price.  But you don't | 13:59 |
| 25 | necessarily see a -- you know, the price move.  It's | 13:59 |

Page 92

| | | |
|---|---|---|
| 1 | that, if you hadn't made the omission, the stock | 13:59 |
| 2 | price might have been something different. | 13:59 |
| 3 | BY MR. LAVELLE: | 13:59 |
| 4 | Q.   And do you have an understanding of what | 13:59 |
| 5 | this case is about? | 13:59 |
| 6 | A.   Yes.  I think I do have an understanding | 14:00 |
| 7 | of what the case is about. | 14:00 |
| 8 | Q.   And what is your understanding based on? | 14:00 |
| 9 | A.   My understanding of the case is based on | 14:00 |
| 10 | the Complaint, plaintiff's expert's report, and the | 14:00 |
| 11 | decision of the judge that we mentioned earlier. | 14:00 |
| 12 | Q.   And does this -- | 14:00 |
| 13 | A.   And I think that's -- that's where I'm | 14:00 |
| 14 | getting my understanding of the -- what plaintiffs | 14:00 |
| 15 | are alleging anyway that still remain in the case. | 14:00 |
| 16 | Q.   Understood. | 14:00 |
| 17 | And so does this case involve affirmative | 14:00 |
| 18 | misrepresentations or omissions or both? | 14:00 |
| 19 | A.   I think it does not involve omissions.  I | 14:00 |
| 20 | think it involves affirmative misrepresentations. | 14:00 |
| 21 | The plaintiffs are claiming that the | 14:01 |
| 22 | statements made were -- I mean, for example, that | 14:01 |
| 23 | the -- that, you know, at the beginning of the | 14:01 |
| 24 | Class Period, that appropriate remediation efforts | 14:01 |
| 25 | had been taken.  Plaintiffs are alleging that that | 14:01 |

Page 93

```
 1      was not true.  That -- regarding 2011 NOV.        14:01

 2           Q.   And so is it your understanding that    14:01

 3      plaintiffs allege that the statements were        14:01

 4      themselves outright false or that they were       14:01

 5      misleading by omitting additional information or  14:01

 6      both?                                             14:01

 7                MR. STOKES:  Objection.  Form.          14:01

 8                THE WITNESS:  I'm not sure I fully       14:01

 9      understand that -- but I -- the -- that distinction.  14:01

10                But I think they are alleging, in part,  14:01

11      that they were misleading.  And I think, in part,  14:02

12      that maybe they were outright false.  I'm not sure.  14:02

13                I think I say in my report what they said.  14:02

14                But for my analysis, it doesn't matter.  14:02

15      I'm assuming it -- it doesn't matter whether they're  14:02

16      false and misleading or just misleading or just   14:02

17      false.                                            14:02

18      BY MR. LAVELLE:                                   14:02

19           Q.   Well, doesn't it matter to your opinions  14:02

20      about whether there's a mismatch between the      14:02

21      information that's been misrepresented or omitted in  14:02

22      the corrective disclosures?                       14:02

23                MR. STOKES:  Objection. Form.           14:03

24                THE WITNESS:  It doesn't matter to my   14:03

25      opinion.                                          14:03
```

Page 94

```
 1           So my opinion is -- my opinion of price       14:03

 2    impact is assuming that there is a match.  I am      14:03

 3    saying that there appears to be a mismatch.  But I   14:03

 4    am assuming there is a match.                        14:03

 5    BY MR. LAVELLE:                                       14:03

 6        Q.   So you --                                   14:03

 7        A.   I'm assuming there is a match between the   14:03

 8    corrective disclosures and the misrepresentations,   14:03

 9    even though it appears there is not match.  I'm      14:03

10    assuming there to be a match in doing an analysis of 14:03

11    price impact, assuming something that appears not to 14:03

12    be true.                                             14:03

13           So I am giving plaintiff's claims of --       14:03

14    you know, a big benefit of the doubt.  I'm including 14:03

15    a table that says, "Look, it doesn't appear to       14:03

16    match.  It doesn't appear to match, but I'm just     14:03

17    assuming it does match," and finding that there is   14:03

18    no price impact, even assuming it does match, which  14:03

19    it appears not to.                                   14:03

20        Q.   So you are not offering the opinion that    14:03

21    there is a mismatch between --                       14:03

22        A.   I'm not offering the opinion.  Well, I      14:03

23    show a table that does show that there is a          14:04

24    mismatch, but my analysis of price impact does not   14:04

25    rest on a conclusion of a mismatch.  It is assuming  14:04
```

Page 95

```
 1    that there is a match, when in actuality, it appears    14:04
 2    to me that there is not a match.                        14:04
 3           So I'm showing what to me appears to be          14:04
 4    evidence of a mismatch, but I'm saying I'm going to     14:04
 5    ignore that mismatch and just assume that there is a    14:04
 6    match.                                                  14:04
 7           And even assuming there is a match --            14:04
 8    assuming there is a match, I'm finding that there is    14:04
 9    no price impact.                                        14:04
10    Q.   Okay.  But for the purposes of your                14:04
11    opinion, you are not affirmatively opining that         14:04
12    there was, in fact, a mismatch.  You are rather         14:04
13    assuming that fact that there was no mismatch?          14:04
14    A.   I am showing that there appears to be a            14:04
15    mismatch.  But I'm saying let's ignore that.  I'm       14:04
16    going to pretend that everything matches.  I'm going    14:04
17    to give plaintiffs all the benefit of the doubt and     14:04
18    analyze price impact, and I'm still finding that        14:05
19    there is no price impact.                               14:05
20           Of course, to the extent that there is --        14:05
21    if there is also the mismatch that would only be        14:05
22    further evidence against price impact.  But I am        14:05
23    doing my analysis as if what plaintiffs claim is        14:05
24    true and that there is a match between the alleged      14:05
25    corrective disclosures and the alleged                  14:05
```

Veritext Legal Solutions
866 299-5127

| | | |
|---|---|---|
| 1 | misrepresentations. | 14:05 |
| 2 | Q.   There are direct and indirect tests for | 14:05 |
| 3 | price impact? | 14:05 |
| 4 | A.   I think you could describe them as direct | 14:05 |
| 5 | or indirect.  So here there are these statements. | 14:05 |
| 6 | There are alleged affirmative misrepresentations | 14:05 |
| 7 | that plaintiffs are claiming that it was not true | 14:05 |
| 8 | that the alleged remediation efforts have been taken | 14:05 |
| 9 | care of or what -- I'm not using the exact words | 14:06 |
| 10 | that are in the Complaint. | 14:06 |
| 11 | And so directly measuring what that | 14:06 |
| 12 | statement, how that affected the market.  I think | 14:06 |
| 13 | you could talk about as being a direct measurement, | 14:06 |
| 14 | and a -- I think you could describe an indirect | 14:06 |
| 15 | measurement by looking at corrective disclosures. | 14:06 |
| 16 | So that might be one -- one way of using | 14:06 |
| 17 | the terms "direct" and "indirect." | 14:06 |
| 18 | Q.   And in terms of the indirect test for | 14:06 |
| 19 | price impact, looking at the corrective disclosure, | 14:06 |
| 20 | how would you go about testing that? | 14:06 |
| 21 | A.   Well -- so at the time of a corrective | 14:06 |
| 22 | disclosure, you can do an event study and see if the | 14:06 |
| 23 | market -- in fact, the price reacts if there is | 14:06 |
| 24 | impact on the price from the corrective disclosure. | 14:07 |
| 25 | You can look to see if it has impacted the | 14:07 |

Page 97

| | | |
|---|---|---|
| 1 | valuations of the analysts who are covering the | 14:07 |
| 2 | company at the time. | 14:07 |
| 3 | You can look to see whether anyone even | 14:07 |
| 4 | mentions -- whether there are analyst reports and | 14:07 |
| 5 | news stories mentioning the alleged corrective | 14:07 |
| 6 | information. | 14:07 |
| 7 | Those are some of the things that I have | 14:07 |
| 8 | done here. | 14:07 |
| 9 | Q.   Do you have an understanding of what | 14:07 |
| 10 | plaintiffs have alleged Cabot failed to disclose? | 14:08 |
| 11 | A.   I believe I say that in my report. | 14:08 |
| 12 | [Witness reviews document]. | 14:08 |
| 13 | I'm not seeing that. | 14:08 |
| 14 | But I think the -- I believe the Complaint | 14:08 |
| 15 | goes through the alleged misrepresentations and says | 14:09 |
| 16 | why they were allegedly false or misleading when | 14:09 |
| 17 | made. | 14:09 |
| 18 | And that there is a category of alleged | 14:09 |
| 19 | misrepresentations that is no longer in the case. | 14:09 |
| 20 | So I don't remember -- I just don't remember how | 14:09 |
| 21 | it's laid out in the Complaint.  But -- but my | 14:09 |
| 22 | recollection is that they go through each alleged | 14:09 |
| 23 | misrepresentation by category. | 14:09 |
| 24 | So some of the misrepresentations are -- | 14:09 |
| 25 | the same misrepresentation is made multiple times in | 14:09 |

Page 98

| | | |
|---|---|---|
| 1 | SEC filings or quarterly 10-Ks or 10-Qs.  And I | 14:09 |
| 2 | think the Complaint lists all those dates and then | 14:10 |
| 3 | says, you know, why they were allegedly false and | 14:10 |
| 4 | misleading. | 14:10 |
| 5 | And I think it's generally that they are | 14:10 |
| 6 | saying that it was generally false and misleading | 14:10 |
| 7 | because they failed to remediate as -- as claimed. | 14:10 |
| 8 | Q.   Remediate what as claimed? | 14:10 |
| 9 | A.   The wells. | 14:10 |
| 10 | Q.   Which wells? | 14:10 |
| 11 | A.   Well, the alleged misrepresentations are | 14:10 |
| 12 | regarding specific wells.  But the Complaint alleged | 14:10 |
| 13 | a more general category of complaint -- of | 14:10 |
| 14 | misrepresentation that the judge is not -- that the | 14:10 |
| 15 | judge threw out of the case.  So that was just that | 14:10 |
| 16 | there -- the category being kind of generally | 14:10 |
| 17 | compliant. | 14:10 |
| 18 | Let me see.  I think I -- | 14:10 |
| 19 | [Witness reviews document]. | 14:11 |
| 20 | Yeah.  So, I mean, I say here [as read]: | 14:11 |
| 21 | "According to plaintiff, Cabot had | 14:11 |
| 22 | in reality 'failed to remediate wells | 14:11 |
| 23 | that it had publicly committed to | 14:11 |
| 24 | fix.'" | 14:11 |
| 25 | So that -- I'm trying to find the -- | 14:11 |

Page 99

| | | |
|---|---|---|
| 1 | somewhere I thought I listed there were four | 14:11 |
| 2 | categories and three of them are still in. | 14:11 |
| 3 | [Witness reviews document cont'd]. | 14:11 |
| 4 | I'm not finding that. | 14:11 |
| 5 | But there was a more general category that | 14:11 |
| 6 | the company was in compliance with its environmental | 14:11 |
| 7 | regulations, which I -- I believe is the category | 14:11 |
| 8 | that the -- that the judge has thrown out of the | 14:12 |
| 9 | case. | 14:12 |
| 10 | Q.   Are you talking about a particular | 14:12 |
| 11 | statement that was made regarding the company being | 14:12 |
| 12 | in substantial -- in substantial compliance?  Is | 14:12 |
| 13 | that what you are referring to? | 14:12 |
| 14 | A.   Yes.  Something along those lines. | 14:12 |
| 15 | Q.   Right. | 14:12 |
| 16 | And my question is a little different. | 14:12 |
| 17 | It's what information do plaintiffs allege | 14:12 |
| 18 | was omitted from the statements that are still in | 14:12 |
| 19 | the case that render them false and misleading? | 14:12 |
| 20 | A.   I think it's generally that they had not | 14:12 |
| 21 | actually done what they claim, and that there was | 14:12 |
| 22 | still issues with the wells and the remediation. | 14:12 |
| 23 | Q.   Right.  And my question is which wells? | 14:12 |
| 24 | A.   Well, the statements are about specific | 14:12 |
| 25 | wells.  So I think the -- what is false and | 14:12 |

Page 100

1    misleading is what -- would have to be about those          14:13

2    statements.  Those statements don't regard -- are           14:13

3    about specific NOVs.                                         14:13

4         So the -- the first two categories of                  14:13

5    misrepresentations are about NOVs related to the            14:13

6    September 2011 NOVs, which all related to Stalter           14:13

7    wells.                                                       14:13

8         So the only statements are about -- the                14:13

9    first two categories of misrepresentations, which is        14:13

10   the bulk of the misrepresentations, relate to -- the        14:13

11   statements only discuss the September 2011 NOV.  And        14:13

12   the September -- the September 2011 NOV relates only         14:13

13   to wells that are Stalter wells.  So I think it's           14:13

14   three of them.                                               14:14

15       Q.   So is that your understanding of the case          14:14

16   that plaintiffs have alleged that the misstatements         14:14

17   are false because the Stalter, Jeffers, and Howell          14:14

18   wells were not remediated as claimed?                       14:14

19       A.   So plaintiffs have a more general claim.           14:14

20   But the statements themselves that are left in the          14:14

21   case are -- relate to specific wells and relate to          14:14

22   specific NOVs, which only pertain to certain wells.         14:14

23       Q.   So you agree that plaintiffs have alleged          14:14

24   that those statements are false and misleading by           14:14

25   omission because they failed to disclose information        14:14

Veritext Legal Solutions
866 299-5127

| | | |
|---|---|---|
| 1 | about remediation on additional wells besides the | 14:14 |
| 2 | Stalter, Jeffers, and Howell wells? | 14:14 |
| 3 | MR. STOKES:  Objection to form. | 14:14 |
| 4 | THE WITNESS:  I think they pled this more | 14:15 |
| 5 | general.  So they had a more general statement -- | 14:15 |
| 6 | alleged misstatement, which was about generally | 14:15 |
| 7 | being in compliance, which the judge threw out as a | 14:15 |
| 8 | misstatement. | 14:15 |
| 9 | So the misstatements that remain relate to | 14:15 |
| 10 | specific NOVs, which relate to specific wells and | 14:15 |
| 11 | only a few of the actual wells of the company. | 14:15 |
| 12 | BY MR. LAVELLE: | 14:15 |
| 13 | Q.   Right.  And I am just asking you a | 14:15 |
| 14 | slightly different question, which is not about the | 14:15 |
| 15 | statements in particular, but what information | 14:15 |
| 16 | plaintiffs have alleged was omitted from the | 14:15 |
| 17 | statements that make them false and misleading? | 14:15 |
| 18 | A.   Yeah.  I am not -- I mean, I am analyzing | 14:15 |
| 19 | it as if it's -- as if it matches the corrective | 14:15 |
| 20 | disclosures, whether it does or it doesn't. | 14:15 |
| 21 | So I don't -- I am giving the plaintiff's | 14:15 |
| 22 | claim a large benefit of the doubt in analyzing | 14:16 |
| 23 | price impact as if there is a match.  So it -- it | 14:16 |
| 24 | doesn't really matter for my analysis.  I am already | 14:16 |
| 25 | pretending the whole thing is a match, whether it is | 14:16 |

Veritext Legal Solutions
866 299-5127

```
 1    or it's not.  And even pretending the whole thing is    14:16
 2    a match, there is no price impact.                      14:16
 3         Q.   You don't have a complete understanding of    14:16
 4    what the plaintiffs have alleged was omitted from       14:16
 5    the alleged false and misleading statements because     14:16
 6    you are assuming that it was all correct?               14:16
 7              MR. STOKES:  Objection.  Form.                 14:17
 8              THE REPORTER:  Repeat --                       14:17
 9              THE WITNESS:  I am assuming --                 14:17
10              THE REPORTER:  I didn't get the last of        14:17
11    the question or the objection.
12              You were assuming it was all correct
13    because...
14              And the question.
15              MR. LAVELLE:  I think that was the end of
16    the question, "you are assuming that it was all
17    correct," and I think there was an objection.
18              THE REPORTER:  Thank you.
19              Sorry.  Thanks.                                14:17
20    BY MR. LAVELLE:                                          14:17
21         Q.   So let me -- let me re-ask the question.       14:17
22    I'll reword it.                                          14:17
23              So the question was you don't have a           14:17
24    complete understanding of what plaintiffs have          14:17
25    alleged was omitted from the alleged false and          14:17
```

Page 103

| | | |
|---|---|---|
| 1 | misleading statements that render them false and | 14:17 |
| 2 | misleading because you are assuming all of | 14:17 |
| 3 | plaintiff's allegations are correct? | 14:17 |
| 4 | MR. STOKES:  Objection.  Form. | 14:17 |
| 5 | THE WITNESS:  I don't think it matters -- | 14:17 |
| 6 | it doesn't matter to my analysis because I am -- I | 14:17 |
| 7 | am assuming that what they are claiming is true. | 14:17 |
| 8 | But from a logical standpoint, I think -- | 14:18 |
| 9 | I think what the Complaint is alleging is that they | 14:18 |
| 10 | were generally not in compliance.  And their | 14:18 |
| 11 | statements that they were in compliance were false | 14:18 |
| 12 | and misleading.  And the judge has thrown those -- | 14:18 |
| 13 | thrown that out as a claim. | 14:18 |
| 14 | So the claims that do remain relate to | 14:18 |
| 15 | very specific -- mostly to the 2011 NOV, which | 14:18 |
| 16 | relates to only certain wells of the | 14:18 |
| 17 | Statler [verbatim] wells. | 14:18 |
| 18 | So to the extent that plaintiffs are | 14:18 |
| 19 | logically saying that those statements are false and | 14:18 |
| 20 | misleading, the statements don't say anything about | 14:18 |
| 21 | wells other than the ones that would be part of | 14:18 |
| 22 | the -- they only refer to the 2011 NOV, which only | 14:18 |
| 23 | refers to certain wells -- certain of the | 14:19 |
| 24 | Statler [verbatim] wells. | 14:19 |
| 25 | So, logically, it -- it doesn't make sense | 14:19 |

Page 104

```
 1    to me that claims could be alleging that this says      14:19
 2    something about a different set of wells or should      14:19
 3    have said something about a different set of wells.     14:19
 4          From a logistical standpoint, I don't            14:19
 5    understand that.  But it doesn't matter.  That's not   14:19
 6    something that I have -- my analysis is just           14:19
 7    assuming that there is a perfect match between what    14:19
 8    plaintiffs are alleging and the alleged corrective     14:19
 9    disclosures even though there -- there is not a        14:19
10    match.                                                 14:19
11    BY MR. LAVELLE:                                        14:19
12          Q.   Did the misstatements -- the alleged       14:19
13    misstatements mention the Stalter wells?              14:19
14          A.   The alleged misstatements mention the      14:19
15    2011 NOV, which -- which applies to the               14:19
16    Stalter wells, only Stalter wells, and no other       14:20
17    wells.                                                 14:20
18          Q.   Right.  So I am asking a very specific     14:20
19    question about what the alleged false and misleading  14:20
20    statements say.                                        14:20
21          A.   Oh.  I have them in my -- I have it in     14:20
22    Paragraph 11, for example, of -- of my report as a    14:20
23    quote from it.                                         14:20
24          Q.   And do they mention the Stalter wells?     14:20
25          A.   No, they don't mention.  They mention the  14:20
```

Page 105

| | | |
|---|---|---|
| 1 | 2011 NOV. | 14:20 |
| 2 | Q.   Is there a particular test or methodology | 14:20 |
| 3 | that you are aware of for determining whether or not | 14:20 |
| 4 | new news is related to an alleged fraud? | 14:20 |
| 5 | A.   I don't know what you mean by "related." | 14:20 |
| 6 | I mean, the term "related" can just be -- you know, | 14:20 |
| 7 | have similar words.  It doesn't mean that -- if | 14:20 |
| 8 | something is caused by it, that's -- you know, | 14:21 |
| 9 | ultimately something has to be proximally caused by | 14:21 |
| 10 | something to have damages or loss causation or to -- | 14:21 |
| 11 | I mean, things could just be -- yeah.  The term | 14:21 |
| 12 | "related" is -- is too loose a term. | 14:21 |
| 13 | Q.   So I'm not trying to be cute. | 14:21 |
| 14 | In other words, you are not aware of there | 14:21 |
| 15 | being different tests or methodologies for | 14:21 |
| 16 | determining whether an alleged -- excuse me -- | 14:21 |
| 17 | whether news is related to an alleged fraud? | 14:21 |
| 18 | A.   It depends on what you mean by "news." | 14:21 |
| 19 | No, I am not aware of any particular test but... | 14:21 |
| 20 | Q.   Can stock price be inflated by a false | 14:22 |
| 21 | statement or omission even if the stock price itself | 14:22 |
| 22 | goes down at the time of the misstatement? | 14:22 |
| 23 | A.   If all you have is positive -- allegedly | 14:22 |
| 24 | positive false news that you are claiming is sliding | 14:22 |
| 25 | the stock price and there is nothing else -- I mean, | 14:22 |

Page 106

```
 1    if your -- sure.  If you don't control for the        14:22

 2    market and the whole market is going down even more.   14:22

 3         Q.   Are you familiar with the term              14:23

 4    "heteroscedasticity"?                                 14:23

 5         A.   Yes.                                        14:23

 6              MR. LAVELLE:  And for the court reporter     14:23

 7    that is spelled H-E-T-E-R-O-S-C-E-D-A-S-T-I-C-I-T-Y.   14:23

 8    BY MR. LAVELLE:                                       14:23

 9         Q.   And what is "heteroscedasticity"?           14:23

10         A.   It's generally when something is changing.  14:23

11    So like your errors or your -- your variances or you  14:23

12    are having a change over time.  It doesn't have to    14:23

13    be over time but...                                   14:23

14         Q.   And does heteroscedasticity have any        14:23

15    affect on a regression analysis?                      14:24

16         A.   It can.                                     14:24

17         Q.   How so?                                     14:24

18         A.   You can have that -- your errors.  So the   14:24

19    difference between what your -- your predicted and    14:24

20    your actual values can have some patterns.  So they   14:24

21    could be growing or changing over time.  So it's      14:24

22    not -- it's not a similar pattern.                    14:24

23              It can be that you're beginning -- you      14:24

24    know, you're getting much more unpredictable and      14:24

25    bigger errors, for example, over time.                14:24
```

Page 107

```
 1          Q.    And that can occur within a regression if      14:25
 2    there is heteroscedasticity present; is that right?        14:25
 3          A.    I mean, that is sort of what it means is        14:25
 4    that, you know, the "hetero," it's just like -- it's        14:25
 5    sort of different.   It's changing.                          14:25
 6          Q.    Okay.   Do you agree that, if you ignore        14:25
 7    potential violations of assumptions of regression,          14:25
 8    such as autocorrelation or heteroscedasticity, that         14:25
 9    would result in a non-normal distribution of                14:25
10    co-efficient estimates?                                      14:25
11             MR. STOKES:   Objection.   Form.                    14:25
12             THE WITNESS:   I don't know if that's true.         14:25
13    BY MR. LAVELLE:                                              14:26
14          Q.    Can you test for the presence of                14:26
15    heteroscedasticity?                                          14:26
16          A.    I mean, in general you'd -- there are           14:26
17    tests that one can do of heteroscedasticity.   There        14:26
18    are.                                                         14:26
19          Q.    And how can one test for it?                    14:26
20          A.    I -- there are different ways of doing it       14:26
21    in different contexts.                                       14:26
22             So one of the tests -- I mean, you were            14:26
23    talking about heteroscedasticity and                         14:26
24    autocorrelation.                                             14:26
25             So one of the tests of an efficient market        14:26
```

Page 108

| | | |
|---|---|---|
| 1 | is that it not be autocorrelated, for example. | 14:26 |
| 2 | So autocorrelation or serial correlation, | 14:26 |
| 3 | if a -- if a market is -- shows that kind of a | 14:26 |
| 4 | pattern, then that's evidence of an inefficient | 14:26 |
| 5 | market. | 14:26 |
| 6 | Q.   And so what are the tests that you can use | 14:26 |
| 7 | to identify the presence of heteroscedasticity? | 14:27 |
| 8 | A.   There are -- there are different -- there | 14:27 |
| 9 | are different tests. | 14:27 |
| 10 | Q.   What are they? | 14:27 |
| 11 | A.   I don't -- it depends on different | 14:27 |
| 12 | contexts.  And, you know, there are -- there are a | 14:27 |
| 13 | number of different tests. | 14:27 |
| 14 | Q.   What are the tests in the different | 14:27 |
| 15 | context? | 14:27 |
| 16 | A.   I wouldn't -- I would -- I don't know if I | 14:27 |
| 17 | can say them off the top of my head.  So yeah. | 14:27 |
| 18 | Q.   Can -- can you name any? | 14:27 |
| 19 | A.   Well, one way you can actually test for it | 14:27 |
| 20 | is you can actually look -- you can look at your | 14:27 |
| 21 | errors. | 14:27 |
| 22 | So you can, like, plot your error | 14:27 |
| 23 | structure over time and see if it's doing something. | 14:27 |
| 24 | You can just do sort of a visual inspection. | 14:28 |
| 25 | Q.   Okay.  Can you think of any others? | 14:28 |

Page 109

```
 1        A.   Yeah.   There are -- there are -- I don't      14:28

 2   know if I could name you the tests, but there --          14:28

 3   there are -- I have used them.                            14:28

 4        There -- there are a number of                       14:28

 5   different tests that one can use, but that's              14:28

 6   basically what you're -- you're looking at.               14:28

 7        Q.   Okay.   But aside from the visual               14:28

 8   inspection, you just can't think of any sitting here     14:28

 9   today?                                                    14:28

10        A.   Well, I can't think of the names of some       14:28

11   of them or what -- you know, what -- what would be.      14:28

12        I mean, for example, the software will --            14:28

13   there are various commands that you can do.  You          14:28

14   can -- I mean, it's -- I think it's literally             14:28

15   called -- in Stata, for example, there's a -- it          14:28

16   might be called, like, "hetero" something is the --      14:28

17   is the command.                                           14:28

18        Q.   And for that command in the software, do       14:28

19   you know what the test is that's being run?               14:28

20        A.   No.   Not as I sit here, I don't.              14:29

21        Q.   Did you test for heteroscedasticity for       14:29

22   your regressions in this case?                            14:29

23        A.   I don't recall.   Not -- not specifically      14:29

24   that I recall.                                            14:29

25        So Dr. Feinstein did this -- did some                14:29
```

Page 110

```
 1    statistical procedures that I described in my          14:29
 2    report, which are to -- generally to control for       14:29
 3    autocorrelation and heteroscedasticity.  And his --    14:29
 4    as I describe in my report, he has -- his results      14:29
 5    are just completely unreliable.                        14:29
 6            And it's clear that what he's done is not       14:29
 7    consistent with what -- with what anyone would do or   14:30
 8    what he's done in prior cases that yields              14:30
 9    unreasonable and unreliable results.                   14:30
10        Q.   So no one would do what Dr. Feinstein did     14:30
11    in this case?                                          14:30
12        A.   Not the way he has done it, no.               14:30
13            If you look at his results, you'll see         14:30
14    that -- I mean, what he's trying to do is find days    14:30
15    that are statistically significant, where the excess   14:30
16    return on a particular day is unusual given -- you     14:30
17    know, if he claims there's some pattern around it --   14:30
18    he keeps claiming that the -- that there's a --        14:30
19    there is a COVID period, and things did change         14:30
20    during COVID.                                          14:30
21            But rather than doing something different      14:30
22    during COVID, he does this procedure over the whole    14:30
23    time.  And if you just look at his days that he has    14:31
24    found to be statistically significant, look at what    14:31
25    he says is the excess return or the abnormal return    14:31
```

Page 111

```
 1    or how much that stock price, according to his model    14:31
 2    moves differently than expected, the days that he       14:31
 3    finds are statistically significant are just like --    14:31
 4    you would never look at these excess returns and        14:31
 5    say, "Okay.  What -- these are days that look            14:31
 6    particularly unusual."                                  14:31
 7            You can just visually look at his results        14:31
 8    and see that that is not something that -- that is      14:31
 9    not a meaningful answer.                                14:31
10       Q.   So you mentioned a procedure that               14:31
11    Dr. Feinstein conducted.                                14:31
12            What was the procedure that you're              14:31
13    referring to?                                           14:31
14       A.   I don't know what his procedure is.             14:31
15            He did a -- he calls it -- it's a               14:31
16    Newey-West procedure is what he describes it as.        14:31
17            But I don't believe that -- whatever he's       14:31
18    done is not something that I have ever seen anyone      14:31
19    do that would yield the kind of results that he is      14:32
20    getting.                                                14:32
21            So there is a Newey-West procedure.             14:32
22       Q.   Have you ever seen it before --                 14:32
23       A.   But he is either not actually using it or       14:32
24    he's not applying it correctly because he's getting     14:32
25    results that make absolutely no sense.                  14:32
```

Page 112

```
 1        Q.   Have you ever used the Newey-West        14:32

 2   procedure before?                                  14:32

 3        A.   I don't think I have.  No.               14:32

 4        Q.   So I think the original question I asked 14:32

 5   was did you test for heteroscedasticity in this    14:32

 6   case?                                              14:32

 7        A.   I don't believe so.  No.  I think        14:32

 8   Dr. Feinstein's backup maybe had some tests or tests 14:32

 9   of autocorrelation.                                14:32

10        I -- I believe I saw some tests that he       14:33

11   did.  But I don't think I performed any myself.    14:33

12        Q.   So it's your recollection that           14:33

13   Dr. Feinstein tested for heteroscedasticity in his 14:33

14   backup materials for his opening report?           14:33

15        A.   Possibly.  There seemed to be some test  14:33

16   that he does not describe that was in his backup   14:33

17   material.  Some tests he did in his backup material. 14:33

18   It's not mentioned in his report is my recollection. 14:33

19        Q.   Do you know if heteroscedasticity was, in 14:33

20   fact, present during the Class Period?             14:33

21        A.   I don't believe I did any tests of it; so 14:33

22   I didn't.                                          14:34

23        Q.   Have you ever heard of the White tests for 14:34

24   testing for the presence of heteroscedasticity?   14:34

25        A.   I have heard of a White test.           14:34
```

Page 113

```
 1        Q.   Have you heard of the White test for       14:34

 2   testing specifically for the presence of            14:34

 3   heteroscedasticity?                                 14:34

 4        A.   I think that is the -- I think I have only  14:34

 5   heard of one White test, and I think it is a test of 14:34

 6   heteroscedasticity but...                           14:34

 7             That's my recollection.                   14:34

 8        Q.   Are you aware of any instances of NERA      14:34

 9   using the White test to find the presence of        14:34

10   heteroscedasticity?                                 14:34

11        A.   Not -- not off the top of my head, but I    14:34

12   wouldn't be surprised.                              14:34

13        Q.   And you mentioned earlier that you have     14:35

14   heard of the Newey-West test or correction before;  14:35

15   right?                                              14:35

16        A.   I don't believe I have ever done the -- a   14:35

17   Newey-West test.  I -- I don't know.  I don't know  14:35

18   if I had before I saw it in -- I'm not sure.  I have 14:35

19   not ever seen it in the context that he is using it, 14:35

20   nor have I -- but I'm not sure if I had seen it      14:35

21   before.  I don't believe I have used it before.     14:35

22   But...                                              14:35

23        Q.   Are you able to describe what the          14:35

24   Newey-West correction is?                           14:36

25        A.   I am aware that it is a test -- it is --   14:36
```

Page 114

```
 1      it is a correction for autocorrelation and           14:36
 2      heteroscedasticity, I think.  But I have not used it  14:36
 3      or I don't recall using it, and I don't know if --    14:36
 4      what Dr. Feinstein has done is actually that.  And I  14:36
 5      have never seen anyone do it, nor does he cite to     14:36
 6      anyone doing it in the kind of context he is using    14:36
 7      it.                                                   14:36
 8           Q.   So is the Newey-West test a generally       14:36
 9      accepted correction for heteroscedasticity?           14:36
10           A.    So I think it's a correction for           14:36
11      heteroscedasticity and autocorrelation.  I don't      14:36
12      know that it's just for heteroscedasticity.  And      14:37
13      I -- it's not a correction that I am seeing to be     14:37
14      generally accepted in the method that Dr. Feinstein   14:37
15      has done it, nor in the context that Dr. Feinstein    14:37
16      has done it.                                          14:37
17              So I -- I am aware that it is a -- it is a     14:37
18      correction.  It is a -- it is something that          14:37
19      academics have done.  I have never seen it done, nor  14:37
20      could I find anyone that has done it in the context   14:37
21      that -- nor does Dr. Feinstein cite it, and I don't   14:37
22      know that what he has done is actually a Newey-West   14:37
23      test.                                                 14:37
24           Q.   Are you aware of any instances of NERA      14:37
25      advocating for the use of the Newey-West test to --   14:38
```

Page 115

```
 1        A.   Not --                                  14:38

 2        Q.   Just let me finish the question.        14:38

 3             Are you aware of any instances of NERA   14:38

 4   advocating for the use of the Newey-West correction 14:38

 5   to address autocorrelation and heteroscedasticity. 14:38

 6        A.   Not in the context that Dr. Feinstein has. 14:38

 7   Not -- not as he has done it.  I'm not aware of    14:38

 8   anyone at NERA doing that.                         14:38

 9             It may be something that has been used in 14:38

10   some other situations.  But...                     14:38

11        Q.   Are you aware of any other context?      14:38

12        A.   At NERA?  I did ask a number of my NERA  14:38

13   colleagues, and nobody had ever seen anyone do     14:39

14   something like Dr. Feinstein had done in this      14:39

15   context.                                           14:39

16        Q.   What about in other context, though?     14:39

17        A.   I think the -- I think the Newey-West    14:39

18   procedure is something that is done in other       14:39

19   contexts, and it makes sense in other contexts.    14:39

20             I -- I cannot find -- I don't know if    14:39

21   that's what -- if Dr. Feinstein has done the       14:39

22   procedure properly or not, but his results show that 14:39

23   what he has done make absolutely no sense in this  14:39

24   context and cannot be correct.                     14:39

25             MR. LAVELLE:  Okay.  We have been going  14:39
```

Page 116

```
 1    for about an hour.  Let's take a quick break off the     14:39
 2    record.                                                  14:40
 3             THE WITNESS:  Okay.                              14:40
 4             THE VIDEOGRAPHER:  Okay.  We're off the          14:40
 5    record.  It's 2:40 p.m.                                  14:40
 6             (Brief recess.)                                  14:50
 7             THE VIDEOGRAPHER:  Back on the record.           14:50
 8    It's 2:51 p.m.                                           14:50
 9    BY MR. LAVELLE:                                          14:50
10        Q.   Welcome back, Ms. Allen.                        14:50
11             Let's look back to your report, which is        14:50
12    Plaintiff's Exhibit 1.  If you turn to Page 6 of         14:50
13    your report there is a subheading about the              14:51
14    "2017 NOV Misrepresentation" at Paragraph 14.            14:51
15             You see that?                                   14:51
16        A.   Yeah.                                           14:51
17        Q.   And it states [as read]:                        14:51
18                 "In its Q2 2019 Form 10-Q filed on          14:51
19             July 26, 2019, Cabot reported it                14:51
20             received the June 17th NOV and the              14:51
21             November 2017 NOV."                             14:51
22             And then it continues on after that.            14:51
23             Do you see that paragraph?                      14:51
24        A.   Yes.                                            14:51
25        Q.   If you look down toward the bottom, the         14:51
```

Page 117

| | | |
|---|---|---|
| 1 | last sentence on Page 6, and it goes on to Page 7 | 14:51 |
| 2 | [as read]: | 14:51 |
| 3 | "It is my understanding that the | 14:51 |
| 4 | June 2017 NOV pertained to the Howell | 14:51 |
| 5 | gas wells" -- that lists a number of | 14:51 |
| 6 | wells -- "and the November 2017 NOV | 14:51 |
| 7 | pertained to the Jeffers Farm gas | 14:51 |
| 8 | wells...." | 14:52 |
| 9 | And it lists a number of wells. | 14:52 |
| 10 | Do you see that? | 14:52 |
| 11 | A.   Yes. | 14:52 |
| 12 | Q.   Why do you use the language "it is my | 14:52 |
| 13 | understanding" in that sentence there? | 14:52 |
| 14 | A.   Oh.  Because it's not something that | 14:52 |
| 15 | really is in my area of expertise.  So it comes both | 14:52 |
| 16 | from the declaration of Mr. Schroeder as well as the | 14:52 |
| 17 | NOVs themselves say that.  But... | 14:52 |
| 18 | Q.   And so looking at just the alleged | 14:52 |
| 19 | misrepresentations themselves in the 2Q 2019 10-K, | 14:52 |
| 20 | does that 10-K mention the Jeffers or Howell wells? | 14:52 |
| 21 | A.   No.  It mentions the NOVs and the NOVs | 14:52 |
| 22 | themselves, which, as I understand, that those -- | 14:52 |
| 23 | they are filed publicly.  Those mention the wells. | 14:52 |
| 24 | Q.   Are you providing an opinion that the | 14:53 |
| 25 | market was aware of the 2017 NOVs at the time of | 14:53 |

Page 118

```
 1    these statements?                                     14:53

 2              MR. STOKES:  Objection.  Form.               14:53

 3              THE WITNESS:  At the time of these           14:53

 4    statements?  Yeah.  This is -- I mean, they are in     14:53

 5    the Q.  So -- and I think the NOVs themselves are --   14:53

 6    I think it's public information.                       14:53

 7              I don't think the market cares is what --    14:53

 8    is what -- what I'm finding both from the price        14:53

 9    reactions as well as from the analysts and the --      14:53

10    but I think the information, the violations            14:54

11    themselves, the NOVs themselves are something that     14:54

12    is publicly accessible.                                14:54

13    BY MR. LAVELLE:                                        14:54

14         Q.   And is that an assumption that you are       14:54

15    making, or do you know that as a fact?                 14:54

16         A.   I'm able to see them now, and it's my        14:54

17    understanding that they were -- I have a part in my    14:54

18    report that says that.                                 14:54

19              But my analysis does not rely on that.  My   14:54

20    conclusions are independent about whether that         14:54

21    information was known and knowable before or not.      14:54

22              So I think that information is publicly       14:54

23    available.  It's not information that the market       14:54

24    cared about.                                           14:54

25         Q.   And are you offering the affirmative         14:55
```

Veritext Legal Solutions
866 299-5127

```
 1    opinion that the market was actually aware of the    14:55
 2    information?                                          14:55
 3         A.   I'm noting that it is -- it is -- I         14:55
 4    have -- it doesn't matter to my analysis.  But I do   14:55
 5    note in my report that the company has said that it   14:55
 6    was previously available, and I can see that you      14:55
 7    could see it now.  But I can't see what you could     14:55
 8    have seen at the time, if that makes sense.           14:55
 9         Q.   I understand.                               14:55
10              If you look at the next page,               14:55
11    Paragraph 15, and it reads [as read]:                 14:55
12              "The portion of Cabot's 2Q 2019             14:55
13              Form 10-Q that contained the alleged        14:55
14              misrepresentation is excerpted below."      14:56
15              And then there is an excerpt that starts    14:56
16    with [as read]:                                       14:56
17              "We received Notices of Violation           14:56
18              ('NOV') from the PaDEP in June and          14:56
19              November, 2017, respectively...."           14:56
20              And it goes on and on.                      14:56
21              Do you see that?                            14:56
22         A.   Yes.                                        14:56
23         Q.   Is it your understanding that this          14:56
24    paragraph contains all of the false and misleading   14:56
25    statements in this 10-Q?                              14:56
```

Page 120

1          A.    That plaintiffs are alleging to be false          14:56

2    and misleading?  I'm not saying whether they are          14:56

3    false or misleading at all.          14:56

4               I think that this is --          14:56

5               [Witness reviews document].          14:57

6               So I have here quotes from what the          14:57

7    plaintiffs say is false and misleading in the          14:57

8    beginning of Paragraph 14 [as read]:          14:57

9                    "...believed 'these water quality          14:57

10                   complaints have been resolved.'"          14:57

11              I don't know if that's within this.  I          14:57

12   think that is within this statement.          14:57

13              I don't know if I have quoted everything          14:57

14   that -- every part of the 10-Q that plaintiffs          14:57

15   allege is false and misleading.          14:57

16         Q.    And so you accepted -- or, excuse me --          14:57

17   excerpted this paragraph from the 10-Q --          14:58

18   correct? -- at least that's what you write in          14:58

19   Paragraph 15?          14:58

20         A.    Yes.          14:58

21         Q.    Okay.  And why did you excerpt it?          14:58

22         A.    Just to put it in context and see what it          14:58

23   is.          14:58

24         Q.    So your excerpt is missing the          14:58

25   misstatement concerning the appropriate -- excuse          14:58

                                             Page 121

```
 1   me.                                                    14:58
 2           The excerpt is missing the alleged            14:58
 3   misstatement concerning appropriate remediation       14:58
 4   efforts.                                               14:58
 5           Did you know that?                             14:58
 6      A.   You are saying there is a portion of          14:58
 7   this -- like, a -- cut out a portion, or you are      14:59
 8   saying there is some other part of the 10-Q?          14:59
 9      Q.   This paragraph.                               14:59
10      A.   I believe this is a -- that this is a --      14:59
11   I'm not missing anything within this part.  I mean,   14:59
12   there might be other parts of the 10-Q, but I don't   14:59
13   think there is something in the middle of this that   14:59
14   I'm missing.                                          14:59
15           I think this is a continuous quote.           14:59
16      Q.   So you are -- it's your understanding that    14:59
17   this is the entire paragraph from the 10-Q?           14:59
18      A.   Oh.  I don't know if it's the whole          14:59
19   paragraph from the 10-Q.                              14:59
20           16.  Person to complain...                    14:59
21           Yeah.  I don't know if this is the whole     14:59
22   paragraph from the 10-Q.  I think this is a           14:59
23   paragraph that has a number of the statements that    14:59
24   plaintiffs claim are false or misleading.             15:00
25           And I thought that this -- yeah.  I          15:00
```

Veritext Legal Solutions
866 299-5127

| | | |
|---|---|---|
| 1 | think -- I mean, the intention was just to -- to put | 15:00 |
| 2 | the statements that plaintiffs are claiming are | 15:00 |
| 3 | false and misleading and put them in the -- you | 15:00 |
| 4 | know, put the sentences around it to see the | 15:00 |
| 5 | context.  That was really all. | 15:00 |
| 6 | Q.   Right. | 15:00 |
| 7 | But you need to see the context to | 15:00 |
| 8 | understand the forming of what the | 15:00 |
| 9 | misrepresentations -- the alleged misrepresentations | 15:00 |
| 10 | are saying? | 15:00 |
| 11 | A.   Well, yeah.  I don't -- I mean, it's not | 15:00 |
| 12 | an attempt to rewrite the Complaint.  It's an | 15:01 |
| 13 | attempt to try to have -- honestly, from -- from | 15:01 |
| 14 | the -- it tends to be the case that everyone else | 15:01 |
| 15 | involved in the case is more familiar with the | 15:01 |
| 16 | actual allegations, and they are spelled out in the | 15:01 |
| 17 | Complaint as well as in, I believe, the -- the | 15:01 |
| 18 | judge's order. | 15:01 |
| 19 | But, partly, it's to make it easier for me | 15:01 |
| 20 | to have it in one place and have the words in | 15:01 |
| 21 | context. | 15:01 |
| 22 | Q.   Sure.  And I understand that. | 15:01 |
| 23 | I'm just asking you if the reason why you | 15:01 |
| 24 | included the excerpt that you did is that you agree | 15:01 |
| 25 | it's important to read the statements in their | 15:02 |

Page 123

```
 1    context?                                        15:02

 2        A.    I think it's helpful to read the      15:02

 3    statements in their context.  Yes.              15:02

 4            I -- so I think that the parts that are 15:02

 5    bolded are parts that the Complaint quoted and  15:02

 6    focused on and it was just trying to put the -- the 15:02

 7    parts that the Complaint focused on, string them 15:02

 8    together and put what was the words around them.  I 15:02

 9    think that was the only intent here.            15:02

10        Q.    Can you look at Paragraph 18 next, please. 15:02

11        A.    18.  Sure.                             15:03

12        Q.    Yeah.  And this is about the           15:03

13    July 26th, 2019, alleged corrective disclosure. 15:03

14        A.    Okay.                                  15:03

15        Q.    And there in paragraph states [as read]: 15:03

16            "In addition, Plaintiff claims that      15:03

17            Cabot's new guidance disclosed in        15:03

18            Cabot's earnings announcement on the     15:03

19            same day is also a partial corrective    15:03

20            disclosure."                             15:03

21            Do you see that?                         15:03

22        A.    Yes.                                   15:03

23        Q.    And when you relate to -- sorry.       15:03

24            When you state "new guidance," what are  15:03

25    you referring to there?                          15:03
```

Page 124

```
 1          A.    The reduction in guidance that is         15:03
 2    announced on that date, on July 26th.                 15:03
 3          Q.    And plaintiffs alleged that was a         15:03
 4    corrective disclosure; correct?                       15:03
 5          A.    Well, they allege that July 26th is a     15:03
 6    corrective disclosure.  They allege that the -- the   15:03
 7    2017 NOVs, along with the guidance, is what they are  15:04
 8    claiming together is a corrective disclosure.         15:04
 9          Q.    And you agree that there was a stock drop 15:04
10    for Cabot's stock price that was statistically        15:04
11    significant at the 95 percent level or greater        15:04
12    following the July 26th disclosure?                   15:04
13          A.    Well, not following the announcement of   15:04
14    the NOVs.  So the 27 NOVs [verbatim] come             15:04
15    afterwards; so the stock price drops before then.     15:04
16    So I have a chart that shows that.  So the stock      15:04
17    price is dropping after the guidance is announced     15:04
18    but before the NOVs are announced.                    15:04
19          Q.    So the stock drop that occurs following   15:05
20    the -- the new guidance but prior to the 10-Q coming  15:05
21    out was statistically significant at the 95 percent   15:05
22    level or greater; is that right?                      15:05
23          A.    I think it was statistically              15:05
24    significant -- the day was statistically significant  15:05
25    of whatever -- the 5 percent level is really what we  15:05
```

Page 125

| | | |
|---|---|---|
| 1 | typically call it.  But... | 15:05 |
| 2 | Q.   You looked at the whole day?  Okay. | 15:05 |
| 3 | A.   I did a statistical significance of the -- | 15:05 |
| 4 | the whole day or I think -- and Dr. Feinstein did | 15:05 |
| 5 | too, I believe. | 15:05 |
| 6 | Q.   Aside from the new guidance, are you aware | 15:05 |
| 7 | of any other factors that contributed to Cabot's | 15:05 |
| 8 | stock drop on July 26th, 2019? | 15:06 |
| 9 | A.   Well, there's a whole earnings -- I mean, | 15:06 |
| 10 | there is a whole announcement and -- I think there | 15:06 |
| 11 | may -- there may be other news that some of the | 15:07 |
| 12 | analysts focus on.  I didn't really parse it into | 15:07 |
| 13 | the various pieces.  I -- I do think generally they | 15:07 |
| 14 | were negative about the reduced guidance of -- the | 15:07 |
| 15 | company is increasing their CapEx, their capital | 15:07 |
| 16 | expenditures, and lowering their expectations | 15:07 |
| 17 | regarding production, and that was considered a real | 15:07 |
| 18 | negative. | 15:07 |
| 19 | There may be other -- some other negative | 15:07 |
| 20 | news. | 15:07 |
| 21 | But, again, from the -- the earlier | 15:07 |
| 22 | earnings announcement, rather from -- then from | 15:07 |
| 23 | the -- the 10-K or 10-Q itself. | 15:07 |
| 24 | I think this one was a Q; right? | 15:08 |
| 25 | Q.   That's right. | 15:08 |

Page 126

```
 1          A.    Yeah.   So I think it's information in the        15:08

 2    announcement before the Q comes out.                         15:08

 3          Q.    That causes the stock price to drop?             15:08

 4          A.    That's right.                                    15:08

 5          Q.    So --                                            15:08

 6          A.    But -- but the focus is on higher capital        15:08

 7    expenditures with lowering production output,                15:08

 8    outlook.                                                     15:08

 9          Q.    Right.                                           15:08

10                And -- so aside from those two things, did       15:08

11    you identify any other information that caused               15:08

12    Cabot's stock price to fall on July 26th?                    15:08

13          A.    So, as I said, I didn't parse what               15:08

14    other -- what other negative pieces in the earnings          15:08

15    announcement other than in the 10-Q.   But,                  15:08

16    generally, yeah, I would have to look back.   There          15:09

17    might be some other pieces that were considered              15:09

18    negative, but I don't recall.   I think the general          15:09

19    focus was on the lower guidance along with a higher          15:09

20    CapEx.                                                       15:09

21          Q.    So looking back at Paragraph 18, where it        15:09

22    states [as read]:                                            15:09

23                "In this earnings release, Cabot               15:09

24                announced a reduction in its production        15:09

25                guidance for the second half of 2019           15:09
```

Page 127

| | | |
|---|---|---|
| 1 | while increased its capital expenditure | 15:09 |
| 2 | guidance for 2019." | 15:09 |
| 3 | Do you see that? | 15:09 |
| 4 | A.   Sorry.  I didn't -- while it increased -- | 15:09 |
| 5 | yes. | 15:09 |
| 6 | Q.   Okay. | 15:09 |
| 7 | A.   I see the statement. | 15:09 |
| 8 | Q.   And then one or two sentences in it states | 15:09 |
| 9 | that [as read]: | 15:09 |
| 10 | "Cabot stated that the changes in | 15:09 |
| 11 | guidance were [quote] 'due in large | 15:09 |
| 12 | part to a change in the operating plan | 15:09 |
| 13 | resulting from a unique opportunity to | 15:10 |
| 14 | acquire acreage adjacent to an | 15:10 |
| 15 | eight-well pad....'" | 15:10 |
| 16 | Do you see that sentence? | 15:10 |
| 17 | A.   Yes. | 15:10 |
| 18 | Q.   Did you review the operating plan | 15:10 |
| 19 | reference? | 15:10 |
| 20 | A.   No. | 15:10 |
| 21 | Q.   Did -- | 15:10 |
| 22 | A.   Review the operating plan itself? | 15:10 |
| 23 | Q.   Yes. | 15:10 |
| 24 | A.   No. | 15:10 |
| 25 | Q.   Did you ask to see it? | 15:10 |

Page 128

| | | |
|---|---|---|
| 1 | A.   No. | 15:10 |
| 2 | Q.   Let's move on to Page 10 of your report, | 15:10 |
| 3 | which starts a new section, "Methodology and | 15:10 |
| 4 | Relevant Economic Principles"? | 15:10 |
| 5 | A.   Okay. | 15:10 |
| 6 | Q.   There at Paragraph 23, which actually | 15:10 |
| 7 | starts -- the sentence I'm looking at starts on | 15:10 |
| 8 | Page 11 of your report, but it's in Paragraph 23. | 15:10 |
| 9 | A.   Okay. | 15:11 |
| 10 | Q.   Where it reads [as read]: | 15:11 |
| 11 | "If a price reaction is not | 15:11 |
| 12 | statistically significant, it is within | 15:11 |
| 13 | the range of normal expected daily | 15:11 |
| 14 | variation in stock prices.  The absence | 15:11 |
| 15 | of a statistically significant price | 15:11 |
| 16 | reaction demonstrates that the | 15:11 |
| 17 | information announced was not material | 15:11 |
| 18 | to investors - i.e., that there was no | 15:11 |
| 19 | new, stock-price relevant information | 15:11 |
| 20 | disclosed." | 15:11 |
| 21 | Do you see all that? | 15:11 |
| 22 | A.   Yes. | 15:11 |
| 23 | Q.   What does it mean for a price reaction to | 15:11 |
| 24 | be statistically significant? | 15:11 |
| 25 | A.   Well, here it means -- I mean, this is | 15:11 |

Page 129

```
 1    doing an event study, and it's saying that the --     15:11
 2    when it's statistically significant, you are saying   15:11
 3    that the movement of the stock price relevant to the  15:11
 4    expected movement given your -- you know, in this      15:11
 5    case it's some sort of model or market model that      15:11
 6    controls for industry and market movement is          15:12
 7    unusually large outside of the -- what you would       15:12
 8    expect.  And it's in the -- it's so large that this    15:12
 9    kind of thing would only happen at 5 percent of the    15:12
10    time.                                                  15:12
11          So that -- meaning, you know, it's              15:12
12    statistically significant at the 5 percent level.      15:12
13    That this -- excess movement or abnormal movement      15:12
14    this large would happen only 5 percent of the time.    15:12
15       Q.   And so if a stock price movement isn't        15:12
16    statistically significant at the 5 percent level or    15:12
17    greater as between 5 and 1 percent, that would         15:13
18    demonstrate that the information was not material?     15:13
19       A.   It's not statistically different than 0.      15:13
20    So it's -- it is demonstrating that it's not          15:13
21    material.  It's not materially different than 0.       15:13
22    You can't statistically differentiate it from 0.       15:13
23       Q.   And so -- and if the -- on the flip side,     15:13
24    part of -- how I referred to it today is -- when you   15:13
25    are talking about the 5 percent level, it can also     15:13
```

Veritext Legal Solutions
866 299-5127

```
 1    be referred to as at the 95 percent confidence       15:13

 2    level.                                               15:13

 3            Do you understand what I mean by that?       15:13

 4        A.   Yeah.  You can -- you can -- you can talk   15:13

 5    about the 95 percent or you can talk about           15:13

 6    5 percent.  100 minus the number.                    15:13

 7        Q.   But they both -- they both mean the same    15:13

 8    thing; right?                                        15:13

 9        A.   Yeah.  You can refer to it.  Yes.  It       15:13

10    doesn't mean you are 95 percent confident, though.   15:13

11        Q.   What --                                     15:14

12        A.   It has nothing to do with the level of      15:14

13    confidence.                                          15:14

14        Q.   Right.                                      15:14

15        A.   So that's -- that's -- that's...            15:14

16        Q.   So if you have a stock price movement that  15:14

17    is statistically significant at the 94 percent       15:14

18    confidence level, is that evidence that the          15:14

19    statement with the news was not material?            15:14

20        A.   That is -- that is generally not            15:14

21    considered -- so something that is not -- the        15:14

22    general standard of statistical significance, the    15:14

23    most typical standard and the one that is generally  15:14

24    used by academics as well as by the courts is the    15:14

25    5 percent level.                                     15:14
```

Page 131

1          So if it's below -- if it's significant at          15:14

2     a threshold below the 5 percent level, then it's          15:14

3     generally considered not statistically significant.       15:14

4          Q.   And so you have the sentence here that I        15:14

5     read before.  [As read]:                                  15:14

6               "The absence of a statistically                 15:14

7               significant price reaction demonstrates         15:15

8               that the information announced was not           15:15

9               material to investors...."                       15:15

10         Do you see that?                                      15:15

11         A.   Yes.                                             15:15

12         Q.   So is it your opinion that, if the price         15:15

13    reaction was only statistically significant at the        15:15

14    94 percent confidence level, that that would mean          15:15

15    that the information announced was not material to         15:15

16    investors?                                                 15:15

17         A.   Well, if you -- if you have a test and           15:15

18    you -- you have a standard for that test, you -- you       15:15

19    decide what your test is ahead of time, and you have       15:15

20    a threshold and the standard threshold is the              15:15

21    5 percent threshold.                                       15:15

22              So if it's below that, it's not -- it's          15:15

23    considered not statistically significant.                  15:15

24              Now, you know, when you are at the               15:15

25    threshold, you know, what you -- what you do when          15:15

                                              Page 132

| | | |
|---|---|---|
| 1 | you are right at the threshold, you could -- you | 15:15 |
| 2 | could argue that, you know, maybe you should go a | 15:15 |
| 3 | little bit one way or the other. | 15:15 |
| 4 | And, you know, it's -- in some sense it's | 15:16 |
| 5 | a -- I mean, it's a standard.  It's not a -- what -- | 15:16 |
| 6 | you know, there is arguments that you shouldn't have | 15:16 |
| 7 | a -- you shouldn't have a bright line, and you | 15:16 |
| 8 | should just give P-values, for example, and you | 15:16 |
| 9 | should have some sort of... | 15:16 |
| 10 | But at some point you have -- you know, | 15:16 |
| 11 | you have fact-finders that are judges or juries and | 15:16 |
| 12 | you have a whole series of tests.  At some point, | 15:16 |
| 13 | you -- people's ability to comprehend -- and what | 15:16 |
| 14 | you'll find is that academic papers will report | 15:16 |
| 15 | results, but they will again determine and say that | 15:16 |
| 16 | something is statistically significant, and | 15:16 |
| 17 | typically they do it at the 5 percent level, which | 15:16 |
| 18 | is why you see there is all these papers about, you | 15:16 |
| 19 | know, p-hacking. | 15:16 |
| 20 | And if you look at the results of academic | 15:16 |
| 21 | literature, you'll find that there is this very | 15:16 |
| 22 | abrupt threshold at the 5 percent that shows that | 15:16 |
| 23 | everyone is just trying to -- you know, just work to | 15:17 |
| 24 | get that result because that is the -- sort of the | 15:17 |
| 25 | gold standard of statistical significance. | 15:17 |

Page 133

```
1            You know, whether you can say that maybe      15:17
2    something could be meaningful if it's below that      15:17
3    level, I think is something that, you know, is --     15:17
4    something that there is some reason to discuss.  But  15:17
5    what the -- generally the courts and academics have   15:17
6    come down at is that the -- this is -- this is the    15:17
7    most standard level to use.                           15:17
8            But I think there is other information        15:17
9    other than just statistical significance that you     15:17
10   can use.  And you would ideally like to -- whatever   15:17
11   conclusions you come to, look at it in a number of    15:17
12   other ways as I found in this report.                 15:17
13       Q.   So the 95 percent level, it's a standard.    15:18
14   But if you fall below that standard, it's not         15:18
15   necessarily a fact that the information disclosed is  15:18
16   immaterial to investors?                              15:18
17       A.   It's evidence that it is immaterial if you   15:18
18   are below the standard.  So if you -- if you are      15:18
19   significant at, you know, something stronger than     15:18
20   the 5 percent level, you are still going to make a    15:18
21   mistake, by definition, 5 percent of the time and     15:18
22   find things to be significant when they are not.  So  15:18
23   you already know you are going to get a mistake, by   15:18
24   definition, 5 percent of the time.                    15:18
25           And you expect to find things that appear     15:18
```

Page 134

| | | |
|---|---|---|
| 1 | to be statistically significant and look to be | 15:18 |
| 2 | material when they are not.  And you are saying I am | 15:18 |
| 3 | going to make -- I'm willing to make that mistake | 15:18 |
| 4 | 5 percent of the time, but after that, that -- you | 15:18 |
| 5 | know, that's my -- that's my cutoff. | 15:18 |
| 6 | And if you want to, you know, just make | 15:19 |
| 7 | the mistake many more times, you can do that.  But | 15:19 |
| 8 | then you are -- you know, it's not -- it's much less | 15:19 |
| 9 | convincing that what you have is actually important | 15:19 |
| 10 | and can be differentiated from zero.  So that's... | 15:19 |
| 11 | Q.   Let's look at Page 12 where you talk about | 15:19 |
| 12 | analyst reports, and specifically at the end of | 15:19 |
| 13 | Paragraph 24 where it states, near the bottom, that | 15:19 |
| 14 | [as read]: | 15:19 |
| 15 | "These reports play an important | 15:19 |
| 16 | role in disseminating information about | 15:19 |
| 17 | a stock and can be a valuable" -- | 15:19 |
| 18 | excuse me -- "valuable source of | 15:19 |
| 19 | information on market knowledge and | 15:19 |
| 20 | sentiment at the time." | 15:19 |
| 21 | Do you see that? | 15:19 |
| 22 | A.   Yes. | 15:19 |
| 23 | Q.   What other sources of information are | 15:19 |
| 24 | there regarding market sentiment besides analyst | 15:20 |
| 25 | reports? | 15:20 |

Page 135

```
 1        A.   We could look at news stories of --       15:20
 2   oftentimes, you know, business publications, for    15:20
 3   example, or depending on what -- what trade -- I     15:20
 4   mean, it depends on the industry but...             15:20
 5        Q.   What are some typical business            15:20
 6   publications?                                       15:20
 7        A.   The Wall Street Journal, for example, is  15:20
 8   a -- is a business publication that, you know, keeps 15:20
 9   up on events that are important to the markets      15:20
10   often.                                              15:20
11        Q.   And Bloomberg.  Is that another one?      15:20
12        A.   Yeah.  Bloomberg is -- so we use Bloomberg 15:21
13   both as a data source, and it's also an aggregator  15:21
14   of news information.                                15:21
15             So Bloomberg has their own stories, but it 15:21
16   also aggregates news from other sources.  And it    15:21
17   also has, you know, price and whatever.  Price and  15:21
18   other types of data, market data.                   15:21
19        Q.   In this case for the purposes of your     15:21
20   Class Certification Report, did you -- did you       15:21
21   analyze news reports to determine whether any of the 15:21
22   alleged corrective disclosures had a price impact?   15:21
23        A.   I looked at news reports to see what      15:21
24   information and -- was out there and if the -- like, 15:21
25   the NOVs, for example, were being reported or -- or  15:21
```

Page 136

```
 1    what was -- yes.                                15:22

 2           We did look at news stories around the    15:22

 3    dates of the alleged misrepresentations and      15:22

 4    corrective disclosures.                          15:22

 5       Q.   And so did you specifically use them for 15:22

 6    the purposes of determining whether the corrective 15:22

 7    disclosures had a price impact?                  15:22

 8       A.   They were part of the information that I 15:22

 9    looked at to determine whether the corrective    15:22

10    disclosures or the misrepresentations had price  15:22

11    impact.                                          15:22

12       Q.   Let's turn to Page 14 of your report.    15:22

13           There's a new heading, "During the Alleged 15:22

14    Class Period Cabot's Stock Price Did Not Decline Due 15:23

15    to the Alleged Misrepresentations."              15:23

16           Then if you go down to Paragraph 29, it   15:23

17    talks about your understanding that [as read]:   15:23

18               "...Cabot's new guidance could not    15:23

19           in fact be corrective of the alleged      15:23

20           misrepresentations because the changes    15:23

21           in guidance were completely unrelated     15:23

22           to alleged environmental violations at    15:23

23           any of the wells that the alleged         15:23

24           misrepresentations pertained to but       15:23

25           were instead due to changes in Cabot's    15:23
```

Page 137

| | | |
|---|---|---|
| 1 | operating plan that were completely | 15:23 |
| 2 | unrelated to those wells." | 15:23 |
| 3 | And then you cite down to the [as read]: | 15:23 |
| 4 | "Declaration of Scott C. | 15:23 |
| 5 | Schroeder." | 15:23 |
| 6 | Do you see that? | 15:23 |
| 7 | A.    Yes. | 15:23 |
| 8 | Q.    So in this paragraph, the understanding | 15:23 |
| 9 | that you are referring to comes from counsel and the | 15:23 |
| 10 | Schroeder declaration; is that accurate? | 15:23 |
| 11 | A.    Yes.  It comes mostly from the Schroeder | 15:23 |
| 12 | declaration.  But that's correct. | 15:23 |
| 13 | Q.    Well, aside from the Schroeder declaration | 15:24 |
| 14 | and partially by counsel, does your understanding | 15:24 |
| 15 | come from any other sources? | 15:24 |
| 16 | A.    There is another declaration.  The -- I | 15:24 |
| 17 | have forgotten his name, but he also mentions the | 15:24 |
| 18 | guidance of -- | 15:24 |
| 19 | Q.    You are referring to the Smelko? | 15:24 |
| 20 | A.    Yes.  Smelko.  I think -- I think he also | 15:24 |
| 21 | references the guidance in his declaration. | 15:24 |
| 22 | Q.    And those were the two declarations that | 15:24 |
| 23 | we discussed previously; correct? | 15:24 |
| 24 | A.    Correct. | 15:24 |
| 25 | Q.    And you -- you highlighted a sentence, a | 15:25 |

Page 138

```
 1    specific sentence, out of the Schroeder declaration    15:25

 2    in Paragraph 29 it reads [as read]:                    15:25

 3               "In particular, according to the            15:25

 4          Declaration of Scott C. Schroeder, 'the          15:25

 5          reduction in Cabot's production growth           15:25

 6          guidance and the increase in Cabot's             15:25

 7          capital budget guidance announced in             15:25

 8          the July 26th, 2019, Disclosures had             15:25

 9          nothing to do with (and did not result           15:25

10          from) any NOV or other alleged                   15:25

11          environmental violations associated              15:25

12          with the Stalter wells (or, for that             15:25

13          matter, with the Howell Wells, the               15:25

14          Jeffers...Well, for any of the                   15:25

15          allegedly deficient wells referenced in          15:25

16          the June 2018 Letter or the                      15:25

17          AG Presentment).'"                               15:25

18          Do you see all that?                             15:25

19    A.    Yes.                                             15:25

20    Q.    Okay.  And my question is did you review         15:25

21    any internal Cabot documents corroborating that       15:25

22    sentence, or did you take it at face value as          15:26

23    written in Mr. Schroeder's declaration?                15:26

24    A.    I did not review any other internal              15:26

25    documents.                                             15:26
```

                                                    Page 139

```
 1        Q.   And paragraph -- in Paragraph 30, you       15:26

 2    state [as read]:                                     15:26

 3             "According to Defendants" --                15:26

 4             And this is the second sentence in          15:26

 5    [as read]:                                           15:26

 6             -- "the July 26th, 2019, alleged            15:26

 7             corrective disclosure only pertained to     15:26

 8             the Howell Well -- Wells and the            15:26

 9             Jeffers Farm Wells...."                      15:26

10             Do you see that?                            15:26

11        A.   Yes.                                        15:26

12        Q.   Then it goes on to state that [as read]:    15:26

13             "...while the alleged                        15:26

14             misrepresentations prior to that            15:26

15             disclosure only pertained to the            15:26

16             Stalter Wells."                             15:27

17             Do you see that?                            15:27

18        A.   Yes.                                        15:27

19        Q.   So your understanding of the -- of the      15:27

20    corrective disclosures here comes from defense       15:27

21    counsel when you -- when you state here "according   15:27

22    to defendants"?                                      15:27

23        A.   It's -- it's both what defense counsel      15:27

24    said.  And then the NOVs themselves say what the     15:27

25    wells are.                                           15:27
```

Veritext Legal Solutions
866 299-5127

| | | |
|---|---|---|
| 1 | So I have the -- it should be in my | 15:27 |
| 2 | Materials Considered.  But they're -- the NOVs | 15:27 |
| 3 | themselves mention the wells and then -- | 15:27 |
| 4 | Q.   I think your last sentence -- your -- not | 15:27 |
| 5 | sentence -- word or two might have cut out there. | 15:27 |
| 6 | Would you mind just repeating the last | 15:27 |
| 7 | part of your answer? | 15:27 |
| 8 | A.   Yes. | 15:27 |
| 9 | [Witness reviews document]. | 15:27 |
| 10 | I think the -- the NOVs, I think I | 15:27 |
| 11 | have the -- the NOVs themselves is what I -- it | 15:28 |
| 12 | should be in my Materials Considered. | 15:28 |
| 13 | Yeah.  So the Notices of Violations, those | 15:28 |
| 14 | themselves mentioned what are the wells.  And I was | 15:28 |
| 15 | able to verify that.  And what counsel was saying, | 15:28 |
| 16 | at least, matched up to what the -- what was said in | 15:28 |
| 17 | the NOVs. | 15:28 |
| 18 | Q.   And then it goes on to state [as read]: | 15:28 |
| 19 | "Further, as detailed in the | 15:29 |
| 20 | Section...below...criminal charges | 15:29 |
| 21 | announced on June 15, 2020, implicated | 15:29 |
| 22 | wells and time periods that Defendants | 15:29 |
| 23 | contend do not correspond to the | 15:29 |
| 24 | alleged misrepresentations." | 15:29 |
| 25 | Do you see that sentence generally? | 15:29 |

Page 141

```
 1          A.   No.  I'm sorry.                        15:29

 2          Q.   Yeah.  It's on Page 15, and it's a     15:29

 3     continuation of Paragraph 30.                    15:29

 4          A.   Yes.  Okay.                            15:29

 5          Q.   And my question is your statement about 15:29

 6     the time periods in the June 15th, 2020,         15:29

 7     announcement of the criminal charges do not      15:29

 8     correspond to the alleged misrepresentations, is 15:29

 9     that based on your understanding of what the alleged 15:29

10     misrepresentations are?                          15:29

11          A.   Well, it's based on looking at the actual 15:30

12     time period in the AG charges compared to the time 15:30

13     that the misrepresentations were made.           15:30

14          Q.   Right.                                 15:30

15               So when you said, "the announcement of 15:30

16     charges don't correspond to the alleged          15:30

17     misrepresentations," that's based on what your   15:30

18     understanding of what plaintiffs allege was      15:30

19     misrepresented and what defendants failed to     15:30

20     disclose; correct?                               15:30

21          A.   Well, it's just that the -- the time   15:30

22     period in the AG charges, the time period of the 15:31

23     violations is before, more than a year before the 15:31

24     alleged misrepresentations were made.  That's -- 15:31

25     that's what I have verified.                     15:31
```

Page 142

| | | |
|---|---|---|
| 1 | Q.   And are the alleged misrepresentations | 15:31 |
| 2 | stating -- strike that. | 15:31 |
| 3 | Let's look on Page 15 now -- continue to | 15:31 |
| 4 | look on Page 15. | 15:31 |
| 5 | A.   Okay. | 15:31 |
| 6 | Q.   There's a new section, Subsection 1, "An | 15:32 |
| 7 | analysis of Cabot's intraday stock price movements | 15:32 |
| 8 | shows that Cabot's stock price decline on July 26, | 15:32 |
| 9 | 2019...." | 15:32 |
| 10 | A.   Yes. | 15:32 |
| 11 | Q.   Do you see that? | 15:32 |
| 12 | A.   Yes. | 15:32 |
| 13 | Q.   Do you have an opinion on what, in fact, | 15:32 |
| 14 | caused Cabot's stock to drop on July 26th? | 15:32 |
| 15 | A.   I think it was the earnings announcement, | 15:32 |
| 16 | which included lower guidance and higher CapEx, | 15:32 |
| 17 | which the market didn't think was good news and | 15:32 |
| 18 | analysts described as being negative. | 15:32 |
| 19 | Q.   And how quickly would the news regarding a | 15:32 |
| 20 | new guidance have been incorporated into Cabot's | 15:32 |
| 21 | stock price? | 15:32 |
| 22 | A.   Well, in an efficient market, it should be | 15:32 |
| 23 | extremely quickly.  I mean, in an efficient market | 15:32 |
| 24 | the -- the point is it happens immediately is really | 15:32 |
| 25 | what the textbooks will tell you about an efficient | 15:32 |

Page 143

```
 1    market.                                              15:33

 2            And what you can see from the chart is       15:33

 3    the -- I think the announcement, I want to say, was, 15:33

 4    like, at 6:00 a.m. or something.                     15:33

 5            But you can see that, you know, by the       15:33

 6    time of the opening, the -- whatever it was,         15:33

 7    12 percent or something, stock price drop was        15:33

 8    already -- happened.  So it opened down right away.  15:33

 9        Q.   And so how long would it take for the --    15:33

10    that news regarding new guidance to be completely    15:33

11    impounded into the stock price?                      15:33

12        A.   Well, one is when it begins to react; and   15:33

13    one is when it continues to react.                   15:33

14            Is that your question?                       15:33

15        Q.   Right.                                      15:33

16        A.   Well, in an efficient market, it -- you     15:33

17    know, it should be -- it -- it should certainly      15:33

18    begin to react immediately.  And I don't know        15:34

19    typically how long.                                  15:34

20            But you can see -- just looking at this      15:34

21    picture, you can see that the drop occurs            15:34

22    immediately at the open.  And then the stock really  15:34

23    doesn't move much the whole rest of the day.         15:34

24        Q.   So do you have an opinion on how long it    15:34

25    would take for the news of the new guidance to be    15:34
```

Page 144

| | | |
|---|---|---|
| 1 | completely incorporated into Cabot's stock price? | 15:34 |
| 2 | A.   Well, what -- I don't particularly. | 15:34 |
| 3 | Plaintiffs are alleging that the stock | 15:34 |
| 4 | price is efficient, which is that it reacts | 15:34 |
| 5 | immediately to news.  And the analysis on efficiency | 15:34 |
| 6 | that plaintiff's expert has done is using daily | 15:34 |
| 7 | stock price return.  So for announcements that | 15:35 |
| 8 | occurred during the day near the end of the day. | 15:35 |
| 9 | Dr. Feinstein is using just that same day. | 15:35 |
| 10 | So is not allowing -- I don't know if any of his | 15:35 |
| 11 | announcements are, you know, near the end of the -- | 15:35 |
| 12 | close of the market. | 15:35 |
| 13 | But he's not -- he's not including | 15:35 |
| 14 | anything more than -- more than one day regardless | 15:35 |
| 15 | of when the announcement occurs during the day. | 15:35 |
| 16 | Q.   Right. | 15:35 |
| 17 | And I'm asking you specifically as a | 15:35 |
| 18 | general matter how long it should take news to be | 15:35 |
| 19 | fully incorporated into a stock price? | 15:35 |
| 20 | A.   Well, it -- you know, it -- I don't -- I | 15:35 |
| 21 | think it can vary.  And it can vary depending on, | 15:35 |
| 22 | you know, one, whether the market is efficient.  And | 15:36 |
| 23 | it could vary depending on whether -- you know, | 15:36 |
| 24 | perhaps if the news is especially complicated. | 15:36 |
| 25 | Q.   And so in an efficient market where the | 15:36 |

Page 145

1    news is potentially complicated, how long could it          15:36
2    take to be fully impounded into a stock's price?            15:36
3         A.   I mean, that's something that you                 15:36
4    couldn't -- that's an empirical question that you           15:36
5    can test.  And I don't.                                     15:36
6              What plaintiffs claim regarding market            15:36
7    efficiency is that it's -- they're doing one day            15:36
8    reactions.  It's nothing that -- that's --                  15:36
9    Dr. Feinstein has -- plaintiff's expert has looked          15:36
10   at earnings announcements, which, by their nature,          15:36
11   are the more complicated announcements and hasn't           15:36
12   done anything that's more than one-day reaction.            15:36
13             So the claim of market efficiency or the          15:37
14   test of market efficiency is all that -- regardless         15:37
15   of the timing -- it -- it would not -- not testing          15:37
16   even whether it spills over to another day is my            15:37
17   recollection.                                               15:37
18             So I don't know.  I haven't tested.               15:37
19        Q.   So you don't have a view as to whether in         15:37
20   an efficient market new material information that is        15:37
21   unexpected by the market needs to be incorporated           15:37
22   within a certain amount of time after disclosure?           15:37
23        A.   I don't have a view that it needs to be           15:37
24   incorporated in a specific time, no.                        15:37
25        Q.   Did Cabot's stock price continue to fall          15:37

                                                    Page 146

```
 1    after the 10-Q was disclosed on July 26th, 2019?    15:37

 2         A.   You can look at this picture.  I think    15:37

 3    it's -- it looks like there's a little bit of a    15:38

 4    downward movement, a general downward movement.  I    15:38

 5    don't recall whether the overall look -- what the    15:38

 6    price does is just -- I have just charted it there    15:38

 7    over time to the market close on Page 16 of my    15:38

 8    report.    15:38

 9         Q.   Okay.  Let's jump ahead a little bit.    15:39

10              If you turn to Paragraph 40, please.    15:39

11         A.   Sure.    15:39

12         Q.   And it starts with that sentence    15:39

13    [as read]:    15:39

14              "A review of the AG Presentment    15:39

15              shows that out of the 25 wells with    15:39

16              alleged violations, 14 of them were not    15:39

17              even wells pertaining to the alleged    15:39

18              misrepresentations.  Moreover, of the    15:39

19              11 wells that actually pertained to the    15:39

20              alleged misrepresentations, the    15:39

21              AG Presentment did not allege any    15:39

22              violations for time periods that    15:39

23              pertained to the alleged    15:39

24              misrepresentations."    15:40

25              Do you see that?    15:40
```

Page 147

| | | |
|---|---|---|
| 1 | A. Yes. | 15:40 |
| 2 | Q. And specifically the -- | 15:40 |
| 3 | A. Yes. | 15:40 |
| 4 | Q. -- last part of that sentence, "the | 15:40 |
| 5 | AG Presentment did not allege any violations for | 15:40 |
| 6 | time periods that pertained to the alleged | 15:40 |
| 7 | misrepresentations," what was the basis for that | 15:40 |
| 8 | statement? | 15:40 |
| 9 | A. That they are -- the allege | 15:40 |
| 10 | misrepresentations happen almost a year after -- | 15:40 |
| 11 | more than a year after the time period that was | 15:40 |
| 12 | supposedly a violation, and the violations are being | 15:40 |
| 13 | charged. That's -- that's what that means. | 15:40 |
| 14 | Q. And do you have an understanding as to | 15:40 |
| 15 | whether those alleged misrepresentations relate back | 15:40 |
| 16 | to a period prior to June 11, 2018? | 15:40 |
| 17 | A. So the misrepresentations are saying we | 15:40 |
| 18 | previously got an NOV in 2011, for example, and that | 15:41 |
| 19 | we have now resolved that issue and plaintiffs are | 15:41 |
| 20 | alleging, you know, "No, you didn't." | 15:41 |
| 21 | Q. So it's your understanding that -- that | 15:41 |
| 22 | the alleged misstatements state that the remediation | 15:41 |
| 23 | issues were resolved as of the date of the | 15:41 |
| 24 | disclosure, the 10-Q on July 26th, 2019; is that | 15:41 |
| 25 | right? | 15:41 |

Page 148

```
 1        A.   What they say is -- I mean, for one, we      15:41

 2   received notices of violation in June --               15:41

 3   November 2017.                                          15:41

 4        Q.   Okay.                                         15:41

 5        A.   We believe these --                           15:41

 6        Q.   Sorry.  Where are you reading from?  Just     15:42

 7   so I can --                                             15:42

 8        A.   Oh.  Paragraph 15 of my report.               15:42

 9             [As read]:                                    15:42

10             "...we believe these water quality            15:42

11             complaints have been resolved...."            15:42

12        So it doesn't say -- doesn't say when they         15:42

13   were resolved, but it -- it clearly is implying that    15:42

14   as of the date that they are saying this they've        15:42

15   been resolved, and plaintiffs are alleging that that    15:42

16   was false and misleading.                               15:42

17        Q.   So your understanding comes from what you     15:42

18   just read there in Paragraph 15 about what the 10-Q     15:42

19   said; right?                                            15:42

20        A.   What I just said was I was reading from my    15:42

21   report, which is quoting from the 10-Q.                 15:42

22        Q.   Okay.  And that's an excerpted portion of     15:42

23   the 10-Q, as we discussed earlier; correct?            15:42

24        A.   Yes.  That is an excerpt from the 10-Q.       15:42

25   What the Complaint says -- I could go to what the       15:42
```

Page 149

```
 1    Complaint says, which I cite the Complaint.  I cite      15:43

 2    to the Complaint.                                        15:43

 3            Paragraph 190(a).                                15:43

 4            [Witness reviews document].                      15:43

 5            They have performed appropriate                  15:43

 6    remediation efforts, and that the -- these water         15:44

 7    quality complaints have been resolved.  So that's        15:44

 8    what they are saying.                                    15:44

 9            The Complaint is saying that the company         15:44

10    said in its 10-Q on July 26th [as read]:                 15:44

11                "We believe these water quality              15:44

12            complaints have been resolved."                  15:44

13            And so saying that they have been resolved       15:44

14    as of that point would -- it's not saying that it        15:44

15    was resolved, you know, a year earlier or more than      15:44

16    a year earlier.                                          15:44

17            So what the AG is charging is that more          15:44

18    than a year earlier there were problems, and this        15:44

19    is -- this is actually -- this alleged                   15:44

20    misrepresentation is agreeing that there were            15:44

21    problems earlier.  It's now saying that those            15:45

22    problems they believe are resolved.                      15:45

23       Q.   When you refer to "at that point," you           15:45

24    mean the date of this disclosure, July 26th, 2019?       15:45

25       A.   Right.  It's not saying that they were           15:45
```

Page 150

| | | |
|---|---|---|
| 1 | resolved earlier.  It's not saying they were | 15:45 |
| 2 | resolved more than a year earlier.  They say they | 15:45 |
| 3 | have been resolved. | 15:45 |
| 4 | And the AG charges are not saying that | 15:45 |
| 5 | there were any problems at this point.  They are | 15:45 |
| 6 | saying that more than a year prior to this point | 15:45 |
| 7 | there were problems, which is actually sort of the | 15:45 |
| 8 | same as what the company is saying. | 15:45 |
| 9 | Because the company is saying, "We | 15:45 |
| 10 | previously -- we're telling you we previously had | 15:45 |
| 11 | problems.  We had these notices of violation.  And | 15:45 |
| 12 | now we think we have done appropriate remediation | 15:45 |
| 13 | efforts, and they -- and we think the quality | 15:45 |
| 14 | complaints have been resolved." | 15:45 |
| 15 | So it's honestly -- rather than correcting | 15:45 |
| 16 | the statement -- and it seems more likely it would | 15:45 |
| 17 | be consistent with the statement, except the -- the | 15:46 |
| 18 | AG announcement involves -- many of the wells are | 15:46 |
| 19 | not even the same wells that are in the alleged | 15:46 |
| 20 | misstatement.  So they are not -- they don't -- they | 15:46 |
| 21 | don't relate to the same NOVs and the same -- but to | 15:46 |
| 22 | the extent they actually relate to the same wells, | 15:46 |
| 23 | then they are -- the -- the AG charges relate to | 15:46 |
| 24 | time periods that the company has not indicated in | 15:46 |
| 25 | the misrepresentations that they didn't have a | 15:46 |

Veritext Legal Solutions
866 299-5127

| | | |
|---|---|---|
| 1 | problem. | 15:46 |
| 2 | They actually were indicating that they | 15:46 |
| 3 | did have a problem in those time periods because | 15:46 |
| 4 | they are saying "We had these NOVs," and they now | 15:46 |
| 5 | are just announcing that they think they have | 15:46 |
| 6 | resolved the issue. | 15:46 |
| 7 | Q.   So the time periods in the misstatements | 15:46 |
| 8 | didn't relate back to prior -- prior to June 11th, | 15:46 |
| 9 | 2018, which is the end of the time frame that the | 15:47 |
| 10 | AG Presentment included? | 15:47 |
| 11 | A.   No.   In some sense the time periods | 15:47 |
| 12 | correspond.   It's just not correcting anything that | 15:47 |
| 13 | could be in the misrepresentation.   The time period | 15:47 |
| 14 | can't be a correction because the time period in the | 15:47 |
| 15 | AG is saying they had a problem well before the | 15:47 |
| 16 | misstatement. | 15:47 |
| 17 | And the misstatement is actually saying | 15:47 |
| 18 | "We previously had a problem that we now think we | 15:47 |
| 19 | have corrected." | 15:47 |
| 20 | And plaintiffs are alleging that that | 15:47 |
| 21 | statement that they have corrected the problem is a | 15:47 |
| 22 | misstatement. | 15:47 |
| 23 | But what the AG is saying is not at all | 15:47 |
| 24 | that there is a problem at the time that the company | 15:47 |
| 25 | was saying they had corrected the problem.   The AG | 15:47 |

Page 152

```
 1    is actually consistent with what the company is         15:47
 2    saying is that previously, earlier there were           15:47
 3    problems.                                                15:47
 4         Q.   And did you do anything to investigate or      15:47
 5    determine whether the wells at issue in the             15:47
 6    July 26th disclosure had, in fact, been remediated      15:48
 7    as of July 26th, 2019?                                  15:48
 8         A.   Well, the AG is not charging that they        15:48
 9    were not -- so there is nothing in the AG statement     15:48
10    that says that they were a problem.  Doesn't say        15:48
11    anything -- it doesn't say that any wells were a        15:48
12    problem at the time that the misrepresentations were    15:48
13    made.                                                   15:48
14         So the company has not been charged with           15:48
15    nor have I seen any evidence that's public that         15:48
16    there were issues with the wells at the time that       15:48
17    the misstatements were made that they -- that anyone    15:48
18    later found out that there were problems with the       15:48
19    wells.                                                  15:48
20         But I didn't -- other than looking at all          15:48
21    public statements that I could find regarding the       15:48
22    wells and the NOVs, I have not done any other           15:48
23    investigation whether the problems were actually        15:49
24    resolved.                                               15:49
25         Q.   If we look at Paragraph 41 of Page 24.        15:49
```

Page 153

```
 1        A.    Okay.                                    15:49

 2        Q.    Where it talks about [as read]:          15:49

 3              "...the majority (if not all) of the     15:49

 4        June 15th, 2020, disclosure could not          15:49

 5        be attributed -- attributed to the             15:49

 6        alleged misrepresentations."                   15:49

 7        Do you see that?                                15:49

 8        A.    Yeah.                                     15:49

 9        Q.    And your reference there to "majority" is 15:49

10   regarding that 14 of the 25 wells at issue in the    15:49

11   AG Presentments related to wells besides Howell and   15:49

12   Jeffers?                                               15:49

13        A.    Besides wells that were part of the NOV.   15:49

14   So the alleged misrepresentations are about NOVs,     15:49

15   and those that -- the notices of violation are about  15:50

16   wells that are not -- wells that are being charged     15:50

17   for 14 of the 25.                                      15:50

18        Q.    And so for 11 of the 25, on the flip side, 15:50

19   they do pertain to the AG Presentment; right?         15:50

20        A.    They do -- yeah.  Wells 11 of the 25 are   15:50

21   at least wells that are -- the company previously      15:50

22   had mentioned NOVs regarding.                          15:50

23              MR. LAVELLE:  Okay.  I think we have been   15:50

24   going for around an hour.  Sorry if we went over.      15:50

25   But let's take a five-minute break.                    15:50
```

Veritext Legal Solutions
866 299-5127

```
 1            THE WITNESS:  Thank you.              15:50

 2            THE VIDEOGRAPHER:  We're off the record.   15:50

 3    It's 3:51 p.m.                               15:50

 4            (Brief recess.)                       15:50

 5            THE VIDEOGRAPHER:  We're back on the   15:59

 6    record.  It's 3:59 p.m.                       15:59

 7    BY MR. LAVELLE:                               15:59

 8       Q.   Welcome back, Ms. Allen.              15:59

 9            Switching gears just for a quick second.   15:59

10    I had a question about your CV.  Where you have a --   15:59

11    you have a master's degree in economics and then a   15:59

12    master's in philosophy in economics; is that right?   15:59

13       A.   That's right.                         15:59

14       Q.   What -- what is the difference between a   15:59

15    master's in economics and master's of philosophy in   15:59

16    economics?                                    16:00

17       A.   Oh.  It's more -- whatever.  It's -- it's   16:00

18    a more advanced degree.  So I have done all of the   16:00

19    course work for a Ph.D., and oral exams, and   16:00

20    et cetera.                                    16:00

21       Q.   So is there a difference between a   16:00

22    master's in philosophy and a Ph.D.?           16:00

23       A.   Just the -- just the dissertation.    16:00

24       Q.   Okay.                                 16:00

25       A.   Or maybe -- I'm not sure.  But, yeah,   16:00
```

Page 155

```
1    there might be another -- I think that's about it.    16:00
2         Q.   Okay.  And I'm just genuinely curious,      16:00
3    why -- if you do all the coursework for a Ph.D., why  16:00
4    didn't you get a Ph.D.?                               16:00
5         A.   Honestly, I just started working at NERA    16:00
6    and what -- just never quite turned it in is the --   16:01
7    I was not doing an academic career.  So...            16:01
8         Q.   Have you given thought to going back and    16:01
9    getting -- or finishing the Ph.D.?                    16:01
10        A.   Not really.  I mean, I have actually -- I    16:01
11   have the paper.  I suppose I could.                   16:01
12        Q.   So you -- you actually wrote a              16:01
13   dissertation?                                         16:01
14        A.   Yeah.  I have a paper.  Yeah.  I have a     16:01
15   paper that was -- you know, I had people wanting to   16:01
16   publish it.  So...                                    16:01
17        Q.   What was the paper on?                      16:01
18        A.   The market for -- it was, like, a lemons    16:01
19   adverse selection in used construction equipment.     16:01
20        Q.   So you wrote the -- the whole thing is      16:01
21   done, and you just decided that you were working and  16:01
22   wanted to go a different direction.                   16:02
23             Is that kind of what happened?              16:02
24        A.   Yeah.  Sort of.  Yeah.  I mean, the way     16:02
25   it -- I was at Yale.  The way it worked you go out    16:02
```

Page 156

1    on the job market while your -- you have your job        16:02

2    market paper.  And it just, you know -- it just          16:02

3    required more of me -- my academic advisor ended up,     16:02

4    you know, eventually going to another -- yeah.  Just     16:02

5    the...                                                   16:02

6          Q.   Okay.  Well, thanks for indulging me.        16:02

7               Anyway, turning back to the substance of     16:02

8    your report.  I'm looking at Page 25 now.                16:02

9          A.   Yep.                                          16:02

10         Q.   Where there is a heading "...no               16:02

11   statistically significant stock price decline           16:03

12   following the June 15th disclosure -- June 15th,         16:03

13   2020, disclosure...."                                    16:03

14              Do you see that heading there?                16:03

15         A.   Yes.                                          16:03

16         Q.   Okay.  So you agree that there was a stock    16:03

17   price decline following the June 15th, 2020,             16:03

18   disclosure in Cabot's stock price; is that right?        16:03

19         A.   Oh.  I don't know if there is a stock         16:03

20   price decline.  There is nothing that could be           16:03

21   distinguished from zero.  I don't know if it             16:03

22   actually went down.                                      16:03

23         Q.   Well, Cabot stock price did go down?          16:03

24         A.   I don't recall if it went down.  There's      16:03

25   no statistically significant -- I don't recall if        16:03

Veritext Legal Solutions
866 299-5127

| | | |
|---|---|---|
| 1 | it -- if the price went down, if the excess return | 16:03 |
| 2 | was negative. | 16:03 |
| 3 | Q.   Okay. | 16:03 |
| 4 | A.   Or if -- I think the excess return was | 16:03 |
| 5 | negative.  I don't recall if the stock went down. | 16:03 |
| 6 | Q.   Okay.  So you are not sure if the stock | 16:03 |
| 7 | price went down following -- following the | 16:03 |
| 8 | June 15th, 2020, disclosure? | 16:04 |
| 9 | A.   As I -- I think -- since the Complaint is | 16:04 |
| 10 | alleging it, Complaints or lawyers tend not to do | 16:04 |
| 11 | event studies.  They just tend to look -- you know, | 16:04 |
| 12 | they don't tend to control for the market or the | 16:04 |
| 13 | industry. | 16:04 |
| 14 | So probably since they allege it as a | 16:04 |
| 15 | corrective disclosure the actual price may have gone | 16:04 |
| 16 | down, but what is important from an event study is | 16:04 |
| 17 | after controlling for the market or index, it would | 16:04 |
| 18 | be the abnormal return or the excess return. | 16:04 |
| 19 | And I believe the abnormal -- or excess | 16:04 |
| 20 | return was negative, but not -- but I know it was | 16:04 |
| 21 | not statistically significant. | 16:04 |
| 22 | Q.   And what does mean that that the abnormal | 16:04 |
| 23 | return was negative? | 16:04 |
| 24 | A.   It means the direction that the stock | 16:04 |
| 25 | price went relative to what was expected, given the | 16:04 |

Page 158

| | | |
|---|---|---|
| 1 | market in the industry on that day. | 16:04 |
| 2 | Q.   Did you reach any conclusions about what | 16:05 |
| 3 | caused the movement in Cabot's stock price on | 16:05 |
| 4 | June 15th, 2020? | 16:05 |
| 5 | A.   So there -- what the event study is saying | 16:05 |
| 6 | is that there isn't a movement.  That the movement | 16:05 |
| 7 | is just the normal daily -- cannot differentiated | 16:05 |
| 8 | from normal daily variation.  So there is not -- | 16:05 |
| 9 | there isn't a cause to a non-movement.  It's -- | 16:05 |
| 10 | it's -- I'm finding that there is no movement in | 16:05 |
| 11 | that data.  There is no movement that can be | 16:05 |
| 12 | statistically differentiated from zero.  It's just | 16:05 |
| 13 | within the normal daily stock price movement. | 16:05 |
| 14 | Q.   Right.  Well, there was an abnormal, a | 16:05 |
| 15 | negative abnormal price stock movement specific to | 16:05 |
| 16 | Cabot, but it wasn't such a large movement so as to | 16:06 |
| 17 | be statistically significant at the 95 percent | 16:06 |
| 18 | level; right? | 16:06 |
| 19 | A.   It wasn't -- it wasn't abnormal.  It was | 16:06 |
| 20 | within the normal range is really what it is.  The | 16:06 |
| 21 | abnormal movement wasn't statistically different | 16:06 |
| 22 | from zero. | 16:06 |
| 23 | MR. STOKES:  I object to the form of the | 16:06 |
| 24 | question. | 16:06 |
| 25 | /// | |

Page 159

```
 1    BY MR. LAVELLE:                                16:06

 2        Q.   So on the topic of event studies, did you  16:06

 3    run regressions for your Class Certification Report?  16:06

 4        A.   The event study, yes, included -- the   16:06

 5    event study model is a regression model or includes  16:06

 6    a regression as part of it.                    16:06

 7        Q.   And how many different regression      16:06

 8    specifications did you run?                    16:06

 9        A.   So there are a number of -- to test this  16:06

10    one particular day?  Or...                     16:07

11        Q.   In total.                             16:07

12        A.   Oh.  So there are different dates that  16:07

13    were tested.  So I had both an event study model for  16:07

14    Cabot -- for Cabot stock price.  I think I tested  16:07

15    another company as well.                       16:07

16            But for Cabot, the -- I tested different  16:07

17    time periods.                                  16:07

18            And I think just the -- just a modified  16:07

19    Dr. Feinstein's model, and then instead I used  16:07

20    two different indices.  So I think just the one --  16:07

21    just that model, other than using different time  16:08

22    periods.                                       16:08

23        Q.   So, in total, do you recall how many   16:08

24    regressions -- different regressions you ran?   16:08

25        A.   Well, I would have to run a different   16:08
```

Page 160

```
 1    regression for each time period.  No.  I could try      16:08

 2    to count up, but I don't know.                          16:08

 3         Q.   Does 25 sound about right?                     16:08

 4         A.   No.  It doesn't really.  I wouldn't -- but     16:08

 5    not that I recall, no.                                   16:08

 6         Q.   Oh.  So you don't recall running              16:08

 7    25 different regressions for this report?                16:08

 8         A.   So 25 different -- for 25 different days?      16:08

 9         Q.   No.  Just in total the number of              16:08

10    regressions that you ran.                                16:08

11         A.   Well, each day that I tested the model --     16:08

12    so I think -- I guess I did all the                      16:09

13    misrepresentations, all the corrective disclosures.      16:09

14    So I don't know how many dates that is.                  16:09

15              I think I just tested all the dates.  So       16:09

16    each time you test the date it was a different           16:09

17    period.  So there was a different control period.        16:09

18    So it would require a different -- we would just be      16:09

19    running the -- a different time period.                  16:09

20              So I think it's the same regression.  It's     16:09

21    just over a different time period because I am           16:09

22    testing a different date.                                16:09

23         Q.   So there was the same regression, but         16:09

24    there was different specifications that you tested.      16:09

25    Is that --                                               16:09
```

Page 161

```
 1          A.   No.  I think it was just one            16:09

 2   specification.  Just different -- it was just over a 16:09

 3   different time period because I'm testing a          16:09

 4   different date.                                       16:09

 5          Q.   And so you -- you tested different dates  16:09

 6   and two different companies; correct?                16:09

 7          A.   [Witness reviews document].              16:09

 8               I think I'm only doing one date on the -- 16:10

 9   yeah.                                                 16:10

10               So I think I did a regression for -- I did 16:10

11   an event study on another company that also,         16:10

12   previous to Cabot, had an announcement of charges by 16:10

13   the same Pennsylvania AG.                             16:10

14               I'm blanking on his name.                 16:10

15               Resources.                                16:10

16          Q.   Range Resources?                          16:10

17          A.   Yeah.  Thank you.  I know it was Rs.      16:10

18               Range Resources.                          16:10

19          Q.   Sure.                                     16:10

20          A.   I think that was only one regression or   16:10

21   maybe two regressions.  And then however many dates  16:10

22   that I tested.                                        16:10

23               So I think it would be however many       16:10

24   alleged misrepresentations there are plus as many    16:10

25   corrective disclosures.                               16:11
```

Page 162

| | | |
|---|---|---|
| 1 | Plus, I think I tested a date after the | 16:11 |
| 2 | end of the Class Period when the -- when Cabot | 16:11 |
| 3 | settled regarding the attorney general's charges. | 16:11 |
| 4 | Q.   So for Cabot itself, it's your | 16:11 |
| 5 | recollection that you only ran one regression for | 16:11 |
| 6 | testing the -- the stock price movement on | 16:11 |
| 7 | June 15th, 2020? | 16:11 |
| 8 | A.   Plus, I guess, Dr. Feinstein's indices -- | 16:11 |
| 9 | and I think I also used his -- his indices, the same | 16:11 |
| 10 | control that he used.  So that would be another one | 16:11 |
| 11 | for the same date, I believe. | 16:11 |
| 12 | Q.   And then for Range Resources, is your | 16:12 |
| 13 | recollection that you only ran one regression for | 16:12 |
| 14 | one particular date for that company? | 16:12 |
| 15 | A.   I think only one date.  And I think maybe | 16:12 |
| 16 | two models.  Maybe one that is just a COVID period | 16:12 |
| 17 | and one that is a longer period. | 16:12 |
| 18 | Q.   In Paragraph 42 of your report, you | 16:12 |
| 19 | reference the June 15th, 2020, price decline. | 16:12 |
| 20 | Do you see that? | 16:12 |
| 21 | A.   Yes. | 16:13 |
| 22 | Q.   And we also talked about previously excess | 16:13 |
| 23 | and abnormal returns. | 16:13 |
| 24 | Do you recall that? | 16:13 |
| 25 | A.   Yes. | 16:13 |

Page 163

```
 1        Q.   Do those two things mean the same?          16:13

 2        A.   Yes.                                        16:13

 3        Q.   And can you explain what they mean?         16:13

 4        A.   Sure.                                       16:13

 5             So in the -- with an event study, you are   16:13

 6   looking to see -- you use a -- oftentimes, you use a  16:13

 7   control period and test what is the relationship      16:13

 8   between the company stock price return and, say, a    16:13

 9   market or an index or both.                           16:13

10             And then you use the predictions from that  16:13

11   model to predict what would happen on the day in      16:14

12   question that you are trying to test.                 16:14

13             And then the difference between what you    16:14

14   predict would happen given the model and what         16:14

15   actually happens on that day you would call an        16:14

16   excess return.                                        16:14

17             MR. LAVELLE:  I'm going to introduce         16:14

18   another exhibit here.  Bear with me while I do so.    16:14

19             (Deposition Exhibit 2 was marked for        16:15

20             identification and is attached hereto.)     16:15

21   BY MR. LAVELLE:                                       16:15

22        Q.   If you refresh it, it should be there,      16:15

23   Ms. Allen.                                            16:15

24             And I'll just state for the record it's a   16:15

25   pdf of an Excel file that were a part of your         16:15
```

Page 164

| | | |
|---|---|---|
| 1 | turnover materials, Ms. Allen, from your Excel | 16:15 |
| 2 | File 3, a sheet entitled "Regression" or "Reg 1." | 16:15 |
| 3 | MR. LAVELLE:  This is being marked as | 16:15 |
| 4 | Plaintiff's Exhibit 2. | 16:15 |
| 5 | THE WITNESS:  Well, I don't seem to be | 16:15 |
| 6 | able to get into anything now. | 16:15 |
| 7 | Oh.  There we go. | 16:16 |
| 8 | BY MR. LAVELLE: | 16:16 |
| 9 | Q.  And the document is about six pages long, | 16:16 |
| 10 | and take a minute to look it over. | 16:16 |
| 11 | My question to start off is simply going | 16:16 |
| 12 | to be if you recognize the information on this | 16:16 |
| 13 | exhibit. | 16:16 |
| 14 | A.  I don't particularly; but, I mean, it -- | 16:16 |
| 15 | it looks like something that would be there.  But I | 16:16 |
| 16 | don't, you know... | 16:16 |
| 17 | Q.  Well, do you recognize turning over | 16:17 |
| 18 | three Excel files as part of your considered | 16:17 |
| 19 | materials? | 16:17 |
| 20 | A.  I don't -- I don't particularly.  I think | 16:17 |
| 21 | we did a couple of turnovers.  I recall that we | 16:17 |
| 22 | turned over all the materials and all the data, | 16:17 |
| 23 | which would be a typical thing.  And I recall that | 16:17 |
| 24 | we got another request, which was to turn over | 16:17 |
| 25 | the -- you know, we thought it was very clear in the | 16:17 |

Page 165

| | | |
|---|---|---|
| 1 | report exactly what was done, and it was replicable. | 16:17 |
| 2 | So I recall another request, but I -- I don't recall | 16:17 |
| 3 | what it was exactly. | 16:17 |
| 4 | Q.   Well, like I said, I'll represent to you | 16:17 |
| 5 | that this came out of an Excel file -- correct? -- | 16:17 |
| 6 | Excel 3 from your turnover materials which included | 16:17 |
| 7 | a number of different sheets. | 16:17 |
| 8 | This is the sheet that was entitled | 16:17 |
| 9 | "Reg 1" from that Excel 3 file. | 16:17 |
| 10 | If you turn to Page Number 6 of the | 16:18 |
| 11 | document, it's a chart with a couple of different | 16:18 |
| 12 | rows and columns.  The first column is "Date," | 16:18 |
| 13 | second column "Company Price," third column, | 16:18 |
| 14 | "Company Return," "Industry Return," "Market | 16:18 |
| 15 | Return," "Predicted Return," "Excess Return," | 16:18 |
| 16 | "t-statistic for Excess Return." | 16:18 |
| 17 | Do you see all those columns? | 16:18 |
| 18 | A.   I do. | 16:18 |
| 19 | Q.   Can you explain what each column refers | 16:18 |
| 20 | to? | 16:18 |
| 21 | A.   I don't know.  I'm not sure what this is. | 16:18 |
| 22 | If this is the market model -- I don't have a name. | 16:18 |
| 23 | I mean, I think what this is -- | 16:19 |
| 24 | Which page did you want me to explain? | 16:19 |
| 25 | I'm sorry. | 16:19 |

Page 166

1        Q.   The last one, Page 6.                    16:19

2        A.   Okay.                                     16:19

3             So I think what this is is the first     16:19

4    column is the Date.                                16:19

5             The second column is, I believe -- so I  16:19

6    don't know if this is Cabot's price.  I guess I    16:19

7    could look and see if this matches up to Cabot.  $20  16:19

8    on 6/12/2020.                                      16:19

9             [Witness reviews document].               16:19

10            Yeah.  This seems right.  So looks like   16:19

11   it's Cabot's price.                                16:19

12            And then the Company Return, I don't know  16:19

13   if this is in -- sometimes we do log return, and  16:19

14   sometimes we do percent returns, and sometimes we  16:20

15   try to -- we try to do whatever the opposing expert  16:20

16   has done just not to confuse everyone so much.     16:20

17            So we find that we actually like to do log  16:20

18   returns because it's a little bit easier, but we   16:20

19   find that when we're -- when it's for a report or  16:20

20   expert report, we try to go back and do percent    16:20

21   returns because it's easier to understand.  But I  16:20

22   guess I would have to see what this is.             16:20

23            But it's -- it's the return.  It's the    16:20

24   difference more or less in percent, but I don't know  16:20

25   if it's exactly percent or log returns between     16:20

```
 1     the -- the price on 6/12 and the price on 6/15.        16:20
 2              And then there's an Industry Return.  So     16:20
 3     it's what -- what has that done on that day.           16:20
 4              And there's a Market Return.  And what has    16:20
 5     that done -- I would have to look at my report if      16:20
 6     this is -- my event study would be whatever industry   16:20
 7     and market I said I was using.                         16:21
 8              And then the Predicted Return would be        16:21
 9     based on the model over the control period, what was   16:21
10     predicted on that day.                                 16:21
11              And the Excess Return is the difference       16:21
12     between the actual return and the predicted return.    16:21
13              And then t-statistic is a statistic that      16:21
14     tells you how large is that relative to -- I mean,     16:21
15     it's -- it's a statistic that helps determine that     16:21
16     you -- that you can use to help determine the          16:21
17     statistical significance.                              16:21
18        Q.   The industry return refers to the stock       16:21
19     price movement of the industry index that you -- you   16:21
20     used for your event study?                             16:21
21        A.   Yes.  I'm just not sure -- so I know that      16:21
22     we both used my own event study as well as one -- as   16:22
23     well as Dr. Feinstein's, and just changing             16:22
24     Dr. Feinstein's to be over the period that he said     16:22
25     was COVID, for example, and not making the             16:22
```

Page 168

```
 1    statistical adjustments that he did.            16:22

 2            So I think this is my own.  And I could  16:22

 3    tell that.  I have somewhere what is the market and  16:22

 4    industry index.  I just...                      16:22

 5        Q.   Right.  I think that's indicated in your  16:22

 6    report.                                          16:22

 7        A.   Yeah.  It is in my report.             16:22

 8        Q.   And so the Market Return column refers to  16:22

 9    the return from the market index?               16:22

10        A.   I believe so.                          16:22

11        Q.   Okay.                                  16:22

12        A.   Yeah.  I mean, I believe that this came  16:22

13    from the turnover -- that this came from us.  I'm  16:22

14    just not sure exactly.  I think we have turned over  16:23

15    exactly what you asked for.  I just forgot exactly  16:23

16    what you asked for, and I don't know what this  16:23

17    corresponds to; so I don't have the numbers in my  16:23

18    head.  So...                                     16:23

19        Q.   And -- so looking back at the Excess    16:23

20    Return column, we had discussed this a little bit  16:23

21    previously, what an excess return is.            16:23

22            Do you see that?                         16:23

23        A.   Yes.                                    16:23

24        Q.   Okay.  And then in that column, the excess  16:23

25    return between June 12th, 2020, and June 15th, 2020,  16:23
```

Page 169

```
 1    is negative .04.                                  16:23

 2            Do you see that?                          16:23

 3       A.    That's -- that's what it appears to be,  16:23

 4    yeah.                                             16:23

 5       Q.    And so what does that mean, that         16:23

 6    negative .04?                                     16:23

 7       A.    So the excess return, as we talked about, 16:23

 8    is the amount that the stock price moved differently 16:23

 9    than expected, given the movement in the industry 16:23

10    and the market on that day.                       16:24

11       Q.    And so the stock price moved down on     16:24

12    June 15th by negative .04 percent specific to Cabot 16:24

13    when controlling for both industry and market     16:24

14    factors?                                          16:24

15       A.    I'm not sure if that's in percent.  I'm  16:24

16    just not sure about that.                         16:24

17       Q.    Okay.  If it's not percent, what would it 16:24

18    be?                                               16:24

19       A.    It could be -- this could be, like, log  16:24

20    returns.                                          16:24

21       Q.    And what's a "log return"?               16:24

22       A.    This is natural logs.  It was close to a 16:24

23    percent.                                          16:24

24            But if you -- one advantage to using log  16:24

25    returns is, if you go -- you know, you start at a  16:25
```

Page 170

| | | |
|---|---|---|
| 1 | dollar and you go up 50 percent, you're at $1.50. | 16:25 |
| 2 | And if you go down 50 percent, you're not back at a | 16:25 |
| 3 | dollar. | 16:25 |
| 4 | But if you do it in log returns, you would | 16:25 |
| 5 | be.  If you go up and down the same amounts, you go | 16:25 |
| 6 | back to where you were.  So that's one advantage | 16:25 |
| 7 | of -- but, yeah. | 16:25 |
| 8 | I think this is -- I should be able to do | 16:25 |
| 9 | this in my head to see whether this is a percent. | 16:25 |
| 10 | But they're -- they're close to the same thing | 16:25 |
| 11 | but... | 16:25 |
| 12 | Q.   So the Excess Return column is saying | 16:25 |
| 13 | that, either on a percentage basis or a log return | 16:25 |
| 14 | basis, Cabot's stock price went down by .04 on | 16:25 |
| 15 | June 15th, 2020, after controlling for both market | 16:26 |
| 16 | and industry factors; is that right? | 16:26 |
| 17 | A.   That's right.  That's right. | 16:26 |
| 18 | It says it's an amount that is not | 16:26 |
| 19 | statistically significant.  So it's something that | 16:26 |
| 20 | is not significant at a 5 percent level or even a | 16:26 |
| 21 | lower threshold of a 10 percent level. | 16:26 |
| 22 | Q.   Right. | 16:26 |
| 23 | A.   So it's not a level that anyone would | 16:26 |
| 24 | consider statistically significant. | 16:26 |
| 25 | Q.   Right. | 16:26 |

Page 171

| | | |
|---|---|---|
| 1 | And it includes the t-statistic for excess | 16:26 |
| 2 | returns of negative 1.518; right? | 16:26 |
| 3 | A.   Yes.   That's what it appears to be. | 16:26 |
| 4 | Q.   And do you know what confidence level that | 16:26 |
| 5 | translates to, that negative 1.518? | 16:26 |
| 6 | A.   I don't know.   I know it's not going to be | 16:27 |
| 7 | at the 5 percent of the 10 percent.   So it would be | 16:27 |
| 8 | a threshold that is lower than anything that | 16:27 |
| 9 | academics or the courts have used. | 16:27 |
| 10 | Q.   And you're just not sure what it is, what | 16:27 |
| 11 | this specific confidence level is? | 16:27 |
| 12 | A.   It's a -- it's a threshold that is lower | 16:27 |
| 13 | than a 5 percent or even a weaker 10 percent | 16:27 |
| 14 | threshold, which are the -- so it would be at a | 16:27 |
| 15 | threshold that is lower than courts or academics use | 16:27 |
| 16 | but... | 16:27 |
| 17 | Q.   So the courts don't look at thresholds | 16:27 |
| 18 | below 5 or 10 percent when determining whether a | 16:27 |
| 19 | defendant has proven the absence of present price | 16:27 |
| 20 | impact or not? | 16:28 |
| 21 | A.   Courts have not found that statistical | 16:28 |
| 22 | significance below -- the only thresholds for | 16:28 |
| 23 | statistical significance that I have seen courts | 16:28 |
| 24 | look at are 5 and possibly 10 percent level.   I have | 16:28 |
| 25 | not seen a court or academics or anyone use | 16:28 |

Page 172

```
 1    thresholds that are lower than that.                16:28

 2        Q.   Looking more in general --                16:28

 3        A.   And that's -- that's not a threshold      16:28

 4    that -- that plaintiff's expert has used.  So the  16:28

 5    plaintiff's expert is -- has tested market         16:28

 6    efficiency using a 5 percent threshold.            16:28

 7        Q.   And in your regression analysis, are      16:28

 8    you -- are you aware of any errors that you made?  16:28

 9        A.   Am I aware of errors.                     16:29

10        Q.   Yeah.  Are you aware of any in your --    16:29

11    your own statistical analysis?                     16:29

12        A.   I am not aware of -- I mean, there --     16:29

13    there are -- something called a standard error comes 16:29

14    out of a regression, which is a statistical term.  16:29

15        Q.   In -- in preparing your report and        16:29

16    finalizing it, did you do a check of the inputs and 16:29

17    the outputs of any of your analysis?               16:29

18        A.   I don't know that I did a check of the    16:29

19    inputs or outputs.  But I -- but I did find a      16:29

20    couple -- there are a couple typos in the report.  16:29

21        Q.   In the report itself?                     16:29

22        A.   Yeah.  In the report itself.              16:29

23        Q.   What were the typos?                      16:30

24        A.   So on Page 4, Paragraph 8, the first      16:30

25    bullet it says [as read]:                          16:30
```

Page 173

| | | |
|---|---|---|
| 1 | "NOV dated September 11, 2011." | 16:30 |
| 2 | It should be September 19th, 2011. | 16:30 |
| 3 | Q.   I am sorry.  Could you say that again.  It | 16:30 |
| 4 | took me a minute to turn to the page. | 16:30 |
| 5 | A.   Sure. | 16:30 |
| 6 | Page 4, Paragraph 8, first bullet it says | 16:30 |
| 7 | [as read]: | 16:30 |
| 8 | "NOV dated September 11th, 2011." | 16:30 |
| 9 | It should say dated September 19th, 2011. | 16:30 |
| 10 | Q.   Okay.  Got it.  Thank you. | 16:30 |
| 11 | Any others? | 16:30 |
| 12 | A.   Yes.  On Page 20, Paragraph 36 it says -- | 16:30 |
| 13 | talks about Cabot stock price decline on July 26th | 16:30 |
| 14 | and it says 2020.  It should be 2019. | 16:31 |
| 15 | Q.   Anything else? | 16:31 |
| 16 | A.   Only other thing that I noticed is on | 16:31 |
| 17 | Page 39, the chart.  The tick marks are all -- like, | 16:31 |
| 18 | should all be one day moved over.  So they are | 16:31 |
| 19 | just -- like at the -- let's see if I can figure out | 16:32 |
| 20 | which way they go. | 16:32 |
| 21 | The tick marks appear to be off by just | 16:32 |
| 22 | one day. | 16:32 |
| 23 | Q.   All right.  Anything else? | 16:32 |
| 24 | A.   That's it. | 16:32 |
| 25 | Q.   All right. | 16:32 |

Page 174

```
 1              MR. LAVELLE:  I'm going to mark another    16:33

 2    exhibit.  I'll let you know when it's introduced    16:33

 3    into Exhibit Share.                                 16:33

 4              (Deposition Exhibit 3 was marked for      16:33

 5              identification and is attached hereto.)   16:33

 6    BY MR. LAVELLE:                                      16:33

 7         Q.   Okay.  It should be there.               16:33

 8         A.   All right.                                16:33

 9         Q.   This is another --                       16:33

10              MR. LAVELLE:  We have been marking as     16:33

11    Plaintiff's Exhibit 3.                              16:33

12    BY MR. LAVELLE:                                      16:33

13         Q.   And this is another sheet from the Excel 3  16:33

14    file as part of your turnover materials.            16:33

15         A.   Yes.                                      16:33

16         Q.   This sheet was entitled "Reg 24."         16:33

17              Take a minute just to look it over.  It's  16:34

18    just another six-page pdf of your Excel file.        16:34

19         A.   I'm just not getting it yet.  Somehow --   16:34

20    I'm -- I don't know why it's -- I think I keep       16:34

21    getting this permission denied.                      16:34

22         Q.   Okay.  Well, give it another few seconds.  16:34

23    If it doesn't fix, let's go off the record, and      16:34

24    we'll fix whatever the issue is.                     16:34

25         A.   It's so erratic.  I can't -- it, like,     16:35
```

Page 175

| | | |
|---|---|---|
| 1 | comes and goes in a way that is very -- not | 16:35 |
| 2 | systematic.  I don't understand that. | 16:35 |
| 3 | Q.   Okay.  Are you able to view the exhibit? | 16:35 |
| 4 | A.   No.  I'm not even able to get into the -- | 16:35 |
| 5 | MR. LAVELLE:  Okay.  Let's go off the | 16:35 |
| 6 | record, and we'll figure it out.  Okay. | 16:35 |
| 7 | THE VIDEOGRAPHER:  Off the record.  It's | 16:35 |
| 8 | 4:36 p.m. | 16:35 |
| 9 | (Brief recess.) | 16:38 |
| 10 | THE VIDEOGRAPHER:  Back on the record. | 16:38 |
| 11 | It's 4:38 p.m. | 16:38 |
| 12 | BY MR. LAVELLE: | 16:38 |
| 13 | Q.   Welcome back, Ms. Allen. | 16:38 |
| 14 | So you have in front of you or you are | 16:38 |
| 15 | looking at your screen, which was previously marked | 16:38 |
| 16 | Plaintiff's Exhibit 3, entitled "Reg 24" on the | 16:38 |
| 17 | Excel Number 3 from your turnover materials. | 16:38 |
| 18 | Do you see that? | 16:38 |
| 19 | A.   Yeah. | 16:38 |
| 20 | Q.   Okay.  Now, do you see at the top how it's | 16:38 |
| 21 | titled "Reg 24"? | 16:38 |
| 22 | A.   Yes. | 16:38 |
| 23 | Q.   Does that refresh your recollection at all | 16:38 |
| 24 | of the number of progressions that were done as part | 16:38 |
| 25 | of your analysis for this report? | 16:38 |

Page 176

```
 1         A.   No.  It doesn't particularly.  But, I        16:38
 2    mean, if I count up the dates --  one, two, three,      16:38
 3    four, five, six, seven, eight, nine, ten -- yeah.  I    16:39
 4    don't -- I don't recall.  No.                           16:39
 5         Q.   Okay.  So this doesn't indicate to you the    16:39
 6    number of regressions that -- that you ran as part      16:39
 7    of your -- as part of your analysis for the Class       16:39
 8    Certification Report?                                   16:39
 9         A.   No.  It doesn't, but I -- I did test each     16:39
10    of the dates, and then a couple other dates; so this    16:39
11    looks like a date after the Class Period.  So this      16:39
12    maybe is the date when the settlement was announced.    16:39
13         Q.   And did you run more than one regression      16:39
14    for Cabot for the June 15th, 2020, date?                16:40
15         A.   The June 15th, 2020, date, that's the end     16:40
16    of the Class Period, the second alleged disclosure.     16:40
17         Q.   Yes.                                          16:40
18         A.   Yeah.  So I think I did both the event        16:40
19    study that I described in my report as well as a        16:40
20    modification of Dr. Feinstein's event study.            16:40
21         Q.   Just those two?                               16:40
22         A.   I believe so.  Yeah.                          16:40
23         Q.   And did you rely on the results of all the    16:40
24    regressions that you ran for your report?               16:40
25         A.   I believe so.  Yeah.                          16:41
```

Page 177

```
 1          Q.    And for range resources, did you run more      16:41
 2    than one regression?                                       16:41
 3          A.    I think so.                                    16:41
 4          Q.    And where you ran more than one regression     16:41
 5    for either Cabot or Range Resources on a particular        16:41
 6    date is one regression more informative than              16:41
 7    another?                                                    16:41
 8          A.    Well, I did run Dr. Feinstein's model, and     16:41
 9    I think that the event study model that I'm using is      16:41
10    more informative.                                          16:41
11                He used a market, and he used                  16:42
12    three explanatory variables.  And my recollection is      16:42
13    that two of them were not statistically significant,      16:42
14    and one of them went the wrong direction of what he       16:42
15    would expect.                                              16:42
16                So, typically, you would want to have          16:42
17    explanatory variables that have -- that are              16:42
18    statistically significant in explaining the stock         16:42
19    price movement that you are trying to explain, and        16:42
20    you would want them to go in the direction that you       16:42
21    would expect them to go.                                   16:42
22                So, for example, if it's a -- you know, a      16:42
23    peer company, industry index, for example, you would     16:42
24    expect to have a positive coefficient.  So you would     16:42
25    expect it to move in the same direction.                  16:42
```

Veritext Legal Solutions
866 299-5127

```
 1              And my recollection is that his were --    16:42

 2    some of them were going the wrong way, and I believe  16:42

 3    two out of the three of them were not significant.    16:42

 4              So I do think the model that I was using    16:43

 5    is something that I would rely on more and makes      16:43

 6    more sense because it uses explanatory variables      16:43

 7    that are statistically significant and they go in     16:43

 8    the direction that you would expect.                  16:43

 9        Q.    And so did you use a -- your own            16:43

10    regression model, a modified version of               16:43

11    Dr. Feinstein's regression model, and then a -- then  16:43

12    Dr. Feinstein's actual regression model to test each  16:43

13    date?                                                 16:43

14        A.    No.  I think only Dr. -- his actual         16:43

15    regression model and my regression model.             16:43

16              So what is modified -- oh.  Yes.  I did     16:43

17    because I changed the control period.                 16:44

18              Well, if it was a date in the COVID period  16:44

19    rather than -- I started that when Dr. Feinstein      16:44

20    said that there was increased volatility due to       16:44

21    COVID.  So, yes, I did modify.  That's correct.       16:44

22              I did a modified version of his regression  16:44

23    as well as my own regression.  That's correct.  If    16:44

24    it was during the COVID period, I'm not sure if I     16:44

25    tested any dates that weren't during the COVID        16:44
```

Page 179

1    period using his model.                              16:44

2        Q.   And so between your model and a modified    16:44

3    version of Dr. Feinstein's model, is one regression  16:44

4    model more informative than the other?               16:44

5        A.   That is the question that I was previously  16:44

6    answering.  The modified version of his model        16:44

7    changes the time period for the control period to be 16:44

8    a control that is -- when it's a COVID event, to be   16:45

9    within what he claimed was the COVID event.  But it   16:45

10   modified the time period but not the explanatory      16:45

11   variables.                                            16:45

12       I think the explanatory variables that I         16:45

13   used in my model -- so the market index and the       16:45

14   industry index made more sense because they were      16:45

15   statistically related to COVID stock price, and they  16:45

16   went in the direction you would expect.  So I do      16:45

17   think that the results from my model made more        16:45

18   sense.                                                16:45

19       But I don't think the -- the excess              16:45

20   returns that we got were very different is my         16:45

21   recollection.                                         16:45

22       Q.   So for each date that you tested, you ran   16:45

23   three different regression models:  Your own,         16:45

24   Dr. Feinstein's, and then a modified version of       16:45

25   Dr. Feinstein's; is that correct?                     16:46

Veritext Legal Solutions
866 299-5127

```
1          A.   Well, I don't know that I ran        16:46
2    Dr. Feinstein's original one because I think --  16:46
3    maybe just to replicate it, but it's in his -- it's  16:46
4    in his report.  So he did that.                  16:46
5          Q.   Okay.  So -- and just to clarify then,  16:46
6    aside from -- for each of the dates that you tested,  16:46
7    aside from your own model and the modified       16:46
8    Dr. Feinstein's model, you didn't run any other  16:46
9    regression models for those dates that you tested is  16:46
10   that correct?                                    16:46
11         A.   Well, I might have done his model just to  16:46
12   see that we got the same thing and that we were --  16:46
13   we could understand it.                          16:46
14              So yeah.  I might have redone his model  16:46
15   just to make sure that we understood.            16:46
16              So we were able to replicate what he did,  16:46
17   and then did my report, and then after we turned  16:47
18   over the data that we had relied upon, plaintiffs  16:47
19   asked for more back up and after -- giving us more  16:47
20   backup gave us more backup to Dr. Feinstein.  But  16:47
21   I -- I had already written my report without that  16:47
22   backup.  So...                                   16:47
23         Q.   And so I -- again, I'm just asking to make  16:47
24   sure we understand each other.                   16:47
25              Aside from your regression model, the  16:47
```

Page 181

```
 1    modified Dr. Feinstein model, and then your          16:47
 2    rerunning of Dr. Feinstein's original model, did you 16:47
 3    run any other regressions for each date tested?      16:47
 4        A.   I don't think so.  So the model for the     16:48
 5    range resources was slightly different, I think.     16:48
 6    But -- but that's all I can recall.                  16:48
 7        Q.   And for -- for the -- for regression        16:48
 8    models that you ran that were your own models as     16:48
 9    well as the modified Dr. Feinstein model, you said   16:48
10    that there were competing results.                   16:48
11             What -- strike that.                        16:48
12             What do you do when two different           16:48
13    regression models that you run have competing        16:48
14    results?                                             16:48
15        A.   I don't recall that being the case here.    16:48
16        Q.   And if it were the case?                    16:48
17        A.   Well, I think it would depend on what --    16:48
18    what are the competing models and what am I trying   16:48
19    to do.  Right.                                       16:49
20        Q.   So in this case you -- you don't recall     16:49
21    there being any competing models; is that right?     16:49
22        A.   Competing results.                          16:49
23        Q.   Yes.                                        16:49
24        A.   I don't recall the results making a         16:49
25    difference.                                          16:49
```

Page 182

```
 1        Q.   Yeah.  Excuse me.  Competing results.        16:49

 2             So turn back to Exhibit 3, which is this     16:49

 3   Regression 24 sheet out of your Excel Number 3 in      16:49

 4   your turnover materials, can you please explain what   16:49

 5   each of the columns mean on Page Number 1 which are,   16:49

 6   I'll say for the record, "Date," "Company Price,"      16:49

 7   "Company Return," "Industry Return," and "Market       16:49

 8   Return"?                                               16:49

 9        A.   Yeah.  I think -- I don't know.  I think     16:49

10   this is -- it's 11/29/2021.  So at some point this     16:49

11   is after the Class Period, I believe.                  16:49

12             And at some point Cabot is bought or         16:50

13   merges with another company.  So I think this is the   16:50

14   successor company's stock price.  Because I think      16:50

15   this is -- let me just see where I refer to this       16:50

16   date.                                                  16:50

17             November 29th, 2022.                         16:50

18             Is that what this is?                        16:50

19             [Witness reviews document].                  16:50

20             Yeah.  So this is the -- this is the         16:50

21   analysis of event study when the criminal charges      16:50

22   were announced.                                        16:50

23             And -- so at this point I'm using            16:50

24   two different -- so Coterra is the successor           16:51

25   company.  And this event study, I believe, uses        16:51
```

Veritext Legal Solutions
866 299-5127

```
 1    two indices that were in its Form 10-K.            16:51

 2          71.  So it's -- the S&P 500 and the "S&P    16:51

 3    Oil & Gas Exploration & Production Select Industry 16:51

 4    Index."                                            16:51

 5          So I believe this would be -- the Company    16:51

 6    Return would be this Coterra;                      16:51

 7          And the Company Price would be Coterra;      16:51

 8          And the Industry Return would be the         16:51

 9    S&P Oil & Gas Exploration & Production Select      16:51

10    Industry Index;                                    16:51

11          And then the Market Return would be the      16:51

12    S&P 500, I believe.                                16:51

13       Q.   Got it.  Thank you.                        16:51

14          And if you look under the "Company Return"   16:52

15    heading, in that column, the first return value in 16:52

16    that cell is negative .76 in dollars.              16:52

17          Do you see that?                             16:52

18       A.   Yeah.                                      16:52

19       Q.   But all the other results are expressed as 16:52

20    a percentage?                                      16:52

21       A.   That's right.                              16:52

22       Q.   Why is the company return expressed as a   16:52

23    dollar figure there?                               16:52

24       A.   I don't know.  Maybe it's just a           16:52

25    formatting.  I'm not sure.                         16:52
```

Page 184

1          Q.    So this return being expressed as a dollar      16:52

2     figure, that's not correct, is it?                        16:53

3          A.    That may be the actual dollar return.           16:53

4     That may be the dollar change.  So you could -- it        16:53

5     just may be a -- we don't see the price before so I       16:53

6     don't know.  So it might have dropped $0.76 from the      16:53

7     price the day before.                                     16:53

8          Q.    Well, would the -- the .76 expressed as a       16:53

9     dollar figure translate into a 76 percent return?         16:53

10         A.    No.  It wouldn't.                               16:53

11         Q.    That wouldn't be a reasonable return;           16:54

12    right?                                                    16:54

13         A.    Well, it could be 76 percent return.            16:54

14         Q.    Do you know if that's correct?                  16:54

15         A.    No.  I don't think it is.  I don't think        16:54

16    it's a 76 percent return, but I don't know.  I don't      16:54

17    see the price before.                                     16:54

18         Q.    And do you know what the actual return as       16:54

19    a percentage was?                                         16:54

20         A.    I don't know.  I don't know what the price      16:54

21    was the day before.  I don't know what the price was      16:54

22    on the 11 -- you know, whatever the trading day is        16:54

23    before, 11/29/2021.                                       16:54

24         Q.    So in order to know whether this is             16:55

25    correct you would have to understand what the price       16:55

Page 185

```
1    was on the prior trading day?                        16:55

2        A.   I -- I don't know what the price is on the  16:55

3    prior trading day.                                   16:55

4        Q.   Let's assume that the .76 expresses a       16:55

5    dollar figure translates into a 76 percent return,   16:55

6    that would be incorrect, wouldn't it, for this       16:55

7    regression?                                          16:55

8        A.   I don't think the -- I don't think the      16:55

9    price drops 76 percent on that day.                  16:55

10       Q.   And if the -- the wrong return was used in   16:55

11   this analysis on this date, what affect would that   16:56

12   have on the regression?                              16:56

13       A.   I don't know.  I don't know if it would      16:56

14   have any affects.  So I don't know if this would --  16:56

15   so the excess return on this particular day -- so I  16:56

16   think it's 11/29 -- November 29th, it looks like     16:56

17   it's, you know, .02.                                 16:56

18            I mean -- let me go back to the return.      16:57

19            Yeah.  The company -- the actual return      16:57

20   is, you know, .03 and the market is doing nothing    16:57

21   and the industry is -- is going up, you know, just a 16:57

22   tiny bit.                                            16:57

23            So it's not -- the model isn't doing a       16:57

24   lot, right, it's just returning an excess return     16:57

25   that is pretty close to what the market -- the       16:57
```

Page 186

```
 1    company return is.                                   16:57

 2            So I don't think that -- I just don't see    16:57

 3    how it's going to make any difference one way or the 16:57

 4    other.                                               16:57

 5        Q.   And would using a company return of that    16:58

 6    date, if it were the case that it was a 76 percent   16:58

 7    return, would that kind of ever cause the background 16:58

 8    volatility in your regression to be over estimated?  16:58

 9        A.   I think that that could.                    16:58

10        Q.   And so -- forgive me if I already asked     16:58

11    you this.  Do you have an explanation of -- of why   16:58

12    the company return as expressed in the dollar figure 16:58

13    and not a percentage is --                           16:58

14        A.   I don't know.  Yeah.  I just don't know.    16:58

15    I don't know what -- I don't know what that -- I     16:58

16    don't know what that is.  I don't have an            16:58

17    explanation for that.                                16:58

18        Q.   And do you have an understanding given      16:59

19    whatever familiarity you might have, with how these  16:59

20    returns are calculated within the date Excel         16:59

21    software whether this negative .76 figure, expressed 16:59

22    in the dollar figure, translates into a negative     16:59

23    76 percent return?                                   16:59

24        A.   I don't understand that question.           16:59

25        Q.   Sure.                                        16:59
```

Page 187

```
 1            So the -- the dollar figure -- well,        16:59
 2    strike that.                                        16:59
 3            Under "Company Return" for the 11/29/2021   16:59
 4    date is expressed as a dollar figure; right?  As    16:59
 5    negative .76; correct?                              16:59
 6        A.   That appears to be what it says.  Yeah.  I 17:00
 7    mean, it says "$.76."  I'm not sure why it says that 17:00
 8    so...                                               17:00
 9        Q.   And if that dollar, negative .76 were to   17:00
10    be translated into a percentage decline as the other 17:00
11    results are, as the other company returns are for   17:00
12    each date in this regression, it would be a negative 17:00
13    76 percent return; correct?                         17:00
14        A.   No.  If it was translated to a percent, it 17:00
15    would be a much smaller than that percent.  Right.  17:00
16    So if you take the $0.76 and translate that into a  17:00
17    percent, that would be, you know, a small percent.  17:00
18        Q.   And is that how the software formula would 17:01
19    work in this regression for the company return?     17:01
20        A.   Yeah.  I don't -- I don't know -- I don't  17:01
21    what -- I don't know why that says -- I don't why   17:01
22    that says $0.76.  I just don't know.                17:01
23        Q.   Okay.  So can we agree that the -- it      17:01
24    being expressed as $0.76 isn't correct within this  17:01
25    regression?                                         17:01
```

Veritext Legal Solutions
866 299-5127

```
 1        A.   No.  I don't know.  I don't know why it        17:01

 2    says -- I don't know why that says 76 in cents.  So     17:01

 3    I just don't know.                                       17:01

 4            But I -- I -- I think you could look at          17:01

 5    the company return here and see that there are          17:02

 6    company returns that are as large as 3 percent a lot     17:02

 7    of the time, which is the company return of the day      17:02

 8    in question.                                             17:02

 9            So the actual day in question, the 11/29,        17:02

10    the company return looks like it's 3 percent.  And       17:02

11    that does not look like an unusual company return.       17:02

12    And what the market and industry are doing on the        17:02

13    day in question is pretty much not much of anything.     17:02

14            So you can just eyeball this and see that        17:02

15    a 3 percent return is not unusual.  So I just -- I       17:02

16    think it doesn't really matter.  You could look at       17:02

17    this and see that that 3 percent return, there are       17:02

18    returns of that magnitude that are happening all the     17:02

19    time.  It's not something that happens less than         17:03

20    5 percent of the time.                                   17:03

21            And on the day in question, what the             17:03

22    actual market and industry are doing is -- sorry.  I     17:03

23    lost the...                                              17:03

24            The industry is going up a little bit and        17:03

25    the market is doing nothing.  So if the industry is      17:03
```

Page 189

| | | |
|---|---|---|
| 1 | going up a little bit, then you would say that | 17:03 |
| 2 | the -- with this regression, you would expect that | 17:03 |
| 3 | the company should go up a little bit.  So then the | 17:03 |
| 4 | 3 percent is -- you know, would be even smaller than | 17:03 |
| 5 | that in terms of excess returns. | 17:03 |
| 6 | So I don't see that this would make any | 17:03 |
| 7 | difference regardless. | 17:03 |
| 8 | But just by -- just by looking at this, | 17:04 |
| 9 | you can see that this day is not going to be | 17:04 |
| 10 | statistically significant. | 17:04 |
| 11 | Q.   You are talking about 11/29/21? | 17:04 |
| 12 | A.   Yes.  The day that the criminal charges -- | 17:04 |
| 13 | that the fine was announced. | 17:04 |
| 14 | MR. LAVELLE:  I'm going to mark a few more | 17:05 |
| 15 | exhibits. | 17:05 |
| 16 | I'm going to mark them all at once and | 17:05 |
| 17 | they'll we emailed to you so we don't have the issue | 17:05 |
| 18 | like we did last time. | 17:05 |
| 19 | So bear with me while I do that. | 17:05 |
| 20 | MR. STOKES:  Kevin, are you uploading them | 17:05 |
| 21 | as well so that I can see them? | 17:05 |
| 22 | MR. LAVELLE:  Yes.  They should all be -- | 17:05 |
| 23 | MR. STOKES:  Okay. | 17:05 |
| 24 | MR. LAVELLE:  They will all be uploaded. | 17:05 |
| 25 | Yeah. | 17:05 |

Page 190

```
 1                MR. STOKES:  Okay.  Great.              17:05

 2                THE WITNESS:  Are they uploaded now or not  17:06

 3     yet?                                                 17:06

 4                MR. LAVELLE:  I'm still in the process.   17:07

 5                THE WITNESS:  Okay.                       17:07

 6                MR. LAVELLE:  But some of them should be  17:07

 7     uploaded.                                            17:07

 8                THE WITNESS:  Could.                      17:08

 9                We take maybe a brief break while they're  17:08

10     uploading or...                                      17:08

11                MR. LAVELLE:  Yeah.  Let's do that.       17:08

12                THE WITNESS:  Okay.  Thank you.           17:08

13                MR. LAVELLE:  Sure.                       17:08

14                MR. STOKES:  We'll take five minutes?     17:08

15                MR. LAVELLE:  Sure.  Yeah.                17:08

16                Dayna, are you getting them on Exhibit    17:08

17     Share?                                               17:08

18                THE REPORTER:  I am.                      17:08

19                MR. STOKES:  So I see Exhibits 4, 5, and  17:08

20     6.                                                   17:08

21                THE VIDEOGRAPHER:  Off the record at      17:08

22     5:08 p.m.                                            17:08

23                (Brief recess.)                           17:08

24                THE VIDEOGRAPHER:  We're back on the      17:19

25     record.  It's 5:20 p.m.                              17:19
```

Page 191

```
 1    BY MR. LAVELLE:                                 17:19

 2        Q.   Welcome back, Ms. Allen.              17:19

 3             So I have marked as Exhibits 4, 5, 6, 7,   17:19

 4    8, and 9 a series of regressions from your Excel   17:19

 5    File 3 in the turnover materials.                  17:20

 6             (Deposition Exhibits 4, 5, 6, 7, 8, and   17:20

 7             9 were marked for identification and is   17:20

 8             attached hereto.)                         17:20

 9    BY MR. LAVELLE:                                    17:20

10        Q.   They are numbered Regression 18,          17:20

11    Regression 19, 20, 21, 22, and 23.                 17:20

12             Do you have all those documents in front  17:20

13    of you?                                            17:20

14        A.   I think so.  Yes.                         17:20

15        Q.   Okay.  Can you review them just generally 17:20

16    to -- to tell me what they are?                    17:20

17        A.   Okay.  So I -- I am noticing -- you are   17:20

18    asking me -- I do have a couple footnotes in my    17:20

19    report.  I was -- was saying about the log returns 17:20

20    versus percentage returns.                         17:20

21             So Footnote 54 of my report says          17:20

22    [as read]:                                         17:20

23             "Results are similar no matter            17:20

24             whether logarithm and returns or          17:20

25             percentage returns are used and no        17:20
```

Page 192

| | | |
|---|---|---|
| 1 | matter whether dummy variables are used | 17:20 |
| 2 | to control for earnings announcements | 17:20 |
| 3 | dates or not." | 17:20 |
| 4 | So I think we did test.  So that would | 17:20 |
| 5 | explain some additional options of running the same | 17:21 |
| 6 | thing in log returns versus in percentage returns. | 17:21 |
| 7 | I think this was just to be consistent, to not have | 17:21 |
| 8 | so many differences with Dr. Feinstein's model. | 17:21 |
| 9 | So I think he -- he dummied out earnings | 17:21 |
| 10 | announcement dates.  And maybe we did log returns. | 17:21 |
| 11 | And so I -- I think for the dates tested, | 17:21 |
| 12 | or at least the ones that are footnoted here, we did | 17:21 |
| 13 | some alternatives applying, you know, logarithmic | 17:21 |
| 14 | and/or percent returns and whether dummying-out the | 17:21 |
| 15 | earnings announcements or not. | 17:21 |
| 16 | And then also, on the Range Resources, it | 17:21 |
| 17 | looks like we tested that date using a couple of | 17:22 |
| 18 | different alternative indices.  So... | 17:22 |
| 19 | Q.   Okay.  So there's two things that you | 17:22 |
| 20 | said. | 17:22 |
| 21 | You referred to the Range Resources date | 17:22 |
| 22 | using a different -- couple of different alternative | 17:22 |
| 23 | indices. | 17:22 |
| 24 | What -- what date are you referring to? | 17:22 |
| 25 | A.   So this is -- I'm looking at Footnote 69. | 17:22 |

Page 193

| | | |
|---|---|---|
| 1 | It says [as read]: | 17:22 |
| 2 | "Results do not change if the event | 17:22 |
| 3 | study model uses..." | 17:22 |
| 4 | Some different indices -- or uses -- so | 17:22 |
| 5 | this is -- I guess we did rerun this doing the | 17:22 |
| 6 | alternatives that are mentioned in the footnote, | 17:22 |
| 7 | which I -- | 17:22 |
| 8 | Q.   For Range Resources? | 17:22 |
| 9 | I'm sorry? | 17:22 |
| 10 | A.   For Range Resources as well as the other | 17:22 |
| 11 | footnote that I mentioned, which is Cabot stock. | 17:22 |
| 12 | Q.   So you reran them both to determine | 17:22 |
| 13 | logarithmic returns as well as percentage returns? | 17:23 |
| 14 | A.   Well, I think these footnotes are | 17:23 |
| 15 | accurate.  So what these footnote describes and what | 17:23 |
| 16 | they reference, those alternatives were also run. | 17:23 |
| 17 | Q.   Okay.  And those are reflected in the | 17:23 |
| 18 | turnover materials? | 17:23 |
| 19 | A.   I think so.  Because when you mentioned | 17:23 |
| 20 | that there were 25, it doesn't seem like there were | 17:23 |
| 21 | that many dates.  So I think that can explain why | 17:23 |
| 22 | there may be multiple on the same date. | 17:23 |
| 23 | Q.   Understood. | 17:23 |
| 24 | Thank you for the clarification. | 17:23 |
| 25 | And did you -- did you -- in rendering | 17:23 |

Page 194

```
 1    your opinions, did you rely on all of the        17:23
 2    regressions that you conducted?                   17:23
 3         A.   The results didn't change regardless.  So  17:24
 4    I did some test to make sure it didn't make a    17:24
 5    difference.                                       17:24
 6              Particularly if some of the -- the minor  17:24
 7    specification differences that Dr. Feinstein used  17:24
 8    were changed.  That's all.  But that's mostly what  17:24
 9    those differences were.                           17:24
10         Q.   Okay.  Understood.                      17:24
11              So turning back to Exhibits 4 through 9.  17:24
12         A.   Okay.                                    17:24
13         Q.   Can you explain to me what they are?    17:24
14         A.   Well, 4 looks like it's Range Resources as  17:24
15    well as a couple indices.                         17:24
16              And then it looks like it's the results of  17:24
17    a -- again, an event study, new model.            17:24
18              [Witness reviews document].             17:24
19              On 6/12/2020 it looks like is the date  17:25
20    that it is being tested.  So that's Exhibit 4.    17:25
21              Exhibit 5 looks like it's also Range    17:25
22    Resources.  And no, I don't know if this is a     17:25
23    different index.                                  17:25
24              [Witness reviews document].             17:25
25              Mid index.  It looks like the same      17:25
```

Page 195

| | | |
|---|---|---|
| 1 | indices.  I'm not sure what's different. | 17:25 |
| 2 | Yeah.  So this uses two different -- let's | 17:25 |
| 3 | see. | 17:25 |
| 4 | So one is the Mid Cap 400 Index.  And one | 17:25 |
| 5 | uses the S&P Small Cap 600 Index. | 17:26 |
| 6 | So SML means the -- I think is the S&P | 17:26 |
| 7 | Small Cap Index. | 17:26 |
| 8 | Q.   And you can finish your answer.  I don't | 17:26 |
| 9 | want to cut you off. | 17:26 |
| 10 | A.   Sure. | 17:26 |
| 11 | Q.   But I think we might be able to short | 17:26 |
| 12 | circuit or jump ahead a little bit.  If you can | 17:26 |
| 13 | just -- | 17:26 |
| 14 | Are all six of these exhibits regressions | 17:26 |
| 15 | that you ran for range resources for regression 18 | 17:26 |
| 16 | through 23? | 17:26 |
| 17 | A.   Yeah.  It does look like that.  So it | 17:26 |
| 18 | looks like this is changing -- as the footnote says, | 17:27 |
| 19 | changing the index and then using only the -- as an | 17:27 |
| 20 | alternative, using only the Dow Jones exploration | 17:27 |
| 21 | production index.  So it's just trying some | 17:27 |
| 22 | different alternatives. | 17:27 |
| 23 | Q.   And did you rely on these regressions to | 17:27 |
| 24 | draw conclusions in your report? | 17:27 |
| 25 | A.   This, in part, is to show that the -- | 17:27 |

Page 196

```
 1     there was not a price reaction to range resources     17:27
 2     stock price after the Pennsylvania Attorney General    17:27
 3     announced charges a little bit before the AG           17:27
 4     announced charges against Cabot.                       17:28
 5          Q.   And -- so these regressing were used to      17:28
 6     form the opinions that you included in your report;    17:28
 7     is that right?                                         17:28
 8          A.   This is part of the analysis that I did in   17:28
 9     my report, yes.                                        17:28
10             MR. STOKES:  Objection to form.               17:28
11     BY MR. LAVELLE:                                        17:28
12          Q.   And what is the examination period that      17:28
13     you were testing in these Exhibits 4 through 9?        17:28
14          A.   The date I think is the -- 6/15/2020         17:28
15     maybe.  I'm not sure.                                  17:28
16          Q.   Well, I'll represent to you that it          17:28
17     appears you -- can confirm this -- that in             17:28
18     Exhibit 4, 5, and 6 you testing June 12th, and 7       17:28
19     through 9 you were testing June 15th.                  17:28
20          A.   Oh.  Then that may be.                       17:29
21          Q.   But I think I'm asking a slightly            17:29
22     different period in terms of what was the              17:29
23     examination period that you were using for these       17:29
24     regressions as opposed to the date you were testing?   17:29
25          A.   Oh.  I don't -- I don't recall.  I mean,     17:29
```

Page 197

```
 1      it might be the period that is on these sheets.        17:29

 2             So I -- I do recall testing range              17:29

 3      resources.  I think both doing a year before the      17:29

 4      date as well as doing a period that was just          17:29

 5      COVID -- in the COVID period is my recollection.      17:29

 6          Q.   Is that reflected in the Date column in      17:29

 7      these regressions that kind of starts depending on    17:29

 8      the regression you are on June 12th, 2019, or         17:29

 9      June 11th, 2019?                                       17:30

10          A.   I don't know.  I'm not sure.  I would        17:30

11      think that would be correct.  But I'm not sure.       17:30

12          Q.   And then it continues, for example, on       17:30

13      Exhibit 9 through June 12th, 2020?  So that would be  17:30

14      consistent with your explanation that you were        17:30

15      testing the period of a year prior to the end date?   17:30

16          A.   That's right.  I think so.                   17:30

17          Q.   And did you -- did you omit any dates from   17:30

18      these regressions?                                     17:30

19          A.   I don't believe so.                          17:30

20          Q.   If we look on the Date column in             17:30

21      October 2019 --                                        17:31

22          A.   Okay.                                         17:31

23          Q.   -- was Range Resources' stock halted on      17:31

24      October 14th, 2019?                                    17:31

25          A.   I don't see trading on October 14th.  Is     17:31
```

Page 198

| | | |
|---|---|---|
| 1 | that what you are saying? | 17:31 |
| 2 | Q.   Uh-huh. | 17:31 |
| 3 | A.   I don't see any -- I don't recall if it | 17:31 |
| 4 | was halted, but I don't see -- I don't see an | 17:31 |
| 5 | October 14th date. | 17:31 |
| 6 | Q.   What about November 11th, 2019?  Was range | 17:31 |
| 7 | resources stock trading halted on that date? | 17:31 |
| 8 | A.   On which date? | 17:31 |
| 9 | Q.   November 11th, 2019. | 17:31 |
| 10 | A.   Oh.  I don't know.  I don't know. | 17:31 |
| 11 | Q.   What about for the various indices that | 17:32 |
| 12 | you used?  Were trading on those indices that you | 17:32 |
| 13 | used in these six regressions here halted on | 17:32 |
| 14 | October 14th, 2019? | 17:32 |
| 15 | A.   I don't -- not that I'm aware of. | 17:32 |
| 16 | Q.   And what about for November 11th, 2019? | 17:32 |
| 17 | A.   I don't know.  I wouldn't think so -- but | 17:32 |
| 18 | I don't know. | 17:32 |
| 19 | Q.   Do you know if there was an observable | 17:32 |
| 20 | return on October 14th, 2019? | 17:32 |
| 21 | A.   I just don't know. | 17:33 |
| 22 | Q.   What about -- | 17:33 |
| 23 | A.   I think if the date is not on here, then | 17:33 |
| 24 | there is probably not an observable return. | 17:33 |
| 25 | Q.   Well, what about for November 11th, 2019? | 17:33 |

Page 199

| | | |
|---|---|---|
| 1 | Was there an observable return for that date? | 17:33 |
| 2 | A.   I don't -- I don't know the answer to | 17:33 |
| 3 | that. | 17:33 |
| 4 | Q.   So if there were observable returns for | 17:33 |
| 5 | both of those dates, October 14th, 2019, and | 17:33 |
| 6 | November 11th, 2019, and they were not included in | 17:33 |
| 7 | these regressions, on Exhibits 4 through 9, that | 17:33 |
| 8 | would be an error; correct? | 17:33 |
| 9 | MR. STOKES:  Objection.  Form. | 17:33 |
| 10 | THE WITNESS:  I'm not sure how to answer | 17:33 |
| 11 | that question.  What do you -- what do you mean "if | 17:33 |
| 12 | there were observable returns"? | 17:33 |
| 13 | BY MR. LAVELLE: | 17:33 |
| 14 | Q.   If there were observable returns on those | 17:33 |
| 15 | dates -- | 17:34 |
| 16 | A.   I'm not sure -- I don't know what that | 17:34 |
| 17 | means. | 17:34 |
| 18 | Q.   If the stock Range Resources traded on | 17:34 |
| 19 | those dates and there was an observable return? | 17:34 |
| 20 | A.   Well, for example, there could be dates on | 17:34 |
| 21 | the weekend where the stock might trade, right, and | 17:34 |
| 22 | you could say there is an observable return, but you | 17:34 |
| 23 | don't tend to use those dates when you do a | 17:34 |
| 24 | regression analysis.  Right.  You use the trading | 17:34 |
| 25 | dates. | 17:34 |

Page 200

|    |                                                                      |       |
|----|----------------------------------------------------------------------|-------|
| 1  | Q.   Do you know if October 14th, 2019,                              | 17:34 |
| 2  | November 11th, 2019, were weekend days?                              | 17:34 |
| 3  | A.   I don't.  I could look through here and,                        | 17:34 |
| 4  | you know, count -- look for where there are five                     | 17:34 |
| 5  | days in a row and deduce it.  But I don't, as I sit                  | 17:34 |
| 6  | here, know.                                                          | 17:34 |
| 7  | Q.   Well, that is easy enough to do, right, on                      | 17:35 |
| 8  | October 11th, 2019, there's the three-day gap --                     | 17:35 |
| 9  | right? -- between that and the next trading day that                 | 17:35 |
| 10 | is included in your Date column October 15th, 2019;                  | 17:35 |
| 11 | right?                                                               | 17:35 |
| 12 | A.   Yeah.                                                           | 17:35 |
| 13 | Q.   So it would seem to include two days for a                      | 17:35 |
| 14 | weekend as well as the third day; right?                             | 17:35 |
| 15 | A.   Yeah.                                                           | 17:35 |
| 16 | Q.   So October 14th, 2019, would not be a solo                      | 17:35 |
| 17 | weekend day; is that right?                                          | 17:35 |
| 18 | A.   That's right.  It doesn't look like it.                         | 17:35 |
| 19 | Q.   So do you have an explanation of why                            | 17:35 |
| 20 | October 14th, 2019, and November 11th, 2019, were                    | 17:35 |
| 21 | not included in these regressions?                                   | 17:35 |
| 22 | A.   I don't know.  So this is -- I believe                          | 17:35 |
| 23 | this is data just downloaded directly from -- I                      | 17:35 |
| 24 | don't recall if we got it from FactSet, but likely                   | 17:35 |
| 25 | FactSet.  So if they don't have a -- that means they                 | 17:36 |

Page 201

| | | |
|---|---|---|
| 1 | are not reporting trading on that day. | 17:36 |
| 2 | Q.   So do you know whether or not FactSet | 17:36 |
| 3 | reported trading on November 11th, 2019, and | 17:36 |
| 4 | October 14th, 2019? | 17:36 |
| 5 | A.   Yeah.  I don't know.  As I sit here, I | 17:36 |
| 6 | don't know. | 17:36 |
| 7 | Q.   If trading had been reported on those | 17:36 |
| 8 | dates, should they have been included in your | 17:36 |
| 9 | regression? | 17:36 |
| 10 | A.   I mean, I don't think it makes a | 17:36 |
| 11 | difference one way or the other.  This is data | 17:36 |
| 12 | that's downloaded -- I believe this is data that is | 17:36 |
| 13 | downloaded from FactSet.  But, as I said, we also | 17:36 |
| 14 | did an analysis just using the COVID period.  So | 17:36 |
| 15 | these dates wouldn't even be in that, and it didn't | 17:36 |
| 16 | make a difference. | 17:36 |
| 17 | So I don't -- so typically -- yeah.  I | 17:36 |
| 18 | don't -- I don't know.  I don't know if there was a | 17:37 |
| 19 | day of no trading or trading was halted or we didn't | 17:37 |
| 20 | have a return or we took out the -- yeah.  I'm just | 17:37 |
| 21 | not sure. | 17:37 |
| 22 | Q.   But if there was trading on those days, | 17:37 |
| 23 | October 14th and November 11th, they -- those dates | 17:37 |
| 24 | should have been included in the progression; | 17:37 |
| 25 | correct? | 17:37 |

Page 202

```
 1        A.   Well, no, not just because there is        17:37

 2   trading on a day.  So if the trading is halted, then  17:37

 3   it's not a full day of trading and then you might     17:37

 4   want -- you might want to omit those days.            17:37

 5        Q.   And so if there were full days of trading   17:37

 6   on October 14th and November 11th, 2019, should      17:37

 7   those dates have been included in your regressions?  17:37

 8        A.   If they were full days of trading?         17:37

 9        Q.   Yes.                                        17:37

10        A.   Well, then I'm not sure why they           17:37

11   wouldn't be -- yeah, I just don't -- I don't know     17:37

12   the answer.  I don't why the -- I mean, sort of all  17:37

13   things equal, it doesn't make a lot of sense to just  17:37

14   erase a day but to download the available price and  17:38

15   return date and use that is certainly standard       17:38

16   practice.  So I just don't know what -- I do not     17:38

17   recall what, if anything, happened on those days.    17:38

18        Q.   It wouldn't be standard practice to omit   17:38

19   or exclude returns on full trading days otherwise;   17:38

20   correct?                                              17:38

21        A.   Well, what Dr. Feinstein is doing is       17:38

22   actually omitting days.  So he's dummying-out days   17:38

23   that are full trading days, and he is running his    17:38

24   regression dummying-out the earnings announcements.  17:38

25   So he is just dummying-out days.                      17:39
```

Page 203

```
1        Q.    Did you dummy-out October 14th --       17:39

2        A.    There isn't really a difference between  17:39

3    omitting the days and dummying the days out.        17:39

4    It's --                                             17:39

5        Q.    Did you dummy-out October 14th and        17:39

6    November 11th, 2019?                                17:39

7        A.    I don't believe so.  But from a -- but    17:39

8    from an analytic standpoint, it's the same thing.   17:39

9        Q.    So is it standard practice to omit days   17:39

10   that you were not otherwise dummying-out in          17:39

11   regression?                                          17:39

12       A.    It's standard practice to take the stock  17:39

13   prices and the returns from FactSet, which is, I     17:39

14   believe, what we did.  So I -- I don't -- I don't    17:39

15   know what happened on those days and if they were    17:39

16   not -- I'm not sure what happened on those days.     17:39

17       Q.    But it's -- it's standard practice to use 17:39

18   the observable trading returns during trading days   17:39

19   during the period that you are testing; right?       17:39

20       A.    It's standard practice to download the    17:39

21   returns from some service, such as FactSet or -- so  17:39

22   I believe what Dr. Feinstein used is CRISP, which is 17:40

23   something that -- you know, is -- is free to         17:40

24   academics.  And I don't know whether -- but, yeah,   17:40

25   this is -- this is -- it's standard to use the       17:40
```

Page 204

| | | |
|---|---|---|
| 1 | prices and download them and use the returns. | 17:40 |
| 2 | And I believe that's what we did. | 17:40 |
| 3 | Q.   So the event study methodology is to just | 17:40 |
| 4 | download the price returns and use that as opposed | 17:40 |
| 5 | to using the price returns on every trading day | 17:40 |
| 6 | during the period of time that you are testing? | 17:40 |
| 7 | A.   I'm -- well, it's not necessarily standard | 17:40 |
| 8 | to use every trading day.  So, for example, what | 17:40 |
| 9 | Dr. Feinstein is doing is he is actually removing | 17:41 |
| 10 | trading days by essentially dummying them out.  So I | 17:41 |
| 11 | don't know that -- I don't know why those days | 17:41 |
| 12 | appear to not be here, whether there was -- you had | 17:41 |
| 13 | mentioned trading halts.  I don't know if that's the | 17:41 |
| 14 | case. | 17:41 |
| 15 | Q.   And -- | 17:41 |
| 16 | A.   If there was a halt in trading then it | 17:41 |
| 17 | would be unusual.  And I think might make some sense | 17:41 |
| 18 | to, in fact, remove those days. | 17:41 |
| 19 | Q.   But it wouldn't be standard practice to | 17:41 |
| 20 | remove or omit trading days that weren't otherwise | 17:41 |
| 21 | dummying-out; right? | 17:41 |
| 22 | A.   Yes.  I think -- I think it would make | 17:41 |
| 23 | sense to -- to remove days if you think that those | 17:41 |
| 24 | days are -- or there is something unusual.  So, for | 17:41 |
| 25 | example, if there is a trading halt, I think that | 17:41 |

Page 205

| | |
|---|---|
| 1 | that would be something that you might want to do is | 17:41 |
| 2 | remove those days. | 17:41 |
| 3 | Q.   And to your recollection, was there | 17:42 |
| 4 | anything unusual about the trading on October 14th | 17:42 |
| 5 | or November 11th, 2019? | 17:42 |
| 6 | A.   I don't have any recollection of that. | 17:42 |
| 7 | As you have pointed out, those dates do | 17:42 |
| 8 | not appear to be in this download of data, which | 17:42 |
| 9 | would indicate -- you know, could indicate something | 17:42 |
| 10 | but... | 17:42 |
| 11 | Q.   And if there was nothing unusual about the | 17:42 |
| 12 | trading on those two dates, October 14th and | 17:42 |
| 13 | November 11th, would it be standard practice to omit | 17:42 |
| 14 | them from the regression? | 17:42 |
| 15 | A.   It isn't standard to just omit dates.  It | 17:42 |
| 16 | isn't -- it isn't particular standard, no, to just | 17:42 |
| 17 | omit dates for no reason. | 17:42 |
| 18 | Q.   Do you know what affect, if any, omitting | 17:42 |
| 19 | these dates from these regressions in Exhibits 4 | 17:42 |
| 20 | through 9 would have on the regressions that you | 17:42 |
| 21 | performed? | 17:43 |
| 22 | A.   I know it wouldn't affect my conclusions | 17:43 |
| 23 | because I know I did an analysis that included just | 17:43 |
| 24 | the COVID period, which does not include this | 17:43 |
| 25 | period.  So I know it doesn't -- it does not affect | 17:43 |

Page 206

| | | |
|---|---|---|
| 1 | the conclusions and the results. | 17:43 |
| 2 | Q.   If you look back at paragraph -- | 17:43 |
| 3 | Paragraph 42 [verbatim] of your report, it talks | 17:43 |
| 4 | about -- for your event study model using S&P 500 | 17:43 |
| 5 | Index as well as the S&P Oil & Gas Exploration & | 17:43 |
| 6 | Production Select Industry. | 17:43 |
| 7 | Do you see those? | 17:43 |
| 8 | A.   Yes. | 17:43 |
| 9 | Q.   And then after you reference each of those | 17:43 |
| 10 | two indices you included, in parentheses, | 17:43 |
| 11 | "(excluding Cabot)." | 17:43 |
| 12 | Do you see that? | 17:43 |
| 13 | A.   Yes. | 17:43 |
| 14 | Q.   How do you exclude a company from an | 17:43 |
| 15 | index? | 17:44 |
| 16 | A.   You take out the return of that company on | 17:44 |
| 17 | that -- that day. | 17:44 |
| 18 | Q.   How do you go about doing that? | 17:44 |
| 19 | A.   Well, that's -- that's a good question. | 17:44 |
| 20 | Ideally, if you know the weights you take the -- you | 17:44 |
| 21 | can remove -- if it's 50 percent -- if it's, you | 17:44 |
| 22 | know, a 50 percent weight, and if on a given day, | 17:44 |
| 23 | whatever, your company went up 10 percent and the | 17:44 |
| 24 | market went up -- and the index -- I mean, sort of | 17:44 |
| 25 | do the math and take out what would happen, you -- | 17:44 |

Page 207

| | | |
|---|---|---|
| 1 | if you think of putting the two together and, you | 17:45 |
| 2 | know, giving them equal weights and you say, "Okay. | 17:45 |
| 3 | This is the return.  If I equally weighted them, | 17:45 |
| 4 | what would be the return if I, you know, gave my | 17:45 |
| 5 | company a weight zero instead and took that out." | 17:45 |
| 6 | And just sort of try to undo what was done, and how | 17:45 |
| 7 | they were put into the index. | 17:45 |
| 8 | Q.   And so is that -- are you familiar with | 17:45 |
| 9 | the term "lagged weights"? | 17:45 |
| 10 | A.   No.  I mean, I know what "lag" means | 17:45 |
| 11 | but... | 17:45 |
| 12 | Q.   Are you -- sorry.  Were you done? | 17:45 |
| 13 | A.   Yeah.  I know what the term "lag" means | 17:45 |
| 14 | but I don't -- I don't really know what "lagged | 17:45 |
| 15 | weights" means, or not in the context that you are | 17:46 |
| 16 | referring to. | 17:46 |
| 17 | Q.   Are you familiar with the method for | 17:46 |
| 18 | removing a constituent company from its index by | 17:46 |
| 19 | using lagged weights and today's returns? | 17:46 |
| 20 | A.   I don't know what that means. | 17:46 |
| 21 | Q.   What about the term "yesterday's returns"? | 17:46 |
| 22 | If you were to remove a constituent company from its | 17:46 |
| 23 | index using yesterday's and today's returns, would | 17:46 |
| 24 | you familiar with that terminology? | 17:46 |
| 25 | A.   I don't think so.  No. | 17:46 |

Page 208

| | | |
|---|---|---|
| 1 | Q.   And how did you remove Cabot from the two | 17:46 |
| 2 | indices that you used here? | 17:46 |
| 3 | A.   I think that's what you just asked me | 17:46 |
| 4 | before; right? | 17:46 |
| 5 | Q.   I was asking generally before. | 17:46 |
| 6 | A.   Oh.  I don't recall.  I think -- I don't | 17:47 |
| 7 | know if we got the weights and -- yeah.  I don't | 17:47 |
| 8 | recall specifically. | 17:47 |
| 9 | Q.   What about for the industry index in | 17:47 |
| 10 | particular, do you recall how you excluded Cabot? | 17:47 |
| 11 | A.   I don't recall.  I don't recall.  No. | 17:47 |
| 12 | Q.   If you used the weights and the returns | 17:47 |
| 13 | from today to remove a company from the index, would | 17:47 |
| 14 | that be the correct or incorrect approach? | 17:47 |
| 15 | A.   I don't understand what you are saying. | 17:47 |
| 16 | Q.   So you have an understanding of using | 17:47 |
| 17 | weights to remove a company from the index; is that | 17:48 |
| 18 | right? | 17:48 |
| 19 | A.   So you want to know how the -- how the | 17:48 |
| 20 | index is prepared. | 17:48 |
| 21 | So one of the ways that we sometimes do an | 17:48 |
| 22 | index is equally weighted.  So there are ten | 17:48 |
| 23 | companies, they each have one-tenth of the weight. | 17:48 |
| 24 | They are counted equally. | 17:48 |
| 25 | Q.   And how, if at all, does a company's | 17:48 |

Page 209

1    returns factor into how you remove it from an index?    17:48

2         A.    I'm not sure I understand that question.    17:48

3              So you are recalculating the index as if    17:48

4    the -- the company had not been in there; right?    17:48

5         Q.    Uh-huh.    17:48

6         A.    That's -- that's really all we are doing.    17:48

7    It's just a matter of how -- how were they included    17:49

8    in the index to begin with.  And I -- I don't recall    17:49

9    for this.  Sorry.  I just don't know.    17:49

10        Q.    Okay.    17:49

11        A.    But from a -- you know, whether it    17:49

12   actually makes any difference to the conclusions,    17:49

13   the -- I have used different indices than    17:49

14   Dr. Feinstein has used and let -- and yet our excess    17:49

15   returns are very similar.    17:49

16        Q.    And so you excluded Cabot from the    17:49

17   industry index that you used.  You just don't recall    17:49

18   how you did it; is that correct?    17:50

19        A.    I don't recall specifically.  That's    17:50

20   right.    17:50

21        Q.    And why -- why would you want to remove    17:50

22   Cabot from the industry index?    17:50

23        A.    Because you are trying to see how the --    17:50

24   the index moved absent -- so you are you are --    17:50

25   predicting on what would have happened on the day --    17:50

| | | |
|---|---|---|
| 1 | on a particular day for Cabot, given what happened | 17:50 |
| 2 | in the industry, for example. | 17:50 |
| 3 | And if you are already including in the | 17:50 |
| 4 | industry Cabot, then you are not -- you are using | 17:50 |
| 5 | the actual result of Cabot to predict the result of | 17:50 |
| 6 | Cabot, which is not what you want to do. | 17:50 |
| 7 | Q.   So it's standard practice or it's good | 17:50 |
| 8 | practice to remove the company from the index? | 17:50 |
| 9 | A.   That's right.  If that's what -- if you | 17:50 |
| 10 | are trying to predict what would happen to Cabot on | 17:50 |
| 11 | a given day, knowing what happened to the industry | 17:51 |
| 12 | on that day, if you actually have what Cabot did | 17:51 |
| 13 | that day in the industry, then you -- you are, in | 17:51 |
| 14 | fact, already including partly what happened, right. | 17:51 |
| 15 | So... | 17:51 |
| 16 | Q.   Okay. | 17:51 |
| 17 | A.   It's not a -- it's not a good control. | 17:51 |
| 18 | You are trying to use a control.  Right.  And you | 17:51 |
| 19 | are not -- you are not fully controlling.  You | 17:51 |
| 20 | have actually -- you have actually concluded some of | 17:51 |
| 21 | what you are trying to -- to capture. | 17:51 |
| 22 | I don't think that Cabot is a big part of | 17:51 |
| 23 | either of these indices. | 17:51 |
| 24 | Q.   Did you remove Range Resources from the | 17:51 |
| 25 | industry index in the six Range Resources | 17:51 |

Page 211

```
 1    regressions?                                      17:51

 2         A.   I don't think they were in all -- we tried  17:51

 3    a bunch of different indices, as we just went over.  17:52

 4    I don't know if we removed them from the ones that  17:52

 5    they might have been in.  I don't know which ones  17:52

 6    they were in.  I just don't recall.  But we did do  17:52

 7    it a few different ways.  So...                   17:52

 8         Q.   So you can't recall Range Resources was  17:52

 9    removed from the industry index with the Range    17:52

10    Resource regressions?                             17:52

11         A.   I don't recall.  So as we just went over,  17:52

12    we saw that we did quite a few alternatives of the  17:52

13    Range Resources using alternative indices.        17:52

14              I'm trying to find that footnote.       17:52

15              And I don't know which, if any, of the  17:52

16    indices Range Resources itself is actually in.    17:52

17         Q.   In your report, for example, at Page 29,  17:53

18    there's a heading that discusses notices of       17:53

19    violation.                                        17:53

20         A.   Page 29?                                17:53

21         Q.   Yeah.  It's in the heading.             17:53

22         A.   Okay.  Yes.                             17:53

23         Q.   What is a notice of violation?          17:53

24         A.   Well, in this instance, it's a -- it's a  17:53

25    notice from -- it's a notice from the -- the      17:53
```

Page 212

| | | |
|---|---|---|
| 1 | regulatory agency, I believe, saying that they have | 17:53 |
| 2 | had violations. | 17:54 |
| 3 | These -- these are environmental | 17:54 |
| 4 | violations.  I don't know what -- I think there can | 17:54 |
| 5 | be other types of notices of violation. | 17:54 |
| 6 | Q.   Aside from the specific one referenced on | 17:54 |
| 7 | the page of the report that we are looking at, on | 17:54 |
| 8 | Page 29, are you aware of other examples of notices | 17:54 |
| 9 | of violation? | 17:54 |
| 10 | A.   I'm sorry.  Can you repeat that question? | 17:54 |
| 11 | Q.   Sure. | 17:54 |
| 12 | Aside from -- well, strike that. | 17:54 |
| 13 | Can you provide examples of different | 17:54 |
| 14 | types of notices of violation? | 17:54 |
| 15 | A.   Oh.  I don't know if I can.  So on the | 17:54 |
| 16 | whole, they aren't something that the market cared | 17:54 |
| 17 | about. | 17:54 |
| 18 | So -- what the company had said repeatedly | 17:54 |
| 19 | in its SEC filings is that we -- you know, we get | 17:54 |
| 20 | these from time to time.  And as I talked about in | 17:54 |
| 21 | my report and previously we talked about here in my | 17:55 |
| 22 | deposition is that they are publicly available, but | 17:55 |
| 23 | I have not found, other than the company mentioning | 17:55 |
| 24 | in the alleged misrepresentations, that they have | 17:55 |
| 25 | resolved issues related to some of these. | 17:55 |

Page 213

```
 1              It's not something that the company had        17:55

 2     made announcements about or anyone, the analysts, or    17:55

 3     other market participants discussed and didn't find     17:55

 4     any analysts that discussed it for Range Resources      17:55

 5     or --                                                    17:55

 6          Q.   So -- sorry.  Go ahead.                        17:55

 7          A.   So I -- yeah.  So it was not -- I don't        17:55

 8     know.                                                    17:55

 9          Q.   Did Cabot care about getting notices of       17:55

10     violation?                                               17:56

11          A.   Oh I'm sure --                                 17:56

12               MR. STOKES:  Objection to form.               17:56

13               THE WITNESS:  -- that -- to some extent,      17:56

14     the company certainly wants to comply with              17:56

15     regulatory agencies and does not want to -- most        17:56

16     companies do not want to, you know, violate rules or    17:56

17     regulations in general.                                  17:56

18              And I think it was just part of their          17:56

19     business.  They expected to get them, they did get      17:56

20     them, and they, you know, remediated or did -- did      17:56

21     things to take care of them.  And that was just -- I    17:56

22     think that is just the -- what -- what happens in       17:56

23     this type of business as well as in many other types    17:56

24     of business, is that -- that there will likely be,      17:56

25     you know, various types of violations and things        17:56
```

Page 214

| | | |
|---|---|---|
| 1 | that need to be taken care of. | 17:56 |
| 2 | Which isn't to say that companies, you | 17:56 |
| 3 | know, don't care about that or try to address that. | 17:57 |
| 4 | BY MR. LAVELLE: | 17:57 |
| 5 | Q.   Are some notices of violation more serious | 17:57 |
| 6 | than others? | 17:57 |
| 7 | A.   I would certainly imagine that that could | 17:57 |
| 8 | be the case.  But in terms of the magnitude and the | 17:57 |
| 9 | economic magnitude, the ones at issue and the ones | 17:57 |
| 10 | that have been discussed and the estimates of the | 17:57 |
| 11 | ones at issue and the criminal charges and the | 17:57 |
| 12 | expected settlement of criminal charges have all | 17:57 |
| 13 | been of a magnitude that is not economically | 17:57 |
| 14 | material to a company the size of Cabot. | 17:57 |
| 15 | Q.   And you referred in your answer there to | 17:57 |
| 16 | the economic magnitude of notices of violation and | 17:57 |
| 17 | criminal charges. | 17:57 |
| 18 | Are you referring there to the potential | 17:58 |
| 19 | fines that could be charged to Cabot as a result of | 17:58 |
| 20 | the violations? | 17:58 |
| 21 | A.   I'm referring to the potential fines as | 17:58 |
| 22 | well as the -- the later -- you know, the expected | 17:58 |
| 23 | fines and the later settlement.  That's right. | 17:58 |
| 24 | Q.   Now, in your analysis of the fines -- | 17:58 |
| 25 | notice of violation, did it take into account all | 17:58 |

Page 215

| | | |
|---|---|---|
| 1 | possible costs to Cabot from a gas migration notice | 17:58 |
| 2 | of violation aside from the fines? | 17:58 |
| 3 | A.   So this is what the analyst mentioned | 17:58 |
| 4 | as -- so this is what the company mentioned as | 17:58 |
| 5 | potential fines.  I have notes of what the analysts | 17:59 |
| 6 | mentioned were the magnitudes, and I have the -- you | 17:59 |
| 7 | know, lack -- the actual amount at the end that the | 17:59 |
| 8 | company pays or announces that they are going to pay | 17:59 |
| 9 | as a result of charges and also is settling other | 17:59 |
| 10 | issues is my understanding. | 17:59 |
| 11 | So all of those -- what the analysts are | 17:59 |
| 12 | saying are what the analysts expect as a result of | 17:59 |
| 13 | the announcement from the AG. | 17:59 |
| 14 | Q.   I'm asking a slightly different question. | 17:59 |
| 15 | I'm asking if you included in your analysis other | 17:59 |
| 16 | costs to Cabot as a result of gas migration notices | 17:59 |
| 17 | of violation aside from the fines themselves? | 17:59 |
| 18 | A.   Well, the market, in essence, is | 18:00 |
| 19 | including, you know -- by the lack of reaction is | 18:00 |
| 20 | saying are these things material and do we care | 18:00 |
| 21 | about them, but the actually math of what I'm doing | 18:00 |
| 22 | are these -- when it comes to the fines -- and I | 18:00 |
| 23 | have a table in my report -- those are -- those are | 18:00 |
| 24 | the -- the -- I think they are maximum fines that | 18:00 |
| 25 | the company is announcing as -- as penalties, | 18:00 |

Page 216

| | | |
|---|---|---|
| 1 | monetary penalties of up to.  So the particular | 18:00 |
| 2 | table that I have done in my report includes the -- | 18:00 |
| 3 | the maximum of the penalties as announced by the | 18:00 |
| 4 | company. | 18:00 |
| 5 | Q.  Let me ask you a different question. | 18:00 |
| 6 | Are you aware of other costs associated | 18:00 |
| 7 | with gas migration notice of violation aside from | 18:00 |
| 8 | the fines that the company has? | 18:00 |
| 9 | A.  Not that anyone in the market cares about | 18:00 |
| 10 | or none of the analysts have put into their | 18:01 |
| 11 | valuations.  So nothing that is economically | 18:01 |
| 12 | material. | 18:01 |
| 13 | Q.  And so I am asking you -- I understand | 18:01 |
| 14 | your answer about referencing analyst reports, but | 18:01 |
| 15 | I'm asking you if you are aware of any other costs | 18:01 |
| 16 | associated with gas migration of fees aside from the | 18:01 |
| 17 | fines? | 18:01 |
| 18 | A.  I have looked at just what the -- what the | 18:01 |
| 19 | company has said, what plaintiffs in the Complaint | 18:01 |
| 20 | have said, and what analysts in the market have said | 18:01 |
| 21 | are relevant regarding the NOVs. | 18:01 |
| 22 | The analyst in the market are not seeing | 18:01 |
| 23 | anything that -- not mentioning anything that they | 18:01 |
| 24 | consider economically relevant. | 18:01 |
| 25 | Q.  So you are not aware of -- | 18:01 |

Page 217

```
 1          A.    In terms -- in terms of the math that I      18:01
 2    have done in my report, I have -- the only numbers       18:02
 3    that I have seen are ones that -- in terms of            18:02
 4    magnitude that's what I have.                            18:02
 5          Q.    So you are not aware of any other costs      18:02
 6    associated with gas migration except for the fines?      18:02
 7          A.    Not that -- I am aware that the market is    18:02
 8    not considering anything else to be economically         18:02
 9    material.  So to the extent that there are other         18:02
10    costs, they are not a concern to the market.  They       18:02
11    are not estimating them.  They are not reacting to       18:02
12    that.  They are not mentioning them.  But I have not     18:02
13    done further investigation of what other potential       18:02
14    costs there could be.                                    18:02
15          Q.    And how do you know that the market knew     18:02
16    those costs?                                             18:02
17          A.    How do I know what?                          18:02
18          Q.    That the market knew those additional        18:02
19    costs?                                                   18:02
20          MR. STOKES:   Objection to form.                   18:02
21          THE WITNESS:   I know that this is -- these        18:03
22    NOVs are something that the company a has repeatedly     18:03
23    said that they will have from time to time.  There       18:03
24    was no reaction by the market that said, "We are         18:03
25    surprised that you had these NOVs."  There's no          18:03
```

Veritext Legal Solutions
866 299-5127

```
 1    discussion of the NOVs.  It is something that is         18:03
 2    known.  It is information that is publicly               18:03
 3    available.  And it is of a magnitude and expected to     18:03
 4    be of a magnitude that the market does not consider      18:03
 5    material to a company the size of Cabot.                 18:03
 6           So it -- it is -- if it's an efficient            18:03
 7    market -- and this is public information -- then         18:03
 8    this isn't a mysterious business that people do not      18:03
 9    understand.  This is -- this is a company that --        18:03
10    there are other companies that are in this business,    18:03
11    and it is -- it is not expected to be economically      18:03
12    material, and it didn't turn out to be economically     18:03
13    material.                                                18:04
14           So to date, there hasn't been any large          18:04
15    costs associated with these -- there's been no          18:04
16    disclosure of that.  And there's been no                18:04
17    understanding by anyone.                                 18:04
18           So these are violations that were                18:04
19    expected, that occur frequently, and there was no,      18:04
20    you know, blink of an eye by the market when there      18:04
21    were these NOVs announced.                               18:04
22    BY MR. LAVELLE:                                          18:04
23      Q.   So Cabot frequently violated environmental       18:04
24    law for gas migration?                                   18:04
25           MR. STOKES:  Objection.  Form.                    18:04
```

Page 219

```
 1            THE WITNESS:  Cabot announced repeatedly      18:04
 2   that they expected to have notices of violation.  I    18:04
 3   do think these are -- these are -- these are           18:04
 4   violations.  I think that is the course of doing       18:05
 5   business to expect to have certain kinds of            18:05
 6   violations.                                            18:05
 7   BY MR. LAVELLE:                                        18:05
 8       Q.   Cabot announced repeatedly that it was       18:05
 9   going to have notices of violation regarding gas       18:05
10   migration?                                             18:05
11       A.   I think -- I think it announced that it       18:05
12   expected to have notices of violation.  I don't know   18:05
13   that it was specific about what type of notices of     18:05
14   violation they expected to have.                       18:05
15            The actual notices of violation that were     18:05
16   announced were not of an unexpected quality to the     18:05
17   market.                                                18:05
18            There was no response that anyone was         18:05
19   surprised that they had received these notices of      18:05
20   violation.  There was just no commentary at all        18:05
21   about it.  It was just not -- it made no reaction at   18:05
22   all.                                                   18:05
23            And the -- the -- if this was of an           18:06
24   economically important impact to the company to have  18:06
25   these sorts of violations, then these things are       18:06
```

Page 220

```
 1   public, they are up on the -- on a website, and in     18:06
 2   an efficient market, if you could -- if this was       18:06
 3   actual material negative economic news to the          18:06
 4   company, then you could just get on this website and   18:06
 5   keep track of this and make money as a investor if     18:06
 6   you could find out this ahead of time.                 18:06
 7          So if this -- if information is                 18:06
 8   economically material in a efficient market, if it's   18:06
 9   public, there is -- people will go after it and try    18:06
10   to find that information and trade on that             18:06
11   information.  And the stock price should reflect       18:06
12   that.                                                  18:06
13          So if this is an efficient market,              18:06
14   there's -- there is -- these NOVs that are part of     18:06
15   the alleged misrepresentations are just not            18:07
16   information that was material to the market.  And it   18:07
17   didn't impact the stock price.                         18:07
18      Q.   And so you said that you reviewed the          18:07
19   information about the cost to Cabot as a result of     18:07
20   these NOVs.                                            18:07
21          What other costs were there aside from the     18:07
22   fines imposed by the regulator?                        18:07
23      A.   I said I reviewed what -- what plaintiffs      18:07
24   have mentioned as the cost as well as all the          18:07
25   information that became publicly available and that    18:07
```

Page 221

| | | |
|---|---|---|
| 1 | was announced about these. | 18:07 |
| 2 | And all I can find is -- that has anything | 18:07 |
| 3 | to do with the NOVs, are these potential fines and | 18:07 |
| 4 | then the $16 million settlement, which not only | 18:08 |
| 5 | resolved issues that are part of the alleged | 18:08 |
| 6 | corrective disclosure regarding the Pennsylvania | 18:08 |
| 7 | AG's charges, but also resolved other issues that | 18:08 |
| 8 | are not part of the alleged misrepresentations in | 18:08 |
| 9 | this case. | 18:08 |
| 10 | Q.   You talked a little bit about publicly | 18:08 |
| 11 | available information. | 18:08 |
| 12 | Did Cabot disclose prior to July 26th, | 18:08 |
| 13 | 2019, or June 15th, 2020, that it was not | 18:08 |
| 14 | remediating known gas migration violations? | 18:08 |
| 15 | A.   That it was what? | 18:08 |
| 16 | Q.   Not remediating known gas migration | 18:08 |
| 17 | violations. | 18:09 |
| 18 | MR. STOKES:   Objection.   Form. | 18:09 |
| 19 | THE WITNESS:   I don't know that it | 18:09 |
| 20 | announced that it was not remediating them on those | 18:09 |
| 21 | dates.   I don't know that it ever announced that it | 18:09 |
| 22 | was not remediating known violations. | 18:09 |
| 23 | BY MR. LAVELLE: | 18:09 |
| 24 | Q.   If you look at Page 32 of your report, | 18:09 |
| 25 | Number 3.   I think that if you are there with me you | 18:09 |

Page 222

| | | |
|---|---|---|
| 1 | mentioned that the analysts mention the criminal | 18:10 |
| 2 | charges would only result in potential fines that | 18:10 |
| 3 | even under a worst case scenario would be minimal. | 18:10 |
| 4 | Do you see that generally?  And I am | 18:10 |
| 5 | paraphrasing. | 18:10 |
| 6 | A.   Yes. | 18:10 |
| 7 | Q.   Can the mention criminal charges in your | 18:10 |
| 8 | experience cause a company's stock price to drop? | 18:10 |
| 9 | MR. STOKES:  Objection.  Form. | 18:10 |
| 10 | THE WITNESS:  Yeah.  I think -- I think | 18:10 |
| 11 | some criminal charges can be -- you know, expected | 18:11 |
| 12 | to be of large economic impact.  So some criminal | 18:11 |
| 13 | charges, I think, can be economically material. | 18:11 |
| 14 | BY MR. LAVELLE: | 18:11 |
| 15 | Q.   And aside from fines, do companies face | 18:11 |
| 16 | other risks from criminal charges? | 18:11 |
| 17 | A.   I think it's possible.  I think some | 18:11 |
| 18 | criminal charges can lead to, you know, the -- not | 18:11 |
| 19 | being allowed to do -- whatever. | 18:11 |
| 20 | There -- there are -- there can be.  For a | 18:11 |
| 21 | certain kinds of criminal charges, I think there can | 18:11 |
| 22 | be the expectation of negative economic events from | 18:11 |
| 23 | them. | 18:11 |
| 24 | Q.   And one of the things -- I'm sorry. | 18:11 |
| 25 | A.   These criminal charges the expectation was | 18:11 |

Page 223

| | |
|---|---|
| 1 | minimal fines that were not expected -- that were of | 18:11 |
| 2 | a magnitude that would be material to the company. | 18:12 |
| 3 | So there was no discussion. | 18:12 |
| 4 | There was -- the -- the AG issues the | 18:12 |
| 5 | charges, issues an announcement announcing these | 18:12 |
| 6 | charges, and not one analyst covering Cabot issues a | 18:12 |
| 7 | report on that day that comments on it. | 18:12 |
| 8 | And it's only days later that one analyst, | 18:12 |
| 9 | one of the 13 or 18 analysts, covering Cabot even | 18:12 |
| 10 | mentions it all and mentions it just to say that | 18:12 |
| 11 | it's not expected to have an impact. | 18:12 |
| 12 | Q.   I think what you were getting at before is | 18:12 |
| 13 | that one potential risk faced by a company from | 18:12 |
| 14 | criminal charges is that they might not be allowed | 18:12 |
| 15 | to do business. | 18:12 |
| 16 | Is that what you were stating? | 18:12 |
| 17 | A.   I think that for some types of criminal | 18:12 |
| 18 | charges and some situations, that is not a risk that | 18:12 |
| 19 | anyone expressed. | 18:13 |
| 20 | Not one analyst covering the company -- | 18:13 |
| 21 | and there were 13 to 18 analysts -- there's not one | 18:13 |
| 22 | that issues a report on this date, nobody commenting | 18:13 |
| 23 | on it. | 18:13 |
| 24 | And the only analyst that comments on it, | 18:13 |
| 25 | which is later, says that even in a worst case | 18:13 |

Page 224

| | | |
|---|---|---|
| 1 | scenario, the potential fines would be minimal and | 18:13 |
| 2 | expresses no other potential risks related to these | 18:13 |
| 3 | criminal charges. | 18:13 |
| 4 | Q.   Were the fines announced associated with | 18:13 |
| 5 | the criminal charges that were resolved in November | 18:13 |
| 6 | of 2022 -- were they minimal? | 18:13 |
| 7 | A.   They were larger than what the one | 18:13 |
| 8 | analyst, the J.P. Morgan analyst, had expected.  But | 18:13 |
| 9 | they're still minimal relative to the revenue of the | 18:13 |
| 10 | company. | 18:14 |
| 11 | Q.   Did you do an analysis of whether the news | 18:14 |
| 12 | announced on November 29th, '22, resolving the | 18:14 |
| 13 | criminal charges was good, bad, or mixed? | 18:14 |
| 14 | MR. STOKES:  Objection.  Form. | 18:14 |
| 15 | THE WITNESS:  So whether the -- the | 18:14 |
| 16 | criminal charges themselves were better or worse | 18:14 |
| 17 | than expected? | 18:14 |
| 18 | BY MR. LAVELLE: | 18:14 |
| 19 | Q.   Let's take a step even further back. | 18:14 |
| 20 | Did you do an analysis of whether the news | 18:14 |
| 21 | announced on November 29th, 2022, was good, bad, or | 18:14 |
| 22 | mixed for Cabot? | 18:14 |
| 23 | A.   Yes.  I believe so.  That's the date that | 18:14 |
| 24 | the criminal charges, the 16 million was announced; | 18:14 |
| 25 | right? | 18:14 |

Page 225

```
 1        Q.    Right.                                    18:14
 2        A.    Yes.   I believe I have a discussion about 18:14
 3   that.                                               18:15
 4              I don't think anyone -- my recollection is 18:15
 5   that none of the analysts -- nobody mentioned it at  18:15
 6   all, the resolution of the criminal charges.   I    18:15
 7   think it was in -- again, in a Q.   And so there     18:15
 8   was -- there was no discussion.                     18:15
 9              I think there's a...                      18:15
10              That's my recollection.                   18:16
11        Q.    So in your report, is there a section that 18:16
12   discusses whether a news announced on November 29th, 18:16
13   2022, was good, bad, or mixed?                      18:16
14        A.    I don't know.   I was just looking for    18:16
15   that.                                               18:16
16              I don't recall.                           18:16
17        Q.    Okay.   If you happen to remember, let me 18:16
18   know.                                               18:16
19              Let's look at Page 35 of your report at   18:16
20   Footnote 70.                                        18:17
21        A.    Okay.                                     18:17
22        Q.    So in there, there is a footnote that     18:17
23   says[as read]:                                      18:17
24              "It is also my understanding that         18:17
25              the prior restriction on drilling         18:17
```

Page 226

| | | |
|---|---|---|
| 1 | within the Dimock Box were unrelated to | 18:17 |
| 2 | any of the alleged misrepresentations." | 18:17 |
| 3 | Do you see that? | 18:17 |
| 4 | A.   Yes. | 18:17 |
| 5 | Q.   And, again, this is a statement that | 18:17 |
| 6 | includes your understanding. | 18:17 |
| 7 | You see that? | 18:17 |
| 8 | A.   Yes. | 18:17 |
| 9 | Q.   So what is the basis of your | 18:17 |
| 10 | understanding? | 18:17 |
| 11 | A.   From counsel for the defendants.  So I | 18:17 |
| 12 | believe it was Peter Stokes. | 18:17 |
| 13 | Q.   And did you do any independent | 18:17 |
| 14 | investigation to verify whether that was accurate or | 18:17 |
| 15 | not? | 18:17 |
| 16 | A.   No.  I don't believe so. | 18:17 |
| 17 | Q.   Do you know when the drilling restriction | 18:17 |
| 18 | within the Dimock Box went into effect for Cabot? | 18:17 |
| 19 | A.   I think it was a ways before the Class | 18:18 |
| 20 | Period, is my recollection. | 18:18 |
| 21 | Q.   And do you know if that restriction is | 18:18 |
| 22 | still in effect or not? | 18:18 |
| 23 | A.   I think it's not in effect.  So I think | 18:18 |
| 24 | it -- I think that's why this -- this $16 million | 18:18 |
| 25 | was -- was more than -- it helped resolve the issues | 18:18 |

Page 227

```
 1    relating to the Dimock Box, which is unrelated to        18:18
 2    the NOVs and the alleged misrepresentations in this      18:18
 3    case.                                                     18:18
 4        Q.   And do you know why drilling in the Dimock       18:18
 5    Box was restricted from that time prior to the           18:18
 6    Class Period through when it was resolved in             18:19
 7    November of 2022 with the payment of the                 18:19
 8    $16 million?                                             18:19
 9        A.   I don't.  I think -- I think that's             18:19
10    addressed in one of the declarations, is my             18:19
11    recollection.  But I have no independent knowledge      18:19
12    of that.                                                18:19
13            MR. LAVELLE:  Let's take a quick break.         18:19
14            THE WITNESS:  Okay.                             18:19
15            THE VIDEOGRAPHER:  Okay.  We're off the         18:19
16    record.  It's 6:20 p.m.                                 18:19
17            (Brief recess.)                                 18:19
18            THE VIDEOGRAPHER:  We're back on the            18:28
19    record.  It's 6:28 p.m.                                 18:28
20            MR. LAVELLE:  Okay.  Thank you.                 18:28
21    BY MR. LAVELLE:                                         18:28
22        Q.   Welcome back, Ms. Allen.                       18:28
23            MR. LAVELLE:  You'll be pleased to hear         18:28
24    that I don't have any further questions for you at      18:28
25    this time.                                              18:28
```

Page 228

```
 1              THE WITNESS:  Thank you.  I am pleased.     18:28
 2              MR. STOKES:  Ms. Allen, I just have a few   18:28
 3    questions and follow-up.  First of all can you just   18:28
 4    state your fame for record.                           18:28
 5              THE WITNESS:  Lucy Allen.                    18:29
 6                                                           18:29
 7                        EXAMINATION                        18:29
 8    BY MR. STOKES:                                         18:29
 9         Q.   What is your current position?              18:29
10         A.   I'm a managing director at NERA.            18:29
11         Q.   And have you been retained on behalf of --  18:29
12    of the defendants in this case to provide expert      18:29
13    testimony?                                             18:29
14         A.   Yes.                                         18:29
15         Q.   Can you briefly summarize your              18:29
16    professional background and qualifications that       18:29
17    relate to the subject matter of your opinions in      18:29
18    this case?                                             18:29
19         A.   Sure.  I have advanced degrees.  I have     18:29
20    degrees in -- an MBA master's in economics and MPhil  18:29
21    in economics all from Yale University, and            18:29
22    undergraduate degree from Stanford University.  I     18:29
23    have analyzed stock price reactions to information.   18:29
24    And I have been qualified as an expert in doing       18:29
25    that, in analyzing price impact, and lost causation   18:29
```

Page 229

| | | |
|---|---|---|
| 1 | and damages. | 18:30 |
| 2 | I have been working at NERA for over | 18:30 |
| 3 | 25 years analyzing the effect of information on | 18:30 |
| 4 | stock prices as well as other types of things. | 18:30 |
| 5 | Q.   Do you have opinions in this case about | 18:30 |
| 6 | price impact? | 18:30 |
| 7 | A.   Yes, I have found that there is no price | 18:30 |
| 8 | impact from the alleged misrepresentations or the | 18:30 |
| 9 | alleged corrective disclosures.  So that the -- the | 18:30 |
| 10 | alleged information, which involves notices of | 18:30 |
| 11 | violation of -- is not something the market | 18:30 |
| 12 | considered important. | 18:30 |
| 13 | There was no price reaction, no analyst | 18:30 |
| 14 | commentary.  Nobody cared about it when the | 18:31 |
| 15 | misrepresentations were made, when the company said | 18:31 |
| 16 | that they had corrected issues regarding prior NOVs. | 18:31 |
| 17 | And similarly, there is no price reaction | 18:31 |
| 18 | to the alleged corrective disclosures. | 18:31 |
| 19 | So I find that the -- there's a mismatch | 18:31 |
| 20 | between the alleged corrective disclosures and the | 18:31 |
| 21 | misrepresentations in terms of the -- the wells and | 18:31 |
| 22 | the timing. | 18:31 |
| 23 | But even assuming that the -- there is a | 18:31 |
| 24 | match, there is still no price reaction, no | 18:31 |
| 25 | statistically significant price reaction, no market | 18:31 |

Page 230

```
 1    commentary at all that -- that -- no indication that    18:31

 2    any analyst has changed their value of the company,     18:32

 3    their expectation of the future value of the            18:32

 4    company, or their price estimates for the company       18:32

 5    based on either the alleged misrepresentations          18:32

 6    and/or the corrective disclosures.                      18:32

 7        Q.   Can you briefly summarize the methodology      18:32

 8    and analysis that you used in reaching that opinion?    18:32

 9        A.   So I have analyzed all the public             18:32

10    information about the company.  I have looked at        18:32

11    other companies that had -- for example, a similar      18:32

12    company that had a similar announcement from the        18:32

13    Pennsylvania AG's office about criminal charges         18:32

14    related to violations of the -- the same type of        18:32

15    violations.                                             18:32

16           I reviewed all analysts that are covering        18:33

17    the company around the time of the                      18:33

18    misrepresentations, around the time of the              18:33

19    corrective disclosures during the alleged               18:33

20    Class Period.                                           18:33

21           I have done event studies of the stock           18:33

22    price reaction using both my own event study as well    18:33

23    as plaintiff's expert's event study that would be       18:33

24    consistent with what -- I mean, modifying his event     18:33

25    study to be consistent with what he has done in         18:33
```

Page 231

| | | |
|---|---|---|
| 1 | other cases and what is consistent with his claim | 18:33 |
| 2 | that there is an increase volatility during the | 18:33 |
| 3 | COVID period and found that there is no | 18:33 |
| 4 | statistically significant reaction. | 18:33 |
| 5 | Q.   Is the event study and the analysis you | 18:33 |
| 6 | did, is that consistent with best practices among | 18:33 |
| 7 | economists who do these types of analyses? | 18:33 |
| 8 | MR. LAVELLE:  Objection to form. | 18:34 |
| 9 | THE WITNESS:  Yes.  I think the event | 18:34 |
| 10 | study is consistent with best practices.  But I | 18:34 |
| 11 | think you don't -- you can -- you can come to the | 18:34 |
| 12 | same conclusion that I have from my event study by | 18:34 |
| 13 | looking at what I think is not as good an event | 18:34 |
| 14 | study that Dr. Feinstein has used and just look at | 18:34 |
| 15 | his excess returns.  So what he has found to be the | 18:34 |
| 16 | amount that, according to his market model, the | 18:34 |
| 17 | Cabot stock price moved beyond what he would have | 18:34 |
| 18 | predicted using his model.  And you'll just see that | 18:34 |
| 19 | the dates of the alleged misrepresentations and | 18:34 |
| 20 | corrective disclosure are -- those movements, | 18:34 |
| 21 | according to his own table, are in line with other | 18:34 |
| 22 | movements on other days that he fines not to be | 18:34 |
| 23 | statistically significant. | 18:34 |
| 24 | And then the alleged misrepresentations, | 18:34 |
| 25 | according to his own model, are not statistically | 18:35 |

Page 232

| | | |
|---|---|---|
| 1 | significant. | 18:35 |
| 2 | So you can just -- you can just look at | 18:35 |
| 3 | his -- I think it doesn't matter.  You can just -- | 18:35 |
| 4 | you can look at a picture.  I've shown a picture of | 18:35 |
| 5 | the excess returns.  You can look at the table of | 18:35 |
| 6 | his excess returns.  But -- and you can look at what | 18:35 |
| 7 | the -- I mean, they are just -- there's a lot of | 18:35 |
| 8 | analysts covering this company.  They issue a lot of | 18:35 |
| 9 | reports.  They are not issuing reports about | 18:35 |
| 10 | anything that is the alleged misrepresentations or | 18:35 |
| 11 | the alleged corrective disclosures. | 18:35 |
| 12 | They are not only not issuing reports. | 18:35 |
| 13 | They are just not mentioning this at all.  So it | 18:35 |
| 14 | doesn't even bubble to the surface of getting into | 18:35 |
| 15 | their reports, much less changing their value of the | 18:35 |
| 16 | company. | 18:35 |
| 17 | BY MR. HELLER: | 18:35 |
| 18 | Q.   In your own event study, did you test the | 18:35 |
| 19 | stock price reaction both on the days the alleged | 18:35 |
| 20 | misrepresentations were made and on the days of the | 18:35 |
| 21 | alleged corrective disclosures? | 18:36 |
| 22 | A.   That's right. | 18:36 |
| 23 | Q.   And what was the result of those tests? | 18:36 |
| 24 | A.   Those dates are not statistically | 18:36 |
| 25 | significant.  So the one corrective disclosure | 18:36 |

1    includes the -- the 27 NOVs [verbatim], which come    18:36

2    out later in the day, and then prior to the market    18:36

3    opening, there is a guidance reduction.    18:36

4         So the stock price drops at the open, but    18:36

5    as I show in my report, you can see a picture of the    18:36

6    drop, the 12 percent drop that plaintiffs mention in    18:36

7    their Complaint all occurs before the alleged    18:36

8    corrective information regarding the two NOVs is    18:36

9    even announced, which happens later.  Something like    18:36

10   11:00 o'clock.    18:36

11        And the -- the misrepresentations are all    18:36

12   not statistically significant with, I believe, the    18:36

13   exemption of the first day in the Class Period,    18:36

14   and -- which is an earnings announcement and    18:36

15   there's -- there's information, positive information    18:37

16   being announced that analysts are discussing, and    18:37

17   there's not one analyst that mentions the alleged    18:37

18   misrepresentation.  And then --    18:37

19        Q.   And the --    18:37

20        A.   And the other days are not statistically    18:37

21   significant at all.    18:37

22        Q.   Why is it significant to you in doing your    18:37

23   analysis that the analysts did not mention the    18:37

24   subject matter alleged misrepresentation?    18:37

25        A.   The analyst are experts in the valuation    18:37

Veritext Legal Solutions
866 299-5127

|    |                                                                      |       |
|----|----------------------------------------------------------------------|-------|
| 1  | of the stock and the company.  And they are -- they                  | 18:37 |
| 2  | issue reports when new information that they think                   | 18:37 |
| 3  | is material to the value is -- is being released to                  | 18:37 |
| 4  | the market.                                                          | 18:37 |
| 5  | And then their reports will summarize                                | 18:37 |
| 6  | what -- you know what is -- what do they think is                    | 18:37 |
| 7  | important about this new information and how does it                 | 18:37 |
| 8  | change their value.                                                 | 18:38 |
| 9  | If they don't even mention the                                       | 18:38 |
| 10 | information, then it -- it is not material to them                   | 18:38 |
| 11 | to their valuation, it's not important.  It doesn't                  | 18:38 |
| 12 | even rise to the level of putting it in -- in their                  | 18:38 |
| 13 | report much less actually information that it was                    | 18:38 |
| 14 | changing their value.                                               | 18:38 |
| 15 | And then for a number of these dates, they                           | 18:38 |
| 16 | are not even issuing reports.  So it's not enough --                 | 18:38 |
| 17 | it's not even enough information to bother to                        | 18:38 |
| 18 | release a report, much less change their value or do                 | 18:38 |
| 19 | anything about it.                                                  | 18:38 |
| 20 | MR. LAVELLE:  And, quickly, I'd interpose                            | 18:38 |
| 21 | an objection.  I don't think it got picked up.                       | 18:38 |
| 22 | Sorry.                                                               | 18:38 |
| 23 | BY MR. STOKES:                                                       | 18:38 |
| 24 | Q.   Did you find a statistically significant                        | 18:38 |
| 25 | price reaction after the Pennsylvania Attorney                       | 18:38 |

Page 235

| | | |
|---|---|---|
| 1 | General charges were announced 2020? | 18:38 |
| 2 | A.   No. | 18:38 |
| 3 | Q.   And -- | 18:38 |
| 4 | A.   It's not statistically significant at the | 18:38 |
| 5 | standard 5 percent level, nor is it statistically | 18:39 |
| 6 | significant at the lower threshold of a 10 percent | 18:39 |
| 7 | level. | 18:39 |
| 8 | Q.   And did -- Dr. Feinstein, did he reach a | 18:39 |
| 9 | different conclusion in his report? | 18:39 |
| 10 | A.   He does not test that day in his report. | 18:39 |
| 11 | Q.   Can you explain the difference between the | 18:39 |
| 12 | 5 percent and 10 percent that you mention? | 18:39 |
| 13 | A.   What is your question? | 18:39 |
| 14 | Q.   I'm sorry. | 18:39 |
| 15 | Could you just briefly explain what you | 18:39 |
| 16 | mean by a 5 percent interval or a 10 percent -- | 18:39 |
| 17 | 10 percent interval? | 18:39 |
| 18 | A.   So a threshold.  So what -- what typically | 18:39 |
| 19 | is the standard used by both the courts and | 18:39 |
| 20 | academics is statistical significance.  Something is | 18:39 |
| 21 | considered statistically significant if it is | 18:39 |
| 22 | something that is -- in this sense, an excess return | 18:39 |
| 23 | is of a magnitude that it would only happen | 18:40 |
| 24 | 5 percent of the time under normal circumstances. | 18:40 |
| 25 | So it's -- you expect to make a mistake | 18:40 |

Page 236

```
 1    and call something significant when it's not        18:40

 2    5 percent of the time.                              18:40

 3           A more lenient threshold, a lower            18:40

 4    threshold with a bigger number would be a 10 percent 18:40

 5    threshold, where you would consider the -- the      18:40

 6    10 percent most extreme events to be statistically  18:40

 7    significant.                                        18:40

 8           And they happen 10 percent of the time.      18:40

 9           So you would be -- if you call something     18:40

10    statistically significant, you would -- at a        18:40

11    10 percent threshold, you would be, by definition,  18:40

12    making a mistake 10 percent of the time.  When      18:40

13    something is actually not significant, you would    18:40

14    call it significant.                                18:40

15           And so the typical thing is to use a         18:40

16    5 percent threshold, but sometimes a 10 percent has 18:40

17    been used.                                          18:40

18    Q.    And did you find statistical significance     18:41

19    at either a 5 percent or a 10 percent threshold with 18:41

20    respect to the stock price movement following the   18:41

21    Pennsylvania Attorney General charges in            18:41

22    June of 2020?                                       18:41

23    A.    No, I did not find it statistically           18:41

24    significant at either level.  So it's not           18:41

25    statistically significant at any level that I have  18:41
```

Page 237

| | | |
|---|---|---|
| 1 | seen the courts or academics use. | 18:41 |
| 2 | Q.    Is there anything in Dr. Feinstein's event | 18:41 |
| 3 | study that you disagree with? | 18:41 |
| 4 | A.    Yes.  So he has done -- the way he has | 18:41 |
| 5 | done his tests of statistical significance, you | 18:41 |
| 6 | can -- I have just shown a couple of charts in my | 18:41 |
| 7 | report.  He's come to conclusions on which dates are | 18:41 |
| 8 | statistically significant. | 18:42 |
| 9 | So he's calculated an excess return.  So | 18:42 |
| 10 | the amount of the market that he says Cabot stock | 18:42 |
| 11 | moves more than he predicts given his market model. | 18:42 |
| 12 | And if you just look at his excess | 18:42 |
| 13 | returns, you'll see that there are days with very, | 18:42 |
| 14 | very large excess returns that he thinks are not | 18:42 |
| 15 | statistically significant, and other days with much | 18:42 |
| 16 | smaller excess returns that he thinks are | 18:42 |
| 17 | statistically significant, and they can be quite | 18:42 |
| 18 | close to each other. | 18:42 |
| 19 | So there can be two days right next to | 18:42 |
| 20 | each other.  One which he is think is statistically | 18:42 |
| 21 | significant; and one which he says is not and they | 18:42 |
| 22 | have very similar excess returns. | 18:42 |
| 23 | So his results are just -- just not -- are | 18:42 |
| 24 | just clearly unreasonable and unreliable.  But what | 18:42 |
| 25 | I have done is look at his excess returns are | 18:42 |

Page 238

| | | |
|---|---|---|
| 1 | calculated using a -- a market model that controls | 18:42 |
| 2 | for a market -- an overall market index, an industry | 18:43 |
| 3 | index, and I think he also uses some sort of a oil | 18:43 |
| 4 | price index. | 18:43 |
| 5 | And I -- although I don't think his | 18:43 |
| 6 | overall market model is -- I think what I have used | 18:43 |
| 7 | makes more sense, his -- his -- what he is using to | 18:43 |
| 8 | explain Cabot stock price does not always move -- | 18:43 |
| 9 | mostly does not move in the direction that it should | 18:43 |
| 10 | and is not always itself statistically significant | 18:43 |
| 11 | in explaining it. | 18:43 |
| 12 | Overall what he gets in terms of his | 18:43 |
| 13 | actual excess returns are very similar to what I'm | 18:43 |
| 14 | getting.  So I don't think that what he gets in | 18:43 |
| 15 | terms of an excess return is what is -- is such a | 18:43 |
| 16 | problem.  His results seem, you know, relative | 18:43 |
| 17 | reasonable as far as that goes. | 18:43 |
| 18 | What is not reasonable is when he's | 18:43 |
| 19 | deciding whether a day is statistically significant | 18:43 |
| 20 | or not. | 18:43 |
| 21 | He's come to completely unreasonable | 18:43 |
| 22 | conclusions where, as I said, he calls certain days | 18:44 |
| 23 | statistically significant when their excess returns | 18:44 |
| 24 | are quite small.  And then he'll find another day as | 18:44 |
| 25 | not statistically significant when it has a huge | 18:44 |

Page 239

| | | |
|---|---|---|
| 1 | excess return according to his own model. | 18:44 |
| 2 | So I think his -- he's done these | 18:44 |
| 3 | additional adjustments, which he say -- he claims | 18:44 |
| 4 | are to take account of changes during COVID.  And | 18:44 |
| 5 | those are yielding, you know, very unreasonable and | 18:44 |
| 6 | unreliable conclusions. | 18:44 |
| 7 | But if you just look at his excess | 18:44 |
| 8 | returns, it's quite similar.  And you would | 18:44 |
| 9 | similarly come to the conclusion that the -- the | 18:44 |
| 10 | dates are not statistically significant.  Like, the | 18:44 |
| 11 | date at the end of the Class Period when the AG | 18:45 |
| 12 | charges are announced, it's not statistically | 18:45 |
| 13 | significant. | 18:45 |
| 14 | Q.   Is the absence of a statistically | 18:45 |
| 15 | significant increase or decrease at the time of the | 18:45 |
| 16 | alleged misstatements, alleged corrective | 18:45 |
| 17 | disclosure, is that the sole basis for your opinion | 18:45 |
| 18 | that there is no price impact? | 18:45 |
| 19 | A.   No.  I have -- I have lots of -- lots of | 18:45 |
| 20 | evidence that there is no price impact. | 18:45 |
| 21 | And I have no evidence that the alleged | 18:45 |
| 22 | misrepresentations or the corrective disclosures are | 18:45 |
| 23 | impacting the market.  So it's not only the lack of | 18:45 |
| 24 | price reaction. | 18:45 |
| 25 | And the misrepresentations are affirmative | 18:45 |

Page 240

| | | |
|---|---|---|
| 1 | misrepresentations. So Cabot is saying -- the | 18:45 |
| 2 | company is saying that we previously had these NOVs, | 18:45 |
| 3 | and we have done something to correct them and | 18:46 |
| 4 | remediate them. And plaintiffs are alleging that | 18:46 |
| 5 | that was not true when you said that. | 18:46 |
| 6 | But that -- that is a positive statement | 18:46 |
| 7 | of saying that we have corrected something that | 18:46 |
| 8 | plaintiffs say that you didn't do. | 18:46 |
| 9 | And so there is -- first of all, there is | 18:46 |
| 10 | nobody mentioning it all. It's literally nobody | 18:46 |
| 11 | mentioning it. It comes out in the SEC filings, the | 18:46 |
| 12 | alleged misstatement. Nobody cares one way or the | 18:46 |
| 13 | other. | 18:46 |
| 14 | But -- so it's not just the lack of price | 18:46 |
| 15 | reactions; it's also the lack of commentary, the | 18:46 |
| 16 | lack of a changing of the value. | 18:46 |
| 17 | And then it's that the actual magnitude of | 18:46 |
| 18 | the cost and the expected magnitude of the cost is | 18:46 |
| 19 | very small. It's less than these -- you know, | 18:46 |
| 20 | expected fines are less than half of a percent or a | 18:46 |
| 21 | 10th of a present of revenue in the net income of | 18:47 |
| 22 | the company. | 18:47 |
| 23 | So it's -- it's just tiny amounts that -- | 18:47 |
| 24 | the expectation is tiny amounts. And it's -- it's | 18:47 |
| 25 | not economically material and not expected to be | 18:47 |

Page 241

```
 1    economically material to the company.              18:47

 2            And there's no evidence that's come out    18:47

 3    that it was ever economically material to the      18:47

 4    company.                                            18:47

 5            MR. STOKES:  I have no further questions    18:47

 6    at this time.                                       18:47

 7            Thank you.                                  18:47

 8            MR. LAVELLE:  Nor do I.                     18:47

 9            THE WITNESS:  Thank you.                    18:47

10            MR. LAVELLE:  Thank you very much.          18:47

11            MR. STOKES:  Thank you.  Good night.        06:48

12            THE VIDEOGRAPHER:  Okay.  We're off the     06:48

13    record at 6:48 p.m.                                 06:48

14            (Whereupon, at 6:48 p.m., EST, the

15            deposition of LUCY ALLEN was adjourned.)

16                    --- oOo ---

17

18

19

20

21

22

23

24

25
```

Page 242

1

2

3

4          I, LUCY ALLEN, hereby certify under

5    penalty of perjury under the laws of the State of

6    California that the foregoing is true and correct.

7          Executed this _____ day of

8    _____, 2023, at _____,

9    California.

10

11

12          _____

13          LUCY ALLEN

14          RULES 26 AND 30

             FEDERAL RULES OF CIVIL PROCEDURE

15

16

17

18

19

20

21

22

23

24

25

                                              Page 243

```
 1    STATE OF CALIFORNIA                          )
 2    COUNTY OF LOS ANGELES                        )  SS.
 3             I, Dayna Hester, C.S.R. No. 9970, in
 4    and for the State of California, do hereby certify:
 5             That, prior to being examined, the witness
 6    named in the foregoing deposition was by me duly
 7    sworn to testify to the truth, the whole truth, and
 8    nothing but the truth;
 9             That said deposition was taken down by me
10    in shorthand at the time and place therein named and
11    thereafter reduced to typewriting under my
12    direction, and the same is a true, correct, and
13    complete transcript of said proceedings;
14             That if the foregoing pertains to the
15    original transcript of a deposition in a Federal
16    Case, before completion of the proceedings, review
17    of the transcript {  } was {  } was not required;
18             I further certify that I am not interested
19    in the event of the action.
20             Witness my hand this 28th day of April, 2023.
21
22
23
24             Certified Shorthand Reporter
25                for the State of California
```

Page 244

```
 1   KEVIN A. LAVELLE, ESQ

 2   KLAVELLE@RGRDLAW.COM

 3                                        April 28, 2023

 4   RE: Delaware County Employees Retirement System Et Al vs.
         Cabot Oil & Gas Corporation Et Al

 5   April 24, 2023, Lucy Allen, JOB NO. 5880171

 6   The above-referenced transcript has been

 7   completed by Veritext Legal Solutions and

 8   review of the transcript is being handled as follows:

 9   __ Per CA State Code (CCP 2025.520 (a)-(e)) - Contact Veritext

10      to schedule a time to review the original transcript at

11      a Veritext office.

12   __ Per CA State Code (CCP 2025.520 (a)-(e)) - Locked .PDF

13      Transcript - The witness should review the transcript and

14      make any necessary corrections on the errata pages included

15      below, notating the page and line number of the corrections.

16      The witness should then sign and date the errata and penalty

17      of perjury pages and return the completed pages to all

18      appearing counsel within the period of time determined at

19      the deposition or provided by the Code of Civil Procedure.

20   __ Waiving the CA Code of Civil Procedure per Stipulation of

21      Counsel - Original transcript to be released for signature

22      as determined at the deposition.

23   __ Signature Waived - Reading & Signature was waived at the

24      time of the deposition.

25
```

Page 245

1  __ Federal R&S Requested (FRCP 30(e)(1)(B)) - Locked .PDF

2     Transcript - The witness should review the transcript and

3     make any necessary corrections on the errata pages included

4     below, noting the page and line number of the corrections.

5     The witness should then sign and date the errata and penalty

6     of perjury pages and return the completed pages to all

7     appearing counsel within the period of time determined at

8     the deposition or provided by the Federal Rules.

9  _X_ Federal R&S Not Requested - Reading & Signature was not

10    requested before the completion of the deposition.

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Veritext Legal Solutions
866 299-5127

**[& - 1:41]**

| & | | | |
|---|---|---|---|
| **&**   1:10 2:11,16 3:2 6:9,18 11:25 184:3,3 184:9,9 207:5 207:5 245:4,23 246:9 | | | |

**0**

**0**   130:19,21,22
**0.76**   185:6
  188:16,24
**0.76.**   188:22
**0001**   4:13
**0002**   4:15
**0003**   4:16
**0004**   4:18
**0005**   4:19
**0006**   4:21
**0007**   4:22
**0008**   5:3
**0009**   5:4
**02**   186:17
**02045**   1:8
**03**   186:20
**04**   170:1,6,12
  171:14

**1**

**1**   4:13 44:4,13
  44:20 117:12
  130:17 143:6
  165:2 166:9
  183:5 246:1
**1.20.23**   4:13

**1.50.**   171:1
**1.518**   172:2,5
**1.pdf**   4:15
**10**   99:1,1
  117:18 118:19
  118:20 120:13
  120:25 121:14
  121:17 122:8
  122:12,17,19
  122:22 125:20
  126:23,23
  127:15 129:2
  147:1 148:24
  149:18,21,23
  149:24 150:10
  171:21 172:7
  172:13,18,24
  184:1 207:23
  236:6,12,16,17
  237:4,6,8,11,12
  237:16,19
**100**   88:17
  131:6
**10th**   46:17
  53:19 241:21
**11**   77:10,11,19
  77:21 105:22
  129:8 147:19
  148:16 154:18
  154:20 174:1
  185:22
**11/29**   186:16
  189:9
**11/29/2021**
  183:10 185:23

188:3
**11/29/21**
  190:11
**1100**   3:4
**11:00**   234:10
**11th**   152:8
  174:8 198:9
  199:6,9,16,25
  200:6 201:2,8
  201:20 202:3
  202:23 203:6
  204:6 206:5,13
**12**   135:11
  144:7 234:6
**12:02**   43:16
**12th**   169:25
  197:18 198:8
  198:13
**13**   224:9,21
**13th**   46:20
**14**   76:22
  117:14 121:8
  137:12 147:16
  154:10,17
**14th**   198:24,25
  199:5,14,20
  200:5 201:1,16
  201:20 202:4
  202:23 203:6
  204:1,5 206:4
  206:12
**15**   120:11
  121:19 141:21
  142:2 143:3,4
  149:8,18

**15th**   76:8 77:12
  77:20 142:6
  154:4 157:12
  157:12,17
  158:8 159:4
  163:7,19
  169:25 170:12
  171:15 177:14
  177:15 197:19
  201:10 222:13
**16**   122:20
  147:7 222:4
  225:24 227:24
  228:8
**164**   4:15
**175**   4:16
**17th**   117:20
**18**   124:10,11
  127:21 192:10
  196:15 224:9
  224:21
**18.pdf**   4:18
**18516**   244:23
**19**   192:11
**19.pdf**   4:20
**190**   150:3
**1900**   2:13
**19087**   2:18
**192**   4:18,19,21
  4:22 5:3,4
**19th**   174:2,9
**1:19**   81:20
**1:41**   81:23

**[2 - 36]**

**2**

**2**  4:15 46:3,7
47:2 57:10
164:19 165:4
**20**  23:8 167:7
174:12 192:11
**20.pdf**  4:21
**2011**  72:19
73:2 94:1
101:6,11,12
104:15,22
105:15 106:1
148:18 174:1,2
174:8,9
**2017**  117:14,21
118:4,6,25
120:19 125:7
149:3
**2018**  139:16
148:16 152:9
**2019**  69:21
74:19 81:6
117:18,19
118:19 120:12
124:13 126:8
127:25 128:2
139:8 140:6
143:9 147:1
148:24 150:24
153:7 174:14
198:8,9,21,24
199:6,9,14,16
199:20,25
200:5,6 201:1
201:2,8,10,16

201:20,20
202:3,4 203:6
204:6 206:5
222:13
**2020**  76:8
77:12 141:21
142:6 154:4
157:13,17
158:8 159:4
163:7,19
169:25,25
171:15 174:14
177:14,15
198:13 222:13
236:1 237:22
**2022**  23:7
46:17,20,23
53:19 183:17
225:6,21
226:13 228:7
**2023**  1:20 2:5
6:2,5 11:3,9
13:2,8,14
44:15 243:8
244:20 245:3,5
**2025.520**  245:9
245:12
**20th**  11:3,8
13:2,8,14
44:15
**21**  192:11
**21.pdf**  4:23
**22**  192:11
225:12

**22.pdf**  5:3
**229**  4:5
**23**  129:6,8
192:11 196:16
**23.pdf**  5:5
**231-1058**  2:14
**24**  1:20 2:5 6:2
76:17,19
135:13 153:25
175:16 176:16
176:21 183:3
245:5
**24.pdf**  4:17
**24th**  6:5
**25**  31:10,19
32:18 76:13,20
77:10,19
147:15 154:10
154:17,18,20
157:8 161:3,7
161:8,8 194:20
230:3
**26**  1:18 2:1
117:19 143:8
243:14
**26th**  69:21
70:12 74:19
81:6 124:13
125:2,5,12
126:8 127:12
139:8 140:6
143:14 147:1
148:24 150:10
150:24 153:6,7
174:13 222:12

**27**  125:14
234:1
**28**  245:3
**280**  2:17
**28th**  244:20
**29**  137:16
139:2 212:17
212:20 213:8
**29th**  183:17
186:16 225:12
225:21 226:12
**2:40**  117:5
**2:51**  117:8
**2q**  118:19
120:12

**3**

**3**  4:15,16,17,18
4:20,21,23 5:3
5:5 46:3,7 47:3
59:25 165:2
166:6,9 175:4
175:11,13
176:16,17
183:2,3 189:6
189:10,15,17
190:4 192:5
222:25
**30**  1:18 2:1 7:6
7:10 140:1
142:3 243:14
246:1
**32**  222:24
**35**  226:19
**36**  174:12

**[39 - academic]**

**39**   174:17
**3:51**   155:3
**3:59**   155:6

**4**

**4**   4:18 46:4
53:16 173:24
174:6 191:19
192:3,6 195:11
195:14,20
197:13,18
200:7 206:19
**40**   147:10
**400**   196:4
**41**   153:25
**42**   163:18
207:3
**44**   4:13
**4:21**   1:8
**4:36**   176:8
**4:38**   176:11

**5**

**5**   4:19 7:6,10
46:5,7 47:3
125:25 130:9
130:12,14,16
130:17,25
131:6,25 132:2
132:21 133:17
133:22 134:20
134:21,24
135:4 171:20
172:7,13,18,24
173:6 189:20
191:19 192:3,6

195:21 197:18
236:5,12,16,24
237:2,16,19
**50**   23:16 24:9
27:13 171:1,2
207:21,22
**500**   184:2,12
207:4
**512**   3:5
**536-5287**   3:5
**54**   192:21
**5880171**   1:24
245:5
**5:08**   191:22
**5:20**   191:25
**5th**   46:23

**6**

**6**   4:21 63:10
117:12 118:1
166:10 167:1
191:20 192:3,6
197:18
**6/12**   168:1
**6/12/2020**
167:8 195:19
**6/15**   168:1
**6/15/2020**
197:14
**600**   196:5
**610**   2:18
**619**   2:14
**655**   2:13
**667-7056**   2:18
**69**   193:25

**6:00**   144:4
**6:20**   228:16
**6:28**   228:19

**7**

**7**   4:22 118:1
192:3,6 197:18
**70**   23:16 24:9
27:14 226:20
**707**   7:7
**71**   184:2
**76**   184:16
185:8,9,13,16
186:4,5,9
187:6,21,23
188:5,7,9,13
189:2
**78701**   3:5

**8**

**8**   4:4 5:3
173:24 174:6
192:4,6

**9**

**9**   5:4 192:4,7
195:11 197:13
197:19 198:13
200:7 206:20
**92101**   2:13
**94**   131:17
132:14
**95**   84:7 125:11
125:21 131:1,5
131:10 134:13
159:17

**98**   3:4
**9970**   1:25 2:7
244:3

**a**

**a.m.**   2:4 6:2,5
144:4
**ability**   133:13
**able**   13:18 30:2
44:8 73:11
75:20 89:2
114:23 119:16
141:15 165:6
171:8 176:3,4
181:16 196:11
**abnormal**
111:25 130:13
158:18,19,22
159:14,15,19
159:21 163:23
**above**   245:6
**abrupt**   133:22
**absence**   83:10
83:20 84:8
87:15 88:14
89:6 90:2
91:15 129:14
132:6 172:19
240:14
**absent**   210:24
**absolutely**
112:25 116:23
**academic**   64:23
83:8,17 89:1
91:11,16
133:14,20

Page 3

**[academic - agency]**

156:7 157:3
**academics** 89:8
115:19 131:24
134:5 172:9,15
172:25 204:24
236:20 238:1
**accepted** 115:9
115:14 121:16
**access** 18:3,6
19:19 47:19,21
**accessible**
119:12
**accommodate**
12:12
**account** 215:25
240:4
**accounting**
42:1
**accuracy** 81:13
81:16
**accurate** 80:10
138:10 194:15
227:14
**acknowledge**
7:4
**acquire** 128:14
**acreage** 128:14
**acronym** 22:9
**action** 1:8
31:16 32:13,22
33:2,6,21,25
39:16 40:4
82:12 86:3
88:5 244:19

**actions** 30:21
30:24 31:2
32:15,19,24
33:10,12,17
34:5 39:2 82:7
**actual** 18:15
19:8,19 29:20
32:4,11 49:13
79:17 102:11
107:20 123:16
142:11 158:15
168:12 179:12
179:14 185:3
185:18 186:19
189:9,22 211:5
216:7 220:15
221:3 239:13
241:17
**actuality** 96:1
**actually** 16:21
17:12 18:9,17
18:22 26:6
29:25 47:15,24
51:8 67:4
72:25 75:25
79:9 84:13
86:19 90:20
100:21 109:19
109:20 112:23
115:4,22 120:1
129:6 135:9
147:19 150:19
151:7,22 152:2
152:17 153:1
153:23 156:10

156:12 157:22
164:15 167:17
203:22 205:9
210:12 211:12
211:20,20
212:16 216:21
235:13 237:13
**added** 15:24
**addition** 21:9
124:16
**additional** 7:9
16:10,17,23
17:5 21:2
37:13 94:5
102:1 193:5
218:18 240:3
**additionally**
7:14
**address** 7:7
23:24 41:2,6
116:5 215:3
**addressed**
228:10
**adjacent**
128:14
**adjourned**
242:15
**adjustments**
169:1 240:3
**advanced**
155:18 229:19
**advantage**
170:24 171:6
**adverse** 156:19

**advisor** 157:3
**advocating**
115:25 116:4
**affect** 89:12
107:15 186:11
206:18,22,25
**affected** 97:12
**affects** 186:14
**affirm** 7:20
**affirmative**
65:22 66:1,1
67:23 93:17,20
97:6 119:25
240:25
**affirmatively**
67:4 84:17
96:11
**ag** 76:21
139:17 142:12
142:22 147:14
147:21 148:5
150:17 151:4
151:18,23
152:10,15,23
152:25 153:8,9
154:11,19
162:13 197:3
216:13 224:4
240:11
**ag's** 222:7
231:13
**agencies**
214:15
**agency** 213:1

Page 4

**[aggregates - amount]**

**aggregates**
136:16
**aggregator**
136:13
**agree**  76:6
77:11 101:23
108:6 123:24
125:9 157:16
188:23
**agreeing**
150:20
**ahead**  44:1
57:16 78:15
81:9,17 132:19
147:9 196:12
214:6 221:6
**aheller**  2:19
**al**  1:10 3:2 6:9
245:4,4
**alex**  2:16 6:21
**allegation**
70:23
**allegations**
52:7,11,15
70:21 71:3,5
104:3 123:16
**allege**  70:17
72:17 94:3
100:17 121:15
125:5,6 142:18
147:21 148:5,9
158:14
**alleged**  34:11
34:14 39:9
40:19 42:18

48:16,17,18
52:3,5,12
53:13 54:15
58:10,11,14,14
58:19,19 59:19
59:20 60:18,19
61:5,7,8,12,12
65:8,10,16
66:2 67:10,14
69:12,18,23
70:1,4,7,8,13
70:20 72:4,8
72:18 73:8,12
73:17 74:5,10
74:13,20 75:1
75:10,11,18
77:1,3,6,22
78:2,17,19,20
78:23 79:1,4
79:13,14,18
80:21,23 81:4
84:5 85:12,13
86:6 87:7
96:24,25 97:6
97:8 98:5,10
98:15,18,22
99:11,12
101:16,23
102:6,16 103:4
103:5,25,25
105:8,12,14,19
106:4,16,17
118:18 120:13
122:2 123:9
124:13 125:3

136:22 137:3
137:13,15,19
137:22,23
139:10 140:6
140:13 141:24
142:8,9,16,24
143:1 147:16
147:17,20,23
148:6,15,22
150:19 151:19
154:6,14
162:24 177:16
213:24 221:15
222:5,8 227:2
228:2 230:8,9
230:10,18,20
231:5,19
232:19,24
233:10,11,19
233:21 234:7
234:17,24
240:16,16,21
241:12
**allegedly**  66:1
67:3 98:16
99:3 106:23
139:15
**alleging**  51:24
52:1 65:24
69:11 70:19
71:10 72:8
76:25 93:15,25
94:10 104:9
105:1,8 121:1
145:3 148:20

149:15 152:20
158:10 241:4
**allen**  1:19 2:2
4:3,13 6:6 8:2
8:8,16 10:4,9
10:23 43:21
44:8,15,17
78:15 81:25
117:10 155:8
164:23 165:1
176:13 192:2
228:22 229:2,5
242:15 243:4
243:13 245:5
**allow**  89:5
**allowed**  223:19
224:14
**allowing**
145:10
**alternative**
193:18,22
196:20 212:13
**alternatives**
193:13 194:6
194:16 196:22
212:12
**altogether**  38:6
**amended**  15:24
46:16,19 53:18
**amending**  77:5
**amount**  28:11
28:12 30:8
32:6 54:13
146:22 170:8
171:18 216:7

**[amount - anybody]**

232:16 238:10
**amounts** 171:5
241:23,24
**analyses** 232:7
**analysis** 25:3
25:15 28:13
34:24 35:1
36:7,12,13,18
41:22,24 42:11
42:16 43:3
48:10 55:2,10
65:11,17 66:13
66:15 69:2
71:15 74:1,2
75:14 79:7
80:20 87:6
88:19 89:17,23
90:4 94:14
95:10,24 96:23
102:24 104:6
105:6 107:15
119:19 120:4
143:7 145:5
173:7,11,17
176:25 177:7
183:21 186:11
197:8 200:24
202:14 206:23
215:24 216:15
225:11,20
231:8 232:5
234:23
**analyst** 16:16
16:17,19,23
17:5,8,10,14,16

17:18,19 18:1
18:8,10,10,11
18:12,16,19,22
19:2,7,9,13,18
49:5,20,25
50:7,10,14,24
51:2,3,9,11
56:9 59:25
60:3,12,15,25
61:11,20,22
62:2,6,12,24
63:7 72:3,6,12
76:3 85:11
98:4 135:12,24
216:3 217:14
217:22 224:6,8
224:20,24
225:8,8 230:13
231:2 234:17
234:25
**analysts** 18:20
18:21 49:4,24
49:25 61:15,19
63:2,5 67:1
68:13,16 98:1
119:9 126:12
143:18 214:2,4
216:5,11,12
217:10,20
223:1 224:9,21
226:5 231:16
233:8 234:16
234:23
**analytic** 204:8

**analyze** 34:23
52:3 58:10
66:3,5 67:13
89:9 92:1
96:18 136:21
**analyzed** 52:15
72:24 79:9
229:23 231:9
**analyzes** 41:18
**analyzing**
49:18 50:9
68:13,20 75:24
82:23 102:18
102:22 229:25
230:3
**andrew** 3:3
**angeles** 7:7
244:2
**announced**
69:14,21 70:10
74:19 81:5
125:2,17,18
127:24 129:17
132:8,15 139:7
141:21 177:12
183:22 190:13
197:3,4 217:3
219:21 220:1,8
220:11,16
222:1,20,21
225:4,12,21,24
226:12 234:9
234:16 236:1
240:12

**announcement**
70:9 75:15
76:4 77:20
89:19 91:18
124:18 125:13
126:10,22
127:2,15 142:7
142:15 143:15
144:3 145:15
151:18 162:12
193:10 216:13
224:5 231:12
234:14
**announcements**
41:21 42:3,5
59:17 145:7,11
146:10,11
193:2,15
203:24 214:2
**announces**
216:8
**announcing**
152:5 216:25
224:5
**answer** 4:7
31:24 33:22
39:4 55:15
112:9 141:7
196:8 200:2,10
203:12 215:15
217:14
**answering**
180:6
**anybody** 20:17

[anyway - available]

**anyway**   93:15
157:7
**appear**   95:15
95:16 134:25
174:21 205:12
206:8
**appearances**
2:9,25 3:1
**appearing**   2:6
245:18 246:7
**appears**   45:2
95:3,9,11,19
96:1,3,14
170:3 172:3
188:6 197:17
**appendix**   36:23
38:15 45:12,15
46:9 47:7
51:17 55:19
57:10 60:1
63:10
**applies**   105:15
**applying**
112:24 193:13
**appreciate**   10:7
**approach**
209:14
**appropriate**
93:24 121:25
122:3 150:5
151:12
**april**   1:20 2:5
6:2,5 11:8 13:8
13:14 46:20
244:20 245:3,5

**area**   118:15
**argue**   73:18
133:2
**arguments**
133:6
**article**   41:15,17
41:20 42:6,8
42:14,16 43:6
**articles**   42:18
42:23,23 43:9
43:11
**aside**   12:18
20:25 40:14
41:10 42:6,22
43:6,9 47:1
49:19 50:5,6
51:11 55:23
57:3 64:18
66:9 110:7
126:6 127:10
138:13 181:6,7
181:25 213:6
213:12 216:2
216:17 217:7
217:16 221:21
223:15
**asked**   12:22
13:22 16:8
23:23 34:23
41:2,6 50:20
50:23 51:6,13
62:20,21 73:21
74:1,6,16,21
79:9 113:4
169:15,16

181:19 187:10
209:3
**asking**   31:8,11
31:14 46:10
51:6,9 57:1
86:8 88:10
102:13 105:18
123:23 145:17
181:23 192:18
197:21 209:5
216:14,15
217:13,15
**aspects**   25:4
**assignment**
52:2
**associated**
139:11 217:6
217:16 218:6
219:15 225:4
**associates**   22:8
**assume**   9:7
70:21 71:2,4
74:6 96:5
186:4
**assumed**   73:7
74:17,21
**assuming**   34:10
34:14,15,16,24
69:10,12 71:15
71:16 75:6,13
79:8 80:24
94:15 95:2,4,7
95:10,11,17,18
95:25 96:7,8
96:13 103:6,9

103:12,16
104:2,7 105:7
230:23
**assumption**
69:13 71:11,14
71:20,23
119:14
**assumptions**
69:8 108:7
**attached**   44:5
164:20 175:5
192:8
**attempt**   123:12
123:13
**attorney**   59:16
75:15,20 77:13
77:21 163:3
197:2 235:25
237:21
**attributed**
154:5,5
**august**   53:19
**austin**   3:5
**authored**   43:10
**autocorrelated**
109:1
**autocorrelation**
108:8,24 109:2
111:3 113:9
115:1,11 116:5
**available**   17:11
17:20,24 47:22
48:16 50:25
119:23 120:6
203:14 213:22

Page 7

**[available - bit]**

219:3 221:25
222:11
**average**   24:3
63:5
**aware**   83:8,17
83:25 91:11
106:3,14,19
114:8,25
115:17,24
116:3,7,11
118:25 120:1
126:6 173:8,9
173:10,12
199:15 213:8
217:6,15,25
218:5,7

**b**

**b**   4:11 5:1 7:6
7:10 45:12,15
46:9 47:7
51:17 55:19
57:10 60:1
63:10 246:1
**back**   14:3
23:20 34:7
38:14 43:18,21
51:16 54:22
55:10,14 56:13
72:18 76:13
81:22,25 86:20
92:14 117:7,10
117:11 127:16
127:21 148:15
152:8 155:5,8
156:8 157:7

167:20 169:19
171:2,6 176:10
176:13 181:19
183:2 186:18
191:24 192:2
195:11 207:2
225:19 228:18
228:22
**background**
37:21 187:7
229:16
**backup**   113:8
113:14,16,17
181:20,20,22
**bad**   225:13,21
226:13
**ballpark**   13:18
31:4
**based**   29:8,13
29:25 30:3,18
50:12 55:19
68:18 87:10
88:9,19 89:17
89:25 93:8,9
142:9,11,17
168:9 231:5
**bases**   14:4,8,11
14:24
**basically**   110:6
**basis**   28:5 31:8
71:10 148:7
171:13,14
227:9 240:17
**bear**   164:18
190:19

**beginning**   6:14
93:23 107:23
121:8
**begins**   144:12
**behalf**   1:6 2:3
6:18,22,25
32:22 33:2,5
33:13,18,19
34:4 229:11
**believe**   11:3
12:25 13:13
14:9,20 15:10
15:13,18,20,23
16:2 19:7,21
20:5 21:21
23:7 24:15
33:1,5 35:15
35:20 36:4,24
41:5 43:2
44:21 52:10
53:1,4,20
64:17 98:11,14
100:7 112:17
113:7,10,21
114:16,21
122:10 123:17
126:5 149:5,10
150:11,22
158:19 163:11
167:5 169:10
169:12 177:22
177:25 179:2
183:11,25
184:5,12
198:19 201:22

202:12 204:7
204:14,22
205:2 213:1
225:23 226:2
227:12,16
234:12
**believed**   121:9
**benefit**   95:14
96:17 102:22
**best**   9:3 12:11
14:2 232:6,10
**better**   29:16,16
225:16
**beyond**   232:17
**big**   56:6 95:14
211:22
**bigger**   107:25
237:4
**bill**   30:13
**billed**   27:25
28:5,12,13
30:8,19
**bills**   30:14,15
30:17
**birds**   90:21
**bit**   24:18 33:7
33:23 37:19
54:4 56:14
79:21 133:3
147:3,9 167:18
169:20 186:22
189:24 190:1,3
196:12 197:3
222:10

Page 8

**[blanking - case]**

**blanking** 38:5
  162:14
**blink** 219:20
**bloomberg**
  59:4 136:11,12
  136:12,15
**body** 57:25
**bolded** 124:5
**bonus** 29:3,4,6
  29:8,21,25
  30:3,10,17
**bonuses** 29:16
**bother** 235:17
**bottom** 117:25
  135:13
**bought** 183:12
**boulevard** 3:4
  7:7
**box** 227:1,18
  228:1,5
**break** 10:5 12:8
  12:10,15 56:15
  81:9,18 83:16
  117:1 154:25
  191:9 228:13
**breaking** 49:19
**brief** 20:21
  43:17 81:21
  117:6 155:4
  176:9 191:9,23
  228:17
**briefly** 20:13
  46:6 229:15
  231:7 236:15

**bright** 133:7
**bring** 10:12
**broadway** 2:13
**brokerage**
  22:16,18,18
**brought** 10:14
**bubble** 233:14
**budget** 139:7
**bulk** 101:10
**bullet** 173:25
  174:6
**bunch** 212:3
**burden** 84:20
  84:21 85:23
  86:4 87:16,25
  87:25 88:3,4,7
**business** 7:6
  42:1 136:2,5,8
  214:19,23,24
  219:8,10 220:5
  224:15
**businesses**
  22:16,17,18
  41:22 56:16
**buying** 18:18
  18:22

**c**

**c** 7:10 107:7,7
  138:4 139:4
**c.s.r.** 1:25 2:7
  244:3
**ca** 245:9,12,20
**cabot** 1:10 3:2
  4:13 6:8 11:25
  16:20 21:22

35:14,17 36:2
36:20 57:12
72:10 81:2
86:25 98:10
99:21 117:19
127:23 128:10
139:21 157:23
159:16 160:14
160:14,16
162:12 163:2,4
167:7 170:12
174:13 177:14
178:5 183:12
194:11 197:4
207:11 209:1
209:10 210:16
210:22 211:1,4
211:5,6,10,12
211:22 214:9
215:14,19
216:1,16 219:5
219:23 220:1,8
221:19 222:12
224:6,9 225:22
227:18 232:17
238:10 239:8
241:1 245:4
**cabot's** 120:12
  124:17,18
  125:10 126:7
  127:12 137:14
  137:18,25
  139:5,6 143:7
  143:8,14,20
  145:1 146:25

157:18 159:3
167:6,11
171:14
**calculated**
  187:20 238:9
  239:1
**california** 2:13
  7:8 243:6,9
  244:1,4,25
**call** 57:11
  126:1 164:15
  237:1,9,14
**called** 110:15
  110:16 173:13
**calls** 20:21,23
  21:1 112:15
  239:22
**cap** 196:4,5,7
**capex** 126:15
  127:20 143:16
**capital** 126:15
  127:6 128:1
  139:7
**caption** 45:6
**capture** 211:21
**care** 9:16 76:4
  97:9 214:9,21
  215:1,3 216:20
**cared** 119:24
  213:16 230:14
**career** 156:7
**cares** 119:7
  217:9 241:12
**case** 11:23,24
  12:23 15:18

Veritext Legal Solutions
866 299-5127

[case - charges]

16:6 19:24
33:20 34:8
35:3 36:21
37:13,14,16
38:4,8 39:1
40:5,7,14 41:5
41:7 44:23
45:25 46:11,13
47:4 50:4,22
51:17 52:14,16
53:4,8,12,15,25
59:14 64:4
69:25 70:22
71:21 75:19
85:7 86:13
93:5,7,9,15,17
98:19 99:15
100:9,19
101:15,21
110:22 111:11
113:6 123:14
123:15 130:5
136:19 182:15
182:16,20
187:6 205:14
215:8 222:9
223:3 224:25
228:3 229:12
229:18 230:5
244:16
**cases**   24:1 32:7
32:24 33:4,9
33:16,18 38:17
39:11 40:20
41:1,3 82:13

111:8 232:1
**categories**
52:11 100:2
101:4,9
**category**   46:13
48:21 51:17
98:18,23 99:13
99:16 100:5,7
**causation**   11:9
12:21 13:7,9
13:11 16:5
106:10 229:25
**cause**   7:21
159:9 187:7
223:8
**caused**   65:19
67:20 106:8,9
127:11 143:14
159:3
**causes**   127:3
**ccp**   245:9,12
**cell**   184:16
**cents**   189:2
**cert**   4:13 10:23
11:2 17:9,17
**certain**   18:8,17
40:18 56:16
59:1 77:22
91:18 101:22
104:16,23,23
146:22 220:5
223:21 239:22
**certainly**   48:2
74:11 90:25
144:17 203:15

214:14 215:7
**certainty**   88:17
**certification**
12:20 13:2,3
14:3,5,12,25
15:5,11,25
16:4,11 17:1,6
17:14 18:3
19:18 23:1,5
23:11,14,21,24
24:14,21 26:14
28:8 34:7,19
35:13,18 36:2
36:6 43:23
46:22 48:6
50:21 52:8
54:2,11 58:8
62:23 69:7
71:2 80:5
82:14 88:8
136:20 160:3
177:8
**certified**
244:24
**certify**   243:4
244:4,18
**cetera**   155:20
**cfo**   69:15 73:24
79:25
**change**   50:1
69:14,17,20
70:3,14,23
71:22,24 73:7
73:12 74:9
107:12 111:19

128:12 185:4
194:2 195:3
235:8,18
**changed**   23:4
26:11 50:9
179:17 195:8
231:2
**changes**   56:25
128:10 137:20
137:25 180:7
240:4
**changing**   50:11
56:7 61:15,17
68:18 85:11
107:10,21
108:5 168:23
196:18,19
233:15 235:14
241:16
**characterizati...**
25:12,13
**charge**   78:22
**charged**   76:20
77:19 148:13
153:14 154:16
215:19
**charges**   75:16
76:5 77:13,20
77:25 78:25
79:12 85:15
141:20 142:7
142:12,16,22
151:4,23
162:12 163:3
183:21 190:12

**[charges - comes]**

| | | | |
|---|---|---|---|
| 197:3,4 215:11 | **city** 10:10 | 26:14 28:8 | 186:25 238:18 |
| 215:12,17 | **civil** 1:8,18 2:2 | 30:21,24 31:2 | **closer** 9:23 10:1 |
| 216:9 222:7 | 7:5 243:14 | 31:16 32:13,15 | 55:19 |
| 223:2,7,11,13 | 245:19,20 | 32:19,22,24 | **code** 245:9,12 |
| 223:16,18,21 | **claim** 34:17,25 | 33:2,6,10,12,17 | 245:19,20 |
| 223:25 224:5,6 | 96:23 100:21 | 33:20,25 34:5 | **coefficient** |
| 224:14,18 | 101:19 102:22 | 34:7,19 35:12 | 178:24 |
| 225:3,5,13,16 | 104:13 122:24 | 35:18 36:2,6 | **colleagues** |
| 225:24 226:6 | 146:6,13 232:1 | 36:20 39:2,16 | 116:13 |
| 231:13 236:1 | **claimed** 99:7,8 | 40:4 43:22 | **column** 166:12 |
| 237:21 240:12 | 101:18 180:9 | 46:22 48:6,18 | 166:13,13,19 |
| **charging** 75:21 | **claiming** 93:21 | 50:21 52:5,8 | 167:4,5 169:8 |
| 150:17 153:8 | 97:7 104:7 | 54:2,11 56:3,5 | 169:20,24 |
| **chart** 25:9 | 106:24 111:18 | 58:8 61:6 | 171:12 184:15 |
| 76:16 125:16 | 123:2 125:8 | 62:23 69:7 | 198:6,20 |
| 144:2 166:11 | **claims** 95:13 | 71:2 80:5 82:7 | 201:10 |
| 174:17 | 104:14 105:1 | 82:12,14 86:2 | **columns** 26:4 |
| **charted** 147:6 | 111:17 124:16 | 88:5,7 93:24 | 166:12,17 |
| **charts** 238:6 | 240:3 | 113:20 136:20 | 183:5 |
| **check** 2:16 | **clarification** | 137:14 160:3 | **combination** |
| 61:25 173:16 | 9:9 35:24 | 163:2 177:7,11 | 68:10 |
| 173:18 | 194:24 | 177:16 183:11 | **come** 19:4 |
| **checked** 55:3,4 | **clarify** 181:5 | 227:19 228:6 | 26:18,24 28:23 |
| **china** 43:1 | **clarifying** | 231:20 234:13 | 40:1 55:10,14 |
| **circuit** 196:12 | 86:21 | 240:11 | 87:24 88:18 |
| **circumstances** | **class** 4:13 | **clean** 10:21 | 89:16 90:16 |
| 236:24 | 10:23 11:2 | **clear** 9:13,21 | 125:14 134:6 |
| **cite** 57:23 58:4 | 12:20 13:2,3 | 19:17 29:11 | 134:11 138:15 |
| 115:5,21 138:3 | 14:3,4,12,25 | 56:10 73:10 | 232:11 234:1 |
| 150:1,1 | 15:5,10,25 | 111:6 165:25 | 238:7 239:21 |
| **cited** 57:25 | 16:4,11,20 | **clearly** 149:13 | 240:9 242:2 |
| 63:13,22,23 | 17:1,6,9,13,17 | 238:24 | **comes** 63:7 |
| **cites** 25:5 | 18:2 19:18 | **close** 81:10 | 118:15 127:2 |
| **citing** 64:11 | 23:1,5,11,14,21 | 145:12 147:7 | 138:9,11 |
| | 23:24 24:13,20 | 170:22 171:10 | 140:20 149:17 |

Veritext Legal Solutions
866 299-5127

**[comes - complicated]**

173:13 176:1
216:22 241:11
**coming** 27:7
41:14 125:20
**command**
110:17,18
**commands**
110:13
**commentary**
220:20 230:14
231:1 241:15
**commenting**
224:22
**comments**
224:7,24
**committed**
99:23
**common** 41:16
42:20,20 59:10
71:7
**communicate**
35:13 36:1
**communicating**
35:17
**companies**
61:19 66:16,18
66:20,21 89:10
90:8 162:6
209:23 214:16
215:2 219:10
223:15 231:11
**company** 19:10
22:10,14,17
43:11 49:14,23
50:2,7,14

56:15,20 58:17
59:1,5,6,8,9,11
59:15 62:5,9
67:1 68:14,21
69:4 74:8
85:12 98:2
100:6,11
102:11 120:5
126:15 150:9
151:8,9,24
152:24 153:1
153:14 154:21
160:15 162:11
163:14 164:8
166:13,14
167:12 178:23
183:6,7,13,25
184:5,7,14,22
186:19 187:1,5
187:12 188:3
188:11,19
189:5,6,7,10,11
190:3 207:14
207:16,23
208:5,18,22
209:13,17
210:4 211:8
213:18,23
214:1,14
215:14 216:4,8
216:25 217:4,8
217:19 218:22
219:5,9 220:24
221:4 224:2,13
224:20 225:10

230:15 231:2,4
231:4,10,12,17
233:8,16 235:1
241:2,22 242:1
242:4
**company's**
39:10,19 42:20
42:24 56:6,12
79:5 89:4,9,12
183:14 209:25
223:8
**compare** 49:9
49:14 66:16,18
**compared**
142:12
**compensated**
29:2
**compensation**
29:5
**competing**
182:10,13,18
182:21,22
183:1
**competitor**
50:18
**competitors**
50:17
**complain**
122:20
**complaint**
10:16,24 21:20
34:11,15 46:1
46:16,20 51:20
52:7,11,12
53:18 93:10

97:10 98:14,21
99:2,12,13
104:9 123:12
123:17 124:5,7
149:25 150:1,1
150:2,9 158:9
217:19 234:7
**complaints**
121:10 149:11
150:7,12
151:14 158:10
**complete** 17:15
24:4 78:14
103:3,24
244:13
**completed**
245:7,17 246:6
**completely**
73:24 111:5
137:21 138:1
144:10 145:1
239:21
**completion**
7:11 244:16
246:10
**complex** 29:10
29:19,22
**compliance**
100:6,12 102:7
104:10,11
**compliant**
99:17
**complicated**
29:12 145:24
146:1,11

Page 12

**[comply - control]**

comply   214:14
components
  29:11,20
comprehend
  133:13
comprehensive
  15:14,16,18
  62:6
concept   82:19
concern   218:10
concerning
  121:25 122:3
concerns   23:21
conclude   74:14
  89:25 91:14
concluded
  211:20
concludes   7:15
  91:12
conclusion   40:1
  85:8 86:14
  88:19 89:3,6
  89:17 90:3,16
  95:25 232:12
  236:9 240:9
conclusions
  72:25 119:20
  134:11 159:2
  196:24 206:22
  207:1 210:12
  238:7 239:22
  240:6
conduct   36:15
  36:16,19 54:21

conducted
  112:11 195:2
conference
  57:11
confidence
  84:8 131:1,13
  131:18 132:14
  172:4,11
confident
  131:10
confirm   197:17
conflict   33:7
conflicting
  84:25
confounding
  87:17 90:9
confuse   167:16
connection
  73:11 81:4
consider   17:4
  63:15 171:24
  217:24 219:4
  237:5
considered
  14:19 15:12,13
  16:10,13,22,24
  17:15 18:4,15
  19:3 45:12,16
  46:10 47:13,18
  47:19,23 48:13
  53:7 56:2 72:9
  72:20 88:25
  126:17 127:17
  131:21 132:3
  132:23 141:2

141:12 165:18
230:12 236:21
considering
  19:2 47:17
  218:8
considers   29:16
consistent   74:7
  82:24 111:7
  151:17 153:1
  193:7 198:14
  231:24,25
  232:1,6,10
consolidated
  53:18
constituent
  208:18,22
construction
  156:19
consulting   22:7
cont'd   100:3
contact   245:9
contacted
  19:23 20:1,6
contain   15:6
  18:17
contained
  120:13
contains   18:11
  120:24
contemporan...
  68:19 69:4
contend   141:23
context   82:3,6
  82:9,21 88:23
  88:24 109:15

114:19 115:6
115:15,20
116:6,11,15,16
116:24 121:22
123:5,7,21
124:1,3 208:15
contexts   108:21
  109:12 116:19
  116:19
contingent
  30:10
continuation
  142:3
continue   13:1
  143:3 146:25
continued   2:25
  3:1 4:25 5:1
continues
  117:22 144:13
  198:12
continuous
  122:15
contrary   86:17
contributed
  43:10 126:7
contributions
  30:4,6
control   107:1
  111:2 158:12
  161:17 163:10
  164:7 168:9
  179:17 180:7,8
  193:2 211:17
  211:18

**[controlling - court]**

| | | | |
|---|---|---|---|
| **controlling** | 179:21,23 | 124:13,19 | **counsel**  2:9 3:1 |
| 158:17 170:13 | 180:25 181:10 | 125:4,6,8 | 4:7 6:13 9:20 |
| 171:15 211:19 | 185:2,14,25 | 136:22 137:4,6 | 9:22 12:1,2,3,5 |
| **controls**  130:6 | 188:5,13,24 | 137:9,19 140:7 | 20:13,14 21:15 |
| 239:1 | 198:11 200:8 | 140:20 158:15 | 74:21 138:9,14 |
| **conversation** | 202:25 203:20 | 161:13 162:25 | 140:21,23 |
| 20:13 | 209:14 210:18 | 222:6 230:9,18 | 141:15 227:11 |
| **conversely**  71:4 | 241:3 243:6 | 230:20 231:6 | 245:18,21 |
| **convincing** | 244:12 | 231:19 232:20 | 246:7 |
| 135:9 | **corrected**  67:11 | 233:11,21,25 | **count**  161:2 |
| **copied**  26:12 | 75:11 152:19 | 234:8 240:16 | 177:2 201:4 |
| **copies**  10:21 | 152:21,25 | 240:22 | **counted**  209:24 |
| 19:8 25:25 | 230:16 241:7 | **correctly** | **counter**  87:19 |
| **copy**  10:14,16 | **correcting** | 112:24 | 87:22 |
| 44:18 45:3 | 151:15 152:12 | **correlation** | **county**  1:5 2:3 |
| **corporation** | **correction**  84:6 | 109:2 | 2:10 6:8 244:2 |
| 1:10 3:2 6:9 | 114:14,24 | **correspond** | 245:4 |
| 11:25 245:4 | 115:1,9,10,13 | 77:4,12 78:16 | **couple**  20:12 |
| **correct**  8:17,20 | 115:18 116:4 | 78:18 79:17 | 59:3 165:21 |
| 11:10 15:7,23 | 152:14 | 141:23 142:8 | 166:11 173:20 |
| 19:21 20:16 | **corrections** | 142:16 152:12 | 173:20 177:10 |
| 23:18,22 24:1 | 245:14,15 | **corresponds** | 192:18 193:17 |
| 28:24 33:14 | 246:3,4 | 75:17 169:17 | 193:22 195:15 |
| 35:22 39:13 | **corrective** | **corroborating** | 238:6 |
| 52:9 53:16 | 48:17 54:16 | 139:21 | **course**  30:9 |
| 55:17 64:9 | 58:11,15,19 | **cost**  221:19,24 | 36:5 54:1 |
| 67:9 69:25 | 60:19 61:8,12 | 241:18,18 | 62:22 63:14 |
| 70:5,22 71:4,6 | 69:24 70:2,4,7 | **costs**  28:8 | 64:3 74:24 |
| 74:23 103:6,12 | 70:13,17,20,24 | 216:1,16 217:6 | 75:4,8 96:20 |
| 103:17 104:3 | 75:11 76:8 | 217:15 218:5 | 155:19 220:4 |
| 116:24 121:18 | 79:8,10 85:13 | 218:10,14,16 | **coursework** |
| 125:4 138:12 | 94:22 95:8 | 218:19 219:15 | 156:3 |
| 138:23,24 | 96:25 97:15,19 | 221:21 | **court**  1:1 2:5 |
| 142:20 149:23 | 97:21,24 98:5 | **coterra**  183:24 | 9:18 32:1,3 |
| 162:6 166:5 | 102:19 105:8 | 184:6,7 | 45:9 53:11,14 |

Veritext Legal Solutions
866 299-5127

[court - dayna]

53:22 64:5,15
82:12 107:6
172:25
**court's**  52:16
52:22,24 53:9
**courts**  64:1
131:24 134:5
172:9,15,17,21
172:23 236:19
238:1
**covering**  98:1
224:6,9,20
231:16 233:8
**covid**  111:19
111:20,22
163:16 168:25
179:18,21,24
179:25 180:8,9
180:15 198:5,5
202:14 206:24
232:3 240:4
**create**  25:9
27:3
**criminal**  76:5
77:13 85:15
141:20 142:7
183:21 190:12
215:11,12,17
223:1,7,11,12
223:16,18,21
223:25 224:14
224:17 225:3,5
225:13,16,24
226:6 231:13

**crisp**  204:22
**criteria**  29:24
30:2,9 58:22
**curiati**  21:5
**curious**  156:2
**current**  23:9,10
23:12 37:4
229:9
**custody**  7:12
**cut**  31:23 122:7
141:5 196:9
**cute**  106:13
**cutoff**  135:5
**cv**  1:8 36:24
155:10

**d**

**d**  4:1 107:7
**daily**  129:13
145:6 159:7,8
159:13
**damages**  11:9
12:21 13:8
106:10 230:1
**data**  136:13,18
136:18 159:11
165:22 181:18
201:23 202:11
202:12 206:8
**date**  16:9 35:5
61:16 70:1,6
71:25 78:20
125:2 148:23
149:14 150:24
161:16,22
162:4,8 163:1

163:11,14,15
166:12 167:4
177:11,12,14
177:15 178:6
179:13,18
180:22 182:3
183:6,16
186:11 187:6
187:20 188:4
188:12 193:17
193:21,24
194:22 195:19
197:14,24
198:4,6,15,20
199:5,7,8,23
200:1 201:10
203:15 219:14
224:22 225:23
240:11 245:16
246:5
**dated**  11:3
44:15 174:1,8
174:9
**dates**  18:12
45:22 61:7
99:2 137:3
160:12 161:14
161:15 162:5
162:21 177:2
177:10,10
179:25 181:6,9
193:3,10,11
194:21 198:17
200:5,15,19,20
200:23,25

202:8,15,23
203:7 206:7,12
206:15,17,19
222:21 232:19
233:24 235:15
238:7 240:10
**day**  10:3 13:13
70:10 111:16
124:19 125:24
126:2,4 144:23
145:8,8,9,14,15
146:7,12,16
159:1 160:10
161:11 164:11
164:15 168:3
168:10 170:10
174:18,22
185:7,21,22
186:1,3,9,15
189:7,9,13,21
190:9,12 201:8
201:9,14,17
202:1,19 203:2
203:3,14 205:5
205:8 207:17
207:22 210:25
211:1,11,12,13
224:7 234:2,13
236:10 239:19
239:24 243:7
244:20
**dayna**  1:25 2:7
7:3 10:4
191:16 244:3

**[days - determine]**

**days** 111:14,23
  112:2,5 161:8
  201:2,5,13
  202:22 203:4,5
  203:8,17,19,22
  203:22,23,25
  204:3,3,9,15,16
  204:18 205:10
  205:11,18,20
  205:23,24
  206:2 224:8
  232:22 233:19
  233:20 234:20
  238:13,15,19
  239:22
**december** 35:7
  46:23
**decide** 55:24
  90:12 132:19
**decided** 156:21
**deciding**
  239:19
**decision** 41:8
  53:11 82:13
  93:11
**decisions** 63:10
  63:12,16
**declaration**
  21:23 22:3
  44:14 80:8,10
  81:3,12,14
  118:16 138:4
  138:10,12,13
  138:16,21
  139:1,4,23

**declarations**
  21:22,25 69:15
  74:7 79:25
  80:6,25 138:22
  228:10
**decline** 71:25
  137:14 143:8
  157:11,17,20
  163:19 174:13
  188:10
**decrease**
  240:15
**deduce** 201:5
**defendant** 3:2
  12:3 38:3
  172:19
**defendant's**
  88:6
**defendants**
  1:11 6:25
  11:24 34:5
  38:4 40:2,2
  46:15,19 53:17
  53:22 71:8,11
  82:14 86:2,3
  140:3,22
  141:22 142:19
  227:11 229:12
**defending** 12:4
**defense** 31:1,15
  32:18 33:25
  53:10 140:20
  140:23
**deficient**
  139:15

**definition** 82:2
  82:9,20 84:13
  134:21,24
  237:11
**degree** 155:11
  155:18 229:22
**degrees** 229:19
  229:20
**delaware** 1:5
  2:3,10 6:7
  245:4
**demonstrate**
  73:11 130:18
**demonstrates**
  87:6 129:16
  132:7
**demonstrating**
  130:20
**denied** 175:21
**depend** 82:3
  86:14 182:17
**depending**
  19:14 88:23
  136:3 145:21
  145:23 198:7
**depends** 50:19
  84:20 106:18
  109:11 136:4
**deponent** 4:2
**deposed** 8:17
  8:19
**deposition** 1:17
  2:2 6:6 7:11,15
  10:13 12:4
  20:8,20 32:1,3

37:1,7,15
  38:12 44:4
  164:19 175:4
  192:6 213:22
  242:15 244:6,9
  244:15 245:19
  245:22,24
  246:8,10
**describe** 97:4
  97:14 111:4
  113:16 114:23
**described**
  26:16,19 29:19
  59:22 111:1
  143:18 177:19
**describes**
  112:16 194:15
**description**
  4:12 5:2
**descriptions**
  30:1
**design** 27:5
**detail** 14:21
  15:6 60:15,20
  60:22
**detailed** 141:19
**determination**
  86:10
**determine** 48:4
  48:22 49:21
  65:12,18
  133:15 136:21
  137:9 153:5
  168:15,16
  194:12

Veritext Legal Solutions
866 299-5127

**[determined - disprove]**

**determined**
245:18,22
246:7
**determining**
106:3,16 137:6
172:18
**diego**   2:13
**difference**
47:16 66:20
107:19 155:14
155:21 164:13
167:24 168:11
182:25 187:3
190:7 195:5
202:11,16
204:2 210:12
236:11
**differences**
193:8 195:7,9
**different**   19:13
19:14 23:6
24:17,18 34:1
57:2 58:23
60:6,7,7 61:21
66:12,23 67:6
67:17,21 73:1
73:25 83:7
84:4 85:5 93:2
100:16 102:14
105:2,3 106:15
108:5,20,21
109:8,9,11,13
109:14 110:5
111:21 130:19
130:21 156:22

159:21 160:7
160:12,16,20
160:21,24,25
161:7,8,8,16,17
161:18,19,21
161:22,24
162:2,3,4,5,6
166:7,11
180:20,23
182:5,12
183:24 193:18
193:22,22
194:4 195:23
196:1,2,22
197:22 210:13
212:3,7 213:13
216:14 217:5
236:9
**differentiate**
130:22
**differentiated**
135:10 159:7
159:12
**differently**
112:2 170:8
**difficulty**   9:15
**dimock**   227:1
227:18 228:1,4
**direct**   97:2,4,13
97:17
**direction**   25:1
25:6,16 26:3
156:22 158:24
178:14,20,25
179:8 180:16

239:9 244:12
**directly**   30:11
30:12 43:10
97:11 201:23
**director**   22:20
229:10
**disagree**   238:3
**disclose**   98:10
101:25 142:20
222:12
**disclosed**   67:11
124:17 129:20
134:15 147:1
**disclosure**
54:16 70:7,18
70:20 76:8
92:19 97:19,22
97:24 124:13
124:20 125:4,6
125:8,12 140:7
140:15 146:22
148:24 150:24
153:6 154:4
157:12,13,18
158:8,15
177:16 219:16
222:6 232:20
233:25 240:17
**disclosures**
48:18 50:7
58:12,15,20
59:20 60:20
61:9,13 69:4
69:24 70:2,5
70:14 75:12

79:6 85:13
94:22 95:8
96:25 97:15
102:20 105:9
136:22 137:4,7
137:10 139:8
140:20 161:13
162:25 230:9
230:18,20
231:6,19
233:11,21
240:22
**discuss**   79:22
101:11 134:4
**discussed**   10:19
12:19 138:23
149:23 169:20
214:3,4 215:10
**discusses**
212:18 226:12
**discussing**   11:1
82:7 83:2
234:16
**discussion**
219:1 224:3
226:2,8
**discussions**
55:12
**dismiss**   46:16
46:19 52:22,25
53:10,17,22
**dismissed**
52:10
**disprove**   63:17
64:16 71:14

Veritext Legal Solutions
866 299-5127

**[disprove - earnings]**

83:3
**disproving**
64:6
**dispute** 34:18
**disseminating**
135:16
**dissertation**
155:23 156:13
**distinction** 19:1
94:9
**distinguished**
157:21
**distribution**
108:9
**district** 1:1,2
**diverted** 90:22
**division** 1:3
**divisions** 56:12
**docs** 21:9
**document**
15:22 35:6
37:6 38:24
39:14 45:8
47:8,25 53:4
98:12 99:19
100:3 121:5
141:9 150:4
162:7 165:9
166:11 167:9
183:19 195:18
195:24
**documents**
10:18 20:12
21:10,15,19
45:25 46:11,13

47:4,14,20
48:4 50:20
51:13,17 53:8
53:15 54:1
81:2 139:21,25
192:12
**doing** 27:10,11
28:13 32:11
34:24 48:15
49:15,17 55:10
55:11 63:3,5
66:7,9 95:10
96:23 108:20
109:23 111:21
115:6 116:8
130:1 146:7
156:7 162:8
186:20,23
189:12,22,25
194:5 198:3,4
203:21 205:9
207:18 210:6
216:21 220:4
229:24 234:22
**dollar** 171:1,3
184:23 185:1,3
185:4,9 186:5
187:12,22
188:1,4,9
**dollars** 184:16
**doubt** 95:14
96:17 102:22
**dow** 196:20
**dowd** 2:11 6:18

**download**
203:14 204:20
205:1,4 206:8
**downloaded**
47:22 201:23
202:12,13
**downward**
147:4,4
**dr** 10:15 21:21
35:2 36:21
110:25 111:10
112:11 113:8
113:13 115:4
115:14,15,21
116:6,14,21
126:4 145:9
146:9 160:19
163:8 168:23
168:24 177:20
178:8 179:11
179:12,14,19
180:3,24,25
181:2,8,20
182:1,2,9
193:8 195:7
203:21 204:22
205:9 210:14
232:14 236:8
238:2
**draw** 86:13,14
89:2,5 196:24
**drilling** 226:25
227:17 228:4
**drop** 125:9,19
126:8 127:3

143:14 144:7
144:21 223:8
234:6,6
**dropped** 185:6
**dropping**
125:17
**drops** 125:15
186:9 234:4
**due** 69:17,17
71:25 73:8,23
73:24 74:4
80:21 128:11
137:14,25
179:20
**duly** 8:3 244:6
**dummied** 193:9
**dummy** 193:1
204:1,5
**dummying**
193:14 203:22
203:24,25
204:3,10
205:10,21

**e**

**e** 4:1,11 5:1
107:7,7,7
245:9,12 246:1
**earlier** 83:1
93:11 114:13
126:21 149:23
150:15,16,18
150:21 151:1,2
153:2
**earnings**
124:18 126:9

**[earnings - event]**

126:22 127:14
127:23 143:15
146:10 193:2,9
193:15 203:24
234:14
**easier**  32:10
79:22 123:19
167:18,21
**eastern**  2:4 6:5
**easy**  201:7
**economic**  22:7
22:8 64:22
129:4 215:9,16
221:3 223:12
223:22
**economically**
85:16 215:13
217:11,24
218:8 219:11
219:12 220:24
221:8 223:13
241:25 242:1,3
**economics**
155:11,12,15
155:16 229:20
229:21
**economist**
64:18,19 67:18
82:22 87:11,13
88:11 89:24
**economists**
91:3 232:7
**edits**  27:7
**edt**  6:2

**effect**  40:3
67:13 227:18
227:22,23
230:3
**efficiency**  34:9
34:10,12,16,24
145:5 146:7,13
146:14 173:6
**efficient**  34:20
87:21 108:10
108:25 143:22
143:23,25
144:16 145:4
145:22,25
146:20 219:6
221:2,8,13
**efforts**  93:24
97:8 122:4
150:6 151:13
**eight**  128:15
177:3
**either**  47:21
48:9 63:17
64:6,16 80:25
112:23 171:13
178:5 211:23
231:5 237:19
237:24
**emailed**  190:17
**empirical**  146:4
**employ**  58:6
**employees**  1:5
2:3,10 6:8
245:4

**employer**  22:4
**ended**  157:3
**ends**  55:2
**engagement**
36:6
**engagements**
38:22 39:7
**enormous**
86:16
**entire**  24:24
122:17
**entirely**  29:11
**entirety**  47:11
48:3
**entitled**  43:1
165:2 166:8
175:16 176:16
**environment**
42:9
**environmental**
100:6 137:22
139:11 213:3
219:23
**equal**  30:16
203:13 208:2
**equally**  208:3
209:22,24
**equipment**
156:19
**erase**  203:14
**errata**  245:14
245:16 246:3,5
**erratic**  175:25
**error**  109:22
173:13 200:8

**errors**  107:11
107:18,25
109:21 173:8,9
**especially**
145:24
**esq**  2:12,16 3:3
245:1
**essence**  216:18
**essentially**
205:10
**est**  242:14
**estimate**  23:16
**estimated**
187:8
**estimates**
108:10 215:10
231:4
**estimating**
218:11
**et**  1:10 3:2 6:9
155:20 245:4,4
**evaluating**  67:7
**evaluation**  50:2
50:12
**event**  36:12,15
36:17,19 49:17
65:4,5,5,25
68:1 89:13
91:6,20 92:1
97:22 130:1
158:11,16
159:5 160:2,4
160:5,13
162:11 164:5
168:6,20,22

**[event - expectation]**

177:18,20
178:9 180:8,9
183:21,25
194:2 195:17
205:3 207:4
231:21,22,23
231:24 232:5,9
232:12,13
233:18 238:2
244:19
**events** 59:2
136:9 223:22
237:6
**eventually**
157:4
**evidence** 72:11
84:12,16,24
85:1,8,17,25
86:7,15,16
87:5,19 88:13
88:15,18,19,25
90:5 96:4,22
109:4 131:18
134:17 153:15
240:20,21
242:2
**exact** 97:9
**exactly** 29:17
31:12 86:12,12
166:1,3 167:25
169:14,15,15
**examination**
4:2 8:6 197:12
197:23 229:7

**examined** 8:4
244:5
**example** 16:20
25:23 48:1
50:24 56:10
61:11 64:24
66:17,24 77:7
89:12 93:22
105:22 107:25
109:1 110:12
110:15 133:8
136:3,7,25
148:18 168:25
178:22,23
198:12 200:20
205:8,25 211:2
212:17 231:11
**examples** 213:8
213:13
**exams** 155:19
**excel** 4:15,16
4:18,19,21,22
5:3,4 27:9
164:25 165:1
165:18 166:5,6
166:9 175:13
175:18 176:17
183:3 187:20
192:4
**excellent** 29:9
**except** 45:5
70:22 151:17
218:6
**exception** 63:1

**excerpt** 120:15
121:21,24
122:2 123:24
149:24
**excerpted**
120:14 121:17
149:22
**excess** 111:15
111:25 112:4
130:13 158:1,4
158:18,19
163:22 164:16
166:15,16
168:11 169:19
169:21,24
170:7 171:12
172:1 180:19
186:15,24
190:5 210:14
232:15 233:5,6
236:22 238:9
238:12,14,16
238:22,25
239:13,15,23
240:1,7
**exclude** 203:19
207:14
**excluded**
209:10 210:16
**excluding**
207:11
**excuse** 45:14
86:24 106:16
121:16,25
135:18 183:1

**executed** 243:7
**exemption**
234:13
**exhibit** 4:12,13
4:13,15,15,16
4:16,18,18,19
4:19,21,21,22
4:22 5:2,3,3,4,4
43:25 44:2,4,7
44:13,20
117:12 164:18
164:19 165:4
165:13 175:2,3
175:4,11 176:3
176:16 183:2
191:16 195:20
195:21 197:18
198:13
**exhibits** 4:25
26:2 27:1,3
190:15 191:19
192:3,6 195:11
196:14 197:13
200:7 206:19
**existed** 19:5
**expect** 92:12,17
130:8 134:25
178:15,21,24
178:25 179:8
180:16 190:2
216:12 220:5
236:25
**expectation**
223:22,25
231:3 241:24

Veritext Legal Solutions
866 299-5127

**[expectations - feel]**

**expectations**
68:14 126:16
**expected** 112:2
129:13 130:4
158:25 170:9
214:19 215:12
215:22 219:3
219:11,19
220:2,12,14
223:11 224:1
224:11 225:8
225:17 241:18
241:20,25
**expenditure**
128:1
**expenditures**
126:16 127:7
**expensive**
62:13
**experience**
223:8
**expert** 31:1,15
32:18 33:25
34:4 36:25
44:14 145:6
146:9 167:15
167:20 173:4,5
229:12,24
**expert's** 93:10
231:23
**expertise** 88:11
118:15
**experts** 68:13
68:20 234:25

**explain** 164:3
166:19,24
178:19 183:4
193:5 194:21
195:13 236:11
236:15 239:8
**explained** 33:8
**explaining**
178:18 239:11
**explanation**
77:8 187:11,17
198:14 201:19
**explanatory**
178:12,17
179:6 180:10
180:12
**exploration**
184:3,9 196:20
207:5
**explore** 79:20
**expressed**
184:19,22
185:1,8 187:12
187:21 188:4
188:24 224:19
**expresses** 186:4
225:2
**extent** 39:25
58:16 61:15
63:2,4,19 67:2
72:15 89:15
96:20 104:18
151:22 214:13
218:9

**extreme** 237:6
**extremely**
143:23
**eye** 219:20
**eyeball** 189:14

**f**

**face** 81:14
139:22 223:15
**faced** 224:13
**fact** 27:4 67:19
68:2 73:23
75:2,7 86:10
96:12,13 97:23
113:20 119:15
133:11 134:15
137:19 143:13
153:6 205:18
211:14
**factiva** 59:3,7
**factor** 210:1
**factors** 50:16
126:7 170:14
171:16
**factset** 201:24
201:25 202:2
202:13 204:13
204:21
**factual** 71:8,10
**failed** 98:10
99:7,22 101:25
142:19
**fair** 9:5,10
11:13 25:12,13
27:2 32:2
60:14,16

**fairly** 24:10
29:23
**fall** 90:23
127:12 134:14
146:25
**falls** 48:20
**false** 39:9,18
94:4,12,16,17
98:16 99:3,6
100:19,25
101:17,24
102:17 103:5
103:25 104:1
104:11,19
105:19 106:20
106:24 120:24
121:1,3,7,15
122:24 123:3
149:16
**fame** 229:4
**familiar** 9:1
52:6 82:19
107:3 123:15
208:8,17,24
**familiarity**
187:19
**far** 16:7 239:17
**farm** 118:7
140:9
**federal** 1:18 2:1
7:4 243:14
244:15 246:1,8
246:9
**feel** 37:18 44:17
71:8

Page 21

**[fees - footnote]**

fees 217:16
feinstein
110:25 111:10
112:11 113:13
115:4,14,15,21
116:6,14,21
126:4 145:9
146:9 179:19
181:20 182:1,9
195:7 203:21
204:22 205:9
210:14 232:14
236:8
feinstein's
10:15 21:21
35:2 36:21
113:8 160:19
163:8 168:23
168:24 177:20
178:8 179:11
179:12 180:3
180:24,25
181:2,8 182:2
193:8 238:2
fell 90:15
fewer 30:15
figure 174:19
176:6 184:23
185:2,9 186:5
187:12,21,22
188:1,4
figuring 50:5
file 4:13,15,16
4:18,19,21,22
5:3,4 164:25

165:2 166:5,9
175:14,18
192:5
filed 44:22 45:6
45:9 46:16,20
46:22 47:4
53:19 117:18
118:23
files 165:18
filing 17:9 54:6
filings 45:20,22
46:13 47:1,14
48:1 51:18
54:5,10,14,20
55:16,18,24
56:2,3,5,14,17
56:24 99:1
213:19 241:11
finalized 13:12
16:1 17:5
finalizing
173:16
finance 42:1
financial 56:18
87:11,13 88:11
89:24 91:3
find 58:25
64:23 89:15
91:21,21 99:25
111:14 114:9
115:20 116:20
133:14,21
134:22,25
153:21 167:17
167:19 173:19

212:14 214:3
221:6,10 222:2
230:19 235:24
237:18,23
239:24
finder 86:10
finders 133:11
finding 9:19
87:4 95:17
96:8,18 100:4
119:8 159:10
findings 14:8
14:17,18 16:9
finds 64:25
112:3
fine 43:23
190:13
fines 85:15
215:19,21,23
215:24 216:2,5
216:17,22,24
217:8,17 218:6
221:22 222:3
223:2,15 224:1
225:1,4 232:22
241:20
finish 78:9
116:2 196:8
finished 25:11
31:24
finishing 156:9
firm 22:7 29:15
30:4,6
first 8:3 13:21
13:23 19:23

46:13 51:17
53:9,18 62:15
70:14 101:4,9
166:12 167:3
173:24 174:6
184:15 229:3
234:13 241:9
five 24:11
154:25 177:3
191:14 201:4
fix 99:24
175:23,24
flip 57:21
130:23 154:18
flock 90:21
focus 42:13
126:12 127:6
127:19
focused 124:6,7
focusing 61:11
folder 60:5
follow 229:3
following 52:16
83:18 125:12
125:13,19
157:12,17
158:7,7 237:20
follows 8:4
245:8
footnote 192:21
193:25 194:6
194:11,15
196:18 212:14
226:20,22

Veritext Legal Solutions
866 299-5127

**[footnoted - go]**

**footnoted** 193:12
**footnotes** 25:5 59:23 63:13 192:18 194:14
**foregoing** 243:6 244:6,14
**forgive** 187:10
**forgot** 169:15
**forgotten** 138:17
**form** 14:10,14 28:10 64:8 76:10 77:15,24 83:11,22 84:18 89:7 92:8,20 94:7,23 102:3 103:7 104:4 108:11 117:18 119:2 120:13 159:23 184:1 197:6,10 200:9 214:12 218:20 219:25 222:18 223:9 225:14 232:8
**format** 25:18 26:5
**formatting** 184:25
**forming** 123:8
**formula** 30:18 188:18
**formulated** 84:14

**found** 40:17 64:1 85:7 89:18 111:24 134:12 153:18 172:21 213:23 230:7 232:3,15
**four** 24:11 31:6 37:2 39:8 100:1 177:3
**frame** 152:9
**fraud** 106:4,17
**frcp** 246:1
**free** 44:17 204:23
**frequently** 219:19,23
**front** 9:25 176:14 192:12
**fulbright** 3:3 6:24
**full** 8:14 11:13 19:20 203:3,5 203:8,19,23
**fully** 14:22 94:8 145:19 146:2 211:19
**further** 79:21 96:22 141:19 218:13 225:19 228:24 242:5 244:18
**future** 231:3

**g**

**gap** 201:8
**gas** 1:10 3:2 6:9 11:25 118:5,7 184:3,9 207:5 216:1,16 217:7 217:16 218:6 219:24 220:9 222:14,16 245:4
**gauge** 90:14,23 91:2
**gears** 155:9
**geller** 2:11 6:18 8:11
**general** 75:20 77:13,21 86:20 99:13 100:5 101:19 102:5,5 108:16 127:18 131:22 145:18 147:4 173:2 197:2 214:17 236:1 237:21
**general's** 59:16 75:15 163:3
**generally** 30:7 30:20,25 38:9 42:23 52:9 82:4 99:5,6,16 100:20 102:6 104:10 107:10 111:2 115:8,14 126:13 127:16 131:20,23

132:3 134:5 141:25 192:15 209:5 223:4
**genuinely** 156:2
**getting** 28:25 61:6 93:14 107:24 112:20 112:24 156:9 175:19,21 191:16 214:9 224:12 233:14 239:14
**give** 7:21 13:20 96:17 133:8 175:22
**given** 24:22 71:15 80:18,19 111:16 130:4 156:8 158:25 164:14 170:9 187:18 207:22 211:1,11 238:11
**giving** 62:19 64:10 95:13 102:21 181:19 208:2
**glad** 11:21
**go** 29:21 43:13 44:1 56:13 57:16 60:5,5 76:13 78:15 81:9,17 90:15 97:20 98:22

Page 23

**[go - hereto]**

133:2 137:16
149:25 156:22
156:25 157:23
165:7 167:20
170:25 171:1,2
171:5,5 174:20
175:23 176:5
178:20,21
179:7 186:18
190:3 207:18
214:6 221:9
**goes** 87:18
98:15 106:22
118:1 120:20
140:12 141:18
176:1 239:17
**going** 8:25
43:24 57:6
61:5,7 78:9,12
81:10 96:4,16
96:16 107:2
116:25 134:20
134:23 135:3
154:24 156:8
157:4 164:17
165:11 172:6
175:1 179:2
186:21 187:3
189:24 190:1,9
190:14,16
216:8 220:9
**gold** 133:25
**good** 6:16,20
6:23 8:8,9
44:11 45:1

77:8 143:17
207:19 211:7
211:17 225:13
225:21 226:13
232:13 242:11
**goodwill** 41:21
42:2,4
**gotcha** 19:22
**great** 10:11,17
11:6,11 191:1
**greater** 125:11
125:22 130:17
**ground** 8:25
**growing** 107:21
**growth** 139:5
**guess** 62:20
161:12 163:8
167:6,22 194:5
**guidance** 64:15
69:14,16,17,21
70:3,6,8,14,19
70:23 72:1,16
72:18 73:1,2,7
73:13,22 74:4
74:8,9,12,17,18
80:21 81:5
124:17,24
125:1,7,17,20
126:6,14
127:19,25
128:2,11
137:18,21
138:18,21
139:6,7 143:16
143:20 144:10

144:25 234:3

**h**

**h** 4:11 5:1
107:7
**hacking** 133:19
**half** 127:25
241:20
**haliburton**
82:13
**halliburton**
41:5,10
**halt** 205:16,25
**halted** 198:23
199:4,7,13
202:19 203:2
**halts** 205:13
**hand** 7:18
244:20
**handled** 245:8
**happen** 71:19
90:8 130:9,14
148:10 164:11
164:14 207:25
211:10 226:17
236:23 237:8
**happened**
71:19 90:20
144:8 156:23
203:17 204:15
204:16 210:25
211:1,11,14
**happening** 61:4
189:18
**happens** 19:10
143:24 164:15

189:19 214:22
234:9
**hard** 44:18
45:3
**he'll** 239:24
**head** 11:18
28:6 32:20
92:4 109:17
114:11 169:18
171:9
**header** 63:10
**heading** 137:13
157:10,14
184:15 212:18
212:21
**health** 42:10
**hear** 9:12 11:21
228:23
**heard** 8:10
113:23,25
114:1,5,14
**heller** 2:16 6:20
6:21 233:17
**help** 24:13,20
24:23 25:1,10
67:13 83:3
168:16
**helped** 36:17
227:25
**helpful** 124:2
**helping** 25:3
**helps** 168:15
**hereto** 44:5
164:20 175:5
192:8

Page 24

[hester - included]

**hester** 1:25 2:7
7:3 244:3
**hetero** 108:4
110:16
**heteroscedast...**
107:4,9,14
108:2,8,15,17
108:23 109:7
110:21 111:3
113:5,13,19,24
114:3,6,10
115:2,9,11,12
116:5
**higher** 30:17
127:6,19
143:16
**highlighted**
138:25
**honestly**
123:13 151:15
156:5
**hour** 12:9,15
81:10 117:1
154:24
**hourly** 23:2,4
28:5
**hours** 23:15,17
24:9 27:14,15
27:22 30:8,13
30:15,15,17,19
**houston** 1:3
**howell** 101:17
102:2 118:4,20
139:13 140:8
154:11

**huge** 239:25
**huh** 199:2
210:5

**i**

**i.e.** 129:18
**idea** 27:18,21
34:3
**ideally** 68:24
134:10 207:20
**identification**
44:5 164:20
175:5 192:7
**identified**
12:24 14:5,10
14:12 15:1,11
16:3 21:16
38:16
**identifies** 14:17
36:24
**identify** 6:13
14:15 23:2
55:18 57:4
58:22 109:7
127:11
**ignore** 96:5,15
108:6
**imagine** 215:7
**immaterial**
134:16,17
**immediately**
143:24 144:18
144:22 145:5
**impact** 11:16
11:19 23:22
24:1,4 35:2

38:17,23 39:10
39:17 40:14,17
40:18,18 41:1
41:3,6,7,16,18
41:19,21,22,24
42:4,16,19,24
43:3,11 63:17
64:4,7,16,21,23
65:2,12,19
66:6 67:20,25
68:23,24 72:15
73:14,16,20
74:4,12,15,25
75:5,9,24 76:2
79:7 82:2,8,17
82:21 83:4,10
83:21 84:9,12
84:13,14,16,17
85:9,24 86:16
86:17,24 87:5
87:7,15 88:7
88:14 89:2,6
89:19 90:2,6
91:5,10,15,18
91:23 92:7,13
92:17,24 95:2
95:11,18,24
96:9,18,19,22
97:3,19,24
102:23 103:2
136:22 137:7
137:11 172:20
220:24 221:17
223:12 224:11
229:25 230:6,8

240:18,20
**impacted** 39:19
52:4 82:4,4,11
97:25
**impacting** 67:8
82:25 240:23
**impacts** 67:5
**impairment**
42:5
**implicated**
141:21
**implying**
149:13
**important** 9:3
68:17 72:10,21
123:25 135:9
135:15 136:9
158:16 220:24
230:12 235:7
235:11
**imposed**
221:22
**impounded**
144:11 146:2
**include** 22:17
53:8 74:12
201:13 206:24
**included** 17:23
53:7 58:12
123:24 143:16
152:10 160:4
166:6 197:6
200:6 201:10
201:21 202:8
202:24 203:7

Veritext Legal Solutions
866 299-5127

**[included - instance]**

206:23 207:10
210:7 216:15
245:14 246:3
**includes**   36:12
160:5 172:1
217:2 227:6
234:1
**including**   33:16
57:12 95:14
145:13 211:3
211:14 216:19
**income**   241:21
**incoordination**
68:3
**incorporated**
143:20 145:1
145:19 146:21
146:24
**incorrect**   186:6
209:14
**increase**   92:6
139:6 232:2
240:15
**increased**
128:1,4 179:20
**increasing**
126:15
**independent**
22:10 72:2
119:20 227:13
228:11
**independently**
80:9
**index**   158:17
164:9 168:19

169:4,9 178:23
180:13,14
184:4,10
195:23,25
196:4,5,7,19,21
207:5,15,24
208:7,18,23
209:9,13,17,20
209:22 210:1,3
210:8,17,22,24
211:8,25 212:9
239:2,3,4
**indicate**   177:5
206:9,9
**indicated**
151:24 169:5
**indicating**
152:2
**indication**
231:1
**indices**   160:20
163:8,9 184:1
193:18,23
194:4 195:15
196:1 199:11
199:12 207:10
209:2 210:13
211:23 212:3
212:13,16
**indirect**   97:2,5
97:14,17,18
**individually**
1:6
**indulging**
157:6

**industry**   49:15
50:16 68:11
130:6 136:4
158:13 159:1
166:14 168:2,6
168:18,19
169:4 170:9,13
171:16 178:23
180:14 183:7
184:3,8,10
186:21 189:12
189:22,24,25
207:6 209:9
210:17,22
211:2,4,11,13
211:25 212:9
239:2
**inefficient**
109:4
**inflated**   106:20
**information**
7:9 15:4,9
18:12,14 41:18
41:23 43:4
45:8 48:13,15
48:20,23 49:12
49:18 50:12,13
54:15,17 56:18
56:20,25 58:5
58:17,25 59:5
66:5 67:3,7
68:5,16,17,18
68:23,25 69:3
79:8 83:3,4
87:18 90:9

91:14 92:2,16
92:19 94:5,21
98:6 100:17
101:25 102:15
119:6,10,21,22
119:23 120:2
127:1,11
129:17,19
130:18 132:8
132:15 134:8
134:15 135:16
135:19,23
136:14,24
137:8 146:20
165:12 219:2,7
221:7,10,11,16
221:19,25
222:11 229:23
230:3,10
231:10 234:8
234:15,15
235:2,7,10,13
235:17
**informative**
178:6,10 180:4
**initial**   53:10
**initially**   61:3
**injuries**   11:19
**inputs**   173:16
173:19
**inspection**
109:24 110:8
**instance**   92:11
212:24

**[instances - kind]**

| | | | |
|---|---|---|---|
| **instances** 39:24 | **investors** | 57:12,13 | **jump** 147:9 |
| 40:11 114:8 | 129:18 132:9 | | 196:12 |
| 115:24 116:3 | 132:16 134:16 | **j** | **june** 76:8 77:12 |
| **instructed** 4:7 | **involve** 93:17 | | 77:20 117:20 |
| **instruction** | 93:19 | **j.p.** 225:8 | 118:4 120:18 |
| 54:25 | **involved** 42:11 | **jacinto** 3:4 | 139:16 141:21 |
| **insurance** | 43:2,3 78:1,17 | **january** 11:3 | 142:6 148:16 |
| 22:13,15,18,21 | 123:15 | 13:2 37:25 | 149:2 152:8 |
| **intend** 12:22 | **involves** 93:20 | 44:15 | 154:4 157:12 |
| **intended** 15:15 | 151:18 230:10 | **jeffers** 101:17 | 157:12,17 |
| **intent** 124:9 | **issue** 10:2 | 102:2 118:7,20 | 158:8 159:4 |
| **intention** 123:1 | 12:14 18:20 | 139:14 140:9 | 163:7,19 |
| **interested** | 41:2 49:8,14 | 154:12 | 169:25,25 |
| 244:18 | 71:8 76:4,7 | **job** 1:24 157:1 | 170:12 171:15 |
| **internal** 81:2 | 79:4 148:19 | 157:1 245:5 | 177:14,15 |
| 139:21,24 | 152:6 153:5 | **john** 3:8 6:10 | 197:18,19 |
| **international** | 154:10 175:24 | **jones** 196:20 | 198:8,9,13 |
| 41:25 42:9 | 190:17 215:9 | **journal** 42:1,9 | 222:13 237:22 |
| **interpose** | 215:11 233:8 | 136:7 | **juries** 133:11 |
| 235:20 | 235:2 | **judge** 52:10 | |
| **interval** 236:16 | **issued** 18:13 | 93:11 99:14,15 | **k** |
| 236:17 | 49:9 | 100:8 102:7 | |
| **intervals** 12:15 | **issues** 23:23 | 104:12 | **k** 118:19,20 |
| **intraday** 143:7 | 56:21,22 78:24 | **judge's** 123:18 | 126:23 184:1 |
| **introduce** | 100:22 148:23 | **judges** 133:11 | **keep** 175:20 |
| 164:17 | 153:16 213:25 | **july** 69:21 | 221:5 |
| **introduced** | 216:10 222:5,7 | 70:12 74:19 | **keeps** 111:18 |
| 44:7,12 175:2 | 224:4,5,6,22 | 81:6 117:19 | 136:8 |
| **investigate** | 227:25 230:16 | 124:13 125:2,5 | **kessler** 2:16 |
| 153:4 | **issuing** 233:9 | 125:12 126:8 | 6:21 |
| **investigation** | 233:12 235:16 | 127:12 139:8 | **kevin** 2:12 6:17 |
| 153:23 218:13 | **it'll** 79:22 | 140:6 143:8,14 | 8:10 190:20 |
| 227:14 | **item** 46:2,4 | 147:1 148:24 | 245:1 |
| **investor** 221:5 | **items** 45:15 | 150:10,24 | **kind** 11:15 |
| | 46:7,7 47:2 | 153:6,7 174:13 | 42:15 51:3 |
| | | 222:12 | 56:11 58:21 |
| | | | 90:11 91:1 |

**[kind - ks]**

99:16 109:3
112:19 115:6
130:9 156:23
187:7 198:7
**kinds**  56:6 92:5
220:5 223:21
**king**  2:17
**klavelle**  2:14
245:2
**knew**  17:23
218:15,18
**know**  8:25 9:15
9:17 10:3,5
11:20 12:11,12
12:14 14:1,15
14:21 16:7,21
17:7,18,22
19:5,13 22:19
22:23 24:3
25:19,20 26:4
26:10 27:15
28:2,3,7,11
29:15,20 30:4
31:3,5,9,17,20
32:4,5,7,8,11
34:6 35:4,8,9
35:11 37:18
38:18,21 39:4
40:22,24 43:22
44:2,8,21
47:22,24 48:11
49:6 50:14
55:1 56:8,12
56:15,16,19
57:17 58:4

59:2 60:6,9,13
62:13 63:2,4
63:25 66:2,16
66:25 68:19
71:8,12,12,16
73:4,5,5 75:8
81:10 84:1,19
84:23,24,24
85:1,3,3 86:8
87:16 88:1,15
88:23 89:17
90:7,10,11,12
90:14,15,19,21
90:24 92:25
93:23 95:14
99:3 106:5,6,8
107:24 108:4
108:12 109:12
109:16 110:2
110:11,19
111:17 112:14
113:19 114:17
114:17 115:3
115:12,22
116:20 119:15
121:11,13
122:5,18,21
123:4 130:4,11
132:24,25
133:2,4,6,10,19
133:23 134:1,3
134:19,23
135:5,6,8
136:2,8,17
144:5,17,18

145:10,11,20
145:22,23
146:18 148:20
150:15 156:15
157:2,4,19,21
158:11,20
161:2,14
162:17 165:16
165:25 166:21
167:6,12,24
168:21 169:16
170:25 172:4,6
172:6 173:18
175:2,20
178:22 181:1
183:9 184:24
185:6,14,16,18
185:20,20,21
185:22,24
186:2,13,13,14
186:17,20,21
187:14,14,15
187:15,16
188:17,20,21
188:22 189:1,1
189:2,3 190:4
193:13 195:22
198:10 199:10
199:10,17,18
199:19,21
200:2,16 201:1
201:4,6,22
202:2,5,6,18,18
203:11,16
204:15,23,24

205:11,11,13
206:9,18,22,23
206:25 207:20
207:22 208:2,4
208:10,13,14
208:20 209:7
209:19 210:9
210:11 212:4,5
212:15 213:4
213:15,19
214:8,16,20,25
215:3,22 216:7
216:19 218:15
218:17,21
219:20 220:12
222:19,21
223:11,18
226:14,18
227:17,21
228:4 235:6
239:16 240:5
241:19
**knowable**
119:21
**knowing**
211:11
**knowledge**
35:25 135:19
228:11
**known**  119:21
219:2 222:14
222:16,22
**kohli**  21:5
**ks**  99:1

Page 28

**[ktmc.com - little]**

| ktmc.com   2:19 |
| --- |

**l**

**l**  4:13
**lack**  64:21,23
  65:2 68:24
  82:17 83:9,19
  84:10 85:23
  87:13 88:12
  89:25 90:6
  91:8 216:7,19
  240:23 241:14
  241:15,16
**lag**  208:10,13
**lagged**  208:9
  208:14,19
**laid**  98:21
**language**  26:20
  118:12
**large**  102:22
  128:11 130:7,8
  130:14 159:16
  168:14 189:6
  219:14 223:12
  238:14
**larger**  225:7
**lavelle**  2:12 4:4
  6:16,17 8:7,11
  9:24 10:8
  28:15 43:20
  44:6,12,16
  64:13 76:15
  77:17 78:4,11
  78:13 81:17,24
  83:15,24 85:21
  87:9 89:21

92:10 93:3
94:18 95:5
102:12 103:15
103:20 105:11
107:6,8 108:13
116:25 117:9
119:13 154:23
155:7 160:1
164:17,21
165:3,8 175:1
175:6,10,12
176:5,12
190:14,22,24
191:4,6,11,13
191:15 192:1,9
197:11 200:13
215:4 219:22
220:7 222:23
223:14 225:18
228:13,20,21
228:23 232:8
235:20 242:8
242:10 245:1
**law**  46:18,21
  219:24
**laws**  243:5
**lawyers**  158:10
**lead**  59:10
  223:18
**left**  101:20
**legal**  63:9,12,15
  64:5,10,11,14
  82:19 84:22
  85:6,20,23
  86:9 87:3 88:2

88:4,6,10,23
  245:7
**legalese**  64:19
**legally**  86:23
**lemons**  156:18
**lenient**  237:3
**letter**  139:16
**level**  30:14 84:8
  85:20 87:17
  125:11,22,25
  130:12,16,25
  131:2,12,18,25
  132:2,14
  133:17 134:3,7
  134:13,20
  159:18 171:20
  171:21,23
  172:4,11,24
  235:12 236:5,7
  237:24,25
**liability**  22:21
  71:15
**likely**  30:16
  47:10 56:1
  151:16 201:24
  214:24
**likewise**  13:6
**limited**  53:12
**line**  19:15
  86:13,14 133:7
  232:21 245:15
  246:4
**lines**  63:25
  100:14

**link**  82:15 86:4
  86:5
**list**  15:15,19
  16:21 17:12,14
  17:17 19:7
  31:5 37:4
  38:20 57:12
  62:2,3,6,10
**listed**  16:12,16
  16:18 19:18
  38:15,17,22
  39:6 41:20
  45:15 47:6
  53:3,5,15
  55:18 57:14
  59:25 61:23
  100:1
**listing**  15:11
  47:12 63:12
**lists**  14:19
  37:10,11 80:14
  99:2 118:5,9
**literally**  110:14
  241:10
**literature**
  91:11,17
  133:21
**little**  24:17 33:7
  33:23 37:19
  54:4 79:20
  83:14 90:14
  100:16 133:3
  147:3,9 167:18
  169:20 189:24
  190:1,3 196:12

Page 29

**[little - magnitude]**

197:3 222:10
**llp**   2:16 3:3
**located**   10:9
**locked**   245:12
246:1
**log**   167:13,17
167:25 170:19
170:21,24
171:4,13
192:19 193:6
193:10
**logarithm**
192:24
**logarithmic**
193:13 194:13
**logical**   104:8
**logically**
104:19,25
**logistical**   105:4
**logs**   170:22
**long**   24:3,5
144:9,19,24
145:18 146:1
165:9
**longer**   52:13
98:19 163:17
**longxuan**   21:4
**look**   26:3 27:6
35:4 36:23
38:19,21 44:19
45:11 49:4,22
51:16 55:19
56:9,23 57:9
59:4,24 63:20
63:22 65:24

66:17,25 67:1
67:10,12,16
68:15 79:21
95:15 97:25
98:3 109:20,20
111:13,23,24
112:4,5,7
117:11,25
120:10 124:10
127:16 133:20
134:11 135:1
135:11 136:1
137:2 143:3,4
147:2,5 153:25
158:11 165:10
167:7 168:5
172:17,24
175:17 184:14
189:4,11,16
196:17 198:20
201:3,4,18
207:2 222:24
226:19 232:14
233:2,4,5,6
238:12,25
240:7
**looked**   16:19
17:9 21:20,20
21:23 45:20,23
47:25 60:4
126:2 136:23
137:9 146:9
217:18 231:10
**looking**   14:2
22:2 45:3

48:15 49:2,3,5
49:11,13,19
50:6,10 55:13
58:13 60:6,6
63:9 68:9,10
68:12,25 97:15
97:19 110:6
118:18 127:21
129:7 142:11
144:20 153:20
157:8 164:6
169:19 173:2
176:15 190:8
193:25 213:7
226:14 232:13
**looks**   44:24,24
91:17 147:3
165:15 167:10
177:11 186:16
189:10 193:17
195:14,16,19
195:21,25
196:18
**loose**   106:12
**los**   7:7 244:2
**loss**   11:9 12:20
13:7,8,11 16:4
106:10
**lost**   189:23
229:25
**lot**   55:8,11
59:10 60:4
91:16 186:24
189:6 203:13
233:7,8

**lots**   32:8 56:17
68:5,7,22
85:17,17 91:25
240:19,19
**lower**   23:7
127:19 143:16
171:21 172:8
172:12,15
173:1 236:6
237:3
**lowering**
126:16 127:7
**lucy**   1:19 2:2
4:3 6:6 8:2,16
44:15 229:5
242:15 243:4
243:13 245:5

**m**

**macdonell**   3:8
6:10
**made**   52:16
58:12 67:15
69:8,13 72:5
77:1 79:2,19
93:1,22 98:17
98:25 100:11
142:13,24
153:13,17
173:8 180:14
180:17 214:2
220:21 230:15
233:20
**magnitude**
85:14,16
189:18 215:8,9

**[magnitude - materials]**

215:13,16
218:4 219:3,4
224:2 236:23
241:17,18
**magnitudes**
216:6
**main** 42:13
**majority** 154:3
154:9
**make** 15:15
19:17 27:7
66:19,21,22
71:11 73:6
86:10 87:21
102:17 104:25
112:25 116:23
123:19 134:20
135:3,3,6
181:15,23
187:3 190:6
195:4,4 202:16
203:13 205:17
205:22 221:5
236:25 245:14
246:3
**makes** 25:20
116:19 120:8
179:5 202:10
210:12 239:7
**making** 37:25
71:23 119:15
168:25 182:24
237:12
**malini** 21:4

**managing**
229:10
**march** 46:17
**mark** 10:18
43:24 175:1
190:14,16
**marked** 44:4
44:20 164:19
165:3 175:4
176:15 192:3,7
**market** 34:9,10
34:12,16,20,23
48:16 49:2,3
49:15,21 50:6
50:16 58:10
68:11 69:12
72:21 87:21
97:12,23 107:2
107:2 108:25
109:3,5 118:25
119:7,23 120:1
130:5,6 135:19
135:24 136:18
143:17,22,23
144:1,16
145:12,22,25
146:6,13,14,20
146:21 147:7
156:18 157:1,2
158:12,17
159:1 164:9
166:14,22
168:4,7 169:3
169:8,9 170:10
170:13 171:15

173:5 178:11
180:13 183:7
184:11 186:20
186:25 189:12
189:22,25
207:24 213:16
214:3 216:18
217:9,20,22
218:7,10,15,18
218:24 219:4,7
219:20 220:17
221:2,8,13,16
230:11,25
232:16 234:2
235:4 238:10
238:11 239:1,2
239:2,6 240:23
**markets** 48:19
48:22 136:9
**marking**
175:10
**marks** 174:17
174:21
**marsh** 22:12,13
22:20 28:23
**master's**
155:11,12,15
155:15,22
229:20
**match** 75:14,22
76:1 79:16
80:16 95:2,4,7
95:9,10,16,16
95:17,18 96:1
96:2,6,7,8,24

102:23,25
103:2 105:7,10
230:24
**matched**
141:16
**matches** 75:17
79:11 96:16
102:19 167:7
**matching** 76:12
80:13
**material** 48:20
85:17 92:13,17
113:17,17
129:17 130:18
130:21 131:19
132:9,15 135:2
146:20 215:14
216:20 217:12
218:9 219:5,12
219:13 221:3,8
221:16 223:13
224:2 235:3,10
241:25 242:1,3
**materially**
130:21
**materials** 14:19
15:12,13,15
16:11,13,24
19:3 45:12,16
45:18 46:10
47:5,13,18
53:7 58:2
113:14 141:2
141:12 165:1
165:19,22

Page 31

**[materials - mid]**

| | | | |
|---|---|---|---|
| 166:6 175:14 | 90:3,10 91:3,9 | 196:6 200:17 | **mentioned** 15:3 |
| 176:17 183:4 | 91:10 93:22 | 201:25 208:10 | 21:8 24:11 |
| 192:5 194:18 | 99:20 102:18 | 208:13,15,20 | 47:13 66:12 |
| **math** 207:25 | 106:5,6,7,11,18 | **meant** 14:7,14 | 72:21 79:24 |
| 216:21 218:1 | 106:25 108:3 | 15:14 53:7 | 83:2 93:11 |
| **matter** 6:7 | 108:16,22 | **measurement** | 112:10 113:18 |
| 10:15 35:18 | 110:12,14 | 97:13,15 | 114:13 141:14 |
| 46:14 47:4 | 111:14 119:4 | **measuring** | 154:22 194:6 |
| 51:18 66:7 | 122:11 123:1 | 97:11 | 194:11,19 |
| 86:17,19 94:14 | 123:11 126:9 | **medication** | 205:13 216:3,4 |
| 94:15,19,24 | 129:23,25 | 11:15 | 216:6 221:24 |
| 102:24 104:6 | 131:3,7,10 | **meet** 20:17 | 223:1 226:5 |
| 105:5 120:4 | 132:14 133:5 | **meetings** 55:12 | **mentioning** |
| 139:13 145:18 | 136:4 143:23 | **meets** 86:11 | 58:18 98:5 |
| 189:16 192:23 | 146:3 149:1 | **meltzer** 2:16 | 213:23 217:23 |
| 193:1 210:7 | 150:24 156:10 | 6:21 | 218:12 233:13 |
| 229:17 233:3 | 156:24 158:22 | **member** 25:9 | 241:10,11 |
| 234:24 | 164:1,3 165:14 | **members** 20:18 | **mentions** 72:4 |
| **matters** 7:13 | 166:23 168:14 | 21:2,3,6 24:12 | 72:6 98:4 |
| 32:14 36:25 | 169:12 170:5 | 24:18,22,23 | 118:21 138:17 |
| 38:15 39:6 | 173:12 177:2 | 25:2,10 27:16 | 224:10,10 |
| 104:5 | 183:5 186:18 | 27:23,25 28:5 | 234:17 |
| **maximum** | 188:7 197:25 | 47:21 60:21 | **merges** 183:13 |
| 216:24 217:3 | 200:11 202:10 | **memorandum** | **met** 20:12,19 |
| **mba** 229:20 | 203:12 207:24 | 46:18,21 53:16 | **method** 115:14 |
| **mclennan** | 208:10 231:24 | **memory** 11:16 | 208:17 |
| 22:12,13,20 | 233:7 236:16 | 11:19 14:1 | **methodologies** |
| 28:23 | **meaning** | **mention** 12:7 | 106:15 |
| **mean** 24:5 | 130:11 | 27:1 33:3 | **methodology** |
| 28:21 30:12,13 | **meaningful** | 105:13,14,24 | 58:7 60:24 |
| 31:23,25 34:13 | 112:9 134:2 | 105:25,25 | 106:2 129:3 |
| 38:19 50:19 | **means** 8:20,22 | 118:20,23 | 205:3 231:7 |
| 54:24 68:4 | 47:23 82:10 | 141:3 223:1,7 | **mic** 9:23,24 |
| 73:23 80:12 | 108:3 129:25 | 234:6,23 235:9 | **mid** 195:25 |
| 84:1 88:22 | 148:13 158:24 | 236:12 | 196:4 |

**[middle - models]**

| | | | |
|---|---|---|---|
| **middle** 122:13 | **mismatch** | 99:11 101:5,9 | 73:12 76:7 |
| **migration** | 94:20 95:3,21 | 101:10 118:19 | 81:4 82:7 |
| 216:1,16 217:7 | 95:24,25 96:4 | 123:9,9 137:3 | 86:23 101:16 |
| 217:16 218:6 | 96:5,12,13,15 | 137:10,15,20 | 102:9 105:12 |
| 219:24 220:10 | 96:21 230:19 | 137:24 140:14 | 105:13,14 |
| 222:14,16 | **mismatching** | 141:24 142:8 | 148:22 152:7 |
| **million** 222:4 | 76:12 | 142:10,13,17 | 153:17 240:16 |
| 225:24 227:24 | **misrepresent...** | 142:24 143:1 | **mistake** 134:21 |
| 228:8 | 58:19 65:23 | 147:18,20,24 | 134:23 135:3,7 |
| **mind** 41:14 | 66:11 67:10,14 | 148:7,10,15,17 | 236:25 237:12 |
| 141:6 | 67:24 77:6 | 151:25 153:12 | **mix** 24:18 |
| **mine** 45:5 | 78:2,21 79:18 | 154:6,14 | **mixed** 225:13 |
| **minimal** 223:3 | 98:23,25 99:14 | 161:13 162:24 | 225:22 226:13 |
| 224:1 225:1,6 | 117:14 120:14 | 213:24 221:15 | **model** 112:1 |
| 225:9 | 150:20 152:13 | 222:8 227:2 | 130:5,5 160:5 |
| **minor** 195:6 | 234:18,24 | 228:2 230:8,15 | 160:5,13,19,21 |
| **minus** 131:6 | **misrepresent...** | 230:21 231:5 | 161:11 164:11 |
| **minute** 43:14 | 40:19 48:17 | 231:18 232:19 | 164:14 166:22 |
| 154:25 165:10 | 52:3 53:13 | 232:24 233:10 | 168:9 178:8,9 |
| 174:4 175:17 | 54:16 58:11,14 | 233:20 234:11 | 179:4,10,11,12 |
| **minutes** 191:14 | 59:19 60:19 | 240:22,25 | 179:15,15 |
| **misinformation** | 61:8,12 65:10 | 241:1 | 180:1,2,3,4,6 |
| 66:2 | 65:16,19 69:19 | **misrepresented** | 180:13,17 |
| **misleading** | 72:5,9,19 73:9 | 67:4 94:21 | 181:7,8,11,14 |
| 92:16 94:5,11 | 73:17 74:5,10 | 142:19 | 181:25 182:1,2 |
| 94:16,16 98:16 | 74:14,20 75:1 | **missing** 121:24 | 182:4,9 186:23 |
| 99:4,6 100:19 | 75:2,7,18 77:1 | 122:2,11,14 | 193:8 194:3 |
| 101:1,24 | 77:3,5,11,23 | **misstatement** | 195:17 207:4 |
| 102:17 103:5 | 78:17,23 79:2 | 84:5 102:6,8 | 232:16,18,25 |
| 104:1,2,12,20 | 79:5,15 80:16 | 106:22 121:25 | 238:11 239:1,6 |
| 105:19 120:24 | 80:22,23 82:15 | 122:3 151:20 | 240:1 |
| 121:2,3,7,15 | 85:12 86:6 | 152:16,17,22 | **models** 163:16 |
| 122:24 123:3 | 87:7 93:18,20 | 241:12 | 180:23 181:9 |
| 149:16 | 95:8 97:1,6 | **misstatements** | 182:8,8,13,18 |
| | 98:15,19,24 | 42:19 65:9 | 182:21 |

Veritext Legal Solutions
866 299-5127

**[modification - news]**

**modification** 177:20
**modified** 160:18 179:10 179:16,22 180:2,6,10,24 181:7 182:1,9
**modify** 179:21
**modifying** 231:24
**moment** 44:3
**monday** 1:20 2:5 6:2
**monetary** 217:1
**money** 28:12 221:5
**month** 13:20
**morgan** 225:8
**morning** 6:16 6:20,23 8:8,9 83:1
**motion** 46:16 46:19,22 52:22 53:10,17,22
**motions** 52:25
**move** 9:23,25 92:25 129:2 144:23 178:25 239:8,9
**moved** 170:8 170:11 174:18 210:24 232:17
**movement** 49:13 66:23

68:10 83:10,20 84:7 87:14 88:13 89:4 90:1 91:13 130:3,4,6,13,13 130:15 131:16 147:4,4 159:3 159:6,6,9,10,11 159:13,15,16 159:21 163:6 168:19 170:9 178:19 237:20
**movements** 143:7 232:20 232:22
**moves** 112:2 238:11
**moving** 50:15 50:17,18 68:2 68:6,11
**mphil** 229:20
**multiple** 60:21 61:1 98:25 194:22
**mysterious** 219:8

**n**

**n** 4:1
**name** 6:17 7:3 8:10,14 25:11 59:5,9 92:3 109:18 110:2 138:17 162:14 166:22

**named** 244:6 244:10
**names** 40:25 79:11 80:13,14 80:17 110:10
**national** 22:8
**natural** 170:22
**nature** 146:10
**near** 135:13 145:8,11
**necessarily** 14:22 17:21 48:2 55:14 71:21 92:25 134:15 205:7
**necessary** 245:14 246:3
**need** 12:10,14 51:25 52:6 86:12 92:6 123:7 215:1
**needed** 64:20
**needs** 146:21 146:23
**negative** 126:14,18,19 127:14,18 143:18 158:2,5 158:20,23 159:15 170:1,6 170:12 172:2,5 184:16 187:21 187:22 188:5,9 188:12 221:3 223:22

**nera** 22:5,6,7 22:10 28:12,13 28:16,19 30:1 30:1 36:1 55:6 114:8 115:24 116:3,8,12,12 156:5 229:10 230:2
**net** 241:21
**never** 26:5 27:10 33:13 72:9,20 112:4 115:5,19 156:6
**new** 10:10 58:17 81:5 106:4 124:17 124:24 125:20 126:6 129:3,19 137:13,18 143:6,20 144:10,25 146:20 195:17 235:2,7
**newey** 112:16 112:21 113:1 114:14,17,24 115:8,22,25 116:4,17
**news** 49:24 50:7,14 57:11 58:2,7,13,15,22 59:4,14,21 62:24 69:4 89:10,12 98:5 106:4,17,18,24

Veritext Legal Solutions
866 299-5127

**[news - occurs]**

| | | | |
|---|---|---|---|
| 126:11,20 | 120:17 141:13 | 118:21,21,25 | **o** |
| 131:19 136:1 | 149:2 151:11 | 119:5,11 125:7 | |
| 136:14,16,21 | 154:15 212:18 | 125:14,14,18 | **o**   107:7 |
| 136:23 137:2 | 213:5,8,14 | 136:25 140:24 | **o'clock**   234:10 |
| 143:17,19 | 214:9 215:5,16 | 141:2,10,11,17 | **object**   159:23 |
| 144:10,25 | 216:16 220:2,9 | 151:21 152:4 | **objection**   28:10 |
| 145:5,18,24 | 220:12,13,15 | 153:22 154:14 | 64:8 76:10 |
| 146:1 221:3 | 220:19 230:10 | 154:22 217:21 | 77:15,24 83:11 |
| 225:11,20 | **noticing**   6:14 | 218:22,25 | 83:22 84:18 |
| 226:12 | 192:17 | 219:1,21 | 87:2 89:7 92:8 |
| **night**   242:11 | **noting**   75:14,18 | 221:14,20 | 92:20 94:7,23 |
| **nine**   177:3 | 120:3 | 222:3 228:2 | 102:3 103:7,11 |
| **non**   108:9 | **nov**   94:1 | 230:16 234:1,8 | 103:17 104:4 |
| 159:9 | 101:11,12 | 241:2 | 108:11 119:2 |
| **normal**   91:1 | 104:15,22 | **number**   32:14 | 197:10 200:9 |
| 108:9 129:13 | 105:15 106:1 | 41:3 46:3,4,5 | 214:12 218:20 |
| 159:7,8,13,20 | 117:14,20,21 | 49:1 53:16 | 219:25 222:18 |
| 236:24 | 118:4,6 120:18 | 57:12 65:21 | 223:9 225:14 |
| **normally**   37:20 | 139:10 148:18 | 66:4,4 67:6 | 232:8 235:21 |
| **norton**   3:3 6:24 | 154:13 174:1,8 | 109:13 110:4 | **obligations**   7:4 |
| **nortonroseful...** | **november** | 116:12 118:5,9 | **observable** |
| 3:6 | 19:25 117:21 | 122:23 131:6 | 199:19,24 |
| **notating** | 118:6 120:19 | 134:11 160:9 | 200:1,4,12,14 |
| 245:15 246:4 | 149:3 183:17 | 161:9 166:7,10 | 200:19,22 |
| **note**   120:5 | 186:16 199:6,9 | 176:17,24 | 204:18 |
| **noted**   79:10 | 199:16,25 | 177:6 183:3,5 | **obtain**   56:4 |
| **notes**   216:5 | 200:6 201:2,20 | 222:25 235:15 | **obtaining** |
| **notice**   72:7 | 202:3,23 203:6 | 237:4 245:15 | 18:10,17 |
| 212:23,25,25 | 204:6 206:5,13 | 246:4 | **obviously** |
| 215:25 216:1 | 225:5,12,21 | **numbered** | 50:19 |
| 217:7 | 226:12 228:7 | 192:10 | **occur**   108:1 |
| **noticed**   174:16 | **novs**   70:9,18 | **numbers**   46:9 | 219:19 |
| **notices**   54:17 | 72:4,6 101:3,5 | 46:12 63:6 | **occurred**   145:8 |
| 59:15 70:15 | 101:6,22 | 169:17 218:2 | **occurs**   125:19 |
| 72:13,20 73:3 | 102:10 118:17 | | 144:21 145:15 |
| | | | 234:7 |

**[october - opined]**

| | | | |
|---|---|---|---|
| **october** 198:21 | 197:25 199:10 | 124:14 126:2 | 82:8 86:24 |
| 198:24,25 | 209:6 213:15 | 128:6 129:5,9 | 93:18,19 |
| 199:5,14,20 | 214:11 | 139:20 142:4 | **omit** 198:17 |
| 200:5 201:1,8 | **oil** 1:10 3:2 6:8 | 143:5 147:9 | 203:4,18 204:9 |
| 201:10,16,20 | 11:25 184:3,9 | 149:4,22 154:1 | 205:20 206:13 |
| 202:4,23 203:6 | 207:5 239:3 | 154:23 155:24 | 206:15,17 |
| 204:1,5 206:4 | 245:4 | 156:2 157:6,16 | **omitted** 67:3 |
| 206:12 | **okay** 7:1 8:19 | 158:3,6 167:2 | 92:16,19 94:21 |
| **offer** 12:19 | 8:24 9:7,12,12 | 169:11,24 | 100:18 102:16 |
| 38:16 39:7 | 9:14,16,24 | 170:17 174:10 | 103:4,25 |
| 40:20 | 10:6,7,11,17,21 | 175:7,22 176:3 | **omitting** 94:5 |
| **offered** 23:25 | 11:11,21 12:15 | 176:5,6,20 | 203:22 204:3 |
| 33:24 38:8 | 13:1,6,11,18,20 | 177:5 181:5 | 206:18 |
| 39:17 | 14:1,11 15:17 | 188:23 190:23 | **once** 29:6 |
| **offering** 11:23 | 18:25 19:16,22 | 191:1,5,12 | 190:16 |
| 15:5 16:6 34:8 | 20:7,14,17 | 192:15,17 | **ones** 54:6 56:2 |
| 38:23 64:3 | 26:9,25 27:21 | 193:19 194:17 | 60:18 63:21 |
| 74:24,25 75:4 | 28:25 29:24 | 195:10,12 | 79:16 104:21 |
| 75:8,9 86:22 | 30:20 32:16 | 198:22 208:2 | 193:12 212:4,5 |
| 87:3 95:20,22 | 33:12,22 34:18 | 210:10 211:16 | 215:9,9,11 |
| 119:25 | 37:13 38:7,14 | 212:22 226:17 | 218:3 |
| **office** 231:13 | 39:6 40:10 | 226:21 228:14 | **ooo** 242:16 |
| 245:11 | 42:17 43:9,13 | 228:15,20 | **opaque** 29:23 |
| **officer** 22:20 | 43:15 44:7,11 | 242:12 | **open** 144:22 |
| **oftentimes** | 45:13,18 46:15 | **omission** 39:9 | 234:4 |
| 136:2 164:6 | 47:1,1,12 | 39:18 53:6 | **opened** 144:8 |
| **oh** 21:17 36:17 | 51:11,16 52:6 | 66:18,19,21,22 | **opening** 113:14 |
| 46:11 47:18 | 55:23 57:21 | 67:11,14,20 | 144:6 234:3 |
| 56:1 57:7 | 63:9 64:3 | 92:13,18,24 | **operating** |
| 73:15 105:21 | 79:20 80:4 | 93:1 101:25 | 128:12,18,22 |
| 118:14 122:18 | 81:8,19 82:6 | 106:21 | 138:1 |
| 149:8 155:17 | 96:10 108:6 | **omissions** | **operative** 51:19 |
| 157:19 160:12 | 109:25 110:7 | 42:19 65:11,17 | **opine** 39:8 |
| 161:6 165:7 | 112:5 116:25 | 65:20 73:12 | **opined** 39:18 |
| 179:16 197:20 | 117:3,4 121:21 | 75:10 81:5 | |

Veritext Legal Solutions
866 299-5127

**[opining - part]**

| | | | |
|---|---|---|---|
| opining 96:11 | opposition | 233:18 240:1 | pages 18:21 |
| opinion 53:10 | 46:19 | owned 22:11 | 165:9 245:14 |
| 53:16,22 71:21 | options 193:5 | 22:12 | 245:17,17 |
| 74:25 79:3 | oral 155:19 | | 246:3,6,6 |
| 86:22 94:25 | order 48:5 52:7 | **p** | paper 43:1 89:1 |
| 95:1,1,20,22 | 52:17,22 53:14 | p 44:15 133:8 | 156:11,14,15 |
| 96:11 118:24 | 67:19 123:18 | 133:19 | 156:17 157:2 |
| 120:1 132:12 | 185:24 | p.m. 43:16,19 | papers 64:23 |
| 143:13 144:24 | orders 52:24 | 81:20,23 117:5 | 83:2,8,17 |
| 231:8 240:17 | original 113:4 | 117:8 155:3,6 | 133:14,18 |
| opinions 11:23 | 181:2 182:2 | 176:8,11 | paragraph |
| 12:18,22 14:5 | 244:15 245:10 | 191:22,25 | 105:22 117:14 |
| 14:8,12,25 | 245:21 | 228:16,19 | 117:23 120:11 |
| 15:4,10,25 | outline 25:19 | 242:13,14 | 120:24 121:8 |
| 16:3,5,9 24:1 | 25:21 | pad 128:15 | 121:17,19 |
| 34:8 38:16,23 | outlook 127:8 | padep 120:18 | 122:9,17,19,22 |
| 39:17 48:5 | output 127:7 | page 2:25 4:2 | 122:23 124:10 |
| 50:22 52:8 | outputs 173:17 | 4:12,25 5:2 | 124:15 127:21 |
| 54:11 63:15 | 173:19 | 8:16 19:15 | 129:6,8 135:13 |
| 64:4,5,10,12,14 | outright 94:4 | 57:10 59:25 | 137:16 138:8 |
| 64:15 69:9 | 94:12 | 63:10 76:17,19 | 139:2 140:1,1 |
| 70:12 71:2 | outside 55:5 | 117:12 118:1,1 | 142:3 147:10 |
| 74:24 75:5,9 | 130:7 | 120:10 129:2,8 | 149:8,18 150:3 |
| 75:10 80:5 | overall 30:13 | 135:11 137:12 | 153:25 163:18 |
| 86:23 87:4,10 | 48:14 54:24 | 142:2 143:3,4 | 173:24 174:6 |
| 88:10 94:19 | 58:25 147:5 | 147:7 153:25 | 174:12 207:2,3 |
| 195:1 197:6 | 239:2,6,12 | 157:8 166:10 | paraphrasing |
| 229:17 230:5 | overlap 24:19 | 166:24 167:1 | 223:5 |
| opportunity | own 12:2 21:11 | 173:24 174:4,6 | parentheses |
| 128:13 | 136:15 168:22 | 174:12,17 | 207:10 |
| opposed 197:24 | 169:2 173:11 | 175:18 183:5 | parse 126:12 |
| 205:4 | 179:9,23 | 212:17,20 | 127:13 |
| opposing | 180:23 181:7 | 213:7,8 222:24 | part 22:2 29:13 |
| 167:15 | 182:8 231:22 | 226:19 245:15 | 41:8 47:19 |
| | 232:21,25 | 246:4 | 52:2,13 65:5 |

Veritext Legal Solutions
866 299-5127

**[part - period]**

| | | | |
|---|---|---|---|
| 65:23 69:2 | 206:16 209:10 | **pending** 7:21 | 189:6,10,15,17 |
| 71:5 74:4 77:8 | 211:1 217:1 | 12:13 | 189:20 190:4 |
| 78:5 79:21 | **particularly** | **pennsylvania** | 193:14 207:21 |
| 80:4,19,24 | 15:2 46:2 63:3 | 2:18 77:13,21 | 207:22,23 |
| 89:22,23 94:10 | 63:18 112:6 | 162:13 197:2 | 234:6 236:5,6 |
| 94:11 104:21 | 145:2 165:14 | 222:6 231:13 | 236:12,12,16 |
| 119:17 121:14 | 165:20 177:1 | 235:25 237:21 | 236:16,17,24 |
| 122:8,11 | 195:6 | **people** 26:23 | 237:2,4,6,8,11 |
| 128:12 130:24 | **partly** 123:19 | 30:14 35:25 | 237:12,16,16 |
| 137:8 141:7 | 211:14 | 156:15 219:8 | 237:19,19 |
| 148:4 154:13 | **parts** 25:22 | 221:9 | 241:20 |
| 160:6 164:25 | 26:19,22 47:10 | **people's** 133:13 | **percentage** |
| 165:18 175:14 | 122:12 124:4,5 | **percent** 32:5 | 171:13 184:20 |
| 176:24 177:6,7 | 124:7 | 84:7 88:17 | 185:19 187:13 |
| 196:25 197:8 | **party** 6:14 | 125:11,21,25 | 188:10 192:20 |
| 211:22 214:18 | 63:16 | 130:9,12,14,16 | 192:25 193:6 |
| 221:14 222:5,8 | **past** 39:8 | 130:17,25 | 194:13 |
| **partial** 69:24 | **pattern** 107:22 | 131:1,5,6,10,17 | **perceptive** |
| 70:4,13,17 | 109:4 111:17 | 131:25 132:2 | 84:22 |
| 124:19 | **patterns** | 132:14,21 | **perfect** 105:7 |
| **partially** | 107:20 | 133:17,22 | **performance** |
| 138:14 | **pay** 216:8 | 134:13,20,21 | 29:14,16 30:7 |
| **participants** | **payment** 228:7 | 134:24 135:4 | **performed** |
| 214:3 | **pays** 216:8 | 144:7 159:17 | 113:11 150:5 |
| **particular** | **pdf** 164:25 | 167:14,20,24 | 206:21 |
| 39:11 47:14 | 175:18 245:12 | 167:25 170:12 | **period** 16:20 |
| 58:21 60:24 | 246:1 | 170:15,17,23 | 34:22 36:20 |
| 61:16 64:5 | **peer** 41:15,17 | 171:1,2,9,20,21 | 48:18 52:5 |
| 67:2 71:5 | 41:20 42:8,17 | 172:7,7,13,13 | 56:3,5,8 61:6 |
| 79:21 89:22 | 42:22 55:5 | 172:18,24 | 75:17 76:18,24 |
| 100:10 102:15 | 61:19 178:23 | 173:6 185:9,13 | 76:25 77:4 |
| 106:2,19 | **penalties** | 185:16 186:5,9 | 78:3,10,18,19 |
| 111:16 139:3 | 216:25 217:1,3 | 187:6,23 | 78:24 79:1 |
| 160:10 163:14 | **penalty** 243:5 | 188:13,14,15 | 93:24 111:19 |
| 178:5 186:15 | 245:16 246:5 | 188:17,17 | 113:20 137:14 |

**[period - point]**

142:12,22,22
148:11,16
152:13,14
161:1,17,17,19
161:21 162:3
163:2,16,17
164:7 168:9,24
177:11,16
179:17,18,24
180:1,7,7,10
183:11 197:12
197:22,23
198:1,4,5,15
202:14 204:19
205:6 206:24
206:25 227:20
228:6 231:20
232:3 234:13
240:11 245:18
246:7
**periods**  61:4
75:22 141:22
142:6 147:22
148:6 151:24
152:3,7,11
160:17,22
**perjury**  243:5
245:17 246:6
**permission**
175:21
**person**  30:16
122:20
**personally**
23:18 45:14,19
47:6 48:7 57:6

57:13 58:1
60:2
**perspective**
64:22 67:17
**pertain**  77:22
101:22 154:19
**pertained**
118:4,7 137:24
140:7,15
147:19,23
148:6
**pertaining**
147:17
**pertains**  244:14
**pertinent**  7:13
**peter**  3:3 6:24
10:4 12:3 20:2
227:12
**peter.stokes**
3:6
**ph.d.**  155:19,22
156:3,4,9
**philosophy**
155:12,15,22
**phone**  20:13
**picked**  235:21
**picture**  144:21
147:2 233:4,4
234:5
**piece**  15:9
48:12 58:5
71:17 83:4
**pieces**  66:4
68:7,22,25
69:3 84:25

126:13 127:14
127:17
**place**  123:20
244:10
**plaintiff**  1:8 2:3
2:10 99:21
124:16
**plaintiff's**
34:16 44:13,20
46:22 70:21,22
71:3,5 72:17
93:10 95:13
102:21 104:3
117:12 145:6
146:9 165:4
173:4,5 175:11
176:16 231:23
**plaintiffs**  6:19
6:22 8:12
32:22,23,25
33:2,4,6,11,14
33:16,18,20
34:15,25 46:18
51:23 52:1
53:18 65:23
69:10,13,23
70:13 71:10,13
72:8 73:5,10
93:14,21,25
94:3 96:17,23
97:7 98:10
100:17 101:16
101:19,23
102:16 103:4
103:24 104:18

105:8 121:1,7
121:14 122:24
123:2 125:3
142:18 145:3
146:6 148:19
149:15 152:20
181:18 217:19
221:23 234:6
241:4,8
**plan**  128:12,18
128:22 138:1
**planes**  90:22
**play**  87:24
135:15
**please**  6:13,15
7:18 8:14 10:3
12:11,14 78:15
124:10 147:10
183:4
**pleased**  228:23
229:1
**pled**  102:4
**plops**  26:1
**plot**  109:22
**pltffs**  4:13
**plus**  162:24
163:1,8
**point**  9:14 10:2
12:10 20:3
25:17 29:12
53:15 66:10
80:16 133:10
133:12 143:24
150:14,23
151:5,6 183:10

**[point - price]**

183:12,23
**pointed** 206:7
**points** 85:18
**populated** 44:2
**portion** 54:8
64:19 120:12
122:6,7 149:22
**portions** 45:21
45:23 57:5
**position** 229:9
**positive** 106:23
106:24 178:24
234:15 241:6
**possible** 14:16
17:3 42:10,12
43:2 216:1
223:17
**possibly** 16:25
17:7 42:25
71:13 113:15
172:24
**potential** 17:4
48:12 85:15
108:7 215:18
215:21 216:5
218:13 222:3
223:2 224:13
225:1,2
**potentially**
87:22 146:1
**practically**
26:5 27:10
**practice** 12:8
203:16,18
204:9,12,17,20

205:19 206:13
211:7,8
**practices** 232:6
232:10
**predict** 164:11
164:14 211:5
211:10
**predicted**
107:19 166:15
168:8,10,12
232:18
**predicting**
210:25
**predictions**
164:10
**predicts** 238:11
**preparation**
20:20
**prepare** 20:7
**prepared**
209:20
**preparing**
28:13 35:12
54:2 62:22
173:15
**preponderance**
84:23 85:25
86:7 88:25
**presence**
108:14 109:7
113:24 114:2,9
**present** 2:12,17
3:4,7,9 108:2
113:20 172:19
241:21

**presentation**
76:21
**presentment**
139:17 147:14
147:21 148:5
152:10 154:19
**presentments**
154:11
**press** 57:10
**pretend** 96:16
**pretending**
102:25 103:1
**pretty** 186:25
189:13
**previous**
162:12
**previously**
24:12 26:19,21
62:8 78:25
120:6 138:23
148:18 151:10
151:10 152:18
153:2 154:21
163:22 169:21
176:15 180:5
213:21 241:2
**price** 23:22
24:1,4 35:1
36:20 38:16,23
39:9,10,17,19
40:14,17,17,18
41:1,3,6,7,16
41:19,19,23,24
42:16,19,24
43:3,4,11

49:12,13,18
50:1,15 52:4
63:17 64:4,6
64:16,21,23,25
65:2,12,18,25
66:5,23 67:8
67:19,25,25
68:1,6,10,15,20
68:23,24 71:25
72:10,12,15,22
73:13,16,20
74:3,12,15,25
75:5,9,24 76:2
76:2 79:7 82:2
82:5,8,11,16,17
82:21,25 83:4
83:10,10,20,21
84:7,9,11,12,13
84:14,16,17
85:9,23 86:6
86:15,17,24,25
87:4,8,14,15
88:7,13,14
89:2,4,5,6,13
89:20 90:1,2,6
91:4,6,10,13,15
91:23 92:6,7
92:12,17,24,25
93:2 95:1,11
95:18,24 96:9
96:18,19,22
97:3,19,23,24
102:23 103:2
106:20,21,25
112:1 119:8

Veritext Legal Solutions
866 299-5127

**[price - proving]**

125:10,15,17
127:3,12
129:11,15,19
129:23 130:3
130:15 131:16
132:7,12
136:17,17,22
137:7,10,14
143:7,8,21
144:7,11 145:1
145:4,7,19
146:2,25 147:6
157:11,17,18
157:20,23
158:1,7,15,25
159:3,13,15
160:14 163:6
163:19 164:8
166:13 167:6
167:11 168:1,1
168:19 170:8
170:11 171:14
172:19 174:13
178:19 180:15
183:6,14 184:7
185:5,7,17,20
185:21,25
186:2,9 197:1
197:2 203:14
205:4,5 221:11
221:17 223:8
229:23,25
230:6,7,13,17
230:24,25
231:4,22

232:17 233:19
234:4 235:25
237:20 239:4,8
240:18,20,24
241:14
**prices**   19:14
50:17,18 91:19
129:14 204:13
205:1 230:4
**primarily**   11:1
29:1
**primary**   29:1
**principles**
129:4
**prior**   35:2
36:20 39:7
59:20 72:18,18
78:2,19,20
111:8 125:20
140:14 148:16
151:6 152:8,8
186:1,3 198:15
222:12 226:25
228:5 230:16
234:2 244:5
**probably**   9:2
12:12 37:5
60:10 158:14
199:24
**problem**   77:7
152:1,3,15,18
152:21,24,25
153:10,12
239:16

**problems**
150:18,21,22
151:5,7,11
153:3,18,23
**procedure**   1:18
2:2 7:5 111:22
112:10,12,14
112:16,21
113:2 116:18
116:22 243:14
245:19,20
**procedures**
111:1
**proceedings**
244:13,16
**process**   26:7,17
29:18 54:23
55:17 191:4
**processes**   55:9
**product**   25:11
43:1
**production**
126:17 127:7
127:24 139:5
184:3,9 196:21
207:6
**products**   56:13
**professional**
229:16
**professionals**
49:4
**progression**
202:24
**progressions**
176:24

**project**   47:20
55:7
**projects**   32:8,9
**proof**   84:20,22
85:5,6,19,20,23
87:16 88:1,3,5
88:7,25 90:17
90:25 91:1
**properly**
116:22
**proposition**
83:18
**prove**   63:17
64:16,20 67:19
68:23 71:9,13
83:3 84:8,17
87:15 88:16,22
**proven**   172:19
**proves**   83:10
83:20
**provide**   11:12
22:20 62:5,9
62:16 64:15
213:13 229:12
**provided**   30:20
30:23 31:1
33:13 34:4
36:25 53:25
62:24 245:19
246:8
**providing**
118:24
**proving**   64:6
85:23 88:13

Page 41

**[proximally - rather]**

| | | | |
|---|---|---|---|
| **proximally** | 49:7,25 68:7 | 139:20 142:5 | **r** |
| 106:9 | 121:22 123:1,3 | 144:14 146:4 | **r**  107:7 |
| **prussia**  2:17 | 123:4 124:6,8 | 155:10 159:24 | **r&s**  246:1,9 |
| **public**  42:10 | 208:7 217:10 | 164:12 165:11 | **radnor**  2:18 |
| 79:5 119:6 | **putting**  42:22 | 180:5 187:24 | **rain**  90:14,15 |
| 153:15,21 | 64:18 208:1 | 189:8,9,13,21 | 90:17,18,20,22 |
| 219:7 221:1,9 | 235:12 | 200:11 207:19 | 90:25 91:2,2,2 |
| 231:9 | | 210:2 213:10 | **rained**  90:12 |
| **publication** | **q** | 216:14 217:5 | **raise**  7:18 |
| 136:8 | **q2**  117:18 | 236:13 | **ran**  55:20 |
| **publications** | **qs**  99:1 | **questions**  4:7 | 160:24 161:10 |
| 136:2,6 | **qualifications** | 9:8 81:9,12 | 163:5,13 177:6 |
| **publicly**  22:16 | 25:23,24 26:10 | 86:18,21 | 177:24 178:4 |
| 48:16 68:5 | 229:16 | 228:24 229:3 | 180:22 181:1 |
| 99:23 118:23 | **qualified** | 242:5 | 182:8 196:15 |
| 119:12,22 | 229:24 | **quick**  38:21 | **range**  24:10 |
| 213:22 219:2 | **quality**  121:9 | 117:1 155:9 | 28:3 129:13 |
| 221:25 222:10 | 149:10 150:7 | 228:13 | 159:20 162:16 |
| **publish**  156:16 | 150:11 151:13 | **quickly**  9:2 | 162:18 163:12 |
| **published** | 220:16 | 143:19,23 | 178:1,5 182:5 |
| 41:16 42:18,22 | **quarterly** | 235:20 | 193:16,21 |
| **purchase**  17:21 | 56:19 99:1 | **quite**  8:25 | 194:8,10 |
| 18:23 19:6 | **question**  12:13 | 29:10 51:9 | 195:14,21 |
| **purchased** | 21:12 29:9 | 58:23 60:10 | 196:15 197:1 |
| 17:24 19:11 | 31:12 34:2 | 84:2 156:6 | 198:2,23 199:6 |
| **purchasing** | 36:8 37:3 | 212:12 238:17 | 200:18 211:24 |
| 18:9 | 39:12,21 57:2 | 239:24 240:8 | 211:25 212:8,9 |
| **purpose**  48:12 | 63:11 83:7,13 | **quote**  105:23 | 212:13,16 |
| 48:12 63:11 | 84:2 85:20 | 122:15 128:11 | 214:4 |
| **purposes**  61:21 | 86:9 88:9 | **quoted**  121:13 | **rate**  23:4,7,7,9 |
| 96:10 136:19 | 89:11,23 | 124:5 | 23:10,12 |
| 137:6 | 100:16,23 | **quotes**  121:6 | **rates**  23:2 |
| **pursuant**  7:4 | 102:14 103:11 | **quoting**  149:21 | **rather**  18:17 |
| **put**  23:18 25:3 | 103:14,16,21 | | 59:8 96:12 |
| 25:17 27:8,22 | 103:23 105:19 | | 111:21 126:22 |
| | 113:4 116:2 | | |

Veritext Legal Solutions
866 299-5127

**[rather - record]**

151:15 179:19
**reach** 159:2
  236:8
**reaching** 231:8
**react** 49:12
  91:5 144:12,13
  144:18
**reacting** 58:10
  218:11
**reaction** 48:19
  48:23 49:18
  64:25 65:6
  72:12,22 76:3
  84:11 85:10
  89:10 91:9,22
  129:11,16,23
  132:7,13
  146:12 197:1
  216:19 218:24
  220:21 230:13
  230:17,24,25
  231:22 232:4
  233:19 235:25
  240:24
**reactions** 43:4
  119:9 146:8
  229:23 241:15
**reacts** 66:1
  97:23 145:4
**read** 6:13 7:2
  7:15 99:20
  117:17 118:2
  120:11,16
  121:8 123:25
  124:2,15

127:22 128:9
129:10 132:5,5
135:14 137:17
138:3 139:2
140:2,5,12
141:18 147:13
149:9,18
150:10 154:2
173:25 174:7
192:22 194:1
226:23
**reading** 149:6
  149:20 245:23
  246:9
**reads** 120:11
  129:10 139:2
**real** 126:17
**reality** 99:22
**really** 27:20
  82:5 102:24
  118:15 123:5
  125:25 126:12
  143:24 144:22
  156:10 159:20
  161:4 189:16
  204:2 208:14
  210:6
**reason** 11:12
  44:21 61:17
  63:22 123:23
  134:4 206:17
**reasonable**
  185:11 239:17
  239:18

**reasons** 56:17
  60:8 61:2
  69:17
**recalculating**
  210:3
**recall** 13:17
  19:8 20:3
  21:24 22:2
  36:22 37:22,22
  38:19,20,22
  39:1,15 40:6,9
  40:10 43:12
  46:2,4,5,25
  47:3 51:6,8
  53:1,11,21
  54:12,12,19
  57:15,18 62:19
  63:3,8 80:2,14
  83:5 110:23,24
  115:3 127:18
  147:5 157:24
  157:25 158:5
  160:23 161:5,6
  163:24 165:21
  165:23 166:2,2
  177:4 182:6,15
  182:20,24
  197:25 198:2
  199:3 201:24
  203:17 209:6,8
  209:10,11,11
  210:8,17,19
  212:6,8,11
  226:16

**recalls** 43:1,4
**receive** 28:16
  50:22 51:7
**received** 51:14
  117:20 120:17
  149:2 220:19
**receiving** 35:2
  36:21
**recently** 11:18
  37:18,25
**recess** 43:17
  81:21 117:6
  155:4 176:9
  191:23 228:17
**recite** 7:13
**recognize**
  165:12,17
**recollection**
  13:22 14:2
  19:11 33:15,19
  35:16,21,22
  51:1 57:8
  62:12 98:22
  113:12,18
  114:7 146:17
  163:5,13
  176:23 178:12
  179:1 180:21
  198:5 206:3,6
  226:4,10
  227:20 228:11
**record** 6:4 8:15
  43:13,16,19
  44:14 81:20,23
  117:2,5,7

Veritext Legal Solutions
866 299-5127

**[record - related]**

155:2,6 164:24
175:23 176:6,7
176:10 183:6
191:21,25
228:16,19
229:4 242:13
**redone**  55:3
181:14
**reduced**  72:16
72:17 126:14
244:11
**reduction**  72:1
73:2 74:18
80:20 125:1
127:24 139:5
234:3
**refer**  13:1,7
20:14 43:24
44:18 104:22
131:9 150:23
183:15
**reference**  41:7
128:19 154:9
163:19 194:16
207:9
**referenced**  11:8
21:1,1 30:6
87:25 139:15
213:6 245:6
**references**
138:21
**referencing**
88:2,4 217:14
**referred**  77:4
130:24 131:1

193:21 215:15
**referring**  20:15
45:7 46:6,8
65:4,4 69:20
100:13 112:13
124:25 138:9
138:19 193:24
208:16 215:18
215:21
**refers**  104:23
166:19 168:18
169:8
**refined**  59:12
**reflect**  221:11
**reflected**  16:23
194:17 198:6
**refresh**  164:22
176:23
**reg**  4:15,17,18
4:20,21,23 5:3
5:5 165:2
166:9 175:16
176:16,21
**regard**  40:18
101:2
**regarding**  15:4
34:16 40:16
42:18,24 53:17
55:16 63:16
71:2 88:7 94:1
99:12 100:11
126:17 135:24
143:19 144:10
146:6 153:21
154:10,22

163:3 217:21
220:9 222:6
230:16 234:8
**regardless**
75:24 145:14
146:14 190:7
195:3
**regards**  58:7
65:8
**regressing**
197:5
**regression**
107:15 108:1,7
160:5,6,7
161:1,20,23
162:10,20
163:5,13 165:2
173:7,14
177:13 178:2,4
178:6 179:10
179:11,12,15
179:15,22,23
180:3,23 181:9
181:25 182:7
182:13 183:3
186:7,12 187:8
188:12,19,25
190:2 192:10
192:11 196:15
198:8 200:24
202:9 203:24
204:11 206:14
**regressions**
110:22 160:3
160:24,24

161:7,10
162:21 177:6
177:24 182:3
192:4 195:2
196:14,23
197:24 198:7
198:18 199:13
200:7 201:21
203:7 206:19
206:20 212:1
212:10
**regulations**
100:7 214:17
**regulator**
221:22
**regulatory**
56:21 213:1
214:15
**relate**  72:8,19
75:16 77:25
101:10,21,21
102:9,10
104:14 124:23
148:15 151:21
151:22,23
152:8 229:17
**related**  14:5
22:18 24:4
42:2 54:11,15
58:17 59:1,19
69:18 73:2,8
73:16 74:5
76:7 79:4
80:22 101:5,6
106:4,5,6,12,17

**[related - report]**

154:11 180:15
213:25 225:2
231:14
**relatedly**  52:21
81:1,11
**relates**  72:12
72:18 78:22
101:12 104:16
**relating**  228:1
**relation**  88:2
**relationship**
164:7
**relative**  50:16
158:25 168:14
225:9 239:16
**relatively**  62:13
**release**  127:23
235:18
**released**  58:13
58:18 235:3
245:21
**releases**  57:10
**relevant**  16:12
129:4,19 130:3
217:21,24
**relied**  181:18
**rely**  119:19
177:23 179:5
195:1 196:23
**relying**  63:18
64:5,14
**remain**  93:15
102:9 104:14
**remaining**
76:23

**remediate**  99:7
99:8,22 241:4
**remediated**
101:18 153:6
214:20
**remediating**
222:14,16,20
222:22
**remediation**
93:24 97:8
100:22 102:1
122:3 148:22
150:6 151:12
**remember**
37:14,15,16,20
38:3,7 40:25
42:14 57:22
98:20,20
226:17
**remembering**
38:10,11
**remote**  1:17 2:1
8:20,22,23
**remotely**  2:6
**remove**  205:18
205:20,23
206:2 207:21
208:22 209:1
209:13,17
210:1,21 211:8
211:24
**removed**  212:4
212:9
**removing**
205:9 208:18

**render**  48:5
50:21 52:7
54:10 100:19
104:1
**rendering**
63:14 69:9
70:12 71:1
80:4 194:25
**repeat**  46:12
65:14 77:16
103:8 213:10
**repeatedly**
213:18 218:22
220:1,8
**repeating**
141:6
**rephrase**  21:14
**replicable**
166:1
**replicate**  181:3
181:16
**report**  10:16,23
11:2,2,4,7,9
12:20,21 13:2
13:3,8,9,11,16
13:21,23 14:4
14:6,7,13,15,17
14:22,25 15:1
15:3,6,11,25
16:4,5,12,12,18
17:1,6,10,11,14
17:17 18:3,10
18:10,11,16,19
18:22 19:19,20
21:7,21 23:1,5

23:11,14,15,18
23:21,24 24:4
24:14,19,21,23
24:24,25 25:18
25:24 26:12,13
26:15 27:14,16
27:19,22 28:7
28:8,14 34:8
34:19 35:2,5
35:13,18 36:3
36:7,21,23
38:8 39:22
40:3 41:8
43:23,24 44:14
44:18,22,25
45:3 48:6
50:21 52:8
54:2,22 55:2
56:10 57:23
58:1,8,8 60:15
62:23,23 63:12
63:15 66:6
69:8 72:2
73:19 74:3
76:19 79:11,22
93:10 94:13
98:11 105:22
111:2,4 113:14
113:18 117:11
117:13 119:18
120:5 129:2,8
133:14 134:12
136:20 137:12
147:8 149:8,21
157:8 160:3

Veritext Legal Solutions
866 299-5127

**[report - results]**

161:7 163:18
166:1 167:19
167:20 168:5
169:6,7 173:15
173:20,21,22
176:25 177:8
177:19,24
181:4,17,21
192:19,21
196:24 197:6,9
207:3 212:17
213:7,21
216:23 217:2
218:2 222:24
224:7,22
226:11,19
234:5 235:13
235:18 236:9
236:10 238:7
**report.pdf**   4:14
**reported**   1:25
117:19 136:25
202:3,7
**reporter**   2:6
6:12 7:1,2,20
7:25 9:18,20
103:8,10,18
107:6 191:18
244:24
**reporting**
202:1
**reports**   10:15
12:19 16:7,16
16:19,23 17:5
17:8,15,17,18

17:19,20,21,23
18:1,2,4,9,12
18:20 19:2,7,9
19:13,18,19
20:11 21:10
24:16 25:4
26:20 34:4,4
37:1,9,10 41:5
49:5,7,8,9,20
49:25 50:7,8
50:11,14,24
51:2,3,3,9,11
57:5,5 59:25
60:3,12,25
61:20,22 62:2
62:7,12,24
63:7 76:4 98:4
135:12,15,25
136:21,23
217:14 233:9,9
233:12,15
235:2,5,16
**represent**
166:4 197:16
**representatives**
74:8
**represented**
12:1
**representing**
8:11
**request**   165:24
166:2
**requested**   7:19
246:1,9,10

**require**   18:9
161:18
**required**   7:9
85:20 157:3
244:17
**reran**   194:12
**rerun**   194:5
**rerunning**
182:2
**research**   22:8
42:9
**resolution**
226:6
**resolve**   227:25
**resolved**   10:6
77:7 78:24
121:10 148:19
148:23 149:11
149:13,15
150:7,12,13,15
150:22 151:1,2
151:3,14 152:6
153:24 213:25
222:5,7 225:5
228:6
**resolving**
225:12
**resource**
212:10
**resources**
162:15,16,18
163:12 178:1,5
182:5 193:16
193:21 194:8
194:10 195:14

195:22 196:15
197:1 198:3,23
199:7 200:18
211:24,25
212:8,13,16
214:4
**respect**   36:6
65:10,16
237:20
**respectively**
120:19
**response**
220:18
**rest**   72:2 95:25
144:23
**restricted**
228:5
**restriction**
226:25 227:17
227:21
**result**   108:9
133:24 139:9
211:5,5 215:19
216:9,12,16
221:19 223:2
233:23
**resulting**
128:13
**results**   56:19
111:4,9,13
112:7,19,25
116:22 133:15
133:20 177:23
180:17 182:10
182:14,22,24

Veritext Legal Solutions
866 299-5127

**[results - right]**

183:1 184:19
188:11 192:23
194:2 195:3,16
207:1 238:23
239:16
**retained**   11:24
20:4 33:10,15
40:1 229:11
**retirement**   1:5
2:4,10 6:8
245:4
**return**   111:16
111:25,25
145:7 158:1,4
158:18,18,20
158:23 164:8
164:16 166:14
166:14,15,15
166:15,16
167:12,13,23
168:2,4,8,11,12
168:12,18
169:8,9,20,21
169:25 170:7
170:21 171:12
171:13 183:7,7
183:8 184:6,8
184:11,14,15
184:22 185:1,3
185:9,11,13,16
185:18 186:5
186:10,15,18
186:19,24
187:1,5,7,12,23
188:3,13,19

189:5,7,10,11
189:15,17
199:20,24
200:1,19,22
202:20 203:15
207:16 208:3,4
236:22 238:9
239:15 240:1
245:17 246:6
**returning**
186:24
**returns**   112:4
163:23 167:14
167:18,21,25
170:20,25
171:4 172:2
180:20 187:20
188:11 189:6
189:18 190:5
192:19,20,24
192:25 193:6,6
193:10,14
194:13,13
200:4,12,14
203:19 204:13
204:18,21
205:1,4,5
208:19,21,23
209:12 210:1
210:15 232:15
233:5,6 238:13
238:14,16,22
238:25 239:13
239:23 240:8

**revenue**   56:7
225:9 241:21
**review**   9:2
21:16,25 25:10
26:24 27:3,6
45:14,19,22
46:8,15 47:2,6
47:15 48:5,7,8
52:24 53:9
54:5,6,7 55:25
57:6,13 60:2
60:14 80:5
81:2 128:18,22
139:20,24
147:14 192:15
244:16 245:8
245:10,13
246:2
**reviewed**   20:11
20:11 21:9,10
41:15,17,20
42:8,17,22
45:25 47:10,24
47:25 48:2,13
51:19 52:21
53:14 54:7
58:2 60:9,10
60:20,22 61:1
61:21,23 62:3
221:18,23
231:16
**reviewer**   55:5
**reviewing**   46:2
46:4,5,25 47:3
47:17 53:11,21

54:10,20 57:19
57:22 58:7
60:12,25
**reviews**   15:22
35:6 37:6
38:24 39:14
47:8 61:10,14
61:18 98:12
99:19 100:3
121:5 141:9
150:4 162:7
167:9 183:19
195:18,24
**reword**   103:22
**rewrite**   123:12
**rgrdlaw.com**
2:14 245:2
**rid**   53:12
**right**   7:18 9:25
10:25 15:8,19
18:5 19:5 20:5
21:8,18 23:2,3
23:19 29:2,25
30:22 35:19,20
36:14 43:5,13
45:4,7,9,11
46:24 51:15,20
51:21 52:18,20
52:23 53:23
57:9 58:6
59:24 64:7
69:5,6,22 70:1
70:3,11,16,25
70:25 71:22
76:9 77:9,14

Veritext Legal Solutions
866 299-5127

**[right - searched]**

| | | | |
|---|---|---|---|
| 77:23 78:2,5,5 | 215:23 225:25 | **s** | 98:15 99:3 |
| 78:6 81:17 | 226:1 233:22 | | 105:1 111:25 |
| 84:21 86:18 | 238:19 | **s**   4:11 5:1 7:14 | 119:18 149:25 |
| 87:11,12 88:3 | **rise**   235:12 | 107:7,7 | 150:1 153:10 |
| 88:9 100:15,23 | **risk**   224:13,18 | **s&p**   184:2,2,9 | 171:18 173:25 |
| 102:13 105:18 | **risks**   223:16 | 184:12 196:5,6 | 174:6,12,14 |
| 108:2 114:15 | 225:2 | 207:4,5 | 188:6,7,7,21,22 |
| 123:6 125:22 | **road**   2:17 | **salary**   28:16,25 | 189:2,2 192:21 |
| 126:24,25 | **robbins**   2:11 | 29:6 | 194:1 196:18 |
| 127:4,9 131:8 | 6:18 8:11 | **san**   2:13 3:4 | 224:25 226:23 |
| 131:14 133:1 | **role**   87:11 | **saw**   113:10 | 238:10,21 |
| 142:14 144:8 | 135:16 | 114:18 212:12 | **scenario**   223:3 |
| 144:15 145:16 | **room**   37:20 | **saying**   16:22 | 225:1 |
| 148:25 149:19 | **rose**   3:3 6:24 | 40:9 49:21,23 | **schedule** |
| 150:25 154:19 | **row**   201:5 | 50:6 73:15,16 | 245:10 |
| 155:12,13 | **rows**   166:12 | 73:24 75:25 | **schroeder** |
| 157:18 159:14 | **rs**   162:17 | 78:23 79:23 | 21:22 79:25 |
| 159:18 161:3 | **rudman**   2:11 | 91:4 95:3 96:4 | 118:16 138:5 |
| 167:10 169:5 | 6:18 | 96:15 99:6 | 138:10,11,13 |
| 171:16,17,17 | **rule**   7:6,10 | 104:19 121:2 | 139:1,4 |
| 171:22,25 | **rules**   1:18,18 | 122:6,8 123:10 | **schroeder's** |
| 172:2 174:23 | 2:1,2 7:5 8:25 | 130:1,2 135:2 | 21:23 22:1,3 |
| 174:25 175:8 | 214:16 243:14 | 141:15 148:17 | 80:8 81:3 |
| 182:19,21 | 243:14 246:8 | 149:14 150:8,9 | 139:23 |
| 184:21 185:12 | **run**   57:4 | 150:13,14,21 | **sciences**   88:16 |
| 186:24 188:4 | 110:19 160:3,8 | 150:25 151:1,4 | 88:16 |
| 188:15 197:7 | 160:25 177:13 | 151:6,8,9 | **scott**   138:4 |
| 198:16 200:21 | 178:1,8 181:8 | 152:4,15,17,23 | 139:4 |
| 200:24 201:7,9 | 182:3,13 | 152:25 153:2 | **screen**   176:15 |
| 201:11,14,17 | 194:16 | 159:5 171:12 | **search**   17:20 |
| 201:18 204:19 | **running**   161:6 | 192:19 199:1 | 18:8,19 19:4 |
| 205:21 209:4 | 161:19 193:5 | 209:15 213:1 | 54:14 58:22 |
| 209:18 210:4 | 203:23 | 216:12,20 | 59:12 |
| 210:20 211:9 | | 241:1,2,7 | **searched**   17:8 |
| 211:14,18 | | **says**   10:23 49:3 | 59:13 |
| | | 79:12 95:15 | |

Veritext Legal Solutions
866 299-5127

**[searches - settlement]**

**searches**  19:6
54:18,21 55:20
55:23 57:3
58:24 59:21
**searching**
18:11
**sec**  45:20,22
47:1,14 48:1
54:5,6,10,14,20
55:16,18,24
56:2,3,5,14,17
56:24 57:5,5
99:1 213:19
241:11
**second**  7:2 53:3
70:15 78:5
127:25 140:4
155:9 166:13
167:5 177:16
**seconds**  175:22
**section**  57:9
129:3 141:20
143:6 226:11
**securities**  30:21
30:24 31:2,16
32:13,15,18,21
32:23,24 33:2
33:3,6,9,12,16
33:17,18,20,25
34:5 39:1,16
40:4,5,7,14
82:6,11 86:2
88:5
**see**  18:20,25
56:6,24 65:24

65:25 67:2,24
67:25 68:1,16
72:24 75:20,22
92:25 97:22,25
98:3 99:18
109:23 111:13
112:8 117:15
117:23 118:10
119:16 120:6,7
120:7,21
121:22 123:4,7
124:21 128:3,7
128:16,25
129:21 132:10
133:18 135:21
136:23 138:6
139:18 140:10
140:17 141:25
143:11 144:2,5
144:20,21
147:25 154:7
157:14 163:20
164:6 166:17
167:7,22
169:22 170:2
171:9 174:19
176:18,20
181:12 183:15
184:17 185:5
185:17 187:2
189:5,14,17
190:6,9,21
191:19 196:3
198:25 199:3,4
199:4 207:7,12

210:23 223:4
227:3,7 232:18
234:5 238:13
**seeing**  58:15
98:13 115:13
217:22
**seem**  165:5
194:20 201:13
239:16
**seemed**  33:6
113:15
**seems**  29:10
37:24 151:16
167:10
**seen**  17:11
112:18,22
114:19,20
115:5,19
116:13 120:8
153:15 172:23
172:25 218:3
238:1
**select**  184:3,9
207:6
**selection**
156:19
**sense**  14:20
25:20 28:4
29:15 61:5,6
104:25 112:25
116:19,23
120:8 133:4
152:11 179:6
180:14,18
203:13 205:17

205:23 236:22
239:7
**sentence**  118:1
118:13 128:16
129:7 132:4
138:25 139:1
139:22 140:4
141:4,5,25
147:12 148:4
**sentences**  123:4
128:8
**sentiment**
135:20,24
**separate**  79:24
82:20
**september**
72:19 101:6,11
101:12,12
174:1,2,8,9
**serial**  109:2
**series**  89:9
133:12 192:4
**serious**  215:5
**service**  18:23
18:24 62:14
204:21
**services**  19:12
51:4
**set**  37:19 105:2
105:3
**setting**  37:15
38:12
**settled**  163:3
**settlement**
177:12 215:12

**[settlement - sorry]**

215:23 222:4

**settling** 216:9

**seven** 177:3

**sever** 82:15
86:4,5

**share** 44:3
175:3 191:17

**sheet** 165:2
166:8 175:13
175:16 183:3

**sheets** 166:7
198:1

**short** 196:11

**shorthand** 13:4
56:11 244:10
244:24

**show** 73:19
74:3 90:5
95:23,23
116:22 196:25
234:5

**showing** 34:17
82:16 96:3,14

**shown** 233:4
238:6

**shows** 75:23
76:11,20 109:3
125:16 133:22
143:8 147:15

**side** 31:1,15
32:18 33:25
57:21 130:23
154:18

**sign** 25:11
245:16 246:5

**signature**
244:23 245:21
245:23,23
246:9

**signed** 13:13

**significance**
66:8,10 126:3
131:22 133:25
134:9 168:17
172:22,23
236:20 237:18
238:5

**significant** 65:1
83:9,20 84:7
84:11 85:10
87:14 88:13
89:4,16 90:1
91:8,13,22
111:15,24
112:3 125:11
125:21,24,24
129:12,15,24
130:2,12,16
131:17 132:1,3
132:7,13,23
133:16 134:19
134:22 135:1
157:11,25
158:21 159:17
171:19,20,24
178:13,18
179:3,7 190:10
230:25 232:4
232:23 233:1
233:25 234:12

234:21,22
235:24 236:4,6
236:21 237:1,7
237:10,13,14
237:24,25
238:8,15,17,21
239:10,19,23
239:25 240:10
240:13,15

**similar** 25:23
25:24 54:15
106:7 107:22
192:23 210:15
231:11,12
238:22 239:13
240:8

**similarly** 1:6
64:1 230:17
240:9

**simply** 165:11

**single** 54:6 60:9
60:15

**sit** 15:2 32:20
37:20 43:8
110:20 201:5
202:5

**sitting** 15:17
37:3 110:8

**situated** 1:7

**situations**
116:10 224:18

**six** 165:9
175:18 177:3
196:14 199:13
211:25

**size** 215:14
219:5

**skimmed** 60:16

**sliding** 106:24

**slightly** 34:1
57:2 67:16
102:14 182:5
197:21 216:14

**small** 45:21,23
188:17 196:5,7
239:24 241:19

**smaller** 188:15
190:4 238:16

**smelko** 69:16
80:1 138:19,20

**smelko's** 81:12
81:14

**sml** 196:6

**social** 88:16

**software**
110:12,18
187:21 188:18

**sole** 240:17

**solely** 73:23

**solo** 201:16

**solutions** 245:7

**somebody**
22:11 25:25
55:4

**sorry** 8:21
31:23 46:12
53:2 57:16
103:19 124:23
128:4 142:1
149:6 154:24

Veritext Legal Solutions
866 299-5127

**[sorry - statements]**

| | | | |
|---|---|---|---|
| 166:25 174:3 | **specifically** | **stamped** 45:8 | **stata** 110:15 |
| 189:22 194:9 | 55:16 57:4,15 | **stand** 83:18 | **state** 8:14 |
| 208:12 210:9 | 57:18,22,25 | **standard** 2:4 | 44:13 79:5 |
| 213:10 214:6 | 110:23 114:2 | 63:16,19,19 | 124:24 140:2 |
| 223:24 235:22 | 135:12 137:5 | 85:5,6 131:22 | 140:12,21 |
| 236:14 | 145:17 148:2 | 131:23 132:18 | 141:18 148:22 |
| **sort** 26:1 29:13 | 209:8 210:19 | 132:20 133:5 | 164:24 229:4 |
| 66:19 68:24 | **specification** | 133:25 134:7 | 243:5 244:1,4 |
| 82:18 89:13 | 162:2 195:7 | 134:13,14,18 | 244:25 245:9 |
| 108:3,5 109:24 | **specifications** | 173:13 203:15 | 245:12 |
| 130:5 133:9,24 | 160:8 161:24 | 203:18 204:9 | **stated** 7:8 |
| 151:7 156:24 | **specifics** 59:18 | 204:12,17,20 | 69:15 128:10 |
| 203:12 207:24 | **specified** 14:22 | 204:25 205:7 | **statement** 7:3 |
| 208:6 239:3 | **spelled** 107:7 | 205:19 206:13 | 39:9,18 67:20 |
| **sorts** 220:25 | 123:16 | 206:15,16 | 92:7,15,18 |
| **sound** 161:3 | **spencer** 21:5 | 211:7 236:5,19 | 97:12 100:11 |
| **source** 135:18 | **spend** 8:24 | **standards** 64:6 | 102:5 106:21 |
| 136:13 | 23:15 24:6,7 | 88:10 | 121:12 128:7 |
| **sources** 50:13 | 54:10 60:11 | **standing** 89:25 | 131:19 142:5 |
| 135:23 136:16 | **spending** 32:11 | 91:14 | 148:8 151:16 |
| 138:15 | 54:19 | **standpoint** | 151:17 152:21 |
| **southern** 1:2 | **spent** 27:13,16 | 104:8 105:4 | 153:9 227:5 |
| **speak** 9:3 | 27:19 | 204:8 | 241:6 |
| **specific** 42:2 | **spills** 146:16 | **stands** 22:9 | **statements** |
| 57:7 58:6 | **ss** 244:2 | **stanford** | 93:22 94:3 |
| 59:22 62:11 | **staff** 24:22 | 229:22 | 97:5 100:18,24 |
| 86:19 99:12 | 36:16 | **start** 13:15 | 101:2,2,8,11,20 |
| 100:24 101:3 | **stage** 82:15 | 165:11 170:25 | 101:24 102:15 |
| 101:21,22 | 88:8 | **started** 156:5 | 102:17 103:5 |
| 102:10,10 | **stalter** 101:6,13 | 179:19 | 104:1,11,19,20 |
| 104:15 105:18 | 101:17 102:2 | **starts** 25:18 | 105:20 119:1,4 |
| 139:1 146:24 | 105:13,16,16 | 59:25 120:15 | 120:25 122:23 |
| 159:15 170:12 | 105:24 139:12 | 129:3,7,7 | 123:2,25 124:3 |
| 172:11 213:6 | 140:16 | 147:12 198:7 | 153:21 |
| 220:13 | | | |

Veritext Legal Solutions
866 299-5127

**[states - strike]**

| | | | |
|---|---|---|---|
| **states**  1:1 | 157:11,25 | 92:6,24 93:1 | **stocks**   42:24 |
| 117:17 124:15 | 158:21 159:12 | 106:20,21,25 | 43:11 |
| 127:22 128:8 | 159:17,21 | 112:1 125:9,10 | **stokes**   3:3 4:5 |
| 135:13 | 171:19,24 | 125:15,16,19 | 6:23,24 12:4 |
| **stating**  83:9 | 178:13,18 | 126:8 127:3,12 | 20:2,15,19,22 |
| 143:2 224:16 | 179:7 180:15 | 129:14,19 | 28:10 64:8 |
| **statistic**   166:16 | 190:10 230:25 | 130:3,15 | 76:10 77:15,24 |
| 168:13,13,15 | 232:4,23,25 | 131:16 135:17 | 78:8 83:11,22 |
| 172:1 | 233:24 234:12 | 137:14 143:7,8 | 84:18 87:2 |
| **statistical**   36:7 | 234:20 235:24 | 143:14,21 | 89:7 92:8,20 |
| 36:12 64:25 | 236:4,5,21 | 144:7,11,22 | 94:7,23 102:3 |
| 65:3,7,11,17 | 237:6,10,23,25 | 145:1,3,7,19 | 103:7 104:4 |
| 66:8,9,13,14,19 | 238:8,15,17,20 | 146:25 157:11 | 108:11 119:2 |
| 66:22 111:1 | 239:10,19,23 | 157:16,18,19 | 159:23 190:20 |
| 126:3 131:22 | 239:25 240:10 | 157:23 158:5,6 | 190:23 191:1 |
| 133:25 134:9 | 240:12,14 | 158:24 159:3 | 191:14,19 |
| 168:17 169:1 | **statler**   104:17 | 159:13,15 | 197:10 200:9 |
| 172:21,23 | 104:24 | 160:14 163:6 | 214:12 218:20 |
| 173:11,14 | **stay**   26:10 | 164:8 168:18 | 219:25 222:18 |
| 236:20 237:18 | **step**   23:20 | 170:8,11 | 223:9 225:14 |
| 238:5 | 225:19 | 171:14 174:13 | 227:12 229:2,8 |
| **statistically** | **stipulation** | 178:18 180:15 | 235:23 242:5 |
| 65:1 83:9,19 | 7:12,14 245:20 | 183:14 194:11 | 242:11 |
| 84:6,11 85:10 | **stock**   36:20 | 197:2 198:23 | **stories**   49:24 |
| 87:14 88:12 | 39:10,19 41:16 | 199:7 200:18 | 57:11 58:16,22 |
| 89:3,16 90:1 | 41:23 42:20,20 | 200:21 204:12 | 59:10,14 62:25 |
| 91:8,13,21 | 43:3 49:12,13 | 221:11,17 | 69:5 98:5 |
| 111:15,24 | 49:18 52:4 | 223:8 229:23 | 136:1,15 137:2 |
| 112:3 125:10 | 67:8 68:5,6,9 | 230:4 231:21 | **story**   59:7 73:6 |
| 125:21,23,24 | 68:15,20 71:24 | 232:17 233:19 | **straightforward** |
| 129:12,15,24 | 72:10,12 82:25 | 234:4 235:1 | 29:17 |
| 130:2,12,16,19 | 86:25 87:7,14 | 237:20 238:10 | **street**   136:7 |
| 130:22 131:17 | 87:20 88:13 | 239:8 | **strike**   65:9 |
| 132:3,6,13,23 | 89:4,12,20 | **stock's**   146:2 | 92:11,14 143:2 |
| 133:16 135:1 | 91:5,19,23 | | 182:11 188:2 |

Veritext Legal Solutions
866 299-5127

**[strike - take]**

213:12
**string** 124:7
**stronger**
134:19
**structure**
109:23
**studies** 91:20
91:24,25 92:1
92:5 158:11
160:2 231:21
**study** 36:12,15
36:18,19 49:17
65:4,5,6,25
68:1 89:14
91:6 97:22
130:1 158:16
159:5 160:4,5
160:13 162:11
164:5 168:6,20
168:22 177:19
177:20 178:9
183:21,25
194:3 195:17
205:3 207:4
231:22,23,25
232:5,10,12,14
233:18 238:3
**subheading**
117:13
**subject** 35:17
229:17 234:24
**submit** 40:3
**submitting**
16:11 17:13
18:2

**subscribe**
19:13
**subsection** 7:6
7:10 143:6
**substance**
26:13 157:7
**substantial**
54:13 100:12
100:12
**substantially**
78:20
**successor**
183:14,24
**suffered** 11:18
**sufficient** 69:12
**suite** 2:13 3:4
**summaries**
53:25 62:24
**summarize**
14:7 16:8
229:15 231:7
235:5
**summarizes**
14:17 15:4
**summary** 14:9
14:14 63:7
**supervision**
25:1,7,16
54:25
**support** 46:21
**supports** 15:10
85:8 86:15
88:18
**suppose** 75:25
75:25 156:11

**supposedly**
148:12
**supreme** 82:12
**sure** 12:16,17
13:5,10,19,25
17:2,2,10,16
19:17 21:13
28:19 29:24
30:1 31:7,13
32:2 38:13,25
39:3 41:4,9
51:9 57:20,24
62:1,4 65:15
72:16,25 73:4
77:18 83:16,23
84:1,3,3,19
92:21 94:8,12
107:1 114:18
114:20 123:22
124:11 147:11
155:25 158:6
162:19 164:4
166:21 168:21
169:14 170:15
170:16 172:10
174:5 179:24
181:15,24
184:25 187:25
188:7 191:13
191:15 195:4
196:1,10
197:15 198:10
198:11 200:10
200:16 202:21
203:10 204:16

210:2 213:11
214:11 229:19
**surface** 233:14
**surmise** 22:24
**surprised**
114:12 218:25
220:19
**swear** 7:16
**swears** 6:12
**switching**
155:9
**sworn** 8:3
244:7
**system** 1:5 2:4
2:10 6:8 245:4
**systematic**
176:2

**t**

**t** 4:11 5:1 107:7
107:7,7 166:16
168:13 172:1
**table** 9:23,24
63:6 75:23
76:11,13 79:10
95:15,23
216:23 217:2
232:21 233:5
**tables** 25:4
**tagged** 59:6
**take** 10:5 12:8
23:20 38:21
55:19 71:14
80:10 81:9,14
81:18 117:1
139:22 144:9

Page 53

**[take - tests]**

144:25 145:18
146:2 154:25
165:10 175:17
188:16 191:9
191:14 204:12
207:16,20,25
214:21 215:25
225:19 228:13
240:4
**taken**   2:2 9:16
93:25 97:8
215:1 244:9
**takes**   24:4
37:19
**talk**   97:13
131:4,5 135:11
**talked**   54:4
163:22 170:7
213:20,21
222:10
**talking**   33:23
55:13 76:16
77:2 82:13
84:21 100:10
108:23 130:25
190:11
**talks**   137:17
154:2 174:13
207:3
**tang**   21:5
**targets**   50:1
**tatiana**   21:5
**team**   20:18
21:2,3,6 24:12
24:18,23 25:2

25:9,9 27:15
27:22,25 28:4
36:17 47:21
48:7 54:17,21
55:12,13,20
57:4 60:21,21
**teammate**
20:25
**teammates**
20:24
**technically**
28:22,22
**technique**
59:12
**telephonically**
20:19
**tell**   27:5 30:3
54:9,20 88:21
143:25 169:3
192:16
**telling**   151:10
**tells**   168:14
**ten**   40:23 177:3
209:22
**tend**   26:2,10
58:25 59:4
158:10,11,12
200:23
**tends**   123:14
**tenth**   209:23
**term**   106:6,11
106:12 107:3
173:14 208:9
208:13,21

**terminology**
208:24
**terms**   25:20
50:5 51:12
69:7 79:17
80:20 97:17,18
190:5 197:22
215:8 218:1,1
218:3 230:21
239:12,15
**test**   14:2 64:25
65:3,6,7 66:9
66:20,22 90:11
90:13 97:18
106:2,19
108:14,19
109:19 110:19
110:21 113:5
113:15,25
114:1,5,5,9,14
114:17,25
115:8,23,25
132:17,18,19
146:5,14 160:9
161:16 164:7
164:12 177:9
179:12 193:4
195:4 233:18
236:10
**tested**   113:13
146:18 160:13
160:14,16
161:11,15,24
162:5,22 163:1
173:5 179:25

180:22 181:6,9
182:3 193:11
193:17 195:20
**testified**   8:4
31:15 32:14,17
32:21,24 33:1
33:3,5,17,19
40:13,16 41:1
41:4 62:9
**testify**   12:23
41:6 244:7
**testifying**   31:25
32:5
**testimony**   7:20
11:13 30:21,23
31:1,6,25 32:8
32:9,12 33:13
33:24 37:1,11
37:12 39:7,20
40:21 84:15
229:13
**testing**   84:14
91:7 97:20
113:24 114:2
146:15 161:22
162:3 163:6
197:13,18,19
197:24 198:2
198:15 204:19
205:6
**tests**   66:7 97:2
106:15 108:17
108:22,25
109:6,9,13,14
110:2,5 113:8

Veritext Legal Solutions
866 299-5127

**[tests - think]**

| | | | |
|---|---|---|---|
| 113:8,10,17,21 | 87:23 98:7 | 84:10,10,22,24 | 161:12,15,20 |
| 113:23 133:12 | 106:11 111:19 | 85:4,7,19,25 | 162:1,8,10,20 |
| 233:23 238:5 | 127:10 134:22 | 86:1,5,9 87:17 | 162:23 163:1,9 |
| **texas**   1:2 3:5 | 134:25 164:1 | 87:23 92:23 | 163:15,15 |
| **text**   18:16 19:4 | 193:19 203:13 | 93:6,13,19,20 | 165:20 166:23 |
| **textbooks** | 214:21,25 | 94:10,11,13 | 167:3 169:2,5 |
| 143:25 | 216:20 220:25 | 97:4,12,14 | 169:14 171:8 |
| **thank**   7:25 10:7 | 223:24 230:4 | 98:14 99:2,5 | 175:20 177:18 |
| 35:24 44:10 | **think**   9:25 | 99:18 100:20 | 178:3,9 179:4 |
| 82:1 103:18 | 14:16,24 15:20 | 100:25 101:13 | 179:14 180:12 |
| 155:1 162:17 | 16:14,15 17:17 | 102:4 103:15 | 180:17,19 |
| 174:10 184:13 | 17:25 19:25 | 103:17 104:5,8 | 181:2 182:4,5 |
| 191:12 194:24 | 21:1,22 22:22 | 104:9 109:25 | 182:17 183:9,9 |
| 228:20 229:1 | 22:25 24:20 | 110:8,10,14 | 183:13,14 |
| 242:7,9,10,11 | 25:20 26:16,25 | 113:3,4,7,11 | 185:15,15 |
| **thanks**   8:13 | 31:11 32:10 | 114:4,4,5 | 186:8,8,16 |
| 12:16 103:19 | 35:4 37:7,10 | 115:2,10 | 187:2,9 189:4 |
| 157:6 | 39:24 40:7 | 116:17,17 | 189:16 192:14 |
| **thing**   12:7 | 41:7 42:11,14 | 119:5,6,7,10,22 | 193:4,7,9,11 |
| 16:14 102:25 | 42:15,15,21 | 121:4,12 | 194:14,19,21 |
| 103:1 130:9 | 43:7 50:15,23 | 122:13,15,22 | 196:6,11 |
| 131:8 156:20 | 51:5,12 52:9 | 123:1 124:2,4 | 197:14,21 |
| 165:23 171:10 | 52:13 57:1 | 124:9 125:23 | 198:3,11,16 |
| 174:16 181:12 | 59:21 61:19,24 | 126:4,10,13,24 | 199:17,23 |
| 193:6 204:8 | 61:25 62:2,8,9 | 127:1,18 134:3 | 202:10 205:17 |
| 237:15 | 62:20 63:13,18 | 134:8 138:20 | 205:22,22,23 |
| **things**   18:7,7 | 63:21 64:9 | 138:20 141:4 | 205:25 208:1 |
| 25:5 26:11,24 | 67:6,12,21 | 141:10,10 | 208:25 209:3,6 |
| 30:16 36:11 | 68:22 70:7,17 | 143:15,17 | 211:22 212:2 |
| 48:14 50:4,9 | 70:19 71:13,14 | 144:3 145:21 | 213:4 214:18 |
| 50:18 54:14 | 71:23,24,25 | 147:2 151:12 | 214:22 216:24 |
| 55:13,21 56:6 | 73:18 74:2,14 | 151:13 152:5 | 220:3,4,11,11 |
| 56:7,23 58:9 | 75:6 79:20 | 152:18 154:23 | 222:25 223:10 |
| 66:12 67:22 | 82:3,5,10,11,12 | 156:1 158:4,9 | 223:10,13,17 |
| 68:4 73:25 | 82:18,23 83:1 | 160:14,18,20 | 223:17,21 |

Page 55

**[think - trading]**

224:12,17
226:4,7,9
227:19,23,23
227:24 228:9,9
232:9,11,13
233:3 235:2,6
235:21 238:20
239:3,5,6,14
240:2
**thinking**   16:15
**thinks**   238:14
238:16
**third**   166:13
201:14
**thought**   73:6
73:22 76:3
78:14 100:1
122:25 156:8
165:25
**three**   100:2
101:14 165:18
177:2 178:12
179:3 180:23
201:8
**threshold**
132:2,20,20,21
132:25 133:1
133:22 171:21
172:8,12,14,15
173:3,6 236:6
236:18 237:3,4
237:5,11,16,19
**thresholds**
172:17,22
173:1

**threw**   99:15
102:7
**thrown**   100:8
104:12,13
**tick**   174:17,21
**time**   2:4 6:5
8:24 12:11
13:23,24 17:8
17:13 18:2
20:3,6,20
23:10 24:5,7
26:11 27:19
28:12 31:8
32:6,11 45:12
49:16 50:10
54:9,13,19
56:3,5,8,19,25
58:4,14 60:11
61:4 66:10
68:15 75:16,22
76:18,24 77:4
78:3,10,18,18
78:22,24 79:1
84:5 90:7
92:13,18,18
97:21 98:2
106:22 107:12
107:13,21,25
109:23 111:23
118:25 119:3
120:8 130:10
130:14 132:19
134:21,24
135:4,20
141:22 142:6

142:12,12,21
142:22 144:6
146:22,24
147:7,22 148:6
148:11 151:24
152:3,7,9,11,13
152:14,24
153:12,16
160:17,21
161:1,16,19,21
162:3 180:7,10
189:7,19,20
190:18 205:6
213:20,20
218:23,23
221:6 228:5,25
231:17,18
236:24 237:2,8
237:12 240:15
242:6 244:10
245:10,18,24
246:7
**times**   30:25
31:10,14,19
32:18 33:24
34:3 61:2,21
98:25 135:7
**timing**   79:17
146:15 230:22
**tiny**   32:5
186:22 241:23
241:24
**titled**   4:13,15
4:16,18,19,21
4:22 5:3,4

176:21
**today**   8:13 9:12
10:9,13 11:1
11:13 12:1,20
15:17 37:4
110:9 130:24
209:13
**today's**   20:8,20
208:19,23
**together**   25:3
68:8 69:1
124:8 125:8
208:1
**took**   80:12,18
80:19 174:4
202:20 208:5
**top**   32:20 45:6
92:4 109:17
114:11 176:20
**topaz**   2:16 6:21
**topic**   160:2
**total**   10:21
27:21 28:8
160:11,23
161:9
**toward**   117:25
**track**   221:5
**trade**   136:3
200:21 221:10
**traded**   22:16
68:5 200:18
**trading**   87:21
185:22 186:1,3
198:25 199:7
199:12 200:24

Veritext Legal Solutions
866 299-5127

**[trading - understand]**

| | | | |
|---|---|---|---|
| 201:9 202:1,3 | 83:16 123:13 | **two**  12:19 | 237:15 |
| 202:7,19,19,22 | 161:1 167:15 | 20:21,21 21:21 | **typically**  18:24 |
| 203:2,2,3,5,8 | 167:15,20 | 21:25 24:16 | 24:6,7 25:14 |
| 203:19,23 | 208:6 215:3 | 30:14 52:25 | 25:18 27:2 |
| 204:18,18 | 221:9 | 67:21 70:9,13 | 29:6 40:2 |
| 205:5,8,10,13 | **trying**  15:20 | 70:15,18 74:8 | 51:10 56:4 |
| 205:16,20,25 | 42:14 90:11 | 77:8 79:24 | 58:3 59:3 60:4 |
| 206:4,12 | 99:25 106:13 | 80:6 101:4,9 | 63:24 126:1 |
| **transcript**  7:12 | 111:14 124:6 | 127:10 128:8 | 133:17 144:19 |
| 244:13,15,17 | 133:23 164:12 | 138:22 141:5 | 178:16 202:17 |
| 245:6,8,10,13 | 178:19 182:18 | 160:20 162:6 | 236:18 |
| 245:13,21 | 196:21 210:23 | 162:21 163:16 | **typos**  173:20 |
| 246:2,2 | 211:10,18,21 | 164:1 177:2,21 | 173:23 |
| **transcripts** | 212:14 | 178:13 179:3 | **u** |
| 57:11 58:2 | **turn**  117:12 | 182:12 183:24 | **uh**  199:2 210:5 |
| **translate**  185:9 | 137:12 147:10 | 184:1 193:19 | **ultimately**  55:5 |
| 188:16 | 165:24 166:10 | 196:2 201:13 | 106:9 |
| **translated** | 174:4 183:2 | 206:12 207:10 | **under**  24:25 |
| 188:10,14 | 219:12 | 208:1 209:1 | 25:6,15 45:15 |
| **translates** | **turned**  156:6 | 234:8 238:19 | 46:11,12 47:3 |
| 172:5 186:5 | 165:22 169:14 | **type**  89:11,19 | 48:20 53:15 |
| 187:22 | 181:17 | 91:18 214:23 | 54:25 184:14 |
| **tried**  212:2 | **turning**  14:3 | 220:13 231:14 | 188:3 223:3 |
| **trouble**  83:13 | 34:7 38:14 | **typed**  26:23 | 236:24 243:4,5 |
| **true**  9:17 34:25 | 81:11 157:7 | **types**  83:3 92:1 | 244:11 |
| 60:17 69:11 | 165:17 195:11 | 136:18 213:5 | **undergraduate** |
| 80:25 94:1 | **turnover**  165:1 | 213:14 214:23 | 229:22 |
| 95:12 96:24 | 166:6 169:13 | 214:25 224:17 | **understand**  9:7 |
| 97:7 104:7 | 175:14 176:17 | 230:4 232:7 | 13:6 17:25 |
| 108:12 241:5 | 183:4 192:5 | **typewriting** | 18:25 26:9,25 |
| 243:6 244:12 | 194:18 | 244:11 | 27:13 29:18 |
| **truth**  7:22,22 | **turnovers** | **typical**  12:8 | 31:7 33:22 |
| 7:23 244:7,7,8 | 165:21 | 24:10 26:7 | 40:12 51:23,25 |
| **try**  9:16 10:5 | **turns**  71:20 | 71:1 131:23 | 54:5 56:14 |
| 38:20 56:14 | | 136:5 165:23 | 61:3 68:8 |

Page 57

**[understand - value]**

| | | | |
|---|---|---|---|
| 79:23 84:2,15 | 181:15 194:23 | 68:23 73:19 | **useful**  49:5 |
| 92:21 94:9 | 195:10 | 92:1 109:6 | **uses**  179:6 |
| 105:5 118:22 | **undo**  208:6 | 110:5 115:25 | 183:25 194:3,4 |
| 120:9 123:8,22 | **unexpected** | 116:4 118:12 | 196:2,5 239:3 |
| 131:3 167:21 | 146:21 220:16 | 134:7,10 | **using**  56:11 |
| 176:2 181:13 | **unique**  128:13 | 136:12 137:5 | 97:9,16 112:23 |
| 181:24 185:25 | **united**  1:1 | 164:6,6,10 | 114:9,19 115:3 |
| 187:24 209:15 | **university** | 168:16 172:15 | 115:6 145:6,9 |
| 210:2 217:13 | 229:21,22 | 172:25 179:9 | 160:21 168:7 |
| 219:9 | **unpredictable** | 200:23,24 | 170:24 173:6 |
| **understanding** | 107:24 | 203:15 204:17 | 178:9 179:4 |
| 9:15 11:22 | **unreasonable** | 204:25 205:1,4 | 180:1 183:23 |
| 21:12 56:8 | 111:9 238:24 | 205:8 211:18 | 187:5 193:17 |
| 64:1,20 68:6 | 239:21 240:5 | 237:15 238:1 | 193:22 196:19 |
| 70:11 83:12,13 | **unrelated**  74:9 | **used**  26:20 | 196:20 197:23 |
| 85:22 86:1,3 | 74:9,18,19 | 55:17 60:25 | 202:14 205:5 |
| 88:6,8,22 93:4 | 137:21 138:2 | 110:3 113:1 | 207:4 208:19 |
| 93:6,8,9,14 | 227:1 228:1 | 114:21 115:2 | 208:23 209:16 |
| 94:2 98:9 | **unreliable** | 116:9 131:24 | 211:4 212:13 |
| 101:15 103:3 | 111:5,9 238:24 | 156:19 160:19 | 231:22 232:18 |
| 103:24 118:3 | 240:6 | 163:9,10 | 239:1,7 |
| 118:13 119:17 | **unusual**  111:16 | 168:20,22 | **usually**  27:10 |
| 120:23 122:16 | 112:6 189:11 | 172:9 173:4 | 59:2 |
| 137:17 138:8 | 189:15 205:17 | 178:11,11 | **v** |
| 138:14 140:19 | 205:24 206:4 | 180:13 186:10 | **valuable** |
| 142:9,18 | 206:11 | 192:25 193:1 | 135:17,18 |
| 148:14,21 | **unusually** | 195:7 197:5 | **valuation**  67:5 |
| 149:17 187:18 | 130:7 | 199:12,13 | 234:25 235:11 |
| 209:16 216:10 | **uploaded** | 204:22 209:2 | **valuations** |
| 219:17 226:24 | 190:24 191:2,7 | 209:12 210:13 | 61:16,17 66:25 |
| 227:6,10 | **uploading** | 210:14,17 | 67:1 98:1 |
| **understood** | 190:20 191:10 | 231:8 232:14 | 217:11 |
| 10:25 12:6 | **use**  56:17 58:21 | 236:19 237:17 | **value**  68:14,18 |
| 19:16 23:13 | 59:3,5 65:11 | 239:6 | 68:20 81:15 |
| 27:12 93:16 | 65:17 66:13 | | 85:11 139:22 |

Page 58

**[value - weekend]**

184:15 231:2,3
233:15 235:3,8
235:14,18
241:16
**values** 107:20
133:8
**variables**
178:12,17
179:6 180:11
180:12 193:1
**variances**
107:11
**variation** 34:1
129:14 159:8
**various** 36:25
38:15 60:6,7
61:4 92:1
110:13 126:13
199:11 214:25
**vary** 145:21,21
145:23
**verbatim** 21:5
104:17,24
125:14 207:3
234:1
**verified** 142:25
**verify** 80:9,17
81:2,13,16
141:15 227:14
**veritext** 6:11
245:7,9,11
**version** 44:19
44:22 45:2
179:10,22
180:3,6,24

**versus** 6:8 19:4
192:20 193:6
**vial** 90:14
**video** 8:22
**videoconfere...**
2:7,12,17 3:4,9
6:1
**videographer**
2:6 3:8 6:4,10
7:8,14 9:22
43:15,18 81:19
81:22 117:4,7
155:2,5 176:7
176:10 191:21
191:24 228:15
228:18 242:12
**videotaped**
1:17 2:1
**view** 44:9
146:19,23
176:3
**violate** 214:16
**violated** 219:23
**violation** 54:17
59:15 70:16
73:3 76:25
78:19 120:17
148:12 149:2
151:11 154:15
212:19,23
213:5,9,14
214:10 215:5
215:16,25
216:2,17 217:7
220:2,9,12,14

220:15,20
230:11
**violations** 72:7
72:13,20 77:2
85:15 108:7
119:10 137:22
139:11 141:13
142:23 147:16
147:22 148:5
148:12 213:2,4
214:25 215:20
219:18 220:4,6
220:25 222:14
222:17,22
231:14,15
**visual** 109:24
110:7
**visually** 112:7
**volatility**
179:20 187:8
232:2
**vs** 1:9 245:4

**w**

**waived** 245:23
245:23
**waiving** 245:20
**walk** 48:10
**wall** 136:7
**wang** 21:4
**want** 34:1
44:13 66:14,17
78:14 135:6
144:3 166:24
178:16,20
196:9 203:4,4

206:1 209:19
210:21 211:6
214:15,16
**wanted** 88:1
156:22
**wanting** 156:15
**wants** 214:14
**water** 121:9
149:10 150:6
150:11
**way** 14:23
22:23 29:1
32:16 35:10
49:3,10,11,17
57:20,24 62:16
64:10 67:24
82:23 84:4
85:18 87:18
90:9,11 91:6
97:16 109:19
111:12 133:3
156:24,25
174:20 176:1
179:2 187:3
202:11 238:4
241:12
**ways** 17:19
49:2,20 65:21
67:7 108:20
134:12 209:21
212:7 227:19
**weaker** 172:13
**website** 221:1,4
**weekend**
200:21 201:2

Veritext Legal Solutions
866 299-5127

**[weekend - yeah]**

| | | | |
|---|---|---|---|
| 201:14,17 | 147:15,17,19 | 87:3 89:8 92:9 | **worked** 21:6 |
| **weigh** 85:1 | 151:18,19,22 | 92:21 94:8,24 | 32:23 54:23 |
| **weight** 207:22 | 153:5,11,16,19 | 98:12 99:19 | 156:25 |
| 208:5 209:23 | 153:22 154:10 | 100:3 102:4 | **working** 25:2 |
| **weighted** 208:3 | 154:11,13,16 | 103:9 104:5 | 32:6 36:1 |
| 209:22 | 154:16,20,21 | 108:12 117:3 | 42:25 55:11 |
| **weights** 207:20 | 230:21 | 119:3 121:5 | 156:5,21 230:2 |
| 208:2,9,15,19 | **went** 90:9 | 141:9 150:4 | **works** 18:24 |
| 209:7,12,17 | 154:24 157:22 | 155:1 162:7 | 29:17 |
| **welcome** 43:21 | 157:24 158:1,5 | 165:5 167:9 | **worse** 225:16 |
| 81:25 117:10 | 158:7,25 | 183:19 191:2,5 | **worst** 223:3 |
| 155:8 176:13 | 171:14 178:14 | 191:8,12 | 224:25 |
| 192:2 228:22 | 180:16 207:23 | 195:18,24 | **write** 24:23 |
| **wells** 75:16,21 | 207:24 212:3 | 200:10 214:13 | 25:8 26:14 |
| 76:6,13,13,14 | 212:11 227:18 | 218:21 220:1 | 121:18 |
| 76:20,22,24 | **west** 2:13 | 222:19 223:10 | **writing** 89:1 |
| 77:10,11,19,21 | 112:16,21 | 225:15 228:14 | **written** 24:25 |
| 78:1,16,16,25 | 113:1 114:14 | 229:1,5 232:9 | 41:4 139:23 |
| 79:12,13,17 | 114:17,24 | 242:9 244:5,20 | 181:21 |
| 80:15,15,17 | 115:8,22,25 | 245:13,16 | **wrong** 178:14 |
| 99:9,10,12,22 | 116:4,17 | 246:2,5 | 179:2 186:10 |
| 100:22,23,25 | **white** 113:23 | **word** 25:8 | **wrote** 156:12 |
| 101:7,13,13,18 | 113:25 114:1,5 | 26:14 59:10 | 156:20 |
| 101:21,22 | 114:9 | 80:11,12 141:5 | **x** |
| 102:1,2,10,11 | **willing** 135:3 | **words** 18:8,17 | **x** 4:1,11 5:1 |
| 104:16,17,21 | **wilshire** 7:7 | 25:19 26:18,23 | 89:19 246:9 |
| 104:23,24 | **witness** 2:5 | 74:11 97:9 | **y** |
| 105:2,3,13,16 | 6:12 7:17,19 | 106:7,14 | **y** 89:19 107:7 |
| 105:16,17,24 | 7:19,24 15:22 | 123:20 124:8 | **yale** 156:25 |
| 118:5,6,8,9,20 | 28:11 35:6 | **work** 13:15,22 | 229:21 |
| 118:23 137:23 | 37:6 38:24 | 25:14 32:9 | **yeah** 28:23 |
| 138:2 139:12 | 39:14 47:8 | 37:19 54:24 | 29:12 30:4 |
| 139:13,15 | 64:9 76:11 | 55:7 133:23 | 31:17 32:4 |
| 140:8,9,16,25 | 77:16,25 78:9 | 155:19 188:19 | 35:11 39:13 |
| 141:3,14,22 | 83:12,23 84:19 | | |

Veritext Legal Solutions
866 299-5127

**[yeah - zoom]**

| | |
|---|---|
| 40:6 45:17 | **year**  19:25 29:7 |
| 73:3 76:19 | 29:14 30:9 |
| 78:6,11 83:23 | 79:18 142:23 |
| 84:3 99:20 | 148:10,11 |
| 102:18 106:11 | 150:15,16,18 |
| 109:17 110:1 | 151:2,6 198:3 |
| 117:16 119:4 | 198:15 |
| 122:21,25 | **years**  31:6 37:2 |
| 123:11 124:12 | 39:8 230:3 |
| 127:1,16 131:4 | **yep**  157:9 |
| 131:9 136:12 | **yesterday** |
| 141:13 142:2 | 90:12 |
| 154:8,20 | **yesterday's** |
| 155:25 156:14 | 208:21,23 |
| 156:14,24,24 | **yield**  112:19 |
| 157:4 162:9,17 | **yielding**  240:5 |
| 167:10 169:7 | **yields**  29:16 |
| 169:12 170:4 | 111:8 |
| 171:7 173:10 | **york**  10:10 |
| 173:22 176:19 | |
| 177:3,18,22,25 | **z** |
| 181:14 183:1,9 | |
| 183:20 184:18 | **z**  89:19 |
| 186:19 187:14 | **zero**  135:10 |
| 188:6,20 | 157:21 159:12 |
| 190:25 191:11 | 159:22 208:5 |
| 191:15 196:2 | **zoom**  1:17 2:1 |
| 196:17 201:12 | 2:6,12,17 3:4,9 |
| 201:15 202:5 | 6:1 |
| 202:17,20 | |
| 203:11 204:24 | |
| 208:13 209:7 | |
| 212:21 214:7 | |
| 223:10 | |

Page 61

Federal Rules of Civil Procedure

Rule 30


(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.



DISCLAIMER: THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019. PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS
COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the
foregoing transcript is a true, correct and complete
transcript of the colloquies, questions and answers
as submitted by the court reporter. Veritext Legal
Solutions further represents that the attached
exhibits, if any, are true, correct and complete
documents as submitted by the court reporter and/or
attorneys in relation to this deposition and that
the documents were processed in accordance with
our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining
the confidentiality of client and witness information,
in accordance with the regulations promulgated under
the Health Insurance Portability and Accountability
Act (HIPAA), as amended with respect to protected
health information and the Gramm-Leach-Bliley Act, as
amended, with respect to Personally Identifiable
Information (PII). Physical transcripts and exhibits
are managed under strict facility and personnel access
controls. Electronic files of documents are stored
in encrypted form and are transmitted in an encrypted
fashion to authenticated parties who are permitted to
access the material. Our data is hosted in a Tier 4
SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and
State regulations with respect to the provision of
court reporting services, and maintains its neutrality
and independence regardless of relationship or the
financial outcome of any litigation. Veritext requires
adherence to the foregoing professional and ethical
standards from all of its subcontractors in their
independent contractor agreements.

Inquiries about Veritext Legal Solutions'
confidentiality and security policies and practices
should be directed to Veritext's Client Services
Associates indicated on the cover of this document or
at www.veritext.com.