# EXHIBIT 3

1

2   UNITED STATES DISTRICT COURT

3   SOUTHERN DISTRICT OF NEW YORK

4   Case No. 1:13-CV-7060-CM

5   -----------------------------)

6   MARVIN PEARLSTEIN, Individually And

7   On Behalf of All Others Similarly Situated,

8              Plaintiffs,

9          vs.

10  BLACKBERRY LIMITED (formerly known as

11  RESEARCH IN MOTION LIMITED),

12  THORSTEN HEINS, BRIAN BIDULKA,

13  and STEVE ZIPPERSTEIN,

14             Defendants.

15  -----------------------------)

16

17       DEPOSITION OF LUCY P. ALLEN

18          New York, New York

19          September 20, 2018

20

21

22

23

24  Reported by:

    Linda Salzman

25  JOB NO. 147982

Page 2

```
 1
 2                    September 20, 2018
 3                    10:05 a.m.
 4
 5          Deposition of LUCY P. ALLEN, the
 6     witness herein, held at the offices of
 7     Morrison & Foerster, 250 West 55th Street,
 8     New York, New York, 10019, pursuant to
 9     Notice, before Linda Salzman, a Notary
10     Public of the State of New York.
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 3

```
 1
 2     A P P E A R A N C E S:
 3
 4          KAHN SWICK & FOTI
 5          Attorneys for Lead Plaintiff and the
 6          Class
 7             1100 Poydras Street
 8             New Orleans, LA 70163
 9          BY:  MATTHEW WOODARD, ESQ.
10             KIM MILLER, ESQ.
11
12          BROWER PIVEN
13          Attorneys for Additional
14          Plaintiffs Cho and Ulug and the
15          Class
16             136 Madison Avenue
17             New York, NY 10016
18          BY:  DAVID BROWER, ESQ.
19
20          MORRISON & FOERSTER
21          Attorneys for Defendant
22             250 West 55th Street
23             New York, NY 10019
24          BY:  JAMES BEHA, II, ESQ.
25             STEVEN RAPPOPORT, ESQ.
```

Page 4

```
 1
 2     ALSO PRESENT:
 3          JACK LONG
 4          SHEILA PIERCE, ESQ. (via phone)
 5          Senior Director, Legal Counsel at
 6          BlackBerry
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 5

```
 1
 2          STIPULATIONS
 3          IT IS HEREBY STIPULATED AND
 4     AGREED by and among counsel for the
 5     respective parties hereto, that the
 6     sealing and certification of the within
 7     deposition shall be and the same are
 8     hereby waived;
 9          IT IS FURTHER STIPULATED AND
10     AGREED all objections, except as to the
11     form of the question, shall be reserved
12     to the time of the trial;
13          IT IS FURTHER STIPULATED AND
14     AGREED that the within deposition may
15     be signed before any Notary Public with
16     the same force and effect as if signed
17     and sworn to before the Court.
18
19
20
21
22
23
24
25
```

Page 6

1      L. Allen
2      MR. BROWER:  Can you mark that
3  as 1.
4      (Allen Exhibit 1, five-page
5  letter, marked for identification, as
6  of this date.)
7      THE VIDEOGRAPHER:  This is the
8  start of media labeled 1 of the video
9  recorded deposition of Lucy P. Allen
10  in the case of Marvin Pearlstein, et
11  al. v. Blackberry Limited, et al., on
12  September 20, 2018, at approximately
13  10:05 a.m.
14      My name is Manny Garcia.
15  I'm the legal video specialist
16  for TSG Reporting.  The court
17  reporter is Linda Salzman, in
18  association with TSG Reporting.
19      Counsel, please introduce
20  yourselves.
21      MS. MILLER:  Kim Miller, Kahn
22  Swick & Foti, for plaintiffs, and Matt
23  Woodard, from my office, Jack Long,
24  who works with Mr. Feinstein.
25      MR. BROWER:  David Brower for

Page 7

1      L. Allen
2  the plaintiffs.
3      MR. BEHA II:  James Beha, from
4  Morrison & Foerster, for the
5  defendants, and with me also is my
6  colleague, Steve Rappoport.  And
7  Sheila Pierce, an in-house attorney at
8  BlackBerry, is participating by
9  telephone.
10      MR. BROWER:  Mr. Beha, you're
11  representing the witness as well?
12      MR. BEHA II:  Yes.
13      THE VIDEOGRAPHER:  Court
14  reporter, please swear in the witness.
15  L U C Y  A L L E N,
16  called as a witness, having been duly
17  sworn by a Notary Public, was examined
18  and testified as follows:
19  EXAMINATION BY
20  MR. BROWER:
21  Q.  Good morning, Ms. Allen.
22  A.  Good morning.
23  Q.  Who do you work for?
24  A.  NERA.
25  Q.  And how long have you worked for

Page 8

1      L. Allen
2  NERA?
3  A.  I think it's 24 years now,
4  but --
5  Q.  And who owns NERA?
6  A.  Marsh & McLennan.
7  Q.  Marsh & McLennan is a public
8  company?
9  A.  Yes, it is.
10  Q.  Are you paid by NERA?
11  A.  I don't know if I'm technically
12  paid by Marsh & McLennan or NERA.
13  Q.  Okay.  And you're a salaried
14  employee?
15  A.  Yes, I am.
16  Q.  What's your salary?
17      MR. BEHA II:  Objection.
18  Q.  Currently?
19  A.  I prefer not to answer that.
20  Q.  Well, you don't really have a
21  choice, ma'am.
22      MR. BEHA II:  Objection.  It's
23  not relevant.
24      MR. BROWER:  Are you directing
25  her not to answer?

Page 9

1      L. Allen
2      MR. BEHA II:  I'm -- I'm
3  objecting and saying that it's not
4  relevant --
5      MR. BROWER:  Are you directing
6  her not to answer?
7      MR. BEHA II:  I'm not directing
8  her not to answer.
9      MR. BROWER:  Okay.
10  Q.  Will you answer the question,
11  please, ma'am?
12  A.  I prefer not to answer that
13  question.
14  Q.  You really don't have a choice,
15  ma'am.
16  A.  It's private information, and I
17  think it's competitive information, from
18  my perspective.
19  Q.  Okay.  Then it will be
20  subject --
21  A.  It's private information, from
22  my perspective, and I think it's
23  competitive information from the
24  perspective of my employer.
25  Q.  Okay.  Then subject to the

Page 10

1        L. Allen
2   confidentiality agreement, we'll treat
3   this is an attorneys' eyes only.
4        Can we please have the
5   information?
6        MR. BEHA II:  Objection.
7        A.   I'm not willing to answer that
8   question.
9        Q.   Okay.  Do you receive stock
10  options from Marsh & McLennan?
11       A.   I may have at -- in the past.  I
12  have not recently.
13       Q.   Do you still own Marsh &
14  McLennan stock?
15       A.   Yes, I believe I own some Marsh
16  & McLennan stock.
17       Q.   Do you know what business Marsh
18  & McLennan is in?
19       A.   It's in a series of different
20  businesses, including insurance brokerage
21  and related matters, as well as consulting
22  and other matters.
23       Q.   Do you know whether Marsh &
24  McLennan places directors and officers
25  insurance?

Page 11

1        L. Allen
2        A.   I don't have specific knowledge
3   of that.  I would think that they may, but
4   I -- I don't have specific knowledge of
5   that.
6        Q.  I've marked Exhibit 1.  We will
7   call it Allen 1 -- we should call it
8   Allen 1.  We will fix it later -- a letter
9   on Morrison & Foerster stationary.  And
10  it's five pages long, including an
11  exhibit.
12       Are you familiar with this
13  letter?
14       A.   Yes.
15       Q.   This is your retention letter in
16  this matter?
17       A.   Yes.
18       Q.   Prior to July 9, 2018, was NERA
19  retained by Morrison & Foerster or
20  BlackBerry in connection with any matters?
21       MR. BEHA II:  Objection.
22       MR. BROWER:  Are these relevance
23  objections?  Because those are
24  withheld until trial.
25       MR. BEHA II:  This objection --

Page 12

1        L. Allen
2   and we may need to step out and
3   discuss it, but -- but some
4   engagements may be privileged.
5        MR. BROWER:  Okay.
6        A.   I'm sorry.  Can you --
7        Q.   Do you need the question read
8   back?
9        A.   Yeah.
10       Q.   Sure.
11       The question was, prior to July
12  9, 2018, have NERA -- has NERA been
13  retained by Morrison & Foerster or
14  BlackBerry?
15       A.   NERA's worked with or been
16  engaged on matters involving Morrison &
17  Foerster.  I don't know if they're
18  technically retained by Morrison &
19  Foerster.  I don't know about BlackBerry.
20       Q.   Okay.  Do you know how many
21  matters NERA has worked for Morrison &
22  Foerster?
23       A.   I do not.
24       Q.   Do you know in what capacity?
25       A.   In what capacity ever?

Page 13

1        L. Allen
2        Q.   NERA has worked for Morrison &
3   Foerster?
4        A.   I may have recollection of
5   specific instances where I believe
6   Morrison & Foerster was involved in
7   projects that NERA has worked on, but I
8   don't have a --
9        Q.   What are those?
10       A.   So there's one project that I
11  recall that I have worked on.  It was a
12  ResCap matter that I worked -- I believe I
13  was retained by Morrison & Foerster.  They
14  were the ones who contacted me, and I
15  worked with them.  I don't know,
16  technically, who the retention was with.
17       And when I say "I," it was
18  really NERA that was retained.
19       Q.   Would NERA possess records of
20  how many times it's been retained by
21  Morrison & Foerster?
22       A.   I don't know.
23       Q.   Okay.  You're a managing
24  director --
25       A.   I am.

Page 14

L. Allen

1
2    Q.    -- of NERA?
3    A.    Yes.
4    Q.    Can you tell me what your
5    understanding of your retention was by
6    Morrison & Foerster in connection with
7    this matter?
8    A.    I was asked to analyze price
9    impact of the case in this matter.  That's
10   my understanding.
11   Q.    Anything else?
12   A.    I think that was -- summarizes
13   what I was asked to do.
14   Q.    Okay.  Were you asked to analyze
15   market efficiency?
16   A.    No, I was not.
17   Q.    Have you been, since retention,
18   asked to analyze market efficiency?
19   A.    With regard to this matter?
20   Q.    Yes, ma'am.
21   A.    No.
22   Q.    Okay.  Have you done any work in
23   connection with analyzing market
24   efficiency in connection with BlackBerry?
25   A.    I have reviewed the expert

Page 15

L. Allen

1
2    report of Dr. Feinstein in this matter,
3    which involves his analysis of market
4    efficiency.
5    Q.    Just curious, have you ever met
6    Dr. Feinstein?
7    A.    I think I have.
8    Q.    Now, if you look at the exhibit
9    to the letter, the last page --
10   A.    Yup.
11   Q.    -- there are five other people
12   listed here; is that correct?
13   A.    Yes.
14   Q.    Who are these other five people?
15   A.    Would you like me to read their
16   names?
17   Q.    No.  Just what did they have to
18   do with this project?
19       MR. BEHA II:  Objection.  Vague.
20   Q.    What did they have to do with
21   providing services to Morrison & Foerster
22   in connection with BlackBerry?
23   A.    They were part of a team that
24   assisted me in doing my analysis in this
25   matter.

Page 16

L. Allen

1
2    Q.    Okay.
3    A.    Or one, two -- four of them are.
4    I don't recall Alice deBrito assisting me
5    in this matter.
6    Q.    Okay.  What did Mr. Baez do?
7    A.    I don't know specifically what
8    any individuals do.  They were part of a
9    team that assisted me in preparing my
10   report.
11   Q.    Did you assign them projects in
12   connection with the project?
13   A.    Yes.  There were specific
14   assignments.  I don't have a recollection
15   of who I assigned what.  And sometimes it
16   was -- they would all be in my office, and
17   I would say, This is what we need to do.
18   So I didn't assign them, individually,
19   projects.  I don't have a recollection of
20   doing that.  In some instance, I might
21   have done that, but --
22   Q.    Do you recall any instances
23   where you did that?
24   A.    I don't really know.
25   Q.    What projects did you assign in

Page 17

L. Allen

1
2    connection with doing the work you did
3    analyzing price impact?
4    A.    My report summarizes all of the
5    work that I did in this project.  And this
6    was a team of people that assisted me.  I
7    don't -- I don't have a specific
8    recollection.
9        MR. BROWER:  Allen Number 2.
10       (Allen Exhibit 2, Expert Report
11   of Lucy P. Allen, marked for
12   identification, as of this date.)
13   Q.    Before I ask a -- you were
14   retained on July 9.
15       Did you have any discussions
16   with anyone at Morrison & Foerster before
17   July 9 about working on this case?
18   A.    Yes.
19   Q.    When did you first start having
20   conversations with someone at Morrison &
21   Foerster about working on this case?
22   A.    I believe, in March of this
23   year.
24   Q.    Did you ever speak to anyone at
25   BlackBerry either before -- either --

Page 18

```
1              L. Allen
2   after March of 2018?
3        A.   Before preparing my report?
4        Q.   Before speaking for the first
5   time to someone at Morrison & Foerster
6   about this case?
7        A.   Oh, I'm sorry.
8        Q.   Let me rephrase that.
9             Prior to March 2018, did you
10  ever have any contact with anyone at
11  BlackBerry -- let's start there.
12       A.   Not with regard to this case.
13       Q.   I understand.
14            How about for other purposes?
15       A.   Not that I recall, no.
16       Q.   Do you know how many employees
17  of NERA are former employees of
18  BlackBerry?
19       A.   I do not.
20       Q.   You do not.
21            Do you know Mr. Luis Vitoria?
22       A.   I don't believe so.
23       Q.   He's the head of business
24  resiliency management at Marsh & McLennan.
25            Do you know how many other Marsh
```

Page 19

```
1              L. Allen
2   & McLennan employees are former employees
3   of BlackBerry?
4        A.   I do not know.
5        Q.   Now, after or during -- or after
6   March of 2018, when you were contacted in
7   connection with this project, did you
8   speak to anyone from BlackBerry?
9        A.   Not before preparing my report
10  in this matter.
11       Q.   Okay.  After you started
12  preparing your report, after March of
13  2018, did you ever speak to anyone from
14  BlackBerry?
15       A.   The only recollection I have of
16  speaking with someone from BlackBerry was
17  this week.
18       Q.   Okay.  Who did you speak with?
19       A.   Shelia Pierce.
20       Q.   Who's in-house counsel?
21       A.   Correct, or that's my
22  understanding.
23            MR. BEHA II:  I'm just going to
24       caution Ms. Allen not to discuss the
25       substance.
```

Page 20

```
1              L. Allen
2            MR. BROWER:  I wasn't going to
3       ask.
4            MR. BEHA II:  I wasn't
5       suggesting you were.  I'm just going
6       to caution Ms. Allen not to discuss
7       the substance of her conversation with
8       Ms. Pierce.
9        Q.   When did you actually start
10  working on your report?
11       A.   I don't recall a specific date,
12  but I believe it would have been soon
13  after being contacted about this matter.
14       Q.   So you were contacted in March,
15  started working on your report, and then
16  retained in July; is that the chronology?
17       A.   Well, you've been saying I was
18  retained in July.
19       Q.   That's what the letter says.
20       A.   The letter was dated July.  I am
21  not a lawyer.  I don't have a legal
22  opinion of when we're technically
23  retained.  It was my understanding at some
24  point that we were retained in this matter
25  and should begin working on this matter.
```

Page 21

```
1              L. Allen
2   I don't know -- that may not have been --
3   my recollection is it would have been
4   before this letter was actually signed.
5        Q.   Okay.  Were you contacted
6   directly in connection with this matter,
7   or was someone else at NERA contacted?
8        A.   I believe I was contacted
9   directly.
10       Q.   And did you provide any
11  preliminary report or preliminary
12  conclusions to anyone at Morrison &
13  Foerster before July 9, 2018?
14       A.   I don't have a recollection of
15  what happened before or after this
16  particular document was signed.  As I
17  said, I don't -- this particular retention
18  letter is a little bit different than
19  NERA's standard retention letter.
20            So I have some recollection that
21  there was some back-and-forth with NERA's
22  counsel, and Morrison & Foerster about the
23  -- to the extent we have a retention
24  letter, that's different than the standard
25  one that we use.  We usually get some sort
```

Page 22

```
1              L. Allen
2    of approval from counsel that it is --
3    meets the standards.
4         So I don't have a specific
5    recollection, but this letter looks
6    somewhat different than a typical letter.
7    So my guess is that's what would have
8    happened.  So I -- I think there might
9    have been some back-and-forth on this
10   letter, and the timing of when this is
11   dated doesn't really tell me anything
12   about when we were doing the work, is what
13   I'm saying.
14       Q.   Do you recall what the issue was
15   that resulted in a letter that's not the
16   same as your typical NERA engagement
17   letter?
18       A.   No.
19       Q.   Were you involved in those
20   discussions?
21       A.   I may have been.  The typical
22   process is we send someone a letter
23   saying, This is our standard letter.
24   Oftentimes there are some, Well we have
25   our own standard letter.  Then we say, If
```

Page 23

```
1              L. Allen
2    you have your own standard letter, we need
3    to send that to our counsel to see if they
4    approve it.  So there's some
5    back-and-forth, but I don't have a -- that
6    would be my -- sort of my general
7    recollection.
8        Q.   You can't recall any particular
9    issue or problem that arose between
10   Morrison & Foerster and NERA with respect
11   to the scope of the retention?
12       A.   I don't particularly know.
13       Q.   At what point in time were you
14   told to prepare an actual report?
15       A.   It was my -- it's my
16   recollection that that was my assignment
17   to begin with, that that was -- that's my
18   recollection.  That's what I was assigned
19   to do from the start.
20       Q.   Let's look at Exhibit 2, which
21   is your report, correct?
22       A.   Okay.
23       Q.   And you testified earlier that
24   it says what you did.  Go to page 5.  It
25   says your "materials considered," right?
```

Page 24

```
1              L. Allen
2        A.   Yes.
3        Q.   Okay.  And it says you
4    considered.  So these are the documents
5    you considered personally?
6        A.   Yes.  "In preparing this report,
7    I considered the following materials."
8        Q.   What materials did other members
9    of your staff consider in preparing this
10   report?
11       A.   All of the materials --
12       MR. BEHA II:  Objection.  No --
13   objection.  I don't think that that is
14   subject to disclosure.
15       MR. BROWER:  What they
16   considered in doing the report that
17   assisted her in doing the report?  Are
18   you joking?
19       MR. BEHA II:  What she
20   considered --
21       MR. BROWER:  Are you directing
22   her not to answer?  I'm not going to
23   debate.
24       Are you directing her not to
25   answer?
```

Page 25

```
1              L. Allen
2        MR. BEHA II:  I am not.  I
3    object to the question.
4        MR. BROWER:  Okay.
5        Q.   Do you need the question back?
6        A.   This is meant to be a
7    comprehensive list of all the materials
8    that were considered in preparing the
9    report.
10       Q.   By you and your staff?
11       A.   Correct.
12       Q.   Now, if you go to item C --
13       A.   Yes.
14       Q.   -- it says, "Report of Steven
15   P. Feinstein, dated May 11, 2018,
16   including exhibits, appendices and
17   materials relied upon.
18       You reviewed every document that
19   is referenced in Dr. Feinstein's report?
20   And by "you," you or members of your
21   staff?
22       A.   No.  This is a list of -- this
23   doesn't say that and, no, I didn't review
24   everything.  This is a list of all the
25   materials that were considered.
```

Page 26

L. Allen

Q. What didn't you review reference to Dr. Feinstein's report?

A. I would have to look. I didn't review every word of every document that's referenced. This is a comprehensive list of all the materials that were considered.

Q. I understand.

A. So, for example --

Q. May I ask what you're looking at?

A. Dr. Feinstein's report.

Q. Okay.

A. Just so I can look at what his materials considered were.

I mean, I believe he considered SEC filings. And I --

MR. BROWER: Hold on a second. Why don't we mark Dr. Feinstein's report, just so we have it as an exhibit. I appreciate you brought one. This is just to keep the record clear.

(Allen Exhibit 3, document headed Report on Market Efficiency,

Page 27

L. Allen

marked for identification, as of this date.)

Q. We've marked Feinstein Exhibit 3, which has been previously marked Feinstein Exhibit 1, by the way.

So you were about to say? I'm sorry I interrupted.

MR. BEHA II: This is Allen Exhibit 3?

MR. BROWER: Yes, Allen Exhibit 3, Feinstein Exhibit 1.

A. So, for example, Dr. Feinstein lists a number of SEC filings, or Form 6-Ks. I have considered the Form 6-Ks. I have not read all of them in their entirety.

Q. Do you know how many were issued during the class period involved here?

A. Well, I think he has a list of them. I suppose I could count, but I don't, as I sit here, know the answer to that, no.

Q. Do you know which ones you read all or part of?

Page 28

L. Allen

A. I don't particularly.

Q. Did you read the ones that were issued during the class period?

A. I didn't read in their entirety all of the ones that were issued in the class period.

Q. Did you read any that were issued outside the class period, either before or after the class period?

A. I looked at parts of them that were issued outside of the class period.

Q. Which ones did you review that were outside the class period?

A. Well, I do recall looking at the one right before and right after the end of the class period.

Q. Why did you believe it was unnecessary to review the entirety of documents that Dr. Feinstein reviewed?

A. Well, there are a number of reasons for that. One, I don't believe that Dr. Feinstein reviewed these documents in their entirety. Two, Dr. Feinstein was doing an analysis of

Page 29

L. Allen

market efficiency. I was not asked to do an analysis of market efficiency.

Q. And so the public documents issued by the company have no relevance to the question of price impact?

MR. BEHA II: Objection. Misstates the testimony.

MR. BROWER: There was a question mark at the end.

A. No, I think they do have relevance. I think they're public documents, which is one of the reasons I did consider those documents.

Q. But you only considered parts of them?

A. I didn't -- I considered all of the documents. I just didn't read every part of every document.

Q. How did you choose what to read or not read?

A. Well, depending on -- I can tell you a few things that I specifically looked for in the documents and a few things that I focused on. I don't recall

Page 30

1          L. Allen
2   all of the reasons I have looked into the
3   filings.
4          So there are a number of --
5   there would be a number of different
6   reasons, in the course of my analysis in
7   this case, that I may have looked at one
8   filing or another at various points in
9   time.
10      Q.   Why don't you tell me the
11  reasons you would look at parts of
12  documents, you would read parts of
13  documents?
14      A.   In general, why does one read
15  parts of documents rather than review an
16  entire document?
17      Q.   No.  No.  Let me see.
18      What you said was -- I asked,
19  "How do you choose what to read or not
20  read?"
21      And you said, "I can tell you a
22  few things I specifically looked for in
23  the documents."
24      What was it you specifically
25  looked for in the documents?

Page 31

1          L. Allen
2      A.   Well, as I'm saying, I think
3   there were a number of times in the course
4   of my work in this matter that I went to
5   the SEC filings of the company to see --
6   to look for different sorts of information
7   for different questions I had at different
8   points in time.
9      Q.   How do you find those things
10  without reading the whole document?
11      A.   Oh, there are a number of ways
12  for finding those things.  For one, the
13  documents are often organized in a
14  consistent manner.  So I have some
15  familiarity with the organization.  I also
16  use search terms to look for them.  So,
17  for example, one of the issues in this
18  matter involves revenue recognition
19  methodology.  So one of the things that I
20  did is look at how the company explained
21  their revenue recognition.
22      So sometimes I may review an
23  analyst's report, for example, and they
24  may use a term or they may have a number,
25  and I'm not sure how they've got it, and

Page 32

1          L. Allen
2   I'm not sure -- you know, they're saying
3   it came from the company or from one of
4   the filings.  And then I will go back and
5   sometimes I search for that specific
6   number or I search for a specific term or
7   I -- there are lots of -- in analyzing
8   price impact, as I've done in this case,
9   I'm reviewing a lot of information, and
10  I'm trying to understand how, you know --
11  so sometimes, for example, a company on a
12  conference call might say things that's
13  little bit shorthand, and I might need to
14  understand what are those terms.
15      So there are lots of reasons why
16  I might go back, and it's possible to
17  search for specific numbers or tables or
18  find the financial statements.  There's
19  also discussions that can be useful.
20      Q.   Okay.  Did you search all of the
21  documents for the term "BB10"?
22      A.   Did I do a search for all
23  documents?
24      Q.   No, for all the public
25  documents.

Page 33

1          L. Allen
2      A.   I don't believe so, no, or I
3   don't recall doing that.
4      Q.   Did you do you a search of all
5   the public documents for the term "Z10"?
6      A.   I don't recall doing that, no.
7      Q.   Do you know whether anyone on
8   your team read every single public
9   document, corner to corner?
10      A.   I did not ask anyone on my team
11  to do that, and I don't believe anyone on
12  my team would have done that.
13      Q.   No one told you they did?
14      A.   Nobody told me they did.
15      Q.   Okay.  Let's go to E on your --
16  on page 5 of your report.
17      "I considered the following
18  materials, quote, analyst reports on
19  BlackBerry and the communications
20  equipment industry from Thomson Reuters
21  and documents produced in discovery.
22      Now, if you go back to
23  Dr. Feinstein's report, starting on
24  page 44 there's a list of analyst reports
25  that continues to page 55.

Page 34

```
 1              L. Allen
 2        Do you see that?
 3     A.   Yes.
 4     Q.   Did you read all of those
 5  analyst reports?
 6     A.   I don't believe so, no.
 7     Q.   How did you -- well, you didn't
 8  provide a list, did you, of the analyst
 9  reports you did read?  Have you?
10     A.   I provided all of the analyst
11  reports that I considered.
12     Q.   Did you provide a list?
13     A.   I provided the reports
14  themselves.
15     Q.   Okay.  So does that include
16  documents that were produced by BlackBerry
17  or documents from your files?
18     A.   It includes all the documents,
19  all the analyst reports that I considered.
20     Q.   But you didn't provide a list
21  like Dr. Feinstein did?
22     A.   I provided the reports
23  themselves.
24     Q.   That's a yes-or-no question.
25        Did you provide a list like
```

Page 35

```
 1              L. Allen
 2  Dr. Feinstein did?
 3     A.   I don't believe I provided a
 4  list like Dr. Feinstein did.  I provided
 5  all the analyst reports themselves.
 6     Q.   Did you provide a list of
 7  Securities and Exchange Commission
 8  filings, like Dr. Feinstein did, that you
 9  write?
10     A.   I don't believe Dr. Feinstein
11  provided a list of SEC filings that he
12  read.  He provided a list that he says of
13  filings that he considered.  I don't
14  believe he said he read these filings.  So
15  I did not provide a list of filings.  I
16  believe I provided the filings themselves
17  that were considered -- that I considered.
18        MR. BROWER:  We call for
19     production.  That wasn't produced to
20     us.
21        MR. BEHA II:  We can discuss
22     that off the record.
23     Q.   Did you provide those documents
24  to Morrison & Foerster, or did they
25  provide them to you?
```

Page 36

```
 1              L. Allen
 2        MR. BEHA II:  Objection.
 3        MR. BROWER:  Basis?
 4        MR. BEHA II:  Based on the form
 5     of the question.  It's not an
 6     either/or.  It's not an either/or
 7     situation.
 8     Q.   You produced the documents,
 9  Ms. Allen.  You didn't produce them to
10  plaintiffs, did you, directly?
11     A.   I'm not sure what documents
12  you're talking about, but --
13     Q.   Your documents.  The SEC filings
14  that you read.
15     A.   Both -- both --
16     Q.   Did you produce them to
17  plaintiff?
18     A.   Both my report and
19  Dr. Feinstein's report lists materials
20  considered.  Not materials read.  I have
21  produced the materials considered, which
22  included the materials that Dr. Feinstein
23  considered.  So it's my understanding that
24  Dr. Feinstein produced the materials that
25  he considered.
```

Page 37

```
 1              L. Allen
 2        And I believe we have turned
 3  over -- along with the additional
 4  materials that I considered that
 5  Dr. Feinstein didn't consider, I think I
 6  also produced back the same materials that
 7  Dr. Feinstein considered.  So there are a
 8  number of materials that Dr. Feinstein
 9  considered that are also the same as the
10  materials that I considered.
11        It was my understanding that we
12  produced everything that I had considered,
13  and much of it was the same as what
14  Dr. Feinstein had considered.
15     Q.   When you say "turned over,"
16  turned over to who?
17     A.   I believe it was turned over to
18  Morrison & Foerster.
19     Q.   What's the difference between a
20  document you consider and a document you
21  read?
22     A.   Considered is a document that
23  was considered in the process of the work.
24  It's a document you had and considered
25  whether it was relevant or not and
```

Page 38

L. Allen

1  considered whether to use it.
2      A document read -- so I think
3  there are -- is something you actually --
4  you can consider information without
5  reading it or reading it in its entirety.
6      So It's a broader category, is
7  my understanding.  And my understanding of
8  the federal rules is that's what are asked
9  for in an expert report, is a more
10 inclusive category, not just what is the
11 materials relied upon, but what were all
12 the materials considered.
13     Q.   So you can consider a document
14 without reading it?
15     A.   That's correct.
16     Q.   Okay.  So with respect to, say,
17 the analyst reports listed in
18 Dr. Feinstein's report that you claim you
19 considered all of, is that correct, you
20 considered all of them?
21     A.   That's correct.
22     Q.   You didn't read them all?
23     A.   I don't believe I read every
24 word of every document.  I do believe I
25

Page 39

L. Allen

1  looked at all the analyst reports.
2      Q.   And when you look at something,
3  what process is that?  You look at the
4  front page and see who the analyst is and
5  a date?
6      Do you go into the report?  Do
7  you scan it looking for information?
8      MR. BEHA II:  Objection.
9      A.   In the process of doing my work
10 in this case, I looked at the analyst
11 reports many, many times in many different
12 ways.  So I looked at them both online,
13 meaning we have electronic versions of
14 them.  And so sometimes I would look at a
15 specific one and look for a specific one,
16 and other times I looked over a specific
17 time period.
18     I also had hard copy versions of
19 the analyst reports and I -- in
20 chronological order, and I looked through
21 them.  So sometimes I looked through them
22 chronologically, other times I looked at
23 them at a particular point in time.
24     So I went through the analyst
25

Page 40

L. Allen

1  reports many, many times in the course of
2  my work in this matter.
3      Q.   Did you keep an electronic
4  folder of all the analyst reports you
5  considered?
6      A.   The analyst reports we have as
7  electronically, as well as I had them
8  printed.
9      Q.   I understand.  Was all of
10 them -- you just said -- you said you
11 could look at them online, on their
12 computer.
13     Did you have them in a folder,
14 some kind of electronic folder so they're
15 all together, not mixed up with Intel
16 analyst reports or IBM analyst reports or
17 Ford analyst reports?
18     Did you have them altogether?
19     A.   The materials that were
20 considered in this project were in a
21 folder that related to this project.
22     Q.   An electronic folder?
23     A.   Yes, most of them we had -- I
24 believe, most of it we had electronically.
25

Page 41

L. Allen

1      Q.   Okay.  How do you decide what
2  analyst report to use or not use?
3      A.   I'm not sure what you mean by
4  "use or not use."
5      Q.   Well, your answer was -- let's
6  go back a little bit.
7      I believe your testimony was
8  that you considered them all and then
9  decided which ones to use or not use.
10     A.   I don't believe that was my
11 testimony.
12     Q.   Okay.  We will look back at that
13 during the break.
14     MR. BROWER:  Can you mark the
15 record here so I can come back.
16     Q.   Next category, G:  BlackBerry
17 press releases, conference transcripts,
18 and news stories from Factiva and
19 Bloomberg, LLP.
20     Did you read all of the
21 newspaper stories about -- or news stories
22 about BlackBerry during the class period?
23     A.   I didn't read every part of
24 every story, no.
25

Page 42

L. Allen

1
2    Q.   How did you decide what parts of
3    a story to read?
4    A.   It depends on the specific issue
5    that I am looking at in that particular
6    instances, that part of the analysis.
7    Q.   Give me an example.
8    A.   So, for example, one of the --
9    one of the plaintiffs' allegations in this
10   case is that statements made on April 12
11   is an alleged misrepresentation.  So one
12   of the things I did is look at all the
13   news that was released on that date to see
14   -- look for timing of that announcement
15   or, rather, a discussion of that
16   announcement, in other words, to try to
17   get timing of that.
18        And there was some similar
19   information released regarding that
20   statement the day before, so I looked at
21   news stories related to that and searched
22   through again, to get timing to get
23   information that was release related to
24   this.
25   Q.   So let me understand.

