Page 1

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF TEXAS

HOUSTON DIVISION

C.A. No. 4:21-CV-02045

----------------------------

DELAWARE COUNTY EMPLOYEES RETIREMENT

SYSTEM, Individually and On Behalf

of All Others Similarly Situated,

Plaintiffs

vs.

CABOT OIL & GAS CORPORATION, et al.

Defendants

------------------------------

DEPOSITION OF STEVEN FEINSTEIN, Ph.D., a witness called on behalf of the Defendants, taken pursuant to the provisions of the Massachusetts Rules of Civil Procedure, before Shannon Dunigan, a Certified Shorthand Reporter and Notary Public in and for the Commonwealth of Massachusetts, held via Zoom, on Friday, June 30, 2023, commencing at 10:06 a.m.



Page 2

APPEARANCES VIA ZOOM:
Robbins Geller Rudman & Dowd LLP
    Kevin Lavelle, Esq.
    655 West Broadway, Suite 1900
    San Diego, CA 92101
    Klavelle@rgrdlaw.com
    Counsel for the Plaintiffs

Kessler Topaz Meltzer Check LLP
    Jamie M. McCall, Esq.
    Alex B. Heller, Esq.
    280 King of Prussia Road
    Radnor, PA 19087
    Counsel for the Plaintiffs

Norton Rose Fulbright US LLP
    Peter A. Stokes, Esq.
    98 San Jacinto Boulevard, Suite 1100
    Austin, TX 78701
    Peter.stokes@nortonrosefulbright.com
    Counsel for the Defendant, Cabot Oil & Gas
    Corporation

Page 3

Norton Rose Fulbright US LLP
    Gerard G. Pecht, Esq.
    Kelly A. Potter, Esq.
    1301 McKinney, Suite 5100
    Houston, TX 77010
    Counsel for the Defendant, Cabot Oil & Gas
    Corporation

VIDEOGRAPHER:
Magna Legal Services
    Chris Russo

Page 4

I N D E X
Deposition of:                    Direct
Steven Feinstein, Ph.D.
By Mr. Stokes................................6

E X H I B I T S
No.                              Page
Exhibit 1  Feinstein Report..............pre-marked
Exhibit 2  Feinstein Rebuttal Report......pre-marked
Exhibit 3  Allen Report Filed.............pre-marked
Exhibit 4  First Amended Consolidated
      Complaint For Violation of the
      Federal Securities Laws........pre-marked
Exhibit 5  Form 10-K.....................pre-marked
Exhibit 6  Securities Litigation Event
      Studies in the COVID
      Volatility Regime.............pre-marked
Exhibit 7  The Fly on the Wall............pre-marked
Exhibit 8  Form 10-Q.....................pre-marked
Exhibit 9  Police Criminal Complaint......pre-marked

Exhibits retained by Attorney Stokes.

Page 5

P R O C E E D I N G S

VIDEOGRAPHER:  We are now on the record. This begins videotape number 1 in the deposition of Steven P. Feinstein in the matter of Delaware County Employees Retirement System versus Cabot Oil & Gas Corporation.  Today is Friday, June 30, 2023 and the time is now 10:06 a.m.

This deposition is being taken virtually at the request of Norton Rose Fulbright US LLP.  The videographer is Chris Russo of Magna Legal Services and the court reporter is Shannon Dunigan of Magna Legal Services.

Will counsel and all parties present state their appearances and whom they represent?

MR. LAVELLE:  Sure.  Good morning. My name is Kevin Lavelle.  I'm here from Robins Geller Rudman & Dowd on behalf of the Plaintiffs.

MR. STOKES:  Good morning.  This is Peter Stokes of Norton Rose Fulbright here on behalf of the Defendants.

VIDEOGRAPHER:  Will the court reporter please swear in the witness?



Page 6

Steven Feinstein, Ph.D., Deponent, having been satisfactorily identified by the production of his Massachusetts driver's license and having been first duly sworn by the Notary Public, deposes and says as follows:

DIRECT EXAMINATION

BY MR. STOKES:

Q. Good morning. Can you state your name, please?

A. My name is Steven Feinstein.

Q. And have you been retained as an expert on behalf of the Plaintiffs in this matter?

A. I've been retained as an expert by the Plaintiffs in this matter.

Q. You have been deposed many times before in securities class action lawsuits; is that fair to say?

A. Yes.

Q. And so you understand the basic rules of the road for giving depositions generally in federal litigation; correct?

A. Yes.

Q. I assume today -- and sometime things can

Page 7

be difficult to hear and connections can be lost. Will you agree that if you don't hear a question clearly, that you'll let me know?

A. Definitely.

Q. And conversely, if I don't hear something that you say, I will endeavor to do the same. Does that sound fair?

A. Sure.

Q. I'll also endeavor to do my best to try to not talk over you and I would ask that you try to do the same. Does that also sound fair?

A. Yes.

Q. And you understand that you're under oath today just like you would be testifying in federal court; correct?

A. Yes.

Q. Do you recognize Exhibit 1 as the expert report that you filed or prepared in support of the Plaintiffs' opening motion for class certification in this case?

A. Yes, I do.

Q. Do you recognize Exhibit 2 as a rebuttal report that you prepared in connection with a reply brief that was filed on behalf of the Plaintiffs in

Page 8

support of class certification in this case?

A. I do have some -- a couple of issues. One, the name of the file appears to be wrong. It says, "Weinstein Rebuttal" instead of "Feinstein Rebuttal." The file itself is my report, my rebuttal report.

Q. I apologize for the misspelling. But other than the misspelling of the PDF file, the contents of the report, you would agree, would be consistent with the rebuttal report that you submitted in connection with the Plaintiffs' class certification reply in this case; correct?

A. I delivered it to the Plaintiffs. I believe they used it for that purpose. But my analysis is for the benefit of the court.

Q. Have you prepared any additional expert reports in this matter other than Exhibits 1 and 2?

A. No.

Q. Just for the record, I am going to rename Exhibit 2 with the Witness's correct name spelled just to avoid any confusion over that issue. So I am uploading a renamed version of Exhibit 2.

And once you have a chance to review, can you confirm that the resubmitted and renamed

Page 9

version of Exhibit 2 is indeed the copy of the rebuttal report that you described earlier?

A. It is.

Q. And just for the record, I'll re-ask the question that I asked earlier now that we have a corrected version of Exhibit 2 in the record.

Other than Exhibits 1 and 2 in your deposition today, have you prepared any other expert reports in this matter?

A. No.

Q. Do Exhibits 1 and 2 contain all of your opinions that you have formed to date in connection with class certification in this matter?

A. Yes, I believe so. There may be additional support that I've thought of for these conclusions, but these are the conclusions as articulated in the report.

Q. And have you --

A. The conclusions articulated in the report are my conclusions as of now.

Q. Fair enough. Have you formed any opinions as to any other matters in this case other than the opinions articulated in Exhibits 1 and 2?

A. No.

MAGNA

LEGAL SERVICES

Page 10

Q. Have you done any analysis to date as to whether particular types of stock price returns after a corrective disclosure can be aggregated to one source or another with respect to the alleged misstatements in this case?

MR. LAVELLE: Object to the form.

A. It's a little hard to understand your question. I have not done a loss causation analysis as of this point in time, if that's what you're asking. I haven't sought to do an attribution analysis or disaggregate price movements and attribute them to specific causes. Except insofar as I've identified that Ms. Allen has not done that either.

BY MR. STOKES:

Q. Just for the record, you have not performed a disaggregation analysis at this stage of the game; correct?

A. That's correct.

Q. In your original report, which is the document marked as Exhibit 1, you offered opinions relating to market efficiency; correct?

A. That's right.

Q. And in that report you analyzed the camera

Page 11

factors and several other factors that courts have examined as being relevant to market efficiency; correct?

A. That's right.

Q. One of the analyses that you performed in your original report was a collective event study to assess how and whether Cabot's stock price reacts to news events; is that fair to say?

A. Yes.

Q. And in that collective event study in Exhibit 1 you compared the percentage of times that Cabot's stock price had a statistically significant reaction on high news flow days to the percentage of times Cabot's stock price had a statistically significant reaction on lower news slow days; is that a fair characterization?

A. It is. Well, defining what I used for the high news days was the company's earning announcements. And as I explained in the report, I designated all the other days as lesser news days, even though I did identify and note that some of those days that were designated as lesser news days because they were not earnings announcement days may actually have had a lot of news. But they weren't

Page 12

earnings announcements and so they were grouped in the lesser news bucket.

Q. So you anticipated my next question. You saved me some time. But just to clarify, for the high news days, as part of that analysis, you selected earnings announcements and the high news category was populated by essentially all of the quarterly news earnings announcements that Cabot had during the class period; correct?

A. That's right. Because those days are indisputably as a group recognized in the literature as being days when there's a higher news flow generally, typically. Maybe not every day. But typically an ordinary news day.

Q. And one piece of information that companies typically announce on quarterly earnings announcements is, in fact, their earnings; correct?

A. That's right.

Q. And earnings are determined prior to litigation. To the extent that there's material change in expectations with respect to earnings, that's something that could potentially have a stock price impact. Is that something that you found in prior cases?

Page 13

A. Yes.

Q. You understand what a confidence level is with respect to statistical analysis; correct?

A. Yes.

Q. You understand what a 95 percent level of confidence is, if I use that terminology?

A. I do.

Q. And, by the way, is there a preferred way that you would describe what I have just referred to as a 95 percent level of confidence?

A. Yeah. I address this in my report. 95 percent confidence means that there's no more than a 5 percent chance of -- that the movement was caused by random volatility alone.

Q. And --

A. I'm sorry. The residual movement after controlling for market and sector effects.

Q. And by residual movement, you refer to the idea that stock prices tend to bounce around each day. And even if there's no company specific news, there still may be some random fluctuation in the stock price on a day-to-day basis; is that fair to say?

A. Well, there's some debate in the literature

Page 14

about that. Stock prices move for a reason. We might not know the reason. And so if we don't know the reason, it might be attributed to what people call random volatility.

But residual return is the stock return, the observed return, the whole return minus the effect that can be attributed to the market and sector effect. So it tends to focus on the company's specific effect or what effect might be caused by a company's specific information, excluding market-wide and sector-wide information.

Q. So I will try to do my best to use the term "residual return" to describe exactly what you just described. I'm just trying to use the same terminology just because I know sometimes that we -- especially on the lawyer's end, we sometimes use less precise terms. I just want to be really clear with my terms about what I'm referring to. So that's why I ask those questions.

And you understand the difference between a 95 percent confidence level and a 90 percent confidence level; correct?

A. Yes.

Q. Or a 90 percent level and an 87 percent

Page 15

level; correct?

A. Sure.

Q. With respect to the collective event study that you performed in your original report, Exhibit 1, you chose 95 percent confidence level as the threshold for determining whether a stock price movement on a particular day -- residual return on a particular day was statistically significant; correct?

A. Yes. With a 95 percent confidence level you can be very sure that it was not random volatility that was driving the stock price movement that day, but rather company specific information.

With lower confidence levels, it might be company information. But there's a higher possibility, somewhat remote, but still higher possibility that it was random volatility driving the stock price. You haven't ruled out random volatility, but you also haven't ruled out company specific information when you're at lower levels of confidence.

Q. But for purposes of the study in Exhibit 1, the collective event study, if you had a residual return on a day that was at any number below a 95

Page 16

percent confidence level, for purposes of that study, you treated that day as not having a statistically significant residual return; correct?

A. Right. For those days I couldn't say that I had proved it was company specific information. I mean, if it was a lower confidence level and deemed not statistically significant at the 95 percent confidence level, the movement still may have been caused by company information. But I wouldn't have proved it.

Q. And you chose that 95 percent threshold that you applied in Exhibit 1 because it is accepted in the scientific community; correct?

A. No. Maybe we should read the footnote in my report. There's a lot of debate about this, a lot of discussion. And it's actually intensifying this discussion, the discussion that people need to understand what these significance levels really mean.

I'll admit, 95 is a common level, but it's not the only level that's informative of what is causing a stock price movement.

Q. You didn't just randomly choose the 95 percent level, though. You chose that specifically

Page 17

because you believe that it is an accepted threshold for determining whether a particular residual return on a particular day is statistically significant; correct?

MR. LAVELLE: Object to the form.

A. It's a common threshold for drawing the conclusion that you have proved that the stock price movement was caused by company information. It's not a common threshold for proving that company information had no effect.

BY MR. STOKES:

Q. But for purposes of Exhibit 1, you would not have chosen a confidence level to use in your analysis that you didn't believe was accepted generally in the scientific community; correct?

MR. LAVELLE: Object to the form.

A. Well, I think it's -- by accepted, I mean, it would be unsalable, I would say. No one would disagree. Very few people would disagree. Actually, some would. But very few people would disagree that you have proved the company information was driving the stock price if it was significant at the 95 percent level.

But people would generally disagree if

MAGNA
LEGAL SERVICES

Page 18

the stock price movement missed that 95 percent threshold, they would say you have not proved that company information did not move the stock price. So it kind of is a one-way rachet. The 95 level is proof that there was movement. Below the 95 percent level is not proof that there was no movement caused by company information.

BY MR. STOKES:

Q. Well, the analysis you were trying to do in Exhibit 1 with your collective event study was to show that there was a higher percentage of days with statistically significant residual returns or your high news flow population days than there were with respect to the other lower flow news days; correct?

A. Well, I mean, I was testing to see if that were the case. And, in fact, that turned out to be the case, that the higher news days had a higher frequency of statistically significant movements than the lesser news days. And on the original articles about this, I'm quite sure they say that other significance levels could be used.

I mean, what you're looking for in this test is is there a greater frequency of statistically significant movements among the news

Page 19

bucket versus the non-news bucket. I think it's the Tobac article, Tobac and Dunbar and Ferlo, they say, you know, you can use a 10 percent -- if it wasn't that article, there was another one they did write. They said you can use a 10 percent significance level as well if you want. Or as long as your consistent between the news and the non-news days, you can use that.

But, you know, there's a quote addressing what you're asking. I think I put the quote in my report. A well-respected textbook author and statistician wrote that, you know, certainly God loves the 6 percent level as much as the 5 percent level for significance, which means it's not a bright line. A lot of things have to be taken into account when you're drawing conclusions.

Q. You didn't separately test the statistical significance ratios that you were calculating in the collective event study. You didn't separately test that at 90 percent level, for example, to ascertain whether there is still a significantly greater percentage of significant residual returns for the high news flow group; correct?

MR. LAVELLE: Object to form.

Page 20

BY MR. STOKES:

Q. You only tested it at a 95 percent?

MR. LAVELLE: Object to the form. Excuse me.

A. That's correct.

BY MR. STOKES:

Q. And so if there was a large number of days, for example, at the 93 percent that had a residual return significant at a 93 percent confidence level in the low news flow days, for example, that could have changed the percentage of statistically significant days within that subgroup if you had analyzed it at a lower confidence threshold; correct?

A. Well, that is a legitimate way to run the test as long as you're consistent and apply the same significance levels to both the news group and the non-news group. So if you set out to see which group has a higher frequency of days that are significant at the 93 percent level and use 93 for both groups, that's a fair way to run the test.

Q. But you didn't run the test that way; correct?

A. No.

Page 21

Q. You didn't run it at a 90 percent or an 87 percent threshold; correct?

A. That's correct.

Q. And you hadn't tested whether had you run the tests at a 90 percent or 87 percent threshold, you would have reached the same outcome and conclusion that you would have reached having run the test at 95 percent; correct?

A. That's right. I mean, it's legitimate to choose other levels, but the important thing is to be consistent for the two groups when you're comparing the frequency levels within the two groups.

