UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| DELAWARE COUNTY EMPLOYEES RETIREMENT SYSTEM, ET AL | § | 4:21-CV-02045 |
|---|---|---|
| | § | |
| | § | |
| | § | |
| V. | § | 11:26 A.M. TO 12:53 P.M. |
| | § | |
| CABOT OIL & GAS | § | |
| CORPORATION, ET AL | § | JULY 7, 2023 |

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| JODY EZELL, ET AL | § | 4:21-CV-02046 |
|---|---|---|
| | § | |
| V. | § | 11:26 A.M. TO 12:53 P.M. |
| | § | |
| DAN O. DINGES, ET AL | § | JULY 7, 2023 |

**HEARING ON CLASS CERTIFICATION VIA VIDEO CONFERENCE**
**BEFORE THE HONORABLE JUDGE LEE H. ROSENTHAL**
Volume 1 of 1 Volume

**APPEARANCES:   (All parties appeared via video conference)**

**FOR THE PLAINTIFFS:**
Attorney Darryl James Alvarado
Attorney Jack Abbey Gephart
Robbins Geller Rudman & Dowd, LLP
655 W. Broadway
Suite 1900
San Diego, California 92101
(619) 231-1058
   and
Attorney Joe Kendall
Kendall Law Group, PLLC
3811 Turtle Creek Boulevard
Suite 1450
Dallas, Texas  75219
(214) 744-3000

**APPEARANCES:    (All parties appeared via video conference)**

**FOR THE PLAINTIFFS:**
Attorney Andrew L. Zivitz
Attorney Alex B. Heller
Kessler Topaz Meltzer Check, LLP
280 King of Prussia Road
Radnor, Pennsylvania  19087
(610) 667-7706
   and
Attorney Benjamin Isaac Sachs-Michaels
Glancy Prongay Murray, LLP
712 Fifth Avenue
31st Floor
New York, New York  10019
(212) 935-7400
   and
Attorney Melinda Nicholson
Attorney Nicolas Kravitz
Kahn Swick & Foti, LLC
1100 Poydras Street
Suite 960
New Orleans, Louisiana 70163
(504) 455-1400
   and
Attorney Balon B. Bradley
Attorney at Law
11910 Greenville Avenue
Suite 220
Dallas, Texas  75243
(972) 991-1582
     and
Attorney Shane P. Sanders
Robbins LLP
5060 Shoreham Place
Suite 300
San Diego, California  92122
(619) 525-3991

**APPEARANCES:    (All parties appeared via video conference)**

**FOR THE DEFENDANTS:**
Attorney Peter Andrew Stokes
Norton Rose Fulbright, US, LLP
98 San Jacinto Boulevard
Suite 1100
Austin, Texas 78701
(512) 536-5287

**ALSO IN ATTENDANCE:**
Jonathan Lichtenstein
Joanne Phillips
Cole DeLancey
Timothy Brown

Court Reporter:
Laura Wells, RPR, RMR, CRR, RDR
601 Rosenberg, Suite 615
Galveston, Texas 77550

Proceedings recorded by mechanical stenography.
Transcript produced by computer-assisted transcription.

**(The following proceedings held via video conference.)**

THE COURT:  Good morning.  We may be a little bit early.  I don't know if everyone is here.  There is someone present whose name is Andy.  If you could rename yourself properly, it would help the court reporter.

ATTORNEY ZIVITZ:  I apologize, Your Honor.  Andrew Zivitz from Kessler Topaz.  I already talked to the court reporter, and my apologies for that.  I'm trying to fix it.

THE COURT:  Okay.  You may not be able to fix it until you log out.  So tell me how I should address you.

ATTORNEY ZIVITZ:  It's Andrew Zivitz from Kessler Topaz.

THE COURT:  All right.  Mr. Zivitz, that's helpful.  Thank you.

All right.  Let's go ahead and start collecting appearances.  And if those of you who are actually going to argue could let me know that, that would also be helpful.

ATTORNEY ALVARADO:  Good morning, Your Honor.  Darryl Alvarado on behalf of the plaintiffs.  I'll be arguing today.  In attendance on the call so far that I see are Jonathan Lichtenstein, deputy solicitor; and Joanne Phillips, the controller of lead plaintiff Delaware County Employees Retirement System.  I see Mr. Kendall on

the line and a few other folks, but I'll be arguing on behalf of the plaintiffs today.

THE COURT:  In both cases?

ATTORNEY ALVARADO:  In the securities case.

THE COURT:  All right.  And what about in the Ezell case?  Who is going to argue for the plaintiffs?

ATTORNEY SACHS-MICHAELS:  Good morning, Your Honor.  Ben Sachs-Michaels from Glancy Prongay and Murray, co-lead counsel for the derivative plaintiffs.

THE COURT:  All right.

ATTORNEY STOKES:  Good morning, Your Honor.  This is Peter Stokes with Norton Rose Fulbright on behalf of defendants in both matters.  I will be arguing for both matters.  And with me is Cole DeLancey, in-house counsel for Coterra.

THE COURT:  Very good.  All right.  These are both pretty old cases.  I'd like to begin by having counsel for both sides tell me if and, if so, how the case law may have changed since these cases were filed two years ago.

ATTORNEY ALVARADO:  I can start for the securities case, if you would like, Your Honor.

THE COURT:  Okay.

ATTORNEY ALVARADO:  I think probably the biggest or maybe the most sort of notable case that's come out as

it relates to class certification, which we're here to talk about with the securities case today, is the *Goldman Sachs* opinion from the Supreme Court, which came out in 2021, and which addressed the question of whether generic statements can be considered at the class certification stage.

I'm not sure if there has really been any key change in the Fifth Circuit or anything like that as it relates to class certification or price impact. I think the issues are fairly joined, and I think *Goldman* is probably the most recent case that has spurred some of the more recent arguments you see related to price impact.

THE COURT: All right. On behalf of the defendants.

ATTORNEY STOKES: Your Honor, we concur with that assessment. *Goldman Sachs* is clearly the elephant in the room when it comes to this case. We think that it actually does clarify the law in several critical respects that I think are very important today.

And as Mr. Alvarado mentioned, the parties vigorously joined issue on these points, and we look forward to arguing them. I could comment also on the derivative case, if you would like.

THE COURT: Sure.

ATTORNEY STOKES: We think the derivative -- the

key derivative -- first of all, we don't think the cases have changed materially since the first iteration of the briefing.  The *MoneyGram* case we think is still highly analogous and instructive in this case.

The *McDonald's* case that came out earlier this year we think is also highly instructive.  It dismissed another similar *Caremark*-style case.  And it made clear that with allegations that we frankly believe are more severe than those presented here, again, the Delaware courts simply do not allow cases with this type of fact pattern to proceed past a motion to dismiss.

THE COURT:  Which leads me to my next question which is not about the law but about the practicalities. Obviously, you have teed up some critical issues; and if we proceed, you are looking at some very expensive pretrial practice.  You know what the issues are.  You know what the law is.  There is really not a huge amount of dispute over what was said, when it was said.  There may be some disagreement on inferences to be drawn, clearly disagreements on inferences to be drawn; but you know the ups and downs and the potential risks and upside benefits of this case a whole lot better than I do.

At what point does it make sense for you to talk about a way to resolve this short of litigation?  And I don't care who answers first.

*Laura Wells, RPR, RMR, CRR, RDR*

ATTORNEY SACHS-MICHAELS:  Your Honor, Ben Sachs-Michaels for the derivative plaintiffs.  I would be happy to answer that.  But I also -- could I have an opportunity to say which case I think has changed the most since we were together last?

THE COURT:  Sure.  Sure.

ATTORNEY SACHS-MICHAELS:  So I would like to direct the Court to the *Walton* case, which is a derivative action involving Walmart.  We cited it in our briefs.  It was issued, like, a month or two ago.

And I think it's particularly relevant because it directly addresses the issue that lead to dismissal of our case last time, which is when to infer that a board has adequately responded to red flags.

And the *Walton* case, it's a different case with different facts; but there are parallels between them. And I -- it's a 90-something-page-long opinion, but I would submit that the inferences that are taken by the Court there are very relevant and informative to the case here.

THE COURT:  Be more specific.

ATTORNEY SACHS-MICHAELS:  Well, that case involved, like this case, a *Caremark* claim where the allegation wasn't that the board had done nothing.  It was that the board hadn't done enough.

And that case, like this one, what we find is the board received red flags of legal noncompliance; and it was also told over a pretty long period of time that the company's remediation efforts were not working.

And what the *Walton* court concluded was that even if the board did something -- and in *Walmart's* case, it drafted an extensive set of policies and procedures. Here, the board received reports about remediation efforts that it could tell were not accomplishing anything.

When the board is repeatedly being told that the company is not complying with the law and their remediation efforts aren't working, the board has to do something. It's not enough to just receive those reports.

And in the *Walton* case, that lead to a pleading stage inference that the directors knew about the noncompliance, which I think is clear from our complaint, and that they allowed it to happen, which meant, according to the *Walton* court, that they consciously condoned illegality, which I think is another way of saying they knew that the company wasn't complying, they knew the remediation wasn't working, and they just let it ride, basically.

I could go on for a long time about it. I don't know if the Court has the patience for it. But I think that the case is relevant.

THE COURT: Well, I have the patience to try to

make this right so we don't have to do it again.  So I think that requires a fair amount of patience.

So your argument is basically one of scienter?

ATTORNEY SACHS-MICHAELS:  Yeah.  I think that what we have alleged here is that -- you know, look, this board -- we've attached for the Court's convenience to our opposition to the motion to dismiss a chart.  It's Exhibit A to the Cochran declaration.

THE COURT:  Right.

ATTORNEY SACHS-MICHAELS:  What we're trying to do is kind of distill this significant pleading record down into something a little more manageable.  And what this chart does is it --

THE COURT:  You mean give me something that complies with Rule 8?

ATTORNEY SACHS-MICHAELS:  Well, yes.  Yes.  And I apologize for sort of -- it has become -- it has taken on a life of its own.

But so what we see from this chart is that over a period of many years, the current board included, the board is being told that there are wells where -- with active gas migration cases and for years and years the list does not change.  The cases are never closed.  It goes on I think on 13 occasions, by my count, between October of 2017 and October of 2020.  The current board

was told 13 times that there were active gas migration cases at Stalter, Shields, Costello, Manzer, Powers, Howell, Jeffers, Foltz, Ely, and Ratzel starting in 2018. And during that time period one well, one case was closed.

And I think the only reasonable inference that you could draw from that, if you are a director, is this isn't working.  This is not doing anything.  It's literally accomplishing nothing.

And at that point, under *Walton,* they had an obligation to do -- I think the term that *Walton* used is institute some kind of business-oriented change to the compliance regime; and I don't think that there is any dispute here that that never happened.  There was never a change that occurred.

THE COURT:  Is it fair to characterize your primary argument not that -- I'm framing this question badly, and I apologize in advance.  Your argument is not so much that the procedures for compliance were missing but that the implementation of those procedures was deficient?

ATTORNEY SACHS-MICHAELS:  So if I can restate that in a way that --

THE COURT:  That's right?

ATTORNEY SACHS-MICHAELS:  I think we're saying the same thing.  I think what we are alleging is there was

a process for telling the board about legal violations, and the board was receiving reports about the purported remediation efforts of management.

THE COURT: Well, back up. Hang on one second. So beneath that statement lies a premise that there was a process to identify a need for remediation in specific wells. There was a process to communicate the results of the identification process to the board as well as to those in management who would, in fact, be tasked with carrying out the steps that were needed and that the failure that you are alleging was at both the implementation stage and the board oversight stage?

ATTORNEY SACHS-MICHAELS: I think that is correct, Your Honor. I would say that the process for identifying the violations was basically that the regulator would tell the company you are in violation, and then the board would review that information. And this is not -- you know, there were problems in 2010 that led to a consent agreement.

THE COURT: Right.

ATTORNEY SACHS-MICHAELS: And those legacy problems were never remediated. But, also, every year there is, like, dozens and dozens of new violations. So it's not just that there were bad wells that they never figured out how to fix. It's that they never figured out

or tried, according to the regulator, to fix them; but, also, throughout the period the business practices were not complying with environmental law.  They were continuing to result in new violations.

THE COURT:  But you are not alleging that there was a deficient process in identifying the violations?  It's what happened after that is what you are --

ATTORNEY SACHS-MICHAELS:  Correct, Your Honor.  It's responding.  And I think the case law I think if we're trying -- there has been a divergence in *Caremark* opinions in the last few years.

But if we try to harmonize the whole thing, the way that it makes sense to me and that they all live in the same universe is that if the board is receiving information that the remediation might be working or is largely working, then it's okay to just sit back and let it play itself out because it's accomplishing something.

But what this board is getting, based on our chart and also on the allegations in the criminal case, is that there is literally no progress at all being made.  So they are claiming to be remediating these wells; and yet, the active cases -- you know, some of these cases, like the Jeffers case I think was opened -- Stalter was open from February of 2015 until 2020.  I mean, at some point there has to be a, no, this isn't working, we're going to change

what we're doing to try and fix the problem.

And another way that things have changed, I think, since the last motion to dismiss, if I may, is that the company was convicted of -- in the criminal case.  And in the last opinion, Your Honor cited the *Lending Club* case for the proposition that, you know, mere allegations of an investigation by a regulator do not rise to the same level as a merits adjudication of criminality.

And so, in that sense, the inferences for plaintiffs here are heightened somewhat from the last go-around because there is an adjudication of criminality.  And the -- you know, defendants' response is that this is a single misdemeanor count, they say.  But if Your Honor looks at the plea document, I think it's Exhibit 7 to Mr. Stokes's declaration, it's a single misdemeanor count and the penalty the company agreed to pay is 650 times the maximum penalty for the misdemeanor count.  So if the maximum penalty is $25,000 and the company is paying 16 and a quarter million to settle -- to resolve the case.

And so I think that, you know, there was obviously a give and a get in the plea negotiations that we're not privy to.  But the inference, when an organization settles criminal charges for hundreds of times the maximum penalty for the charge that they agreed to plead to, I think is that there was very serious wrongdoing that would have

been proven.

THE COURT:  All right.  I'm not sure how far those inferences go because of the opaque nature of the plea process, but I take your point.  And certainly corporate criminal convictions are unusual.

ATTORNEY STOKES:  Your Honor, may I respond to some of those arguments?

THE COURT:  Absolutely.  Yes, sir.

ATTORNEY STOKES:  Thank you, Your Honor.  So a couple of points.  Number one, the mere fact that 13 cases remained open for a period of time by itself comes nowhere close to supporting an inference of bad faith.  As these cases themselves demonstrate, litigation and regulatory matters often remain open for years at a time.  And that's entirely consistent with how the department operates.

THE COURT:  Mr. Stokes, can I interrupt you for a question for a minute --

ATTORNEY STOKES:  Oh, sure.  Sure.

THE COURT:  -- and ask you to tell me where in the record I will find support for more insight into what it means for a case to remain open?

Does it mean that nothing is being done?

Does it mean that some individual within the company has failed to mark it closed even though it is in fact over, even though whatever is required has been done?

What does "remain open" mean in that context?

ATTORNEY STOKES:  So I would cite the Court to the quarterly status report that was provided at the environmental -- the EAC meetings of the board.  And each month they discuss each of the cases.  And there is a lengthy discussion of the status of the case, the steps that are taken, the testing that's being done, the status dealing with the landowners.  These are not all strictly DEP cases, by the way.  These are complaints by the landowners --

THE COURT:  Can I ask you to avoid acronyms?

ATTORNEY STOKES:  I'm sorry.  The Department of Environmental Protection for Pennsylvania.

THE COURT:  Thank you.

ATTORNEY STOKES:  These are also landowner cases, and they are described in detail in those monthly -- I'm sorry -- quarterly status reports.

And one thing that I think is clear from those reports is that there are significant negotiation periods where there is back and forth between either the Department of Environmental Protection or the landowners that goes on for months and years at a time where there are proposals and counter-proposals and some of the landowners settle, some of the landowners are not responsive.

It's the typical twists and turns in any litigation

type of discussion.  But they also reflect that the tail -- to evaluate these claims, there is a considerable tail period of testing that has to be done.  It's not simply that you turn a screw and whatever is allegedly leaking is suddenly shut off and the landowners and the Department of Environmental Protection immediately go away.

Instead, there is a complex, lengthy period of testing that goes on and that is discussed in considerable detail in those quarterly status reports.  And I think it supports exactly the opposite inference that Mr. Sachs-Michaels is trying to advocate.  There is nothing unusual about the fact that these remained open for any particular time period.

And then Mr. Sachs-Michaels I think referenced the Jeffers or the Howell orders.  Far from showing that the board was doing nothing, the department issued orders in December of 2020, which are part of the record in this case; and we submit both of those orders specifically found that Cabot performed remediation measures and that those remedial measures were performed, that they were effective, and the testing showed that they were effective, and that they were shown to be effective, and the inference is they were effective before the July 26, 2019, the challenged disclosures regarding those wells.

So for all of those reasons -- and again, as we argued

before, the indictment or the presentation and the plea -- the plea was to a single misdemeanor.  The $16 million was essentially to unlock the Dimock Box where, you know, once they paid that amount to set up a, you know, water system that that unlocked new production for the company.

And I think we put in the record, at least in the class case, the stock price did not fall by any significant amount.  I think it was a good development.  It's not like they paid a $16 million deadweight penalty and got nothing in return.  The actual penalty on the misdemeanor itself was less than $10,000.

So I think when you look at the plea, you look at the negligence-oriented nature of the misdemeanor allegations, which are, you know, negligence is clearly far below what they -- the plaintiffs have to plead in a derivative case to show demand futility, and then when you look at the extensive board record where I think the parties have joined issue on these various documents over the course of two briefing cycles, the bottom line is nothing has changed.

The only thing that has changed is that I don't recall the extent to which the December 2020 orders were as prominent a part of the record the first time, but I think those documents are extremely helpful and only further

undercut the inference that Mr. Sachs-Michaels is advocating.

ATTORNEY SACHS-MICHAELS:  Your Honor.

THE COURT:  Are you --

Hang on one second.  I have a question for Mr. Stokes, if you don't mind.

Are you advocating that these were not material?

ATTORNEY STOKES:  We did.  We don't think they were economically material in terms of the company's disclosure obligations.  So with respect to the disclosure-related claim in the derivative case, the plaintiffs have to show a false material statement but they also have to show that this was bad faith, intentionally misleading, and that the individual outside directors themselves acted fraudulently and intentionally.

And I would submit, Your Honor, that the plaintiffs don't even really address, at least with particularity, the issue of the outside directors' participation in actually drafting and reviewing the statements at issue.

This is not a Section 11 case where all the directors are liable just by signing the document.

This is a 10(b)(5) case where the only 10(b)(5) defendants are the officers, and there is just simply no particularized pleading establishing the director-by-director facts that the plaintiffs need to

establish.

And there is case law and I have got -- I may test the Court's patience. I have got a few PowerPoint slides that I would be happy to share during this hearing.

THE COURT: That's fine.

ATTORNEY STOKES: Let me go ahead and share my screen. I'm just going to focus on one. It looks like screen sharing has been disabled on mine, but I can read it.

THE COURT: Yeah. Go ahead. I'm not sure that I can adjust it on this end. Hang on one second. Only the host can share. I'm going to ask a question of one of my law clerks who is on the Zoom.

Can you enable sharing from your end, Farrah?

LAW CLERK BARA: I can't, Judge, because I'm not the host. If you'll go to your meeting settings --

THE COURT: Got it.

LAW CLERK BARA: -- you should be able to see that.

THE COURT: Got it.

LAW CLERK BARA: Okay.

THE COURT: All right. So what I'm looking for is -- the menu doesn't seem to permit enabling screen sharing. So I'm not sure that does it.

LAW CLERK BARA: Judge, would you be able to make

me the host?  If you just click on my name, on the little dots after it, it should give you that option.

THE COURT:  Let me try that.  No.  I don't think I can actually, Farrah, from this, from what it's giving me as options.  Let's see.

So let's figure out another way, Mr. Stokes.

ATTORNEY STOKES:  I'm happy just to read the case cite.

THE COURT:  That's fine.

ATTORNEY STOKES:  It's Zirn, Z-i-r-n, v. VLI, Corp., the letters V-L-I, 681 A.2d 1050 at 1062, Delaware Supreme Court (1996).

"A good faith erroneous judgment as to the proper scope or content of required disclosure implicates the duty of care rather than the duty of loyalty."

