UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS

Civil Action No. 4:21-cv-02045

DELAWARE COUNTY EMPLOYEES RETIREMENT
SYSTEM, Individually and on behalf
of all others similarly situated,

                Plaintiffs,

v.

CABOT OIL & GAS CORPORATION, et al.,

                Defendants.

_____

*************************************

REMOTE VIDEO DEPOSITION OF GUY SHIREY

July 31, 2023

*************************************

        REMOTE VIDEO DEPOSITION OF GUY SHIREY taken via Zoom in the above-styled and numbered cause on July 31, 2023, commencing at 10:04 a.m. Eastern before Gina Williams, Registered Professional Reporter, Certified Realtime Reporter, and Certified Realtime Captioner.

Deposition of Guy Shirey                                    Delaware County Employees Retirement System v. Cabot Oil & Gas Corp., et al

Page 225

Q    As you recall, Mr. Lavelle began by stating that he was asking you about the time period from 2016 to 2020, and I'd like to focus on that same time period.

Is that all right?

A    Yeah, that's fine.

Q    What were your responsibilities during that time period with respect to calculating production -- projections -- capital budget?

MR. LAVELLE:  Objection to form.  I think you cut out quite a bit, Peter.  I didn't catch the question.

MR. STOKES:  I'll reask.  I got an "unstable internet" sign.

BY MR. STOKES:

Q    During the 2016 to 2020 time period, what were your responsibilities with respect to calculating production guidance and capital budget at Cabot?

A    Me and my reservoir engineering staff would forecast production based on decline curves.  We would gather capital expenditure forecasts from the various departments.  We would work with geology on developing and massaging the drill schedule, what pads you drill in what years, and we would put all that together in creating a production and capital forecast at each quarterly update.

Q    And did that include the quarterly update for July 26, 2019?

Page 226

A    Yes.

MR. LAVELLE:  Objection to form.

BY MR. STOKES:

Q    Do you know what the term "gas migration" refers to?

A    Yes.

Q    And tell us a little bit about your responsibilities at Cabot with respect to gas migration or the investigation of gas migration.

A    Yeah, in my first four years from 2013 to roughly 2017, I would be responsible for developing workover procedures for gas migration issue wells, as well as other procedures that involve production enhancement projects such as tubing installs, CAP string installs, plunger lift and things like that.

Q    You used the term "workover," and Mr. Lavelle asked questions about workovers earlier.

Can you just describe basically what a workover is?

A    A workover is a general term that can cover both issues.  It can cover a production enhancement project.

It's anytime you go do something different for a well or enhance a well or address gas migration issues in a well.

So a workover can be any of those things.  You're

Page 227

basically going in, bringing in a rig and working on a well.  That's a workover.

Q    What proportion of the workovers that were conducted at Cabot during your tenure were related to or resulted from gas migration issues?

A    Very small number, a handful.  Compared to the large amount of tubing installs and production enhancement projects and things like that, the gas migration issues were certainly something we did our due diligence with, but it was a small number, a small percentage of all those total workovers.

Q    With respect to gas migration, I believe Mr. Lavelle asked you some questions about how complaints would be received from the Department of Environmental Protection and land owners.

Do you recall that generally?

A    Yes.

Q    How frequently an occurrence was that at Cabot that you'd get complaints from land owners and through the Department?

Was it a large number of wells?

MR. LAVELLE:  Objection to form.

A    No.  It was a small handful of wells compared to the overall -- I mean, compared to the process of drilling 80 to 90 wells a year and fracking those same wells and

Page 228

operating, at that time frame, about 800 wells.  Now we operate over 1,100 wells.

So compared to the large volume of other work that we do, the GMI issues were very small.

BY MR. STOKES:

Q    By "GMI," do you mean gas migration investigation?

A    Yes.

Q    By the way, Mr. Lavelle asked some questions, and I think you gave some responses earlier about the issue of shallow gas during the drilling process or encountering shallow gas during the drilling process, and annular venting.

Do you recall that?

A    Yes.

