# EXHIBIT 3

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS

Civil Action No. 4:21-cv-02045

DELAWARE COUNTY EMPLOYEES RETIREMENT
SYSTEM, Individually and on behalf
of all others similarly situated,

                Plaintiffs,

v.

CABOT OIL & GAS CORPORATION, et al.,

                Defendants.

_____


          ***********************************

       REMOTE VIDEO DEPOSITION OF STEVE NOVAKOWSKI

                  July 28, 2023

          ***********************************


          REMOTE VIDEO DEPOSITION OF STEVE NOVAKOWSKI taken

via Zoom in the above-styled and numbered cause on July 28,

2023, commencing at 9:07 a.m. Eastern before Gina Williams,

Registered Professional Reporter, Certified Realtime

Reporter, and Certified Realtime Captioner.

BY MR. McCALL:

Q    Mr. Novakowski, I'm showing you Exhibit 28.

Go ahead and take a look, and let me know when you're ready, sir.

A    Okay.

Q    I'm showing you Exhibit 28, Mr. Novakowski.  This is a Disclosure Checklist that's dated April 3, 2019 that's authored by you; is that correct?

A    That's correct.

Q    Do you recognize this document, sir?

A    Yes.

Q    Okay.  So this is, of course, three months after the last Disclosure Checklist that we just reviewed together.

And again, when you're filling out these documents, you're trying to be as accurate as possible with the information that you're providing to Mr. Stalnaker and the disclosure committee folks that are receiving this; is that right?

A    That's correct.

Q    Number 5, again, the question about are you aware of regulatory agency notifications or possible pending notifications of violations of environmental or other regulatory requirements?

You wrote, "Gas migration on Jeffers Farm Pad 2

Deposition of Steve Novakowski

continues.  The potential remains for the investigation to extend beyond this well pad if remedial work continues to be inconclusive."

Do you see that?

A    Yes.

Q    Okay.  So at this point you're writing in this Disclosure Checklist that the remedial work on Jeffers is inconclusive, which is to say there was no finality to the investigation at this point; right?

A    No, that's not what I'm saying.

What I'm saying, as we discussed earlier, we hadn't got a satisfactory impact or reduction of impact at the water well, right.

So the work had largely been done, but we're waiting on the water wells to respond to the work, and that's what I mean by this continues.

So it's not that it wasn't effective.  It's just that we're waiting to see if the effects of it, you know, just take a longer time to work through the system.

So it was more a reflection of that timeline, which we've alluded to, and we discussed this many times today that more time in these cases is what you really need just to be sure you've covered all the bases, and that's what I'm referring to here.

Q    Okay.  Now, you would agree that it doesn't

specify that the water well is what's the specific issue that you're referring to; correct?

MR. STOKES:  Objection to form.

A    Right.  It doesn't exactly specify that.

What's going on at this time again is, we're taking those samples coincident with the DEP on making sure that the gas situation at the pad is alleviating itself, right, dissipating after remedial work.  And again, that takes time to resolve.

BY MR. McCALL:

Q    Right.  And it's fair to say both of those issues, what's happening at the pad and what's going on with the water supplies, it was inconclusive at this point in time?

MR. STOKES:  Objection to form.

A    Inconclusive because we hadn't gotten to a finality on it yet to be able to say definitely we're done with the work, right.  So it's an open -- open playbook yet that you may have to go and do more work at this point, yes.

BY MR. McCALL:

Q    And not only you might have to go do more work, but the other concern that you note in here is that the investigation, the potential remains for it to go beyond the Jeffers well pad; right?

A    I mean, you have to look --

Deposition of Steve Novakowski

If you're being thorough, you have to --

If you don't see a response to the Jeffers and you continue to see impacts, you have to start casting a broader net.  That's really what this is referring to is that that potential exists that you might have to cast a broader net.

These investigations, you know, are timed to impacts observed while a rig was doing a particular operation and so, you know, the logical place to start is, what were you working on when this happened, and that happened to be Jeffers.

So most likely it's Jeffers, and that's where the work was focused but, again, you're waiting for that response to confirm it.

And, you know, being --

Using scientific principles and trying to just dot all the Is, you're never done until you're sure, and you need a result to confirm it, right, and at this point we don't have it.

So we're just -- I'm just ruminating over the possibility at this point.

Q    If we could go to the last question again on page Bates ending _6656.  Again, in the question "Keeps you awake at night," number 22, you reference the potential impact of gas migration or alleged gas migration issues on the ability

of the company to meet guidance.

You go on to talk about the same disclosures you made the last quarter about the parent-child well relationships, frac communications on capital requirements, field development practices and reserve realizations; correct?

A    Correct.

Q    You end with saying, "Increasing environmental regulation and scrutiny could impact effective operations and create capitally burdensome requirements."

Correct?

A    Yes.

Q    Okay.  So what were the capitally burdensome requirements that increased environmental regulation and scrutiny?

What did you consider those to be?

A    Well, we talked about it earlier I made a note in one of the earlier disclosures about the air regulations and methane mapping or methane monitoring or permitting, and also the State intensifying a rewrite of the Chapter 78 rules on drilling and requirements for drilling.  That's what I was referring to, I believe.

This is going back a few years.  I can only think those would be the things that would cause me to say that, right.

As far as capital, anytime you increase regulatory oversight, it's going to have a capital penalty associated with it because we're going to have to respond and react to any additional increase in regulation by putting a countermeasure in place that addresses their concerns.

So I think it's just natural to say capital is going to probably result -- capital will be increased if we get this additional regulation.

"Scrutiny" word, I'm not --

"Scrutiny," I don't know.  I can't speak to where my mind was at that time.

Q    "Scrutiny" means a closer look; correct?

A    Yes.

Yeah, and I don't know why --

Exactly, but I don't know why I would -- why that was concerning me at the time because I'm not afraid for any scrutiny as far as my operations are concerned with anybody as far as the DEP is concerned.  It doesn't bother me at all.

So I don't know what was going through my mind. I can't speak to it.

Q    So turning back for a moment to the gas migration statement that you wrote in this document, it's fair to say now, looking through the documents, that you started

Deposition of Steve Novakowski

documenting this concern back in 2017 and continued through -- fairly consistently through April 2019; is that right?

MR. STOKES:  Objection to form.  That misstates the documents.

A   I mean, it's --

The question is what keeps you awake at night. These things are scary to me, right, and so we do everything we can to address them.

We're frustrated by them, but it doesn't stop us from pursuing them vigorously.  They're just a big -- they're very scary situations to get into because you want to make sure you don't put yourself in a position to fail.

So it's an ongoing concern, and it's in the frontal lobes of your operation all the time.

So that's why I have continued attention to that as something I kept putting in there because, yes, that was something that would keep me awake at night is worrying about these things because they're so insidious and unexpected.

MR. McCALL:  Can we pull up Tab 34, please?

(Exhibit 29 was marked for identification.)

BY MR. McCALL:

Q   Go ahead and look at, this is now going to be Exhibit 29.