# Exhibit 1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS

Civil Action No. 4:21-cv-02045

DELAWARE COUNTY EMPLOYEES RETIREMENT SYSTEM, Individually and on behalf of all others similarly situated,

        Plaintiffs,

v.

CABOT OIL & GAS CORPORATION, et al.,

        Defendants.

_____

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

REMOTE VIDEO DEPOSITION OF PHIL STALNAKER

September 29, 2023

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

REMOTE VIDEO DEPOSITION OF PHIL STALNAKER taken via Zoom in the above-styled and numbered cause on September 29, 2023, commencing at 8:02 a.m. Central Time before Gina Williams, Registered Professional Reporter, Certified Realtime Reporter, and Certified Realtime Captioner.

Deposition of Phil Stalnaker

Page 6

VIDEOGRAPHER:  We are now on the record.  Today's date is September 29, 2023, and the time is 8:02 a.m. Central.

This is the recorded video deposition of Phil Stalnaker in the matter of Delaware County Employees Retirement System v. Cabot Oil & Gas Corp., et al. in the United States District Court, Southern District of Texas, Civil Action No. 4:21-cv-02045.

My name is Ken Amrhein from Everest Court Reporting.  I'm the video specialist.

The court reporter today is Gina Williams, also from Everest Court Reporting.

All counsel appearing today will be noted on the stenographic record.

Will the court reporter please swear in the witness.

- - - -

WHEREUPON,

PHIL STALNAKER

was called as a witness and, after having been first duly sworn, was deposed and testified as follows:

EXAMINATION

BY MR. McCALL:

Q    Good morning, Mr. Stalnaker.

A    Good morning.

Page 7

Q    We met each other very briefly before we started. Again, I'm Jamie McCall.  I'm going to be taking the deposition today on behalf of the class of plaintiffs in this litigation, okay?

A    Okay.

Q    All right.  Before we get started, let's just cover some basic ground rules for the deposition today.

I'm going to presume that you understand the questions that I have asked unless you tell me that you do not understand, okay?

A    Okay.

Q    Is there anything, sir, that would prevent you from thinking clearly and testifying truthfully today?

A    No, there's not.

Q    All right.  Do you understand that you are testifying under the same oath today as if you were in a courtroom testifying in front of a jury?

A    I do.

Q    If you need a break, please let me know.

I only ask that if a question is pending, that you answer the question, and then we can go to the break.

Fair enough?

A    Okay.

Q    All right.  And typically we've been going for about an hour or so before taking breaks throughout the day,

Page 8

all right?

A    That works.

Q    Where are you sitting today for the deposition?

A    I'm sorry.  Repeat that.

Q    Where are you sitting for your deposition today, Mr. Stalnaker?

A    I'm in Houston in the Coterra office.

Q    And where do you currently reside?

A    I currently reside in Steamboat Springs, Colorado.

Q    Are you retired from Coterra?

A    Yes, I am.

Q    Can you provide me your address?

A    It is 250 Boulder Ridge Road, Steamboat Springs, Colorado 80487.

Q    Thank you, sir.

Could you tell me how you prepared for your deposition today?

A    I met with counsel, Peter Stokes and Cole DeLancey.

Q    How many times?

A    Three, I believe.

Q    Okay.  And approximately how long were your sessions with Mr. Stokes and Mr. DeLancey?

A    It was a few hours each time.

Page 9

Q    Did you review documents in preparation for your testimony today?

A    Reviewed some.

Q    Okay.  Did you review prior deposition testimony from other witnesses in this litigation?

A    I did not.

Q    Okay.  Did you review the Amended Complaint that's been filed in this case?

A    I did not.

Q    Did the documents that you review refresh your memory as to the facts and circumstances underlying this litigation?

A    In some cases.

Q    Can you describe for me your understanding of the allegations that are involved in this case?

A    My understanding is challenging some of the accuracies of the environmental disclosures by Cabot Oil & Gas.

Q    Today if I refer to Cabot Oil & Gas as "Cabot," please know that's -- that's that I'm indeed referring to Cabot Oil & Gas, okay?

A    Okay.

Q    Now, are you aware that a series of felony and misdemeanor criminal charges were filed by the Pennsylvania Attorney General in June 2020 against Cabot?

Deposition of Phil Stalnaker

Page 250

it will -- it will go inside of the production casing string.

Q    The act of fishing that you referred to here, "So we had go in and remove the liner by fishing pieces of it," what does that refer to?

