# Exhibit 2

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS

Civil Action No. 4:21-cv-02045

DELAWARE COUNTY EMPLOYEES RETIREMENT
SYSTEM, Individually and on behalf
of all others similarly situated,

                Plaintiffs,

v.

CABOT OIL & GAS CORPORATION, et al.,

                Defendants.

_____

        **********************************

        REMOTE VIDEO DEPOSITION OF JOHN SMELKO

                September 8, 2023

        **********************************

        REMOTE VIDEO DEPOSITION OF JOHN SMELKO taken via
Zoom in the above-styled and numbered cause on September 8,
2023, commencing at 7:03 a.m. Central Time before Gina
Williams, Registered Professional Reporter, Certified
Realtime Reporter, and Certified Realtime Captioner.

Deposition of John Smelko

Page 7

VIDEOGRAPHER:  We are now on the record.  Today's date is August 8, 2023, and the time is 7:03 a.m. Central Time.

This is the recorded video deposition of John Smelko being taken in the matter of Delaware County Employees Retirement System v. Cabot Oil & Gas Corp., et al. in the United States District Court, Southern District of Texas, Case No. 4:21-cv-02045.

My name is Ken Amrhein from Everest Court Reporting.  I'm the video specialist.

The court reporter today is Gina Williams, also from Everest Court Reporting.

All counsel appearing today will be noted on the stenographic record.  Will the court reporter please swear in the witness.

- - - -

WHEREUPON

JOHN SMELKO

was called as a witness and, after having been first duly sworn, was deposed and testified as follows:

EXAMINATION

BY MR. ALVARADO:

Q    Good morning, Ms. Smelko.

Can you please state your full name for the record?

Page 8

A    John Smelko.

Q    My name is Darryl Alvarado, and I represent the Plaintiffs in this action.  Thank you for being here today.

Where are you located?

Where are you providing testimony from today?

A    I'm in Houston, Texas.

Q    Is there anyone in the room with you today?

A    Peter Stokes.

Q    You are employed by Coterra Energy; correct?

A    Correct.

Q    Today I'm going to refer to Coterra as "Cabot."

Will you understand what I'm referring to when I say "Cabot"?

A    I will.

Q    Have you ever had your deposition taken?

A    No.

Q    Do you understand that you're giving testimony here and that even though we're in an informal setting, the testimony you provide is given the same way as if given in a court of law?

A    I do.

Q    Do you understand that the testimony you provide today may be shown to a jury one day?

A    I do.

Q    You understand that you are to testify truthfully

Page 9

and to the best of your ability this morning and throughout today?

A    I do.

Q    The court reporter that's on line with us today is taking down everything that's said today, my questions and your answers, so it's important that we try not to speak over each other.

So I'd ask if you'd please let me finish my question before you respond, and I'll in turn let you finish your response before I move on to the next question.

Is that fair?

A    Yeah, understood.

Q    If for any reason you don't understand a question that I ask you today, please ask me to rephrase it.

If you go ahead and answer, I'm going to assume that you understood the question.

Is that fair?

A    Understood.

Q    Is there anything preventing you from giving your best testimony here today, medical or otherwise?

A    No.

Q    Did you bring any documents or notes with you today?

A    No.  This tablet -- piece of paper and pen and water.

Page 10

Q    Just a blank piece of paper?

A    A tablet.

Q    Will you agree not to consult any documents other than -- other than the exhibits I show you today during today's deposition?

A    Yes, sir.

Q    Have you ever been named as a defendant in a criminal action?

A    No.

Q    Have you ever been named as a defendant in a civil action?

A    Not personally, no.

Q    Is there a distinction you're making between being named personally or in some other capacity?

A    I was --

I was a witness for an EHB hearing for Cabot multiple years ago.

Q    What is an EHB hearing?

A    Environmental Hearing Board hearing with the State of Pennsylvania.

Q    And approximately when was that testimony provided?

A    '16'ish maybe.

It's been a long time.

'15, '16.

Case 4:21-cv-02045    Document 190-2    Filed 11/13/23 in TXSD    Page 4 of 11
Deposition of John Smelko
Delaware County Employees Retirement System v. Cabot Oil & Gas Corp., et al

Page 235

Phil Stalnaker and others with a series of attachments.  It bears Bates number CABOT00116766.

