# Exhibit 4

Deposition of Gordon Ganaway                    Delaware County Employees Retirement System v. Cabot Oil & Gas Corp., et al

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS

Civil Action No. 4:21-cv-02045

DELAWARE COUNTY EMPLOYEES RETIREMENT
SYSTEM, Individually and on behalf
of all others similarly situated,

          Plaintiffs,

v.

CABOT OIL & GAS CORPORATION, et al.,

          Defendants.

_____


          ***********************************

     REMOTE VIDEO DEPOSITION OF GORDON GANAWAY

                September 6, 2023

          ***********************************


          REMOTE VIDEO DEPOSITION OF GORDON GANAWAY taken
via Zoom in the above-styled and numbered cause on
September 6, 2023, commencing at 8:03 a.m. Central Time
before Gina Williams, Registered Professional Reporter,
Certified Realtime Reporter, and Certified Realtime
Captioner.

Page 7

VIDEOGRAPHER:  We are now on the record.  Today's date is September 6, 2023, and the time is 8:03 a.m. Central Time.

This is the recorded video deposition of Gordon Ganaway being taken in the matter of Delaware County Employees Retirement System v. Cabot Oil & Gas Corp., et al. in the United States District Court, Southern District of Texas, Civil Action No. 4:21-cv-02045.

My name is Alex Held.  I'm the video specialist. The court reporter is Gina Williams, and we are both from Everest Court Reporting.

All counsel appearing today will be noted on the stenographic record.  Will the court reporter please swear in the witness.

- - - -

GORDON GANAWAY

was called as a witness and, after having been first duly sworn, was deposed and testified as follows:

EXAMINATION

BY MR. HELLER:

Q    Good morning, Mr. Ganaway.  My name is Alex Heller from the law firm of Kessler Topaz Meltzer & Check representing the Plaintiffs in this matter.

Would you please state your full name for the record?

Page 8

A    Gordon Paul Ganaway.

Q    Would you please state your current home address for the record?

A    30007 Canyon Side Court, that's three words, Spring, Texas 77386-2917.

Q    Do you understand that you're testifying under the same oath today as if you were in a courtroom testifying in front of a jury?

A    Yes, sir.

Q    I'm going to assume that you understand the questions that I've asked unless you ask for clarification.

Is that okay?

A    Yes, sir.

Q    If you need a break, just let me know.  I only ask if a question is pending, you finish your answer, okay?

A    Yes, sir.

Q    Where are you located today?

A    I am in Coterra's corporate office in Houston, Texas at 840 Gessner.

Q    Did you bring any notes with you to the deposition today?

A    No, sir.

Q    Is there anything that would prevent you from thinking clearly and testifying truthfully today?

A    No, sir.

Page 9

Q    How did you prepare for your deposition today?

A    I met with my counsel yesterday on Tuesday for a couple hours.

Q    Who attended that meeting?

A    It was myself, Mr. Stokes and Mr. DeLancey.

Q    Was that in-person, the meeting?

A    In-person for me and Mr. Stokes, and Mr. DeLancey was video, like Zoom.

Q    How long was that meeting?

A    Probably six to seven hours.

Q    Did you review documents during that session?

A    I did have some documents that I reviewed.

Q    What types of documents?

A    Reports that I had put together over the last couple years to our Safety Environmental Affairs Committee.

Q    Did you review the transcripts from any depositions in this matter?

A    No, sir.

Q    Did you review any other documents to prepare for today's deposition?

A    No, sir.

Q    Did you have any communications or discussions with anyone from Cabot in preparation for today's deposition?

MR. STOKES:  Other than counsel.

Page 10

BY MR. HELLER:

Q    Other than counsel.

A    Yeah, other than counsel, no, sir.

Q    The corporate defendant in this case is Coterra Energy, Inc., formerly known as Cabot Oil & Gas.

For ease of reference today, I'm going to refer to the company as "Cabot" throughout this deposition.

Do you understand that?

A    Yes, sir.

