# Exhibit 5

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS

DELAWARE COUNTY EMPLOYEES RETIREMENT )
SYSTEM, Individually and on Behalf   )
of All Others Similarly Situated,    )
                                     )
        Plaintiff,                   )Civil Action No.
                                     )4:21-cv-02045
vs.                                  )
                                     )
CABOT OIL & GAS CORPORATION, et al., )
                                     )
        Defendants.                  )

*********************************
REMOTE VIDEOTAPED DEPOSITION OF
KENNETH JAMES KENNEDY
October 4, 2023
*********************************

        KENNETH JAMES KENNEDY, produced as a witness

    at the instance of the Plaintiff, was duly sworn

    and deposed in the above-styled and numbered cause

    on October 4, 2023, from 8:01 a.m. to

    3:32 p.m. CST, stenographically reported remotely,

    pursuant to the Federal Rules of Civil Procedure

    and the provisions stated on the record.


    Reported by:   Rebecca A. Graziano, CSR, RMR, CRR
                   Texas CSR 9306
                   California CSR 14407
                   Illinois CSR 084.004659

Deposition of Kenneth James Kennedy

Page 6

PROCEEDINGS

(On the record at 8:01 a.m. CST)

THE VIDEOGRAPHER:  We are now on the record.  Today's date is October 4th, 2023, and the time is 9:01 a.m. Eastern.

This is the recorded video deposition of Kenneth Kennedy being taken in the matter of Delaware County Employee Retirement System versus Cabot Oil & Gas Corporation, et al., in the United States District Court, Southern District of Texas, Civil Action Case Number 4:21-cv-02045.

My name is Andrew Whitner and I am the video specialist.  The court reporter today is Becky Graziano.  We are both from Everest Court Reporting.

All counsel appearing today will be noted on the stenographic record.

Will the court reporter please swear in the witness.

(Witness duly sworn.)

KENNETH JAMES KENNEDY, being first duly sworn, testified as follows:

Page 7

EXAMINATION

BY MR. LAVELLE:

Q    Good morning, Mr. Kennedy.

A    Good morning.

Q    We met off the record just a moment ago, but, again, my name is Kevin Lavelle.  I'm here from the firm Robbins Geller, and we represent the class in this action.  It's nice to meet you, and we very much appreciate you being here today.

Can you please state your full name for the record?

MS. IPPOLITO:  And, Mr. Lavelle, can I put the stipulation on the record first before you begin questioning?

MR. LAVELLE:  Please go ahead.

MS. IPPOLITO:  Thank you.

All parties have stipulated that all objections are reserved but for objections to the form and the privilege.

Do you agree to that, Mr. Lavelle?

MR. LAVELLE:  I agree.

MS. IPPOLITO:  And either Mr. Stokes or Ms. Barrette?

MR. STOKES:  I agree.

MS. IPPOLITO:  Thank you.

Page 8

BY MR. LAVELLE:

Q    Mr. Kennedy, can you please state your full name for the record?

A    Kenneth James Kennedy.

Q    And have you ever been deposed before?

A    Yes.

Q    How many times?

A    Three, I believe.

Q    And what were those three times that you were deposed?

A    For the Attorney General grand jury hearing, and I really don't recall the other two instances.  It was maybe five years ago.

Q    That's fair enough.

Were those other two instances -- other than the grand jury hearing, do you know if they were also grand jury testimony or in a civil action?

A    I believe they were a civil action.

Q    Okay.

A    It was not -- not the grand jury.

Q    Okay.  And the grand jury testimony that you gave, was that in person or was that a remote setting like today?

A    That was in person.

Page 9

Q    Okay.  So since it's been a while since the last time you provided testimony, I'll go over a few ground rules that we should try and bear in mind today.  Okay?

A    Okay.

Q    The first is, as we have been doing, not talking over one another, allowing me to finish the question before you begin your answer, and vice versa.  I'll do my best to wait to ask you another question until you've completed your answer.

