# Exhibit 6

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS

Civil Action No. 4:21-cv-02045

DELAWARE COUNTY EMPLOYEES RETIREMENT
SYSTEM, Individually and on behalf
of all others similarly situated,

        Plaintiffs,

v.

CABOT OIL & GAS CORPORATION, et al.,

        Defendants.

_____

*************************************

REMOTE VIDEO DEPOSITION OF MICHAEL SETH PELEPKO

October 10, 2023

*************************************

REMOTE VIDEO DEPOSITION OF MICHAEL SETH PELEPKO taken via Zoom in the above-styled and numbered cause on October 10, 2023, commencing at 9:02 a.m. Eastern Time before Gina Williams, Registered Professional Reporter, Certified Realtime Reporter, and Certified Realtime Captioner.

Deposition of Michael Seth Pelepko

Page 5

VIDEOGRAPHER:  We are now on the record.  Today's date is October 10, 2023, and the time is 9:02 a.m. Eastern.

This is the recorded video deposition of Michael Seth Pelepko in the matter of Delaware County Employees Retirement System v. Cabot Oil & Gas Corporation., et al. in the United States District Court, Southern District of Texas, Civil Action No. 4:21-cv-02045.

My name is Alex Held, and I am the video specialist.  The court reporter today is Gina Williams. We are both from Everest Court Reporting.

All counsel appearing today will be noted on the stenographic record.

Will the court reporter please swear in the witness.

- - - -

WHEREUPON,

MICHAEL SETH PELEPKO

was called as a witness and, after having been first duly sworn, was deposed and testified as follows:

EXAMINATION

BY MR. HELLER:

Q    Good morning, Mr. Pelepko.
My name is Alex Heller from Kessler Topaz.
Could you please state your full name for the

Page 6

record?

A    Michael Seth Pelepko.

Q    Do you understand that you're testifying under the same oath today as if you were in a courtroom testifying in front of a jury?

A    I do.

Q    Do you understand that your testimony may be shown to a jury?

A    I do.

Q    Is there anything that would prevent you from thinking clearly and testifying truthfully today?

A    No.

Q    I'm going to assume that you understand the questions that I've asked unless you ask for clarification.
Is that okay?

A    Yes.

Q    If you need a break, just let me know.  I only ask, if a question is pending, you finish your answer.
Is that okay?

A    Yes.

Q    We'll try to take a break every hour or so or whenever you want.
The corporate defendant in this case is Coterra Energy, Inc., formerly known as Cabot Oil & Gas.
For ease of reference today, I'm going to refer

Page 7

to the company as "Cabot" throughout this deposition.
Do you understand that?

A    Yes.

Q    Mr. Pelepko, where are you located today?

A    Lancaster, Pennsylvania.

Q    Have you ever been deposed before?

A    Yes.

Q    How many times?

A    Twice.

Q    What types of cases were those?

A    One was related to a rule-making that I was involved with that the agency I was working for at the time was advancing the Pennsylvania Department of Environmental Protection, and the other one was related to UIC underground injection control well permit that the Department of Environmental Protection was responsible for reviewing and issuing.

Q    So both of those depositions were in your capacity with the Pennsylvania Department of Environmental Protection; is that correct?

A    Yes.  Yes.

Q    Can you please describe your educational background?

A    I attended the Pennsylvania State University for my undergraduate degree, which was in earth sciences with

Page 8

minors in geosciences and geography, and I graduated bachelor of science, earth science, in 1998.

And I went back to school after I was working professional to pursue my master's of science in geology at the University of Delaware and defended my master's thesis in fall of 2013 -- yes, 2013.

I started that program initially, I believe it was 2008 was my first semester back there at University of Delaware.

Q    What was the topic of your master's thesis?

A    I looked at construction aggregates, limestones, dolomites, generally referred to as carbonates, and I looked at engineering properties that would affect how they would impart friction when used on roadways.

Q    Do you have any certifications?

A    I am a licensed professional geologist in the Commonwealth of Pennsylvania.
That's my only certification I can think of that I have right now.

Q    How do you obtain the licensed professional geologist certification?

A    I specifically took an exam to receive my license in the Commonwealth.

Q    Do you recall what year you took that exam when you were licensed?

Page 177

demonstrated; correct?

A    Correct.

Q    So it was anticipated that once those returned to background, that closure letters would be issued to those landowners as well -- or for those landowners as well; correct?

MR. HELLER:  Objection to form.

A    If the COSA conditions were satisfied that a background determination could be made, yes.

