# Exhibit 7

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS

Civil Action No. 4:21-cv-02045

DELAWARE COUNTY EMPLOYEES RETIREMENT
SYSTEM, Individually and on behalf
of all others similarly situated,

        Plaintiffs,

v.

CABOT OIL & GAS CORPORATION, et al.,

        Defendants.

_____

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

REMOTE VIDEO DEPOSITION OF MICHAEL O'DONNELL

October 3, 2023

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

REMOTE VIDEO DEPOSITION OF MICHAEL O'DONNELL
taken via Zoom in the above-styled and numbered cause on
October 3, 2023, commencing at 9:04 a.m. Eastern Time before
Gina Williams, Registered Professional Reporter, Certified
Realtime Reporter, and Certified Realtime Captioner.

Deposition of Michael O'Donnell

Page 5

VIDEOGRAPHER:  We are now on the record.  Today's date is October 3, 2023, and the time is 9:04 a.m. Eastern.

This is the recorded video deposition of Michael O'Donnell taken in the matter of Delaware County Employees Retirement System v. Cabot Oil & Gas Corporation, et al. in the United States District Court, Southern District of Texas, Civil Action Number 4:21-cv-02045.

My name is Ken Amrhein from Everest Court Reporting, and I am the video specialist.

The court reporter today is Gina Williams, also from Everest Court Reporting.

All counsel appearing today will be noted on the stenographic record.

Will the court reporter please swear in the witness.

- - - -

MICHAEL O'DONNELL

was called as a witness and, after having been first duly sworn, was deposed and testified as follows:

EXAMINATION

BY MR. McCALL:

Q    Good morning, Mr. O'Donnell.

A    Good morning.

Page 6

Q    I know before we got started this morning I introduced myself, but let me do it again for purposes of the record.

I'm Jamie McCall.  I represent the class of Plaintiffs in the current litigation, okay?

A    Okay.

Q    Great.

Just some basic ground rules for our deposition this morning.  So I'm going to presume that you understand the questions that I have asked unless you tell me that you do not understand.

Fair enough?

A    Fair enough.

Q    Okay.  Is there anything that would prevent you from thinking clearly and testifying truthfully today?

A    No.

Q    Do you understand that you are testifying under the same oath today as if you were in a courtroom testifying in front of a jury?

A    I understand.

Q    If you need a break, please let me know.  We can take the break.  I would just ask that if a question is pending, we finish the answer, and then we can go to that break.

Fair enough?

Page 7

A    That's reasonable.

Q    Okay, great.

Could you just tell me briefly how you prepared for your deposition today?

MS. IPPOLITO:  Before you continue, I wanted to place on the record the situation with respect to the objections.

MR. McCALL:  Go ahead.

MS. IPPOLITO:  It's my understanding that all parties have stipulated that the objections are reserved but for privilege and to form?

MR. McCALL:  Yes.

Okay.  Is that all?

MS. IPPOLITO:  Yes.

BY MR. McCALL:

Q    I was asking, Mr. O'Donnell, if you could describe briefly how you prepared for your deposition this morning.

A    In terms of?

Q    Did you meet with counsel?

I don't need to know the substance of conversations, but did you meet with counsel?

Did you look at documents?

What did you do, sir?

A    Yes, I met with counsel.

Page 8

So I tried to make sure that I had all the Internet things working here.

I did not review many documents or any at this point.

Yeah, that's about it.

Q    Okay.  How many times did you meet with counsel in preparation?

A    Two or three times.

Q    And about how long were each of those sessions?

A    Maybe a half an hour each.

Q    Okay.  Could you tell me --

Just turning to your background now, could you tell me what your education is?

A    Yes.  I have a bachelor's degree in environmental resource management from Penn State.

Q    Okay.  I'm sorry.

A    No, and that's --

Education, that's it.

Q    Now, how long have you --

Well, strike that.

Who is your current employer?

A    Commonwealth of Pennsylvania DEP.

Q    What does "DEP" stand for?

A    The Department of Environmental Protection.

