IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

-----

DELAWARE COUNTY EMPLOYEES        )
RETIREMENT SYSTEM,               )    CIVIL ACTION
Individually and on behalf of    )
all other similarly situated,    )    NO. 4:21-cv-02045
                                 )
          Plaintiffs,            )
                                 )
          vs.                    )
                                 )
CABOT OIL & GAS CORPORATION,     )
et al.,                          )
                                 )
          Defendants.            )

-----

FRIDAY, OCTOBER 27, 2023
-----

VIDEOTAPED DEPOSITION OF EMILY MERCURIO, PH.D., a

witness herein, called for examination in the

above-styled and numbered cause, by and before

Dutcheen O. Cameron, a Registered Merit

Reporter-Certified Realtime Reporter and a Notary

Public in and for the Commonwealth of Pennsylvania,

at the offices of Buchanan Ingersoll & Rooney, PC,

Union Trust Building, 501 Grant Street, Suite 200,

Pittsburgh, PA 15219, on Friday, October 27, 2023,

at 9:33 a.m.

-----

Case 4:21-cv-02045    Document 190-8    Filed 11/13/23 in TXSD    Page 2 of 22
Deposition of Emily Mercurio, Ph.D.
Delaware County Employees Retirement System v. Cabot Oil & Gas Corp., et al

Page 6

COMMENCING -- 9:33 A.M.

THE VIDEOGRAPHER:  We are now on the record.  Today's date is October 27, 2023, and the time is 9:33 a.m.  This is the recorded video deposition of Emily Mercurio in the matter of Delaware County Employees Retirement System versus Cabot Oil and Gas Corp, et al in the United States District Court for the Southern District of Texas, Civil Action No. 4:21-cv-02045.

This deposition is being held at 501 Grant Street, Suite 200, Pittsburgh, PA 15219.

My name is Adam Balenciaga from Everest Court Reporting and I am the video specialist.  The court reporter today is Dutcheen Cameron, also from Everest Court Reporting.

Counsel will now state their appearances for the record.

MR. LAVELLE:  Kevin Lavelle from Robbins Geller Rudman & Dowd on behalf of plaintiffs and the class.

MS. BARRETTE:  Amy Barrette from Buchanan Ingersoll & Rooney on behalf of the defendants.

MR. STOKES:  Peter Stokes, Norton Rose Fulbright, also on behalf of the defendants.

MR. DUTILL:  Keith Dutill from Stradley

Page 7

Ronon for the witness.

THE VIDEOGRAPHER:  Will the court reporter please swear in the witness.

EMILY MERCURIO, having been first duly sworn, was examined and testified as follows:

EXAMINATION

BY MR. LAVELLE:

Q.  Good morning.

A.  Good morning.

Q.  My name is Kevin Lavelle as you just heard.  I'm here on behalf of the plaintiffs, and I'm from the firm Robbins Geller.

Can you please state your name for the record.

A.  Emily Constantine Mercurio.

Q.  And your home address.

A.  2014 LaCrosse Street, Pittsburgh, 15218.

Q.  Thank you.

Have you ever been deposed before?

A.  Never.

Q.  Okay.  Well, we can go over a few very simple ground rules so that this goes as smoothly as possible.

The first and probably the most important one is that we should try our best not to speak over

Page 8

one another.  I don't think that's going to be a big problem today but it's important because everything that we're saying is being taken down by the court reporter.

A.  Right.

Q.  And in order to create a clean record, it's best not to have that cross talk.

Does that sound okay?

A.  Yes.

Q.  Okay.  Great.  Today at different points objections might be made.  You should go ahead and still answer the question unless you're directed not to.

Does that sound fair?

A.  Yes.

Q.  Great.  Typically I take a break around once an hour.  If you need a break at any time just please let me know --

A.  Okay.

Q.  -- I'm happy to accommodate you.  If there's a question pending, I might ask that you just finish answering the question before you take that break.  But, you know, I'm happy to accommodate you whenever you need some time.  Okay?

A.  Yes.

Page 9

Q.  Okay.  Good.

So do you understand that today you're giving testimony just like we were in a courtroom?

A.  Yes.

Q.  Okay.  And is there any reason why you can't give full and truthful testimony today?

A.  No.

Q.  You're not on any kind medication that might affect your memory or anything like that?

A.  Not at all.

Q.  No recent head injuries or anything like that?

A.  No.

Q.  Okay.  Good, I'm happy to hear that.

So I'd like to talk at the beginning a bit about your background.

MR. LAVELLE:  And I'm going to mark as Plaintiffs' first exhibit which is going to be -- which is going to be Plaintiffs' Exhibit 299, a copy of your LinkedIn profile.  I'm going to hand that to you.

* * *

(Plaintiffs' Deposition Exhibit 299 was marked for identification.)

* * *

Page 138

didn't think that I was -- in talking about it, I did not believe that I was in conflict with my confidentiality agreement.

Q. Okay. So now if you look down to paragraph 1, it states that you were agreeing to maintain in confidence at all times during and after your employment any knowledge which you acquired in the course of your employment with Cabot, technical know-how, trade secrets of Cabot, and also as to confidential records, maps, plots, logs, interpretation, reserve studies, contracts and drawings, et cetera, correct?

A. Yeah, I see that written there.

Q. Okay. And that does not mention geophysical logs either, does it?

A. It doesn't. However, because these types of logs had been discussed in the public domain, I felt that a lot of the work or a lot of the talking I was doing with Mr. Lavelle's firm was like teaching. It was very similar to, like, teaching. I was just describing basic concepts, industry standard, well construction sorts of things. It was not -- many times what was I was speaking of was not Cabot specific.

Q. But what I just saw and heard you

Page 139

discussing in the complaint, you're saying you were just teaching Mr. Lavelle about what you interpreted off of Cabot's confidential cement bond logs.

MR. DUTILL: Object -- object to the form.

MR. LAVELLE: Join that objection.

A. Some of what I -- was in here was just general to the industry. The things I was mentioning about the bond logs I believed were things that were already in the public domain that the DEP already had knowledge of. And I was talking about, you know, my observations of those things.

Q. Your specific interpretations that you made while an employee at Cabot, correct?

A. I was recalling them way after the fact of being an employee. Because while I was there, I was not documenting this, I was not, you know, qualifying it in any way.

Q. So what you're saying now is that because you were no longer an employee, you felt like you could talk about the confidential -- the interpretations that you made about Cabot's confidential cement bond logs?

MR. DUTILL: Object to the form.

MR. LAVELLE: Objection to the form.

Page 140

A. Well, the way I understand this confidentiality agreement, I believe that I was not in breach of this because this was not a trade secret, it was not intellectual property, it was not that type of a thing. It was -- and it was in the public domain, a lot of what I was talking about. It was information that the DEP already had from what I understood, and I felt as though it was something I could speak to.

Q. Well, you just said in 2012 you talked to Secretary Hanger because you didn't think the DEP had cement bond logs.

So now you're saying you think they did have them?

MR. DUTILL: Objection to the form.

MR. LAVELLE: Object to the form.

A. That's not accurate. When I spoke to Mr. Hanger, I didn't mention Cabot, I didn't mention that I worked there, I didn't mention that there was something bad in those. All I mentioned was that it would be a good idea if the state had them. I was not making any sort of judgment.

It was -- like I was saying before, it was a concern because we had no water well construction standards in the state, and I felt that

Page 141

it would be better for our industry and the citizens, everyone, to have more information, that it be required. It would be, you know, a submittal that oil and gas companies should do. And I was saying that as a private citizen.

Q. A private citizen who was employed by Cabot Oil and Gas at the time?

A. Who also had a Ph.D. and had looked at these things, yeah.

Q. Well, we're going to get to you looking at these things. But you made the statements to Secretary Hanger when you were a private citizen employed by Cabot Oil and Gas, correct?

A. I did.

Q. Did you tell anybody at Cabot that you made these statements to Secretary Hanger?

A. Yeah.

Q. Who did you tell?

A. I'm pretty sure I told some of my co-workers that I had met him the night before and, you know, yeah, I'm pretty sure I did.

Q. Did you tell your co-workers that you suggested to Secretary Hanger that he should suggest -- that he should request -- or the DEP should request bond logs from natural gas operators?

Page 150

\* \* \*

MS. BARRETTE: And you've been handed what's been marked for identification purposes as Exhibit 306.

Q. And this is a copy of your CV you provided to the company when you were seeking employment, correct?

A. Yeah.

Q. And Mr. Lavelle went through some of your education. So I -- I don't want to belabor that but I'd like to go back through a little bit. You received your bachelor's from Penn State.

You were there between 1992 and 1996, correct?

A. Yes.

Q. Okay. And your thesis, then, was -- it was A Comprehensive Eruptive History of Merapi Volcano from 1768 to 1984, correct?

