**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | |
|---|---|
| DELAWARE COUNTY EMPLOYEES RETIREMENT SYSTEM, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiffs,<br><br>v.<br><br>CABOT OIL & GAS CORPORATION, *et al.*,<br><br>Defendants. | Case No: 4:21-CV-02045 |

**DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR LEAVE TO AMEND**

**TABLE OF CONTENTS**


**INTRODUCTION AND SUMMARY OF ARGUMENT ........ 1**

**NATURE AND STAGE OF PROCEEDING ........ 2**

**STATEMENT OF ISSUES TO BE RULED ON ........ 2**

**FACTUAL BACKGROUND ........ 3**

**ARGUMENT AND AUTHORITIES ........ 18**

**I. THE NEW PROPOSED CLAIMS FAIL ON THE PLEADINGS ........ 8**

**A. The Guidance Claims Fail Based on the PSLRA Safe Harbor, Lack of Falsity, and Lack of Scienter ........ 18**

**B. The 2018 Production Growth Guidance Claims Are Time-Barred ........ 22**

**C. The Additional Environmental Claims Likewise Fail ........ 22**

**II. THE NEW CLAIMS ARE AN IMPROPER END-RUN AROUND THE PSLRA, WERE UNDULY DELAYED, AND WILL CAUSE UNWARRANTED PREJUDICE AND DISRUPTION ........ 24**

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Aguirre v. SBC Communs., Inc.*,
2007 WL 772756 (S.D. Tex. 2007) (Rosenthal, J.) ....25

*In re Alstom SA*,
406 F. Supp. 2d 433 (S.D.N.Y. 2017)....23

*In re AT & T Sec. Litig.*,
2004 WL 6392120 (D.N.J. Apr. 7, 2004) ....25

*In re Bisys Sec. Litig.*,
496 F. Supp. 2d 384 (S.D.N.Y. 2007), *aff'd sub nom. Pub. Employees Ret. Ass'n of New Mexico v. PricewaterhouseCoopers LLP,* 305 Fed. Appx. 742 (2d Cir. 2009)....24

*In re Bristol-Myers Squibb Sec. Litig.*,
228 F.R.D. 221 (D.N.J. 2005)....24

*Carlton v. Cannon*,
184 F. Supp. 3d 428 (S.D. Tex. 2016) (Rosenthal, J.)....18

*In re Celgene Corp. Secs. Litig.*,
2019 WL 6909463 (D.N.J. Dec. 19, 2019)....20

*City of Warwick Mun. Empls. Pens. Fund v. Rackspace Hosting, Inc.*,
2019 WL 452051 (S.D.N.Y. Feb. 5, 2019)....20

*Clean Energy v. Trillium Transportation Fuels, LLC*,
2021 3410668 (S.D. Tex. July 6, 2021)....21

*Coggins v. Camber Energy Inc.*,
-- F. Supp. 3d __, 2023 WL 6202056 (S.D. Tex. Sept. 22, 2023) ....17

*College Ret. Equities Fund v Boeing Co.*,
2023 WL 6065260 (N.D. Ill. Sept. 18, 2023) ....20

*Corley v. Entergy Corp.*,
220 F.R.D. 478 (E.D. Tex. 2004)....24

*Firefighters Pens. & Relief Fund of the City of New Orleans v. Bulmahn*,
147 F. Supp. 3d 493 (E.D. La. 2015)....18

*Firefighters Pens. & Relief Fund of the City of New Orleans v. Bulmahn*,
2015 WL 4879217 (E.D. La. Aug. 14, 2015) ....19

*Flaherty & Crumrine Preferred Income Fund, Inc. v. TXU Corp.*,
565 F.3d 200 (5th Cir. 2009) ....................22

*Gamboa v. Citizens, Inc.*,
2018 WL 2107205 (W.D. Tex. May 7, 2018) ....................22

*Greebel v. FTP Software, Inc.*,
182 F.R.D. 370 (D. Mass. 1998), aff'd, 194 F.3d 185 (1st Cir. 1999) ....................25

*Heinze v. Tesco Corp.*,
971 F.3d 475 (5th Cir. 2020) ....................18

*Ho v. Flotek Indus., Inc.*,
248 F. Supp. 3d 847 (S.D. Tex. 2017), *aff'd sub nom. Alaska Electrical Pension Fund v. Flotek Indus., Inc.*, 915 F.3d 975 (5th Cir. 2019) ....................22

*Ind. Elec. Workers' Pension Trust Fund IBEW v. Shaw Grp., Inc.*,
537 F.3d 527 (5th Cir. 2008) ....................22

*Johnson v. Kansas City S. Ry. Co.*,
208 F. App'x 292 (5th Cir. 2006) ....................24

*JRS Partners, GP v. Leech Tishman Fuscaldo & Lampl, LLC*,
615 F. Supp. 3d 750 (M.D. Tenn. 2022) ....................21

*Kalnit v. Eichler*,
264 F.3d 131 (2d Cir. 2001) ....................22

*In re Longtop Fin. Tech. Ltd. Secs. Litig.*,
939 F. Supp. 3d 360 (S.D.N.Y. 2013) ....................21

*Margolies v. Deason*,
464 F.3d 547 (5th Cir. 2006) ....................21

*Material Yard Workers Local 1175 Ben. Funds v. Men's Wearhouse, Inc.*,
2011 WL 3059229 (S.D. Tex. July 22, 2011) ....................7

*Medhekar v. U.S. Dist. Court for the N. Dist. of California*,
99 F.3d 325 (9th Cir. 1996) ....................24

*Naglich v. Applied Optoelectronics*,
436 F. Supp. 3d 954 (S.D. Tex. 2020) ....................18

*Nix v. Major League Baseball*,
62 F.4th 920 (5th Cir. 2023) ....................17

*In re Noah Educ. Holdings, Ltd. Sec. Litig.*,
2010 WL 1372709 (S.D.N.Y. Mar. 31, 2010) ....................21

*In re Oracle Corp. Sec. Litig.*,
627 F.3d 376 (9th Cir. 2010) ....................21

*In re Overstock Sec. Litig.*,
2021 WL 4267920 (D. Utah Sept. 20, 2021) ....................21

*Sanders v. AVEO Pharm., Inc.*,
2015 WL 1276824 (D. Mass. Mar. 20, 2015) ....................22

*Schirle v. Sokudo USA, L.L.C.*,
484 F. App'x 893 (5th Cir. 2012) ....................21

*SEC v. Mapp*,
240 F. Supp. 3d 569 (E.D. Tex. 2017) ....................23

*Seeligson v. Devon Energy Prod. Co.*,
761 F. App'x 329 (5th Cir. 2019) ....................24

*Southeastern Pa. Trans. Auth. v. Orrstown Fin. Services Inc.*,
12 F. 4th 337 (3d Cir. 2021) ....................21

*Southland Sec. Corp. v. INSpire Ins. Sols., Inc.*,
365 F.3d 353 (5th Cir. 2004) ....................19

*Stichting Pensioenfonds ABP v. Countrywide Fin. Corp.*,
802 F. Supp. 2d 1125 (C.D. Cal. 2011) ....................21

*Stripling v. Jordan Prod. Co., LLC*,
234 F.3d 863 (5th Cir. 2000) ....................17

*U.S. v. Corp. Mgt., Inc.*,
78 F.4th 727 (5th Cir. 2023) ....................21

*Varela v. Gonzales*,
773 F.3d 704 (5th Cir. 2014) (per curiam) ....................17

*W. Pennsylvania Elec. Employees Pension Fund v. Mentor Graphics Corp.*,
2017 WL 3668957 (D. Or. June 2, 2017) ....................20

*W. Pennsylvania Elec. Fund v. Mentor Graphics Corp.*,
2017 WL 3622779 (D. Or. Aug. 23, 2017) ....................20

*Welch v. Atlas Roofing Corp.*,
2007 WL 3245444 (E.D. La. Nov. 2, 2007) ....................24

*Yoshikawa v. Exxon Mobil Corp.*,
2022 WL 4677621 (N.D. Tex. Sept. 29, 2022) ....................18, 19

*Zwick Partners, LP v. Quorum Health Corp.*,
394 F. Supp. 3d 804 (M.D. Tenn. 2019) ....................24, 25

**Rules and Statutes**

35 P.S. § 691.602 ....................17

15 U.S.C. § 78u-5(c)(1)(A) ....................................................................................................18

15 U.S.C. § 78u-5(c)(1)(B) ....................................................................................................18

28 U.S.C. § 1658(b) ...............................................................................................................21

17 C.F.R. § 229.103(c)(3) .........................................................................................................5

Defendants Cabot Oil & Gas Corporation ("Cabot"), Dan O. Dinges, and Scott C. Schroeder ("Defendants") respectfully oppose Plaintiffs' motion for leave to amend.

