United States District Court
Southern District of Texas
**ENTERED**
January 08, 2024
Nathan Ochsner, Clerk

## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| DELAWARE COUNTY EMPLOYEES RETIREMENT SYSTEM, individually and on behalf of all others similarly situated, | § § § § § | |
| Plaintiffs, | § § | CIVIL ACTION NO. H-21-2045 |
| v. | § § | |
| CABOT OIL & GAS CORPORATION, et al., | § § § § | |
| Defendants. | | |

### MEMORANDUM AND OPINION

The named plaintiffs in this class action lawsuit—Delaware County Employees Retirement System and the Iron Workers District Council (Philadelphia & Vicinity) Retirement and Pension Plan—represent shareholders of Cabot Oil & Gas Corporation. The plaintiffs allege that Cabot and two of its executive officers, Dan Dinges and Scott Schroeder, made material misrepresentations or omissions that caused their representations to be misleading, in violation of Section 10(b) of the Securities Exchange Act of 1934, as amended by the Private Securities Litigation Reform Act of 1995, 15 U.S.C. §§ 78j(b), 78t(a), and its implementing regulation, Rule 10b–5, 17 C.F.R. § 240.10b–5.

The plaintiffs seek leave to file a second amended complaint adding new alleged misrepresentations and omissions. (Docket Entry No. 185). The defendants are opposed. (Docket Entry No. 191). Based on the pleadings, the motion, the response, and the applicable law, leave to amend is granted. However, the plaintiffs' claims based on the 2018 production guidance are dismissed with prejudice because they are time-barred. The reasons are set out below.

## I.     Background

### A.     Cabot's Wells Polluted Susquehanna County Water Supplies

The factual background is summarized in detail in the court's memorandum and opinion granting the motion for class certification.  (Docket Entry No. 173).  The court merely sketches the allegations here.

Cabot does hydraulic fracturing of the Marcellus Shale underneath Susquehanna County, Pennsylvania.  (Docket Entry No. 110 at ¶ 29).  In 2009, the Pennsylvania Department of Environmental Protection (the "Department") concluded that Cabot's wells had been releasing dissolved methane into nearby residential water supplies.  (*Id.* at ¶ 45).  This led to a series of consent orders and agreements between Cabot and the Department.  (*Id.*).  The consent orders and agreements required Cabot to remediate both the defective wells that had been leaking dissolved methane and the residential water supplies that the methane had contaminated.  (*Id.* at ¶¶ 46–49, 133–34).  The orders and agreements also restricted Cabot's ability to operate wells within certain areas of Susquehanna County.  (*Id.* at ¶¶ 133–34).

The plaintiffs allege that Cabot ignored its obligations under the consent orders and agreements for nearly a decade.  (*Id.* at ¶¶ 136–49).  They allege that Cabot's dereliction of its legal obligations led the Pennsylvania Attorney General to charge Cabot with felonies in 2020.  (*Id.* at ¶¶ 50, 208).  This lawsuit was filed in 2020.  (Docket Entry No. 1).

### B.     The Alleged Misrepresentations and Omissions

In January 2022, the court granted the defendants' motion to dismiss.  (Docket Entry No. 109).  The plaintiffs then filed a first amended complaint.  (Docket Entry No. 110)  That complaint alleged that Cabot had made several material misrepresentations and omissions concerning its compliance with environmental laws in Susquehanna County and its remediation of defective

wells and contaminated waters, violating the consent orders and agreements.  (*Id.* at ¶¶ 184–204).  In August 2022, the court dismissed some of these claims with prejudice.  (Docket Entry No. 118).  In September 2023, the court granted the plaintiffs' motion to certify a class "of all persons or entities who purchased or otherwise acquired Cabot common stock between February 22, 2016, and June 12, 2020, inclusive and were damaged thereby."  (Docket Entry No. 173 at 1–2).

In October 2023, on the deadline to amend pleadings under the scheduling and docket control order, (Docket Entry No. 156), the plaintiffs moved for leave to file a second amended complaint.  (Docket Entry No. 185).  The proposed second amended complaint alleges not only that Cabot misrepresented the extent to which it was complying with environmental laws and regulations and remediating defective wells and contaminated waters, but also that Cabot had: (1) publicly announced production guidance in 2018 and 2019 that it knew it would not meet; (2) knowingly failed to disclose that it had reduced its 2018 production guidance because of a gas migration investigation by the Department; (3) knowingly failed to disclose that it would soon be charged with felonies by the Pennsylvania Attorney General; and (4) knowingly failed to disclose a proposed consent order and agreement it had received from the Department to address its alleged noncompliance with environmental laws and regulations.  These alleged misrepresentations and omissions were not alleged in the plaintiffs' previous complaints.  The defendants oppose the motion for leave to amend on the grounds that amendment would be futile and would cause undue delay and prejudice.  (Docket Entry No. 191).

The plaintiffs' new claims, with one exception, satisfy the applicable pleading standards and amendment would therefore not be futile.  The exception is the claim based on the 2018 production guidance, which is barred by the applicable five-year statute of repose.  Amendment would not cause undue delay or prejudice.  The motion for leave to amend is therefore granted,

but the 2018 production guidance claims are dismissed with prejudice.  The reasons are set out below.

## II.      The Legal Standards

### A.      Rule 15(a)

Rule 15(a) provides that a party may amend its pleading once without seeking leave of court or the consent of the adverse party at any time before a responsive pleading is served.  FED. R. CIV. P. 15(a).  After a responsive pleading is served, a party may amend only "with the opposing party's written consent or the court's leave."  *Id.*  Although a court "should freely give leave when justice so requires," *id.*, leave to amend "is not automatic."  *Matagorda Ventures, Inc. v. Travelers Lloyds Ins. Co.*, 203 F. Supp. 2d 704, 718 (S.D. Tex. 2000) (citing *Dussouy v. Gulf Coast Inv. Corp.*, 660 F.2d 594, 598 (5th Cir. 1981)).  A district court reviewing a motion to amend pleadings under Rule 15(a) may consider factors such as "undue delay, bad faith or dilatory motive . . . undue prejudice to the opposing party, and futility of amendment."  *In re Southmark Corp.*, 88 F.3d 311, 314–15 (5th Cir. 1996).  Amendment is futile when the amended complaint would fail to state a claim upon which relief could be granted or would otherwise be subject to dismissal.  *Legate v. Livingston*, 822 F.3d 207, 211 (5th Cir. 2016), *cert. denied sub nom. Legate v. Collier*, 137 S. Ct. 489, 196 L.Ed.2d 389 (2016), *reh'g denied*, 137 S. Ct. 1139, 197 L.Ed.2d 239 (2017); *Daniels v. Corr. Corp*, 47 F.3d 426 (5th Cir. 1995).

### B.      Rule 12(b)(6)

Rule 12(b)(6) allows dismissal if a plaintiff fails "to state a claim upon which relief can be granted."  FED. R. CIV. P. 12(b)(6).  Rule 12(b)(6) must be read in conjunction with Rule 8(a), which requires a short and plain statement of the claim showing that the pleader is entitled to relief."  FED. R. CIV. P. 8(a)(2).  "[A] complaint must contain sufficient factual matter, accepted as

true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  Rule 8 "does not require 'detailed factual allegations,' but it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Id.* at 678 (quoting *Twombly*, 550 U.S. at 555).  "A claim has a facial plausibility when the plaintiff pleads factual content that allows the courts to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S. at 556).  "The plausibility standard is not akin to a 'probability requirement.'  But it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* (quoting *Twombly*, 550 U.S. at 556).

