# EXHIBIT B

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF TEXAS

| | | |
|---|---|---|
| DELAWARE COUNTY EMPLOYEES RETIREMENT SYSTEM, Individually and on Behalf of All Others Similarly Situated, | § § § | Civil Action No. 4:21-cv-02045 |
| | § | CLASS ACTION |
| Plaintiff, | § § | |
| | § | |
| vs. | § | |
| | § | |
| CABOT OIL & GAS CORPORATION, et al., | § § | |
| | § | |
| Defendants. | § § | |
| | § | DEMAND FOR JURY TRIAL |

**~~FIRST~~SECOND AMENDED CONSOLIDATED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS**

**TABLE OF CONTEST**

**Page**

I. INTRODUCTION ...................................................................................................1

II. NATURE OF THE ACTION .................................................................................6

III. JURISDICTION AND VENUE .............................................................................6

IV. THE PARTIES.......................................................................................................7

V. SUBSTANTIVE ALLEGATIONS ......................................................................10

    A. Cabot's Pennsylvania Drilling Operations Were (and Are) Critically Important to the Company's Business ......................................................10

    B. Relevant Law Governing Cabot's Drilling Operations .........................11

        1. The Clean Streams Law.................................................................12

        2. The Oil and Gas Act .....................................................................14

    C. Cabot's History of Disregarding Known Violations of Environmental Law ........14

    D. Cabot's Management and Board Was Specifically Informed Regarding Cabot's Non-Compliance with Applicable Environmental Laws .....................~~17~~18

        1. The Safety and Environmental Affairs Committee .................................20

        2. The Environmental Health & Safety Department......................................21

        3. The Audit Committee ....................................................................22

        4. ~~Dinge's~~Dinges's and Schroeder's Sarbanes-Oxley Certifications ...........23

        5. Cabot's Code of Business Conduct .........................................................24

    E. Defendants Repeatedly and Falsely Assure Investors that Cabot's Fracking During the Class Period Was in Compliance with Governing Laws.....................27

    F. A Grand Jury Finds Cabot Knowingly Disregarded Environmental Law Throughout the Class Period.................................................................27

        1. Cabot's Fracking Activities in Susquehanna County ...............................29

        2. The Environmental Impact of Cabot's Fracking on Susquehanna County Residents .......................................................30

            a. Nolan Scott Ely...........................................................31

4880-5761-4861.v1

**Page**

b.      Eric Roos........................................................~~32~~33

c.      Testimony by Other Dimock Area Residents ...........................~~33~~34

3.      The Pennsylvania Department Confirms that Cabot's Drilling
Operations Released Methane Pollution into Water Supplies ..............~~34~~35

4.      Cabot's Specific Criminal Acts Throughout the Class Period..............~~38~~39

a.      Crimes Related to Cabot's Knowing Failure to Remediate
Violations Cited in the December 2010 Consent Order ............~~38~~39

b.      Crimes Related to Cabot's Problem Wells Drilled After
2015 Outside of Dimock...................................................................41

G.      Cabot Repeatedly Violates Pennsylvania's Environmental Regulations...........~~42~~43

1.      Cabot Fails to Remediate Stray Gas Migration Pursuant to Its
Obligations Under the December 2010 Consent Order ........................~~43~~44

2.      Cabot's Violations for Stray Gas Migration Outside the Dimock
Box....................................................................................................................46

3.      Cabot's Violations and Failures to Remediate Known Violations
Were Pervasive and Widespread ........................................................~~47~~48

a.      Additional Unaddressed Violations Cited in the June 2018
Letter for Failures to Abide by the December 2010 Consent
Order .......................................................................................................48

b.      Additional "Continuing" Violations .............................................49

c.      Follow-Up Inspections Resulting in Violations.......................~~49~~50

H.      The Noncompliant Cabot Wells Had a Significant Impact on Company
Operations ................................................................................................................51

I.      Former Cabot Employees Corroborate the Grand Jury's Findings and the
Defendants' Knowledge of Cabot's Criminal Failure to Remediate ................~~53~~54

1.      The Geologist.............................................................................~~53~~54

2.      The Environmental Health & Safety Manager .........................................58

3.      The Environmental Health & Safety Specialist ........................................59

VI.      DEFENDANTS' MISLEADING STATEMENTS AND OMISSIONS.......................~~62~~63

VII.      DEFENDANTS' OTHER FALSE AND MISLEADING STATEMENTS AND
OMISSIONS ..................................................................................................~~67~~78

- ii -

**Page**

VIII.   THE RELEVANT TRUTH EMERGES .................................................................... ~~70~~82

IX.    DEFENDANTS KNEW, OR AT A MINIMUM WERE RECKLESS IN NOT
       KNOWING, THAT THE ALLEGED MISREPRESENTATIONS WERE
       MISLEADING .......................................................................................................... ~~72~~84

       A.    The Pennsylvania Department and Criminal Investigation Found that
             Cabot "Knowingly" Failed to Comply with Applicable Environmental
             Laws and Remediation Requirements ........................................................... ~~74~~85

       B.    Dinges, as CEO and Chairman of the Board, and Schroeder, as CFO, Were
             Routinely Apprised of the Alleged Continuing Violations............................. ~~75~~86

       C.    Dinges Publicly and Repeatedly Addressed the Alleged Violations ................ ~~77~~89

       D.    Stalnaker Presented to Cabot's Board and Prepared Cabot's Form 10-Ks
             and 10-~~Q s~~Qs with Knowledge of Their Falsity ................................................. ~~80~~92

       E.    Defendants Have Engaged in a Pattern of Wrongdoing ................................... ~~82~~93

       F.    Cabot's Gas Exploration and Production in Pennsylvania Is a Core
             Operation...................................................................................................... ~~82~~94

       G.    Defendants Were Incentivized to Ignore Cabot's Criminal Violations of
             Environmental Law........................................................................................ ~~83~~94

       H.    Defendants' Violation of Company Policy Supports an Inference of
             Scienter ......................................................................................................... ~~84~~95

       I.    Cabot Operates in a Highly Regulated Industry ............................................. ~~84~~96

       J.    Dinges's and Schroeder's SOX Certifications and Signing of SEC Filings
             Further Support a Strong Inference of Scienter ............................................. ~~84~~96

       K.    The Duration and Magnitude of the Misconduct Adds to the Inference of
             Scienter ......................................................................................................... ~~85~~97

       L.    Dinges's and Other Executive Officers' Stock Sales Support a Motive to
             Commit Fraud ................................................................................................ ~~85~~97

X.    LOSS CAUSATION................................................................................................ ~~87~~99

XI.    SCHEME LIABILITY............................................................................................. ~~91~~103

XII.   APPLICABILITY OF THE PRESUMPTION OF RELIANCE AND FRAUD ON
       THE MARKET........................................................................................................ ~~91~~103

XIII.  NO SAFE HARBOR ............................................................................................... ~~92~~104

XIV.   CLASS ACTION ALLEGATIONS ......................................................................... ~~93~~105

- iii -

**Page**

CLAIMS FOR RELIEF ...................................................................................94106

COUNT I ...........................................................................................................94106

COUNT II ..........................................................................................................95107

XV.    PRAYER FOR RELIEF ...................................................................................95108

XVI.    JURY DEMAND ...............................................................................................96108

4880-5761-4861.v1

~~Lead Plaintiff~~Class Representatives Delaware County Employees Retirement System ("~~Lead Plaintiff~~Delaware County") and ~~additional plaintiff~~ Iron Workers District Council (Philadelphia and Vicinity) Retirement and Pension Plan ("Iron Workers" and together with ~~Lead Plaintiff~~Delaware County, "Plaintiffs"), by their undersigned attorneys, individually and on behalf of all purchasers of Cabot common stock (the "Class") between February 22, 2016 and June 12, 2020, inclusive (the "Class Period"), allege the following based upon personal knowledge as to Plaintiffs and upon information and belief based on the investigation of Plaintiffs' attorneys as to all other matters, which included, among other things, a review and analysis of: Cabot Oil & Gas Corporation ("Cabot" or the "Company")[1] U.S. Securities and Exchange Commission ("SEC") filings, conference calls, Defendants' (as defined herein) public statements, media reports, analyst reports, industry reports, other complaints filed against Defendants, court proceedings, findings by regulators and law enforcement resulting from investigations of Cabot, interviews with former Cabot employees and persons knowledgeable about the Company's business, and other publicly available information.  Plaintiffs believe substantial additional evidentiary support will likely exist for the allegations set forth herein after a reasonable opportunity for discovery.

## I.    INTRODUCTION

1.    This case concerns a straightforward fraudulent scheme – Cabot and its Chairman and CEO, Dan O. Dinges ("Dinges"); CFO, Scott C. Schroeder ("Schroeder"); and Vice President and Regional Manager, Phil L. Stalnaker ("Stalnaker") (collectively, the "Defendants")[2], after Cabot committed high-profile environmental violations in prior years, told investors throughout

---

[1]    Subsequent to the filing of this action, Cabot merged with Cimarex Energy Co. and is now known as Coterra Energy Inc.  For sake of simplicity, "Cabot" or the "Company" is used herein.

[2]    While the Court previously dismissed Defendant Stalnaker and certain alleged false statements from this case, *see* ECF No. 118, Plaintiffs re-allege those references in the Second Amended Complaint only for purposes of appellate preservation.

- 1 -

4880-5761-4861.v1

the Class Period that the Company "substantially compl[ied] with the Clean Water Act and related federal and state regulations" and "had performed appropriate remediation efforts" to address known environmental violations in which methane gas had spread from its wells into fresh groundwater.

2.      Yet nothing could have been further from the truth.  In reality, Cabot cut corners and knowingly violated the very environmental laws it publicly claimed to uphold – polluting Pennsylvania's waters and failing to remediate wells Defendants had publicly committed to fix, despite repeated notices of regulatory violations and consent orders, for over a decade.  According to testimony and other evidence presented to a statewide criminal Grand Jury in Pennsylvania (the "Grand Jury"), *Cabot undertook little to no remedial work on numerous gas wells until approximately August 2018 – shortly after the Grand Jury began its investigation of Cabot's activities*.  Cabot's actions were so egregious that the Pennsylvania Attorney General filed fifteen criminal charges, including *nine felony* charges, against Cabot after the lengthy Grand Jury investigation that concluded – *based upon review of extensive evidence* – that Cabot had "*knowingly*" violated applicable environmental laws.  In announcing those charges against Cabot, Pennsylvania Attorney General Josh Shapiro concluded: "The Grand Jury presentments *prove that Cabot took shortcuts that broke the law*" by failing to remediate *known* violations, and "[t]he Grand Jury repeatedly found evidence of a company that placed profit over our laws."

3.      In recommending the criminal charges, the Grand Jury found "that, over a period of many years, and *despite mounting evidence, Cabot Oil & Gas failed to acknowledge and correct* conduct that polluted Pennsylvania water through stray gas migration" and criticized Cabot's "*long-term indifference* to the damage it caused to the environment and citizens of Susquehanna County."  Cabot's failures to redress ongoing environmental violations, however, were even more pervasive than the 15 criminal charges brought by the Attorney General suggested.

4880-5761-4861.v1

An exhaustive analysis piecing together information from records, data and correspondence from the Pennsylvania Department of Environmental Protection (the "Pennsylvania Department") reveals that Cabot was subject to a parade of additional violations and failures to remediate beyond those identified in the criminal action.  The extent of the Company's chronic failure to remediate violations, including those underlying the Grand Jury investigation, was unknown to investors.

4.     By the start of the Class Period in 2016, Cabot was already one of the most cited fracking company operating in Pennsylvania, having received hundreds of environmental violations from governing authorities.  During the Class Period, Cabot received hundreds more.  Of these, dozens of violations were not mere technical or first time infractions, but rather failures to remediate known, pre-existing violations, including methane leaks, among other issues.  Cabot, however, consistently assured investors that it was a responsible environmental steward working hand-in-hand with the Pennsylvania Department to "perform[] appropriate remediation efforts."

5.     The Cabot wells and well sites specifically affected by these continuing and unresolved violations were significant, collectively responsible for between 10% to 19% of Cabot's annual gas production during the Class Period.  These noncompliant wells and well sites generated approximately 13% of Cabot's total gas production during the entire Class Period and affected 17% of Cabot's well pads – the surface installations where the wells were drilled.

6.     Additionally, during the Class Period, the wells and well sites at which Cabot committed these environmental law violations generated approximately $1 billion in revenue for Cabot.  Cabot, by comparison, generated $1.5 billion per-year in revenue, on average, during the five year period between 2016 and 2020 encompassing the Class Period.  Accordingly, the wells affected by these violations had a material impact on Cabot's operations.

7.     Those inside Cabot recognized that the affected wells were significant to Cabot's business and thus closely monitored by the Company.  One Cabot Reservoir Engineering Manager

- 3 -

explained, for example, that when two of the wells subject to these continuing violations were first drilled, their rate of production was phenomenal: It "wasn't just uncommon for the region, but for the entire industry"; "*[i]t was unheard of*."  A former Cabot geologist further explained that many of the contaminated wells were located in Cabot's "core area" – the Company's best acreage responsible for producing the highest quality gas for Cabot.

8.      Moreover, the number of environmental violations actually cited was likely understated as compared to the actual contamination Cabot caused in Pennsylvania.  The Grand Jury concluded "after comprehensive study in the course of [its] investigative duties" that Pennsylvania's oversight of the fracking industry, including the Pennsylvania Department, "was for many years poor, and has only more recently shown signs of improvement."  Indeed, two former Environmental Health & Safety officials who worked for Cabot and one of its wholly-owned subsidiaries confirmed that gas migration issues occurred at Cabot wells.  And a former Cabot geologist explained that, out of the 120 wells they helped drill while employed at the Company, as many as one-in-three appeared to contain insufficient cement to prevent gas migration.  Fittingly, the Attorney General referred to Cabot's behavior in a June 25, 2020 press release as "*repeated and systematic* violation[s] of Pennsylvania environmental law."

9.      Cabot's management and Board of Directors (the "Board"), including the Individual Defendants,[23] were routinely apprised of  – and thus knew of – these continuing violations and failures to remediate.  For example, a description of internal Cabot "books and records" documents states that on at least nine different occasions, Cabot's Board was "told between approximately 2010 and 2018 that methane was migrating out of its wells [and] that the position of the regulator was that [Cabot] wasn't in compliance" with Pennsylvania's

---

[23]     The Individual Defendants refers to Dinges, Schroeder and Stalnaker.

- 4 -

environmental laws.  Further, those internal Company records show that the Board, including Dinges,  specifically "monitor[ed] the problems."  Dinges, as Board Chairman, and the Individual Defendants, as senior Cabot executives, attended Board meetings and thus reviewed the Board materials evidencing the environmental violations caused by Cabot.

10.     Former employee reports corroborate and add further evidence of Defendants' scienter.  For example, Cabot management, including the Individual Defendants, also received a Quarterly Update Report that was provided to the Board by Cabot's Director of Safety & Environmental Compliance, Gordon Ganaway, before each of Cabot's Board meetings, which took place six times per year during the Class Period.[34]  These reports included the number of environmental violations, all gas migration cases, and the status of Cabot's compliance, or lack thereof, with its remediation requirements.  The Individual Defendants were therefore warned that mandatory remediation was not occurring as required at least six times a year during the more than four-year Class Period – or on roughly twenty-four separate occasions.

11.     Underscoring the severity of the issues and further cementing Defendants' scienter, on June 11, 2018, Cabot received a letter from the Pennsylvania Department addressed to Stalnaker informing the Company of a laundry list of specific *continuing* environmental violations for discharges of pollution and other misconduct that remained unresolved under the December 2010 Consent Order (defined below).  As a senior member of management, Stalnaker was required to report this information to Cabot management according to the Company's Code of Conduct and to the Company's Environment, Health and Safety Board committee.  In fact, Stalnaker presented to Cabot's Board at least on a quarterly basis to keep the Company's directors and senior

---

[34]     Though referred to as the Quarterly Update Report, the Board received the report prior to every Board meeting, which occurred more frequently than on a quarterly basis and at least six times per year.

- 5 -

4880-5761-4861.v1

executives, including the two other Individual Defendants, apprised of Cabot's Pennsylvania operation where the violations and failures to remediate were taking place.

12. As noted above and further detailed below, Defendants were informed throughout the Class Period of Cabot's ongoing and widespread environmental violations, and the Company's failure to adequately address them – a state of affairs that directly contradicted Defendants' representations to investors during the Class Period.

13. When the relevant truth was disclosed, the Company's stock price plummeted, causing millions of dollars of damages to Cabot investors who bought Cabot securities at inflated prices. Plaintiffs seek to recover those damages on behalf of the putative Class through this action.

## II. NATURE OF THE ACTION

14. This is a federal securities class action on behalf of the Class during the Class Period, seeking to pursue remedies under §§10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), as amended by the Private Securities Litigation Reform Act of 1995 ("PSLRA") and Rule 10b-5 promulgated thereunder (17 C.F.R. §240.10b-5).

## III. JURISDICTION AND VENUE

15. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331 and §27 of the Exchange Act (15 U.S.C. §78aa), as the claims asserted herein arise under and pursuant to §§10(b) and 20(a) of the Exchange Act (15 U.S.C. §§78j(b) and 78t(a)) and SEC Rule 10b-5 promulgated thereunder (17 C.F.R. §240.10b-5).

16. Venue is proper in this District pursuant to §27 of the Exchange Act and 28 U.S.C. §1391(b)-(d). Cabot is headquartered in this judicial district and dissemination of the materially false and misleading information occurred in this judicial district.

17. In connection with the acts and conduct alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but

- 6 -

not limited to, the U.S. mails, interstate telephone communications, and the facilities of the New York Stock Exchange ("NYSE").

## IV.   THE PARTIES

18.   As set forth in the attached declaration, ~~Lead Plaintiff~~ Delaware County ~~Employees Retirement System~~ purchased Cabot common stock at artificially inflated prices during the Class Period and suffered damages as a result of Defendants' alleged misconduct.  *See* Ex. A.

19.   As set forth in the attached declaration, ~~additional plaintiff~~ Iron Workers, headquartered in Philadelphia, Pennsylvania, also purchased Cabot common stock at artificially inflated prices during the Class Period and suffered damages as a result of Defendants' alleged misconduct.  *See* Ex. B.

20.   Defendant Cabot was an independent oil and gas company engaged in the development, exploitation, and exploration of oil and gas properties, including through fracking, exclusively in the continental United States.  Since 2015, Cabot continuously refined its operating focus, and narrowed its natural gas development effort to the Marcellus Shale in northeast Pennsylvania.  During the Class Period, the Company's shares traded on the NYSE under the symbol COG.  It is incorporated in Delaware, and its offices are located in Pittsburgh, Pennsylvania; Montrose, Pennsylvania (in Susquehanna County); and Houston, Texas.

21.   Defendant Dinges was Cabot's CEO and Chairman of the Company's Board during the Class Period.  During the Class Period, Dinges sold 66,610 shares of his Cabot stock for proceeds of more than $1.8 million.  As CEO, Dinges spoke on Cabot's behalf in press releases, conference calls, and SEC filings.  Pursuant to §§302 and 906 of the Sarbanes-Oxley Act of 2002, SEC Rule 13a-14(a), and 18 U.S.C. §1350, Dinges certified and signed the Company's Forms 10-K filed with the SEC on February 22, 2016, February 27, 2017, March 1, 2018, February 26, 2019, and February 25, 2020.  Dinges further certified and signed the Company's Forms 10-Q filed with

4880-5761-4861.v1

the SEC on May 3, 2016, July 29, 2016, October 28, 2016, July 26, 2019, October 25, 2019, and May 1, 2020. In addition, the Company's Annual Reports were issued under his name, and included an introductory letter signed by Dinges to shareholders. As CEO and Board Chairman, Dinges attended Board meetings and reviewed Board materials.

22.    Defendant Schroeder was Cabot's CFO and Executive Vice President during the Class Period. As CFO, Schroeder spoke on Cabot's behalf in press releases, conference calls, and SEC filings. Pursuant to §§302 and 906 of the Sarbanes-Oxley Act of 2002, SEC Rule 13a-14(a) and 18 U.S.C. §1350, Schroeder certified and signed the Company's Forms 10-K filed with the SEC on February 22, 2016, February 27, 2017, March 1, 2018, February 26, 2019, and February 25, 2020. Schroeder further certified and signed the Company's Forms 10-Q filed with the SEC on May 3, 2016, July 29, 2016, October 28, 2016, July 26, 2019, October 25, 2019, and May 1, 2020. In addition, the Company's Annual Reports were issued under his name. As CFO, Schroeder attended Cabot Board meetings and reviewed Board materials.

23.    Defendant Stalnaker was Cabot's Vice President, Regional Manager North Region at the start of the Class Period, and he has been a Cabot executive officer since 2009. During the Class Period, he was promoted in 2017 to Senior Vice President, North Region, and promoted again in 2019 to Senior Vice President, Operations. Stalnaker oversaw Cabot's Pennsylvania operations from the Company's Pittsburgh, Pennsylvania offices. Prior to and during the Class Period, Stalnaker was repeatedly described on Cabot conference calls as "running our north region" and the person who "runs our Marcellus." As an executive officer of the Company, Stalnaker spoke on behalf of Cabot, including during quarterly earnings conference calls, and the Company's Annual Reports were issued under his name. As the executive officer in charge of the North Region, Stalnaker presented to Dinges and the Board regarding Cabot's Pennsylvania

- 8 -

4880-5761-4861.v1

operations and prepared Cabot's SEC filings on issues that pertained to the Company's Pennsylvania operations.

24.     During the Class Period, the Individual Defendants, as senior executive officers and/or a director of Cabot, were in possession of and privy to confidential, proprietary information concerning Cabot, its operations, finances, and financial condition, and its legal and regulatory compliance and liability related to its gas wells.  During the Class Period, Dinges and Schroeder routinely traveled from Houston to Cabot's Pittsburgh, Pennsylvania office, where Stalnaker was located, and all three Individual Defendants inspected the Company's Pennsylvania operations multiple times per year.

25.     Because of their positions as Cabot's senior-most executive officers, the Individual Defendants obtained, had access to, and/or were in possession of materially adverse nonpublic information concerning Cabot via internal corporate documents and communications with other corporate officers and employees, routine visits to Cabot's Pennsylvania operations sites, attendance at management and/or Board meetings (and committees thereof), and via the reports, presentations, and other information provided to them in connection therewith.  As detailed below, the Individual Defendants also received, including as the named addressees or signatory on behalf of Cabot, nonpublic regulatory letters, agreements and notices of violation sent by Pennsylvania authorities to the Company related to the facts and circumstances underlying the claims in this case.  As a result of their possession of such information, the Individual Defendants knew or recklessly disregarded that the adverse facts specified herein had not been disclosed to, and were being concealed from, the investing public.

26.     As senior executive officers and controlling persons of a publicly traded company whose common stock, during the Class Period, was registered with the SEC pursuant to the Exchange Act and was actively traded on the NYSE and governed by the federal securities laws,

4880-5761-4861.v1

the Individual Defendants had a duty to promptly disseminate accurate and truthful information regarding Cabot's operations, business, and financial statements and to correct any previously issued statements that had become materially misleading or untrue, so that the market price of Cabot stock would be based upon truthful and accurate information.  Defendants' materially false statements and omissions during the Class Period violated these requirements and obligations.

27.     The Individual Defendants, because of their positions of control and authority as officers and/or a director of the Company, were able to, and did, control the disclosures in various SEC filings, press releases, and public statements pertaining to the Company during the Class Period.  Each Individual Defendant was provided with information alleged herein to be misleading before or shortly after its issuance and/or had the ability and/or opportunity to prevent its issuance or cause it to be corrected.  Accordingly, each Individual Defendant is responsible for the accuracy of the public statements detailed herein and is, therefore, primarily liable for the misrepresentations contained in those public statements.

28.     Each of the Individual Defendants is liable as a participant in a fraudulent scheme and course of business that operated as a fraud or deceit on purchasers of Cabot common stock by engaging in the violative conduct alleged herein, which caused Cabot securities to trade at artificially inflated prices during the Class Period.

