UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF TEXAS

HOUSTON DIVISION

| | | |
|---|---|---|
| DELAWARE COUNTY EMPLOYEES RETIREMENT SYSTEM, Individually and on Behalf of All Others Similarly Situated, | § § § § | Civil Action No. 4:21-cv-02045 |
| | § | CLASS ACTION |
| Plaintiff, | § § | |
| | § | |
| vs. | § § | |
| | § | |
| CABOT OIL & GAS CORPORATION, et al., | § § | |
| | § | |
| Defendants. | § § | |
| | § | |

**JOINT DECLARATION OF DARRYL J. ALVARADO AND ANDREW L. ZIVITZ
IN SUPPORT OF: (1) PLAINTIFFS' MOTION FOR FINAL APPROVAL OF CLASS
ACTION SETTLEMENT AND APPROVAL OF PLAN OF ALLOCATION,
AND
(2) CLASS COUNSEL'S MOTION FOR AN AWARD OF
ATTORNEYS' FEES AND EXPENSES AND AWARDS TO
PLAINTIFFS PURSUANT TO 15 U.S.C. §78u-4(a)(4)**

4881-7567-7405.v1

We, DARRYL J. ALVARADO and ANDREW L. ZIVITZ, declare as follows:

1.      I, Darryl J. Alvarado, am an attorney duly licensed to practice before all of the courts of the state of California, and I have been admitted *pro hac vice* to appear before this Court in the above-captioned action ("Action" or "Litigation").[1]  I am a partner of the firm of Robbins Geller Rudman & Dowd LLP ("Robbins Geller" or "Lead Counsel"), which is counsel of record for Delaware County Employees Retirement System ("Delaware County" or "Lead Plaintiff") and the Court-certified Class.[2]  I have been actively involved in the prosecution and resolution of this Action, am familiar with its proceedings, and have personal knowledge of the matters set forth herein based on my active participation and supervision of all material aspects of the Action.

2.      I, Andrew L. Zivitz, am an attorney duly licensed to practice law in the states of Pennsylvania and New Jersey, and I have been admitted *pro hac vice* to appear before this Court in the Action.  I am a partner of the firm of Kessler Topaz Meltzer & Check, LLP ("Kessler Topaz" and, together with Robbins Geller, "Class Counsel"), which serves as counsel for Iron Workers District Counsel (Philadelphia and Vicinity) Retirement and Pension Plan ("Iron Workers" and, together with Delaware County, "Plaintiffs" or "Class Representatives") and the Class.  I have been actively involved in the prosecution and resolution of this Action, am familiar with its proceedings,

---

[1]    All capitalized terms that are not defined herein have the same meanings as set forth in the Stipulation of Settlement dated June 3, 2024 (ECF 207-2) (the "Stipulation" or the "Settlement Agreement").

[2]    The Class means the class defined by the Court in its September 27, 2023 Order (ECF 173): All persons or entities who purchased or otherwise acquired Cabot Oil & Gas Corporation ("Cabot" or the "Company") common stock between February 22, 2016, and June 12, 2020, inclusive (the "Class Period"), and were damaged thereby.  Excluded from the Class are: (1) Defendants; (2) any directors or officers of Cabot during the Class Period and members of their immediate families; (3) the subsidiaries, parents, and affiliates of Cabot; (4) any firm, trust, corporation, or other entity in which Defendants have or had a controlling interest; and (5) the legal representatives, heirs, successors, and assigns of any such excluded party.  Also excluded from the Class is any Person who properly excludes himself, herself, itself, or themselves from the Class by submitting a valid and timely request for exclusion.  To the extent any Cabot employee benefit plan receives a distribution from the Net Settlement Fund, no portion shall be allocated to any person or entity who is excluded from the Class by definition.

- 1 -

4881-7567-7405.v1

and have personal knowledge of the matters set forth herein based on my active participation and supervision of all material aspects of the Action.

3. We jointly submit this declaration in support of Plaintiffs' motion, pursuant to Rule 23 of the Federal Rules of Civil Procedure ("Rules"), for final approval of the Settlement, which provides for a cash settlement of $40,000,000 (the "Settlement Amount"), and for approval of the proposed plan for allocating the net proceeds of the Settlement to eligible Class Members (the "Plan of Allocation"). We also submit this declaration in support of Class Counsel's application for an award of attorneys' fees and expenses and awards to Plaintiffs for their representation of the Class.[3]

## I.    PRELIMINARY STATEMENT

4. The $40,000,000 proposed Settlement is the culmination of years of tireless, hard-fought litigation. As detailed below, Plaintiffs, through Class Counsel, zealously prosecuted the Class's claims at every stage of this Action, successfully defending their claims against Defendants'[4] repeated dismissal attempts. The Settlement, which represents approximately 14% of the estimated maximum recoverable damages (as calculated by Plaintiffs' expert assuming success by Plaintiffs on all liability and loss causation issues), is a tremendous result for the Class under the circumstances.

5. The Settlement was achieved after more than three years of litigation, during which Class Counsel, *inter alia*:

- Conducted a thorough and wide-ranging investigation concerning the alleged fraudulent misrepresentations made by Defendants, which included an extensive review of publicly available information concerning Cabot and its compliance with environmental laws and regulations, the Pennsylvania Department of Environmental Protection (the "Pennsylvania Department"), and information from percipient witnesses;

---

[3]   In conjunction with this Joint Declaration, Plaintiffs and Class Counsel are submitting: (i) the Memorandum of Law in Support of Plaintiffs' Motion for Final Approval of Class Action Settlement and Approval of Plan of Allocation (the "Settlement Memorandum") and (ii) the Memorandum of Law in Support of Class Counsel's Motion for an Award of Attorneys' Fees and Expenses and Awards to Plaintiffs Pursuant to 15 U.S.C. §78u-4(a)(4) (the "Fee and Expense Memorandum").

[4]   The Defendants are: Cabot, Dan O. Dinges ("Dinges"), and Scott C. Schroeder ("Schroeder").

4881-7567-7405.v1

- Prepared and filed the Consolidated Complaint for Violation of the Federal Securities Laws ("Complaint") (ECF 47) and the First Amended Consolidated Complaint for Violation of the Federal Securities Laws (the "Amended Complaint") (ECF 110) based on their extensive investigation;

- Opposed two rounds of motion to dismiss and defeated in substantial part Defendants' motion to dismiss the Amended Complaint;

- Prepared for and defended depositions of Plaintiffs' market efficiency and price impact expert, and deposed Defendants' market efficiency and price impact expert, during class certification discovery;

- Achieved certification of a class of investors who purchased or otherwise acquired Cabot common stock between February 22, 2016, and June 12, 2020, inclusive, and were damaged thereby;

- Successfully opposed Defendants' Rule 23(f) petition to appeal the Court's class certification order;

- Conducted extensive party and third-party document discovery for nearly a year, including the exchange, careful review, and analysis of 4,437,870 pages of documents;

- Prepared for and conducted 15 fact depositions of both party and third-party witnesses;

- Responded to Defendants' various discovery requests and interrogatories, and defended two Rule 30(b)(6) depositions of Plaintiffs' corporate representatives;

- Engaged in multiple lengthy and contentious discovery-related disputes concerning the scope of fact discovery, Defendants' privilege logs and assertions of privilege over various materials, and Defendants' delays in producing documents necessary to rebut Defendants' arguments opposing class certification;

- Successfully moved for leave to amend the Amended Complaint based on new evidence uncovered during discovery, and filed the Second Amended Consolidated Complaint for Violation of the Federal Securities Laws ("Second Amended Complaint") (ECF 199);

- Retained and consulted with several experts, including an oil and gas expert, a production guidance expert, and a regulatory expert;

- Prepared and submitted four expert reports in preparation for trial and were in the process of preparing for the depositions of those experts; and

- Attended two in-person mediation sessions with an experienced, well-regarded mediator, and engaged in post-mediation negotiation efforts, in an attempt to resolve the Action.

4881-7567-7405.v1

6.    As further detailed herein, given Class Counsel's comprehensive prosecution of this Action, Plaintiffs fully understood the strengths of their case as well as the substantial risks they faced in proceeding with the Litigation at the time the Settlement was reached. And, while Plaintiffs are confident that their claims are supported by both the documentary evidence and deposition testimony produced and developed through fact discovery, Plaintiffs understood the real risks in proving their claims at summary judgment and trial.

7.    Plaintiffs alleged that, in violation of §§10(b) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act") and Rule 10b-5 promulgated thereunder by the U.S. Securities and Exchange Commission ("SEC"), Defendants engaged in a fraudulent scheme to artificially inflate Cabot common stock by making materially false and misleading statements and/or omitting material information regarding the extent of the Company's compliance with state environmental laws governing its fracking operation in Pennsylvania, which ultimately impacted Cabot's ability to produce natural gas, as well as false and misleading statements about the Company's production guidance. ¶¶184-217.[5] Defendants, conversely, have argued consistently that they made no false or misleading statements or omissions during the Class Period. *See, e.g.*, ECF 111 at 15-20; ECF 191 at 18-20.

8.    Likewise, Defendants have consistently argued that Plaintiffs would be unable to show scienter, both for the statements originally pled in the Amended Complaint and for the additional misrepresentations regarding Defendants' production guidance forecasts that were included, for the first time, in the Second Amended Complaint. *See, e.g.*, ECF 111 at 21-23; ECF 191 at 21.

9.    Additionally, Defendants have vigorously contested loss causation and damages. From the start, Defendants have taken the position that: (1) the price of Cabot common stock was not

---

[5]   All "¶" or "¶¶" references are to the Second Amended Complaint, unless otherwise stated.

- 4 -

impacted by the alleged misrepresentations; and (2) the alleged misrepresentations concerning Cabot's remediation of ongoing violations of Pennsylvania environmental laws were "mismatched" with the alleged corrective disclosures. *See, e.g.*, ECF 142 at 16-23. On this basis, Defendants have maintained that there are no damages associated with this case. There is no doubt that Defendants would have continued to assert these arguments disputing loss causation and damages at summary judgment and trial.

10. Accordingly, the proposed Settlement avoids the substantial risks of further litigation on these issues and others. Indeed, Plaintiffs faced the real possibility that a jury would adopt Defendants' view of loss causation and damages, which would have potentially resulted in no recovery whatsoever for the Class. Given the significant risks as well as the additional costs and delay associated with bringing this Action to trial, Plaintiffs and Class Counsel concluded that the $40,000,000 Settlement was in the best interest of the Class. The Court preliminarily approved the Settlement by Order dated June 27, 2024 (the "Preliminary Approval Order"). *See* ECF 211.

