UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

*********************************************************************

DELAWARE COUNTY EMPLOYEES          4:21-cv-02045
RETIREMENT SYSTEM,
Individually and on Behalf of
All Others Similarly
Situated,

    Plaintiff,

                          HOUSTON, TEXAS
VS.

CABOT OIL & GAS CORPORATION,
et al.,

    Defendants.          OCTOBER 28, 2024

*********************************************************************

TRANSCRIPT OF SETTLEMENT APPROVAL HEARING PROCEEDINGS
HEARD BEFORE THE HONORABLE LEE H. ROSENTHAL
UNITED STATES DISTRICT JUDGE

*********************************************************************

<u>APPEARANCES:</u>

FOR THE PLAINTIFF                    MR. DARRYL J. ALVARADO
Delaware County Employees            MS. ELLEN GUSIKOFF STEWART
Retirement System                    Robbins Geller
*Individually and on behalf*            Rudman & Dowd LLP
*of all others similarly*            655 W. Broadway
*situated:*                          Suite 1900
                                     San Diego, California 92101

    Proceedings recorded by mechanical stenography,
transcript produced via computer.

```
                              MR. JOE KENDALL
                              Kendall Law Group
                              3811 Turtle Creek Blvd.
                              Suite 825
                              Dallas, Texas 75219


FOR THE PLAINTIFF             MR. JAMIE M. MCCALL
Iron Workers District         Kessler Topaz
Council (Philadelphia and       Meltzer & Check LLP
Vicinity) Retirement          280 King of Prussia Road
and Pension Plan:             Radnor, Pennsylvania 19087


FOR THE DEFENDANTS:           MR. PETER ANDREW STOKES
                              Norton Rose Fulbright US LLP
                              98 San Jacinto Boulevard
                              Suite 1100
                              Austin, Texas 78701


                              MS. KELLY ANN POTTER
                              Norton Rose Fulbright US LLP
                              1550 Lamar
                              Suite 2000
                              Houston, Texas 77010


Official Court Reporter:      Lanie M. Smith, CSR, RMR, CRR
                              Official Court Reporter
                              United States District Court
                              Southern District of Texas
                              515 Rusk
                              Room 8004
                              Houston, Texas 77002
```

**P R O C E E D I N G S**

THE COURT:  Good afternoon.  Go ahead and state your appearances, please.

MR. ALVARADO:  Darryl Alvarado from Robbins Geller on behalf of the class.

MS. STEWART:  Good afternoon, Your Honor. Ellen Stewart from Robbins Geller on behalf of plaintiffs.

MR. KENDALL:  Joe Kendall on behalf of plaintiffs.

MR. MCCALL:  Good afternoon, Your Honor.  Jamie McCall on behalf of plaintiffs.

MR. STOKES:  Good afternoon, Your Honor.  Peter Stokes here for the defendants.

MS. POTTER:  And Kelly Potter also for the defendants.

THE COURT:  All right.  Please be seated.

Okay.  We are here on a final approval of a settlement and of the proposed plan for allocating the proceeds of that settlement.  My understanding is that this is a non-reversionary 40-million-dollar payment.  We had a preliminary approval hearing in June.

Since then, I understand there have been -- despite a robust notice program, only two have opted out -- one for a somewhat unusual reason, preferring a different judge -- which is a good result.

I'd like to hear your presentations in support of the final approval.

I am a little bit concerned, just had a question about one of the statements made in your thorough presentations. You stated that this was not a claims-made settlement, but those who are going -- the nominees or representatives and members of the class have to submit a claim in order to get payment.

So can you square those two statements for me, somebody?

MR. ALVARADO: Sure, Your Honor. Should I go to the podium?

THE COURT: It's easier. There's a good mic there for the court reporter.

MR. ALVARADO: Good afternoon, Your Honor. Darryl Alvarado on behalf of the class.

To answer your first question, that's probably not the most artful way for us to have put it. It is a -- it is not a claims-made settlement in the sense that people have to make a claim in order to get a -- it is a claims -- a required-claims settlement, but all -- and it's a non-reversionary piece; so every dollar of the settlement, absent fees and expenses, will be paid to the class, assuming, you know, claimants are valid after the claims administrator has gone through all of them.