Page 43

L. Allen

1
2    MR. BEHA II:  I'm sorry.  Please
3    let her finish her story.
4    MR. BROWER:  I think she was.
5    MR. BEHA II:  I don't believe
6    so.
7    Q.   Are you done or do we keep
8    going?
9    A.   I sort of lost focus on that.
10   Q.   So I understand when you were
11   looking at news stories, you looked at
12   disclosures or events alleged in the
13   Complaint and then looked at the news
14   stories around that date?
15   A.   I think that's generally
16   correct, for a number of reasons,
17   including to understand the timing of when
18   information was released and whether that
19   same information was released previously
20   or.
21   Q.   With respect to the news stories
22   that you read around those dates, did you
23   read the entirety of those news stories?
24   A.   I don't have a specific
25   recollection but, in general, if -- you

Page 44

L. Allen

1
2    know, there is a news story released which
3    has come up because it mentions the
4    company, and so that's in our search of
5    news stories, but it turns out to be about
6    something completely unrelated, and I can
7    tell from either the headline or the first
8    paragraph that it's completely unrelated,
9    then I am unlikely to continue to read the
10   entire story.
11        So I don't -- I don't have a
12   specific recollection of that, but that
13   would be my general practice.
14   Q.   Okay.  I need to go back on
15   something.  I apologize.
16        With respect to the analyst
17   reports that were searchable, did you
18   search -- strike that.
19        Did you search every 10-K --
20   strike that, sorry -- every SEC filing for
21   the term "Q10"?
22   A.   I don't have a recollection of
23   doing that, no.
24   Q.   With respect to the news
25   stories, they were searchable as well,

Page 45

L. Allen

1
2    were they not?
3    A.   The news stories were searchable
4    and they were obtained through a search.
5    Q.   Okay.
6    A.   So we did a search to obtain
7    news stories.
8    Q.   Could you then search the body
9    of the news stories once you had assembled
10   them, retrieved them, however --
11   A.   Sure.
12   Q.   Did you search all of those
13   documents for every mention of the term
14   "BB10"?
15   A.   I don't recall doing that, no.
16   Q.   Did you search every one of
17   those news stories retrieved for the
18   phrase "Q10"?
19   A.   I don't recall searching all of
20   them, no.
21   Q.   Did you search all the news
22   stories for the term "C 10"?
23   A.   I don't have a recollection of
24   doing that, no.
25   Q.   Do you believe news stories are

Page 46

L. Allen

1
2 a useful avenue to pursue in connection
3 with analyzing price impact?
4          MR. BEHA II:  Objection to form.
5      A.   I think they can be a useful
6 avenue.  One of the things they can tell
7 you is what time information is released
8 to the market, what information is public
9 at various points in time.  So that's -- I
10 think those are -- can be important uses
11 of news stories.
12      Q.   Have you, in the past, believed
13 that news stories were not helpful?
14      A.   Well, I can certainly think of
15 instances where something that is in a
16 news story may not be helpful in some
17 circumstance.  I think that in -- I can
18 imagine there are circumstances where news
19 stories are not helpful to explain certain
20 issues.
21      Q.   In other cases in which you've
22 testified, have you testified that you did
23 not use news stories to analyze price
24 impact?
25      A.   I don't have a specific

Page 47

L. Allen

1
2 recollection of that.  I may have analyzed
3 price impact and not used news stories,
4 but I don't particularly have a
5 recollection of that, no.
6      Q.   Why would you analyze price
7 impact without looking at news stories?
8      A.   It may have been possible to
9 analyze price impact without looking at
10 news stories.  I don't have a recollection
11 of that, but -- so, for example, if it's
12 -- one of the reasons, I think I just
13 said, it's helpful to look at news
14 stories, it can help you pin down the
15 timing of when information is public.
16          If you have some other way of
17 pinning down that information or you know
18 that through some other circumstance, then
19 it may not be necessary to use news
20 stories.
21      Q.   What would be the circumstances
22 where news stories would be helpful versus
23 those where they would not?
24      A.   I don't know.  I'm not sure I
25 can think of all the instances.

Page 48

L. Allen

1
2      Q.   With respect to your report,
3 Allen Exhibit 2, what was your
4 understanding of plaintiffs' allegations?
5      A.   I have a five-page summary of
6 allegations in my report.  So I have -- I
7 would -- I have tried to accurately
8 represent my understanding of plaintiffs'
9 allegations in my report in these five
10 pages that summarize plaintiffs'
11 allegations.
12      Q.   Okay.  Then let's go a little
13 further into the report.  On page 24 --
14      A.   Okay.
15      Q.   -- the middle of the second
16 bullet, you state:  "Further, I find that,
17 despite the alleged misrepresentation that
18 purportedly assured the market of
19 BlackBerry 10's success," and you go on.
20          The word "assured," where did
21 you get that from?
22      A.   I'm sorry.  I don't even see
23 where you are.
24      Q.   Second bullet point, middle of
25 the --

Page 49

L. Allen

1
2      A.   Page 24?
3      Q.   Yes.  Sentence starting with
4 "further."
5      A.   The word "assured" is not in
6 quotes.  I have some other -- "asserted"
7 is, I believe, in quotes.
8      Q.   So assured is your word?
9      A.   It is my word here, yes,
10 correct.  It's my understanding that's
11 what the plaintiffs say.  That may be what
12 -- it may be that plaintiffs also used the
13 word "assured."  I don't have a specific
14 recollection.
15      Q.   Would you be shocked to know
16 that the word "assured" doesn't appear
17 anywhere in plaintiffs' 91-page complaint?
18          MR. BEHA II:  Objection.
19      Q.   You can answer the question.
20          MR. BEHA II:  It's not a
21 question.  It's your testimony.
22          MR. BROWER:  I asked her if she
23 would be shocked.
24      A.   I'm not shocked.  I don't have
25 that word in quotes.  I do have the word

Page 50

```
 1              L. Allen
 2   "asserted" in quotes.
 3       Q.   Okay.  Can you go to page 27,
 4   the last paragraph on the page.
 5           You used the word "assured"
 6   again.  Again, that's your
 7   characterization of plaintiffs'
 8   allegations?
 9       A.   I do not have quotes around that
10   word; that's correct.
11       Q.   So that's your characterization
12   of plaintiffs' allegations?
13       A.   I think plaintiffs, as I've
14   quoted, used the word "asserted."  I don't
15   have a recollection of them using the word
16   "assured."
17       Q.   So --
18       A.   I think -- but -- now that
19   you've asked that, I don't know.  I could
20   go back and look and see what --
21       Q.   What the complaint actually
22   says?
23       A.   I could see what the complaint
24   actually says and see if the word
25   "assured" is in.  I don't have a
```

Page 51

```
 1              L. Allen
 2   recollection that plaintiffs particularly
 3   used the word "assured."  And I think if
 4   they had used the word "assured," I may
 5   have put quotes around it.  I try to put
 6   quotes around words that were, you know,
 7   specific quotes.  I try to be clear.
 8       Q.   Now, you used the word "assured"
 9   a lot.
10           If you go to page 28, the first
11   line says, "Despite the alleged
12   misrepresentation that purportedly assured
13   the market of the BlackBerry 10 success,"
14   later in the same paragraph you say, "The
15   enormous range of variation in analyst
16   priced targets for Blackberry stocks after
17   the alleged misrepresentations, despite
18   the alleged misrepresentations,
19   purportedly assured the market."
20           Go to page 32, paragraph 51.
21   Same thing.  You use the word "assured."
22   Page 33, paragraph 52, you use the word
23   "assured."  I could go on and on.  There's
24   about a hundred uses of the word "assured"
25   in your report.
```

Page 52

```
 1              L. Allen
 2       A.   I think I'm just --
 3           MR. BEHA II:  Hold on.  That's
 4   not a question.
 5       Q.   Where did you get the word
 6   "assured" from?
 7           MR. BEHA II:  I move to strike
 8   Mr. Brower's testimony.
 9           MR. BROWER:  Okay.
10       Q.   Where did you get the word
11   "assured" from that you use all over your
12   report?
13       A.   I think I used the same phrase
14   repeatedly.  I'm analyzing the same
15   alleged misrepresentations repeatedly in
16   my report, and I repeat the phrase and.  I
17   think I've answered the question about the
18   word "assured."
19       Q.   That it is your characterization
20   of plaintiffs' allegations or is it what
21   plaintiffs allege?
22           MR. BEHA II:  Objection to form.
23       A.   I think I answered the question.
24   I believe that I have tried to put quotes
25   around the words when it is the exact
```

Page 53

```
 1              L. Allen
 2   words the plaintiffs are using.  I did not
 3   put quotes around the word "assured."  I
 4   have quoted specifically what plaintiffs
 5   have said.  I believe they have used the
 6   word "asserted."  I don't have a
 7   recollection of them using the word
 8   "assured."
 9       Q.   So plaintiffs used the word
10   "asserted," so let's read a sentence with
11   that.
12           Paragraph 51, "I find despite
13   the alleged misrepresentation that
14   purportedly asserted the market of
15   BlackBerry 10's success," is that your
16   recollection of what plaintiffs allege?
17       A.   I'm sorry?
18           MR. BEHA II:  Objection.
19       Q.   Are you trying to substitute the
20   word "asserted" for "assured," where you
21   have used the word "assured"?
22       A.   I don't think I'm doing that,
23   no.
24       Q.   Okay.  So go back to the word
25   "assured" versus whatever word plaintiffs
```

Page 54

L. Allen

1
2  used, were the allegations relating to
3  what you claim plaintiffs -- strike that.
4        When you decided to use the word
5  "assured" throughout your report, was that
6  your interpretation of plaintiffs'
7  allegations?
8        MR. BEHA II:  Objection.  Asked
9  and answered.
10       A.   I think you asked me that
11 question.
12       Q.   I asked you again.
13       A.   That's now at least the third
14 time, and I have the same answer.
15       Q.   I'm trying to get a yes or no.
16 I haven't gotten one yet.
17       MR. BEHA II:  You don't get to
18 tell her how to answer your questions.
19       A.   I have a five-page summary of
20 plaintiffs' allegations in this case.  And
21 I have -- there's a lengthy complaint in
22 this case.  I have summarized plaintiffs'
23 allegations, and I have tried to quote
24 them with actual quotes when I'm using the
25 specific words that plaintiffs used.  And

Page 55

L. Allen

1
2  I have tried to be clear of what
3  plaintiffs are alleging.
4        I don't recall plaintiffs using
5  the word "assured."  I believe plaintiffs
6  use the word "asserted."
7        Q.   Just to be clear, the choice of
8  the word "assured" was your choice?
9        A.   I don't have a recollection of
10 plaintiffs using the word "assured," so I
11 believe it's my choice, yes.
12       Q.   Okay.
13       A.   But it's possible that
14 plaintiffs have used the word "assured,"
15 and I -- I don't recall.
16       MR. BROWER:  Can we take a
17 two-minute break -- wait.  Wait.  Let
18 me just check something.  I've been
19 waiting for some information.
20       THE WITNESS:  I wouldn't mind a
21 break.
22       MR. BEHA II:  Why don't we go
23 ahead and take a break.  It's been
24 about an hour.
25       THE VIDEOGRAPHER:  The time is

Page 56

L. Allen

1
2  11:05.  We are going off the record.
3        (Recess taken.)
4        THE VIDEOGRAPHER:  The time is
5  11:22.  We're back on the record.
6  BY MR. BROWER:
7        Q.   Ms. Allen, can you go back to
8  your report, Exhibit 2.  There's no page,
9  but -- are you using a different copy than
10 the marked one?
11       A.   I can use the marked one.
12       Q.   It's in your -- it's page 68 of
13 70 from the printout.  You'll see that at
14 the top there.
15       A.   Yes.
16       Q.   This is expert reports,
17 deposition testimony in the last four
18 years.
19       Is the Dell case here?  Did you
20 testify in the Dell case that you -- you
21 were asked to do a price impact report
22 there as well, right?
23       A.   I think it was price impact.
24       Q.   Did you testify that you did not
25 look at news stories in that case?

Page 57

L. Allen

1
2        A.   I think I considered news
3  stories in the Dell case, if I recall.  I
4  recall considering news stories.
5        MR. BROWER:  Mark this 4.
6        (Allen Exhibit 4, Deposition of
7        Lucy Allen, marked for identification,
8        as of this date.)
9        A.   Are you asking news stories
10 about the company Dell or news stories in
11 general or?
12       Q.   About Dell.
13       A.   About Dell?
14       Q.   Uh-huh.
15       A.   I do recall considering some
16 news stories, because I believe I talked
17 about Wall Street Journal stories.  I have
18 some recollection.
19       Q.   Take what's been marked
20 Exhibit 4.
21       A.   Sorry.
22       Q.   That's fine.  Can you go to page
23 -- it says "45...48," because it's a
24 mini-script of a deposition transcript.
25 It's page 14.

Page 58

L. Allen

1
2       If you look at the top, the
3   runner at the top, it's page 14.
4       A.   Okay.
5       Q.   Go to the part that says
6   page 47, the lower left.
7       A.   Okay.
8       Q.   If you go to line 10.  You can
9   read it to yourself.  You don't have to
10  read it out loud.
11      A.   Do you have a question?
12      Q.   Yeah.  Is that still your view,
13  your answer to the question on line 10 of
14  page 47 of the transcript?
15          MR. BEHA II:  Where she's
16      talking about what is helpful in
17      understanding what is affecting Dell's
18      stock price?
19          MR. BROWER:  Yeah.
20          MR. BEHA II:  Okay.  Just to be
21      clear, this is her testimony about her
22      analysis of Dell's stock price.
23          MR. BROWER:  Well, analyzing
24      price impact, actually.
25          MR. BEHA II:  Well, it says --

Page 59

L. Allen

1
2           MR. BROWER:  Why don't we read
3       it?  Let's read it.
4       Q.   Question:  "Why did you elect to
5   review the analyst reports for the class
6   period and not the news stories?"
7           "Objection."
8           The witness -- you, Ms. Allen:
9   "So in this matter, one of the things I've
10  been asked to do is analyze price impact,
11  and it is helpful in understanding what is
12  affecting Dell's stock price, or the
13  company's stock price, to review what
14  analysts are saying about the value of the
15  stock and how they are valuing the stock.
16  So I find that analyst reports have
17  more -- have a focus on some of the issues
18  that were particularly relevant to this
19  matter."
20          Do you believe that's true for
21  this case as well?
22      A.   So the question is, "Why do you
23  elect to review the analyst reports and
24  not the news stories?"
25      Q.   Uh-huh.

Page 60

L. Allen

1
2       A.   And I did not agree that that is
3   what I said.  So there's an objection that
4   that mischaracterizes prior testimony.  I
5   never said that I didn't review the news
6   stories.
7       Q.   Okay.
8       A.   I then say, on the next page,
9   that in my materials considered were news
10  stories and other information.  So I did
11  consider the news stories.  I don't
12  disagree with my testimony here, which is
13  that, in this matter, one of the things
14  that was helpful was analyzing what the
15  analysts were saying.  I don't say that it
16  wasn't helpful to look at news stories and
17  I don't say that I didn't look at the news
18  stories.  The news stories were in my
19  materials considered.
20      Q.   Okay.  You reviewed analyst
21  reports here, correct?
22      A.   I don't know what you mean by
23  "here."
24      Q.   In this case.
25      A.   In which case?

Page 61

L. Allen

1
2       Q.   BlackBerry.
3       A.   I did review analyst reports in
4   this matter and in the BlackBerry matter.
5       Q.   What else do you find helpful in
6   addition to analyst reports in determining
7   price impact?
8       A.   Well, I have a whole report in
9   this matter that analyzes all of -- that
10  summarizes all of the work that I did in
11  analyzing price impact in this matter.
12      Q.   You have a list of things you
13  considered but now have clarified did not
14  read corner to corner.
15          So my question is, what else did
16  you find helpful that you actually read,
17  other than analyst reports?
18          MR. BEHA II:  Objection.  It
19      mischaracterizes the testimony.
20      A.   I don't agree with how you
21  characterized my prior testimony, and I
22  wish I had said that in the last
23  deposition, because I did not agree with
24  that either, and I was not agreeing with
25  that question.

Page 62

L. Allen

So I have found much of the material that I considered useful in my analysis of price impact in this case, and my report in this case summarizes the analysis that I did and what I -- how I went through the analysis.

Q.   Anything in particular you found useful?

A.   I don't understand that question.

Q.   Okay.  Did you concentrate -- in your analysis, did you find anything particularly helpful in forming your opinions?

A.   I don't know how to answer that. I've done an entire analysis of price impact that involved reviewing plaintiffs' allegations in this case, that involved looking at how the price moved in this case, that involved looking at how analyst who covered the stock and valued the stock, how they reacted and how they valued the stock.

I looked at -- so there's lots

Page 63

L. Allen

of information that I looked at.  I don't know how to say what I found particularly helpful.

Q.   With respect to doing your report, did you make any assumptions in connection with doing your analysis?

A.   I assume that plaintiffs' claim of market efficiency was correct, so I did the analysis assuming plaintiffs' claim of market efficiency.  And I believe I stated that in my report somewhere.

Q.   I believe you did.  Any other assumptions you made, other than that the market for BlackBerry securities during the class period were efficient?

A.   I don't believe so, no.

Q.   Do you assume the accuracy of plaintiffs' allegations?

A.   I assume that plaintiffs are correct that their allegations are misrepresentations.

Q.   Did you make any other assumptions in connection with doing your report, other than assuming that

Page 64

L. Allen

plaintiffs' allegations and misrepresentations are correct and that the market for BlackBerry securities during the class period was efficient?

A.   So on the first one I'm not -- no, I don't have other -- I don't believe I have any other assumptions.  And on the first one I'm not -- I mean to the he can at the present time that plaintiffs say that -- I don't have a specific recollection of this happening, but they say that something happened that a statement was made at a particular time.

I'm not assuming that plaintiffs are correct in that.  I'm looking to see when statements were made or what was actually made.  I am assuming that plaintiffs are claiming that the company made allegedly fraudulent statements.  I am not -- I'm taking that he as a given but I'm looking at what the company actually said, not -- I'm not assuming that how plaintiffs characterized it is correct, if that makes sense.

Page 65

L. Allen

Q.   Well, let me try and clarify.

Had plaintiffs alleged the defendants said the sky was blue on a Tuesday, you checked to see if the defendants said the sky was blue on that Tuesday and not on Wednesday?

A.   That's correct.

Q.   Okay.

A.   But I'm not -- I'm taking as given that plaintiffs are correct that they shouldn't have said the sky was blue, if that's what the plaintiffs are saying.

Q.   Okay.  Fair enough.

A.   That's what I'm --

Q.   So the statements that are accurately quoted --

A.   I'm not saying whether plaintiffs should or shouldn't have said anything.  I'm assuming -- I mean, not that BlackBerry should or shouldn't have said anything.  I'm assuming that plaintiffs are correct that BlackBerry said or did the wrong things.  So I'm analyzing price impact of those allegedly

Page 66

L. Allen

1 wrong things.
2 Q.   Okay.  What does price impact
3 mean?
4 A.   In the context in which I've
5 been asked to analyze it, I think price
6 impact can mean whether something impact
7 the stock price.  Here I've been asked to
8 analyze whether the alleged
9 misrepresentations impacted the stock
10 price when made.
11 Q.   When you say "in the context,"
12 that's as an economist?
13 A.   In the context of a securities
14 class action, my understanding of the
15 relevant legal question is, is the price
16 impact of the alleged misrepresentations.
17 Q.   Okay.  And what does that mean?
18 I'm trying find out what does "price
19 impact" mean?
20 A.   Oh, whether there was an effect
21 on the stock price.
22 Q.   When you say an "effect" on the
23 stock price, what does that mean?
24 A.   Whether it impacted the stock

Page 67

L. Allen

1 price.  Whether if not for the alleged
2 misrepresentation, the stock price would
3 have been different or it moved the stock
4 price.
5 Q.   So it's your view that in order
6 to show price impact, the price of the
7 stock must move?
8 A.   That's not what I said, no.
9 Q.   Okay.  "When you say an efect
10 on the stock price, what does that mean?"
11 You answered:  "Whether it
12 impacted the stock price -- whether if not
13 for the alleged misrepresentation, the
14 stock price would have been different or
15 it moved the stock price."
16 That was your answer.
17 My question was, "So your view
18 is that, in order to show price impact,
19 the price of the stock must move?"
20 You said no.
21 So let me try again.
22 MR. BEHA II:  That's not what
23 she said in the portion you read back.
24 She said that the price would have

Page 68

L. Allen

1 been different, right?  That's what
2 she said.  She didn't say that the
3 price had to move.  She said the price
4 would be different but for the
5 statement.
6 MR. BROWER:  Well, she said "had
7 been different" or "had moved."
8 Q.   How would it be different?  How
9 would the stock price be different if
10 there was price impact?
11 A.   It would depend on the
12 circumstances.  I don't know what you mean
13 by -- it would depend on the circumstances
14 how much it would have been different, but
15 when I'm talking about a different stock
16 price, I'm talking about the price would
17 have been different.
18 Q.   Does that mean the price would
19 have moved?
20 A.   Not that the price did move.
21 The price would have been different.
22 Q.   If there was price impact, the
23 price would have moved; is that what
24 you're saying?

Page 69

L. Allen

1 A.   Would have been different.
2 Q.   What does "different" mean?
3 Same price?  The price is $10 --
4 A.   A stock price moving is from
5 some point in time to some later point in
6 time.  A different stock price is, if
7 things had been different, it would have
8 been a different price.  Movement is from
9 one time period to the next time period.
10 When you say a stock price
11 moves, you typically say, from some
12 earlier period of time, the stock price is
13 different than what it is in a later point
14 in time.  Price impact is, at given point
15 in time, would the price have been
16 different.
17 Q.   Okay.  And you show on the
18 video, you're holding your hand up and
19 down just now.
20 Does price impact imply an
21 increase in the price of the stock or a
22 decrease depending on the information?
23 MR. BEHA II:  Objection to form.
24 A.   Does it imply that?  I think the

1      L. Allen
2  impact could be positive or negative on
3  the stock price.  It could be positive or
4  negative price impact on a stock price.
5      Q.   If it's positive impact, the
6  price goes up?
7      MR. BEHA II:  Objection.
8      Q.   Or avoid the word "move."
9      A.    No.  So price impact isn't
10  whether it moves.  Price impact is whether
11  the price would have been different in an
12  alternative situation, if not for the
13  alleged misrepresentations.
14      Q.   I know at various times in your
15  report, in analyzing the price impact of
16  the alleged misrepresentations, you note
17  the price did not increase upon the
18  release of that information.
19      Do you recall that?
20      A.   Yes.
21      Q.   Why do you provide that
22  analysis?
23      A.   Plaintiffs claim, for example,
24  with regard to the April 12 alleged
25  misrepresentation, that the company made

1      L. Allen
2  -- issued a press release that was -- had
3  a positive effect on the stock price by
4  refuting a Detwiler Fenton report that had
5  been released the prior day.  If that
6  information had price impact and affected
7  the stock price, information that
8  plaintiffs are claiming positively
9  impacted the stock price -- there's not
10  other information released that day
11  affecting the stock price, and the lack of
12  positive reaction to that alleged
13  affirmative misstatement is evidence that
14  that statement did not impact the stock
15  price.
16      Q.   Did you analyze -- while we're
17  talking about April 12 did you analyze
18  whether or not the company, in fact,
19  denied the assertions in the Detwiler
20  Fenton report at the end of the day but
21  before the market closed on April 11?
22      MR. BEHA II:  Objection to form.
23  I'm not sure what you mean by
24  "analyze."
25      Q.   Do you not understand the

1      L. Allen
2  question?
3      A.   I have a discussion of that --
4  yes, I did look at that.  I have a
5  discussion of that in my report.
6      So there's a prior statement --
7  there's news coming out that's attributed
8  to the company, the day before, that
9  plaintiffs are not alleging as a
10  misrepresentation in this case.  I did
11  look at that.  As you say, it was released
12  very near the end of the market close.  I
13  did look at how the market reacted after
14  that, and I saw no evidence that there was
15  a price impact from that statement as
16  well.
17      Q.   Did you analyze -- I may not
18  have understood you just now.
19      Did you analyze whether or not
20  there was an impact on the price on April
21  11 of the company's late-in-the-day denial
22  of the allegations in the Detwiler Fenton
23  report?
24      A.   Yes.  As I understand it, that's
25  not an alleged misrepresentation in the

1      L. Allen
2  case.  I did look at whether that e-mail
3  packet had the stock price and I believe I
4  have a discussion of that.  I was just
5  trying to find that in my report.
6      Q.   It starts at page 37, I believe.
7      A.   Okay.
8      Q.   But I'm not sure where you're --
9      A.   If you look at footnote 77, I
10  think that explains what I am referring
11  to.
12      Q.   Okay.
13      MR. BROWER:  Can I have my
14  chart, please?
15      Q.   So let me be clear.
16      Your conclusion was there was no
17  price impact on April 12?
18      A.   Of the alleged
19  misrepresentation.
20      Q.   Is it your opinion there was no
21  price impact on April 11 either, as a
22  result of the denial of the Detwiler
23  Fenton report?
24      A.   No price impact from this
25  Bloomberg news article, yes.

Page 74

L. Allen

1
2      Q.   Did you look at any other
3  sources of information that may have
4  carried the company's denial on the 11th?
5      A.   I looked for when news regarding
6  what was released, or similar to what was
7  released, on the 12th, was first announced
8  on the 11th.  Yes.
9      Q.   By similar, the company denying
10  Detwiler Fenton information was correct
11  regarding returns?
12      A.   Yes.
13      Q.   Okay.  Let's mark this 5.
14      (Allen Exhibit 5, document
15  headed IntraDay Price Analysis, marked
16  for identification, as of this date.)
17      Q.   I provided you a document that
18  has been created by Dr. Feinstein's
19  company that shows the movement in the
20  price of BlackBerry stock from Bloomberg
21  data on a two-minute interval, during the
22  time period between 9:30, on April 10,
23  to -- that's fifteen and three -- I guess,
24  3:58 on April 12.
25      And for convenience, the second

Page 75

L. Allen

1
2  page is a -- what would you do -- forgive
3  me -- on an iPhone, when would you enlarge
4  the center of the chart.  So it shows the
5  period from 12:06 on the 11th, until
6  approximately 12 noon on the 12th.
7      MR. BEHA II:  Has this document
8  been produced or disclosed before?
9      MR. BROWER:  No.  I just had it
10  made.  The ink is wet.
11      MR. BEHA II:  I don't recognize
12  it.  So there's no foundation or basis
13  in the record to conclude that this is
14  actually an accurate document.
15      MR. BROWER:  Go to the record
16  and check the stock price.  It's on
17  Bloomberg.  You can do that.  We're
18  not going to discuss it.
19      MR. BEHA II:  There's no
20  foundation in the record that --
21      MR. BROWER:  Is that an
22  objection or a speech?
23      MR. BEHA II:  I'm asking you is
24  there any --
25      MR. BROWER:  I'm not answering

Page 76

L. Allen

1
2  you.
3      Yes, the stock price information
4  from Bloomberg is in the record.  It's
5  one of the many things Dr. Feinstein
6  considered in connection with his
7  report.  You can go look it.
8      MR. BEHA II:  I'm just going to
9  object to all the questions related to
10  this document for the lack of
11  foundation.
12      MR. BROWER:  Okay.  That's your
13  right.
14      Q.   Ms. Allen, can you take a look
15  at the chart, please, particularly the
16  second page?
17      A.   I'm not sure this is information
18  that Dr. Feinstein considered in preparing
19  his report.
20      Q.   He considered stock prices.
21      A.   Yeah, this is intraday stock
22  prices.  I don't believe Dr. Feinstein
23  considered intraday stock prices in doing
24  his report, so I don't see anything that
25  says that.

Page 77

L. Allen

1
2      Q.   Did you conduct this analysis?
3      A.   I did not conduct this analysis.
4  It looks like Dr. Feinstein conducted this
5  analysis.
6      Q.   Right.
7      Did you independently conduct
8  this analysis before providing your report
9  here in this case?
10      A.   I did not conduct this analysis
11  at all.  It looks to me like Dr.
12  Feinstein conducted analysis.  It does not look to
13  me like he conducted this analysis before
14  he did his report because it doesn't look
15  to me like this was information that was
16  even considered in preparing his report
17  analysis.
18      Q.   Once again, did you conduct an
19  analysis of the intraday price movement of
20  BlackBerry stock between sometime around
21  noon on the 11th to sometime around noon
22  on the 12th, on a two-minute or other
23  short interval period, in order to reach
24  your conclusions set forth in the report?
25      A.   I looked at intraday stock

L. Allen

1
2  prices.
3      Q.   Uh-huh.
4      A.   For BlackBerry as well as some
5  of the indices around this time period.
6      Q.   Okay.  Did you find any stock
7  movement between 3:46 on April 11th to the
8  close on April 11th?
9      A.   3:46, you're asking?
10     Q.   Uh-huh.  That's the time set
11  forth in footnote 77 of your report that
12  Bloomberg announced that the company was
13  denying the Detwiler Fenton allegations.
14     A.   Can you repeat your question?
15     Q.   Sure.
16         Did you notice any movement in
17  the price of the stock of BlackBerry on an
18  intra day analysis between 3:46 p.m. on
19  April the 11th to the close on April 11th?
20     A.   I do recall the stock going up
21  and down and coming back to essentially
22  where it was before the announcement
23  within a very short timeframe.
24     Q.   When you say the "announcement,"
25  which announcement are you referring to?