Q. As part of this analysis and in support of your report you included a table at the back of the document. And I'll direct you to page 213 of the PDF, Exhibit 1.

A. Okay.

Q. This is Exhibit 1, your opening report. And there's a series of tables that you attached to it. And the last table is a list of trading days --

A. Which exhibit?

Q. This is Exhibit 1. It starts on page 212. There is a blue number in the upper right-hand



Page 22

corner of the document that shows the page number.

A. Okay.

Q. It's Exhibit 10 of Exhibit 1 and it says, "Cabot Stock Daily Event Study Results." Let me know once you found it. It's part of Exhibit 1 at the very back.

A. It's Exhibit 10 of Exhibit 1; right?

Q. Yeah. Exhibit 1 is your entire report with all the attachments. And the last attachment I believe is Exhibit 10. And it runs from page 212 of the document to the very end.

A. Got it.

Q. Okay. I'll give you some time to find that.

A. I'm there.

Q. Okay. And this table at the end of Exhibit 1, this is a table of every trading day in the alleged class period for Cabot stock from February 22nd of 2016 until June 12th of 2020; correct?

A. That's right.

Q. And at the very far right of the table you'll periodically see a -- what looks like a little cross marking for certain of the entries. Do you know what I'm talking about?

Page 23

A. Oh, asterisks.

Q. Those are asterisks. Okay.

A. I see the markings. Usually I use asterisks. Let me check the bottom. It's like a dagger. It indicates the significance of the 95 percent confidence level. Okay.

Q. So I'll just call it a dagger because that sounds more interesting than an asterisk.

A. Okay.

Q. But you would agree that days that have a dagger next to them on the right are days that you determined to have a statistically significant residual return at a 95 percent confidence level; correct?

A. That's right. And because it's based off an empirical distribution, it means they were in the 5 most extreme tails of the histogram. 2 and a half percent highest tail and 2 and a half percent lowest tail. These are the extreme movements within the entire period. Once normalized by the estimated volatility.

Q. Would you expect -- so is it the case that only 5 percent of the total number of days would produce a statistically significant residual return

Page 24

at 95 percent confidence level?

A. Well, with an empirical distribution, that's tautological. As I just mentioned, it's -- with an empirical distribution, you're talking about the returns, the residual returns once normalized by estimated volatility that land among the 5 percent most extreme movements.

Q. So am I --

A. 5 percent can reside in the 5 percent tail. That's the point. Only 5 percent of the observations can reside in the 5 percent tail.

Q. Again, that just clears up what I was trying to ask. I just wanted to make sure that, you know, by design only 5 percent of the trading days reflected at the end of Exhibit 1 in this table would have a -- would be marked as having a statistically significant residual return at a 95 percent confidence level; is that fair?

A. That's right.

Q. Okay. And you found in paragraph 148 of your opening report, of the 17 earnings announcements, five of them had a statistically significant residual return at a 95 percent confidence level; correct?

Page 25

A. Well, that's first mentioned in paragraph 145. But, yeah, it's in 148 as well.

Q. So the majority of earnings announcements during the class period did not produce a residual return at the 95 percent confidence level in the analysis you did in Exhibit 1; correct?

A. That's true. And there's good reasons for that. Especially for a natural gas company. But I got to tell you, what the analysis shows is that five of 17 could not reasonably have happened if this stock was not reacting to information. I mean, that's just way too high a percentage of the 17 if there really was no effect going on.

Q. Would you agree that whether the stock price moves or has a statistically significant residual return after an earnings report does not by itself tell you whether any particular piece of news disclosed in that report itself has price impact; correct?

MR. LAVELLE: Object to the form.

A. I do agree with that. You can't -- unless you do an attribution analysis, you will not have been able to attribute the movement to specific pieces of information. You can't rule them out.



Page 26

But you couldn't rule them in either.

BY MR. STOKES:

Q. And so you had to do some additional analysis to ascertain whether a specific piece of news within an earnings announcement itself had price impact; correct?

A. Yes. Or no price impact. I mean, if you want to -- if your conclusion is no price impact, you'd have to do additional analysis as well regardless whether the movement was significant or nonsignificant in total.

Q. And so just to provide a crude analysis of this, the CEO says during an earnings call that they're wearing a blue shirt today before they announce the earnings and revenue results for the quarter and the stock price falls, you can't simply infer from the stock price decline that it had anything to do with the color of the CEO's shirt as opposed to financial information or other information that was disclosed; correct?

A. Well, I mean, you immediately impress -- subconsciously or unconsciously assess whether that piece of information is in the literature as being material or immaterial. But that is the additional

Page 27

analysis. You'd have to assess based on the literature and financial principals whether that information could possibly be valuation relevant.

But if you don't even do that, if you don't do any analysis whatsoever, then you are right, you can't either rule in or rule out any particular piece of information.

Q. And so in assessing whether a particular piece of information is likely to have had a price impact, I think you mentioned looking at valuation literature and other literature, would analyst reports be another place where you would look for guidance as to whether a particular piece of information is value relevant?

A. I was thinking I do want to add something to my prior answer. I mean, the history of the company as well is important information to consider when you're doing the analysis. If in a prior conference call the CEO says when I'm wearing a blue shirt, it means we had a good quarter and when I'm wearing a red shirt, it means we had a bad quarter.

Well, if you hadn't read that earlier conference call transcript and not heard the CEO say that, you might not know what the relevance of what

Page 28

that red and blue shirt are. But if you did know the history of the company statement, you would know that a blue shirt is highly relevant and material. So that's why you can't rule information out or in without doing additional analysis.

Now, when it comes to analyst reports, generally, typically analysts do their job and what they say is helpful in establishing what's important information and what's not important information. But there's also research done on how analysts do their job and how they're in a predicament when there's bad news to report.

On the one hand, they have an obligation to inform their investors about the bad news. On the other hand, they have a need and an obligation to maintain good relations with the company that's providing that news. So usually they're very delicate. It's a very delicate situation when they've got embarrassing news to report.

So I would say if the analysts do mention a piece of news, that's a good indicator -- that's a good indicator that the news is important. If they don't, you've got more work to do to determine whether the news is material or not.

Page 29

Q. If not a single analyst references a piece of news a company that is well-covered by a large number of analysts, wouldn't you agree that that would be against an inference that the piece of news at issue was value relevant?

MR. LAVELLE: Object to the form.

A. Well, A, are we talking hypothetically here or are we talking about what happened in the history of this company? I pointed out how things that she said no analyst mentioned, at least one analyst did. But if we're talking hypothetically, it could weigh against a finding of materiality. But that's not deterministic. It's not -- yeah. But it might not.

BY MR. STOKES:

Q. And you understand -- by the way --

A. Especially if it's bad or embarrassing news. I'm sorry to cut you off while you were talking.

Q. You used the phrase analysts I think generally do their job. If I misheard that, I apologize. But that's what I recall hearing you say. Would you agree that providing and identifying and assessing value relevant information and explaining to the market how that may effect the

MAGNA
LEGAL SERVICES

Page 30

value of the company going forward, that that is part of an analyst's job?

MR. LAVELLE: Object to the form.

A. Yes. But there's quite a -- there's a deep literature now on the conflicts of interest and rules and regulations and disclosures to address the well-known conflict of interest. Certainly they should be telling their investors what's going on at that particular company. On the other hand, they want to maintain good relations with the executives of that company.

And even though there's supposed to be a firewall between investment banking and sell-side analysis, it's still a well-known fact that investment banks that want the business of companies going forward have at least an incentive to gloss over the most negative or embarrassing news, and you might not find it in analysts' reports for that reason.

BY MR. STOKES:

Q. Have you performed any testing or analysis to ascertain whether any of the analysts covering Cabot had conflicts of interests themselves?

A. They disclosed them. I don't recall

Page 31

looking specifically at the disclaimers of the analyst reports here. But almost every analyst report for other cases I've looked at, when the company that the analyst works for also does investment banking, there's the disclaimer that says so and says take into account there may be a conflict of interest essentially.

Q. Have you --

A. I mean, out of 40 analysts, I'm quite sure you'll find that disclaimer here in this case.

Q. Have you done any analysis or examined any evidence specific to this case about whether internal separations at the analyst firms between the investment banking side and the equity research analyst report side were actually breached or not observed with respect to the analyst reports in this case?

A. No, not with respect to this case in particular. But I'm well aware of the literature that analyzes this issue generally.

Q. Have you performed any analyses yourself that have contributed to that literature?

A. Yes. I did a study on analyst reports and something called tipping. I didn't come prepared

Page 32

today to talk about it, but I've looked into this issue. And of course for that research reviewed the literature on analyst report and analyst incentives and motivations and biases.

Q. And do you recall the title of that publication that that report was published in?

A. It was a working paper that was picked up by the New York Times. It's in my CV. I think I have it here. We're looking at Exhibit 1. Let's find my CV. Yeah. Okay. Page 67 of my report, it's the first entry under Papers and Publications. Lehman Equity Research Tipping Evidence in the Stock Price Data cited in the New York Times May 19, 2012 and available on the New York Times website.

Q. Thanks for that clarification. If you could turn to Exhibit 5. I'm going to go out of order here. Exhibit 5 is a copy of a Form 10-K that Cabot filed on February 22, 2016. Let me know when you've had a chance -- I'm going to ask you about page 56 of the PDF.

A. I'm well aware of the document. I read it when I wrote my report and reviewed it for the deposition. So we want to go to page 55? Is that it?

Page 33

Q. It's page 56 of the PDF. This is not the internal page 56, but rather the page 56 of the 171 page PDF. There's an item 3, legal proceedings disclosure.

A. I'm there. Okay.

Q. And do you see the paragraph immediately under the subheading Environmental Matters?

A. I do.

Q. Okay. It states, "On November 12, 2015 we received a proposed consent order and agreement from the Pennsylvania Department of Environmental Protection (PA DEP) relating to gas migration allegations in the area surrounding several wells owned and operated by us in Susquehanna County, Pennsylvania.

The allegations relating to these wells were initially raised by residents in the area in August 2011. We received a notice of violation from the PA DEP in September 2011 for failure to prevent the migration of gas into fresh groundwater sources in the area surrounding these wells. Since then, we have been engaged with the PA DEP in investigating the incident and have formed appropriate remediation efforts, including the provision of alternative

MAGNA
LEGAL SERVICES

Page 34

sources of drinking water to affected residents.

We believe the source of methane has been remediated and are working with the PA DEP to reach an agreement on the disposition of this matter. The proposed consent order and agreement is the culmination of this effort and, if finalized, would result in the payment of a civil monetary penalty in an amount likely to exceed $100,000, up to approximately $300,000. We will continue to work with the PA DEP to finalize the consent order and agreement and bring this matter to a close."

Did I read that correctly?

A. You did.

Q. And do you recognize that as one of the alleged misstatements that is still at issue in this case?

A. Yes.

Q. And are you familiar generally with the fact that the court issued a ruling on a motion to dismiss which the judge dismissed certain claims and allowed certain other claims to proceed?

A. Yes.

Q. And while I refer to the remaining alleged misstatements or the remaining claims, are you

Page 35

familiar with the disclosures that comprise those remaining claims?

A. You mean the disclosures that corrected them?

Q. No. The actual alleged misstatements themselves.

A. I am.

Q. And do you understand that similar disclosures to the disclosure that I just read were contained in other Form 10-Q and 10-K statements during 2016; is that fair to say?

A. That's my understanding, yes.

Q. Are you aware of any analyst report that mentioned or discussed the notices of violation and proposed consent order that are referenced in this disclosure?

A. This particular one or any?

Q. I'll represent to you -- I think you just testified that this is a nearly identical or very similar disclosure to this was contained in other Cabot Form 10-Q filings during 2016.

A. As I sit here now, I can't tell you what's in all the analyst reports. I did consider Ms. Allen's analysis and I responded to it. I think

Page 36

that -- I think she was wrong when she said that no analyst addressed these issues. And I gave some examples where they did in my rebuttal report.

But even if she were right, I mean, it's a misrepresentation that essentially -- I mean, it's alleged misrepresentation that says that this is a nonissue, that the matter is remediated and resolved and won't amount to much. Which would make it less interesting and less necessary for analysts to feel they have to report on it.

So, I mean, I didn't think that was very compelling analysis of hers to say that when the company essentially minimizes or makes light of an issue, that at that time it won't be reported on by analysts as being a major issue.

Q. So I'll object to that as nonresponsive. I didn't ask about Ms. Allen's analysis. I simply asked were you aware of any analyst reports that discussed or referenced this specific disclosure?

A. That's why I'm having a little trouble with your question. Well, let's be more specific, then. Let me go to my report. And it's the KeyBanc analyst as well as a few others.

I mean, when you say this report, I

Page 37

mean, if someone comments on the criminal charges that were maybe known at the end of the case and the criminal charges relate back to the issue in general, well, then in some sense they're relating to this report, this disclosure. So I can't say no, no analyst reacted in any way to these statements. There is a link. Let me --

Q. Did any analyst actually recite the content in any way of this disclosure?

A. Okay. I don't recall. It doesn't mean it's not there. But I don't recall an analyst who specifically cited to that paragraph in their report.

Q. Do you recall or did you know any analysts covering Cabot made any reference to the fact that a civil monetary penalty in an amount likely to exceed a hundred thousand dollars up to approximately $300,000 would be assessed against Cabot in connection with the proposed consent order described in this disclosure?

A. I don't recall reading a statement like that in an analyst report.

Q. Do you recall any analyst concluding that this disclosure about this notice of violation from

Page 38

September 2011, that that particular notice would have a -- would be expected to have a material impact on Cabot stock price?

MR. LAVELLE:  Object to the form.

A.  Well, when you say impact, do you mean, like, an observable impact or maintenance impact or any kind of impact?

BY MR. STOKES:

Q.  Any kind of impact.

A.  No.  I don't recall an analyst report that said that statement at that time would have a positive impact.  I mean, they wouldn't know yet what was concealed.

Q.  I'm not just asking positive or negative.  Not positive -- just positive.  Sorry.  I'm not asking just about positive impact.  I'm asking about any impact.

Did any analyst, to your knowledge, treat the fact that Cabot had received a notice of violation in September 2011 and a proposed consent order with a penalty of up to approximately $300,000?  Are you aware of any analyst report that concluded that this NOV and this consent order and this potential penalty was likely to have a material

Page 39

impact on Cabot stock price?

MR. LAVELLE:  Object to the form.

A.  I'm not aware of that.

BY MR. STOKES:

Q.  Do you conduct any analysis to assess whether this February 22, 2016 Form 10-K as a whole had an impact on -- strike that.

Did you assess whether there was a statistically significant residual return after filing of this February 22, 2016 Form 10-K?

A.  Well, I did test every day in the class period for statistical significance, but -- oh, in fact, yes.  That's the first day of the class period and that also was an earnings announcement.  So the answer is yes, I did.  Because that would have been included in the collective event study for market efficiency.

Q.  And just looking at the first line of the table at the end of Exhibit 1.  And I know it's confusing that it's Exhibit 10 to Exhibit 1, but it's the first line of your analysis in Exhibit 10 of Exhibit 1.  You concluded that the February 22 -- strike that.

Again, neither February 22nd or February

Page 40

23rd of 2016 is reflected in your analysis as having produced a statistically significant residual return at a 95 percent confidence level; is that correct?

A.  That's correct.

Q.  Okay.  And if you could take a look at Exhibit 3.  And I'll represent Exhibit 3 is a copy of the Allen report that was filed with the Defendant's own brief on class certification.  Let me know once you've confirmed that I've accurately described Exhibit 3.

A.  Yes.  The January 20, 2023 report.

Q.  If you could please turn to paragraph 48 on page 31 of the PDF of Exhibit 3.

MR. LAVELLE:  Which paragraph was it?