And duty of care claims are not cognizable here.  They have got to show duty of loyalty.  And, again, we think the board records, at a bare minimum, provide abundant evidence of good faith and a good-faith basis, to the extent the plaintiffs have even properly alleged that the outside directors culpably participated in preparing these disclosures.

I would also be remiss, just revisiting the point about the monthly summaries and the open cases, just to point out, again, as confirmed in that Pennsylvania trial

court decision and as reflected in the landowner case that we cited in our briefing and in the summaries themselves, there is a robust debate about whether methane in groundwater in Pennsylvania is naturally occurring or if it's coming from Cabot's wells.

And there is background methane.  It is not this easy, clearcut type of analysis that I think Mr. Sachs-Michaels implies would be obvious to the board that they are not doing their job as a board.

So we think that the Delaware courts -- and we've cited cases.  You know, standing and fighting is a permissible option in Delaware.  Companies are told all the time that they are doing something wrong, they are violating antitrust laws, they are violating securities laws, and companies have the -- you know, they have the right to stand and fight and make arguments against it.

And just because those turn out to be unsuccessful or partially unsuccessful doesn't rise to the high level of bad faith.  I think the *McDonald's* case really drives that point home in a fact pattern that, frankly, is somewhat eyebrow raising with what happened in that case; and still, the Court found no demand futility.

THE COURT:  All right.  Did you want to respond, Mr. Sachs-Michaels?

ATTORNEY SACHS-MICHAELS:  Yes.  Thank you, Your

Honor.  I apologize for piping up too quickly before.

Yeah.  I think I would like to respond briefly, which is a lot of the argument that Mr. Stokes is making here is factual argument that isn't really appropriate at the pleadings stage where the plaintiff receives the inferences.

For example, this thing about methane -- debate about methane in groundwater in Pennsylvania, that's really not a pleading stage issue.

The same for the description of this sort of regulatory process and this -- there is, obviously, a factual question about what active gas migration cases mean.  And on this motion we receive the inferences.

And I think I want to point out that every other third party that has reviewed this record that is before the Court, which is the Pennsylvania Department of Environmental Protection, the Attorney General, and the grand jury, all reached the opposite conclusion that's being advocated by the company here, which is that for approximately eight and a half years the company did little to no remedial work on the wells that were the problem.

So defendants are asking the Court to draw inferences in their favor from this record, which wouldn't be permissible, in any event, at this stage.  But if we're

balancing the weight of the inferences, defendants' inferences are advocated by no one except themselves. There is no third party that has endorsed them.

Here, we have all the regulators. The allegations in our complaint give rise, at a bare minimum, to competing inferences.

And, in fact, Your Honor in the securities class action decision held that the allegations supported the inference that Cabot exhibited a pattern of willful violation of applicable environmental laws, regulations, and other legal obligations for more than a decade and was criminally charged with knowing violations of environmental law.

So I think that as a matter of pleading, the company's interpretation that it's advancing here, which is a lot of what the argument is about, really isn't appropriate for resolution in the company's favor at this stage, respectfully.

The only other quick point I would like to make is, you know, standing and fighting is certainly allowed. But also operating a company in violation of that posited law is not allowed. That's a bottom-line requirement of Delaware law is that you have got to operate your company lawfully.

There is a difference. Here, in 2010, this company

entered a consent agreement where it agreed to do certain things. So it's not the same as the *Qualcomm* case where they are having a fight with regulators about antitrust, whether they violated prohibitions on monopolistic conduct. Here, in 2010, the company agreed to do things that it didn't do. So it's not really a stand-and-fight situation.

And I think the last point I would just like to make, if I might, is, you know, these December 2020 orders related to Howell and Jeffers, I -- Mr. Stokes can correct me if I'm wrong -- I don't think they were in the record before this opposition. I don't -- this motion to dismiss. I don't know where they came from. I don't think they are publicly accessible. They certainly weren't put in -- I don't think they were put in the securities case, even though they were available. So we kind of aren't -- you know, I'm not sure if the Court should be taking judicial notice of those or where they came from.

And I also -- I think, also, that if the Court looks at them, they don't actually undermine the decision that the statements were misleading anyway because they don't show -- in the case of Jeffers, when the report was issued, there hadn't been a conclusive remediation; and that was December of 2020.

In the case of Howell there was -- until, I think it was, September, 2020, there wasn't a conclusive -- there wasn't a conclusion that the well had been remediated until they did something called a -- excuse me -- something called a pressure buildup test was conducted in September of 2020, and that's when it was determined that the problem had been fixed.

So those are my responses to Mr. Stokes.

ATTORNEY STOKES:  Your Honor, if I could reply briefly.

THE COURT:  Yes.

ATTORNEY STOKES:  So with respect to the orders being in the record, we submitted at Docket 105 with our motion to dismiss the Howell and Jeffers orders as Exhibits 6 and 7 -- I'm sorry -- Exhibits 5 and 6.  They are ECF numbers 105-6 and -7.  So those have been in the record since we filed the renewed motion to dismiss on April 28th.

But the issue that Mr. Sachs-Michaels describes with respect to the consent order is, frankly, a dead ringer for *MoneyGram* again where there was -- there was a prior -- a deferred prosecution agreement.  The company didn't correct the problems.  They were hit for another $125 million fine.  It crushed the stock price.  And on those facts, the Delaware Court of Chancery granted

dismissal.

And it looks back to the materiality question, which I'm not sure I adequately answered the first time.

I think it raises another inference on the derivative side that, again, supports dismissal; and that is, when you look at the cases that -- where companies survive motions to dismiss, it's typically cases where companies know what they are doing is illegal and they decide to do it anyway so that they can sell more products, they can sell -- you know, they can sell more drugs through off-label use, which is the most common fact pattern.

That just isn't -- the inference is just not supportable here.  The amounts of the penalties, you know, that were levied and paid are frankly -- you know, I don't want to say the violations are trivial, but the penalties are.  The financial amounts of the penalties here are exceedingly small compared to the market cap of the company.

And I think it severely undercuts any inference that there was intentional fraud as to the content of the disclosures as well as any inference that there was some kind of deliberate effort by the directors to sweep this under the rug so the company could make more money.

I mean, the amounts here, this was all in plain view of the regulators.  There was a dialogue back and forth.

The company was not trying to, you know, hide violations from the regulators, which is the inference I think in a lot of the cases where dismissal has been denied.

But rather, they were quite transparent about where things stood; and they submitted reports and hired consultants and did testing and undertook remedial work. And, yes, you know, there were different conclusions reached to certain wells by the regulators; but it was ultimately resolved for a misdemeanor.

And I think any way one looks at the allegations in the record here, it is a weaker case than the *MoneyGram* case. It's a weaker case than *McDonald's*. And we submit it should be dismissed.

THE COURT: Let me ask you about the relationship between the two cases. If I certify a class in the Cabot case, how does that affect the Ezell case?

ATTORNEY STOKES: So our view is that it -- at most, it would affect the demand futility analysis with respect to the individual defendants on the board through the CEO Dinges. It would affect his ability to consider a demand potentially.

But as the Delaware courts say over and over again, you look at the entire -- you know, the majority or half of the entire board. It does nothing to increase the risk of liability with respect to the outside directors who are

not part of the class action suit.

And I think that's the distinction the courts have drawn that if the derivative allegations are -- you know, if they are premised on 10(b)(5) allegations that only name a handful or one member of the board, then they don't support it.  They really add nothing.

Just like an allegation of insider trading as to one defendant who is on the board, it may have consequence for that director's analysis; but it has no practical significance for evaluating the notion as a whole.

THE COURT:  Are the Ezell plaintiffs members of the class that is alleged in the Cabot case?

ATTORNEY STOKES:  That is a good question, Your Honor.  I think they purport to be, from their allegations, but it's not necessarily the case because it could have been that they held their stock before the class period and never sold, in which case they wouldn't be part of the class.

So they don't have to do quite the same level of production to the Court or certification that the federal class action plaintiffs have to do.  And so that would require some further exploration, I think.

THE COURT:  So the cases can't be consolidated because the proof requirements or burdens are going to be slightly different?

ATTORNEY STOKES:  That's our view, Your Honor.  I think the plaintiffs in the derivative case share that view on consolidation.  I think there is a disagreement about the impact of the Court's -- some of the Court's rulings on the pleadings.

THE COURT:  Right.

ATTORNEY STOKES:  I think that's the only -- I think we -- I think even on that there is -- I sensed, and I don't want to overstate, but there was agreement that -- I don't think the plaintiffs argued that the class action merits decision on the pleadings was binding on this case in some way.  I think they -- there is an argument that it's persuasive authority.  Both sides agree that you can cite cases -- any cases for persuasive authority, but it's always subject to the same types of distinctions, limitations, and so forth, how you would distinguish any authority.

And, yes, there are different defendants, different standards, different theories, different plaintiffs.  So for a variety of reasons we don't think it could be consolidated.

THE COURT:  All right.

ATTORNEY SACHS-MICHAELS:  Your Honor, may I respond on those two points?

THE COURT:  Yes, sir.

ATTORNEY SACHS-MICHAELS:  Yeah, I -- the class certification decision, I think what it does is it -- from the perspective of the shareholders, it enhances the need for the derivative action because it increases the likelihood of exposure to the company, right.  And so there is an increased need for indemnification action to hold the wrong-doers directly accountable.  That's not a case-wide issue.  That's just a practicality issue.  But I don't think that the decision itself results in anything in particular happening in our case.

And then with respect to consolidation, we I think agree with defendants that the cases should not be consolidated; but it is I think normal in these situations for discovery to be coordinated if those cases are --

THE COURT:  No.  I agree.  I wasn't suggesting that.

ATTORNEY SACHS-MICHAELS:  All right.

THE COURT:  I was distinguishing between consolidation and coordination.

ATTORNEY SACHS-MICHAELS:  Understood, Your Honor.

THE COURT:  All right.  What else would be helpful?

ATTORNEY SACHS-MICHAELS:  If I may, I would just like to respond.  There was a point that Mr. Stokes made about profit motive being the thing that drives illegal

conduct, and I think here in the record there is an indication that that's actually what was going on at Cabot as well.

At paragraph 269 of the complaint we reference a board meeting in February of 2018 where the board was told that there is an inverse relationship to cost-cutting measures and incident rates. So what that's telling the board is: If we want to cut costs to increase profitability, it's also going to drive up incident rates and noncompliance in the operations.

So I don't know that that's a smoking gun, but I think it gives an indication of why there wouldn't be a more robust compliance regime.

That I think -- and I'd like to distinguish the *McDonald's* case because the *McDonald's* case is certainly an interesting case and I think in some ways it broke new ground in Delaware law. But this case does not involve cooperations of the company and the primary regulator of the company's operations.

This involves misconduct by the CEO in his professional life and related to interactions he was having with subordinates. It is really not the same thing as *Walton* or this case, and that would be my comment on that.

THE COURT: All right. Thank you. Is there any

*Laura Wells, RPR, RMR, CRR, RDR*

separate argument that the parties want to make on the derivative case?

ATTORNEY STOKES:  Your Honor, we would just reiterate our position in the briefing that we don't see the pleading stage ruling in the class action as compelling the same outcome in the derivative case for a variety of reasons, not the least of which is this disconnect between the pleadings in the derivative case and the outside directors.

There is just no particularized allegation with respect to their involvement in the disclosures.  The case law demonstrates that when the outside directors are involved you have to do a different analysis, and they just haven't supplied the basis to find in their favor on that issue, in the plaintiff's favor.

And, plus, it's just a different record than the Court had in the class action case.  The class action record didn't have the 220 documents.  It was a very ordinary Rule 12 pleadings record.

Here, the Court has the board documents underlying, you know, the factual allegations and can see the full picture.  The Court has before it the orders that show, you know, which wells related to the NOVs in the derivative case.  I don't think that was clear in the much smaller class action record.

*Laura Wells, RPR, RMR, CRR, RDR*

So I think the record is very different here.  And assessing whether, you know, outside directors intentionally misled or intended to mislead is a very different decision and requires a lot more on the bone than what the plaintiffs have offered here.  It's just -- they just can't get there on this record, and it's a very different record than what the Court had in the class case.

THE COURT:  I have two more questions that I can think of right now.  First is just -- well, three questions.

You filed a number of the briefing under seal.  Why?

ATTORNEY SACHS-MICHAELS:  Your Honor, I can answer that, which is that there is a confidentiality -- the company produced the 220 documents subject to a confidentiality agreement.  I suppose that's the -- Mr. Stokes could speak to why the company felt it needed a confidentiality agreement, but the agreement required us to file under seal.

THE COURT:  Okay.  Are the reasons for that, Mr. Stokes, still in place?

ATTORNEY STOKES:  Your Honor, I will concede one of the reasons is not still in place, and that's the reason that we advocated last time that we -- it would violate the PSLRA, in our view, to give the class

plaintiffs access to them.  They now have access to those documents.

We do think that within the total universe of documents produced there are some documents that we can still view as confidential, but we are willing to meet and confer about the sealing issue and discuss it further with our client on more of a document-by-document basis.  We're open to that conversation.

But we do -- I don't want to suggest we're completely abandoning any claim over any documents because there are things like, you know, names of complainants and information in the board records, I think in particular, that we view as potentially more sensitive and confidential.  Historical financial information, we can revisit that potentially.  It may be stale five years later.

THE COURT:  I would think so.

ATTORNEY STOKES:  We're happy to work with the Court and with our -- with opposing counsel in both cases on that issue.

THE COURT:  There is a very strong policy against sealing, particularly in cases that have some kind of public impact, public interest; and I think this one qualifies.  So, yes, I would like you to revisit things that have been sealed and see if you can minimize what is

now to be kept under seal and minimize efforts to seal in the future.

And I sure don't want to seal the opinion, even if it relies in part on documents that are initially filed under seal.  So you need to tell me what really needs to be kept under seal, including in an opinion.

The second point and more urgent:  What are the parties' views on whether and, if so, what claims have already been dismissed?

ATTORNEY STOKES:  Are we talking about the derivative case still?

THE COURT:  Yes.  Yes.  Well, both.

ATTORNEY STOKES:  Both.  So our view in the derivative case is that the Court dismissed all the claims on the pleadings but with leave to amend and there wasn't a finding that I believe was made that any of those claims were dismissed with prejudice --

THE COURT:  All right.

ATTORNEY STOKES:  -- in the derivative case.

In the class action case the Court dismissed the claims relating to what I would call the generalized statements of substantial compliance, the generalized statements in the letter accompanying one of the annual meeting documents, and all other claims other than what we call the three categories of disclosures that I think both

parties use that terminology in the briefing.

There are two categories that disclose a 2011 NOV -- I'm sorry, acronym -- notice of violation in a proposed consent order that was ultimately executed.  Those are the categories one and two.

Category three involved a July 26th, 2019, disclosure and similar orderly disclosures relating to two notices of violation received in 2017, which were ultimately resolved through the December 2020 orders that I referenced earlier.

So we believe the opinion specifically held that the other claims were dismissed with prejudice but that the three categories of claims I described are still part of the case.

THE COURT:  Okay.  Is there any disagreement as to that characterization?

ATTORNEY SACHS-MICHAELS:  Your Honor, I don't -- with the derivative action, I don't think so.  Except that I will say that I think our view is that the Court disposed of the substantial compliance allegations in the securities case and we -- as the Court can see from our opposition to the motion to dismiss, we have let those go.

THE COURT:  Okay.  Good.  Well, that's something.

ATTORNEY ALVARADO:  And for the securities plaintiffs, Your Honor, we agree.  I think the parties

agree on what statements remain.

Obviously, from the briefing and class certification, I'm sure you've gleaned the debate about what those statements mean; but what the statements are that remain are -- are in agreement.

THE COURT: All right. Anything further that would be helpful?

ATTORNEY STOKES: With respect to class or the derivative?

THE COURT: Both. I have got to decide them both.

ATTORNEY ALVARADO: I'd be happy if you would indulge just a quick discussion of class certification and why we think the class should be certified.

THE COURT: All right.

ATTORNEY ALVARADO: I think that the issue is fairly straightforward. Defendants have conceded the Rule 23(a) requirements. The class is numerous. There are common questions of law. There is no challenge to the adequacy of the proposed class representatives or class counsel.

There is also a concession that the market for Cabot securities was efficient during this time period, giving rise to the basic fraud in the market presumption for plaintiffs.

*Laura Wells, RPR, RMR, CRR, RDR*

And so, really, the only issue in dispute is whether and to what extent there was price impact relating to the two corrective disclosures in the 10(b) case.  There are two, as the Court is aware:  July 26th, 2019, and June 15th, 2020.

The first in July was an announcement of disappointing production.  So as for 2019 and for the go forward of 2020, an announcement of increased cost and an announcement of the receipt of two notices of violation, we allege that those items are corrective of the misstatements in this case.

Defendants concede that those announcements caused a statistically significant decline on that day.  And so what they do instead is argue that the statements or -- I'm sorry -- the disclosures were not corrective.

We submit that that's not an appropriate analysis or inquiry at the class certification stage.  I am happy to talk about the argument in more detail, but I think -- I think it's pretty clear in the papers what the arguments are.

And it really boils down to, in our view, what they are arguing is a loss causation argument, an argument that the disclosure was not causally linked to the prior misrepresentations.  That's a textbook merits issue that cannot be resolved at this stage.

At this stage what we allege to be corrective has to be accepted as corrective.  Defendants concede that that information caused a statistically significant decline on July 26th, 2019.

And so we would submit that there has just been a failure to prove an absence of price impact because, as you recall, the inquiry is whether there is a complete absence of price impact, not whether there is some doubt as to some disclosures.

Once there is some price impact, the case should proceed and the parties should proceed to the merits stage of determining whether or not there was causation on the days.

Quickly, on the June 15th day, the defendants, even with their sort of mismatched argument that I alluded to, they concede that at least some of that -- the bad news that day in the presentment of charges from the AG related to wells that even they say the cases circumscribe to which, again, we don't agree with.

So again, on that basis there is no -- there is no showing of an absence of price impact, and we would submit that the case should proceed to expert discovery and to merits.

THE COURT:  It's hard to show the absence.

ATTORNEY ALVARADO:  It is.  And, you know, one

*Laura Wells, RPR, RMR, CRR, RDR*

thing they try to do, which is what defendants in these cases often do, is, for example, on the June 15th disclosure, point to a lack of statistically significant decline, which their expert opines occurred. Our expert found a statistically significant decline. But even if you accepted their expert's event study, an absence of a statistically significant decline does not prove an absence of price impact.

So, you know, it may be difficult but, in any event, they have not established an absence of price impact in this case such that, you know, a class should not be certified and proceed to proving causation on the merits.

THE COURT: Well, since we are at the pleading stage it's a little bit awkward to talk in terms of them meeting a burden of proof at this stage.

ATTORNEY ALVARADO: Sure. I mean, they are -- they have put in evidence, which they have done. It just doesn't meet their burden.

*Goldman* was very clear. You know, we talked about *Goldman* at the outset. *Goldman* was very clear to say that nothing has changed from *Basic* or *Halliburton,* the previous Supreme Court jurisprudence on class certification; and the Supreme Court said in *Goldman* "But *Basic* and *Halliburton II* plainly require more." The defendant must "...in fact, sever the link between a

misrepresentation and the price paid by the plaintiff. And the defendant's mere production of some evidence relevant to price impact would rarely accomplish this feat."

And that's, respectively, what defendants, we say, have done here. They have put in some evidence. And now it's up to the trier of fact to determine who they -- whose story they find more compelling.

THE COURT: Mr. Stokes.

ATTORNEY STOKES: Thank you, Your Honor. So we do disagree about the real import of *Goldman Sachs* on a couple of fronts.

Number one, *Goldman Sachs* made clear, as prior decisions have, that the Court must look beyond the pleadings and consider evidence submitted by the parties. We're past the stage where the Court can simply assume that the guidance related to the disclosures at issue.

Number two, *Goldman Sachs* also said that -- went out of its way to emphasize that the burden should rarely be outcome determinative. This is the feather test, the fifty and a feather test that the plaintiffs themselves recite in the reply brief. But it applies to class certification, and the Court said something very similar in *Tellabs* about the inferences of scienter. It should rarely be an equipoise.

*Laura Wells, RPR, RMR, CRR, RDR*

So it is not the complete absence, you know, insurmountable, 100 percent, lock-down type of burden that I think Mr. Alvarado may have applied. We think it's a much more reasonable burden for defendants, and I think the *Qualcomm* case that came out a few months ago that we submitted demonstrates how courts have appropriately applied that burden to deny class cert in appropriate circumstances.