Q    Did those issues --

Are those issues gas migration issues?

A    No.  No.  It become --

No, they are not all gas migration issues.

Venting gas from above the top of cement is a normal and recommended procedure, and it's allowable in the regulations by the DEP.

Q    To the best of your knowledge, did the Department of Environmental Protection ever cite Cabot for any violations or accuse Cabot of any violations based on the

Deposition of Guy Shirey

Page 229

encountering or release of shallow gas during the drilling process?

MR. LAVELLE:  Objection to form.

A   No.

BY MR. STOKES:

Q    Did the Department of Environmental Protection either cite Cabot for any violations or accuse Cabot of any violations with respect to the venting of gas at the surface?

MR. LAVELLE:  Objection to form.

A   My answer would be no, unless it --

BY MR. STOKES:

Q    Go ahead.

A    Unless it were already in conjunction with some type of landowner complaint and GMI issue, but not just in the normal course of drilling and encountering shallow gas, no, and venting that shallow gas.

BY MR. STOKES:

Q    Did you read cement logs during your time with Cabot, cement bond logs?

A   Yes.

Q   Briefly, what is a cement bond log?

A   It basically is a --

It's a downhole wireline log that evaluates the extent and effectiveness of your cement bond to the pipe and

Page 230

to the formation.

Q   What did the cement bond logs that you reviewed show with respect to most of Cabot's gas logs?

MR. LAVELLE:  Objection to form.

A   Yeah, most of them are very -- show good bond. Considering the number of wells we drill and cement, most of them show very good bond.

BY MR. STOKES:

Q   Did the cement bond logs show any pervasive cementing problems at Cabot?

MR. LAVELLE:  Objection to form.

A   I would say no.

BY MR. STOKES:

Q   I asked earlier about the July 26, 2019 guidance. Do you recall those questions?

A   Yes.

Q   Did Cabot make any changes to its -- to any of its July 26, 2019 guidance based on gas migration investigations, remediation or any related issue?

MR. LAVELLE:  Objection to form, and I didn't hear most of the question.

MR. STOKES:  I'll repeat the question.  I'll restate it.

Can you hear me now?

THE WITNESS:  Yes.

Page 231

MR. STOKES:  It looks like we have a bad connection.

BY MR. STOKES:

Q    Mr. Shirey, did Cabot make any changes to any of its July 2016, 2019 guidance or capital budget based on any gas migration --

Can you hear me?

A   No.

MR. LAVELLE:  Objection to form.

MR. STOKES:  Can you hear me?

Can we take a one-minute break?

I'm going to move to a different room, if that works.

VIDEOGRAPHER:  Off the record.  The time is 6:52.

(Discussion was held off the record.)

VIDEOGRAPHER:  Back on the record.  The time is 6:53.

BY MR. STOKES:

Q    Mr. Shirey, did Cabot make any changes to any of its July 2016, 2019 production guidance or capital budget based on gas migration investigations or remediation?

MR. LAVELLE:  Objection to form, lack of foundation.

A   No.

Page 232

BY MR. STOKES:

Q    Are you familiar with the Stalter, Howell and Jeffers Farm wells generally?

A    I worked on the Stalter wells personally, and I'm just vaguely familiar with the Jeffers Farms and Howell wells.

Q    Did you ever --

Did you believe at any point in time that Cabot's remedial efforts with respect to the Stalter wells were inappropriate or inadequate?

MR. LAVELLE:  Objection to form.

A   No.  I always believed that we responded appropriately, that we worked hand in hand with the DEP, and we did our best to remediate any such issues.

BY MR. STOKES:

Q    In your view, how did Cabot's team perform with respect to the remediation efforts on the Stalter wells?

A    I think we performed well.

Q    Were you aware of any widespread or systemic deficiencies in Cabot's efforts to prevent or remediate gas migration?

MR. LAVELLE:  Objection to form.

A    Not aware of any deficiencies, no.

BY MR. STOKES:

Q    Did you ever communicate to Mr. Dan Dinges,