A    So "fishing" is an oil and gas term.  If you have something downhole and you need to go back and retrieve it, if you drop some tubing or whatever, if you have any type of -- anything downhole that you need to retrieve out of a hole, we call that fishing.

Q    When you wrote, "This delayed the Powers frac, and we had nowhere else to move to," this phrase, "We had nowhere else to move to," what did you mean?

A    Well, we had two large --

Looks like we had --

Hang on a second.  Let me read this.

I'm assuming that since we are talking about frac days and crew, we didn't have another place at that particular time to go ahead and move the frac crew to, a pad ready to complete.

MR. McCALL:  I see.  Okay, thank you.  I have no more questions.

EXAMINATION

BY MR. STOKES:

Q    What was your role at Cabot from 2016 to 2020?

Page 251

A    I was senior vice president of the North Region, which also included the operations -- Marcellus operation.

Q    And when did you retire from what's now known as Coterra, formerly known as Cabot?

A    End of September of 2022.

Q    Specifically --

Before I go further, I'm going to refer to the period from February 2016 to January 2020 as "the class period."

Is that all right with you?

A    That is.

Q    What were your responsibilities at Cabot during the class period with respect to environmental compliance issues in the Department of Environmental Protection in Pennsylvania?

MR. McCALL:  Objection to form.

A    Again, I was over all --

All my direct reports were over the drilling completion production and gathering of production in the Susquehanna County.

Any environmental issues that would have arose would have been brought to me and disclosed.

BY MR. STOKES:

Q    What was your role at Cabot during the class period with respect to the environmental disclosures in

Page 252

Cabot's Form 10-K and 10-Q filings with the SEC?

A    I would have received a draft of those and would have reviewed those for the accuracy.

Q    Can you describe the process you followed each quarter with respect to reviewing those environmental disclosures?

A    Yeah.  So as far as environmental disclosures, again all of my direct reports would reach out to their individuals.  It would come -- everything would come to me. I would sit down and review them with John Smelko, et cetera.

And then we had a disclosure committee that met once a quarter, and then I would provide them a summary of the results.

Q    Do you recall who was on the disclosure committee during the class period?

A    I do.  It was Steve Lindeman, Todd Roemer, Jeff Hutton and Deidre Shearer.

Q    Were these meetings with the disclosure committee in person or by phone?

A    They were all in the Houston office, and I would call in by phone.

Q    Was it your practice to review Cabot's draft SEC environmental disclosures each quarter?

A    It was.

Page 253

Q    Are you aware of a $100,000 threshold with respect to disclosing environmental enforcement proceedings that was in effect during the class period?

MR. McCALL:  Objection to form.

A    I am.

BY MR. STOKES:

Q    And were there any discussions about that at disclosure committee meetings?

MR. McCALL:  Objection to form.

A    Again, yes, at each meeting we would have a discussion with the disclosure committee, and I would be asked, okay, do you think any of these are going to exceed $100,000.  So that discussion took place at every quarterly meeting.

BY MR. STOKES:

Q    And when you say "these," what are you referring to?

A    I'm sorry.  Repeat that.

Q    Sorry.  You said "any of these."

A    If there was --

If there was any --

If there was anything that was going to exceed $100,000 as far as on the environmental side, those would have been brought up and disclosed.

Q    And how did --

Page 254

How did you keep track of what environmental matters there were at Cabot during that time?

MR. McCALL:  Objection to form.

A    Again, I would sit down with John Smelko.  He's EHS manager and also reported to Gordon Ganaway.

We'd sit down and review every NOV that happened during the last quarter, and then I would take that data, present it -- also, Gordon Ganaway would also present that to the disclosure committee.

BY MR. STOKES:

Q    And just for the record, what does "EHS" stand for?

A    Environmental Health & Safety.

Q    Why would Mr. Ganaway and Mr. Smelko -- why did you consult with them about these issues?

A    Again, John Smelko was the EHS manager, and he was out of the Pittsburgh office.  And Gordon Ganaway was the director, and he was out of the corporate office in Houston.

Again, they would be -- they would be first to get reports of any environmental issues and would sit down and have the detail, and I'd go through it with them.

Q    And was there any written record of the environmental enforcement matters or NOVs compiled during that time period?

Page 255

A    Yeah, they kept a complete log that I also would provide to the disclosure committee.

Q    And did you have any discussions with Mr. Smelko about the $100,000 threshold?

A    Yes, we would --

MR. McCALL:  Objection to form.