A    5/1/19?

Q    Yes.

A    I've got it.

Q    You sent this e-mail to Mr. Stalnaker in the ordinary course of your duties; correct?

A    I would have sent this in the ordinary course of my duties, correct.

Q    This appears to be a true and correct copy of the e-mail and attachments you sent on May 1, 2019; right?

A    This does appear to be a true and correct copy.

Q    You wrote, "Phil, when you have a few minutes, I would like to discuss the subject program.  In particular, I would like to discuss budget.  See the file titled '2019 Reclamation Budget,' PDF and Excel files attached."

Do you see that?

A    Yes.

Q    My question to you is, what is a --

What is the reclamation budget?

A    Here we are referring to well pad reclamation.  So in the State of Pennsylvania we, as operators -- oil and gas operators for unconventional operations, we're required to -- we are required to reclaim well pads nine months after the last well -- last active well or last permitted well and

Page 236

pad has been -- has been TD'd or drilled to total depth, and so that's what this is referring to here.  This is a --

You know, we have an ongoing program to reclaim pads as we -- as we perform our work.

The pads themselves are built to a size to accommodate drilling and completions operations.  And then once those operations are done, the pad can be shrunk, if you will, or minimized based on the well pad design that was approved by the Department.

So we would go in and reclaim that pad and then restabilize it accordingly.

Q    That reclamation occurs, you said, within nine months after a well has been TD'd or reached total depth.

What does that mean?

A    Well, by regulation --

So say you have a well pad with five wells on it, and you permit all the wells.  You get -- you have five approved permits.  You start drilling those wells.

Once the last well on that pad has been drilled to its total depth, then the clock starts ticking for a requirement to reclaim that pad or apply for an extension of restoration, and that could be based on timing of the year, whether it might be wintertime, which is not conducive to construction and stabilizing the well pad surface, or it could be based on the fact that we're planning on getting

Page 237

additional wells on the pad in the near term.  It could be because we haven't completed the wells yet, and we require the additional space.

So there's a number of reasons.  It's referring to the well pad itself.

MR. ALVARADO:  Okay.  Why don't we go off the record.

VIDEOGRAPHER:  Going off the record 3:43 p.m.

(Recess was taken.)

VIDEOGRAPHER:  Back on the record 3:49 p.m.

MR. ALVARADO:  Mr. Smelko, Plaintiffs have no further questions at this time.

MR. STOKES:  Can everybody hear me?

MR. ALVARADO:  Yes.

MR. STOKES:  I've got a couple documents that I'm going to send to the tech at everestdepo.com e-mail address.  Is that the correct address?

VIDEOGRAPHER:  Yes.

EXAMINATION

BY MR. STOKES:

Q    Mr. Smelko, could you restate your name for the record?

A    John Smelko.

Q    Mr. Smelko, what was your role at Cabot from 2016 to 2020?

Page 238

A    Environmental and regulatory compliance manager.

Q    What were your duties as environmental regulatory compliance manager?

A    Responsible for regulatory tasks, permitting and associated planning, environmental compliance, environmental remediation, interfacing with regulatory agencies as a liaison, facilitating and managing remedial projects, and pretty much sums up the majority of the work.

Q    When you mention remediation, would that include remediation of potential gas migration issues?

A    I manage those projects.

Q    And when you mention regulatory, your role as a liaison to regulatory agencies, does that include the Pennsylvania Department of Environmental Protection?

A    It did.

Q    I believe you testified earlier today that you were the point person at Cabot for communicating with the DEP or the Department; is that correct?

A    That's correct.

Q    Can you briefly summarize your educational background and your background before joining Cabot with respect to environmental compliance-related issues?

A    Applied mathematics degree from University of Pittsburgh with a minor in chemistry.

I have --

Page 243

engineers or other persons at Cabot that had expertise in addressing those tests?

A    Absolutely.

Q    Did that inform your overall views of whether particular wells were successfully remediated or not?

MR. ALVARADO:  Objection to form.

A    My discussions with the engineers helped guide our projects through the investigation phase.

I facilitated the logistics associated with them, but I did not directly oversee the field portions of those tests.  It was a team effort.  We engaged --

If you look at the e-mails, we engaged not only in the department, but we engaged field operators and engineers to ensure that we had the proper mechanics associated with the tasks to accomplish the goal and the objectives required.