Q    Did you review the Complaint filed in this case?

A    I haven't seen the Complaint.

Q    Describe your understanding of the allegations set forth in the Complaint, to the best of your knowledge.

A    I believe it had to do with SEC, I guess it's like 10-K disclosures, and then just on, you know, information relating to the greenhouse --

I mean, I'm sorry, not greenhouse.

-- gas migration allegations -- gas migration incident allegations.

Q    You're aware that a series of felony and misdemeanor criminal charges were filed by the Pennsylvania Attorney General in June 2020 against Cabot; is that correct?

A    Yes, sir.

Q    Were you ever interviewed by any law enforcement

Page 231

committee?

Q    Right.

Did you --

Did you participate in disclosure committee meetings at Cabot?

A    Right, Cabot had an internal disclosure committee consisted of generally four people, I believe, and that committee would meet on a quarterly basis like usually within about seven to nine days at the end of the quarter, and we would disclose to that committee, I would say at a not high level, but it was designed to be making sure they were aware of anything that we had concerns about.  So we would bring that up to the disclosure committee.

Q    Did John Smelko report to you?

A    Yes, sir, John has been a direct report to me.

Q    What's his role in the company?

A    John is our North Region Environmental & Regulatory Manager, and he's the main contact in the North Region.  He's been with us --

I think --

I hired John I believe around May of 2010, I believe, or somewhere -- might have been a little bit earlier, maybe March of 2010, but somewhere early 2010 was when John joined Legacy Cabot, and John has got a real strong background, came from the consulting side, and he had

Page 232

a real strong background on the water data management like water type stuff.

Q    Does his responsibilities include responding to gas migration related issues?

A    He was responsible to help build a team that helped, you know, like manage those issues.

Q    And is Mr. Smelko still with the company today?

A    Yes, sir.

Well, as of the last time --

Before --

He was here when I retired.  As far as I know, he's still here.

Q    When, again, did you retire?

A    I retired effective April 1st of 2023, and John was still here at that time, and I'm assuming he's still here.

Q    Between 2020 and 2023, did you stay in the same role at Cabot?

A    Yes, sir.  We went through our merger in -- effective October of '21.  So the title --

I stayed in my same role.

Q    How did John --

What's your impression of John's performance as an employee with respect to -- specifically with respect to gas migration issues?

Page 233

A    John --

MR. HELLER:  Objection to form.

You can answer.

A    John has always been an exemplary performer, even --

Whether it's on his personnel skills or on his technical knowledge, he's always been an excellent performer, and he's been -- he's been a real critical person in helping us work with all these items that we addressed with the DEP in Pennsylvania.

BY MR. STOKES:

Q    I'm going to ask you a few questions about the reports that you presented to, we'll call it the EHS or SEA Committee -- I'm referring to the same committee -- between 2016 and 2020.

By the way, did Mr. Dinges or Mr. Schroeder attend those meetings?

A    From what I recall, I really don't recall them missing any of them.

Q    How did he go about preparing the reports that you provided to -- or presented to the SEA Committee with respect to potential gas migration issues?

MR. HELLER:  Objection to form.

BY MR. STOKES:

Q    You can answer.

Page 234

A    When we looked at the gas migration issues, we would take that and gradually evolve over the reporting periods.

I would work closely with John, and John would do a lot of the drafting, John and his team up there, specifically John Smelko and Andy Mehalko, and they would work with us really closely on the technical details on what we included for the gas migration allegations.

Q    Were you aware --

Strike that.

Were you aware that Cabot was seeing a Notice of Violation or NOV from the Pennsylvania Department of Environmental Protection relating to the Stalter well pad in September of 2011?

A    Yes, sir, from what I recall.

Q    Did you provide reports to the SEA Committee regarding the status of the remediation for those wells?

MR. HELLER:  Objection to form.

A    Yes.

Sorry.

BY MR. STOKES:

Q    What's the answer to the question?

A    Yes, sir.