Is that fair enough?

A    Fair enough.

Q    I'll also assume that you understood the question I asked unless you ask for clarification.  Sound fair?

A    Okay.  Sounds fair.

Q    And we'll take breaks around every hour.  If you need a break, please let me know.  Happy to accommodate that.  But if there's a question pending, I just ask that you finish answering the question before we take a break.  Is that okay with you?

A    That sounds fine.

MS. IPPOLITO:  And, Mr. Lavelle,

Deposition of Kenneth James Kennedy

Page 138

that were performed.

And to my knowledge, Matt Depue did not have a gas meter with him.

BY MR. LAVELLE:

Q     Mr. Depue did not have a gas meter with him at the time of these inspections?

A     To my recollection, no.

Q     But Cabot, more generally, in 2015, to your knowledge, had multigas meters?

MR. STOKES:  Objection; form.

THE WITNESS:  As far as I know, yes.  A lot of them were, you know, personal use type of meters for safety purposes, little clip-on meters that let you know when your oxygen level is down or an explosive environment exists.

BY MR. LAVELLE:

Q     And if you go down in your memo on Page 2, there is a "Summary of Findings" section.

Do you see that?

A     Yes.

Q     And the first finding there is:  "Out of the 30 wells inspected:  22 wells were found to have gas detected within the intermediate by surface casings or cemented annuli or Category I

Page 139

wells"?

A     Yes.

Q     And so the gas being detected in the intermediate by surface casing or cemented annuli in these 22 wells, did that suggest that additional evaluation was needed?

MR. STOKES:  Objection; form.

THE WITNESS:  No.  Because once a gas detection would be done, they'd check for flow.  If there was no flow, there was no further evaluation that was needed.  Because it's the flow of gas within a cemented annulus that is a violation with the Department that is a concern, not the mere presence.

BY MR. LAVELLE:

Q     And what is that understanding based on, that the flow of gas in a cemented annuli, but not the presence of gas in a cemented annuli, is a violation?

A     Mainly because the annular vent extension from the annulus, the 2-inch pipe that comes up, can be 3 to sometimes 4 feet tall, vertical.  And unless you take that whole 4-inch pipe off at a 90 fitting that is facing sideways, that gas can

Page 140

remain in there stagnant for quite a while, where there -- there really needs to be a flow present to show that gas is moving through that cemented annulus.

And the mere presence of gas that is sitting on top of the cement of that casing that may have been introduced to that standpipe that didn't have anywhere to vent off could have been the result of back venting from the vent manifolds that were tied into a vent tank.

They do have check valves in place, mainly for -- to stop liquids from coming out of the annular spaces.  However, those check valves need to have some kind of pressure against that flapper on the check valve to make them seal.

If they're in the vertical position with no pressure on them, remnant gas with no pressure that may be coming out of a -- the backside of a production casing with the cement top left down below the intermediate casing may be back venting over to one of those cemented annulus.

Q     And as an oil and gas inspector, is it your job to determine whether the presence of gas in a cemented annuli is a violation of Department

Page 141

regulations and rules?

MR. STOKES:  Objection; form.

MS. IPPOLITO:  Objection to the form.

THE WITNESS:  In my opinion, no.  The regulation states flow of gas within that cemented annulus.  Not presence; flow.

BY MR. LAVELLE:

Q     And which specific regulation are you referring to?

A     78a.85(a)(5).

Q     And as an oil and gas inspector, was it your job or someone else's job at the DEP to interpret whether the results of an oil and gas inspection resulted in a violation of the DEP rules and regulations?

MS. IPPOLITO:  Objection to the form.

MR. STOKES:  Objection; form.

THE WITNESS:  Can I answer the question?

MS. IPPOLITO:  Yeah.

BY MR. LAVELLE:

Q     Yes.