BY MR. STOKES:

Q    The last bullet point there's a reference to gas well integrity assessments.

There's no specific reference on this slide to pressure buildup tests; correct?

A    That's correct.  I don't see any reference to pressure buildup tests.

Q    And you don't have a specific --

Strike that.

You don't have a specific recollection, sitting here today, that pressure buildup tests were specifically discussed at this meeting; correct?

MR. HELLER:  Objection to form.

A    I don't remember if they were discussed or not.

I thought --

Can we scroll back to the --

Page 178

BY MR. STOKES:

Q    Let me rephrase that because I think there are some discussions of previously done pressure buildup tests in this presentation.

I'll rephrase the question.

You can't recall, sitting here today, if there was any discussion about future pressure buildup tests being conducted; correct?

MR. HELLER:  Objection to form.

A    Yeah, I don't recall if there was a specific discussion to conduct those at certain wells.

There was some sort of message conveyed that DEP was not satisfied with the integrity assessments conducted to date, that further assessments should begin, as this slide suggests.

BY MR. STOKES:

Q    You can't recall, sitting here today, any specific instance where the Department requested Cabot to do a pressure buildup test and Cabot refused to do it; correct?

MR. HELLER:  Objection to form.

A    I don't recall personally requesting that and having them -- having Cabot refuse to conduct that analysis.

I had not really been managing the field application or field management of the wells because.

I looked at data gathered at the wells, but a lot

Page 179

of those recommendations, while I was working, were made by our oil and gas inspectors.  That was sort of their jurisdiction, if you will, from an investigative standpoint.

BY MR. STOKES:

Q    Are you referring to Ken Kennedy, the oil and gas inspector?

A    Ken Kennedy would have been involved, yes, correct.

(Exhibit 247 was previously marked for identification.)

BY MR. HELLER:

Q    If we could please pull up Exhibit 247 that was marked previously.

I'll represent to you other witnesses at the Department identified this as another presentation that I believe you provided.

Can you take a look and just see if this --

Do you recognize this?

A    Yes, it looks familiar.

Q    Is this a document that you prepared?

A    I believe it --

Yes, I believe it was a document that I prepared.

Q    And did you prepare this in the course of your ordinary duties working for the Department?

A    Yes.

Page 180

Q    Is this an ordinary business record of the Department?

MR. DUTILL:  Objection.  If you know how to answer that question, Seth.

A    I'm trying to think about that.

There were --

There are provisions in the regs and the law that protect some documents that are considered associated with investigation work.

So I am not --

I can't give you a legal interpretation of this, but this was an ongoing investigation.  So I don't really know how to answer that.  I don't know that I can answer that with my expertise.

BY MR. STOKES:

Q    This is something you created and maintained as an employee of the Department as part of your ordinary duties working for the Department; correct?

A    It would --

Yes, I did --

I'm certain that I prepared this while I was working for DEP in the oil and gas program.

Q    Do you recall what "CO" means in the first bullet point?

A    That's Central Office.

Deposition of Michael Seth Pelepko

Page 181

Q    And do you see where it says, "CO staff determined Cabot's data should be independently assessed due to the contentious high-profile nature of the Dimock stray gas investigation"?

A    Yes.

Q    Is that something that you wrote as part of this presentation?

A    Yes.  I would agree, yes.

Q    And do you recall presenting this presentation during the meeting with Cabot?

MR. HELLER:  Objection to form.

A    I think that's probably the case, yes.

BY MR. STOKES:

Q    If we can go to Slide 18.  It should say, "Water Well Trends" at the top.

A    Yes.

Q    You wrote that "Statistical analysis suggests correspondence between workover and cementing activities at Ely 2, 4 and 6H-SE and Teel 6 and reductions in dissolved phase methane concentrations at residential water supplies."

Did you present that conclusion to Cabot?

A    Yes.

Q    Did you also present the conclusion to Cabot that "Improving conditions are believed to be attributable to multiple actions, including primary and remedial cementing

Page 182

activities and a change in the standard operating procedures regarding venting versus shutting in annular spaces implemented in the fall of 2009"?

A    Yes.

Q    If we can shift to Slide 43, do you see there's a slide that says, "Defining background methane in Dimock," and the first conclusion is, "Unable to develop statistically robust model for predicting background methane concentrations"?

A    Yes.

Q    Did you convey to Cabot in this presentation that the Department was unable to develop a statistically robust model for predicting background methane concentrations?

A    Yes, I believe that would be the case, as stated.

Q    If we could please turn to Slide 52, do you see the last bullet point says, "Significant lag time exists between conclusion of workover and water supply responses"?