Q    And what is the mission of the DEP?

Deposition of Michael O'Donnell

Page 181

Mr. O'Donnell, do you see where it says on the Pennsylvania Department of Environmental Protection's website, "The extensive range of records DEP routinely provides access to for public inspection include notifications, inspection reports, notices of violation, enforcement orders, applications, permit review letters, sample results, remediation plans, progress reports, monitoring reports, permits, approvals, denials, public comments, civil penalty assessments, consent orders, closure reports, pollution prevention plans, monitoring well records, and external correspondence"?

Did I read that correctly?

A    I see that it says that.

Q    And has it been the Department's practice during your tenure and specifically during 2016 to 2020 that notices of violation, enforcement orders, consent orders, and civil penalty assessments and external correspondence are treated as public records?

A    That's my understanding, yes.

Q    And as public records, they are available for public inspection; correct?

A    Yes.

Q    And in fact, the DEP maintains a publicly accessible database on its website that contains information about notices of violations and inspections on gas wells in

Page 182

Pennsylvania; correct?

A    Yes.

Q    And that would include information about Cabot's gas wells during 2016 to 2020; correct?

A    Yes.

Q    And so if somebody wanted to get information about a notice of violation issued to Cabot during a particular time period or a consent order that was entered, they could look at the public database and access that information; correct?

MR. McCALL:  Objection to form.

A    So, I mean, there are certain things you can find on your own publicly but, as it says on this website, you can also request things.  They're all public information. Some are more readily accessible than others on the -- on kind of the electronic part of the database.

BY MR. STOKES:

Q    But if somebody is told, for example, that a notice of violation was issued to Cabot during a particular month, they could look up that particular month on the database or make a request to the DEP for the notices of violation issued during that month and obtain the records; correct?

A    Yes.

MR. STOKES:  If we could pull up Tab -- let's

Page 183

pull up Tab D4.  We'll mark this as Exhibit 242, if that's all right.

(Exhibit 242 was marked for identification.)

BY MR. STOKES:

Q    Mr. O'Donnell, we've put in front of you a September 19, 2011 Notice of Violation issued by the Department to Cabot pertaining to the Stalter well pad.

Have you seen this document before?

A    I'm just looking it over.

Q    Take your time.

A    I recognize it.

Q    And you would agree that this, along with other notices of violations, are public records and publicly accessible documents maintained by the Department; correct?

MR. McCALL:  Objection to form.

A    Yes.

BY MR. STOKES:

Q    If you could scroll down, please, to the paragraph on the third page at the bottom.

A    Further down?

Q    Further down, yes, please.  There it is.

Do you see the paragraph that says, "This Notice of Violation is neither an order nor any other final action of the Department of Environmental Protection.  It neither imposes nor waives any enforcement action available to the

Page 184

Department under any of its statutes.  If the Department determines that additional action is appropriate, you will be notified of when the Department takes that action."

Did I read that correctly?

A    Yes, that's what it says.

Q    And is this paragraph something that is commonly included in notices of violations issued by the Department?

A    Yes, it is.

Q    And this paragraph says that the notice of violation itself is not an order or a final action of the Department and doesn't impose or waive any enforcement action that might be available; is that correct?

MS. IPPILITO:  Objection to form.

A    That's correct.

BY MR. STOKES:

Q    It also says, if the Department determines that additional action is appropriate you, being the recipient of the notice, will be notified of when the Department takes that action; is that right?

A    That's what it says.

MR. STOKES:  If we could then turn to Tab D5, which we will mark as Exhibit 243.

(Exhibit 243 was marked for identification.)

BY MR. STOKES:

Q    This is a copy of the Consent Order that was

Page 185

entered with respect to the Stalter wells in December 30th -- on December 30th of 2016.

Are you familiar with this document?

A    I'm going to take a look through.

Q    Take your time.

A    I can say that first page I've not seen where the "AG" is referenced.

Q    How about the Consent Order itself?

A    That's what I'm reviewing now.

Q    Perfect, thanks a lot.

A    I've reviewed.