A. That's right.

Q. Okay. And you did not take petroleum engineering courses then, did you?

A. No, not then.

Q. And you did not take cementing -- or cement engineering courses, did you?

A. No.

Page 151

Q. And you did not take casing engineering courses then, did you?

A. No.

Q. Did you have an occasion to study any cement bond logs during that period?

A. None between '92 and '96, no.

Q. Then you received your master's from Michigan Technology University. You were there from '96 to 1998, correct?

A. That's right.

Q. And your thesis was Remote Sensing of the August, 1991 Cerro Hudson Volcanic Eruption Clouds, correct?

A. Yeah.

Q. Okay. Did you take any cement engineering courses then?

A. No.

Q. What about any casing engineering courses?

A. No.

Q. Did you have an occasion to study cement bond logs during that period?

A. Huh-uh.

Q. And did you take any petroleum engineering courses during that time?

Page 152

A. Not between '96 and '98, I didn't.

Q. So through your bachelor's and your master's, no petroleum engineering courses, no cementing engineering courses, no casing engineering courses, and no study of any type of cement bond logs during those periods, correct?

A. Correct.

Q. Then you returned to Pittsburgh and obtained your Ph.D. in -- I believe you said geoscience, correct?

A. Geology.

Q. Geology. Okay. And that was from 2007 to 2011, correct?

A. Correct.

Q. And your thesis was Processes, Products and Depositional Environments of Ice-Confined Basaltic Fissure Eruptions, correct?

A. Yeah.

Q. Do you have an occasion to look at any cement bond logs during that period?

A. I did not.

Q. Did you take any cementing engineering courses during that period?

A. Not cementing engineering, no.

Q. What about casing engineering courses?

Page 153

A. Casing -- I took a course called Well Drilling and Completions my last semester at Pitt and that was through the petroleum engineering department. I was the first geologist in the department to take that class. It was actually -- I remember that because he couldn't figure out how to enroll me in the class because I wasn't a petroleum engineering major but they did it for me.

Q. Okay. And how long was that course?

A. It was a semester long and I audited the course but I went to every class.

Q. And what do you mean you audited the course?

A. Audited meaning I wasn't taking it for credit, I took it because I wanted to learn basically. So I don't think you get a grade for audited classes because I didn't take the exams but I did the homeworks for my own learning.

Q. So there's no record of -- of what type of grade you would have received in that course, correct?

A. There's not, no.

Q. And during that time, did you have an occasion to study cement bond logs?

A. We talked about them but I did not study

Deposition of Emily Mercurio, Ph.D.

Page 154

them in the way that we had -- like, there was no -- I knew what they were, generally speaking, but, no, we did not study them. No.

Q. Okay. Now, during your time with your employment with Cabot, you received yearly performance reviews, correct?

A. I did, yeah.

Q. Now, you began -- your start date with Cabot was around August 1, 2011, correct?

A. As a full-time employee. I was working part-time over the summer while I was finishing my dissertation.

Q. And you resigned June 21st, 2018?

A. That sounds about right.

Q. And your last day was July 5th, 2018, correct?

A. Yes.

Q. Okay. So, as you sit here today, you have absolutely no knowledge of the company's -- anything that the company did or does in their operations from July 5th, 2018, forward?

A. That's -- that's right. Any -- yes, that is true. I've kept up on some news here and there but that is all.

Q. But as to the details of their

Page 155

operations, how they're handling things, how they manage things internally, you have no idea, correct?

A. After my last day there, no.

Q. So when you say you wanted things to get better and you thought you could do that by talking to these attorneys, you have no idea whether things were already better or whether they even needed to be better.

MR. LAVELLE: Objection to the form.

A. I see what you mean by that. And I guess what I would say in response is that we still don't require this type of information by regulators and we still don't have groundwater well construction standards.

Q. So nothing you're doing here today, that was helping to get groundwater construction standards, is it?

MR. LAVELLE: Objection to the form.

MR. DUTILL: Objection to the form.

A. I don't know. I don't know what's going to happen in the future but -- I don't know.

Q. And when you say, "We still don't require this type of information by regulators," are you saying that regulators still do not require cement bond logs?

Page 156

A. So for the surface string, I don't believe they do require them.

Q. They don't require them for any string, do they?

A. Probably not. But I'm not -- I'm not so sure. But, yeah, not for the ones that I was speaking about today. Yeah, not any, you're probably right about that.

Q. And do you think the DEP -- well, forget that.

Could it be the reason that they do not require cement bond logs is because they're really not an effective tool for evaluating the cement?

MR. LAVELLE: Objection to the form.

MR. DUTILL: Object to the form.

A. Well, I don't know their reasoning.

Q. But if these were such a great tool and if they were so accurate and able to detect, you know, with accuracy issues with cementing, you know, don't you think the DEP would require those?

MR. LAVELLE: Objection to the form.

MR. DUTILL: Same objection.

A. That's a good question. I don't know.

Q. I mean, surely you know the DEP is aware that these types of tests exist, correct?

Page 157

A. Yeah.

Q. And yet they are not required by the regulations, are they?

A. They're not, no.

Q. But there are other methods and lines of evidence for determining the integrity of cementing that are required by the DEP, correct?

MR. LAVELLE: Object to the form.

A. I don't know.

What are they?

Q. Well, I'm asking. You don't know what other things --

A. What other things? Well, they would test the pressure at the -- at the wellhead. There are some other ways but this is one diagnostic tool that does provide some empirical information that's like a calibrated measurement. And I'm not saying it is the be-all end-all, but it is one piece of information in addition to what we know during drilling and what we can detect on the surface.

Q. So you said it's a calibrated measurement. It is not a calibrated measurement of cement, is it?

MR. LAVELLE: Objection to the form.

A. It is a calibrated measurement of

Page 162

MS. BARRETTE: You didn't request them. I'm putting on the record that these were not requested. They were not responsive to any document request. And, in fact, they weren't even looked for until you did this surprise of adding Ms. Mercurio to the deposition or to the list to be deposed on the last day of discovery. So we did the best we can.

MR. LAVELLE: I am going to reiterate my objection that none of these materials were provided to Plaintiffs' counsel before this deposition and reiterate that Ms. -- Dr. Mercurio was deposed during the fact discovery period that the parties agreed to.

MS. BARRETTE: Anything else?

MR. LAVELLE: Not at this time.

MS. BARRETTE: Okay.

BY MS. BARRETTE:

Q. All right. So I am going to refresh your recollection in a minute, but let's talk about May of -- well, let me back up a little bit.

May of 2013, do you recall a meeting with Dr. Wylie where you said he was very critical of your recent Geneseo (phonetic) work and he expressed to you in an e-mail you sent him was unacceptable.

Page 163

Do you remember that?

A. I do.

MR. LAVELLE: Objection to the form.

Q. And you talked about you reported to HR that Mr. -- or Dr. Wylie felt that your performance had been languishing, correct?

A. Yeah.

Q. And, in fact, you know, he -- based on what you told HR, he was in a meeting with you and he pulled out one of your prior reviews where he was saying and listing off all these great things about you and he said, you know, where is this person? I don't know this person anymore.

Do you remember that?

A. I do.

MR. LAVELLE: Objection to the form.

Q. And you felt that that was very insulting and belittling and just unacceptable to you, correct?

MR. LAVELLE: Objection to the form.

A. Yeah, because -- yeah, I did.

Q. And then in November of 2014, do you recall Dr. Wylie expressed frustration at you for an e-mail that you almost sent to Mr. Stalnaker that had incomplete information in it -- inaccurate

Page 164

information.

Do you remember that?

MR. LAVELLE: Objection to the form.

Counselor, are you going to mark and supply the exhibit that you're referring to?

MS. BARRETTE: Maybe.

MR. LAVELLE: Okay. Well, I request that you do that, please.

MS. BARRETTE: I'll think about it. If I get to that I will, if I need to.

MR. LAVELLE: Well, I think you're relying on it during the deposition, so I'm going to formally request that you provide it to plaintiffs.

MS. BARRETTE: And I'm going to formally deny that until I'm done questioning the witness about her recollection of time, and if there comes a time when I need to introduce the document, I will, but we are not at that time.

MR. LAVELLE: Well, we disagree.

MS. BARRETTE: Okay. We are probably going to have a lot of that.

MR. LAVELLE: Probably.

MS. BARRETTE: Okay.

BY MS. BARRETTE:

Q. So back to my question. Do you recall

Page 165

the incident where Dr. Wylie was upset with you because there was an e-mail that you were sending -- getting ready to send to Mr. Stalnaker that had incorrect information?

MR. LAVELLE: Objection to the form.

A. Yes. I documented all of this and sent it to HR. Yeah, I know exactly what you're talking about and I never -- I sent it to Buddy first to have him check it and he used it against me. I never sent it to Phil.