**INTRODUCTION AND SUMMARY OF ARGUMENT**

After spending three years litigating an environmental disclosure case, and having watched their remaining environmental claims implode during discovery, Plaintiffs have now made a last-ditch effort to transform this suit into a production guidance case. Plaintiffs cannot plausibly dispute that Defendants appropriately repaired the wells subject to the three notices of violation ("NOVs") referenced in the three categories of remaining alleged misstatements in the existing complaint. Indeed, it is unrefuted that the Pennsylvania Department of Environmental Protection ("PaDEP") did not require Cabot to perform any additional repairs with respect to those NOVs after the challenged disclosures, thus negating any conceivable inference that Dinges or Schroeder acted with severe recklessness or fraudulent intent in approving the challenged disclosures.

The Court should reject Plaintiffs' eleventh-hour effort to add brand-new claims over statements never previously challenged and to add other meritless claims that should be dismissed on the pleadings. Leave to amend should be denied when the proposed claims would fail on the pleadings—and the proposed claims here come nowhere close to meeting the rigorous requirements for securities fraud claims. The production guidance statements are classic forward-looking statements subject to the Private Securities Litigation Reform Act ("PSLRA") safe harbor. They were accompanied by robust cautionary disclosures and were not made with "actual knowledge" of falsity, a far higher standard than the already-onerous recklessness standard for non-forward-looking statements. The proposed claims over the 2018 guidance are moreover outside the five-year statute of repose and do not relate back to the earlier complaints. Plaintiffs have also attempted to add new claims pertaining to environmental issues, but those claims are equally meritless and likewise fail on the pleadings. The new allegations do not state a claim.

Denial of leave to amend is also appropriate on other grounds. Lead Plaintiff has already filed three complaints in this matter and should not be permitted yet another opportunity to amend, especially after the Court already dismissed the majority of their prior claims with prejudice. Allowing securities plaintiffs to use discovery on an initial narrow set of claims to bring new claims that were never pled and would not have survived a pleadings motion is an impermissible end-run around the PSLRA that should not be permitted. Plaintiffs moreover have continued to reassert the same baseless claims that the Court already rejected, including previously dismissed claims against Phil Stalnaker that should never have been pled, let alone repeatedly repled. The testimony from the PaDEP witnesses and Plaintiffs' "confidential witness" further confirmed that Plaintiffs' fraud claims are groundless and that the suit should not be further prolonged with new meritless claims. The parties incurred substantial time and expense litigating class certification on the existing claims and would need to litigate class certification again on the potential new claims, which include different theories, potential individualized issues created by their untimeliness, and an entirely new corrective disclosure and stock drop for the 2018 guidance claims. The Court should thus reject Plaintiffs' end-of-fact-discovery effort to revamp their failing claims.

**NATURE AND STAGE OF PROCEEDING**

The Court granted in part Defendants' motion to dismiss on August 10, 2022, allowing the case to proceed with respect to three categories of alleged misstatements. (*See* ECF #118.) The Court granted class certification on September 27, 2023. (ECF #173.) Defendants have filed a motion with the Fifth Circuit for leave to pursue an interlocutory appeal.

**STATEMENT OF ISSUES TO BE RULED ON**

1. Whether Plaintiffs should be granted leave to amend their complaint despite the insufficiency of the new allegations, the untimeliness of the claims, the prejudice and disruption

from allowing them, the weakness of the existing claims, the improper circumvention of the PSLRA's threshold pleading requirements, and Plaintiffs' continued assertion of meritless claims.

## FACTUAL BACKGROUND[1]

***Plaintiffs' Existing Claims Are Demonstrably Meritless***

As stated previously, there are three categories of remaining alleged misstatements. The "Category 1" and "Category 2" alleged misstatements were made between February 2016 and February 2017 and pertained to a proposed Consent Order received on November 12, 2015 to resolve an NOV issued in September 2011.[2] This proposed order and agreement related to certain wells on the Stalter well pad (the "Stalter Wells"). (*See* ECF 142-2 at 4, ECF 142-5, ECF 142-6, and ECF 142-7.) The "Category 3" disclosures were initially made in Cabot's July 26, 2019 Form 10-Q and concerned two proposed Consent Orders received on June 17, 2019 to resolve two NOVs issued in June and November 2017 (Compl ¶ 189). The statements regarding the June 2017 NOV pertain exclusively to certain wells on the Howell well pad (the "Howell Wells"). (See ECF 142-2 at 4; ECF 142-8; ECF 142-9; ECF 142-10 (same).) The statements regarding the November 2017 NOV pertain exclusively to certain wells on the Jeffers Farms Pad 2 well pad (the "Jeffers Farms Wells"). (ECF 142-2 at 4; ECF 142-11; ECF 142-12; ECF 142-13 (same).)

The unrefuted testimony and evidence in this matter demonstrates that these statements were truthful and, at a bare minimum, not recklessly or intentionally false. Indeed, PaDEP—which

---

[1] Defendants have attached emails and statements cited in the Proposed Amended Complaint. Courts may consider full copies of documents incorporated by reference or cited in the complaint and central to the claims. *See Alaska Elec. Pens. Fund v. Asar*, 768 F. App'x 175, 180 (5th Cir. 2019); *Lone Star Fund V (U.S., LP v. Barclays Bank PLC*, 594 F.3d 383, 387 (5th Cir. 2010). The exhibits are central to Plaintiffs' new claims and may be considered.

[2] *See* "First Amended Consolidated Complaint for Violation of the Federal Securities Laws" (ECF #110 ("Compl.") ¶¶ 186-88. Defendants will refer to Plaintiffs' proposed second amended consolidated complaint (ECF #185-6 and 185-7), which contains the same allegations as the prior complaint plus additional allegations in new paragraphs 191-203 and 271-72, as "Prop. Amended Compl."

monitored these wells for years before and after the challenged disclosures—never required Cabot to perform any additional repair or mechanical work on these wells other than permanently plugging the Stalter 8V well as disclosed in the "Category 2" disclosures. (*See, e.g.,* Ex. 1, Stalnaker Tr. 260:3-261:25; Ex. 2, Smelko Tr. 248:15-249:15, 254:10-19.) On December 28, 2020, PaDEP issued an order finding that "Cabot concluded remedial actions [on the Howell Wells] in November 2017. Evaluation of pressure in the annuli of the Gas Wells since the remedial work indicated that the work was effective in eliminating the flow of gas in the cemented annuli." (*See* ECF 142-10 ¶ V.) PaDEP issued a separate order similarly finding that its August 9, 2019 inspection of the Jeffers Farms Wells confirmed there was "no flow and no methane present on the 20x13 and 13x9 cemented annular spaces" for those wells. (*See* ECF 142-13 ¶ Z.)

The three challenged disclosures were also vetted by a four-person Disclosure Committee,[3] which met with Phil Stalnaker (who served as Senior Vice President, North Region at the end of the class period and oversaw Cabot's Pennsylvania operations) and Gordon Ganaway (who served as Director of Safety and Environmental Compliance) each quarter to discuss the environmental disclosures and the status of any PaDEP enforcement proceedings and related remediation. (*See* Ex. 1, Stalnaker Tr. 252:4-253:24; Ex. 4, Ganaway Tr. 231:4-13.). Stalnaker and Ganaway met with John Smelko, Cabot's Environmental and Regulatory Compliance Manager and the "point person at Cabot for communicating with [PaDEP]," each quarter to discuss the status of any ongoing environmental matters. (*See* Ex. 1, Stalnaker Tr. 252:4-11, 254:1-257:10; Ex. 4, Ganaway

---

[3] The Disclosure Committee consisted of Deidre Shearer (who served as Vice President and Corporate Secretary or Vice President, Administration and Corporate Secretary throughout the class period), Todd Roemer (who served as Vice President and Chief Accounting Officer), Steve Lindeman (who served as Senior Vice President, EHS and Engineering during the latter phase of the class period and Senior Vice President, South Region and Engineering during the earlier phase), Jeffrey Hutton (who served as Senior Vice President, Marketing). (*See* Ex. 1, Stalnaker Tr. 252:4-253:24; Ex. 3, Schroeder Tr. 182:12-185:15.)