"A complaint 'does not need detailed factual allegations,' but facts alleged 'must be enough to raise a right to relief above the speculative level.'" *Cicalese v. Univ. Tex. Med. Branch*, 924 F.3d 762, 765 (5th Cir. 2019) (quoting *Twombly*, 550 U.S. at 555).  "Conversely, when the allegations in a complaint, however, true, could not raise a claim of entitlement to relief, this basic deficiency should be exposed at the point of minimum expenditure of time and money by the parties and the court." *Cuvillier v. Taylor*, 503 F.3d 397, 401 (5th Cir. 2007) (alterations omitted) (quoting *Twombly*, 550 U.S. at 558).

A court reviewing a motion to dismiss under Rule 12(b)(6) may consider "(1) the facts set forth in the complaint, (2) documents attached to the complaint, and (3) matters of which judicial notice may be taken under Federal Rule of Evidence 201." *Inclusive Cmtys. Project, Inc. v. Lincoln Prop. Co.*, 920 F.3d 890, 900 (5th Cir. 2019).

### C.   Section 10(b) of the Securities Exchange Act of 1934

Under § 10(b) of the Securities Exchange Act of 1934, "[i]t shall be unlawful for any person, directly or indirectly, . . . [t]o use or employ, in connection with the purchase or sale of

any security registered on a national securities exchange . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulation as the [Securities and Exchange Commission] may prescribe as necessary or appropriate in the public interest or for the protection of investors."  15 U.S.C. § 78j(b).  Rule 10b–5 implements § 10(b) by forbidding, among other things, the making of any "untrue statement of material fact" or the omission of any material fact "necessary in order to make the statements made . . . not misleading."  17 C.F.R § 240.10b–5(b). While providing a cause of action to securities purchasers or sellers injured by statutory and rule violations, *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 318 (2007), "these latter actions [are] available, not to provide investors with broad insurance against market losses, but to protect them against those economic losses that misrepresentations actually cause."  *Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 345 (2005).

To state a claim under § 10(b), a plaintiff must allege facts sufficient to show: (1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation.  *R2 Invs. LDC v. Phillips*, 401 F.3d 638, 641 (5th Cir. 2005) (internal citations omitted); *see also Dura Pharm.*, 544 U.S. at 338 (citing 15 U.S.C. § 78u–4(b)(4)).

### 1.      Material Misrepresentations and Omissions

A plaintiff who asserts securities fraud in violation of § 10(b) and Rule 10b–5 must comply with the pleading requirements of Federal Rule of Civil Procedure 9(b) and the Private Securities Litigation Reform Act.  *See Lormand v. U.S. Unwired, Inc.*, 565 F.3d 228, 239 (5th Cir. 2009); *see also Tellabs*, 551 U.S. at 322–23.  Rule 9(b) requires the complaint to "state with particularity the circumstances constituting fraud."  FED. R. CIV. P 9(b).  In the Fifth Circuit, "the Rule 9(b)

standards require 'specificity as to the statements (or omissions) considered to be fraudulent, the speaker, when and why the statements were made, and an explanation why they are fraudulent." *Plotkin v. IP Axess Inc.*, 407 F.3d 690, 696 (5th Cir. 2005).   "Put simply, Rule 9(b) requires 'the who, what, when, where, and how' to be laid out."   *Benchmark Elecs., Inc. v. J.M. Huber Corp.*, 343 F.3d 719, 724 (5th Cir. 2003) (citation omitted); *see also Martin Res. Mgmt. Corp. v. Fed. Ins. Co.*, No. 20-40571, 2021 WL 4269565, at *5 (5th Cir. Sept. 20, 2021); *Neiman v. Bulmahn*, 854 F.3d 741, 746 (5th Cir. 2017).

The Private Securities Litigation Reform Act requires the party to "specify each statement alleged to have been misleading, and the reason or reasons why the statement is misleading." *Neiman*, 854 F.3d at 746 (quoting *Local 731 I.B. of T. Excavators & Pavers Pension Tr. Fund v. Diodes, Inc.*, 810 F.3d 951, 956 (5th Cir. 2016)).   "[F]or each act or omission alleged to be false or misleading, plaintiffs must state with particularity facts giving rise to a strong inference that the defendant acted with the requisite state of mind."   *Id.* (quoting *Diodes*, 810 F.3d at 956)).

Even if misrepresentations and omissions are pleaded with sufficient specificity, they must be material.   There is no bright-line rule; determining materiality is a fact-intensive inquiry into "the source, content, and context" of the allegedly misleading or omitted information.   *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 43 (2011).   A representation is material if there is a substantial likelihood that a reasonable investor would consider it important in making an investment decision. *Basic Inc. v. Levinson*, 485 U.S. 224, 231 (1988).   Omitted facts are material if there is a "substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available."   *Emp. Ret. Sys. v. Whole Foods Mkt., Inc.*, 905 F.3d 892, 901 (5th Cir. 2018) (quoting *Rosenzweig v. Azurix Corp.*, 332 F.3d 854, 865 (5th Cir. 2003)).

"[T]he disclosure required by the securities laws is measured not by literal truth, but by the ability of the statements to accurately inform rather than mislead prospective buyers." *Lormand*, 565 F.3d at 248.  Opinion statements, such as those prefaced by "we believe" or "we think," may, or may not, be actionable.  *Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*, 575 U.S. 175, 188 (2015).  Whether representations in an opinion statement are actionable depends on whether (1) "the speaker did not hold the belief she professed" and (2) "the supporting fact she supplied [was] untrue." *Id.* at 185–86.  Whether omissions in an opinion statement are actionable depends on whether the statement "omits material facts about the issuer's inquiry into or knowledge concerning a statement of opinion, and if those facts conflict with what a reasonable investor would take from the statement itself." *Id.* at 189.

Applying these principles, courts have found that "corporate cheerleading" in the form of "generalized positive statements about a company's progress" is not a basis for liability under the securities laws.  *Nathenson v. Zonagen Inc.*, 267 F.3d 400, 419 (5th Cir. 2001).  A statement "of the vague and optimistic type . . . cannot support a securities fraud action [because it] contain[s] no concrete factual or material misrepresentation." *Southland Sec. Corp. v. INSpire Ins. Sols., Inc.*, 365 F.3d 353, 372 (5th Cir. 2004) (quotation marks omitted).  "[G]eneralized positive characterization[s] [are] not actionable under the securities laws." *Rosenzweig v. Azurix Corp.*, 332 F.3d 854, 870 (5th Cir. 2003).  "[N]o reasonable investor would consider such statements material and … investors and analysts are too sophisticated to rely on vague expressions of optimism rather than specific facts." *In re BP p.l.c. Sec. Litig. (BP I)*, 843 F. Supp. 2d 712, 748 (S.D. Tex. 2012) (citing *Krim v. BancTexas Grp.*, Inc., 989 F.2d 1435, 1446 (5th Cir. 1993)).  The statements the plaintiffs rely on must be something more than a corporate officer's generalized

optimistic comments about the company's policies, programs, or performance.  As in other areas

of the law, "puffery" is not actionable.  *BP I*, 843 F. Supp. 2d at 748; *Omnicare*, 583 F.3d at 944.