## V.     SUBSTANTIVE ALLEGATIONS

### A.     Cabot's Pennsylvania Drilling Operations Were (and Are) Critically Important to the Company's Business

29.     During the Class Period, Cabot generated revenues each year from its oil and gas operations, primarily in Pennsylvania.  In 2015, Cabot's revenues exceeded $1.3 billion.  By 2019, the Company's revenue grew to more than $2 billion.  The source of Cabot's financial growth during and before the Class Period was its operations in the Marcellus Shale, located in northeastern Pennsylvania – the location of the alleged environmental crimes committed by Cabot.

- 10 -

4880-5761-4861.v1

Cabot was, in fact, "named #1 performing S&P 500 stock" in 2011, "driven by [its] success in the Marcellus" Shale in Pennsylvania.  The Company later became "one of the largest and lowest-cost U.S. producers of gas in the prolific Marcellus region of Pennsylvania."  ECF 41-1 at 32.

30.    Cabot described its position in the Marcellus Shale as the "***cornerstone asset*** of its portfolio" and the "***primary driver*** of record production and reserve growth" during the period since 2008.  In 2015, just before the start of the Class Period in February 2016, Cabot's properties in Susquehanna County, Pennsylvania, already represented the Company's largest operating and growth area in terms of reserves (*i.e.*, oil or gas that can be recovered at a financially feasible cost), production, and capital investment, and approximately 90% of Cabot's 2015 total equivalent production (a standardized measure of oil and gas production) came from the Marcellus Shale.  By 2019, "***substantially all***" of Cabot's annual total equivalent production came from its Pennsylvania operations.

31.    Like its growth during the Class Period, Cabot's future success was also tied to Pennsylvania.  As of December 31, 2016, 97% of Cabot's year-end proved reserves were natural gas and 93% were located in the Marcellus Shale.  By 2019, ***all*** of Cabot's proved undeveloped reserves were located in Susquehanna County, Pennsylvania.

### B.    Relevant Law Governing Cabot's Drilling Operations

32.    Cabot's oil and gas exploration and production operations in Pennsylvania have always been subject to an array of federal, state, and local laws and regulations.  During the Class Period, Cabot told investors that:

> Our operations are subject to extensive federal, state and local laws and regulations relating to the generation, storage, handling, emission, transportation and discharge of materials into the environment.  Permits are required for the operation of our various facilities.  These permits can be revoked, modified or renewed by issuing authorities.  Governmental authorities enforce compliance with their regulations through fines, injunctions or both.  Government regulations can increase the cost of planning, designing, installing and operating, and can affect the timing of installing and operating, oil and natural gas facilities.

- 11 -

4880-5761-4861.v1

33.    Because Cabot's drilling operations were primarily located in Pennsylvania, that state's laws concerning the oil and gas industry are particularly relevant to this case, especially its environmental protection laws, including the Pennsylvania Clean Streams Law, 35 P.S. §§691.1 *et seq*.

### 1.    The Clean Streams Law

34.    Pennsylvania enacted its Clean Streams Law to preserve and improve the purity of the state's waters for the protection of public health.  The Clean Streams Law's objective is not only to prevent further pollution of Pennsylvania's waters, but also to restore streams in Pennsylvania to a clean and unpolluted state.  The law recognizes that the prevention and elimination of water pollution is directly related to the economic future of Pennsylvania.  Under the law, water pollution includes the "contamination of any waters of the Commonwealth such as will create or is likely to create a nuisance or to render such waters harmful, detrimental or injurious to public health, safety or welfare."  To further its goal of preventing water pollution, the Clean Streams Law provides certain prohibitions against and penalties for polluters.

35.    Section 301 of the Clean Streams Law, in particular, prohibits unauthorized discharges of "industrial waste," which broadly includes "any liquid, gaseous, radioactive, solid or other substance, not sewage, resulting from any manufacturing or industry." 35 P.S. §301 states: "No person or municipality shall place or permit to be placed, or discharged or permit to flow, or continue to discharge or permit to flow, into any of the waters of the Commonwealth any industrial wastes, except as hereinafter provided in this act."  35 P.S. §307 further provides:

> No person or municipality shall discharge or permit the discharge of industrial wastes in any manner, directly or indirectly, into any of the waters of the Commonwealth unless such discharge is authorized by the rules and regulations of the department or such person or municipality has first obtained a permit from the department. . . .

36.    P.S. §401, moreover, prohibits other types of pollutants, stating:

- 12 -

4880-5761-4861.v1

It shall be unlawful for any person or municipality to put or place into any of the waters of the Commonwealth, or allow or permit to be discharged from property owned or occupied by such person or municipality into any of the waters of the Commonwealth, any substance of any kind or character resulting in pollution as herein defined. . . .

37.     It is a crime to cause air or water pollution or violate any provision of the Clean Streams Law.  As further detailed in 35 P.S. §611, it is also a crime to fail to comply with or violate any order of the Pennsylvania Department or its rules and regulations:

It shall be unlawful to fail to comply with any rule or regulation of the department or to fail to comply with any order or permit or license of the department, to violate any of the provisions of this act or rules and regulations adopted hereunder, or any order or permit or license of the department, to cause air or water pollution . . . .

38.     In addition to civil penalties, "[a]ny person or municipality who negligently violates any provision of this act, any rule or regulation of the department, any order of the department, or any condition of any permit issued pursuant to the act is guilty of a misdemeanor of the second degree" (35 P.S. §602(b)), and "[a]ny person or municipality *who intentionally or knowingly violates* any provision of this act, any rule or regulation of the department, any order of the department, or any condition of any permit issued pursuant to the act is guilty of a *felony* of the third degree."  35 P.S. §602(b.1).

39.     The Pennsylvania Department is responsible for determining when pollution has occurred, for formulating and adopting rules and regulations, and issuing such orders as are necessary to implement the provisions of the Clean Streams Law.  The Pennsylvania Department, as the primary enforcer of the law, is also tasked with investigating any alleged source of pollution of Commonwealth waters, and instituting appropriate proceedings under the provisions of the law to discontinue any such pollution.  Among the recourse provided by the Clean Streams Law is the Pennsylvania Department's ability to issue orders as necessary to "aid in the enforcement of the provisions of this act" or to modify, suspend, or revoke permits.  The Pennsylvania Department

- 13 -

may also issue orders that require persons "to cease operations of an establishment which, in the course of its operation, has a discharge which is in violation of any provision of this act."

40.    Under Section 205 of the Commonwealth Attorneys Act and Section 601 of the Clean Streams Law, violations of the Clean Streams Law may be referred to the Pennsylvania Office of the Attorney General by the Pennsylvania Department or local district attorneys.

### 2.    The Oil and Gas Act

41.    The Pennsylvania Department also enforces Pennsylvania's Oil and Gas Act and the rules and regulations promulgated thereunder.  These rules require, for example, that operators properly case and cement their wells so as to prevent the migration of gas or other fluids into fresh groundwater.  25 Pa. Code §78.81(a)(2)-(3).  The rules also set cement and well construction standards and require that an operator report and correct defective, improper, or insufficient cement casings on gas wells.  *See* 25 Pa. Code §§78.86; 78a.73(b); 78a.85(a)(5).  The failure to abide by these rules constitutes a violation under the Oil and Gas Act.

42.    During the Class Period, Cabot failed to ensure that its drilling activities complied with these laws, and knowingly violated them, thereby committing numerous felony and misdemeanor criminal acts under Pennsylvania law.

### C.    Cabot's History of Disregarding Known Violations of Environmental Law

43.    Cabot was, fundamentally, a fracking company.   "Fracking" refers to an unconventional drilling process used for extracting natural gas from underground geological formations that could not otherwise be extracted by conventional drilling methods.  For years, Cabot exploited the Marcellus Shale Deposit – a geological formation located underground that stretches 575 miles beneath parts of Pennsylvania, West Virginia, Ohio, and New York – for natural gas extraction through fracking.

- 14 -

4880-5761-4861.v1

44.     Prior to and leading into the Class Period, Cabot was clamoring to establish itself as an environmentally responsible fracking business.  The Company's drilling operations in the town of Dimock, in Susquehanna County, had become the poster child for the hazards fracking posed to rural communities.  Susquehanna County was critically important to Cabot; it is where substantially all of the Company's natural gas production occurred.  Without drilling in Susquehanna County, Cabot had virtually no business whatsoever.

45.     Following a January 1, 2009 explosion at a Dimock resident's water well, the Pennsylvania Department began investigating Cabot's gas wells in the area.  It found that Cabot's drilling caused methane gas to migrate into numerous Dimock residents' water wells and, as a result, the Pennsylvania Department and the Company entered into a Consent Order and Agreement on November 4, 2009, which Stalnaker signed (the "November 2009 Consent Order"), to address the problem.

46.     But on April 15, 2010, the Pennsylvania Department announced in a press release that Cabot and the Pennsylvania Department had entered into a new, sweeping Consent Order and Agreement, which Dinges signed (the "April 2010 Consent Order"), following "Cabot's failure to abide by the terms" of the November 2009 Consent Order.  The Pennsylvania Department Secretary John Hanger stated in a related press release that "Cabot had every opportunity to correct these violations, but failed to do so.  Instead, it *chose to ignore* its responsibility to safeguard the citizens of this community and to protect the natural resources there."  As Secretary Hanger explained in the press release, drilling companies "have the legal responsibility to design and construct their wells to keep all gas contained within the wells and to prevent gas from moving into fresh groundwater."  He added: "Gas migration is a serious issue that can have dire consequences to affected communities."

- 15 -

4880-5761-4861.v1

47.     Then, on December 15, 2010, Cabot and the Pennsylvania Department entered into what would be the final, global Consent Order and Agreement, which Dinges also signed, concerning the Dimock pollution (the "December 2010 Consent Order").  While refusing to take responsibility for polluting the water, Cabot did agree to "***take all actions*** necessary . . . to comply with all applicable environmental laws and regulations, including all applicable provisions" of Pennsylvania's Clean Streams Law, Oil and Gas Act, and related regulations.

48.     Following these consent orders, Cabot was eager to rebuild its reputation and remove the overhang the story had on the Company's stock price.  As one stock analyst at KeyBanc wrote on December 14, 2010: "We believe a settlement would be received favorably by the market, as it would remove a hangover on the stock caused by the negative press associated with its Marcellus operations."  Thus, after signing the April 2010 Consent Order, Dinges assured investors on an April 29, 2010 conference call that the Company "takes safety in all environmental matters extremely seriously" and that Cabot "will continue to cooperate fully with the Pennsylvania DEP to remedy and resolve the items from the consent order."  Following the December 2010 Consent Order, Cabot issued a press release, in which Dinges further stated: "we have redoubled our efforts with the Pennsylvania Department of Environmental Resources to resolve past issues" and that the Company was "committed to responsible operations within Susquehanna County."

49.     But none of that was true.  As detailed below, throughout the Class Period, Cabot continued to knowingly violate Pennsylvania environmental laws, through repeated felony-level violations, yet assured the public that the Company complied with the law and that the "sources of methane ha[d] been remediated."

50.     On June 15, 2020, following a Grand Jury investigation, Cabot was charged by the Pennsylvania Office of the Attorney General with fifteen criminal charges, including ***nine felonies***, for failing to fix ***known*** faulty gas wells leaking methane into the residential water

- 16 -

supplies in Dimock and surrounding communities.  The Grand Jury found "that, *over a period of many years*, and *despite mounting evidence, Cabot Oil & Gas failed to acknowledge and correct* conduct that polluted Pennsylvania water through stray gas migration," before further criticizing Cabot's "*long-term indifference* to the damage it caused to the environment and citizens of Susquehanna County."

51.     Attorney General Shapiro said in a video statement that same day that "[t]he Grand Jury presentments *prove* that Cabot took shortcuts that broke the law, and damaged our environment – harming our water supply and public health . . . .  They put their bottom line ahead of the health and safety of Pennsylvanians.  The Grand Jury repeatedly found *evidence* of a company that placed profit over our laws."

52.     Indeed, numerous residents of Susquehanna County testified during the grand jury proceeding that, shortly after Cabot had drilled gas wells near their homes, they began experiencing nausea, bodily blotches and rashes after showering, vision problems, and difficulty breathing and that their water turned black and oily in some instances or orange in others.  Testing showed poisons such as arsenic and lead in their water.  Their property values plummeted.  Cabot had knowingly polluted Pennsylvania waters and failed to comply with Pennsylvania Department orders requiring the Company to remediate its gas wells to stop the discharge of methane gas, in direct contravention of its Class Period representations to the contrary.

53.     When this truth was partially revealed in Company disclosures and the June 15, 2020 announcement of the Pennsylvania Attorney General's criminal charges against Cabot, the Company's stock price plummeted, causing millions of dollars of damages to investors who bought Cabot common stock at prices inflated by Defendants' fraudulent scheme.

- 17 -

**D.    Cabot's Management and Board Was Specifically Informed Regarding Cabot's Non-Compliance with Applicable Environmental Laws**

54.    Defendants' knowledge of Cabot's failure to remediate and address known serial violations is established through internal Company documents obtained via a books and records demand, documents obtained from a Pennsylvania Right to Know Law request, accounts of former Cabot employees and Cabot's own descriptions of the processes that Cabot's Board and management undertook to monitor the status of new and ongoing violations of environmental law. Committees and departments within Cabot, including the Board's Safety and Environmental Affairs Committee and Cabot's Environmental Health & Safety department were specifically tasked with monitoring Cabot's compliance with and violations of environmental laws and the status of Cabot's ongoing efforts (or lack thereof) to redress those violations. Management, including the Individual Defendants, were therefore kept well informed regarding Cabot's continuing violations and failures to remediate, despite representing to investors that the Company substantially complied with the law and undertook appropriate remediation.

55.    Cabot's management, Board, and its committees also regularly assessed legal and regulatory risks to the Company, specifically including those risks associated with environmental law compliance, throughout the Class Period. Cabot's management routinely provided the Board and its committees with reports on these subject matters and reviewed Cabot's operations concerning environmental matters. Members of Cabot's management also received notices from regulators, including the Pennsylvania Department, stating that its drilling operations violated applicable laws and regulations.

56.    Based on counsel's description of internal Company documents obtained the *In re Cabot Oil & Gas Corp. Derivative Litigation*, No. 4:21-cv-02046 (S.D. Tex.), pursuant to an 8 Del. Ch. §220 books and records demand, on at least nine specific occasions constituting "red

- 18 -

4880-5761-4861.v1

flags," Cabot's Board, which included Dinges, was "told between approximately 2010 and 2018 that methane was migrating out of its wells, that it was not – that the position of the regulator was that it wasn't in compliance." Further, the Board "monitor[ed] the problems," yet none of the Board materials produced pursuant to the §220 books and records demand reflect the implementation of a new process for remediating those wells deemed out of compliance.

57.    Dinges, as Chairman of Cabot's Board, received these materials and participated in meetings during which the Board and Cabot's management was informed that the Pennsylvania Department found Cabot out of compliance with environmental laws and regulations due to continued methane migration from the Company's wells, among other reasons. Dinges was therefore apprised that Cabot was non-compliant and aware of Cabot's failures to take appropriate steps to remediate the problem wells over eight-plus years. That Dinges and the Board were repeatedly informed of and continued to monitor this issue on at least nine occasions also confirms the severity of the problems and their significance to Cabot.

58.    Schroeder, consistent with his responsibilities as Cabot's CFO, also attended Cabot Board meetings and, like Dinges, received Board materials. Schroeder was therefore similarly apprised of the "red flags" informing the Board of the methane migration and the fact that Cabot's wells were not in compliance with applicable law. Moreover, both Schroeder and Dinges, as CFO and CEO, respectively, reviewed and approved Board materials before they were provided to Board members. Schroeder and Dinges therefore knew in detail, both prior to and during the Class Period, that Cabot's wells continued to leak methane for at least eight years, between 2010 and 2018, in violation of the law, and that the Company was not sufficiently redressing the problem.

59.    Stalnaker attended Board meetings and presented to the Board regarding Cabot's Pennsylvania operations and, as the senior most executive officer in charge of the region, was kept informed regarding the Company's Pennsylvania regulatory violations and efforts to address them.

- 19 -

4880-5761-4861.v1

Certain notices of violation outlining Cabot's noncompliance from the Pennsylvania Department were personally addressed to Stalnaker. Stalnaker was therefore aware of the unlawful methane migration in Susquehanna County, the Pennsylvania Department's position regarding Cabot's continuing non-compliance, and Cabot's failure to remediate.

### 1.    The Safety and Environmental Affairs Committee

60.    Cabot's Safety and Environmental Affairs Committee (the "S&EA Committee"), which was made up of at least three Board members, assisted the Board in providing "oversight and support" for the Company's safety and environmental policies, programs, and initiatives.

61.    The S&EA Committee's charter specifically included, among other things, responsibility for "[r]eviewing and *providing input to management and the Board regarding the Company's compliance with laws, regulations*, policies, programs and practices with regard to environmental, health, and safety matters," including by "*receiving and reviewing with management reports regarding* . . . the Company's management of and responses to releases, investigations, *notices of violations, remediations*, civil action, or other occurrences involving environmental laws or regulations." As detailed herein, Cabot was subject to numerous such investigations and notices of violations in Pennsylvania during the Class Period, including for failures to remediate *known* violations. *See* §§V.F.-G., *infra.*

62.    During the Class Period the S&EA Committee met at least four times per year to discuss regulatory violations and the status of remediations.[45]

63.    The S&EA Committee was required to report its actions and recommendations to the Board, which included Dinges and whose meetings were attended by Schroeder and Stalnaker, following each S&EA Committee meeting.

---

[45]    During the Class Period, the S&EA Committee's name was changed to the "Environment, Health & Safety Committee."

- 20 -

4880-5761-4861.v1

64.     As members of management, the Individual Defendants were thus required to advise the S&EA Committee regarding violations received from the Pennsylvania Department, including the Notices of Violation detailed in §V.G. below informing Cabot that the Company's drilling operations were not in compliance with environmental law and consent orders entered into with the Pennsylvania Department, including for allowing methane to migrate into groundwater. The Individual Defendants, as members of management, were also required to inform the S&EA Committee regarding Cabot's remediation efforts, including the remediation of wells deemed to be noncompliant by the Pennsylvania Department.

65.     The Individual Defendants therefore had knowledge regarding the violations raised by the Pennsylvania Department and Cabot's failure to remediate them, including the Pennsylvania Department's June 11, 2018 letter to Cabot specifically informing the Company that it had not been in compliance with obligations established under the eight-year-old December 2010 Consent Order due to Cabot's extensive ***continuing*** violations for methane migration, among other things. *See* §V.G.1.-2., 3.a., *infra*.  Despite this, however, Defendants informed investors that Cabot had "performed ***appropriate*** remediation efforts" and that the Defendants "believe that [they] ***substantially comply*** with the Clean Water Act and related federal and state regulations."

### 2.     The Environmental Health & Safety Department

66.     According to corroborating accounts of former Company employees (*see* §V.I.2.-3., *infra*), Cabot maintained an Environmental Health & Safety department for the specific purpose of monitoring regulatory violations and ongoing efforts to address them.

67.     As a matter of process, Cabot's Director of Safety & Environmental Compliance, Gordon Ganaway, who worked from Cabot's Houston headquarters, attended weekly calls with other Environmental Health & Safety personnel in Pennsylvania in order to keep Cabot's

4880-5761-4861.v1

headquarters informed regarding Pennsylvania Department violations and the status of remediations.

68.    Mr. Ganaway also represented the Environmental Health & Safety department at least semi-annually at Board meetings, and reported to the Board and Dinges.  As a part of this process, Environmental Health & Safety personnel in Pennsylvania maintained a log of ongoing environmental violations and complaints and their resolution status.

69.    In addition, Cabot's Environmental Health & Safety department prepared Quarterly Update Reports for Mr. Ganaway.  The Quarterly Update Reports included the number of violations, larger spill cleanups and remediation cases in Pennsylvania.  All gas migration cases and their remediation status were included in the Quarterly Update Report.  Mr. Ganaway provided the Quarterly Update Reports to the Board in connection with each Board meeting, and the reports were specifically provided to Schroeder and Dinges prior to each Board Meeting.[56]

70.    Each of the Individual Defendants, who attended Board meetings, reviewed Board materials and were senior Cabot executives, were therefore kept apprised of continuing violations and the status of remediations on a routine basis, through the Quarterly Update Reports and at Board meetings.  Mr. Ganaway also apprised Cabot's senior management of developments from the weekly Environmental Health & Safety conference call with Pennsylvania, which Cabot conducted for the purpose of informing the Company's headquarters about environmental issues, including violations and the status of remediation.

### 3.    The Audit Committee

71.    As stated in Cabot's Proxy Statements, the function of the Audit Committee is to assist the Board in overseeing, among other things, "the integrity of the financial statements of the

---

[56]    Though referred to as the "Quarterly Update Report," the report was compiled and provided to the Board on a more frequent basis – prior to each of the Board's six annual meetings.

4880-5761-4861.v1

Company" and the "compliance by the Company with legal and regulatory requirements." Each year, Company management provided Cabot's Audit Committee with "periodic reports" on these areas of potential exposure, including litigation, financial reporting and disclosures, and regulatory risks, among others.

72.     Cabot's management, including the Individual Defendants, was required to provide the Audit Committee with "periodic reports" concerning the regulatory risks Cabot faced, which, during the Class Period, included Cabot's failure to remediate known violations raised by the Pennsylvania Department in Notices of Violation (*see* §V.G., *infra*), including those detailed in the Pennsylvania Department's June 11, 2018 letter informing Cabot that the Company had not been in compliance with the December 2010 Consent Order for eight years due to Cabot's extensive and unresolved ***continuing*** violations for discharges of pollution. *See* §V.G.1.-2., 3.a., *infra*.

### 4.     ~~Dinge's~~**Dinges's** and Schroeder's Sarbanes-Oxley Certifications

73.     Appended as an exhibit to the 2015 10-K filed on February 22, 2016 was a signed certification pursuant to the Sarbanes-Oxley Act of 2002, wherein Dinges and Schroeder certified that they had designed disclosure controls to ensure that material information relating to the Company was made known to them. Dinges and Schroeder signed similar statements in connection with the 2016 10-K filed on February 27, 2017, the 2017 10-K filed on March 1, 2018, the 2018 10-K filed on February 26, 2019, and the 2019 10-K filed on February 25, 2020, and in connection with Cabot's other quarterly reports on Forms 10-Q filed with the SEC during the Class Period.

74.     Dinges and Schroeder therefore certified that Cabot had sufficient controls in place to ensure that material information concerning the Company's core Pennsylvania operations was made known to them. Dinges and Schroeder were thus informed when Cabot received Notices of

- 23 -

Violation from the Pennsylvania Department and were informed by the regulator in a June 11, 2018 letter that the Company had not been in compliance with the December 2010 Consent Order for eight years due to Cabot's extensive **continuing** violations for discharges of pollution that remained unresolved.   Indeed, from time to time, Cabot included limited (and misleading) disclosures regarding Notices of Violation in its Form 10-K and 10-Q filings, as detailed herein. *See* §§VI.-VIII, *infra*.

### 5.      Cabot's Code of Business Conduct

75.      During the Class Period, Cabot publicly represented on the Company's website that it maintained and complied with a Code of Business Conduct (sometimes referred to herein as the "Code").  The Code concerned, among other things, Cabot's purported adherence to environmental laws.  Cabot required that every director, officer, and employee sign a statement that he or she understood and would comply with the principles enumerated in the Code.  The Code further stated that Cabot would ensure that all employees complied with the Code's policies.

76.      As relevant here, the Code stated that "[i]t is the Company's policy to observe and comply with all governmental laws, rules and regulations applicable to it or the conduct of its business wherever located."  Concerning "The Environment," the Code stated:

> It is Company policy to comply fully with the letter and the spirit of all applicable federal, state, and local environmental protection laws and regulations (the "Environmental Laws").  The Company will conduct operations in such a manner as to meet or exceed all Environmental Laws in its business activities.

To achieve this policy, the Code affirmed Cabot's practice of "**routinely review[ing]** the conduct of its operations in an effort to strive for continuous improvement in its environmental performance."  Defendants' required adherence provides further support that they were aware of Cabot's environmental violations throughout the Class Period.