11. Class Counsel have prosecuted this Action on a wholly contingent basis and, thus, have advanced or incurred all the litigation expenses, charges, and costs associated with that prosecution. Class Counsel shouldered substantial risk in doing so and, to date, have not received any compensation for their efforts. Accordingly, in consideration of Class Counsel's extensive efforts on behalf of the Class, Class Counsel, on behalf of Plaintiffs' Counsel, are applying for an award of attorneys' fees in an amount of 30% of the Settlement Fund (which amount includes interest). Such a fee award is fair and reasonable and is within the range of fee percentages frequently awarded in this type of case. Further, Class Counsel's fee request is more than justified by the particular facts of this case, including the substantial benefits conferred on the Class, the risks undertaken, the quality of representation, the nature and extent of the legal services performed, and

the fact that Plaintiffs and Defendants (together, the "Parties") settled after two separate mediations (11 months apart) and following the close of an arduous discovery process.

12.     Class Counsel also seek payment of $1,515,974.05 in expenses, costs, and charges that were reasonably and necessarily incurred by Plaintiffs' Counsel in their prosecution of this Action.  These expenses, charges, and costs include: (i) the costs associated with taking or defending 19 fact and expert witness depositions, such as travel expenses and court reporter and videographer fees; (ii) hosting and managing a database of over 4.4 million pages of documents produced in the course of discovery; (iii) online factual and legal research; (iv) the fees and expenses of Plaintiffs' experts and consultants whose services were necessary for the successful prosecution of this Action; and (v) mediation fees.  As will be evident from the discussion below regarding Class Counsel's efforts in achieving this outstanding result for the Class, these expenses were reasonable and necessary.

13.     Class Representatives Delaware County and Iron Workers, both institutional investors with significant financial interests in the outcome of this case and which remained actively engaged in its progress, support both the Settlement and Class Counsel's request for attorneys' fees and expenses.  *See* Declaration of Jonathan Lichtenstein ("Lichtenstein Decl."), submitted on behalf of Delaware County, attached as Exhibit 1 hereto; Declaration of William Andrew Kolfenbach, Jr. ("Kolfenbach Decl."), submitted on behalf of Iron Workers, attached as Exhibit 2 hereto.  Because Plaintiffs' involvement in this Action is the type of involvement envisioned by Congress in enacting the Private Securities Litigation Reform Act of 1995, 15 U.S.C. §78u-4, *et seq.* (the "PSLRA"), Plaintiffs' approval of the relief sought here is entitled to significant weight by the Court in approving the Settlement and awarding attorneys' fees and expenses to counsel.  Further, although the October 3, 2024 deadline for exclusions/objections has not yet passed, the reaction of the Class thus far has been positive.  To date, there have been no objections to any aspect of the Settlement,

- 6 -

including Class Counsel's request for attorneys' fees and expenses, and there have been only two requests for exclusion from the Class.[6]

14.     The following section summarizes the primary events that occurred during the course of the Litigation and the extensive legal services provided by Class Counsel.

## II.     THE LITIGATION

### A.     Delaware County Is Appointed Lead Plaintiff, and the Litigation Is Transferred to the Southern District of Texas

15.     On October 5, 2020, Delaware County filed the initial complaint in this Action against Cabot and the individual Defendants in the Middle District of Pennsylvania alleging that Defendants violated §§10(b) and 20(a) of the Exchange Act by issuing false and misleading statements and omissions.  ECF 1.

16.     On October 13, 2020, Delaware County moved to be appointed as Lead Plaintiff and for approval of its selection of Robbins Geller as Lead Counsel.  ECF 4.  The court in the Middle District of Pennsylvania granted the motion, and appointed Delaware County as Lead Plaintiff and Robbins Geller as Lead Counsel on February 3, 2021.  ECF 24-25.

17.     On February 25, 2021, Defendants filed with the court in the Middle District of Pennsylvania a motion requesting transfer of the case to the United States District Court for the Southern District of Texas.  ECF 29.  Lead Plaintiff opposed the transfer, arguing that its claims arose from Defendants' actions in the Middle District of Pennsylvania and noting the location of important non-party witnesses in Pennsylvania.  ECF 41.  Nevertheless, on June 22, 2021, the court

---

[6]     *See* Declaration of Luiggy Segura Regarding: (A) Dissemination of the Postcard Notice and Notice Packet; (B) Publication/Transmission of the Summary Notice; (C) Establishment of Call Center Services and Website; and (D) Requests for Exclusion Received to Date ("Segura Decl."), attached hereto as Exhibit 3, ¶16.  Should any objections or additional requests for exclusion be received after the date of this submission, Class Counsel will address them in their reply papers to be filed with the Court on October 17, 2024.

4881-7567-7405.v1

in the Middle District of Pennsylvania granted Defendants' transfer request, and the Litigation was transferred to this District and this Court.  ECF 68.

**B.      Plaintiffs Defeat Defendants' Motion to Dismiss, and Defendants File Their Answer to the Amended Complaint**

18.     Following its appointment as Lead Plaintiff, Delaware County, along with Iron Workers as additional plaintiff, represented by Kessler Topaz, conducted an extensive factual investigation, analyzing years of Cabot's public filings with the SEC, findings by regulators and law enforcement resulting from investigations of Cabot, media reports, analyst reports, and trading data. As part of their investigation, Class Counsel, with the assistance of in-house investigators, also located and spoke with witnesses with first-hand knowledge of the alleged fraud, including one confidential witness whose allegations were detailed in the Complaint.  Following their thorough investigation, Plaintiffs filed the Complaint on April 12, 2021.  ECF 47.

19.     The Complaint alleged violations of §§10(b) and 20(a) of the Exchange Act and Rule 10b-5 promulgated thereunder by the SEC on behalf of all purchasers of Cabot common stock.  *Id.*, ¶1.  More specifically, the Complaint alleged that, during the relevant time period, defendants[7] issued materially false and misleading statements concerning Cabot's compliance with environmental law and regulations and that defendants repeatedly represented that Cabot was in compliance with applicable environmental laws and a "good steward of the environment" when, in reality, the Company "cut corners and knowingly violated the very environmental laws it publicly claimed to uphold – polluting Pennsylvania's waters over and over again, despite repeated notices of regulatory violations and consent orders, for over a decade." *Id.*  The Complaint further alleged that Cabot's stock price was artificially inflated due to these allegedly false and misleading statements,

---

[7]     The derivative case captioned *In re Cabot Oil & Gas Corp. Derivative Litig.*, No. 3:20-cv-1948 (M.D. Pa.) / No. 4:21-cv-02046 (S.D. Tex.) (the "Derivative Litigation") was also transferred along with this Litigation.  *Id.*

- 8 -

and declined when the alleged corrective disclosures occurred, causing the Class to suffer damages. *Id.*, ¶¶169-178.

20.     On June 11, 2021, prior to the transfer of the Litigation to this District, defendants moved to dismiss the Complaint.  ECF 63-65.  Among other things, defendants asserted that: (i) the statements alleged in the Complaint as false consisted of inactionable, generalized statements of aspiration or opinion; (ii) Plaintiffs had failed to plead scienter; and (iii) the corrective disclosures identified in the Complaint were not sufficiently linked to stock price drops, thus negating loss causation.  ECF 64.  Plaintiffs opposed defendants' motion on August 10, 2021, following the transfer of the Litigation to this District.  ECF 90.  Defendants filed their reply on September 6, 2021.  ECF 93.

21.     By Memorandum and Opinion dated January 12, 2022 (the "January 2022 Opinion") (ECF 109), the Court granted defendants' motion to dismiss the Complaint with leave to amend in order to show actionable statements and scienter with respect to the following categories of allegations: (1) substantial compliance statements in Form 10-Ks; (2) remediation statements related to the 2011 Notice of Violation in Form 10-Qs and Form 10-Ks; (3) the 2016 Consent Order Notification in the 2016 Form 10-K; and (4) the Report of 2017 Notices of Violation in the 2019 Form 10-Q.  ECF 109 at 30.  By the January 2022 Opinion, the Court also denied as moot Plaintiffs' December 15, 2021 motion for partial relief from the PSLRA discovery stay for the limited purposes of obtaining documents produced in the Derivative Litigation.  ECF 106.

22.     In accordance with the Court's January 2022 Opinion, Plaintiffs, on February 11, 2022, filed the Amended Complaint on behalf of all purchasers of Cabot common stock between February 22, 2016 and June 12, 2020, inclusive.  ECF 110.  Defendants moved to dismiss the Amended Complaint on March 10, 2022. ECF 111.  Again, defendants attacked falsity, arguing that Plaintiffs did not provide sufficient allegations to warrant a finding that the alleged misstatements

- 9 -

were materially misleading. *Id.* at 15-20. Defendants also argued that the Amended Complaint did not sufficiently allege scienter, and that there continued to be a lack of loss causation, arguing that the wells discussed in the alleged misstatements were not implicated by the corrective disclosures. *Id.* at 20-25. Plaintiffs filed their opposition to defendants' motion to dismiss the Amended Complaint on April 13, 2022. ECF 113. Defendants filed their reply on May 10, 2022. ECF 114. With the Court's permission, Plaintiffs filed a sur-reply on May 31, 2022. ECF 117.

23. By Memorandum and Opinion dated August 10, 2022 (the "August 2022 Opinion"), the Court granted in part, and denied in part, defendants' motion to dismiss the Amended Complaint. ECF 118. While the Court determined that the "substantial compliance" statements were not adequately pled and that Plaintiffs had not alleged that defendant Phil L. Stalnaker was responsible for any of the misstatements, the Court denied the motion to dismiss with respect to all other claims alleged in the Amended Complaint. *Id.* at 3. In particular, the Court found that the allegations supported a reasonable "inference of scienter" as to Defendants Dinges and Schroeder, and that Plaintiffs had adequately alleged loss causation. *Id.* at 34-42. Thus, per the Court's August 2022 Opinion, the sustained misstatements, attributable to Defendants Dinges and Schroeder, were as follows: (1) remediation statements related to the 2011 Notice of Violation in Form 10-Qs and Form 10-Ks; (2) the 2016 Consent Order Notification in the 2016 Form 10-K; and (3) the Report of 2017 Notices of Violation in the 2019 Form 10-Q. *Id.* at 43.