THE COURT: If there are some claims that are rejected or that are simply not made, won't that create a surplus?

MR. ALVARADO:  Typically, Your Honor, everyone will get a pro rata share.  And to the extent that there was more money in the settlement fund than claims made, which is highly unlikely to happen, then that will just be a pro rata addition to each valid claimant.

THE COURT:  So you're going to calculate your way through that potential wrinkle?

MR. ALVARADO:  Correct.

THE COURT:  All right.  That makes sense.

Go ahead.

MR. ALVARADO:  Sure.  So we're pleased to present the final approval today of the 40-million-dollar non-reversionary cash settlement for final approval on behalf of Cabot investors in common stock between February 22, 2016, and June 12, 2020.

This settlement was reached after arm's-length negotiations and two mediations nearly a year apart before David Murphy of Phillips ADR, a highly experienced litigator and now mediator.

As the Court mentioned, the Court preliminarily approved the settlement on June 27, 2024; and in accordance with that preliminary approval order, postcard notices and long-form notices were sent to more than 200,000 potential class members and their nominees.

Notice of the settlement was posted to the Depository Trust Company's legal notice system.  That was

posted on July 17, 2024.

The claims administrator sent notice to a large number of nominees that it has experience with based on a proprietary database of those nominees who tend to represent the majority of class members in cases like this.

This summary notice was published in the *Wall Street Journal* and on the *PR Newswire* in July of 2024.

Settlement information was posted on a website dedicated solely to this settlement.  That website to date has garnered over 32,000 visitors.

There's been a call center established that has fielded 350 phone calls for potential class members.

And after this robust notice program, as the Court mentioned, there are zero objections to any aspect of the settlement, the plan of allocation, or the request for fees and expenses and there are only two exclusions from folks who didn't submit enough information to even know if they're a class member.  But nonetheless, just two out of the many, many potential thousands of class members.

Based on that and based on our memoranda and supporting documents, we request that the Court grant final approval of the settlement and plan of allocation.  This is because the settlement is substantively and procedurally fair. It is a substantial result given the inherent risks in proceeding through protracted litigation.

This case was heavily litigated for four years now.  We went through multiple complaints, multiple motions to dismiss, we completed fact discovery, we reviewed millions of documents, we took 15 fact witness depositions, we obtained class certification, we engaged in a Rule 23(f) request for appeal, we exchanged opening and rebuttal expert reports.

All that's to say that the parties were clear-eyed about the strengths and weaknesses of their respective cases before reaching a settlement.

And obviously, although we were confident in our case, as the Court knows, these cases are complex and uniquely risky, particularly in the Fifth Circuit.

Defendants had strident arguments about falsity, about scienter, about loss causation, and about damages.  They contended that there was no falsity, that there was no state of mind, and that there were no damages.

Even if we had prevailed through all of those arguments at summary judgment and at a trial; *Daubert* motions, which are fraught propositions to say the least, defendants would have pressed appeals and any recovery would have been delayed for likely years.

So the 40-million-dollar settlement now eliminates those risks and, in the process, results in a substantial recovery for the class.

So in sum, the settlement satisfies all of the

*Reed* factors, which have been adopted in the Fifth Circuit to assess the fairness and reasonableness of class action settlements and the settlement is also fair, reasonable, and adequate under Rule 23(e); and on that basis, we respectfully request final approval of it.

THE COURT:  Did you want to address the fees as well?

MR. ALVARADO:  Sure.  On the fees, as we specified in ECF 213, our motion for award of attorneys' fees and expenses for our efforts, which have been conducted on a wholly contingent basis over the past four years, lead counsel respectfully requests an award of attorneys' fees in the amount of 30 percent of the settlement fund plus interest and we also respectfully request just over $1.5 million in expenses incurred for the litigation.

These expenses and fees are reasonable given lead counsels' extraordinary efforts prosecuting this case to resolution.  The requests are supported by lead plaintiffs who are two sophisticated institutional investors.  The fee request is also consistent with fees routinely awarded in securities class actions such as this one.

And importantly, the requested fee resulted in a fractional multiplier of the lodestar; so in other words, the class is getting a substantial discount on the time actually expended by lead counsel to obtain this extraordinary result.