L. Allen

1
2      A.   Were you asking me about the
3  Bloomberg news article?
4      Q.   Denying the Detwiler Fenton
5  story?
6      A.   The Bloomberg news article that
7  I have referenced in footnote 77.
8      Q.   Okay.  And in that Bloomberg
9  news article it reported the company's
10  denial of the allegations in the Detwiler
11  Fenton report from earlier in the day?
12     A.   There was similar information in
13  the -- I think I -- I say in paragraph 63,
14  "I find that substantially similar
15  statements to the April 12 alleged
16  misrepresentations, addressing the
17  Detwiler Fenton report were made by
18  BlackBerry before April 12.  These
19  statements are not claimed as alleged
20  misrepresentations."
21         And I say they were reported in
22  an article by Bloomberg.
23     Q.   Okay.  So, where plaintiffs just
24  say -- I don't know, amend their complaint
25  and say the company started its

L. Allen

1
2  misrepresentation regarding the Detwiler
3  Fenton report, would you still find that
4  there was no price impact with respect to
5  the company's denials?
6      A.   Yes.
7         MR. BEHA II:  Objection to form.
8      A.   I think I would, because you can
9  see even from what Dr. Feinstein appears
10  to have done here, is that the stock price
11  is back by the close.  And I will note
12  this doesn't go down to zero.  So these
13  look like huge price movements.  But this
14  is only going from $14 down to $13.  So
15  this whole thing is only 70 cents.
16         So it makes it look like the
17  stock is moving -- that it dropped
18  90 percent and then it shoots back up
19  another 40 percent.  So this makes the
20  stock price movements look enormous
21  because the scale is not at zero, but you
22  can see from the chart that Dr. Feinstein
23  appears to have done, that the stock price
24  by the close is right back to where it was
25  before -- before the announcement.

L. Allen

1
2      Q.   Which announcement?
3      A.   Before this Bloomberg.
4      Q.   Then it goes back up the next
5  day?
6      A.   I believe the next day -- well,
7  I know the next day is non statistically
8  significant so that's both what
9  Dr. Feinstein's two event studies show, as
10  well as what my event study shows, that
11  there's no statistically significant
12  reaction in BlackBerry's stock price on
13  the day of the alleged misrepresentation.
14     Q.   On the 11th?
15     A.   On the day of the alleged
16  misrepresentation, which is what you asked
17  me about -- I believe is what you asked me
18  about -- there is no statistically
19  significant reaction in BlackBerry's
20  stock, according to both of
21  Dr. Feinstein's event study methodologies,
22  as well as the alternative event study
23  methodology that I have in my report.
24         MR. BEHA II:  Just to be clear,
25     the day of the alleged

Page 82

L. Allen

1  misrepresentation is the 12th.
2  MR. BROWER: I understand. And
3  I believe she also testified there was
4  none on the 11th, that she analyzed
5  the 11th as well.
6  Q.  Is that incorrect?  Did I
7  misunderstand you?
8  A.  I looked at whether there was
9  evidence of price impact from the same and
10  from similar statements that were made
11  prior to the alleged misrepresentation --
12  statements that were not alleged by
13  plaintiffs as misrepresentations but were
14  previously announced.  And, as you can see
15  even from this chart, I found that the
16  stock moved back -- went up briefly, and
17  moved back to where it was before the
18  Bloomberg article -- or, essentially back
19  to where it was before the Bloomberg
20  article.
21  Q.  Okay.  So you did analyze the
22  11th as well -- strike that.
23  Did you do an event study for
24  the 11th after the Bloomberg story?

Page 83

L. Allen

1  A.  So I did a -- I used the event
2  study -- I did a daily event study.  Not
3  using the daily price movement, I did a
4  daily analysis the day of the
5  misrepresentation.  I did, as I note in
6  footnote 77, look to see whether there was
7  any evidence that there was price impact.
8  So there's two things going
9  on -- at least two things going on, on the
10  day of the 11th.  There is the Detwiler
11  Fenton report itself, and then there are
12  statements attributed to the company that
13  are very similar to those statements that
14  plaintiffs claim as alleged
15  misrepresentations on the 12th.
16  I have looked whether there's
17  evidence of price impact from the
18  statements that are very similar to the
19  alleged misrepresentations that plaintiffs
20  claim the company made on April 12 and
21  found no evidence of price impact from
22  those.
23  Q.  With respect to doing your event
24  study -- daily event study for the 11th,

Page 84

L. Allen

1  did you look at intraday prices analysis?
2  MR. BEHA II:  I think that
3  misstates her testimony.  I don't
4  think she said she did an event study
5  for the 11th.  I think she said she
6  did it for the 12th, just to be clear.
7  Q.  Did you do an event study for
8  the 11th?
9  MR. BEHA II:  A daily event
10  study?
11  MR. BROWER:  Uh-huh.
12  A.  I don't recall.  I may have.
13  Q.  But it's not in your report?
14  A.  Well, so I replicated
15  Dr. Feinstein's two different event
16  studies.
17  Q.  Uh-huh.
18  A.  And I believe he shows them on
19  every day.  I'm not sure.  I didn't, not
20  specifically, and not that the goes into
21  the analysis in my report.  But in the
22  process of either replicating
23  Dr. Feinstein.
24  I don't -- I think Dr. Feinstein

Page 85

L. Allen

1  just has every day.  So it's possible I
2  did do something where I have every day,
3  because in replicating him, it shows every
4  day.  I don't have a recollection.
5  Q.  How about in conducting your
6  personal test, your third version?
7  A.  Yeah, that's what I don't
8  recall.  It might be because I just don't
9  recall how it was set up.  So if in, you
10  know, if it spit out, it wasn't
11  particularly relevant to what I was doing
12  here.  But it's possible the way the --
13  it's possible that, in replicating
14  Dr. Feinstein, it spit out those results,
15  because he has every day in the class
16  period.  I just don't recall.
17  Q.  Fair enough.
18  By the way, with respect -- I
19  realize that the axis of the chart is a
20  relatively small group of prices.  That
21  was to blow it up, to make it look big
22  bigger.
23  My question is, was the 70-cent
24  movement -- I think that was the number

Page 86

L. Allen

1   L. Allen
2   you mentioned.  I will accept that for
3   now -- was the 70-cent movement in the
4   price of the BlackBerry stock a
5   significant movement?
6       A.   I couldn't answer that question.
7   It depends on what's going on in the
8   indices and what's going on during the
9   day.  But just in response to -- it's not
10  the case that you just blew it up that it
11  looks big because of the way you blew it
12  up to focus in on it.  That's only
13  focusing in on it across time.
14          The first chart, which is isn't
15  focusing in on it, also makes the
16  movements look much bigger than they are,
17  because it only goes down to $13 instead
18  of going down to zero.  So it looks like
19  the stock price is moving by magnitudes of
20  50 percent, when it's really moving by
21  much smaller magnitudes than that.
22          So it's not just what you're
23  calling the "blowup" that gives a
24  misleading impression.  The other one does
25  as well.

Page 87

L. Allen

1   L. Allen
2       Q.   Right.  Or we could use bigger
3   paper, and it would look the same?
4       A.   No.  It's not the size of the
5   paper, it's just the axis is only going to
6   $13 instead of going to zero.
7       Q.   But if I used much bigger paper
8   and it went, at the bottom, down to zero,
9   it would sill be down to zero, wouldn't
10  it, from here?  This is the range it
11  traded at.
12      A.   It wouldn't look like the stock
13  price dropped 50 percent.
14      Q.   Is this the range -- do you have
15  any reason to believe this is not the
16  range the stock traded in during the
17  period on the chart and we will look at
18  the first chart?
19      A.   I don't know what you mean by
20  the range.
21      Q.   The range of prices it looks
22  like it went from 14.70 to -- a high of
23  14.70 to what appears to be a low of --
24  call it 13.35, give or take.
25          Do you have any reason to

Page 88

L. Allen

1   L. Allen
2   believe that's not the trading range on
3   than day?
4       A.   I don't have a particular
5   reason.  I could probably look at
6   something.  No, I don't have a reason to
7   believe that's not it.
8       MR. BROWER:  This is 6.
9       (Allen Exhibit 6, document
10      headed Historical BlackBerry Price
11      Data, marked for identification, as of
12      this date.)
13      Q.   For the record, this is just a
14  list of trading prices.  Again, I believe
15  it comes from Bloomberg.  It's highs,
16  lows, and closes.
17          You're familiar with these kind
18  of statistics, Ms. Allen?
19      A.   I'm familiar with --
20      Q.   Not these -- I'm not asking if
21  you're familiar with these particular
22  numbers.
23      A.   What are you asking then?
24      Q.   Whether this shows the range
25  during the day for -- if you go to April

Page 89

L. Allen

1   L. Allen
2   11, 2013, which is on the third page --
3   I'm sorry, it's on the second page.  I
4   apologize -- is that range consistent with
5   the chart that's Exhibit 5?  And by
6   "range," I mean the range of trading
7   prices during that day?
8       A.   No, I don't believe so.  I mean,
9   for example, this -- the high on April 11
10  is 14.20.
11      Q.   Right.
12      A.   And I do see prices that seem to
13  be on 4/11 that seem to be above 14.20.
14      Q.   That's not before the 11th.
15  That's before the market opened at 9:30?
16      A.   This is on the 11th, isn't it?
17      Q.   No.  It's before the market
18  opened.  You will notice there's a legend
19  there for stock price Detwiler Fenton
20  report premarket with a little red dot?
21      A.   I do see that.  I don't see
22  anything that gets as high as 14.20 that's
23  after that point.  So I don't -- it
24  doesn't look consistent.  Neither way does
25  it look consistent, regardless of how you

Page 90

L. Allen

1  look at it.
2
3      Q.   Okay.
4      A.   So, you know.  Either you've got
5  prices that are too high, if you're
6  talking about the whole day, and if you're
7  talking about only after the market, then,
8  no, there's nothing that hits 14.20, so --
9      Q.   Did you do any analysis of a
10  market trading between April 11 and
11  April 12?
12      A.   I don't recall specifically, no.
13      Q.   Would an analysis of a market
14  trading provide any additional information
15  with respect to price impact between
16  April 11 and April 12?
17      A.   I've only been asked to analyze
18  price impact from the alleged
19  misrepresentation the alleged
20  misrepresentation on April 12th.  If
21  plaintiffs had different alleged
22  misrepresentations, I don't know.
23          I think -- I'm not sure, as I
24  sit here, the answer to that.  I've
25  analyzed the alleged misrepresentations.

Page 91

L. Allen

1
2      Q.   And this was on April 12, that's
3  alleged in the Complaint?
4      A.   Also, plaintiffs claim there was
5  an alleged misrepresentation on April 12,
6  and that's what I have analyzed.
7      Q.   You also testified that the same
8  information that constituted the
9  plaintiffs' alleged misrepresentation on
10  the 12 had actually been released to the
11  market late in the day on April 11; is
12  that correct?
13      A.   Yes.  Similar.  Substantially
14  similar statements.
15      Q.   Okay.  And did you analyze that
16  movement in the price -- strike that.
17          Did you analyze price impact
18  with respect to the statement on the 11th
19  that is substantially similar to the one
20  the plaintiffs allege on the 12th?
21          MR. BEHA II:  Asked and
22  answered.
23      A.   As we previously discussed, I
24  did the analysis that's discussed that's
25  in footnote 77 of my report.

Page 92

L. Allen

1
2      Q.   Did you do anything beyond
3  what's in footnote 77?
4      A.   I don't believe so, no.
5  Anything that's described beyond, yeah.
6      Q.   Okay.
7      A.   I mean, of course I did lots of
8  things that went beyond what's summarized
9  in my report.
10      Q.   I'm sorry.  I meant with respect
11  to April 11, the subject matter we're
12  discussing.
13      A.   Well, other than whatever else
14  is described in my report.  There's lots
15  of things I did in my report that have to
16  do with -- so I don't want to -- there may
17  be other things described in my report
18  that are relevant.  I do not want to limit
19  my answer.  My report summarizes all the
20  work that I have done in this matter.
21      Q.   Can you tell us what else in
22  your report, other than paragraph 62 and
23  footnote -- I'm sorry, paragraph 63 and
24  footnote 77 is -- and footnote 76 is
25  relevant to whatever occurred on April 11?

Page 93

L. Allen

1
2          I could restate that, if it's
3  helpful.
4      A.   Well, I mean one, of the things
5  that is relevant is understanding, you
6  know, what is important to the market at
7  this point in time.  What is going on with
8  BlackBerry.  What is being announced.  Who
9  are the analysts that are covering the
10  company.  How are they valuing the
11  company.  What are they doing.  What
12  information is being released.  How has
13  the stock price moved relative to other
14  market peer indices.
15          So all of the things that I have
16  been generally looking at in other aspects
17  of my report, I think can be related to
18  this or could be related to this.
19      Q.   Okay.  Does a price of a stock
20  have to increase for there to be price
21  impact from the stock price statement?
22          MR. BEHA II:  Asked and
23  answered.
24      A.   I don't believe so, no.
25      Q.   Does a price of a stock have to

Page 94

L. Allen

1 decrease in response to a statement for
2 there to be price impact?
3 A.   No, I don't believe so.
4 Q.   Do you understand the concept of
5 price maintenance?
6 A.   I've heard the term "price
7 maintenance." I've heard it used in
8 different ways.  I wouldn't say I do
9 understand without context on how it's
10 being used in different ways.
11 Q.   In your report, you -- I believe
12 you cited to some case law you reviewed in
13 connection with this case, in doing your
14 report.
15 Do you recall that?
16 A.   Sorry.  Can you repeat that?
17 Q.   Sure.
18 In your report you referred
19 looking to some case law in connection
20 with doing your report and forming your
21 opinions.  I asked if you recall that?
22 A.   Yes, I do recall citing what
23 price impact means with regard to -- I
24 think I've quoted from the Halliburton

Page 95

L. Allen

1 decision, footnote 31.
2 Q.   Did you cite any other cases?
3 A.   Well, I see below that I cite
4 Halliburton 2.
5 Q.   Can you refer to the page?
6 A.   Page 12.
7 Q.   Did you cite any other cases
8 with respect to price impact?
9 A.   I don't recall specifically, no.
10 Q.   Are you familiar with the law in
11 the Second Circuit with respect to price
12 impact?
13 A.   I am not a lawyer, and I don't
14 want to say whether -- I don't know
15 whether I'm familiar with the law.  I'm
16 not sure how to answer that question.
17 Q.   Well, let me ask you a broader
18 question.
19 Do you believe you need an
20 understanding of what the law is with
21 respect to how an economic theory is to be
22 used in a lawsuit in order to provide an
23 opinion?
24 A.   I don't think you have to you

Page 96

L. Allen

1 have an understanding of how it's going to
2 be used.  I think you have to have an
3 understanding of what you've been asked to
4 do and make clear what the assignment is
5 and what are the assumptions.  Under what
6 legal theory or how it might be used
7 legally I don't think is necessarily
8 required to do an analysis.
9 Q.   Now, I asked, again, do you know
10 what the price maintenance theory is with
11 respect to price impact?
12 A.   Are you just repeating a
13 question that I previously answered?
14 Q.   Yes.  I just want to make sure
15 it's clear.  You do or you don't?
16 A.   I have seen discussions on it.
17 I don't.  I think people mean different
18 things by it, but I would say, no, I don't
19 have a good understanding of how it's used
20 in different context.  To me I have seen
21 what seems to be conflicting discussions
22 of it.
23 Q.   Do you believe there's such a
24 thing as price maintenance?

Page 97

L. Allen

1 A.   I don't know how to answer that
2 question.  It's not a thing that exists
3 like you do believe in the Easter Bunny.
4 It's a term that I think lawyers use in
5 different context.  It seems like it's a
6 legal construct.  I don't think it's
7 something I could believe in or not
8 believe in.
9 Q.   Let me ask it a different way.
10 Do you believe if a company's
11 stock has been inflated by a
12 misrepresentation, that a later
13 misrepresentation on the same or similar
14 subject matter can keep the price of the
15 stock level without causing it to go up or
16 down?
17 A.   Can you repeat that?
18 Q.   Sure.  I will try it a different
19 way.
20 Hypothetical:  The company stock
21 and the price is inflated by a
22 misrepresentation.  A month later, the
23 company makes a similar statement
24 consistent with the prior

Page 98

1      L. Allen
2   misrepresentation which is also a
3   misrepresentation.  The price doesn't
4   move.
5        How would you explain -- would
6   it be your position that there's no price
7   impact with respect to the second
8   statement?
9      A.   I think it would depend on the
10  circumstances.  If that statement had not
11  been made, what would the price have been.
12  And if without that statement the price
13  would have been the same then I think if
14  the price would have been the same with or
15  without a particular statement, then I
16  think it doesn't have price impact.
17     Q.   Is it your position that if a
18  company releases -- makes a
19  misrepresentation but the
20  misrepresentation is believed by the
21  market and reflects expected information,
22  it would have an impact on the price of
23  the stock?
24       I will rephrase it.
25       Is it true the market sometimes

Page 99

1      L. Allen
2   has expectations for how a company is
3   going to perform?
4      A.   Yes, I would agree with that.
5      Q.   If a company delivers what the
6   market expects, are there circumstances
7   where the price of the stock doesn't move,
8   or doesn't move in a statistically
9   significant way?
10     A.   Yes, I believe that's correct.
11     Q.   What is the reason that occurs?
12     A.   I think one reason is if the
13  information that's announced is what is
14  expected, then you wouldn't expect a
15  reaction from that.  It's not new.  It's
16  not new information.
17     Q.   If it turns out that that
18  information that was expected is, in fact,
19  false information, i.e. the maker of the
20  statement is telling the market what it
21  expects but, in fact, the truth is
22  otherwise, would the stock price be
23  expected to move?
24     A.   I think, in general, if the
25  company announces something that is

Page 100

1      L. Allen
2   expected by the market, then you wouldn't
3   expect a reaction to that.
4      Q.   Whether it's true or not,
5   whether the statement itself is true?
6      A.   Correct.  That would be my
7   general --
8      Q.  Okay.
9      A.   In general, all things equal.
10     Q.   If it's a false statement that
11  the company makes of something the market
12  is expecting, would there be price impact
13  from that false statement?
14     A.   I don't have an answer to that.
15  It would depend.
16     Q.   It would depend on what?
17     A.   I think the question of price
18  impact is whether a statement affects the
19  took price and so if in the absence of
20  that statement the stock price would have
21  been something different, then I think
22  that is -- that statement is affecting the
23  stock price.
24       So that's what would have to be
25  analyzed and your hypothetical is whether

Page 101

1      L. Allen
2   that statement, in fact, affected the
3   stock price because the absence of that
4   statement would have had a different
5   effect.
6      Q.   Let me give you -- let me try to
7   give you an example.  Let me give you
8   another hypothetical.
9        The market is expecting the
10  company to report $10 per share in income
11  for a quarter.  The company announces they
12  have made $10 a share in income.  In fact,
13  the company lost money.  That's a lie.  If
14  the company had told the truth, would the
15  stock price likely be different all things
16  being equal?
17     A.   I mean, I would say in a --
18  generally one would expect that losing
19  money is worse news than making money, I
20  think was your --
21     Q.   $10 a share.
22     A.   And that, you know, in general,
23  I would expect that losing money isn't
24  good news to stock prices and making money
25  is so that companies that -- the

L. Allen

difference between announcing making money
and losing money can, you know, in the
most -- you know, certainly not always,
and that's not -- if I had to guess what's
more typical, in general, it's better for
companies to make money than to lose
money, I think, is the general -- is
generally true.

Q.   And you would expect the stock
price to fall if they announced they lost
money instead of making the $10 the market
expected?

A.   You would need to analyze that.
I think certainly that's not always the
case, but I think generally losing money
is bad news and making money is good news.

Q.   What happens to stock prices
when there is bad news?

A.   Typically, if it's bad news,
stock prices fall, and they go up with
good news.

Q.   And they basically stay the same
with expected news?

A.   Yeah.  This is all very general,

L. Allen

after controlling for things -- other
things that are going on, yeah.  Simplest
case, all other things equal, generally,
if things don't change, stock prices stay
the same.  If there's good news, stock
prices go up, with bad news, they go down.
That's most generally.

Q.   In the hypothetical where the
company has represented that it made the
expected $10 a share, but, in fact, has
lost money, would there be a price impact,
all other things being equal?

A.   Then you have to be clear on
what are you asking about price impact.
So what's your actual question, price
impact from what?

Q.   Does maintaining the price of a
stock by a misrepresentation constitute a
type of price impact?

A.   I wouldn't expect the stock to
react in the circumstances that you just
said.

Q.   And is that a form of price
impact?

L. Allen

A.   No, that's not particularly a
form of price impact.  So not reacting
itself is not a form of price impact.  I
would say, no.

Q.   Okay.

MR. BROWER:  It's a good time
for a break.

MR. BEHA II:  Okay.

THE VIDEOGRAPHER:  The time is
12:21.  We're going off the record.

(Recess taken.)

A F T E R N O O N   S E S S I O
N

(Time noted:  1:32 p.m.)

L U C Y   A L L E N, resumed and
testified as follows:

THE VIDEOGRAPHER:  The time is
1:32.  We're back on the record.

EXAMINATION BY (Cont'd.)

MR. BROWER:

Q.   Ms. Allen, earlier I was asking
you about theories of price impact, and
you said that you've seen discussions of
it, and you think it means different

L. Allen

things to different people.

Do you remember that?

A.   I think that was with regards to
price maintenance.

Q.   Maintenance, correct.  Thank you
for the correction.

And then you ended by saying,
"To me, I have seen what seems to be
conflicting discussions of it."

Can you tell me what your
understanding of the conflicting
discussions are?

A.   I can't really.  I mean, I have
seen the term "price maintenance" used in
different circumstances.  And it is -- I
have not -- if you show me some
circumstances of it being used, I can try
to explain what I think is different
between them or what I've seen, but as I
sit here, I don't have a particular
instance in mind.

Q.   Have you seen it in connection
with securities litigation?

A.   That's what I am referring to,

1          L. Allen
2    is the term "price maintenance" used in
3    the context of securities litigation.
4        Q.   Okay.  Can you go to page 6 of
5    your report, please?
6        A.   Sure.
7        Q.   Okay.  Item letter N, "legal
8    decisions on class certification and
9    market efficiency," what legal decisions
10   on class certification did you consider in
11   connection with your report?
12            MR. BEHA II:  I think this was
13       asked and answered this morning.
14            MR. BROWER:  No, it wasn't.
15       A.   I think to the extent -- I
16   should have footnoted them.
17       Q.   Other than Halliburton 1 and 2
18   that you identified, any other legal
19   decisions on class certification you
20   considered in connection with your report?
21       A.   I don't believe so, unless I
22   footnoted them.
23       Q.   Okay.  Did you consider Basic
24   versus Levinson?
25       A.   I have reviewed

1          L. Allen
2    Basic v. Levinson a number of times in the
3    past.  I don't recall specifically doing
4    it with regard to this report.  I don't
5    believe I did so in preparing this report,
6    no.
7            MR. BEHA II:  I apologize.  Can
8       we very quickly go off the record.
9            MR. BROWER:  Yeah, sure.
10            THE VIDEOGRAPHER:  The time is
11       1:35.  We are going off the record.
12            (Off-the-record discussion
13       held.)
14            THE VIDEOGRAPHER:  The time is
15       1:37.  We're back on the record.
16   BY MR. BROWER:
17       Q.   Ms. Allen, you also indicate you
18   reviewed legal decisions on market
19   efficiency; is that correct?
20       A.   Considered.  They're on my list
21   of materials reviewed.  That's correct.
22       Q.   What legal decisions on market
23   efficiency did you consider in connection
24   with doing your report?
25       A.   I think I reference a

1          L. Allen
2    Cammer v. Bloom decision on footnote 34.
3        Q.   And why did you consider legal
4    decisions on market efficiency for your
5    price impact report?
6        A.   I'm noting here that courts -- I
7    mean, what it has in footnote 34 is that
8    courts often look to the number of
9    analysts reports published on a company as
10   an indication of market efficiency.
11       Q.   Do they look at the number of
12   analyst reports on a company for the issue
13   of market impact?
14            MR. BEHA II:  Objection to form.
15       Market impact?
16       Q.   Price impact.  Sorry.
17       A.   I think courts have looked at --
18   I'm not particularly citing that.  If your
19   question is, have courts looked at the
20   number of analyst reports with regard to
21   price impact, yes.  I believe they have.
22            For example, I believe I've seen
23   circumstances where experts, in analyzing
24   price impact, have said that there were a
25   number of analysts or there were no

1          L. Allen
2    analysts that included this information or
3    incorporated this information in their
4    valuation or, for example, that no
5    analysts reported on a particular matter.
6    I believe I have seen instances of that,
7    but that's not particularly what I'm
8    citing Cammer v. Bloom for.
9        Q.   Did market efficiency factor
10   into your report?
11       A.   Yes, as I testified previously,
12   I assumed that the market was efficient,
13   as plaintiffs and their expert,
14   Dr. Feinstein, allege.
15       Q.   Right.
16            So why were you looking at
17   Cammer v. Bloom in its progeny?
18            MR. BEHA II:  Objection.  Asked
19       and answered.
20       A.   I'm not sure I looked at a
21   progeny of Cammer v. Bloom.  I'm not sure
22   -- I'm not even sure what that means, but
23   I think I explained why I cited
24   Cammer v. Bloom here.  I explained why I
25   cited that in the footnote there.

Page 110

L. Allen

Q.   I'm not sure how it fit into your report. I'm trying to figure out why it fit into your report.

If you assume market efficiency, why then target back Cammer v. Bloom?

MR. BEHA II:  Objection.  Asked and answered.

A.   One of the indicia that courts look at, at whether a market is efficient is whether analysts are covering the stock and disseminating information, and that there is a belief that the more analysts -- that having a number of analysts or more analysts covering a stock, that information is -- it's an indicia of market efficiency in that it's information that's impounded into the stock price, or can be impounded into the stock price.

Q.   I understand that, but you assumed the market for BlackBerry stock was efficient, so why did you need to reference case law relating to what the factors are in determining efficiency in your report on price impact?

Page 111

L. Allen

MR. BEHA II:  Objection.  Asked and answered.

A.   I'm not sure if I needed to do it.  I think it was helpful in showing that one of the issues that the -- that is one of the -- I'm discussing what analysts reports are.  For example, in paragraph 23, I'm explaining they're periodic reports issued by professional financial analysts, brokerage firms that perform research and analysis on specific industries and companies.

So I'm giving information and background on what our analysts report, and why it's important to review them. And I think it's helpful and supportive that courts also think in the context of market efficiency.

And Dr. Feinstein has claimed, in his analysis of market efficiency, that the presence of these analyst reports and having their analysis and their dissemination of this information is part of how information gets impacted into and

Page 112

L. Allen

impounded into the stock price.

Q.   Okay.  Were there a large number of analysts that followed Blackberry?

A.   There were quite a few analysts that followed BlackBerry.  I don't recall sort of various points.  I might say -- yeah, for example, I might say there were 55 analysts, or at least 55 analysts covering BlackBerry during the alleged class period.

Q.   Okay.  Why did you -- strike that.

Did you look at legal decisions on price impact in securities cases?

A.   I have seen legal decisions on price impact in securities cases. I don't believe -- well, I do reference the Halliburton decision, where the term "price impact," as it relates in this particular context, I think -- I don't know if that's the -- that's often where -- I think the price impact that I've been asked to analyze was something that the Supreme Court in Halliburton was referring

Page 113

L. Allen

to.  So I think the use of the term is the same.

Q.   Okay.

A.   I don't know if that's the first time it was used.  I believe it's been used before.  But --

Q.   But that was not listed in item N that you did not look at legal decisions on price impact in connection with preparing your report other than Halliburton 2?

MR. BEHA II:  Objection.  I'm not sure that --

MR. BROWER:  You want me to redo it?

MR. BEHA II:  Yeah.  Reask that question just to make sure we're clear.

Q.   You didn't list in item N any legal decisions on price impact.

Did you look at any other legal decisions on price impact in connection with your report in this case other than Halliburton 2?

Page 114

1       L. Allen
2       MR. BEHA II:  Objection.  I
3   think the preamble to the question
4   misstates what's in the report.
5       MR. BROWER:  Okay.
6       A.   So item N in my report has a
7   category called "legal decisions on class
8   certification and market efficiency."  The
9   type of price impact that I am
10  understanding that I have been asked to
11  address is at the class certification
12  stage.  So I think price impact at the
13  class certification stage would be
14  subsumed within the category "class
15  certification."
16      Item N does not list particular
17  decisions.  It list as category.  I have
18  tried to footnote the specific decisions
19  as well as other documents that I am
20  referencing in my report at the point that
21  I am referencing them.  So item N doesn't
22  list any specific decisions to the extent
23  they are referenced in my report.  I
24  believe I have either put them in the
25  footnote or put e-mail in the body of the

Page 115

1   text itself.
2       L. Allen
3       Q.   Other than Halliburton 2, what
4   legal decisions relating to market price
5   impact did you consider in connection with
6   providing your opinion in this case?
7       A.   I don't know if I cite other --
8   I mean, I can he look through my report
9   and look for the cites.
10      Did you say Halliburton 2?
11      Q.   I said other than Halliburton 2?
12      A.   I believe I cite both
13  Halliburton 1 and Halliburton 2, and I
14  believe Halliburton 1 -- the definition of
15  price impact I believe comes from -- at
16  least according to my footnote, from
17  Halliburton 1.
18      Q.   Any other cases other than
19  Halliburton 1 and 2 relating to legal
20  decisions on price impact?
21      A.   I don't recall, as I sit here.
22  I can go through my report and look
23  through my -- look through the footnotes,
24  but --
25      Q.   Did you review the Second

Page 116

1       L. Allen
2   Circuit decision in, in Re Vivendi
3   securities litigation?
4       A.   In preparing my report in this
5   case?
6       Q.   Yes, ma'am?
7       A.   I don't believe I did, unless it
8   is referenced in my report.
9       Q.   Did you review the FindWhat
10  Investor Group case from the 11th Circuit,
11  in connection with preparing your report?
12      A.   I don't believe so, no.
13      Q.   Did you review
14  Waggoner v. Barclays in connection with
15  preparing your report?  Also Second
16  Circuit, by the way.
17      A.   I believe so.  I will say
18  that I did review, in preparing my report,
19  plaintiffs' motion for class
20  certification.  To the extent that they
21  have cited decisions or have quotes from
22  decisions, I may have seen that but I
23  don't recall reviewing the decision it is
24  that you've asked for in preparing my
25  report.