MR. STOKES:  This is paragraph 48.

A.  I'm there.

BY MR. STOKES:

Q.  Do you see where Ms. Allen concludes there was no specific -- sorry.  Do you see in the first sentence of paragraph 48 where Ms. Allen concludes that when she observes that there were no significant stock pricing increases on any of the nine days that the alleged misstatements were made, according to your event study?  And that according

Page 41

to her event study, there was no statistically significant positive stock price reaction on eight of the nine days on which the alleged misstatements were made.  Do you see where I'm reading that?

A.  I do.

Q.  And do you contest those conclusions?

A.  No.

Q.  Then she goes on to say the one day under her analysis that had a statistically significant increase was February 22, 2016.  But then she concluded that the entire stock price increase that day had already happened before the Form 10-K itself was released.  Do you see that?

A.  I see that she wrote that, yes.

Q.  And you haven't done any of your own testing or analysis to ascertain or -- strike that.

Again sitting here today, you're not contesting her finding that the entire stock price increase happened before the Form 10-K was released that day; correct?

A.  I'm not.  But neither am I agreeing with it.  I mean, it's irrelevant.  I mean, I found that to be a misguided analysis and an essentially irrelevant observation, given that Plaintiffs are

MAGNA
LEGAL SERVICES

Page 42

alleging essentially that there were omissions and the company was misinforming the market that this was not news. I mean, if you say something's not news, you wouldn't expect a significant reaction to it.

Q. So you wouldn't expect to see a significant reaction to a $300,000 potential penalty as was announced in that Form 10-K; correct?

A. Well, no. If they had said something different, you'd probably see a significant reaction. But the statement that they did make reasonably would not cause a significant reaction.

If they had said that, you know, this is an existential threat to our business model or this is going to keep us from drilling where it's most efficient for us to drill and extract natural gas or that this could result in criminal charges, I mean, those things probably would have had a significant -- would have elicited a significant reaction.

But saying that the matter is essentially resolved and remediated and is a nonissue, reasonably would not have a significant impact -- wouldn't noticeably, significantly move the stock price, but could have an impact by

Page 43

maintaining the stock price where it was.

Q. I'm going to load another exhibit up. I'm going to -- if it's okay with you, I'm going to ask a few similar questions about it and then I'm happy to take a break roughly every hour or so. But I'll leave it to the witness and everybody else -- the reporter and everybody else on the call to decide whether that's fair or not.

MR. LAVELLE: It's okay with me.

MR. STOKES: Okay.

BY MR. STOKES:

Q. I have uploaded Exhibit 8 into the chat. I will represent that Exhibit 8 is a copy of a July 26, 2019 Form 10-Q that was filed by Cabot with the SEC. Let me know once you've had a chance to look at Exhibit 8 and confirm that it is, in fact, July 26, 2019 Form 10-Q.

A. Yes. 10-Q for the period ended June 30, 2019. I almost wish that they would put the date more prominently on these things.

Q. You and me both. Agree. My question is going to be similar to the questions I had about the 10-K disclosure. And I'm going to direct you to page 49 of the PDF. Let me know once you've made it

Page 44

there.

A. Okay. I'm there.

Q. Do you see that there is a paragraph under the subheading Environmental Matters at the bottom of the page?

A. Yes.

Q. And do you see how it says -- I'm just going to read this for the record. "On June 17, 2019 we received two proposed consent order and agreements (CO&A) from the Pennsylvania Department of Environmental Protection (PA DEP) relating to gas migration allegations in areas surrounding several wells owned and operated by us in Susquehanna County, Pennsylvania.

The allegations relating to these wells were initially raised by residents in the area in March and June of 2017, respectively, in the form of complaints about their drinking water supply. Since then, we have been engaged with the PA DEP and investigating the incidents and have performed appropriate remediation efforts, including the provision of alternative sources of drinking water to the effected residents.

We received notices of violation (NOV)

Page 45

from the PA DEP in June and November of 2017, respectively, for failure to prevent the migration of gas into fresh groundwater sources in the area surrounding these wells.

With regard to the June 27 NOV, we believe these water quality complaints have been resolved and we are working with the PA DEP to reach agreement on the disposition that this matter. The proposed CO&A is the culmination of this effort and, if finalized, would result in the payment of a civil monetary penalty in an amount likely to exceed a hundred thousand dollars, up to approximately $215,000. We will continue to work with the PA DEP to finalize the CO&A and to bring this matter to a close.

With regard to the November 2017 NOV, the proposed CO&A, if finalized and drafted, would require Cabot to submit a detailed written remediation plan, continue water sampling and other investigative matters and restore or replace affected water supplies and would result in the payment of a civil monetary payment penalty in an amount likely to exceed a hundred thousand dollars, up to approximately $355,000. We will continue to

Page 46

work with the PA DEP to finalize the CO&A and to complete the ongoing investigation and remediation."

Did I read that correctly?

A. You got one word wrong, but essentially correct.

Q. What word did I get wrong?

A. Third line from the bottom you said, "investigative matters" instead of "investigative measures."

Q. Fair enough. I stand corrected. It does say, "investigative measures." Otherwise, though, I read that correctly?

A. Right.

Q. And similar to the disclosure we examined in the Form 10-K in 2016, you understand that this particular disclosure is one of the remaining alleged misstatements that's still at issue in this case; correct?

A. Yes. Yes.

Q. And similar to my question about the prior disclosure, you are unaware of any analyst report that discussed either the NOV's or the C -- the consent orders referenced in this disclosure or the proposed penalty amounts; correct?

Page 47

MR. LAVELLE: Object to form.

A. It's hard for me to answer that question. Well, let me tell you why it's hard. We know that the KeyBanc analyst and some other authors did say that the criminal charges, when they were ultimately brought, would have a negative impact on the stock price. And there is a link between those criminal charges and this alleged misrepresentation here.

So I can't really say that, you know, no analyst addressed this in any way because there's the link as I described it. But I will say that, I mean, I don't recall an analyst specifically citing this paragraph and providing commentary about this paragraph on his or her report.

BY MR. STOKES:

Q. You don't recall any analyst specifically citing the proposed penalty amounts in this paragraph as being significant or material to Cabot's stock price; correct?

MR. LAVELLE: Object to the form.

A. Right. No one wrote exactly that. I'll leave it at that, no one wrote exactly that.

BY MR. STOKES:

Q. In fact, you can't identify any analyst

Page 48

report that even mentioned the proposed penalty amounts associated with these NOV's and consent orders; correct?

A. I mean, again, with the same caveat that I said before that when they did comment, it was from the perspective of now having heard -- received corrective -- you know, the final corrective disclosure. And so they commented on that, which Plaintiffs are alleging relates back to these misrepresentations. So I can't say they didn't in any way address these. I mean, there is that linkage.

But to interpret your question a different way, I don't -- no one said specifically or wrote in the report that these dollar amounts were what made the matter significant. These dollar penalty amounts is what made the matter, you know, economically material to the company. You know, the allegation is that it's the change -- it's the behavior impact on the company of these matters that analysts commented was economically material.

Q. Prior to the June 15, 2020 release of the attorney general report and the charges that you described, to your knowledge, no analyst ever stated

Page 49

in a report that they believed that any of the penalties previously assessed or previously disclosed with respect to the NOV's referenced in this July 26, 2019 disclosure or in the prior disclosure that we examined earlier from February of 2016, no analyst ever stated that they believed that those NOV's and those penalties were likely to have a material impact on Cabot's stock price; correct?

MR. LAVELLE: Object to the form.

A. Well, it may be against my better judgment, I think I might answer the question yes, you are correct. But, you know, I have to add that that's what this case is about. I mean, Plaintiffs are alleging that those analysts and the investors were misled into believing this was a nonissue, that this was an immaterial issue.

And so if Plaintiffs' allegations are correct, any analyst who would be writing that it was a material issue before corrective disclosures would be disagreeing with the company's alleged misrepresentations. So, yeah, I think the facts are that for -- either for the reasons Plaintiff laid out or for maybe other reasons, analysts did not write in the report that these issues purported by

MAGNA
LEGAL SERVICES

Page 50

the company to be resolved and remediated were economically material problems the company was having. Plaintiffs are alleging that that's the misrepresentation.

BY MR. STOKES:

Q. Is it your testimony that this disclosure from the July 26, 2019 Form 10-Q, that the substance of this disclosure was to convey that the NOV's described in this paragraph were a nonissue at this stage?

MR. LAVELLE: Object to the form.

A. Well, I don't have an opinion or a conclusion as to the merits of the case, obviously, at this point. Especially legal issues. But as an economist and as a finance professor, you know, and as someone who can read the plain English, this paragraph says that these issues are essentially resolved. I mean, it says that in plain English. It says, "We believe these water quality complaints have been resolved."

And then they give dollar amounts which are small dollar amounts compared to the market cap of this company. You know, it says, "We will continue to work with the Pennsylvania Department of

Page 51

Environmental Protection to finalize the CO&A and to bring this matter to a close." So, I mean, I understand that Plaintiffs are alleging that those are the misrepresentations inherent in here. They convey what Plaintiffs are saying was misinformation, that these are non -- this is not a problem anymore, that these issues have been resolved and remediated.

I mean, I'm not saying it. I'm telling you that that's my understanding of what Plaintiffs are alleging. But it's consistent with the plain reading of the plain language of the statement.

MR. STOKES: We've been going just over an hour. I'm happy to take a break, if you are. Or I can keep going.

THE WITNESS: Let's take a break.

MR. STOKES: You want to do five minutes?

THE WITNESS: Sure.

VIDEOGRAPHER: We're going off the record at 11:16 a.m.

(A brief recess was taken.)

VIDEOGRAPHER: We're on the record at 11:27.

Page 52

BY MR. STOKES:

Q. Before the break we were discussing the role of analysts. Do you recall that?

A. Yes.

Q. And in paragraph 59 of your opening report, Exhibit 1, you addressed the role that analysts play. Do you recall providing commentary about that issue in your report?

A. Of course.

Q. In paragraph 59 you wrote, "Securities analysts interpret and disseminate information about the companies they cover. They conduct research and provide valuation opinions, helping market participants acquire relevant information and understand the implications of that information or valuation and investment decisions. Consequently, securities analysts facilitate the flow of information and the digestion of information within the marketplace."

Did I accurately reflect your statements in paragraph 59?

A. Yes.

Q. And you agree with those statements today?

A. Yes. You have to take into account they're

Page 53

human beings and they're subject to conflicts of interest and biases and competing -- I mean, not conflict of interests, but competing incentives. But, yeah, this is what they generally do.

Q. Do you agree that if you have a larger set of analysts versus a smaller set of analysts, the fact that a piece of information is not addressed in any of the analyst reports in the larger set may be more indicative of a consensus among the analysts that the piece of information at issue is not valued relevant?

MR. LAVELLE: Object to the form.

A. I think it depends on the nature of the information and what it is that they -- yeah, it depends on the nature of the information. Whether the information is presented as something that is emphasized by the company as being important information or de-emphasized as being less important information.

BY MR. STOKES:

Q. Is it your opinion that an analyst report -- I'm sorry. Strike that.

Is it your opinion that an analyst would be potentially dissuaded by conflicts of interest to

MAGNA

LEGAL SERVICES

Page 54

report about a notice of violation that the company itself had publicly disclosed?

A. Yes, for a number of reasons. I mean, if the company said it was non-important because it was a matter that was resolved or remediated, that's one reason. I mean, or, you know, if it's embarrassing news to the company, you know, analysts don't want to be put in the end of the line when it comes to having opportunities to ask questions. And that's what could happen to an analyst that they get a reputation for being very critical of the company in the analyst reports that they --

Q. Analysts could also lose credibility by not covering information that actually is valuable and important and has a negative impact on the stock price; correct?

A. That's true. So there's a balance they seek to strike.

Q. Would you also agree with the general proposition that holding everything else equal, the larger the number of analysts who reach the same determination in their reports about whether a piece of information is value relevant, the more likely it is that that conclusion is a product of a

Page 55

defensible, independent analysis as opposed to an individual analyst's own conflict of interest?

MR. LAVELLE: Objection.

A. I think there is research on that question. It seems plausible on the surface what you're saying. But there is some research that says there's a certain amount of clustering among analysts that they don't write in a vacuum and they look to each other to determine what to emphasize and what to de-emphasize.

BY MR. STOKES:

Q. Have you done any --

A. They're not entirely independent one from the other. Which would mean that a larger number might not necessarily lead to more breakthrough reporting.

Q. What specific evidence have you seen in your analysis in this case that the specific analyst reports for Cabot were affected either by conflicts of interests or by clustering, as you describe?

A. I didn't do that analysis for this particular case. But I think the conclusion I drew about this issue is that there's good reason why there wasn't a lot of -- or there wasn't analyst

Page 56

coverage of the alleged misrepresentations. There's good reason for that given that the nature of the alleged misrepresentations and omissions was at the issue was a nonissue. So, I mean, it didn't make sense to do deeper analysis than that.

Q. If you can turn to paragraph 51 of Exhibit 2. This is your rebuttal report.

A. I'm there.

MR. LAVELLE: Paragraph 52, Peter? Is that right?

MR. STOKES: I'm sorry. It's paragraph 51 of Exhibit 2.

BY MR. STOKES:

Q. Let me know once you've gotten there.

A. I'm there.

Q. And do you see where you write, "Ms. Allen and I agree that the company's lower production and CapEx guidance caused the statistically significant decline in Cabot's stock on July 26, 2019"?

Did I read that correctly?

A. You did. I bet you were surprised that we agree on anything.

Q. I'll take it where we can get it. But I take it you still hold that opinion today; correct?

Page 57

A. Yeah. But, you know, preparing for today I wanted to make sure -- nowhere did I say that the follow-on disclosure that day had no impact whatsoever. The follow-on disclosure that day was the paragraph that we read just before the break and it provided information on the market that there were new NOV's and that there were other problems that had to -- that needed to have been remediated and addressed.

And that was new information which Plaintiffs are alleging caused a further decline. Now, a further decline by itself was not statistically significant, but there was a further decline.

Q. You didn't do any testing or analysis to ascertain whether that further decline that you referenced actually resulted from the disclosure in the July 26, 2019 10-Q specifically about the notices of violation; correct?

A. Correct. The scope of my analysis was to determine whether Ms. Allen did. I mean, her conclusion was that it caused -- that nothing related to this case -- nothing related to the allegations of this case had any price impact. But

MAGNA
LEGAL SERVICES

Page 58

she did not do the analysis to see whether that further decline was or was not caused by the second disclosure that day.

So, you know, my conclusion from that is it's an unreliable, unsupported opinion because of incomplete analysis.

Q. Again, I'll move to strike that as nonresponsive. I did not ask about Ms. Allen's opinion. I simply asked about the analysis that you had done.

And, again, you, yourself, did not do any analysis to determine whether the specific disclosure that we reviewed on July 26, 2019 in the Form 10-Q about the additional notices of violation itself contributed to any decline in the stock price that may have occurred that day?

MR. LAVELLE: Object to the form.

A. That's not entirely accurate. I did look to see if there was either a decline or a rise from the opening price that would have included a reaction to the opening -- to the premarket disclosure to the closing price. And I saw that there was a further decline that day. So there was a decline.

Page 59

You're going to say it's nonresponsive. But, I mean, you asked about the analysis I did. I observed to see if there was a decline that Ms. Allen didn't attribute -- didn't consider be attributed to the allegation.

BY MR. STOKES:

Q. And I'm just asking to the extent that there was any further decline after the Form 10-Q was released on July 26, 2019, you did not do any analysis to ascertain whether that further decline actually resulted from the specific disclosure about the NOV's that we read before the break as opposed to potentially other pieces of 10-Q that we haven't examined?