Number two, the plaintiffs just have an insurmountable problem on both of the corrective disclosures in all three categories; and it's a complete lack of any connection between the NOVs at issue in the first two categories and either of the alleged corrective disclosures.

Mr. Schroeder submitted a declaration saying that the Stalter wells were the wells at issue on the NOVs in those two categories. They had no impact on the guidance. They had no -- the well, the main well at issue was permanently plugged years earlier. These were old wells, too; and the Court knows, I think, how natural gas wells work. There is a decline curve, and production tails off over time. Mr. Schroeder put in evidence about the very small residual production left from even the remaining Stalter wells.

So there is no connection. And it's been conceded, I think, in this case -- there is no dispute that the NOV

disclosure in 2019 related to wells that hadn't even -- some of the wells hadn't been drilled yet.  They were totally different pads, completely unrelated.

The *KBR* case from Judge Werlein I think is highly instructive here just on the scope of the disclosure, and that's 2018 WL 4208681 at page 7.

THE COURT:  Could you repeat that.

ATTORNEY STOKES:  Sorry.  It's 2018 WL 4208681 at page 7.  It's a 2018 dismissal.

THE COURT:  Got it.

ATTORNEY STOKES:  He writes "The alleged statements about the Nigerian bribery scheme did not put at issue other uncharged, unadjudicated wrongdoing and defendants did not have a duty to disclose Unaoil-related conduct.  The Court agreed that companies do not have a duty to disclose uncharged unadjudicated wrongdoing."

And the law has long been in this circuit that there is no freestanding duty of disclosure as to render an affirmative statement misleading.  And the statements here were narrow.  They were specifically directed at these NOVs and these NOVs only.  I think that's partially why the motion to dismiss came out negatively for us on that issue.

But the flip side has to be true now.  They are narrow, and they are more likely to be actionable as

alleged, you know, concrete misstatements. But the flip side is they were concrete. They related to specific wells that had nothing to do with the wells at issue in the two alleged corrective disclosures.

And price impact is not loss causation, as Mr. Alvarado points out. The relevant impact is what would the stock price have done had the company either made a compliant disclosure at the time or said nothing, which is what we think the standard logically is under Fifth Circuit law.

But even under *Vivendi*, the Second Circuit approach, we have a live fire drill in the case, a real-life drill showing that there is no price impact. And the drill is the fact that the third category of alleged misstatement, the disclosures about the 2017 NOVs, those disclosures specifically say, with respect to the Jeffers Farm wells, that Cabot still had to, quote, "Submit a detailed remediation plan, continue water sampling and other investigative measures and restore or replace effective water supplies." That it still needed to, quote, "complete the ongoing investigation and remediation."

So Cabot disclosed on July 26th, 2019, exactly this sort of disclosure that the plaintiffs say should have been made the first time around back in February, that remediation hadn't been completed.

And the stock market did -- there was no statistically significant reaction from the 10-Q disclosure. And for -- I think really persuasively, not a single analyst in this well-covered, you know, larger-cap company said a word about these disclosures or expressed an iota of concern that this remediation was still going on or that the well had been plugged as announced in 2017. None of them expressed any worry that the remediation costs would materially affect the company or that guidance would be affected.

So the analysts cover this company quite thoroughly and not a single one, the plaintiffs' expert admitted this, said a word about these issues. And there was -- I think this is a rare case where you have a real-life demonstration on July 26, 2019, of what the market would have done and what the analysts would have done had the company made a statement that we think would have clearly corrected the alleged deficiency in the earlier statement; and the market did nothing. There was no significant stock price reaction caused by that disclosure. We think both Lucy Allen's report and Dr. Feinstein's report bears that out.

So I think that's one -- we look at this -- in *Goldman Sachs* the opinion commands that we look at the full set of issues and apply a commonsense approach to it. And we --

we joined issue on each of these -- these points.

The mismatch point, not a single well at issue in the categories of disclosures was charged in the AG presentation for the time periods covered in the disclosures.

The only wells that related were the Howell and Jeffers Farm wells but those wells involved only misdemeanor charges and they only involved time periods well before the July 26th, 2019, disclosure.  There is no inconsistency between the July disclosure in 2019 and the AG presentment.

And so drawing an inference of -- that the stock price would have reacted differently in July, 2019, is just -- there is no basis for it.  And again, the company did make the disclosure that they were still doing remediation.

So we think there is powerful evidence here.  And then I was going to bring in the PowerPoint on these -- on these points to drive them home, and I apologize for that. We did submit the deposition of Dr. Feinstein.  I apologize for the late submission.  I'm not trying to be the Fourth of July Grinch, but we didn't depose him until the Friday before.  And we think, frankly, he made a lot of admissions that are, in our view at least, just devastating to the price impact case here.

*Laura Wells, RPR, RMR, CRR, RDR*

THE COURT: Mr. Stokes, I think -- excuse me. I didn't mean to interrupt you. Go ahead. Finish your thought.

ATTORNEY STOKES: I'm sorry. I don't want to test the Court's patience --

THE COURT: You are not.

ATTORNEY STOKES: -- in going through each of these. If I can provide a couple of cites that might be helpful.

THE COURT: Okay.

ATTORNEY STOKES: We highlighted these in the version we submitted.

First of all, page 117 at Lines 11 through 20, I asked him if he had "...done any specific analysis or testing to assess whether those particular statements had price impact, correct?" The particular statements about the remediation efforts that we just discussed.

He said, "Correct. Because the scope of the engagement was to assess whether Lucy Allen's analysis was valid, and I determined that it was not."

But he didn't do his own. He didn't do any of his own analysis. And it's perplexing -- and I just raise a rhetorical question -- given how *Goldman Sachs* articulated the standard as being this feather, you know, test. You know, he didn't do -- Ms. Allen did the test, and I think

*Laura Wells, RPR, RMR, CRR, RDR*

the results are even discernible without looking at any -- I mean, you can just look at the stock price and the admissions that the parties have made and the types of disclosures and the analyst reports.  I thought that was a damaging admission.

He also on page 42, lines 6 through 12, and 50, lines 21 through 23, I asked him, "So you wouldn't expect to see a significant reaction to a $300,000 potential penalty as was announced in that Form 10-K?"

He said, "Well, no.  If they had said something different, you'd probably see a significant reaction.  But the statement that they did make reasonably would not cause a significant reaction."

And then he went on in 50, at 21 to 23, to say the July 26, 2019, Form 10-Q disclosure about the second round of penalties involved "...small dollar amounts compared to the market cap of the company."

On this issue about -- and again, I asked him on page 57, lines 15 to 24.  "You didn't do any testing or analysis to ascertain whether that further decline that you referenced actually resulted from the disclosure in the July 26, 2019, 10-Q specifically about the notices of violation, correct?"

"Correct."  Again, "The scope of my analysis was to determine what Ms. Allen did."

And he didn't do -- the plaintiffs repeatedly did not place anything on the scale on the other side on each of these points.  I asked him --

THE COURT:  Mr. Stokes, if I could sum up, your argument is essentially that the record shows no harm and, therefore, no foul?

ATTORNEY STOKES:  I think that is correct.  But I think it's beyond that.  It's under *Vivendi*, when thinking about price impact, you think about would the stock price have done anything differently on that day if the company had made a sufficient disclosure?

And the disclosures here were strictly limited to these NOVs.  The argument is, well, you said you fixed them and you hadn't fixed them yet and you still needed to fix them.

And here they made precisely that disclosure on July 26, 2019, with respect to Jeffers.  They said we still have to submit a remediation plan and continue to do the work.  And that didn't move the stock price, according to our expert.

And so we -- you know, we think there is empirical proof from a dry run in live fire of this very type of disclosure, and that's -- we think that's a surefire -- I mean, it's very rare you get direct evidence like that.  And we think that is highly persuasive.

I also asked -- by the way, I asked if he conducted any testing to assess whether the challenged disclosure made in February of 2016 changed investors' expectations with respect to Cabot's environmental liabilities because that's one of the arguments they've tried to make in this case.

And he said, "Well, I mean, I did not do an independent loss causation or price impact analysis.  What I did was assess whether Ms. Allen did a valid price impact analysis.  So I'd have to say no."  Page 144 at 5 to 14.

So I am going to, I think, sum up here.  He also, on the analysts, he admitted the analysts didn't say anything at all about the NOVs subject to these disclosures.  He understood that -- he admitted Cabot did not make any -- here is another admission.  Page 69, 11 through 70 -- 11 through page 70 at page -- I'm sorry.  69, line 11, to 70, line 4.

And I asked him, "You would agree that in the February 22nd, 2016, disclosure about the early NOVs Cabot did not make any representation that there would never be any further NOVs in the future associated with different wells, correct?"

And he gave a long answer but part of what he said, and it's in the record, he said, "Well, I mean, you know,

my understanding is about -- yes, that is my understanding."

And then he says, "Yeah.  As far as what's written in the documents, they didn't specifically say there was not going to be another NOV...the company didn't say one way or the other that there wouldn't -- there won't be or that there are."

So he admits, as he has to admit, there is nothing in this representation about whether future NOVs on wells in some cases that haven't been drilled yet in different areas are ever going to be free from problems.  No one would ever reasonably draw that interpretation.

The Court has written twice, in both this case and the derivative case, construing it the way we think it should be construed.  I don't think the derivative plaintiffs have argued otherwise in that case.  And Dr. Feinstein had to, you know, admit what the disclosure said.

And all of this goes back to the *KBR* point that there is no duty to -- you know, this idea that Cabot should be -- that you can infer price impact from a disclosure of felony charges on different wells in different time periods, it's just drained of any significance because there is no -- it's the mismatch.

This is the classic mismatch that *Goldman Sachs* and *Qualcomm* were all about.  And this is a -- this case is

really the paradigm case for a mismatch, and there is no basis to infer price impact from the disclosures at issue.

And *Goldman* also made clear the Court -- you know, just because loss causation and materiality are merits issues, the Court has to look at any evidence, any argument relating to price impact even if it overlaps or is very similar to a merits argument.

And we think that's exactly what we tried to do with our expert -- we think successfully did -- and we don't think that the plaintiffs, again, put anything on the table to really overcome that.

So that's our view of the issue. We think that the lack of any analyst mentioned is quite powerful.

There was also this point about heteroskedasticity, which I had to say 15 times to get the pronunciation right. We don't think the Court even needs to get to the statistical significance issue because of the mismatch because there is no -- there is no basis for inferring that the -- there is a price impact as to the earlier statements based on the felony charges about other wells.

But even if there was, Ms. Allen found a sub-90 percent confidence interval. So it would not be statistically significant. That was well below the 90 percent that some courts have adopted and well below the 95 percent that Judge Lynn adopted in *Halliburton*,

which we think it should be highly persuasive, given the pathway of that case and her extensive involvement with those issues.

But -- so Dr. Feinstein tries to import this Newey-West methodology which supposedly corrects or changes in volatility across the class period.  He initially, I think, tried to posit this as a COVID-related adjustment because there is more volatility in the COVID period, which in my view would actually further reduce the inference because if there is a lot of volatility it just gets even more difficult to show that any particular movement is going to be outside the normal range of the stock during that period.  But he adopts this Newey-West approach.  Ms. Allen I think fairly criticized it in her report and in her testimony.

But I asked -- I asked Mr. Feinstein -- and you can see in plaintiffs' briefing on this -- are there any cases where any Court has ever adopted this and endorsed this in a securities class action, in an event study.

And I haven't found any certainly that address it squarely.  He couldn't identify any.  I didn't see any in the plaintiffs' brief.  To my knowledge, I don't think there is any.  I'd stand corrected if Mr. Alvarado has a case.  But that, to me, is new territory.  It is not a standard approach in event studies.

*Laura Wells, RPR, RMR, CRR, RDR*

The types of event studies that have been adopted by courts in other cases have been the same type of standard study that Ms. Allen did.  And Dr. Feinstein didn't do any -- he didn't come up with any number above 90 percent or above 87 percent using any other analysis other than this Newey-West approach, which again we don't think it's -- the Court even has to get to that point.

We think it's improper.  It's not standard.  It's just not -- it's not an accepted way of treating event studies for class actions.

He agreed the NERA -- he cites a NERA report that advocated in a very different context using Newey-West and competition analysis but not in an event study for stock prices.

So we emphatically reject this argument that there is 95 percent confidence under a proper measure of that second disclosure.

But the small -- I mean, the small size of it, again just on its face, you know, when you look at the felonies and the misdemeanors, I asked Dr. Feinstein if he did any analysis of the breakdown between felonies and misdemeanors or even the mismatch issue generally; and he said -- this is the last slide, I promise, I'm going to read.  But he -- I thought I had it.  Oh, here it is.

It's 89, line 20 to Page 90 at 1.  I asked him, "Do

you know whether the argument has been made in this case that there is a mismatch between the alleged corrective disclosure and the alleged misstatements?"

Response, "I didn't draw an opinion one way or the other on that."

And then, "Did you undertake any analysis as to the severity of the individual charges in the AG presentment with respect to individual wells and which ones were charged felonies versus misdemeanors and which ones corresponded to the wells that had received the NOVs discussed..."

He said, "No, I didn't do that analysis."  Page 139, line 24, to page 140, line 6.

So the bottom line is we don't think there is competent evidence in the record that there was a statistically significant price, you know, decline from the July 15th -- I'm sorry -- the June 15th, 2020, disclosure.

This COSA issue the plaintiffs have raised is a red herring.  The three NOVs, the three well pads at issue in those NOVs, were not part of the Dimock Box and that's in the Schroeder declaration.  And Cabot never at any point told investors during the class period that we think we're going to be allowed to drill new wells in Dimock or get the locks lifted.  They didn't make that disclosure.

And so the idea that the class would get credit for an alleged drop, that issue, again, is a mismatch.  There is just -- it doesn't match up with the alleged disclosures.  It doesn't match up with the disclosures remaining in this case.  There is no price impact, and we think the class should be denied.

THE COURT:  All right.  Mr. Stokes, now that you have paused to take a breath, let me ask if opposing counsel want to respond to any of the particular points you just made or emphasized.

ATTORNEY ALVARADO:  I would, Your Honor.  I appreciate that.

Well so, as you just heard, I think Mr. Stokes's lengthy exposition sort of underscores the point that the -- the sort of foundational point we're making in this case, which is what you just heard was a highly fact-specific, merits-based, scientific argument that goes to a myriad of contested factual issues.  You have heard about the Schroeder declaration a couple of times.

There are three self-serving declarations untested in this case that declare various things without supporting any evidence -- without any supporting evidence to back up the assertions made in those declarations.

We don't -- this is not a case where we have -- we have litigated and assessed the full factual record

*Laura Wells, RPR, RMR, CRR, RDR*

Case 4:21-cv-02045   Document 162   Filed 07/26/23 in TXSD   Page 58 of 84   58

related to what wells and what time periods; and, you know, defendants want you to sort of match one NOV to one statement and one different timeline. I mean, it's -- frankly, it's dizzying, and it's unnecessary in this case because this is not a case -- this is -- defendants' argument -- Mr. Stokes's argument relies on rewriting the statements.

So, for example, the category one statements they don't identify a well. They don't say only the Stalter well is at issue here. The statement says various wells in Susquehanna County. This is a case about falsity not just because of the Stalter wells that apparently, according to the defendants, underlie those NOVs, which by the way were not named in the false statements that were made.

This is also a case about in the context of this company that had just come out of a decade-long problem with the Pennsylvania Department, seeking desperately to rehabilitate its image, making statements, selective disclosures, about its compliance in the one area that it matters, Susquehanna County.

So when they go out and in their SEC filings under the heading, quote, "environmental matters" purporting to tell the investors what the scope of their environmental matters are in the one area that it matters for this

company and they selectively disclose that we got an NOV related to various wells in Susquehanna County but we're remediating it appropriately, that is false not just because of the specific well that may or may not underlie that NOV but because defendants in this context gave a misleading picture of what the -- what the true state of affairs was with respect to their compliance in Susquehanna County.

What they want the Court to do at class certification is to find that that statement can't mean anything but what they say it means. That isn't even appropriate, we would submit, at summary judgment. That's a question for the jury. The extent to which a statement is misleading because it omitted or didn't omit what a plaintiff alleges is material information is a question of fact for the jury. This is not something that should be -- certainly not resolved at class certification.

This is a case that alleges the defendants misled about their compliance in Susquehanna County and there are two disclosures that come out during the class period with negative financial news and negative stock price declines that are related to noncompliance in Susquehanna County. Read fairly, read according to the allegations that plaintiffs allege in this case, there is clearly price impact.

Now, you heard a couple of references to purported concessions that Dr. Feinstein made in his deposition. But the point is:  Dr. Feinstein wasn't asked to assess loss causation because there is no requirement that plaintiffs prove anything related to price impact at class cert.  It is defendants' burden.

What Dr. Feinstein did was he assessed Ms. Allen's report and opinions and concluded on all the bases that she provided that there was no demonstration of a lack of price impact.

So taking July 26th, for example, the market learns that day that there is bad news financially and that there is bad news related to noncompliance in Susquehanna County.  The stock price drops in response to both, both in the morning, which Ms. Allen urges a sort of an intraday.  You should sort of look at it throughout the day.  But even if you do that, in the morning it drops in response to the bad news.  And we submit evidence in our case in our briefing showing that that bad production was related specifically to noncompliance and costs related to noncompliance.

In fact, we've cited an e-mail where defendant Schroeder, the same person who put in a declaration saying that there was no connection between compliance and stock price -- and the production missed that day, he received

an e-mail from the treasurer of Cabot a few days before that disclosure saying one of the issues that is causing missed production is remediation and problems related to the Powers well.  The Powers well was a well that at this time was undergoing gas migration investigation.

Later at -- don't forget, too, Your Honor, on July 26th the market also responds to negative 2020 production for the next year.  And, in fact, Ms. Allen says that's the cause.  You know, that's -- in her view, that's what the market was really responding to was the bad news for the next year.

Well, what do you know?  The Powers well and the gas migration issues related to that well caused a substantial portion of that 2020 miss.  We have evidence in the record that shows that wells that were the subject of the Pennsylvania AG charges -- Ratzel, Ely, and Gesford -- were wells that had to be stopped production in the months leading up to July 26, 2019, showing that wells that had been producing and contributing to Cabot production had to stop contributing to production because of environmental issues.

We have evidence in the record that shows that the stock price declined an additional three percent later in the day when the notices of violations were announced in the 10-Q because, again, there was a press release in the

*Laura Wells, RPR, RMR, CRR, RDR*

morning that had the bad production news and the bad cost news and then later the 10-Q comes out announcing the notices of violation.

There is a further three percent decline that day. I know that Ms. Allen opined that that three percent decline, that intraday three percent decline was not statistically significant. That doesn't prove anything.

And, in fact, I would urge the Court to look at *Arcadia* where -- a case that is near and dear to my heart because that's also my case. Ms. Allen was the same expert in that case. She made an identical opinion in that. She offered an identical opinion in that case where there were two pieces of news on the same day and she argued that the decline later in the day was not statistically significant, and the Court rejected that argument.

The Court said that doesn't prove an absence of price impact. It proves we know that the stock declined, and a jury can decide whether they think it's sufficiently linked to the relevant news the plaintiffs say it is or it isn't. But this is not an issue that proves an absence of price impact certainly.

Similar to -- moving to June, 2020, really at the end of the day the only argument is statistical significance and their expert's conclusion that there is no statistical

significant decline on that day.

It's just not true.  Dr. Feinstein found a statistically significant decline.  Ms. Allen has a different analysis purporting to find an 87 percent significant decline, not 95.  What that leaves you with, at most, is a battle of the experts, which numerous courts have said that certainly doesn't rise to the level of proving an absence of price impact.  That's in the *Southern* case.  We've cited a number of cases.

And then, by the way, there is no request that Dr. Feinstein's analysis be disregarded.  There is no *Daubert* motion in this case.

So you have two pieces of evidence.  One shows a 95 percent significant decline.  One shows an 87 percent significant decline.

We think Dr. Feinstein's model is better for the reasons that you've heard about from Mr. Stokes.  There was heteroskedasticity in the volatility because of COVID during the period.  All of -- there is literature cited by Dr. Feinstein in his rebuttal explaining why that needs to be corrected for, why that impacts a model's ability to predict movement.

Ms. Allen seemingly didn't even know what that was.  She had never adjusted for it before, even though her own consulting group has a paper saying that it needs to be

corrected for.