A    Yes, we would sit down and review that.  We would sit down and review that each quarter.

BY MR. STOKES:

Q    And when you say that, what did you actually review?

A    We would review --

MR. McCALL:  Objection.

A    I'm sorry.  We'd review the NOV log and any NOV that was listed in the log and discuss each one of them.

BY MR. STOKES:

Q    As a result of this review, did you form a view as to whether any environmental matters at Cabot during the class period were above the threshold -- $100,000 threshold for disclosure?

MR. McCALL:  Objection to form.

A    We did.

BY MR. STOKES:

Q    What was that view?

A    The only ones that came up during the time period

Page 256

was the Stalter, the Howell and Jeffers Farms.

Q    And did Mr. Smelko ever suggest or take the position that there were other environmental matters besides the three that you mentioned that rose to that threshold?

MR. McCALL:  Objection to form.

A    Never.

BY MR. STOKES:

Q    How often did the disclosure committee ask about the -- whether matters rose to the $100,000 threshold?

A    Each quarter that we met.

Q    Was that your regular practice to ask those questions?

MR. McCALL:  Objection to form.

A    It was.

BY MR. STOKES:

Q    And what did you communicate to the disclosure committee with respect to whether any environmental matters during the class period rose to the $100,000 threshold?

MR. McCALL:  Objection to form.

A    During that time period, the only ones that we said reached that was the Stalter, the Howell and Jeffers Farm during that time.

BY MR. STOKES:

Q    Did anybody oppose that view or dissent or -- strike that.

Page 257

Did anybody disagree, on the disclosure committee, with that view?

MR. McCALL:  Objection to form.

A    No, there was no disagreements with the three that we came up with, and there was no others that rose to that level.

BY MR. STOKES:

Q    And are you confident in that conclusion?

MR. McCALL:  Objection to form.

A    I am.

BY MR. STOKES:

Q    With respect to the Stalter, Howell and Jeffers wells, do you recall that there were environmental disclosures that were made about draft Consent Orders that Cabot had received with respect to those pads?

A    I do.

Q    Prior to receiving the draft Consent Orders from the DEP referenced in those disclosures, did the DEP or Department of Environmental Protection ever communicate to Cabot that it intended to pursue enforcement proceedings or penalties with respect to those pads?

A    No, not until we got the draft Consent Orders.

Q    During the class period, did the Department ever convey to Cabot that it intended to pursue penalties or enforcement proceedings with respect to any other pads other

Deposition of Phil Stalnaker

Page 258

than the Stalter, Howell and Jeffers pads?

A    No, they did not.

Q    You were asked some questions about a 2018 -- June 2018 letter from the Department.

Do you recall that?

A    I do.

Q    And that letter referenced a number of wells from the Dimock COSA from 2010, as well as some additional wells.

Do you recall that?

A    That's correct.

Q    Did the Department of the Environmental Protection ever convey to Cabot during the class period that it intended to pursue penalties and enforcement proceedings with respect to those wells?

A    No, never.

MR. McCALL:  Objection to form.

BY MR. STOKES:

Q    There was --

I think you were asked the question earlier about a proposal with respect to additional Consent Orders with respect to the box.

Do you recall that?

A    I do.

Q    Did Cabot accept that proposal from the Department?

Page 259

MR. McCALL:  Objection to form.

BY MR. STOKES:

Q    Can you restate just your answer?

A    We did not.

Q    And what was the Department's reaction to that?

MR. McCALL:  Objection to form.

A    Again, they understood.

I explained to them that we wanted to continue under the existing COSA that was still in effect, and they understood my decision.

BY MR. STOKES:

Q    Did the Department advise Cabot that it intended to pursue additional enforcement proceedings under either the old COSA or any other bases with respect to the COSA wells during the class period?

A    No, they did not.

Q    To the best of your knowledge, did the -- did the Department ever convey -- or did any Pennsylvania regulatory or enforcement authority ever convey to Cabot during the class period, prior to announcement of the criminal charges in June of 2020, did anybody from any Pennsylvania regulatory or law enforcement authority ever convey to Cabot that they intended to bring criminal charges against Cabot over any gas wells?

MR. McCALL:  Objection to form.

Page 260

A    No, they did not.

BY MR. STOKES:

Q    Do you recall that there was --

In the public disclosures with respect to the Stalter, Howell and Jeffers wells, do you recall that there was a statement about Cabot performing appropriate remediation work and believing that the source of the methane had been remediated?

Do you recall those disclosures?