BY MR. STOKES:

Q    Did Cabot also conduct any water sampling?

A    Yes.  Yes, we did.

Q    Are you familiar with the term "pre-drill methane"?

A    Yes.

Q    What is pre-drill methane?

A    Pre-drill methane means that we would collect samples and analyze those -- those samples and obtain

Page 244

results prior to drilling.

And typically at present, at least since 2011, anything -- anything beyond 2,500 feet can arguably be viewed as pre-drill or outside the influence of drilling.

Q    Was there pre-drill methane in the waterways and water sources near the wells at issue in this case?

MR. ALVARADO:  Objection to form.

A    I'm sorry.  Can you --

BY MR. STOKES:

Q    I'll repeat that.

Were there --

Was there pre-drill methane in the waterways near Cabot's gas wells in Northeast Pennsylvania?

A    Yes.

MR. ALVARADO:  Objection to form, overbroad.

BY MR. STOKES:

Q    What's the basis for your answer?

MR. ALVARADO:  Same objection.

A    Actually, because we did not have pre-drill samples available associated with the Dimock Box because of the early --

Early on there really was no industry standard or regulatory standard that would guide the analysis for dissolved gas.  We had none of those results to rely upon, no pre-drill data.

Page 245

So we undertook an extensive sampling and analysis program to move beyond or outside the 9 square-mile box and collected samples across Susquehanna County that were outside the influence of drilling and established, through thousands of data points, what -- what could be regionally or locally expected from a dissolved gas standpoint.

Q    What is "background methane"?

A    Background methane I would say is naturally occurring methane that exists -- that exists in water in certain water wells without any influence from drilling-related activities, naturally occurring.

Q    Do you recall being asked some questions earlier today about the Stalter wells' NOV?

A    Yes.

Q    Are you familiar with the NOV for the Stalter wells received by Cabot in September of 2011?

A    Yes.

Q    As part of your responsibilities overseeing environmental work, are you familiar with the remediation efforts that were done?

A    I am.

Q    What was the outcome of the remediation efforts on the Stalter wells that were the subject of the NOV?

A    We successfully --

Page 246

MR. ALVARADO:  Form.

A    We successfully remediated those wells.

We have a highly competent team of professionals, geologists, engineers.  We attacked it as a team and, based on work that was done and the subsequent testing, we believed that those wells were properly remediated.

BY MR. STOKES:

Q    And what was the status of the remediation of those wells as of February -- February 2016?

A    February of 2016?

Q    Yes, sir.

A    I believe they would have been --

They would have been completed by that time, I believe.

Q    Do you know if there was a plugging of the 8V Stalter well?

A    We did plug the 8V -- Stalter 8V.

Q    The first time that it was plugged, was it permanently plugged?

A    I don't know about --

I don't know about the first time it was plugged. Ultimately it was plugged.

Q    Is there a reason why it was permanently plugged in 2017?

A    So we would have --

Deposition of John Smelko

Page 247

As we worked through that project, we would have initially began -- began to -- began to plug it, but we wanted to make sure that we were successful.

So in 2017 it would have been -- we would have deemed it to be complete, in other words, fully remediated, and we felt comfortable formally plugging and abandoning that well.

And I don't recall for sure, but it may have been a stipulation within the Consent Order & Agreement that was executed in December of 2020 -- or 2016.

Q    If you could pull up Exhibit 140.  This is an exhibit that you were shown this morning.  I'll share my screen.

A    Okay.

Q    Do you recall testifying this morning about this February 8, 2016 e-mail from Deidre Shearer -- sorry -- from you to Ms. Deidre Shearer dated February 8, 2016?

A    Yes.

Q    Ms. Shearer asked you for any updates on the SEC disclosure for the Form 10-K that was going to be filed February of 2016.

Do you see that?

A    Yes.

Q    And could you read your statements to Ms. Shearer for the record?

Page 248

A    "The statement below is still accurate.  Let me know if you have any questions or if you would like to discuss further."

Q    Was that your belief at the time?

A    Yes, it was.

Q    Is that your belief today?

A    Yes, it is.

Q    What's the basis for that belief?