Q    What was the outcome of the remediation efforts undertaken by --

Page 243

disclosures with respect to environmental issues.

Do you recall that?

A   Yes, sir.

Q   Did you review any draft SEC or final SEC disclosures with respect to the NOVs on the Stalter wells from 2011?

MR. HELLER:  Objection to form.

A   Yes, sir.

BY MR. STOKES:

Q   And can you just describe your review process and how it worked when you reviewed those types of disclosures?

MR. HELLER:  Objection to form.

A   When we would receive the draft disclosure, I would get with John Smelko, our North Region safety environmental -- I mean safety and regulatory manager, environmental regulatory manager.

I would get with John, and we'd discuss it, and if we had any edits or anything, we would agree on whatever edits we had or suggested verbiage, and we'd take that, redline it, and send it back to -- it was Todd Roemer's group, but I'm not sure who we sent it to.  I don't recall.

BY MR. STOKES:

Q   What was your view with respect to the accuracy of the public SEC disclosures relating to the Stalter wells that you reviewed?

Page 244

MR. HELLER:  Objection to form.

THE WITNESS:  I'm sorry.

A   I was comfortable with the accuracy of the disclosure.

BY MR. STOKES:

Q   What did you convey to the disclosure committee with respect to the reviews on the substance of the Stalter wells SEC disclosures?

MR. HELLER:  Objection to form.

A   Can you repeat the question?

BY MR. HELLER:

Q   Sorry about that.

Did you convey to the disclosure committee or anybody else at Cabot any concerns about the substance of the SEC disclosures regarding the Stalter wells' NOV?

MR. HELLER:  Objection to form.

A   No, I didn't convey any concerns.

BY MR. STOKES:

Q   Did you have any concerns personally with respect to the accuracy or substance of the Stalter wells' public SEC disclosures that Cabot made?

MR. HELLER:  Objection to form.

A   I didn't personally have any objection to them.

BY MR. STOKES:

Q   Did Mr. Smelko or anybody else express any

Page 245

concerns to you about the substance or accuracy of the SEC disclosures Cabot made about the Stalter wells' NOV?

MR. HELLER:  Objection to form.

A   I don't recall John voicing any objections to the SEC disclosure that we had drafted.

BY MR. STOKES:

Q   And what's the basis for your views regarding the accuracy of those disclosures?

MR. HELLER:  Objection to form.

A   Discussions with Mr. Smelko on the verbiage of the disclosure and what we agreed on what was being said.

BY MR. STOKES:

Q   Did you review SEC disclosures that Cabot made in July of 2019 and afterwards with respect to the NOVs issued for the Howell and Jeffers Farms wells?

MR. HELLER:  Objection to form.

A   Yes, sir, we would have reviewed it.

BY MR. STOKES:

Q   What was your view regarding the substance of those disclosures?

MR. HELLER:  Objection to form.

A   I was comfortable with the language.

BY MR. STOKES:

Q   Did you have any concerns about the accuracy or completeness of those disclosures?

Page 246

MR. HELLER:  Objection to form.

A   No, sir, I didn't have any concerns.

BY MR. STOKES:

Q   Did you --

What did you convey to the --

Strike that.

Did you convey to the disclosure committee or anybody else at Cabot that you had any concerns about the substance or accuracy of the SEC disclosures Cabot made about the Howell and Jeffers Farms NOVs?

MR. HELLER:  Objection to form.

A   No, sir, I didn't convey nor have any concerns on those disclosures.

BY MR. STOKES:

Q   Did you review any other environmental disclosures that Cabot made such as disclosures about substantial compliance with environmental regulations and laws?

MR. HELLER:  Objection to form.

A   Yes, sir, we would have reviewed it.

BY MR. STOKES:

Q   What was your view regarding the substance of those disclosures regarding substantial compliance with environmental laws?

MR. HELLER:  Objection to form.

Deposition of Gordon Ganaway

Page 247

A    I was comfortable with the use of the word "substantial" in describing our activities.