Deposition of Kenneth James Kennedy                    Delaware County Employees Retirement System v. Cabot Oil & Gas Corp., et al

Page 142

A    Okay.  In this particular case -- again, as I remember it, when these inspections were being done, there was not an oil and gas supervisor in place.

So I do recall having a conversation with Marc Cooley at the time and Jennifer Means that, in my opinion, since there was already a CO&A existing with all these wells, and Cabot was complying to the requests that we had to evaluate these wells and, in turn, fully assess them and the ones that need remediation, to do that remediation work, it was my suggestion that we not cite violations on these wells.

Q    And -- and who was responsible for making the final determination regarding whether violations of DEP rules and regulations occurred?

MS. IPPOLITO:  Objection to the form.

MR. STOKES:  Objection; form.

THE WITNESS:  At the time, I believe it was Marc Cooley.

BY MR. LAVELLE:

Q    And so as an oil and gas inspector, you would make -- or you could make recommendations, but the file determination regarding whether the

Page 143

results of an inspection resulted in violations of DEP rules and regulations was up to Marc Cooley?

MS. IPPOLITO:  Objection to the form.

MR. STOKES:  Objection; form.

THE WITNESS:  Sorry.  Could you repeat that question?

BY MR. LAVELLE:

Q    Yeah.  Let me reask it.

As an oil and gas inspector, you could make recommendations, but the final determination regarding whether the results of an inspection resulted in violations of DEP rules and regulations was up to somebody else in DEP?

MS. IPPOLITO:  Objection to the form.

THE WITNESS:  Yes.

BY MR. LAVELLE:

Q    And --

A    I had -- I had input, but I didn't have final say on it.  I highly recommended that we do not do violations to keep Cabot involved in correcting these defects that were eventually further assessed, and where remediation was needed to be done, it was done.

Page 144

I'm jumping ahead there a little.

Q    And the person, though, during this time, 2015, that had that final determination, to your knowledge, was Mr. Cooley?

MR. STOKES:  Objection; form.

THE WITNESS:  To my knowledge, yes.

BY MR. LAVELLE:

Q    Would Ms. Means also be involved in that final determination?

MR. STOKES:  Objection; form.

MS. IPPOLITO:  Objection to form.

THE WITNESS:  I -- I don't know that.

BY MR. LAVELLE:

Q    And as a result of this reassessment that you conducted in 2015 in the memo that we're discussing, you recommended further evaluation at 11 priority gas wells; is that right?

MR. STOKES:  Objection; form.

BY MR. LAVELLE:

Q    Well, let me --

MS. IPPOLITO:  Are you referencing something in the document?

MR. LAVELLE:  Yeah.  Let me -- let me ask it differently.

Page 145

BY MR. LAVELLE:

Q    On Page 3 of this document, under "Further Analysis," the first paragraph states:  "As a result of this evaluation, I recommend that 11 of the 30 Category I and II gas wells be prioritized for further evaluation and potential remediation."

Do you see that?

A    Yes.

Q    And I read that correctly?

A    Yes.

Q    Okay.  And so that's what you recommended in this memo; correct?

A    Correct.

Q    And that recommendation was based off of the results of the inspections that you conducted between May 6th and 12th, 2015, at those 30 wells; correct?

A    Yes.

Q    In the "Summary of Findings" section of this document on Page 3, you note:  "22 wells, six of which are two-string designs," at the very top.

A    Where are you at now?

Q    The top of Page 3.

"Of these 22 wells, six are two-string designs."

Deposition of Kenneth James Kennedy

Page 230

MR. LAVELLE:  Objection to the form.

BY MR. STOKES:

Q    Did I read that correctly?

A    Yes, you did.

MR. LAVELLE:  Objection to the form.

BY MR. STOKES:

Q    And then the next paragraph says:  "On May 6 through 12, 2015, the Department and Cabot conducted further inspections of Cabot gas wells, including some of the Dimock/Carter Road gas wells listed in Exhibit B of the 2010 agreement."

A    Yes, that's correct.