A    Yes.

Q    Did you present to Cabot that a significant lag time may exist between conclusion of workover and water supply responses?

A    Yes.

Q    Is that consistent with your testimony earlier today that there could be situations where a successful remediation would be done on the well, and yet it could take

Page 183

a significant amount of time to see the methane and groundwater fully dissipate?

MR. HELLER:  Objection to form.

A    It is consistent with that.  We'd be talking about dissolved-phase methane in this context.

BY MR. STOKES:

Q    If we could please turn to Slide 56, this is a slide that says, "Future Remedial Activities."

Did you convey to Cabot in this presentation that "Steadily declining annular pressures and significant workover activities have reduced risks"?

A    Yes.

Q    And did you also convey to Cabot in this presentation that water quality continues to improve?

A    Yes.

Q    You can put this exhibit to the side.

Is it your position that thermogenic gas can only be reached by drilling down into the earth with complex industrial machinery?

MR. HELLER:  Objection to form.

A    No.

BY MR. STOKES:

Q    That's because thermogenic gas exists as naturally occurring methane in the groundwater in Susquehanna County; correct?

Page 184

MR. HELLER:  Objection to form.

A    Thermogenic gas has been identified in shallower sequences in the subsurface.  Yes, I believe that's been documented.

BY MR. STOKES:

Q    And thermogenic gas has also been documented as part of the pre-drill methane that existed prior to oil and gas drilling activities in Northeastern Pennsylvania; correct?

MR. HELLER:  Objection to form.

A    There have been instances where it's been documented, that's correct.  Yes.

BY MR. STOKES:

Q    For example, Salt Springs Park is located in -- it's in Susquehanna County; correct?

A    Yes.

Q    And there's a spring there that is -- that has thermogenic methane at the surface; correct?

MR. HELLER:  Objection to form.

A    I believe that's correct.

MR. STOKES:  If we could turn --

Let's pull up Slide 30.  What's our next exhibit number?

VIDEOGRAPHER:  Counsel, you said Slide 30.  Do you mean Tab 30?

Page 185

MR. STOKES: Tab 30, correct. Sorry about that.

VIDEOGRAPHER: And this will be Exhibit 266.

(Exhibit 266 was marked for identification.)

BY MR. STOKES:

Q    Mr. Pelepko, this is an article --

I'm sorry.

This is Exhibit 266, and it's an article by Lisa Molofsky and others entitled "Environmental Factors Associated With Natural Methane Occurrence In the Appalachian Basin."

The first sentence under the introduction paragraph near the bottom of the first page says, "The historical occurrence of methane in residential water wells in part of the Appalachian Basin, Pennsylvania, New York, West Virginia has long been recognized as a natural phenomenon."

Do you agree with that sentence?

A    I agree, yes.

Q    One of the first citations is from an article from 1873, which is approximately 150 years ago.

Do you agree that there have been reports of significant amounts of methane in the water supply of Northeastern Pennsylvania since the 1800s?

MR. HELLER: Objection to form.

A    I'm not sure --

Page 186

"Significant" is the term I'm having --

I'm not sure how you're defining "significant."

BY MR. STOKES:

Q    Enough to create flammability?

MR. HELLER: Objection to form.

A    I believe there have been limited observations of that, correct.

BY MR. STOKES:

Q    For over 100 years, correct?

MR. HELLER: Objection to form.

A    I don't know the timeline when the first concentration that could have resulted in a combustible environment. I don't know the timeline there.

There have been documented occurrences of methane in this part of the state.

BY MR. STOKES:

Q    And those occurrences of methane and water catching on fire because of methane, those happened long before oil and gas drilling activities in Susquehanna County; correct?

A    They would have occurred before shale gas development. There has been some limited development. I don't know if it's Susquehanna County, but some limited oil and gas development as part of the state historically.

The Sullivan County report talks a little bit

Page 187

about that, that I had mentioned earlier in my testimony.

MR. STOKES: If we could pull up Tab 31 and mark it as Exhibit 267.

(Exhibit 267 was marked for identification.)

BY MR. STOKES:

Q    Exhibit 267 is another article by Lisa Molofsky and others called "Evaluation of Methane Sources in Groundwater in Northeastern Pennsylvania."

The first sentence of the abstract says, "Testing of 1,701 water wells in Northeastern Pennsylvania shows that methane is ubiquitous in groundwater."

Will you agree that methane is ubiquitous in groundwater in Northeastern Pennsylvania?

MR. HELLER: Objection to form.