Q    Do you recognize this document as the Consent Order that was entered between Cabot and the Department on December 30, 2016 pertaining to the Stalter wells?

A    Yeah, excluding that first page.

Q    Fair enough.  Fair enough.

Starting on page 2 where it -- from page 2 on where it says, "Consent Order and Agreement," that portion you recognize as the Consent Order entered December 30, 2016 between Cabot and the Department with respect to the Stalter wells; correct?

A    Yes.

Q    If you could please turn to page 6.  I'm sorry. It's actually -- internal page 6.  If you could scroll down to the bottom where it says, "Corrective Action --

Page 186

Corrective Actions"?

A    Okay.  I see that.

Q    And this particular section of the Consent Order for the Stalter wells spells out the corrective actions that Cabot was required to undertake as a result of this order correct?

MS. IPPILITO:  Objection to form.

A    Yes.

BY MR. STOKES:

Q    And the corrective actions that are listed with respect to the Stalter wells include an acknowledgment that Cabot submitted and the Department then approved a plugging plan for the 8V gas well; is that correct?

A    That's what it says under A.

Q    And then under B it says that Cabot shall commence the plugging pursuant to the plugging plan for 8V within 30 days of the effective date.

Is that correct?

A    Yes, that's what it says.

Q    And then paragraph C says that Cabot is required to submit to the Department a certificate of plugging to memorialize that plugging was completed pursuant to A and B; is that correct?

A    That's what C says, yes.

Q    And there's no paragraph D.  That's the end of

Page 187

the "Corrective Actions" section; correct?

A    Yes.

Q    And then in paragraph 4 on the next page there's a description of a continuing obligation to provide temporary drinking water in paragraph A; is that correct?

A    Yes.  That's what paragraph A is referencing, yes.

Q    And then continued sampling and monitoring requirements in paragraph B on page 7; correct?

A    Yeah, sampling monitoring period is ii, so yes.

Q    And there's a reference to "background" in paragraph -- subparagraph 3 at the bottom of page 7.

Does "background" refer to the level of methane that would be expected to exist in the water absent any impact from gas wells?

MR. McCALL:  Objection, form.

MS. IPPILITO:  Form.

A    Background would be what we would expect for that methane to return to once we get to the end of a gas migration case that all -- any and all gas wells that are contributing have been addressed, and a water supply that was previously affected returns to a condition similar to what we saw in pre-drill, or if we don't have pre-drill, something that -- something where we can say that it's -- the gas is at background based on the data that's been

Page 188

collected.

BY MR. STOKES:

Q    And the benchmark that's included in this subparagraph 3 by the Department is that Cabot would need to show for eight consecutive quarters that 75 percent of the water samples taken from each landowner's water supply contains 7mg/L or less of dissolved methane and that no individual sample is double that standard?

A    Yeah, that's the typical standard that we apply, again, taken from the cleanups program, the 75 2X standard.

Q    Fair enough.

And you had previously testified that there was a history of pre-drill methane in Susquehanna County and in the Marcellus; is that correct?

A    In certain portions, yes.

Q    Do you know if in 2008 it was a common practice for gas operators in the Marcellus to test for pre-drill methane before commencing drilling activities?

MR. McCALL:  Objection to form.

A    Unfortunately there were a number of instances where operators did not include that in their pre-drill sampling suite.

BY MR. STOKES:

Q    Do you know, it was mobile operators?

MR. McCALL:  Objection to form.

Deposition of Michael O'Donnell                                        Delaware County Employees Retirement System v. Cabot Oil & Gas Corp., et al

CERTIFICATE

I, Gina Williams, Registered Professional Court Reporter, do certify that the above deposition was reported by me and that the foregoing transcript is a true and accurate record to the best of my knowledge, skills, and ability.

I further certify that I am not an employee of counsel or any of the parties, nor a relative or employee of any attorney or counsel connected with the action, nor financially interested in the action.

Subscribed and sworn to before me when taken this 3rd day of October, 2023.

_Gina Williams_

GINA WILLIAMS, RPR, CRR