Q. And it's a good thing you did not, correct, because it had incorrect information, correct?

A. I don't know what information was in it, but that's why I sent it to him first, to check it over.

Q. Okay.

A. Which is routine.

Q. You also complained in September, you wrote up about an incident in September of 2015 that involved, you know, you going to -- going to Indianapolis.

Do you recall that?

A. I do.

Q. Can you tell me about it?

Deposition of Emily Mercurio, Ph.D.

Page 186

receive that review?

A. Like, no later than November usually.

Q. Now, do you recall receiving a review wherein Dr. Wylie noted: "Emily needs to work more fully to more fully understand the deep details of the data and information she uses in her interpretations including recognition of the inherent errors and/or quality of the analyses, the methods used to produce the data, and/or the pitfalls of the data and/or the risking of the data based on the data's qualities, sources, and completeness/incompleteness."

MR. LAVELLE: Objection to the form. And just a quick request on the record that the document that you're reading off of is produced.

A. I remember.

Q. And what is your understanding of what Dr. Wylie meant by that?

MR. LAVELLE: Objection to form.

A. I think what he was saying was, you know, being sure to look through all of the data in your geologic characterization work, and, you know, understanding that there are nuances, that there are -- you know, there could be inaccuracies, that sort of thing. And, you know, I did, I followed his

Page 187

advice. And I spent the next three years trying to understand what he meant and trying to do a better job.

Q. Do you think it's important that when you're going to make an interpretation that you have a deep understanding of the methods that are used to produce the data?

MR. LAVELLE: Objection to form.

A. Absolutely.

Q. Do you think it's important when you're making an interpretation to understand the pitfalls of the data that you're using to make an interpretation?

MR. LAVELLE: Same objection.

A. Yes, and I believe that other data can be used to help you understand that.

Q. Correct. So when you're making an interpretation, there could be often multiple sources of data that you would look at and analyze and understand before making an interpretation, correct?

A. That's true. And it's -- yes, definitely, uh-huh.

Q. And would you also think it's important that when you're making an interpretation that you

Page 188

understand the underlying data's qualities, sources, and completeness or incompleteness of that data?

MR. LAVELLE: Objection to the form.

A. Yes.

Q. And would you agree with me that if you don't do those things, your interpretations could be completely incorrect?

A. That is true, I agree.

MR. LAVELLE: Objection to form.

Q. Now, you said you spent the next three years trying to understand what Dr. Wylie meant by that.

A. Uh-huh.

Q. Did you ask him?

A. Yeah, of course.

Q. What did he tell you?

A. We just kind of had, like, the same conversations about how you can't leave any stone unturned, how you have to look at all versions of the dataset that you have, that you have to understand kind of the legacy, and the -- kind of the history chain of that dataset before it's called, like, a final dataset, and even then there could be questions that you have about the data when you're comparing it with some of the other versions.

Page 189

One of the most important things is when you're looking at a single dataset that you're looking at other datasets with it. So you just can't make a decision on one log or one instance of something. It's when you're seeing things over and over again and you're starting to, like, learn a pattern or like understand a relationship between the different data elements. So kind of having this wholistic approach to interpretation of data.

Q. And do you recall receiving a performance evaluation in 2016?

A. I do.

Q. And who wrote the comments for that performance evaluation, do you recall?

A. The comments for that one, I'm not sure what you mean.

Q. Well, who completed your performance evaluation?

A. It would have been Dr. Wylie.

Q. And do you recall in 2016 that -- in or about November of 2016 when you received this, Dr. Wylie made the same comment that Emily needs to continue to work more fully -- to more fully understand the deep details of the data and information she uses in her interpretations,

Deposition of Emily Mercurio, Ph.D.

Page 190

including recognition of the inherent errors and/or quality of the analysis, the methods used to produce the data, and/or the pitfalls of the data and/or the risking of the data based on the data's qualities, sources, and completeness, incompleteness?

A. Uh-huh. Yes.

Q. And that was something he seemed to tell you frequently, correct?

MR. LAVELLE: Objection to form.

A. For a time. 2016 -- I'm sorry, I interrupted -- 2016 was probably the roughest year we had together as a -- in a working relationship. So a lot of that is like recycled language, yes. And I note that you left out the interaction he and I had in February of 2016, that he did receive corrective action behavior, you know, to correct his behavior for.

Q. Oh, I didn't leave that out.

A. Okay, good.

Q. We'll get to that.

A. Okay.

Q. And when you went to HR in 2016, that was just two months after you received that review where Dr. Wylie gave you a 2 in job knowledge and pointed out that you needed to work more fully to understand

Page 191

details and to have a better understanding of the datasets, correct?

A. Yeah.

MR. LAVELLE: Objection to the form. And request the document to the extent it wasn't previously requested.

Q. Okay. You turned in another employee to HR as well, complained about another one, correct?

A. I did, yeah. Yep.

Q. Is there something funny about that?

A. What that person called me was -- I think anybody would have done the same.

Q. Now, in 2016, your gross wages went down by $20,000 as well, correct?

A. Yes, they did.

Q. And that's the year -- I believe that's the year that you formed -- actually formed your company --

A. No.

Q. That was in 2015 it was formed, right?

A. '15 it formed, yeah.

Q. Do you recall giving an interview with the Pittsburgh Technology Council and The Machine?

A. Yeah, I've given more than one interview to them.

Page 192

Q. Okay. Do you recall the article, Emily Mercurio Has It All Mapped Out?

A. Yeah, vaguely.

Q. And are you aware that in that article it says that she returned to Pittsburgh in 2007 to get her Ph.D. and after that worked for an oil and gas company as an exploration geologist, but five years into that job she realized she was ready to move on. Do you recall that?

MR. DUTILL: She's asking if you recall that in the article.

A. I don't recall that in the article.

MS. BARRETTE: Okay. Here, let me give it to you.

A. I don't recall that.

MS. BARRETTE: What are we on?

MR. STOKES: I think 307.

* * *

(Plaintiffs' Deposition Exhibit 307 was marked for identification.)

* * *

MS. BARRETTE: You've been handed what's been marked for identification purposes as Exhibit 307. This is an article, January 11th, 2001, article by the Pittsburgh Technology Council

Page 193

and The Machine, it's titled, Get Pittsburgh: Emily Mercurio Has It All Mapped Out. Okay. Do you see that?

A. Yeah, from 2021, yes. Yeah.

Q. And that's a photo of you in the front of the article; correct?

A. Yeah.

Q. And do you see in the third paragraph where it states that you returned to Pittsburgh to get your -- in 2007 to get your Ph.D., and after that worked at an oil and gas company as an exploration geologist, but five years into that job she realized she was ready to move on?

A. Yeah, I see that. I don't remember saying that to this -- for this article. And, you know, this is also dated 2021, so this would have been, like, a past recollection. But it was not my -- "ready to move on" was not something I was thinking in 2015.

Q. Were you ready to move on in 2016?

A. No, I was not ready to move on in 2016.

Q. Were you working at CityMapper during the time you were working at Cabot in 2015?

A. CivicMapper.

Q. CivicMapper, I'm sorry.

Deposition of Emily Mercurio, Ph.D.                    Delaware County Employees Retirement System v. Cabot Oil & Gas Corp., et al

Page 202

doesn't mention Cabot or anything like that.

Q. Did you recently edit your LinkedIn profile?

A. No.

Q. You didn't take any language off of your LinkedIn profile under the description of the work you did for Cabot?

A. Maybe I mentioned less about it, made it more generalized, yeah. I might have done that. Whatever it looks like now is how it's looked for a while, but I don't know when I made those last changes. I was trying to just kind of consolidate a lot of the text in there and make it easier to read.

Q. Do you have Exhibit 209 (sic) there in front of you? It's your -- it's the summary of your LinkedIn page.

A. Yeah, I have it.

Q. I'm sorry, it's Exhibit 299. Sorry about that.

A. Yeah. Uh-huh. Yeah.

Q. The last line where you're talking about --

MR. LAVELLE: Where are you, counsel?

MS. BARRETTE: Page 2 going into page 3 where she's talking about Cabot, her work for Cabot.

Page 203

BY MS. BARRETTE:

Q. You say, "Drilled more than 120 successful shale gas wells valued at over $1 billion of capital investment."

Do you see that?

A. I do.

Q. You described the 120 gas wells that you drilled as successful; correct?

A. Yes, I did.

Q. Now, when you gave the information to Attorney Lavelle for the complaint, I didn't see it mentioned in there where you were describing the gas wells, the 120 gas wells that you drilled as successful.

Did you tell him that your gas wells were successful?

MR. LAVELLE: Object to the form.

A. I don't -- I don't recall that -- I believe during the conversations I've had with them that I probably mentioned that I never had a complaint from my wells, anything that arose.

Q. Okay. Even though you told them that you -- it was your belief that the surface casing may have been deficient on some of them, you did also tell them that there was never a water quality

Page 204

complaint associated with your wells, correct?

A. That is true.

MR. LAVELLE: Objection to form.