Tr. 243:4-246:13; Ex. 2, Smelko Tr. 238:1-19.) All three witnesses testified unequivocally that they believed the challenged disclosures were accurate, that the remediation was successful, that they did not voice any concerns about the accuracy of the disclosures to anyone else at the company, and that there were no additional items that needed to be disclosed under the relevant SEC rule for environmental disclosures, which during the class period did not require disclosure of an environmental enforcement proceeding if Cabot had a reasonable belief the proceeding would not result in monetary penalties exceeding $100,000. (*See* 17 C.F.R. § 229.103(c)(3);[4] Ex. 1, Stalnaker Tr. 254:1-257:10, 261:13-267:10; Ex. 4, Ganaway Tr. 243:4-246:13, 247:22-252:21; Ex. 2, Smelko Tr. 245:13-255:25, 264:18-267:11.)

Testimony from PaDEP's own witnesses—whom Plaintiffs subpoenaed in hopes of bolstering their claims— further undercut Plaintiffs' allegations. For example, while Plaintiffs spent much of their discovery efforts on the wells subject to the Dimock Box restrictions (which did not include the Stalter, Howell, or Jeffers Farms Wells, and which were not within the actual or intended scope of the remaining alleged misstatements), PaDEP's inspector for those wells (Ken Kennedy) recommended that PaDEP "***not cite violations*** on these wells" during the class period "because Cabot ***was complying***" with PaDEP's requests, and testified that the mere "presence" of gas in the cemented annulus is not a violation of Pennsylvania law and that PaDEP's June 11, 2018 and April 25, 2019 letters to Cabot did not say PaDEP intended to pursue any enforcement order or penalties with respect to the wells described therein. (Ex. 5 Kennedy Tr. 142:1-143:25, 140:23-141:12, 232:17-235:19.). Seth Pelepko, the PaDEP manager cited in the Complaint, made a presentation to Cabot regarding the Dimock Wells that praised "[i]mproving conditions" likely

[4] Item 103(c)(3) was amended after the class period to increase the penalty threshold from $100,000 to $300,000.

attributable to "primary and remedial cementing activities," as well as "[s]teadily declining annular pressures and significant workover activities" that "have reduced risks." (Ex. 6, Pelepko Tr. 179:12-183:15.) Pelepko also refuted Plaintiffs' assertion that thermogenic methane resulted solely from oil and gas production, agreeing that thermogenic methane already existed in Susquehanna County groundwater. (*Compare* Compl. ¶ 108 *with* Pelekpo Tr. 183:17-196:7.) Michael O'Donnell, who served as a PaDEP water quality supervisor and environmental group manager, acknowledged that NOVs, PaDEP orders, and external correspondence are public records that anyone could access, that the issuance of an NOV does not "impose" any enforcement action, and that PaDEP did not require any further "corrective actions" on the Stalter Wells in its December 2016 Consent Order other than completing the plugging disclosed in the Category 2 disclosure. (Ex. 7, O'Donnell Tr. 181:14-182:23, 183:21-184:20, 186:10-187:2.) There is also no evidence Cabot refused to perform any test that PaDEP required with respect to the wells at issue.

***The Implosion of Plaintiffs' "Confidential Witness" Allegations***

Plaintiffs' primary confidential witness, the unnamed "Geologist" prominently cited in Paragraphs 156-168 of the Complaint (Emily Mercurio), also was deposed at Plaintiffs' request.[5] Despite knowing that Mercurio had signed a confidentiality agreement/NDA as a condition of her employment with Cabot, Plaintiffs' counsel conducted numerous interviews of her, during which they elicited confidential information about Cabot's operations that they then used to litter the Complaint with inaccurate, unfounded speculation, disguised as "fact." As Mercurio's testimony demonstrated, she is a disgruntled former employee who received critical comments on

[5] Plaintiffs did not serve any notice that she would be deposed until October 4, 2023, shortly before the discovery cutoff and during the PaDEP witness depositions. Defendants thereafter served their own cross-subpoena on Mercurio.

performance reviews, left Cabot on bad terms with her direct supervisor (who is not a defendant), and was entirely unqualified to make the allegations attributed to her in the Complaint.

Mercurio's testimony confirmed the adage that "[a] secret witness is not far above a false witness."[6] First, just days before the date of her originally scheduled deposition, Mercurio removed language from her LinkedIn profile—language that contradicted the narrative she intended to present during her deposition. Specifically, Mercurio removed language stating that there were no water quality complaints associated with the 120 natural gas wells that she claimed to have "drilled" at Cabot. During her deposition, she initially (***and falsely***) denied that she made any recent changes to her LinkedIn profile. When pressed, she admitted that she scrubbed her LinkedIn profile "just seven or eight days before [she] was going to be deposed" to remove the statement that there were ***no water quality complaints*** on the 120 wells she claims to have drilled at Cabot – the same 120 wells Plaintiffs claim she described as "routinely" lacking adequate cement bonds. (*See* Ex. 8, Mercurio Tr. 202:14-207:8; Compl. ¶ 159.) When caught in her initial untruth about editing her profile, she claimed that she deleted the language because she was nervous about reporting the "capital investment" for those wells, yet she ***kept*** the reference to "$1 billion of capital investment" in her public profile. (*See id.* 203:2-9, 205:12-22.) The real reason for the scrub is self-evident: she knew the "no water complaints" statement was detrimental to Plaintiffs' case and inconsistent with the testimony she planned to present at her soon-approaching deposition.

Further, notwithstanding Plaintiffs' mischaracterization of these 120 wells in the Complaint as "routinely" lacking adequate cement and being a "ticking time bomb" of supposed gas migration problems, Mercurio testified that all 120 wells were "successful." (*See id.* 203:2-

---

[6] *See Material Yard Workers Local 1175 Ben. Funds v. Men's Wearhouse, Inc.*, 2011 WL 3059229, at *6 (S.D. Tex. July 22, 2011) (rejecting confidential witness allegations in securities fraud complaint).

204:2, 205:23-206:2.) She described them as "successful" in her LinkedIn profile and in other public and private communications. (*See id.*) She further testified that she was "very proud" of the wells' "success," and that during her communications with Plaintiffs' counsel she likely described the wells as successful, in addition to telling them that there were no water quality complaints for the wells. (*See id.*) Plaintiffs' counsel, however, omitted from the Complaint any reference to the "success" of the wells and the lack of water quality complaints for those wells.

The other allegations attributable to Mercurio likewise crumbled. Plaintiffs heavily relied on her statements to support their claims related to alleged improper cementing and lack of remediation. (Complaint ¶¶ 158-160.) More specifically, Plaintiffs relied on Mercurio to advance their false claims that cement bog logs ("CBL") demonstrated problems with Cabot's wells, which led to gas migration issues. (*See id.*) During her deposition, however, Mercurio admitted that she was wholly unqualified to make the speculative, unfounded allegations attributed to her in the Complaint. Mercurio testified that during the entirety of her formal academic training, spanning several years, she took one drilling course, for which she did not take the tests and during which she did not review CBLs. (*See* Ex. 8, Mercurio Tr. 150:9-154:3.) She further testified that she: (1) does not know the types of CBLs that were run on Cabot's wells; (2) does not know the pitfalls of the different types of CBLs; (3) does not know the difference between the types of CBLs; (4) does not know how additives to cement would affect a CBL; (5) does not know the steps that have to be taken before a CBL is run; (6) never made any efforts while reviewing CBLs to understand what other factors could affect her opinion; (7) is not an expert in CBL interpretation; (8) is not holding herself out as an expert in CBL interpretation; and (9) that analysis and interpretation of CBLs was not part of her job. (*See id.* 251:8-271:18.)