### 2.    Scienter

In addition to pleading that specific statements misrepresented or omitted material facts,

the plaintiffs must plead that the responsible person acted with the necessary culpability, or

scienter.  *Tellabs*, 551 U.S. at 319.  Section 10(b) and Rule 10b–5 do not insure against bad

corporate management.    Rather, they protect against only knowing or severely reckless

misstatements. *Indiana Elec. Workers' Pension Trust Fund IBEW v. Shaw Group., Inc.*, 537 F.3d

527, 535 (5th Cir. 2008).  "Scienter, in the context of securities fraud, is defined as 'an intent to

deceive, manipulate, or defraud or that severe recklessness in which the danger of misleading

buyers or sellers is either known to the defendant or is so obvious that the defendant must have

been aware of it.'"  *Flaherty & Crumrine Preferred Income Fund, Inc. v. TXU Corp.*, 565 F.3d

200, 207 (5th Cir. 2009) (quoting *R2*, 401 F.3d at 643).  "[F]or 'each act or omission alleged,'

securities fraud plaintiffs must 'state with particularity facts giving rise to a strong inference that

the defendant acted with the required state of mind.'"  *Shaw Grp.*, 537 F.3d at 533 (quoting 15

U.S.C. § 78u–4(b)(2)).

The court may consider documents incorporated by reference into the complaint and

matters proper for judicial notice.  *BP I*, 843 F. Supp. 2d at 748 (citing *Tellabs*, 551 U.S. at 323).

The court looks to the allegations about an individual's state of mind when that individual made a

challenged statement to determine whether the allegations support a strong inference of scienter.

*Tellabs*, 551 U.S. at 33; *Southland*, 365 F.3d at 364–65.  The inference must be "cogent and

compelling," not simply "reasonable" or "permissive," and "at least as compelling as any opposing

inference one could draw from the facts alleged." *Tellabs*, 551 U.S. at 324.  The court must

consider "plausible nonculpable explanations for the defendant's conduct, as well as inferences favoring the plaintiff." *Id.* at 323–24. "[O]missions and ambiguities count against inferring scienter, for plaintiffs must 'state with particularity facts giving rise to a strong inference that the defendants acted with the required state of mind.'" *Id.* at 326 (quoting 15 U.S.C. §78u–4(b)(2)). "[A]ppropriate allegations of motive and opportunity may meaningfully enhance the strength of the inference of scienter, but . . . allegations of motive and opportunity, without more, will not fulfill the pleading requirements of the [Private Securities Litigation Reform Act]." *Owens v. Jastrow*, 789 F.3d 529, 539 (5th Cir. 2015) (quoting *Goldstein v. MCI WorldCom*, 340 F.3d 238, 246 (5th Cir. 2003)). The plaintiffs must plead facts that give rise to a strong inference of scienter, for each individual defendant, for each alleged misstatement.

The plaintiffs cannot simply allege that some person at the corporation knew of facts that make a challenged statement misleading and impute that person's knowledge to the speaker. *Southland*, 365 F.3d at 366. The plaintiffs must make specific factual allegations about each responsible person's state of mind when each challenged statement was made. Allegations about another person's knowledge, or about the defendants' collective knowledge, are insufficient. Simply pleading that internal information contradicted an individual defendant's public statements is not enough. *In re BP P.L.C. Sec. Litig. (BP II)*, 852 F. Supp. 2d 767, 817 (S.D. Tex. 2012) (citing *ABC Arbitrage Plaintiffs Grp. v. Tchuruk*, 291 F.3d 336, 356 (5th Cir. 2002)). To the extent that a plaintiff's scienter argument is based on the availability of some internal document setting out certain facts, the complaint must make specific allegations about the document, its author, contents, and character, and when and by whom it was received, to link it to the person making the challenged statement when the statement was made. *Abrams v. Baker Hughes Inc.*, 292 F.3d 424, 432 (5th Cir. 2002).

### 3.      Loss Causation

Under the Private Securities Litigation Reform Act, "the plaintiff shall have the burden of proving that the act or omission of the defendant . . . caused the loss for which the plaintiff seeks to recover damages."  15 U.S.C. § 78u–4(b)(4).  The Act "makes clear Congress' intent to permit private securities fraud actions for recovery where, but only where, plaintiffs adequately allege and prove the traditional elements of causation and loss."  *Broudo*, 544 U.S. at 346.  "To establish proximate causation, the plaintiff must allege that when the 'relevant truth' about the fraud began to leak out or otherwise make its way into the marketplace, it caused the price of the stock to depreciate and, thereby, proximately caused the plaintiff's economic harm."  *Pub. Emps. Ret. Sys. of Miss. v. Amedisys, Inc.*, 769 F.3d 313, 320 (5th Cir. 2014).  The Fifth Circuit has stated that

> [l]oss causation in fraud-on-the-market cases can be demonstrated circumstantially by: (1) identifying a "corrective disclosure" (a release of information that reveals to the market the pertinent truth that was previously concealed or obscured by the company's fraud); (2) showing that the stock price dropped soon after the corrective disclosure; and (3) eliminating other possible explanations for this price drop, so that the factfinder can infer that it is more probable than not that it was the corrective disclosure—as opposed to other possible depressive factors—that caused at least a "substantial" amount of price drop.

*Id.* at 320–21 (internal quotation marks and citation omitted).

Although the corrective-disclosure information need not "precisely mirror" the alleged misrepresentations, *Alaska Elec. Pension Fund v. Flowserve Corp.*, 572 F.3d 221, 230 (5th Cir. 2009) (quotation marks omitted), a corrective disclosure must be "'related to' or 'relevant to' the defendants' fraud and earlier misstatements."  *Amedisys*, 769 F.3d at 321.  "The test for relevant truth simply means that the truth disclosed must make the existence of the actionable fraud more probable than it would be without that alleged fact, taken as true."  *Id.*

### D.      The Private Securities Litigation Reform Act "Safe Harbor"

11

The Private Securities Litigation Reform Act protects certain "forward-looking statements."  A forward-looking statement includes:

> (A) a statement containing a projection of revenues, income (including income loss), earnings (including earnings loss) per share, capital expenditures, dividends, capital structure, or other financial items;
>
> (B) a statement of the plans and objectives of management for future operations, including plans or objectives relating to the products or services of the issuer;
>
> (C) a statement of future economic performance, including any such statement contained in a discussion and analysis of financial condition by the management or in the results of operations included pursuant to the rules and regulations of the Commission;
>
> (D) any statement of the assumptions underlying or relating to any statement described in subparagraph (A), (B), or (C);
>
> (E) any report issued by an outside reviewer retained by an issuer, to the extent that the report assesses a forward-looking statement made by the issuer; or
>
> (F) a statement containing a projection or estimate of such other items as may be specified by rule or regulation of the Commission.

15 U.S.C. § 78u–5(i)(1).

Under the Act's "safe-harbor" provision, a defendant "shall not be liable with respect to any forward-looking statement, whether written or oral, if":

> (A) the forward-looking statement is--
>
> > (i) identified as a forward-looking statement, and is accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement; or
> >
> > (ii) immaterial; or
>
> (B) the plaintiff fails to prove that the forward-looking statement--
>
> > (i) if made by a natural person, was made with actual knowledge by that person that the statement was false or misleading; or
> >
> > (ii) if made by a business entity; was--
> >
> > > (I) made by or with the approval of an executive officer of that entity; and

12

> (II) made or approved by such officer with actual knowledge by that officer that the statement was false or misleading.

§ 78u-5(c)(1).