- 24 -

4880-5761-4861.v1

77.     Senior Cabot officers, including each of the Individual Defendants, also had a duty to inform the Company of any violations of the Code that they learned, such as a failure to "meet or exceed all Environmental Laws in its business activities."  The Code stated:

> The CEO and each senior financial officer shall promptly bring to the attention of (i) the Corporate Secretary or (if the reporting officer is not the CEO) the CEO and (ii) the Audit Committee any information he or she may have concerning any violation of this Code . . . involving any management or other employees who have a significant role in the Company's financial reporting, disclosures or internal controls.

Pursuant to the Code, all employees, including the Individual Defendants, had a duty to inform the Company regarding any material information that affected disclosures made in Cabot's public filings.  The Code stated:

> Each employee, including the CEO and each senior financial officer, shall promptly bring to the attention of the Corporate Disclosure Committee any material information of which he or she may become aware that affects the disclosures made by the Company in its public filings . . . .

78.     Therefore, each of the Individual Defendants had a duty to advise Cabot's Corporate Secretary, CEO, Audit Committee and Corporate Disclosure Committee of Notices of Violation and correspondence from the Pennsylvania Department, such as the June 11, 2018 Letter, informing the Company that certain of Cabot's wells continued to leak methane into groundwater for a period of at least eight years and that Cabot had failed to remediate these known violations.  Stalnaker was therefore duty bound to report the Notices of Violation he personally received, or was otherwise informed of, from the Pennsylvania Department (*see* §§V.G.1.-3.; V.I.1., *infra)*, including the June 11, 2018 Pennsylvania Department letter.  *See* §V.G.1.-2., 3.a., *infra*.

79.     Likewise, members of Cabot's Environmental Health & Safety department, including Mr. Ganaway, were required to report environmental violations, such as those recorded in the Quarterly Update Reports and the ongoing log.  Specifically, the Code required that

- 25 -

"directors, officers and employees should immediately report any suspected violations of laws, rules or regulations or unethical conduct (***including violations of this Code***) connected with the business of the Company or its subsidiaries to their supervisor and the Corporate Secretary."  As described above, the Code required Cabot to "meet or exceed all Environmental Laws in its business activities" and "routinely review the conduct of its operations in an effort to strive for continuous improvement in its environmental performance."  Therefore violations of this policy were required to be reported, and were, in fact, reported to Cabot's Board and management.

80.    As detailed above, Cabot carried out routine reviews of its environmental compliance, informing the Company, senior management and the Board of violations and the status of remediations.  In addition to the environmental "red flags" reported to the Board and Cabot management on nine separate occasions during the Class Period detailed above, Cabot management was advised of environmental law violations through the following: (1) Cabot's Environmental Health & Safety department's Quarterly Update Reports provided to management in connection with Board meetings, (2) weekly conference calls conducted for the purpose of keeping Cabot's headquarters apprised of environmental violations and the status of remediation, (3) reports to the Audit and EH&S Committees from management on the Company's compliance with environmental law and (4) daily operational meetings with its Montrose and Pittsburgh offices, in person and telephonically, to review daily well operations, including well procedures and any problems at each well and rig, where geologists, drilling engineers and completion engineers would brief Stalnaker, a member of Cabot's senior management.

81.    It was not only critical that Cabot's drilling operations in Susquehanna County comply with Pennsylvania's environmental laws to avoid regulatory and enforcement penalties and risk, including potential criminal liability, which could interfere with Cabot's extensive Pennsylvania operations, but also because violating such laws could (and did) harm the health of

- 26 -

local residents and the value of their properties.  As Defendants knew, and admitted on their website, Cabot's Susquehanna County operations were situated in rural communities where the majority of residents relied on groundwater wells as their primary source of water.

82.    As detailed herein, however, in conduct that belied its public statements to investors, Cabot routinely and knowingly violated Pennsylvania's Clean Streams Law and the Oil and Gas Act by polluting Pennsylvania groundwater – and then purposely avoided its obligations to remediate those violations throughout the Class Period.

**E.    Defendants Repeatedly and Falsely Assure Investors that Cabot's Fracking During the Class Period Was in Compliance with Governing Laws**

83.    As fully set forth in §IV., *infra*, during the Class Period Defendants made materially misleading statements concerning Cabot's compliance with environmental law and regulations. For example, Cabot's SEC Form 10-Ks filed throughout the Class Period stated that Defendants "***believe that [they] substantially comply with the Clean Water Act and related federal and state regulations***."  Defendants also repeatedly assured that they had remediated faulty wells in Cabot's Form 10-K and 10-Q filings, stating after receiving certain Notices of Violation that Defendants "***have performed appropriate remediation***" and that Defendants "believe the source of methane ***has been remediated*** and are working with the [Pennsylvania Department] to reach agreement on the disposition of this matter."  As explained further below, *see* §IV., *infra*, Defendants' statements were materially misleading when made.

**F.    A Grand Jury Finds Cabot Knowingly Disregarded Environmental Law Throughout the Class Period**

84.    During the latter portion of the Class Period, Pennsylvania convened the Forty-Third Statewide Investigating Grand Jury in connection with a comprehensive and ongoing statewide investigation of numerous environmental crimes that occurred during fracking operations in Pennsylvania by oil and gas companies, including Cabot.  Members of the Grand

- 27 -

4880-5761-4861.v1

Jury received *__evidence__*, including documentary evidence and sworn testimony provided by witnesses from the Pennsylvania Department, regarding violations of the Clean Streams Law by Cabot that occurred in and around Susquehanna County, Pennsylvania. Based on that evidence, the Grand Jury made numerous *__findings of fact__* concerning Cabot's drilling activities in Pennsylvania. As a result of these findings, on February 11, 2020, the Grand Jury recommended that criminal charges be filed against Cabot, including numerous *__felony__* charges, based on its determination that Cabot's drilling and fracking activities caused *__known and widespread__* *__contamination__* of residential water supplies in Susquehanna County in direct violation of Pennsylvania law. The entirety of the evidence presented to and relied on by the Grand Jury has not been made available to the public, and the Grand Jury's findings were not made public until June 15, 2020, when Cabot was criminally charged.

85.     Specifically, the Grand Jury found that:

> [O]ver a period of *many years*, and despite mounting evidence, Cabot Oil & Gas *failed to acknowledge and correct conduct that polluted Pennsylvania water through stray gas migration*. Indeed, some of these gas wells have been in place for more than a decade, yet Cabot has only recently taken steps to remediate them. *In light of Cabot's long-term indifference to the damage it caused to the environment and citizens of Susquehanna County, these were not merely technical violations* . . . .

86.     The Pennsylvania Office of the Attorney General led an investigation that reviewed the Grand Jury's findings of fact and found that they were consistent with the Attorney General's own investigative findings. Based on the Grand Jury's findings of fact and its own investigation, the Attorney General found *probable cause* that Cabot *committed the crimes alleged and knowingly violated Pennsylvania environmental laws and regulations*, including that Cabot:

- "did *knowingly* discharge, permit to flow or continue to discharge or permit to flow, methane into groundwater"; and

- "did *knowingly fail to comply with orders of the department*, including but not limited to the December 15, 2010 Consent Order and Settlement Agreement, when

- 28 -

4880-5761-4861.v1

it failed to remediate its gas wells to eliminate the discharge of natural gas, which allowed contamination to continue unabated."

87.    Supervisory Special Agent H. Justus Brambley in the Attorney General's office, provided an affidavit accompanying the criminal charges stating that he (1) "reviewed the sworn testimony given by the witnesses before the Grand Jury and finds that it is consistent with the information contained within the Presentment"; and (2) "reviewed the evidence presented to the Grand Jury and finds that it comports with the results of the OAG investigative efforts and findings as to the allegations contained in this instant criminal complaint" and, as a result, stated that "based upon the above facts, there is probable cause to believe that the defendant, Cabot Oil and Gas Corporation, committed the acts alleged therein, in violation of Pennsylvania law."

88.    The Pennsylvania Attorney General announced the criminal charges against Cabot on June 15, 2020.  Cabot has waived the preliminary criminal hearing, meaning that the charges will move forward toward trial, and Cabot is precluded from raising the sufficiency of the Attorney General's *prima facie* case going forward.  In a written statement reported on January 7, 2022, prosecutors stated that ***this is a "recognition that the evidence against [Cabot] is sufficient to proceed in the criminal process*.**"

### 1.    Cabot's Fracking Activities in Susquehanna County

89.    To understand Cabot's knowing violations of Pennsylvania environmental laws as determined by the Grand Jury, one must understand Cabot's natural gas drilling practice called "fracking."  The Grand Jury learned, with explanations from witnesses, about the process of drilling and fracking a well.  Fracking is a multistep process that involves drilling down deep into the earth to shale rock deposits.  Next, fluid is injected into the rock at high pressures to create fractures in the shale that release the natural gas otherwise trapped within the rock.  The gas is then able to flow freely up to the surface to be captured by oil and gas operators, like Cabot.

4880-5761-4861.v1

90.     As the initial step of this process, heavy machinery is used to drill a hole, known as a wellbore, into the ground at the well site. Piping, known as casing, is then inserted down into the hole to stabilize the wellbore, and the drillers pour cement into spaces between the casing and the walls of the wellbore to both secure the piping in place and to fill any voids through which gas, such as methane, might escape. Methane is the chief constituent of natural gas, which contains from 50% to 90% methane, and is a potentially explosive gas that burns readily in air.

91.     Numerous potential flaws that arise during the cementing process, however, may cause the cement in a well to fail to bond properly. For example, when the cement is pumped in to seal the space between the wellbore and the pipe that lines it, groundwater may dilute the cement, which affects the cement's ability to bond to and fill the voids between the casing and wellbore, causing imperfections in the cement. Once a well goes into production, such imperfections provide a pathway for gas, including methane, to migrate into and contaminate other nearby geological features, such as drinking water aquifers.

92.     Cabot began fracking in Susquehanna County, Pennsylvania, in the mid-2000s after it leased mineral rights from multiple residents in Dimock Township. In 2006, it started to drill gas wells on their properties. As described below, Cabot's drilling activities polluted the groundwater in Dimock, leading to the entry of the December 2010 Consent Order.

### 2.     The Environmental Impact of Cabot's Fracking on Susquehanna County Residents

93.     Multiple landowners in Susquehanna County testified before the Grand Jury that they had been personally, adversely affected by Cabot's drilling. As recounted in the Grand Jury's Findings of Fact, by 2008, residents in the Dimock area began to experience changes to their water, causing them to suspect that methane gas was migrating into their water supply from Cabot's new, nearby wells. Some began to see effervescence in their water, while others noticed sediment. But one event in particular alerted local residents to the problem – when the water well of Norma

- 30 -

4880-5761-4861.v1

Fiorentino, a Dimock area resident, *spontaneously exploded*. Despite the fact that the explosion happened in close proximity to Cabot's drilling operations, the Company denied responsibility.

94.    The Pennsylvania Department began investigating and concluded that Cabot's drilling activities released stray methane gas that had migrated into and contaminated the aquifer in Dimock. The Pennsylvania Department determined that no fewer than 18 drinking water supplies serving 19 homes were affected by Cabot's Dimock drilling activities. The methane migration was so prevalent that the Pennsylvania Department took legal action against Cabot, which ultimately resulted in the Company entering into a Consent Order and Agreement with the Pennsylvania Department, which was finalized in the December 2010 Consent Order. The December 2010 Consent Order shut down Cabot's operations within a nine-square mile area in Dimock (known as the "Dimock Box") and established a series of obligations, which remain in force today, including that Cabot restore or replace the impacted drinking water supplies and undertake remedial work on its gas wells to eliminate any further methane migration. As noted above, Dinges signed the December 2010 Consent Order on behalf of Cabot.

95.    As would be disclosed at the end of the Class Period, numerous Dimock residents who relied on well or spring water for their water supply were among the witnesses who testified to the Grand Jury regarding the effect Cabot's drilling activities had on their homes, health, and drinking water. Despite the December 2010 Consent Order requiring that Cabot remediate its wells to stop the migration of methane into their water, residents testified that the problems never abated and have in fact continued for over a decade.

### a.    Nolan Scott Ely

96.    Nolan Scott Ely and his extended family lived on 183-acres of farmland in Dimock. Starting in 2008, Cabot drilled six wells on the Ely property and, soon thereafter, Mr. Ely's wife began experiencing nausea and bodily blotches. Mr. Ely assured his wife that the recent drilling

- 31 -

4880-5761-4861.v1

activity could not be the cause. After all, Mr. Ely, himself a Cabot employee, had worked on many of the Company's well sites, helping to construct well pads and set up drill rigs. He had repeatedly asked his well site supervisor if there was any possibility that the drilling could contaminate his water. His supervisor, as Mr. Ely testified, "kept telling me, no, there is no possible way."

97.     But Mr. Ely's groundwater had been contaminated by stray methane gas from Cabot's mining activities. A relative who lived next door brought Mr. Ely two jugs of tap water, filled from their common water source. The water was brown, and when Mr. Ely applied a lighter to it, the water caught fire – "*flames came flying out of the jug*." He then turned on the kitchen faucet and found that he was able to set the running water on fire as well. When he alerted Cabot to the problem, he was told he should leave his house because it might explode. Testing of the well water at his house revealed "astronomical" amounts of methane, as well as ethane, propane, excessive levels of sodium, and magnesium.

98.     Prior to discovering the contamination, however, Mr. Ely and his family had regularly been drinking the water. Mr. Ely experienced vision problems, such as "tunnel vision" while driving. His wife had difficulty breathing and dizziness, and experienced rashes on her skin after showering. The contamination of his property from Cabot's activities took more than just a physical and emotional toll on Mr. Ely and his family – it also took a financial one. While their land was once valued at $1.2 million, it is now valued at just $153,000, an 87% decrease.

99.     Mr. Ely was surprised by Cabot's reaction to his plight given that the Company was not only a local business, but his employer. He testified:

> I spent a lot of time with them. I knew them. I knew them, and I worked with them to try to get them to help us out with[] our situation. And they just – *they didn't care* . . . they weren't really doing anything other than just bringing me water, which didn't last very long.

- 32 -

### b.    Eric Roos

100.    Eric Roos lived in Montrose, Susquehanna County for 29 years.  When Cabot commenced drilling in the County in the mid-to late 2000s, an agent of the Company approached him to sign a lease that would allow drilling on his land in return for royalties.  Effectively forcing Mr. Roos to sign, the Cabot agent told him that if he refused to sign the lease, the Company would legally be able to take what it wanted from his property.  Mr. Roos signed the lease, but at no time did Cabot inform him that its drilling activities could contaminate his well water.

101.    As with Mr. Ely, problems with Mr. Roos's water began shortly after Cabot had drilled a number of wells near his home in 2009.  Mr. Roos testified that there were violent blasts of gas and water while his wife was washing dishes, intimating that the Rooses' water was contaminated with methane and should not be consumed.  Cabot agreed, without admitting it had caused any stray gas migration, to install a vent on Mr. Roos's well because his well head was located in the basement of his home.  That meant that explosive concentrations of methane emanating from his well water put the inhabitants of the house at risk.

102.    In addition to the potential for an explosion, high methane concentrations can also cause asphyxiation in rooms where water is used, such as bathrooms.  Despite these dangers, it took six months before Cabot installed the vent at the Rooses' residence.  And in addition to methane, the water in Mr. Roos's well was also found to contain lithium, barium, manganese, and other toxic chemicals.  Due to Cabot's failure to remediate, the Rooses were forced to obtain their drinking water from a public well, which required a 14-mile trip every time they needed water.

103.    A decade later, the problem remains.  At the time Mr. Roos testified in March 2019, his neighbors were still having problems with their water.  Mr. Roos told the Grand Jury that he would like to move away, but added, "I don't know who will buy my house now.  How can I leave?"

- 33 -

4880-5761-4861.v1

### c.    Testimony by Other Dimock Area Residents

104.    One of the Rooses' neighbors testified that she and her husband built their home on land in Dimock that the couple had bought in 2003.  Their home also relied on well water.  Beginning in February 2008, a new Cabot oil or gas well was constructed in the area every month, the closest being just 650 feet away from their house.  By late fall of 2008 the neighbor testified that she began finding black, oily water in her washing machine.  She later found orange water coming from the kitchen faucet and in the toilet.

105.    In April 2010, a test of her well water revealed the presence of ethylene glycol, propylene glycol, and two other unidentified hazardous chemicals.  The neighbor further recalled that when coming out of the tap, the water would foam with "an Alka Seltzer consistency," smelled like turpentine, and left behind a "black slime."  In 2012, water testing showed manganese present at twice the state limit and a high level of lithium.  A 2018 water test found arsenic, lead, sodium, uranium, lithium, and propane.  The testifying neighbor provided her observations and test results to Cabot, which refused to accept responsibility. Cabot representatives told her the arsenic in her well water must have come from "apple orchards."  The couple has not been able to drink water from their property for ten years.

106.    Other residents of Susquehanna County similarly reported changes in their water's color, taste, smell, and appearance, along with "Alka Seltzer-like" bubbling.  Some also described explosive bursts from their faucets that could blow a plate out of a person's hands while washing dishes.  Many of the neighbors similarly experienced rashes and other skin problems following bathing after Cabot's drilling started.  Despite this, Cabot has, for many years, declined to remedy the gas well integrity issues that the Pennsylvania Department found caused stray methane migration into Dimock water sources.

- 34 -

4880-5761-4861.v1

**3.    The Pennsylvania Department Confirms that Cabot's Drilling Operations Released Methane Pollution into Water Supplies**

107.    Methane is naturally present in the surface and groundwater in Susquehanna County as a result of the normal decomposition of organic matter.  This naturally present methane is known as "biogenic" methane gas.  Another type of methane gas – known as "thermogenic" methane gas – is created by heat and pressure deep in the geologic strata.  Biogenic and thermogenic gases have two different chemical identities.  Consequently, laboratory tests can identify methane as either biogenic or thermogenic.

108.    Unlike biogenic gas, thermogenic gas remains trapped underground until it is released ***by drilling activities***.  The methane gas identified in the contaminated water in Susquehanna County has been, by and large, identified as thermogenic in the testing of samples over the ten-plus year period that the pollution problems in Susquehanna County have materialized.

109.    As Pennsylvania Department Program Manager Seth Pelepko explained to the Grand Jury, if "the signature looks like a deep gas that has been isolated for hundreds of millions of years, it shouldn't be there unless there is an impairment or pathway that has been opened up." Such a newly opened pathway, he concluded, existed in Susquehanna County, allowing thermogenic methane to pollute local water, because of "the way the [Cabot] wells were constructed in this area, the gas wells."

110.    The Grand Jury learned, through testimony, that Cabot's well integrity issues were related to problems with the cement jobs at its wells.  Either gas flowed through the cement while it was hardening, resulting in permanent channels through which gas could escape, or the cement did not completely fill certain spaces between the casing and the wellbore.  The Pennsylvania Department used various sophisticated geochemistry analyses to confirm this conclusion about Cabot's role in releasing thermogenic methane into local water supplies.

- 35 -

4880-5761-4861.v1

111.    Notably, when Cabot began gas exploration in Susquehanna County, it collected pre-drilling samples of the drinking water of residents nearby the Company's wells.  Cabot, however, failed to test the samples for methane levels.  When announcing criminal charges against Cabot in June 2020, Pennsylvania's Attorney General stated that the Company ***deliberately*** did not test for methane in residential water wells prior to drilling in order to maintain plausible deniability: "Cabot's failure to test its pre-drill water samples for methane eliminated the ability to establish a baseline for promptly assessing and addressing the problem of stray gas . . . .  In essence, ***they didn't test their samples so that there would be no proof that they were contaminating nearby water supplies***."

112.    To compensate for this deliberate omission by Cabot, the Pennsylvania Department conducted its own analysis to establish baseline methane levels in local water by reviewing 10,615 water samples collected by other organizations operating in the area, including the United States Environmental Protection Agency, the United States Agency for Toxic Substances and Disease Registry, Duke University scientists, and consultants engaged by area property owners.  The Pennsylvania Department used the samples to establish, using isotopic geochemistry, the origin of methane gas in the Dimock area groundwater.

113.    As part of this review, the Pennsylvania Department also analyzed 12 post-drilling samples of drinking water supplies within Dimock Township dating back to 2009 that had been contaminated with "stray" methane gas from Cabot wells.  These samples exhibited extremely high and hazardous levels of methane.  For example, the highest level readout, 92 mg/l, exceeded the point at which gas-filled water can explode.  Over 50% of the time, the methane concentration in these impacted water supplies was greater than 10 mg/l – the warning range for dangerous methane concentration and over 20 times higher than the baseline levels in the surrounding area.  As noted above, aside from the risk of explosion or fire, high methane concentrations can also

- 36 -

cause asphyxiation in rooms where water is used, such as bathrooms.  The methane levels in these impacted water supplies far exceeded the background methane levels found in the area at large: In 90% of testing, the naturally occurring background level of methane, by comparison, was less than 0.5 mg/l.

114.    Citing these analyses, Pennsylvania Department Program Manager Pelepko testified to the Grand Jury that Cabot's defective wells caused methane to migrate into homeowners' water wells and that this connection is demonstrated by the elevated levels of thermogenic methane found in multiple data sets.  Pelepko further testified that, in addition to methane, he looked for other substances in well water when testing for contamination from fracking activities.  He stated that he found elevated levels of these substances in the Dimock well tests, and further explained that these other substances likely were lying inert at the bottom of the water wells, but were stirred up by migrated methane bubbling through the water.

115.    The hazardous test results drove the Pennsylvania Department to investigate and comprehensively address the methane migrating from Cabot's wells into Dimock area residents' water supplies in 2009 and 2010, culminating in the December 2010 Consent Order.  As part of that investigation, the Pennsylvania Department determined that 18 water supplies, serving 19 homes, in Dimock Township around Carter Road had been affected by Cabot's drilling.  The Pennsylvania Department further found, as reflected in the December 2010 Consent Order, that Cabot had not stopped the discharge of methane into the groundwater aquifers as initially promised as part of the November 2009 Consent Order and that the contamination was ongoing.

116.    Despite the remediation obligations memorialized in the December 2010 Consent Order and Cabot's public promises to comply with all applicable environmental laws and regulations, the Grand Jury found that contamination from Cabot's drilling activity continued unabated after the December 2010 Consent Order and throughout the Class Period.

- 37 -

117.    Ken Kennedy, an Oil and Gas Inspector Supervisor at the Pennsylvania Department who investigated integrity issues in Cabot's gas wells, testified to the Grand Jury that he became involved in the ongoing Dimock investigation in 2013.  He explained that certain of Cabot's wellbore integrity issues had been addressed in 2009-2010, but that Pennsylvania Department inspections in 2011 raised questions about the integrity of additional wells.  Kennedy rechecked these wells, and other wells that shared the same well pad.  By 2015, he had identified 11 wells needing further evaluation.  Cabot then did some of its *own* testing, but did not begin actively remediating *any* of these wells until 2018.

118.    This was particularly egregious because the December 2010 Consent Order required that Cabot restore or replace impacted drinking water supplies and undertake remedial work of certain of its gas wells to eliminate further migration.  Yet, according to testimony and other evidence presented to the Grand Jury, *Cabot undertook little to no remedial work on its gas wells until approximately August 2018 – shortly after the Grand Jury began its investigation of Cabot's activities – and even then, the Company started work on only certain wells*.

119.    As a result of Cabot's repeated failures to remediate the environmental harms it was continuing to create in Pennsylvania and its overall "indifference" to the ongoing damage it had caused, the Grand Jury, unbeknownst to investors, found in February 2020 that:

> [O]ver a period of many years, *and despite mounting evidence*, Cabot Oil & Gas failed to acknowledge and correct conduct that polluted Pennsylvania water through stray gas migration.  Indeed, some of these gas wells have been in place for more than a decade, yet Cabot has only recently taken steps to remediate them. *In light of Cabot's long-term indifference to the damage it caused to the environment and citizens of Susquehanna County, these were not merely technical violations*.

The Grand Jury concluded that, as to Cabot, "criminal charges are appropriate."

- 38 -

### 4.    Cabot's Specific Criminal Acts Throughout the Class Period

120.    Following the Grand Jury's recommendation, the Pennsylvania Office of the Attorney General filed fifteen criminal counts against Cabot, including nine felonies for **knowing** violations of Pennsylvania law, on or around June 15, 2020, stemming from stray methane migration from numerous Cabot wells into groundwater sources (the "June 15, 2020 Presentment of Charges"). Notably, **additional criminal charges were contemplated but not ultimately brought due to the Clean Streams Law's statute of limitations**. The charges filed were based on two categories of problem Cabot wells: (i) those covered by the December 2010 Consent Order that were not remediated as of 2015; and (ii) other, more recently drilled wells in Susquehanna County outside of the Dimock area.