24. Defendants answered the Amended Complaint on September 14, 2022. ECF 127. In their answer, Defendants denied all of Plaintiffs' material allegations and raised 32 separate affirmative defenses. *Id.*

## C. Plaintiffs Obtain Class Certification

25. Shortly after the Court's August 2022 Opinion granting in part and denying in part defendants' motion to dismiss the Amended Complaint, the Parties met and conferred regarding a

pretrial schedule and thereafter jointly submitted a Proposal for Scheduling and Docket Control Order on August 25, 2022, which proposed, in part, that substantial completion of document production would be finished by January 10, 2023, and that Plaintiffs would file their opening class certification brief on February 6, 2023. ECF 124. On August 30, 2022, the Court entered a Scheduling Order that moved up the Parties' requested timeline for class certification to December 5, 2022. ECF 126.

26.    Consistent with the Scheduling Order, on December 5, 2022, Plaintiffs filed a motion for class certification (the "Class Certification Motion"), which requested that the Court certify the Class, appoint Lead Plaintiff Delaware County and additional plaintiff Iron Workers as Class Representatives, and appoint Robbins Geller and Kessler Topaz as Class Counsel. ECF 134. In their Class Certification Motion, Plaintiffs argued that the Action was appropriate for class action treatment and that all the requirements of Rule 23 had been satisfied. *Id.* In support of their motion, Plaintiffs submitted an expert report from Professor Steven P. Feinstein, Ph.D., CFA. ECF 134-3. In his report, among other things, Professor Feinstein: (1) explained why all five of the *Cammer v. Bloom*, 711 F. Supp. 1264 (D.N.J. 1989) factors and all three of the *Krogman v. Sterritt*, 202 F.R.D. 467 (N.D. Tex. 2001) factors – factors that courts in the Fifth Circuit consider in assessing market efficiency – were met; (2) detailed the event study he undertook concerning Cabot's stock price movement as a result of quarterly earnings announcements; and (3) concluded that Cabot common stock traded in an efficient market throughout the Class Period. *Id.* Professor Feinstein also opined that damages pursuant to Plaintiffs' theory of the case could be proven on a class-wide basis. *Id.*

27.    On January 21, 2023, Defendants filed their opposition to Plaintiffs' Class Certification Motion, consisting of 388 pages of briefing and exhibits. ECF 142. Defendants, while conceding that Cabot stock traded in an efficient market, argued nonetheless that Plaintiffs could not rely on the presumption of reliance under *Basic Inc. v. Levinson*, 485 U.S. 224 (1988), because

- 11 -

Plaintiffs had not shown that the alleged misrepresentations impacted the price of Cabot stock. *Id*. at 19-21. In support, Defendants attached to their opposition the expert report of Lucy P. Allen, which purported to identify nine different arguments disproving price impact. ECF 142-1. Defendants also argued that the alleged disclosures did not inflate the value of Cabot stock, and that there was a "mismatch" between the alleged misstatements and the drops in Cabot's stock price. ECF 142 at 21-23.

28. Following amendments to the Scheduling Order requested by the Parties to allow additional time for Defendants to substantially complete their document production (ECF 146, 148), Plaintiffs filed their reply in further support of their Class Certification Motion on May 8, 2023 in which they addressed each of Defendants' arguments against class certification. ECF 151. Plaintiffs also submitted a rebuttal report from Professor Feinstein addressing Ms. Allen's criticism of his event study and responding to Ms. Allen's price impact opinions. ECF 151-2.

29. Defendants deposed Professor Feinstein on June 30, 2023 in connection with his expert report and rebuttal report, submitted in support of Plaintiffs' Class Certification Motion. Defendants submitted a highlighted copy of the transcript from that deposition (ECF 157-1), along with a declaration by Cabot Vice President of Finance Matthew Kerin (the "Kerin Declaration") (ECF 157-2) and the Southern District of California's March 20, 2023 opinion in *In re Qualcomm Inc. Sec. Litig.*, 2023 WL 2583306 (S.D. Cal. Mar. 20, 2023) (ECF 157-3) as a supplement to their opposition to Plaintiffs' Class Certification Motion on July 3, 2023. ECF 157.

30. Plaintiffs filed a response to Defendants' supplemental submission on July 5, 2023, which contained a counter-highlighted transcript of Professor Feinstein's deposition (ECF 158, Exhibit 1); and responses to the Kerin Declaration and Defendants' arguments regarding the *Qualcomm* opinion. ECF 158.

- 12 -

31.     On July 7, 2023, the Court held a hearing on Plaintiffs' Class Certification Motion. ECF 161.  On September 27, 2023, the Court granted Plaintiffs' motion (the "Class Certification Order"), appointing Delaware County and Iron Workers as Class Representatives, appointing Robbins Geller and Kessler Topaz as Class Counsel, and certifying the following Class:

> All persons or entities who purchased or otherwise acquired Cabot common stock between February 22, 2016, and June 12, 2020, inclusive, and were damaged thereby.

ECF 173.

**D.      Defendants' Petition for Permission to Appeal the Class Certification Order**

32.     On October 11, 2023, Defendants petitioned the Court of Appeals for the Fifth Circuit for permission to appeal the Court's September 27, 2023 Class Certification Order, pursuant to Rule 23(f).  *See Del. Cnty. Emp. Ret. Sys. v. Cabot Oil & Gas Co.*, No. 23-90035, ECF 1 (5th Cir. Oct. 11, 2023).  In their petition, Defendants argued, among other things, that the Court "misconstrued" the standards for class certification and "certified a class despite unrefuted evidence" that there was a mismatch between the corrective disclosures and the alleged misstatements, and that the Court failed to consider whether the price of Cabot stock would have been different on the date of the alleged misstatements if there had been a "legally sufficient disclosure."  *Id*. at 2-4.

33.     On October 23, 2023, Plaintiffs responded to Defendants' Rule 23(f) petition, arguing that class certification was proper and that Defendants had failed to satisfy the requirements for immediate interlocutory review pursuant to Rule 23(f).  *Cabot*, No. 23-90035, ECF 15 (5th Cir. Oct. 23, 2023).

34.     On November 17, 2023, a three-judge panel of the Fifth Circuit denied Defendants' 23(f) petition by a 2-1 majority.  *Cabot*, No. 23-90035, ECF 23 (5th Cir. Nov. 17, 2023).

35. On December 1, 2023, Defendants petitioned the Fifth Circuit for reconsideration and re-hearing *en banc* of the denial of Defendants' 23(f) petition. *Cabot*, No. 23-90035, ECF 26 (5th Cir. Dec. 1, 2023).

36. On December 18, 2023, the Fifth Circuit denied Defendants' request for reconsideration and for *en banc* review. *Cabot*, No. 23-90035, ECF 31 (5th Cir. Dec. 18, 2023).

### E.    Fact Discovery

37. As set forth herein, Plaintiffs were relentless in their discovery efforts throughout this Litigation. Plaintiffs' efforts included, among other things: (i) preparing and serving initial disclosures, requests for production of documents, and interrogatories on Defendants; (ii) exchanging correspondence with Defendants concerning various discovery issues; (iii) serving document subpoenas on 21 nonparties; (iv) obtaining, reviewing, and analyzing more than 4.4 million pages of documents produced by Defendants and nonparties; (v) reviewing and analyzing thousands of privilege log entries; (vi) reviewing and producing documents in response to Defendants' discovery requests, as well as providing written responses to Defendants' document requests and interrogatories; and (vii) preparing for and taking 15 fact depositions of current and former Cabot employees, environmental consultants, and government regulators. In addition, Defendants deposed Plaintiffs' corporate representatives and the Parties' expert witnesses were deposed in connection with Plaintiffs' Class Certification Motion.

38. By the January 2022 Opinion, the Court denied as moot Plaintiffs' December 15, 2021 motion for partial relief from the PSLRA discovery stay for the limited purposes of obtaining documents produced in the Derivative Litigation. ECF 106.

### 1.     Requests for Documents

#### a.     Document Requests Directed at Defendants

39.     Following the Court's August 2022 Opinion granting in part and denying in part Defendants' motion to dismiss the Amended Complaint (ECF 118), discovery in the Litigation commenced.  Plaintiffs served their First Set of Requests for Production of Documents ("Plaintiffs' First RPDs") on Defendants on August 26, 2022, which requested documents previously disclosed in related matters.[8]  Plaintiffs served their Second Set of Requests for Production of Documents ("Plaintiffs' Second RPDs") on September 14, 2022.

40.     Defendants served their Responses and Objections to Plaintiffs' First RPDs on September 24, 2022.  Thereafter, the Parties met and conferred to discuss the scope of the bulk of discovery, as well as the production of the documents identified in Plaintiffs' First RPDs. Defendants produced documents in response to Plaintiffs' First RPDs on October 4, 2022. Defendants served their Responses and Objections to Plaintiffs' Second RPDs on October 12, 2022.

41.     Subsequently, the Parties continued negotiating the relevant topics for discovery, sources to be searched, the relevant time period, custodians, and search terms.  In conjunction and simultaneously with these negotiations, Defendants began producing documents and corresponding privilege logs to Plaintiffs on a rolling basis.  Throughout the discovery process, the Parties engaged in near constant negotiations, including numerous telephonic meet-and-confers and the exchange of written proposals and counter proposals, regarding the scope of Defendants' production and the sufficiency of the many iterations of Defendants' privilege logs.

42.     The careful examination and analysis of the documents produced by Defendants required a massive undertaking by a large team of attorneys.  For example, the attorneys organized

---

[8]     *See In re Cabot Oil & Gas Co. Derivative Litig.*, 2024 WL 23365 (S.D. Tex. Jan. 2, 2024); *Commonwealth of Pa. v. Cabot Oil & Gas Corp.*, No: CP-58-CR-0000015-2022 (Ct. of Common Pleas Susquehanna Cnty. Jan. 7, 2022).

- 15 -

and analyzed the documents, selected those that supported Plaintiffs' allegations or could be used in Defendants' defense, identified relevant witnesses and issues, and established procedures to identify additional documents and information that had not been produced. Class Counsel then reviewed and analyzed the documents to determine what information the documents conveyed and how they were relevant to Plaintiffs' claims. Class Counsel also applied that understanding to other documents that had been produced. Further, because the documents produced to Plaintiffs included complex, technical documents regarding Cabot's drilling and natural gas production processes, Class Counsel and their industry experts had to perform a painstaking review and specialized analysis of gas production projections, technical drawings of gas wells, PowerPoint presentations, and Excel spreadsheets.

43.    As a result of Plaintiffs' discovery efforts, Defendants made 45 separate productions comprised of more than 866,000 documents totaling 4,224,139 pages of documents.

### b.    Document Requests Directed at Plaintiffs

44.    On September 19, 2022, Defendants served their First Requests for Production on Plaintiffs. On October 19, 2022, Plaintiffs served their Responses and Objections to Defendants' First Requests for Production on Plaintiffs. In response to Defendants' discovery requests, Plaintiffs produced responsive, non-privileged documents on December 5, 2022.