Like the settlement, after more than 200,000

notices to potential class members, there have been zero objections to the fee and just the two exclusions from the case in general.

The *Johnson* factors, which are the relevant factors that the Court is guided by in assessing an attorney's fee award request also support the requested fee.

The time and labor expended, one of the *Johnson* factors, that factor is clearly satisfied here. Lead counsel expended in excess of 31,000 hours prosecuting this case through the various stages of litigation that I mentioned, through very hard-fought litigation, lots of motion practice, full discovery, experts.

The novelty and difficulty of the case.

As I mentioned, these cases are notoriously difficult and fraught, especially in this jurisdiction. Defendants challenged every element of liability in this case; and it was going to be a very, very steep uphill battle to proceed going forward.

The skill requisite to perform the legal services properly.

I would submit that class counsel here is highly skilled and we demonstrated that skill in navigating this case through thorny legal issues and obtaining a significant result.

The customary fee is another factor that *Johnson* points to.

The customary fee, as I mentioned here, it's vast wide support for a 30 percent fee when plaintiffs in cases like this have obtained a common fund benefit.

Whether fixed or contingent is another factor.

In this case, as I mentioned, we have conducted our work on a wholly contingent basis.  That is a substantial factor in supporting a fee request when the risk has been taken on for all these years.

Amount involved and the result obtained is another one.

Based on our experts' aggregate damages estimate assuming full success, we recovered 14 percent of what would be maximum recoverable damages.  That dwarfs the median in these cases as we pointed out in our papers.

The experience, reputation and abilities of attorneys.

As I've mentioned, I would submit that our work has been high quality and not to mention our adversaries, Mr. Stokes and his team, Ms. Potter, at Norton Rose, very significant adversaries at every step.

The undesirability of the case is another factor.

I'd note that when Delaware County and Robbins Geller moved for lead plaintiff and lead counsel, no other plaintiff or firm sought to lead this case demonstrating that it was risky and underscoring that the significant result

obtained is extra notable in that sense.

Plaintiffs in this case have supported the fee. As I mentioned, there's no objections.

And on the expenses, we're seeking $1,515,974.05. The majority of that is unsurprisingly for experts and consultants.  The remainder are expenses for hosting the 4.4 million pages of documents electronically; mediation fees; online research -- Lexis, Westlaw, that sort of thing; deposition fees; and travel.

And finally, Your Honor, plaintiffs' costs.

Under the PSLRA, we request an aggregate of $12,454.32.  That's the total for both plaintiffs for their time dedicated to overseeing this litigation.  And that's pursuant to the PSLRA, 15, USC, Section 78u-4(a)(4).

And unless the Court has any questions, I'll leave it there.

THE COURT:  Mr. Stokes, did you want to add anything?

MS. POTTER:  I we agree that the stipulation is fair; and prior to that, they did perform negotiations at arm's length.

We take no position on the attorneys' fees portion.

THE COURT:  All right.

MR. STOKES:  Thank you, Your Honor.

THE COURT:  Thank you.  You may be seated.

MR. ALVARADO:  I'm concluded unless the Court has specific questions.

THE COURT:  No.  Be seated.  I just need to announce my ruling on the record.

I did not see in the documents -- and I've got a big notebook here -- a proposed final judgment.  So I assume you were waiting for this hearing before you submitted it.

MR. ALVARADO:  We attached a proposed final judgment to our reply, which is at ECF 215-2.  We can resubmit it if it's easier for the Court.  There's a proposed final judgment, a proposed order approving the plan of allocation and a proposed order regarding fees and expenses.

THE COURT:  What was the docket entry number again?

MR. ALVARADO:  ECF 215-2 is the proposed final judgment, -3 is the order on the plan of allocation --

THE COURT:  All right.

MR. ALVARADO:  And -4 is the order on fees and expenses.

THE COURT:  All right.  I know where to find it now so I won't need you to resubmit.

Thank you.

All right.  Yes, you're right.  This is the culmination of four years of litigation, formal mediations that resulted in the parties, as I understand it, accepting the mediator's recommendation.  That followed, as I understand it

as well, more than one mediation effort.