Page 117

1       L. Allen
2       Q.   Have you ever read any of those
3   three decisions that I just mentioned?
4       A.   Well, then I would have to
5   listen again to what those decisions were.
6       Q.   In Re Vivendi in the Second
7   Circuit?
8       A.   I believe I have seen that
9   decision.  The name sounds familiar to me.
10      Q.   I asked if you read it.
11      Have you read it?
12      A.   I believe I have read that
13  decision or at least portions of it
14  because the name sounds familiar to me,
15  but I'm not sure.
16      Q.   Okay.  Have you read the
17  FindWhat Inventor Group case?
18      A.   Not that I recall.
19      Q.   Have you read
20  Waggoner v. Barclays, PLC?
21      A.   I don't know.
22      Q.   Have you read Lentell v. Merrill
23  Lynch from the Second Circuit?
24      A.   I don't know as I sit here.
25      Q.   Have you read Virginia

Page 118

L. Allen
1
2   Bankshares v. Sandberg from the United
3   States Supreme Court?
4       A.   I don't recall as I sit here.
5       Q.   You testified earlier that price
6   impact does not require the stock price
7   increase and the price impact does not
8   require price decrease.
9       If a price doesn't increase or a
10  price does not decrease, how do you have
11  price impact?
12      A.   Well, first, I'm not sure if
13  what you just said is what I actually
14  testified to.  So you've been asking me
15  questions.  And what I have been asked to
16  do here is analyze price impact from the
17  alleged misrepresentations.
18      The word "price impact" can mean
19  different things in different contexts,
20  but we often talk about does a certain
21  statement impact the price and does it
22  have price impact, which is more general
23  than whether alleged misrepresentations
24  have price impact.
25      So I want to make that

Page 119

L. Allen
1
2   distinction.  In general, the methodology
3   of analyzing whether a statement has price
4   impact is generally the same thing
5   regardless of whether it's a
6   misrepresentation or it's not an alleged
7   misrepresentation.  But I think we've been
8   using some sort of shorthand -- and I've
9   been doing that too.  I want to make -- be
10  more clear about what we're actually
11  talking about.
12      I don't particularly agree that
13  he what you said is what I had previously
14  testified to and if it is what I
15  previously testified to it's because I was
16  using shorthand when I probably shouldn't
17  have, and been more clear about what it is
18  we're talking about.
19      Q.   Let's read the question and
20  answer back:  "Does the price of a stock
21  have to increase for there to be price
22  impact from a statement?"
23      "I don't believe so, no."
24      "Does the price of a stock have
25  to decrease in response to a statement for

Page 120

L. Allen
1
2   there to be price impact?"
3       "No, I don't believe so."
4       That was your testimony.  So
5   let's make it easier, so it's clear.
6       A.   Okay.  I agree with that
7   testimony.
8       Q.   Okay.  Does the price of a stock
9   have to increase in response to a
10  misrepresentation for there to be price
11  impact?
12      A.   From the alleged
13  misrepresentation?
14      Q.   From the alleged
15  misrepresentation?
16      A.   No, I don't believe so.
17      Q.   Okay.  Does the price of a stock
18  have to decrease in response to a
19  misrepresentation for there to be price
20  impact from the misrepresentation?
21      A.   No.  It does not have to be the
22  case.
23      Q.   Okay.  Please explain what
24  happens if -- strike that.
25      Please explain how there is

Page 121

L. Allen
1
2   price impact if there is no increase or
3   decrease in the price of a stock in
4   response to a misrepresentation.
5       A.   Can you repeat that?
6       Q.   Sure.
7       Please explain what happens
8   if -- strike that.
9       Please explain how there is
10  price impact if there is no increase or
11  decrease in the price of a stock in
12  response to a misrepresentation.
13      A.   So it can be the case the stock
14  does not move after alleged
15  misrepresentation, but if an alternate
16  statement had been made or if the alleged
17  misrepresentation had not been made at
18  all, the price would have been different.
19      And the difference -- so the
20  alleged misrepresentation is affecting the
21  stock price in this hypothetical because
22  the stock price would have been different
23  if not for the alleged misrepresentation.
24      Q.   Is it possible for a
25  misrepresentation to maintain the price of

L. Allen

1
2  a stock at a particular price?
3      A.   I'm not sure what that means.
4      Q.   Go back to the hypothetical we
5  did before lunch.  If the company issues a
6  statement that is within the expectations
7  of the market consistent with the
8  expectations of the market, but, in fact,
9  it's a lie, and the stock doesn't move
10  does that lie still have a price impact?
11      A.   I think if what you're saying is
12  the alleged misrepresentation if it had
13  not been made the stock price would have
14  been different, then I think that is
15  showing -- is saying that the alleged
16  misrepresentation affected the stock price
17  and that is my understanding of price
18  impact.
19      Q.   Okay.  So just to finish the
20  hypothetical, if the company had, in fact,
21  told the truth in my hypothetical, rather
22  than the price staying the same as the
23  market -- because the information was as
24  the market expected, the price would go
25  down; is that correct?

L. Allen

1
2      A.   I don't know if that's correct.
3  It's your hypothetical.
4      Q.   Well, you remember, $10 versus a
5  loss?
6      A.   If that's what you want to say,
7  assuming that's true.  I mean, that's your
8  hypothetical.
9      Q.   Would you expect the price to go
10  down?
11      A.   If the price would be different
12  but for the alleged misrepresentation,
13  then the alleged misrepresentation is
14  impacting or affecting the stock price,
15  and then that is my understanding of price
16  impact.  So price impact is where the
17  alleged misrepresentation affects the
18  stock price.
19      Q.   Did you read Dr. Feinstein's
20  deposition transcript?
21      A.   Yes.
22      Q.   Did you find anything
23  interesting in it?
24          MR. BEHA II:  Objection to form.
25      Q.   You can answer.

L. Allen

1
2      A.   Yes.  I don't know about
3  interesting.  I found some things -- I
4  cited his deposition in parts here, and I
5  did find some things interesting, yes.
6      Q.   Is there anything you disagreed
7  with Dr. Feinstein relating to price
8  impact -- strike that.
9          Did you find anything you
10  disagreed with Dr. Feinstein that's not in
11  your report?
12      A.   Yes.
13      Q.   Okay.  And what was the subject
14  matter of the things you disagreed with in
15  the matter?
16      A.   There are lots of things I
17  disagreed with from Dr. Feinstein's
18  deposition.
19      Q.   Anything in connection with the
20  work you've been retained to do in this
21  case?
22      A.   I think his entire deposition
23  was in connection with this case, as is
24  the work in this case.  So I think, in
25  that sense, they're all connected to this

L. Allen

1
2  case, so --
3      Q.   I'm asking if anything you
4  disagreed with in Dr. Feinstein's
5  deposition relates to the work you were
6  retained to do in this case, which you've
7  testified was exclusively price impact?
8      A.   Sure.  I think it all kind of
9  relates.  I'm not sure where to draw the
10  line on where it relates or doesn't
11  relate.  I think much of what he was asked
12  in his deposition bears some relationship
13  to what I have been asked to do.
14      Q.   What is the relationship?
15      A.   I think you would have to go
16  through his deposition and I mean
17  different pieces have different
18  relationships.  He was asked about some
19  things that are -- I think he was asked
20  about how he would analyze price impact.
21  I think he was asked about -- I don't
22  recall all the things he was asked in his
23  deposition, but many of the -- much of his
24  deposition is somehow related -- all of it
25  is related to this case, so it all bears

Page 126

```
1            L. Allen
2   some relationship. I'm not sure --
3       Q.   Yeah, but I'm asking
4   specifically with respect to your report
5   and your retention in this case.  Not the
6   scope of his testimony, the scope of your
7   testimony.
8       A.   There was nothing in his
9   deposition that would cause me to change
10  the conclusions in my report.
11      Q.   Okay.
12      A.   But there are a number of things
13  in his deposition that I did not agree
14  with.
15      Q.   Okay.  But you were not retained
16  to rebut those things; is that correct?
17      A.   Well that's correct.
18  Dr. Feinstein's has prepared an analysis
19  of market efficiency and I was not asked
20  to address market efficiency.  I guess
21  he's done market efficiency as well as a
22  common damages methodology.  I was not
23  asked to address either of those.
24      Q.   Okay.  Were you aware of whether
25  BlackBerry or Morrison & Foerster retained
```

Page 127

```
1            L. Allen
2   any other expert firms in connection with
3   analyzing stock prices in this case or in
4   connection with anything involving this
5   case?
6            MR. BEHA II:  Objection to form.
7       Q.   You can answer.
8       A.   I am aware now because I
9   understand that you have subpoenaed
10  Cornerstone as well as NERA, so I have
11  some understanding that Cornerstone was
12  retained to do something, I think, with
13  regard to a different matter, is my
14  understanding, but --
15      Q.   Do you know what that matter
16  was?
17      A.   I think it had something to do
18  with Detwiler Fenton report, is my
19  understanding.
20      Q.   And do you know what it was in
21  connection with, with respect to the
22  Detwiler Fenton report?
23      A.   I think there's some sort of
24  litigation regarding the Detwiler Fenton
25  report or the information within it that
```

Page 128

```
1            L. Allen
2   Cornerstone was retained to analyze
3   something with respect to that is my
4   understanding.
5       Q.   Did anyone share with you any of
6   the work product of Cornerstone in
7   connection with providing your report?
8       A.   No.
9       Q.   Anyone provide you with any of
10  the Cornerstone materials in connection
11  with preparing for this deposition?
12      A.   No.
13      Q.   Who explained the Detwiler
14  Fenton situation to you?
15           MR. BEHA II:  Objection to form.
16      Q.   You can answer.
17           MR. BEHA II:  No.  What is the
18  "Detwiler situation"?
19      Q.   Who explained to you what
20  Cornerstone did for BlackBerry and/or
21  Morrison & Foerster in connection with
22  BlackBerry?
23      A.   I don't recall.
24      Q.   Was it counsel?
25      A.   Counsel of some kind.  It was
```

Page 129

```
1            L. Allen
2   lawyers of some kind, but I don't recall
3   which ones.
4       Q.   Have you spoken to anybody at
5   Cornerstone about BlackBerry?
6       A.   Not that I recall.
7       Q.   And just to be clear, were you
8   given any BlackBerry documents that
9   discussed Cornerstone, or any analysis by
10  Cornerstone, of the Detwiler Fenton report
11  or price movement of BlackBerry stock?
12      A.   Can you repeat that?
13      Q.   Sure.
14           Just to be clear, have you --
15  were you given any BlackBerry document
16  that discussed Cornerstone or any analysis
17  by Cornerstone related to BlackBerry or
18  the Detwiler Fenton --
19      A.   So any BlackBerry document that
20  related to Cornerstone; is that your
21  question?
22      Q.   Uh-huh.
23      A.   I mean, there are BlackBerry
24  documents that relate to the Detwiler
25  Fenton report that had nothing to do with
```

Page 130

L. Allen

1  Cornerstone.  So I do have -- I don't
2  think I was given them by BlackBerry, but
3  there's a press release, for example, that
4  plaintiffs are claiming is the alleged
5  misrepresentation, which is a BlackBerry
6  statement that refers to the Detwiler
7  Fenton report, and that is something that
8  I didn't obtain through BlackBerry itself.
9       But I have not gotten or
10 received or reviewed any documents
11 relating to any work done by Cornerstone
12 from BlackBerry.
13     Q.   Or from Morrison & Foerster?
14     A.   Not with regards to this matter.
15     Q.   How about with regard to the
16 other litigation you described?
17     A.   No.
18     Q.   Okay.  How about with respect to
19 any presentations made to the Securities
20 and Exchange Commission?
21     A.   I don't believe so, no.
22     Q.   How about with respect to
23 presentations made to Canadian securities
24 regulators?

Page 131

L. Allen

1      A.   No, I don't think so.
2      Q.   Do you know whether NERA was
3  approached to do any analysis on behalf of
4  BlackBerry, Morrison & Foerster, or other
5  counsel representing BlackBerry, in
6  connection with presentations to the
7  Securities and Exchange Commission?
8      A.   Not that I know of.
9      Q.   Do you know whether -- that's
10 fine.
11     Did you review BlackBerry
12 internal emails discussing the Detwiler
13 Fenton report and the impact of the
14 Detwiler Fenton report?
15     A.   Not that I recall.  Not in my
16 materials considered then I wouldn't have.
17 I have no recollection of that but --
18     Q.   There is nothing on your list,
19 Roman numeral 4, starting on page 5 and
20 going over to page 6, that indicates you
21 received any internal BlackBerry emails.
22     A.   Correct.
23     Q.   Would you have listed here, if
24 you had received internal BlackBerry

Page 132

L. Allen

1  emails as among the materials you would
2  have considered in connection with doing
3  your report if, in fact, they were
4  provided to you?
5      A.   Yes.  It's just if they were
6  somehow attached to a complaint or part of
7  what Dr. Feinstein's turned over, then it
8  would just be subsumed with some other
9  category.
10     Q.   I understand.
11     I'm talking about internal
12 emails that were not publicly available.
13     A.   No, I don't.  If I had received
14 them, they would be listed under here.
15 I've intended to make this comprehensive
16 materials considered.
17     Q.   Ms. Allen, has class -- has any
18 case in which you testified -- strike
19 that.
20     How many times have you
21 testified in a securities case about price
22 impact?  And when I say "how many times,"
23 if you have testified four times in the
24 same case, we will treat that as one.  I

Page 133

L. Allen

1  understand it was more work than one.
2      But in how many cases have you
3  testified on price impact in securities
4  cases?
5      A.   I would say that most of the
6  securities cases in which I have worked on
7  the impact of information on the price is
8  often an issue.  So there has been lots of
9  analysis of whether information has impact
10 had the stock price.
11     So that's one of the things that
12 often happens in a securities case is
13 what's affecting the stock price so that's
14 very often an issue.
15     Q.   That's the fifth Cammer factor?
16     A.   No.  I think the fifth -- one of
17 the Cammer factors is about -- the Cammer
18 factors are on market efficiency.  And one
19 of the Cammer factors is whether the stock
20 reacts quickly to information.  Whether
21 the stock reacts to a particular piece of
22 information, and whether there is a price
23 impact from information is -- I mean,
24 basically an event study.

L. Allen

So every time you do an event study, you're looking at price impact. You're looking at whether that -- what is the impact of that event on the price. So if you're just sort of talking generally about the term price impact and whether information affects a stock price that's something I have often done in lots of different matters, but more often in matters that involve stock prices.

Q.   Okay. Can you tell me in what cases a class certification has been denied where you have testified there was no price impact?

A.   I don't have a list of cases where class certification has been denied or granted. I'm not sure. I don't have an answer to that.

Q.   Let's be clear. I am asking for the number of cases where class certification has been denied where you have testified that there was no price impact and the court denied class certification based on there not being

L. Allen

proof of price impact.

MR. BEHA II:  Objection. Asked and answered.

A.   So I'm not sure -- I don't have an answer to that. I don't have a list of cases where I have testified on price impact and I'm not sure what you mean by testify on price impact.

Do you mean price impact to alleged misrepresentations, as I've been asked to do in this case, or do you mean price impact more generally, where information has an impact on the stock price?

Q.   I will make it easier.

Let's limit it to the type of testimony and report you have provided here in the BlackBerry case.

A.   I don't know what you mean by that.

Q.   Okay. How many times have you testified about the absence of price impact in connection with misrepresentations in a securities action,

L. Allen

let's say, since the decision on Halliburton 2?

A.   I don't know the answer to that.

Q.   So you can't recall in the last four years?

Why don't you take a look at your list attached as to the courts all of the times you have testified or provided reports in the last four years and point out in which of those cases.

Let's start with securities cases.

A.   What's your question?

Q.   Which of the cases on your list, expert reports, depositions, and testimony in four years, which security cases?

A.   I believe the third one.

Q.   Let me rephrase that.

Were securities class action cases -- apologies.

A.   I believe the third one is a securities class action. The fourth one is a securities case.

Q.   The third one, can you just say

L. Allen

the title of the case?

A.   Nikki Bollinger Grae v. Corrections Corporation of America.

Q.   Any others?

A.   The next one is, I believe, a securities case. I'm not sure if it's a class action or not.

Q.   Bernstein Liebhard v. Sentinel Insurance Company?

A.   No. Artic Glacier Savings and Retirement Plan v. Principal Life Insurance Company.

Q.   You think that's a securities class action?

A.   I don't know. I think it's a securities litigation. I don't know if it's a class action. Bernstein Liebhard is not. The next one is not. Andrew Meyer v. Concordia International, I believe, is a securities class action.

The next one, Alan Hall and James DePalma v. Rent-A-Center is, I believe, a securities class action. The

Page 138

L. Allen

1  
2  next one is not. The next one is not.
3  The next one is not. The next one, I
4  believe, is, City of Pontiac General
5  Employees' Retirement System v. Dell.
6      The next one is, I believe, a --
7  it's a security litigation. I believe
8  it's a securities class action. In Re
9  Willbros. The next one is not. The next
10  one, I believe, is a securities class
11  action, in Re Cobalt International Energy
12  Securities Litigation. The next one, I
13  believe, is a securities class action DEKA
14  Investment, et al. V. Santander Consumer.
15      The next one is but next. The next
16  one, I don't believe, is. The next one is
17  Halliburton. That is a securities class
18  action.
19      Q.   Not anymore.
20      A.   Well, is your question are they
21  still pending?
22      Q.   No. No. Go on.
23      A.   SunTrust ERISA Litigation is an
24  ERISA litigation. The next one is not. I
25  don't believe the next one is a securities

Page 139

L. Allen

1  
2  class action. I don't believe the next
3  one is. I don't believe the next one is.
4  Halliburton again, which is. The next one
5  is not. The next one is not.
6      Atul Kumar Sood, et
7  al. V. Catalyst Pharmaceutical Partners is
8  a securities class action. I don't really
9  have a recollection of what the next one
10  is. Psychiatric Solutions v. Garden City
11  Employees' Retirement Systems and Central
12  States Southeast and Southwest Areas
13  Pension Fund is, I believe, a securities
14  class action. And the next ones are not.
15      Q.   Okay. And just to be clear, in
16  the City of Pontiac v. Dell case, class
17  certification was granted there, was it
18  not?
19      A.   I believe so, yes.
20      Q.   Do you remember whether you
21  testified that there was no price impact
22  in that case?
23      A.   I think I did, but I don't
24  recall. That's my recollection.
25      Q.   The court rejected your

Page 140

L. Allen

1  
2  opinion -- I will rephrase that.
3      A.   That's not my recollection. My
4  recollection is not that the court
5  rejected my opinion.
6      Q.   I understand.
7      The court did not accept your
8  opinion as a basis to deny class
9  certification?
10      MR. BEHA II:  Objection to the
11  form.
12      A.   My recollection is the class was
13  certified. I don't recall the court
14  having an opinion on my analysis.
15      Q.   I assume you testified for the
16  defendants?
17      A.   I was retained by Dell in that
18  case.
19      Q.   Dell was the defendant?
20      A.   Dell was the defendant. I
21  believe I was retained by Dell in that
22  case.
23      Q.   In Aranaz v. Catalyst
24  Pharmaceutical, did you testify that there
25  was no -- did you represent the

Page 141

L. Allen

1  
2  defendants? Let's start with that.
3      A.   I was retained by the
4  defendants.
5      Q.   Okay. I stand corrected.
6      Did you testify there was no
7  price impact in that case?
8      A.   I think I did, yes.
9      Q.   Was class granted in that case?
10      A.   Yes. I believe class was
11  granted, and the case was on appeal, I
12  believe.
13      Q.   The class was certified by the
14  District Court?
15      A.   I'm sorry?
16      Q.   The class was certified by the
17  District Court?
18      A.   On appeal, that's correct. And
19  then I think it settled.
20      Q.   So it settled; so that's it?
21      A.   What?
22      Q.   So it settled, you believe?
23      A.   It settled.
24      Q.   So the appeals court is never
25  going to consider it?

Page 142

```
1              L. Allen
2      A.   That would be my understanding.
3      Q.   Okay.  And in Halliburton, you
4  testified after remand from the Supreme
5  Court the second time around that there
6  was no price impact?
7      A.   I don't know whether -- I'm not
8  sure what "after remand the second time
9  around" means.
10     Q.   After Halliburton 2 was decided
11 and the case was remanded to the District
12 Court.
13     A.   I testified a number of times in
14 the Halliburton case over a number of
15 years.  And the class was not certified.
16 Class certification was, I think,
17 originally denied based on an analysis of
18 loss causation.
19     Q.   And then the case went to the
20 Supreme Court, and they said that he was
21 error, and they sent it back, correct?
22     A.   They said that loss causation
23 wasn't a -- not that my analysis of loss
24 caution was in error or that there was no
25 loss causation, but that loss causation
```

Page 143

```
1              L. Allen
2  wasn't an issue at the class certification
3  stage, is my understanding.
4      Q.   And then the case went back to
5  the District Court and --
6      A.   That's correct.
7      Q.   -- the District Court certified
8  the class second time around?
9      A.   And found no price impact with
10 regard to a number of the alleged
11 misrepresentations, based on my analysis.
12     Q.   And then the case went back up
13 to the Supreme Court?
14     A.   Oh, so, yeah.  I'm not sure
15 where we are now.
16          At some point I testified on
17 price impact, and the court found there
18 was no price impact with regard to a
19 number of the alleged misrepresentations.
20     Q.   Was the class certified?
21     A.   The class was certified with
22 regard to one remaining alleged corrective
23 disclosures, is my recollection.
24     Q.   And the case settled?
25     A.   The case settled.
```

Page 144

```
1              L. Allen
2      Q.   By the way, do you remember how
3  much?
4      A.   I do not.
5      Q.   Does $100 million refresh your
6  recollection?
7          MR. BEHA II:  I bet Kim knows.
8          MR. BROWER:  I bet Kim does.
9          MS. MILLER:  Probably.
10     A.   That was a $4 billion claim, I
11 think.
12     Q.   He will tell you that's a great
13 result.
14          Have you ever testified for
15 plaintiffs in a securities class action?
16     A.   I have worked for plaintiffs in
17 securities cases.  I've worked for
18 plaintiffs in securities class actions.  I
19 don't know if I've testified for
20 plaintiffs in a securities class action,
21 so --
22     Q.   Any time recently?
23     A.   I am currently working for
24 plaintiffs in securities class action.
25     Q.   Okay.  Do you agree with the
```

Page 145

```
1              L. Allen
2  proposition that "The idea of a free and
3  open public market is built upon the
4  theory that competing judgments of buyers
5  and sellers as to the fair price of a
6  security brings about a situation where
7  the market price reflects, as nearly as
8  possible, a just price"?
9          MR. BEHA II:  Objection to form.
10     Q.   You can answer.
11     A.   Can you read that again?
12     Q.   Do you agree with the
13 proposition that "The idea of a free and
14 open public market is built upon the
15 theory that competing judgments of buyers
16 and sellers as to the fair price of a
17 security brings about a situation where
18 the market price reflects, as nearly as
19 possible, a just price"?
20     A.   I don't particularly disagree
21 with that.  I think it's --
22     Q.   Think it's what?  You think it's
23 correct?
24     A.   I don't -- I don't have any
25 particular reason to disagree with that.
```

L. Allen
1
2     MR. BROWER:  Can we take break?
3     MR. BEHA II:  Sure.
4     THE VIDEOGRAPHER:  The time is
5  2:27.  We're going off the record.
6     (Recess taken.)
7     MR. BROWER:  Mark this Allen 7.
8     (Allen Exhibit 7, document
9  headed Blackberry LTD Form 40-F,
10 marked for identification, as of this
11 date.)
12    (Recess taken.)
13    THE VIDEOGRAPHER:  The time is
14 2:49.  We're back on the record.
15 By MR. BROWER:
16    Q.   Could you look at paragraph 8 of
17 your report, please.
18    You say that, and I quote,
19 "Analysts, rather than believing that
20 BlackBerry 10 was 'successful,' believed
21 right after the alleged misrepresentation
22 that there was a substantial risk that
23 BlackBerry 10 smartphones could fail."
24    Where are you getting that
25 information from?

L. Allen
1
2     A.   Which part are you asking about,
3  what analysts believed?
4     Q.   Uh-huh.  What analysts believed.
5     A.   Where are your --
6     Q.   Paragraph 8.
7     A.   Where are you reading from is a
8  summary of findings.  And so the rest of
9  my report details that analysis.
10    Q.   I understand.
11    A.   But one of the things -- one of
12 the analyses that I do is I look at the --
13 go through all the analyst reports and
14 determine whether they say -- whether the
15 analyst says is the probability of
16 the BlackBerry 10 succeeding or failing.
17 So there are a few analyst reports that
18 give actual numbers and give
19 probabilities.
20    Q.   Uh-huh.
21    A.   And I have put that in -- it's
22 in my report.  There's a table of that
23 on -- for example, on page 32.  One of the
24 other analyses that I've done is I've
25 looked at all the analyst reports at the

L. Allen
1
2  beginning of the alleged class period and
3  what were there price targets of
4  BlackBerry stock.  And I have a table and
5  a picture of that also in my report.
6     Q.   And yours is nice colored.  Mine
7  is not.
8     A.   Exactly.
9     MR. BEHA II:  I call for a copy
10 of the color version.
11    A.   So I've done a number of
12 analyses.  I've also reviewed what the
13 analysts were saying, so what were their
14 models in terms of how they were valuing
15 the stock, whether they -- you know, what
16 are they saying.  Much of that is
17 described in my report.
18    So I will note that the ones who
19 specifically give probabilities of failure
20 and success have probabilities of failure
21 that are, you know, 90 percent,
22 80 percent, 70 to 80 percent, and
23 Canaccord says that the probability of
24 success is very low.
25    Q.   Let's focus on that.  We're

L. Allen
1
2  going to focus on pages 29 through 31.
3  Actually, we will go to 32.  So let me
4  see.  There were four analysts that gave
5  probabilities.
6     A.   Yeah.  Gave explicit
7  probabilities of failure and success for
8  the BlackBerry 10.
9     MR. BEHA II:  Sorry.  What page
10 are we looking at?
11    MR. BROWER:  32.
12    A.   32.  So three give actual
13 numbers, and Canaccord says very low,
14 without giving a specific percent.
15    Q.   And the other 36 -- let's see, 3
16 less 36 -- 33 that you have listed on
17 page 29, didn't do some sort of numerical
18 probability of success of the
19 BlackBerry 10?
20    A.   They don't give a probability of
21 success.  They have price targets.  And if
22 you look at their price targets, which you
23 can see on page 30, you will see that
24 there's a -- a huge range of what they're
25 expecting, and that the ones who have

Page 150

L. Allen

given an actual probability of success,
are some of them -- the other ones are in
the same ranges as the ones who give the
probabilities.

Q.   Let me ask a basic question
before we get into this.

Is it correct that any time a
company begins selling a new product,
there's a risk the product may not be
well-received?

A.   I think there can be a risk with
products that it may not be well-received.
I think what -- the situation we have here
is one where it was known to be extremely
uncertain what the future would be for
this product.  It was considered highly
speculative and risky.

And the analyst felt that, at
the beginning of the class period, you
didn't know what was going to happen.  You
needed another quarter or two, in order to
see what would happen but they thought
that the likelihood of failure was very
high.

Page 151

L. Allen

Q.   All of the analysts thought
that?

A.   The analysts that -- I find no
analyst that gives an indication that the
likelihood of success was very high.  All
of the analysts that have given specific
numbers in terms of the probability I have
detailed in my report.

And, as you can see, those
analysts, some of them have higher and
some of them have lower price targets than
average.  So they're not the ones that all
fall into the more pessimistic analysts
about the company.

Q.   In fact, some of them are very
optimistic, given the then current stock
price?

A.   Some of them are more optimistic
than other analysts, and some of them are
less optimistic.

Q.   Okay.  That would be --

A.   In general, the majority of
analysts think that the stock will go down
if the price target is below the current

Page 152

L. Allen

stock price at the beginning of the
alleged class period.

Q.   Okay.  By the way, of the 36
analysts you have here, is that every
analyst that did a report in or around
March 28, 2013?

A.   So I think what you're referring
to is a table that I have on page --

Q.   29?

A.   -- 29 and those are all of the
analysts that gave price targets for
Blackberry stock after the March 29th
alleged misrepresentation.  So there are a
bunch of analysts that are following the
stock that are not giving -- there are
some that are not giving price targets.

Q.   Okay.

A.   And I think I have a footnote
that explains that somewhere, but --

Q.   Are all analyst firms the same?

A.   I'm not sure what your question
is referring to, in what manner, but
surely they're not all the same.  No
matter what you're referring to, I think

Page 153

L. Allen

it would be the case that all analysts are
not the same.

Q.   Are some analysts higher quality
than other analysts?

A.   I think you would have to define
what you mean to me by "higher quality."

Q.   Are some analysts more
influential than other analysts?

A.   I think some analysts have -- I
know Dr. Feinstein's said that -- he
seemed to define influential by analysts
that had a bigger following, so the number
of people who -- I don't know, subscribe
to them -- or his definition of what was
influential seemed to be in terms of
numbers of followers.