A. Well, I didn't prove -- I didn't do a loss causation analysis and I didn't do a comprehensive attribution analysis. I didn't prove what did or didn't cause that price decline. But it was important to observe that no one else did either, which leads all possible explanations as possible.

Q. If we can go back to Exhibit 8. And we were looking at page 49 earlier of the PDF. I'm going to ask you to look at page 50 of the PDF. Let me know when you are there. I'm going to ask about

Page 60

the disclosure that says, "From time to time."

A. Okay.

Q. Do you see where Cabot disclosed on page 50 of the PDF for the July 26, 2019 Form 10-Q that "From time to time we received notices of violation from governmental and regulatory authorities in areas in which we operate relating to alleged violations of environmental statutes or the rules and regulations promulgated thereunder.

While we cannot predict with certainty whether these notices of violation will result in fines and/or penalties, if fines and/or penalties are imposed, they may result in monetary sanctions, individually or in the aggregate, in excess of a hundred thousand dollars."

Did I read that correctly?

A. You did.

Q. And is it your understanding that Cabot made an identical disclosure to this in every Form 10-Q and 10-K that was filed during the class period?

A. Well, I saw many. I can't attest to whether it was all of them, but I saw frequent appearance of this disclosure.

Page 61

Q. And I'll just show you for the record that in the 10-K we examined earlier from February 22, 2016, if you can look at page 56 of the PDF, I'll represent to you that the same disclosure is at the bottom of that page as well. Let me know once you've confirmed that.

A. It's confirmed.

Q. Would you agree that a reasonable investor reading this disclosure would have an expectation that Cabot would periodically receive notices of violation relating to environmental issues that could resolve in monetary sanctions above a hundred thousand dollars?

MR. LAVELLE: Object to the form. Calls for a legal conclusion.

A. The way you stated it, yes. But not necessarily. I mean, this would not inform a reasonable investor that the company was having much more pervasive and serious problems with methane infiltration into groundwater than it previously disclosed. I mean, these violations could be about anything.

BY MR. STOKES:

Q. Would you agree -- go ahead.

MAGNA
LEGAL SERVICES

Page 62

A.  Again, it's -- well, this does not disclose what the Plaintiffs are alleging was concealed, which is that the company was having much more pervasive, widespread, serious problems with the methane infiltration into groundwater than the market was led to believe.

Q.  Would you agree that -- notwithstanding -- I'm not asking at this stage about the subsequent disclosures about the Pennsylvania AG, like this disclosure in the February 22, 2016 Form 10-K about the September 2011 notice of violation and the proposed consent order associated with that violation.  Do you recall that disclosure that we looked at earlier about that issue immediately above the "from time to time" disclosure?

A.  I kind of lost you.

Q.  I'm sorry.  I'll just ask the fact that Cabot received a notice of violation in September 2011 and a proposed consent order relating to that violation that would result in a payment of a penalty up to approximately $300,000, would you agree that that occurrence is consistent with the disclosure in the next paragraph that "From time to time we receive notices of violations from

Page 63

governmental and regulatory authorities"?

MR. LAVELLE:  Object to the form.

A.  No.  I mean, I don't know what you mean by consistent.  I mean, there's certainly more substance to this specific disclosure that, you know, four years -- the dates are side by side.  You know, this problem that was described earlier and purports to have been remediated appropriately earlier is popping up again, is new news in 2019.

So, I mean, that's not the same as saying from time to time we receive -- you know, a specific -- a description of a specific violation and -- yeah, of a specific violation is different than saying from time to time we may receive notices of violation.

BY MR. STOKES:

Q.  Again, I'm not asking about whether some later disclosure in 2019 or 2020 is consistent with the "from time to time" disclosure.  I'm simply asking looking at Exhibit 5, the disclosure about the September 2011 NOV and the next paragraph about receiving notices of violation from time to time, the fact that Cabot received a notice of violation in September of 2011 and later received a proposed

Page 64

consent order relating to that specific NOV as disclosed in this paragraph, that, that particular NOV and consent order, the fact that Cabot received it is not inconsistent with the disclosure in the subsequent sentence that "From time to time we receive notices of violation"?

MR. LAVELLE:  Object to the form.

BY MR. STOKES:

Q.  Right?

A.  I think so.  I'm having a little trouble understanding.  I mean, yeah, it doesn't say we don't receive violations.  I mean, that would be inconsistent two paragraphs.  So it says, you know, we received a consent order.  There was a notice of violation.  We believe the source of methane has been remediated.  It's all in the first paragraph.  I'm looking at the February 22, 2016 paragraph.

And then to later say from time to time this happens, the second paragraph -- if anything, what the second paragraph does is tell you that -- it kind of downplays it.  I mean, this is something that happens.  You know, we receive these challenges and we knock down the pins when, you know, we have to is basically what it says.

Page 65

This happens from time to time and we took care of it like we always do is what the February 2016 two paragraphs essentially say.  But, you know, that's what Plaintiffs are saying was false.

Q.  Nothing in the second paragraph that says, "From time to time we receive notices," nothing in that second paragraph says anything about Cabot fixing violations as they occur; correct?

A.  Well, the first paragraph says they did.

Q.  I'm asking about the second paragraph.  Nothing about the second paragraph promises that Cabot actually fixes or remediates specific violations; correct?

A.  Maybe you need to talk to a semantics expert here.  As an economist or as, you know, professor who teaches financial analysts and equity analysis, the way I read the second paragraph is it tells you -- it essentially downplays the events of the first paragraph.  This is something that happens from time to time and, when it does, we take care of it.  That's what it says.

Q.  Where does it say we take care of it in the second paragraph?



Page 66

A. Well, it doesn't say we don't take care of it. It doesn't say it's a pervasive problem that's, you know, keeping us from drilling and extracting gas or that we would -- you know, we expect criminal charges. I mean, it says what it says. I mean, we both read it a few times now.

"From time to time we receive notices. While we cannot predict with certainty whether these notices of violation will result in fines," I mean, they give a number. They say they may result -- you know, they give a number of a hundred thousand. They say it may be bigger than a hundred thousand, but they don't say it's substantially bigger than a hundred thousand.

I think I've answered your questions. I'm struggling a little bit with this one. But I've tried.

Q. By the way, in the preceding paragraph about the 2011 NOV and the consent order, Cabot does not deny anywhere in that paragraph that a violation actually occurred; correct?

A. Correct.

Q. And the same is true with respect to the July 26, 2019 statement in Exhibit 8 on page 49.

Page 67

Cabot does not deny anywhere in that disclosure that violations actually occurred with respect to the June and November 2017 NOV's; correct?

A. You're right, that's correct.

Q. Did you do any testing or analysis to assess whether the disclosure in this July 2016, 2019 paragraph about the June and November 2017 NOV's was inconsistent in any way with what the market would already be expecting as to Cabot's environmental risk profile based on the disclosures?

MR. LAVELLE: Object to the form.

A. Yes. Yes, I did.

BY MR. STOKES:

Q. What exactly did you do?

A. I looked to see if 2017, June and November NOV's, were previously disclosed. And I found that they were not.

Q. Other than the fact that those specific NOV's had not been disclosed in Cabot's prior public filings, did you conduct any testing or analysis to assess whether the occurrence of those specific NOV's and the penalties associated with those NOV's and consent orders was inconsistent with the market's existing view of Cabot's environmental risk

Page 68

profile based on Cabot's prior disclosures?

MR. LAVELLE: Object to the form.

A. No. I mean, I considered the arguments and I considered everything that Ms. Allen said about it and identified that she hadn't appropriately comprehensibly addressed that question. But I didn't do a loss causation analysis or attempt to assess. I just saw that she didn't do a comprehensive price impact analysis.

I mean, the argument I considered was could an investor be surprised that after having been told that issues were resolved back in 2011 or 2015, that these issues were popping up again. I mean, I imagine I would have been surprised. But I didn't -- but beyond that, I didn't do any quantitative analysis.

BY MR. STOKES:

Q. Do you know one way or the other whether the NOV's referenced in the July 26, 2019 paragraph about the June and November 2017 NOV's, do you know one way or the other whether those involved the same wells or well pads as the NOV's disclosed in the February 22, 2017 Form 10-K?

A. Okay. So we've got February 2016 and then

Page 69

July 2019. So I know there was subsequent disclosure after February 2016 about the same September 2011 NOV. My understanding is that the new ones, the June and November 2017 NOV's, were about different wells. That's my understanding.

Q. And would you agree that in the February 22, 2016 disclosure about the earlier NOV's, Cabot did not make any representation that there would never be any further NOV's in the future associated with different wells; correct?

A. Well, I mean, you know, my understanding is about -- yes, that is my understanding. But in understanding the facts of the case, I'll just leave it to the lawyers to argue that out.

Yeah, as far as what's written in the documents, they didn't specifically say there was not going to be another NOV. But, you know, my understanding is the Plaintiffs are alleging what there should have been was a disclosure that we are having problems with a lot of other wells.

So my understanding is that the allegations from Plaintiffs were about omissions about the other wells. The company didn't say one way or the other that there won't be or that there

MAGNA
LEGAL SERVICES

Page 70

are. The Plaintiffs are saying they should have said there are other problems. It's not me saying it. I'm just telling you what I understand the allegations are.

Q. You did not do any testing or analysis of your own to assess whether the civil monetary penalties disclosed for the NOV's referenced in either the February 2016 -- February 22, 2016 10-K or the July 26, 2019 10-Q were economically material; correct?

A. I did some.

Q. Can you point to any place in your report where you did that analysis?

A. No. It was more considering Lucy Allen's analysis. I mean, I looked at those. I compared them to the market cap of the company, revenue of the company, earnings of the company. But also considered that a lot of things go into whether or not a dollar fine is economically material.

I mean, one thing that also has to be considered is how large are these fines relative to other fines that have been assessed or levied against other companies and what's the authority of the levy -- of the regulatory body to levy fines.

Page 71

So I've seen other cases where a fine will look relatively small compared to the size of the company, but it's the biggest fine the regulatory agency has ever imposed and, therefore, it has a lot of meaning to investors.

So I considered the arguments, but I didn't do analysis to draw a conclusion one way or the other. I did draw conclusion that Ms. Allen has not established that these fines were de minimis.

Q. Is it your conclusion that there is a material -- did you -- you have not expressed an opinion in this case and you don't have an opinion that the penalties -- that the dollar amounts of the penalties assessed against Cabot or the NOV's disclosed in February of 2016 and July of 2019 were economically material; correct?

A. I haven't determined that they were economically material or de minimis. But my opinion is that neither has Ms. Allen.

I did look to see the penalty -- I compared the penalty from -- well, the ultimate penalty from the criminal charges. Ms. Allen tried to make the argument that the company Range Resources was similarly situated to Cabot. And I

Page 72

examined the financial penalties that each were -- that were imposed on each of those two companies and found that Cabot's was a hundred times bigger.

So it's not just the absolute magnitude of the fine that matters. It's also one should consider the comparative size of fines when assessing whether a fine is economically material or de minimis.

Q. You have not concluded in this matter and you don't have an opinion in this matter that the fines or penalties assessed against Cabot as disclosed in the July 26, 2019 10-Q are materially larger than the fines or penalties assessed against Cabot with respect to the NOV and consent order referenced on February 22nd of 2016; correct?

A. It would help if I can see your question in writing. It was long. What are we comparing? Which two fines?

Q. So I'll just show you again. There is a disclosure in February 22, 2016 that we've looked at before that cited that there would be a civil monetary penalty up to approximately $300,000 associated with the September 2011 notice of violation; correct?

Page 73

A. Over a hundred thousand, up to approximately 300,000. That's what I have to look at?

Q. That's right. That's right. And do you recall -- I won't show this to you unless you don't recall it. But I'll represent to you that there was a subsequent disclosure that Cabot entered into a consent order with respect to the NOV's as described herein for 0.3 million dollars or $300,000.

A. Right.

Q. So my question -- and then if you look at Exhibit 8, there is a disclosure of penalty of $215,000 for the June 2017 NOV's and up to approximately $355,000 for the November 2017 NOV's for a total of, between those two, of about $560,000.

And my question is you have not expressed an opinion in this case and you don't hold the opinion that the difference between the $560,000 approximate penalty described on July 26, 2019 is significantly or materially higher than the $300,000 penalty that was previously assessed for the 2011 NOV?

A. Yeah, correct, I don't have an affirmative

MAGNA

LEGAL SERVICES

Page 74

opinion that the second fine -- I guess it adds up to $570,000. I don't have an affirmative opinion that that number is necessarily materially more significant than the earlier $300,000 number. But my opinion is also that it could be. And nobody proved it wasn't.

Q. And you, again, have not disputed Ms. Allen's conclusions that the prior disclosures in February of 2016 and thereafter during 2016 and 2017 about the 2011 NOV's and the $300,000 penalty assessed on that NOV, you're not disputing her conclusion that those disclosures did not cause a statistically significant abnormal return in Cabot's stock price; correct?

MR. LAVELLE: Object to the form.

A. I am contesting that the way you phrased it and the way she phrased it is just incomplete. I mean, there was a drop in the stock price. And that drop in the stock price may have been caused by this disclosure. That it wasn't over the threshold for statistical significance, that drop in isolation by itself, that I'm agreeing with.

But I'm also making sure it's clear to the court and everyone else that just because it's

Page 75

under the threshold for statistical significance, doesn't mean it didn't happen and it also doesn't mean it wasn't caused by this disclosure. And, you know, the reason why -- you know, if somebody gets a speeding ticket and is charged a hundred dollars, might be able to afford the hundred dollars. And then they get another speeding ticket for a hundred dollars, you know, same amount, but now you know the person has a problem with speeding.

The market very well might have seen this disclosure as partially informing them that this company has continuing more problems with methane infiltration, more pervasive than they previously let on. I mean, that would have to be disproved in order to prove no price impact. And it wasn't disproved, so no price impact was proved.

BY MR. STOKES:

Q. Do you agree that the stock price behavior after the disclosures in 2016 and 2017 about the $300,000 penalty are at least relevant in terms of seeing the likelihood of whether the later disclosure in July of 2019 about the 2017 NOV's had price impact?

MR. LAVELLE: Object to the form.

Page 76

A. It's probably relevant. But exactly how it's relevant is still uncertain. I mean, the speeding ticket example is I think worthwhile here. You know, the fact that the person might have received an earlier speeding ticket might make the second speeding ticket more important, not less. But, you know, it depends on the facts and circumstances of the case. That's the analysis that has to be done.

BY MR. STOKES:

Q. Did you do any testing or analysis to assess whether the potential remediation costs that might be associated with the NOV's disclosed in Exhibit 5 and Exhibit 8 were economically material to Cabot investors?

MR. LAVELLE: Object to the form.

A. Yes. The answer is yes.

BY MR. STOKES:

Q. And where did you do that analysis in your report?

A. Well, I explained that I've assumed for purposes of my analysis Plaintiffs' allegations. I carefully read, well, the press release on July 26, 2019, the subsequent conference call and then this

Page 77

filing. And it's clear. It's indisputable that the company said that their capital expenditure budget had to be increased and that CapEx spending would be greater. And I saw that Plaintiffs alleged that that was because of these previously undisclosed problems with -- well, the environmental problems.

BY MR. STOKES:

Q. Have you done any independent analysis or testing to ascertain whether, in fact, the capital budget was changed or the guidance announced on July 26, 2019 was changed in any way from the prior quarter's guidance for capital budget because of specifically remediation or environmental issues?

A. No. I didn't do any independent analysis. I did read Mr. Schroeder's declaration and I, of course, read Ms. Allen's report. But I also read the complaint. And I understand they're at odds about that exact issue and I didn't seek to resolve it with my own analysis. I wasn't part of the scope of the engagement.