But even putting that aside, you have two pieces of evidence:  One 95.  One 87.  Clearly not an absence of price impact.

And another last point I'll make on June 15th is there was a residual abnormal return even using -- even using Ms. Allen's model.  And case after case finds that probative of there being price impact.

Again, plaintiffs don't have the burden to prove it but what we have done is show that Ms. Allen has not disproved it and we've put forth evidence showing that there is price -- evidence of price impact.

And so when there is a residual decline, even under Ms. Allen's model, which we think is inferior, that is proof of price impact.  That's in the *Southern* case.  That's in the *Alexion* case.

And ultimately, you know, this really does come down to a question on the merits.  And there will be a hot debate about whether there is loss causation or the extent to which there is loss causation and, if there is, how much of the damages is or is not attributed to the alleged fraud.

But for purposes of class certification, the conclusions that the defendants are asking you to make go far beyond what should be done at class certification.

And, you know, Mr. Stokes mentioned *Goldman* and suggested that it has some huge impact on this case. But really, if you read *Goldman* fairly read, it's considering whether it's a -- it's a very narrow factual analysis, and it does not stray from that factual analysis and it's considering whether if there are generic statements can those have price impact. And if it's a very generic statement on the front end and a very specific disclosure on the back end, the Court said then the connection may begin to break down.

First of all, that's not even present here. There is no allegation that there is a generic statement. In fact, the defendants' argument is that the statement is very, very specific.

So *Goldman's* sort of mismatched premise is not here. But what *Goldman* did also say is -- although the Court is to look at evidence submitted in support of an attempted showing of an absence of price impact, the Court said, "The district court must use the evidence to decide the price impact issue while resisting the temptation to draw what may be obvious inferences for the closely-related issues that must be left for the merits." And that includes loss causation.

So this evidence can be considered. I would submit it just doesn't get them over the hump for multiple reasons,

which we have explained.  But, ultimately, this goes to is there a causal connection between the alleged misstatements and the alleged corrective disclosures?  And that is a loss causation question that cannot be resolved at class certification.

THE COURT:  All right.  I think I have heard plenty to think about, and I appreciate the efforts of counsel to make sure that I am sufficiently informed.  I can't promise when I'm going to be able to get the opinion out, but I will get it out as quickly as I can.

ATTORNEY STOKES:  Thank you, Your Honor.

ATTORNEY ALVARADO:  Thank you, Your Honor.

THE COURT:  Have a very good weekend and rest of the summer.

ALL COUNSEL:  Thank you, Your Honor.

THE COURT:  You are excused.

(Proceedings concluded at 12:53 p.m.)

*Date:  July 26, 2023*

### **COURT REPORTER'S CERTIFICATE**

*I, Laura Wells, certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.*

_____/s/ Laura Wells_____

*Laura Wells, CRR, RMR*

*Laura Wells, RPR, RMR, CRR, RDR*

**$**

$10,000 [1] - 18:12
$125 [1] - 26:24
$16 [2] - 18:3, 18:10
$25,000 [1] - 14:18
$300,000 [1] - 49:8

**/**

/s [1] - 66:23

**1**

1 [3] - 1:15, 55:25
10(b [1] - 39:3
10(b)(5 [3] - 19:22, 29:4
10-K [1] - 49:9
10-Q [5] - 46:2, 49:15, 49:22, 61:25, 62:2
100 [1] - 43:2
10019 [1] - 2:8
105 [1] - 26:13
105-6 [1] - 26:16
1050 [1] - 21:11
1062 [1] - 21:11
11 [5] - 19:20, 48:13, 51:16, 51:17, 51:18
1100 [2] - 2:11, 3:4
117 [1] - 48:13
11910 [1] - 2:14
11:26 [2] - 1:5, 1:12
12 [2] - 33:19, 49:6
12:53 [3] - 1:5, 1:12, 66:17
13 [3] - 10:24, 11:1, 15:10
139 [1] - 56:12
14 [1] - 51:11
140 [1] - 56:13
144 [1] - 51:10

**2**

20 [2] - 48:13, 55:25
2010 [3] - 12:18, 24:25, 25:5
2011 [1] - 37:2
2015 [1] - 13:24
2016 [2] - 51:3, 51:20
2017 [4] - 10:25, 37:8, 45:15, 46:7
2018 [5] - 11:3, 32:5, 44:6, 44:8, 44:9
2019 [15] - 17:24, 37:6, 39:4, 39:7, 40:4, 44:1, 45:22, 46:15, 47:9, 47:10, 47:13, 49:15, 49:22, 50:17, 61:18
2020 [15] - 10:25, 13:24, 17:17, 18:23, 25:9, 25:25, 26:2, 26:6, 37:9, 39:5, 39:8, 56:17, 61:7, 61:14, 62:23
2021 [1] - 6:4
2023 [3] - 1:7, 1:13, 66:18
21 [2] - 49:7, 49:14
212 [1] - 2:8
214 [1] - 1:24
220 [3] - 2:15, 33:18, 34:15
22nd [1] - 51:20

**1450** [1] - 1:23
15 [2] - 49:19, 53:15
15th [6] - 39:5, 40:14, 41:2, 56:17, 64:5
16 [1] - 14:18
1900 [1] - 1:19
19087 [1] - 2:4
1996) [1] - 21:12

**23** [2] - 49:7, 49:14
23(a [1] - 38:18
231-1058 [1] - 1:20
24 [2] - 49:19, 56:13
26 [7] - 17:23, 46:15, 49:15, 49:22, 50:17, 61:18, 66:18
269 [1] - 32:4
26th [7] - 37:6, 39:4, 40:4, 45:22, 47:9, 60:11, 61:7
280 [1] - 2:4
28th [1] - 26:18

**3**

300 [1] - 2:18
31st [1] - 2:7
3811 [1] - 1:22

**4**

4 [1] - 51:18
42 [1] - 49:6
4208681 [2] - 44:6, 44:8
455-1400 [1] - 2:12
4:21-CV-02045 [1] - 1:3
4:21-CV-02046 [1] - 1:11

**5**

5 [2] - 26:15, 51:10
50 [2] - 49:6, 49:14
504 [1] - 2:12
5060 [1] - 2:18
512 [1] - 3:5
525-3991 [1] - 2:19
536-5287 [1] - 3:5
57 [1] - 49:19

**6**

6 [4] - 26:15, 49:6, 56:13
601 [1] - 3:10
610 [1] - 2:5
615 [1] - 3:10
619 [2] - 1:20, 2:19
650 [1] - 14:16
655 [1] - 1:19
667-7706 [1] - 2:5
681 [1] - 21:11
69 [2] - 51:16, 51:17

**7**

7 [7] - 1:7, 1:13, 14:14, 26:15, 26:16, 44:6, 44:9
70 [3] - 51:17, 51:18
70163 [1] - 2:12
712 [1] - 2:7
744-3000 [1] - 1:24
75219 [1] - 1:23
75243 [1] - 2:15
77550 [1] - 3:10
78701 [1] - 3:4

**8**

8 [1] - 10:15
87 [4] - 55:5, 63:4, 63:14, 64:3
89 [1] - 55:25

**9**

90 [3] - 53:24, 55:4, 55:25
90-something-page-long [1] - 8:17
92101 [1] - 1:20
92122 [1] - 2:19
935-7400 [1] - 2:8

**95** [5] - 53:25, 55:16, 63:5, 63:14, 64:3
960 [1] - 2:11
972 [1] - 2:16
98 [1] - 3:3
991-1582 [1] - 2:16

**A**

A.2d [1] - 21:11
A.M [2] - 1:5, 1:12
abandoning [1] - 35:10
Abbey [1] - 1:18
ability [2] - 28:20, 63:21
able [4] - 4:10, 20:18, 20:25, 66:9
abnormal [1] - 64:6
above-entitled [1] - 66:22
absence [13] - 40:6, 40:8, 40:21, 40:24, 41:6, 41:8, 41:10, 43:1, 62:17, 62:21, 63:8, 64:3, 65:18
absolutely [1] - 15:8
abundant [1] - 21:18
accepted [3] - 40:2, 41:6, 55:9
access [2] - 35:1
accessible [1] - 25:14
accompanying [1] - 36:23
accomplish [1] - 42:3
accomplishing [3] - 9:9, 11:8, 13:17
according [5] - 9:17, 13:1, 50:19, 58:13,

59:23

accountable [1] - 31:7

acronym [1] - 37:3

acronyms [1] - 16:11

acted [1] - 19:15

action [14] - 8:9, 24:8, 29:1, 29:21, 30:10, 31:4, 31:6, 33:5, 33:17, 33:25, 36:20, 37:18, 54:19

actionable [1] - 44:25

actions [1] - 55:10

active [4] - 10:22, 11:1, 13:22, 23:12

actual [1] - 18:11

add [1] - 29:6

additional [1] - 61:23

address [3] - 4:11, 19:17, 54:20

addressed [1] - 6:4

addresses [1] - 8:12

adequacy [1] - 38:20

adequately [2] - 8:14, 27:3

adjudication [2] - 14:8, 14:11

adjust [1] - 20:11

adjusted [1] - 63:24

adjustment [1] - 54:8

admission [2] - 49:5, 51:16

admissions [2] - 47:24, 49:3

admit [2] - 52:8, 52:17

admits [1] - 52:8

admitted [3] - 46:12, 51:13, 51:15

adopted [4] - 53:24, 53:25, 54:18, 55:1

adopts [1] - 54:13

advance [1] - 11:17

advancing [1] - 24:15

advocate [1] - 17:11

advocated [4] - 23:19, 24:2, 34:24, 55:12

advocating [2] - 19:2, 19:7

affairs [1] - 59:7

affect [4] - 28:16, 28:18, 28:20, 46:9

affected [1] - 46:10

AG [5] - 40:17, 47:3, 47:11, 56:7, 61:16

ago [3] - 5:20, 8:10, 43:5

agree [7] - 30:13, 31:12, 31:15, 37:25, 38:1, 40:19, 51:19

agreed [6] - 14:16, 14:24, 25:1, 25:5, 44:15, 55:11

agreement [8] - 12:19, 25:1, 26:22, 30:9, 34:16, 34:18, 34:19, 38:5

ahead [4] - 4:16, 20:6, 20:10, 48:2

AL [4] - 1:4, 1:7, 1:11, 1:13

Alex [1] - 2:3

Alexion [1] - 64:16

ALL [1] - 66:15

allegation [4] - 8:24, 29:7,

33:10, 65:12

allegations [13] - 7:8, 13:19, 14:6, 18:14, 24:4, 24:8, 28:10, 29:3, 29:4, 29:15, 33:21, 37:20, 59:23

allege [3] - 39:10, 40:1, 59:24

alleged [16] - 10:5, 21:20, 29:12, 43:13, 44:11, 45:1, 45:4, 45:14, 46:18, 56:2, 56:3, 57:2, 57:3, 64:21, 66:2, 66:3

allegedly [1] - 17:4

alleges [2] - 59:14, 59:18

alleging [3] - 11:25, 12:11, 13:5

Allen [12] - 48:25, 49:25, 51:9, 53:21, 54:14, 55:3, 60:15, 61:8, 62:5, 62:10, 63:3, 63:23

allen [1] - 64:10

Allen's [5] - 46:21, 48:19, 60:7, 64:7, 64:14

allow [1] - 7:10

allowed [4] - 9:17, 24:20, 24:22, 56:24

alluded [1] - 40:15

ALSO [1] - 3:6

ALVARADO [11] - 4:20, 5:4, 5:21, 5:24, 37:24, 38:12, 38:16, 40:25, 41:16, 57:11, 66:12

Alvarado [6] - 1:17, 4:21, 6:20, 43:3, 45:6, 54:23

amend [1] - 36:15

amount [4] - 7:17, 10:2, 18:4, 18:9

amounts [4] - 27:13, 27:16, 27:24, 49:16

analogous [1] - 7:4

analysis [21] - 22:7, 28:18, 29:9, 33:13, 39:16, 48:14, 48:19, 48:22, 49:20, 49:24, 51:8, 51:10, 55:5, 55:13, 55:21, 56:6, 56:12, 63:4, 63:11, 65:4, 65:5

analyst [3] - 46:3, 49:4, 53:13

analysts [4] - 46:11, 46:16, 51:13

Andrew [4] - 2:2, 3:2, 4:7, 4:12

Andy [1] - 4:4

announced [3] - 46:7, 49:9, 61:24

announcement [3] - 39:6, 39:8, 39:9

announcements [1] - 39:12

announcing [1] - 62:2

annual [1] - 36:23

answer [3] - 8:3, 34:14, 51:24

answered [1] - 27:3

answers [1] - 7:25

antitrust [2] - 22:14, 25:3

anyway [2] - 25:22, 27:9

apologies [1] - 4:8

apologize [6] - 4:6, 10:17, 11:17, 23:1, 47:19, 47:21

APPEARANCES [3] - 1:16, 2:1, 3:1

appearances [1] - 4:17

appeared [3] - 1:16, 2:1, 3:1

applicable [1] - 24:10

applied [2] - 43:3, 43:7

applies [1] - 42:22

apply [1] - 46:25

appreciate [2] - 57:12, 66:7

approach [5] - 45:11, 46:25, 54:14, 54:25, 55:6

appropriate [5] - 23:4, 24:16, 39:16, 43:7, 59:11

appropriately [2] - 43:6, 59:3

April [1] - 26:18

Arcadia [1] - 62:9

area [2] - 58:20, 58:25

areas [1] - 52:11

argue [3] - 4:18, 5:6, 39:14

argued [4] - 17:25, 30:10, 52:16, 62:14

arguing [5] - 4:22, 5:1, 5:13, 6:22, 39:22

argument [24] - 10:3, 11:16, 11:17, 23:3, 23:4, 24:16, 30:12, 33:1, 39:18, 39:22, 40:15, 50:5, 50:13, 53:6, 53:7, 55:15, 56:1, 57:17,

58:6, 62:16, 62:24, 65:13

arguments [5] - 6:12, 15:7, 22:16, 39:19, 51:5

articulated [1] - 48:23

ascertain [1] - 49:20

aside [1] - 64:2

assertions [1] - 57:23

assess [5] - 48:15, 48:19, 51:2, 51:9, 60:3

assessed [2] - 57:25, 60:7

assessing [1] - 34:2

assessment [1] - 6:16

assisted [1] - 3:12

associated [1] - 51:22

assume [1] - 42:16

attached [1] - 10:6

attempted [1] - 65:17

ATTENDANCE [1] - 3:6

attendance [1] - 4:22

Attorney [13] - 1:17, 1:18, 1:21, 2:2, 2:3, 2:6, 2:9, 2:10, 2:13, 2:14, 2:17, 3:2, 23:17

ATTORNEY [68] - 4:6, 4:12, 4:20, 5:4, 5:7, 5:11, 5:21, 5:24, 6:15, 6:25, 8:1, 8:7, 8:22, 10:4, 10:10, 10:16, 11:21, 11:24, 12:13, 12:21, 13:8, 15:6, 15:9, 15:18, 16:2, 16:12, 16:15,

19:3, 19:8, 20:6, 21:7, 21:10, 22:25, 26:9, 26:12, 28:17, 29:13, 30:1, 30:7, 30:23, 31:1, 31:17, 31:20, 31:23, 33:3, 34:13, 34:22, 35:18, 36:10, 36:13, 36:19, 37:17, 37:24, 38:8, 38:12, 38:16, 40:25, 41:16, 42:10, 44:8, 44:11, 48:4, 48:7, 48:11, 50:7, 57:11, 66:11, 66:12

attributed [1] - 64:21

Austin [1] - 3:4

authority [3] - 30:13, 30:14, 30:17

available [1] - 25:16

Avenue [2] - 2:7, 2:14

avoid [1] - 16:11

aware [1] - 39:4

awkward [1] - 41:14

## B

background [1] - 22:6

bad [12] - 12:24, 15:12, 19:13, 22:19, 40:16, 60:12, 60:13, 60:18, 60:19, 61:11, 62:1

badly [1] - 11:17

balancing [1] - 24:1

Balon [1] - 2:13

BARA [4] - 20:15, 20:18, 20:21, 20:25

bare [2] - 21:18, 24:5

based [3] - 13:18,

53:20, 57:17

bases [1] - 60:8

basic [1] - 38:24

Basic [2] - 41:21, 41:24

basis [7] - 21:19, 33:14, 35:7, 40:20, 47:14, 53:2, 53:18

battle [1] - 63:6

bears [1] - 46:21

become [1] - 10:17

BEFORE [1] - 1:14

begin [2] - 5:17, 65:10

behalf [4] - 4:21, 5:2, 5:12, 6:13

below [3] - 18:15, 53:23, 53:24

Ben [1] - 8:1

ben [1] - 5:8

beneath [1] - 12:5

benefits [1] - 7:22

Benjamin [1] - 2:6

better [2] - 7:22, 63:16

between [13] - 8:16, 10:24, 16:20, 28:15, 31:18, 33:8, 41:25, 43:12, 47:10, 55:21, 56:2, 60:24, 66:2

beyond [3] - 42:14, 50:8, 64:25

biggest [1] - 5:24

binding [1] - 30:11

bit [2] - 4:2, 41:14

board [34] - 8:13, 8:24, 8:25, 9:2, 9:6, 9:8, 9:10, 9:12, 10:6, 10:20, 10:21, 10:25, 12:1, 12:2, 12:8,

12:12, 12:17, 13:14, 13:18, 16:4, 17:16, 18:18, 21:18, 22:8, 22:9, 28:19, 28:24, 29:5, 29:8, 32:4, 32:5, 32:7, 33:20, 35:12

boils [1] - 39:21

bone [1] - 34:4

bottom [3] - 18:20, 24:22, 56:14

bottom-line [1] - 24:22

Boulevard [2] - 1:22, 3:3

Box [2] - 18:3, 56:21

Bradley [1] - 2:13

break [1] - 65:10

breakdown [1] - 55:21

breath [1] - 57:8

bribery [1] - 44:12

brief [2] - 42:22, 54:22

briefing [9] - 7:3, 18:20, 22:2, 33:4, 34:12, 37:1, 38:2, 54:17, 60:19

briefly [2] - 23:2, 26:10

briefs [1] - 8:9

bring [1] - 47:18

Broadway [1] - 1:19

broke [1] - 32:16

Brown [1] - 3:8

buildup [1] - 26:5

burden [8] - 41:15, 41:18, 42:19, 43:2, 43:4, 43:7, 60:6, 64:9

burdens [1] - 29:24

business [2] - 11:11, 13:2

business-

oriented [1] - 11:11

## C

CABOT [1] - 1:6

Cabot [14] - 17:19, 24:9, 28:15, 29:12, 32:2, 38:22, 45:17, 45:22, 51:15, 51:20, 52:19, 56:22, 61:1, 61:19

Cabot's [2] - 22:5, 51:4

California [2] - 1:20, 2:19

cannot [2] - 39:25, 66:4

cap [3] - 27:17, 46:4, 49:17

care [3] - 7:25, 21:15, 21:16

Caremark [3] - 7:7, 8:23, 13:10

Caremark-style [1] - 7:7

carrying [1] - 12:10

case [122] - 5:4, 5:6, 5:18, 5:22, 5:25, 6:2, 6:11, 6:17, 6:23, 7:3, 7:4, 7:5, 7:7, 7:22, 8:4, 8:8, 8:13, 8:15, 8:19, 8:22, 8:23, 9:1, 9:6, 9:14, 9:24, 11:4, 13:9, 13:19, 13:23, 14:4, 14:5, 14:19, 15:21, 16:6, 17:18, 18:8, 18:16, 19:11, 19:20, 19:22, 20:2, 21:7, 22:1, 22:19, 22:21, 25:2, 25:16, 25:23, 26:1, 28:11, 28:12, 28:16, 29:12, 29:15, 29:17, 30:2, 30:11, 31:8, 31:10,