MR. McCALL:  Objection to form.

A    I do.

BY MR. STOKES:

Q    What was your personal view regarding the substance of those statements?

MR. McCALL:  Objection to form.

A    Again, working with Steve Novakowski, again, Steve has a lot of experience.  He also worked with a service company.  He had experts on his staff.  We felt very confident in the remediation work that was done.

We also would send copies of the procedures to the Department of Environmental Protection before the work was done.  We also had inspectors come out while the work was being done and felt very confident in the work that was performed by this group.

Page 261

BY MR. STOKES:

Q    Did the Department ever, to your knowledge, require Cabot to perform additional repair work on the Stalter wells after the February 2016 Form 10-K disclosure that Cabot made about that pad?

A    No, they did not.

Q    To the best of your knowledge, did the Department of Environmental Protection require Cabot to perform additional repair work on the Powell or Jeffers Farms pads after the July 26, 2019 Form 10-Q disclosure about those pads?

A    No, they did not.

Q    Do you have a view as to whether the statements that Cabot performed appropriate remediation work and believed the source of the methane from those pads -- those three pads had been remediated, do you have a view as to whether those statements were accurate?

MR. McCALL:  Objection to form.

A    Yes, I believe those were accurate and correct.

BY MR. STOKES:

Q    Did you ever convey to the disclosure committee that you thought those statements were incorrect or incomplete or misleading in any way?

MR. McCALL:  Objection to form.

A    No.

Deposition of Phil Stalnaker

Page 262

BY MR. STOKES:

Q   Did you ever convey to Mr. Dinges or Mr. Schroeder that you thought those disclosures about the Stalter, Howell, Jeffers pads were incomplete or misleading in any way?

MR. McCALL:  Objection to form.

A   No.

BY MR. STOKES:

Q   Did you ever convey to the disclosure committee or Mr. Dinges or Mr. Schroeder or anybody at Cabot that you thought any of Cabot's public statements during the class period were incorrect, too aggressive, or materially misleading?

MR. McCALL:  Objection to form.

A   No.

BY MR. STOKES:

Q   Did you ever witness anybody at Cabot express the view during the class period that any of Cabot's public statements were incorrect, misleading, or too aggressive?

MR. McCALL:  Objection to form.

A   No.

BY MR. STOKES:

Q   With respect to the statements about the appropriateness of the remedial work, what was the Department's role in connection with how the work was

Page 263

scheduled and performed?

A   Well, we worked closely with the Department. We would actually send in procedures before the work was done and ask them for any input, if they had any input in them, and then they would actually send inspectors out while we were performing work and meet with our guys on location and also review the work.

Q   Just to be clear, when you're using the words "the work," are you referring to the remedial work that was performed on the Stalter, Howell and Jeffers wells?

MR. McCALL:  Objection to form.

A   Correct.  I'm referring to the remedial work that was being performed.

BY MR. STOKES:

Q   And to what extent did the Department witness the work that was being done -- remedial work that was being done on those three pads?

MR. McCALL:  Objection to form.

A   Yes, the Department would come out and actually witness the work while we were performing it.

BY MR. STOKES:

Q   Did the Department express the views to you or to Cabot that they thought the remedial work performed on those three pads was insufficient or inappropriate in any way?

MR. McCALL:  Objection to form.

Page 264

A   No, they did not.

MR. McCALL:  Foundation.

BY MR. STOKES:

Q   Whose group at Cabot performed the remedial work on those three pads?

A   It would have been Steve Novakowski's group.

Q   And what's your view as to Mr. Novakowski's qualifications and competence with respect to remedial work?

MR. McCALL:  Objection to form.

A   Steve Novakowski is, again, one of the best engineers I've ever worked with.  He had prior experience with the service company, very knowledgeable.  He actually had put a very great team together, and they had experts on cementing that had also worked for service companies that worked for him.

Again, he has shown over the years he's been a great asset to Cabot.

BY MR. STOKES:

Q   And did you have any views as to the mechanical quality of the remedial work that was done?

MR. McCALL:  Objection to form.

A   Yes, we were very, very confident that the remedial work that was done, again, was appropriate.  We did all the necessary testing and collected all the necessary data and felt very confident about the remedial work that

Page 265

was performed on these wells.

BY MR. STOKES:

Q   Did you --

There was more testing that was done after some of these disclosures.

Do you recall that?

A   Yes.  So the Department's always wanting additional data.