A    Based on --

Well, based on the remedial work that we had done on the Stalter pad and the subsequent execution of the CO&A, the payment of the penalty associated with the CO&A, and the subsequent monitoring and work that has been done with that -- with that project.

Q    Was Cabot required by DEP to perform any additional mechanical repair work on the well -- the Stalter wells after February of 2016?

MR. ALVARADO:  Objection to form.

A    Well, beyond the P&A work that was done in 2017, I don't -- I don't believe there was any other remedial work during the time frame of 2016 to 2020.

BY MR. STOKES:

Q    So other than plugging the 8V well, no other mechanical work was done on the Stalter wells following this February 2016 e-mail?

Page 249

A    I do not recall any other remedial work being performed on the Stalter wells between 2016 and 2020.

Q    Do you recall the Department ever requiring you, after December -- sorry -- February of 2016 --

I'll rephrase that.

Did the Department ever tell you after February of 2016 that they were going to require additional mechanical work on the well?

MR. ALVARADO:  Objection to form.

A    There was nothing between 2016 and 2020 time frame.

I believe that we were -- we were all in agreement with the Department that we had remediated the Stalter wells, and that was borne out in the water supplies that were associated with -- with the Stalter pad.

BY MR. STOKES:

Q    If you could look at Exhibit 141, this is another exhibit you reviewed this morning, and it is a January 12, 2017 e-mail exchange between you and Deidre Shearer where you were provided a draft of -- the draft 10-K language for the Stalter NOV, and you provided revisions.

Do you recall that?

A    Yes.

Q    And this --

These e-mails where you're being asked to provide

Page 250

revisions or comments on the disclosure language regarding the Stalter NOV, what was the purpose, as best you understand, of you being consulted with respect to the statements?

MR. ALVARADO:  Objection to form.

A    As a person who was assigned to oversee the gas migration project, investigation project, Stalter, I was asked to make sure that the language in that -- in that statement was true and accurate to the best of my belief because it was going to be used for 10-K purposes and filings.

BY MR. STOKES:

Q    If you go to your comments at the end, the last page of the document, do you see where it says, "We believe the source of methane has been remediated"?

A    Where are you at here?

Q    It's right above the changes in the "Environmental Matters" paragraph.

Do see where it says --

A    Yes.

Q    Do you see above that it says, "Since then we have been engaged with the PA DEP in investigating incident and have performed appropriate remediation efforts"?

A    Yes.

Q    Did you strike out or change those two

Deposition of John Smelko

Page 251

statements?

A    No.

Q    Why didn't you change those statements?

A    Because they were accurate.

MR. STOKES:  Can we pull up Exhibit --

This is --

Have you received, Court Reporter --

VIDEOGRAPHER:  Yes, I have received your e-mail.

MR. STOKES:  Can we mark the Cabot 29 -- July 26, 2019 10-Q as the next exhibit?

(Exhibit 173 was marked for identification.)

MR. STOKES:  Do you know what number that would be?

VIDEOGRAPHER:  This will be Exhibit 173.

MR. STOKES:  173.

BY MR. STOKES:

Q    Mr. Smelko, are you familiar with the NOVs that were issued in 2017 for the Howell and Jeffers Farms well pads -- certain wells on those pads?

A    Yes.

Q    And are you familiar with the remediation work that was done on those wells?

A    I am.

Q    What was the outcome of the remediation work on the Howell wells?

Page 252

A    It was successful.

Q    What's the basis for that statement?

A    Working with the engineering team, we designed a remediation process and performed that remedial work in the field, followed that up with testing and monitoring and diagnostic analysis, and the conclusion from the engineers and from the water supplies, which demonstrated that there was a reduction in dissolved gas at the water supplies, that remedial work was successful.

Q    Are you familiar with the remedial work that was done on the Jeffers Farm wells?

A    Yes.

Q    What was the outcome of that remedial work?

A    We believe that it was successful, the same reasoning as for the Howell.

As a team we put together a plan to address the -- address the gas migration issues that we were seeing at the Jeffers.  The team put together a remediation plan for the gas wells.  They executed that plan, followed that up with ongoing monitoring, which is still ongoing and includes sampling and analysis of water supply receptors, and based on that work we have identified that the remedial work on the Jeffers pad was successful.