BY MR. STOKES:

Q    What's the basis for that, your comfort on that?

MR. HELLER:  Objection to form.

A    When we look at, say for example, NOVs issued, the number of wells that might be involved compared to our well count, we may have had 750 to 800 wells at this time, and say --

I can't remember the date.

We might have had 25 -- 20, 25, 30 wells that were listed in some of the Department orders.

So just looking at the well count and the number involved, I would consider that meeting substantial compliance with the well count that we had and what type of NOVs we got.

BY MR. STOKES:

Q    Were you aware of a --

Strike that.

Was there any discussion --

Strike that.

Were you aware or did you have any discussion about a $100,000 threshold with respect to public disclosure of government enforcement actions on environmental-related issues?

Page 248

MR. HELLER:  Objection to form.

A    Yes, sir, I'm aware of the $100,000 limit.

BY MR. STOKES:

Q    Did you have any discussions with Mr. Smelko about that or anybody else?

MR. HELLER:  Objection to form.

A    We've had discussions about the threshold level and what we report.

BY MR. STOKES:

Q    During the period from 2016 to 2020 --

Strike that.

Did you do assessments each quarter or make assessments in your mind each quarter as to whether there were any pending or potential environmental enforcement issues that would potentially resolve with penalties over $100,000?

MR. HELLER:  Objection to form.

A    Parts of my discussion with John with NOVs would involve potential penalty amounts and what we might think if we received an NOV or types NOVs.

So potential volume amounts of the penalty would have been something that John would have discussed with me if he had an idea of anything that might cross a certain threshold.

Page 249

BY MR. STOKES:

Q    And do you recall I asked a few questions about the SEC disclosures regarding the Stalter, Howell and Jeffers Farms wells?

MR. HELLER:  Objection to form.

A    Yes.

THE WITNESS:  Oh, sorry.

BY MR. STOKES:

Q    During the period from 2016 to 2020, did you assess that there were any other actual potential environmental government enforcement issues that could resolve in more than $100,000 in penalties?

MR. HELLER:  Objection to form.

A    Can you repeat the question?

BY MR. STOKES:

Q    I'll repeat that.

During 2016 to 2020, other than the Howell, Stalter and Jeffers Farms NOVs that were disclosed, did you assess whether any other --

I'll repeat that again.

Between 2016 and 2020, other than the Howell, Jeffers and Stalter NOVs, did you have a view as to whether any other environmental enforcement actions or potential enforcement actions would result or likely result in $100,000 or more in penalties?

Page 250

MR. HELLER:  Objection to form.

A    My discussions and review, John was -- we were both comfortable that we didn't anticipate anything $100,000 or greater as an NOV penalty.

BY MR. STOKES:

Q    And you were shown earlier what was described as ongoing or open or active investigations involving various other wells besides Stalter, Howell, Jeffers Farm.

Do you remember looking at those lists in Mr. Heller's questioning?

MR. HELLER:  Objection to form.

A    Yes.

BY MR. STOKES:

Q    Those included the Dimock -- wells relating to the Dimock COSA and Shields wells and some other wells.

Do you recall that?

MR. HELLER:  Objection to form.

A    I remember seeing several of Mr. Heller's lists that addressed those wells.

BY MR. STOKES:

Q    And did any of those --

With respect to all those lists that Mr. Heller showed you, were there any wells or potential enforcement actions listed other than Stalter, Howell and Jeffers Farms that you thought would likely result in a penalty of

Case 4:21-cv-02045    Document 190-4    Filed 11/13/23 in TXSD    Page 7 of 8
Deposition of Gordon Ganaway
Delaware County Employees Retirement System v. Cabot Oil & Gas Corp., et al

Page 251

$100,000 or more?

MR. HELLER: Objection to form.

A    No. Sorry. No, sir.

BY MR. STOKES:

Q    What's the basis for that?

A    Discussion --

I'm sorry.

MR. HELLER: Objection to form.