Q    And there's no assertion that -- in this section of the June 11th, 2018, letter that Cabot failed to perform any required actions between 2011 and 2015; correct?

MR. LAVELLE:  Objection to the form.

MS. IPPOLITO:  Objection to the form.

THE WITNESS:  Not in this section of the document, no.

Page 231

BY MR. STOKES:

Q    And then...

A    If there is a question, I did not hear that.

Q    No, I -- there's no question.  I apologize.  I'm trying to cut a few things.

And then on Page 6, there's a paragraph -- the first full paragraph that starts with:  "Based on the information obtained to date, including from the May 6 through 12, 2015, inspections, further information from, testing by, and/or corrective actions by Cabot are necessary before a final determination can be made as to whether the Cabot gas -- the Cabot wells with natural gas in their annular spaces comply with 25 Pennsylvania Code Chapter 78a, and the 2010 agreement."

Did I read that correctly?

A    Yes.

Q    And so at the time of this letter, in June of 2018, the Department had not yet made a final determination as to whether the Cabot wells referenced in this letter comply with Chapter 78 and the 2010 agreement; correct?

MR. LAVELLE:  Objection to the

Page 232

form.

THE WITNESS:  Correct.

BY MR. STOKES:

Q    And by the way, the 2018 -- this section on pressure -- "Gas Well Pressure Testing" on Pages 5 to 6 of the June 11th, 2018, letter, it doesn't say that Cabot, at any point, was required to perform a pressure buildup test or any other type of test and failed to perform that test; correct?

MS. IPPOLITO:  Objection to the form.

MR. LAVELLE:  Objection to the form.

THE WITNESS:  Correct.

BY MR. STOKES:

Q    And -- and the June 11th, 2018, letter does not say that the Department intends to pursue an enforcement order or penalties with respect to the wells that are mentioned in the letter; correct?

MR. LAVELLE:  Objection to the form.

THE WITNESS:  I did not see any reference to that.

Page 233

MR. STOKES:  If we could turn to Exhibit 235 that was marked earlier today.  This is the April 25th, 2019, letter from the Department to Mr. Stalnaker at Cabot.

THE VIDEOGRAPHER:  Did you mean 253?

MR. STOKES:  I have it as 235.  Can you scroll up?  This is -- this is 53.

No, I'm on to a different document now.

MR. LAVELLE:  Which document are we on?

MR. STOKES:  235.  It was shown earlier today.

THE VIDEOGRAPHER:  Oh, got it.  Sorry about that.

MR. STOKES:  No problem.

BY MR. STOKES:

Q    And if you could scroll to the top of Exhibit 235.  Again, this is a letter from the Department to Mr. Stalnaker at Cabot dated April 25th, 2019, and it's in further response to -- to a prior letter from Cabot relating to the 2010 consent order that was referenced in the June 2018 letter as well; correct?

Page 234

A    Correct.

Q    And it deals with the same -- it's the same universe of wells, I believe, that are the subject of this letter that were the subject of the June 2018 letter.  Is that fair to say?

MR. LAVELLE:  Objection to the form.

THE WITNESS:  Yes.  I don't believe there were any additional wells added to this.

BY MR. STOKES:

Q    If you could just scroll -- or turn to the -- to Page 6 of the document.  And I'll -- I'm just going to look at the last paragraph.

Do you see the last paragraph right before the signature line in the April 25th, 2019, letter that starts with:  "Please provide an updated remedial action schedule for the priority gas wells"?

A    Yes, I do.

Q    And then do you see four lines down, it says:  "No further response beyond the updated remedial plan is needed at this time.  We look forward to Cabot's continued cooperation in working through the remaining obligations of the

Page 235

2010 agreement."

Did I read that correctly?

A    Yes.

Q    And that message was conveyed by the Department to Cabot on April 25th of 2019; correct?

MR. LAVELLE:  Objection to the form.

THE WITNESS:  Yes.