A    I believe --

Yes, I believe it's not uncommon to find certain concentrations of methane in groundwater in this part of the state.

BY MR. STOKES:

Q    The abstract also says, "In addition, our assessment of isotopic and molecular analyses of hydrocarbon gases in the Dimock Township suggests that gases present in local water wells are most consistent with Middle and Upper Devonian gases sampled in the annular spaces of local gas wells as opposed to Marcellus production gas."

Page 188

You agree that Middle -- thermogenic gas from Middle and Upper Devonian -- from those spaces has been found in pre-drill methane in Dimock Township; correct?

MR. HELLER: Objection to form.

A    I believe there have been, yes, occurrences of gas consistent with those formations.

BY MR. STOKES:

Q    And that is thermogenic gas, correct?

A    Correct.

Q    And those --

That gas was in the groundwater in Susquehanna County prior to any drilling activity by Cabot; correct?

MR. HELLER: Objection to form.

A    Thermogenic --

I think you have to be careful there because thermogenic is a pretty -- if you recall back to the crossplots, it's a big zone of those crossplots.

You know, my experience, there are different areas where you might see points plotting within that zone. So it's not safe to say that, you know, across the board that all the thermogenic gas was present before shale development.

BY MR. STOKES:

Q    If you can turn to page 346 of Exhibit 267, I want to focus your attention to the bottom paragraph on the

Deposition of Michael Seth Pelepko

Page 189

right side of the page.

There's a sentence that says, "The significant history of gas production from the Lock Haven and to a lesser extent the Catskill Formation in Northeastern Pennsylvania suggests that methane naturally present in many Susquehanna water wells contains thermogenic components from the Catskill and Lock Haven Formations."

You don't disagree with that sentence; correct?

MR. HELLER:  Objection to form.

A    I don't --

In general, no, I don't disagree with that statement.

BY MR. STOKES:

Q    You would agree that just because gas is thermogenic doesn't necessarily mean that it migrated from a gas well; correct?

A    Yes, I agree with that.

MR. HELLER:  If we can pull up Exhibit --

I'm sorry.  If we can now pull up Tab 32.

(Exhibit 268 was marked for identification.)

MR. HELLER:  Exhibit 32 --

Let's mark this as Exhibit 268.

VIDEOGRAPHER:  One moment.  It's loading.

BY MR. STOKES:

Q    Exhibit 268 is a slide that I found through an

Page 190

online search.  It's titled, "The Application Of 3-D Modeling to Differentiate Between Naturally Occurring Methane and Methane Migration Associated with Natural Gas Development," and it lists you as one of the two co-authors of this document.

Do you recall helping to prepare this document?

A    Yes.

Q    And is this a slide that the Pennsylvania Department made accessible online for purposes of educating people in the industry?

A    I believe we must have at some point, yes.

Q    I'd like to focus your attention to the paragraph right above the chart at the bottom left-hand side of the document, that one right there.

You wrote in this presentation --

Strike that.

You wrote in this publicly available slide that "As exploration and production activities in the region progressed in the more recent years, much effort has been focused on thorough characterization of the shallow subsurface and groundwater sampling.  This has revealed in some cases that background thermogenic methane coincident with the fresh groundwater-bearing zone is not entirely unexpected."

Did I read that correctly?

Page 191

A    Yes.

Q    And you wrote that in your capacity as an employee of the Department of Environmental Protection; correct?

A    Yes.

Q    You also wrote, "Such an observation confounds water supply complaint investigations received following the commencement of nearby gas well drilling, oftentimes adding a layer of complexity when attempting to differentiate between the background condition and departures from that baseline."

Did I read that correctly?

A    Yes.

Q    That's something you also wrote as part of this presentation; correct?

A    Yes.  Correct.

Q    You used the word "confounds."

You said that the fact that thermogenic methane -- this and the fresh groundwater-bearing zone confounds water supply complaint.

Do you mean by "confounds" that it adds complexity and makes the investigation more difficult?

MR. HELLER:  Objection to form.

A    Yes, the implication, if I recall, it goes back to you can't rely on one piece of information all the time

Page 192

in these investigations.  That's too simplistic of an approach.

BY MR. STOKES:

Q    Do you recall if you testified to the Grand Jury that the mere fact that gas is thermogenic doesn't necessarily mean that it came from oil and gas drilling activities or production activities?

MR. DUTILL:  I'm going to object, Counsel, to your question as to what he testified to as to the Grand Jury specifically.

You can ask him if it's true or if he believes it, but I don't want him testifying to what he said to the Grand Jury.