A. Yes.

Q. And did you tell him that? Did you tell Mr. Lavelle that, that you never had a water quality complaint with any of your 120 wells?

A. I think I might have mentioned it, but I'm not a hundred percent certain. But probably I mentioned it.

Q. Did you edit your LinkedIn on or about October 4th of this year?

A. I don't remember. I honestly don't remember.

Q. That's just a few weeks ago.

A. Yeah, I don't remember.

Q. You don't remember taking language off in that section where you -- that --

A. About the 1V?

Q. Yes.

A. I -- I know I did take that out but I don't remember when I did it.

Q. Okay. You took out the language that said you never had a water quality complaint associated with your wells, correct?

Page 205

A. Oh, yeah. But that wasn't the intent of me taking that out of there.

Q. You took that out on October 4th, didn't you?

A. I might have. I don't remember doing it.

MR. LAVELLE: Objection to the form.

Q. Yeah. And that's the day that we received the notice that you were going to be deposed in this case on October 12th, correct?

A. Oh. It might have been. I don't remember.

Q. What caused you to go into your LinkedIn that day and remove that language that said you never had a water quality complaint with your -- with the 120 gas wells that you drilled?

A. It wasn't --

MR. LAVELLE: Objection to the form.

A. It wasn't because of that. It was because I was nervous that I mentioned anything about capital investment. I didn't know if that was like -- I was starting to second-guess myself, like, am I allowed to, you know, put that out there.

But it wasn't about the success of those wells. I'm very proud of that. I tell it to people all the time when I meet them, I drilled 120 wells

Deposition of Emily Mercurio, Ph.D.

Page 206

in the Marcellus.  But, yeah, I think I was like a little nervous about putting the dollar value on that.

Q.   But you took out language about the fact that there was no -- there were no water quality complaints associated with the wells, too, correct?

A.   Yeah.  Yes, I must have done -- yes, yes.

Q.   And you took that out just probably seven or eight days before you were going to be deposed, correct?

A.   Yes.  And I see where you're going with it.  But it was --

MR. DUTILL:  Well, just answer her question.

A.   Yes.

Q.   Before -- did you let Mr. Lavelle know that you took that language out of your LinkedIn profile?

A.   No.

Q.   Did you let anybody from the Robbins firm know that you edited your LinkedIn profile to remove that information just a mere week before you were going to be deposed?

A.   No.  I'm sorry, I didn't.

Q.   And when Mr. Lavelle or Attorney Lavelle

Page 207

was questioning you about Exhibit 299, you didn't say to him, oh, by the way, I edited this earlier this month, did you?

A.   No, I --

MR. DUTILL:  Object to the form.

A.   I'm sorry.

No, I didn't think of it to mention.  I honestly didn't think it was a mentionable thing.

* * *

(Plaintiffs' Deposition Exhibit 310 was marked for identification.)

* * *

Q.   You've been handed what's been marked for identification purposes as Exhibit 310.

A.   Uh-huh.

Q.   This is a packet that contains the e-mails that were produced -- that Mr. Dutill sent to me in response to the subpoena that he accepted on your behalf.  And I have them a little out of order.  It starts with Bates number -- or Bates label EM021 and then it goes to EM022, then back to EM001 through EM029.  And I rearranged the order a little bit to give it a more -- put it in chronologic order.

So starting -- and I'd like to walk

Page 208

through these.  I have some questions for you about these.

MR. LAVELLE:  I would just object.  We haven't received these documents.

MS. BARRETTE:  Well, okay.

Q.   Starting with --

MS. BARRETTE:  Well, you're objecting to receiving them?  You're on -- your firm's all over them.  These are your e-mails.

Other than the first two, the rest of them are all you.

MR. LAVELLE:  Okay.  Well, I'm saying we haven't received this production and the first page has e-mails that our firm is not on.

Q.   So starting with EM021 and EM022, can you tell me what -- what that is, what those documents represent?

A.   Yes.  So, I sent an e-mail to Deb Larkin asking her to please send me any copies of the documents I signed when I was hired and when I left the company, and I had done this because I didn't have a confidentiality agreement that is represented by one of the exhibits that you already gave.

Which one was that?  I'm not sure.

MR. DUTILL:  That's okay.

Page 209

A.   Anyways.  Yeah, I didn't have a copy of that in my records.

So -- and I had already received a call from the Plaintiffs' attorneys asking to talk to me.  So this was my attempt at trying to get ahold of the actual confidentiality agreement, even though I had my offer letter which mentions some information there, I just wanted to see it, see what it said, but Deb said she could not provide that.

So I was, like, okay, well, it's my decision now of what I'm going to do.

Q.   If you turn to the page marked EM001 -- let me back up.

So you, without having a copy of the confidentiality agreement, even though you knew you signed one, you made the decision to speak to the attorneys and provide them information about Cabot.

MR. DUTILL:  Object to the form.

MR. LAVELLE:  Join.

A.   I did make that decision.

Q.   Now, EM001, this appears to be an e-mail dated February 16th.  It's an e-mail chain, February 16, 2021, at 1:16 p.m.  It's the bottom e-mail.  It's from Brian Fitzpatrick to you.

Who is Brian Fitzpatrick?

Page 242

landed and how they should be.  We were following the structure of the Marcellus to give them that information and effectively designing the plan for drilling that we would give to them.

Q.  Correct -- I'm sorry.

And that is with respect to the geology, correct, like and that was in well progs, correct?

MR. LAVELLE:  Objection to the form.

(Court Reporter interruption for clarification.)

MS. BARRETTE:  Progs.

A.  Yes.

MR. LAVELLE:  Objection to the form.

Q.  Now, earlier when you were giving the -- your testimony about paragraph 147 and the micro-annular space, what does a micro-annular space look like on a bond log?

(Court reporter interruption for clarification.)

(Cross-talk).

Q.  What does a micro-annular space look like on a bond log, a cement bond log?

A.  I don't know.

Q.  If you don't know what they look like then am I correct that you've never seen one on a

Page 243

bond log?

A.  So what I've seen on a bond log is either an attenuated response from acoustic impedance or a non-attenuated one.  And that I would say is the extent of the confidence of my interpretation for a bond log.  So cement yes, cement no, the micro-annular void spaces, I wouldn't say I'm qualified to determine that.

Q.  Okay.  In paragraph 157, it says:  The geologist also explained that a cement job could otherwise be insufficient, which would allow gas to migrate into the water table.

What is your definition of "insufficient"?

A.  An inadequate coverage or application of cement between the steel pipe and the formation wall is how I would describe that.

Q.  Okay.

A.  And that is not unique to Cabot, that is just across the board textbook example or industry standard in my definition.

Q.  Would you agree with me that the purpose of the cement is to achieve hydraulic isolation?

MR. LAVELLE:  Objection to form.

A.  Hydraulic isolation, yes.

Page 244

Q.  Okay.  And would you also -- well, we'll move on.

Now, you say you discussed this language, "a ticking time bomb" in paragraph 157.

Is that your specific language, "a ticking time bomb"?

A.  Yeah, I think I said -- yes, I said that.

Q.  And I believe you said it's because conditions could perhaps change in the geology and that created a time bomb situation?

A.  I would say that it -- conditions can change in the hydrology, and the exposure of cement to water, particularly if it's not bonded well or consistently, opens up a pathway for corrosion of cement which is a known fact in research and testing of cement casings.

Q.  And when you say that's a known fact, known to who?

A.  Yeah, so the National Energy Technology Laboratory here in Pittsburgh has done quite a lot of research on cement and the kind of cement that are used in gas wells.  And, yeah, and some of their findings have suggested that certain classes of cement are vulnerable to corrosion due to things like groundwater and exposure to methane.  So I was

Page 245

thinking of those kinds of studies when saying that.  And, yeah, that's what I meant.

Q.  Okay.  And what types of cement does Cabot use in its cementing jobs?

A.  Yeah, so in the driller's reports that I've seen, and those are also in the public domain, typically it -- I believe a class A cement is being used.

Q.  Okay.  To this day is that what they're using?

A.  I don't know.

Q.  Okay.  What additives are added to that to prevent the type of corrosion and things that you were discussing?

MR. LAVELLE:  Objection to the form.

A.  Yeah, I don't know.  I don't know.  I've heard them discuss certain types of additives when we were at our drill meetings but I don't know what Cabot was using.  I've heard of certain things being used on the well site like sugar, oddly, is a recollection.  I remember hearing they would have that on hand in case there was a problem because sugar would delay, if not deter, curing of cement if things were not, like, done right.  So I, you know, remember hearing those kind of things.

Deposition of Emily Mercurio, Ph.D.

Page 246

Q.  So as you sit here today you have no idea whether additives that Cabot put in its cement would have prevented this type of corrosion or things that you were discussing.

MR. LAVELLE:  Objection to the form.