Mercurio also testified that poorly bonded wells were a "ticking time bomb" because they "open[] up a pathway for corrosion of cement," but then admitted she had "no evidence" that such corrosion occurred on any Cabot wells and that her "deficient cement jobs were a ticking time bomb" statement in Paragraph 157 of the Complaint was "just speculation." (*See id.* 244:1-16; 246:1-247:4.) Despite statements attributed to Mercurio in Paragraph 157 of the Complaint concerning the formation of a "micro-annular space," Mercurio testified she didn't know what a "micro-annular space" even looked like on a CBL, (*id.* 242:14-243:8), that she was not qualified to determine whether they existed from reading a CBL (*id.*), and that she "can't say for certainty whether the anomalies that [she] perceived on the [CBLs] really reflected an absence of cement. (*Id*. 254:5-14.) When asked if she "would feel confident taking the witness stand in court and making those statements that you made in the complaint" concerning CBLs, she admitted that "I guess I would still feel confident in saying that I saw – what I – what I saw were, like, discrepancies in them, but I do not feel confident – as much confidence in interpreting that." (*See id.* 268:22-269:8.) She further admitted that her supervisor's prior criticisms about her difficulties in "getting the details and understanding the data when formulating an opinion . . . kind of plays over" to the speculative and unfounded comments she made to Plaintiffs' counsel about CBLs. (*See id.*)

Mercurio further testified that she could not identify a single instance where Cabot refused to perform a needed repair to back up her assertion in Paragraph 160 of the Complaint that "when issues were identified in the [CBLs], the company was reluctant to repair the casings because of the expense." (*See id.* 272:7-25.) Likewise, contrary to the allegation in Paragraph 160 of the Complaint, that Cabot was only concerned about "doing things as fast and as cost effective as possible," Mercurio clarified that "safety was important" and that "we believed it was important to do things well and safely." (*See id.* 273:23-274:16.) As for her statement that "Cabot did not

address the reoccurring issues" in what she perceived to be "inadequate cement bonding of the surface strings in its wells," Mercurio admitted that she did not know whether issues were addressed or not. (*See id.* 275:4-276:10.)

Concerning Cabot's predrill water testing, Mercurio testified that she was not accusing Cabot of failing to test water wells "because it didn't want to be attached to or have financial obligations for the wells" (contrary to Paragraph 161 of the Complaint). (See id. 279:1-23, 280:22-281:11.) Indeed, Mercurio's testimony confirms that Cabot had a very extensive water testing program, which included testing samples for over 200 analytes, including methane, and that thermogenic pre-drill methane existed in Susquehanna County water wells (contrary to Plaintiffs' allegations in Paragraph 108). (*See id.* 276:17-278:11, 293:8-24.)

With regard to Mr. Stalnaker, contrary to Plaintiffs' allegations in Paragraphs 164-168 Mercurio testified that she had ***no firsthand knowledge*** of the following: (1) the frequency of communications between Mr. Stalnaker and Mr. Dinges; (2) Mr. Stalnaker's attendance at board meetings; (3) what, if anything, was presented at board meetings (4) Mr. Stalnaker's alleged preparation of SEC filings; (5) Mr. Stalnaker's knowledge of notices of violations ("NOV"); (6) Mr. Stalnaker's knowledge of remediation efforts; (7) meetings Mr. Stalnaker may have had with regulatory managers; (8) what, if anything Mr. Stalnaker may have conveyed to anyone about NOVs; (9) what, if anything was forwarded to Deidre Shearer concerning NOVs; (10) what, if anything, managers reported to Mr. Stalnaker about gas migration; (11) whether remediation costs had to be signed off by Mr. Stalnaker; (12) what expenditures, if any, were approved by Mr. Stalnaker; and (13) whether well expenses and costs for remediation were included in a package forwarded to Mr. Stalnaker for approval. (*See id.* 281:12-291:10.). In sum, all of the allegations attributable to Mercurio concerning Mr. Stalnaker were, at best, sheer speculation. Finally,

Mercurio testified that she never reported any concerns she may have had to Mr. Dinges, Mr. Schroeder, or through Cabot's whistleblower hotline. (*See id.* 291:11-293:7.)

In short, the allegations attributable to Mercurio in the Complaint, obtained by Plaintiffs' counsel knowing Mercurio had signed a confidentiality agreement, are wholly lacking in foundation or credibility and are simply speculation from the viewpoint of a disgruntled former employee. They should never have been alleged in the first instance, and should not be re-alleged.

***The Proposed Additional Claims***

Plaintiffs' proposed new claims are set forth in Paragraphs 191-203 and 271-73 of the Proposed Amended Complaint. Two are guidance-related. The remainder are environment-related.

***First,*** Plaintiffs assert that Cabot falsely reaffirmed its 2018 annual production growth guidance of 10% to 15% in its first quarter earnings announcement on April 27, 2018, which Plaintiffs say was improper based on a series of selectively quoted emails discussing "concerns" about certain parts of internal forecasts. (*See* Prop. Am. Compl. ¶¶ 191-92.) As a preliminary matter, the only "corrective disclosure" Plaintiffs allege for this statement is Cabot's subsequent quarterly announcement on July 27, 2018 that it was compressing the guidance range from 10 to 15% to 10 to 12%. (*See* Prop. Am. Compl. ¶ 271.) In other words, even the "corrected" July 2018 production growth guidance was still within the range of the supposedly false prior guidance.

Plaintiffs' selective quotations fall far short of showing that the July 27, 2018 guidance announcement was knowingly false, as Plaintiffs must do to overcome the PSLRA safe harbor assuming *arguendo* that the cautionary disclosures were insufficient (which they most certainly were not). Plaintiffs cite an April 6, 2018 email from Cabot employee Matt Kerin to Defendant Scott Schroeder asking "how do you want to handle the communication with the North Region regarding our concerns with their updated production forecast?" (*See id.* ¶ 191(c); Ex. 25, April 6,

2018 email.) Merely expressing "concerns" with preliminary forecasts—a common and indeed expected dynamic between employees when companies are preparing, evaluating, and debating performance estimates—comes nowhere close to showing "actual knowledge" of falsity.

Plaintiffs next cite an April 9, 2018 email from Kerin to Schroeder that admittedly reflected production levels were still within the low end of the guidance range—which ***refutes*** any inference the guidance was knowingly false (let alone as of the first quarter, with three quarters remaining to achieve the projection). (*See* Prop. Am. Comp. ¶ 191(d).) Schroeder moreover admittedly responded by asking "what we are doing to get back closer to budget," again confirming his subjective belief that the "budget" was still achievable. (*See id.*) Plaintiffs also selectively quote from an April 9, 2018 email chain between Cabot employee Gary Hlavinka and members of the "forecasting team" listing issues that had contributed to "production delays," but conspicuously fail to identify any portion of the email suggesting that any particular forecast was unattainable. (*See* Prop. Am. Compl. ¶ 191(f); Ex. 18, April 11, 2018 email.)

Plaintiffs then admit that Cabot's forecasting team did in fact submit a new forecast on April 18, 2018, again refuting any inference that the forecasting team (let alone Schroeder or Dinges) believed the forecast was unattainable. (*See* Prop. Am. Compl. ¶ 191(g); Ex. 19, April 18, 2018 email.) While Plaintiffs assert that Kerin expressed concerns about certain parts of the forecast, Plaintiffs do not and cannot allege that Kerin told anyone (or personally believed) that the updated forecast was unachievable. (*See id.*) Further, while Plaintiffs selectively quote Kerin as stating that the forecasted production increase in August was a "huge feat" and presented "a risk of missing 'production by a decent amount'" (which, again, is a far cry from saying Cabot was assured to miss its guidance), the actual sentences read: "That seems like a huge feat and historically we have tried to cap the month to month growth levels to less than 300/d since we have

had issues in the past bringing on that much gas at once. ***Perhaps the in-service of ASR fixes that*** but we do run the risk that if it is delayed to September, we would either have to flood the market or miss production by a decent amount." (*See* Ex. 19) (emphasis added.) This paragraph thus did not say Cabot has never achieved a similar month-to-month increase and acknowledged it was possible for the "in-service of ASR" to result in the forecasted increase. Plaintiffs allege no facts showing that Cabot did not in fact have additional potential production that could ramp up later in 2018—and again, because it was the first quarter, Cabot had the rest of the year to catch up.