The Fifth Circuit has described the test for applying the safe-harbor provision as "two independent prongs: one focusing on the defendant's cautionary statements and the other on the defendant's state of mind." *Southland*, 365 F.3d at 371. Under the first prong, the safe harbor protects a forward-looking statement if it is either (1) identified as forward looking and accompanied by "meaningful cautionary statements" or (2) immaterial. *Id.* Under the second prong, the safe harbor protects a forward-looking statement if the plaintiff fails to prove that the statement was made with "actual knowledge" that it was false or misleading. *Id.*

The safe harbor is disjunctive. *See* 15 U.S.C. § 78u–5(c)(1) (using the word "or"). Fifth Circuit case law makes clear that the safe harbor applies to a statement that is identified as forward-looking and accompanied by meaningful cautionary language, that is immaterial, or that was not made with actual knowledge that it was false or misleading. *Lormand*, 565 F.3d at 243 (a three-pronged, disjunctive inquiry); *Southland*, 365 F.3d at 371 ("two independent prongs"). Even if the plaintiffs show actual knowledge, the safe harbor may still apply if the statement is either immaterial or is identified as forward looking and is accompanied by meaningful cautionary language. *Southland*, 365 F.3d at 371; *see also BP I*, 843 F. Supp. 2d at 777. Other circuits are consistent.[2]

---

[2] *See, e.g.*, *Slayton v. Am. Express Co.*, 604 F.3d 758, 766 (2d Cir. 2010) ("The safe harbor is written in the disjunctive; that is, a defendant is not liable if the forward-looking statement is identified and accompanied by meaningful cautionary language *or* is immaterial *or* the plaintiff fails to prove that it was made with actual knowledge that it was false or misleading."); *In re Aetna, Inc. Sec. Litig.*, 617 F.3d 272, 278–79 (3d Cir. 2010) ("[T]he safe harbor applies to statements that are forward-looking as defined by the statute provided that they are (1) identified as such, and accompanied by meaningful cautionary statements; or (2) immaterial; or (3) made without actual knowledge that the statement was false or misleading."); *In re Cutera Sec. Litig.*, 610 F.3d 1103, 1112 (9th Cir. 2010) ("[T]he investors argue for a conjunctive reading of the safe harbor provision, under which a sufficiently strong inference of actual knowledge would

A cautionary statement must "identify important factors that could cause actual results to differ materially from those in the forward-looking statement." § 78u–5(c)(1)(A)(i).  This standard is "somewhat ambiguous given the variety of possible factual circumstances that could arise."  *In re Harman Int'l Indus., Inc.*, 791 F.3d 90, 101 (D.C. Cir. 2015) (citations omitted).  The question is how to separate those disclosures that provide investors with "meaningful" and "important" information from those that are either too vague for an investor to find relevant or too specific to expect a reasonable issuer to identify as important.  The case law is clear that while "cautions must be tailored to the risks that accompany the particular projections," the cautionary-statement requirement does not demand prescience.  *Asher v. Baxter Int'l Inc.*, 377 F.3d 727, 732 (7th Cir. 2004) (collecting cases).  "[T]he cautions need not identify what actually goes wrong and causes the projections to be inaccurate."  *Id.*  This tension reflects a safe-harbor provision born out of "a compromise between legislators who did not want any safe harbor . . . and those who wanted a safe harbor . . . that did not require any cautionary statements but just required the projection to have a reasonable basis."  *Id.*

---

overcome a claim of safe harbor protection even for statements identified as forward-looking and accompanied by meaningful cautionary language.  The difficulty with this approach is that it ignores the plain language of the statute, which is written in the disjunctive as to each subpart."); *Edward J. Goodman Life Income Trust v. Jabil Circuit, Inc.*, 594 F.3d 783, 795 (11th Cir. 2010) ("The statute offers several ways for a defendant to avoid liability, all written in the disjunctive.  . . . First, a defendant may avoid liability by showing that his statement was issued with meaningful cautionary language.  Or, the defendant can show that the statement was simply immaterial.  As a third alternative, the defendant can avail himself of the safe harbor if the plaintiff fails to prove that the statement was made with actual knowledge that it was false.  Any one of these suffices for the defendant; a top-to-bottom reading of the statute shows that the plaintiff's inability to show knowledge of falsity is only relevant if the defendant is unable to produce meaningful cautionary statements or evidence of immateriality." (citations omitted)); *Ind. State Dist. Council & Hod Carriers Pension & Welfare Fund v. Omnicare, Inc.*, 583 F.3d 935, 943 (6th Cir. 2009) (the safe-harbor provision "is overcome only if the statement was material; if defendants had actual knowledge that it was false or misleading; and if the statement was not identified as 'forward-looking' or lacked meaningful cautionary statements." (quotation marks omitted)).

14

A "meaningful" cautionary statement "calls for 'substantive' company-specific warnings based on a realistic description of the risks applicable to the particular circumstances, not merely a boilerplate litany of generally applicable risk factors." *Southland*, 365 F.3d at 372.  A "generic and formulaic" cautionary statement that is repeated "only with slight variations" and used "in conjunction with *each* alleged misrepresentation" is not meaningful.  *Lormand*, 565 F.3d at 245 (emphasis in original).  Nor are "[s]tatements along the lines of 'all businesses are risky' or 'the future lies ahead,'" which at bottom "come to nothing other than caveat emptor." *Asher*, 377 F.3d at 733; *see also Lormand*, 565 F.3d at 244 (the following disclaimer was not meaningfully cautionary: "[The statements are] not guarantees of future performance . . . and involve known and unknown risks and other factors that could cause actual results to be materially different from any future results expressed or implied by them."); *Plotkin v. IP Axess, Inc.*, 407 F.3d 690, 694 (5th Cir. 2005) (the following disclaimer was not meaningfully cautionary: "These forward-looking statements involve numerous risks, uncertainties and assumptions, and actual results could differ materially from anticipated results.").

A cautionary statement must be tailored "to a particular company's status at a particular time." *In re Harman*, 791 F.3d at 101.  The disclaimer must warn of what "could cause actual results to differ materially from those in the forward-looking statement." 15 U.S.C. § 78u–5(c)(1)(A)(i); *see In re Harman*, 791 F.3d at 102.  The investor must be "warned of risks of a significance similar to that actually realized" so that she "is sufficiently on notice of the danger of the investment to make an intelligent decision about it according to her own preferences for risk and reward." *Harris v. Ivax Corp.*, 182 F.3d 799, 807 (11th Cir. 1999) (quotation marks omitted).  That said, while "investors would like to have . . . a full disclosure of the assumptions and calculations *behind* the projections[,] . . . this is not a sensible requirement.  Many of the

assumptions and calculations would be more useful to a firm's rivals than to its investors." *Asher*, 377 F.3d at 733. "[D]isclosing assumptions, methods, or confidence intervals" underlying a projection is not required. *Id.* at 734. "The PSLRA does not require the *most* helpful caution; . . . it is enough to point to the principal contingencies that could cause actual results to depart from the projection." *Id.*

In keeping with the statutory and case-law emphasis on tailored disclosures, "[e]ach statement that benefits from the safe harbor must be addressed individually." *Lormand*, 565 F.3d at 245. When a statement is forward looking only in part, the "mixed present/future statement is not entitled to the safe harbor with respect to the part of the statement that refers to the present." *Spitzberg v. Houston Am. Energy Corp.*, 758 F.3d 676, 691 (5th Cir. 2014) (quoting *Makor Issues & Rights, Ltd. v. Tellabs Inc.*, 513 F.3d 702, 705 (7th Cir. 2008)).