### a.    Crimes Related to Cabot's Knowing Failure to Remediate Violations Cited in the December 2010 Consent Order

121.    The June 15, 2020 Presentment of Charges disclosed numerous facts that were previously unknown to investors, including that prior to and throughout the Class Period, Cabot did, among other violations, "**knowingly** discharge, permit to flow or continue to discharge or permit to flow, methane into groundwater" on one or more occasions from numerous of the Company's gas wells through at least June 11, 2018 – the date the Pennsylvania Department sent a letter to Stalnaker (the "June 2018 Letter") listing the Company's extensive **continuing** violations for discharges of pollution that remained unresolved under the December 2010 Consent Order. According to the June 15, 2020 Presentment of Charges, these criminal violations occurred:

- On or about **August 14, 2009 through at least June 11, 2018**, the defendant, Cabot Oil and Gas Corporation did **knowingly** allow or permit the discharge, of methane into groundwater, from the gas wells G Shields 1V, G Shields 2H, G Shields 4H and G Shields 5H located in Dimock Township, Susquehanna County, Pennsylvania;

- On or about **July 16, 2008 through at least June 11, 2018**, the defendant, Cabot Oil and Gas Corporation did **knowingly** allow or permit the discharge, of methane

- 39 -

4880-5761-4861.v1

into groundwater, from the gas wells Costello 1V, Costello 2V, Gesford 4H and Gesford 8H located in Dimock Township, Susquehanna County, Pennsylvania;

- On or about ***October 31, 2008 through at least June 11, 2018***, the defendant, Cabot Oil and Gas Corporation did ***knowingly*** allow or permit the discharge, of methane into groundwater, from the gas wells Ratzel 1H, Ratzel 2H, and Ratzel 3V located in Dimock Township, Susquehanna County, Pennsylvania; and

- On or about ***March 27, 2008 through at least June 11, 2018***, the defendant, Cabot Oil and Gas Corporation did ***knowingly*** allow or permit the discharge, of methane into groundwater, from the gas wells Ely 4H and Ely 6H located in Dimock Township, Susquehanna County, Pennsylvania.

122.    Each of the above four charges constitutes a felony for knowingly violating the Clean Streams Law's prohibition against the discharge of industrial waste.  35 P.S. §691.301. Based on this same conduct, the Attorney General also charged Cabot with an additional four felony counts under the Clean Streams Law for knowingly polluting Pennsylvania waters.  35. P.S. §691.401. All of the criminal charges were brought against Cabot pursuant to 18 Pa C.S.A. §307 pertaining to liability of corporations for acts performed by its agents.

123.    The Attorney General further charged that on or about ***December 15, 2010 through January 9, 2020***, Cabot, based on the above conduct, did "***knowingly*** fail to comply with orders of the [Pennsylvania Department], including but not limited to the December 15, 2010 Consent Order and Settlement Agreement, when it failed to remediate its gas wells to eliminate the discharge of natural gas, which allowed contamination to continue unabated," in violation of the Clean Streams Law's prohibition of unlawful conduct, another felony.  35. P.S. §691.611.

124.    For each of the gas wells described in ¶121, *supra*, the Pennsylvania Department had previously served Cabot with Notices of Violation, both prior to and during the Class Period, alerting Cabot that its cementing and casing activities failed to prevent the migration of gas into

- 40 -

4880-5761-4861.v1

fresh groundwater.[67]   Despite Cabot's obligations to remediate these wells and to eliminate methane gas migration pursuant to the December 2010 Consent Order, however, Cabot knowingly failed to do so during the Class Period in direct contravention of its representations to investors.

125.   Indeed, Defendants' statements that Cabot performed "appropriate remediation efforts" on certain of its wells in response to Notices of Violation and representations that the source of the methane leak had "been remediated" were materially misleading and made with intent to deceive in light of the Grand Jury's findings and Cabot's continuing violations reflecting that the Company actually had longstanding and widespread failures to remediate known violations for methane migration, among other breaches of environmental regulations, in contravention of the December 2010 Consent Order.

126.   In particular, the Pennsylvania Department issued the Notice of Violation for the G Shields wells on October 20, 2011; for the Costello and Gesford wells on June 16, 2014; for the Ratzel wells on December 19, 2014; and for the Ely wells on March 21, 2018.   Despite Cabot management's receipt of the Notices of Violation, Cabot did not address these violations as of the June 2018 Letter, which, as noted above, listed the Company's continuing violations under the December 2010 Consent Order.[78]   Cabot's violations are further detailed in §V.G.1.-2., 3.a., *infra*.

> **b.      Crimes Related to Cabot's Problem Wells Drilled After 2015 Outside of Dimock**

127.   In addition to knowingly ignoring the problems with the Dimock gas wells subject to the December 2010 Consent Order – in direct conflict with their public representations to the

---

[67]   The continuing violations in these Notices of Violation were detailed in the June 2018 Letter, which did not come to light until described in the June 15, 2020 Presentment of Charges.

[78]   Nor were these Notices of Violation contemporaneously disclosed.  Rather, they did not become publicly known until the June 15, 2020 Presentment of Charges came to light, which detailed Cabot's violations identified in the June 2018 Letter.

- 41 -

contrary – Cabot began drilling new gas wells outside Dimock, but still within Susquehanna County, that suffered from similar violations and well integrity issues: (a) in 2016, Cabot drilled gas wells on the Howell well pad in Auburn Township; (b) in 2017, the Company drilled the Jeffers Farm wells in Harford Township; and (c) in 2019, Cabot drilled the POWERS M wells in Auburn Township.  Shortly after Cabot drilled these gas wells, problems began to appear in local water supplies, just as they had in Dimock.

128.    For each of these wells, and at the time unknown to investors, the Pennsylvania Department served Cabot with Notices of Violation during the Class Period for cementing and casing activities that failed to prevent the migration of gas into fresh groundwater, in violation of Pennsylvania law: (a) the Howell gas wells 2H, 4H, 6H and 8H were the subject of two separate Pennsylvania Department Notices of Violation on March 16, 2017 and June 20, 2017; (b) the Jeffers Farm gas wells 7H, 8H, 9H, l0H, 11H, 12H, and 14H were the subject of a Notice of Violation on November 16, 2017; and (c) the POWERS M gas well 002 was the subject of a Notice of Violation October 18, 2019.

129.    Further, the Notices of Violation for the Howell and Jeffers Farm wells remained unresolved, and were both included in the June 2018 Letter listing Cabot's continuing violations as of that date.  These violations are further detailed in ¶140, *infra*.  Cabot would later reveal in a SEC Form 10-Q, filed on July 26, 2019, that it had received two proposed Consent Order and Agreements that were related to the June 2017 Notice of Violation at the Howell gas wells and the November 2017 Notice of Violation at the Jeffers Farm gas wells.  ¶¶205, 258, *infra.*  The other pertinent Notices of Violation identified in the June 2018 Letter were not publicly known until that letter was detailed in the June 15, 2020 Presentment of Charges.

130.    The violations described in ¶¶121, 128, *supra*, and ¶140, *infra*, formed the basis of additional criminal charges against Cabot for  further violations of the Clean Streams Law's

- 42 -

4880-5761-4861.v1

prohibition against the discharge of industrial waste and other pollutions.  35 P.S. §691.301; 35. P.S. §691.401.

131.   In announcing the charges against Cabot in June 2020, Pennsylvania Attorney General Shapiro concluded: "The Grand Jury presentments *prove that Cabot took shortcuts that broke the law*, and damaged our environment – harming our water supply and public health." Cabot "put their bottom line ahead of the health and safety of Pennsylvanians," and "[t]he Grand Jury repeatedly found evidence of a company that placed profit over our laws."

### G.   Cabot Repeatedly Violates Pennsylvania's Environmental Regulations

132.   As detailed in the June 2018 Letter, but unknown to investors until 2020, Cabot – both prior to and throughout the Class Period – repeatedly ignored known environmental violations that the Company was obligated to address under the December 2010 Consent Order.  These serial violations, which in many instances rose to the level of criminal offenses, belied Defendants' public Class Period misrepresentations, as set forth in Sections V.F.4.; V.G.1.-3.; VI., *infra*. Numerous of these violations were based on Cabot's defective cementing and casing activities that failed to prevent the migration of gas into fresh groundwater.  These included many of the same violations underlying the Pennsylvania Attorney General's 2020 criminal case against Cabot.

133.   Pursuant to the December 2010 Consent Order signed by Dinges on behalf of Cabot, the Company expressly agreed to "take all actions necessary including, but not limited to, the requirements set forth in th[e] Consent Order and Settlement Agreement, to comply with all applicable environmental laws and regulations, including all applicable provisions of the Clean Streams Law, Oil and Gas Act, and Regulations [promulgated thereunder]."  Cabot further agreed to conduct ongoing testing of its gas wells and water supplies until the identified violations were adequately remediated.

4880-5761-4861.v1

134. To ensure Cabot's compliance with the December 2010 Consent Order, the Pennsylvania Department conditioned its authorization for the completion of any existing Cabot wells and the drilling of any new gas wells in the Dimock Township area upon the Pennsylvania Department confirming that Cabot was in compliance with all obligations under the order, following a written request by the Company to renew drilling.

135. Although Cabot had undertaken some superficial efforts to remediate the environmental impact of its drilling activities, the Pennsylvania Department made clear in the nonpublic June 2018 Letter that the Company's obligations under the December 2010 Consent Order remained outstanding throughout the Class Period, as it had yet to restore and/or replace the polluted water supplies and prevent and remediate the unpermitted discharge of natural gas into fresh groundwater sources.

### 1. Cabot Fails to Remediate Stray Gas Migration Pursuant to Its Obligations Under the December 2010 Consent Order

136. Despite its agreement to satisfy its obligations under the December 2010 Consent Order and comply with all applicable environmental laws and regulations, Cabot failed to do so between 2010 and 2020. Both before and during the Class Period, the Pennsylvania Department consistently advised Cabot, through a parade of Notices of Violation, that it had failed to comply with the terms of the order and that it remained in continuing violation of applicable environmental laws.

137. The June 2018 Letter, which was written in response to a request by Cabot to begin drilling new gas wells within the Dimock Box, provided a detailed history of Cabot's failure to comply with its obligations under the December 2010 Consent Order and identified each continuing violation that remained unresolved as of the date of the letter.

138. As a result of the unresolved violations, the Pennsylvania Department denied Cabot's request to begin drilling, stating that "[u]ntil these compliance matters are resolved, Cabot

- 44 -

4880-5761-4861.v1

is not in compliance with its obligation under the 2010 Agreement and cannot begin drilling new Gas Wells within the Dimock/Carter Road Area."

139. The June 2018 Letter referenced no fewer than four Notices of Violation within Dimock for stray gas migration that Cabot had failed to resolve in accordance with its obligations under the December 2010 Consent Order:

(a) On October 20, 2011, the Pennsylvania Department privately issued Cabot a Notice of Violation, which was addressed to Stalnaker, for stray gas migration and pollution of a water supply. Although Cabot installed a treatment system on the water supply and conducted some water sampling, it failed to provide the Pennsylvania Department with a final report demonstrating satisfactory water quality of the impacted water supply. In light of this deficiency, the Pennsylvania Department sent Cabot a follow-up letter on January 28, 2013, requesting further information. Cabot failed to provide a full and complete response. Violations cited in the October 20, 2011 Notice of Violation for failure to prevent the migration of gas or other fluids into sources of fresh groundwater, the existence of defective casing or cementing, and the unpermitted discharge of polluting substances, remained unresolved as of the June 2018 Letter.

(b) On June 16, 2014, the Pennsylvania Department privately issued Cabot another Notice of Violation, which was addressed to Stalnaker, for stray gas migration and pollution of water supplies. Based upon its investigation, the Pennsylvania Department determined that an additional water supply had been impacted as a result of stray gas migration associated with Cabot's gas wells. Although Cabot drilled a new water well for the impacted resident in response, it failed to permanently restore or replace the impacted water supply. Issues with the integrity of Cabot's gas wells were also unresolved. Violations cited in the June 16, 2014 Notice of Violation for failure to prevent the migration of gas and other fluids into sources of fresh

- 45 -

4880-5761-4861.v1

groundwater, as well as the unpermitted discharge of polluting substances, remained unresolved as of the June 2018 Letter.

(c)     On December 19, 2014, the Pennsylvania Department privately issued Cabot another Notice of Violation, which was addressed to Stalnaker, for stray gas migration and pollution of water supplies.  Based upon its investigation, the Department determined that two additional water supplies were impacted as a result of stray gas migration associated with Cabot's wells.  Violations cited in the December 19, 2014 Notice of Violation for failure to prevent the migration of gas or other fluids into sources of fresh groundwater, general well construction and operation, cement standards, and the unpermitted discharge of polluting substances remained unresolved as of the June 2018 Letter.

(d)     On March 21, 2018, the Pennsylvania Department privately issued Cabot another Notice of Violation for stray gas migration and pollution of water supplies.  Based upon its investigation, the Pennsylvania Department determined that at least one additional water supply was impacted as a result of stray gas migration associated with Cabot's wells.  Violations cited in the March 21, 2018 Notice of Violation for failure to prevent the migration of gas or other fluids into sources of fresh groundwater, general well construction and operation, and the unpermitted discharge of polluting substances remained unresolved as of the June 2018 Letter.

### 2.     Cabot's Violations for Stray Gas Migration Outside the Dimock Box

140.    Following the December 2010 Consent Order, Cabot began drilling new gas wells in areas outside the Dimock Box.  These gas wells, too, were plagued with integrity issues and polluted water supplies – often just months after Cabot installed the well – and were the subject of private Notices of Violation from the Pennsylvania Department:

(a)     In 2016, Cabot drilled gas wells on the Howell pad in Auburn Township, Susquehanna County.  On March 16, 2017 and June 20, 2017, the Pennsylvania Department

- 46 -

4880-5761-4861.v1

privately issued Cabot Notices of Violation for stray gas migration and pollution of water supplies at the Howell pad. Based upon its investigation, the Pennsylvania Department determined that at least two water supplies were impacted by stray gas migration associated with Cabot's gas wells. Violations cited in the June 20, 2017 Notice of Violation for failure to prevent the migration of gas or other fluids into sources of fresh groundwater, inadequate well construction and operation, cement standards, and unpermitted discharge of polluting substances remained unresolved as of the June 2018 Letter.

(b)    In 2017, Cabot drilled gas wells on the Jeffers Farm in Harford Township, Susquehanna County. On November 16, 2017, the Pennsylvania Department privately issued a Notice of Violation to Cabot for a gas migration incident and pollution of private water supplies from the Jeffers well. Based upon its investigation, the Pennsylvania Department determined that at least two water supplies had been impacted by stray gas migration associated with Cabot's wells. Violations cited in the November 16, 2017 Notice of Violation for failure to prevent the migration of gas or other fluids into sources of fresh groundwater, general well construction and operation, cements standards, and the unpermitted discharge of pollution were unresolved as of the date of June 2018 Letter.

(c)    In 2019, Cabot drilled the POWERS M gas wells in Auburn Township, Susquehanna County. On October 18, 2019, the Pennsylvania Department privately issued a Notice of Violation to Cabot for stray gas migration and pollution of private water supplies. Based upon its investigation, the Pennsylvania Department determined that at least one additional water supply had been impacted as a result of stray gas migration associated with Cabot's well. Violations cited in the October 18, 2019 Notice of Violation for failure to prevent the migration of gas or other fluids into sources of fresh groundwater, general well construction and operation, and

- 47 -

the unpermitted discharge of polluting substances were unresolved through at least January 9, 2020, according to the June 15, 2020 Presentment of Charges by the Attorney General.

### 3. Cabot's Violations and Failures to Remediate Known Violations Were Pervasive and Widespread

141.    Cabot's violations for failures to prevent and remediate methane gas migration and otherwise abide by environmental laws and regulations were not limited to the 25 wells included in the June 15, 2020 Presentment of Charges.  *See* §V.F.4., *supra*.  In fact, Cabot was one of the worst offending operators in Susquehanna County.  Prior to and during the Class Period, from January 2008 to September 2016, Cabot was the second most cited fracking company operating in Pennsylvania, with 451 violations.  That meant that Cabot had nearly one violation per each of its 587 wells drilled as of September 2016, near the start of the Class Period.

142.    The violations continued apace throughout the Class Period.  Between October 2016 and March 2020, the Pennsylvania Department cited Cabot for an additional 333 violations. From January 2011, the month after Cabot entered into the December 2010 Consent Order, through March 2020, the Pennsylvania Department cited Cabot for a total of 781 violations.

143.    Unbeknownst to investors, numerous of these violations were not for first time infractions incidental to the fracking business, but for known failures to remediate, continuing violations, and violations noted during follow-up inspections at wells and well sites in addition to those targeted by the Grand Jury in the June 15, 2020 Presentment of Charges that, together, implicated a significant proportion of Cabot's gas production during the Class Period.

### a. Additional Unaddressed Violations Cited in the June 2018 Letter for Failures to Abide by the December 2010 Consent Order

144.    As detailed in the non-public June 2018 Letter, numerous violations remained unresolved at Cabot wells and well sites in violation of the December 2010 Consent Order that were not included in the June 15, 2020 Presentment of Charges:

- 48 -

4880-5761-4861.v1

- Pennsylvania Department cited the Jeffers Farms wells 13H, 15H, 16H, 17H and 18H, located in Harford Township, Susquehanna County, in a November 16, 2017 Notice of Violation for failing to prevent the migration of gas into sources of fresh groundwater. The June 2018 Letter stated the violations "remain unresolved to date."

- On April 2, 2013, an estimated 42 gallons of flow back fluid (brine) was released to the soil as a vacuum truck was loading a frack tank at the Aldrich I well site, located in Gibson Township, Susquehanna County. As of the June 2018 Letter, Cabot had "not demonstrated attainment of a cleanup standard" and a final report for the remediation had "not yet been received by the [Pennsylvania Department]."

- On August 28, 2008, Cabot released drilling mud at the Black 1H/2H well site, located Springville Township, Susquehanna County. Yet, as of the June 2018 Letter, Cabot had "not yet demonstrated attainment of an Act 2 cleanup standard for groundwater contamination from this release."

- On December 22, 2014, an estimated 500 gallons of base oil flowed into the J Foltz 8H well located in Brooklyn Township, Susquehanna County, and a Notice of Violation was issued on January 30, 2015. As of the June 2018 Letter, however, Cabot had "not demonstrated attainment of an Act 2 cleanup standard for this release."

- On January 21, 2011, the Pennsylvania Department issued an Notice of Violation to Cabot for defective casings and cementing at the Greenwood 8 well. The violations remained "unresolved to date" as of the June 2018 Letter.

145. Each of these events constituted additional failures to remediate known violations under the December 2010 Consent Order, many of which remained outstanding for years at the time of the June 2018 Letter.

### b.    Additional "Continuing" Violations

146. According to the Pennsylvania Department, a "continuing violation" is a "violation that was noted in a previous inspection that is still continuing through current inspection." The Pennsylvania Department noted "continuing violations" for at least ten additional wells and well sites separate from those named in the Attorney General's criminal charges. Like the wells in the June 15, 2020 Presentment of Charges and June 2018 Letter, unbeknownst to investors, the violations at these wells still had, in most instances, not been addressed for months and years after

- 49 -

the violations were initially noted and included failures to "report defect in a well that has defective, insufficient or improperly cemented casing":

- In Forest Lakes Township, Susquehanna County, the Pennsylvania Department recorded violations at Cabot's Powers N5 and N8 wells on September 22, 2015 for defective well casing or cementing, but outstanding continuing violations remained at these wells after inspections on March 6, 2018 and November 20, 2018.

- In Brooklyn Township, Susquehanna County, similar violations were noted at the Foltz J 9, 10, 11, 12, 13 and 14 wells on September 6, 2017 for defective well casing or cementing, but the violations remained outstanding as of September 18, 2019.

- In Auburn Township, Susquehanna County, at the Powers M 0008 well, the Pennsylvania Department cited Cabot for failing to prevent gas flow in the annulus on December 12, 2019, but violations remained outstanding during an inspection the following month on January 21, 2020.

- In Springville Township, Susquehanna County, at the R HINKLEY 2 well, the Pennsylvania Department cited Cabot for a failure to properly store, transport, process or dispose of a residual waste on January 5, 2011.  During a follow-up inspection, the violations remained outstanding as of April 20, 2011.

147. Each of these events constituted additional failures to redress known violations, many of which remained outstanding for years.

### c.   Follow-Up Inspections Resulting in Violations

148. According to the Pennsylvania Department, "follow-up inspections" are specifically performed to determine if a previously issued violation has been resolved or if a potential violation that was noted in a previous inspection report has been addressed.  Following the December 2010 Consent Order Dinges signed with the Pennsylvania Department, in which Cabot agreed to "take *all actions* necessary . . . to comply with all applicable environmental laws and regulations, including all applicable provisions" of Pennsylvania's Clean Streams Law, Oil and Gas Act, and related regulations, follow-up inspections conducted by the Pennsylvania Department continued to result in violations for Cabot.  Follow-up inspections at 21 additional Cabot wells and well sites in Susquehanna County resulted in violations between 2011 and 2017

- 50 -

relating to all manner of regulatory non-compliance for spills, defective well casing, gas leaks and improper waste storage.[89]

149.    For example, in September 2011, and unbeknownst to investors, the Company received yet another Notice of Violation, addressed to Stalnaker, for failing to prevent the migration of gas into fresh groundwater sources in the area surrounding several additional wells owned and operated by Cabot in Susquehanna County.  As described below (*see* ¶187, *infra*), Cabot later disclosed this particular violation after receiving a proposed consent order to resolve the issue with the Pennsylvania Department on November 12, 2015, four years after receiving the Notice of Violation.  Stalnaker ultimately signed the final version of the consent order and agreement, which Cabot fully executed on December 30, 2016.  This particular Notice of Violation concerned Cabot's Statler well site, where the Pennsylvania Department noted violations during a follow-up inspection at the Statler 8 well, indicating that a previously issued violation had not been resolved or a potential violation noted in a previous inspection report had not been addressed.

**H.    The Noncompliant Cabot Wells Had a Significant Impact on Company Operations**

150.    Based on a non-public proprietary forensic analysis conducted by Plaintiffs of voluminous data available as of the writing of this pleading, during the Class Period, from 2016 through 2019, the noncompliant wells and well sites described in §§V.G.1.-3., *supra*, were responsible for a significant amount of Cabot's gas production, ranging between 10% to 19% of annual production.  These wells affected approximately 17% of Cabot's well pads – the surface installations where one or more wells are drilled.  In total, the 65 noncompliant wells and well sites

---

[89]    These 21 wells and well sites are: R Warriner 2, A & M Hibbard 1H, Fraser 3, Cosner 4, A Hunsinger 3H NW, J Lyman 2, Greenwood 1, Greenwood 6, Greenwood 7, Statler 8, John Lopatofsky 1V, Corbin J P1 4H, Mead B 1, Chambers O 8, Reynen J P1 Pad Og Escgp, Augustine Well Site & Tank Farm, R Hull Pad, Hoover 2H SE Pad, Stellitano A P1 Pad, W Hawley Pad, and Kropa T Pad.

4880-5761-4861.v1

were responsible for approximately 13% of Cabot's total Company gas production during the Class Period.

| | |
|---|---|
| Total production *(Mcf)* during the Class Period from wells with continuing violations | 493,704,446 |
| as % of total Company production during the Class Period | 12.7% |

151.    The implicated wells are not only significant as a percentage of Cabot's total gas production, but also as a portion of its revenue.  As revealed by Plaintiffs' forensic analysis, during the Class Period, the implicated wells generated approximately $1 billion in revenue for Cabot. By comparison, Cabot itself generated a total of approximately $1.5 billion per-year in revenue on average during the five year period between 2016 and 2020, which encompassed the Class Period. Moreover, the wells operated in the single most important area from which Cabot derived nearly all of its revenue – an area Cabot described as its "***cornerstone asset***" and the "***primary driver***" of its gas production.