### 2.    Interrogatories and Requests for Admissions

### a.    Interrogatories Directed at Defendants

45.    On September 23, 2022, Plaintiffs served their First Set of Interrogatories on Defendants, comprised of seven different interrogatories that covered topics ranging from, among other things, contact with the Pennsylvania Department of Environmental Protection to identifying all persons who advised Cabot's Safety and Environmental Affairs Committee on regulatory

- 16 -

compliance and well-remediation efforts during the Class Period. On October 31, 2022, Defendants served their Answers and Objections to Plaintiffs' First Set of Interrogatories.

### b.    Interrogatories Directed at Plaintiffs

46.    On September 19, 2022, Defendants served their First Set of Interrogatories on Plaintiffs. Plaintiffs, through Class Counsel, served their Responses and Objections to Defendants' First Set of Interrogatories on October 19, 2022.

### 3.    Fact Depositions

47.    In preparation for summary judgment and trial, Class Counsel took the depositions of ten current and former Cabot employees, and defended two 30(b)(6) depositions taken of representatives for Delaware County and Iron Workers. These depositions required Class Counsel to have a strong technical understanding of how gas wells are constructed, maintained, and remediated within the fracking industry, as well as how companies, like Cabot, forecast the production of natural gas to investors. Accordingly, Class Counsel expended significant time and effort in preparation for these depositions by conferring with their industry experts, identifying exhibits for these depositions among the millions of pages produced in discovery, and preparing deposition outlines.

48.    Class Counsel took and defended depositions of the following party and party-affiliated witnesses:

| Deponent | Date of Deposition | Location | Relationship |
|---|---|---|---|
| Steve Novakowski | July 28, 2023 | Remote | Cabot Oil & Gas Drilling Manager for North Region during the Class Period |
| Guy Shirey | July 31, 2023 | Remote | Cabot Oil & Gas Manager of Reservoir Engineering and District Engineer during the Class Period |
| Marcus Barnes | August 2, 2023 | Remote | Cabot Oil & Gas District Engineer during the Class Period |
| Matt Kerin | August 22, 2023 | Remote | Cabot Oil & Gas VP of Finance & Treasurer during the Class Period |

4881-7567-7405.v1

| Deponent | Date of Deposition | Location | Relationship |
|---|---|---|---|
| Gary Hlavinka | August 30, 2023 | Remote | Cabot Oil & Gas Regional Operations Manager for North Region during the Class Period |
| Gordon Ganaway | September 6, 2023 | Remote | Cabot Oil & Gas Director of Environmental Health and Safety during the Class Period |
| John Smelko | September 8, 2023 | Remote | Cabot Oil & Gas North Region Manager of Environmental and Regulatory Compliance during the Class Period |
| Scott Schroeder | September 22, 2023 | Remote | Cabot Oil & Gas CFO during the Class Period |
| William Andrew Kolfenbach Jr. 30(b)(6) | September 27, 2023 | Remote | Iron Workers District Council Retirement Pension Plan Administrator during the Class Period |
| Jonathan Lichtenstein 30(b)(6) | September 28, 2023 | Remote | Delaware County Employees Retirement System Solicitor during the Class Period |
| Phil Stalnaker | September 29, 2023 | Remote | Cabot Oil & Gas Senior VP and Regional Manager of North Operations during the Class Period |
| Dan Dinges | October 23, 2023 | Remote | Cabot Oil & Gas President & CEO during the Class Period |

49.    The depositions identified above were essential to establishing evidence concerning the difficulties that Cabot faced in remediating ongoing violations of environmental laws and the complex issues involved in forecasting the production of natural gas, as well as Defendants' knowledge of material, undisclosed facts.  In addition, these depositions were crucial in providing the foundational admissibility of documentary evidence.

### 4.    Discovery Directed at Nonparties

50.    Plaintiffs also sought extensive discovery from third parties with knowledge relevant to Defendants' material misstatements and omissions.  Once again, these discovery efforts required Class Counsel to understand not only how natural gas wells are maintained and remediated, but also how regulators overseeing the fracking industry in Pennsylvania supervised Cabot during the Class

- 18 -

4881-7567-7405.v1

Period, including, among other things, understanding the various technical tests employed by regulators to verify the integrity of the gas wells.  These third-party discovery efforts included deposing former Cabot employees and current and former employees of Cabot's government regulators, as well as issuing subpoenas to Cabot's government regulators and environmental consultants.

51.    Commencing on November 3, 2022, Plaintiffs began issuing subpoenas for documents to numerous relevant nonparties, including Cabot's government regulators, and environmental consultants.

52.    Below are the ten nonparties that Plaintiffs subpoenaed in this Action:

| Entity | Subpoena Date | Relationship |
|---|---|---|
| ALS Global USA Corp. | 11/22/2022 | Environmental Consultant |
| Goldman Sachs Group Inc. | 11/3/2022 | Analyst |
| Johnson Rice & Company, L.L.C. | 11/3/2022 | Analyst |
| KPMG LLP | 3/28/2023 | Auditor |
| Moody and Associates, Inc. | 11/22/2022 | Environmental Consultant |
| Pennsylvania Department of Environmental Protection | 12/21/2022 | Government Regulator |
| PEP Advisory LLC | 11/3/2022 | Environmental Consultant |
| Stantec Consulting Services, Inc. | 11/15/2022 | Environmental Consultant |
| Tuohy Brothers Investment Research, Inc. | 11/3/2022 | Analyst |
| Wolfe Research, LLC | 11/3/2022 | Analyst |

53.    Class Counsel engaged in numerous meet-and-confers with most of the subpoenaed nonparties to discuss their objections to the subpoenas, negotiate the scope of the document requests, and arrange for the production of responsive documents.  In total, Plaintiffs' third-party subpoenas

- 19 -

4881-7567-7405.v1

and subsequent negotiations resulted in the production of 213,731 pages of documents. Class Counsel expended significant resources obtaining, reviewing, and analyzing these documents.

54. Plaintiffs, in preparation for summary judgment, took the depositions of five nonparty witnesses, as set forth below:

| Deponent | Date of Deposition | Location | Relationship |
|---|---|---|---|
| Michael O'Donnell | October 3, 2023 | Remote | Pennsylvania Department of Environmental Protection Environmental Group Manager during the Class Period |
| Kenneth Kennedy | October 4, 2023 | Remote | Pennsylvania Department of Environmental Protection Oil and Gas Inspector during the Class Period |
| Michael Seth Pelepko | October 10, 2023 | Remote | Pennsylvania Department of Environmental Protection Professional Geologist Manager during the Class Period |
| Jennifer Means | October 11, 2023 | Remote | Pennsylvania Department of Environmental Protection Environmental Program Manager during the Class Period |
| Emily Mercurio | October 27, 2023 | Pittsburgh, PA | Cabot Oil & Gas Geologist during the Class Period (Former Cabot Employee) |

**F.      Plaintiffs Are Granted Leave to File the Second Amended Complaint**

55. During the course of discovery, Defendants produced internal emails and other documents that exposed new theories of liability to which Plaintiffs were previously unaware. Thus, pursuant to the Court's Scheduling Order entered on June 23, 2023 (ECF 156), Plaintiffs moved the Court for leave to amend their complaint pursuant to Rule 15(a) on October 20, 2023 (ECF 198) ("Motion for Leave").[9]

---

[9]   The Motion for Leave was initially filed under seal. *See* ECF 185. Following the Court's Order denying Plaintiffs' motion to file the Motion for Leave under seal (ECF 197), the Motion for Leave was filed on the public docket on January 9, 2024.

4881-7567-7405.v1

56.     Specifically, Plaintiffs moved to amend the Amended Complaint to conform the pleadings to the evidence developed during discovery by adding three new sets of alleged misleading statements regarding: (i) the fiscal year 2018 production guidance; (ii) the fiscal year 2019 production guidance; and (iii) the failure to disclose material information about pending or anticipated criminal and legal actions.  ECF 198 at 2.  In their Motion for Leave, Plaintiffs argued that the new allegations in the proposed Second Amended Complaint satisfied the standard under Rule 15(a): that the proposed amendment was timely, not made in bad faith, and that the new allegations were not futile.  *Id*. at 11-19.

57.     Defendants filed their opposition to the Motion for Leave on November 13, 2023. ECF 191.  In their opposition, Defendants attacked the new allegations on futility grounds, arguing that: (i) the guidance-related statements were protected by the PSLRA safe harbor (*id*. at 18-21); (ii) the allegations specifically regarding the fiscal year 2018 guidance were time-barred by the five-year statute of repose (*id*. at 22); and (iii) the new allegations generally lacked falsity and scienter and were an end-run around the pleading standards of the PSLRA.  *Id*. at 18-25.  Plaintiffs filed their reply under seal on November 20, 2023.  ECF 192.

58.     On January 8, 2024, the Court, by Memorandum and Opinion, granted in part and denied in part Plaintiffs' Motion for Leave.  ECF 196.  Specifically, the Court found that the allegations based on the fiscal year 2018 production guidance were time barred, but otherwise granted Plaintiffs' Motion for Leave.  *Id*. at 24-27, 33.

59.     Plaintiffs filed the operative Second Amended Complaint on January 9, 2024 (ECF 199), and Defendants filed their corresponding answer on January 22, 2024 (ECF 200).

**G.      Expert Witnesses and Consultants**

60.     As set forth below, to assist Class Counsel in investigating and proving Plaintiffs' claims, as well as navigating the complex issues involved in this matter, the services of certain

experts and consultants were required.  At the time of Settlement, the Parties were engaged in expert discovery.  The Parties had exchanged multiple expert reports and rebuttal reports and were preparing for expert depositions.

### 1.     Plaintiffs' Expert Witnesses

#### a.     Steven P. Feinstein, Ph.D., CFA

61.     A critical element of Plaintiffs' claims involved establishing market efficiency and rebutting Defendants' claims that the alleged false statements had no impact on the price of Cabot common stock.  To establish market efficiency, provide evidence on class-wide damages, and rebut Defendants' price impact arguments at the class certification stage, Plaintiffs retained Professor Feinstein.  Professor Feinstein is the founder and president of Crowninshield Financial Research, Inc. and an Associate Professor of Finance at Babson College.  Professor Feinstein has published academic research in peer-reviewed journals and has presented research at professional and academic conferences.  In addition, Professor Feinstein has provided numerous expert reports and testimony in class action securities litigations, such as this one, as well as in litigation concerning business solvency and valuation.