Yes, there was a vigorous motions practice and an equally vigorous discovery practice that included challenges to whether there was a claim stated, challenges to whether the statements that were challenged were false, challenges to whether there was scienter, whether the defendants who made the statements did not legitimately and, in fact, believe the truth of the statements at the time they were made.  There were some rulings in the related derivative case that were adverse to the plaintiffs as to certain of the disclosures.  Loss causation is always difficult, particularly in cases like this.  Damages are also difficult.  This settlement, of course, involves all of the risks and delays of litigating through both issues of liability and of damages.

So, yes, the case was one that was particularly appropriate for resolution by settlement.  The alternative was years of litigation and appeals.

As to the terms of the settlement themselves, counsel has argued and the record fully supports finding that the terms of the settlement are fair, reasonable, and adequate.

The range of recovery in this case appears to be somewhere between 288 million if everything the plaintiff said was correct and upheld throughout the litigation process.  On the other end, zero, which was what the defendants were arguing for both on the absence of false statements, the absence of

scienter, the absence of loss causation, the absence of damages.

The settlement is 14 percent of that 288-million-dollar best possible result for the plaintiffs. Most securities class actions do involve far smaller percentages of recovery. So this is a quite healthy recovery, particularly in light of the many challenges to both liability and damages that could have been presented that would at best delay the result and at worst defeated it.

The method of distribution appears to be appropriate.

This case is not one in which the nature of the relief is divorced from the identity of the relief that is obtained. The names of the nominees; the names of those who bought, held or purchased these -- or sold these securities during the class period is known and individual notice has been given and individual notices of the need to make a claim can also be given. And the notice method that is outlined in the papers appears to meet all the requirements for the best possible notice that is feasible under the circumstances.

We've talked about the fact that the settlement occurred after significant motions to practice and discovery; the fact that it was negotiated at arm's length; the reasonableness of the settlement amount taking into account the costs, the risks, and the delays. The method of distribution

of the relief to the class is indeed effective.

That then takes us to the fees.

The parties seek 30 percent of the settlement fund.  And here is one question that I had.  As I read the papers, the payment of attorneys' fees is to be paid on the Court's approval.

MR. ALVARADO:  That's fair, Your Honor.

THE COURT:  Generally in these cases it is my preference to hold back a significant portion of the fees until after the benefits have been distributed to the class members.  Generally in a case like this where the distribution is not going to be particularly difficult compared to other cases, perhaps it might make sense to amend this one provision of the proposed order that you've submitted to have 50 percent of the fees, which total $1,515,974.05 -- no, that's the cost of expenses.

The total amount of the fees at 30 percent, have you calculated the dollar figure?

MR. ALVARADO:  12 million.

THE COURT:  Yes, here it is.  6 million to be distributed when the first benefits are distributed to the class members and the remaining 6 million to be distributed in attorneys' fees at the time that the last benefits have been distributed.  If all the benefits go out at once, then the full fees can be paid at the same time, but not at the approval

stage, but at the distribution of benefits stage.

MR. ALVARADO:  Just to be clear, Your Honor, you're speaking about -- so you're contemplating a 50 percent award today and a 50 percent award on the initial distribution of the settlement?

THE COURT:  That would work.

MR. ALVARADO:  Okay.

THE COURT:  That would work.

MR. ALVARADO:  If there's any space, could we get a larger percentage at the up front?  As I mentioned, it's a non-reversionary settlement, so there's never an instance where there will be money not going to the class.  It's just a matter of finding those class members.

THE COURT:  How difficult is that going to be in a case like this where the names of the investors or their nominees are known?

MS. ALVARADO:  It's not a matter of difficulty. Typically there will be a distribution and typically another one potentially when late claims are cured, that sort of thing. But ultimately every cent of the settlement fund less fees and expenses will go to class members.

THE COURT:  So your proposal would be 75 percent initially and then the remaining 25 percent when the distributions have been completed?

MR. ALVARADO:  That would be my preference, Your Honor.

THE COURT: Given the nature of the case and the relative ease of making the distribution, that's fine.

MR. ALVARADO: Okay. I appreciate that, Your Honor.