I don't know if that's -- I
don't know if an analyst that has more
followers is necessarily more influential.
I don't know what basis Dr. Feinstein's
had for that conclusion, but I recall him
saying that.  I have not seen any analysis
of what makes an analyst, you know,
whether more followers makes an analyst

Page 154

```
 1            L. Allen
 2    more influential.
 3        Q.   I didn't ask you that.  So that
 4    doesn't really help.
 5            I asked you whether you believe
 6    some analysts are more influential than
 7    others.  I didn't ask you what
 8    Dr. Feinstein's testified to.
 9        A.    Yeah.  I think I asked you what
10    you meant by that.  And I said I recall
11    him giving the definition, which was that
12    there were more followers.
13        Q.    Do you believe there are some
14    analysts who are more influential than
15    others?
16        A.    I wouldn't particularly doubt
17    that.  I don't know what you mean by
18    "influential."
19            Do you mean that they are -- do
20    they influence the stock more?  Do they
21    influence people more?  I don't know what
22    you mean.  I would think regardless of
23    what you mean, it would seem likely to me
24    that some analysts are more influential
25    than others, regardless of whatever
```

Page 155

```
 1            L. Allen
 2    meaning you have for "influential."
 3        Q.   Are some firms more equipped
 4    than other firms?
 5            MR. BEHA II:  Objection to form.
 6        A.    In general, some firms have more
 7    equipment and are more equipped to do
 8    various things than other firms.  Sure.
 9        Q.    For instance, just looking at
10    your list -- does Morgan Stanley -- strike
11    that.
12            Does MKM Partners have the same
13    resources as Morgan Stanley?
14        A.    I don't know what you mean by
15    "resources," but my guess is different
16    analyst firms have different resources,
17    you know, kind of regardless of what you
18    might mean by "resources."  So I would
19    think that different analyst companies
20    have larger numbers of people or more
21    computers or whatever, than others.
22        Q.    More access to information?
23        A.    I'm not sure if they have more
24    access to information or the information
25    that affects the stock price.  I think
```

Page 156

```
 1            L. Allen
 2    there's some -- I don't know.  I'm not
 3    sure if that's an important difference.
 4    I'm not sure what -- I wouldn't -- I
 5    haven't analyzed that question.  I
 6    wouldn't particularly say it couldn't be
 7    true, but.
 8        Q.    Well, did you determine, in
 9    connection with preparing the chart on
10    page 29 -- strike that.
11            In connection with preparing the
12    chart on page 29, you treated all analysts
13    equally?
14            MR. BEHA II:  Objection to form.
15        A.    The chart on page 29 does not
16    have any subjective determinations about
17    the influence of various analysts.  It's
18    an objective analysis, where I have taken
19    every single analyst report that I was
20    able to obtain or that plaintiffs and
21    their experts were able to obtain
22    regarding the company, I reviewed every
23    single analyst report that followed
24    BlackBerry stock and put together a table
25    of -- an objective table of, if they had a
```

Page 157

```
 1            L. Allen
 2    price target, what was their price target
 3    at this point in time.
 4            So this is an objective
 5    replicable analysis that is not based on
 6    any subjective opinions about the relative
 7    influence of different analysts.
 8        Q.    So there was no qualitative
 9    analysis done in assembling these analyst
10    companies?
11            MR. BEHA II:  Objection to form.
12    What do you mean by "assembling the
13    analyst companies"?
14            MR. BROWER:  That the list
15    has -- nothing in connection with
16    preparing this list was influenced by
17    any qualitative factors relating to
18    the individual firms on the list.
19        A.    This was an objective replicable
20    analysis that didn't require any
21    subjective analysis about the relative
22    influence of analysts.
23            MR. BROWER:  Mark this Allen 8.
24            (Allen Exhibit 8, document
25    headed Institutional Investor, marked
```

Page 158

L. Allen

1  for identification, as of this date.)
2  MS. MILLER:  Could you read back
3  the last answer.
4  (Whereupon, the requested
5  portion was read back by the court
6  reporter.)
7  Q.   I've marked as Exhibit 8 -- I
8  will get to Exhibit 9 -- Exhibit 7,
9  rather, later.  This is a list of
10  something called the All-America Research
11  Team Institutional Investor.
12  Are you familiar with this
13  ranking?
14  A.   I'm familiar with institutional
15  investor.  I'm familiar that they do some
16  sort of ranking.  I don't know if I've
17  seen this, or the All-America.  I don't
18  have a particular recollection of this,
19  no.
20  Q.   Do you understand what this
21  purports to do?
22  A.   No.
23  Q.   I just want to point out, Morgan
24  Stanley is below the line in your chart on

Page 159

L. Allen

1  page 29.  Morgan Stanley is number 3 in
2  the All-American Research Team for
3  Institutional Investor.
4  Do you see that?
5  A.   In 2013, it looks like?
6  Q.   Yeah, in 2013.
7  A.   I see there's a 3 under 2013 for
8  Morgan Stanley on this page that you've
9  handed me.
10  Q.   Let's see who else is on it.
11  Just go through who is on the list,
12  regardless.
13  It's a list of 21 firms.  You
14  have Morgan Stanley, Goldman Sachs,
15  Jefferies, Wells Fargo.  All of those
16  firms are below the line.  Those are the
17  firms that have optimistic price targets
18  for BlackBerry on your chart on page 29.
19  A.   I'll just say that the thing
20  that you handed me, you say that's a list
21  of 21.  It says that it's 1 to 25 of 30
22  items.  So it doesn't look like it's even
23  complete.
24  Q.   Complete?

Page 160

L. Allen

1  A.   So whatever this is, it doesn't
2  seem to be a complete list of whatever it
3  is.
4  Q.   Right.
5  A.   So I don't -- I don't even know
6  what it is.  It seems to have 21, when it
7  says it's 1 to 25 of 30.  So I just have
8  no idea what this is.
9  Q.   Do you see any of the firms
10  above your line?  Those are the firms that
11  were pessimistic about BlackBerry on the
12  list that's here of the 21 firms, that is,
13  the first 21 firms ranked on this list?
14  A.   Deutsche Bank.
15  Q.   Okay.  Any others?
16  A.   That's what I'm doing.  You're
17  finding ones that are -- where they have
18  something below the stock price.
19  Q.   I'm asking above your line.  The
20  ones that were, in your words, I believe
21  "pessimistic" about Blackberry future.
22  A.   Well, the ones who are
23  pessimistic with the higher ones.
24  Q.   Above the line.

Page 161

L. Allen

1  MR. BEHA II:  We're talking
2  about -- right now about the ones
3  identified on your list as 1 through
4  24?
5  MR. BROWER:  Correct.
6  MR. BEHA II:  Okay.  So he's
7  asking you to take a look at
8  Exhibit 8 --
9  MR. BROWER:  21, actually.  I'm
10  sorry -- yeah.
11  A.   What --
12  Q.   Let's start over.
13  Okay.  In connection with your
14  list on page 29 of your report, Ms. Allen,
15  how many above the line, that is, where it
16  says "BlackBerry 328 stock price 14.45,"
17  above that box -- are on the list of these
18  21 analysts in Exhibit 8?
19  A.   Okay.  Bank of America.
20  Deutsche Bank.  Citi.  Are you going to
21  also ask me how many are below?  Should I
22  start doing that while I'm doing this, or
23  should I just go through this all over
24  again?

L. Allen
1
2    Q.   I've already done below.
3    A.   UBS.  Credit Suisse.  I can't
4  read one on the next line -- next page.
5         MR. BEHA II:  I think that's
6  Jefferies.
7         MR. BROWER:  No, Jefferies is at
8  the bottom of the first page.
9         MR. BEHA II:  Yeah, but it
10  crosses over.  They're both Number 12.
11        MR. BROWER:  Okay.  You're
12  correct.  You're correct.  That's how
13  it was copied.
14        Let me help with below the line.
15        Goldman Sachs, RBC, Wells Fargo,
16  Jefferies, and Morgan Stanley are on
17  this list of 21 analyst firms; is that
18  correct?
19    A.   They are on the list.  They're
20  on my list.
21    Q.   And --
22    A.   Are you asking whether they're
23  on this list?
24    Q.   Yeah.
25        MR. BEHA II:  I'd just like,

L. Allen
1
2  since you asked her to do it, for her
3  to --
4         MR. BROWER:  Okay.
5         MR. BEHA II:  -- continue to
6  identify the ones on the list.
7         MR. BROWER:  Okay.
8         MR. BEHA II:  And there are
9  more -- more above the line than below
10  the line -- significantly more above
11  the line than there are below the
12  line.
13        MR. BROWER:  Well, so far, I
14  have five and five.
15        MR. BEHA II:  There are seven
16  above the line.  There's Nomura and
17  BMO.
18  BY MR. BROWER:
19    Q.   So we have seven versus five
20  that are on the list that's Exhibit 8; is
21  that correct?
22    A.   I believe that's correct.
23    Q.   Okay.  And I recall somewhere in
24  your report you did some sort of analysis
25  where you averaged those above the line

L. Allen
1
2  with those below the line, to come up with
3  some percentage of negative versus
4  positive.
5         Do you recall doing that?  I
6  think it's under the diagram.
7    A.   No.  So what I have on the
8  diagram is -- I have -- you're missing the
9  color -- but I have a blue line that goes
10  all the way across that shows what is the
11  price at the beginning of the alleged
12  class period and the time of the alleged
13  misrepresentation.  And then I have what
14  is the average of the analysts' estimates,
15  which is 13.55.  And then I have what is
16  the max and what is the min.
17    Q.   Uh-huh.  And if you eliminated
18  the firms that are not on Exhibit 5, would
19  that likely raise the average?
20    A.   I don't know.  I have no idea.
21        MR. BEHA II:  Could you repeat
22  that question or read it back?
23        MR. BROWER:  Well, she said she
24  doesn't know.
25        MR. BEHA II:  I know, but I'd

L. Allen
1
2  like to -- I didn't catch it, and I
3  would like to know what it was.
4         (Whereupon, the requested
5  portion was read back by the court
6  reporter.)
7         MR. BEHA II:  On Exhibit 8?
8         MR. BROWER:  Yup, where -- did I
9  say 5?  I'm sorry.  I apologize.
10    Q.   Did you understand I meant the
11  list of analysts on Exhibit 8?
12    A.   I did.
13    Q.   Okay.
14    A.   I think it might -- I mean, one
15  thing I will say is that the Seaport
16  Group, which has a price target of $30 is
17  quite high and something of an outlier.
18  So eliminating that, which I think is not
19  on this -- whatever this piece of paper is
20  that you gave me -- would lower the
21  average.
22        And I think we said there were
23  approximately the same number in the top
24  part as the bottom part, relative to the
25  number that I currently have in the top

L. Allen

1 versus the bottom.
2       So, you know, not doing any math
3 and not thinking about where they actually
4 are, it would look like it would actually
5 lower the price target a little bit, if
6 you -- would be my guess --
7       Q.   Okay.
8       A.   -- but I don't --
9       Q.   Okay.  That's easy math.  Okay.
10 We can do the math.
11      Okay.  What do you know about
12 MKM?  You seem to focus on them a lot in
13 these couple of pages.
14      What's their -- their business,
15 or company?
16      MR. BEHA II:  Objection to form.
17      Q.   You can answer.
18      A.   I wouldn't say I focus on them a
19 lot.  I give an example of them.  And I
20 think the example is easier to understand
21 because the math works out nicely.
22      Q.   Okay.
23      A.   So I try to just explain the
24 math.  So I have a picture that shows the

L. Allen

1 math, which is like a probability tree.
2 And then I have a paragraph that explains
3 that, because in my experience, although
4 the people that I work with do this sort
5 of thing a lot, other people have, you
6 know, other things that they do a lot and
7 are more familiar with them.
8       And so I tried to both have a
9 picture and explain the math in a
10 probability tree in words.  That's why it
11 takes up a little bit of room.
12      Q.   Let me ask you a question.
13 Assuming, for the moment, your chart, the
14 90/10 percent thing on page 31 -- did the
15 10 percent chance of success that this
16 chart indicates have an impact on the
17 price of BlackBerry stock?
18      A.   So what this chart says -- I'm
19 not sure how to answer that question.
20 This chart says that this analyst thought
21 there was a 90 percent chance that the
22 company -- the BlackBerry 10, would fail,
23 and that if that were the case, the stock
24 price would be $7 and that there's a

L. Allen

1 10 percent chance the stock price -- the
2 BlackBerry 10 would succeed.  And in that
3 case, the stock price would go up and be
4 $40.
5       And their price target is a
6 weighted average of those, of the $7 and
7 the $40.  And this is explaining how that
8 particular analyst price target works and
9 how -- what were their expectations of the
10 future success of the BlackBerry 10.
11      Q.   Earlier we -- let's look at the
12 chart again.  We can look at the chart on
13 page 30.
14      Does the difference of opinion
15 between analysts -- strike that.
16      It would be fair to say there
17 was a difference of opinion between
18 analysts at this time -- we're in March 28
19 to early April 2013 -- reflect the kind of
20 differences in judgment that we -- that I
21 asked you about earlier?
22      A.   So I think what you read back to
23 me sounded like a quote from
24 Basic v. Levinson, and that's talking

L. Allen

1 about an efficient market.  And that
2 information, what I have found in this
3 instance, is I have not been asked to
4 analyze whether the market is efficient.
5       I have found that, at the
6 beginning of the alleged class period,
7 rather than as plaintiffs claim, because
8 the alleged misrepresentations led the
9 market to believe that the BlackBerry 10
10 would be successful, the analysts were
11 saying that it's very uncertain.  We're
12 not going to know the success of this at
13 all until later, we can't tell, and that
14 they had different hypotheses about the
15 future.
16      They, in general, felt it was
17 unlikely to succeed and that the risk of
18 failure was high, but that wouldn't be
19 knowable until there was another quarter
20 or two of data and results.
21      Q.   So was this an attempt to show
22 that plaintiffs' allegations are
23 incorrect?
24      A.   No.  This -- I don't know --

Page 170

L. Allen

1    when you're saying "this," I'm not sure
2    what you're referring to.
3       Q.   Well, what you just said was --
4       A.   I'm still answering the
5    question.
6       MR. BEHA II:  Will you let her
7    answer the question?
8       MR. BROWER:  Well, she hasn't
9    answered the question.
10      MR. BEHA II:  She believes she's
11   answering the question.  She's
12   attempting to answer the question.
13   Please don't interrupt her in her
14   answers --
15      MR. BROWER:  I need to know what
16   she's thinking.
17      MR. BEHA II:  -- whether you
18   think she's answering or not.
19      A.   You asked me whether this shows
20   the principles of market efficiency --
21      Q.   No, I didn't ask that question.
22      MR. BROWER:  I move to strike.
23      MR. BEHA II:  Excuse me.  Let
24   her finish her response.  Do not

---

Page 171

L. Allen

1    interrupt her.
2       A.   You asked me whether what was
3    illustrated in here were the same
4    principles that -- what you had read to me
5    earlier.
6       Q.   Yes.
7       A.   And the principles that you read
8    to me earlier, I believe, come from Basic
9    Levinson.  And I believe those are about
10   an efficient market.  And I have not been
11   asked to analyze whether the market is
12   efficient here.
13      I am explaining to you what the
14   chart that I am -- have shown, what are
15   some of the things that it told me and why
16   I have included it and why I think it's
17   helpful to visualize or to understand the
18   analysis of price impact.
19      So I have tried to give some
20   aides to understand what's the analysis
21   and what I have seen.  So that's what I
22   was trying to explain.
23      My understanding of your
24   question was, does this chart show what

---

Page 172

L. Allen

1    you had previously read to me, which my
2    recollection from hearing it was, it was
3    quotes from Basic v. Levinson.
4       Q.   Okay.  I'm going to ask you a
5    different way.
6       Is it fair to say that this
7    chart, as well as the chart on page 29,
8    reflect differences in opinions among
9    analysts as to the likely success or
10   failure of BlackBerry, going forward?
11      A.   I think that is one of the
12   things that you could take away from this.
13      Q.   And some analysts were
14   optimistic about the future of the BB10s;
15   is that correct?
16      A.   Well, no, I wouldn't necessarily
17   say that's true.  Some analysts were more
18   optimistic than others.  But even those
19   that are optimistic -- so, for example,
20   let's see, Goldman Sachs, Goldman Sachs is
21   one of the more optimistic analysts.
22   Their price target is higher than the
23   other price targets.  Higher than average.
24   They think the stock price is likely to go

---

Page 173

L. Allen

1    up.
2       So their current -- their price
3    target at the beginning of the class
4    period is that the stock is going to go
5    up.  They also think that there's an
6    80 percent chance that the BlackBerry 10
7    is going to fail.  So I wouldn't call that
8    being very optimistic about the
9    BlackBerry 10.  An 80 percent failure rate
10   is, I don't think, what someone's idea is
11   of optimism.
12      They are more optimistic -- they
13   have a higher price target and they have
14   more optimism than others do, but I
15   wouldn't say that they were optimistic.
16   They thought it was much more likely than
17   not that the BlackBerry 10 would fail.
18      Q.   Does Goldman Sachs's optimism,
19   at whatever percentage that optimism is,
20   have an impact on the price of the stock?
21      MR. BEHA II:  Objection to form.
22      A.   I don't know what any individual
23   analyst's effect on the stock is, and I
24   haven't tried to analyze what the effect

Page 174

L. Allen

of individual analysts' impact on the
stock is.  I am analyzing whether the
alleged misrepresentations affected the
stock, not whether what Goldman Sachs said
affected the stock price.

Q.   Did you do any analysis of
whether anything BlackBerry said impacted
Goldman Sachs' optimism about BlackBerry?

MR. BEHA II:  Objection to form.

Q.   You can answer.

A.   So you're calling it "optimism."
I would say if you think there's an
80 percent chance of failure, I wouldn't
call that optimism.  So I don't want to
use the word "optimism."  You're calling
it "optimism."  To me, that's not very
optimistic, okay?

So, if you want to call it that,
they are -- have a higher price target and
are relatively more optimistic, but
they're not optimistic about the success
of the Blackberry 10.

At the beginning of the class
period, when plaintiffs claim that the

Page 175

L. Allen

company made alleged misstatements that
led the market to believe that the
BlackBerry 10 would be successful after
those alleged misstatements were made,
Goldman Sachs, who had a more -- a higher
price target than the average analysts --
and in that sense, was relatively more
optimistic -- still was of the belief that
there was an 80 percent likelihood that
the BlackBerry 10 would fail.

Q.   Let's go to the chart on 29.
Morgan Stanley didn't try and do
probabilities; is that correct?

A.   No, it's not correct that Morgan
Stanley didn't try to do probabilities.
Morgan Stanley, in their analyst report,
after the alleged misrepresentation at the
beginning of the class period, didn't
report what their probability -- their --
what their opinion was regarding the
current probability of success or failure
for the BlackBerry 10, which is not to say
they weren't doing probabilities.  It's
that they didn't report it.

Page 176

L. Allen

And when they did an objective
and replicable analysis of what all of the
analysts who covered the stock were
finding about the probabilities or the
expected probabilities of the
BlackBerry 10, they did not indicate that
on their analyst report.

Q.   That's fair.
Yet they had a price target of
$22 a share, when BlackBerry shares were
trading at 14.45; is that correct?

A.   Morgan Stanley had a price
target of $22; that's correct.

Q.   And the stock was trading at
14.45 at the time?

A.   That's correct.  The second --
they had the second highest price target.

Q.   Does Morgan Stanley's position
and its -- its price target have an impact
on the price of BlackBerry's shares?

MR. BEHA II:  Objection to form.

A.   That's not something I
particularly analyzed.  So some of these
reports are after the date of the stock

Page 177

L. Allen

price.  So these are analysts digesting
the information that plaintiffs claim
alleged misrepresentation, and I'm saying,
given the alleged misrepresentation what
our -- what our analysts think is the
value of the stock.  I'm not saying how
are the analysts affecting the stock
price.

Q.   My question is, do analysts'
opinions have an impact on stock prices?

MR. BEHA II:  Objection to the
form.

A.   Yes, I think there are instances
where analysts' opinions can have an
impact on stock prices.  I have not been
asked what is the effect of analyst
opinions in this case on the stock price.
I have been asked to analyze the impact of
the alleged misrepresentations on the
stock price.

Q.   Do you recall whether or not
Morgan Stanley believes that BlackBerry
10s were off to a solid start at this
time, at the time they issued this report?

Page 178

L. Allen

1
2       A.   That sounds like something that
3   was in their report.  That sounds correct.
4       Q.   And do you know whether Morgan
5   Stanley said the BlackBerry 10 volumes of
6   1 million was in line, lifting ASPs to 256
7   million from 227 million?
8       A.   Say that again.  Lifting ASPs
9   from what to what?
10      Q.   256 from 227.
11      A.   That sounds correct.  I think
12  those are ASPs overall, rather than
13  particularly for the BlackBerry 10.  I
14  believe the 1 million number you mentioned
15  is for the BlackBerry 10, so.
16      Q.   That was -- by "1 million,"
17  they're referring to 1 million handsets
18  sold?
19      A.   Yeah, of BlackBerry 10 devices,
20  I believe, they're talking about.  I
21  believe those numbers are correct.  Those
22  are numbers that I believe were reported
23  by the company and are not restated.
24          MR. BROWER:  Mark this Allen 9.
25          (Allen Exhibit 9, document

Page 179

L. Allen

1
2   headed Morgan Stanley, marked for
3   identification, as of this date.)
4       Q.   On the first page, it states:
5   "BlackBerry 10 also appears off to a solid
6   start, with 1 million units in fiscal
7   quarter 4, spot-on our est, and a
8   surprising 55 percent users coming from
9   other platforms, we suspect, Android.  CEO
10  Heins stated 65 to 75 percent of the Z10s
11  shipped in fiscal quarter 4 sold through
12  implying channel inventory is lean."
13          Did Morgan Stanley consider
14  those all positives?
15      A.   I don't know what you're
16  referring to.
17      Q.   That they -- 55 percent of their
18  users of the BlackBerry 10s were coming
19  from other platforms?
20      A.   I think they say later that
21  that's one of those things they thought
22  was particularly helpful.  I don't think
23  they think the 1 million units is
24  particularly positive.  They're just
25  saying it's "spot-on our estimates."

Page 180

L. Allen

1
2          So that would be what they
3   expected.  So that sounds -- I mean, they
4   might be -- they might be happy that it's
5   on their estimate, but in terms of a
6   positive, in terms of their -- I don't
7   think that's positive in terms of
8   evaluation.
9       Q.   And the fact that 65 to 75
10  percent of the 10s shipped in the quarter
11  sold through, is that positive
12  information?
13      A.   I think there are some that
14  think it's positive, and there are some
15  that think it's -- it's negative, so.
16      Q.   You understand what "selling
17  through" means?
18      A.   Yes.
19      Q.   Okay.  Would you explain for the
20  record what "selling through" means?
21      A.   So "sell in" is the number that
22  BlackBerry sells to the retailers.  And
23  "sell through" is the number of devices
24  that are sold through to customers, users.
25      Q.   Uh-huh.  And why is it negative

Page 181

L. Allen

1
2   for the actual handsets to be sold to
3   actual users rather than to stores?
4          MR. BEHA II:  Objection.  I
5   think --
6       A.   I didn't say it was --
7          MR. BEHA II:  -- it misstates
8   the testimony.
9       A.   I didn't say it was negative
10  for --
11      Q.   Well, you said --
12      A.   -- handsets to be sold to users.
13  That's not what I said at all.
14      Q.   Well, you said some people would
15  find the sell-through number not be
16  positive.
17      A.   So, if they were expecting a
18  higher sell-through number, so if only
19  two-thirds were sold through -- so one of
20  the things that the analysts say at the
21  beginning of the class period is they're
22  worried about the sell-through, and that
23  that could be a problem --
24      Q.   Please -- I'm sorry.
25      A.   -- that --

Page 182

L. Allen

Q.   Please identify every analyst who said they were worried about sell-through at the beginning of the class period.

A.   Well, I think I said there was something like 55 analysts that are covering the company at the beginning of the -- I mean, as I sit here, I cannot recite that.

Q.   Is it set forth somewhere in your report, which analysts were saying that they were concerned about sell-through at the beginning of the class period?

A.   Well, some of them say that. One of the things I don't -- do I have a count of how many?  Um, okay.

So this one says -- this one does, for example.  "Investment risks" --

Q.   Which page?  Where are you reading from?

A.   -- "BlackBerry" -- I'm reading from page 2 of the Morgan Stanley analyst proposal.  When they talk about risks,

Page 183

L. Allen

they talk about "BlackBerry 10 sell-through slow.  Inventory builds causing discounting."

So that's one of the things they're noting as a risk.  So this analyst is explicitly saying that they're worried about the sell-through for the BlackBerry 10s and noting that as an investment risk.

Q.   Okay.

A.   If you hand me some other analyst reports, I could continue to --

Q.   Okay.  Would that always -- would that have been -- is that not a risk with any new product, that it -- that customers won't buy it?

A.   I think it's a fairly unusual thing to have analyst reports that have -- that talk about sell-in and sell-through. It's not a common discussion in analyst reports.  It is not a common risk in general.

I mean, if we were to look at other cases that I have worked on

Page 184

L. Allen

recently, I don't believe I recall any cases recently where analysts have been worried about sell-in versus sell-through and that that is something that has been listed as a risk, so.

Q.   I'm curious.  What kind of companies have you recently worked on in connection with securities litigation that involve manufacturers of a product that sold through distributors?

A.   Okay.  Well, let's look at the ones that are on my -- that we just -- that we went through.  Manufacturers of a product which sold through distributors.

Q.   To retail consumers.  Not to governments.

A.   Rent-A-Center, they don't manufacture.  They do sell or rent products, including phones, I believe, to consumers.

Q.   But they don't make them?

A.   No, they don't make them.

Q.   They just sell in?  Somebody manufactures and sells in to them?

Page 185

L. Allen

A.   Yeah.  That's correct.

Q.   Okay.

A.   I don't particularly see another manufacturing company on the list here, but.

Q.   Okay.  By the way, you notice that, if you're on page 5 of the Morgan Stanley report, they raise their estimates for the company.

What does it mean when a company raises estimates for a company?

A.   It means they're raising their estimates.  So, for example, if they raised their price target, it means that they now have a higher price target than they had the last time they issued a report.

Q.   Does that indicate they are more optimistic than they were the last time they issued report?

A.   I think that is generally true. Raising estimates, in general, is, you could say, being more optimistic, rather than last time.

L. Allen

1
2  Q.   On page 29 of your report, how
3  many of the firms on that list raised
4  their estimates and/or price targets after
5  March 28, 2013? I'm speaking about the
6  entire list of 36 companies.
7  A.   Raised their price targets
8  and/or?
9  Q.   And/or their estimates for --
10 for revenues and earnings?
11 A.   I don't have the answer as I sit
12 here.  I don't know.
13 Q.   Many?
14 A.   I just don't know.
15 Q.   You didn't do any analysis of
16 what the impact on the analysts were,
17 other than the information and what their
18 responses to it were, nonverbal responses?
19 A.   I did look at what the -- I
20 looked at the price reaction.  So the
21 market price reaction to the information,
22 I found that there's no statistically
23 significant market price reaction to the
24 information.
25      I did look at how the analysts,

L. Allen

1
2  how they commented upon the information
3  and how they changed their valuation
4  models and what was their response to the
5  information, so.
6  Q.   But you didn't assemble a list,
7  for instance, of each of the companies on
8  your list of 36 that raised their price
9  target?
10 A.   No.
11 Q.   And you didn't assemble a list
12 of each of the companies on your list of
13 36 companies that raised their estimates
14 for earnings per share?
15 A.   No.
16 Q.   Would you be surprised that the
17 third company on your list, which,
18 presumably, is the low end of price
19 targets; is that correct?
20 A.   What's your question?
21 Q.   That the third -- the third one
22 on your list is the low end of price
23 targets?
24 A.   On page 29?
25 Q.   Yeah.

L. Allen

1
2  A.   You're saying the one that has a
3  price target of 7?
4  Q.   Yes.  That's the low end of the
5  scale, correct?
6  A.   It's at the lower end.
7  Q.   Okay.
8  A.   It's not as -- it's not as --
9  Q.   It's not the lowest?
10 A.   It's not the lowest.
11 Q.   Would you be surprised if they
12 increased their price target after
13 April -- after March 28?
14 A.   It doesn't surprise me, no.
15 Q.   Do you know any that lowered
16 their price targets after March 28?  And I
17 mean immediately, I don't mean in
18 September.
19 A.   I don't.  I don't recall that,
20 no.
21 Q.   Do you know whether there was a
22 difference in the minds of analysts
23 whether the BB10s were going to be a
24 success and whether or not the BB10 would
25 be sufficiently successful to save

L. Allen

1
2  BlackBerry from poor results going down
3  the road?
4  MR. BEHA II:  Objection to form.
5  A.   I'm trying to understand that.
6  Q.   Okay.  Let me give you
7  Canaccord, one of your analysts.
8  MR. BROWER:  Mark this 10.
9  (Allen Exhibit 10, document
10 headed Canaccord Genuity, marked for
11 identification, as of this date.)
12 Q.   All right.  I've marked for you
13 a Canaccord analyst report, dated
14 March 28, 2013, which is one of the
15 ones -- what I'll call "above the line,
16 above the box" on your chart on page 29
17 who, I take it, are on the pessimistic
18 side of the box, and refer you to the
19 second bullet under "investment
20 highlights."
21      I will read it into the record:
22 "While RIM management remains bullish
23 about its BB10 platform launched January
24 30, we do not believe BB10 devices will
25 turn around its struggling business, as

1          L. Allen
2   initial global store surveys indicate
3   mixed demand for the more expensive Z10
4   smartphones.  With a very low probability
5   the market will support RIM's BB10
6   ecosystem, we believe RIM will eventually
7   need to sell the company."
8          I ask you again, do you recall
9   if analysts were concerned that the BB10,
10  whether or not successful, would be
11  sufficient to save the company from, for
12  instance, needing to be sold to someone
13  else?
14      A.   I'm still not sure I understand
15  that question.  I think you asked me
16  something about was there a difference
17  between being successful and something
18  else, and I don't --
19      Q.   Well, the difference between the
20  phone itself, the handset, being
21  successful and the handset's success being
22  sufficient to save the company, do you
23  recall if analysts made that distinction?
24      A.   I recall this analyst, and I
25  have -- I have reviewed this one before.

1          L. Allen
2   I -- I don't -- I wouldn't particularly
3   say that is making a distinction.  So I do
4   recall this:  I would not describe this
5   comment to be consistent with how you --
6   of your characterization.
7      Q.   When the analysts says RIM's
8   management remains bullish about the BB10
9   platform, does management's bullishness
10  have an impact on price?
11      A.   Well, one of the things that
12  plaintiffs are alleging in this case is
13  that management has made statements that
14  were too bullish.  So, for example, one of
15  the alleged misrepresentations in this
16  case is that customers were embracing the
17  technology.  And I have found that that
18  statement had no price impact and did not
19  affect the market.
20         I think there are lots of times
21  when companies make statements that sound
22  positive that have no impact on the
23  market.
24      Q.   Why does that occur?
25      A.   Why does that occur?