Q. Would you agree that if it turns out to be the case that the changes in Cabot's guidance and capital budget and production that were announced on July 26, 2019 were unrelated to the environmental

MAGNA
LEGAL SERVICES

Page 78

issues that had been disclosed back in 2016 and 2017 in the disclosures that we reviewed in Exhibit 5, if, in fact, there was no relationship, then you would agree that any residual return in the stock price that may have occurred because of the guidance or the capital budget changes or the production, you couldn't use that residual return to infer anything about whether the prior alleged misstatements about the environmental issues had price impact; correct?

MR. LAVELLE: Object to the form.

A. I mean, if Plaintiffs' allegations were different, the case would be different. I mean, if the facts of the case were different, the analysis and the conclusions would be different. My engagement was to assess whether Ms. Allen -- well, to evaluate her report. Since her report was about price impact, was to assess her price impact argument.

And the appropriate way to do that at this juncture in the case is to assume Plaintiffs' allegations are true. If you deviate from that engagement, it's a different engagement, different methodologies, you might find anything.

BY MR. STOKES:

Page 79

Q. But you understand the general concept in litigation that Plaintiffs often make allegations and sometimes they turn out to be well-founded and sometimes not. But that's why there is discovery and evidence; correct?

A. Right.

Q. Is it your understanding that the court has to take Plaintiffs' allegations as true for purposes of class certification?

MR. LAVELLE: Objection.

A. I'm not a lawyer. My understanding is that the role of the financial -- the forensic financial analyst at this juncture is to assess what the implications are of the allegations and, therefore, they require one assuming the allegations to be true at this juncture. You know, give me a different set of facts, I'll possibly arrive at a different conclusion.

BY MR. STOKES:

Q. Well, hypothetically, then, if it turns out that Plaintiffs are wrong and that there is no connection between the changes in capital budget and guidance, production announced on July 26, 2019 and the prior NOV's at issue in the disclosures that

Page 80

Plaintiffs say were misrepresentations, if you make that assumption -- I'm not asking you to opine one way or the other, you know, who's right about the assumption.

But if you make that assumption, you would agree at that point that you can't use the residual return occurring because of the guidance and production changes to infer anything about whether the environmental disclosures that were made earlier had price impact; correct?

MR. LAVELLE: Object to the form.

A. I mean, your hypothetical is basically the same as the conclusion. You're saying that if the allegations had no effect, then the allegations had no effect. Your hypothetical is saying the allegations had no effect, therefore, what effect did the allegations have. The premise of your hypothetical is the allegations had no effect. I mean, but I think one would have to delve into, again, to what extent does no mean none.

I mean, maybe -- you know, maybe they don't have a drawn-up budget with a line item that says remediation of problematic wells, you know, but on the other hand maybe they have a drawn-up budget

Page 81

that says we're going to have to drill elsewhere because we can't drill in the demic box. So you not only have to delve into, you know, what are the facts, what is the relationship between the CapEx going forward and the allegations in this case, but also, you know, more indirect effects have to also be considered.

BY MR. STOKES:

Q. Are you familiar with the general principal of finance theory that the -- that an efficient stock market value stock based on the market's expectations of the company's future cash flows?

A. Well, that's -- I've written on this subject. That's the definition of fundamental market efficiency, which is distinct from informational market efficiency. And I think that it's not true in all circumstances. There are other factors besides expected -- discounted and expected future cash flows that might matter. The literature is full of factors that don't fit that specific fundamental valuation equation.

Q. And in your analysis with respect to Cabot specifically, did you identify any occurrences when there was a residual return -- a statistically



Page 82

significant residual return that was attributable to a disclosure or piece of news that would not affect the market's expectation of future cash flows for the company?

MR. LAVELLE: Object to the form.

A. Well, as I've already said, I did not do an attribution analysis. I did not do an affirmative price impact study, either trying to prove or disprove price impact. I evaluated what was put out there as a price impact study. So I considered what was right about it, what was wrong about it.

I did note that Ms. Allen said that that is how valuation is always determined. And I believe she's wrong. I considered that there's something known as -- well, headline risk or ESG, environmental social governance, factors are taken into account by investors. And things that make a company -- things that produce negative sentiments against a company may have valuation effects. I considered the literature on that when determining that Ms. Allen's study was incomplete.

BY MR. STOKES:

Q. Aside from considering literature about how a market might react to what you describe as

Page 83

informational disclosures that don't affect expected future cash flows of the company, did you do any specific testing with respect to Cabot itself to assess whether Cabot's stock price is likely to react to information that is not economically material to the company or has no material impact on future cash flows?

A. Well, I did the entire market efficiency study, including the empirical testing element, and determined that the market takes into account all public information in assessing what the market price ought to be for Cabot. Separating that out between cash flows and other factors, I did not do. It wasn't part of the scope of the engagement. No.

Q. You mentioned a few minutes ago the fact that Cabot announced different capital budget or a change in capital budget on July 26, 2019. Do you recall that?

A. Yes.

Q. Do you know if the Plaintiffs in this case have made any allegations that Cabot misrepresented its capital budget or guidance?

A. No, I don't think that they alleged that anything was misrepresented. What they allege is

Page 84

that the new guidance was surprising. And that it was surprising because of the impact of undisclosed environmental problems.

Q. Let's assume now that the Plaintiffs -- let's just assume the Plaintiffs' allegations about the budget or guidance changes announced in July 2019, let's just assume for the sake of argument that there was a relationship between that issue and the prior alleged misstatements. For the record, that's not our position. But let's just assume that for the sake of argument. Are you with me?

MR. LAVELLE: Objection.

A. Sure.

BY MR. STOKES:

Q. Even if that is true, the fact that there is a statistically significant residual return after the announcement of the guidance change, that by itself would not be enough to tell you whether or not there's price impact from the earlier challenged statements; right?

MR. LAVELLE: Object to the form.

A. I would disagree. It's altogether possible that had there been full forthcoming disclosures as Plaintiffs alleged there should have been, that the

Page 85

market would have been able to anticipate higher costs and lower production output such that when it was ultimately announced it would not have caused the price to fall because the price would have already fallen sooner when the market had anticipated it.

So the price impact of not making -- the price impact of concealing what Plaintiffs are alleging was concealed, would have been -- is equal to how much the price did fall when the market learned what they otherwise would have anticipated.

BY MR. STOKES:

Q. Do you understand that as part of the class certification analysis, the court has to assess whether a preponderance of evidence in the record shows absence of price impact?

MR. LAVELLE: Object to form.

A. I do. And, you know, now that Defendants have made that the issue, they're entitled to make that an issue and the court has to consider that.

BY MR. STOKES:

Q. And so --

A. I'm not a lawyer. I just want to make sure I'm not going to get in trouble here for saying



Page 86

something, you know, about the law. But, you know, I've done enough cases as a financial analyst to know that that is -- I've read the court opinions that say that defendants have the opportunity to do that.

Q. And you testified a few minutes ago that, you know, it might be the case that, you know, had a different disclosure been made by Cabot about the environmental issues earlier, the market may have viewed that as impacting what the guidance or budget would ultimately be? Did I understand that correctly?

A. Not quite. Plaintiffs are affirmatively alleging that the stock price fell because the market was surprised by that guidance, and that guidance was caused by the environmental issues that were concealed.

So it follows logically that if there had been full disclosure earlier, the price would have fallen earlier when the market would have anticipated a higher cost and lower input. Therefore, the -- I mean, under that, you know -- under that argument, which is what Plaintiffs are alleging, the allegations -- the allegations of

Page 87

omissions and misrepresentations did impact the stock price by keeping it from falling. And Ms. Allen didn't even touch that argument.

Q. Well, do you understand that allegations, again, are not evidence?

A. Now you're into legal realm that I really can't speak to. I mean, what the court will choose to focus on or not, it's up to the court. That's why we have courts.

Q. But in assessing whether the allegation that there is a connection between the earlier alleged misstatements and the guidance, in assessing whether the change in guidance shows price impact as to the former challenged statement, the alleged misstatement.

A. Is that a question?

Q. Strike that. I'm thinking about rephrasing this.

MR. STOKES: Actually, do you want to take a short break?

THE WITNESS: Sure.

MR. STOKES: I think we've been going for another --

THE WITNESS: Sure.

Page 88

MR. LAVELLE: How long do you want to take, Steve? Five, ten minutes? I mean, you know, however long you need.

MR. STOKES: Ten and then we go for a stretch and then have lunch?

THE WITNESS: That's fine.

MR. STOKES: Ten minutes is fine.

VIDEOGRAPHER: Off the record at 12:26 p.m.

(A brief recess was taken.)

VIDEOGRAPHER: We're on the record at 12:38.

BY MR. STOKES:

Q. You would agree with me that the issue that the court has to determine on class certification is not simply whether the corrective disclosures support an inference that the alleged -- I'm sorry. Strike that.

You would agree with me that the issue on class certification for the court to decide is not simply whether the alleged corrective disclosures had an impact on the stock price, but whether the stock price movement after the corrective disclosure supports an inference that the

Page 89

alleged misstatement itself had price impact; correct?

MR. LAVELLE: Object to the form. Calls for a legal conclusion.

A. Yeah, I don't think I can weigh in on a legal argument. My understanding is that defendants have the opportunity to prove that the alleged misrepresentations and omissions had no price impact -- had no impact on the price of the subject security. Exactly what the court considers in making that determination is out of my realm of expertise.

BY MR. STOKES:

Q. Are you familiar with the concept of whether there is a mismatch between a corrective disclosure and alleged misstatement?

A. Well, I've seen the argument made, sure. Not in this case. But other cases I've seen the argument being offered.

Q. Do you know whether the argument has been made in this case that there is a mismatch between the alleged corrective disclosure and the alleged misstatements?

A. I didn't draw an opinion one way or another

MAGNA
LEGAL SERVICES

Page 90

on that. I mean, I do know I've seen -- you know, I've read a lot of legal documents and I've seen the proposition before that there does not -- that the disclosure does not have to be a mirror image of the misrepresentation. And disclosures can take many forms. I've seen that. But really these are legal issues for lawyers and judges to decide.

Q. Would you agree with the proposition -- I'm just speaking general really here. The greater degree of mismatch between a corrective disclosure and an alleged misstatement, the less confidence one can have that any stock price drop that followed the corrective disclosure supports an inference that the alleged misstatement itself had --

MR. LAVELLE: Object to the form.

A. I had trouble following that. You know, maybe I should say that as a legal argument, you know, I'm not going to -- I shouldn't weigh in on the validity of -- from an economic perspective, if someone asked me as an economist to assess did a statement have any impact on certain securities price, you know, there is an economic, analytic way to approach that, which the court might be interested in.

Page 91

I mean, first ask for clarification. Does no mean no. I mean, does no mean none. And, also, what's the standard of proof. But, I mean, I can tell you whether it's been proved or not proved from an economic point of view. And that's what my report was about. My rebuttal report was about whether or not Ms. Allen had proved that there was no price impact. And I definitively determined and offered the opinion that she did not prove that there was no price impact.

I mean, your question seems to be about other legal elements of an argument that can be offered to the court rather than the economic question of has no price impact been proved economically or not.

BY MR. STOKES:

Q. Well, right now I'm just asking about the issue about whether -- I'll strike that. I'll strike that.

Did you conduct any economic analysis or other expert analysis to assess whether and how much of a mismatch there may be between the alleged corrective disclosures and the alleged misstatements?

Page 92

A. When you say there may be, do you mean that there's allowed to be or that in this case there was?

Q. That in this case there was.

A. I read the case documents and sought to understand what the allegations were and I looked at the case facts and I looked at Ms. Allen's report and her argument.

I understand that Plaintiffs are alleging that the company concealed the extent and severity of these environmental problems. And I also understand from looking at the case facts that information was provided at the end of the class period on two occasions near the end of the class period. And at the end of the class period informed the market that the extent and severity was greater than the market was led to believe.

I mean, there was no mea culpa type admission. I don't think the company said we're sorry we misled you. There wasn't anything like that. But there was information provided that filled in to the marketplace what Plaintiffs are alleging was omitted. And there was also development that informed the marketplace -- well,

Page 93

the economic impact of what was concealed apparently became apparent to the market. Although, the market did not yet know that there was the reason -- that the undisclosed environmental problems was reportedly the reason for the economic impact that they were processing.

Q. Did you conduct any economic analysis or expert analysis or testing to ascertain whether the criminal charges announced on July 15, 2020 pertained to the same wells and time periods that were described in the alleged misstatements?

MR. LAVELLE: Object to the form.

A. I did two things that I think are relevant to your question. So the answer would be yes.

BY MR. STOKES:

Q. What were those two things?

A. Well, I read the complaint carefully and observed that it's not just a specific mis -- affirmative misstatements in this case, but also what was concealed and what was omitted. So there's omissions element to the allegations.

And I don't think anyone can dispute that the market learned from the presentment of charges that there were a lot more wells at issue



Page 94

than were identified in the company's -- well, by the company previous to that presentment of charges. In fact, Ms. Allen agrees with that. She has a chart that says the company never mentioned these other problems.

And so the market learned from the presentment of charges that there were a lot more problems than the company had identified. And, you know, that's corrective of what Plaintiffs are saying was fraudulently concealed. That's one thing.

And the second thing is in the presentment itself. I did this analysis because I was trying to figure out what her chart was about. You know, the chart that has dates on it about particular wells, whether they were mentioned before and date ranges from when the violations at issue were operative.

So I was trying to understand that chart. So I compared her chart to the actual presentment of charges and saw that the presentment of charges described lack of remediation through -- I think it was January 9, 2020. So I found that to be convincing that that was a correct disclosure

Page 95

that related to Plaintiffs' allegations about what was misrepresented and omitted.

Q. Did you assess whether the specific alleged remediation deficiencies that were alleged by the AG to be still ongoing in 2020 pertained to any of the NOV's or wells described in the February 2016 and July 2019 disclosures that we examined earlier?

A. The NOV's didn't identify any wells. So, I mean, it's kind of like you'd have to look behind the scenes and, you know, what the company knew about what they were being charged for. But the NOV's didn't describe specific wells. And so the market would not have known specifically which wells. Just that what they learned that the problem was much more extensive than they were led to believe.

Q. Did you, however -- strike that.

Do you have access in this case -- strike that.

Have you undertaken any research or do you know specifically sitting here today which well pads and wells were at issue with respect to the 2011 NOV's and the 2017 NOV's that were described in the February 2016 and July 2019 disclosures?

Page 96

MR. LAVELLE: Object to the form.

A. I read Mr. Schroeder's declaration and Ms. Allen's report. I don't have that information committed to memory. The answer is I don't know specifically. I found it to be not relevant to the task at hand.

BY MR. STOKES:

Q. Whether you found it relevant or not, did you make any assessment as to whether the July 15 -- I'm sorry. The June 15, 2020 disclosure about the AG charges matched up with the wells and time periods that were at issue in the 2011 NOV's or the 2017 NOV's?

MR. LAVELLE: Object to the form.

A. Yes, in the course of doing what I did. So those -- the alleged misrepresentations all stated that the issue was either remediated or in the process of being remediated and did not state that there were other problems that the company was unable to remediate or had chosen not to remediate (inaudible) omissions.

And then the presentment of charges did say that there were other wells. And some of the same wells that were cited I believe that were not

Page 97

appropriately remediated. I mean, the company had said specifically that they have performed appropriate remediation efforts. That was one of the alleged misrepresentations.

And the criminal charges said that the company did not perform appropriate remediation efforts. So I think there is an overlap between what was charged at the end and what was alleged to have been concealed throughout the class period.