32:15, 32:16, 32:17, 32:23, 33:2, 33:6, 33:8, 33:11, 33:17, 33:24, 34:8, 36:11, 36:14, 36:19, 36:20, 37:14, 37:21, 39:3, 39:11, 40:10, 40:22, 41:11, 43:5, 43:25, 44:4, 45:12, 46:14, 47:25, 51:6, 52:13, 52:14, 52:16, 52:25, 53:1, 54:2, 54:24, 56:1, 57:5, 57:16, 57:21, 57:24, 58:4, 58:5, 58:11, 58:16, 59:18, 59:24, 60:19, 62:9, 62:10, 62:11, 62:12, 63:9, 63:12, 64:7, 64:15, 64:16, 65:2

case-wide [1] - 31:8

cases [35] - 5:3, 5:17, 5:19, 7:1, 7:10, 10:22, 10:23, 11:2, 13:22, 15:10, 15:13, 16:5, 16:9, 16:15, 21:24, 22:11, 23:12, 27:6, 27:7, 28:3, 28:15, 29:23, 30:14, 31:12, 31:14, 35:19, 35:22, 40:18, 41:2, 52:10, 54:17, 55:2, 63:9

categories [8] - 36:25, 37:2, 37:5, 37:13, 43:11, 43:12, 43:16, 47:3

category [3] - 37:6, 45:14, 58:8

causal [1] - 66:2

causally [1] -

39:23

causation [11] - 39:22, 40:12, 41:12, 45:5, 51:8, 53:4, 60:4, 64:19, 64:20, 65:23, 66:4

caused [4] - 39:12, 40:3, 46:20, 61:13

causing [1] - 61:2

CEO [2] - 28:20, 32:20

cert [2] - 43:7, 60:6

certain [2] - 25:1, 28:8

certainly [8] - 15:4, 24:20, 25:14, 32:15, 54:20, 59:16, 62:22, 63:7

CERTIFICATE [1] - 66:19

certification [15] - 6:1, 6:5, 6:9, 29:20, 31:2, 38:2, 38:13, 39:17, 41:23, 42:23, 59:9, 59:17, 64:23, 64:25, 66:5

CERTIFICATION [1] - 1:14

certified [2] - 38:14, 41:12

certify [2] - 28:15, 66:20

challenge [1] - 38:19

challenged [2] - 17:24, 51:2

Chancery [1] - 26:25

change [5] - 6:7, 10:23, 11:11, 11:14, 13:25

changed [8] - 5:19, 7:2, 8:4, 14:2, 18:21, 18:22, 41:21, 51:3

changes [1] - 54:6

characterizati on [1] - 37:16

characterize [1] - 11:15

charge [1] - 14:24

charged [3] - 24:12, 47:3, 56:9

charges [7] - 14:23, 40:17, 47:8, 52:21, 53:20, 56:7, 61:16

chart [4] - 10:7, 10:13, 10:19, 13:18

Check [1] - 2:3

Circuit [3] - 6:8, 45:10, 45:11

circuit [1] - 44:17

circumscribe [1] - 40:18

circumstance s [1] - 43:8

cite [3] - 16:2, 21:8, 30:14

cited [7] - 8:9, 14:5, 22:2, 22:11, 60:22, 63:9, 63:19

cites [2] - 48:8, 55:11

claim [3] - 8:23, 19:11, 35:10

claiming [1] - 13:21

claims [9] - 17:2, 21:16, 36:8, 36:14, 36:16, 36:21, 36:24, 37:12, 37:13

clarify [1] - 6:18

class [45] - 6:1, 6:5, 6:9, 18:8, 24:7, 28:15, 29:1, 29:12, 29:17, 29:18, 29:21, 30:10, 31:1, 33:5, 33:17, 33:25, 34:8, 34:25, 36:20, 38:2, 38:8, 38:13,

38:14, 38:18, 38:20, 39:17, 41:11, 41:22, 42:22, 43:7, 54:6, 54:19, 55:10, 56:23, 57:1, 57:5, 59:9, 59:17, 59:20, 60:5, 64:23, 64:25, 66:5

CLASS [1] - 1:14

classic [1] - 52:24

clear [9] - 7:7, 9:16, 16:18, 33:24, 39:19, 41:19, 41:20, 42:13, 53:3

clearcut [1] - 22:7

clearly [6] - 6:16, 7:20, 18:15, 46:17, 59:24, 64:3

CLERK [4] - 20:15, 20:18, 20:21, 20:25

clerks [1] - 20:13

click [1] - 21:1

client [1] - 35:7

close [1] - 15:12

closed [3] - 10:23, 11:4, 15:24

closely [1] - 65:21

closely- related [1] - 65:21

Club [1] - 14:5

co [1] - 5:9

co-lead [1] - 5:9

Cochran [1] - 10:8

cognizable [1] - 21:16

Cole [2] - 3:7, 5:14

collecting [1] - 4:16

coming [1] - 22:5

commands [1] - 46:24

comment [2] - 6:22, 32:23

common [2] -

27:11, 38:19

commonsens e [1] - 46:25

communicate [1] - 12:7

companies [5] - 22:12, 22:15, 27:6, 27:7, 44:15

company [33] - 9:11, 9:19, 12:16, 14:4, 14:16, 14:18, 15:23, 18:6, 23:19, 23:20, 24:21, 24:23, 24:25, 25:5, 26:22, 27:18, 27:23, 28:1, 31:5, 32:18, 34:15, 34:17, 45:7, 46:4, 46:9, 46:11, 46:17, 47:14, 49:17, 50:10, 52:5, 58:17, 59:1

company's [5] - 9:4, 19:9, 24:14, 24:17, 32:19

compared [2] - 27:17, 49:16

compelling [2] - 33:6, 42:8

competent [1] - 56:15

competing [1] - 24:5

competition [1] - 55:13

complainants [1] - 35:11

complaint [3] - 9:16, 24:5, 32:4

complaints [1] - 16:9

complete [4] - 40:7, 43:1, 43:11, 45:21

completed [1] - 45:25

completely [2] - 35:9, 44:3

complex [1] - 17:7

compliance [9] - 11:12, 11:18, 32:13, 36:22, 37:20, 58:20, 59:7, 59:19, 60:24

compliant [1] - 45:8

complies [1] - 10:15

complying [3] - 9:11, 9:20, 13:3

computer [1] - 3:12

computer-assisted [1] - 3:12

concede [4] - 34:22, 39:12, 40:2, 40:16

conceded [2] - 38:17, 43:24

concern [1] - 46:5

concession [1] - 38:22

concessions [1] - 60:2

concluded [3] - 9:5, 60:8, 66:17

conclusion [3] - 23:18, 26:3, 62:25

conclusions [2] - 28:7, 64:24

conclusive [2] - 25:24, 26:2

concrete [2] - 45:1, 45:2

concur [1] - 6:15

condoned [1] - 9:18

conduct [3] - 25:5, 32:1, 44:15

conducted [2] - 26:5, 51:1

confer [1] - 35:6

CONFERENCE [1] - 1:14

conference [4] -

1:16, 2:1, 3:1, 4:1

confidence [2] - 53:22, 55:16

confidential [2] - 35:5, 35:14

confidentiality [3] - 34:15, 34:16, 34:18

confirmed [1] - 21:25

connection [5] - 43:11, 43:24, 60:24, 65:9, 66:2

consciously [1] - 9:18

consent [4] - 12:19, 25:1, 26:20, 37:4

consequence [1] - 29:8

consider [2] - 28:20, 42:15

considerable [2] - 17:2, 17:8

considered [2] - 6:5, 65:24

considering [2] - 65:3, 65:6

consistent [1] - 15:15

consolidated [3] - 29:23, 30:21, 31:13

consolidation [3] - 30:3, 31:11, 31:19

construed [1] - 52:15

construing [1] - 52:14

consultants [1] - 28:6

consulting [1] - 63:25

content [2] - 21:14, 27:20

contested [1] - 57:18

context [4] - 16:1, 55:12, 58:16, 59:5

continue [2] - 45:18, 50:18

continuing [1] - 13:4

contributing [2] - 61:19, 61:20

controller [1] - 4:24

convenience [1] - 10:6

conversation [1] - 35:8

convicted [1] - 14:4

convictions [1] - 15:5

cooperations [1] - 32:18

coordinated [1] - 31:14

coordination [1] - 31:19

Corp [1] - 21:11

corporate [1] - 15:5

CORPORATION [1] - 1:7

Correct [1] - 48:18

correct [10] - 12:14, 13:8, 25:10, 26:23, 48:16, 49:23, 49:24, 50:7, 51:23, 66:21

corrected [4] - 46:18, 54:23, 63:21, 64:1

corrective [10] - 39:3, 39:10, 39:15, 40:1, 40:2, 43:10, 43:13, 45:4, 56:2, 66:3

corrects [1] - 54:5

corresponded [1] - 56:10

COSA [1] - 56:19

cost [3] - 32:6, 39:8, 62:1

cost-cutting [1] -

32:6

Costello [1] - 11:2

costs [3] - 32:8, 46:8, 60:20

Coterra [1] - 5:15

COUNSEL [1] - 66:15

counsel [7] - 5:9, 5:14, 5:18, 35:19, 38:21, 57:9, 66:8

count [4] - 10:24, 14:13, 14:15, 14:17

counter [1] - 16:23

counter-proposals [1] - 16:23

County [8] - 4:25, 58:11, 58:21, 59:2, 59:8, 59:19, 59:22, 60:14

COUNTY [1] - 1:3

couple [5] - 15:10, 42:12, 48:8, 57:19, 60:1

course [1] - 18:19

Court [44] - 3:9, 6:3, 8:8, 8:19, 9:23, 16:2, 21:12, 22:22, 23:16, 23:23, 25:17, 25:20, 26:25, 29:20, 33:16, 33:20, 33:22, 34:7, 35:19, 36:14, 36:20, 37:19, 37:21, 39:4, 41:22, 41:23, 42:14, 42:16, 42:23, 43:19, 44:15, 52:13, 53:3, 53:5, 53:16, 54:18, 55:7, 59:9, 62:8, 62:15, 62:17, 65:9, 65:16, 65:18

COURT [74] -

1:1, 1:8, 4:2, 4:10, 4:14, 5:3, 5:5, 5:10, 5:16, 5:23, 6:13, 6:24, 7:12, 8:6, 8:21, 9:25, 10:9, 10:14, 11:15, 11:23, 12:4, 12:20, 13:5, 15:2, 15:8, 15:16, 15:19, 16:11, 16:14, 19:4, 20:5, 20:10, 20:17, 20:20, 20:22, 21:3, 21:9, 22:23, 26:11, 28:14, 29:11, 29:23, 30:6, 30:22, 30:25, 31:15, 31:18, 31:21, 32:25, 34:9, 34:20, 35:17, 35:21, 36:12, 36:18, 37:15, 37:23, 38:6, 38:10, 38:15, 40:24, 41:13, 42:9, 44:7, 44:10, 48:1, 48:6, 48:10, 50:4, 57:7, 66:6, 66:13, 66:16, 66:19

court [6] - 4:5, 4:8, 9:5, 9:18, 22:1, 65:19

Court's [5] - 10:6, 20:3, 30:4, 48:5

courts [8] - 7:9, 22:10, 28:22, 29:2, 43:6, 53:24, 55:2, 63:6

cover [1] - 46:11

covered [2] - 46:4, 47:4

COVID [3] - 54:7, 54:8, 63:18

COVID-related [1] - 54:7

credit [1] - 57:1

Creek [1] - 1:22

criminal [4] - 13:19, 14:4,

14:23, 15:5
criminality [2] - 14:8, 14:11
criminally [1] - 24:12
critical [2] - 6:18, 7:14
criticized [1] - 54:14
CRR [2] - 3:9, 66:24
crushed [1] - 26:24
culpably [1] - 21:21
current [2] - 10:20, 10:25
curve [1] - 43:20
cut [1] - 32:8
cutting [1] - 32:6
cycles [1] - 18:20

**D**

Dallas [2] - 1:23, 2:15
damages [1] - 64:21
damaging [1] - 49:5
DAN [1] - 1:13
Darryl [2] - 1:17, 4:21
Date [1] - 66:18
Daubert [1] - 63:12
days [2] - 40:13, 61:1
dead [1] - 26:20
deadweight [1] - 18:10
dealing [1] - 16:8
dear [1] - 62:9
debate [4] - 22:3, 23:7, 38:3, 64:19
decade [2] - 24:11, 58:17
decade-long [1] - 58:17

December [5] - 17:17, 18:23, 25:9, 25:25, 37:9
decide [4] - 27:8, 38:10, 62:19, 65:19
decision [7] - 22:1, 24:8, 25:21, 30:11, 31:2, 31:9, 34:4
decisions [1] - 42:14
declaration [6] - 10:8, 14:15, 43:14, 56:22, 57:19, 60:23
declarations [2] - 57:20, 57:23
declare [1] - 57:21
decline [18] - 39:13, 40:3, 41:4, 41:5, 41:7, 43:20, 49:20, 56:16, 62:4, 62:6, 62:14, 63:1, 63:3, 63:5, 63:14, 63:15, 64:13
declined [2] - 61:23, 62:18
declines [1] - 59:21
defendant [3] - 29:8, 41:25, 60:22
defendant's [1] - 42:2
DEFENDANTS [1] - 3:2
defendants [20] - 5:13, 6:14, 19:23, 23:23, 28:19, 30:18, 31:12, 38:17, 39:12, 40:2, 40:14, 41:1, 42:5, 43:4, 44:14, 58:2, 58:13, 59:5, 59:18, 64:24
defendants' [5] - 14:12, 24:1, 58:5, 60:6,

65:13
deferred [1] - 26:22
deficiency [1] - 46:18
deficient [2] - 11:20, 13:6
DeLancey [2] - 3:7, 5:14
DELAWARE [1] - 1:3
Delaware [9] - 4:24, 7:9, 21:11, 22:10, 22:12, 24:23, 26:25, 28:22, 32:17
deliberate [1] - 27:22
demand [4] - 18:17, 22:22, 28:18, 28:21
demonstrate [1] - 15:13
demonstrates [2] - 33:12, 43:6
demonstration [2] - 46:15, 60:9
denied [2] - 28:3, 57:6
deny [1] - 43:7
DEP [1] - 16:9
department [2] - 15:15, 17:16
Department [5] - 16:12, 16:20, 17:5, 23:16, 58:18
depose [1] - 47:22
deposition [2] - 47:20, 60:2
deputy [1] - 4:23
derivative [23] - 5:9, 6:22, 6:25, 7:1, 8:2, 8:8, 18:16, 19:11, 27:4, 29:3, 30:2, 31:4, 33:2, 33:6, 33:8, 33:24, 36:11, 36:14, 36:19, 37:18, 38:9, 52:14,

52:15
described [2] - 16:16, 37:13
describes [1] - 26:19
description [1] - 23:10
desperately [1] - 58:18
detail [3] - 16:16, 17:8, 39:18
detailed [1] - 45:17
determinative [1] - 42:20
determine [2] - 42:7, 49:25
determined [2] - 26:6, 48:20
determining [1] - 40:12
devastating [1] - 47:25
development [1] - 18:9
dialogue [1] - 27:25
Diego [2] - 1:20, 2:19
difference [1] - 24:25
different [22] - 8:15, 8:16, 28:7, 29:25, 30:18, 30:19, 33:13, 33:16, 34:1, 34:4, 34:7, 44:3, 49:11, 51:22, 52:10, 52:21, 55:12, 58:3, 63:4
differently [2] - 47:13, 50:10
difficult [2] - 41:9, 54:11
Dimock [3] - 18:3, 56:21, 56:24
Dinges [1] - 28:20
DINGES [1] - 1:13
direct [2] - 8:8, 50:24

directed [1] - 44:20
directly [2] - 8:12, 31:7
director [3] - 11:6, 19:25
director's [1] - 29:9
director-by-director [1] - 19:25
directors [9] - 9:15, 19:15, 19:20, 21:21, 27:22, 28:25, 33:9, 33:12, 34:2
directors' [1] - 19:18
disabled [1] - 20:8
disagree [1] - 42:11
disagreement [3] - 7:19, 30:3, 37:15
disagreements [1] - 7:20
disappointing [1] - 39:6
discernible [1] - 49:1
disclose [4] - 37:2, 44:14, 44:16, 59:1
disclosed [1] - 45:22
disclosure [31] - 19:10, 19:11, 21:14, 37:6, 39:23, 41:3, 44:1, 44:5, 44:18, 45:8, 45:23, 46:2, 46:20, 47:9, 47:10, 47:15, 49:15, 49:21, 50:11, 50:16, 50:23, 51:2, 51:20, 52:17, 52:20, 55:17, 56:3, 56:18, 56:25, 61:2, 65:8

disclosure-related [1] - 19:11
disclosures [27] - 17:24, 21:22, 27:21, 33:11, 36:25, 37:7, 39:3, 39:15, 40:9, 42:17, 43:10, 43:13, 45:4, 45:15, 46:5, 47:3, 47:5, 49:4, 50:12, 51:14, 53:2, 57:3, 57:4, 58:20, 59:20, 66:3
disconnect [1] - 33:8
discovery [2] - 31:14, 40:22
discuss [2] - 16:5, 35:6
discussed [2] - 17:8, 48:17
discussed.. [1] - 56:11
discussion [3] - 16:6, 17:1, 38:13
dismiss [9] - 7:11, 10:7, 14:3, 25:13, 26:14, 26:17, 27:7, 37:22, 44:22
dismissal [5] - 8:12, 27:1, 27:5, 28:3, 44:9
dismissed [7] - 7:6, 28:13, 36:9, 36:14, 36:17, 36:20, 37:12
disposed [1] - 37:20
disproved [1] - 64:11
dispute [4] - 7:18, 11:13, 39:1, 43:25
disregarded [1] - 63:11
distill [1] - 10:11
distinction [1] - 29:2

distinctions [1] - 30:15
distinguish [2] - 30:16, 32:14
distinguishing [1] - 31:18
DISTRICT [4] - 1:1, 1:1, 1:8, 1:9
district [1] - 65:19
divergence [1] - 13:10
DIVISION [2] - 1:2, 1:9
dizzying [1] - 58:4
Docket [1] - 26:13
document [4] - 14:14, 19:21, 35:7
document-by-document [1] - 35:7
documents [12] - 18:19, 18:25, 33:18, 33:20, 34:15, 35:2, 35:4, 35:10, 36:4, 36:24, 52:4
doers [1] - 31:7
dollar [1] - 49:16
done [15] - 8:24, 8:25, 15:22, 15:25, 16:7, 17:3, 41:17, 42:6, 45:7, 46:16, 48:14, 50:10, 64:10, 64:25
dots [1] - 21:2
doubt [1] - 40:8
Dowd [1] - 1:18
down [5] - 10:11, 39:21, 43:2, 64:17, 65:10
downs [1] - 7:21
dozens [2] - 12:23
Dr [13] - 46:21, 47:20, 52:16, 54:4, 55:3, 55:20, 60:2,

60:3, 60:7, 63:2, 63:11, 63:16, 63:20
drafted [1] - 9:7
drafting [1] - 19:19
drained [1] - 52:22
draw [5] - 11:6, 23:23, 52:12, 56:4, 65:20
drawing [1] - 47:12
drawn [3] - 7:19, 7:20, 29:3
drill [4] - 45:12, 45:13, 56:24
drilled [2] - 44:2, 52:10
drive [2] - 32:9, 47:19
drives [2] - 22:19, 31:25
drop [1] - 57:2
drops [2] - 60:14, 60:17
drugs [1] - 27:10
dry [1] - 50:22
during [7] - 11:4, 20:4, 38:23, 54:13, 56:23, 59:20, 63:19
duty [8] - 21:15, 21:16, 21:17, 44:14, 44:16, 44:18, 52:19

**E**

e-mail [2] - 60:22, 61:1
EAC [1] - 16:4
early [2] - 4:3, 51:20
easy [1] - 22:6
ECF [1] - 26:16
economically [1] - 19:9
effective [5] - 17:21, 17:22, 17:23, 45:19
efficient [1] -

38:23
effort [1] - 27:22
efforts [7] - 9:4, 9:8, 9:12, 12:3, 36:1, 48:17, 66:7
eight [1] - 23:20
either [3] - 16:20, 43:13, 45:7
elephant [1] - 6:16
Ely [2] - 11:3, 61:16
emphasize [1] - 42:19
emphasized [1] - 57:10
emphatically [1] - 55:15
empirical [1] - 50:21
EMPLOYEES [1] - 1:4
Employees [1] - 4:25
enable [1] - 20:14
enabling [1] - 20:23
end [5] - 20:11, 20:14, 62:23, 65:8, 65:9
endorsed [2] - 24:3, 54:18
engagement [1] - 48:19
enhances [1] - 31:3
entered [1] - 25:1
entire [2] - 28:23, 28:24
entirely [1] - 15:15
entitled [1] - 66:22
Environmental [4] - 16:13, 16:21, 17:6, 23:17
environmental [8] - 13:3, 16:4, 24:10, 24:13,