Q   Does the fact that Cabot had to collect additional data on these three pads and continue to do so, does that mean that you didn't have enough information at the time of those disclosures to conclude that the work was appropriate?

MR. McCALL:  Objection to form.

A   No.  We felt very confident in the work that we had done and completed and, again, had been reviewed by the Department.  We felt very comfortable with those.

Again, the Department always likes to have additional data so, again, we're happy to supply it to them.

BY MR. STOKES:

Q   Did you ever attend a board or board committee meetings where environmental issues were discussed?

A   Yes, each quarter.

Q   Who made the presentations and prepared the materials for those meetings with respect to environmental

Deposition of Phil Stalnaker

Page 266

matters?

A    The presentations were presented by Gordon Ganaway.  And Gordon, along with John Smelko, would prepare the presentations.

Q    Were you familiar personally with the gas migration and other environmental matters discussed in those presentations and reports?

A    Yes, I had reviewed those.  I would review those with John Smelko every quarter.

Q    And I think you mentioned a list or log that you also reviewed with Mr. Smelko.

What was the name of that log or --

Strike that.

Did any of --

Am I remembering it correctly there was a log or a list of environmental matters you would review each quarter with Mr. Smelko?

A    Yes, he would keep --

He would keep a running list of any -- all the environmental issues or NOVs with a running log throughout the whole year.

Q    Did --

Was there anything that you saw in any of those presentations, reports or logs that you thought were inconsistent with any of Cabot's public environmental

Page 267

disclosures?

MR. McCALL:  Objection to form.

A    No.  They were all consistent.

BY MR. STOKES:

Q    Did any of those presentations, reports or logs suggest to you that there were other enforcement matters or potential enforcement matters during the class period that were likely to result in $100,000 and more in penalties?

MR. McCALL:  Objection to form.

A    No.

BY MR. STOKES:

Q    Were you aware of any evidence during the class period that Cabot had systemic or widespread problems with the quality or integrity of the cement work that was done on Cabot's gas wells?

MR. McCALL:  Objection to form.

A    No.

BY MR. STOKES:

Q    Have you heard the term "pre-drill methane"?

A    I have.

Q    What is pre-drill methane?

A    Again, pre-drill methane is existing methane before there's any drilling at all in the activity -- or in the area.

So we've known from a study that we did -- our

Page 268

exploration manager led -- we went out and did a study of the area way away from any drilling, and it showed that over 80 percent of the water wells in the area had pre-drill methane, so it's preexisting before there's any drilling anywhere close to it.

Q    Was there pre-drill methane in Susquehanna County?

MR. McCALL:  Objection, foundation.

A    Yes, there were.  Again --

BY MR. STOKES:

Q    And what's the basis for saying that?

MR. McCALL:  Objection, form.

A    There is literature going back, but also we did our own study that examined water wells outside of any drilling activity going on.

Again, it was like over 80 percent of the wells had pre-drill methane before any associated drilling was even anywhere in the area.

BY MR. STOKES:

Q    Did that include the wells that were within the Dimock Box?

MR. McCALL:  Objection, form.

A    Again, yes.  Based upon our study, there was pre-drill methane throughout the whole area.

Again, before we drill in the area, we did not do

Page 269

methane testing before the drilling.  But based upon our study and the analysis, you can see that there was greater methane in the valleys, which would have been included in the Dimock Box.

BY MR. STOKES:

Q    Are you familiar with the terms "thermogenic" and "biogenic methane"?

A    Again, in general, yes.  It's a different --

You can look at the isotopic data and get an idea between the two.

Q    Were there both types of methane, both thermogenic and biogenic, in pre-drill methane?

A    That is correct.

MR. McCALL:  Objection, form.

BY MR. STOKES:

Q    So your testimony is that the thermogenic methane was present in pre-drill methane that existed before the drilling took place?

MR. McCALL:  Objection.

Sorry, Peter.

Objection, form.

A    That is correct.

BY MR. STOKES:

Q    Was there ever any instance during the class period when you proposed adding other wells or Notices of

CERTIFICATE

I, Gina Williams, Registered Professional Court Reporter, do certify that the above deposition was reported by me and that the foregoing transcript is a true and accurate record to the best of my knowledge, skills, and ability.

I further certify that I am not an employee of counsel or any of the parties, nor a relative or employee of any attorney or counsel connected with the action, nor financially interested in the action.

Subscribed and sworn to before me when taken this 29th day of September, 2023.

_Gina Williams_

GINA WILLIAMS, RPR, CRR