Q    Exhibit 173 is a copy of Cabot's July 26, 2019 Form 10-Q, and I'd ask you to turn to the 49th page of this

Page 253

document, page 49 out of 53.

A    Okay.

Q    Are you --

Do you see the paragraph under "Environmental Matters"?

A    I see it.

Q    Are you familiar with this disclosure?

A    I'm going to have to read.

Okay.

Q    Are you familiar --

Is this a disclosure you've reviewed in your responsibilities as environmental manager at Cabot?

A    That would have been --

That would have been a paragraph that would have been forwarded to me by Deidre.

Q    Do you have a view as to whether this paragraph is accurate?

A    The paragraph is accurate.

Q    If you could look at the --

If you could look at the sentence that I'm highlighting.

Do you see where it says, "Since then we have engaged with the PA DEP in investigating the incidents and have performed appropriate remediation efforts"?

A    Yes.

Page 254

Q    Was that statement accurate as of July 26, 2019?

A    Yes.

Q    Is it accurate today?

A    It is.

Q    What was the status of the remediation efforts on the Howell and Jeffers wells as of July 26, 2019?

A    They would have been --

It would have been substantially complete at that point.

Q    Was Cabot ever required to perform additional repair work or remediation on the Howell or Jeffers Farms wells after July 26, 2019?

A    I don't recall that to be the case.

Q    Do you recall any additional remediation work -- mechanical remediation work that the Department required after July 26, 2019 for either of those pads?

A    Once we completed the work and we determined that that remedial work was successful, the Department did not ask us to go back in and do any further remedial work.

Q    If you had believed that this statement or the other statements that were reflected in Exhibits 140 and 141 were incorrect or inaccurate, what would you have done?

A    I would have revised them accordingly and submitted them to corporate for inclusion in this report.

Q    Do you recall some questions earlier today about

Deposition of John Smelko

Page 255

the Dimock -- the wells that were subject to the Dimock COSA?

A    Yes.

Q    Are you familiar with the remedial work that Cabot did on those wells?

A    Yes.

Q    And as of February 2016, what was your understanding of the status of the remedial work that had been done by Cabot on the COSA wells?

A    We believed at that time that the wells in the box were compliant with regulations.

Q    During 2015 to --

Strike that.

You were asked some questions about quarterly reports that you prepared for a committee of the Cabot board called the SEA or EHS Committee.

Do you recall that?

A    Yes.

Q    And did you prepare those reports each quarter between 2016 and 2020?

A    Yes.

Q    Did you convey to the SEA Committee during that time that you believed Cabot's remedial work on the Dimock wells was improper or insufficient?

A    No, I don't believe that was the case.

Page 256

Q    During 2015 to 2017, did you have any discussions or interactions with the Department with respect to ongoing monitoring of the Dimock wells?

A    So we would have continued to do quarterly sampling of the drinking water wells that were identified in the 2010 COSA.

We would have also continued doing quarterly mechanical integrity assessments as required by regulation over that time frame as well.

In addition we would have -- in 2015 we had submitted two Ratzel GMI reports to the Department, one I think it was in springtime, and then we had submitted a supplemental report in November of 2015.

Q    Can you discuss what the Department's role was in connection with the sampling and monitoring you mentioned?

A    Yeah.  By that point the Department, they -- they no longer did split sampling I don't believe at that point, and they would just rely on our quarterly sampling, which we would obtain and then provide copies to the Department.

Q    And did the Department ever actually show up physically at the test sites or receive the data afterwards?

A    I didn't physically go out and sample myself, but I don't believe the Department was typically present for any of those sampling activities at the water supplies, but we would share those results with the Department once we

Page 257

obtained them from our analytical laboratory.

Q    Were they shared as they became available?

A    Yes, that's typically our practice that once they're available, we share -- we share the data.

Q    So I'm going to pull up Exhibit 154, if you could pull up that document.

A    Okay.

Q    So this is a July -- I'm sorry -- March 30, 2016 e-mail that you sent to others at Cabot, as well as Ken Kennedy at DEP.

In this e-mail I believe you referred to pressure PBUT tests on Stalter well pads.

Do you recall that?

A    Yes.

Q    Did the Department between 2015 and 2017 ever make any similar requests to do pressure buildup tests on the Dimock COSA wells?

A    Not over that time frame.