A    Discussion with Mr. Smelko, and we would look at the NOVs, and some of the discussion might have involved, you know, number of water supplies that might be impacted, you know, maybe what we're looking at as far as impact to the area, and we didn't feel that there was anything at the time that would have reached $100,000 threshold.

BY MR. STOKES:

Q    Did you ever convey to anybody at Cabot that you thought there were any other wells other than Howell, Stalter and Jeffers Farms where there was likely to be a penalty of $100,000 or more?

MR. HELLER: Objection to form.

A    No. No, sir.

BY MR. STOKES:

Q    If you could pull up Exhibit 117. This was previously marked.

Exhibit 117 is an e-mail chain between you,

Page 252

Mr. Smelko and Andy Mehalko dated October 26, 2016.

Do you see that?

A    Yes, sir.

Q    Do you see the second e-mail in the chain or the second to the top e-mail in the chain on the first page is an e-mail from Mr. Smelko to you, Mr. Ganaway, the same day, October 26, 2016?

A    Yes, sir.

Q    What does Mr. Smelko write in the first sentence of his e-mail about the resolution of the Powers GMI?

A    Mr. Smelko noted that the Powers GMI was effectively resolved, so they moved completion -- the closure report to the back burner due to some other projects that were ongoing.

Q    If you could take a look at Exhibit 18 -- I'm sorry -- Exhibit 118.

A    Yes, sir.

Q    Exhibit 118 again is an e-mail you sent dated October 17, 2017 to Steve Lindeman and Terry Johns and copied to a number of other people. It contains an S&E or SEA Committee report for October 25, 2017.

Do you see that?

A    Yes, sir.

Q    Let's go to page 11 of the PDF.

Do you recall making reports to the SEA Committee

Page 253

regarding the Dimock COSA in 2010?

A    Yes, sir.

Q    If you go down a couple paragraphs to the one that starts with "Consequently," do you see there's a description of a meeting with the DEP's Eastern District on August 1st of 2017?

A    Yes, sir.

Q    I believe you may have been asked some questions about this earlier.

Do you see in the third sentence of that paragraph it says, "While they," being the Department, "concur that the majority of the residents have returned to baseline conditions, their current belief is that the data obtained to date only partially meets the requirements of the COSA and that additional quarterly sampling would be required."

Did I read that correctly?

A    Yes, sir.

Q    What did you write or present here with respect to the DEP's view regarding the sampling of the majority of residents?

MR. HELLER: Objection to form.

A    Can you ask me that question --

MR. STOKES: I can ask a simpler question.

Page 254

BY MR. STOKES:

Q    What did you mean by saying that the DEP concurred that the majority of residents have returned to baseline conditions?

A    That at that time mechanical remediation -- wellbore remediation or any other, it would have indicated that those -- any remedial activities has been successful so far. The resident data is trending favorably, and we just have to do additional sampling.

So there was no request for any type of additional mechanical integrity testing for anything else. It was, they were really adding water sampling testing requirements.

Q    At this stage was the Department asking for additional pressure buildup tests or PBUTs?

MR. HELLER: Objection to form.

A    They were requesting more sampling data.

BY MR. STOKES:

Q    At this time did they --

Did you state in this report that the Department was asking for PBUT tests --

MR. HELLER: Objection to form.

BY MR. STOKES:

Q    -- with respect to the Dimock COSA-related wells?

MR. HELLER: Objection to form.

Deposition of Gordon Ganaway                Delaware County Employees Retirement System v. Cabot Oil & Gas Corp., et al

CERTIFICATE

I, Gina Williams, Registered Professional Court Reporter, do certify that the above deposition was reported by me and that the foregoing transcript is a true and accurate record to the best of my knowledge, skills, and ability.

I further certify that I am not an employee of counsel or any of the parties, nor a relative or employee of any attorney or counsel connected with the action, nor financially interested in the action.

Subscribed and sworn to before me when taken this 6th day of September, 2023.

_Gina Williams_

GINA WILLIAMS, RPR, CRR