BY MR. STOKES:

Q    And, again, nothing in the April 25th, 2019, letter states that the Department intends to seek penalties or enforcement relief as to the wells discussed in this letter; correct?

MR. LAVELLE:  Objection to the form.

MS. IPPOLITO:  Objection to the form.

THE WITNESS:  Correct.

MR. STOKES:  We can pull up Tab D15 and mark that as the next exhibit.  This is a spreadsheet.

This is Exhibit 256?

THE VIDEOGRAPHER:  256.

(Kennedy Exhibit 256 marked.)

Page 236

BY MR. STOKES:

Q    I will represent to you that Exhibit 256 is a compilation of some public data from the Pennsylvania DEP database with respect to notices of violations.

You testified earlier, I think, that you were involved with approximately 100 gas migration investigations.  Is that -- do I recall that correctly?

A    Yes.  That was a ballpark number of investigations, not actual determinations over the time I've been with the EP from 2011.

Q    Fair enough.

And I believe you also testified this morning that there was -- that there were some staffing shortages at the Department prior to 2015 that may have impacted the status of gas migration investigations; is that correct?

MR. LAVELLE:  Objection to the form.

THE WITNESS:  I don't think I specified that it had an impact on the gas migration investigations.  I was referring mainly to the downtime that -- in between these wells being checked by Doug Welsh

Page 237

prior, and then revisiting the wells in this particular migration case.

BY MR. STOKES:

Q    And so you're referring to the gap between 2011 when Mr. Welsh prepared the letter that's referenced in -- in your memo and in the June 11th, 2018, letter -- the gap between 2011 and then the reassessment that you did in 2015?

A    Correct.

Q    Were you involved with gas migration investigations involving other operators besides Cabot?

A    Yes.

Q    And are you aware that the Department issued notices of violation to other operators between 2010 and 2022, besides Cabot, for gas migration-related issues?

A    Yes.

Q    For example, do you see Chesapeake Appalachia?

MR. LAVELLE:  Objection to the form.

THE WITNESS:  Yes.

MS. IPPOLITO:  Are you referring to -- can you just make it clear on the

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS

DELAWARE COUNTY EMPLOYEES RETIREMENT )
SYSTEM, Individually and on Behalf   )
of All Others Similarly Situated,    )
                                     )
         Plaintiff,                  )Civil Action No.
                                     )4:21-cv-02045
vs.                                  )
                                     )
CABOT OIL & GAS CORPORATION, et al., )
                                     )
         Defendants.                 )

REPORTER'S CERTIFICATION
REMOTE VIDEOTAPED DEPOSITION OF
KENNETH JAMES KENNEDY
October 4, 2023

         I, Rebecca A. Graziano, Certified Shorthand

Reporter in and for the States of Texas,

California, and Illinois, hereby certify to the

following:

         That the witness, KENNETH JAMES KENNEDY, was

duly sworn and that the transcript of the oral

deposition is a true record of the testimony given

by the witness;

         I further certify that pursuant to FRCP Rule

30(f)(1) that the signature of the deponent:

         ____ was requested by the deponent or a

party before the completion of the deposition and

returned within 30 days from date of receipt of

the transcript.  If returned, the attached Changes

Deposition of Kenneth James Kennedy

Delaware County Employees Retirement System v. Cabot Oil & Gas Corp., et al

and Signature Page contains any changes and the reasons therefor.

_____ was not requested by the deponent or a party before the completion of the deposition.

I further certify that I am neither attorney nor counsel for, related to, nor employed by any of the parties to the action in which this testimony was taken.

Further, I am not a relative or employee of any attorney of record in this cause, nor do I have a financial interest in the action.

Certified on October 11, 2023

_____
Rebecca A. Graziano, CSR, RMR, CRR
Texas CSR 9306
Expiration:  07/31/24
California CSR 14407
Expiration:  09/30/24
Illinois CSR 084.004659
Expiration:  05/31/25