BY MR. STOKES:

Q    And are you taking your advice of counsel not to answer?

A    Yes.

MR. STOKES:  Can we pull up Tab 33 and mark it as Exhibit 268 (sic).

MR. DUTILL:  I think you marked the last Exhibit 268.

MR. STOKES:  Yeah, thanks a lot.  Let's mark it 269.

(Exhibit 269 was marked for identification.)

Deposition of Michael Seth Pelepko

Page 193

VIDEOGRAPHER:  One moment, please.

BY MR. STOKES:

Q    By the way, are you familiar with something called the Baldassare protocol?

MR. HELLER:  Objection to form.

A    No.

I know the name, but I don't know what that refers to.

BY MR. STOKES:

Q    Do you recall or have you ever read any articles or publications by a Mr. Baldassare -- Baldassare?

Sorry.

A    If it's --

Q    I'm sorry.

Have you read any of Mr. Baldassare's publications regarding methane identification or migration?

A    Yes.

MR. HELLER:  Objection to form.

BY MR. STOKES:

Q    Let's look at Exhibit 269.

This is an affidavit by Norma McNeal, a resident of Montrose, Pennsylvania.

Do you see how she writes that as a teenager in the 1950s it was a morning ritual for students to try to be first into the high school, which was the top floor of the

Page 194

building, and light with fire the first draw of water from the water fountain to create a momentary flame?

A    Yes.

Q    Is this consistent with the reports of flammability of water due to methane that existed in Northeastern Pennsylvania prior to oil and gas drilling activities?

MR. HELLER:  Objection to form.

A    It suggests that there could be background methane at a high enough level in certain cases to be ignitable.

BY MR. STOKES:

Q    And to be ignitable?

A    Yes.

MR. STOKES:  And if we could look at --

If we could pull up Tab 34 and mark it as Exhibit 270.

(Exhibit 270 was marked for identification.)

BY MR. STOKES:

Q    Exhibit 270 is another affidavit by a resident named Mildred Green who resided in Elk Lake, Pennsylvania, and in paragraphs 5 and 6 she describes how, after noticing bubbles in the water, her husband and son-in-law would entertain themselves and others by filling a milk jug with tap water from their sink, placing a lid on it, shaking it

Page 195

up, and lighting it after removing the cap, and this action would create a momentary flame about 6 inches long.

Is this account also consistent with the accounts you're aware of, of enough methane being in the water before oil and gas activities to cause ignitability?

MR. HELLER:  Objection to form.

A    It appears consistent with that.

BY MR. STOKES:

Q    You have no reason to doubt the accounts in Exhibit 269 and 270; right?

A    No.

MR. STOKES:  If we could pull up Exhibit -- or Tab 35.

Let's mark this Exhibit 271.

(Exhibit 271 was marked for identification.)

BY MR. STOKES:

Q    Exhibit 271 is affidavit by another resident in Hop Bottom, Pennsylvania named Martha Locey, and she writes and attests under oath that in the early 1960s her nephew took a sample of her water from the well at her home to Elk Lake High School, and his teacher opened the jar and lit it causing a momentary burst of flame.  The teacher explained there was methane in much of the local water well -- well water.

Again, is that consistent with your recollection

Page 196

that there was -- there were instances of enough methane located in the groundwater of Northeastern Pennsylvania prior to any drilling activities or production activities that caused ignitability?

A    Yes.

MR. HELLER:  Objection to form.

A    Yes, it's consistent with that.

BY MR. STOKES:

Q    And you're aware Michael O'Donnell testified the Department took into account or considers anecdotal evidence from residents as part of the investigations conducted; correct?

MR. HELLER:  Objection to form.

A    I don't know what testimony Michael provided.

BY MR. STOKES:

Q    Would you agree that there was no requirement prior to 2009 that oil and gas companies conduct pre-drill sampling for methane in Pennsylvania?

MR. HELLER:  Objection to form.

A    No, the pre-drill --

I mean, there's never been a requirement. It's -- it falls under the Oil and Gas Act as one way to rebut the presumption of guilt or causing an incident.

That's my understanding of the law.

CERTIFICATE

I, Gina Williams, Registered Professional Court Reporter, do certify that the above deposition was reported by me and that the foregoing transcript is a true and accurate record to the best of my knowledge, skills, and ability.

I further certify that I am not an employee of counsel or any of the parties, nor a relative or employee of any attorney or counsel connected with the action, nor financially interested in the action.

Subscribed and sworn to before me when taken this 10th day of October, 2023.

_Gina Williams_

GINA WILLIAMS, RPR, CRR