A.  I don't know.  If it was not mentioned on the driller's log or like the drill notes, no, I don't know.

Q.  Okay.  So this statement, this cement jobs -- "deficient cement jobs were a ticking time bomb," that's just speculation on your part, correct?

MR. LAVELLE:  Objection to the form.

But go ahead.

Q.  Is that a yes?

A.  That's a yes.  Yes.  That's my opinion of what I understood.

Q.  And as you sit here today, you have no evidence that that ever occurred on any of Cabot's gas wells, correct?

A.  That, what, didn't occur?

MR. LAVELLE:  Objection to the form.

Q.  I'm sorry.  That what?

A.  That, what, didn't occur?  I'm asking to clarify the question.

Page 247

Q.  This so-called corrosion, you have no evidence that that ever occurred on a Cabot gas well, correct?

A.  I do not.  I do not.

MR. LAVELLE:  Same objection.

A.  Yeah, I don't -- I don't.

Q.  Paragraph 158, it says, "To test the cement job in its wells, the geologist stated that Cabot would create a cement bond log by placing a rod containing sensors down into the well to test the casings."

Do you see that?

A.  Uh-huh.

Q.  Did you make that statement to Mr. Lavelle?

A.  Well, this is part of, like, the teaching that I felt like I did.  I was trying to explain things in simplified terms.

Q.  Did you make that statement?

A.  I said something similar to that.  I don't -- I wouldn't say that those were my exact words.

Q.  Do you recall what your exact words were?

A.  No, I don't.

Q.  Is it still your position today that

Page 248

Cabot would create cement bond logs?

A.  My position would be that Cabot would hire companies that would perform that service.

Q.  And what were those companies during your time when you worked at Cabot and when you were reviewing all of these bond logs, what companies were actually creating the bond logs?

A.  Yeah, it varied.  There was -- there were several different ones.  I don't remember all of the ones that would do this service but I'm thinking of companies like, you know, like Weatherford, and there -- there were others, I just don't recall their names right now.

Q.  Is Weatherford the only one you can think of?

A.  If I sat here long enough I might be able to think of others.  But it was a long time ago and I -- like I said, I didn't keep any of my notes and I haven't looked at driller's notes in a very long time.  And all of those are in there, the driller's notes mentioned, what companies came on-site to run which types of logs, and that's in the public domain.

Q.  When you say that this log was being run to test the casings, does that go back to your --

Page 249

when you say "casings," you're not talking about the actual casing of the well, the metal pipe, it's not testing the metal pipe, correct?

MR. LAVELLE:  Objection to the form.

A.  No, it's not -- I'm sorry.  No, it's not. It's a test -- not even a test, it's just a measurement of that bonding of cement between the formation and the pipe.

Q.  And it doesn't actually measure the bond, it actually measures the acoustic impedance, correct?

A.  Acoustic impedance.  (Nodding affirmatively.)

Q.  So with a cement bond log, there is no direct physical examination of the cement, correct?

A.  There is not.  Like I said before, they're looking for this attenuation of the signal. It's like the ringing from this kind of active dinging that the tool is doing.  But you're correct, it's acoustic impedance.

Q.  Did you ever speak with any of the employees of the companies that were actually conducting the cement bond logs?

A.  I have spoken with the people working on-site who are running the logs, but not when they

Deposition of Emily Mercurio, Ph.D.

Page 250

were running the CBLs but when they were running the open-hole logs --

Q.   Okay.

A.   -- I would speak to them.

Q.   Did you ever, you know, in the process of reviewing the cement logs later at your office, did you ever reach out and contact any of the vendors who conducted the cement bond logs?

A.   Not the vendors, no.

Q.   Did you ever go out and actually watch a cement bond log being run?

A.   I've been on drill sites and I've watched some logging but I don't believe it was when they were running the CBL.  It was when they were running open-hole.

Q.   What type of CBLs did Cabot's vendors run?

A.   They ran them on the surface casing, I believe they ran them on intermediate and on the production string.  The production spring would only be cemented for a certain portion, not the entire wellbore, that's actually not -- you know, it's a DEP policy to not do that.  So it was just on -- on those strings.  I don't know if they were running them on the conductor holes or not.

Page 251

Q.   Okay.  And I'm sorry, maybe my question wasn't clear.  I'm asking about the specific type of CBLs.

You understand there are different type of CBLs, correct?

A.   Yes.  Yeah, yeah, the actual tool.  I don't know.  I did not investigate that.

Q.   Okay.  And I'm not referring to the -- but what are -- to your knowledge, what are the types of CBLs that Cabot ran on its -- or that the different companies would run on Cabot's wells?

A.   Yeah, that's a great question, and I don't know.  Like I said, I'm not an engineer, I'm not a cementing engineer, I don't know what types.

Q.   Do you have any understanding aside from you don't know what types were run on Cabot's walls, do you have any understanding of the different types of CBLs that exist?

A.   I can't say I do, no.

Q.   Okay.  So am I correct that you don't know the differences between a conventional or a radial CBL?

A.   Oh, I see what you're saying.  I'm familiar with what that means but if I were to be looking at a log, I don't -- that's not something I

Page 252

ever asked myself when I was looking at it, if that makes sense.

Q.   Did you ever ask anyone else what the difference was between a conventional and a radial bond log?

A.   I didn't.

Q.   As you sit here today, are you able to explain for us what are some of the pitfalls of a conventional CBL?

A.   I can't.

Q.   Are you able to explain what are some of the pitfalls of a radial bond log?

MR. LAVELLE:  Objection to the form.

A.   I can't.  I'm sorry.  I can't.

Q.   Are you able to explain any pitfalls of an ultrasonic cement bond log?

MR. LAVELLE:  Objection to the form.

A.   No.

Q.   And as you sit here today, you don't know what types of cement bond logs were run on Cabot's wells, correct?

A.   You're right.

Q.   Do you know if one type of bond log is better than another?

A.   I don't.

Page 253

MR. LAVELLE:  Objection to the form.

Q.   And you would agree with me that you're not an expert in cement bond log interpretation, correct?

A.   I agree.

Q.   And you're not holding yourself out to be an expert in cement bond log interpretation, correct?

A.   Correct.

Q.   And you're not holding yourself out to be an expert in, you know, cementing of wells, correct?

A.   Correct.

Q.   And you're not holding yourself out to be an expert in whether wells have insufficient or sufficient cement in the annular spaces, correct?

MR. LAVELLE:  Objection to the form.

A.   I'm not an expert in that.

Q.   I'd like for you to describe for me because you've said you looked at a number of bond logs and that you found on your interpretation that there was insufficient cementing in the surface casing.

And that was across all of Cabot's acreage, correct?

A.   Um, the ones that I've observed, I can't

Deposition of Emily Mercurio, Ph.D.

Page 254

say that they came from one region or -- only one region or another where I saw this discrepancy in log quality. So, right, it could have come from anywhere in the acreage, yeah.

Q. And as you sit here today, given that you're not a cement bond log -- you're not an expert in cement bond log interpretation, you can't say for certainty whether the anomalies that you perceived on the cement bond logs really reflected an absence of cement, correct?

MR. LAVELLE: Objection to the form.

A. As an engineer -- sorry, as a non-engineer, I -- yeah, I can't say that for certain.

Q. Okay. Could you walk me through -- let's say, imagine you have a bond log, a cement bond log in front of you, please walk me through your process for analyzing that bond log.

A. Okay. So the first thing I would do is look at the well name, you know, which well it was on the pad. I would look at the well ID number to make sure it was appropriately attributed to that well, just basic QA/QC sort of checks.

And then I would look at the log header to see what am I looking at, look at the units, and

Page 255

then I would proceed to sort of, like, flip through. And as I'm looking at the measured depth and the total depth of the well depths, I'd be looking at -- over at, like, the next column which shows that CBL, you know, figure, like the responses that were recorded in a graphical way.

And I believe there's also, like, numeric but I understood that less. I was just kind of looking to see, do I see a lot of straight lines that are bold and, like, kind of unbroken? Or am I seeing these, like, wavy or like kind of staticky-looking lines where it's indicating some acoustic impedance.

So I would just, like, flip through, look at that, kind of get a, you know, overview of what the quality of this log looked like. Am I seeing bonding? You know, am I seeing that acoustic impedance show up? Am I seeing, like, train tracks, as they were called, that John Abshire told me about?

And basically, that's about it. That would be like the extent of my review of it.

Q. Nothing else?

A. You know, if I saw something that looked like a lot of train tracks, a lot of bold straight

Page 256

lines, I might make a mental note that, hey, maybe this one's not so good. Or if I saw one that had, like, pretty great, you know, readings, I'd say, oh, it's a good one. But that's about it.

Q. Okay. So am I correct then that your interpretation of a cement bond log is based on looking to see whether train tracks -- what is defined as train tracks appear in a section of the bond log?

MR. LAVELLE: Objection to the form.