Plaintiffs also misleadingly allege that Hlavinka sent Schroeder an email on April 24, 2018 "conceding" that Cabot "would need to revisit their full-year guidance" because a lower-than-expected production rate "has reduced our expectations of attaining previously forecast production levels for the remainder of the year." (*See* Prop. Am. Compl. ¶ 191(h); Ex. 20, April 24, 2018 email.) As a preliminary matter, saying that one has a "reduced" expectation of achieving guidance is a far cry from saying that one has ***no*** expectation of meeting the forecast. Plaintiffs moreover omit the fact that the "reduced" expectations paragraph was contained in an April 11, 2018 email that Hlavinka forwarded to Schroeder for purposes of providing "[a]dditional color" regarding the forecasting, as well as the portions of the April 11, 2018 email showing "[w]hat we are doing to get back to budget" and listing multiple opportunities for ***increasing*** 2018 production. (*See* Ex. 20 at 2.) The email does not "concede" that Cabot will need to "revisit" its guidance and instead confirms that Cabot did have a reasonable belief the guidance range could still be achieved.

The Complaint also cites another April 24, 2018 email from Hlavinka to Stalnaker (but not to Schroeder or Dinges) that contained three forecasts, including what Plaintiffs claim to be the "pressure sensitized" forecast Kerin referenced on April 18, 2018 as well as an "unadjusted" forecast that did not adjust for production delays. (*See* Prop. Am. Compl. ¶ 192(i); Ex. 24, April

24, 2018 email.) While Plaintiffs allege the "pressure sensitized" forecast shows lower production than estimated in Cabot's original 2018 budget, Plaintiffs allege no facts showing that the "pressure sensitized" forecast was the sole or primary basis for Cabot's April 27, 2018 guidance reaffirmation, or that Hlavinka intended to communicate any reservations to Stalnaker in this email (which, again, was not sent to Schroeder or Dinges) about Cabot's ability to meet its public guidance. Plaintiffs also make no particularized allegations regarding the time period between this April 24, 2018 and the guidance announcement on April 27, 2018. Further, while Plaintiffs cite the "nine billion cubic feet" ("BCF") reduction in the "pressure sensitized" forecast (*see* Prop. Am. Compl. ¶ 191), that is less than 1% of the 902 BCF forecasted in the "2018 Budget," a small reduction that fails to show the public guidance is unachievable. (*See* ECF #190-24, page 5 of 17.)

Lastly, the Complaint cites a set of disclosure questionnaire checklist responses from Cabot drilling manager Steve Novakowski in which he expressed general concerns about the pressure created by gas migration investigations and the impacts of drilling schedule delays in response to questions about potential risk areas for the company. (*See* Prop. Am. Compl. ¶ 192(b).) Plaintiffs do not and cannot allege, however, that these concerns were conveyed to Dinges or Schroeder, that Novakowski's concerns actually materialized, or that Novakowski expressed any specific concern that any of Cabot's publicly reported guidance was unachievable. The 2018 guidance claim fails.

***Second*****,** Plaintiffs allege that Cabot acted improperly in disclosing "preliminary" 2019 production growth guidance of 20 to 25% on October 26, 2018, or 20% guidance the next two quarters. (*See* Prop. Am. Compl. ¶ 193-99.) The word "preliminary" itself conveys that this range was an early estimate subject to change. In addition to relying on Novakowski's disclosure checklist responses (which, again, were not furnished to Dinges and Schroeder, involved personal concerns that did not materialize, and expressed no specific views that any specific guidance

forecasts were unachievable), Plaintiffs rely on an email chain between Hlavinka and the forecasting team, in which Hlavinka expressed his view that the team's low-end growth forecast of 16% was "not reasonable" and advocated instead for a 22% low-end forecast as a more reasonable number.[7] Nothing about this email suggests that Hlavinka (let alone Dinges or Schroeder, who were not copied) believed the higher range was unreasonable or unattainable; indeed, it shows that Hlavinka believed the initial 16% forecasts were unreasonably low. The unsurprising fact that Hlavinka allegedly could not recall every specific detail regarding this five-year-old email at his deposition does nothing to show that he disbelieved his forecast at the time or never had any foundation for it, let alone that Dinges or Schroeder acted fraudulently.

Plaintiffs also cite an after-the-fact July 15, 2019 email from Stalnaker (shortly before Cabot announced a reduced production growth guidance range of 16-18%) stating that "we were never at 20% production growth based on our forecast," but omit Kerin's response that "[w]e were at 19 and change." (*See* Prop. Am. Compl. ¶ 197(h); Ex. 22, July 15, 2019 email.) Cabot moreover had previously reduced the "preliminary" 20-25% range to a flat 20% projection during the prior two quarters. (*See* Prop. Am. Compl. ¶ 196.) There are no allegations showing Dinges or Schroeder knew Cabot could not achieve a 20-25% growth at the time of the initial "preliminary" guidance or 20% growth as forecasted during the first and second quarter earnings calls in 2019.

Plaintiffs also cite a statement by Dinges during the October 26, 2018 earnings call that "we get reports that have come out, and some of the headlines and reports are guidance and

---

[7] *See* Prop. Am. Compl. ¶ 197(d)-(g); Ex. 21, October 24, 2018 email from Hlavinka to Stalnaker stating that the forecasting team's initial forecast showed low end growth of 16% for 2019, that "I don't believe this is reasonable," that "The guys then recommended using 20% growth as the low end of our production range," and then reasoning that the 22% high-end growth tab "accounts for known wells already impacted by frac hits, adds in 9 days of delay for TILs, includes estimated impacts from outages associated with Zenith facility expansions in 2019, and raises the downstream impact in October to 50 MMCFD" and thus provided an appropriate basis for the low-end growth forecast.

production is light in 2019. Yes, it's light, Okay, it's only 20%, 25%, but we think it's also reasonable to take in consideration the value proposition that Cabot brings to the table. (*See* Prop. Am. Compl. ¶ 194; Ex. 9, October 26, 2018 Earnings Call Transcript.) While Plaintiffs are apparently insinuating that "light" should be interpreted to mean "unjustifiably conservative" and that Dinges was trying to convey that the market should actually expect higher growth, nothing in Dinges' remarks conveyed any representation that Cabot was likely to exceed the guidance range.

***Third***, Plaintiffs assert that the July 26, 2019 press release announcing Cabot's reduced 16-18% production growth guidance range was misleading because it attributed the reduction "in large part to a change in the operating plan resulting from a unique opportunity to acquire acreage adjacent to an eight-well pad," rather than a gas migration investigation relating to that pad (the "Powers Pad") initiated on July 17, 2019." (*See* Prop. Am. Compl. ¶ 200; Ex. 10, July 26, 2019 earnings release.) Plaintiffs, however, plead no particularized facts showing that the Powers Pad investigation resulted in any change to the guidance, let alone that Cabot's statement about the acquisition of additional acreage contributing a "large part" of the reduction was untrue. Cabot did not represent that the acreage acquisition was the only reason for the change. Even assuming *arguendo* that the gas migration investigation caused an additional guidance reduction between July 17, 2019 and July 26, 2019—which it did not—the allegations still fail to state a claim. Plaintiffs also say the disclosure omitted another proposed consent order about the Dimock wells (Compl. ¶ 201), but plead no particularized facts showing that Cabot had a duty under 17 C.F.R. § 229.103(c)(3) to disclose this order, that the alleged order rendered any other statements materially misleading or fraudulent, or that Dinges and Schroeder acted with scienter.

***Fourth,*** Plaintiffs assert that Cabot's risk disclosure that a failure to comply with environmental laws "may" subject it "to civil and criminal penalties" was misleading because

Cabot had received a grand jury subpoena on November 13, 2018 and was supposedly "expecting that criminal charges would be forthcoming" as of February 25, 2020 based on the preparation of a draft February 24, 2020 press release in response to a potential charging announcement. (*See* Prop. Am. Compl. ¶¶ 202-03; Ex. 23, February 25, 2020 email.) But the February 24, 2020 draft press release does not reflect that Cabot had already received the charging document (which Cabot had not) and instead pertained to the potential announcement of "a ***misdemeanor*** violation of [state environmental laws]," rather than the felonies that were ultimately announced in June 2020, thus undermining any inference that Cabot had seen the document or knew it would be charged. (*See* Ex. 23.) And even if Cabot knew or had an apprehension that charges would be filed, that would not render the statement about potential exposure "to civil and criminal penalties" misleading. Simply being "charged" is not the same as being "convicted" or assessed a penalty. Cabot's February 25, 2020 risk disclosures were thus fully accurate. Further, while the version of Item 103(c) of Regulation S-K in place during the class period required disclosure of a governmental environmental "proceeding" unless the company "reasonably believes" the proceeding would not result in "monetary sanctions, exclusive of interest and costs, of less than $100,000," Plaintiffs plead no facts showing that Cabot believed the potential charges would result in more than $100,000 in penalties as of February 25, 2020, let alone that Cabot would have known that even the ***maximum*** penalty available on any potential charges would exceed $100,000. The maximum penalty for a ***felony*** Clean Streams Law violation is just $50,000, while the penalty range for a misdemeanor violation is $2,500 to $10,000. *See* 35 P.S. § 691.602.