## III.    Analysis

The defendants argue that leave to amend should be denied because amendment would be futile and would cause undue delay and prejudice. The defendants argue that amendment would be futile because (1) the production guidance statements are subject to the Private Securities Litigation Reform Act safe harbor; (2) the 2018 production guidance claims are time-barred under the applicable statute of repose; and (3) the plaintiffs fail to state a claim under Rule 12(b)(6) and the Private Securities Litigation Reform Act's heightened pleading standard.

For the reasons that follow, only the second argument is persuasive.

### A.    The Production Guidance Claims

#### 1.    The Safe Harbor

The defendants argue that the production guidance statements fall within the Private Securities Litigation Reform Act safe harbor. The plaintiffs argue that the safe harbor does not

apply because: (1) the production guidance was "knowingly false"; (2) "the alleged misrepresentations are not accompanied by meaningful cautionary language"; and (3) the production guidance contained certain statements that were not forward-looking.  (Docket Entry No. 193-2 at 16–19).  The court disagrees with the defendants that the safe harbor applies.  Before explaining the reasons, the court summarizes the allegations related to the production guidance.

The proposed second amended complaint alleges that Dinges and Schroeder knowingly issued false statements about Cabot's production guidance in press releases and investor conference calls.  The production guidance statements fall into two categories: (1) production guidance for fiscal year 2018 and (2) production guidance for fiscal year 2019.

The alleged misrepresentations regarding the 2018 production guidance are as follows:

- On April 27, 2018, Cabot stated in a press release that "[t]he Company has [] reaffirmed its total 2018 daily production growth guidance of 10 to 15 percent." (Docket Entry No. 186-4 at ¶ 191; Docket Entry No. 190-12 at 8).

- On July 27, 2018, Cabot issued another press release announcing a reduction of its "2018 daily production growth guidance range from 10 - 15 percent to 10 - 12 percent." (Docket Entry No. 186-4 at ¶ 192; Docket Entry No. 190-17 at 10).  The press release explained that the reduced guidance was "[d]ue to our year-to-date actual volumes being slightly lower than originally budgeted, primarily resulting from delays in third-party compressor stations in the first-quarter and downtime on Transco and Millenium during the second-quarter[.]" (Docket Entry No. 190-17 at 10).

The alleged misrepresentations regarding the 2019 production guidance are as follows:

- On October 26, 2018, Cabot issued a press release announcing "its preliminary 2019 production growth guidance range of 20 to 25 percent[.]"  (Docket Entry No. 19-12 at 10; Docket Entry No. 186-4 at ¶ 193).

- Dinges stated on Cabot's third quarter 2018 earnings call, held the same day as the press release, that: "We felt like we were prudent in dialing back our capital spend, dialing back our '19 guidance to 20% to 25% growth in 2019, which is 25% to 30% growth on a debt adjusted per share basis.  And that's off a 2 Bcf plus net production. We think that's fairly robust production.  Regardless of what we said earlier, we think that's fairly . . . productive.  But we get reports that have come out, and some of the headlines and reports are guidance and production is light in 2019.  Yes, it's light, Okay, it's only 20%, 25%, but we think it's also reasonable to take in consideration the value proposition that Cabot brings to the table." (Docket Entry No. 186-4 at ¶ 194).

- On February 22, 2019, Cabot issued a press release announcing that it had "updated its 2019 production growth guidance to 20 percent[.]"  (Docket Entry No. 190-13 at 12; Docket Entry No. 186-4 at ¶ 196).  The release explained that "[t]his production growth is based on an updated capital budget of $800 million. Approximately $160 million of the 2019 capital budget relates to wells that are drilled and / or completed in 2019 but not placed on production until 2020." (Docket Entry No. 190-13 at 12).

- On April 26, 2019, Cabot issued a press release "reiterat[ing] its 2019 production growth guidance of 20 percent[.]"  (Docket Entry No. 190-14 at 9; Docket Entry No. 186-4 at ¶ 196).

The proposed second amended complaint contains numerous allegations supporting scienter—that is, that Dinges and Schroeder knew that Cabot would not be able to meet the production guidance numbers that it gave investors.  The plaintiffs allege that the production guidance was "falsely manufactured . . . to appease shareholders."  (Docket Entry No. 186-4 at ¶ 197).

Each press release containing the allegedly false production guidance featured this forward-looking statements disclaimer:

> This press release includes forward-looking statements within the meaning of Section 27A of the Securities Act of 1933, as amended, and Section 21E of the Securities Exchange Act of 1934, as amended. The statements regarding future financial and operating performance and results, strategic pursuits and goals, market prices, future hedging and risk management activities, and other statements that are not historical facts contained in this report are forward-looking statements. The words "expect", "project", "estimate", "believe", "anticipate", "intend", "budget", "plan", "forecast", "outlook", "predict", "may", "should", "could", "will" and similar expressions are also intended to identify forward-looking statements. Such statements involve risks and uncertainties, including, but not limited to, market factors, market prices (including geographic basis differentials) of natural gas and crude oil, results of future drilling and marketing activity, future production and costs, legislative and regulatory initiatives, electronic, cyber or physical security breaches and other factors detailed herein and in our other Securities and Exchange Commission (SEC) filings. See "Risk Factors" in Item 1A of the Form 10-K and subsequent public filings for additional information about these risks and uncertainties. Should one or more of these risks or uncertainties materialize, or should underlying assumptions prove incorrect, actual outcomes may vary materially from those indicated. Any forward-looking statement speaks only as of the date on which such statement is made, and the Company does not undertake any obligation to correct or update any forward-looking statement, whether as the result of new information, future events or otherwise, except as required by applicable law.

(Docket Entry No. 190-10 at 11–12).

Cabot's Form 10-Ks, which the disclaimer references as containing additional "Risk Factors," stated in relevant part:

> Our growth is materially dependent upon the success of our drilling program. Drilling for natural gas and oil involves numerous risks, including the risk that no commercially productive natural gas or oil reservoirs will be encountered. The cost

of drilling, completing and operating wells is substantial and uncertain, and drilling operations may be curtailed, delayed or canceled as a result of a variety of factors beyond our control, including:

- decreases in natural gas and oil prices;

- unexpected drilling conditions, pressure or irregularities in formations;

- equipment failures or accidents;

- adverse weather conditions;

- surface access restrictions;

- loss of title or other title related issues;

- lack of available gathering or processing facilities or delays in the construction thereof;

- compliance with, or changes in, governmental requirements and regulation, including with respect to wastewater

- disposal, discharge of greenhouse gases and fracturing; and

- costs of shortages or delays in the availability of drilling rigs or crews and the delivery of equipment and materials.

Our future drilling activities may not be successful and, if unsuccessful, such failure will have an adverse effect on our future results of operations and financial condition. Our overall drilling success rate or our drilling success rate within a particular geographic area may decline. We may be unable to lease or drill identified or budgeted prospects within our expected time frame, or at all. We may be unable to lease or drill a particular prospect because, in some cases, we identify a prospect or drilling location before seeking an option or lease rights in the prospect or location. Similarly, our drilling schedule may vary from our capital budget. The final determination with respect to the drilling of any scheduled or budgeted wells will be dependent on a number of factors, including:

- the results of exploration efforts and the acquisition, review and analysis of seismic data;

- the availability of sufficient capital resources to us and the other participants for the drilling of the prospects;

- the approval of the prospects by other participants after additional data has been compiled;

- economic and industry conditions at the time of drilling, including prevailing and anticipated prices for natural gas and oil and the availability of drilling rigs and crews;

- our financial resources and results; and

- the availability of leases and permits on reasonable terms for the prospects and any delays in obtaining such permits.