152.    The wells at issue thus comprised some of Cabot's most prized assets.  For example, John Papso, the Reservoir Engineering Manager in Cabot's Pittsburgh office, described the significance of certain wells that Cabot drilled in and around the Dimock area in an October 5, 2016 Cabot blog post.  He specifically recalled the production rates from the Ely 6 well, one of the wells Cabot failed to remediate and was later criminally charged for by the Attorney General, and the Blacks 1 & 2H wells, which the Pennsylvania Department cited in the June 2018 Letter for Cabot's failure to demonstrate attainment of an Act 2 cleanup standard for groundwater contamination following the release of drilling mud there.

153.    Mr. Papso stated that when the Ely 6 well first went into production, the max rate from that well was "6 MMCF per day from five frac stages" and that the Blacks 1&2H wells produced at "an initial combined rate of 17.1 MMCF per day from just 9 total stages."  It was at

- 52 -

this point Mr. Papso "'pretty much knew it was going to be special,'" as he explained that "this kind of production wasn't just uncommon for the region, but for the entire industry. These kind of wells are what you expect to see from offshore wells, he explained. But onshore? ***It was unheard of*.**" To emphasize this point he further shared that "we were looking at the production rates from the producing wells when [an employee from another fracking company] looked up and said, 'We're going to need a bigger boat.' It was a total *Jaws* moment."

154.    Well remediation on even a single well could therefore have a significant effect on Cabot's gas production both due to the lost production of a single well and potential downtime for the whole well pad. For example, during Cabot's first quarter 2020 earnings call on May 1, 2020, Dinges told investors that the Company expected a "sequential decline in production during the second quarter," which reflected, among other things, "the impact of an unplanned downtime related to remedial work on 1 well on a large pad that resulted in the deferral of over 230 completed stages from the first quarter to the second quarter . . . ."

155.    The number of Cabot wells and well sites where violations were occurring was likely understated, however. The Grand Jury, "by a preponderance of the evidence and in many instances by clear and convincing evidence, and that after comprehensive study in the course of our investigative duties," concluded that "government oversight of this activity was for many years poor, and has only more recently shown signs of improvement." On this issue, "[m]ore than 30 witnesses from the [Pennsylvania Department] testified. They included retired and current employees, ranging from the ground-level inspectors up through various managers, to the people at the very top of the agency." The Grand Jury further concluded from this evidence that the Pennsylvania Department "was initially unprepared for and at times overwhelmed by the challenges resulting from the new technologies of unconventional drilling – or, as it is known in the general public, 'fracking,'" and that there were employees within the Pennsylvania Department

- 53 -

"who appeared to show undue deference to the fracking industry, and undue indifference to citizens with serious complaints about appalling effects they were suffering."

**I.      Former Cabot Employees Corroborate the Grand Jury's Findings and the Defendants' Knowledge of Cabot's Criminal Failure to Remediate**

**1.      The Geologist**

156.    A former geologist in Cabot's Pittsburgh office from 2011 to 2018 (the "Geologist") further supports the factual findings by both the Grand Jury and the Pennsylvania Department.  The Geologist, who advised Cabot engineers regarding Cabot's drilling activities, confirmed that problems plagued the cement casings Cabot installed at the Company's gas wells.

157.    The Geologist explained that if natural gas present in a geological formation bubbled up during the cementing process after a well had been drilled, a "micro-annular space" (*i.e.*, a space between casings) could be created that would allow gas to migrate into the water table.  The Geologist also explained that a cement job could otherwise be insufficient, which would also allow gas to migrate into the water table.  In other words, if the well was not cemented properly, it could create a pathway for the gas to migrate into drinking water.  The Geologist described that deficient cement jobs were a "ticking time bomb."

158.    To test the cement job in its wells, the Geologist stated that Cabot would create a "cement bond log" by placing a rod containing sensors down into the well to test the casings.  The sensors sent out sound waves that would bounce off the walls of the casings and detect annular spaces that were devoid of cement.  According to the Geologist, the cement bond logs often showed that insufficient cement was present in the well.  Specifically, the Geologist stated that it was a common occurrence at Cabot to observe poor or inadequate cement in the "surface casing string," a secondary string of casings installed specifically to protect the groundwater table.  The

- 54 -

inadequate surface string cement casings were, in the Geologist's view, "the number one issue for gas migration at the Company's drill sites."

159.    The Cabot wells that the Geologist reviewed routinely did not contain adequate cement bonds in the annular spacing.  The Geologist stated that, "when you saw a good log you were surprised."  The Geologist further indicated that Cabot's cementing problems were not isolated to the Dimock area, but were also present everywhere over Cabot's acreage.  The Geologist helped drill approximately 120 wells while working at Cabot between 2011 and 2018, and reviewed cement bond logs for as many as 80 of those wells.  Based on job training and experience, the Geologist estimated that as many as 50% of the logs indicated the well did not contain adequate cement in its annular space for the surface casing string.  In other words, up to 40 wells – or 1-in-3 – of the 120 wells the Geologist personally helped drill appeared to contain insufficient cement.  The Geologist further indicated that problematic wells were located in Cabot's "core area" – the Company's best acreage producing the highest quality gas for Cabot.

160.    Cabot engineers and geologists received a copy of the cement bond log report from the drill site, and the Geologist believed that Stalnaker reviewed copies of the logs, as well, based on seeing them in his office.  Cabot's internal documentation of casing issues at its wells, as described by the Geologist, is consistent with the violations the Pennsylvania Department issued to the Company related to cementing and well integrity problems found at Cabot's wells.  The Geologist explained, moreover, that when issues were identified in the cement bond logs, the Company was reluctant to repair the casings because of the expense.  Once a surface string was set, it would take at least a day to fix, and Cabot would lose approximately $10,000 to $35,000 per-day in rig costs alone due to the downtime it would take to repair the string.  As the Geologist stated, Cabot was "all about doing things fast and as cost effectively as possible."  According to

- 55 -

4880-5761-4861.v1

the Geologist, Cabot did not address the recurring issues concerning the inadequate cement bonding and integrity of the surface string in its wells.

161. The Geologist also explained that Cabot had the ability to test gas methane levels and isotopes present in residential water wells. This testing would have identified if there was some level of gas migration prior to drilling, which would have provided a baseline understanding of the amount of gas in the water supply – a baseline that the Attorney General faulted Cabot for not measuring. The Geologist further stated that Cabot only sampled well water from a well after a well was drilled if a complaint regarding the well water was made, because every time the Company pulled a water well cap, Cabot would be "attached" and "responsible" for that well. The Geologist explained the Company's view was, "no news is good news," and that Cabot did not want to be "attached" to, or have financial obligations for, the water wells.

162. The Geologist's description of Cabot's drilling process during the Class Period is corroborated by information found on Cabot's own website, which states, for example, that "[m]aintaining an effective barrier between our oil and gas wells and water supplies is critical to the protection of these resources" and that "[m]ultiple strings of steel pipe, known as casing, are then cemented into place as each well section is drilled. The sections at the uppermost portion of the well are designed to provide specific protection for groundwater sources while later sections provide an isolated conduit for production."

163. Cabot's website further states that "[b]efore hydraulic fracturing begins, Cabot conducts a 'cement bond evaluation' using sound waves" and that "[a]ny anomalies observed during these tests are evaluated and necessary pre-emptive measures are taken to ensure wellbore integrity." Cabot's website also claims that the Company can offer landowners nearby Cabot drill sites "the opportunity to have their water resource supply tested at our expense," including for "general water quality indicators, metals, dissolved gases, and petroleum constituents." During

- 56 -

the Class Period, however, Cabot failed to address well integrity issues after the cement bond evaluations or test water supplies for baseline methane levels at affected residential water wells. *See* §§V.F.3.; V.G.3., *supra*.

164.    The Geologist further explained that Stalnaker was in "constant," near daily communication with Dinges and others at Cabot's Houston headquarters, and that Stalnaker had remarked that he spoke with Dinges "regularly."  Stalnaker would request information for his calls with Dinges, and the Geologist observed Buddy Wylie, an Exploration Manager in Pennsylvania, meeting with Stalnaker in preparation for these calls.

165.    The Geologist stated that Stalnaker attended and presented at Cabot's Board meetings and kept the Board apprised of Cabot's Pennsylvania operations.  Over the course of several weeks, Cassie Culpepper, a Geologic and Geophysical Technician in Cabot's Pittsburgh office, prepared PowerPoint slide decks for Stalnaker to present at Board meetings.[910]  Information from across all Cabot departments was compiled into the slide deck and provided to Dinges before final approval.  The presentations included information concerning drill sites for wells and their status.  At least twice a year, following Board meetings, Stalnaker held all-hands meetings in Pennsylvania to provide Cabot employees highlights from the Board meetings.

166.    According to the Geologist, Stalnaker was also involved in preparing Cabot's SEC filings.  The Pittsburgh office, including the Geologist's department, participated in contributing information for the SEC filings, such as data regarding well drilling, completions and production. During the preparation of this data for Cabot's SEC filings, meetings were held over the course of multiple weeks.  Stalnaker attended these meetings and conducted presentations near the end of the process.

---

[910]    Ms. Culpepper was regularly referred to as the "Board Slide Queen" and the "PowerPoint Presentation go-to for VP."  In total, she prepared approximately 6-10 presentations per year.

4880-5761-4861.v1

167. The Geologist had "no doubt" that Stalnaker knew about every Notice of Violation and every single action the Company performed to remediate, and described that Stalnaker was informed of every Notice of Violation that Cabot received from the Pennsylvania Department. The Company regarded Notices of Violation as a "crisis." The Geologist observed Stalnaker attend closed-door meetings with regulatory managers when compliance problems occurred. The Geologist recalled being requested to prepare reports and diagrams based on problems at well sites, such as the loss of cement. In addition, the Geologist believed that Stalnaker, either directly or through another, informed Cabot's headquarters in Houston, including Dinges, regarding Notices of Violation, because Cabot's legal department was located in Houston, and Stalnaker and Cabot's Pittsburgh office required legal support to address the violations. The Geologist also believed that Notices of Violation were forwarded to Deidre Shear, Cabot's Vice President and Managing Counsel in Houston.

168. Managers would report all stray gas leaks or gas migration to Stalnaker, including slide presentations explaining the problem. Any remediation costs would have to be signed off by Stalnaker. The Geologist explained that Stalnaker approved all funds Authorized for Expenditure (AFE) over $25,000 as part of Cabot's accounting and financial system. Well expenses and any additional costs, such as for remediation, were included in a package that was forwarded to Stalnaker for approval.

### 2. The Environmental Health & Safety Manager

169. A former Environmental Health & Safety Manager for a wholly-owned subsidiary of Cabot in Susquehanna County from 2017 to 2019 (the "EHS Manager") participated in weekly Cabot Environmental Health & Safety conference calls with Cabot's Houston headquarters. The EHS Manager reported directly to Gordon Ganaway, Cabot's Director of Safety & Environmental Compliance.

4880-5761-4861.v1

170.     Mr. Ganaway led the weekly conference calls from Houston.  Mr. Ganaway's administrative assistant took notes during these calls and would email the notes to the participants.

171.     The EHS Manager explained that the purpose of the weekly conference call was to update Cabot's headquarters regarding safety and environmental issues and remediation.  There also would be discussion and updates about Pennsylvania Department issues, violations, and the status of violations and other issues, including remediations.

172.     The EHS Manager stated that there was gas migration into wells and water supplies and landowners were complaining.  The complaints would be discussed on the weekly conference calls and related to Susquehanna County, Pennsylvania and included old violations in Dimock, Pennsylvania.

173.     The EHS Manager said that the group had to provide Environmental Health & Safety information to Mr. Ganaway for a Quarterly Environmental Health & Safety report.  The EHS Manager said that Mr. Ganaway would furnish an Environmental Health & Safety report to the Cabot Board on a quarterly basis.  The EHS Manager said that Mr. Ganaway would send the EHS Manager a template into which the EHS Manager would enter information related to Environmental Health & Safety incidents or claims.  The EHS Manager said that, by way of example, if there was a spill, the EHS Manager would have to detail the amount of the spill, the location of the spill, how the spill was cleaned up, and include any photographs.  The EHS Manager would have to also include any injuries or accidents.  The EHS Manager would email the template back to Mr. Ganaway directly.  Mr. Ganaway would take the EHS Manager's report and put it into a Quarterly Report which would go to Dinges, the Board, and certain individuals in Pittsburgh.

### 3.     The Environmental Health & Safety Specialist

174.     A former Cabot Environmental Health & Safety Specialist (the "EHS Specialist") from 2011 to 2021, who dealt with the Pennsylvania Department on issues related to air quality

- 59 -

4880-5761-4861.v1

and water withdrawal permits, corroborated the weekly Cabot Environmental Health & Safety conference calls described by the EHS Manager.

175.   The EHS Specialist explained that Mr. Ganaway was in charge of the conference calls, which first began in approximately 2016.  The weekly calls included detailed discussions and reports on remediation issues.  The weekly calls also covered current and ongoing issues with the Pennsylvania Department and their status, including Pennsylvania Department violations.  In addition to Mr. Ganaway, other Cabot attendees of the call included John Smelko, who was Regional Manager – Environmental, responsible for the Pennsylvania Region, and Andy Mehalko, Supervisor for Environmental, who was responsible for remediation.  The EHS Specialist further confirmed that the purpose of the weekly Environmental Health & Safety conference call was to update headquarters regarding safety and environmental issues and remediation in the Susquehanna County area.

176.   The EHS Specialist said that failures to remediate were discussed on the calls. Remediation discussions would include a detailed discussion regarding the remediation, including if soil was removed and sampled, and if test results were back.  Regarding gas migration issues, there would be a discussion about the landowner complaints, what had been done for the landowner's water systems, if there was sampling, and if they do or do not have a system in place to deal with the issue.  Landowner complaints would also be discussed on the weekly calls if there was an issue with a landowner.  If it was an ongoing issue it would be discussed more frequently. The EHS Specialist noted that there would be particular concern if a gas migration complaint involved methane.  The EHS Specialist commented that the "Dimock issue" began before they started at Cabot but was an ongoing issue while they were at the company.

- 60 -

4880-5761-4861.v1

177. The EHS Specialist mentioned that Dinges was mentioned on the weekly conference calls if it was time for the Quarterly Update Report and everyone on the call was told that they had to get the report out to Dinges and the Board.

178. The EHS Specialist recalled an ongoing log document, and further specified this document was kept on a shared drive for people within the Company to review and update. The EHS Specialist believes that Stalnaker would have had access to this log. Any incidents were logged whether they were minor or major issues. The EHS Specialist would send updates to Mr. Smelko's administrative assistant so that she could add it to the log in the format she preferred. The EHS Specialist would also tell Mr. Smelko and Mr. Mehalko about the incident.

179. The EHS Specialist explained that this ongoing log was a spreadsheet which recorded the date of the report, who reported the issue, what was initially done, steps taken to correct the issue, and what was outstanding. Major issues where the correction was ongoing would be recorded in the log but would also get its own reports and files. Employees would work on these major issues until the work on them was done. When major issues were included on the log that were not remediated immediately, the EHS Specialist explained that the issue would remain on the log and would state "correction ongoing" or something to that effect. The EHS Specialist stated that Mr. Ganaway would have been made aware of such major issues.

180. The EHS Specialist stated that Mr. Smelko, who received Notices of Violation, including the June 20, 2017 Howell; November 16, 2017 Jeffers Farm; March 21, 2018 Ely 6H and 4H; and January 9, 2020 POWERS M Notices of Violation that were the subject of the criminal charges detailed in Section V.F.4.b. above, compiled the Quarterly Update Reports for the Pittsburgh and Susquehanna regions, which were provided to Mr. Ganaway for the Board. The Quarterly Update Reports were prepared in advance of every Board meeting. For the years 2015 to 2020, the Board met six times each year. The EHS Specialist reviewed parts of the draft

- 61 -

4880-5761-4861.v1

Quarterly Update Report on certain occasions to confirm information included in the report. According the EHS Specialist, the Quarterly Update Report portion they would review was condensed to three to four pages so that the entire report could be usable by the Board.

181.    The EHS Specialist said that Mr. Smelko requested information for the Quarterly Update Report one week before every Board meeting.  Anyone in Environmental Health & Safety or otherwise in possession of Environmental Health & Safety information in Pittsburgh could send information to Mr. Smelko for the report.  Mr. Smelko would compile the information from the North region to give to Mr. Ganaway and Mr. Ganaway would then combine the North region information with information from the South to generate a full report.  The EHS Specialist said that some information would be repeated from one Quarterly Update Report to the next because the work on the issue had not been completed.

182.    The EHS Specialist said that the Quarterly Update Report went to Schroeder and Dinges prior to the Board meetings.   The EHS Specialist knew this occurred based on conversations they had with Mr. Ganaway.

183.    The Quarterly Update Reports included the number of violations, larger spill cleanups and remediation cases with the potential for private lawsuits.  The EHS Specialist explained that all gas migration cases and their remediation status were included in the Quarterly Update Report. According to the EHS Specialist, gas migration cases were always included in the report due to potential liability related to gas migration issues.  The EHS Specialist noted that the Board was also made aware of any other sizeable issues.  According to the EHS Specialist, the Board was informed of such issues if the cost was approximately over $25,000-$50,000, although this was just a rule of thumb used by the EHS Specialist and their colleagues to be used along with other factors to determine if an incident should be included in the Quarterly Update Report.

4880-5761-4861.v1

## VI.    DEFENDANTS' MISLEADING STATEMENTS AND OMISSIONS

184.    Throughout the Class Period, Defendants made a series of materially misleading statements and omissions regarding the Company's business, operations, and legal and regulatory compliance.  As detailed below, from 2016-2020, Defendants misstated that Cabot complied with applicable environmental laws and remediated known faulty gas wells.

185.    These issues were foreseeably likely to and did subject Cabot to increased governmental scrutiny, investigation and enforcement, as well as increased reputational and financial harm, and also impacted Cabot's ability to achieve its financial and operational projections.  As a result, the Company's public statements, which touted Cabot's purported compliance with environmental regulations and downplayed the risks associated with its conduct in Pennsylvania, were materially false and misleading when made.

186.    The Class Period begins on February 22, 2016, when Cabot filed its 2015 10-K with the SEC, reporting the Company's financial and operating results for the quarter and year ended December 31, 2015, which touted the Company's compliance with environmental law and regulations, representing that Defendants "***believe that [they] substantially comply with the Clean Water Act and related federal and state regulations***."  The federal Clean Water Act, like the Pennsylvania Clean Streams Law, seeks to "restore and maintain . . . the Nation's waters" by, among other means, governing the discharge of certain pollutants into the water.  Defendants repeated this same bolded statement in the 2016 10-K filed on February 27, 2017, the 2017 10-K filed on March 1, 2018, the 2018 10-K filed on February 26, 2019, and the 2019 10-K filed on February 25, 2020.

187.    With respect to Cabot's response to ongoing environmental matters related to gas migration allegations in Susquehanna County, Pennsylvania, the 2015 10-K assured investors, in relevant part, that: (i) following receipt of a Notice of Violation from the Pennsylvania Department

- 63 -

4880-5761-4861.v1

in September 2011 for failure to prevent the migration of gas into fresh groundwater sources in the area surrounding several wells owned and operated by Cabot in Susquehanna County, Pennsylvania, Defendants "*have been engaged with the [Pennsylvania Department] in investigating the incident and have performed appropriate remediation efforts, including the provision of alternative sources of drinking water to affected residents*;" that Defendants "believe the source of methane *has been remediated* and are working with the [Pennsylvania Department] to reach agreement on the disposition of this matter;" (ii) on November 12, 2015, Defendants received a "proposed Consent Order and Agreement [that] is the culmination of th[eir] effort[s] and, if finalized, would result in the payment of a civil monetary penalty in an amount likely to exceed $100,000, up to approximately $300,000;" and (iii) Defendants "will continue to work with the [Pennsylvania Department] to finalize the Consent Order and Agreement and bring this matter to a close."

188.    Cabot's 1Q16 Form 10-Q filed on May 3, 2016, 2Q16 Form 10-Q filed on July 29, 2016, and 3Q16 Form 10-Q filed on October 28, 2016 contained substantively similar representations as those set forth in ¶187.  Cabot updated this statement in the 2016 10-K filed on February 27, 2017, reflecting that Cabot had finalized the Consent Order and Agreement with the Pennsylvania Department.  It stated, in relevant part:

> On November 12, 2015, we received a proposed Consent Order and Agreement from the Pennsylvania Department of Environmental Protection (PaDEP) relating to gas migration allegations in an area surrounding several wells owned and operated by us in Susquehanna County, Pennsylvania.  The allegations relating to these wells were initially raised by residents in the area in August 2011. We received a Notice of Violation from the PaDEP in September 2011 for failure to prevent the migration of gas into fresh groundwater sources in the area surrounding these wells.  Since then, we have been engaged with the PaDEP in investigating the incident and have performed appropriate remediation efforts, including the provision of alternative sources of drinking water to affected residents.  We believe the source of methane *has been remediated* and we entered into a Consent Order and Agreement with the PaDEP on December 30, 2016.  We agreed to pay a civil monetary penalty in the amount of approximately $0.3 million

- 64 -

4880-5761-4861.v1

and to continue to provide alternative sources of drinking water to affected residents until the affected water supplies are permanently restored. Further, the related gas well is being permanently plugged. Following the plugging of the gas well, additional monitoring will be required to ensure the source of methane has been remediated. Cabot continues to work with the PaDEP to bring this matter to a close.

189. Cabot's 2Q19 Form 10-Q filed on July 26, 2019, 3Q19 Form 10-Q filed on October 26, 2019, and 1Q20 Form 10-Q filed on May 1, 2020 contained similar representations regarding Notices of Violation it received in June and November 2017, stating in relevant part that "we have been engaged with the [Pennsylvania Department] in investigating the incidents and have *performed appropriate remediation efforts*" and that "we believe these water quality complaints *have been resolved* and we are working with the [Pennsylvania Department] to reach agreement on the disposition of this matter."

190. The statements referenced in ¶¶186-189 above were materially misleading because Defendants omitted then-known (or recklessly disregarded) material information detailed above, including that:

(a) As confirmed by the June 15, 2020 Presentment of Charges, June 2018 Letter and the myriad of "continuing violations" and violations noted during "follow-up inspections," Cabot repeatedly failed to: (1) fix known faulty gas wells and redress known violations for years, in contravention of its obligations under the December 2010 Consent Order and applicable law; (2) remediate, over a period of years, continuing violations at its wells identified in various Notices of Violation and formal letters issued to Cabot by the Pennsylvania Department, thereby knowingly polluting Pennsylvania's water supplies through stray gas migration and knowingly, serially violating Pennsylvania laws, including the Clean Streams Law; and (3) prevent stray gas migration into fresh groundwater by failing to employ proper well construction and cement standards in wells across Pennsylvania in violation of applicable law. As

- 65 -

stated by Pennsylvania's Attorney General, Cabot's violations of environmental law were "***repeated and systematic***."

(b)    Cabot was ***not*** in "substantial compliance" because: (1) by the start of the Class Period in 2016, Cabot was already the second most cited fracking company operating in Pennsylvania, and had and would continue to  receive hundreds of violations prior to and during the Class Period; (2) the Cabot wells specifically affected by continuing, unresolved violations was significant, comprising between 10% to 19% of Cabot's annual gas production during the Class Period; (3) in total, Cabot's noncompliant wells and well sites produced approximately 13% of Cabot's total gas production during the Class Period and encompassed 17% of Cabot's well pads; (4) the affected wells generated approximately $1 billion in revenue for Cabot during the Class Period; (5) the noncompliant wells were located in the single most important area from which Cabot derived nearly all of its revenue – an area Cabot described as its "***cornerstone*** asset" and the "***primary driver***" of its gas production; and (6) the Geologist further explained that problematic wells were located in Cabot's "core area" – the Company's best acreage producing the highest quality gas for Cabot.

(c)    According to the Geologist, cement bond logs routinely appeared to identify insufficient cement in Cabot's wells, specifically in the "surface casing strings," which were secondary casings specifically installed to protect the groundwater table.  The Geologist also stated that, "when you saw a good log you were surprised."  The Geologist further indicated that the problems at Cabot were not isolated to the Dimock area, but were present everywhere over Cabot's Pennsylvania acreage.  Out of the 120 wells the Geologist helped drill for Cabot, as many as 1-in-3 appeared to contain insufficient cement to prevent gas migration.