62.     In order to address the issues of market efficiency, price impact, and damages at class certification, Professor Feinstein expended a significant amount of time reviewing the record, publicly available information concerning Cabot, and certain documents produced by Defendants and nonparties.  Professor Feinstein then conducted an economic analysis to show that each of the relevant factors supported a finding that Cabot's common stock traded in an efficient market during the Class Period.  In addition, he conducted further economic analysis, which included an event study, that demonstrated that Defendants had not proven the absence of price impact.  Professor Feinstein was deposed in connection with class certification on June 30, 2023 and, as stated above, Defendants filed a highlighted copy of the transcript from that deposition as part of a supplement in

- 22 -

opposition to Plaintiffs' Class Certification Motion on July 3, 2023.  ECF 157-1.  Plaintiffs filed a response, including a counter-highlighted transcript, on July 5, 2023, ECF 158, Exhibit 1.

63.    Professor Feinstein, in preparation for summary judgment and trial, also prepared a loss causation and damages report, which was served on Defendants on February 5, 2024.  In this report, Professor Feinstein outlined the results of his analysis of the impact that the corrective disclosures alleged by Plaintiffs had on Cabot's stock price, and the estimated artificial inflation caused by Defendants' alleged fraud.  Professor Feinstein undertook an event study, which employed the use of statistical regression analysis, and determined that Defendants' misrepresentations were economically material and that the disclosure events alleged by Plaintiffs caused the dissipation of the artificial inflation caused by Defendants' alleged misrepresentations.

64.    Professor Feinstein's participation in the Action was essential to achieving certification of the Class, and would have been instrumental in proving Plaintiffs' claims at summary judgment and trial.

### b.    Professor Robert Jackson, Jr.

65.    An essential element of Plaintiffs' claims involved establishing that Defendants were required to disclose receipt of communications from government authorities that informed Defendants of any intended or ongoing regulatory or criminal proceedings against Cabot. Specifically, Plaintiffs alleged that Defendants made material omissions in their public statements by failing to disclose that: (i) Defendants received a proposed consent order from the Pennsylvania Department of Environmental Protection on June 17, 2019 informing Defendants that Cabot had not resolved certain ongoing violations[10]; and (ii) a Pennsylvania grand jury issued Cabot a subpoena on

---

10    *See* ¶201.

- 23 -

November 13, 2018 requesting documents and data in relation to a criminal investigation pertaining to Cabot's compliance with environmental law.[11]

66.     To assist Plaintiffs in substantiating these allegations, Class Counsel retained Professor Robert Jackson, Jr., a former SEC Commissioner and an expert in securities disclosure practices.    Professor Jackson received an MBA from the Wharton School, University of Pennsylvania in 2000, and a Juris Doctor from Harvard Law School and a Masters of Public Policy from Harvard Kennedy School, Harvard University, in 2005.    Professor Jackson was a Commissioner of the SEC from 2018-2020, an Attorney Advisor to the United States Department of the Treasury from 2009-2010, and currently serves as the Pierrepont Family Professor of Law and Co-Director of the Institute on Corporate Governance at New York University School of Law.

67.     Professor Jackson concluded that, under current SEC rules and longstanding securities practice, and based on an analysis of historical empirical evidence, Defendants were required to disclose receipt of the consent order and the grand jury subpoena.  Professor Jackson's expert report was served on Defendants on February 5, 2024.

### c.    Valerie Davisson

68.     Following the filing of the Second Amended Complaint, Plaintiffs' claims included allegations that Defendants made material misrepresentations regarding Cabot's production guidance for the 2019 fiscal year.  Specifically, following review of documents received during discovery, Plaintiffs alleged that Defendants' process for forecasting their production disclosed to the market was the result of improper, top-down pressure and decision-making and did not accurately reflect the reality of Defendants' ability to produce natural gas.[12]

---

[11]    *See* ¶¶202-203; Office of the Attorney General of the Commonwealth of Pennsylvania, Forty-Third Statewide Investigating Jury, Subpoena No. 278 (Nov. 13, 2018).

[12]    ¶¶191-192.

- 24 -

69.     To assist Plaintiffs in substantiating these allegations and proving the falsity of Defendants' statements regarding Cabot's 2019 production guidance, Class Counsel retained Valerie Davisson as an expert in processes underpinning the development of production guidance.  Ms. Davisson was a Wall Street analyst from 1999-2011 (both on the buy-side and sell-side), and since 2012 has served as the President of West Newton Consulting LLC, providing corporations with outsourced CFO and expert testimony services.  Ms. Davisson earned her Master of Accounting from St. Louis University in 1992, and was a Certified Public Accountant licensed in Arizona from 1994-2001.

70.     In drafting her report, Ms. Davisson reviewed numerous internal documents produced by Defendants during discovery, deposition transcripts, and Cabot's public filings and analyst reports regarding Cabot.  Ms. Davisson found that the process used by Defendants to set production guidance was heavily influenced by Cabot's executive management, and found no evidence that Defendants followed a proper, bottom-up process for forecasting their production of natural gas.  Ms. Davisson's expert report was served on Defendants on February 5, 2024.

### d.     Dr. Anthony Ingraffea, Ph.D., P.E.

71.     Essential elements of Plaintiffs' claims involved establishing falsity and scienter, and rebutting Defendants' argument that they reasonably believed they substantially completed remediation regarding the numerous ongoing violations of environmental regulations at their well sites in Pennsylvania.  In order to assist Plaintiffs in understanding the highly technical engineering processes for constructing, maintaining, and remediating these well sites, as well as the corresponding regulatory issues involved in Defendants' gas production operation, Class Counsel retained Dr. Anthony Ingraffea, Ph.D., P.E. as an expert in the field of natural gas production and the environmental laws and regulations that govern the fracking industry.  Dr. Ingraffea received his Ph.D. in Civil Engineering in 1977 from the University of Colorado/Boulder, and has over 45 years

- 25 -

of experience as a professor of civil and environmental engineering at Cornell University and as a consultant for the oil/gas industry and the federal government.  He currently serves as the Dwight C. Baum Professor of Civil and Environmental Engineering, Emeritus at Cornell University.

72.     In drafting his expert report, Dr. Ingraffea reviewed hundreds of documents produced by Defendants during discovery, transcripts of both party and non-party witness depositions taken by Plaintiffs in this Action, publicly available documents, and scientific literature.  Dr. Ingraffea concluded that Cabot's initial construction of its gas wells was faulty and resulted in numerous findings by regulators that Cabot was not in compliance with environmental laws and regulations, and that Cabot's attempts at remediating these violations were insufficient.  Dr. Ingraffea's expert report was served on Defendants on February 5, 2024.  As noted above, Class Counsel also consulted with Dr. Ingraffea throughout the pendency of the case to assist in understanding, among other things, Cabot's internal technical documents regarding the work it conducted on its various well sites.

73.     Absent these experts' advice, reports, and critical deposition testimony, Plaintiffs would have lacked substantial evidence regarding key, hotly-disputed factual elements of their case, and would not have been able to adequately address Defendants' opposition to Plaintiffs' arguments at the class certification stage or Defendants' anticipated arguments at summary judgment and trial.

### 2.     Defendants' Expert Witnesses

#### a.     Lucy P. Allen

74.     As discussed above, given the highly technical nature of securities litigation, Defendants retained Lucy P. Allen to support their arguments at the class certification stage.  Class Counsel spent substantial time preparing for and taking the deposition of Ms. Allen in connection with class certification.  Class Counsel's preparation included an extensive review of documents produced in discovery, an analysis of the Parties' respective positions on issues that were the subject

4881-7567-7405.v1

of expert testimony, and consultation with Professor Feinstein on appropriate topics on which to examine Ms. Allen.

75.     Moreover, Ms. Allen, at the behest of Defendants, compiled a rebuttal to Professor Feinstein's February 5, 2024 expert report on loss causation and damages, which was served on Plaintiffs on March 25, 2024.  In her rebuttal report, Ms. Allen attacked Professor Feinstein's conclusions regarding the alleged corrective disclosures and damages to the Class.  If the Parties did not settle, Class Counsel would need to depose and/or cross examine Ms. Allen on the issues of loss causation and damages at summary judgment and trial.

**b.      Gary B. Goolsby**

76.     In order to rebut the expert reports of Ms. Davisson and Professor Jackson, Defendants retained Gary B. Goolsby.  Mr. Goolsby's report was served on Plaintiffs on March 25, 2024.  In his report, Mr. Goolsby criticized the conclusions of both Professor Jackson and Ms. Davisson, regarding the disclosure requirements concerning criminal and regulatory action, and the propriety (or lack thereof) of Defendants' processes by which they developed their production guidance.  If the Parties did not settle, Class Counsel would need to depose and/or cross examine Mr. Goolsby on these issues at summary judgment and trial.

**III.     MEDIATION AND SETTLEMENT EFFORTS**

77.     The Settlement is the product of hard-fought, arm's length negotiations.  Class Counsel participated in two in-person mediation sessions with David M. Murphy, Esq. of Phillips ADR – the first mediation session was held on May 11, 2023, and the second on April 18, 2024.  Class Counsel believe that their continued and diligent work in the eleven months between the two mediation sessions to strengthen and develop the case, including aggressively pursuing discovery and developing the evidence that led to the filing of the Second Amended Complaint, substantially

strengthened Plaintiffs' negotiating position and eventually led to the favorable Settlement of the Action.

78.     In advance of the first mediation session on May 11, 2023, the Parties prepared and exchanged detailed mediation statements, reply mediation statements, and corresponding exhibits. Plaintiffs' opening mediation statement included 46 exhibits and totaled 1,058 pages. Defendants' opening mediation statement included 133 pages of exhibits. Plaintiffs' reply mediation statement, which included 339 pages of exhibits, identified the substantial evidence and law contradicting each one of Defendants' arguments in their opening mediation statement.

79.     On May 11, 2023, the Parties participated in a full-day in-person mediation session with Mr. Murphy in New York, New York. Both sides presented oral presentations about the strengths and weaknesses of the Parties' respective positions. The case, however, did not settle after this first mediation session. Accordingly, Class Counsel continued to vigorously prosecute the Action. In fact, over the next eleven months, Plaintiffs certified the Class, including defeating Defendants' Rule 23(f) appeal to the Fifth Circuit, took 15 fact depositions, requested and were granted leave to file the Second Amended Complaint, and substantially developed their position by retaining four expert witnesses to submit reports for use at summary judgment and trial. *See supra* §II.G.

80.     On February 23, 2024, following certification of the Class, Defendants' unsuccessful attempts to appeal the Court's Class Certification Order, and the filing of the Second Amended Complaint, the Parties jointly moved to stay remaining pretrial deadlines in order to afford the Parties another chance to resolve the Litigation through mediation. ECF 203. On March 6, 2024, the Court granted the Parties' joint motion, and directed the Parties to notify the Court of the results of the mediation by May 1, 2024. ECF 204. The Court further directed the Parties to appear at a

4881-7567-7405.v1

status conference on May 7, 2024, following which the pretrial deadlines would be re-established, in the event that mediation efforts were not successful. *Id*.