THE COURT: All right. One of the factors that I have not mentioned is whether the class members are treated equitably in relation to one another. The plan is to distribute to each of the class members who claim a right to the settlement funds a pro rata share of the funds based on the calculation of their recognized losses and that calculation is going to be based on the number of shares that were purchased or acquired during the class period and held through at least one of the dates when the disclosure of the corrective information partly removed the alleged artificial inflation of the stock price.

So it's going to depend on when each claimant bought, acquired, or sold the stock during the class period; the price at which all those occurred; and the amount of stock that they either purchased, acquired otherwise, or sold.

So all of those calculations will have to be individually made; but because they are pro rata in nature and are based on these objective factors that mirror their potential loss or actual loss, it is a payment scheme that does treat each of the class members equitably in relation to other members.

The notice that the Court also has to find to be

appropriate, I've concluded it already, but just to flesh it out:  193,000 postcards, 4,443 notice packets, these were sent to potential class members through September 18th of this year.

You've already talked about publication in the *Wall Street Journal* and *PR Newswire*.  There was also a dedicated settlement website that was kept active during this period.

There was an initial mailing of these notice packets in July, reminder postcards sent to nominees who didn't respond to the initial mailing telling them that they had to facilitate notice of the settlement to those clients who bought or acquired Cabot stock during the relevant periods.

That was followed with telephone calls to the top 100 nominees and then there was a toll free phone number and an interactive voice recording and a live operator to answer inquiries, which did occur.

Apparently there were over 300 calls through October 16, and many of those were -- most of those were handled by a live operator.  That's on top of e-mails and website visits.  So the notice program is robust.

The fees that are sought includes 1.5 million in costs and expenses.  Most of those are experts, as stated.  Those are in line with similar kinds of cases.

There is an amount of $12,454.32 to the court-appointed class representatives to compensate them for

their time and expense in pursuing the claims.

I understand that some of them sat for deposition.

MR. ALVARADO:  Correct.

THE COURT:  And assisted in responding to discovery requests.

MR. ALVARADO:  Correct.

THE COURT:  So that is an appropriate recovery for those individuals.

The lodestar check on the fees, the lodestar amount would be, I believe, $18,607,533.  The 30 percent fee request, it would be a negative multiplier of 0.64 percent on the lodestar value.

The lodestar check does what it's supposed to do and reveals that the fees sought are reasonable; and all the *Johnson* factors support the fee award, particularly the time and labor expended in pursuing this case.

This was a difficult case.  My own work in deciding some of the motions in this and the related derivative case made that clear.  It's a highly technical field of drilling and producing natural gas.  The issues surrounding the nature of fracking and its uncertainties were an important part of this case, so that introduced the technical issues on top of the legal issues of liability, including loss causation and scienter and then because of the issue of damages.

I'm not sure that other work had to be given up, but certainly there was a huge amount of work that was devoted to this case and it was on full-on contingency, all of which supports the amount of fees sought and the 30 percent of the lodestar is indeed on the modest side of the fee requests that I have been seeing in the last several years.

So the Court does approve the settlement as fair, reasonable, and adequate, and separately approves the attorneys' fees sought as fair and adequate and appropriate when considered under all the *Johnson* factors and the *Reed* factors.

Is there anything else we need to do today?

MR. ALVARADO:  Just one question.  Would you like us to submit a revised fee order that indicates the 75/25 percent split?

THE COURT:  Yes.

MR. ALVARADO:  We will do that.

THE COURT:  That would be very helpful so you have the staggered payment reflected in the revised order.  So if you can get that to me promptly, I will sign it promptly.

MR. ALVARADO:  We will try to get that to you today, Your Honor.

THE COURT:  Very good.  Anything further?

MR. STOKES:  No, Your Honor.

THE COURT:  Thank you.  You're all excused.

I'll be up here for a moment, but you're all free to leave.

(The proceedings were adjourned.)

* * * *

REPORTER'S CERTIFICATE

I, Lanie M. Smith, CSR, RMR, CRR, Official Court Reporter, United States District Court, Southern District of Texas, do hereby certify that the foregoing is a true and correct transcript, to the best of my ability and understanding, from the record of the proceedings in the above-entitled and numbered matter.


_____/s/ Lanie M. Smith_____
Official Court Reporter