1          L. Allen
2      Q.   Yeah.
3      A.   I think companies always make
4   statements in a positive -- or almost
5   always make statements in a positive vein.
6   I think it's good marketing and business
7   to sound positive about your business.
8   And I think, regardless of how good or bad
9   results or, you know, financials may be,
10  companies will describe the results in a
11  way that, at least on the surface sounds
12  positive.
13         That's -- that's a common way
14  for a company to make announcements.  I
15  think it's sort of a PR marketing type
16  thing.
17      Q.   Do you recall whether Deutsche
18  Bank characterized the launch of the Z10s
19  as modestly successful?
20      A.   I don't have a specific
21  recollection of that, no.
22      Q.   I have a question.  With respect
23  to the price targets, if a price target is
24  below the current trading price, why
25  would -- why would an analyst not simply

1          L. Allen
2   have a sell recommendation?
3      A.   You mean why give more
4   information than actually give the price
5   target?
6      Q.   No.  No.  No.
7         I'm saying if they have a price
8   target that is below the then current
9   trading price, why would the
10  recommendation be anything other than to
11  sell?
12      A.   I think because there's a bit of
13  a timing lag, so the price targets are
14  typically one year out.  I think, in
15  general, if the price target is above,
16  it's generally a buy, and if it's below,
17  it's generally a sell.  But the price
18  targets aren't for -- you know, aren't for
19  tomorrow.  They're for -- they're
20  typically one year out, is a -- is a
21  typical time period for a price target.
22      Q.   I'm -- I'm not that
23  sophisticated in this.
24         On March 28, the price of
25  Blackberry shares was 14.45.  Deutsche

L. Allen

1
2  Bank -- where is it?  It's on here
3  somewhere.
4        Deutsche Bank is estimating a
5  price target of $8, you're saying, in a
6  year, correct?
7     A.   I would have to look --
8     Q.   About?
9     A.   -- and see what they're -- what
10 they're saying.  Yeah, I think it's -- I
11 think the price target is a year out.
12    Q.   Okay.  Why, then, would -- and
13 when they make a -- when there's a rating
14 or a recommendation in an analyst report,
15 it's like buy, sell, or hold; is that
16 correct?
17    A.   Uh-huh.
18    Q.   Why would an analyst tell
19 investors to hold if it has a price target
20 of $8 and the stock is then trading for
21 14.45?
22       MR. BEHA II:  Do you want to
23    show her the report that you're
24    talking about?
25    A.   Yeah, I could take a look and

L. Allen

1
2  see what they're doing.
3     Q.   Sure.  I don't think it's
4  specific.  It's not specific to this one,
5  but I'm happy to.
6        MR. BROWER:  11.
7        (Allen Exhibit 11, document
8     headed Deutsche Bank Markets Research,
9     marked for identification, as of this
10    date.)
11    A.   See here, they have a 52-week
12 range on the one you just gave me, which
13 is from 17.90, down to 6.30.  So that's a
14 huge range.
15    Q.   That's the past year.
16    A.   Maybe.  Yeah, you might be
17 right.
18       (Reviewing document.)
19       MR. BROWER:  Let me --
20       (Whereupon, the requested
21    portion was read back by the court
22    reporter.)
23    Q.   You said -- let me see the
24 document.
25    A.   Yeah, I think it has to do -- I

L. Allen

1
2  think it's a somewhat unusual situation.
3  I think it's because it's a time period
4  out, and it's so volatile how much the
5  stock could move in the time period.
6     Q.   Okay.
7        MR. BEHA II:  Let's go off the
8     record.
9        MR. BROWER:  Sure.
10       THE VIDEOGRAPHER:  The time is
11    3:59.  We're going off the record.
12       (Recess taken.)
13       THE VIDEOGRAPHER:  The time is
14    4:20, and we're back on the record.
15 BY MR. BROWER:
16    Q.   Ms. Allen, what does it mean
17 when an analyst says a result, a
18 particular metric, is in line with their
19 estimates?
20    A.   That it's similar to what they
21 had been expecting.
22       MR. BROWER:  I will give you one
23    more of these.  I think it's 12.
24       (Allen Exhibit 12, Document
25    headed Technology, Media & Telecom:

L. Allen

1
2  Mobile Devices, marked for
3     identification, as of this date.)
4     Q.   I believe this is another one of
5  the companies on your -- above the line,
6  the pessimists, number 16 on your list.
7  And you'll notice this -- the key points
8  these analysts make is, "Gross margins
9  surge 850 points on controlled BB10
10 launch.  Blackberry posted strongest gross
11 margin performance in nearly two years.
12 Gross margin of 40.1 percent was well
13 above fiscal third quarter 31.6" --
14 "print" -- I don't know what that means.
15       Was that positive information
16 from the standpoint of this analyst?
17    A.   I think they thought the gross
18 margin information was positive.
19    Q.   It also goes on to say,
20 "Management projected the image of a team
21 that was beginning to arrest negative
22 momentum as commentary on the call made it
23 clear the company is focused on preserving
24 service ARPU on the back of a controlled
25 BB10 launch.  We came away from the call

L. Allen

1 with the idea that the widely reported Z10
2 stockouts were more a result of managing
3 the service base through BB 7 versus BB10
4 sales than they were true production
5 stockouts. We think the stock could
6 respond positively to several possible
7 catalysts, including the launch of the Q10
8 QWERTY keyboard device as soon as this
9 week and the announcement of several new
10 service offerings."
11          Again, this is someone with a
12 below then-current price target. You view
13 that as this analyst believing this is
14 positive information they received from
15 the company?
16     A.   No, that's not what I said. So
17 you have cherry-picked a few comments --
18     Q.   Shame on me.
19     A.   -- within --
20     MR. BEHA II: Please do not
21 interrupt her.
22     A.   -- within this report that sound
23 more positive than other comments. I -- I
24 did say that I thought they thought the

L. Allen

1 gross margin was one -- was positive. The
2 actual gross margins that were announced
3 were that -- that does appear what this
4 analyst was saying. I would not agree
5 with you -- with your characterization of
6 generally what this analyst is saying.
7     Q.   Okay.
8     A.   And I don't think it's --
9     Q.   Take a look at the third bullet
10 point on the first page, under "key
11 points."
12          "Negative momentum turning,
13 raising estimates and price target to $11
14 from 6.50."
15          Does that indicate that this
16 analyst is more optimistic than he or she
17 was on March 28?
18     A.   This particular analyst, I
19 believe, did raise their price targets.
20 They still think the price is too high,
21 and they're saying they are not
22 recommending that you buy this stock. So
23 they are saying the current price of the
24 stock is higher than they think it should

L. Allen

1 be, that the market is overly optimistic.
2     Q.   Would you go over to the second
3 page, Investment Thesis.
4          "We expect that shares of
5 BlackBerry may respond positively to news
6 of the BB10 launch over the next quarter
7 or two."
8          That's more optimistic than this
9 analyst had previously been or less, after
10 March 28?
11     A.   I don't know. I would have
12 to -- I would have to look about that.
13 They say, "We expect RIM's new devices to
14 launch into a crowded and increasingly
15 competitive smartphone marketplace and
16 believe RIM has a reasonable chance to
17 substantially slow market share declines,
18 but we think a growing smartphone share
19 may be difficult for the embattled vendor
20 over the long-term. We expect the
21 competitive" -- "the increasingly
22 competitive smartphone market, coupled
23 with substantial product and service price
24 concessions to make 2013 a challenging

L. Allen

1 year. We maintain our underperform
2 rating."
3     Q.   Then --
4     A.   So --
5     Q.   Then they raised their price
6 target?
7     A.   Not "and then they raised their
8 price target." They're saying at -- after
9 this alleged misrepresentation, they are
10 saying, You know, we think the company is
11 embattled, that there's an increasingly
12 competitive smartphone market. They're
13 saying underperform. They think the stock
14 price is too high. And they're saying
15 that there is substantial product and
16 service price concessions to make 2013 a
17 challenging year for the company.
18     Q.   Go to the next page.
19          They raise their estimates for
20 revenues?
21     A.   I believe that's correct.
22     Q.   Something I keep forgetting to
23 ask you.
24          How many presentations did you

1    L. Allen
2  give to Morrison & Foerster over the
3  years?
4    A.   I can only recall one.
5    Q.   Are you sure?
6    A.   Am I sure I only recall one?  I
7  only recall one, as I sit here.
8    Q.   And what was the -- I believe
9  that's listed in your list of
10  presentations.
11    This is not a trick question.  I
12  thought I saw it.
13    A.   Yeah.  It's "High Frequency
14  Trading, a Primer."
15    Q.   When you gave that presentation,
16  were you retained for any particular
17  purpose?
18    A.   No.
19    Q.   Was this by promotional --
20  strike that.
21    Did you give the presentation in
22  New York or in California?
23    A.   In New York.
24    Q.   Why did you give that
25  presentation?

1    L. Allen
2    A.   I think I was invited for lunch,
3  and I gave a -- a luncheon talk.  I think
4  they have a luncheon meeting.
5    Q.   Okay.  When was it?
6    A.   I'm sorry.  Would you -- oh,
7  2014.
8    Q.   Okay.  Were you doing work for
9  Morrison & Foerster at the time on another
10  matter?
11    A.   I don't believe so.
12    Q.   What impact, if any, do analysts
13  have on the price of a stock generally?
14    A.   Well, one of the -- I haven't
15  particularly analyzed that question.  I
16  certainly haven't analyzed that with
17  respect to this case.  I have, on
18  occasion, analyzed whether a specific
19  analyst report or piece of information
20  impacted the stock price.
21    One of the things that
22  plaintiffs claim in this case is that the
23  market is efficient, and one of the
24  reasons they claim the market is
25  efficient, because there are a number of

1    L. Allen
2  analysts covering the company, and because
3  information about the company is
4  disseminated and quickly analyzed by the
5  market by these analysts, and that helps
6  to make the market efficient.
7    So one of the ways that they
8  impact the market is disseminating the
9  information.
10    Q.   Do analysts also make
11  recommendations to institutional
12  investors?
13    A.   You say "also" as if there's
14  something else we just said.
15    Q.   Well, say, let them -- we can
16  pick up an analyst report on Bloomberg.
17    A.   Yeah.  Analysts do make
18  recommendations, yes.
19    Q.   You mention in your report that
20  market professionals were aware that the
21  BlackBerry 10s had not done well in
22  Europe.
23    A.   So what I mentioned is that the
24  alleged information that plaintiffs claim
25  was inflating the stock price and withheld

1    L. Allen
2  from the market about the lack of success
3  in international markets was publicly
4  available information that was known to
5  the market, including a number of stories
6  that plaintiffs have -- have used to show
7  that there was negative results in the
8  international markets regarding them the
9  BlackBerry devices.
10    MR. BROWER:  Up to 13.
11    (Allen Exhibit 13, Citi Research
12    Equities, marked for identification,
13    as of this date.)
14    Q.   I'm going to give you a Citibank
15  analyst report dated March 24, 2013, which
16  you quote in paragraph 54 of your report.
17  I'm just going to point you to the first
18  bullet point.
19    I will read it:  "This weekend
20  BlackBerry launched in the United States
21  its new Z10 BlackBerry product at AT&T.
22  Given the 37 percent year-to-date rally in
23  BlackBerry shares and a highly successful
24  and carrier-promoted initial launch in
25  Europe and Canada last month, investors

Page 206

L. Allen

1
2   were expecting a similarly successful
3   launch in the U.S."
4          Was this analyst misled?
5      A.   I don't believe this analyst was
6   misled, no.
7      Q.   He was not -- the information
8   about the problems with the sales of BB10s
9   in Europe wasn't shared with him?
10     A.   I'm sorry.  I think -- so this
11  analyst, then, I'm quoting them, you're
12  saying, in paragraph 54?
13     Q.   Yeah.  No, we -- that's where
14  you quoted them.  You didn't quote this
15  part.  I think your term was
16  "cherry-picking."
17     A.   So what I'm saying is the
18  analyst said, "We recently did follow-up
19  international checks in Europe and Canada,
20  now that the 30-day honeymoon launch
21  period has passed, and found sales of
22  BlackBerry Z10s have dramatically slowed."
23     Q.   Uh-huh.  So is it correct that
24  the --
25     A.   So this is information that's

Page 207

L. Allen

1
2   coming out before the alleged
3   misrepresentation.  And what plaintiffs
4   are claiming is this sort of information
5   is the information that was kept from the
6   market, but this is -- this is what I'm
7   saying is this information is published in
8   this analyst report.
9          You seem to be asking me were
10  they somehow misled because you're reading
11  two different statements in the same
12  analyst report as if to say that they're
13  somehow contradictory.  But the analyst, I
14  don't believe, is trying to write
15  contradictory information in their analyst
16  report.  I think they're trying to analyze
17  the stock and give information.
18         So your -- your question is
19  somehow making the insinuation that
20  there's something that these -- there's
21  something contradictory here.
22     Q.   Okay.
23     A.   I don't read it that way, and I
24  don't think that particularly makes sense
25  for the analyst to have written the report

Page 208

L. Allen

1
2   in this way.  If they're telling you
3   things that are contradictory, that would
4   seem -- it wouldn't make sense for an
5   analyst to say -- to intentionally say, on
6   the one hand, Let me tell you one thing,
7   and then, Let me tell you something that's
8   the opposite and contradictory, without
9   trying to resolve those things.
10         So I think by your question it
11  doesn't seem a sensible reading of this
12  analyst report.
13     Q.   Was it your understanding that
14  the launch in Europe was -- had been
15  highly successful?
16     A.   I think what you -- how you term
17  it is -- I think you can use those words
18  differently.  So I think that what this
19  analyst is saying is that they are noting
20  that, after a 30-day honeymoon period,
21  things are not -- you know, things don't
22  look as good anymore.
23         MR. BROWER:  14.
24         (Allen Exhibit 14, document
25  headed Daily Edge, marked for

Page 209

L. Allen

1
2   identification, as of this date.)
3      Q.   I give you Exhibit Number 14.
4   It's a DailyEdge equity research report of
5   May 9, 2013.  This is after the alleged
6   misrepresentation, March 28, as well as
7   the misrepresentation on April 11 and 12.
8          This says: "Update on BB10
9   volumes:  We believe the company may give
10  an update on BB10 volume" -- where was I
11  reading from?  Oh, I'm sorry.  It was the
12  paragraph above.
13     A.   I think this is Scotiabank
14  analyst report.
15     Q.   Yes. I'm sorry.  Yes.
16     A.   Not a Daily Edge.
17     Q.   That is correct.
18         The third bullet point, "Update
19  on BB10 volumes:  We believe the company
20  may give an update on BB10 volumes.  The
21  Q10 has been selling very well in the U.K.
22  and Canada, with stockouts at many
23  locations.  We estimate the company will
24  sell approximately 3.6 million BB10
25  devices in fiscal quarter 1."

1        L. Allen
2        This analyst thinks that they're
3  doing well in Europe and Canada -- in the
4  U.K. and Canada; is that correct?
5     A.   They say the Q10 has been
6  selling very well in the U.K. and Canada.
7     Q.   Did you take this into -- this
8  report into consideration when you did
9  your report?
10    A.   Yes.  This was one of --
11    Q.   Uh-uh.
12    A.   What?
13    Q.   I don't believe -- this one is
14  not quoted in your report.
15    A.   Just because I haven't quoted it
16  doesn't mean I haven't taken it into
17  consideration.
18    Q.   Fair enough.  Fair enough.
19  Okay.
20        Yes, for the record --
21    A.   Yes, I did take this report into
22  consideration.
23    Q.   Okay.  But you didn't quote it
24  in your report?
25    A.   I don't know if I quoted it in

1        L. Allen
2  my report.  But you can tell that I took
3  it into consideration because it has an
4  Allen Bates number stamp on it.
5     Q.   Let's talk about selling in and
6  selling through.
7        You indicate numerous times in
8  your report that the market was aware of
9  Blackberry's revenue recognition policy
10  and, therefore, was not misled by its
11  accounting.
12        Do you recall that?
13    A.   Yes, I think that's -- something
14  along those lines.  Are you asking did I
15  testify to that or do I have something
16  like that --
17    Q.   It's in your report.
18    A.   I -- think you have loosely
19  worded what you're saying, but revenue
20  recognition policies is an issue that I
21  address as one of the issues that
22  plaintiffs claim is an alleged
23  misrepresentation.
24    Q.   And you reach the conclusion, I
25  believe, that investors were not misled by

1        L. Allen
2  the revenue recognition policy; is that
3  correct?
4     A.   That the alleged
5  misrepresentations regarding the revenue
6  recognition did not have price impact and
7  that investors were aware of differences
8  between sell-in and sell-through.
9     Q.   Okay.  Do you know whether or
10  not BlackBerry provided statistics on
11  sell-in and sell-through, typically, in
12  their public filings?
13    A.   So I am aware that the company,
14  during the class period, gave some numbers
15  regarding the number of units shipped,
16  which were -- as well as giving some
17  numbers in terms of sell-through numbers.
18  So there -- but there was not sell-in and
19  sell-through numbers by device, for
20  example.
21    Q.   Okay.
22    A.   In terms of units or dollars.
23    Q.   Okay.  Are you aware that, at
24  the end of the first quarter, the June
25  2013 quarter, BlackBerry refused to

1        L. Allen
2  provide selling figures to analysts at the
3  analyst meeting, the conference call?
4        MR. BEHA II:  Objection to the
5  form.
6     Q.   You can answer.
7        MR. BEHA II:  It just -- it
8  assumes fact and lacks foundation.
9     A.   I think the company gave numbers
10  in terms of the number of units overall
11  that were sold-in.  I don't think the
12  company gave breakdowns, in terms of
13  revenue or units by device.
14    Q.   Can you describe what their
15  revenue recognition policy was, "theirs"
16  being BlackBerry's -- I'm sorry, I'm
17  sorry -- at the beginning of the class
18  period?  My apologies.
19    A.   They've maintained the same
20  policy throughout the class period.
21  There's certain criteria that the sales of
22  devices, for example, must meet in order
23  for the revenue to be recognized.
24        And, you know, they lay that out
25  in their filings.  I couldn't recite it as

Page 214

L. Allen

1  I sit here, but I have read it a number of
2  times.
3      Q.   I'm going to give you what's
4  been marked as Allen Exhibit 7.
5      For the record, Allen Exhibit 7
6  is a form 40-F for the period ending
7  3/2/12, filed on 3/28/13.
8      Ms. Allen, just for starters,
9  this is the Canadian version of a 10-K.
10      A.   Yeah.
11      Q.   All right.  And page 6 --
12      MR. BEHA II:  Sorry, just to be
13  clear, I don't know what you mean by
14  "Canadian version of a Form 10-K," but
15  it's -- it's a filing with the SEC.
16  It's not a Canadian filing.
17      I just find that confusing.
18      A.   It's a filing that international
19  companies file in the U.S. with the SEC,
20  who are not U.S. companies.
21      Q.   Okay.  You understood the
22  question.
23      A.   Yeah, but I -- I did not give
24  a --

Page 215

L. Allen

1      Q.   Okay.
2      A.   I did not give a very clear
3  answer.
4      Q.   Okay.  By the way, just look at
5  page 16, under "strategy."
6      A.   16.
7      Q.   "Company strategy is based on
8  the following" -- third bullet point --
9  "building on the successful launch of
10  BlackBerry 10 by continuing to roll out
11  BlackBerry 10s to customers around the
12  world while holding the position of
13  BlackBerry 7 products for entry-level,
14  low-cost markets."
15      Do you recall reviewing that in
16  connection with preparing your report?
17      A.   I don't specifically recall
18  this, but.
19      Q.   Well, did you read this -- this
20  document, Exhibit 7, corner to corner?
21      A.   No.
22      Q.   Okay.  Did you scan it?
23      A.   Yes.
24      Q.   Take a look at page 20.

Page 216

L. Allen

1      A.   20.  Okay.
2      Q.   Okay.  It goes on, "Revenue
3  recognition:  The company recognizes
4  revenue" --
5      A.   I'm on the wrong page.
6      Q.   Are you with me?  Oh, sorry.
7  Page 20.  It's Bates number 361, just, if
8  that helps.
9      A.   Okay.
10      Q.   And I highlighted it, just to
11  make it easier.
12      I will represent for the record
13  there is yellow highlighting on the marked
14  exhibit that we added, just to -- it's a
15  thick document.
16      Okay.  Could you -- you know
17  what?  Read it yourself, the revenue
18  recognition policy stated there, as well
19  as a hardware discussion.
20      A.   (Reviewing document.)
21      Okay.
22      Q.   Okay.  Can you tell me what
23  inputs management at BlackBerry puts into
24  determining whether or not to recognize

Page 217

L. Allen

1  revenues on handsets, from the disclosure
2  here?
3      A.   Can I tell you what the inputs
4  are?
5      Q.   Yeah.
6      A.   Oh, I don't know.  I mean, I
7  haven't tried to do that.
8      Q.   Okay.  Can you --
9      A.   Maybe I could.  I don't --
10      Q.   Can you figure it out from what
11  they've disclosed here?
12      A.   As we sit here right now, can I
13  find out what all the inputs are?  I don't
14  know if I could.  I mean, are you saying
15  that's what -- where specifically they get
16  the data or -- I'm not sure what your
17  question is.
18      Q.   No.  What data goes into the
19  analysis?
20      A.   Oh, what are all the data items
21  that go into it?  I don't know.
22      Q.   And it's not disclosed here?
23      A.   Are all the data items that got
24  -- that go into the analysis disclosed

Page 218

L. Allen

1  L. Allen
2  here?
3  Q.   Yeah.
4  A.   No.  They're not.
5  Q.   What data item --
6  A.   It would not be my expectation
7  that all the data items that typically go
8  into an analysis in a filing such as this
9  would be typically disclosed.
10  Q.   What data -- what data is
11  provided?
12  A.   I'm not sure what your question
13  refers to.
14  Q.   What data --
15  A.   There's lots of data provided in
16  this filing.
17  Q.   What data is provided under the
18  revenue recognition policy for hardware?
19  A.   Typically, data isn't provided
20  in a policy.  A policy states principles.
21  Data is provided in other parts of an SEC
22  filing typically.
23  Q.   Do you know where else in this
24  SEC filing BlackBerry provided disclosure
25  of the inputs that went into its revenue

Page 219

L. Allen

1  L. Allen
2  recognition for hardware?
3  A.   I wouldn't expect the inputs to
4  particularly be in a -- I don't know.  I
5  mean, that's not something I've thought
6  about before, and it seems surprising.
7  This is an example of what is policy for
8  revenue -- that the SEC filing is telling
9  you, once we apply these principles that
10  we're explaining, what are some results
11  and what are some numbers.
12  So, for example, the -- the
13  company, you know, has their reporting
14  of -- I'm trying to think of an example --
15  property, plans, and equipment or
16  something.  And, typically, they might
17  have some policy of how they're valuing
18  their property, plans, and equipment.  And
19  they would give you the number of the
20  value.
21  They wouldn't tell you all the
22  inputs that went into the number that they
23  put down for the value of their property,
24  plans, and equipment.  That's not what an
25  SEC filing typically does.

Page 220

L. Allen

1  L. Allen
2  Q.   Let me ask you a different
3  question.
4  Under "hardware," it says,
5  "Revenue from sales of BlackBerry wireless
6  hardware products, which includes their
7  handsets, is recognized from persuasive
8  evidence of:  An arrangement exists,
9  delivery has occurred, sales price is
10  fixed or determinable, and the collection
11  is probable."
12  Who makes those determination?
13  A.   Who makes which determination?
14  Q.   Those series of determinations
15  that are described in the sentence.
16  A.   Well, I mean -- so, in my
17  experience, companies have certain
18  criteria and make certain determinations.
19  They have accountants that review their
20  accounting and their numbers, and there's
21  a fair amount of -- you know, there can be
22  some back-and-forth.  So I think they
23  typically have an accounting company that
24  does some sort of a review.  They have
25  people in -- generally, in, sort of, the

Page 221

L. Allen

1  L. Allen
2  finance area of a company, that help put
3  together the information that goes into
4  a -- a filing such as this.
5  Q.   Do you know if that's true on --
6  do you know whether or not -- strike that.
7  Do you know whether or not it's
8  management's responsibility for providing
9  the determinations?
10  A.   I'm not sure I understand that
11  question.
12  Q.   Does management make the
13  determination of whether the criteria
14  met -- in the sentence I read to you are
15  met?
16  A.   I think the process works more
17  the way I described, that there's a -- a
18  finance department that's responsible for
19  doing the accounting and the financial
20  statements.  And there's an auditing firm
21  that does a review of audited financial
22  statements.
23  Q.   And that's for an annual report.
24  What about quarterly?
25  A.   I think a similar process

Page 222

```
1              L. Allen
2   occurs.  Quarterly statements are
3   typically not audited --
4       Q.   The --
5       A.   -- but the quarterly statements
6   roll up into an annual statement.  So much
7   of the information that goes into the --
8   the -- you know, once you have three
9   quarters of the statement, then the annual
10  report has an additional quarter, but
11  there's some -- generally some consistency
12  of policy and methodology in the quarterly
13  statements to the then rolled-up fourth
14  quarter and annual report.
15          MR. BEHA II:  Could we go off
16  the record for just a minute?
17          MR. BROWER:  Yeah.
18          THE VIDEOGRAPHER:  The time is
19  4:57.  We're going off the record.
20          (Recess taken.)
21          THE VIDEOGRAPHER:  The time is
22  5:05.  We're back on the record.
23  BY MR. BROWER:
24      Q.   Okay.  Let's look at the next
25  paragraph on page 20.  "The company
```

Page 223

```
1              L. Allen
2   records reductions to revenue for
3   estimated commitments related to price
4   protections right of return and for
5   customer incentive programs."
6           Who does the estimation?
7       A.   I don't know.
8           MR. BEHA II:  I'll just object
9   and say that the operation of
10  Blackberry accounting functions is
11  totally outside the opinions --
12          MR. BROWER:  Okay.
13          MR. BEHA II:  -- being offered,
14  you know, and Ms. Allen's expertise,
15  so.
16          MR. BROWER:  Okay.
17      A.   I don't know who does --
18      Q.   Do anal -- do analysts --
19      A.   I don't know who does --
20  estimation, was that your word?
21      Q.   Uh-huh.
22          Do analysts -- strike that.
23          Do analysts rely, when they
24  review results of operations, that the
25  estimates have been done properly?
```

Page 224

```
1              L. Allen
2       A.   I think the general belief is
3   that estimates have been done to the best
4   of, you know, our ability and have been
5   done reliably.  That -- that's my --
6       Q.   And they rely on reported
7   financial results contained in SEC
8   filings?
9       A.   I think analysts can and do rely
10  on financial statements in SEC filings.
11      Q.   Okay.
12          MR. BROWER:  Mark this Allen 15.
13          (Allen Exhibit 15, SEC Form 6-K
14  for June 2013, marked for
15  identification, as of this date.)
16      Q.   I put before you Allen
17  Exhibit 15, which is the first quarter
18  2014 Form 6-K, dated -- I will tell you
19  exactly when it was dated -- dated June
20  28, 2013.
21      A.   Dated when, did you say?
22      Q.   June 28, 2013.
23      A.   Oh.
24      Q.   This is the -- the first
25  quarterly report after the annual report
```

Page 225

```
1              L. Allen
2   we just looked at, Exhibit 14.
3       A.   Yeah.
4       Q.   Okay.  And this was --
5           MR. BEHA II:  The annual report
6   was Exhibit 7.
7           MR. BROWER:  Sorry.  Exhibit 7.
8   Thank you.
9       Q.   And just for the record, this is
10  the BlackBerry equivalent of a Form 10-Q
11  that it files with the SEC because it's a
12  foreign corporation?
13      A.   Yes.  Well, I think that's
14  correct.
15      Q.   Let's look at page 6.  It says
16  "critical accounting policies and
17  estimates:  The preparation of the" --
18      A.   Hold on.  I --
19      Q.   You're not there?  It should
20  be -- do we have the same document?
21          MR. BEHA II:  It may be easier
22  to use the Bates numbers.
23          MR. BROWER:  Mine is 234.
24      Q.   Do you have 234?  Or that could
25  be wrong.
```

Page 226

L. Allen
1
2    A.   Mine says 206 on the bottom.
3        MR. BEHA II:  Yeah, mine does
4    too.
5        MS. MILLER:  So you guys have a
6    different --
7        MR. BROWER:  They have a
8    different document.
9        MS. MILLER:  Okay.
10    Q.   Can I see the exhibit back for a
11    minute?
12    A.   Sure (handing).
13    Q.   Thank you.
14        MR. BROWER:  No, my copy is
15    different.  I apologize.  My copy is
16    different.  Correct document, wrong
17    copy.  I will find the page.
18        Can I go off the record just for
19    a second?  I may just have to
20    substitute the exhibit.
21        MR. BEHA II:  Okay.
22        THE VIDEOGRAPHER:  Time is 5:11
23    p.m.  We're going off the record.
24        (Recess taken.)
25        THE VIDEOGRAPHER:  The time is

Page 227

L. Allen
1
2    5:13, and we're back on the record.
3    BY MR. BROWER:
4    Q.   "Critical Accounting Policies
5    and Estimates," on page 234, Bates number,
6    states:
7        "The preparation of the
8    consolidated financial statements requires
9    management to make estimates and
10    assumptions with respect to the reported
11    amounts of assets, liabilities, revenues
12    and expenses, and the disclosure of
13    contingent assets and liabilities.  These
14    estimates and assumptions are based upon
15    managementï¿½s historical experience and are
16    believed by management to be reasonable
17    under the circumstances.  Such estimates
18    and assumptions are evaluated on an
19    ongoing basis and form the basis for
20    making judgments about the carrying values
21    of assets and liabilities that are not
22    readily apparent from other sources.
23    Actual results could differ from these
24    estimates."
25        Is that your understanding of

Page 228

L. Allen
1
2    how they determine whether or not to
3    recognize revenue?
4        MR. BEHA II:  Objection to form.
5    A.   I don't think this is really
6    very specific about revenue recognition.
7    I think they have a section that's on
8    revenue recognition.
9    Q.   They do?  Could you show it to
10    me?  Or "point it out" would be a better
11    word.
12    A.   I mean, perhaps they just
13    reference their policy as described in
14    their annual filing.
15    Q.   Perhaps.  But they don't.
16    A.   I don't recall.  I -- I thought
17    I had seen in one of the 6-Ks, the
18    description of the revenue recognition
19    policy.  That's my recollection, but.
20    Q.   You don't recall if it was the
21    first quarter ended June 28th, do you?
22    A.   No.  I don't particularly recall
23    that, no.
24    Q.   Okay.  All righty.
25        What does it mean when the

Page 229

L. Allen
1
2    company says "sales are in line" --
3    A.   So "The following discussion
4    should be read together with the
5    consolidated financial statements."
6    Q.   Ms. Allen, it's not a treasure
7    hunt.  You don't have to keep looking for
8    it.
9    A.   Okay.  You asked me the
10    question, so --
11    Q.   You -- you don't --
12    A.   -- I'm not --
13    Q.   You don't know where it is in
14    the document, if it's in there, without
15    going page by page?
16    A.   First you asked me if I could
17    find it, and now you're not -- now
18    you're --
19    Q.   Uh-huh.  Now I'm letting you off
20    the hook.
21    A.   Now you're interrupting me
22    trying to answer your question, but --
23    Q.   I'm letting you off the hook.
24    A.   -- as I sit here, I don't know
25    what page it's on or if it's in here.