BY MR. STOKES:

Q. Let's assume for a minute that the court determines that only the three well pads at issue in the 2011 and 2017 NOV's are potentially -- could potentially be corrective with respect to the alleged misstatements and omissions in this case. I'm not asking you to accept that position. I'm just asking you to assume that the court determines that the scope of the representations made in February 2017 and July of 2019 was limited to just the NOV's at issue and that they convey nothing about any other NOV's.

If you accept that premise, just assuming it, do you have any opinion as to whether any aspect of the June 15, 2020 AG charges would

MAGNA
LEGAL SERVICES

Page 98

show price impact as to any of the prior disclosure?

MR. LAVELLE: Object to the form.

A. Can we pull up those charges? I mean, there's a line in there. I don't have it committed to memory. But I know it contains the date and an allegation from the attorney general extending through January 9th of 2020. And my recollection is that sentence would relate to the pads that you referred to in your question. That was my recollection.

I mean, I think also part of your question calls for a legal evaluation because, you know, it just begs the question why weren't these other wells ever identified and disclosed by the company to the public as being problematic. So, I mean, even if the presentment of charges includes other wells that were not previously the subject of affirmative misrepresentations, it begs the question and you'd have to ask the court -- it would have to be a determination from the court that it didn't matter that these others were concealed and undisclosed.

I mean, in sum -- let me just sum up. I could not -- Ms. Allen's logic was faulty when they

Page 99

argued that the presentment of charges had nothing to do with the allegations. She was just wrong. And I think you can point to dates. And dates in her chart and allegations in the complaint that bear out that she was wrong with that conclusion.

BY MR. STOKES:

Q. I'm pulling up Exhibit 9. Exhibit 9 is a copy of the AG presentment. Let me know when you have that in front of you.

A. I'm trying to download it. Here we are.

Q. Can you point to the portions of this document that show the violations that were continuing to 2020 allegedly that you contend relate to the same -- can you point to the allegations in the presentment that you contend relate to the same wells or well pads that were at issue in the 2011 NOV's and the 2017 NOV's that were the subject of the February 2016 and July 2019 disclosures?

A. Well, I need to compare the 2015 10-K statement to what you have here in offense number 15. Okay. So it's Exhibit 5. Let's look at Exhibit 5 again. Well, on page -- is it page? Okay. We can look at offense number 15.

And at the bottom of the page where

Page 100

offense 15 is introduced it says, "On one or more occasion, on or about December 15, 2010 through January 9, 2020, the Defendant, Cabot Oil and Gas Corporation, did knowingly fail to comply with orders from the department, including but not limited to the December 15, 2010 consent order and settlement agreement when it failed to remediate its gas wells to eliminate the discharge of natural gas, which allowed contamination to continue unabated."

So this is referring to a problem evident to the company in at least as of the date of the start of the class period, February 22, 2016. And whatever the company -- notwithstanding that the company continued to say that its problems that it identified were remediated or being remediated or had been remediated, this document told the market that there were un-remediated problems throughout the entire class period and the entire period addressed by the affirmative alleged misrepresentations.

I couldn't name the pad for you, but it's the time periods that overlap.

Q. Does anything in offense number 15 specifically state that it relates to an NOV that

Page 101

was issued in 2011?

A. Well, it says that it relates to an NOV that was outstanding. Well, wait. It says it relates to an order that was outstanding as of the start of the class period. From the time of the start of the class period to the end of the class period it was not remedied and still a problem to the company.

Q. Was anything in offense 15 in the description of offense 15 say anything about any specifically identified Cabot wells?

A. It doesn't identify the well. But neither did the company's disclosures earlier that are (inaudible).

Q. Do you know if the December 15, 2020 consent order included any findings as to the wells at issue in the 2011 NOV's?

MR. LAVELLE: Object to the form.

A. Say that again.

BY MR. STOKES:

Q. I'll strike that.

Do you know if the wells that were the subject of the 2011 NOV were also the subject of the December 15, 2020 -- 2010 --

MAGNA
LEGAL SERVICES

Page 102

MR. LAVELLE: Object to the form.

A. I think that connection was made in the chart in Lucy Allen's report. Let me open that. But I do recall looking at it and trying to figure all that out. So that would be Exhibit 3. Here it is. Page 24. The PDF is page 27.

Well, she has a column here, Alleged Violation Period, and none of the alleged violation periods in her chart correspond to the dates that we were just looking at, which is December 15, 2010 through January 9, 2020. So what I can tell you is that if that violation is about any of these wells, then the violation period is much broader. But I can't tell you for sure which well it is that's in offense number 15.

We have a similar situation with -- well, it certainly looks like the same dates as her item number 25 that corresponds to offense 15 in those broader dates. I guess we can look at Schroeder's declaration and see if he has it there. But I don't know.

I looked at these dates and I looked at her argument and it occurred to me that the charges -- the presentment of charges cover dates

Page 103

that were broad enough that they cover the entire class period. Not just portions of the class period.

Q. Do you have an opinion or view on whether the February 2016 disclosure and the July 26, 2019 disclosure about the NOV's that we looked at earlier, did you have a view as to whether those disclosures would have given the market longer sense of security that problems with were being fixed or were not significant versus the rest of Cabot's disclosures that had been made in those documents?

MR. LAVELLE: Object to the form.

A. I'm going to need to hear that question again.

MR. STOKES: Could you read that back?

(Question read by the reporter.)

MR. LAVELLE: Same objection.

A. Well, the statement from the company in those disclosures is that the problems were either remedied or were in the process of being remedied. That's what the company said. That's what they communicated to the public.

The 2019 -- the July 2019 disclosure, which also comprises of misrepresentations, informed

Page 104

the market that problems were continuing, that they weren't limited to just the wells that had been previously identified. But they certainly didn't inform the market about the full extent of the problem and the ramifications of the problem specifically.

I think that's responsive to your question. I had a little trouble understanding --

BY MR. STOKES:

Q. I was actually listening to the court reporter read it back. I'm going to rephrase it a little bit to try to make it more clear what I'm getting at.

Do you have a view as to whether -- let me back up. I'm going to use the word "the challenged disclosures" to refer to the specific disclosures in the February 2016 10-K and the July 26, 2019 10-Q that discussed the NOV's and the remediation. Do you understand what I'm talking about? That might cut the verbiage down in my question.

So with that understanding, as to whether the challenged disclosures would have caused the stock price to behave differently immediately

Page 105

after those disclosures versus had the company simply omitted the challenged disclosures entirely?

MR. LAVELLE: Object to the form.

A. That's an interesting question. I understand that the issues the Plaintiffs have with those challenged disclosures is that they stated that these problems were remediated, essentially under control. When, in fact, Plaintiffs are alleging that they weren't under control and they hadn't been appropriately remediated. And the extent of the problem with gas infiltration into water was not limited to those specific wells that were cited in those challenged disclosures. That's what I think Plaintiffs' allegation is. That's what their complaint is.

And you're asking if they hadn't said that at all, would the stock price had been higher or lower or different. And that's a hard question to answer without more analysis. On the one hand, I mean, it's sort of like what the company did here is they said we had a problem, but we fixed it. So having a problem is bad news, but having fixed it is good news. And the ability to fix problems is also good news. So the market would not have had the bad

MAGNA
LEGAL SERVICES

Page 106

news that there was a problem, but they also wouldn't have had the good news that they fixed it. At this point I'd say without more analysis, I don't know. If the truth, however, was that they had a problem and they didn't fix it, then those statements inflated the stock price. I mean, under those assumptions and pursuant to generally accepted principals of financial analysis and that it's established.

BY MR. STOKES:

Q. So if the -- do you have a -- let's assume that the allegation is that Cabot disclosed that it had fixed the problems in the challenged disclosures when, in fact, it had not, let's assume that's the case, do you have a view whether the fact that Cabot made the challenged disclosure about a problem that existed that had been fixed when it wasn't allegedly fixed, do you believe that would have caused the stock price to behave differently immediately after what would have happened if Cabot simply stayed silent and not mentioned either the NOV or the remediation of the NOV?

MR. LAVELLE: Object to the form.

A. You're asking me to speculate to some

Page 107

extent. I mean, I haven't done a loss causation analysis. But I can, you know, on the fly apply basic principals of financial valuation. Let's see where it leads us.

It seems that there's some evidence that -- I don't know. I'm thinking now I really shouldn't speculate about this. I mean, I do financial analysis and loss causation analyses very carefully, you know, with the documents and date in front of me. It's unsafe to do it on the fly.

I think there's some merit to Plaintiffs' argument that if the company concealed what they should have told the public and what they concealed was negative information and that they had a legal -- other things they were saying, I mean, if all of that is true, I mean, from an economic perspective, you know, that set of facts generally means that the stock price is inflated.

Inflated relative to if they had told the full truth. That's why your question is actually quite complex. What's the but-for world is the question. If we're comparing the state of affairs as it was and as Plaintiffs allege it was to a different state of affairs where the full truth

Page 108

was told and that full truth was that there were much more serious problems that were not being remedied, the conclusion would typically be that the stock price was inflated by the challenged statements.

If, alteratively, the but-for world that the company just stayed silent, I don't know. At this juncture, I just don't know. I'd have to think about that some more.

BY MR. STOKES:

Q. Let's take a look at the language again in the challenged disclosure in Exhibit 5, February 22, 2016 10-K disclosure.

A. Okay.

Q. Do you see where it says, "We have been engaged with the PA DEP in investigating the incident and have performed appropriate remediation efforts, including the provision of alternative sources of drinking water to affected residents"?

MR. LAVELLE: Is this page 56, Peter?

MR. STOKES: 56, that's right.

MR. LAVELLE: Of Exhibit 5?

A. I see it.

BY MR. STOKES:

Page 109

Q. And then the next sentence says, "We believe the source of methane has been remediated and are working where the PA DEP to reach agreement on the disposition of this matter."

Do you see that?

A. I do.

Q. Do you have a view or opinion as to whether the stock price would have behaved differently after this disclosure had -- instead of making those two sentences, Cabot placed a period after the word "incident" struck everything else through the next sentence where it says, "We believe the source of remediation has been remediated" and said second sentence, "We are working with the PA DEP to reach agreement on the disposition of this matter"? Do you follow the edit that I'm proposing?

A. I do.

Q. Okay.

A. I do.

Q. Okay. In other words, instead of making the statement about having performed appropriate remediation efforts and making the statement that we believe the source of methane has been remediated, let's assume Cabot had simply said, since then, we

MAGNA
LEGAL SERVICES

Page 110

have been engaged with the PA DEP in investigating the incident, we are working with the PA DEP to reach agreement on the disposition of this matter, do you have a view as to whether making that edit would have been likely to have an impact on stock price after this disclosure?

MR. LAVELLE: Object to the form.

A. Well, I'm going to start by saying more likely -- I'm glad you added that "likely." It's an important word. Because you're asking me to -- you're inviting me to offer up loss causation price impact study conclusion without actually having done a full-blown loss causation and price impact study. I can tell you what a reasonable -- you know, what a reasonably likely outcome would be on the basis of certain assumptions. But I just wanted to caveat all this with I haven't done the full study.

If we were to agree that the parts that you would have stricken are countervailing positive representations, the part that you don't have stricken is the negative news, that there's a problem and there's a notice of a violation, and the part that you would have stricken is the positive countervailing of additional representation that

Page 111

essentially the situation's under control and we fixed it, you know, principals of valuation would tell you that if you leave the negative and take out the positive, you'll have a negative impact on the stock price.

BY MR. STOKES:

Q. Don't you have to assess first whether the -- what you described as the positive would be likely to have a material impact on the stock price in the first place?

A. Well --

Q. It has to be materially positive; correct?

A. Yeah. I mean, I said that, you know, this is just preliminary. You're inviting me to speculate about what the conclusion might be. And in order to do that -- I took debate. And in order to do that I said let's assume that this is a positive countervailing statement. You're saying that I should have said that it's -- let's assume that it's material and positive.

Okay. Let's assume that this is material and positive. If you eliminate the materially positive part but leave in the material and negative part, you'll have a negative impact on

Page 112

the stock price. It might not be over the threshold for statistical significance, but it will have a negative impact on the price nonetheless. If you take out the positive and leave in the negative.

Q. Your statement, though, is based on the assumption that the information that is stricken out in my proposed effort would be both material --

A. I did not do the loss causation analysis. I'm only answering this question at all because you invited me to. You said, you know, what do you think it might show. And I said, well, I'm reluctant to offer an opinion on -- I'm not offering an opinion basically. I'm telling you what, you know, based on valuation principals, what the result might be. That's what I'm saying here.

This is not one of the opinions I presented in my report. But I can tell you as a finance expert that financial principals say that if you have a dual statement that has negative information and positive statement and let's assume for the sake of argument that they're both material, if you scratch the positive part but leave in the negative part, it's an efficient market. And in an efficient market, if you scratch the positive part

Page 113

and leave in the negative part, you'll have a negative impact on the stock price.

Q. How would you go about testing whether the portions that I proposed were to strike out in my hypothetical edit here are actually real and positive and likely to have an impact on the stock price?

A. I --

Q. I'm not trying to suggest you've done this already. To assess whether proposed deleted language is material and positive, how would you go about assessing whether that is likely to have a price impact?

A. Well, I usually look at a few things. I mean, if the statement was in a more isolated context and it wasn't countervailing against negative news or if you can find an incident where just the negative news was, you can see whether there's a price movement. And in this case we have that at the end of the class period. You know, the presentment of charges is all about problems without saying -- you know, specifically saying they were not remediated. So, you know, there is some empirical analysis that can be done.

MAGNA
LEGAL SERVICES

Page 114

But the other thing I usually look at is, you know, did the company say these things were -- this kind of issue was important. Did -- and they did. I think analysts did identify the issues like this are important from time to time, you know, for this company and others. There's literature. There's financial principals that how a company interacts with the environment, you know, the ESG literature identifies that this is material information.

I mean, if company statements and principals in the literature state that this is material and positive and we've established that it's an efficient market, a material positive statement will have a positive impact on the stock price.

Q. When you say the analysts -- so just to be clear, when you are saying that the analysts in their own reports referenced the environmental risks -- Cabot's environmental risk disclosures, the analysts referenced the disclosure -- the type of disclosure in the second paragraph of Exhibit 5, page 56, the "from time to time" disclosure and the other cautionary disclosures that were read, but

Page 115

they did not specifically reference the disclosure in the first paragraph about, you know, specific notices of violation and whether they were remediated; correct?

MR. LAVELLE: Object to the form.

A. What I meant was generally there's been analyst reports that how a company interacts with the environment is important information. So what I'm trying to -- I'm saying that there's abundance support that whether or not this company has a problem or doesn't have a problem with well water pollution or groundwater pollution is established by the literature, analyst commentary. Not just for this case or this company, but others. And company statements in this case.

I just don't think that's disputable, you know, whether or not the company has a groundwater pollution problem matters to investors and analysts. So given that, it would follow that a positive statement that they can fix the problems have a positive impact. And the absence of such a statement would have a negative impact.

BY MR. STOKES:

Q. So you believe -- as part of your answer

Page 116

there you cited a couple times the analyst reports. And so you believe that the analysts' treatment of Cabot's disclosures with respect to its environmental risks and violations and remediation, that that is something that analysts would view as important based on what you say is the importance that analysts give generally to environmental issues; correct?

MR. LAVELLE: Object to the form.

A. I'm saying you'll find support in analyst reports generally for the proposition that environmental issues matter.

BY MR. STOKES:

Q. When you say environmental issues -- I'm sorry. When you say analyst reports generally, are you speaking generally of Cabot analyst reports or analyst reports as to all companies required?