51:4, 58:23, 58:24, 61:20
equipoise [1] - 42:25
erroneous [1] - 21:13
essentially [2] - 18:3, 50:5
establish [1] - 20:1
established [1] - 41:10
establishing [1] - 19:24
ET [4] - 1:4, 1:7, 1:11, 1:13
evaluate [1] - 17:2
evaluating [1] - 29:10
event [8] - 23:25, 41:6, 41:9, 54:19, 54:25, 55:1, 55:9, 55:13
evidence [22] - 21:19, 41:17, 42:2, 42:6, 42:15, 43:21, 47:17, 50:24, 53:5, 56:15, 57:22, 60:18, 61:14, 61:22, 63:13, 64:3, 64:11, 64:12, 65:17, 65:19, 65:24
exactly [3] - 17:10, 45:22, 53:8
example [4] - 23:7, 41:2, 58:8, 60:11
exceedingly [1] - 27:17
except [2] - 24:2, 37:18
excuse [2] - 26:4, 48:1
excused [1] - 66:16
executed [1] - 37:4
Exhibit [2] - 10:8,

14:14

exhibited [1] - 24:9

Exhibits [2] - 26:15

expect [1] - 49:7

expectations [1] - 51:3

expensive [1] - 7:15

expert [7] - 40:22, 41:4, 46:12, 50:20, 53:9, 62:11

expert's [2] - 41:6, 62:25

experts [1] - 63:6

explained [1] - 66:1

explaining [1] - 63:20

exploration [1] - 29:22

exposition [1] - 57:14

exposure [1] - 31:5

expressed [2] - 46:5, 46:8

extensive [3] - 9:7, 18:18, 54:2

extent [5] - 18:23, 21:20, 39:2, 59:13, 64:19

extremely [1] - 18:25

eyebrow [1] - 22:21

Ezell [3] - 5:6, 28:16, 29:11

EZELL [1] - 1:11

**F**

face [1] - 55:19

fact [17] - 7:10, 12:9, 15:10, 15:24, 17:12, 22:20, 24:7, 27:11, 41:25, 42:7, 45:14, 57:17, 59:15, 60:22, 61:8,

62:8, 65:12

fact-specific [1] - 57:17

facts [3] - 8:16, 19:25, 26:25

factual [7] - 23:4, 23:12, 33:21, 57:18, 57:25, 65:4, 65:5

failed [1] - 15:24

failure [2] - 12:11, 40:6

fair [2] - 10:2, 11:15

fairly [5] - 6:10, 38:17, 54:14, 59:23, 65:3

faith [6] - 15:12, 19:13, 21:13, 21:19, 22:19

fall [1] - 18:8

false [3] - 19:12, 58:14, 59:3

falsity [1] - 58:11

far [6] - 4:22, 15:2, 17:15, 18:15, 52:3, 64:25

Farm [2] - 45:16, 47:7

Farrah [2] - 20:14, 21:4

favor [4] - 23:24, 24:17, 33:14, 33:15

feat [1] - 42:4

feather [3] - 42:20, 42:21, 48:24

February [5] - 13:24, 32:5, 45:24, 51:3, 51:20

federal [1] - 29:20

Feinstein [11] - 47:20, 52:16, 54:4, 54:16, 55:3, 55:20, 60:2, 60:3, 60:7, 63:2, 63:20

Feinstein's [3] - 46:21, 63:11, 63:16

felonies [3] -

55:19, 55:21, 56:9

felony [2] - 52:21, 53:20

felt [1] - 34:18

few [5] - 5:1, 13:11, 20:3, 43:5, 61:1

Fifth [3] - 2:7, 6:8, 45:10

fifty [1] - 42:21

fight [3] - 22:16, 25:3, 25:6

fighting [2] - 22:11, 24:20

figure [1] - 21:6

figured [2] - 12:25

file [1] - 34:19

filed [4] - 5:19, 26:17, 34:12, 36:4

filings [1] - 58:22

financial [3] - 27:16, 35:14, 59:21

financially [1] - 60:12

fine [3] - 20:5, 21:9, 26:24

finish [1] - 48:2

fire [2] - 45:12, 50:22

first [11] - 7:1, 7:2, 7:25, 18:24, 27:3, 34:10, 39:6, 43:12, 45:24, 48:13, 65:11

five [1] - 35:15

fix [6] - 4:9, 4:10, 12:25, 13:1, 14:1, 50:15

fixed [3] - 26:7, 50:13, 50:14

flags [2] - 8:14, 9:2

flip [2] - 44:24, 45:1

Floor [1] - 2:7

focus [1] - 20:7

folks [1] - 5:1

following [1] - 4:1

Foltz [1] - 11:3

FOR [3] - 1:17, 2:2, 3:2

foregoing [1] - 66:20

forget [1] - 61:6

Form [2] - 49:9, 49:15

forth [4] - 16:20, 27:25, 30:16, 64:11

forward [2] - 6:21, 39:7

Foti [1] - 2:10

foul [1] - 50:6

foundational [1] - 57:15

Fourth [1] - 47:22

framing [1] - 11:16

frankly [6] - 7:8, 22:20, 26:20, 27:14, 47:23, 58:4

fraud [3] - 27:20, 38:24, 64:22

fraudulently [1] - 19:15

free [1] - 52:11

freestanding [1] - 44:18

Friday [1] - 47:23

front [1] - 65:8

fronts [1] - 42:12

Fulbright [2] - 3:3, 5:12

full [3] - 33:21, 46:24, 57:25

futility [3] - 18:17, 22:22, 28:18

future [3] - 36:2, 51:22, 52:9

**G**

Galveston [1] - 3:10

GAS [1] - 1:6

gas [6] - 10:22,

11:1, 23:12, 43:19, 61:5, 61:12

Geller [1] - 1:18

General [1] - 23:17

generalized [2] - 36:21, 36:22

generally [1] - 55:22

generic [4] - 6:4, 65:6, 65:7, 65:12

Gephart [1] - 1:18

Gesford [1] - 61:16

given [2] - 48:23, 54:1

Glancy [2] - 2:6, 5:8

gleaned [1] - 38:3

go-around [1] - 14:10

Goldman [17] - 6:2, 6:10, 6:16, 41:19, 41:20, 41:23, 42:11, 42:13, 42:18, 46:23, 48:23, 52:24, 53:3, 65:1, 65:3, 65:16

Goldman's [1] - 65:15

good-faith [1] - 21:19

grand [1] - 23:18

granted [1] - 26:25

Greenville [1] - 2:14

Grinch [1] - 47:22

ground [1] - 32:17

groundwater [2] - 22:4, 23:8

Group [1] - 1:22

group [1] - 63:25

guidance [3] - 42:17, 43:16, 46:9

gun [1] - 32:11

**H**

half [2] - 23:20, 28:23
Halliburton [3] - 41:21, 41:24, 53:25
handful [1] - 29:5
hang [3] - 12:4, 19:5, 20:11
happy [6] - 8:3, 20:4, 21:7, 35:18, 38:12, 39:17
hard [1] - 40:24
harm [1] - 50:5
harmonize [1] - 13:12
heading [1] - 58:23
heard [6] - 57:13, 57:16, 57:18, 60:1, 63:17, 66:6
hearing [1] - 20:4
HEARING [1] - 1:14
heart [1] - 62:9
heightened [1] - 14:10
held [4] - 4:1, 24:8, 29:16, 37:11
Heller [1] - 2:3
help [1] - 4:5
helpful [6] - 4:15, 4:19, 18:25, 31:22, 38:7, 48:9
herring [1] - 56:20
heteroskedasticity [2] - 53:14, 63:18
hide [1] - 28:1
high [1] - 22:18
highlighted [1] - 48:11
highly [6] - 7:3, 7:6, 44:4, 50:25, 54:1, 57:16

hired [1] - 28:5
historical [1] - 35:14
hit [1] - 26:23
hold [1] - 31:7
home [2] - 22:20, 47:19
Honor [33] - 4:6, 4:20, 5:8, 5:11, 5:22, 6:15, 8:1, 12:14, 13:8, 14:5, 14:13, 15:6, 15:9, 19:3, 19:16, 23:1, 24:7, 26:9, 29:14, 30:1, 30:23, 31:20, 33:3, 34:13, 34:22, 37:17, 37:25, 42:10, 57:11, 61:6, 66:11, 66:12, 66:15
HONORABLE [1] - 1:14
host [3] - 20:12, 20:16, 21:1
hot [1] - 64:18
house [1] - 5:14
HOUSTON [2] - 1:2, 1:9
Howell [6] - 11:3, 17:15, 25:10, 26:1, 26:14, 47:6
huge [2] - 7:17, 65:2
hump [1] - 65:25
hundreds [1] - 14:23

**I**

idea [2] - 52:19, 57:1
identical [2] - 62:11, 62:12
identification [1] - 12:8
identify [3] - 12:6, 54:21, 58:9
identifying [2] - 12:15, 13:6

II [1] - 41:24
illegal [2] - 27:8, 31:25
illegality [1] - 9:18
image [1] - 58:19
immediately [1] - 17:6
impact [40] - 6:9, 6:12, 30:4, 35:23, 39:2, 40:6, 40:8, 40:10, 40:21, 41:8, 41:10, 42:3, 43:16, 45:5, 45:6, 45:13, 47:25, 48:16, 50:9, 51:8, 51:10, 52:20, 53:2, 53:6, 53:19, 57:5, 59:25, 60:5, 60:10, 62:18, 62:22, 63:8, 64:4, 64:8, 64:12, 64:15, 65:2, 65:7, 65:18, 65:20
impacts [1] - 63:21
implementation [2] - 11:19, 12:12
implicates [1] - 21:14
implies [1] - 22:8
import [2] - 42:11, 54:4
important [1] - 6:19
improper [1] - 55:8
IN [1] - 3:6
in-house [1] - 5:14
incident [2] - 32:7, 32:9
included [1] - 10:20
includes [1] - 65:23
including [1] - 36:6

inconsistency [1] - 47:10
increase [2] - 28:24, 32:8
increased [2] - 31:6, 39:8
increases [1] - 31:4
indemnification [1] - 31:6
independent [1] - 51:8
indication [2] - 32:2, 32:12
indictment [1] - 18:1
individual [5] - 15:23, 19:14, 28:19, 56:7, 56:8
indulge [1] - 38:13
infer [3] - 8:13, 52:20, 53:2
inference [15] - 9:15, 11:5, 14:22, 15:12, 17:10, 17:23, 19:1, 24:9, 27:4, 27:12, 27:19, 27:21, 28:2, 47:12, 54:10
inferences [13] - 7:19, 7:20, 8:18, 14:9, 15:3, 23:6, 23:13, 23:23, 24:1, 24:2, 24:6, 42:24, 65:21
inferior [1] - 64:14
inferring [1] - 53:18
information [6] - 12:17, 13:15, 35:12, 35:14, 40:3, 59:15
informative [1] - 8:19
informed [1] - 66:8
inquiry [2] - 39:17, 40:7
insider [1] - 29:7
insight [1] - 15:20

instead [2] - 17:7, 39:14
institute [1] - 11:11
instructive [3] - 7:4, 7:6, 44:5
insurmountable [2] - 43:2, 43:9
intended [1] - 34:3
intentional [1] - 27:20
intentionally [3] - 19:14, 19:15, 34:3
interactions [1] - 32:21
interest [1] - 35:23
interesting [1] - 32:16
interpretation [2] - 24:15, 52:12
interrupt [2] - 15:16, 48:2
interval [1] - 53:22
intraday [2] - 60:16, 62:6
inverse [1] - 32:6
investigation [3] - 14:7, 45:21, 61:5
investigative [1] - 45:19
investors [2] - 56:23, 58:24
investors' [1] - 51:3
involve [1] - 32:17
involved [6] - 8:23, 33:13, 37:6, 47:7, 47:8, 49:16
involvement [2] - 33:11, 54:2
involves [1] - 32:20
involving [1] - 8:9
iota [1] - 46:5
Isaac [1] - 2:6

**issue** [35] - 6:21, 8:12, 18:19, 19:18, 19:19, 23:9, 26:19, 31:8, 33:15, 35:6, 35:20, 38:16, 39:1, 39:24, 42:17, 43:12, 43:15, 43:17, 44:13, 44:23, 45:3, 47:1, 47:2, 49:18, 53:2, 53:12, 53:17, 55:22, 56:19, 56:20, 57:2, 58:10, 62:21, 65:20

**issued** [3] - 8:10, 17:16, 25:24

**issues** [12] - 6:10, 7:14, 7:16, 46:13, 46:25, 53:5, 54:3, 57:18, 61:2, 61:13, 61:21, 65:22

**items** [1] - 39:10

**iteration** [1] - 7:2

**itself** [4] - 13:17, 15:11, 18:12, 31:9

## J

**Jacinto** [1] - 3:3

**Jack** [1] - 1:18

**James** [1] - 1:17

**Jeffers** [9] - 11:3, 13:23, 17:15, 25:10, 25:23, 26:14, 45:16, 47:7, 50:17

**Joanne** [2] - 3:7, 4:24

**job** [1] - 22:9

**JODY** [1] - 1:11

**Joe** [1] - 1:21

**joined** [4] - 6:10, 6:21, 18:19, 47:1

**Jonathan** [2] - 3:6, 4:23

**JUDGE** [1] - 1:14

**Judge** [3] - 20:15, 44:4, 53:25

**judge** [1] - 20:25

**judgment** [2] - 21:13, 59:12

**judicial** [1] - 25:18

**July** [19] - 17:23, 37:6, 39:4, 39:6, 40:4, 45:22, 46:15, 47:9, 47:10, 47:13, 47:22, 49:15, 49:22, 50:17, 56:17, 60:11, 61:7, 61:18, 66:18

**JULY** [2] - 1:7, 1:13

**June** [6] - 39:5, 40:14, 41:2, 56:17, 62:23, 64:5

**jurisprudence** [1] - 41:22

**jury** [4] - 23:18, 59:13, 59:16, 62:19

## K

**Kahn** [1] - 2:10

**KBR** [2] - 44:4, 52:18

**Kendall** [3] - 1:21, 1:22, 4:25

**kept** [2] - 36:1, 36:5

**Kessler** [3] - 2:3, 4:7, 4:12

**key** [2] - 6:7, 7:1

**kind** [5] - 10:11, 11:11, 25:17, 27:22, 35:22

**King** [1] - 2:4

**knowing** [1] - 24:12

**knowledge** [1] - 54:22

**knows** [1] - 43:19

**Kravitz** [1] - 2:10

## L

**label** [1] - 27:11

**lack** [4] - 41:3, 43:11, 53:13, 60:9

**landowner** [2] - 16:15, 22:1

**landowners** [6] - 16:8, 16:10, 16:21, 16:23, 16:24, 17:5

**largely** [1] - 13:16

**larger** [1] - 46:4

**larger-cap** [1] - 46:4

**last** [10] - 8:5, 8:13, 13:11, 14:3, 14:5, 14:10, 25:8, 34:24, 55:23, 64:5

**late** [1] - 47:21

**Laura** [4] - 3:9, 66:20, 66:23, 66:24

**law** [17] - 5:19, 6:18, 7:13, 7:17, 9:11, 13:3, 13:9, 20:2, 20:13, 24:13, 24:21, 24:23, 32:17, 33:12, 38:19, 44:17, 45:10

**Law** [2] - 1:22, 2:14

**LAW** [4] - 20:15, 20:18, 20:21, 20:25

**lawfully** [1] - 24:24

**laws** [3] - 22:14, 22:15, 24:10

**lead** [4] - 4:24, 5:9, 8:12, 9:14

**leading** [1] - 61:18

**leads** [1] - 7:12

**leaking** [1] - 17:4

**learns** [1] - 60:11

**least** [5] - 18:7, 19:17, 33:7, 40:16, 47:24

**leave** [1] - 36:15

**leaves** [1] - 63:5

**led** [1] - 12:18

**LEE** [1] - 1:14

**left** [2] - 43:22, 65:22

**legacy** [1] - 12:21

**legal** [3] - 9:2, 12:1, 24:11

**Lending** [1] - 14:5

**lengthy** [3] - 16:6, 17:7, 57:14

**less** [1] - 18:12

**letter** [1] - 36:23

**letters** [1] - 21:11

**level** [4] - 14:7, 22:18, 29:19, 63:7

**levied** [1] - 27:14

**liabilities** [1] - 51:4

**liability** [1] - 28:25

**liable** [1] - 19:21

**Lichtenstein** [2] - 3:6, 4:23

**lies** [1] - 12:5

**life** [4] - 10:18, 32:21, 45:12, 46:14

**lifted** [1] - 56:25

**likelihood** [1] - 31:5

**likely** [1] - 44:25

**limitations** [1] - 30:16

**limited** [1] - 50:12

**line** [9] - 5:1, 18:20, 24:22, 51:18, 55:25, 56:13, 56:14

**lines** [3] - 49:6, 49:19

**Lines** [1] - 48:13

**link** [1] - 41:25

**linked** [2] - 39:23, 62:20

**list** [1] - 10:23

**literally** [2] - 11:7, 13:20

**literature** [1] - 63:19

**litigated** [1] - 57:25

**litigation** [3] - 7:24, 15:13, 16:25

**live** [3] - 13:13, 45:12, 50:22

**LLC** [1] - 2:10

**LLP** [5] - 1:18, 2:3, 2:6, 2:17, 3:3

**lock** [1] - 43:2

**lock-down** [1] - 43:2

**locks** [1] - 56:25

**log** [1] - 4:11

**logically** [1] - 45:9

**look** [16] - 6:21, 10:5, 18:13, 18:17, 27:6, 28:23, 42:14, 46:23, 46:24, 49:2, 53:5, 55:19, 60:16, 62:8, 65:17

**looking** [3] - 7:15, 20:22, 49:1

**looks** [5] - 14:13, 20:7, 25:20, 27:2, 28:10

**loss** [9] - 39:22, 45:5, 51:8, 53:4, 60:4, 64:19, 64:20, 65:23, 66:4

**Louisiana** [1] - 2:12

**loyalty** [2] - 21:15, 21:17

**Lucy** [2] - 46:21, 48:19

**Lynn** [1] - 53:25

## M

**mail** [2] - 60:22, 61:1

**main** [1] - 43:17

**majority** [1] - 28:23

manageable [1] - 10:12

management [2] - 12:3, 12:9

Manzer [1] - 11:2

mark [1] - 15:24

market [10] - 27:17, 38:22, 38:24, 46:1, 46:15, 46:19, 49:17, 60:11, 61:7, 61:10

match [3] - 57:3, 57:4, 58:2

material [4] - 19:7, 19:9, 19:12, 59:15

materiality [2] - 27:2, 53:4

materially [2] - 7:2, 46:9

matter [2] - 24:14, 66:22

matters [7] - 5:13, 5:14, 15:14, 58:21, 58:23, 58:25

maximum [3] - 14:16, 14:17, 14:23

McDonald's [5] - 7:5, 22:19, 28:12, 32:15

mean [17] - 10:14, 13:24, 15:22, 15:23, 16:1, 23:13, 27:24, 38:4, 41:16, 48:2, 49:2, 50:24, 51:7, 51:25, 55:18, 58:3, 59:10

means [2] - 15:21, 59:11

meant [1] - 9:17

measure [1] - 55:16

measures [4] - 17:19, 17:20, 32:6, 45:19

mechanical [1] - 3:11

meet [2] - 35:5, 41:18

meeting [4] - 20:16, 32:5, 36:24, 41:15

meetings [1] - 16:4

Melinda [1] - 2:9

Meltzer [1] - 2:3

member [1] - 29:5

members [1] - 29:11

mentioned [3] - 6:20, 53:13, 65:1

menu [1] - 20:23

mere [3] - 14:6, 15:10, 42:2

merits [11] - 14:8, 30:11, 39:24, 40:11, 40:23, 41:12, 53:4, 53:7, 57:17, 64:18, 65:22

merits-based [1] - 57:17

methane [4] - 22:3, 22:6, 23:7, 23:8

methodology [1] - 54:5

Michaels [9] - 2:6, 5:8, 8:2, 17:11, 17:14, 19:1, 22:7, 22:24, 26:19

MICHAELS [21] - 5:7, 8:1, 8:7, 8:22, 10:4, 10:10, 10:16, 11:21, 11:24, 12:13, 12:21, 13:8, 19:3, 22:25, 30:23, 31:1, 31:17, 31:20, 31:23, 34:13, 37:17