Q    Did the Department ever communicate to you, as the point person for Cabot during the 2015 to 2017 time frame, that they needed Cabot to perform more tests on gas wells than what Cabot was already doing?

MR. ALVARADO:  Objection to form.

A    I don't --

I don't recall that being the case.

Page 258

BY MR. STOKES:

Q    Do you recall, did Department ever tell Cabot or complain to Cabot during that time frame that Cabot needed to do different kinds of tests than what it was doing?

MR. ALVARADO:  Objection to form.

A    I don't recall --

I don't recall that to be the case.

BY MR. STOKES:

Q    Did the Department ever tell you, as the point person for Cabot during the 2015 to 2017 time frame, that Cabot had failed or refused to perform any tests that the Department wanted Cabot to perform on the Dimock wells?

MR. ALVARADO:  Same objection.

A    I don't recall that to be the case.

BY MR. STOKES:

Q    Do you recall in June of 2018 you received a letter from the Department with respect to the status of the Dimock COSA and some of the wells subject to the COSA?

A    In --

What was the date?

Q    June 11, 2018.

A    Yes.

Q    And in that correspondence --

You looked at some e-mail correspondence this morning with the Department from 2018.

Deposition of John Smelko

Page 263

Q    Are you familiar with a water quality complaint from the Mayes?

A    I am.

Q    Did Cabot investigate those complaints?

A    We did.

Q    And what was the outcome of that?

A    The Mayes water supply has been deemed to return to background, not only by us, but by the Department of Environmental Protection.

Q    Can activities by landowners affect methane concentration in water wells?

A    Yes, they can.

Q    How is that possible?

A    So --

So there can be variability in concentrations based on water usage.

In certain wells, if they are stressed and you draw down the water column, you can liberate gas or potentially access different water-bearing zones within that wellbore and potentially affect the amount of gas in a water supply.

I was going to say additionally, you know, weather-related variables can also be at play, drought conditions versus high water tables and so forth.

Q    Do you recall any instances of landowners, for

Page 264

example, that you were asked about over today where the landowner activity may have impacted methane?

A    Yes.

Q    What's that example?

A    So the Grosso residence and also the Chichura residence.

Q    How did the landowners' activities affect --

MR. ALVARADO:  I'm having a lot of trouble hearing you, Peter, if you could speak up.  I think you're relying on --

BY MR. STOKES:

Q    How did the landowner activities impact those two water sources?

A    Increased usage before sampling ultimately affected the dissolved gas concentrations so that it went up, increased usage beyond what potentially would be considered normal or typical.

Q    Are you familiar with a $100,000 disclosure threshold with respect to environmental enforcement actions by government entities?

A    Yes.

Q    Did you assess during the 2016 to 2020 time period whether there were any potential or actual environmental violations that might be implicated by that threshold?

Page 265

A    In the course of my responsibilities, we continually monitor incidents and projects that have occurred over time, and over that time frame there were only three, Stalter, Howell and Jeffers.

There were no other water --

There were no other projects that would have risen to that level or even come close to that level.

Q    Did the June 2018 letter from the Department on the COSA wells, does that change your view at all?

A    The June?

Q    The June 2018 letter from the Department about the COSA wells, did that change your view at all on whether there were any other issues to meet that threshold -- $100,000 threshold?

MR. ALVARADO:  Objection to form.

A    Not at all.

BY MR. STOKES:

Q    Why not?

MR. ALVARADO:  Same objection.

A    The 2010 COSA was a binding document that included civil penalty.  There was no reason to believe that there was going to be follow-on penalties associated with the box.

We were and have been continuing to work through the technical issues of the box, however.  There's no

Page 266

further penalty expected.  We --

As I said a minute ago, there were no other projects beyond Stalter or Howell and Jeffers that rose to that level from a penalty standpoint, and no other projects were under that.

BY MR. STOKES:

Q    You were asked some questions earlier about the Attorney General charges that were filed in June of 2020.

Do you recall that?

A    Yes.

Q    When did you first find out about those charges from the Attorney General?

A    Just shortly before it was released.

Q    Prior to the time that you learned about the AG charges, had the Department ever communicated to you, as the point person for Cabot between 2016 and 2020, that they intended to impose additional penalties on Cabot that would have reached that $100,000 threshold to anything besides Howell, Jeffers and Stalter?