A. Oh, sorry.

So I would say not a tiny section. That wouldn't be something that would alert me, but over the larger sections, you know, more than a few feet.

Q. Let me rephrase. Maybe I was imprecise in my question.

Your interpretation is based on -- your interpretation of whether there is good cement, adequate, good bonding, whatever it is, is based on a simple review of that actual physical bond log.

MR. LAVELLE: Objection to the form; misstates testimony.

A. It would be, yes.

Q. What else goes into your interpretation? If that's not all it is, is looking at the bond log?

Page 257

What else do you do in order to formulate your interpretation that, as you said in the complaint, that there was insufficient cement?

MR. LAVELLE: Objection to the form.

A. Yes, seeing large segments where there did not appear to be that bonding.

Q. And, again, that is based on your visual looking at the cement bond log, correct?

A. Yes.

MR. LAVELLE: Objection to form.

Q. Is there anything else you do when you're making your interpretation as to whether there's good cement or not, do you do anything other than looking at the cement bond log?

MR. LAVELLE: Objection to the form.

A. That is all that I would do.

Q. Are you able to tell me anything that would -- let me back that up.

Well, what other factors would you need to know when interpreting a cement bond log?

MR. LAVELLE: Objection to the form.

MR. DUTILL: Object to the form.

A. I guess I don't understand the question. Like what --

Q. Let me ask it a different way.

Deposition of Emily Mercurio, Ph.D.

Page 266

A.   That sound waves travel differently through water than they would through other medium and other media, yeah.  But what that would look like on a bond log, I don't know.

Q.   And when you were reviewing and analyzing the cement bond logs and making interpretations about them and determining that the -- there was insufficient cement, did you ever check to see what the volume of the water spacer was or the level of the water spacer that was pumped into the well?

MR. LAVELLE:  Objection to the form.

A.   I didn't.

Q.   What's the purpose of the water spacer? Do you know?

A.   I don't remember.  I used to know but I don't remember anymore.

Q.   Do you know whether there are any steps that have to be taken to the well prior to running a cement bond log?

MR. LAVELLE:  Objection to the form.

A.   I don't -- I don't know.

Q.   Do you know whether residual mud in the formation following drilling, do you know whether that could have any impact on a cement bond log?

MR. LAVELLE:  Objection to the form.

Page 267

A.   I assume it would, but I don't know the science of that.

Q.   Did you ever make any efforts while you were looking at these cement bond logs to even try to understand what other factors could play into to form your opinion about the quality of the cement work?

MR. LAVELLE:  Objection to the form.

A.   No.

Q.   But yet you felt confident enough, despite not doing any of that, despite not being able to tell the difference between a conventional, radial or an ultrasonic bond log, despite not even knowing what type of bond longs that were run on the Cabot wells, you felt confident enough to tell Attorney Lavelle that Cabot's wells -- there was -- so many of these Cabot wells had insufficient cement in the surface casing.

MR. DUTILL:  Object to the form.

MR. LAVELLE:  Object to the form.

A.   At the time, I guess I did.

Q.   Do you feel confident about what you told him now after hearing all these things?

MR. DUTILL:  Same objection.

MR. LAVELLE:  Objection to the form.

Page 268

A.   I feel a little less confident.

Q.   Now, earlier when we were talking about Buddy's review and he said -- he made the comment that, Emily needs to work on, you know, getting the details and understanding the data when formulating an opinion, it kind of plays over to this, doesn't it?

A.   It does.

MR. DUTILL:  Objection.

MR. LAVELLE:  Objection to the form.

A.   Yeah, it does.

Q.   Now, you said you're a little less confident about your interpretation of the cement bond logs that you reviewed.

Would you feel confident now going into court and making the statements that you made in the complaint?

MR. LAVELLE:  Objection to the form.

MR. DUTILL:  Objection to the form.  What -- are you referring to particular statements?

BY MS. BARRETTE:

Q.   The statements about the cement bond logs, would you feel confident taking the witness stand in court and making those statements that you made in the complaint?

Page 269

MR. LAVELLE:  Objection to the form.

MR. DUTILL:  Same -- same objection.  I mean, we've had five hours of testimony.

A.   Um, so to answer the question, I guess I would still feel confident in saying that I saw -- what I -- what I saw were, like, discrepancies in them, but I do not feel confident -- as much confidence in interpreting that.

Q.   Okay.  You focused a lot on the surface casing string.  And is my understanding correct that of the logs that you looked at, it seemed like the surface casing strings had a higher number of anomalies?

MR. LAVELLE:  Objection to form.

A.   Yes.  Yeah.

Q.   Now, earlier when I was talking about the size of the actual tool that is used to run the cement bond logs, and I asked you if had any understanding of how that would impact a cement bond log, you said no, correct?

A.   I did.

Q.   And what's the size of the -- the surface casing?

A.   Oh gosh, I don't remember.  I used to know but I don't remember.

Deposition of Emily Mercurio, Ph.D.                    Delaware County Employees Retirement System v. Cabot Oil & Gas Corp., et al

Page 270

Q.   Now, you did a presentation in 2012.  I believe Mr. Lavelle asked you about it, The Effective Groundwater Protection Strategies?

A.   Yeah.

Q.   And you had a PowerPoint that you put together?

A.   Uh-huh.

Q.   The surface casing, does 13 and 3/8s sound familiar?

A.   Yeah.  Sounds familiar.  But like I said, it's been over ten years since I prepared that and it's been five years since I've worked in this industry.  So it's -- I don't -- I don't remember it like I used to.

Q.   But the surface casing string size, that diameter of pipe didn't change, correct?

MR. LAVELLE:  Objection to the form.

A.   You mean through the wellbore itself?

Q.   Through the -- the 13 and -- 13 and 3/8s, that's typically the surface casing string, correct?

MR. LAVELLE:  Objection to form.

A.   I don't know.

Q.   As you sit here today, you can't even tell us what the size of the surface casing string is?

Page 271

MR. LAVELLE:  Objection to the form.

MR. DUTILL:  Object to the form.

A.   I can't.  I -- this is far in the past for me and I've moved on to other things.  I don't remember.  It sounds right.  I believe, you know, Cabot was using a consistent casing program.  We've got other casings to build inside of that one.  But I don't recall the exact dimensions of things.  It's been a while for me.

Q.   And given that you did not do any investigation into other things that could affect a cement bond log --

MR. LAVELLE:  Objection to the form.

Q.   -- is it -- is my understanding correct that you have no understanding as to the maximum diameter allowable for the actual bond log tool?

MR. LAVELLE:  Objection to the form.

A.   I don't know.

MR. LAVELLE:  Ask that the presentation that you're referring to be produced as well.

MS. BARRETTE:  I'll consider it.

Q.   Attorney Lavelle asked you about the statement that said, "The geologist explained, moreover, that when issues were identified in the cement bond logs, the company was reluctant to

Page 272

repair the casings because of the expense."

Do you recall that?

A.   Yes.

MR. DUTILL:  Where are you, counsel?

MS. BARRETTE:  I'm sorry, page 55, paragraph 160.

Q.   Were you insinuating or are you suggesting that Cabot refused to repair problems because they were too expensive?

MR. LAVELLE:  Objection to the form.

A.   No.

Q.   Are you able to identify one time when there was something that needed corrected that Cabot said, no, we are not going to fix that because it's too expensive?

MR. LAVELLE:  Objection to the form.

A.   No.

Q.   Because that's a very serious allegation you seem to be making about the company and I want to make it very clear if you're aware of any incident where they said, yes, that needs fixed but we are not going to do it because it's too expensive, I would like to know what that is.

MR. LAVELLE:  Objection to the form.

A.   I don't have anything to tell you.

Page 273

Q.   Now, aside from cement bond logs, there are other methods to test the efficacy of the cement job, correct?

A.   I think so.

Q.   Do you have any understanding as to what those tests might be?

A.   A pressure -- pressure testing.

Q.   Do you have any understanding of the mechanical integrity assessments that Cabot does on its wells?

A.   Only a vague understanding.

Q.   Okay.  Do you have any understanding as to what the DEP requires the company to do as far as mechanical -- ongoing mechanical integrity assessments of its wells?

A.   No.

Q.   Would it surprise you to know that there are regulations that require natural gas operators to regularly monitor the integrity of their cement casing or their cement jobs?

MR. LAVELLE:  Objection to the form.

A.   It doesn't surprise me to know that.

Q.   Attorney Lavelle also questioned you about the statement -- this is also on page 55, paragraph 160, "Cabot was all about doing things

Page 274

fast and cost-effectively as possible," correct?

A. That was a -- yes, I stand by that, yeah.

Q. Are you suggesting that the company disregarded safety or doing things properly just to get it done quick and cheap?

MR. LAVELLE: Objection to the form.

A. No, that's not -- no. I don't think that is the case. I think that they wanted to do things fast and cost-effectively, but I think safety was important.