## ARGUMENT AND AUTHORITIES

### I. THE NEW PROPOSED CLAIMS FAIL ON THE PLEADINGS

Leave to amend should be denied when the new proposed claims fail under the Rule 12 pleading standards applicable to the claims.[8] The PSLRA's particularized pleading requirements apply with full force in evaluating a request for leave to amend.[9]

#### A. The Guidance Claims Fail Based on the PSLRA Safe Harbor, Lack of Falsity, and Lack of Scienter

Guidance and projections are quintessential forward-looking statements subject to the PSLRA safe harbor and bespeaks caution doctrine. *See Heinze*, 971 F.3d at 484; *Naglich v. Applied Optoelectronics*, 436 F. Supp. 3d 954, 973 (S.D. Tex. 2020); *Kurtzman v. Compaq Computer Corp.*, 2002 WL 32442832, at *22 (S.D. Tex. Mar. 30, 2002). The safe harbor "has two independent prongs. First, defendants will not be held liable for immaterial statements nor forward-looking statements that are identified as such and are accompanied by cautionary language." *Yoshikawa v. Exxon Mobil Corp.*, 2022 WL 4677621, at *10 (N.D. Tex. Sept. 29, 2022); 15 U.S.C. § 78u-5(c)(1)(A). "Second, to evade the safe harbor, plaintiffs must properly plead that the forward-looking statement was made with actual knowledge that it was false and misleading." *See Yoshikawa*, 2022 WL 4677621, at *10; 15 U.S.C. § 78u-5(c)(1)(B).

---

[8] *See Nix v. Major League Baseball*, 62 F.4th 920, 935 (5th Cir. 2023) (denial of leave to amend appropriate "where the proposed amendment fails to state a claim, and courts review them under the 'same standard of legal sufficiency as applies under Rule 12(b)(6)'" (quoting *Stripling v. Jordan Prod. Co., LLC*, 234 F.3d 863, 872-73 (5th Cir. 2000)); *Varela v. Gonzales*, 773 F.3d 704, 707 (5th Cir. 2014) (per curiam) ("[A] district court may refuse leave to amend if the filing of the amended complaint would be futile," that is, "if the complaint as amended would be subject to dismissal." (citation omitted)).

[9] *See Coggins v. Camber Energy Inc.*, -- F. Supp. 3d __, 2023 WL 6202056, at * (S.D. Tex. Sept. 22, 2023) ("The Fifth Circuit affirms denial of leave to amend where it's determined as a matter of law that the plaintiff failed to state a claim upon which relief can be granted under the PSLRA") (citing *Heinze v. Tesco Corp.*, 971 F.3d 475, 485 (5th Cir. 2020)).

"The safe harbor provision is 'disjunctive'; it may apply even when a plaintiff adequately alleges that the speaker has such knowledge if meaningful cautionary language was provided, and it also may apply even without that language if the plaintiff fails to allege facts sufficient to satisfy the second prong."[10] Because only statements rendered misleading by omission (as opposed to omissions themselves) are potentially actionable, the safe harbor necessarily bars any claim that a forward-looking statement is misleading because of omissions. *See Heinze*, 971 F.3d at 483-84.

The guidance claims fail under both prongs. Each of the challenged guidance statements contained forward-looking-statement warnings stating that Cabot's ability to meet projections could be affected by "market factors, market prices (including geographic basis differentials) of natural gas and crude oil, results of future drilling and marketing activity, future production and costs, legislative and regulatory initiatives, electronic, cyber or physical security breaches and other factors detailed herein and in our other Securities and Exchange Commission (SEC) filings." (*See* Ex. 11, April 27, 2018 Earnings Release; Ex. 12, October 26, 2018 Earnings Release; Ex. 13, February 22, 2019 Earnings Release; Ex. 14, April 26, 2019 Earnings Release.)

The Form 10-Ks referenced in these releases provided additional robust cautionary disclosures, including that results could be affected by "unexpected drilling conditions, pressure or irregularities in formations," "equipment failures or accidents," "surface access restrictions," "compliance with, or changes in, governmental requirements," and "delays in the availability of drilling rigs or crews," as well as "the availability of leases and permits on reasonable terms for

---

[10] *See Yoshikawa*, 2022 WL 4677621, at *10 (citing *Carlton v. Cannon*, 184 F. Supp. 3d 428, 453 (S.D. Tex. 2016) (Rosenthal, J.). To the extent the Fifth Circuit's decision in *Lormand v. US Unwired, Inc.* can be read as suggesting that a finding of actual knowledge by itself would defeat the safe harbor, it would conflict with prior Fifth Circuit precedent. *See* 565 F.3d 228, 244 (5th Cir. 2009); *Firefighters Pens. & Relief Fund of the City of New Orleans v. Bulmahn*, 147 F. Supp. 3d 493, 508 & n. 60 (E.D. La. 2015) (applying safe harbor prongs disjunctively and holding that *Lormand* is not binding to the extent it conflicts with prior panel decisions on that issue).

the prospects and any delays in obtaining such permits," the fact that "business opportunities not previously identified" such as "possible acquisitions and dispositions" could occur, the possibility of production exceeding the capacity of available transportation and processing facilities, risks associated with environmental noncompliance, challenges with "[t]he integration of the properties we may acquire," "pipe or cement failures and casing collapses," "uncontrolled flows of natural gas, oil or well fluids," and numerous other risks. (*See* Ex. 15, March 1, 2018 Form 10-K at 21-31; Ex. 16, February 26, 2019 Form 10-K at 21-31.)

Not only are these warnings perfectly appropriate for an energy production company like Cabot,[11] but the disclosures warned of the same types of risks that led to the guidance reductions. Cabot attributed the July 27, 2018 guidance range compression from 10 to 15 percent to 10 to 12 percent to "year-to-date actual volumes being slightly lower than originally budgeted, primarily resulting from delays in third-party compressor stations in the first-quarter and downtime on Transco and Millennium during the second-quarter . . ." (Ex. 17, July 27, 2018 Earnings Release at 5.) Cabot specifically warned in its March 1, 2018 Form 10-K that results could be affected by lack of capacity or delays from "pipelines" and "[t]hird-party systems and facilities. . . ." (Ex. 15 at 25.) Cabot attributed the July 26, 2019 reduction to the acquisition of additional acreage, which corresponds to Cabot's February 26, 2019 Form 10-K risk disclosure about "possible acquisitions and dispositions." (Ex. 16 at 25.) And, while Plaintiffs are wrong that gas migration issues caused

[11] *See Yoshikawa*, 2022 WL 4677621, at *10 (approving very similar risk disclosures for energy company); *Firefighters Pens. & Relief Fund of the City of New Orleans v. Bulmahn*, 2015 WL 4879217, at *12-15 (E.D. La. Aug. 14, 2015) (same) (holding that similar cautionary statements easily satisfy Fifth Circuit's "substantive company-specific warnings" standard) (citing *Southland Sec. Corp. v. INSpire Ins. Sols., Inc.*, 365 F.3d 353, 365 (5th Cir. 2004)); *In re KLX, Inc. Secs. Litig.*, 232 F. Supp. 3d 1269, 1280 (S.D. Fla. 2017) (statements that customers were impacted by oil price and rig counts were meaningful cautionary language).

the July 26, 2019 reduction, the claim would fail even if they had, as Cabot provided extensive risk disclosures about risks posed by environmental issues as described in the prior paragraph.