These projects may not be successfully developed and the wells, if drilled, may not encounter reservoirs of commercially productive natural gas or oil.

(Docket Entry No. 190-15 at 39).

The applicability of the safe harbor to the production guidance depends on whether the disclaimer in the press releases (1) sufficiently identified the production guidance as forward-looking statements and (2) meaningfully cautioned investors with "statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement[s]." § 78u–5(c)(1)(A).

The disclaimer satisfies the first inquiry because it identified the production guidance as forward-looking statements.  It stated that "[t]his press release includes forward-looking statements within the meaning of Section 27A of the Securities Act of 1933, as amended, and Section 21E of the Securities Exchange Act of 1934, as amended."  It identified these forward-looking statements as including "[t]he statements regarding future financial and operating performance and results . . . and other statements that are not historical facts[.]"  That description clearly included the production guidance statements.

However, the disclaimer fails the second inquiry because it did not contain "meaningful cautionary statements."  The factors that the disclaimer identified as having the potential to cause Cabot's actual production to differ materially from its production guidance were "a boilerplate litany of generally applicable risk factors."  *Southland*, 365 F.3d at 372.  The factors were not Cabot-specific and were not tailored to Cabot's circumstances at the particular time.  *See Southland*, 365 F.3d at 372; *In re Harman*, 791 F.3d at 101.  Cabot used the same "generic and formulaic" disclaimer in each press release.  *Lormand*, 565 F.3d at 245 (emphasis in original).  An investor reading the disclaimer would not have been "sufficiently on notice of the danger of the

21

investment to make an intelligent decision about it according to her own preferences for risk and reward." *Harris*, 182 F.3d at 807 (quotation marks omitted).

The defendants argue that the disclaimer warned of the specific risk that the plaintiffs allege caused Cabot's actual production to differ materially from its production guidance. The defendants presumably refer to the disclaimer's warnings about "legislative and regulatory initiatives" and "compliance with . . . governmental requirements and regulation." However, these generic warnings are insufficiently specific to put an investor on notice of the danger of the investment, particularly because the plaintiffs allege that Cabot's production from specific wells was already being negatively affected by the Department's enforcement of environmental laws and regulations.

As other circuits have recognized, "cautionary language cannot be meaningful if it is misleading in light of historical facts[] that were established at the time the statement was made" because "[s]uch statements are neither significant nor of useful quality or purpose." *In re Harman*, 791 F.3d at 102 (citing *Slayton v. Am. Exp. Co.*, 604 F.3d 758, 770 (2d Cir. 2010)) (quotation marks omitted). The proposed second amended complaint alleges that, from 2017 to 2019, Cabot's drilling manager, Steven Novakowsi, "repeatedly informed" Dinges and Schroeder "that ongoing gas migration investigations at various Cabot wells had the potential to negatively impact the company's performance." (Docket Entry No. 186-4 at ¶ 191(b)). The proposed second amended complaint also alleges that the defendants were informed in April 2018 that "drilling issues" and "remedial work" was causing production delays. (*Id.* at ¶ 191(f)). Finally, the plaintiffs allege that, just weeks before Cabot issued its 2019 production guidance, Novakowsi again warned the defendants about the "potential impact of gas migration and/or alleged gas migration issues on the ability of the company to meet guidance." (*Id.* at ¶ 197(b)).

These allegations support an inference that the defendants knew that a specific risk had materialized that was significantly likely to cause Cabot's actual production to differ materially from the production guidance that it had issued.  In light of these allegations, it was insufficient for Cabot to warn vaguely of "legislative and regulatory initiatives" and "compliance with . . . governmental requirements and regulation."

The D.C. Circuit's opinion in *In re Harman* is analogous.  The defendant in that case had warned that actual outcomes might differ from forward-looking statements because of "amassed inventory."  791 F.3d at 104.  The court held that this statement was not meaningful because it "did not convey that inventory was obsolete, as opposed to stocked with the latest, cutting-edge models.  Even if viewed as implicitly raising the specter of obsolescence, the statements were insufficient for at least the reason that they did not warn of actual obsolescence that had already manifested itself." *Id.*  Likewise, it was not sufficiently meaningful for Cabot to raise the specter of regulatory compliance issues when specific regulatory action had already begun affecting Cabot's production.

The safe harbor does not apply to the production guidance.

### 2.      Falsity and Scienter

The defendants argue that, even if the safe harbor does not apply, the proposed second amended complaint fails to state a claim on which relief can be granted as to the production guidance statements.  (Docket Entry No. 191 at 27).  The court disagrees.

As already partially detailed, the plaintiffs have alleged facts giving rise to the reasonable inference that the defendants issued production guidance with knowledge—or at least with "severe recklessness"—that Cabot was unlikely to meet the production guidance.  *Nathenson*, 267 F.3d at 408.  The plaintiffs allege that the defendants had been informed by internal analysts that Cabot's

23

"overall production level was [] forecasted to be lower than the production level disclosed to the market." (Docket Entry No. 186-4 at ¶ 191(i)). Nonetheless, the plaintiffs allege that Cabot publicly reaffirmed its 2018 production guidance a few days later. (*Id.* at ¶ 192). The proposed second amended complaint further alleges that, just weeks before Cabot issued its 2019 production guidance, Novakowski had informed the defendants "about the potential impact of gas migration and/or alleged gas migration issues on the ability of the company to meet guidance." (*Id.* at ¶ 197(b)). The plaintiffs allege that Cabot's own internal forecasts "were never at 20% production growth" even though its 2019 production guidance announced a low end of 22% growth. (*Id.* at ¶ 197(h)).

The plaintiffs have stated a claim on which relief can be granted with respect to production guidance statements.

### 3.    The Statute of Repose

The defendants argue that the plaintiffs' claims based on the 2018 production guidance are time-barred under 28 U.S.C. § 1658(b). (Docket Entry No. 191 at 28). Section 1658(b) provides that "a private right of action that involves a claim of fraud, deceit, manipulation, or contrivance in contravention of a regulatory requirement concerning the securities laws[] . . . may be brought not later than the earlier of—(1) 2 years after the discovery of the facts constituting the violation; or (2) 5 years after such violation."

The defendants note that the motion for leave to amend was filed more than five years after the alleged misstatements. (Docket Entry No. 191 at 22). They argue that the 2018 production guidance allegations do not relate back to prior complaints because they "are based on substantially different disclosures, documents, and theories." (*Id.*).

The plaintiffs respond that § 1658(b) does not apply because they filed the action within the five-year repose period.  (Docket Entry No. 193-2 at 20).  The plaintiffs rely on *Southeastern Pennsylvania Transportation Authority v. Orrstown Financial Services Inc.*, 12 F.4th 337, 351 (3rd Cir. 2021), for the proposition that "statutes of repose create a deadline for *filing* actions, rather than *resolving* them."  The plaintiffs misread *Orrstown*.  The plaintiffs in that case sought to "reassert the *same* claims against the *same* parties" that they had previously brought within the repose period, but which had been dismissed.  *Id.* at 344.  The Third Circuit held that the claims that the plaintiffs sought to reassert through an amended complaint related back to the previously dismissed claims and were not time-barred.  *Id.* at 352–53.  If, as the plaintiffs contend, the court had interpreted the statute of repose to limit only the time that an action could be filed, rather than the time that a claim could be brought, relation-back would have been a moot point.