- 66 -

4880-5761-4861.v1

(d)    Cabot routinely and knowingly failed to comply with the December 2010 Consent Order, itself a violation of the Clean Streams Law, when the Company failed to remediate its gas wells to stop the migration of stray methane gas into Pennsylvania waters.

(e)    The number of outstanding and continuing violations of environmental law that Cabot knowingly failed to remediate constituted "long-term indifference" to applicable law and the damage the Company caused to the environment and citizens of Susquehanna County, such that its violations were "not merely technical" in nature, but criminal acts.

(f)    Cabot continually downplayed its potential civil and/or criminal liabilities with respect to such environmental matters, despite Cabot's management receiving direct communications from Pennsylvania authorities regarding Cabot's serial violations and continuing failure to address it violations of environmental laws and regulations, and its management, Board, and its committees regularly assessing such legal and regulatory risks.

(g)    Cabot had inadequate environmental controls and procedures and/or failed to properly mitigate known issues related to those controls and procedures to ensure its gas wells prevented stray methane gas migration into fresh groundwater supplies.

(h)    The foregoing was foreseeably likely to subject Cabot to increased governmental scrutiny and enforcement, as well as increased reputational and financial harm.

(i)    These issues were reasonably likely to, and would, adversely impact Cabot's ability to achieve its financial and operational projections, given that substantially all of Cabot's production is derived from its wells in Susquehanna County, Pennsylvania.

191.    Beginning on April 27, 2018, Defendants materially misled investors about their 2018 production growth guidance.  On that day, during Cabot's 1Q 2018 Earnings Call, Defendant Dinges told investors that Cabot was "reaffirm[ing]" its "2018 daily production guidance range of 10% to 15%," even though internal documents and testimony show that Cabot knew the 2018

- 67 -

production results would fall materially short of that range and lacked any reasonable basis. This guidance range was reiterated in a Press Release, also filed on April 27, 2018 on Form 8-K. The evidence demonstrating the false and misleading nature of these statements includes the following:

(a) Prior to publicly reporting financial guidance regarding Cabot's production and capital expenditure levels, Phil Stalnaker, the Executive Vice President of the North Region, would meet with Gary Hlavinka, the Operations Manager for the North Region, and review projections assembled by the forecasting team for the North Region. At the conclusion of this review process, the forecasting information would be transmitted to Cabot's corporate headquarters in Houston, Texas for further review by Cabot senior executives, including Defendants Dinges and Schroeder. According to Stalnaker, after the forecasts were sent to Houston, he would attend additional meetings with Dinges, Schroeder and Matthew Kerin, Cabot's Treasurer and Head of Investor Relations, among others, to review the forecasts to "make sure we're all on the same page and all in agreement on the numbers that were put forward."

(b) Beginning in 2017, and lasting through early 2019, Steven Novakowski, Cabot's Drilling Manager for the North Region, repeatedly informed Cabot's Disclosure Committee, which was responsible for ensuring the completeness and accuracy of Cabot's public disclosures, and Stalnaker, who also spoke to Dinges and Schroeder regularly about the North Region's operational status, that ongoing gas migration investigations at various Cabot wells had the potential to negatively impact the company's performance. In various "Disclosure Checklists," designed to memorialize significant employee concerns and circulated to Stalnaker and the Disclosure Committee, Novakowski repeatedly detailed how these ongoing gas migration cases caused "extraordinary" and "undue" pressure to maintain the drilling schedule, even telling Stalnaker in stark terms that "expediency trumps ethics" in resolving these issues and that "good decision making" was being "impede[d]." Novakowski further testified that delays in the drilling

- 68 -

schedule resulted in a "cascading effect" that impacted the company's ability to maintain its budget.  On April 1, 2018, in response to a Disclosure Checklist question about "what keeps you awake at night," Novakowski warned Stalnaker about the "ongoing" gas migration investigations at Cabot.

(c)     In addition to Novakowski's warning, concerns from Cabot's senior management about the North Region's ability to achieve their production forecast began growing in the weeks leading up to Cabot's April 27, 2018 earnings release and conference call.  On April 6, 2018, Kerin emailed Schroeder inquiring "how do you want to handle the communication with the North Region regarding our ***concerns with their updated production forecast?***"

(d)     As these concerns mounted over achieving the publicly issued production forecast, on April 9, 2018, Kerin sent an email to Schroeder and Dinges that provided a "snapshot" of the forecast, observing that a "true-up" for March actuals was still pending – indicating that the forecast was still incomplete.  Kerin further highlighted that while production levels are "coming in at the very low-end of the guidance range," his "biggest concern" remained the production levels.

(e)     That same day, Schroeder sent an email to Hlavinka, Stalnaker, and Kerin noting that the current production levels had declined as compared to the January 2018 forecast, concluding that "[t]his now places us ***below the low end of our guidance for the year*** instead of the middle."  Schroeder then directed Hlavinka to "boil it down to what has happened, is happening and what we are doing to get back closer to the budget."

(f)     Within hours of Schroeder's top-down directive, the forecasting team sent an email to Hlavinka identifying the various ongoing problems that were causing the production delays, including "drilling issues [and] remedial work" on Cabot's "[turn-in-line]" production estimates – the very same "cascading" problems that Novakowski had warned about.  Guy Shirey,

- 69 -

4880-5761-4861.v1

the lead Reservoir Engineer who was responsible for the production forecast, testified that "turn-in-line" production means that a new well has been drilled, completed, and fracked, and is now ready for production, and that delays in these new wells are "more harmful" because "new wells make more gas than old wells."  Shirey also conceded that these turn-in-line delays caused an approximately negative 15 billion cubic feet ("BCF") impact on the 2018 annual production forecast.

(g)     On April 18, 2018, the forecasting team submitted a new forecast to Cabot's senior management in response to Schroeder's mandate.  Kerin immediately raised alarms about the "new" forecast in an email to Schroeder and Stalnaker.  Specifically, Kerin noted, among other things, that the "new" forecast: (1) shows a month-to-month sequential production increase of "~44- [million cubic feet per day] (gross) between July and August," which he described as a "huge feat" because the company "historically cap[ped]" these monthly levels at "300/d"– a production difference of approximately 140 million cubic feet per day; (2) presents a risk of missing "production by a decent amount"; and (3) requires the need for additional capital in 2019 because "the exit production rate for [2018] is now coming in lower than the original three-year plan."

(h)     On April 24, 2018, just three days before Cabot reissued its 2018 guidance, Hlavinka emailed Schroeder conceding that, due to a lackluster performance in the first quarter of 2018, the company *would need to revisit their full-year guidance*:

> New facility and pipeline in-service delays certainly contributed complexity to our analysis, but ultimately we reached the end of Q1 (a three month period with no new wellpad TILs) at a lower production rate and at lower field pressures than originally forecast.  Beginning the month of April at a lower than expected production rate in our updated forecast *has reduced our expectations of attaining*

- 70 -

4880-5761-4861.v1

*previously forecast production levels for the remainder of the year.*

(i)    That same day, Hlavinka sent a separate email to Stalnaker, which included an attached chart that depicted three different forecasts, including the "new" forecast described above by Kerin.  The chart contrasted the estimated production levels for the three forecasts, including: (1) the "2018 Budget" forecast, which according to other internal Cabot documents represented the basis for Cabot's public guidance of 10%-15%; (2) the "unadjusted" forecast, which according to Hlavinka's testimony represented the initial projection of Cabot's well-production capabilities before adjusting for any interruptions or delays in production; and (3) the "pressure sensitized" or "new" forecast, which Kerin described as requiring production level increases that the Company had *never historically achieved*.  The chart moreover reveals that the "pressure sensitized" or "new" forecast is *lower* than the "2018 Budget" forecast by approximately 9 billion cubic feet for the full year – showing that even if Cabot could achieve these unprecedented production levels in July and August for the first time in the Company's history, the overall production level was *still forecasted to be lower than the production level disclosed to the market*.

192.    Despite these known material shortfalls in Cabot's 2018 production forecast, on April 27, 2018, Defendants reaffirmed the previously provided 2018 production guidance.  It was not until July 27, 2018 that Cabot publicly reduced its production guidance range.  During Cabot's 2Q 2018 Earnings Call, Defendant Dinges announced a reduction in the top end of the Company's annual production guidance for 2018, down to 10%-12%.  Cabot's July 27, 2018 announcement caused Cabot's stock price to decline 7.7%, from $24.72 to $22.81, on abnormally heavy trading volume, causing damage to investors.

193.    Similarly, beginning on October 26, 2018, Defendants also issued inflated production guidance numbers for 2019.  During Cabot's 3Q 2018 Earnings Call held on this date,

- 71 -

4880-5761-4861.v1

Defendant Dinges stated that Cabot's "*2019 production growth guidance range [was between] 20% to 25%* or 25% to 30% on a debt adjusted per share basis."

194.   On this same Earnings Call, Dinges assured investors that this 20% to 25% guidance range was "*light*" because of the Company's purportedly "prudent" decision to cut growth in order to provide additional value to shareholders, stating:

> "*We felt like we were prudent in dialing back our capital spend, dialing back our '19 guidance to 20% to 25% growth in 2019, which is 25% to 30% growth on a debt adjusted per share basis.* And that's off a 2 Bcf plus net production. We think that's fairly robust production. Regardless of what we said earlier, we think that's fairly . . . productive. But we get reports that have come out, and some of the headlines and reports are guidance and production is light in 2019. Yes, it's light, Okay, it's only 20%, 25%, but we think it's also reasonable to take in consideration the value proposition that Cabot brings to the table."

195.   These statements confirmed an earlier Press Release filed that day on Form 8-K providing the Company's 3Q 2018 financial results, which stated: "*Cabot has provided its preliminary 2019 production growth guidance range of 20 to 25 percent* (25 to 30 percent on a debt-adjusted per share basis)."

196.   On February 22, 2019, in a Press Release accompanying 2018 financial results filed on Form 8-K, Defendants continued the false fiscal year 2019 production guidance statement, narrowing production guidance to 20% – the lower end of the previously provided guidance range issued on October 26, 2018.  On April 26, 2019, in a Press Release accompanying 1Q 2019 financial results filed on Form 8-K, Defendants falsely reaffirmed fiscal year 2019 production guidance of 20%.

197.   The statements referenced in ¶¶191-196 above were materially false and misleading, omitted material facts, and lacked a reasonable basis when made. Documents produced by Defendants and testimony from witnesses show that Defendants never expected Cabot's

- 72 -

production growth for fiscal year 2019 to reach 20% and falsely manufactured this production guidance range to appease shareholders as follows:

(a)     As noted above, throughout 2018, Cabot struggled to meet its preliminary fiscal year 2018 production guidance of 10%-15%, lowering it on two separate occasions during the year, including down to 7%-8% on October 26, 2018 – the same day Cabot issued its false and misleading preliminary-production guidance for 2019.   Moreover, prior to publicly reducing the fiscal year 2018 production guidance for the first time on July 27, 2018, Kerin informed Dinges, Schroeder, and Stalnaker that the Company's declining 2018 production performance would lead to negative concerns from analysts and investors over the state of Cabot's 2019 production productivity, stating, "Phil, I need some good talking points from you and your team to help soften the blow since [lowering our full year 2018 guidance] will likely lead to concerns about the 2019 program including capital efficiency / well productivity."

(b)     Other internal Cabot documents demonstrate that investors and analysts had good reason to be concerned about Cabot's production and capital efficiency programs.   On October 1, 2018, just weeks before the false and misleading fiscal year 2019 guidance was issued, and on April 3, 2019, Novakowski once again warned Stalnaker and the Disclosure Committee – just as he had been doing since October 2017 – about the "potential impact of gas migration and/or alleged gas migration issues on the ability of the company to meet guidance."

(c)     Against this internal backdrop, and subject to the pressure of appeasing Cabot investors, Cabot manufactured an inflated 2019 production range that lacked any reasonable basis.  On October 18, 2018, Stalnaker informed Hlavinka and other members of the forecasting team to be prepared to discuss "how much risk" was in the 2019 production forecast with Dinges, Schroeder, and Kerin.

- 73 -

(d)    On October 22, 2018, Shirey warned Hlavinka and Stalnaker about the risks associated with achieving the 2019 production forecast, including that the current forecast has been "***trimmed to the bare bones***."  Shirey further described the risks surrounding the time estimated in the forecast to bring newly drilled wells into production, indicating that the forecasting team "shaved 18 days from Drill Complete to TIL" as compared to the 2017 process, and questioned whether the "***data supports it***" and "***are assumptions too optimistic?***"

(e)    On October 24, 2018, just two days before Cabot released its fiscal year 2019 preliminary production guidance of 20% to 25%, Hlavinka emailed Stalnaker informing him that the production forecasting team calculated a "***[l]ow end growth of 16% for 2019***."  Hlavinka then told Stalnaker that he arrived at 22% production growth for 2019 over 2018, which would serve as "the basis for the low end of our production range."

(f)    Hlavinka's testimony demonstrates that the 2019 guidance was without a reasonable basis and materially false and misleading.  Hlavinka testified that the forecasting team worked to "quantify various aspects that rolled up into the production forecast" and used specific software programs to prepare the forecast.  Hlavinka further testified that he did not know how to operate the software programs used to calculate the production forecasts.  Despite his lack of knowledge, Hlavinka confirmed that he told the forecasting team that the 16% production growth number was not reasonable and that he proposed using 22% growth for 2019 as the basis for the low end of production range.  Hlavinka, however, could not recall his bases and assumptions for asserting that the forecasting team's 16% production growth number should be increased.  Moreover, when Hlavinka was shown the spreadsheet that set forth his proposed 22% growth number, which included specific upward adjustments in the monthly production estimates for 2019 as compared to the forecasting team's estimates, he could not recall or provide any rationale for

- 74 -

4880-5761-4861.v1

these specific monthly changes, stating, "I can't speak to the specifics" and "I did not include that detail…."

(g)     In response to Hlavinka's unsupported, top-down machinations, Stalnaker told him to use the 22% number to set the publicly provided production guidance range.  And like Hlavinka, Stalnaker's mandate was done without any confirmation of the underlying rationale for the increased figure.  Indeed, Stalnaker could not provide any rationale or understanding regarding (1) why the forecasting team's fact-based 16% projected growth number for 2019 was ignored and arbitrarily increased to 22%, or (2) what data and assumptions were used to arrive at the 22% projection.

(h)     By July 2019, Cabot internally recognized that it could no longer conceal its poor production performance from the market and in doing so admitted that Cabot was never in a position to achieve 20% to 25% production growth in 2019.   For example, in a July 15, 2019 email, Kerin updated Dinges, Schroeder, and Stalnaker regarding the 2019 production guidance, stating that "we need to think about IR messaging/guidance for 2019 given our forecasted production growth guidance of 17.3% for $820mm-$825mm vs. our current guidance of 20% growth for $800mm capital."  After Kerin clarified for Stalnaker the basis for the 17.3% production growth number, Stalnaker responded, "we were ***never at 20% production growth*** based on our forecast."  Kerin agreed and further conceded, "***we had previously issued a range of 20-25% in October and didn't want to drop the guidance below the low-end of the previously disclosed range.***"

198.    On July 26, 2019, Cabot publicly reduced its production growth guidance to a range of 16%-18% – which was consistent with Cabot's forecasting team's original projection in October 2018, before Hlavinka and Stalnaker issued their top-down directive to inflate the guidance range without a factual basis.  Specifically, on July 26, 2019, in a Press Release discussing Cabot's 2Q

- 75 -

4880-5761-4861.v1

2019 financial results, Cabot disclosed to investors that it would *not* meet its previously announced production guidance for full-year 2019, reducing it "to a range of 16 to 18 percent," a statement reiterated by Dinges later that same day on the 2Q 2019 Earnings Call.

199.    As alleged below, Cabot also issued its Form 10-Q filed with the SEC on July 26, 2019, which provided Cabot's 2Q 2019 financial results and revealed that it had also received two proposed Consent Orders and Agreements related to a June 2017 Notice of Violation and a November 2017 Notice of Violation. The July 26, 2019 disclosures substantially caused Cabot's stock price to decline 12%, from $21.79 to $19.16, on abnormally heavy trading volume, causing investors to suffer damages.

200.    The July 26, 2019 Press Release, however, also misled investors regarding a then ongoing, but undisclosed, gas migration incident at the Powers M well pad impacting Cabot's operations.  In the Press Release, Cabot stated the reduction in production guidance was due "***in large part to a change in the operating plan resulting from a unique opportunity to acquire acreage adjacent to an eight-well pad, allowing the Company to increase the total lateral footage on the pad…***"  Cabot's statement, which concerned the Powers M well pad, failed to disclose the then ongoing gas migration investigation at the Powers M well pad, which required a lengthy cessation of drilling operations there, indefinitely delaying the completion of the wells and, therefore, gas production.  Defendants, however, concealed these facts from investors.  According to an internal Cabot presentation to Schroeder and Stalnaker, Cabot suspended operations at the Powers M well pad following a gas migration investigation reported on July 17, 2019, prior to the Company issuing its disappointing guidance on July 26, 2019. On January 9, 2020, the Pennsylvania Department issued Cabot an NOV as a result of the gas migration incident at the Powers M well pad, and the Powers M pad continued to experience problems associated with gas migration that delayed production on that pad well into 2020, thereby impacting production in both

- 76 -

2019 and 2020.  Notably, the Powers M well pad was one of the well pads that provided the basis for the eventual criminal allegations filed against the Company by the Pennsylvania Attorney General on June 15, 2020.

201.    In addition, Cabot, in its Form 10-Q filed on July 26, 2019, revealed that it had received two proposed Consent Orders and Agreements related to the June 2017 Notice of Violation and the November 2017 Notice of Violation.  However, Defendants omitted that they had simultaneously received a third proposed consent order from the Pennsylvania Department for wells in the Dimock Box based on the ***ongoing violations*** of the terms of the December 2010 Consent Order.  Thus, despite disclosing the first two proposed consent orders, Defendants concealed the third, which detailed Cabot's known, ongoing violations at wells within the Dimock Box dating back to the December 2010 Consent Order.

202.    On February 25, 2020, Cabot filed its 2019 Form 10-K with the SEC.  The Form 10-K represented that "[t]he Company is a defendant in various legal proceedings ***arising in the normal course of business***."  This statement was repeated in the 1Q20 Form 10-Q filed on May 1, 2020. The February 25, 2020 Form 10-K also made representations about legal proceedings related to "Environmental Matters" currently facing the Company, including statements substantially similar to those stated in paragraph 189.  However, in reporting on the risks and ongoing legal proceedings related to environmental laws that were currently facing the Company, Defendants omitted the fact of the Pennsylvania Attorney General's criminal case, despite: (i) having received the Grand Jury's subpoena on November 13, 2018, (ii) knowing of the Attorney General's criminal complaint, and (iii) expecting that criminal charges would be forthcoming at the time that the 2019 Form 10-K was filed.  In fact, internal Cabot documents confirm that, as early as September 2019, Cabot understood the timing of any criminal charges to be on or before February 2020.  Notably, as a result of its findings, the Grand Jury recommended that criminal

- 77 -

4880-5761-4861.v1

charges be filed against Cabot on February 11, 2020.  In addition, Defendants had an independent duty to disclose this information according to Item 103 of Regulation S-K, which requires, among other things, the disclosure of "proceedings known to be contemplated by governmental authorities."  17 CFR § 229.103(a).

203.    In fact, on or before February 24, 2020, Cabot, including, but not limited to Defendant Schroeder and Deidre Shearer, Cabot's Vice President of Administration and Corporate Secretary to Defendant Dinges, was aware of the Pennsylvania Attorney General's criminal complaint against Cabot related to its violations of environmental law, began drafting a public statement in response to the anticipated charges, and expected the charges to be filed as early as February 25, 2020, following the receipt of a grand jury subpoena in November 2018.  Defendants omitted these facts from the Form 10-K filed on February 25, 2020 and Form 10-Q filed on April 30, 2020.

## VII.    DEFENDANTS' OTHER FALSE AND MISLEADING STATEMENTS AND OMISSIONS[10][11]

204.    191. On October 23, 2015, Cabot filed its quarterly report on Form 10-Q with the SEC which downplayed Cabot's potential liabilities with respect to environmental matters, assuring investors, in part:

> From time to time we receive notices of violation from governmental and regulatory authorities in areas in which we operate relating to alleged violations of environmental statutes or the rules and regulations promulgated thereunder.  While we cannot predict with certainty whether these notices of violation will result in fines and/or penalties, if fines and/or penalties are imposed, they may result in monetary sanctions individually or in the aggregate in excess of $100,000.

---

[10][11]    The allegations in this section relate to misstatements the Court previously dismissed with prejudice and are included herein solely for purposes of preserving the claims related to them.  *See* ECF No. 109 at 2.  Should some or all of these alleged false and misleading statements later be revived, the Class Period would be appropriately modified to include all sustained alleged false and misleading statements.

4880-5761-4861.v1

205.    ~~192.~~ Defendants repeated this same statement in Cabot's 2015 Form 10-K filed on February 22, 2016, 2016 Form 10-K filed on February 27, 2017, 2017 Form 10-K filed on March 1, 2018, 2018 Form 10-K filed on February 26, 2019, and 2019 Form 10-K filed on February 25, 2020.  The Company further repeated the same statement in Cabot's other quarterly reports on Forms 10-Q filed with the SEC during the Class Period.

206.    ~~193.~~ On or around March 15, 2017, Cabot published its 2016 Annual Report.  The 2016 Annual Report was prepared and distributed by and under the names of Defendants on behalf of Cabot, and featured a letter to shareholders signed by Dinges on behalf of Cabot, which stated, in relevant part: "First and foremost, Cabot's objective is to deliver profitable results and to conduct our operations in a safe and prudent manner for the protection of our employees and contractors ***with an unwavering commitment to comply with or exceed all regulations to enhance the environment and communities where we operate***."

207.    ~~194.~~ On August 20, 2018, Schroeder spoke at the EnerCome Oil & Gas Conference.  During his presentation, he told investors that Cabot's well completion process was "environmentally friendly," stating:

> We have more wells that we're completing right now in the Upper Marcellus.  And look to the February year-end reserve report for data on that.  Question you might ask is, "Okay, why – if you're doing them now, why don't you tell us sooner?" ***Because of the way we complete our wells in the field to be environmentally friendly, green, however you want to say it***, a long time ago, several years ago, we changed our completion technique.

208.    ~~195.~~ Cabot then published its 2019 Annual Report on or around March 13, 2020.  The 2019 Annual Report was prepared and distributed by and under the names of Defendants on behalf of Cabot and featured a letter to shareholders signed by Dinges on behalf of Cabot, which stated, in relevant part: "***We make every effort to reduce and limit our impact on air, water and the environment with the best technologies currently available***" and that "[o]ur commitment to

- 79 -

free cash flow, return on capital, and return of capital back to shareholders ***with the least possible impact to the environment remains paramount in importance to us***."

209.   ~~196.~~ The 2019 Annual report further stated that "Cabot embraces environmental innovation and is a leader in utilizing new technology to reduce our overall impact on the environment" and that "[i]t is from this platform that ***we will continue our efforts to improve the environment, being a beacon of light by doing the right thing***."

210.   ~~197.~~ In addition, the 2015 10-K contained materially false and misleading representations about ***potential*** risks with respect to "environmental and safety regulations, which can adversely affect the cost, manner or feasibility of doing business" for Cabot, when, in fact, such risks were then ***existing***.  The 2015 10-K represented, in relevant part, that Cabot's:

> [O]perations are subject to extensive federal, state and local laws and regulations, including drilling, permitting and safety laws and regulations and those relating to the generation, storage, handling, emission, transportation and discharge of materials into the environment.  These laws and regulations ***can*** adversely affect the cost, manner or feasibility of doing business. . . .  Governmental authorities have the power to enforce compliance with their regulations, and violations could subject us to fines, injunctions or both. . . .  Failure to comply with these laws also ***may*** result in the suspension or termination of our operations and subject us to administrative, civil and criminal penalties as well as the imposition of corrective action orders. . . .