81.     On April 18, 2024, the Parties participated in a second full-day, in-person mediation session with Mr. Murphy in New York, New York. As before, the Parties exchanged mediations statements.[13]  Plaintiffs' mediation statement included over 4,608 pages of exhibits, while Defendants' mediation statement included 592 pages of exhibits.

82.     The Parties engaged in good-faith negotiations, but did not reach an agreement to resolve the Action at the second mediation session. Following continued settlement discussion with Mr. Murphy's assistance, Mr. Murphy issued a mediator's proposal to settle the Litigation in return for a cash payment of $40 million, subject to Court approval. The Parties accepted Mr. Murphy's proposal on April 29, 2024. On May 1, 2024, the Parties jointly notified the Court of their settlement and filed a joint motion to vacate the May 7, 2024 status conference, which the Court granted. ECF 205-206. Thereafter, Class Counsel worked diligently to negotiate the terms of the Settlement Agreement with Defendants' counsel and prepare preliminary approval papers. The Parties executed the Settlement Agreement on June 3, 2024.[14]

83.     That same day, Plaintiffs filed an unopposed motion seeking preliminary approval of the proposed Settlement. ECF 207. The Court granted Plaintiffs' motion for preliminary approval on June 27, 2024, and set the final settlement hearing for October 24, 2024 at 3:00 p.m. ECF 211.

---

[13]   The Parties did not exchange reply mediation statements prior to the April 18, 2024 mediation.

[14]   On June 3, 2024, the Parties also entered into a confidential Supplemental Agreement, under which Defendants can exercise a right to withdraw from the Settlement in the event that valid requests for exclusion from the Class exceed an agreed-upon amount. Pursuant to its terms, the Supplemental Agreement is not being made public but may be submitted to the Court *in camera* so as to preserve the confidentiality of the Supplemental Agreement, and particularly the agreed-upon amount warranting Defendants' right to withdraw from the Settlement.

4881-7567-7405.v1

## IV.   THE SETTLEMENT IS FAIR, REASONABLE, AND ADEQUATE

84.   The Settlement of $40,000,000 is the result of extensive, arm's-length negotiations among the Parties that reflects the strengths and weaknesses of the case, and would not have been achieved without Class Counsel's extensive efforts described herein.

85.   We further believe that Class Counsel's reputation as attorneys who will zealously prosecute a case through the trial and appellate levels, as well as our aggressive litigation of this Action, put the Class in a strong position with Defendants and their insurance carriers and led to the superior result achieved here.

86.   As set forth below and in the Settlement Memorandum, the Settlement is a favorable result for the Class when evaluated in light of the risks of continued litigation and all of the other circumstances that courts consider when determining whether to grant final approval of a proposed class action settlement under Rule 23(e).

87.   At the time the Settlement was reached, Class Counsel had a comprehensive understanding of the strengths and weaknesses of Plaintiffs' claims as well as the risks of further litigation.  While Plaintiffs and Class Counsel believe that the claims asserted against Defendants are meritorious, they also recognize that there were considerable challenges to continued litigation, including, but not limited to, proving that Defendants made false statements and omissions, that these alleged misrepresentations were made with scienter, and that when the truth was revealed, the Class suffered compensable damages.  Thus, the Settlement results from a realistic assessment by both sides of the strengths and weaknesses of their respective claims and defenses as well as the risks of further litigation, and is a fair, reasonable, and adequate resolution of the Action for the Class.

4881-7567-7405.v1

88.     In addition to the Rule 23(e)(2) factors,[15] courts within the Fifth Circuit generally apply the following criteria when evaluating the fairness of a proposed class action settlement: (i) the existence of fraud or collusion behind the settlement; (ii) the complexity, expense, and likely duration of the litigation; (iii) the stage of the proceedings and the amount of discovery completed; (iv) the probability of plaintiffs' success on the merits; (v) the range of possible recovery; and (vi) the opinions of class counsel, class representatives, and absent class members. *See Reed v. Gen. Motors Corp.*, 703 F.2d 170, 172 (5th Cir. 1983). Under the foregoing factors, the Settlement is fair, reasonable, and adequate, and warrants the Court's final approval.

### A.     The Strengths and Weaknesses of the Case Favor Settlement

89.     As noted above, the Settlement was the product of contentious negotiations, over the course of two mediation sessions (11 months apart), and reflects the strengths and weaknesses of the Parties' respective positions. The Settlement would not have been achieved absent Class Counsel's tireless efforts to plead and obtain the evidence necessary to prove Plaintiffs' claims of fraud. Nor would the Settlement have been achieved without the substantial participation and assistance of Mr. Murphy, a neutral mediator with experience in negotiating resolution of complex actions of this type.

90.     There is no doubt that Plaintiffs and Class Counsel had sufficient knowledge and information to accurately evaluate the strengths and weaknesses of their claims and the propriety of the Settlement. While Plaintiffs and Class Counsel believe their case against Defendants has merit and were prepared to proceed to summary judgment and trial, they also realize that they would have

---

[15]   Rule 23(e)(2) provides that, in determining whether a class action settlement is "fair, reasonable, and adequate," the Court should consider whether: "(A) the class representatives and class counsel have adequately represented the class; (B) the proposal was negotiated at arm's length; (C) the relief provided for the class is adequate, taking into account: (i) the costs, risks, and delay of trial and appeal; (ii) the effectiveness of any proposed method of distributing relief to the class, including the method of processing class-member claims; (iii) the terms of any proposed award of attorney's fees, including timing of payment; and (iv) any agreement required to be identified under Rule 23(e)(3); and (D) the proposal treats class members equitably relative to each other." Fed. R. Civ. P. 23(e)(2).

4881-7567-7405.v1

faced considerable challenges and defenses on every element of their claims.  As discussed below, there were a number of factors that made the outcome of continued litigation, and ultimately a trial in the Action (and the inevitable appeals that would follow), uncertain.

91.     Plaintiffs and Class Counsel carefully considered each of these risks, which were also thoroughly vetted during the Parties' settlement discussions.  Several of the most serious risks faced by Plaintiffs and the Class are discussed in the following paragraphs.  In light of these risks, Plaintiffs and Class Counsel believe that the Settlement is in the best interests of the Class, and is fair, reasonable, and adequate.

### 1.     Dismissal of the Parallel Derivative Action

92.     On January 2, 2024, this Court dismissed, for the second time, derivative allegations brought against Defendants in the parallel Derivative Litigation.  *See Cabot*, 2024 WL 23365.  As a result, Plaintiffs faced significant risk at summary judgment and trial given the Court's rulings regarding falsity and scienter in the Derivative Litigation.

93.     Moreover, given the similarities between the Derivative Litigation and this Action, including the similarities in the evidence presented in each, Defendants surely would have argued that a dismissal by this Court in the Derivative Litigation warranted a finding of summary judgment in Defendants' favor.

### 2.     Risks to Proving Loss Causation

94.     Plaintiffs faced additional challenges in demonstrating loss causation with respect to the corrective disclosures alleged in the Litigation.  *See Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 345-46 (2005) (plaintiff bears burden of proving "that the defendant's misrepresentations 'caused the loss for which the plaintiff seeks to recover'").  Had the Litigation continued, Defendants would likely assert that Plaintiffs would be unable to demonstrate that many (or all) of Defendants' alleged misrepresentations directly or proximately caused the economic losses incurred.

- 32 -

95.     More specifically, as demonstrated in their motions to dismiss and their opposition to Plaintiffs' Class Certification Motion, Defendants argued, and would continue to argue, that any losses suffered by Class Members on their investments in Cabot common stock were not attributable to the alleged corrective disclosures.  Defendants repeatedly claimed that the information contained in Cabot's alleged disclosures did not contain information corrective of the fraud – that there was a "mismatch" between the false statements alleged and the disclosures.  Additionally, Defendants asserted, and surely would have continued to assert, that there was no statistically significant decline following both of the alleged corrective disclosures.  Ultimately, these issues would have resulted in a battle of the Parties' experts.

### 3.     Risks to Proving Falsity and Scienter

96.     Defendants would have undoubtedly continued to argue, both at summary judgment and at trial, that Defendants' alleged misstatements were not actionable and that Plaintiffs did not demonstrate that Defendants acted with the requisite state of mind.  *See, e.g.*, ECF 64 at 18-27; ECF 191 at 18-22.

97.     Specifically, Defendants argued repeatedly that the alleged misstatements regarding the state of Cabot's environmental compliance, including the ones that survived Defendants' motions to dismiss, were generalized statements of opinion that did not result in liability under the securities laws.  ECF 64 at 18-21.  Additionally, Defendants argued that any falsity relating to the guidance statements was immunized by the risk warnings regarding production that Defendants included in the Company's SEC filings.  ECF 191 at 18-20.  Moreover, Defendants would surely have continued to assert that all of the alleged statements were forward-looking, and protected by the PSLRA safe harbor.  ECF 64 at 21-22; ECF 191 at 18-19.

98.     Defendants also repeatedly attacked Plaintiffs' scienter allegations as insufficiently particularized and unable to support a strong inference that Defendants' statements were knowingly false or misleading.  ECF 64 at 23-27; ECF 191 at 21.

99.     While Plaintiffs are confident in the strength of their allegations, and that the record developed during discovery would have borne those allegations out at summary judgment and trial, there is a real risk that the Court at summary judgment or a jury at trial could find otherwise for some or all of the alleged misstatements and omissions.  If the Court or a jury accepted any of Defendants' foregoing arguments, the Class's maximum damages could have been materially reduced, or eliminated altogether.

**B.      Considering the Range of Possible Recovery, the Settlement Is Within the Range of Reasonableness**

100.    The Settlement provides for an all-cash payment of $40,000,000.  This Settlement Amount represents approximately 14% of the estimated maximum recoverable damages, as calculated by Plaintiffs' damages expert, assuming that Plaintiffs prevailed on all issues at summary judgment and trial.  Given that the median ratio of the settlement amount to investor losses in securities litigation did not exceed 1.8% from 2019 to 2023, based on NERA Economic Consulting's most recent study, the Settlement Amount obtained here represents an outstanding recovery.  *See* Edward Flores and Svetlana Starykh, *Recent Trends in Securities Class Action Litigation: 2023 Full-Year Review* ("NERA Study") (NERA Jan. 23, 2024) at 26, Fig. 22, available at: https://www.nera.com/insights/publications/2024/recent-trends-in-securities-class-action-litigation--2023-full-y.html?lang=en.  This is particularly true here, where Defendants put forth arguments that Plaintiffs would not be able to collect any damages.