Page 230

L. Allen

1
2    Q.   Okay.  Okay.
3         Could you go to page 12 --
4         MR. BEHA II:  David, please stop
5    interrupting the witness.
6    Q.   Could you go to page 12, please?
7    A.   Which page 12 are we on now?
8    Q.   I'm sorry.  Go to 239.  Start
9    with 239, by the Bates number.
10        Okay.  Starting at the last
11   sentence on the page.
12   A.   Yes.
13   Q.   "Approximately 40 percent of
14   handheld devices shipped were
15   BlackBerry 10 smartphones.  The decline in
16   the volume of Blackberry devices shipped
17   was primarily a result of decreased demand
18   of the company's older device models in a
19   very competitive environment, partially
20   offset by the continued introduction of
21   BlackBerry 10 smartphones into certain
22   markets in the first quarter of fiscal
23   2014."
24        You see that?
25   A.   I do.

Page 231

L. Allen

1
2    Q.   Okay.  Do you see anything in
3    this paragraph dealing with sell-ins
4    versus sell-throughs of BlackBerry 10 or
5    other handsets?
6    A.   I don't particularly see
7    anything, no.
8    Q.   Let's put that aside just for a
9    minute, the document.
10        You indicate that, as of June
11   28, the market believed the launch of the
12   BlackBerry 10 had been a failure.  I'm
13   reading from paragraph 67 of your report.
14   A.   Paragraph 67?
15   Q.   Uh-huh.
16   A.   I say:  "I find that the June 28
17   alleged misrepresentation that
18   BlackBerry 10 was well-received did not
19   have price impact because analysts, right
20   after the alleged misrepresentation,
21   rather than believing that BlackBerry 10
22   smartphones had been well-received, stated
23   essentially the opposite, that the launch
24   of BlackBerry 10 had been a failure."
25        And this is a little bit of a

Page 232

L. Allen

1
2    summary of what are the paragraphs to
3    follow.  So this is some bullet point
4    summaries.
5    Q.   Did any of the analysts say that
6    the launch had not been a failure as of
7    June 28, 2013?
8    A.   There's -- I'm recalling one of
9    the analysts, CIBC, after the June 28th
10   alleged misrepresentations, they say they
11   think that -- that, you know, what was
12   actually the, sort of, you know, alleged
13   "bad news," that while it was corrective
14   in driving the price down, they're saying
15   that was what they were expecting.
16        They're expecting a sort of
17   staggered approach to introducing new
18   devices.  And they actually think things
19   are still on track, given their
20   hypothesis.  So I do recall CIBC saying,
21   Yeah, others think this -- the news to
22   date has been bad news, but this was
23   our -- this was what we were expecting.
24   We were expecting this to happen, and we
25   think, you know, it's still on track.

Page 233

L. Allen

1
2    So it was not because of the
3    alleged misrepresentations that plaintiffs
4    claim, nor was it consistent with
5    plaintiffs' claim that this was a
6    corrective disclosure in correcting the
7    truth, but CIBC was saying, Yeah, this was
8    what we thought was going to happen, and
9    we think we're still on track, given our
10   hypothesis.
11   Q.   By the way, a number of your
12   statements in this section, June 28 and
13   August 12, indicates that the statements
14   plaintiffs allege were false and
15   misleading.  The analysts believed the
16   opposite of the statements from the
17   company.
18        Do you recall that?  I'm going
19   to go one by one, but I'm summarizing.
20   A.   They believe the opposite of
21   what plaintiffs claim was allegedly false
22   and misleading in the statements.
23   Q.   Okay.  So, for --
24   A.   So plaintiffs are claiming
25   that --

Page 234

L. Allen

Q.   Take a look at paragraph 68
for -- just as an example.

A.   Paragraph 68?

Q.   69.  I apologize.

A.   (Reviewing document.)
I'm not sure what the question
is, now that I'm looking at that.

Q.   Sure.  I understand.
The plaintiffs -- the plaintiffs
allege the company said the BlackBerry 10s
were well-received.
Did you check -- I believe you
testified earlier you actually checked the
document cited in the Complaint to at
least confirm that what plaintiffs said
BlackBerry said was actually said; is that
correct?

A.   I don't know that I did say
that.  I think what I testified before
is -- you asked what assumptions I had.
And my analysis was under the assumption
that what plaintiffs claim was false, or
that the statements shouldn't have been
said -- that I adopted that.  I -- I

Page 235

L. Allen

didn't test whether those statements
should or should not have been said, in
that --

Q.   If plaintiffs correctly quoted
defendants as saying that the
BlackBerry 10 smartphones were
well-received, is it your view that the
analysts disbelieved BlackBerry?

A.   I think I would say they took no
real meaning from the statement that it
was well-received, that they had the data
and the understanding of -- that the
company saying it was well-received was
not attributed by the analysts to tell
them anything, that that's the sort of
statement that companies make that are
positive and sound positive, but that, you
know, may be described, as puffery, or not
particularly meaningful to the market.
But it's not what is my opinion
of what that statement means.  What I have
done is analyze what did the analysts in
the market take away from the statement,
so.

Page 236

L. Allen

Q.   Okay.  So paragraph 79, you say:
"I find that analysts right after the
alleged misrepresentation" -- I think
we're still at -- now we're at August
12 -- "rather than believing that
consumers were 'embracing' Blackberry 10,
stated essentially the opposite, that the
launch of the BlackBerry 10 had been a
failure."
So, again, if plaintiffs
correctly quoted the defendants as saying
consumers were embracing BlackBerry 10s in
their August 12 statement, is it your view
that the analysts disagree?

A.   I think it's a similar answer.
So I think what the company was actually
saying is they were embracing the
technology.  And the -- I find that there
is no analyst that repeated that statement
or changed their valuation or did anything
with regard to that statement.  And what
the analysts are actually saying after
that is inconsistent with what plaintiffs'
alleged misrepresentation claim of a

Page 237

L. Allen

misrepresentation about that statement.
So whether that statement really
means what plaintiffs are claiming and
whether that is a misrepresentation or not
a misrepresentation is not something that
I've analyzed.  I have analyzed whether
that statement has had the impact -- has
impacted the price of BlackBerry stock.

Q.   Do you believe a curative
disclosure requires that the disclosure be
a mirror-image correction?

A.   No.  I wouldn't particularly say
I believe that.

Q.   And you understand that this --
this circuit, that an event can occur that
reflects a prior misrepresentation?

A.   I think events can occur in all
sorts of similar ways.  Events don't occur
differently in one circuit than another.
I have no opinion there are different
types of events that occur in one circuit
than another circuit.

Q.   Okay.  I'm actually not asking
you -- I'm asking you about, are you

L. Allen

familiar with the Southern District --
strike that -- the Second Circuit loss
causation requirements?
        MR. BEHA II:  Ms. Allen is not
    offering an opinion on loss causation,
    and she's also not offering an opinion
    -- a legal opinion about what the
    legal requirements for anything are.
        MR. BROWER:  Actually, Ms. Allen
    does offer, in paragraph 88 of her
    report, a discussion of what is or is
    not a curative disclosure.  And that
    implies a loss causation analysis.
        MR. BEHA II:  It doesn't.  And I
    don't believe she's talking about a
    legal analysis of what a curative
    disclosure is on causation.
BY MR. BROWER:
    Q.    Paragraph 88:  "Further, a
review of analyst commentary after June
28" -- start again.
        Paragraph 88:  "Further review
of analysts' commentary after the June 28
alleged curative disclosure yields no

L. Allen

evidence that analysts believe that the
March 28 alleged misrepresentations or
Blackberry's accounting for revenue in
4Q13 had assured them that BlackBerry 10
smartphones were successful at the time
the misrepresentation was made or would be
successful in the future."  Period.
        What -- what is your point
there, ma'am?
    A.    For one, I think you read a
couple of words wrong.  I talk about a
corrective disclosure, and you said a
different word.
    Q.    I said something different than
"corrective."  I missed the -- I missed
the high point?
    A.    You did.
    Q.    All right.  First sentence --
        MR. BEHA II:  You said
    "curative."
    A.    I think you had a couple of
other --
    Q.    Okay.
    A.    But now that we have said that

L. Allen

you may not have read the sentence
correctly, your question was, what's the
point of the sentence?
    Q.    What point are you trying to
make in the first sentence in
paragraph 88?
    A.    I'm saying a review of the
analysts' commentary after the corrective
disclosure yields no evidence that's
consistent with one of the alleged
misrepresentations, is -- is one of the
things that I'm saying.
    Q.    What does that mean?
        What would you expect to see?
    A.    Well, for example, what you
wouldn't expect to see is analysts saying,
This is just what we thought was going to
happen, which is one of the things that
the CIBC analyst said.  So despite the
alleged misrepresentations, the analyst
said, Yeah, we're not surprised by this.
This is where we thought we'd be.
        There are other analysts that
say there are things that happened this

L. Allen

quarter that we were afraid would happen,
and they have happened, and this is --
this is -- and there are other negative
things that are announced in this -- in
this announcement that analysts say is new
negative information that's newly released
to the market.
        They're not saying, How could
this have happened?  We thought that this
had -- was going to be successful.
They're saying there are things that have
happened that were along the lines of
something we knew full well was a
possibility.
    Q.    So, in essence, they're saying
the impact on the price of the stock is a
result of other events, not the revelation
that the statements, in the beginning of
the class period or in the middle of the
class period, were false?
    A.    That's not particularly what
this says, no.  I think that -- that may
also be true.  It's not un -- that's not
inconsistent with some of the things that

Page 242

L. Allen

I have found.  That's not particularly what this sentence says.

Q.   Okay.  That's your proposition with respect to the June 28th announcement?

A.   The sentence that we have been reading is a conclusion that I found, based on an analysis that I did.  I'm not sure what you're talking about is a proposition.

You then said, Is this conclusion the same as something else?

And I said, No, it's not the same, but your conclusion is also something that -- that may also be true, but is not particularly what this particular sentence says and is not -- of this particular -- this particular sentence is saying what is the result of an analysis that I did.

Q.   Okay.  I'm asking more generally.

Is your thesis that the impact on the price that occurred on June 28 and

Page 243

L. Allen

thereafter was the result of information unrelated to the alleged misrepresentations that plaintiffs allege occurred before and on June 28?

A.   The question you've now just asked me is what is my thesis?  I don't have a thesis.  This isn't a theoretical paper, where I have some sort of a point of view that I am trying to point out.  I've been asked to do an analysis.  I've done an objective, reliable, scientific analysis of what is -- whether there is price impact from the alleged misrepresentations, and I have found that there is not price impact from the alleged misrepresentations.

One of the things that I have found which supports a point which is consistent with my findings of no price impact is that analyst commentary after the first alleged corrective disclosure doesn't -- and there are a lot of analysts covering the company -- doesn't -- is not consistent and doesn't yield any evidence

Page 244

L. Allen

that the analysts had believed that the alleged misrepresentations at the beginning of the class period in March, had assured them that the phones were successful at that time, or would be successful in the future.

Q.   September 20, you found that there was no price impact resulting from the misrepresentations that plaintiffs alleged before September 20; is that right?

A.   No.  What I found is that there is no price impact from the alleged misrepresentations when made.  So what I've been analyzing is whether there is price impact from the alleged misrepresentations when made.

And one of the things I have looked to, to see if there's evidence of price impact, is not only what happened at the time of the alleged misrepresentations, but also what happened at the time that, allegedly, "corrective information" of the alleged

Page 245

L. Allen

misrepresentations was made and entered into the market.

So I have reviewed information around the alleged corrective disclosures, and from that analysis, along with all the other analyses, I've found that there is no price impact from the alleged misrepresentations.

Q.   Okay.  Now, for a layperson like myself, I'm going to have to break that down a little bit.

In connection with determining whether or not there was price impact connected to a misrepresentation, is one of the things that economists do is to look at the corrective disclosure and what happened to the price when the alleged corrective disclosure occurred?

A.   So one of the things that can -- the most direct way of looking at price impact from an alleged statement or event is to look how the market reacts when an -- an alleged statement is made.  A less direct method is to look at when that

L. Allen

statement is reversed or changed.

So, in a context such as this,
one can look at the time of the alleged
misrepresentations, when an alleged
fraudulent statement is made, and look how
the market reacts then.  It can also be
helpful to look when an allegedly
fraudulent statement is corrected, because
that can give an indication of what was
the impact when an alleged fraudulent
statement was made.

So the analysis that I have done
here is both to analyze all of the alleged
misstatements and what was the market
reaction and market commentary when made
and how did that change, as well as, when
the allegedly fraudulent statements were
allegedly corrected.

Q.   Was there a price movement --
strike that.

Was there a statistically
significant change in BlackBerry price
with the announcement on September 20?

A.   The end of the class period

L. Allen

September 20, like, the end of any alleged
class periods in securities class actions,
is a statistically significant price drop.

Q.   If you look at Allen Exhibit 6,
it was from around $14.48 to $10.46.

A.   This is a document that you
showed me earlier.  You showed me two
documents, and you said, didn't they --
neither of which I had produced, and you
said didn't they confirm each other
because they had the same numbers?  And we
went through that, and we decided they
don't have the same numbers.

Q.   I recall the two documents --

A.   So you showed me two documents
that you say report to show BlackBerry
stock prices, and one shows the high and
the low and the other one showed intraday
stock prices.  And the high and the low
from the one document that you showed me
was not consistent with the stock prices
in the other.

So neither of these are
documents that I produced.  They appear to

L. Allen

be documents that Dr. Feinstein produced,
and they don't appear to be consistent
with each other.  So I would not refer to
these to have any confidence of what
Blackberry's actual stock price was.

Q.   That's fine.

What was the drop in stock
price?  What was the drop in stock price
as a result of the September 20, 2013,
announcement?

A.   I don't know what the
September 20 price was as a result, so
this is a -- one of the things you do an
event study for, if you want to say what
is the result of it.  You can look at how
much the stock price drops.

And I have a picture of the
stock price in my report, on page 11.  And
there is a stock price drop at the end of
the class period, as there is at the end
of most securities class periods.

Q.   And is it your conclusion that
the drop in price had nothing to do with
the alleged misrepresentations that

L. Allen

plaintiffs allege?

A.   No, that is not my opinion.
It's my opinion that, after review of the
alleged corrective disclosure and the
reaction to it, that does not support
price impact from the alleged
misrepresentations.  It's my opinion that
plaintiffs have brought this case because
they find the stock price drop, and they
have made allegations that have some
relationship to the stock price drop.
That is how a securities class action
works.

So the fact that there's some
relationship between a stock price drop
and the allegation is not itself proof of
price impact, but is only evidence of how
plaintiffs and plaintiff counsel bring
forward securities class actions.

Q.   How much was the relationship
between the stock price and the corrective
disclosure -- the alleged corrective
disclosure?

A.   I don't understand that

Page 250

L. Allen

1  question.
2      Q.   You said that there's some
3  relationship to the stock price drop from
4  the September 20, 2013, announcement; is
5  that correct?
6      A.   No.  I said there's some
7  relationship between the -- that
8  plaintiffs have put forward a complaint
9  that alleges something that bears some --
10  so plaintiffs' counsel sees a stock price
11  drop, and that's a potential to -- for
12  money, and if they can claim that there's
13  some sort of misrepresentation that's
14  somehow related to it, that's how you can
15  put forward a securities class action.
16      So just saying that there's
17  some -- there are some words and there are
18  some similar -- there's some sort of a
19  word relationship between -- and some
20  similar themes in what's announced at a
21  stock price drop and what is a claim in a
22  securities class action, only goes to show
23  how plaintiffs and counsel have put
24  together a claim.  It's not an analysis of

Page 251

L. Allen

1  why the stock price is dropping or how --
2  or what is price impact.
3      I'm not saying that the alleged
4  misrepresentation caused the stock price
5  drop.  I'm saying that plaintiffs have put
6  forward some sort of a complaint where the
7  things have some, at least, superficial
8  relationship to each other or it
9  wouldn't -- it wouldn't make sense to file
10  a claim.
11      MR. BROWER:  I forget what
12  number we're up to -- 16.
13      (Allen Exhibit 16, document
14  headed Blackberry News Release, marked
15  for identification, as of this date.)
16      Q.   I put before you what's been
17  marked Allen Exhibit 16.  This is the
18  September 20, 2013, BlackBerry press
19  release.
20      You understood, did you not,
21  that the company took a significant charge
22  with respect to writing off BlackBerry 10
23  handsets?
24      A.   They took an accounting charge,

Page 252

L. Allen

1  yes.
2      Q.   An accounting charge is a
3  reduction of revenue; is that right?
4      A.   No, I don't think they took a --
5  I don't think they took a charge to
6  revenue.  I think they took a charge to
7  inventory.
8      Q.   When you take a charge to
9  inventory, what's the impact on your net
10  profits?
11      A.   If you're looking at -- charges
12  can hit the -- hit the bottom line of an
13  income statement, so they can reduce
14  reported income.
15      Q.   The company also changed its
16  accounting policy with respect to sales of
17  BlackBerry 10 handsets?
18      A.   No.  It's not my understanding
19  that they changed their policy.  I believe
20  they kept the same policy, and they, I
21  think, reconfirmed their policy right
22  after the end of the alleged class period.
23  So I think they have maintained the same
24  policy and have been consistent with the

Page 253

L. Allen

1  same policy.  Applying the same policy,
2  because circumstances had changed during
3  the class period, resulted in booking
4  revenue for BlackBerry 10 devices at
5  sell-through rather than sell-in.
6      But it is in compliance with the
7  same stated revenue policy that we read
8  earlier in the deposition.
9      Q.   What's your understanding of the
10  circumstances that changed between
11  March 28, 2013, and the second quarter of
12  2013?
13      A.   Well, I think there are a lot of
14  circumstances that change, but some of the
15  circumstances that change with regard to
16  the change in their booking, becoming less
17  assured that the sales price was
18  determinable and collection was reasonably
19  assured, were, I think, you know, in part,
20  increasing competition and lack of sales
21  and consumer interest in the BlackBerry 10
22  devices.
23      Q.   And these were events that
24  occurred between June 28 and September 20?

Page 254

L. Allen
A.   Between June 28 and
September 20, yes.  I think there was
negative events that occurred.  And the
company became -- felt that -- yes, there
were events that occurred between June 28
and the end of the class period.
Q.   What's the basis -- your basis
for that statement, your factual basis?
A.   Well, the company made
statements to that effect.  A number of
the analysts made statements to that
effect.  The analysts, throughout this
time period, are doing their own research
and checks on what is happening -- you
know, what is happening at the retail
stores.  They do checks on -- I know one
of them looked at Google trends, I guess,
in terms of how people are, I assume,
typing in the name of whatever it is
they're interested in buying.
So there's a lot of information
on negative trends that were occurring
during this time period, much of which is
in analyst commentary, and the company

Page 255

L. Allen
reports some of that information in its
statements.
Q.   Which statements?
A.   Well, they have a statement, a
press release I believe, right at the end
of the class period.  They have another
filing.
Q.   That's Exhibit 16?
A.   Yeah.
Q.   Yeah.
A.   Their filing which occurs a
little bit after that has a discussion
of --
MR. BROWER:  Let's mark this 17.
(Allen Exhibit 17, SEC Form 6-K
for October 2013, marked for
identification, as of this date.)
Q.   Is that the filing after the
press release you referred to?
A.   Yes, I believe so.
Q.   For the record, this is the
October 1st, 2013, Form 6-K filed with the
Securities and Exchange Commission by
BlackBerry Limited.

Page 256

L. Allen
MR. BEHA II:  This is 17?
MR. BROWER:  Yes.
THE WITNESS:  Yes.
Q.   There is a bit more discussion
in this quarterly report on revenue
recognition than they had in the prior
quarterly report; is that fair?
A.   Yes.  So they say here there
were no changes to the company's revenue
recognition policy in the second quarter.
However, given the developments in the
second quarter, the company has provided
further detail on the application of its
existing policy.
Q.   Do they describe what the
developments were?
A.   They discussed increased
competition, at least in this press
release, earlier.
Q.   How about in Exhibit 17?
A.   They're saying the sell-through
levels for BlackBerry 10 devices decreased
during the second quarter of fiscal 2014,
causing the number of BlackBerry 10

Page 257

L. Allen
devices in the channel to increase above
the company's expectations.
"In order to improve
sell-through levels and stimulate global
demand for BlackBerry 10 devices, the
company continued to execute on marketing
campaigns and reduced the price on new
shipments of BlackBerry Z10 smartphones
during the second quarter.  Additionally,
the company plans to implement further
sales incentives with its carrier and
distributor payments to increase
sell-through, which could be applicable to
the 10 devices.
"As a result, the company
determined that it could no longer
reasonably estimate the amount of
potential future sales incentives that may
be offered on the BlackBerry 10 devices.
Therefore, the company concluded that the
delivery of these devices did not meet the
criteria for revenue recognition."
I skipped a couple of words here
and there --

1        L. Allen
2    Q.   That's okay.
3    A.   -- to make it --
4    Q.   They go on, on the second page,
5 to say, "Significant judgment was applied
6 by the company to determine whether
7 shipment of devices had met the company's
8 revenue recognition criteria."
9    A.   That's -- that's the -- that's
10 the beginning of the paragraph that I was
11 reading from.
12    Q.   Okay.  Yeah.
13    A.   So they are -- they do have some
14 discussion of what happened.
15    Q.   Yeah.
16    A.   That is the paragraph I just
17 read.
18    Q.   And it's your understanding that
19 it's the same significant judgment on the
20 part of management, in prior quarters, to
21 determine whether or not to book revenues
22 upon sell-in rather than sell-through?
23    A.   I'm not sure I understand that
24 question.
25        My understanding is they've

1        L. Allen
2 applied the same revenue recognition
3 methodology, and they're describing what
4 has happened during the second quarter
5 that, given their policy, would mean that
6 they are now going to book the
7 BlackBerry 10s on a sell-through rather
8 than a sell-in basis.
9    Q.   According to the analyst, was
10 the company facing sell-through problems
11 in the end of the first quarter of 2013?
12    A.   They -- so whether you call it a
13 problem or not a problem, as you asked me
14 earlier, did people think that two-thirds'
15 to three-quarters' sell-through on the
16 BlackBerry 10 that the company announced
17 at the beginning of the class period, was
18 that good news or bad news, I think some
19 thought it was better than they expected,
20 some thought it was worse than they
21 expected, and others thought it was
22 actually lower than what the company was
23 announcing.
24        So I think -- I think, all
25 along, including at the beginning of the

1        L. Allen
2 class period, the market was aware that
3 there's a difference between sell-in and
4 sell-through, and that, ultimately, if
5 there isn't good sell-through, that the --
6 the product is likely to be a failure.
7        And that is something that has
8 been a concern all along and something
9 that the -- the market has been watching,
10 and closely watching.
11    Q.   In fact, at the end of the first
12 quarter, some analysts were already
13 discussing the risk of write-downs, with
14 respect to the BB10s?
15    A.   Yes.  They were aware right from
16 the beginning that this was something that
17 could happen.  So the very thing that
18 plaintiffs are alleging was withheld from
19 the market and -- was, in fact, known to
20 the market and was known as a risk.
21        So, from the beginning of the
22 class period, the analysts are saying they
23 were aware that there was a risk that
24 there would not be sell-through of these
25 products and that the BlackBerry 10 would

1        L. Allen
2 not succeed, and that that would hurt the
3 company.
4    Q.   So, as I understand -- so from
5 March 28 -- strike that.
6        From March 28, 2013, analysts
7 knew that write-downs of BB10 handsets was
8 a risk?
9    A.   Yes.  I think it's something
10 that the company even put in their -- its
11 disclosure.
12    Q.   Writing down the product?
13 Writing off the product?
14    A.   That there are potential for
15 write-downs, yes.  I believe that's
16 something that the company stated, but
17 it's certainly something that the market
18 was aware of.
19    Q.   On the BlackBerry 10s?
20    A.   On -- yes, if the BlackBerry is
21 a failure and the company has produced a
22 whole bunch of BlackBerry 10s -- so if the
23 market, for example, is thinking that
24 the -- the chance of the BlackBerry 10
25 being a 90 percent failure if you've

L. Allen

1   L. Allen
2   manufactured and made a whole bunch of
3   BlackBerry 10s, and you've got them in
4   inventory and the product is a failure,
5   that that is a likely circumstance that
6   there will have to be write-downs of
7   inventory.
8       Q.   Did analysts in the market rely
9   on management with respect to recognizing
10  revenues in the first quarter of 2013 on a
11  sell-in basis?
12      MR. BEHA II:  Objection to form.
13      A.   I don't understand that
14  question.
15      Q.   Did analysts rely on management
16  of BlackBerry with respect to the
17  appropriateness of booking revenues based
18  on the sell-in of BlackBerry 10s during
19  that quarter?
20      A.   Just repeating the question
21  doesn't make me understand it any better.
22      Q.   Oh.  Do analysts rely on
23  management for financial statistics?
24      A.   I think analysts rely on
25  financial disclosures.  Analysts often

1   L. Allen
2   rely on financial statistics, yes.
3       Q.   Okay.  And in this first quarter
4   of 2013, BlackBerry booked revenues based
5   on the sell-in of BlackBerry 10s; is that
6   correct?
7       A.   That's correct.
8       Q.   Okay.  So that -- so that
9   analysts would have relied on management
10  for the decision to book BlackBerry 10s on
11  a sell-in basis?
12      MR. BEHA II:  Objection to form.
13      A.   I don't know that analysts care
14  about what decision the company makes.
15  What they do care about is the business of
16  the company.  So if the company says, you
17  know, we've come to the conclusion this is
18  the appropriate accounting method to use
19  and the market understands it, other than,
20  you know, being accused, I suppose, of
21  accounting fraud, I don't think the market
22  has an opinion.
23      I mean, I guess they have some
24  opinion.  They find it somewhat more
25  helpful to have a -- it's easier to

1   L. Allen
2   understand numbers if you don't make a
3   change.  So some of the analysts felt that
4   the change from sell-in to sell-through
5   made it harder to tie numbers and make it
6   a little bit harder to -- to work with.
7   But I don't believe that analysts have a
8   particular reason to care what accounting
9   policy a company adopts in general.
10      Q.   But they didn't change the
11  accounting policy right, BlackBerry,
12  between the second -- first and second
13  quarters?
14      A.   That's correct.
15      Q.   Okay.  They just made -- changed
16  their judgment as to whether or not they
17  could sell the BlackBerry 10s?
18      A.   Given a change in the market.
19  So they -- they found that, given the
20  changes that occurred in the second
21  quarter, that the changes were such that
22  their accounting policy -- that they felt
23  they would have to do price concessions or
24  other things, such that they felt --
25      Q.   Do you know --

1   L. Allen
2       A.   -- made more sense to book the
3   revenue, given their accounting policy, at
4   a sell-through basis rather than a
5   sell-in, for the BlackBerry 10 devices.
6       Q.   Do you know what the
7   sell-through was during the first quarter
8   of 2013?
9       A.   Overall, I think it was 6. -- I
10  don't know.  I did.  At some point, I did
11  know the numbers of -- sell-through?
12      Q.   Sell-through in the first
13  quarter of 2013.
14      A.   For all devices that they do --
15      Q.   For the BlackBerry 10s.
16      A.   Oh.  The company, as I sort of
17  previously said, they -- they tended to
18  report total numbers of sell-in and
19  sell-through for all devices.  They tended
20  to not break it down by device.
21      Q.   Do you know if they provided
22  sell-through statistics in the second
23  quarter -- at the end of the first quarter
24  of 2013 -- strike that.
25      Do you know whether they -- I'll

1           L. Allen
2   start again.
3       A.   Okay.
4       Q.   Do you know whether they
5   provided sell-through figures on June 28,
6   2013?
7           MR. BEHA II:  That was asked and
8   answered.
9       A.   Yes, I do believe they provided
10  sell-through numbers after the first
11  quarter announcement, for all devices, as
12  I believe they had before, and they also
13  provided sell-in numbers.
14      Q.   Okay.
15      A.   I don't believe they broke it
16  down by -- by device.
17      Q.   Okay.
18          MR. BROWER:  Could we take a
19      break?
20          MR. BEHA II:  Yes.
21          MR. BROWER:  Oh, actually,
22      before we do that, I -- can -- let's
23      go back for a minute.  I want to
24      speedily do something.
25      Q.   Did you take a look at the third

1           L. Allen
2   quarter report and events in the third
3   quarter of 2013?  It's the third quarter
4   of 2014, but --
5       A.   Right.
6       Q.   -- you know what I mean, the one
7   that ends November 30, 2013?
8       A.   You know, I think I did.  I
9   don't recall now what happened.
10          MR. BROWER:  Let me just give
11      you this.  Will have you mark that to
12      close the gap.
13          (Allen Exhibit 18, SEC Form 6-K
14      for December 2013, marked for
15      identification, as of this date.)
16      Q.   All right.  If you go to page --
17  for the record, this is the 6-K, dated
18  December 20, 2013 -- I misspoke.  I said
19  November 30.  This is the third quarter
20  for BlackBerry in 2000- -- for their 2014
21  fiscal year, I believe -- 2013 fiscal
22  year.
23          Take a look at page 9, using the
24  Bates number --
25          MR. BEHA II:  2014.  It's the

1           L. Allen
2   calendar year in which the fiscal year
3   ends.  So we're in 2013, but it's the
4   2014 fiscal year.
5           MR. BROWER:  Thank you.
6       Q.   If you look at page 9, the
7   company now provides a little more
8   substantive discussion of its revenue
9   recognition policy than had been provided
10  in prior filings; is that correct?
11      A.   No.  I think the one we just
12  looked at had more discussion.
13      Q.   Well, it says it's doing more
14  than it did before?
15      A.   Well, maybe it goes on -- it's a
16  little short page here.
17      Q.   And then it keeps going.
18      A.   I don't know if this is -- I'm
19  not sure if this is more or less than the
20  other one.
21          Do you want me to compare?
22      Q.   No, I don't want you to compare.
23          Do you know whether they took an
24  additional write-off of BlackBerry 10
25  products in the third quarter?