A. The latter. I mean, I'm really uncomfortable with the questions. I mean, you're entitled to ask them and I guess I can choose to answer or not. But I'm a little uncomfortable because you did -- I mean, you're asking me to speculate about what I suspect at this juncture one might find if one did a loss causation analysis on a

Page 117

hypothetical set of facts where certain statements were stricken.

I did my best, but I just want to point out that everything has got to be with a -- you know, all my answers have to be with the caveat that I recognize I did not do a full-blown loss causation analysis and I am answering what you ask, what do I suspect the answer might be on the basis of my expertise and generally accepted financial principals.

Q. At this stage in the case, though, you had not done any testing or analysis to assess whether the statement that Cabot performed appropriate remediation efforts and you believe the source of methane has been remediated, you haven't done any specific analysis or testing to assess whether those particular statements had price impact; correct?

A. Correct because the scope of the engagement was to assess whether Lucy Allen's analysis was valid. And I determined it was not. She has not proved that there was no price impact because of the multiple deficiencies or incompleteness or logical or methodological flaws that I pointed out in my report critiquing her work.

Page 118

Q. Speaking of her work, can we take a look at paragraph 59 -- I'm sorry. 69 of her report, Exhibit 3?

A. Paragraph 69. Got it.

Q. Do you recall that one point of dispute that you and Ms. Allen have had is the application of a different methodology for the COVID portion of the class period?

A. Yeah. Yes.

Q. And one criticism she raises is that on, you know, at least one or certain of these statistically significant days, the magnitude of the excess return was very small -- or not very small but less than 3 percent and that almost a third of the days in the COVID period had larger excess. But you found that none of them were statistically significant. And her contention is that doesn't make -- that's just not reasonable and doesn't make sense.

Do you agree that you found that statistical significance on May 15th going back to the table at the end of your report, your opening report?

A. Yes.

Page 119

Q. And there were larger -- you know, considerably larger returns one way or the other on different days, such as, you know, May 28th, for example, where it appears that there was a -- you know, quite a bit larger return that you did not find statistically significant. And same thing with June 8th, there's an 8.9 percent residual return that you did not find statistically significant.

I mean, isn't it a fact that under your analysis you did find statistical significance on days that had far lower residual returns during the COVID period that reverses other days that had significantly larger -- isn't it true that you found statistical significance on, you know, May 15, 2020 which involved a much smaller residual return, 2.74 percent, than you did on days like June 8th where there was an 8.9 percent residual return or on May 28 where there was a 5.37 percent residual return?

A. Well, let me answer it this way. What she doesn't understand with that critique, and she admitted in her deposition that she didn't understand it, is that statistical significance in a heteroskedastic environment where volatility is changing is not just a function of the magnitude of

Page 120

the residual return, rather it's a function of the magnitude of the residual return relative to the appropriate volatility that should be applied to that particular date and that particular residual return.

And the new -- I mean, she -- it seems that she agrees from the work that she did do that in the COVID period, volatility was variable. If volatility is variable, you need to account for variable volatility. And the Newey-West procedure that I applied is not only well-known generally accepted methodology, but it's endorsed by her own firm.

You're looking at the wrong thing if you're only looking at the magnitude of the return. You have to look at the magnitude of the return and the appropriate volatility against which to assess that return as predicted by the Newey-West methodology. I could elaborate more if you'd like.

Q. I may ask you about it. I find this interesting, actually. Let me ask a couple of questions just to kind of go back a little bit on what you said. Did you conduct any analysis to determine specifically with respect to Cabot's own

Page 121

stock price behavior whether Cabot stock experienced additional volatility during the COVID period versus during earlier time periods?

A. I did look at the results, the output. And what happened is the volatility was variable. There were periods of higher and periods of lower. In fact, towards the end of the class period volatility actually had diminished. But it was variable. It's not just that it was a higher volatility throughout. It was variable over the course of, you know, from day to day.

And I'd like to point out paragraph 70 in her report has a graph she thinks -- I believe she thinks that this graph would show that my results were unreasonable. But what I'd like to have the opportunity to point out is that the graph that she puts in here with the red and the green bars, is a good exhibit for understanding why my results are reasonable.

If you notice, the red bars are the ones that the Newey-West procedure found to be statistically significant. What the Newey-West procedure does is it estimates a volatility that's appropriate for each day. And that volatility

MAGNA
LEGAL SERVICES

Page 122

estimation comes from the vicinity of the day at issue.

So this first red bar -- you can't see my cursor. But the first red bar is around February 19, 2020, it's not nearly as big as some of the green bars that come after it. But within its vicinity it stands out. It's like a skyscraper. It's not a skyscraper, but it's a high-rise building in a neighborhood of lower buildings.

I don't think there's any dispute about the second red bar. It's the highest one in the entire period. But then if you go to the last two, again, they're not the highest bars in the entire graph, but they are the highest bars in their immediate vicinity. And that's what the Newey-West procedure identifies. Is this an unusual day given the volatility that's at issue that's prevailing at that time period.

Q. How do you define what the neighborhood is with respect to a particular residual return? Are you contending that the May 27 return is in a different neighborhood than the May 20th return or the May 8th return or the May 4th return?

A. Yeah. The procedure has an autoregressive

Page 123

process built into it that looks historically at what were the returns. And based on historically what were the returns, preceding a date at issue what is the appropriate volatility to measure the residual return against. So that's endogenous to the methodology.

Q. Did you apply the Newey-West approach consistently throughout the entire class period?

A. Yes, I did. However, the T statistics from the Newey-West procedure in the pre-COVID period were compared against a historical empirical histogram for the pre-COVID period. And the T statistics for the COVID period were compared against other COVID period T statistics. So I split the historical experience, the historical histograms based on pre-COVID versus COVID.

But the Newey-West T statistics for every day were executed the same way, a rolling regression of one year of observations before the date with variables for the date at issue and earnings announcements that came before it.

Q. I have loaded into the chat Exhibit 6, which is a January 24, 2022 article that you coauthored entitled Securities Litigation Event

Page 124

Studies in the COVID Volatility Regime. Let me know once you have that in front of you and once you've been able to confirm that this is, in fact, the article that I'm describing.

A. This is not the typeset version. I'd have to compare this against the typeset version to see what was ultimately published. But, you know, it's certainly my format.

Q. You don't deny that this is something -- you did write this piece that we're looking at jointly about Mr. Villanueva?

A. Yeah. Let me go back. This is not the date of the published article. The article is in print now and it's not that date. But, I mean, I don't doubt that you'd get a reasonable version of it.

Q. Did you advocate the years of the Newey-West adjustment in this article?

A. No. See, Newey-West is necessary because we had proof of heteroskedasticity. The article -- the empirical distribution -- I did use the empirical distribution. That component of the methodology is compelled by the fact that COVID and pre-COVID have different price dynamics.

Page 125

But you also need Newey-West if you have evidence of heteroskedasticity. Which is in addition to the fact that there was a break in the volatility. Heteroskedasticity means that the volatility is variable. Whereas COVID versus pre-COVID is a discreet time period break in volatility, usually an increase.

Q. But the subject matter of the article was what do you do when you have, you know, potential increase in volatility during the COVID pandemic. And it's quite common place, you would agree, to have securities class actions where the class period may straddle the onset of the pandemic where parts of it are pre-pandemic and parts of it are post-pandemic? Do you agree with that?

A. I lost the video. One moment, please. I have too many documents open. I guess I can continue. But maybe we should take a break soon. Can you ask the question again, please?

Q. Sure. At the time that you wrote this article it was certainly impossible that there would be securities class actions in existence where class periods would over -- you know, you had some of the class period before the pandemic began and some

MAGNA
LEGAL SERVICES

Page 126

portion of the class period afterwards?

A. Yes.

Q. So would one example of heteroskedasticity be when you have a class where there's a period of time in the class period before the onset of COVID and a period of class after the onset of COVID there is different volatility stock between those two periods?

A. Yes. That is an example of a type of heteroskedasticity. And the solution for that one is what I did in my published article and also what Ms. Allen did in most of her quantitative analysis, which is to split the period between a COVID period and a pre-COVID period and a post-COVID period.

So if the type of heteroskedasticity is a break, usually an increase in the volatility, then simply splitting the comparison period works as a solution. But if the heteroskedasticity is also of the type that volatility is varying from day to day, in either period, the pre-period or the post period, and there are tests for that, which I ran and Ms. Allen did not, then you need an additional correction. The Newey-West is one.

Q. How many times have you opined in

Page 127

securities class actions that it's appropriate to use a Newey-West adjustment?

A. Just yesterday I was sitting at my desk and I made a list of five off the top of my head figuring that you'd probably ask. I didn't go and do a full-blown search. But at least five in recent couple years.

Q. Do you recall which cases those were?

A. McKesson, Aegean, Wreck It, Cardinal Health and the Sealed Air one that Ms. Allen brought up.

Q. If you followed the methodology laid out in Exhibit 6, your article, without using the Newey-West method and you didn't apply the Newey-West method in this case, would you have concluded that there was a statistically significant residual return on June 15, 2020 at either a 95 percent or 90 percent confidence level?

A. Well, that is the test that Ms. Allen ran. And she found significance levels of under 90. So 87 percent. We began talking this morning about the 87 percent level. So it was significant at the 87 percent level -- confidence level, but not at the 90.

Q. Okay.

Page 128

A. But even that, you can't conclude from that finding that the disclosure had no impact on the stock price. In fact, what you would conclude is that it most likely did.

And I also want to add, you'd be wrong to use that method, to use just plain, old OLS, ordinary least squares. If you observed that the test for heteroskedasticity tripped the wire and there was significant heteroskedasticity, that would tell you. That diagnostic test tells you you should not be using OLS. You should be using something like Newey-West.

Q. You made a statement earlier that NERA itself had -- in a different case or a different report had suggested use of the Newey-West adjustment. Is that in paragraph 99 of your rebuttal report, Exhibit 2?

A. I'm sorry. My report?

Q. Yes. I'm looking at it now. Paragraph 99 of Exhibit 2, your rebuttal report on page 37, you say, "NERA, the firm at which Ms. Allen is the managing director, endorses 'adjusting the standard errors of the significant tests, like those proposed by Newey and West, were residual autocorrelation or

Page 129

White for residual heteroskedasticity.'"

Did I read that correctly?

A. That's right.

Q. Do you know if that report is about a securities case?

A. I thought it was a competition economics case, but it's the same kind of metrics.

Q. Did it involve an events study?

A. I don't recall.

Q. Doesn't it -- when you read this sentence it says the NERA report endorses what you say is "adjusting the standard errors of the significance tests, like those proposed by Newey and West for residual autocorrelation or White for residual heteroskedasticity."

Did I read that correctly?

A. Yes.

Q. And so the NERA report you're referencing is discussing the use of a Newey and West test for residual autocorrelation or White for residual heteroskedasticity; correct?

A. Yeah. That's the language. That's the quote. So I quoted them accurately. But Newey-West corrects for heteroskedasticity and autocorrelation.

MAGNA
LEGAL SERVICES

Page 130

Q. You're not saying that in this particular sentence NERA is advocating that Newey-West should be used specifically for heteroskedasticity. In this sentence it describes the use of Newey and West for autocorrelation, not heteroskedasticity; correct?

A. No. I disagree. White is a version of Newey-West. Newey-West is a version of White.

Q. You're not contending that there is autocorrelation in this case; correct?

A. No. But if there is, then Newey-West corrects it.

Q. Would autocorrelation be inconsistent with market --

A. Not necessarily. There's literature on that, too. Some people say it is, but it's not accurate. There are a lot of reasons -- well, a random walk, if you identified that a stock falls around a random walk, you know that it's weak form efficient. But if it's not following a random walk, it does not mean that it's not efficient. There's a lot of reasons for that.

Q. Do you see in paragraph 101 of your rebuttal report, Exhibit 2, there's a footnote 77 at

Page 131

the end of that paragraph after the word "heteroskedasticity"?

A. Yes.

Q. And there's a cite to A Guide to Econometrics by Peter Kennedy?

A. That's right.

Q. Do you have -- I understand that's a very large textbook. Do you happen to have a more specific citation than just to the book at large or was there something you recall specifically from that book?

A. It probably would have helped to give you a page number. I could supply that for you. Most econometrics textbooks will say the same thing, that heteroskedasticity corrections allow for the appropriate volatility to be applied. The appropriate volatility that should be applied to each observation will change from day to day.

Q. What page is that on again?

A. I don't know. I mean, it's definitely in this textbook and it's pretty much in any econometrics textbook that addresses heteroskedasticity corrections.

Q. If you look at page 16 of your rebuttal

Page 132

report, Exhibit 2, do you see that there's a table 1, Heteroskedasticity Test Results?

A. Page 16?

Q. Page 16 of your report. Not paragraph 16, but page 16. I'm sorry. I'm looking at page 16 of the PDF.

A. Okay.

Q. Page 13 using the internal number. And it's paragraph 36.

A. Okay. I'm there.

Q. Do you see that there's a reference to regression 6 and regression number 7 for --

A. Oh, yeah.

Q. And your table reflects that, in fact, there was no heteroskedasticity in the regression models that Ms. Allen used for the June 15, 2020 event study; correct?

A. Wrong.

Q. Let me re-ask the question. I think I phrased it the wrong way. Would you agree that looking at this table, you know, your own tests as reflected in the reg 6 and reg 7 line items, reflect that those regression numbers had no heteroskedasticity; correct?

Page 133

MR. LAVELLE: Objection.

A. I disagree. I think you would draw the opposite conclusion from this table.

So regression number 6, the test for heteroskedasticity points to heteroskedasticity at the 93.7 percent confidence level. Yeah, it's not 95. That's why it doesn't say yes, but it's still in the 90's. And then the next one, regression 7 is at the 91. Yeah, 90.3 percent confidence level.

Now, if those were -- if all of the regressions gave you numbers like that, maybe someone could argue, you know, the diagnostic for heteroskedasticity wasn't tripped. You know, the red light didn't go off. But if you've got eight regressions -- yeah. Eight regressions all testing June 15, 2020 and six of them give you -- you know, heteroskedasticity at the 99 percent confidence level and two of them give you heteroskedasticity at somewhere in the 90's confidence level, you know you have heteroskedasticity.

You've got to do something about it. You can't just simply ignore that. I mean, I don't get any -- I wouldn't get any comfort from a finding of 6.3 percent T value for regression 6 given that

MAGNA
LEGAL SERVICES

Page 134

all the other regressions had heteroskedasticity at the 99 percent level.

BY MR. STOKES:

Q. Do you think Ms. Allen's regression numbers, looking at 1 through 5, or even 1 through 8, under your analysis for any of those regression models, did you find a statistically significant residual return at a 95 percent confidence level?

MR. LAVELLE: Object to the form.

A. I don't remember which one of these is my model. But my model, which is the appropriate model, had -- did have statistical significance -- did find statistical significance of the June 15, 2020 residual return at the 95 percent confidence level.

In fact, I just looked at this this morning. If you look at where it placed in the histogram, that day was the second most extreme negative day, given that the Newey-West corrected T statistic out of about a hundred days.

BY MR. STOKES:

Q. That's using your model, though; right? Not -- if you use Ms. Allen's regression models, you know, 1 through 8 that deal with the 6/15/2020 test

Page 135

date, using those models, you would agree there is not statistical significance at a 95 percent level; correct?

A. I don't recall. What I wrote about is how these models are invalid. She doesn't correct for changing volatility.

Q. Do you recall you made a statement earlier about Ms. Allen being wrong about analysts not referring to the AG charges?

A. Oh, yes, I do recall that.

Q. And if you look at 71.

A. Paragraph 71?

Q. Paragraph 71 of your rebuttal report. Is this what you're referring to?

A. Yes.

Q. Are you aware of any other analyst report or analyst commentary, oral or written, besides this June 15, 2020 media article about a KeyBanc analyst where an analyst commented that they viewed the AG charges as having an impact or likely to have an impact on the stock price?