might [3] - 13:15, 25:9, 48:8

migration [5] - 10:22, 11:1, 23:12, 61:5, 61:13

million [4] - 14:19, 18:3, 18:10, 26:24

mind [1] - 19:6

mine [1] - 20:8

minimize [2] - 35:25, 36:1

minimum [2] - 21:18, 24:5

minute [1] - 15:17

misconduct [1] - 32:20

misdemeanor [8] - 14:13, 14:15, 14:17, 18:2, 18:12, 18:14, 28:9, 47:8

misdemeanors [3] - 55:20, 55:22, 56:9

mislead [1] - 34:3

misleading [5] - 19:14, 25:22, 44:19, 59:6, 59:13

misled [2] - 34:3, 59:18

mismatch [8] - 47:2, 52:23, 52:24, 53:1, 53:17, 55:22, 56:2, 57:2

mismatched [2] - 40:15, 65:15

misrepresentation [1] - 42:1

misrepresentations [1] - 39:24

miss [1] - 61:14

missed [2] - 60:25, 61:3

missing [1] - 11:18

misstatement [1] - 45:14

misstatements [4] - 39:11, 45:1, 56:3, 66:3

model [3] - 63:16, 64:7, 64:14

model's [1] - 63:21

money [1] - 27:23

MoneyGram [3] - 7:3, 26:21, 28:11

monopolistic [1] - 25:4

month [2] - 8:10, 16:5

monthly [2] - 16:16, 21:24

months [3] - 16:22, 43:5, 61:17

morning [7] - 4:2, 4:20, 5:7, 5:11, 60:15, 60:17, 62:1

most [6] - 5:25, 6:11, 8:4, 27:11, 28:18, 63:6

motion [10] - 7:11, 10:7, 14:3, 23:13, 25:12, 26:14, 26:17, 37:22, 44:22, 63:12

motions [1] - 27:7

motive [1] - 31:25

move [1] - 50:19

movement [2] - 54:12, 63:22

moving [1] - 62:23

multiple [1] - 65:25

Murray [2] - 2:6, 5:8

must [4] - 41:25, 42:14, 65:19, 65:22

myriad [1] - 57:18

**N**

name [3] - 4:4, 21:1, 29:5

named [1] - 58:14

names [1] - 35:11

narrow [3] - 44:20, 44:25, 65:4

natural [1] - 43:19

naturally [1] - 22:4

nature [2] - 15:3, 18:14

near [1] - 62:9

necessarily [1] - 29:15

need [5] - 12:6, 19:25, 31:3, 31:6, 36:5

needed [4] - 12:10, 34:18, 45:20, 50:14

needs [4] - 36:5, 53:16, 63:20, 63:25

negative [3] - 59:21, 61:7

negatively [1] - 44:22

negligence [2] - 18:14, 18:15

negligence-oriented [1] - 18:14

negotiation [1] - 16:19

negotiations [1] - 14:21

NERA [2] - 55:11

never [10] - 10:23, 11:13, 12:22, 12:24, 12:25, 29:17, 51:21, 56:22, 63:24

new [6] - 12:23, 13:4, 18:5, 32:16, 54:24, 56:24

New [3] - 2:8, 2:12

Newey [4] - 54:5, 54:13, 55:6, 55:12

Newey-West [4] - 54:5, 54:13, 55:6, 55:12

news [10] - 40:16, 59:21, 60:12, 60:13, 60:18, 61:11, 62:1,

62:2, 62:13, 62:20

next [3] - 7:12, 61:8, 61:11

Nicholson [1] - 2:9

Nicolas [1] - 2:10

Nigerian [1] - 44:12

noncomplianc e [7] - 9:2, 9:15, 32:9, 59:22, 60:13, 60:20, 60:21

none [1] - 46:7

normal [2] - 31:13, 54:12

Norton [2] - 3:3, 5:12

notable [1] - 5:25

nothing [14] - 8:24, 11:8, 15:22, 17:12, 17:16, 18:11, 18:20, 28:24, 29:6, 41:21, 45:3, 45:8, 46:19, 52:8

notice [2] - 25:18, 37:3

notices [5] - 37:7, 39:9, 49:22, 61:24, 62:3

notion [1] - 29:10

NOV [5] - 37:2, 43:25, 58:2, 59:1, 59:5

NOV...the [1] - 52:5

NOVs [15] - 33:23, 43:12, 43:15, 44:21, 45:15, 50:13, 51:14, 51:20, 51:22, 52:9, 56:10, 56:20, 56:21, 58:13

nowhere [1] - 15:11

Number [3] - 42:13, 42:18, 43:9

number [4] -

15:10, 34:12, 55:4, 63:9

numbers [1] - 26:16

numerous [2] - 38:18, 63:6

**O**

obligation [1] - 11:10

obligations [2] - 19:10, 24:11

obvious [2] - 22:8, 65:21

obviously [4] - 7:14, 14:20, 23:11, 38:2

occasions [1] - 10:24

occurred [2] - 11:14, 41:4

occurring [1] - 22:4

October [2] - 10:25

OF [2] - 1:1, 1:9

off-label [1] - 27:11

offered [2] - 34:5, 62:12

officers [1] - 19:23

often [2] - 15:14, 41:2

OIL [1] - 1:6

old [2] - 5:17, 43:18

omit [1] - 59:14

omitted [1] - 59:14

ON [1] - 1:14

once [2] - 18:4, 40:10

one [38] - 9:1, 10:3, 11:4, 12:4, 15:10, 16:18, 19:5, 20:7, 20:11, 20:12, 24:2, 28:10, 29:5, 29:7, 34:22, 35:23, 36:23, 37:5,

40:25, 42:13, 46:12, 46:23, 51:5, 52:5, 52:11, 56:4, 58:2, 58:3, 58:8, 58:20, 58:25, 61:2, 63:13, 63:14, 64:3

ones [2] - 56:8, 56:9

ongoing [1] - 45:21

opaque [1] - 15:3

open [8] - 13:23, 15:11, 15:14, 15:21, 16:1, 17:12, 21:24, 35:8

opened [1] - 13:23

operate [1] - 24:23

operates [1] - 15:15

operating [1] - 24:21

operations [2] - 32:10, 32:19

opined [1] - 62:5

opines [1] - 41:4

opinion [11] - 6:3, 8:17, 14:5, 36:3, 36:6, 37:11, 46:24, 56:4, 62:11, 62:12, 66:9

opinions [2] - 13:11, 60:8

opportunity [1] - 8:4

opposing [2] - 35:19, 57:8

opposite [2] - 17:10, 23:18

opposition [3] - 10:7, 25:12, 37:22

option [2] - 21:2, 22:12

options [1] - 21:5

order [2] - 26:20, 37:4

orderly [1] - 37:7

orders [9] - 17:15, 17:16, 17:18, 18:23, 25:9, 26:12, 26:14, 33:22, 37:9

ordinary [1] - 33:18

organization [1] - 14:22

oriented [2] - 11:11, 18:14

Orleans [1] - 2:12

otherwise [1] - 52:16

outcome [2] - 33:6, 42:20

outset [1] - 41:20

outside [8] - 19:14, 19:18, 21:21, 28:25, 33:9, 33:12, 34:2, 54:12

overcome [1] - 53:11

overlaps [1] - 53:6

oversight [1] - 12:12

overstate [1] - 30:9

own [4] - 10:18, 48:21, 63:24

**P**

p.m [1] - 66:17

P.M [2] - 1:5, 1:12

pads [2] - 44:3, 56:20

Page [1] - 55:25

page [11] - 44:6, 44:9, 48:13, 49:6, 49:18, 51:10, 51:16, 51:17, 56:12, 56:13

paid [4] - 18:4, 18:10, 27:14, 42:1

paper [1] - 63:25

papers [1] - 39:19

paradigm [1] -

53:1

paragraph [1] - 32:4

parallels [1] - 8:16

part [8] - 17:17, 18:24, 29:1, 29:18, 36:4, 37:13, 51:24, 56:21

partially [2] - 22:18, 44:21

participated [1] - 21:21

participation [1] - 19:18

particular [7] - 17:13, 31:10, 35:12, 48:15, 48:16, 54:11, 57:9

particularity [1] - 19:17

particularized [2] - 19:24, 33:10

particularly [2] - 8:11, 35:22

parties [11] - 1:16, 2:1, 3:1, 6:20, 18:18, 33:1, 37:1, 37:25, 40:11, 42:15, 49:3

parties' [1] - 36:8

party [2] - 23:15, 24:3

past [2] - 7:11, 42:16

pathway [1] - 54:2

patience [5] - 9:23, 9:25, 10:2, 20:3, 48:5

pattern [4] - 7:10, 22:20, 24:9, 27:11

paused [1] - 57:8

pay [1] - 14:16

paying [1] - 14:18

penalties [4] - 27:13, 27:15, 27:16, 49:16

penalty [7] -

14:16, 14:17, 14:18, 14:23, 18:10, 18:11, 49:8

Pennsylvania [8] - 2:4, 16:13, 21:25, 22:4, 23:8, 23:16, 58:18, 61:16

percent [14] - 43:2, 53:22, 53:24, 53:25, 55:4, 55:5, 55:16, 61:23, 62:4, 62:5, 62:6, 63:4, 63:14

performed [2] - 17:19, 17:20

period [16] - 9:3, 10:20, 11:4, 13:2, 15:11, 17:3, 17:7, 17:13, 29:17, 38:23, 54:6, 54:9, 54:13, 56:23, 59:20, 63:19

periods [5] - 16:19, 47:4, 47:8, 52:22, 58:1

permanently [1] - 43:17

permissible [2] - 22:12, 23:25

permit [1] - 20:23

perplexing [1] - 48:22

person [1] - 60:23

perspective [1] - 31:3

persuasive [4] - 30:13, 30:14, 50:25, 54:1

persuasively [1] - 46:3

Peter [2] - 3:2, 5:12

Phillips [2] - 3:7, 4:24

picture [2] - 33:22, 59:6

pieces [3] - 62:13, 63:13, 64:2

piping [1] - 23:1

Place [1] - 2:18

place [3] - 34:21, 34:23, 50:2

plain [1] - 27:24

plainly [1] - 41:24

plaintiff [4] - 4:24, 23:5, 42:1, 59:14

plaintiff's [1] - 33:15

PLAINTIFFS [2] - 1:17, 2:2

plaintiffs [31] - 4:21, 5:2, 5:6, 5:9, 8:2, 14:9, 18:16, 19:12, 19:16, 19:25, 21:20, 29:11, 29:21, 30:2, 30:10, 30:19, 34:5, 35:1, 37:25, 38:25, 42:21, 43:9, 45:23, 50:1, 52:15, 53:10, 56:19, 59:24, 60:5, 62:20, 64:9

plaintiffs' [3] - 46:12, 54:17, 54:22

plan [2] - 45:18, 50:18

play [1] - 13:17

plea [6] - 14:14, 14:21, 15:4, 18:2, 18:13

plead [2] - 14:24, 18:16

pleading [7] - 9:14, 10:11, 19:24, 23:9, 24:14, 33:5, 41:13

pleadings [7] - 23:5, 30:5, 30:11, 33:8, 33:19, 36:15, 42:15

plenty [1] - 66:7

PLLC [1] - 1:22

plugged [2] - 43:18, 46:7

plus [1] - 33:16

point [22] - 7:23, 11:9, 13:24, 15:4, 21:23, 21:25, 22:20, 23:14, 24:19, 25:8, 31:24, 36:7, 41:3, 47:2, 52:18, 53:14, 55:7, 56:22, 57:14, 57:15, 60:3, 64:5

points [8] - 6:21, 15:10, 30:24, 45:6, 47:1, 47:19, 50:3, 57:9

policies [1] - 9:7

policy [1] - 35:21

portion [1] - 61:14

posit [1] - 54:7

posited [1] - 24:21

position [1] - 33:4

potential [2] - 7:21, 49:8

potentially [3] - 28:21, 35:13, 35:15

powerful [2] - 47:17, 53:13

PowerPoint [2] - 20:3, 47:18

Powers [4] - 11:2, 61:4, 61:12

Poydras [1] - 2:11

practical [1] - 29:9

practicalities [1] - 7:13

practicality [1] - 31:8

practice [1] - 7:16

practices [1] - 13:2

precisely [1] - 50:16

predict [1] - 63:22

prejudice [2] - 36:17, 37:12

premise [2] - 12:5, 65:15

premised [1] - 29:4

preparing [1] - 21:21

present [2] - 4:4, 65:11

presentation [2] - 18:1, 47:4

presented [1] - 7:9

presentment [3] - 40:17, 47:11, 56:7

press [1] - 61:25

pressure [1] - 26:5

presumption [1] - 38:24

pretrial [1] - 7:16

pretty [3] - 5:17, 9:3, 39:19

previous [1] - 41:22

price [50] - 6:9, 6:12, 18:8, 26:24, 39:2, 40:6, 40:8, 40:10, 40:21, 41:8, 41:10, 42:1, 42:3, 45:5, 45:7, 45:13, 46:20, 47:12, 47:25, 48:15, 49:2, 50:9, 50:19, 51:8, 51:9, 52:20, 53:2, 53:6, 53:19, 56:16, 57:5, 59:21, 59:24, 60:5, 60:10, 60:14, 60:25, 61:23, 62:17, 62:22, 63:8, 64:4, 64:8, 64:12, 64:15, 65:7, 65:18, 65:20

prices [1] - 55:14

primary [2] - 11:16, 32:18

privy [1] - 14:22

probative [1] -

64:8

problem [5] - 14:1, 23:22, 26:7, 43:10, 58:17

problems [5] - 12:18, 12:22, 26:23, 52:11, 61:3

procedures [3] - 9:7, 11:18, 11:19

proceed [6] - 7:10, 7:15, 40:11, 40:22, 41:12

Proceedings [2] - 3:11, 66:17

proceedings [2] - 4:1, 66:21

process [8] - 12:1, 12:6, 12:7, 12:8, 12:14, 13:6, 15:4, 23:11

produced [3] - 3:12, 34:15, 35:4

producing [1] - 61:19

production [14] - 18:5, 29:20, 39:7, 42:2, 43:20, 43:22, 60:19, 60:25, 61:3, 61:8, 61:17, 61:19, 61:20, 62:1

products [1] - 27:9

professional [1] - 32:21

profit [1] - 31:25

profitability [1] - 32:8

progress [1] - 13:20

prohibitions [1] - 25:4

prominent [1] - 18:24

promise [2] - 55:23, 66:9

Prongay [2] - 2:6,

5:8

**pronunciation**
[1] - 53:15

**proof** [4] - 29:24,
41:15, 50:22,
64:15

**proper** [2] - 21:13,
55:16

**properly** [2] - 4:5,
21:20

**proposals** [2] -
16:22, 16:23

**proposed** [2] -
37:3, 38:20

**proposition** [1] -
14:6

**prosecution** [1]
- 26:22

**Protection** [4] -
16:13, 16:21,
17:6, 23:17

**prove** [6] - 40:6,
41:7, 60:5, 62:7,
62:17, 64:9

**proven** [1] - 15:1

**proves** [2] -
62:18, 62:21

**provide** [2] -
21:18, 48:8

**provided** [2] -
16:3, 60:9

**proving** [2] -
41:12, 63:8

**Prussia** [1] - 2:4

**PSLRA** [1] -
34:25

**public** [2] - 35:23

**publicly** [1] -
25:14

**purport** [1] -
29:14

**purported** [2] -
12:2, 60:1

**purporting** [2] -
58:23, 63:4

**purposes** [1] -
64:23

**put** [10] - 18:7,
25:15, 41:17,
42:6, 43:21,
44:12, 53:10,
60:23, 64:11

**putting** [1] - 64:2

## Q

**Qualcomm** [3] -
25:2, 43:5,
52:25

**qualifies** [1] -
35:24

**quarter** [1] -
14:19

**quarterly** [3] -
16:3, 16:17,
17:9

**questions** [3] -
34:9, 34:11,
38:19

**quick** [2] - 24:19,
38:13

**quickly** [3] - 23:1,
40:14, 66:10

**quite** [4] - 28:4,
29:19, 46:11,
53:13

**quote** [3] - 45:17,
45:20, 58:23

## R

**Radnor** [1] - 2:4

**raise** [1] - 48:22

**raised** [1] - 56:19

**raises** [1] - 27:4

**raising** [1] - 22:21

**range** [1] - 54:12

**rare** [2] - 46:14,
50:24

**rarely** [3] - 42:3,
42:19, 42:25

**rates** [2] - 32:7,
32:9

**rather** [2] - 21:15,
28:4

**Ratzel** [2] - 11:3,
61:16

**RDR** [1] - 3:9

**reached** [2] -
23:18, 28:8

**reacted** [1] -
47:13

**reaction** [5] -
46:2, 46:20,

49:8, 49:11,
49:13

**read** [7] - 20:8,
21:7, 55:24,
59:23, 65:3

**real** [3] - 42:11,
45:12, 46:14

**real-life** [2] -
45:12, 46:14

**really** [20] - 6:7,
7:17, 19:17,
22:19, 23:4,
23:8, 24:16,
25:6, 29:6,
32:22, 36:5,
39:1, 39:21,
46:3, 53:1,
53:11, 61:10,
62:23, 64:17,
65:3

**reason** [1] - 34:24

**reasonable** [2] -
11:5, 43:4

**reasonably** [2] -
49:12, 52:12

**reasons** [7] -
17:25, 30:20,
33:7, 34:20,
34:23, 63:17,
65:25

**rebuttal** [1] -
63:20

**receipt** [1] - 39:9

**receive** [2] - 9:13,
23:13

**received** [5] -
9:2, 9:8, 37:8,
56:10, 60:25

**receives** [1] -
23:5

**receiving** [2] -
12:2, 13:14

**recent** [2] - 6:11,
6:12

**recite** [1] - 42:22

**record** [27] -
10:11, 15:20,
17:17, 18:7,
18:18, 18:24,
23:15, 23:24,
25:11, 26:13,
26:17, 28:11,
32:1, 33:16,
33:17, 33:19,

33:25, 34:1,
34:6, 34:7, 50:5,
51:25, 56:15,
57:25, 61:14,
61:22, 66:21

**recorded** [1] -
3:11

**records** [2] -
21:18, 35:12

**red** [3] - 8:14, 9:2,
56:19

**reduce** [1] - 54:9

**reference** [1] -
32:4

**referenced** [3] -
17:14, 37:9,
49:21

**references** [1] -
60:1

**reflect** [1] - 17:1

**reflected** [1] -
22:1

**regarding** [1] -
17:24

**regime** [2] -
11:12, 32:13

**regulations** [1] -
24:10

**regulator** [4] -
12:16, 13:1,
14:7, 32:18

**regulators** [5] -
24:4, 25:3,
27:25, 28:2,
28:8

**regulatory** [2] -
15:13, 23:11

**rehabilitate** [1] -
58:19

**reiterate** [1] -
33:4

**reject** [1] - 55:15

**rejected** [1] -
62:15

**related** [22] -
6:12, 19:11,
25:10, 32:21,
33:23, 40:17,
42:17, 44:1,
44:14, 45:2,
47:6, 54:7, 58:1,
59:2, 59:22,
60:5, 60:13,

60:20, 61:3,
61:13, 65:21

**relates** [2] - 6:1,
6:8

**relating** [4] -
36:21, 37:7,
39:2, 53:6

**relationship** [2] -
28:14, 32:6

**release** [1] -
61:25

**relevant** [6] -
8:11, 8:19, 9:24,
42:3, 45:6,
62:20

**relies** [2] - 36:4,
58:6

**remain** [5] -
15:14, 15:21,
16:1, 38:1, 38:4

**remained** [2] -
15:11, 17:12

**remaining** [2] -
43:22, 57:4

**remedial** [3] -
17:20, 23:21,
28:6

**remediated** [2] -
12:22, 26:3

**remediating** [2]
- 13:21, 59:3

**remediation** [18]
- 9:4, 9:8, 9:12,
9:20, 12:3, 12:6,
13:15, 17:19,
25:24, 45:18,
45:21, 45:25,
46:6, 46:8,
47:16, 48:17,
50:18, 61:3