A    There was some discussion from the Department about entering into a, quote, new consent order to update or replace the 2010 COSA.

However, Cabot summarily dismissed that, and we disagreed with that approach.

The 2010 COSA was binding, and that was our

Deposition of John Smelko

Page 267

position at the time.

Q    So why -- did the discussions about a potential new COSA change your views that there were no other matters with $100,000 threshold?

A    Because we --

MR. ALVARADO:  Objection to form.

A    We --

We didn't know --

We were not agreeable or amenable to entering into a new COSA.  We were operating and complying with the existing 2010 COSA, and that's the way we acted.

BY MR. STOKES:

Q    Did --

Did anybody ever raise any concerns with you that Cabot was not denoting sufficient funding, attention or timing towards complying with environmental regulations?

A    No.  Across the board within Cabot from top to bottom, field regional management to executive management and corporate management, board of directors, there's always been an important primary objective of being compliant, and resources was not the issue.

The primary objective was to operate in a responsible, ethical and environmentally responsible manner, and if we were in noncompliance, then we were expected to resolve those issues.

Page 268

Q    By the way, I just want to pull up Exhibit 160 again, which is the NOV for the Howell wells.

Do you recall seeing that earlier today?

A    Which one are we looking at?

Q    This is Exhibit 160, and it's the attachment on page 2 of the PDF that includes the Howell NOV from June of 2017.

Do you recall that?

A    Page 2 of the NOV?

Q    Page 2 of the PDF.

A    I got it.

Q    Do you recognize this as the Howell NOV of June of 2017?

A    Yes.

Q    If you go down to near the bottom, do you see a paragraph that starts, "This Notice of Violation is neither an order nor any other final action of the Department of Environmental Protection.  It neither imposes nor waives any enforcement action available to the Department under any of its statutes.  If the Department determines that additional enforcement is appropriate, you will be notified of the action"?

A    Yes, I'm familiar with that.

Q    Have you seen that language in other NOVs?

A    That's standard boilerplate language.

Page 269

NOVs are not deemed to be enforcement actions.  They are simply Notices of Violation.

Q    Has Cabot received NOVs relating to gas migration issues that have not yet resulted or haven't resulted in penalties?

A    Yes.

Q    Did Howell --

Did the Department assess penalties for the Powers wells?

A    Not to this point.

Q    Did the Department assess penalties as to the Shields wells?

A    No.

Q    Are there other wells that we've discussed today for which the Department has not received penalties?

A    Not that we've discussed, I don't believe.

Q    Does the mere fact that the Department served an NOV mean that you would expect there to be $100,000 penalty from receipt of that NOV?

MR. ALVARADO:  Objection to form.

A    No.

BY MR. STOKES:

Q    You were asked some questions earlier about whether methane is toxic or causes health problems, I believe.

Page 270

Do you recall that?

MR. ALVARADO:  Objection, mischaracterizes testimony.

A    Can you restate?

BY MR. STOKES:

Q    I'll ask it straight up.

Do you have a view or --

Do you have a view as to whether the presence of methane in drinking water is a health environmental hazard?

MR. ALVARADO:  Objection to form.

A    Methane is not a health hazard --

Dissolved methane, when tested, does not have -- is nontoxic.

BY MR. STOKES:

Q    And have you --

Are you aware of any regulatory action on that?

MR. ALVARADO:  Objection to form.

A    Regarding dissolved gas?

BY MR. ALVARADO:

Q    Has any government agency concluded one way or the other, or any other outside entity?

MR. ALVARADO:  Objection.

BY MR. ALVARADO:

Q    I'll just ask it this way:  What's the basis for your statement that it's not toxic?

Deposition of John Smelko                    Delaware County Employees Retirement System v. Cabot Oil & Gas Corp., et al

CERTIFICATE

I, Gina Williams, Registered Professional Court Reporter, do certify that the above deposition was reported by me and that the foregoing transcript is a true and accurate record to the best of my knowledge, skills, and ability.

I further certify that I am not an employee of counsel or any of the parties, nor a relative or employee of any attorney or counsel connected with the action, nor financially interested in the action.

Subscribed and sworn to before me when taken this 8th day of September, 2023.

*Gina Williams*

GINA WILLIAMS, RPR, CRR