Q. And you worked with -- you were friends with a lot of the people who worked there, correct?

A. Yes.

Q. And they took their jobs very seriously, didn't they?

A. Yes, they did.

Q. Okay. And they cared about the environment, didn't they?

A. It was, I'd say, mixed. I think some people did more than others. But overall, I think the general sentiment was that we have to do things -- at least with the people that I was interacting with, which was more of a, you know, my fellow geologists, and the few people that we worked with in land and in the drilling department,

Page 275

regulatory, that I feel like our -- generally, yes, we believed that it was important to do things well and safely.

Q. It said according to the -- also on page 55, paragraph 160, the statement, "According to the geologist, Cabot did not address the recurring issues concerning the inadequate cement bonding and integrity of the surface strings in its wells."

Do you see that?

A. I do, yeah.

Q. Did you make that statement?

A. I might have said something similar to that, yeah.

Q. And what reoccurring issues concerning inadequate cement bonding and integrity of the surface string are you referring to? Are you referring to your analysis of what you believe were problems?

A. I would say --

MR. LAVELLE: Objection to the form.

A. Sorry.

I would say that when there were water well issues as a result of drilling, that, from my view of things, it didn't seem that the, you know -- I didn't see it personally, but it doesn't mean it

Page 276

didn't happen, that evaluation of those surface strings and the cement bonding in them were something that they were really looking at as much as they were looking at geological reasons why something like that could have occurred.

Q. Okay. And as you sit here today, you really don't know whether issues were addressed or not, correct?

MR. LAVELLE: Objection to the form.

A. I -- I don't, no.

Q. Paragraph 161, it says: The geologist also explained that Cabot had the ability to test methane levels and isotopes present in residential water wells.

Do you see that?

A. Yes.

Q. And Cabot did test methane levels and, on occasion, isotopes present in residential water wells; isn't that true?

MR. LAVELLE: Objection to the form.

A. Yes, they would test.

Q. And, in fact, Cabot had a very extensive water testing program, correct?

A. Correct.

MR. LAVELLE: Objection to the form.

Page 277

Q. And the individual -- the individual -- each individual water sample tested for over 200 different analytes, correct?

A. Correct.

Q. And you were familiar with the AX system, correct?

A. Yes.

Q. And you were able to access that data?

A. Yes.

Q. And, in fact, you did access that data in formulating different maps and things of that nature, correct?

A. Sometimes.

Q. Okay. Now, earlier you said that there was a time when Cabot did not conduct any predrill testing at all, correct?

A. From my understanding, in the early days of activity in Susquehanna County that there was not a predrill water well testing program in place was what I was told.

Q. Are you talking about a formal program or are you saying there was no predrill testing done whatsoever? Because I can show you some examples of predrill testing that was done and I'm trying to understand where that information is coming from.

Page 278

MR. LAVELLE:  Objection to the form.

A.  I'm sorry.  Yeah, it was just what was told to me when I started working there, that, you know, it -- earlier, like I just said, that there wasn't a program that was testing people's water before drilling.  And that is one reason why Phil Levasseur took that position, is that he was kind of put in charge of that program.

So, yeah, if there was testing done, I don't disbelieve it, but it was -- I'm just telling you what was explained to me.

Q.  Okay.  Also, in paragraph 161 it says, "The geologist further stated that Cabot only sampled well water from a well after a well was drilled if a complaint regarding the well water was made."

Do you see that?  Is that your position?

MR. LAVELLE:  Objection to the form.

A.  That's what I was told.  And what I understood is that the post drill samples of water taken from a faucet was only done if the landowner requested it or if there was a problem reported.  It wasn't done automatically, if that makes sense.  But that's not what I observed.  That's what I was told by people.

Page 279

Q.  Okay.  And you say -- in continuing that sentence, you say that water was only sampled after a well was drilled "because every time the company pulled a water well cap, Cabot would be attached and responsible for that well."

Could you explain to me what that means because I don't understand it.

A.  Yeah, this is awkwardly written right here.  This is not -- this doesn't make sense to me either.

So what I was trying to convey was that Cabot was not in the habit of pulling water well caps off of water wells because you never want to do that and -- because if conditions changes after they did that, then that would be, you know, you'd be attached to it in some way.  What did you do when you pulled my cap?

So, yeah, that's an awkwardly written thing and I'm not okay with the way this is written.

Q.  Okay. All right.  Good.  Because I didn't understand it and I just wanted to make sure we were clear.

A.  Yeah.

Q.  Okay.  It says:  The geologist explained that the company's view was no news is good news and

Page 280

that Cabot did not want to be attached to or have financial obligations for the water wells.

Do you see that?

A.  Yeah.

Q.  Did you say that?

A.  I said no news is good news in regards to after a gas well was drilled and if you didn't hear any complaints or anything like that from a landowner, that was good.  You know, they were happy with things, and, you know, that's what everybody wants.

And that Cabot did not want to be attached to or have financial obligations for -- yeah, I mean that's -- yeah.  Say if someone did complain, now it's Cabot's problem.  They're going to have to go in and do testing and who knows what's going to happen after that.

So, of course, we all wanted there to be no complaints, no news, and that would be good news.

Q.  But -- I just want to make sure I'm clear.

Are you suggesting that Cabot didn't go in and test water after wells were drilled because it didn't want to be attached to or have financial obligations for the wells?  Are you saying that

Page 281

there?

MR. LAVELLE:  Objection to the form.

A.  That's not what I'm saying at all.  No.

Q.  Okay.

A.  And like I said, a lot of the information was given was, like, teaching, this is how the industry works, like, in general, these are the practices.

Q.  Okay.

A.  I think that something got lost in translation there.

Q.  Okay.  Paragraph 164, it says:  The geologist further explained that Stalnaker was in constant, near daily communications with Dan Dinges and others at Cabot's Houston headquarters and that Stalnaker had remarked that he spoke with Dan Dinges regularly.

Do you see that?

A.  Yes.

Q.  You do not have any firsthand knowledge as to how often Mr. Stalnaker spoke with Mr. Dinges, correct?

A.  You're right.

MR. LAVELLE:  Objection to the form.

A.  I don't.

Page 282

Q.   And you were not monitoring his e-mails, Mr. Stalnaker's e-mails, correct?

A.   Correct.

Q.   And you were not tapping into his phone conversations, correct?

A.   Correct.

Q.   So you can't sit here and say whether he was in constant or near daily communications with Mr. Dinges, correct?

MR. LAVELLE:  Objection to the form.

A.   I can't confirm it, no.  It's just what I heard around the office and what I understood about how that communication occurred.  But no, I did not have any direct knowledge.

Q.   Okay.  You also say or the complaint says, "Stalnaker would request information for his calls with Dinges, and the geologist observed Buddy Wylie, an exploration manager in Pennsylvania, meeting with Stalnaker in preparation for these calls."

Do you see that?

A.   Yes.

Q.   You did not attend the meetings between Mr. Stalnaker and Dr. Wylie, did you?

A.   No, not with -- not meetings with

Page 283

Mr. Dinges, no.

Q.   Okay.  But you did not attend the meetings with Mr. Stalnaker and Dr. Wylie in connection with these meetings that were supposedly happening in preparation of calls with Mr. Dinges.

MR. LAVELLE:  Objection to the form.

A.   There might have been occasions when I was, you know, if -- if Dr. Wylie asked me to come to a meeting to talk to Phil about something, an issue or a finding, I would, and some of that might have been information that would be passed on to Houston but I can't confirm that.

Q.   Did you pass any information along directly to Houston yourself?

A.   No.

Q.   But let me phrase it this way.  You cannot say with any firsthand knowledge -- you don't have any firsthand knowledge of any meetings that occurred between Dr. Wylie and Mr. Stalnaker for which you were not present, correct?

MR. LAVELLE:  Objection to the form.

A.   Correct.

Q.   Okay.  Paragraph 165, it says "The geologist stated that Stalnaker attended and presented at Cabot's board meetings and kept the

Page 284

board apprised of Cabot's Pennsylvania operations."

Do you see that?

A.   Yes.

Q.   You do not have any firsthand knowledge of Mr. Stalnaker attending any board meetings, correct?

A.   You're right, correct.

Q.   And you do not have any firsthand knowledge as to what Mr. Stalnaker kept the board apprised of, if anything, correct?

A.   All I know is what I would see in board slides that were being prepared and sometimes I would have input into those board slides but that is all.

Q.   Okay.  But you don't have any firsthand knowledge if he ever even showed those slides at a board meeting, correct?

A.   Correct.

Q.   Further down in that paragraph it talks about slides that Cassie Culpepper prepared.  You say that information from all department was compiled into the slide deck.

Do you see that?

A.   Yes.

Q.   Okay.  You don't have any firsthand

Page 285

knowledge as to whether those specific slides were actually presented to the board, correct?

A.   Correct.

MR. LAVELLE:  Objection to the form.