Additionally and alternatively, Plaintiffs' allegations far fall short of supporting a strong inference that Dinges and Schroeder actual knowledge of falsity, or even that they acted with severe recklessness (which, in any event, does not apply). Courts have consistently rejected arguments that disagreements between employees about projections, the choice of a particular number within a potential guidance range, or the fact that executives knew of significant headwinds or risks demonstrate actual knowledge of falsity, and have instead insisted on particularized allegations showing that the defendants knew the guidance was unattainable.[12]

[12] *See College Ret. Equities Fund v Boeing Co.*, 2023 WL 6065260, at *13 (N.D. Ill. Sept. 18, 2023) ("Plaintiffs make no allegations to show that any officers had knowledge that Boeing's plan to increase production was unattainable"); *In re Celgene Corp. Secs. Litig.*, 2019 WL 6909463, at *16 (D.N.J. Dec. 19, 2019) ("While Plaintiff certainly pleads facts to demonstrate that certain Celgene employees doubted whether the 2017 projections were attainable from the beginning of the Class Period, Plaintiff does not establish that any Defendant knew that the 2017 projection was unattainable until, at the earliest, July 2016"); *City of Warwick Mun. Empls. Pens. Fund v. Rackspace Hosting, Inc.*, 2019 WL 452051, at *4 (S.D.N.Y. Feb. 5, 2019) (rejecting claim that guidance was unachievable; "Simply put, companies are regularly pushed into taking non-typical actions in response to challenging conditions and many do so successfully"); *W. Pennsylvania Elec. Empls, Pension Fund v. Mentor Graphics Corp.*, 2017 WL 3668957, at *25 (D. Or. June 2, 2017), report and recommendation adopted *W. Pennsylvania Elec. Fund v. Mentor Graphics Corp.*, 2017 WL 3622779 (D. Or. Aug. 23, 2017) ("[A] company can be aware of potential challenges and yet believe in good faith that it will be able to overcome them and meet its projections. To allege that a forecast is actionably misleading, a plaintiff must allege that, at the time the forecast is made, ***the author of the forecast had knowledge that it was not possible to meet the projection.***") (internal citation omitted); *In re Oracle Corp. Sec. Litig.*, 627 F.3d 376, 391 (9th Cir. 2010) ("Companies generate numerous estimates internally, and they may reveal the projection they think best while withholding others, as long as the projection revealed had a reasonable basis"); *In re Overstock Sec. Litig.*, 2021 WL 4267920, at *8 (D. Utah Sept. 20, 2021) ("There is no reason to believe that every executive at a company will agree with the range or where the company will fall within that range. Those differences of opinion are inescapable when dealing with future projections. . . . The fact that executives disagree as to the appropriate specific point within a determined range does not demonstrate fraud or an intent to defraud, only an internal disagreement. These allegations do not meet the requirement of showing that any Defendant believed or had actual knowledge that it was impossible for Overstock to meet its guidance").

### B. The 2018 Production Growth Guidance Claims Are Time-Barred

The claims regarding the 2018 production growth guidance, including the April 27, 2018 reaffirmation of guidance, are also time-barred under the five-year statute of repose.[13] The motion for leave to amend was not filed until October 20, 2023, more than five years after the alleged misstatements. Because the guidance statements are based on substantially different disclosures, documents, and theories—*i.e.*, an April 27, 2018 quarterly earnings statement that has never before been mentioned as a fraudulent public statement in prior complaints—the new 2018 guidance claim does not relate back to prior complaints and is thus untimely.[14] In addition, several courts have concluded that relation back does not apply to the statute of repose for securities claims.[15] Even if relation back could apply, the new claims are "factually distinct" and do not relate back.

### C. The Additional Environmental Claims Likewise Fail

The new environmental claims likewise fail to show an actionably misleading or fraudulent statement. Again, scienter must be established individually as to Dinges and Schroeder.[16] With respect to the July 26, 2019 explanation for the guidance reduction, Plaintiffs have pled no

---

[13] *See* 28 U.S.C. § 1658(b) ("[A] private right of action that involves a claim of fraud ... may be brought not later than the earlier of—(1) 2 years after discovery of the facts constituting the violation; or (2) 5 years after such violation."); *Margolies v. Deason*, 464 F.3d 547, 551 (5th Cir. 2006).

[14] *See U.S. v. Corp. Mgt., Inc.*, 78 F.4th 727, 743 (5th Cir. 2023) (finding no relation back in False Claims Act case); *Schirle v. Sokudo USA, L.L.C.*, 484 F. App'x 893, 901-02 (5th Cir. 2012) (new defamation claim does not relate back to earlier complaint where claims were "factually distinct"); *Clean Energy v. Trillium Transportation Fuels, LLC*, 2021 3410668, at *3-4 (S.D. Tex. July 6, 2021) (finding no relation back where "[t]he claims in the two complaints may be similar, but they are factually distinct"); *Stichting Pensioenfonds ABP v. Countrywide Fin. Corp.*, 802 F. Supp. 2d 1125, 1133 (C.D. Cal. 2011) (holding that new scienter-based Section 10(b) claim did not relate back to Section 11 claim over same offering materials); *In re Noah Educ. Holdings, Ltd. Sec. Litig.*, 2010 WL 1372709, at *9 (S.D.N.Y. Mar. 31, 2010) ("Relation back is only appropriate in securities actions where the new allegations relate to the same or similar conduct complained of in the original complaint").

[15] *See JRS Partners, GP v. Leech Tishman Fuscaldo & Lampl, LLC*, 615 F. Supp. 3d 750, 766-67 (M.D. Tenn. 2022) (finding that relation back doctrine could not salvage reposed securities claim); *In re Longtop Fin. Tech. Ltd. Secs. Litig.*, 939 F. Supp. 3d 360, 380 (S.D.N.Y. 2013) (same); *but see Southeastern Pa. Trans. Auth. v. Orrstown Fin. Services Inc.*, 12 F. 4th 337, 345-51 (3d Cir. 2021) (concluding that relation back could apply to statute of repose if claims otherwise meet requirements of Fed. R. Civ. P. 15(c)).

[16] *See Flaherty & Crumrine Preferred Income Fund, Inc. v. TXU Corp.*, 565 F.3d 200, 208 (5th Cir. 2009) (holding plaintiff must establish intent of individual who made the alleged misstatement).

particularized facts showing that the Powers gas migration investigation caused any change to Cabot's guidance between the receipt of the complaint on July 17, 2019 and the release of guidance on July 26, 2019. And even if Plaintiffs could plead such facts, Cabot did not represent that the acreage acquisition rationale was the only reason for the guidance change. (*See supra* at 16.) A company need not disclose every conceivable reason for a change in outlook or other business development as long as the affirmative statements are not misleading.[17] There are also no particularized allegations showing that the statement is so dramatically and indisputably misleading as to create a "highly unreasonable" and "obvious" risk of deceiving investors.[18]

With respect to the claim over the alleged omissions of the proposed Dimock consent order and the alleged Attorney General charges from the July 26, 2019 environmental proceedings disclosure and the February 25, 2020 risk disclosures, respectively (Prop. Am. Compl. ¶¶ 201-02), Plaintiffs likewise plead no particularized facts showing that Cabot was required to disclose these alleged items under 17 C.F.R. § 229.103(c)(3), that the alleged omissions rendered any affirmative statements misleading, that Dinges or Schroeder knew for sure Cabot would be charged, let alone charged with felonies (or knew any particulars about the alleged order or charges), that Dinges or Schroeder had no reasonable basis to believe that the alleged proposed consent order or charges would result in less than $100,000 in penalties,[19] or that Cabot had no reasonable chance of prevailing at trial. (*See supra* at 18.) The allegations wholly fail to show falsity or scienter.

---

[17] *See Ind. Elec. Workers' Pension Trust Fund IBEW v. Shaw Grp., Inc.*, 537 F.3d 527, 541-42 (5th Cir. 2008) (no duty to disclose adverse facts unless they render affirmative statement materially misleading).