The plaintiffs' reliance on *Hogan v. Pilgrim's Pride Corporation*, 73 F.4th 1150 (10th Cir. 2023), is also misplaced.  The Tenth Circuit held that relation-back applied to § 1658(b).  It also interpreted § 1658(b) to apply to initiating or commencing a claim rather than amending one.  *Id.* at 1157.  However, the court made the following disclaimer:

> This is not to say, however, that once a complaint is filed within the repose period, § 1658(b)(2) always continues to be satisfied despite later amendments to the complaint.  The repose statute is claim specific.  It speaks in terms of a cause of action "that involves a claim of fraud."  A claim raised for the first time in an amendment to a complaint may well be barred by the statute.  But that is not the situation here, where the SAC adds no parties or causes of action; it does not even add additional statements alleged to be fraudulent.  We thus see no reason to bar the SAC under the repose statute.

*Id.* at 1157–58.

Unlike the amended complaint at issue in *Hogan*, the plaintiffs' second amended complaint does "add additional statements alleged to be fraudulent."  The question, therefore, is whether the new statements relate back to the claims that were brought within the repose period.

25

Federal Rule of Civil Procedure 15(c) provides that: "An amendment to a pleading relates back to the date of the original pleading when: . . . the amendment asserts a claim or defense that arose out of the conduct, transaction, or occurrence set out—or attempted to be set out—in the original pleading.  FED. R. CIV. P. 15(c)(1)(B).

"[R]elation back depends on the existence of a common 'core of operative facts' uniting the original and newly asserted claims."  *Mayle v. Felix*, 545 U.S. 644, 659 (2005).  "The fact that an amendment changes the legal theory on which the action initially was brought is of no consequence if the factual situation upon which the action depends remains the same and has been brought to defendant's attention by the original pleading."  *F.D.I.C. v. Bennett*, 898 F.2d 477, 480 (5th Cir. 1990) (quoting WRIGHT & MILLER, FEDERAL PRACTICE & PROCEDURE 6A, § 1497, p. 94).  However, "when new or distinct conduct, transactions, or occurrences are alleged as grounds for recovery, there is no relation back, and recovery under the amended complaint is barred by limitations if it was untimely filed."  *Holmes v. Greyhound Lines, Inc.*, 757 F.2d 1563, 1566 (5th Cir. 1985); *see also F.D.I.C. v. Conner*, 20 F.3d 1376, 1385 (5th Cir. 1994) ("If a plaintiff attempts to interject entirely different transactions or occurrences into a case, then relation back is not allowed.").  "In a securities fraud action, courts examine whether the allegations relate to the same statements and/or documents referenced in the original complaint."  *In re Enron Corp.*, No. H-01-3624, 2005 WL 1638039, at *4 (S.D. Tex. June 21, 2005) (quoting reference and quotation marks omitted).  The relation-back doctrine is "liberally applied . . . 'based on the idea that a party who is notified of litigation concerning a given transaction or occurrence is entitled to no more protection from statutes of limitation than one who is informed of the precise legal description of the rights sought to be enforced.'"  *Williams v. United States*, 405 F.2d 234, 236 (5th Cir. 1968) (quoting 3 MOORE, FEDERAL PRACTICE ¶ 15.15[2]).

The plaintiffs argue that the 2018 production guidance allegations relate back to the first amended complaint because the allegations arise "from the same operative conduct alleged in the FAC and amplify that Cabot's ongoing remedial work negatively impacted Cabot's ability to meet its production guidance." (Docket Entry No. 193-2 at 23).

The plaintiffs are correct that the first amended complaint alleged that Cabot's environmental compliance issues were "reasonably likely to, and would, adversely impact Cabot's ability to achieve its financial and operational projections." (Docket Entry No. 110 at ¶¶ 190(i), 259). However, the first amended complaint did not allege that Cabot's 2018 production guidance was a material misrepresentation, and it did not allege the facts that are the basis for that theory. *Compare In re Enron Corp.*, 2005 WL 1638039, at *4 (applying relation-back because the amended complaint "assert[ed] claims based on the same alleged misrepresentations and omissions" as the original complaint); *Hogan*, 73 F.4th at 1157–58. The 2018 production guidance allegations are based on "new or distinct conduct, transactions, or occurrences" and do not relate-back to the allegations in the first amended complaint. The claims based on the 2018 production guidance are time-barred.

### B.    The Failure-to-Disclose Claims

The proposed second amended complaint alleges that the defendants failed to disclose the following material facts that made Cabot's public statements misleading: (1) that its lowered production guidance announced in a July 17, 2019 press release had been caused by a gas migration investigation conducted by the Department; (2) that it had received a proposed consent order and agreement from the Department relating to ongoing violations of a previous consent order; and (3) that the Pennsylvania Attorney General was preparing to file criminal charges against Cabot. The

defendants argue that the proposed second amended complaint fails to state a claim on which relief can be granted as to each alleged omission.  The court disagrees.

The second amended complaint alleges that, beginning July 17, 2019, an "ongoing gas migration investigation at the Powers M well pad[] required a lengthy cessation of drilling operations there, indefinitely delaying the completion of the wells and, therefore, gas production." (Docket Entry No. 186-4 at ¶ 200).  The plaintiffs further allege that Dinges and Schroeder had been informed of the investigation and suspension.  (*Id.*).  Instead of disclosing this investigation, the plaintiffs allege that Cabot attributed the lowered production guidance "in large part to a change in the operating plan resulting from a unique opportunity to acquire acreage adjacent to an eight-well paid, allowing the Company to increase the total lateral footage on the pad."  (*Id.*).  The defendants contend that the non-disclosure is not actionable because "Cabot did not represent that the acreage acquisition rationale was the only reason for the guidance change."  (Docket Entry No. 191 at 29).  This argument is unavailing because Cabot incurred "a duty to speak the full truth" when it released a statement about the delayed production from the Powers M well pad.  *See Oklahoma Firefighters Pension & Ret. Sys. v. Six Flags Entm't Corp.*, 58 F.4th 195, 217 (5th Cir. 2023) (quoting *Lormand*, 565 F.3d at 249).  Cabot cannot avoid liability by arguing that the statement was a partial truth.

The defendants argue that the plaintiffs do not sufficiently claim that Cabot failed to disclose the proposed consent order and criminal charges because the plaintiffs have not pleaded particularized facts showing that: (1) "Cabot was required to disclose these alleged items under 17 C.F.R. § 229.103(c)(3)"; (2) "the alleged omissions rendered any affirmative statements misleading"; (3) "Dinges or Schroeder knew for sure Cabot would be charged, let alone charged with felonies"; (4) "Dinges or Schroeder had no reasonable basis to believe that the alleged

proposed consent order or charges would result in less than $100,000 in penalties, or that Cabot had no reasonable chance of prevailing at trial." (Docket Entry No. 191 at 29).

The defendants' argument with respect to the proposed consent order fails because, as explained above, once the defendants addressed the proposed consent orders and agreements, they were obligated to do so accurately. The plaintiffs allege that the defendants disclosed only two proposed consent orders and agreements and failed to disclose a proposed consent order and agreement that Cabot had received on the same day as the other two consent orders and agreements. (Docket Entry No. 186-4 at ¶ 201). The plaintiffs have stated a claim that the defendants breached their duty to disclose this proposed consent order and agreement.