211.   ~~198.~~ The 2016 10-K filed on February 27, 2017, the 2017 10-K filed on March 1, 2018, the 2018 10-K filed on February 26, 2019, and the 2019 10-K filed on February 25, 2020, contained substantively similar risk warnings.

212.   ~~199.~~ The statements referenced in ¶¶ ~~191-198~~ 204-211 above were materially false and misleading for the reasons stated in ¶190 herein.

213.   ~~200.~~ In Cabot's 2015 Proxy Statement on Form Def 14A filed with the SEC on March 12, 2015, the Company highlighted Cabot's Code of Business Conduct as requiring employees' "strict adherence" to legal and regulatory requirements.  The Proxy Statement stated, in relevant part:

4880-5761-4861.v1

All employees, officers and directors are required to comply with the Company's Code of Business Conduct to help ensure that the Company's business is conducted in accordance with the highest standards of moral and ethical behavior. The Code of Business Conduct covers all areas of professional conduct . . . , as well as requiring strict adherence to all laws and regulations applicable to the Company's business. Employees, officers and directors are required annually to reply to a Code of Conduct Questionnaire, which is designed to elicit information related to any known or possible violation of the Code. . . .

214. ~~201.~~ Cabot's other Proxy Statements filed during the Class Period contained substantively similar representations as in ¶~~200~~213.

215. ~~202.~~ The statements contained in ¶¶~~200-201~~213-214 were materially false and/or misleading because Defendants misrepresented and failed to disclose that Cabot was not in compliance with its Code of Business Conduct, including the requirement that Cabot conduct its business in "strict adherence to all laws and regulations applicable to the Company's business," for the reasons stated in ¶190 herein.

216. ~~203.~~ Cabot's Code of Business Conduct itself, which the Company made publicly available and specifically referenced in Cabot's Forms 10-K filed with the SEC during the Class Period, stated, in relevant part, that "[i]t is the Company's policy to observe and comply with all governmental laws, rules and regulations applicable to it or the conduct of its business wherever located." Concerning "The Environment," the Code further stated:

It is Company policy to comply fully with the letter and the spirit of all applicable federal, state, and local environmental protection laws and regulations (the "Environmental Laws"). The Company will conduct operations in such a manner as to meet or exceed all Environmental Laws in its business activities.

217. ~~204.~~ The statements contained in ¶~~203~~216 were materially false and/or misleading because Defendants misrepresented and failed to disclose that Cabot was not in compliance with its Code of Business Conduct, including the requirement that Cabot "will conduct operations in such a manner as to meet or exceed all Environmental Laws in its business activities," for the reasons stated in ¶190 herein.

- 81 -

## VIII.    THE RELEVANT TRUTH EMERGES

218.    205. On July 26, 2019, the Company filed its 2Q19 10-Q, reporting that it had received two proposed Consent Order and Agreements related to two Notices of Violation from the Pennsylvania Department for failure to prevent the migration of gas into fresh groundwater sources in the area surrounding Susquehanna County.  As noted above, Cabot had received the pertinent Notices of Violation in June and November 2017.  Specifically, the 2Q19 10-Q stated, in part:

> We will continue to work with the [Pennsylvania Department] to finalize the [Consent Orders and Agreements], and to bring this matter to a close.  With regard to the November 2017 [Notice of Violation], [t]he proposed [Consent Order and Agreement], if finalized as drafted, would require Cabot to submit a detailed written remediation plan, continue water sampling and other investigative measures and restore or replace affected water supplies and would result in the payment of a civil monetary penalty in an amount likely to exceed $100,000, up to approximately $355,000.  We will continue to work with the [Pennsylvania Department] to finalize the [Consent Order and Agreement], and to complete the ongoing investigation and remediation.

219.    206. Despite this announcement, which partially revealed the truth of Defendants' fraudulent scheme, Defendants continued to misstate and conceal the true extent of their violations and exposure to financial and reputational harm.

220.    207. For example, in the same section of the 2Q19 10-Q, the Defendants assured investors that, following the receipt of the Notices of Violation from the Pennsylvania Department, Defendants "*have been engaged with the [Pennsylvania Department] in investigating the incidents and have performed appropriate remediation efforts*, including the provision of alternative sources of drinking water to the affected residents"; that, "[w]ith regard to the June 2017 [Notice of Violation], [Defendants] *believe these water quality complaints have been resolved, and [they] are working with the [Pennsylvania Department] to reach agreement on the disposition of this matter*;" that "[t]he proposed CO&A [for the June 2017 Notice of Violation] is the culmination of [Defendants'] effort[s];" that Defendants "will continue to work with the

- 82 -

[Pennsylvania Department] to finalize the CO&A [related to the June 2017 Notice of Violation], and to bring this matter to a close;" and that, with respect to the November 2017 Notice of Violation, Defendants "will continue to work with the [Pennsylvania Department] to finalize the CO&A, and to complete the ongoing investigation and remediation." Although this announcement partially revealed that the Company was not in compliance with applicable law, the full extent of the Company's violations continued to be concealed, and the bolded statements in this paragraph were materially false and misleading for the reasons stated in ¶190 herein.

221. 208. Then, on June 15, 2020, following the Grand Jury's recommendation, the Attorney General's office charged Cabot with 15 criminal counts arising from its failure to fix faulty gas wells, thereby polluting Pennsylvania's water supplies through stray gas migration. The Associated Press reported the Grand Jury's findings:

> "We find that, over a period of many years, and despite mounting evidence, Cabot . . . failed to acknowledge and correct conduct that polluted Pennsylvania water through stray gas migration," the grand jury wrote, criticizing Cabot's "long-term indifference to the damage it caused to the environment and citizens of Susquehanna County."

> \*      \*      \*

> "Cabot took shortcuts that broke the law, damaged our environment, harming our water supplies and endangering Pennsylvanians. They put their bottom line ahead of the health and safety of our neighbors," Attorney General Josh Shapiro said in a video statement.

> \*      \*      \*

> The company has long insisted the gas in Dimock's aquifer is naturally occurring, saying its pre-drill testing of thousands of private water wells in the area show a high percentage with methane. The grand jury asserted that Cabot's initial sampling of wells and groundwater did not include tests for methane. State environmental regulators eventually determined that Cabot's drilling and fracking operations leaked explosive levels of methane into private water supplies.

> \*      \*      \*

> Residents said they suffered ill health effects from the contamination of their water with methane and drilling chemicals, including nausea, dizziness, skin

- 83 -

4880-5761-4861.v1

rashes, impaired vision and breathing difficulties.  Property values plummeted, too, they said.

222.   ~~209.~~ The criminal case against Cabot is ongoing.  On January 7, 2022, Cabot formally waived its right to a preliminary hearing.

223.   ~~210.~~ As a result of Defendants' wrongful acts and omissions, Plaintiffs and the Class purchased Cabot common stock at artificially inflated prices and were damaged thereby.

## IX.   DEFENDANTS KNEW, OR AT A MINIMUM WERE RECKLESS IN NOT KNOWING, THAT THE ALLEGED MISREPRESENTATIONS WERE MISLEADING

224.   ~~211.~~ The Defendants acted with scienter in that they knew or recklessly disregarded that the public documents and statements issued or disseminated in the name of the Company and/or under their signature were materially false and misleading.  The Defendants knowingly or recklessly participated or acquiesced in the issuance or dissemination of such statements or documents as primary violators of the federal securities laws.

225.   ~~212.~~ By virtue of their receipt of information reflecting the true facts regarding Cabot's operations, as well as their control over and/or receipt of the Company's materially misleading misstatements and/or their associations with the Company that made them privy to confidential proprietary information concerning Cabot, the Defendants were active and culpable participants in the fraudulent scheme alleged herein.  The Defendants knew of and/or recklessly disregarded the alleged false and misleading information they caused to be disseminated to the investing public.  The ongoing fraud as described involved personnel at the highest level of the Company, including the Individual Defendants, and could not have been perpetrated without the knowledge and/or reckless complicity of personnel at the highest level of the Company, including the Individual Defendants and other senior executives.

226.   ~~213.~~ Numerous facts support a strong inference of the Defendants' scienter during the Class Period, including: (a) the Individual Defendants' knowledge of and access to information

- 84 -

and reports reflecting that Cabot was not in compliance with relevant environmental laws and prior order from the Pennsylvania Department; (b) Defendants' obligations associated with Cabot's disclosure controls and environmental compliance; and (c) that the misstatements and omissions of material facts concerned the Company's core operations.

227. 214. As detailed herein, there are numerous facts that, taken holistically, give rise to a strong inference that, throughout the Class Period, the Individual Defendants and Cabot knew or, at a minimum, recklessly disregarded that their statements were materially false and misleading.  The cumulative knowledge of Cabot's management team, including, but not limited to, the Individual Defendants, is properly imputed to Cabot.

### A. The Pennsylvania Department and Criminal Investigation Found that Cabot "Knowingly" Failed to Comply with Applicable Environmental Laws and Remediation Requirements

228. 215. The pervasive illegal behavior alleged herein is probative of Defendants' scienter.  Here, the Grand Jury and Pennsylvania Department investigations demonstrate that prior to and throughout the Class Period, Cabot ignored *known* violations of environmental law – that the Company's drilling operations caused methane gas to migrate into the water supply of Susquehanna County citizens and other violations – and *knowingly* failed to remediate these violations for years.  Much of the same illegal conduct was also detailed in the Pennsylvania Department's June 2018 Letter to Cabot.  *See* §§V.G.1.-3, *supra*.

229. 216. As detailed herein (*see* §§V.G.1.-3, *supra*), the Pennsylvania Department repeatedly put Cabot on notice prior to and throughout the Class Period, through the November 2009, April 2010, and December 2010 Consent Orders, and the Notices of Violation issued to the Company, that Cabot's drilling operations were unlawfully polluting Pennsylvania groundwater. Nevertheless, Cabot failed to meet its obligation to remediate these offenses, resulting in rampant and repeated violations of environmental law.

- 85 -

230. 217. As a result, Cabot was criminally charged with "***knowing***" violations of Pennsylvania environmental law.  Because the underlying failure to remediate took place, as the Grand Jury found, "over a period of ***many years***" – in some cases over a decade – and "despite mounting evidence," "***Cabot's long-term indifference to the damage it caused to the environment and citizens of Susquehanna County***" was known to Cabot's management, including the Individual Defendants, through various regularly occurring meetings and reports monitoring Cabot's compliance with environmental regulations and remediations.

231. 218. The inference that the illegal conduct was knowingly allowed by senior management, including Dinges is also reasonable given the felony charges brought against Cabot by the Pennsylvania Attorney General.  Specifically, the charges allege that Cabot "did ***knowingly*** fail to comply with orders of the department, including but not limited to the December 15, 2010 Consent Order and Settlement Agreement, when it failed to remediate its gas wells to eliminate the discharge of natural gas, which allowed contamination to continue unabated," and it was Dinges himself who signed the December 2010 Consent Order, binding Cabot to "take ***all actions*** necessary . . . to comply with all applicable environmental laws and regulations, including all applicable provisions" of Pennsylvania's Clean Streams Law, Oil and Gas Act, and related regulations.

**B.    Dinges, as CEO and Chairman of the Board, and Schroeder, as CFO, Were Routinely Apprised of the Alleged Continuing Violations**

232. 219. As detailed herein, Cabot's management and Board closely monitored the Company's compliance with environmental laws, including the Pennsylvania Department's findings that methane was migrating out of Cabot wells and that the Company was not in compliance with applicable environmental regulations.  *See* §§V.D.; V.I.2.-3, *supra*.  Dinges was the Chairman of the Board throughout the Class Period and, as CEO, a member of Cabot's management team.  Cabot's management specifically provided the S&EA Committee reports on

- 86 -

investigations, notices of violations, and remediation activities involving environmental laws or regulations. Further, the S&EA Committee, in turn, provided reports on these activities to Cabot's Board, which necessarily included Dinges and whose meetings were attended by Dinges and Schroeder, multiple times per year.

233. 220. In particular, during the Class Period, as set forth above, Cabot received multiple Notices of Violation from Pennsylvania authorities related to Cabot's wells in Pennsylvania, and was subject to an extended investigation by the Pennsylvania Attorney General that resulted in numerous felony criminal charges in 2020. Prior to and during the Class Period, on no fewer than nine occasions between approximately 2010 and 2018, Cabot's Board was told that methane was migrating out of Company wells and that the Pennsylvania Department had found Cabot was out of compliance.

234. 221. Dinges, as a Board member, also received Quarterly Update Reports from Cabot's Director of Safety & Environmental Compliance, regarding the number of violations, large spill cleanups and remediation cases, and Dinges, as a member of the Board, was made aware of any sizeable environmental issues and all issues relating to gas migration. Thus, as a Board member and member of Cabot's management, Dinges kept apprised of the Notices of Violation the Company received from the Pennsylvania Department and Cabot's related remediation efforts, or the lack thereof.

235. 222. Dinges also demonstrated his personal knowledge of remediation issues on investor conference calls. During Cabot's Q1 2020 Earnings Call on May 1, 2020, Dinges told investors that the Company expected a "sequential decline in production during the second quarter" because of, among other things, "the impact of an unplanned downtime related to remedial work." Dinges's familiarity with remediation issues on this conference call underscores that he

4880-5761-4861.v1

had knowledge of and was kept apprised of Cabot's environmental violations and remediation responsibilities during the Class Period and their financial impact on the Company.

236. ~~223.~~ Similarly, Schroeder, as CFO, attended Board meetings and received the same updates and materials presented to the Board, including the Quarterly Update Reports from Cabot's Director of Safety & Environmental Compliance. Both Dinges and Schroeder reviewed and approved Board materials.

237. ~~224.~~ And Cabot *routinely reviewed* its operations through regular meetings, calls and reports all of which informed Cabot of its environmental non-compliance. The Company, indeed, held daily meetings to discuss well operations, including problems with those wells, which were attended by Stalnaker who, according to Dinges, "runs our Marcellus" Shale operations. Spills, Pennsylvania Department visits, cementing problems, landowner complaints and violations were all discussed during the daily meetings. Stalnaker updated Dinges, Schroeder and the Board on Cabot's Pennsylvania operations at quarterly Board meetings and kept in "constant communication" with Dinges. Cabot also maintained a weekly Environmental Health & Safety conference call with its Houston headquarters, which was attended by the Director of Safety & Environmental Compliance, Mr. Ganaway, who represented the Environmental Health & Safety department at Board meetings. The purpose of the weekly conference call was to update headquarters regarding safety and environmental issues, which included discussion of Pennsylvania Department violations and the status of the Company's environmental remediation obligations. Cabot kept an ongoing log of these issues and their resolution status, which Dinges and Schroeder had access to as CEO and CFO, respectively. In addition, other internal reports accessed and accessible by Cabot's management, such as each gas well's cement bond logs, informed Cabot that its wells were not cemented properly so as to prevent stray gas migration into groundwater. *See* §V.I.1, *supra*.

4880-5761-4861.v1

238.    225. These reports further informed Cabot's executives that, as detailed in the Pennsylvania Department and Grand Jury investigations, the Company was not undertaking ongoing remediation to address the environmental violations cited in the June 2018 Letter or otherwise originating from Cabot's defective cement and casing activities, which permitted methane to migrate into fresh groundwater sources throughout Susquehanna County prior to and during the Class Period, in violation of applicable environmental laws and regulations.

**C.    Dinges Publicly and Repeatedly Addressed the Alleged Violations**

239.    226. Dinges' knowledge or reckless disregard for Cabot's Class Period environmental violations can also be inferred from his public representations that he monitored and understood the importance of Cabot's compliance with Pennsylvania's environmental laws. Amid the ongoing controversy concerning Dimock, which began after Cabot started drilling there in 2008, Dinges stated in an April 27, 2010 Cabot press release that the Company has "been an active member of the Appalachia exploration and production community for over 120 years, and throughout that time we have been committed to conducting compliant, safe operations," and assured the public that "we take every issue involving people and the environment very seriously, and we appreciate the sensitive nature of methane in the water for the citizens of the Commonwealth."

240.    227. Dinges reiterated his purported commitment to environmental compliance days later on an April 29, 2010 conference call: "Cabot takes safety in all environmental matters extremely seriously.  As Cabot announced Tuesday night in a press release, we will continue to cooperate fully with the Pennsylvania DEP to remedy and resolve the items from the consent order."  In fact, this messaging became a common refrain for Dinges.  During a July 22, 2010 conference call, Dinges promised that "Cabot will continue to work with the DEP and the families affected by the operations to the complete satisfaction and a good conclusion," noting that he

- 89 -

thought the "issue ha[d] cast uncertainty with the Street on Cabot's ability to conduct operations in Pennsylvania."

241.   228. When Cabot announced the December 2010 Consent Order, **which Dinges himself signed**, he told investors in a December 15, 2010 press release that Cabot was "committed to responsible operations within Susquehanna County," and stated that the "we have redoubled our efforts with the Pennsylvania Department of Environmental Resources to resolve past issues."  In the December 2010 Consent Order, Cabot, through Dinges, indeed agreed to "take **all actions** necessary . . . to comply with all applicable environmental laws and regulations, including all applicable provisions" of Pennsylvania's Clean Streams Law, Oil and Gas Act, and related regulations.

242.   229. Market analysts reacted favorably to the prospect that Cabot and its CEO appeared committed to environmental compliance by entering into the December 2010 Consent Order.  One analyst from KeyBanc wrote on December 14, 2010: "We believe a settlement would be received favorably by the market, as it would remove a hangover on the stock caused by the negative press associated with its Marcellus operations."  Another analyst from BMO published a report on December 15, 2010, stating: "This is a positive development for Cabot.  With the resolution of the water claims and the lifting of the drilling ban, Cabot can begin to repair its reputation, which is likely to facilitate smoother interactions with land holders and reduce delays in drilling and completion activities."

243.   230. A few month later, Dinges again assured investors and the community on an April 28, 2011 conference call that he and the Company were "**doing all we can right now to mitigate any potential risks**" relating to gas migrations potentially caused by the Company's drilling operations.  Dinges's intimate personal involvement in promising investors and the public that Cabot was addressing the problems raised in the December 2010 Consent Order further

evidences his scienter.    Dinges's detailed pronouncements on this topic provide strong circumstantial evidence that he received or recklessly disregarded information about environmental compliance matters, which demonstrated, as detailed in the Pennsylvania Department and Grand Jury investigations, that Cabot was not, in fact, remediating its gas wells in the Dimock area under the terms of the December 2010 Consent Order.

244.    231. On January 26, 2012, Dinges sent a letter to the EPA and Cabot filed a press release the same day titled "Cabot Oil & Gas Corporation Comments on EPA Decision."  The letter and press release addressed the EPA's decision to initiate a water sampling program in Dimock, Pennsylvania, with Dinges writing, in part, "we have been working closely with the Dimock community and with state and local regulators on concerns in the area."  The letter and press release provide further evidence of Dinges's knowledge of and familiarity with Cabot's environmental compliance activities.

245.    232. Moreover the controversy surrounding fracking in Dimock remained a focus for the Company through the start of the Class Period, further contributing to the inference that Dinges and the other Individual Defendants kept apprised of all environmental issues resulting from the Company's drilling activities.  For example, during a second quarter 2012 earnings call held on July 25, 2012, Dinges discussed Cabot's negotiation and settlement of environmental contamination claims with Dimock landowners harmed by environmental contamination caused by Cabot drilling: "Cabot has reached verbal settlement agreement with 32 out of 36 households. . . .  Resolution of this litigation will have a very positive impact on [general and administrative costs] going forward due to the reduction in cost of defense."  In 2016, certain of these private litigants, who had initiated lawsuits in November 2009 alleging Cabot's drilling in Dimock contaminated their groundwater, obtained a jury verdict and $4.2 million award.  In 2017, a

4880-5761-4861.v1

Pennsylvania federal judge vacated the jury's award and ordered a new trial. A new trial never occurred and the case was dismissed following a settlement conference.[11][12]

    **D.**    **Stalnaker Presented to Cabot's Board and Prepared Cabot's Form 10-Ks and 10-Q sQs with Knowledge of Their Falsity**

246. 233. Stalnaker oversaw Cabot's Susquehanna operations from the Company's Pittsburgh, Pennsylvania offices. Prior to and during the Class Period, Stalnaker was repeatedly described on Cabot conference calls as "running our north region" and the person who "runs our Marcellus." In that role, Stalnaker attended and presented at meetings of Cabot's Board. Specifically, Stalnaker kept Dinges and the Board apprised at Board meetings and during regular calls with Dinges of Cabot's Pennsylvania operations, where the continuing violations and regulatory noncompliance occurred.

247. 234. Stalnaker also furnished information to Cabot for inclusion in the Company's SEC filings. As the Cabot officer in charge of the Company's Pennsylvania operations, Stalnaker was involved in preparing Cabot's SEC filings concerning Cabot's Susquehanna operations, including in Form 10-Ks and 10-Qs. Stalnaker attended meetings and conducted presentations over the course of a multi-week process to prepare data and information from the Company's Pittsburgh office regarding well operations, completions and production to be included in Cabot's SEC filing. Stalnaker thus prepared Cabot's SEC filings knowing, or recklessly disregarding, the Company's failures to remediate and address known violations of Pennsylvania environmental laws and regulations.

248. 235. Stalnaker received cement bond logs, which would have shown wells with insufficient cement, and attended daily well operation meetings where spills, Pennsylvania

---

[11][12]    *Nolan Scott Ely, et al. v. Cabot Oil & Gas Corporation and GasSearch Drilling Services Corporation*, Case No. 3:2009-cv-02284, United States District Court for the Middle District of Pennsylvania.

4880-5761-4861.v1

Department visits, cementing problems, landowner complaints and violations were all discussed. Stalnaker was further informed of every Notice of Violation that Cabot received from the Pennsylvania Department and personally received Notices of Violation concerning Cabot's failure to remediate known violations (*see* §§V.D.1.-5.; V.G.1.-2.; V.I.1., *supra*), including the Pennsylvania Department's June 2018 Letter informing Cabot that the Company had not been in compliance with the December 2010 Consent Order for eight years due to Cabot's extensive ***continuing*** violations for discharges of pollution that remained unresolved. *See* §§lV.G.1.-2., 3.a., *supra*. Managers reported all stray gas leaks to Stalnaker, including through slide presentations explaining the problem.

249. ~~236.~~Stalnaker also received Board materials, such as the Quarterly Update Report, and would have been informed as a Board meeting attendee regarding the nine separate "red flags," discussed in paragraphs 56,58, *supra*, in which the Board was "told between approximately 2010 and 2018 that methane was migrating out of its wells, that it was not – that the position of the regulator was that it wasn't in compliance," all of which informed the Board and each of the Individual Defendants of the stray methane migration and the Pennsylvania Department's position that Cabot's wells were not in compliance with applicable law. Additionally, Stalnaker no doubt knew that Cabot was not adequately remediating these environmental problems, as Stalnaker was required to sign off on remediation activities.

## E.    Defendants Have Engaged in a Pattern of Wrongdoing

250. ~~237.~~Courts have recognized that "pattern evidence" (*i.e.*, evidence that a defendant participated in a pattern of malfeasance over a significant period of time), is probative of scienter. As detailed herein, the Grand Jury and Pennsylvania Department investigations and factual findings demonstrate that Cabot exhibited a pattern of willful violation of applicable environmental laws, regulations and other legal obligations over more than a decade. By way of

- 93 -

4880-5761-4861.v1

example, Cabot failed to remediate faulty gas wells for years on end and even attempted to avoid liability by consciously failing to establish baseline methane levels in water wells near Cabot drill sites so that Defendants could maintain plausible deniability regarding their violations.  *See* §V.F.3, *supra*.

### F.   Cabot's Gas Exploration and Production in Pennsylvania Is a Core Operation

251.   238. Defendants' knowledge of or reckless disregard for Cabot's noncompliance with environmental law in the Company's Susquehanna County gas exploration and production operations discussed herein can readily be inferred because these operations were existential to the Company's business.  Substantially all of Cabot's oil and gas production occurred in Susquehanna County during the Class Period.  *See* ¶¶29-31.  Cabot indeed refers to its Marcellus Shale properties there as its "*core operations*," and its "*cornerstone asset*" that is the "*primary driver*" of Cabot's gas production.  Cabot quite literally obtains essentially all of its revenue from its activities in Pennsylvania – the site of its pervasive violations of applicable laws.