**C.      The Complexity, Expense, and Likely Duration of Continued Litigation Support Approving the Settlement**

101.    The continuation of this Litigation would be long, complex, and costly to all Parties involved.  Were the litigation to proceed, further expert discovery, summary judgment motions, trial, and (likely) appeals would follow and entail significant additional costs.  The case schedule prior to the Parties' request for a stay for mediation contemplated completion of summary judgment briefing on April 29, 2024, followed by lengthy motions *in limine* and a pretrial conference.  Even if the Court reinstated the exact same pretrial schedule following the mediation, had it not been successful, this case realistically would not have been tried until later in 2024 or even 2025, with inevitable appeals thereafter.  The Settlement provides a substantial, near-term recovery for the Class.

**D.      The Stage of Proceedings at Which the Settlement Was Reached Supports Approving the Settlement**

102.    As detailed above, the Parties have been actively litigating this case since 2020.  During the course of the Action, Class Counsel engaged in extensive investigation, research, and analysis of the Class's claims, including a review of the Company's SEC filings, analyst reports, news media, and conference calls.

103.    In addition to the foregoing, Class Counsel, among other things: (i) drafted and filed the Complaint; (ii) drafted and filed the Amended Complaint following the Court's first order on Defendants' motion to dismiss; (iii) defeated in substantial part Defendants' motion to dismiss the Amended Complaint; (iv) conducted significant discovery, including reviewing and analyzing more than 4.4 million pages of documents produced by Defendants and nonparties that Class Counsel only obtained after conducting countless contentious meet-and-confer discussions; (v) prepared and filed class certification briefing; (vi) achieved certification of the Class and successfully opposed Defendants' numerous attempts to overturn the Court's Class Certification Order; (vii) conducted or defended 19 depositions; (viii) successfully moved for leave to file the operative Second Amended

- 35 -

Complaint; and (ix) retained and worked with four expert witnesses, each of whom produced a report in anticipation of summary judgment.

104. The knowledge and insight gained during years of investigating, developing, and refining Plaintiffs' claims through various stages of litigation provided Plaintiffs and Class Counsel with sufficient information to make an informed assessment of the strengths and weaknesses of the case and the propriety of settlement.

### E. The Reaction of the Class to Date Warrants Approval of the Settlement

105. As of September 18, 2024, a total of 193,003 Postcard Notices and 4,443 Notices have been mailed to potential Class Members and nominees. *See* Segura Decl., ¶12. Pursuant to the Court's Preliminary Approval Order (ECF 211) and as set forth in the notices, the deadline for Class Members to object to any aspect of the Settlement, including the Plan of Allocation and request for fees and expenses, or to request exclusion from the Class, is October 3, 2024. To date, there have been no objections to any aspect of the Settlement and only two requests for exclusion from the Class.

## V. THE PLAN OF ALLOCATION IS FAIR AND REASONABLE

106. The Plan of Allocation, proposed by Plaintiffs set forth in the Notice (*see* Segura Decl., Ex. B at 14-19), provides the manner in which the Net Settlement Fund will be distributed to Class Members who submit timely, valid Proofs of Claim and whose claims for recovery are accepted for payment pursuant to the terms of the Settlement Agreement, including the Plan of Allocation ("Authorized Claimants"). The Plan of Allocation provides that Class Members will only be eligible to participate in the distribution of the Net Settlement Fund if they purchased or otherwise acquired Cabot common stock during the Class Period and were damaged thereby and their *pro rata* share of the Net Settlement Fund is $10.00 or greater. *See id.*

107.     The Plan of Allocation reflects the estimated amount of alleged artificial inflation in the per share price of Cabot common stock that was allegedly proximately caused by Defendants' alleged false and misleading statements and omissions during the Class Period.

108.     Class Counsel conferred with Plaintiffs' damages expert Professor Feinstein to develop the Plan of Allocation.

109.     In calculating the estimated artificial inflation allegedly caused by Defendants' alleged misrepresentations and omissions, Plaintiffs' damages expert considered price changes in Cabot common stock in reaction to the public disclosures that allegedly corrected the respective alleged misrepresentations and omissions, adjusting the price changes for factors that were attributable to market or industry forces, and for non-fraud related Company-specific information.

110.     Under the Plan of Allocation, for each Class Period purchase/acquisition of Cabot common stock that is properly documented, a "Recognized Claim Amount" will be calculated according to the formulas described in the Notice.[16]  As set forth in greater detail in the Notice, the calculation of a claimant's Recognized Claim Amount is based on a formula that takes into account such information as: (a) when a claimant's share(s) of Cabot common stock were purchased/acquired and whether they sold their stock during the Class Period, or retained their stock beyond the end of the Class Period; (b) the amount of the alleged artificial inflation per share; (c) the purchase/acquisition price per share; and (d) the purchase price minus the average closing price for Cabot common stock during the 90-day look-back period described in Section 21(D)(e)(1) of the Exchange Act.

---

[16]   If, however, as expected, the amount of the Net Settlement Fund is not sufficient to permit payment of the total Recognized Claim Amount of each claimant, then each claimant shall be paid the percentage of the Net Settlement Fund that each claimant's Recognized Claim Amount bears to the total Recognized Claim Amount of all claimants – *i.e.*, the claimant's *pro rata* share of the Net Settlement Fund.

- 37 -

4881-7567-7405.v1

111.    In sum, the Plan of Allocation, which is similar to plans routinely approved by courts, represents a reliable method by which to weigh, in a fair and equitable manner, the claims of Authorized Claimants.  To date, not a single Class Member has objected to the Plan of Allocation.

## VI.    CLASS COUNSEL'S APPLICATION FOR ATTORNEYS' FEES AND EXPENSES IS REASONABLE

112.    Class Counsel have zealously and diligently litigated this Action on behalf of the Class for over three years.  We undertook this effort on a contingency basis, and expended over 31,800 hours of professional and paraprofessional time litigating this Action.  In addition, Plaintiffs' Counsel have incurred a total of $1,515,974.05 in litigation expenses, costs, and charges.  Accordingly, Class Counsel, on behalf of Plaintiffs' Counsel,[17] respectfully request an award of attorneys' fees in the amount of 30% of the Settlement Fund and $1,515,974.05 in expenses.  Plaintiffs' Counsel have submitted declarations that provide additional support for the requested fees and expenses.  *See* Declaration of Darryl J. Alvarado Filed on Behalf of Robbins Geller Rudman & Dowd LLP in Support of Application for Award of Attorneys' Fees and Expenses ("RGRD Decl."), attached as Exhibit 4 hereto; Declaration of Andrew L. Zivitz Filed on Behalf of Kessler Topaz Meltzer & Check, LLP in Support of Application for Award of Attorneys' Fees and Expenses ("Kessler Decl."), attached as Exhibit 5 hereto; Declaration of Joe Kendall Filed on Behalf of Kendall Law Group, PLLC in Support of Application for Award of Attorneys' Fees and Expenses ("Kendall Decl."), attached as Exhibit 6 hereto.  Class Counsel's fee and expense request is supported by Plaintiffs.  To date, no objections to the maximum amount of attorneys' fees and expenses set forth in the notices have been received.[18]

---

[17]    Plaintiffs' Counsel consists of Class Counsel and Local Counsel.

[18]    Class Counsel will address any objections received after this submission in their reply to be filed with the Court on October 17, 2024.

- 38 -

A.    **Class Counsel's Fee Request Is Reasonable**

113.    As demonstrated below, an analysis of the applicable factors considered by the Fifth Circuit in evaluating a fee request (*Union Asset Mgmt. Holding A.G. v. Dell, Inc.*, 669 F.3d 632, 642 n.25 (5th Cir. 2012) (citing *Johnson v. Ga. Highway Express, Inc.*, 488 F.2d 714, 717 (5th Cir. 1974)) supports the reasonableness of Class Counsel's requested fee in this case.

1.    **The Time and Labor Required Supports the Reasonableness of Class Counsel's Request**

114.    Class Counsel dedicated a substantial amount of time and energy to advocate on behalf of Plaintiffs and the Class.  Throughout the entirety of this Litigation, Defendants have adamantly denied all of Plaintiffs' material allegations and sought to have the case dismissed and/or narrowed at every juncture.  In response, Class Counsel aggressively rebutted each of Defendants' attacks while simultaneously strengthening the merits of Plaintiffs' allegations.

115.    Plaintiffs' Counsel expended substantial time and effort to litigate this Action to a successful resolution for Plaintiffs and the Class  In total, from the inception of this Action through September 10, 2024, Plaintiffs' Counsel devoted a total of 31,806 hours on the investigation, prosecution, and resolution of the claims against Defendants for a total lodestar of $18,607,588.00.[19] Thus, pursuant to a lodestar "cross-check," Class Counsel's fee request of 30% of the Settlement Fund (or, $12 million, plus interest), if awarded, would yield a *negative* (or fractional) multiplier of approximately 0.64 on Plaintiffs' Counsel's lodestar – falling below the range of positive fee multipliers typically awarded in comparable securities class actions and in other class actions

---

[19]   Class Counsel will continue to perform legal work on behalf of the Class should the Court approve the Settlement.  Additional resources will be expended assisting Class Members with their Claims and related inquiries and working with the Claims Administrator, JND, to ensure the smooth progression of claims processing.  *No additional legal fees will be sought for this work*.

- 39 -

involving significant contingency fee risk, in this Circuit and elsewhere. *See* Fee and Expense Memorandum, §IV.B.[20]

### 2. The Novelty and Difficulty of the Issues Warrants Approval of Class Counsel's Request

116.   As demonstrated above in §IV.A., this Action presented a number of multi-faceted, complex issues of both law and fact, and the Class faced formidable defenses to liability and damages.   For instance, issues surrounding the elements of price impact and damages required repeated rounds of briefing, substantial work with experts, depositions of fact and expert witnesses, and other extensive discovery efforts.   §§II.B.-E.

117.   Given the novelty and the difficulty of the issues presented in this Litigation, the Settlement is a favorable recovery for the Class that reflects the sophistication and diligence of Class Counsel's work.

### 3. The Skill Required to Perform the Legal Service Adequately Supports the Reasonableness of the Requested Fee

118.   As noted above, given the complexity of the issues involved and the existence of numerous hotly contested issues, highly skilled counsel with extensive expertise in securities litigation was essential to the successful representation of the Class.   Further, Class Counsel had to be particularly zealous and skilled in this case because Defendants' Counsel are highly experienced, diligent attorneys well-versed in complex securities litigation.   Class Counsel's experienced and skilled work secured a highly favorable recovery for the Class.