1           L. Allen
2       A.   I don't recall.  I would imagine
3   it says in here, but I have no
4   recollection.
5       Q.   Take a look at page 13.
6           At the bottom, they talk about
7   the write-off charge to inventory of
8   $1.6 billion.
9       A.   Yes, I do see an inventory
10  charge discussed here.
11      Q.   Those were -- from the
12  description here that's in connection with
13  the BlackBerry 10s again?
14      A.   It says "primarily attributable"
15  to the BlackBerry 10s.
16      Q.   So that adds up to approximately
17  a $2 billion write-off of inventories of
18  BlackBerry 10s during the two quarters?
19          MR. BEHA II:  Objection to the
20      form.  It mischaracterizes the
21      document.
22      A.   Yeah, I don't think that's
23  necessarily what it says.
24      Q.   Okay.  Did you do any analysis
25  of whether any of the write-off in the

Page 270

L. Allen
1   L. Allen
2   third quarter was of inventory that should
3   have been written off in the second
4   quarter?
5       A.   I did not do that, no.
6       Q.   That was outside the scope of
7   your retention?
8       A.   Yes.
9       Q.   Okay.
10          MR. BROWER:  Off the record.
11          THE VIDEOGRAPHER:  The time is
12   6:10.  We're going off the record.
13          (Recess taken.)
14          THE VIDEOGRAPHER:  The time is
15   6:33.  Back on the record.
16          MR. BROWER:  Mark this Allen 19.
17          (Allen Exhibit 19, list of
18   names, marked for identification, as
19   of this date.)
20   BY MR. BROWER:
21       Q.   Okay.  Ms. Allen, is it your
22   experience that when analysts are
23   surprised by management, they typically
24   complain that they were fooled or lied to?
25       A.   "Surprised by management"

Page 271

L. Allen
1   L. Allen
2   meaning they had expected something else
3   and then management says something
4   different?
5       Q.   Yeah.
6       A.   I'm not sure that being
7   surprised is the same thing as being
8   fooled.  I think management is saying, for
9   example, This quarter is -- whatever --
10   you know, This quarter something is
11   happening.  And that could be a surprise.
12          I think if management says
13   something that indicates last quarter was
14   completely different than what the market
15   had thought, then I do think they --
16   there's some indication that analysts say,
17   Well, wait a minute, we were under a
18   different impression about what you said.
19          So I think there's something
20   different about -- management can issue a
21   statement that is a surprise, it's not
22   what they were expecting, but for
23   management to say something that leads the
24   market to think that what they -- what
25   management had previously told them was

Page 272

L. Allen
1   L. Allen
2   not true, I think analysts' commentary can
3   be -- can be different.
4          Can say, Well, we don't
5   understand how that's the case.  They told
6   us something quite different before; or,
7   That doesn't seem consistent with what
8   they said; or, That changes our
9   understanding about the past.
10       Q.   Do they typically accuse
11   management -- in such a circumstance, do
12   they typically, in the reports, accuse
13   management of being liars?
14       A.   I don't know if they use the
15   word "liars."  I think they can say
16   something like, This sounds -- We had a --
17   I think it depends.  If they feel that the
18   company was actually lying, I think that
19   they can.  If they feel that they -- I
20   think they can make an indication that
21   this is, Different than what we were led
22   to believe about what had happened in the
23   past, which is different than, I found out
24   something about the future, something
25   changed.

Page 273

L. Allen
1   L. Allen
2       Q.   Do you -- you have an
3   understanding of the changes in management
4   that took place at BlackBerry between
5   September 20 and December 20th of 2013?
6       A.   Personnel changes, is that what
7   you mean?
8       Q.   Management, yes.
9          MR. BEHA II:  Between -- what
10   were the dates?
11          MR. BROWER:  September 20, 2013,
12   and December 20, 2013.
13       A.   As I sit here, I don't recall
14   that.  If there were changes, I'm pretty
15   sure I read about them and had some
16   understanding.
17       Q.   You know that the CEO was
18   terminated?
19       A.   I probably did know that, if
20   that's what happened during that time, but
21   at the moment, I don't particularly
22   remember that.
23       Q.   Are you aware the CFO was
24   ultimately terminated?
25       A.   I honestly don't have a specific

L. Allen

1   L. Allen
2   recollection of who the -- I don't have a
3   specific recollection of that right now.
4       Q.   Are you aware that BlackBerry
5   brought a new person to become CEO from
6   the outside of the company after September
7   20, 2013?
8       A.   As I said, as I'm sitting here,
9   I don't recall.  If you reminded me with
10  some of the names, it might come back to
11  me, but I'm just not -- I'm not --
12      Q.   Mr. Chen.  Does that help?
13          MR. BEHA II:  C-H-E-N.
14      A.   Yeah, I do have some
15  recollection of that, but it's not
16  something that I had particularly focused
17  on or --
18      Q.   If you look at the second
19  quarter report -- I think it's
20  Exhibit 17 --
21      A.   Okay.
22      Q.   -- look at the last page, you
23  see who signed the document?
24      A.   Yeah.  Bidulka.
25      Q.   Did you -- you're aware he was

L. Allen

1   the CFO?
2       A.   Yes.
3       Q.   Where he was terminated after
4   this document was filed?
5       A.   I don't recall that he was
6   terminated.  I do recall the name Chen,
7   and I do recall some changes, now that you
8   say that, but I -- I don't recall --
9       Q.   Could you look at the next
10  prior, which I believe is exhibit -- well,
11  take a look at Exhibit 7.  It's the big,
12  fat one.
13          Look at the last page and see
14  who signed it.
15      A.   Okay.  So this one is earlier,
16  right?
17      Q.   Yeah.
18      A.   It looks like its Bidulka again.
19      Q.   Mr. Chen?
20      A.   No.  Bidulka, CFO.
21      Q.   Keep going backwards.  That's
22  forward.
23      A.   What?
24      Q.   Keep going backwards.

L. Allen

1       A.   What's backwards?  I'm going to
2   the end.  Isn't backwards the end?
3       Q.   No.  Go the other way.  There's
4   another certification.
5       A.   Heins --
6       Q.   Yeah.
7       A.   -- is the CEO.
8       Q.   Yes.
9       A.   Yes.
10      Q.   You understand he was terminated
11  after September 20?
12      A.   I recall some change.  I don't
13  recall a termination.
14      Q.   Okay.
15      A.   I don't have a specific
16  recollection of that.
17      Q.   Is -- just in general, is
18  termination of the CEO and CFO a
19  meaningful event to a corporation?
20      A.   It can be a meaningful event.  I
21  mean, it -- it does affect employees
22  often, who -- sure, it can be meaningful.
23      Q.   Can you -- I've marked that
24  Exhibit 19.

L. Allen

1       Do you know any of the people on
2   that list personally?
3       A.   I don't believe so, no.
4       Q.   Would it be fair to say you
5   don't know what the background or
6   education of any of those people are?
7       A.   That would be fair to say.
8       Q.   Okay.  And as far as you know,
9   you've never done any business with them
10  or know anything about them personally?
11      A.   The names are not familiar to
12  me.
13          MR. BROWER:  Subject to our
14  ongoing fights over discovery and
15  documents, which you're aware of and
16  Ms. Allen doesn't have to be involved
17  with, we're done.  We don't have
18  anything further today.
19          MR. BEHA II:  Okay.  I'm just
20  going to ask a couple of questions,
21  Ms. Allen.
22          MR. BROWER:  That should open
23  the door.
24  EXAMINATION BY

Page 278

1           L. Allen
2   MR. BEHA II:
3       Q.   Ms. Allen, just to be clear, are
4   all of the materials that you considered
5   or relied upon in forming your opinions
6   and writing the report disclosed in your
7   report?
8       A.   Yes, I believe they are --
9           MR. BROWER:  Objection.
10  Leading.
11          Sorry.
12      A.   They're disclosed either very
13  specifically or in terms of a category.
14          So, for example, I have a
15  category of SEC filings, I believe.  And I
16  believe all of the materials that I
17  considered were provided to counsel for
18  turnover to plaintiffs' counsel.
19      Q.   And are there any documents or
20  materials that anyone at Morrison &
21  Foerster or BlackBerry provided to you in
22  connection with your engagement in this
23  matter that are not listed?
24      A.   All of the materials that were
25  considered in my report were turned over

Page 279

1           L. Allen
2   and listed in my report -- in my reports,
3   both of my reports.
4       Q.   Thank you.
5       A.   No additional materials.
6       Q.   Do you recall earlier today
7   there was some discussion of the term
8   "price maintenance"?
9       A.   I do.
10      Q.   And just as a reminder, what's
11  your understanding of that term?
12      A.   Understanding -- my
13  understanding of the term as I was asked
14  about it today, was in the situation that
15  we're looking at now in the securities
16  class action, where an alleged
17  misrepresentation, rather than being
18  expected to move the price at the time of
19  the misrepresentation, would be expected
20  to have a price impact relative to not
21  having the alleged misrepresentation.
22          So a situation where the alleged
23  misrepresentation impacts the price, but
24  not because you see the price reaction
25  after it's made, but the difference

Page 280

1           L. Allen
2   between having the alleged
3   misrepresentation and not having the
4   alleged misrepresentation would be a
5   difference in the price.
6       Q.   And you agreed with Mr. Brower's
7   proposition that there could be a price
8   impact even if there was not price
9   movement at the time that the alleged
10  misrepresentation was made?
11      A.   That's correct.
12      Q.   And did you analyze or consider
13  the possibility that that happened here or
14  that that was true here, with respect to
15  the alleged misrepresentations in this
16  case?
17      A.   Yes.  For each of the alleged
18  misrepresentations, I analyzed them not
19  only to see whether the stock price moved
20  on the date of the alleged
21  misrepresentation, but as well as whether
22  there was price impact and whether the
23  price would have been different if not for
24  the alleged misrepresentation.  So I've
25  done a whole analysis, not only looking at

Page 281

1           L. Allen
2   did the actual stock price move on the
3   date of the alleged misrepresentation.
4       Q.   So just accept for this purpose
5   the definition that "price maintenance"
6   refers to a case where the price does not
7   move following a misstatement, but there
8   is, nonetheless, price impact from the
9   misstatement.
10          Can we just accept that, for
11  purposes of this discussion, as a
12  definition of "price maintenance"?
13      A.   Okay.
14      Q.   What was your conclusion about
15  whether there was price impact based on
16  price maintenance with respect to the
17  misrepresentations alleged here?
18      A.   That there was no price impact
19  from any of the alleged
20  misrepresentations, including the theory
21  that you have just described that you're
22  calling "price maintenance."
23          MR. BEHA II:  Thank you.  I have
24  nothing further.
25  EXAMINATION BY

1         L. Allen
2 MR. BROWER:
3     Q.   With respect to each
4 misrepresentation, you analyzed to
5 determine whether the price would have
6 been different if -- but not for the
7 misrepresentation?
8     A.   Correct.
9     Q.   Please tell me how you went
10 about doing that.
11    A.   My report summarizes, and so
12 that is the entire analysis that I have
13 done in my report.  My report
14 summarizes -- everything that is in my
15 report speaks to that.  That -- that is my
16 assignment, as I understand it, is whether
17 the alleged misrepresentations impacted
18 the price, and that's exactly what I have
19 been asked to analyze.
20        And everything that I have done
21 in this -- in this report, in this
22 project, was to answer that question.
23    Q.   Is there a difference between
24 the price not having a statistically
25 significant change due to a

1         L. Allen
2 misrepresentation and the analysis of
3 whether the stock would have been
4 different had the misrepresentation not
5 been made?
6     A.   So one question is, after a
7 misrepresentation is made, is there a
8 stock price movement?
9     Q.   Uh-huh.
10    A.   That can help to analyze price
11 impact.  That is one of the things that I
12 looked at here in analyzing price impact,
13 but as we just discussed and as we have
14 discussed a number of times, it is
15 possible for there to be a statistically
16 significant reaction after
17 misrepresentation, and for there to be no
18 price impact, and it is possible for there
19 to be price impact and no statistically
20 significant reaction after an alleged
21 misrepresentation.
22    Q.   Your report says, in various
23 parts, that the misrepresentation did not
24 cause any increase in the price.
25        Do you recall that?

1         L. Allen
2     A.   I'm not sure I do recall that,
3 no.
4     Q.   Okay.  Well, you can't look at
5 the price of a stock to determine whether
6 or not there was price impact where there
7 was no movement in the price of the stock;
8 is that correct?
9     A.   I don't understand the question.
10    Q.   Sure.
11        How do you analyze -- I want to
12 know how you analyze and -- strike that.
13        I want to know how you went
14 about analyzing that there was no price
15 impact, based on the assumption the stock
16 price would have been different but for
17 the misrepresentation.
18    A.   It's not an assumption.  What I
19 am testing is whether there is price
20 impact, whether the stock price would have
21 been different but for the alleged
22 misrepresentation.  That is the question
23 that I am answering, and my entire
24 analysis speaks to that question.
25    Q.   But where in your -- show me --

1         L. Allen
2 show me with respect to the June 28
3 announcement, the work you did with
4 respect to what you just described.
5     A.   So my whole report is not --
6 I've done an analysis in its entire -- you
7 know, the analysis is -- some of it
8 discusses it by alleged misrepresentation,
9 but we've gone through this.  My whole
10 report is analyzing that.  There are a
11 number of alleged misrepresentations in
12 much of my report.
13        I'm not sure which parts of my
14 report aren't relevant to that, I guess is
15 why -- why I'm having trouble answering,
16 except the shares specific to a different
17 alleged misrepresentation.
18    Q.   Well, I saw you tested -- you
19 tested whether or not the price itself had
20 a statistically significant change.
21        And you did that based on the
22 event studies?
23    A.   Correct.
24    Q.   Okay.  The rest of your report
25 discusses what analysts were saying about

L. Allen

the company compared to what plaintiffs
allege was misstated; is that fair?
    A.  No.
    Q.  Okay.  What scientific
application did you do to determine that
there was no price impact with respect to
the misrepresentations made where the
price was maintained based on how your
counsel has described it, rather than
causing the price to go up or down?
    A.  So the analysis that I have done
in my report -- all of the analyses that I
have done in my report is regarding price
impact.  And the question that I'm
analyzing is whether the alleged
misrepresentations impacted the stock
price, whether the alleged
misrepresentations, if they had not been
made, would the stock price have been
different.  That is the question I am
analyzing.
       The analysis that I have done in
my report is a standard and replicable
analysis.  So each of the pieces that I

L. Allen

have done, another analyst can come in, or
an economist can come in, and say, Is it
the case that, for example, is this -- if
you look at what was -- what were the
analysts thinking was the probability of
the BlackBerry 10's success?  You could do
the same analysis, and you could see you
can come to a different conclusion.
       You asked me -- you showed me
some analyst reports, and you found some
sentences in analyst reports that appear
to say -- you know, that you characterized
as saying positive things and supporting
plaintiffs' claim.  A review of those
analyst reports shows, in fact, that they
don't support plaintiffs' claim.  They --
you know, as we just looked at while we
were looking at them, they're clearly
saying something that contradicts price
impact from the alleged
misrepresentations.
       So each one of the pieces of
analysis that I have done in my report is
something that someone else can do, can

L. Allen

replicated and see if they -- it's
scientific.  I have a methodology.  It's
described.
       You can do the same methodology
and see if you can come to the same
conclusions, or do you find something that
is -- come to a different conclusion.
This is the same methodology that -- or
part of it is the same as what
Dr. Feinstein described as how one would
analyze price impact.
    Q.  So let me understand.
       From based on what your report
provides, you look at the analyst reports,
and you determine where the analysts did
not support plaintiffs' allegations that
they were misrepresentations at all?
    A.  No.
    MR. BEHA II:  Objection.
Misstates her testimony.
    A.  That's not what I said, and I
wouldn't agree with that.
    Q.  Well, your report goes on and on
and on and says, Plaintiffs say this, but

L. Allen

the analysts say the opposite.
       So either, A, they didn't
believe -- they didn't believe the
company's statements, or they were
immaterial as a matter of law, or they
didn't matter.  But that's how you proved
the lack of price impact, wherein the
price did not move upon the misrep- -- the
alleged misrepresentations.
       And I just want to understand
your methodology.
       Is that your methodology?  You
go through the analysts, and you compare
what they say to what plaintiffs allege,
to show that plaintiffs' allegations are
wrong?
    A.  No.
    Q.  Okay.
    A.  I would not agree with that.
    Q.  Okay.  Let's go to June 28, not
March 28, in your report.
       Show me the analysis for the
June 28 alleged misrepresentation to show
the lack -- where you show the lack of

Page 290

L. Allen

1
2  price impact in connection with that
3  statement, irrespective of the statistical
4  significance of the price movement itself?
5      A.   So I would refer back to my
6  prior answers that my entire report
7  describes a whole process and that the
8  allegations that plaintiffs put forward
9  are -- have some relationship to each
10  other, and that what I have done
11  throughout my report is -- there are many
12  things that I have done and analyses that
13  I have done in my report that speak not
14  only to any specific date of alleged
15  misrepresentations, but speak to other
16  claims within the Complaint.
17        So plaintiffs have -- one, two,
18  three -- four alleged misrepresentations
19  and two alleged corrective disclosures.
20  So there's not a -- there's obviously some
21  overlap in terms of misrepresentations and
22  alleged corrective disclosures.
23        So I'm not sure that I can
24  separate which of the pieces of mine -- I
25  would -- I would tell you to look to my

Page 291

L. Allen

1
2  entire report. I think much of my entire
3  report speaks to an analysis of the
4  alleged misrepresentations on June 28,
5  because plaintiffs are claiming that the
6  alleged misrepresentations on June 28
7  are -- are corrected and -- at
8  September 20.
9        And they're also claiming that
10  September 20 corrects the alleged
11  misrepresentations at the beginning of the
12  class period. So plaintiffs' claim is
13  that these two -- the stock price at the
14  end of the class period is not only
15  correcting misrepresentations in June, but
16  other misrepresentations.
17        So there's a lot of
18  intermingling of plaintiffs' claims in
19  this case. So it's hard to say I think
20  that my entire report would be helpful in
21  analyzing the alleged misrepresentations
22  in June 28.
23      Q.   I understand.
24      A.   But --
25      Q.   Go ahead.

Page 292

L. Allen

1
2      A.   So I don't want to limit myself
3  to -- but some of the things that are
4  specific to the alleged misrepresentations
5  in June 28 is that the statements that
6  plaintiffs claim are misrepresentation is
7  that the BlackBerry 10 has been
8  well-received. At the time after the
9  alleged misrepresentations, the -- a
10  number of analysts, including the majority
11  of analysts, were evaluating the company
12  by the sum of the parts.
13        So they were telling us what is
14  their expectation, what is their valuation
15  of each of the pieces of the company. And
16  at that point, they had already given zero
17  value to that portion of the company. So,
18  for that statement to have price impact,
19  that "the BlackBerry 10 has been
20  well-received" after this statement that
21  supposedly is increasing the stock price
22  and giving false impression that the
23  BlackBerry 10 is doing well, the analysts
24  are giving zero value to the
25  BlackBerry 10.

Page 293

L. Allen

1
2        So that's one of the pieces of
3  objective scientific evidence and
4  something that is replicable and that
5  another analyst, another economist, can
6  look at the analyst reports and see
7  whether a lot of them are valuing the
8  company, doing some of the parts, and for
9  the analysts valuing the company, doing
10  some of the parts, is that true that they
11  have given zero value to the BlackBerry 10
12  part of the business?
13        That's one piece that shows
14  there is no price impact from the alleged
15  misrepresentation that the BlackBerry 10
16  has been well-received.
17        Another piece of objective
18  evidence that the alleged
19  misrepresentation that the BlackBerry 10
20  has been well-received had no price impact
21  when made, is that the analysts are not
22  repeating that statement. They are not
23  taking that statement from the company and
24  saying that that is impacting their
25  valuation of the company.

L. Allen

1
2       One of the criteria, one of the
3  ways that Dr. Feinstein testified to as
4  analyzing price impact is whether an
5  alleged misstatement goes into the
6  valuations of -- whether the analysts say
7  it goes into their valuations of the
8  company.  So that's another analysis
9  that's described in my report that shows
10 that there is no price impact from the --
11 the alleged misrepresentations.
12      I think there's -- I think,
13 really, my whole report would be helpful.
14 And I could go through every page and try
15 to find additional things that are in
16 here, but I think they're -- my report has
17 summarized all of the analysis that I have
18 done, and much of it, because plaintiffs'
19 allegations have -- are related, the
20 analysis speaks not only to -- whatever --
21 speaks to all of the alleged allegations
22 in the case.
23      Q.   Were all analysts analyzing
24 BlackBerry based on the sum of its parts?
25      A.   No.  I think I say how many of

L. Allen

1
2  the analysts were analyzing BlackBerry
3  based on the sum of the parts.
4      Q.   And was that before or after the
5  announcement that they had formed a
6  strategic committee to look into strategic
7  possibilities for the company, which the
8  analysts viewed as a potential merger or
9  takeover transaction?
10     A.   No, this is before that, so --
11     Q.   Did any of the analysts before
12 August 12 analyze the company as a
13 potential takeover target?
14     A.   Did they analyze it?
15     Q.   Yeah.
16     A.   Sure.  They were thinking about
17 a potential takeover target at that point
18 in time.
19     Q.   Yeah, they were doing it before
20 the class period began, didn't they?
21     A.   There was -- so the company,
22 before the class period started, some
23 period before, had mentioned they were
24 pursuing strategic alternatives or
25 something to that effect.  I don't think

L. Allen

1
2  the analysts thought it was as likely a
3  scenario as they do in August, during the
4  alleged class period, when they think
5  it's -- they -- you know, the stock price
6  goes up.  That's another alleged
7  misrepresentation.
8      But what I have found, as
9  Dr. Feinstein has found, is that the stock
10 is going up because of the announcement of
11 pursuing strategic alternatives.
12     Q.   Let me just be clear, so we can
13 tie this up.
14      Your analysis of the lack of
15 price impact, where the price did not move
16 in a statistically significant way, is
17 based on what the analysts were saying
18 that are set forth in your report?
19     A.   My analysis of price impact is
20 based on all the analysis that is
21 described in my report.  I have tried to
22 be as clear as possible, and I have tried
23 to be very specific about what is the
24 analysis and how to do it and how one can
25 replicate it.  It is cited in my report.

L. Allen

1
2  And your characterization of it, I would
3  not agree with.
4      Q.   Okay.  By the way, what -- what
5  educational background do you have to
6  interpret analyst reports?
7      What classes or specialty do you
8  have for that exercise?
9      A.   I have been at NERA for over 20
10 years.  I have read -- I can't hazard a
11 guess, but I have read many, many, many
12 analyst reports.  I have analyzed enormous
13 numbers of analyst reports.  I spend a lot
14 of my time over the last 20-plus years
15 looking at analyst reports and listing
16 how -- their relationships to stock price
17 movements.
18     I have, gosh, reviewed
19 depositions and testimony of analysts on,
20 you know, what they do and why they do it,
21 because that's been an issue in a number
22 of cases that I have worked on.
23     Q.   Is interpreting analyst reports
24 or what the intent of an analyst report a
25 subjective or objective exercise?

1              L. Allen
2        A.    I don't know about interpreting
3    analyst reports.  I think what I have done
4    is an objective analysis.  I think it's
5    objective and replicable.  I'm not talking
6    about interpretation.  I am -- I have a
7    number of analyses here that are objective
8    and rep- -- replicable.
9        Q.    You also have a number of
10   analyses which are summaries of what the
11   market believed.  I believe that's a
12   phrase that appears regularly in the
13   report.
14       A.    I have summarized it.  And then
15   I have given evidence of how I have come
16   to that conclusion, and I have given all
17   of the analyst reports that I have
18   reviewed and all of those statements over
19   to you and your experts.
20             And that is something that -- I
21   mean, so, in other cases, I have -- I have
22   copied every single statement that
23   analysts made with regard to a specific
24   issue and attached them to my report.  And
25   I have said this is -- these are -- this

1              L. Allen
2    is every single statement that is made.
3             In this case there are a handful
4    of reports, and the -- the BlackBerry 10
5    and those devices are a big part of what
6    analysts are covering, so it is voluminous
7    for the fact-finder.  But I have -- have a
8    methodology, and I've described it, and
9    your expert can go through and do exactly
10   the same things and see if he or she comes
11   to a different conclusion and show to what
12   extent those are different.
13             So it's not a -- it's not that I
14   have done something and have my
15   interpretation of it.  I have done an
16   analysis that can be checked and
17   replicated.
18       Q.    And just to end this, you -- you
19   said, in the past, you've attached every
20   statement regarding an issue that you
21   could find in every analyst report?
22       A.    I have done that --
23       Q.    Yeah.
24       A.    -- in one particular case that I
25   am just remembering that I have recently

1              L. Allen
2    done, because it was not -- wouldn't --
3    you know, didn't require stacks and stacks
4    of paper.  I think that is -- that can be
5    helpful.  I think it can be overwhelming
6    if it's -- it it's overwhelming, if it's
7    just too much.
8        Q.    And here you've selected from
9    the volume of analyst reports which
10   analyst reports you were going to cite and
11   quote?
12       A.    I didn't do a selection in terms
13   of the analysis.  I have -- for many of
14   the analyses, I have given you all of the
15   information that was in the analyst
16   reports, to the extent that I could fit it
17   on a page and do that.
18             To the extent it was quotes to
19   give, I have said what the conclusion is,
20   having reviewed all of them, and I have
21   given examples because there are too many
22   quotes to give every single quote.
23             So there are instances where I
24   have -- I have reviewed all of the
25   comments by analysts at a particular point

1              L. Allen
2    in time and have stated my conclusion
3    about that and given quotes to show how it
4    is that I have come to the conclusion that
5    I have turned over all of the analyst
6    reports.
7             And you or your expert can look
8    through them and see if that is not a
9    conclusion that one comes to from
10   reviewing that.
11       Q.    And you selected quotes from
12   the -- by the way, 444 analyst reports not
13   257.  But there were 440 analyst reports
14   during the class period on BlackBerry.
15             You selected quotes to put in
16   your report.  Every one is not there,
17   correct?
18       A.    I have not included -- so, for
19   each topic that I am discussing something.
20   So, for example, I have not done a
21   selection, but I have reported every
22   analyst that gave probabilities of the
23   failure and success for the BlackBerry 10.
24       Q.    All three?
25       A.    There were -- well, there

L. Allen

1
2  were -- there were three of them that gave
3  specific numbers and a fourth analyst that
4  gave -- gave it in words.  And then I have
5  shown, for the-- I have another analysis
6  where I have taken every single analyst
7  and shown you -- that had price targets,
8  and shown you what their price target was
9  at the beginning of the class period.
10      And then you can look at the
11 analysts that gave actual probabilities
12 and see where -- are they an unusual set
13 of analysts?  Are their price targets all
14 at one end, or are they -- and that's
15 something you can see.
16    Q.   Ms. Allen, with respect to the
17 quotes in the sections where you discuss
18 each of the misrepresentations, did you
19 select them from the universe of analyst
20 reports that you reviewed?
21    A.   There are different quotes from
22 analyst reports in here, and they're on
23 different topics.
24    Q.   Did you select --
25    A.   On some of them, they are --

L. Allen

1
2  there are some -- there are some selection
3  of quotes where I say something, and I say
4  "for example."
5     Q.   Okay.  How do you know that
6  Morrison & Foerster turned over everything
7  that you advised them or provided them
8  that you reviewed in connection with
9  preparing your report?
10    A.   Because we gave it all to them,
11 and they told me that they had given it
12 all to you.
13    Q.   Do you have any firsthand
14 knowledge that they did it?
15    A.   No.
16        MR. BROWER:  Okay.  Thank you
17 very much.  Same reservations.
18        THE VIDEOGRAPHER:  The time is
19 7:14.  This closes today's deposition,
20 September 20, 2018.
21        (Time noted:  7:14 p.m.)
22
23
24
25

L. Allen

1
2  STATE OF _____ )
3                          ) :ss
4  COUNTY OF _____)
5
6
7      I, LUCY P. ALLEN, the witness
8  herein, having read the foregoing
9  testimony of the pages of this deposition,
10 do hereby certify it to be a true and
11 correct transcript, subject to the
12 corrections, if any, shown on the attached
13 page.
14
15
16
17    _____
18      LUCY P. ALLEN
19
20
21
22
23
24
25

1
2        C E R T I F I C A T E
3  STATE OF NEW YORK   )
4                : ss.
5  COUNTY OF NEW YORK   )
6
7      I, Linda Salzman, a Notary
8  Public within and for the State of
9  New York, do hereby certify:
10     That LUCY P. ALLEN, the witness
11 whose deposition is hereinbefore set
12 forth, was duly sworn by me and that
13 such deposition is a true record of
14 the testimony given by the witness.
15     I further certify that I am not
16 related to any of the parties to
17 this action by blood or marriage,
18 and that I am in no way interested
19 in the outcome of this matter.
20     IN WITNESS WHEREOF, I have
21 hereunto set my hand this 25th day
22 of September, 2018.
23
24    _____
25        Linda Salzman

Page 306

1
2          --------------- I N D E X ---------------
3    WITNESS        EXAMINATION BY       PAGE
4    LUCY P. ALLEN   MR. BROWER         7
5
6          ---------------REQUESTS--------------
7    SEC filings                35
8    Copy of color version         148
9
10   -------------- EXHIBITS ---------------
11   EXHIBIT      FOR ID          PAGE
12   EXHIBIT 1   Five-page letter      6
13   EXHIBIT 2   Expert report of      17
14          Lucy P. Allen
15   EXHIBIT 3   Document headed Report on   26
16          Market Efficiency
17   EXHIBIT 4   Deposition of Lucy Allen   57
18   EXHIBIT 5   Document headed IntraDay   74
19          Price Analysis
20   EXHIBIT 6   Document headed Historical   88
21          BlackBerry Price Data
22   EXHIBIT 7   Document headed Blackberry  146
23          LTD Form 40-F
24   EXHIBIT 8   Document headed          157
25          Institutional Investor

Page 307

1
2         -----------EXHIBITS CONTINUED--------
3    EXHIBIT      FOR ID          PAGE
4    EXHIBIT 9   Document headed Morgan    178
5          Stanley
6    EXHIBIT 10  Document headed Canaccord  189
7          Genuity
8    EXHIBIT 11  Document headed Deutsche   195
9          Bank Markets Research
10   EXHIBIT 12  Document headed Technology, 196
11          Media & Telecom: Mobile
12          Devices
13   EXHIBIT 13  Document headed Citi      205
14          Research Equities
15   EXHIBIT 14  Document headed Daily Edge  208
16   EXHIBIT 15  SEC Form 6-K for June 2013  224
17   EXHIBIT 16  Document headed Blackberry  251
18          News Release
19   EXHIBIT 17  SEC Form 6-K for October   255
20          2013
21   EXHIBIT 18  SEC Form 6-K for December  267
22          2013
23   EXHIBIT 19  List of names          270
24
25

Page 308

1
2    ERRATA SHEET FOR THE TRANSCRIPT OF:
3    Case Name: PEARLSTEIN VS. BLACKBERRY
4    LIMITED
5    Dep. Date: September 20, 2018
6    Deponent:  LUCY P. ALLEN
7    Pg. Ln.  Now Reads  Should Read  Reason
8    _____
9    _____
10   _____
11   _____
12   _____
13   _____
14   _____
15   _____
16   _____
17
18        _____
19        Signature of Deponent
20
21   SUBSCRIBED AND SWORN BEFORE ME
22   THIS    DAY OF      , 2018.
23   _____
24   (Notary Public)  MY COMMISSION
25   EXPIRES:_____