A. Well, I mean, paragraph 73 talks about journalists, two additional journalists. But someone with the title of analyst, this is a . . .

Page 136

Q. Right. And, by the way, with respect to the journalist articles, 73, journalists reported the fact that there was a stock price decline after the AG allegations, there is a description as to how much the stock price fell. But nothing in the journalist's articles, the Bloomberg article referenced here, purported to make any conclusions about whether the announcement of the AG allegations actually caused the stock price to change; correct?

MR. LAVELLE: Object to form.

BY MR. STOKES:

Q. I'll say it's common place when Bloomberg reports a news event about a company for them to note how the stock price is performing that day, given that Bloomberg is -- reaches an audience that cares about stock prices; correct?

A. I hear what you're saying. I mean, but if it's a question, I think the implication is here. When they have a headline that says Cabot Oil drops quickly after Pennsylvania AG allegations, the implication is that there's some causation there, that this wasn't just random volatility.

Similarly -- by the way, Seeking Alpha is equity analysis. So paragraph 74 notes that the

Page 137

Seeking Alpha report also made the connection. "Cabot Oil dips deeply into the red after the Pennsylvania attorney general's office formally charges the company for environmental crimes in the state."

I mean, it's -- I think anybody who -- I mean, the way newspaper headlines are written or newspaper articles are written, that definitely suggests a connection between the two. It's not just a coincidence.

MR. LAVELLE: Peter, I know you're trying to get everyone out of here. But when it makes sense, can we take a quick just, like, five-minute break?

MR. STOKES: Oh, sure. Yeah. I'm getting pretty close to the end. Why don't we go ahead and do that. I'll see how much I've got left, but I should be able to wrap things up.

MR. LAVELLE: Okay. I appreciate that. Thanks.

VIDEOGRAPHER: We're going off the record at 2:04 p.m.

(A brief recess was taken.)

VIDEOGRAPHER: We are on the record at

MAGNA
LEGAL SERVICES

Page 138

2:13 p.m.

BY MR. STOKES:

Q. So since the break I have uploaded Exhibit 7 into the chat. And I'll give you an opportunity to open it. And once you've had a chance to open it, can you let me know when you're ready and confirm that this is the same Fly on the Wall report dated June 15, 2020 that's referenced in paragraph 71 of your rebuttal report?

A. Yes.

Q. And do you see in Exhibit 7 in the paragraph that starts with, "13:11," which I assume is a 1:11 Eastern Daylight Time, do you see where it says, "KeyBanc sees 'slightly negative' reaction"?

A. Yes.

Q. Okay. And does that correspond to the quote in, you know, the quoted portion of paragraph 71 of your rebuttal report?

A. Yes. I mean, they seem to be from different sources, but it's the same article.

Q. Do you see where it goes on to say after the phrase, "down 4 percent to 19.30" in Exhibit 7? It goes on to say, "While difficult to predict what these changes will mean for Cabot over the long

Page 139

term, they are unlikely to be 'very material' as the industry has demonstrated many times over the years that methane gas is naturally occurring in the water supply and in the area."

Do you see that portion?

A. I do.

Q. And you do not --

A. Actually, it said, "charges." Not "changes."

Q. Charges.

A. Aside from that.

Q. Okay. I agree, it does say, "charges." And you didn't include that portion of the article in the portion that you excerpted in paragraph 71 report; correct?

A. Correct. I mean, it doesn't say immaterial and it says that the stock price reaction is from this news.

Q. Holding all things equal, would you expect to see a larger negative stock price reaction from the announcement of felony charges or misdemeanor charges?

A. It depends on a host of factors.

Q. Did you undertake any analysis as to the

Page 140

severity of the individual charges in the AG presentment with respect to individual wells and which ones or charged felonies versus misdemeanors and which ones corresponded to the wells that had received the NOV's discussed in the --

A. No, I didn't do that analysis.

MR. LAVELLE: And I'm going to pose an objection to form.

BY MR. STOKES:

Q. Paragraphs 45 and 46 of your rebuttal report, you discuss what you describe as inaccurate stock return that Ms. Allen had entered into data of a particular event study regression. Do you see that?

A. I do.

Q. Do you know if Ms. Allen actually included that number in her report itself?

A. I don't know what you mean by in her report.

Q. Do you know if the error or the inaccurate stock return that you describe in this paragraph, is that part of her report or was that part of your turnover materials that were provided after filing her report?

Page 141

A. Well, it was in the -- we detected it from what was turned over. And it did -- it was the data she used to produce the results that were written in her report. The error is in the data that she used to generate the results that are reported in the report.

Q. What analysis did you do to assess the error that you describe in paragraph 45 actually affected the analysis in the report itself?

A. Well, I and my team replicated her analysis. It did have a quantitative impact, a substantial quantitative impact, as described in paragraph 48. But whether something was over the line or under the line for significance, qualitatively was not affected. Quite a dramatic quantitative effect that changed the range of 95 percent significance level from 3.63, plus or minus, to 10.2, plus or minus.

Q. Did that change any -- can you point to any conclusions in the Allen report that changed with or without that error?

A. No.

Q. Going back to the questions I had been asking earlier about what would potentially have

MAGNA
LEGAL SERVICES

Page 142

happened to the stock price had Cabot either modified or omitted portions of the alleged misstatements at issue in this case, would you agree that if the -- if there was an overall net positive -- strike that.

Would you agree that if the overall effect of alleged issues in this case in the February 2016 10-K and the -- I'm sorry.

Would you agree that if the overall impact of the challenged disclosure was to convey more positive than negative news and the net positive from the challenged disclosure was material and significant, would you agree that under economic theory that you would expect everything else equal to see a statistically significant positive residual return in the stock price versus not including that disclosure at all?

MR. LAVELLE: Object to the form.

A. Not necessarily for a variety of reasons.

BY MR. STOKES:

Q. Why is that?

A. Well, information -- first of all, the part of your question that relates to statistical significance, you can have a very positive statement

Page 143

or a very negative statement that will impact the stock price, but in an amount that's less than the threshold for statistical significance.

So let's say, you know, the appropriate volatility is 2 percent per day, you would need a movement bigger than 4 percent or less than negative 4 percent roughly to be considered statistically significant. But a very positive statement might move the stock price up 3 percent. Or negative statement might move it down 3 percent. There is price impact and price movement.

You might have other means for determining that the movement was caused by the information. But it wouldn't be statistically significant. So significance is not the only way to assess causation and you don't always need significance when there is causation.

Now, there's one reason. So just to summarize, it's possible that you might have an impact and a movement that's not significant.

The other reason is information -- I mean, it's hard to analyze or to speak generally about the impact of hypothetical statements or bits of information in a vacuum without knowing the

Page 144

context of what the market knew, what the market expected, the implications of the news and so on. So it's just hard to make a general statement about what would happen in all cases or most cases.

Q. Did you conduct any testing or analysis to assess whether the challenged disclosure made on February 22, 2016 changed investors' expectations with respect to Cabot's environmental liabilities versus what Cabot had previously disclosed?

MR. LAVELLE: Object to the form.

A. Well, I mean, I did not do an independent loss causation or price impact analysis. What I did was assess whether the -- whether Ms. Allen did a valid price impact analysis. So I'd have to say no.

BY MR. STOKES:

Q. Going back to my earlier question, I think we tripped up a little on my use of the words "statistical significance," so I'm going to omit that piece of it now.

If we assume that the net impact of the February 22, 2016 alleged statement was to -- was positive in nature and was materially positive versus what Cabot had previously disclosed about its environmental liability risks, would you expect to

Page 145

see some positive price impact as a result of including that disclosure?

MR. LAVELLE: Object to the form.

A. I lost you as to which part of the -- I mean, there was a negative part and a positive part. I lost --

BY MR. STOKES:

Q. I'm trying to control -- I hear that. And I'm trying to control for that in saying let's assume that the net effect, considering the negative and positive together, assume with me that the net effect of that disclosure was positive overall. Does that make sense?

A. Okay.

Q. The positive exceeds the negative.

A. I can make that assumption. All right.

Q. If that were true such that holding everything else equal, the net impact would be to convey a more positive view of Cabot's environmental risks than what had previously been disclosed, would you expect to see some positive movement in Cabot's stock price as a result of including that disclosure?

MR. LAVELLE: Object to the form.

MAGNA
LEGAL SERVICES

Page 146

A. So we need to be careful about what we're comparing it to. What's the but-for world. Is the but-for world not saying anything. Is the but-for world telling the full truth, which is contrary to the positive statement. I mean . . .

BY MR. STOKES:

Q. That's not quite what I'm asking. I'm asking a different concept. I'm not asking you to assume whether something that was said wasn't said or vice versa. I'm just taking the disclosures as they are.

So just assume with me that disclosures were made as they were made and that the net impact that a -- or the net effect of what a reasonable investor would draw from the challenged disclosure on February 22, 2016 was positive, it was overall positive.

A. Okay.

Q. We're agreeing conceptually what that meant; right?

A. Okay.

Q. So if that were the case, then wouldn't you expect to see positive movement in the stock price after the alleged misstatement on February 22, 2016

Page 147

was announced?

A. Well, I need to --

MR. LAVELLE: Object to form.

A. -- know more about the hypothetical. What else was disclosed that day? I mean, in reality we know that that day was a day of -- that was an earnings announcement day, so there was a lot said. So are we saying nothing else was said at all that day. You'd have to also have to look at what else was said that day that may have reenforced or countervailed against the price movement.

Q. Just holding everything equal, holding everything equal, would you expect to see a positive stock price movement from the making of a disclosure that is a net positive to the company from an economics standpoint?

A. In an efficient market, let me say that again, an efficient market, positive news exerts positive upward pressure on the stock price. Whether you're going to see a movement or not really depends on what else is going on that day. And to some extent, also whether the news is unexpected and new. But it's important to consider that what else is being said that day is also important.

Page 148

But, yes, positive news in an efficient market will exert positive pressure -- positive upward pressure on the stock price that might result in a significant movement of the price or it might result in a nonsignificant movement of the price. Or if it's countervailed, it might result in no movement of the price. Or if there's other negative news, it might result in less downward movement in the price than otherwise would have occurred.

Q. Other than the NERA report that you cite in paragraph 99 of your rebuttal report, have you cited any other academic literature that supports applying the Newey-West adjustment to the type of event study that you formed in this case?

A. Well, the event study uses a regression and all the articles on event studies say that a regression is an important part of the event study. The academic literature says that when you're running a regression, if there is heteroskedasticity, you need a correction such as the Newey-West correction.

So right there in paragraph 99 I've got the citation to Newey-West. It cites the 1980 White correction. White and Newey-West are very similar.

Page 149

I mean, Newey-West went a little bit beyond what White did and corrected for both autocorrelation and heteroskedasticity simultaneously. But, you know, even the White article say you need a correction. You can't draw inferences without a correction for the change in volatility.

So I cite those two, you know, the original papers. I cite the Kennedy textbook. I think you can also -- I mean, there's abundant literature. I cite at least those things, but I could have cited many more.

Q. Can you list any others as we're sitting here today?

A. In support of a heteroskedasticity correction, yeah. Intriligator. I cited Intriligator's textbook in either this report or the first one. Let me find it. Well, there it is, documents considered, page 39. Michael Intriligator, Econometric Models, Techniques, & Applications, Prentice-Hall.

But seems according to the search -- oh, here we are. Paragraph 34. Yeah. So we've got Intriligator cited. Mason, Lind and Marchal explains that heteroskedasticity is a problem.

MAGNA
LEGAL SERVICES

Page 150

That's what that quote is that's excerpted there. And another quote from the same textbook talks about what homoscedasticity is as opposed to heteroskedasticity. But those books will also tell you you need a correction when that condition is not met.

Hold on. There's more. That's an odd question because there's so much here. Oh. You're saying they specifically point to the Newey-West?

Q. Yes.

A. Okay. They very well may not. They say you need a correction. And Intriligator actually precedes the Newey-West article. So they say you need a correction and the Newey-West article says, you know, here's a correction that works.

Q. Can you think of any other academic literature or publications that endorse using specifically the Newey-West approach to this type of event study?

A. Well, as I sit here now, I stand by my report. But I can get more for you if you want them. There are others. I mean, it's a generally accepted correction for heteroskedasticity.

Q. Sitting here today, can you think of any

Page 151

court decisions where a court has accepted the use of the Newey-West approach in a securities class action events study?

A. I wouldn't call it an approach.

Q. Or use of the test.

A. As I sit here now, no. But that doesn't mean -- I don't know of any where the courts rejected it. And I would find it hard to believe that any court would reject it given that it's state ADR generally accepted econometric methodology.

MR. STOKES: All right. Well, I have no further questions at this time. Thank you very much.

I reserve the right to the extent other reports are submitted or other testimony is given, to ask future questions. But right now I pass the Witness and thank you for your time.

MR. LAVELLE: I have no questions. Thanks very much. Thanks for your time.

VIDEOGRAPHER: Off the record at 2:39 p.m.

COURT REPORTER: Rough draft today and final on Monday?

MR. STOKES: We'll take the rough as

Page 152

soon as you can. But understanding it is a Friday afternoon. But, yeah, anything you can do on that front would be appreciated.

MR. LAVELLE: We'll take the rough whenever you send it over to Peter. And then I'll follow up with the final when we want that.

(Deposition concluded at 2:40 p.m.)

Page 153

ERRATA SHEET DISTRIBUTION INFORMATION

DEPONENT'S ERRATA & SIGNATURE INSTRUCTIONS

ERRATA SHEET DISTRIBUTION INFORMATION

The original of the Errata Sheet has been delivered to Kevin Lavelle, Esquire.

When the Errata Sheet has been completed by the deponent and signed, a copy thereof should be delivered to each party of record and the ORIGINAL forwarded to Peter Stokes, Esquire, to whom the original deposition transcript was delivered.

INSTRUCTIONS TO DEPONENT

After reading this volume of your deposition, please indicate any corrections or changes to your testimony and the reasons therefor on the Errata Sheet supplied to you and sign it. DO NOT make marks or notations on the transcript volume itself. Add additional sheets if necessary. Please refer to the above instructions for Errata Sheet distribution information.

Page 154

PLEASE ATTACH TO THE DEPOSITION OF STEVEN FEINSTEIN

CASE:   Delaware County Employees vs. Cabot, et al.

DATE TAKEN:  June 30, 2023

ERRATA SHEET

Please refer to Page 153 for Errata Sheet

instructions and distribution instructions.

PAGE    LINE    CHANGE OR CORRECTION AND REASON

_____|_____|_____

_____|_____|_____

_____|_____|_____

_____|_____|_____

_____|_____|_____

_____|_____|_____

_____|_____|_____

_____|_____|_____

I have read the foregoing transcript of my deposition, and except for any corrections or changes noted above, I hereby subscribe to the transcript as an accurate record of the statements made by me.

Executed this _____ day of _____, 2023.

_____
Steven Feinstein, Ph.D.

Page 155

CERTIFICATE OF COURT REPORTER

I, Shannon Dunigan, Certified Shorthand Reporter and Notary Public in and for the Commonwealth of Massachusetts, do hereby certify that Steven Feinstein, Ph.D., the witness whose deposition is hereinbefore set forth, was duly sworn by me and that such deposition is a true record of the testimony given by the witness.

I further certify that I am neither related to or employed by any of the parties in or counsel to this action, nor am I financially interested in the outcome of this action.

In witness whereof, I have hereunto set my hand and seal this 2nd day of July, 2023.

Notary Public
My commission expires:
August 1, 2025

MAGNA
LEGAL SERVICES