**remiss** [1] - 21:23

**rename** [1] - 4:4

**render** [1] - 44:18

**renewed** [1] -
26:17

**repeat** [1] - 44:7

**repeatedly** [2] -
9:10, 50:1

**replace** [1] -
45:19

**reply** [2] - 26:9,
42:22

**report** [7] - 16:3,

25:23, 46:21, 54:15, 55:11, 60:8

Reporter [1] - 3:9

reporter [2] - 4:5, 4:8

REPORTER'S [1] - 66:19

reports [8] - 9:8, 9:13, 12:2, 16:17, 16:18, 17:9, 28:5, 49:4

representation [2] - 51:21, 52:9

representatives [1] - 38:20

request [1] - 63:10

require [2] - 29:22, 41:24

required [3] - 15:25, 21:14, 34:19

requirement [2] - 24:22, 60:4

requirements [2] - 29:24, 38:18

requires [2] - 10:2, 34:4

residual [3] - 43:22, 64:6, 64:13

resisting [1] - 65:20

resolution [1] - 24:17

resolve [2] - 7:24, 14:19

resolved [5] - 28:9, 37:8, 39:25, 59:17, 66:4

respect [13] - 19:10, 26:12, 26:20, 28:19, 28:25, 31:11, 33:11, 38:8, 45:16, 50:17, 51:4, 56:8, 59:7

respectfully [1] - 24:18

respectively [1] - 42:5

respects [1] - 6:18

respond [6] - 15:6, 22:23, 23:2, 30:24, 31:24, 57:9

responded [1] - 8:14

responding [2] - 13:9, 61:10

responds [1] - 61:7

response [4] - 14:12, 56:4, 60:14, 60:18

responses [1] - 26:8

responsive [1] - 16:24

rest [1] - 66:13

restate [1] - 11:21

restore [1] - 45:19

result [1] - 13:4

resulted [1] - 49:21

results [3] - 12:7, 31:9, 49:1

Retirement [1] - 4:25

RETIREMENT [1] - 1:4

return [2] - 18:11, 64:6

review [1] - 12:17

reviewed [1] - 23:15

reviewing [1] - 19:19

revisit [2] - 35:15, 35:24

revisiting [1] - 21:23

rewriting [1] - 58:6

rhetorical [1] - 48:23

ride [1] - 9:21

ringer [1] - 26:20

rise [5] - 14:7, 22:18, 24:5, 38:24, 63:7

risk [1] - 28:24

risks [1] - 7:21

RMR [2] - 3:9, 66:24

Road [1] - 2:4

Robbins [2] - 1:18, 2:17

robust [2] - 22:3, 32:13

room [1] - 6:17

Rose [2] - 3:3, 5:12

Rosenberg [1] - 3:10

ROSENTHAL [1] - 1:14

round [1] - 49:15

RPR [1] - 3:9

Rudman [1] - 1:18

rug [1] - 27:23

Rule [3] - 10:15, 33:19, 38:18

ruling [1] - 33:5

rulings [1] - 30:5

run [1] - 50:22

## S

Sachs [17] - 2:6, 5:8, 6:3, 6:16, 8:2, 17:11, 17:14, 19:1, 22:7, 22:24, 26:19, 42:11, 42:13, 42:18, 46:24, 48:23, 52:24

SACHS [21] - 5:7, 8:1, 8:7, 8:22, 10:4, 10:10, 10:16, 11:21, 11:24, 12:13, 12:21, 13:8, 19:3, 22:25, 30:23, 31:1, 31:17, 31:20, 31:23, 34:13, 37:17

Sachs-

Michaels [9] - 2:6, 5:8, 8:2, 17:11, 17:14, 19:1, 22:7, 22:24, 26:19

SACHS-MICHAELS [21] - 5:7, 8:1, 8:7, 8:22, 10:4, 10:10, 10:16, 11:21, 11:24, 12:13, 12:21, 13:8, 19:3, 22:25, 30:23, 31:1, 31:17, 31:20, 31:23, 34:13, 37:17

sampling [1] - 45:18

San [3] - 1:20, 2:19, 3:3

Sanders [1] - 2:17

scale [1] - 50:2

scheme [1] - 44:12

Schroeder [5] - 43:14, 43:21, 56:22, 57:19, 60:23

scienter [2] - 10:3, 42:24

scientific [1] - 57:17

scope [5] - 21:14, 44:5, 48:18, 49:24, 58:24

screen [3] - 20:7, 20:8, 20:23

screw [1] - 17:4

seal [7] - 34:12, 34:19, 36:1, 36:3, 36:5, 36:6

sealed [1] - 35:25

sealing [2] - 35:6, 35:22

SEC [1] - 58:22

second [6] - 12:4, 19:5, 20:11, 36:7, 49:15, 55:17

Second [1] - 45:11

Section [1] - 19:20

securities [10] - 5:4, 5:22, 6:2, 22:14, 24:7, 25:16, 37:21, 37:24, 38:23, 54:19

see [14] - 4:23, 4:25, 6:12, 10:19, 20:18, 21:5, 33:4, 33:21, 35:25, 37:21, 49:7, 49:11, 54:17, 54:21

seeking [1] - 58:18

seem [1] - 20:23

seemingly [1] - 63:23

selective [1] - 58:19

selectively [1] - 59:1

self [1] - 57:20

self-serving [1] - 57:20

sell [3] - 27:9, 27:10

sense [3] - 7:23, 13:13, 14:9

sensed [1] - 30:8

sensitive [1] - 35:13

separate [1] - 33:1

September [2] - 26:2, 26:6

serious [1] - 14:25

serving [1] - 57:20

set [3] - 9:7, 18:4, 46:24

settings [1] - 20:16

settle [2] - 14:19, 16:23

settles [1] - 14:22

sever [1] - 41:25

several [1] - 6:18

severe [1] - 7:8
severely [1] - 27:19
severity [1] - 56:7
Shane [1] - 2:17
share [4] - 20:4, 20:6, 20:12, 30:2
shareholders [1] - 31:3
sharing [3] - 20:8, 20:14, 20:24
Shields [1] - 11:2
Shoreham [1] - 2:18
short [1] - 7:24
show [9] - 18:17, 19:12, 19:13, 21:17, 25:23, 33:22, 40:24, 54:11, 64:10
showed [1] - 17:21
showing [7] - 17:15, 40:21, 45:13, 60:19, 61:18, 64:11, 65:18
shown [1] - 17:22
shows [5] - 50:5, 61:15, 61:22, 63:13, 63:14
shut [1] - 17:5
side [4] - 27:5, 44:24, 45:2, 50:2
sides [2] - 5:18, 30:13
significance [4] - 29:10, 52:22, 53:17, 62:24
significant [22] - 10:11, 16:19, 18:9, 39:13, 40:3, 41:3, 41:5, 41:7, 46:2, 46:19, 49:8, 49:11, 49:13, 53:23, 56:16, 62:7, 62:15, 63:1, 63:3, 63:5, 63:14, 63:15
signing [1] -

19:21
similar [5] - 7:7, 37:7, 42:23, 53:7, 62:23
simply [4] - 7:9, 17:3, 19:23, 42:16
single [6] - 14:12, 14:15, 18:2, 46:3, 46:12, 47:2
sit [1] - 13:16
situation [1] - 25:7
situations [1] - 31:13
size [1] - 55:18
slide [1] - 55:23
slides [1] - 20:3
slightly [1] - 29:25
small [5] - 27:17, 43:21, 49:16, 55:18
smaller [1] - 33:25
smoking [1] - 32:11
sold [1] - 29:17
solicitor [1] - 4:23
someone [1] - 4:4
somewhat [2] - 14:10, 22:20
sorry [9] - 16:12, 16:17, 26:15, 37:3, 39:15, 44:8, 48:4, 51:17, 56:17
sort [11] - 5:25, 10:17, 23:10, 40:15, 45:23, 57:14, 57:15, 58:2, 60:15, 60:16, 65:15
SOUTHERN [2] - 1:1, 1:9
Southern [2] - 63:9, 64:15
specific [8] - 8:21, 12:6, 45:2, 48:14, 57:17, 59:4, 65:8, 65:14

specifically [7] - 17:18, 37:11, 44:20, 45:16, 49:22, 52:4, 60:20
spurred [1] - 6:11
squarely [1] - 54:21
stage [16] - 6:6, 9:14, 12:12, 23:5, 23:9, 23:25, 24:17, 33:5, 39:17, 39:25, 40:1, 40:11, 41:14, 41:15, 42:16
stale [1] - 35:15
Stalter [6] - 11:2, 13:23, 43:15, 43:22, 58:9, 58:12
stand [3] - 22:16, 25:6, 54:23
stand-and-fight [1] - 25:6
standard [5] - 45:9, 48:24, 54:25, 55:2, 55:8
standards [1] - 30:19
standing [2] - 22:11, 24:20
start [2] - 4:16, 5:21
starting [1] - 11:3
state [1] - 59:6
statement [13] - 12:5, 19:12, 44:19, 46:17, 46:18, 49:12, 58:3, 58:10, 59:10, 59:13, 65:8, 65:12, 65:13
statements [19] - 6:5, 19:19, 25:22, 36:22, 36:23, 38:1, 38:4, 39:14, 44:12, 44:19, 48:15, 48:16, 53:20, 58:7, 58:8, 58:14,

58:19, 65:6
STATES [2] - 1:1, 1:8
statistical [3] - 53:17, 62:24, 62:25
statistically [11] - 39:13, 40:3, 41:3, 41:5, 41:7, 46:1, 53:23, 56:16, 62:7, 62:15, 63:3
status [5] - 16:3, 16:6, 16:7, 16:17, 17:9
stenography [1] - 3:11
steps [2] - 12:10, 16:6
still [13] - 7:3, 22:22, 34:21, 34:23, 35:5, 36:11, 37:13, 45:17, 45:20, 46:6, 47:15, 50:14, 50:18
stock [17] - 18:8, 26:24, 29:16, 45:7, 46:1, 46:20, 47:12, 49:2, 50:9, 50:19, 54:13, 55:13, 59:21, 60:14, 60:24, 61:23, 62:18
Stokes [17] - 3:2, 5:12, 15:16, 19:5, 21:6, 23:3, 25:10, 26:8, 31:24, 34:17, 34:21, 42:9, 48:1, 50:4, 57:7, 63:17, 65:1
STOKES [34] - 5:11, 6:15, 6:25, 15:6, 15:9, 15:18, 16:2, 16:12, 16:15, 19:8, 20:6, 21:7, 21:10, 26:9, 26:12, 28:17, 29:13, 30:1, 30:7, 33:3, 34:22, 35:18, 36:10, 36:13, 36:19, 38:8, 42:10, 44:8,

44:11, 48:4, 48:7, 48:11, 50:7, 66:11
Stokes's [3] - 14:14, 57:13, 58:6
stood [1] - 28:5
stop [1] - 61:20
stopped [1] - 61:17
story [1] - 42:8
straightforward [1] - 38:17
stray [1] - 65:5
Street [1] - 2:11
strictly [2] - 16:8, 50:12
strong [1] - 35:21
studies [3] - 54:25, 55:1, 55:9
study [4] - 41:6, 54:19, 55:3, 55:13
style [1] - 7:7
sub-90 [1] - 53:21
subject [4] - 30:15, 34:16, 51:14, 61:15
submission [1] - 47:21
submit [12] - 8:18, 17:18, 19:16, 28:12, 39:16, 40:5, 40:21, 47:20, 50:18, 59:12, 60:18, 65:24
Submit [1] - 45:17
submitted [7] - 26:13, 28:5, 42:15, 43:6, 43:14, 48:12, 65:17
subordinates [1] - 32:22
substantial [3] - 36:22, 37:20, 61:13
successfully [1] - 53:9

suddenly [1] - 17:5

sufficient [1] - 50:11

sufficiently [2] - 62:19, 66:8

suggest [1] - 35:9

suggested [1] - 65:2

suggesting [1] - 31:15

suit [1] - 29:1

Suite [7] - 1:19, 1:23, 2:11, 2:15, 2:18, 3:4, 3:10

sum [2] - 50:4, 51:12

summaries [2] - 21:24, 22:2

summary [1] - 59:12

summer [1] - 66:14

supplied [1] - 33:14

supplies [1] - 45:20

support [3] - 15:20, 29:6, 65:17

supportable [1] - 27:13

supported [1] - 24:8

supporting [3] - 15:12, 57:21, 57:22

supports [2] - 17:10, 27:5

suppose [1] - 34:16

supposedly [1] - 54:5

Supreme [4] - 6:3, 21:12, 41:22, 41:23

surefire [1] - 50:23

survive [1] - 27:6

Susquehanna [7] - 58:11,

58:21, 59:2, 59:8, 59:19, 59:22, 60:13

sweep [1] - 27:22

Swick [1] - 2:10

SYSTEM [1] - 1:4

system [1] - 18:5

System [1] - 4:25

**T**

table [1] - 53:11

tail [2] - 17:1, 17:2

tails [1] - 43:20

tasked [1] - 12:9

teed [1] - 7:14

Tellabs [1] - 42:24

temptation [1] - 65:20

term [1] - 11:10

terminology [1] - 37:1

terms [2] - 19:9, 41:14

territory [1] - 54:24

test [7] - 20:2, 26:5, 42:20, 42:21, 48:5, 48:24, 48:25

testimony [1] - 54:15

testing [8] - 16:7, 17:3, 17:7, 17:21, 28:6, 48:14, 49:19, 51:2

TEXAS [2] - 1:1, 1:9

Texas [4] - 1:23, 2:15, 3:4, 3:10

textbook [1] - 39:24

THE [75] - 1:14, 1:17, 2:2, 3:2, 4:2, 4:10, 4:14, 5:3, 5:5, 5:10, 5:16, 5:23, 6:13, 6:24, 7:12, 8:6, 8:21, 9:25, 10:9,

10:14, 11:15, 11:23, 12:4, 12:20, 13:5, 15:2, 15:8, 15:16, 15:19, 16:11, 16:14, 19:4, 20:5, 20:10, 20:17, 20:20, 20:22, 21:3, 21:9, 22:23, 26:11, 28:14, 29:11, 29:23, 30:6, 30:22, 30:25, 31:15, 31:18, 31:21, 32:25, 34:9, 34:20, 35:17, 35:21, 36:12, 36:18, 37:15, 37:23, 38:6, 38:10, 38:15, 40:24, 41:13, 42:9, 44:7, 44:10, 48:1, 48:6, 48:10, 50:4, 57:7, 66:6, 66:13, 66:16

themselves [5] - 15:13, 19:15, 22:2, 24:2, 42:21

theories [1] - 30:19

therefore [1] - 50:6

they've [1] - 51:5

thinking [1] - 50:8

third [3] - 23:14, 24:3, 45:14

thoroughly [1] - 46:11

three [12] - 34:10, 36:25, 37:6, 37:13, 43:10, 56:20, 57:20, 61:23, 62:4, 62:5, 62:6

throughout [2] - 13:2, 60:16

timeline [1] - 58:3

Timothy [1] - 3:8

TO [2] - 1:5, 1:12

today [4] - 4:22, 5:2, 6:2, 6:19

together [1] - 8:5

Topaz [3] - 2:3, 4:7, 4:13

total [1] - 35:3

totally [1] - 44:3

trading [1] - 29:7

transcript [1] - 66:21

Transcript [1] - 3:12

transcription [1] - 3:12

transparent [1] - 28:4

treasurer [1] - 61:1

treating [1] - 55:9

trial [1] - 21:25

tried [4] - 13:1, 51:5, 53:8, 54:7

trier [1] - 42:7

tries [1] - 54:4

trivial [1] - 27:15

true [3] - 44:24, 59:6, 63:2

try [5] - 9:25, 13:12, 14:1, 21:3, 41:1

trying [6] - 4:8, 10:10, 13:10, 17:11, 28:1, 47:21

turn [2] - 17:4, 22:17

turns [1] - 16:25

Turtle [1] - 1:22

twice [1] - 52:13

twists [1] - 16:25

two [21] - 5:19, 8:10, 18:20, 28:15, 30:24, 34:9, 37:2, 37:5, 37:7, 39:3, 39:4, 39:9, 42:18, 43:9, 43:12, 43:16, 45:4, 59:20, 62:13, 63:13, 64:2

type [6] - 7:10, 17:1, 22:7, 43:2, 50:22, 55:2

types [3] - 30:15, 49:3, 55:1

typical [1] - 16:25

typically [1] - 27:7

**U**

ultimately [5] - 28:9, 37:4, 37:8, 64:17, 66:1

unadjudicated [2] - 44:13, 44:16

Unaoil [1] - 44:14

Unaoil-related [1] - 44:14

uncharged [2] - 44:13, 44:16

under [13] - 11:9, 27:23, 34:12, 34:19, 36:1, 36:4, 36:6, 45:9, 45:11, 50:8, 55:16, 58:22, 64:13

undercut [1] - 19:1

undercuts [1] - 27:19

undergoing [1] - 61:5

underlie [2] - 58:13, 59:4

underlying [1] - 33:20

undermine [1] - 25:21

underscores [1] - 57:14

understood [2] - 31:20, 51:15

undertake [1] - 56:6

undertook [1] - 28:6

UNITED [2] - 1:1, 1:8

universe [2] - 13:14, 35:3

unlock [1] - 18:3

unlocked [1] - 18:5

unnecessary [1] - 58:4

unrelated [1] - 44:3

unsuccessful [2] - 22:17, 22:18

untested [1] - 57:20

unusual [2] - 15:5, 17:12

up [13] - 7:14, 12:4, 18:4, 23:1, 32:9, 42:7, 50:4, 51:12, 55:4, 57:3, 57:4, 57:22, 61:18

ups [1] - 7:21

upside [1] - 7:21

urge [1] - 62:8

urgent [1] - 36:7

urges [1] - 60:15

US [1] - 3:3

**V**

valid [2] - 48:20, 51:9

variety [2] - 30:20, 33:7

various [4] - 18:19, 57:21, 58:10, 59:2

version [1] - 48:12

versus [1] - 56:9

VIA [1] - 1:14

via [4] - 1:16, 2:1, 3:1, 4:1

VIDEO [1] - 1:14

video [4] - 1:16, 2:1, 3:1, 4:1

view [14] - 27:24, 28:17, 30:1, 30:3, 34:25, 35:5, 35:13, 36:13, 37:19, 39:21, 47:24, 53:12, 54:9, 61:9

views [1] - 36:8

vigorously [1] - 6:20

violate [1] - 34:25

violated [1] - 25:4

violating [2] - 22:14

violation [8] - 12:16, 24:10, 24:21, 37:3, 37:8, 39:9, 49:23, 62:3

violations [9] - 12:1, 12:15, 12:23, 13:4, 13:6, 24:12, 27:15, 28:1, 61:24

Vivendi [2] - 45:11, 50:8

VLI [2] - 21:10, 21:11

volatility [4] - 54:6, 54:8, 54:10, 63:18

Volume [2] - 1:15

**W**

Walmart [1] - 8:9

Walmart's [1] - 9:6

Walton [8] - 8:8, 8:15, 9:5, 9:14, 9:17, 11:9, 11:10, 32:23

water [3] - 18:5, 45:18, 45:20

ways [1] - 32:16

weaker [2] - 28:11, 28:12

weekend [1] - 66:13

weight [1] - 24:1

well-covered [1] - 46:4

wells [37] - 10:21, 12:7, 12:24, 13:21, 17:24, 22:5, 23:21, 28:8, 33:23, 40:18, 43:15, 43:18, 43:19, 43:23, 44:1, 44:2, 45:3, 45:16, 47:6, 47:7, 51:23,

52:9, 52:21, 53:20, 56:8, 56:10, 56:24, 58:1, 58:10, 58:12, 59:2, 61:15, 61:17, 61:18

Wells [4] - 3:9, 66:20, 66:23, 66:24

Werlein [1] - 44:4

West [4] - 54:5, 54:13, 55:6, 55:12

whole [3] - 7:22, 13:12, 29:10

wide [1] - 31:8

willful [1] - 24:9

willing [1] - 35:5

WL [2] - 44:6, 44:8

word [2] - 46:4, 46:13

worry [1] - 46:8

writes [1] - 44:11

written [2] - 52:3, 52:13

wrong-doers [1] - 31:7

wrongdoing [3] - 14:25, 44:13, 44:16

**Y**

year [4] - 7:5, 12:22, 61:8, 61:11

years [10] - 5:20, 10:20, 10:22, 13:11, 15:14, 16:22, 23:20, 35:15, 43:18

York [2] - 2:8

yourself [1] - 4:5

**Z**

Zirn [1] - 21:10

ZIRN [1] - 21:10

Zivitz [4] - 2:2, 4:7, 4:12, 4:14

ZIVITZ [2] - 4:6, 4:12

Zoom [1] - 20:13

**§**

§ [13] - 1:3, 1:4, 1:4, 1:5, 1:5, 1:6, 1:6, 1:7, 1:11, 1:11, 1:12, 1:12, 1:13