Q.   Okay.  Paragraph 166, the complaint says, "According to the geologist, Stalnaker was also involved in preparing Cabot's SEC filings."

Do you see that?

A.   Yes.

Q.   You do not have any firsthand knowledge of Mr. Stalnaker's preparation of any SEC filings, correct?

MR. LAVELLE:  Objection to the form.

A.   Correct.

Q.   And I believe you testified that you can only speak to your work that you may have been asked to give information, correct?

A.   Correct.

Q.   At the end of paragraph 166, it says, "Stalnaker attended these meetings and conducted presentations near the end of the process."

Do you see that?

A.   I do.

Q.   And I believe you said that you personally had only attended one meeting, correct?

Case 4:21-cv-02045   Document 190-8   Filed 11/13/23 in TXSD   Page 20 of 22
Deposition of Emily Mercurio, Ph.D.
Delaware County Employees Retirement System v. Cabot Oil & Gas Corp., et al

Page 286

A.  Yes, I would say safely say one meeting, yeah.

Q.  Okay.  So for all of the other meetings, you do not have any firsthand knowledge as to whether Mr. Stalnaker attended those meetings, correct?

MR. LAVELLE:  Objection to the form.

A.  Correct.

Q.  And you do not have any firsthand knowledge of anything that was discussed during those meetings, correct?

A.  Correct.

Q.  Paragraph 167, it said, "The geologist had no doubt that Stalnaker knew about every notice of violation and every single action the company performed to remediate."

Do you see that?

A.  I do.

Q.  Okay.  You do not have any firsthand knowledge as to what Mr. Stalnaker knew about notices of violation, correct?

A.  You're right; correct.

Q.  And you do not have any firsthand knowledge about actions that Mr. Stalnaker was aware of to remediate any wells, correct?

Page 287

MR. LAVELLE:  Objection to the form.

A.  Correct.  I do not have firsthand knowledge.

Q.  Okay.  It said, "The geologist observed Stalnaker attend closed-door meetings with regulatory managers when compliance problems occurred."

Do you see that?

A.  Yeah.

Q.  Okay.  You don't have any firsthand knowledge as to what was discussed in any meetings in which you were not present, correct?

A.  Correct.

Q.  So you don't know whether meetings that Mr. Stalnaker was having with regulatory managers even had to deal with compliance issues, correct?

MR. LAVELLE:  Objection to the form.

A.  Correct.

Q.  Okay.  Further down that paragraph it says, "In addition, the geologist believed that Stalnaker, either directly or through another, informed Cabot's headquarters in Houston, including Dinges, regarding notices of violation."

Do you see that?

A.  Uh-huh.

Page 288

Q.  You don't have any firsthand knowledge as to what Mr. Stalnaker may have conveyed to anyone at Houston, if anything, about notices of violation; correct?

A.  I don't have any firsthand knowledge, no.

Q.  Further down it said, "The geologist also believed that notices of violation were forwarded to Deidre Shear, Cabot's vice president and managing counsel in Houston."

Do you see that?

A.  I do.

Q.  Okay.  You do not have any firsthand knowledge of what was forwarded, if anything, to Miss Shear, correct?

A.  Correct.

Q.  Paragraph 168, it said, "Managers would report all stray gas leaks or gas migration to Stalnaker, including slide presentations explaining the problem."

Do you see that?

A.  Yes.

Q.  Did you say that?

A.  I don't know if I would say "all."  Yeah, I wouldn't agree with the term "all."  Some, but not -- all, I don't know.

Page 289

Q.  Okay.  Do you have -- you don't have any firsthand knowledge as to what specific managers reported to Mr. Stalnaker about gas migration if anything at all, correct?

MR. LAVELLE:  Objection to the form.

A.  I don't.  I don't.

Q.  Okay.  Any -- the next sentence says, "Any remediation costs would have to be signed off by Stalnaker."

Do you see that?

A.  Yes.

Q.  There are others at the company who could have signed off on remediation costs, correct?

A.  I don't know.  I don't know.

Q.  So you don't know whether all -- any remediation costs would had to have been signed off by Mr. Stalnaker.

MR. LAVELLE:  Objection to the form.

A.  I don't know for sure.  But I guess I was basing that statement on the fact that I had been told by Dr. Wylie that costs over a certain amount had to be approved by Phil.  So that's where I was kind of making that connection.

Q.  Okay.  So, again, you don't know whether that's true that all -- any remediation costs would

Page 290

have to be signed off by Mr. Stalnaker.

MR. LAVELLE: Objection to the form.

A. I don't know for sure.

Q. Okay. The next sentence, "The geologist explained that Stalnaker approved all funds authorized for expenditure (AFE) over $25,000 as part of Cabot's accounting and financial system."

You don't have any firsthand knowledge as to what Mr. Stalnaker approved, do you?

MR. LAVELLE: Objection to the form.

A. No. I never saw the other side of that, so, no, I don't know. And -- yeah, that's my best answer.

Q. Where it says, "Well expenses and any additional costs, such as for remediation, were included in a package that was forwarded to Stalnaker for approval."

Do you see that?

A. Yes.

Q. Did you tell Mr. Lavelle that?

A. So I think this was just part of my previous statement that, you know, if there was -- anything done over a certain amount had to get approval, and I think that's just part of that general assertion there.

Page 291

Q. Okay. So you don't have any --

A. So I don't.

Q. You don't have any firsthand knowledge to support the statement that "Well expenses and any additional costs, such as for remediation, were included in a package that was forwarded to Stalnaker for approval"?

MR. LAVELLE: Objection to the form.

A. I don't have -- I don't have firsthand knowledge.

Q. Did you have any calls just between you and Mr. Dinges?

A. No.

Q. Did you ever have any calls where you had expressed concerns or reported anything back to Mr. Dinges?

A. No.

Q. Did you ever have any calls with Mr. Schroeder?

A. No.

Q. Did you ever take any of your concerns and report them to Mr. Schroeder?

A. No.

Q. You were not the geologist on the Stalter wells; correct?

Page 292

A. I don't remember. I don't think so, but I don't remember.

Q. Okay. If I were to show you the well progs, would that help you?

A. If my name wasn't on it, then I wasn't the geologist.

Q. Okay. You were not the geologist on the Howell wells; correct?

A. I don't remember.

Q. What about the Jeffers wells?

A. I don't remember.

Q. What about the Powers wells?

A. I don't remember.

Q. But you do remember, though, that the wells that you drilled never had any water contamination issues associated with them, correct?

MR. LAVELLE: Objection to the form.

A. Sorry. As far as what I knew, what I was told, there was not.

Q. Now, you knew the company had a hotline that -- you're aware that the company had a hotline that if you did have any problems or issues or there were any issues with safety, you could call that hotline and report it, correct?

A. Yeah, I'm familiar with that. Yeah.

Page 293

Q. And did you ever call the hotline to report anything about well integrity issues?

MR. LAVELLE: Objection to the form.

A. I didn't.

Q. Did you ever call the hotline for anything?

A. I don't remember if I ever did.

Q. Okay. You would agree with me that there were -- there was thermogenic pre-existing methane in water wells in Susquehanna County, correct?

MR. LAVELLE: Objection to the form.

A. Yes.

Q. And dissolved methane, as you stated, was seen bubbling up to surface in places like Salt Springs Park, correct?

A. Correct.

Q. And it's true, isn't it, that the naturally occurring methane was observed at high levels quite frequently in the valley areas?

MR. LAVELLE: Objection to the form.

A. Yes. Yes.

Q. And that's opposed to water wells that are drilled in the upland sections, correct?

A. Correct.

MS. BARRETTE: Can we just take a quick

Deposition of Emily Mercurio, Ph.D.                    Delaware County Employees Retirement System v. Cabot Oil & Gas Corp., et al

COMMONWEALTH OF PENNSYLVANIA)
COUNTY OF WESTMORELAND        )


        I, Dutcheen O. Cameron, Registered Merit Reporter-Certified Realtime Reporter and Notary Public in and for the Commonwealth of Pennsylvania, do hereby certify that the witness was by me first duly sworn to testify the truth, the whole truth, and nothing but the truth; that the foregoing deposition was taken at the time and place stated herein; and that the said deposition was recorded stenographically by me and then reduced to typewriting under my direction, and constitutes a true record of the testimony given by said witness, all to the best of my skill and ability.

        I further certify that the inspection, reading and signing of said deposition were not waived by counsel for the respective parties and by the witness and if after 30 days the transcript has not been signed by said witness that the witness received notification and has failed to respond and the deposition may then be used as though signed.

        I further certify that I am not a relative, or employee of either counsel, and that I am in no way interested, directly or indirectly, in this action.

        IN WITNESS WHEREOF, I have hereunto set my hand and affixed my seal of office this 2nd day of November, 2023.



        _____

        Dutcheen O. Cameron, RMR, CRR