[18] *See Ho v. Flotek Indus., Inc.*, 248 F. Supp. 3d 847, 857 (S.D. Tex. 2017) ("Flotek's actual disclosures are not so blatantly misleading as to be severely reckless."), *aff'd sub nom. Alaska Electrical Pension Fund v. Flotek Indus., Inc.*, 915 F.3d 975 (5th Cir. 2019); *see also Kalnit v. Eichler*, 264 F.3d 131, 143 (2d Cir. 2001) (claim fails where "the duty to disclose . . . was not so clear"); *Gamboa v. Citizens, Inc.*, 2018 WL 2107205, at *3 (W.D. Tex. May 7, 2018) (plaintiff "must show more than that it is debatable whether the disclosures were adequate").

[19] Claims over "subject judgments" like estimating a possible legal claim provide no basis for inferring scienter *See Owens v. Jastrow*, 789 F.3d 529, 541-43 (5th Cir. 2008) (no scienter for "subjective" accounting determinations).

Having failed to plead a Section 10(b) claim, Plaintiff's control person claims fail.[20] Plaintiffs have also not pled facts supporting a SEC Rule 10b-5(a) or (c) "scheme" claim.[21] Defendants also rely on all of their prior arguments for why there was no valid motive to defraud and, to the extent necessary, why the previously pled and rejected claims still fail.

## II. THE NEW CLAIMS ARE AN IMPROPER END-RUN AROUND THE PSLRA, WERE UNDULY DELAYED, AND WILL CAUSE UNWARRANTED PREJUDICE

Plaintiffs' effort to add new claims based on litigation discovery is also an improper end-run around the PSLRA's pleading standards. "Congress clearly intended that complaints in these securities actions should stand or fall based on the actual knowledge of the plaintiffs rather than information produced by the defendants after the action has been filed."[22] The Court should not "allow, at the tail end of litigation, what the PSLRA limited at the commencement."[23]

The meritless nature of Plaintiffs' existing claims, the length and stage of the litigation, and the burdens imposed by amendment at this late date also weigh against allowing further amendment. Plaintiffs have continued to make groundless legal claims and factual assertions, including the claims against Stalnaker, the claims regarding thermogenic methane originating solely from oil and gas production, and the unfounded "Geologist" claims.[24] The parties have

---

[20] *See* 396 F. Supp. 3d at 477; *Asar*, 768 F. App'x at 189 (same).

[21] *See, e.g., In re Alstom SA*, 406 F. Supp. 2d 433, 475 (S.D.N.Y. 2017) ("[A] plaintiff may not cast claims of misrepresentations as claims under Rule 10b-5(a) and(c) and thus evade the pleading requirements imposed in misrepresentation cases"); *SEC v. Mapp*, 240 F. Supp. 3d 569, 585 (E.D. Tex. 2017). Plaintiffs' deficient misstatement allegations do not plead scheme liability.

[22] *Medhekar v. U.S. Dist. Court for the N. Dist. of California*, 99 F.3d 325, 328 (9th Cir. 1996); *In re Bisys Sec. Litig.*, 496 F. Supp. 2d 384, 387 (S.D.N.Y. 2007), *aff'd sub nom. Pub. Employees Ret. Ass'n of New Mexico v. PricewaterhouseCoopers LLP,* 305 Fed. Appx. 742 (2d Cir. 2009) ("[T]he PSLRA effectively shifted the burden to plaintiffs to acquire particularized knowledge of a party's scienter prior to obtaining discovery."); *Zwick Partners, LP v. Quorum Health Corp.*, 394 F. Supp. 3d 804, 814 (M.D. Tenn. 2019) (noting "there is an inherent tension between the purpose of the PSLRA and repeated amendments of a complaint by Plaintiffs").

[23] *See In re Bristol-Myers Squibb Sec. Litig.*, 228 F.R.D. 221, 229 (D.N.J. 2005) (holding that amendment to add new misstatements after the previous dispositive motion practice would be an "end run" around PSLRA's requirements).

[24] *See supra* at 3-11. Plaintiffs contend they have realleged these meritless claims simply for appellate preservation.

completed fact discovery, including the production of more than 3.5 million pages of documents and 19 depositions, and have fully briefed and argued class certification at the District Court level with dueling expert reports regarding the existing claims—which did not include the July 27, 2018 stock drop alleged in the Proposed Amended Complaint. Allowing the new claims would require a new class certification proceeding to assess the 2018 stock drop, as well as potential predominance issues based on the expiration of the two-year statute of limitations for the new 2019 and 2020 claims (which were brought within the five-year repose period but, without relation back, would be beyond the two-year limitations period and subject to inquiry notice).[25] Courts have found undue prejudice, undue delay, or other grounds for denying leave to amend when a party seeks to amend late in the case, the existing claims are meritless, the amendment adds significantly different new claims, and/or the amendment would force parties to reopen discovery or other phases of the litigation.[26]

The Court should thus deny leave to amend.

---

[25] *See Seeligson v. Devon Energy Prod. Co*., 761 F. App'x 329, 339 (5th Cir. 2019) (remanding in part because district court did not consider the impact of the statute of limitations); *Johnson v. Kansas City S. Ry. Co*., 208 F. App'x 292, 296-97 (5th Cir. 2006) ("individual issues, e.g., statute of limitations, deed interpretation, and center-line theory, predominate over the common ones" (emphasis added)); *Welch v. Atlas Roofing Corp.*, 2007 WL 3245444, at *7 (E.D. La. Nov. 2, 2007) ("[C]ourts are in agreement that affirmative defenses, such as statute of limitations, are factors to be considered in class certification hearings"); *Corley v. Entergy Corp.*, 220 F.R.D. 478, 487 (E.D. Tex. 2004) ("By its nature, a statute of limitations defense is fact-intensive and individualized. . . . The presence of this affirmative defense and its varying applicability may defeat predominance . . . .").

[26] *See Aguirre v. SBC Communs., Inc.*, 2007 WL 772756, at *17-18 (S.D. Tex. 2007) (Rosenthal, J.) (denying leave to amend as to certain plaintiffs who unduly delayed amendment until late stage of litigation, and where additional discovery would be required to avoid prejudice); *Greebel v. FTP Software, Inc*., 182 F.R.D. 370, 376 (D. Mass. 1998), aff'd, 194 F.3d 185 (1st Cir. 1999) ("Plaintiffs would not have discovered the additional evidence but for the inclusion of the white-out claim, which saved Plaintiffs from earlier dismissal, and ***has since turned out to be groundless.*** To allow Plaintiffs to amend at this point would fly in the face of PSLRA and the First Circuit's pre-PSLRA pleading standard") (emphasis added); *Zwick Partners, LP v. Quorum Health Corp*., 394 F. Supp. 3d 804, 814 (M.D. Tenn. 2019) (denying motion to amend under Rule 16(b) and Rule 15 where "[f]actual discovery has largely been completed, opening expert reports are scheduled to be exchanged in September, dispositive motions are due at the end of this year, and trial is scheduled to begin July 7, 2020"); *In re AT & T Sec. Litig.*, 2004 WL 6392120, at *7 (D.N.J. Apr. 7, 2004) (denying leave to amend filed in late stage of litigation where parties produced 3.5 million pages and completed 80 depositions)

Dated: November 13, 2023

Respectfully submitted,

/s/ Peter A. Stokes

Peter A. Stokes (*pro hac vice*)
TX ID No. 24028017
peter.stokes@nortonrosefulbright.com
98 San Jacinto Boulevard, Suite 1100
Austin, Texas 78701-4255
Telephone: (512) 474-5201
Facsimile: (512) 536-4598
peter.stokes@nortonrosefulbright.com

Kelly A. Potter (*pro hac vice*)
TX ID No. 24119284
1301 McKinney, Suite 5100
Houston, TX 77010-3095
Telephone: (713) 651-5151
Facsimile: (713) 651-5246
kelly.potter@nortonrosefulbright.com

Amy L. Barrette - *Pro Hac Vice*
Pennsylvania Bar No. 87318
BUCHANAN INGERSOLL & ROONEY, PC
Union Trust Building
501 Grant Street, Suite 200
Pittsburgh, PA 15219
Telephone: 412-562-1626
Facsimile: 412-562-1041
amy.barrette@bipc.com

*Counsel for Defendants*

**CERTIFICATE OF SERVICE**

I hereby certify that a copy of the foregoing document was filed with the Court's electronic case filing (ECF) system on November 13, 2023, which caused an electronic copy of this document to be served on all counsel of record in this matter who have registered for ECF service.

/s/ *Peter A. Stokes*
Peter A. Stokes