The defendants' argument with respect to the criminal charges also fails. 17 C.F.R. § 229.103(a) requires registrants to "[d]escribe briefly any material pending legal proceedings, other than ordinary routine litigation incidental to the business, to which the registrant or any of its subsidiaries is a party or of which any of their property is the subject." This requirement applies also to "any such proceedings known to be contemplated by governmental authorities." *Id.* Section 229.103(c) further requires disclosure of "[a]dministrative or judicial proceedings (including proceedings which present in large degree the same issues) arising under any Federal, State, or local provisions that have been enacted or adopted regulating the discharge of materials into the environment or primarily for the purpose of protecting the environment." Such proceedings "shall not be deemed 'ordinary routine litigation incidental to the business' and shall be described if:

(i) Such proceeding is material to the business or financial condition of the registrant;

(ii) Such proceeding involves primarily a claim for damages, or involves potential monetary sanctions, capital expenditures, deferred charges or charges to income and the amount involved, exclusive of interest and costs, exceeds 10 percent of the current assets of the registrant and its subsidiaries on a consolidated basis; or

29

(iii) A governmental authority is a party to such proceeding and such proceeding involves potential monetary sanctions, unless the registrant reasonably believes that such proceeding will result in no monetary sanctions, or in monetary sanctions, exclusive of interest and costs, of less than $300,000 or, at the election of the registrant, such other threshold that (A) the registrant determines is reasonably designed to result in disclosure of any such proceeding that is material to the business or financial condition is disclosed, (B) the registrant discloses (including any change thereto) in each annual and quarterly report, and (C) does not exceed the lesser of $1 million or one percent of the current assets of the registrant and its subsidiaries on a consolidated basis; provided, however, that such proceedings that are similar in nature may be grouped and described generically.

§ 229.103(c)(3).  The version of § 229.103 that was in place during the relevant time required, in (c)(3)(iii), disclosure of governmental environmental proceedings unless the company "reasonably believes" that the proceeding will not result in "monetary sanctions, exclusive of interest and costs, of less than $100,000," rather than the $300,000 in the current version.  (Docket Entry No. 191 at 23).

The second amended complaint sufficiently alleges that the criminal charges were not "ordinary routine litigation incidental to the business" and were subject to the disclosure requirements of § 229.103.  The plaintiffs allege that, when Cabot filed its 2019 Form 10-K and 1Q20 Form 10-Q—which failed to disclose the criminal charges—the defendants "(i) ha[d] received the Grand Jury's subpoena . . ., (ii) kn[ew] of the Attorney General's criminal complaint, and (iii) expect[ed] that criminal charges would be forthcoming[.]"  (Docket Entry No. 186-4 at ¶ 202).  The plaintiffs have further alleged that the criminal charges were "material to the business or financial condition" of Cabot.  § 229.103(c)(3).  They have alleged that Cabot's "Susquehanna County gas exploration and production operations . . . were existential to the Company's business" and that "[s]ubstantially all of Cabot's oil and gas production occurred in Susquehanna County during the Class Period."  (Docket Entry No. 186-4 at ¶¶ 251–52).  Finally, drawing all reasonable inferences in the plaintiffs' favor, it would have been unreasonable for the defendants to believe that the criminal charges would result in monetary sanctions less than $100,000 because, as the

30

plaintiffs allege, the defendants knew that a single notice of violation it had received from the Department in September 2011 would "likely" result in the payment of a penalty between $100,000 and $300,000.  (Docket Entry No. 186-4 at ¶ 187).

The plaintiffs have stated a claim that Cabot failed to disclose material facts necessary to make its statements not misleading.

### C.    Undue Delay and Prejudice

Finally, the defendants argue that, even if the amendment is not futile, it should not be allowed because (1) the plaintiffs' "effort to add new claims based on litigation discovery is [] an improper end-run around the PSLRA's pleading standards"; and (2) amendment would cause delay and prejudice because a new class certification proceeding would be required.  (Docket Entry No. 191 at 31–32).

The court is not persuaded that amendment would be an "end-run around the PSLRA's pleading standards."  The defendants cite several cases describing a "tension" between the Act's heightened pleading standard and the liberal leave to amend under Rule 15.  But these cases deny leave to amend only when the plaintiff presents no explanation for not including the new allegations earlier, *see In re Bristol-Myers Squibb Sec. Litig.*, 228 F.R.D. 221, 229–30 (D.N.J. 2005), or when the claims asserted in the amended complaint were previously dismissed for failure to meet the heightened pleading standard, *see In re Bisys Sec. Litig.*, 496 F. Supp. 2d 384, 387 (S.D.N.Y. 2007), *aff'd sub nom. Pub. Employees Ret. Ass'n of New Mexico v. PricewaterhouseCoopers LLP*, 305 Fed. App'x. 742 (2d Cir. 2009); *Zwick Partners, LP v. Quorum Health Corp.*, 394 F. Supp. 3d 804, 813 (M.D. Tenn. 2019), or when amendment would be futile, *see Miller v. Champion Enterprises Inc.*, 346 F.3d 660, 692 (6th Cir. 2003), *In re NAHC, Inc. Sec. Litig.*, 306 F.3d 1314, 1332 (3d Cir. 2002).

In this situation, in which the plaintiffs met the heightened pleading standard initially but seek to add additional claims based on information learned in discovery, the purpose behind the heightened pleading standard—"to screen out lawsuits that have no factual basis," *In re NAHC*, 306 F.3d at 1332—would not be frustrated by amendment.  The Third Circuit has recognized that amendment ought to be permitted when the plaintiff learns the basis of a claim through discovery and could not have done so earlier.  *See Werner v. Werner*, 267 F.3d 288, 297 (3d Cir. 2001) ("Given the high burdens the PSLRA placed on plaintiffs, justice and fairness require that the plaintiffs before us be allowed an opportunity to amend their complaint to include allegations relating to the newly discovered Board meeting minutes."); *see also In re Livent, Inc. Noteholders Secs. Lit.*, 174 F. Supp. 2d 144, 148 (S.D.N.Y. 2001) (allowing a third amendment); *McNamara v. Bre–X Minerals, Ltd.*, 197 F. Supp. 2d 622 (E.D. Tex.2001) (allowing a fourth amendment); *Chu v. Sabratek Corp.*, 100 F. Supp. 2d 827, 844 & n. 14 (N.D. Ill. 2000) (allowing a sixth amendment); *In re Southern Pac. Funding Corp. Sec. Lit.*, 83 F. Supp. 2d 1172, 1174 (D. Or. 1999) (allowing a fourth amendment).  On these facts, amendment would not frustrate the Act's heightened pleading standard.

The court is also not convinced that amendment would cause undue delay or prejudice. The defendants argue that amendment "would require a new class certification proceeding to assess the 2018 stock drop," but, as the court has explained, the 2018 production guidance claim is time-barred.  (Docket Entry No. 191 at 31).  The defendants also argue that amendment would require resolving "potential predominance issues based on the expiration of the two-year statute of limitations for the new 2019 and 2020 claims (which were brought within the five-year repose period but, without relation back, would be beyond the two-year limitations period and subject to inquiry notice)."  (*Id.*).  The court doubts that any putative class members learned of the facts

32

underlying those claims over two years ago, but to the extent there are genuine predominance issues, they can be resolved efficiently and without undue delay or prejudice to the defendants.

**IV.     Conclusion**

The motion for leave is granted, (Docket Entry No. 185), but the claims based on the 2018 production guidance are dismissed with prejudice.


SIGNED on January 8, 2024, at Houston, Texas.


_____
                 Lee H. Rosenthal
            United States District Judge