252.   239. By 2015, Cabot's Marcellus Shale properties in Susquehanna County, Pennsylvania, already represented the Company's largest operating and growth area in terms of reserves, production, and capital investment, and approximately 90% of Cabot's 2015 total equivalent production came from the Marcellus Shale.  By 2019, "*substantially all*" of Cabot's annual total equivalent production came from its Marcellus Shale operations in Susquehanna County, Pennsylvania, where the violations occurred.

### G.   Defendants Were Incentivized to Ignore Cabot's Criminal Violations of Environmental Law

253.   240. Cabot operated in a highly competitive industry and experienced "strong" and "intense" competition in its primary gas production business.  Moreover, Cabot's competitors had

"financial and technological resources and exploration and development budgets that are substantially greater than" Cabot's.

254. ~~241.~~ Cabot's focus was therefore on efficiency and, as the Geologist stated, "***doing things fast and as cost effectively as possible***," not on environmental compliance. As Dinges noted in a July 28, 2016 press release, Cabot was expanding the activity levels of its Marcellus operations "'[b]ased on continued efficiency gains'" and "lower service costs" as Cabot was the "'lowest cost producer in Northeast Pennsylvania.'" Yet Cabot still worked to "optimize" their drilling, completion and operational efficiencies, to continue to "lower operating costs per unit of production."

255. ~~242.~~ And the increased volatility in commodities prices during the Class Period only "dr[o]ve[] [Cabot] to be more efficient," as Dinges said in a October 28, 2016 press release, adding: "'We have been successful at creating a free cash flow positive investment program that still generates growth, while simultaneously driving down our cost structure and our resulting breakeven levels.'" Cabot's focus on "efficiency" in order to drive revenue incentivized the Defendants to ignore environmental compliance, especially given that the Pennsylvania Department was initially overwhelmed by the size and scope of the fracking boom in Pennsylvania. As the Attorney General stated on June 15, "[t]he game that Cabot continues to play, risking the lives of people across the Commonwealth for a profit, well, that cannot go on any longer."

**H.      Defendants' Violation of Company Policy Supports an Inference of Scienter**

256. ~~243.~~ The Company purported to have a robust policy of compliance with environmental laws. *See* §V.D.5., *supra*. To that end, Cabot's Code of Conduct stated that the "Company will conduct operations in such a manner as to meet or exceed all Environmental Laws in its business activities." ¶76. Despite these commitments, the Company continuously violated its own policies throughout the Class Period by knowingly failing to abide by the Clean Streams

- 95 -

Law and regulations promulgated under the Oil and Gas Act prohibiting stray gas pollution and requiring sound cementing of its well casings. *See* §§V.F.4.; V.G.1.-3, *supra*. These violations enhance the inference of scienter.

## I. Cabot Operates in a Highly Regulated Industry

257. 244. As acknowledged in various Company SEC filings during the Class Period, Cabot was subject to extensive federal, state, and local laws and regulations relating to its drilling and production operations. Violations of those laws and regulations subjected Cabot to extensive fines, penalties, and business disruptions. For example, each Notice of Violation required that Cabot draft a remediation plan, often with detailed specifications or required meetings with the Pennsylvania Department. Given this comprehensive and onerous regulatory scheme, it can be inferred that the Individual Defendants and those working at or under their direction closely monitored the Company's compliance with environmental law during the Class Period.

## J. Dinges's and Schroeder's SOX Certifications and Signing of SEC Filings Further Support a Strong Inference of Scienter

258. 245. Defendants' scienter is also underscored by the Sarbanes-Oxley certifications signed by Dinges and Schroeder, which acknowledged their responsibility to investors for establishing and maintaining controls to ensure that material information about Cabot was made known to them and that the Company's disclosure controls were operating effectively.

259. 246. During the Class Period, Dinges and Schroeder repeatedly certified that they had undertaken an assessment and evaluation of the Company's disclosure controls to ensure that their SEC filings did not contain any false information, including controls designed to ensure all relevant and material information is reviewed by Dinges and Schroeder prior to certifying those filings pursuant to Sarbanes-Oxley. This further establishes that Dinges and Schroeder knowingly misled the market, or were reckless in making such representations and executing such certifications because Dinges and Schroeder were at that time aware of and/or recklessly

- 96 -

disregarded material weaknesses in Cabot's system of internal controls concerning environmental compliance and disclosures regarding the same that were not disclosed to the investing public.

### K. The Duration and Magnitude of the Misconduct Adds to the Inference of Scienter

260. 247. The duration and magnitude of the misconduct also supports an inference of scienter. That Cabot's knowing non-compliance with applicable environmental law continued for several years relating to multiple different wells in multiple different locations following the December 2010 Consent Order demonstrates that the fraud was not the result of a temporary lapse in otherwise rigorous management oversight, but rather was caused by a sustained course of misconduct facilitated by Cabot's senior executives that rose to the level of felony crimes.

### L. Dinges's and Other Executive Officers' Stock Sales Support a Motive to Commit Fraud

261. 248. Dinges was CEO and Chairman of the Board and, as set forth herein, possessed material non-public information regarding Cabot's business. Dinges exploited his access to and knowledge of material non-public information by selling 66,610 shares of Cabot stock at artificially inflated prices for over $1.8 million in proceeds on November 2, 2017.

262. 249. Dinges's stock sales during the Class Period were both suspicious and unusual. His November 2017 transactions occurred while the price of Cabot common stock was near its Class Period high and just two weeks before Cabot formally received the November 16, 2017 Notice of Violation from the Pennsylvania Department relating to repeated prior failures to prevent the migration of gas into fresh groundwater caused by drilling at Cabot wells. Moreover, Dinges did not regularly sell his Cabot stock. Prior to November 2017, Dinges had not sold any other Cabot stock during the Class Period. In fact, Dinges's last sale of Cabot stock occurred in 2012, five years earlier. His November 2017 stock sales were therefore out of the ordinary and occurred

4880-5761-4861.v1

while he was in possession of material non-public information concerning Cabot's non-compliance with environmental law.

263.   250. Other executive Cabot officers sold significant amounts of stock during the Class Period, as well.  Just after the start of the Class Period, Cabot's General Counsel, George Kevin Cunningham sold 17,678 shares worth approximately $438,387 during a four month period between May and September 2016.  Notably, Mr. Cunningham, along with Mr. Dinges, signed the December 2010 Consent Order with the Pennsylvania Department.  These stock sales were significant, constituting 19.4% of Mr. Cunningham's holdings at that time.  They were also Mr. Cunningham's only sales during the Class Period.

264.   251. Cabot's Senior Vice President of Marketing, Jeffrey Hutton, similarly sold large amounts of Cabot stock during the Class Period.  On March 22, 2019, while the Grand Jury investigation was ongoing, Mr. Hutton sold 150,720 shares of Cabot common stock for $3,935,877 – 23% of his holdings at that time.  Then, on March 18, 2020, just after the Grand Jury had recommended on February 11, 2020 that criminal charges be filed against Cabot, Mr. Hutton sold 200,000 shares, or 37.8% of his then-holdings, for $3,664,000.  These transactions were out of the ordinary and much larger when compared to prior sales.  For example, before March 2019, Mr. Hutton's next earliest trade occurred on September 5, 2017, also during the Class Period.  He sold just 11,918 shares, or 1.9% of his then-holdings.  Before that, Mr. Hutton had not sold any stock since July 2012, five years earlier, when he sold just 15,199 shares.

265.   252. A chart reflecting these Cabot executive's Class Period stock sales is provided below:

- 98 -

4880-5761-4861.v1

| Filer Name | Transaction Date | Price | Shares Sold | Proceeds | % Sold |
|---|---|---|---|---|---|
| **Cunningham (George Kevin)** | 5-May-16 | $24.26 | 8,500 | $206,210 | |
| | 21-Jun-16 | $25.32 | 6,178 | $156,427 | |
| | 13-Sep-16 | $25.25 | 3,000 | $75,750 | |
| | | | **17,678** | **$438,387** | **19.4%** |
| **Hutton (Jeffrey W)** | 5-Sep-17 | $26.79 | 11,918 | $319,283 | **1.9%** |
| | 22-Mar-19 | $26.38 | 21,312 | $562,211 | |
| | 22-Mar-19 | $26.07 | 129,408 | $3,373,667 | **23.0%** |
| | 18-Mar-20 | $18.32 | 200,000 | $3,664,000 | **37.8%** |
| | | | **362,638** | **$7,919,160** | |
| **Grand Total** | | | **380,316** | **$8,357,547** | |

266. ~~253.~~ These stock sales were suspicious in timing and scope and support the inference that they occurred while Cabot's senior management was in possession of material non-public information concerning Cabot's non-compliance with environmental law.

## X. LOSS CAUSATION

267. ~~254.~~ Defendants' wrongful conduct, as alleged herein, directly and proximately caused Plaintiffs' and Class members' economic loss. Plaintiffs' claims for securities fraud are asserted under the fraud-on-the-market theory of reliance. The markets for Cabot's common stock were open, well-developed and efficient at all relevant times. During the Class Period, as detailed herein, Defendants made false and misleading statements by misrepresenting that Cabot had remediated faulty wells that were polluting Pennsylvania's water supplies in accordance with its obligations under Pennsylvania law and regulations, including various consent decrees, and manufactured inflated production guidance in an effort to appease investors. Defendants' conduct artificially inflated the price of Cabot common stock and operated as a fraud or deceit on the Class.

268. ~~255.~~ The Class Period inflation in Cabot's stock price was removed when information concealed by Defendants' false or misleading statements was revealed to the market. The information was disseminated through partial disclosures that revealed both the nature and extent of Defendants' failure to remediate the faulty wells, and the inflated production guidance that Cabot provided to investors. These disclosures, as more particularly described below,

4880-5761-4861.v1

removed artificial inflation from Cabot common stock, causing economic injury to Plaintiffs and other members of the Class.

269.    ~~256.~~ The corrective impact of the first and second partial ~~disclosure~~disclosures, which occurred during the Class Period alleged herein, however, was tempered by Defendants' continued false and misleading statements that continued to conceal the true nature of Defendants' fraud.  The partial ~~disclosure~~disclosures did not on ~~its~~their own fully remove the inflation from Cabot's stock price~~, because it only partially revealed the nature and extent of the fallout from Defendants' previously misrepresented and concealed inadequate and incomplete well remediation activities~~.  Defendants' continued misrepresentations maintained the price of Cabot common stock at a level that was inflated by fraud, inducing members of the Class to continue purchasing shares in Cabot even after Defendants' partial ~~disclosure~~disclosures.

270.    ~~257.~~ The disclosures that corrected the market price to eliminate the inflation maintained by Defendants' fraud are detailed below.  The relevant stock price declines were due to firm-specific, fraud-related disclosures and not the result of market, industry, or firm-specific, non-fraud factors.  The following stock price declines are not necessarily comprehensive since fact and expert discovery are not complete.

271.    A partial disclosure entered the market on July 27, 2018, when Cabot reduced its production growth guidance from 10%-15% to 10%-12%.  Cabot's production guidance was reduced because the prior guidance was unachievable and manufactured to appease shareholders, in part because of the production delays and costs associated with gas migration investigations. Defendants continued to conceal, however, that ongoing gas migration incidents were negatively impacting the Company's production.  As a result of the July 27, 2018 partial disclosure, the price of Cabot stock declined 8% on volume of more than 15.4 million shares to close at $22.81 per

4880-5761-4861.v1

share on July 27, 2018.  In contrast to the 8% decline in Cabot common stock, the Dow Jones U.S. Exploration & Production Index actually *increased*.[13]

272.    258. A~~Another~~ partial disclosure ~~relating to Cabot's failure to remediate the faulty oil wells~~ entered the market on July 26, 2019, when Cabot ~~issued disappointing~~reduced its production growth guidance to 16%-18% and disclosed that it had "received two proposed Consent Order and Agreements . . . from the Pennsylvania Department "of Environmental Protection relating to gas migration allegations in areas surrounding several wells owned and operated by us in Susquehanna County, Pennsylvania."  Defendants further disclosed the Consent Order and Agreements related to Notices of Violation received from the Pennsylvania Department nearly two years earlier – in November 2017 – "for failure to prevent the migration of gas into fresh groundwater sources in the area surrounding these wells."

~~259.~~    Cabot's production guidance was reduced because the prior guidance was unachievable and manufactured to appease shareholders, in part because of delays and costs associated with gas migration investigations.  On July 26, 2019, Cabot also lowered 2020 production guidance, in part because of delays and costs associated with gas migration investigations.  ~~Cabot's production guidance had been negatively impacted by the Company's inability to resume drilling in the Dimock Box, located in Cabot's "core area" – the Company's best acreage producing Cabot's highest quality gas – due to ongoing violations.  For example, the Pennsylvania Department denied Cabot's request to resume drilling in the June 2018 Letter because of the Company's failure to remediate longstanding violations.  Cabot would go on to later disclose a reduction in production guidance in Q2 2020 caused by the impact of remediation on a large well pad that caused work downtime.~~

---

[13]    For purposes of comparing its stock price performance vis-à-vis the oil and gas market, Cabot referred investors to the Dow Jones U.S. Exploration & Production Index.

- 101 -

4880-5761-4861.v1

260. As a result of the July 26, 2019 partial disclosure, the price of Cabot stock declined 12% on volume of more than 22.6 million shares to close at $19.16 per share on July 26, 2019. In contrast to the 12% decline in Cabot common stock, the Dow Jones U.S. Exploration & Production Index fell by less than a half a percent.[12]

273. 261. Despite the negative news disclosed in the July 26, 2019 Form 10-Q, Defendants falsely reassured the market that Cabot had "performed appropriate remediation efforts, including the provision of alternative sources of drinking water to the affected residents." Defendants also falsely stated that the violations giving rise to the November 2017 Notices of Violation had been "resolved." Defendants' continued false and misleading statements regarding Cabot's remediation efforts and its exposure to enforcement risk, including criminal liability, related thereto, however, maintained artificial inflation in the price of Cabot's common stock.

274. 262. Then, before the market opened on June 15, 2020, following the two-year Grand Jury investigation, the Pennsylvania Attorney General's office charged Cabot with fifteen criminal counts – including nine felonies – arising from its failure to remediate faulty gas wells, thereby polluting Pennsylvania's water supplies through stray gas migration. The Grand Jury report noted the Company's "long-term indifference" to the damage it caused to Pennsylvania water supplies. The Grand Jury presentment continued: "We find that, over a period of many years, and despite mounting evidence, Cabot Oil & Gas failed to acknowledge and correct conduct that polluted Pennsylvania water through stray gas migration. Indeed, some of these gas wells have been in place for more than a decade, yet Cabot has only recently taken steps to remediate them." In announcing the charge, Attorney General Shapiro stated: "Cabot took shortcuts that

---

[12] For purposes of comparing its stock price performance vis-à-vis the oil and gas market, Cabot referred investors to the Dow Jones U.S. Exploration & Production Index.

broke the law, damaged our environment, harming our water supplies and endangering Pennsylvanians. They put their bottom line ahead of the health and safety of our neighbors."

275. ~~263.~~ As a result of the June 15, 2020 disclosure, the price of Cabot stock declined more than 3% on volume of more than 7.6 million shares to close at $19.40 per share. In contrast to the more than 3% decline in Cabot common stock, the Dow Jones U.S. Exploration & Production Index actually *increased* slightly.

276. ~~264.~~ The chart below shows Cabot's stock price during the Class Period and the dates of Defendants' disclosures:



## XI.    SCHEME LIABILITY

277. ~~265.~~ The Defendants engaged in a scheme to put profits over compliance by knowingly failing to comply with applicable environmental laws and failing to remediate known violations. This conduct caused the price of Cabot stock to trade at artificial levels during the Class Period, as the market was unaware that, in fact, Cabot was not in compliance with environmental obligations. Defendants also engaged in a scheme to defraud by disseminating

- 103 -

4880-5761-4861.v1

misleading statements to the investing public through the alleged false and misleading statements made in Cabot's SEC filings.  Throughout the Class Period, each Individual Defendant prepared the SEC filings on Forms 10-K and 10-Q knowing, or recklessly disregarding, they contained false and misleading statements that were to be disseminated to investors upon filing.  Each Defendant is liable as a participant in the fraudulent scheme described herein.

## XII.   APPLICABILITY OF THE PRESUMPTION OF RELIANCE AND FRAUD ON THE MARKET

278.   266. Plaintiffs will rely upon the presumption of reliance established by the fraud-on-the-market doctrine in that, among other things:

(a)   Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

(b)   The omissions and misrepresentations were material;

(c)   Cabot common stock traded in an efficient market;

(d)   The misrepresentations alleged would tend to induce a reasonable investor to misjudge the value of Cabot common stock; and

(e)   Plaintiffs and other members of the Class purchased Cabot common stock between the time Defendants misrepresented or failed to disclose material facts and the time the true facts were disclosed, without knowledge of the misrepresented or omitted facts.

279.   267. At all relevant times, the market for Cabot common stock was efficient for the following reasons, among others:

(a)   Cabot common stock met the requirements for listing, and was listed and actively traded on the NYSE, a highly efficient and automated market;

(b)   As a regulated issuer, Cabot filed periodic public reports with the SEC; and

(c)   Cabot regularly communicated with public investors via established market communication mechanisms, including through regular dissemination of press releases on the

- 104 -

major news wire services and through other wide-ranging public disclosures, such as communications with the financial press, securities analysts and other similar reporting services.

## XIII.   NO SAFE HARBOR

280.   268. Many (if not all) of Defendants' false and misleading statements during the Class Period were not forward-looking statements and/or identified as such by Defendants, and thus did not fall within any "Safe Harbor."

281.   269. Defendants' verbal "Safe Harbor" warnings accompanying its oral forward-looking statements issued during the Class Period were ineffective to shield those statements from liability.

282.   270. Defendants are also liable for any false or misleading forward-looking statement pleaded because, at the time each forward-looking statement was made, the speaker knew the forward-looking statement was false or misleading and the forward-looking statement was authorized and/or approved by an executive officer of Cabot who knew that the forward-looking statement was false or misleading.  Further, none of the historic or present tense statements made by Defendants were assumptions underlying or relating to any plan, projection or statement of future economic performance, as they were not stated to be such assumptions underlying or relating to any projection or statement of future economic performance when made.

## XIV.   CLASS ACTION ALLEGATIONS

283.   271. Plaintiffs bring this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of all persons who purchased or otherwise acquired Cabot common stock during the Class Period.  Excluded from the Class are Defendants and their families, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns, and any entity in which Defendants have or had a controlling interest.

- 105 -

4880-5761-4861.v1

284. 272. The members of the Class are so numerous that joinder of all members is impracticable.  During the Class Period, the Company's stock actively traded on the NYSE, and there were nearly 400 million shares of Cabot stock outstanding.  While the exact number of Class members is unknown to Plaintiffs at this time and can only be ascertained through appropriate discovery, Plaintiffs believe that there are hundreds or thousands of members in the proposed Class.  Record owners and other members of the Class may be identified from records maintained by Cabot or its transfer agents and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

285. 273. Common questions of law and fact predominate and include: (i) whether Defendants violated the 1934 Act; (ii) whether Defendants omitted and/or misrepresented material facts; (iii) whether Defendants knew or recklessly disregarded that their statements were false and misleading; and (iv) whether Defendants' statements and/or omissions artificially inflated the price of Cabot common stock and the extent and appropriate measure of damages.

286. 274. Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

287. 275. Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class and securities litigation.

288. 276. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small per Class member, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

- 106 -

## CLAIMS FOR RELIEF

## COUNT I

### For Violation of §10(b) of the 1934 Act and Rule 10b-5
### Against All Defendants

289.    ~~277.~~ Plaintiffs incorporate ¶¶ ~~1-276~~ 1-288 by reference.

290.    ~~278.~~ During the Class Period, Defendants disseminated or approved the false statements specified above, which they knew or recklessly disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

291.    ~~279.~~ Defendants violated §10(b) of the 1934 Act and Rule 10b-5 in that they:

    (a)    Employed devices, schemes, and artifices to defraud;

    (b)    Made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

    (c)    Engaged in acts, practices, and a course of business that operated as a fraud or deceit upon Plaintiffs and others similarly situated in connection with their purchases of Cabot common stock during the Class Period.

292.    ~~280.~~ Plaintiffs and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for Cabot common stock.  Plaintiffs and the Class would not have purchased Cabot common stock at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by Defendants' misleading statements and omissions.

293.    ~~281.~~ As a direct and proximate result of these Defendants' wrongful conduct, Plaintiffs and the other members of the Class suffered damages in connection with their purchases of Cabot common stock at artificially inflated prices during the Class Period.

4880-5761-4861.v1

## COUNT II

### For Violation of §20(a) of the 1934
### Act Against All Defendants

294.   ~~282.~~ Plaintiffs incorporate ¶¶ ~~1-281~~ 1-293 by reference.

295.   ~~283.~~ During the Class Period, the Defendants acted as controlling persons of Cabot within the meaning of §20(a) of the 1934 Act.  By virtue of their positions and their power to control public statements about the Company, the Individual Defendants had the power and ability to control the actions of the Company and their employees.  Cabot controlled the Individual Defendants and its other officers and employees.  By reason of such conduct, Defendants are liable pursuant to §20(a) of the 1934 Act.

## XV.   PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for judgment as follows:

A.      Determining that this action is a proper class action, certifying Plaintiffs as class representatives under Rule 23 of the Federal Rules of Civil Procedure, and designating Plaintiffs' counsel as Class Counsel;

B.      Awarding Plaintiffs and the members of the Class damages and interest;

C.      Awarding Plaintiffs' reasonable costs, including attorneys' fees; and

D.      Awarding such equitable/injunctive or other relief as the Court may deem just and proper.

## XVI.   JURY DEMAND

Plaintiffs demand a trial by jury.

DATED: ~~February 11, 2022~~ October 20, 2023

KENDALL LAW GROUP, PLLC
JOE KENDALL (S.D. Texas Bar No. 30973,
Texas Bar No. 11260700, Attorney in Charge)

/s/ ~~JOE KENDALL~~ Joe Kendall

- 108 -

4880-5761-4861.v1

JOE KENDALL

3811 Turtle Creek Blvd., Suite 1450
Dallas, TX  75219
Telephone:  214/744-3000
214/744-3015 (fax)
jkendall@kendalllawgroup.com

Local Counsel for Lead Plaintiff

ROBBINS GELLER RUDMAN
  & DOWD LLP
DARRYL J. ALVARADO
KEVIN A. LAVELLE
FRANCISCO J. MEJIAJACK A. GEPHART
655 West Broadway, Suite 1900
San Diego, CA  92101-8498
Telephone:  619/231-1058
619/231-7423 (fax)
dalvarado@rgrdlaw.com
klavelle@rgrdlaw.com
fmejiajgephart@rgrdlaw.com

LeadClass Counsel for Lead Plaintiff

KESSLER TOPAZ MELTZER
  & CHECK, LLP
ANDREW L. ZIVITZ
JOSHUA E. D'ANCONA
JAMIE M. McCALL
ALEX B. HELLER
HELEN J. BASS
280 King of Prussia Road
Radnor, PA  19087
Telephone:  610/667-7706
610/667-7056 (fax)
azivitz@ktmc.com
jdancona@ktmc.com
jmccall@ktmc.com
aheller@ktmc.com
hbass@ktmc.com

AdditionalClass Counsel for the Class

- 109 -

4880-5761-4861.v1

| Summary report: Litera Compare for Word 11.3.1.3 Document comparison done on 10/20/2023 5:37:36 PM | |
|---|---|
| **Style name:** Default Style | |
| **Intelligent Table Comparison:** Active | |
| **Original filename:** 2022-02-11 - First Amended Consolidated Complaint.DOCX | |
| **Modified filename:** 2023-10-20 - Proposed Second Amended Consolidated Complaint.docx | |
| **Changes:** | |
| Add | 266 |
| Delete | 217 |
| Move From | 0 |
| Move To | 0 |
| Table Insert | 0 |
| Table Delete | 0 |
| Table moves to | 0 |
| Table moves from | 0 |
| Embedded Graphics (Visio, ChemDraw, Images etc.) | 0 |
| Embedded Excel | 0 |
| Format changes | 0 |
| **Total Changes:** | 483 |