---

[20]   The time devoted to this Action by Plaintiffs' Counsel is set forth in the declarations attached hereto as Exhibits 4 through 6.   Plaintiffs' Counsel's declarations report on the amount of time spent by each attorney and professional support staff employee who worked on the Action and their resulting "lodestar," *i.e.*, hours multiplied by hourly rates.   The hourly rates of Plaintiffs' Counsel here range from $785 to $1,400 per hour for partners, $300 to $985 per hour for counsel/associates, $370 to $475 per hour for other attorneys, $240 to $410 per hour for paralegals, and $300 to $660 per hour for in-house investigators.   *See* RGRD Decl., Ex. A; Kessler Decl., Ex. A; and Kendall Decl., Ex. A.   These hourly rates are reasonable for this type of complex litigation.   *See* Fee and Expense Memorandum, §IV.B.

- 40 -

4881-7567-7405.v1

**4.      The Preclusion of Other Employment Favors Class Counsel's
Fee Request**

119.   Class Counsel *alone* expended 31,762 hours over more than three years prosecuting this Action on behalf of Plaintiffs and the Class.  These substantial hours could have been devoted to other cases.

**5.      The Contingent Nature of This Action Supports the
Reasonableness of Class Counsel's Fee Request**

120.   Class Counsel undertook this Litigation on a wholly contingent basis.  Accordingly, to date, Class Counsel have borne all of the expenses and risks of this complex, costly litigation with no guarantee that their investment would ever be recovered.  Nevertheless, Class Counsel undertook this significant responsibility and, as a result, were required to ensure that sufficient attorney, expert, and paraprofessional resources were allocated to effectively prosecute this Action.  Further, because of the nature of a contingency fee practice where cases often last for several years, Robbins Geller and Kessler Topaz have had to pay regular overhead as well as advance the expenses of the Litigation – which exceed $1.5 million.

121.   As Class Counsel know from experience, the commencement and ongoing prosecution of a class action does not guarantee a settlement.[21]  To the contrary, it takes sustained

---

[21]   For example, there are many appellate decisions affirming summary judgment and directed verdicts for defendants, showing that surviving a motion to dismiss is not a guarantee of recovery. *See, e.g.*, *In re BankAtlantic Bancorp, Inc. Sec. Litig.*, 2011 WL 1585605 (S.D. Fla. Apr. 25, 2011) (granting judgment as a matter of law following plaintiff's jury verdict), *aff'd on other grounds sub nom. Hubbard v. BankAtlantic Bancorp, Inc.*, 688 F.3d 713 (11th Cir. 2011); *Robbins v. Koger Props. Inc.*, 116 F.3d 1441 (11th Cir. 1997) (jury verdict of $81 million for plaintiffs against accounting firm reversed on appeal); *Anixter v. Home-Stake Prod. Co.*, 77 F.3d 1215 (10th Cir. 1996) (overturning securities class action jury verdict for plaintiffs' in case filed in 1973 and tried in 1988); *Bentley v. Legent Corp.*, 849 F. Supp. 429 (E.D. Va. 1994) (judgment as a matter of law after plaintiffs' presentation of their case to the jury), *aff'd sub nom.*, *Herman v. Legent Co.*, 50 F.3d 6 (4th Cir. 1995); *In re Apple Comput. Sec. Litig.*, 1991 WL 238298 (N.D. Cal. Sept. 6, 1991) (after jury verdict for plaintiffs following an extended trial, the court overturned the verdict); *Backman v. Polaroid Corp.*, 910 F.2d 10 (1st Cir. 1990) (after eleven years of litigation, and following a jury verdict for plaintiffs and an affirmance by a First Circuit panel, plaintiffs' claims were dismissed by an *en banc* decision and plaintiffs recovered nothing).

4881-7567-7405.v1

and diligent work by skilled counsel to develop the facts and legal arguments needed to survive a motion to dismiss or win at class certification, summary judgment, and trial, or on appeal, or to cause sophisticated defendants to engage in serious settlement negotiations at meaningful levels. Here, there existed a substantial and real risk that Class Counsel's significant investment of time, effort, and money would have resulted in $0 in fees or payment of expenses.

### 6. The Amount Involved and the Favorable Results Obtained Supports Class Counsel's Request

122. The $40,000,000 Settlement obtained for the benefit of the Class represents a substantial recovery – *i.e.*, approximately 14% of the estimated maximum recoverable damages (as calculated by Plaintiffs' expert, assuming success on all of Plaintiffs' claims). This is more than seven times the median recovery as a ratio of investor losses in similar securities actions settled in 2019-2023. *See* NERA Study at 26, Fig. 22.

### 7. The Experience, Reputation, and Ability of the Attorneys Supports Class Counsel's Fee Request

123. Class Counsel are among the most knowledgeable and capable practitioners in the field of securities class actions. The experience and skill of Robbins Geller and Kessler Topaz has resulted in an incredibly successful record in securities class actions in both federal and state courts throughout the United States.

### 8. The Undesirability of the Case Supports the Reasonableness of the Requested Fee

124. As noted above, Class Counsel undertook this complicated case on a wholly-contingent basis, and pursued the Class's claims against a large, sophisticated corporation with endless resources to fight such allegations. Notably, at the outset of the Litigation, Delaware County was the only party to move for lead plaintiff and Robbins Geller was the only law firm that sought to be appointed lead counsel.

4881-7567-7405.v1

### 9.    Awards in Similar Cases Supports Class Counsel's Request

125.    Class Counsel's request is in line with fee awards approved in similar class action cases.  *See Burnett v. CallCore Media, Inc.*, 2024 WL 3166453, at *5 (S.D. Tex. June 25, 2024) (awarding 32.6% of the settlement); *see also In re Vioxx Prods. Liab. Litig.*, 802 F. Supp. 2d 740, 771 (E.D. La. 2011) (awarding 32% of the settlement); *City of Omaha Police & Fire Ret. Sys. v. LHC Grp.*, 2015 WL 965696 (W.D. La. Mar. 3, 2015) (recommending a fee amounting to 30% of the settlement).  Given that Class Counsel's request is consistent with – and in many instances lower than – the awards provided in similar cases, this factor warrants approval of the requested fee.

### B.    Class Counsel's Request for an Award of Expenses

126.    Class Counsel also request payment from the Settlement Fund of $1,515,974.05 in expenses that were reasonably and necessarily incurred in prosecuting and resolving this Action on behalf of Plaintiffs and the Class.  The notices inform the Class that Class Counsel will apply for expenses, costs and charges in an amount not to exceed $1,750,000.  The amount of expenses requested by Class Counsel, along with the total amount requested by Plaintiffs as set forth below, is below the expense cap set forth in the notices.  To date, there have been no objections to the maximum amount of expenses set forth in the notices.

127.    From the beginning of the Action, Class Counsel were aware that they might not recover any of the expenses they incurred in prosecuting the claims against Defendants and, at the very least, would not recover any of their out-of-pocket expenses until the Action was successfully resolved.  Class Counsel also understood that, even assuming the Action was ultimately successful, an award of expenses would not compensate counsel for the lost use or opportunity costs of funds advanced to litigate the Class's claims against Defendants.  Thus, Class Counsel were motivated to, and did, take significant steps to minimize expenses whenever practicable without jeopardizing the vigorous and efficient prosecution of the Action.

- 43 -

128.     Plaintiffs' Counsel's expenses include: (i) the costs of Plaintiffs' experts; (ii) the costs associated with attending court proceedings; (iii) the costs associated with taking and defending depositions; (iv) the costs necessary to provide document management services and review; (v) online factual and legal research costs; (vi) the costs associated with the Parties' mediation and settlement negotiations with Mr. Murphy; and (vii) document reproduction costs.  These expenses are detailed in the accompanying declarations of Plaintiffs' Counsel attached as Exhibits 4 through 6 hereto.  Courts have consistently found that these kinds of expenses are payable from a fund recovered by counsel for the benefit of a class.

### C.       Reimbursement of Costs to Plaintiffs

129.     In addition, Plaintiffs seek reimbursement of the reasonable costs they incurred directly in connection with their representation of the Class in the Action.  Such payments are expressly authorized and anticipated by the PSLRA, as more fully discussed in the Fee and Expense Memorandum at §VI.  Specifically, Plaintiff Delaware County seeks reimbursement in the amount of $6,500 for the time its employees expended in connection with the Action.  Lichtenstein Decl., ¶6. Plaintiff Iron Workers seeks reimbursement in the amount of $5,954.32 for the time and expenses its employees expended in connection with the Action.  Kolfenbach Decl., ¶¶14-16.

130.     The substantial amount of time and effort devoted to this Action by Plaintiffs' employees is detailed in their accompanying declarations.  As discussed therein, Plaintiffs have been fully committed to pursuing the Class's claims since they became involved in the Action and have provided valuable assistance to Class Counsel during the prosecution and resolution of the Action. Plaintiffs' efforts during the course of the Action included regular communications with Class Counsel concerning significant developments in the litigation and case strategy, reviewing and approving significant pleadings and briefs filed in the Action, responding to Defendants' discovery requests and searching for and producing potentially relevant documents, preparing and sitting for

4881-7567-7405.v1

depositions, and overseeing the settlement negotiations. *See* Lichtenstein Decl., ¶3; Kolfenbach Decl., ¶¶4-6. These are precisely the types of activities courts have found to support reimbursement of representative parties, and fully support Plaintiffs' request for reimbursement here.

## VII.   CONCLUSION

131.    For the reasons set forth above, Class Counsel respectfully submit that the Settlement and the Plan of Allocation should be approved as fair, reasonable, and adequate. Class Counsel further submit that the requested attorneys' fees in the amount of 30% of the Settlement Fund should be approved as fair and reasonable, and the request for Plaintiffs' Counsel's expenses in the amount of $1,515,974.05, and Plaintiffs' costs in the aggregate amount of $12,454.32 should also be approved.

We declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this 19th day of September, 2024 in San Diego, California.

_____
DARRYL J. ALVARADO

Executed this 19th day of September, 2024 in Radnor, Pennsylvania.

_____
ANDREW L. ZIVITZ

4881-7567-7405.v1

## <u>CERTIFICATE OF SERVICE</u>

I certify that on September 19, 2024, I caused a true and correct copy of the foregoing to be electronically filed with the Clerk of the Court using the CM/ECF system. Notice of this filing will be sent to counsel of record by operation of the Court's electronic filing system.

<u>*s/ Darryl J. Alvarado*</u>
Darryl J. Alvarado